**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE FACEBOOK, INC., IPO SECURITIES AND DERIVATIVE LITIGATION, | MDL No. 12-2389 ECF Case |

| | |
|---|---|
| EDWARD CHILDS, Derivatively on Behalf of Himself and All Others Similarly Situated, | Hon. Robert W. Sweet |
| Plaintiff, | Case No. 12-CV-4156 (RWS) |
| v. | ECF Case |
| MARK ZUCKERBERG, et al., | |
| Defendants, -and- | |
| FACEBOOK, INC., a Delaware corporation, | |
| Nominal Defendant. | |

| | |
|---|---|
| WILLIAM COLE, Derivatively on Behalf of Facebook, Inc., | Case No. 12-CV-7549 (RWS) |
| Plaintiff, | ECF Case |
| v. | |
| MARK ZUCKERBERG, et al., | |
| Defendants, -and- | |
| FACEBOOK, INC., a Delaware corporation, | |
| Nominal Defendant. | |

| | |
|---|---|
| HAL HUBUSCHMAN, Derivatively on Behalf of Facebook, Inc, | Case No. 12-CV-7553 (RWS) |
| Plaintiff, | ECF Case |
| v. | |
| MARK ZUCKERBERG, et al., | |
| Defendants, | |
| -and- | |
| FACEBOOK, INC., a Delaware corporation, | |
| Nominal Defendant. | |
| LIDIA LEVY, Derivatively on Behalf of Facebook, Inc., | Case No. 12-CV-7815 (RWS) |
| Plaintiff, | ECF Case |
| v. | |
| MARK ZUCKERBERG, et al., | |
| Defendants, | |
| -and- | |
| FACEBOOK, INC., a Delaware corporation, | |
| Nominal Defendant. | |

**MEMORANDUM IN SUPPORT OF NOMINAL DEFENDANT FACEBOOK, INC.'S THRESHOLD MOTION TO DISMISS THE DERIVATIVE COMPLAINTS PURSUANT TO FED. R. CIV. P. 12(B)(1), 12(B)(3), 12(B)(6), AND 23.1**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

BACKGROUND ....................................................................................................5

ARGUMENT ..........................................................................................................7

I.  THE FORUM SELECTION CLAUSE REQUIRES DISMISSAL.....................................7

II. PLAINTIFF'S UNEXCUSED FAILURE TO MAKE A DEMAND REQUIRES
    DISMISSAL. ..........................................................................................14

    A.  Plaintiffs Have Inadequately Alleged That A Majority Of The Directors
        Face A Substantial Threat Of Personal Liability. ..................................15

    B.  Plaintiffs Have Not Adequately Alleged That A Majority Of The Directors
        Lacked Independence. ............................................................................22

        1.  Plaintiffs Cannot Overcome The Presumption Of Directorial
            Independence. .................................................................................23

        2.  Plaintiff's Allegations Of Actual Bias Are Inadequate...........................26

III. PLAINTIFFS' FAILURE TO OWN THEIR SHARES AT THE TIME OF THE
     ALLEGED WRONGDOING REQUIRES DISMISSAL. ...............................................31

IV.  SLUSA REQUIRES DISMISSAL. ............................................................................35

    A.  The Derivative Actions Are "Covered Class Action[s]" Under SLUSA. ............35

    B.  These Cases Are Not "Exclusively Derivative" Under SLUSA..........................37

V.  THE COMPLAINTS SHOULD BE DISMISSED AS UNRIPE. ...................................39

CONCLUSION.....................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*7547 Partners v. Beck*,
   682 A.2d 160 (Del. 1996)................................................... 4, 34

*Abbott Labs. v. Takeda Pharm. Co.*,
   476 F.3d 421 (7th Cir. 2007)................................................... 12

*Albert v. Alex. Brown Mgmt. Servs., Inc.*,
   2005 WL 2130607 (Del. Ch. Aug. 26, 2005)................................................... 38

*Amorosa v. Ernst & Young LLP*,
   672 F. Supp. 2d 493 (S.D.N.Y. 2009),
   *aff'd,* 409 App'x 412 (2d Cir. 2011) ................................................... 36

*Andreae v. Andreae*,
   1992 WL 43924 (Del. Ch. Mar. 5, 1992)................................................... 24

*Arber v. Essex Wire Corp.*,
   490 F.2d 414 (6th Cir. 1974)................................................... 19

*Aronson v. Lewis*,
   473 A.2d 805 (Del. 1984)................................................... passim

*Baker v. Impact Holding, Inc.*,
   2010 WL 1931032 (Del. Ch. May 13, 2010) ................................................... 12

*Brehm v. Eisner*,
   746 A.2d 244 (Del. 2000)................................................... 14

*Brinckeroff v. Jac Holding Corp.*,
   782 N.Y.S.2d 58 (1st Dep't 2004) ................................................... 38

*Centaur Partners, IV v. Nat'l Intergroup, Inc.*,
   582 A.2d 923 (Del. 1990)................................................... 8

*Coleman & Co. Secs., Inc. v. Giaquinto Family Trust*,
   236 F. Supp. 2d 288 (S.D.N.Y. 2002)................................................... 10

*Desimone v. Barrows*,
   924 A.2d 908 (Del. Ch. 2007)................................................... 15, 22

*Dodds v. Cigna Secs., Inc.*,
   12 F.3d 346 (2d Cir. 1993)................................................... 10

*Elf Atochem N. Am., Inc. v. Jaffari,*
  727 A.2d 286 (Del. 1999) ........................................................................ 12

*Felton v. Morgan Stanley Dean Witter & Co.,*
  429 F. Supp. 2d 684 (S.D.N.Y. 2006) ..................................................... 35

*Ferre v. McGrath,*
  2007 WL 1180650 (S.D.N.Y. Feb. 16, 2007) ............................................ 7

*Fink v. Weill,*
  2005 WL 2298224 (S.D.N.Y. Sept. 19, 2005) .................................... 25, 28

*Forsythe v. ESC Fund Mgmt. Co.,*
  2007 WL 2982247 (Del. Ch. Oct. 9, 2007) .............................................. 18

*Franklin Life Ins. Co. v. Commonwealth Edison Co.,*
  451 F. Supp. 602 (S.D. Ill. 1978),
  *aff'd*, 598 F.2d 1109 (7th Cir. 1979) ...................................................... 11

*Galaviz v. Berg,*
  763 F. Supp. 2d 1170 (N.D. Cal. 2011) ................................................... 10

*Gentile v. Rossette,*
  906 A.2d 91 (Del. 2006) .......................................................................... 38

*Glassman v. Computervision Corp.,*
  90 F.3d 617 (1st Cir. 1996) ..................................................................... 19

*Green v. Phillips,*
  1996 WL 342093 (Del. Ch. 1996) ........................................................... 25

*Griggs v. Jornayvaz,*
  2010 WL 4932674 (D. Colo. Nov. 29, 2010) ........................................... 33

*Grobow v. Perot,*
  539 A.2d 180, 188 (Del. 1988),
  *overruled on other grounds*, 746 A.2d 244 (Del. 2000) ............................. 26, 29, 31

*Guttman v. Huang,*
  823 A.2d 492 (Del. Ch. 2003) ................................................................. 22

*In re Accuray, Inc. S'holder Derivative Litig.,*
  757 F. Supp. 2d 919 (N.D. Cal. 2010) ..................................................... 32

*In re Allion Healthcare, Inc. S'holders Litig.,*
  2011 WL 1135016 (Del. Ch. Mar. 29, 2011) ........................................... 13

*In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*,
   757 F. Supp. 2d 260 (S.D.N.Y. 2010) ............................................................... 18

*In re Bank of N.Y. Derivative Litig.*,
   320 F.3d 291 (2d Cir. 2003) .............................................................................. 31

*In re Beatrice Cos., Litig.*,
   1987 WL 36708 (Del. Feb. 20, 1987) ............................................................... 34

*In re Burlington Coat Factory Sec. Litig.*,
   114 F.3d 1410 (3d Cir. 1997) ............................................................................ 19

*In re Caremark Int'l Inc. Derivative. Litig.*,
   698 A.2d 959 (Del. Ch. 1996) ........................................................................... 16

*In re Citigroup Inc. S'holder Derivative Litig.*,
   2009 WL 2610746 (S.D.N.Y. Aug. 25, 2009) .................................................. 15

*In re Citigroup S'holder Derivative Litig.*,
   964 A.2d 106 (Del. Ch. 2009) ..................................................................... 16, 17

*In re Dow Chem. Co. Derivative Litig.*,
   2010 WL 66769 (Del. Ch. Jan. 11, 2010) ........................................................ 16

*In re Fannie Mae 2008 Sec. Litig.*,
   2012 WL 3758537 (S.D.N.Y. Aug. 30, 2012) ............................................. 36, 37

*In re Forest Labs., Inc. Derivative Litig.*,
   450 F. Supp. 2d 379 (S.D.N.Y. 2006) ............................................................... 14

*In re Goldman Sachs Grp., Inc. S'holder Litig.*,
   2011 WL 4826104 (Del. Ch. Oct. 12, 2011) ............................................. passim

*In re Gulf Oil*,
   725 F. Supp. 712 (S.D.N.Y. 1989) .................................................................... 11

*In re IAC/InterActiveCorp Secs. Litig.*,
   478 F. Supp. 2d 574 (S.D.N.Y. 2007) ...................................................... 4, 28, 30

*In re Ivan F. Boesky Sec. Litig.*,
   825 F. Supp. 623 (S.D.N.Y. 1993),
   *aff'd*, 36 F.3d 255 (2d Cir. 1994) ................................................................... 20

*In re J.P. Morgan Chase & Co. S'holder Litig.*,
   906 A.2d 808 (Del. Ch. 2005),
   *aff'd*, 906 A.2d 766 (Del. 2006) ...................................................................... 29

iv

*In re LimitNone, LLC*,
  551 F.3d 572 (7th Cir. 2008) ................................................................................. 2, 7

*In re Magi XXI, Inc. v. Stato Della Citta Del Vaticano*,
  818 F. Supp. 2d 597 (E.D.N.Y. 2011) ...................................................................... 7, 8

*In re Merrill Lynch & Co.*,
  273 F. Supp. 2d 351 (S.D.N.Y. 2003),
  *aff'd,* 396 F.3d 161 (2d Cir. 2005) ............................................................................... 7

*In re N. Telecom Ltd. Sec. Litig.*,
  116 F. Supp. 2d 446 (S.D.N.Y. 2000) .......................................................................... 19

*In re NYSE Specialists Sec. Litig.*,
  405 F. Supp. 2d 281 (S.D.N.Y. 2005) (Sweet, J.),
  *rev'd on other grounds*, 503 F.3d 89 (2d Cir. 2007) .................................................. 35

*In re Oracle Corp. Derivative Litig.*,
  867 A.2d 904 (Del. Ch. 2004),
  *aff'd,* 872 A.2d 960 (Del. 2005) ............................................................................ 21, 22

*In re Paxson Commc'n Corp. S'holders Litig.*,
  2001 WL 812028 (Del. Ch. July 12, 2001) ................................................................. 37

*In re Refco Inc. Sec. Litig.*,
  859 F. Supp. 2d 644 (S.D.N.Y. 2012) .......................................................................... 36

*In re Revlon S'holders Litig.*,
  990 A.2d 940 (Del. Ch. 2010) ............................................................................... 12, 13

*In re Sagent Tech., Inc.*,
  278 F. Supp. 2d 1079 (N.D. Cal. 2003) ....................................................................... 27

*In re United Telecomms., Inc., Secs. Litig.*,
  1993 WL 100202 (D. Kan. Mar. 4, 1993) .................................................................... 39

*Jacobs v. Yang*,
  2004 WL 1728521 (Del. Ch. Aug. 2, 2004),
  *aff'd*, 867 A.2d 902 (Del. 2005) ................................................................................. 30

*Kalnit v. Eichler*,
  264 F.3d 131 (2d Cir. 2001) ........................................................................................ 22

*Kamen v. Kemper Fin. Servs., Inc.*,
  500 U.S. 90 (1991) ....................................................................................................... 16

v

*Khanna v. McMinn*,
  2006 WL 1388744 (Del. Ch. May 9, 2006) ...................................................... 28, 30

*Kohls v. Duthie*,
  765 A.2d 1274 (Del. Ch. 2000) ...................................................................... 25

*Krim v. BancTexas Group, Inc.*,
  989 F.2d 1435 (5th Cir. 1993) ........................................................................ 19

*KTV Media Int'l, Inc. v. Galaxy Grp. LA LLC*,
  812 F. Supp. 2d 377 (S.D.N.Y. 2011) ............................................................. 13

*La. Mun. Police Employees Ret. Sys. v. Blankfein*,
  2009 WL 1422868 (S.D.N.Y. May 19, 2009) .................................................... 7

*Lefort v. Black*,
  2003 WL 1563997 (N.D. Cal. Mar. 21, 2003) ................................................. 33

*M/S Bremen v. Zapata Off-Shore Co.*,
  407 U.S. 1 (1972) .............................................................................................. 9

*M+J Savitt, Inc. v. Savitt*,
  2009 WL 691278 (S.D.N.Y. Mar. 17, 2009) ...................................................... 8

*McMillan v. Intercargo Corp.*,
  768 A.2d 492 (Del. Ch. 2000) ......................................................................... 17

*Metcalf v. Zoullas*,
  2012 WL 169874 (S.D.N.Y. Jan. 19, 2012) ..................................................... 31

*Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*,
  854 A.2d 121 (Del. Ch. 2004) ......................................................................... 21

*Mimbre v. New Alliance Bancshares, Inc.*,
  206 F. App'x. 63 (2d Cir. 2006) ...................................................................... 10

*Mobil Sales & Supply Corp. v. Rep. of Lithuania*,
  1998 WL 196194 (S.D.N.Y.),
  *aff'd,* 166 F.3d 1201 (2d Cir. 1998) ............................................................... 7

*Montgomery v. Aetna Plywood, Inc.*,
  231 F.3d 399 (7th Cir. 2000) ........................................................................... 33

*Nat'l Park Hospitality Ass'n v. Dep't of Interior*,
  538 U.S. 803 (2003) ........................................................................................ 39

*Omnicare, Inc. v. NCS Healthcare, Inc.*,
 809 A.2d 1163 (Del. Ch. 2002) ............................................................ 34

*Phillips v. Audio Active Ltd*,
 494 F.3d 378 (2d Cir. 2007) ........................................................ 9, 11, 12

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust ex rel. Fed. Nat'l Mortg. Ass'n v. Raines*,
 534 F.3d 779 (D.C. Cir. 2008) ............................................................. 27

*Potter v. Hughes*,
 546 F.3d 1051 (9th Cir. 2008) ..................................................... 2, 15, 31

*Rales v. Blasband*,
 634 A.2d 927 (Del. 1993) .............................................................. 14, 15

*RCM Secs. Fund, Inc. v. Stanton*,
 928 F.2d 1318 (2d Cir. 1991) ......................................................... 14, 27

*Repairman's Serv. Corp. v. Nat'l Intergroup, Inc.*,
 1985 WL 11540 (Del. Ch. Mar. 15 1985) .............................................. 21

*Romano v. Kazacos*,
 609 F.3d 512 (2d Cir. 2010) ............................................................... 38

*Rubke v. Capitol Bancorp Ltd*,
 551 F.3d 1156 (9th Cir. 2009) ............................................................ 19

*Ruhrgas AG v. Marathon Oil Co.*,
 526 U.S. 574 (1999) .......................................................................... 39

*Scottish Air Int'l, Inc. v. British Caledonian Grp., PLC*,
 81 F.3d 1224 (2d Cir. 1996) ............................................................... 12

*Seminaris v. Landa*,
 662 A.2d 1350 (Del. Ch. 1995) .......................................................... 15

*Sheppard v. TCW/DW Term Trust 2000*,
 938 F. Supp. 171 (S.D.N.Y. 1996) .................................................. 19, 21

*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*,
 549 U.S. 422 (2007) ......................................................................... 2, 7

*Stolow v. Greg Manning Auctions Inc.*,
 258 F. Supp. 2d 236 (S.D.N.Y.),
 *aff'd*, 80 F. App'x 722 (2d Cir. 2003) .................................................... 8

*Stone v. Ritter,*
  911 A.2d 362 (Del. 2006) ........................................................................ 16, 17, 19

*Stroud v. Milliken Enters., Inc.,*
  585 A.2d 1306 (Del. Ch. 1988) ......................................................................... 24

*Talley v. Mann,*
  2012 WL 946990 (C.D. Cal. Feb. 14, 2012) ................................................. 18, 24

*Telxon Corp. v. Meyerson,*
  802 A.2d 257 (Del. 2002) .............................................................................. 27, 29

*Tradecomet.com LLC v. Google, Inc.,*
  647 F.3d 472 (2d Cir. 2011) ................................................................................ 14

*TUC Elecs., Inc. v. Eagle Telephonics, Inc.,*
  698 F. Supp. 35 (D. Conn. 1988) ........................................................................ 14

*White v. Panic,*
  793 A.2d 356 (Del. Ch. 2000),
  *aff'd* 783 A.2d 543 (Del. 2001) ......................................................................... 29

**Statutes**

15 U.S.C. § 77p(b) ...................................................................................... 4, 35

15 U.S.C. § 77p(f)(2)(A) ................................................................................... 36

15 U.S.C. § 77p(f)(2)(B) ................................................................................... 37

5 U.S.C. § 77p(f)(2)(A)(ii) ................................................................................ 36

Del. Code Ann. tit. 8, § 102(b)(7) ..................................................................... 17

Del. Code Ann. tit. 8, § 141(a) ............................................................................ 3

Del. Code Ann. tit. 8, § 327 ......................................................................... 3, 31

**Rules**

Fed. R. Civ. P. 23.1 ............................................................................... 3, 14, 31

Fed. R. Civ. P. 23.1(b)(1) .................................................................................... 4

Fed. R. Civ. P. 23.1(b)(3) .................................................................................. 14

**Other Authorities**

70 Fed. Reg. 44722 (Aug. 3, 2005).............................................................................. 20

70 Fed. Reg. 44722-01 (Aug. 3, 2005) ....................................................................... 20

Charles J. Johnson, Jr. & Joseph McLaughlin,
    *Corporate Finance and the Securities Laws* (4th ed. 2011 Supp.) .......................... 20

David A. Westenberg,
    *Initial Public Offerings: A Practical Guide to Going Public* (PLI Sept. 2011) ...................... 20

S. Rep. No. 105-182 (1998) ......................................................................................... 36

**INTRODUCTION**

Pursuant to the Transfer Order entered on October 4, 2012, more than forty cases related to Facebook's IPO are now pending in this Court for consolidated or coordinated pre-trial proceedings.  *See* Transfer Order at 2 in *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, No. 12-md-02389 (J.P.M.L. Oct. 4, 2012), Dkt. No. 1 ("Transfer Order")*.*  The overwhelming majority of those actions directly allege violations of federal securities law.  This motion concerns the four remaining purported derivative actions:  *Childs*, *Cole*, *Hubuschman*, and *Levy* (collectively, the "Derivative Actions").[1]  These four actions are "based on substantially similar factual allegations and assert substantially similar legal claims."  Order Granting Defendants' Motion For Stay of Proceedings, *Cole v. Zuckerberg*, No. 12-cv-3367, at 3 (N.D. Cal. Sept. 11, 2012) (attached as Exhibit A to Declaration of Andrew B. Clubok ("Clubok Decl.") in Support of Motion to Dismiss.  Like the securities actions, the "derivative actions allege that Facebook and underwriter defendants violated federal securities laws by providing material non-public information to certain preferred investors, causing Facebook's stock price to decline."  Transfer Order at 2.

Three of these derivative actions — all but *Childs* — were originally filed in California state court.  Defendants removed the state court cases to the Northern District of California, and the removed plaintiffs filed motions to remand.  Because there are threshold grounds for dismissing these actions that should be considered before plaintiffs' remand arguments, nominal defendant Facebook moved to dismiss the derivative cases.  The Northern District of California stayed the derivative actions, finding that it would be more efficient for the transferee court to

---

[1]   A fifth derivative action, *Southward*, was voluntarily dismissed on November 14, 2012.  *See* Notice of Voluntary Dismissal in *Southward v. Zuckerberg*, No. 12-cv-07813 (S.D.N.Y.), Dkt. No. 24.

consider the remand motions and the motions to dismiss together because the threshold grounds

for dismissing these actions are "common" to all of the derivative cases, including *Childs*.

Following transfer, this Court ordered on November 7, 2012, that the outstanding issues

pertaining to the derivative actions, including both the remand motions and motions to dismiss

on threshold grounds, be heard at the same time.  Accordingly, nominal defendant Facebook files

this motion to dismiss all four Derivative Actions on the independent threshold grounds of

venue, standing, preclusion, and ripeness.[2]

       As a threshold matter, the Court should first resolve Facebook's motion to dismiss the

Derivative Actions and bypass the remand motions that Plaintiffs are filing in three of the four

Derivative Actions.   The threshold non-merits issues that Facebook raises herein (1) are

"logically antecedent" to the jurisdictional issues raised by Plaintiffs, *see Potter v. Hughes*, 546

F.3d 1051, 1055 (9th Cir. 2008), or (2) should be resolved prior to plaintiffs' remand motions

because "considerations of convenience, fairness, and judicial economy so warrant," *Sinochem*

*Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 432-33 (2007).   For example, the

enforceability of Facebook's forum selection clause should be decided before remand issues, *see*

*In re LimitNone, LLC*, 551 F.3d 572, 576-77 (7th Cir. 2008), as should derivative standing, *see*

*Potter*, 546 F.3d at 1055.   As the District Court for the Northern District of California

recognized, addressing Facebook's dismissal grounds first will avoid the risk of duplicative

litigation and potentially conflicting rulings on these same issues by a California state court.

(Clubok Decl., Ex. A at 3-4 (all of the derivative actions "give rise to a number of common

issues" including "whether the cases are improperly venued in any court other than a state court

---

[2]    This threshold motion to dismiss is brought only on behalf of nominal defendant Facebook and presents only threshold grounds for dismissal.  All defendants, including Facebook, reserve the right to respond to each of the Complaints on the merits.  (11/7/12 Hearing Tr. at 21.)

in Delaware, whether the cases are ripe to the extent they are based on a theory that Facebook, Inc. has suffered any injury by reason of defendants' alleged violation of federal securities laws, and whether plaintiffs lack standing to seek relief on behalf of Facebook, Inc.," as well as "whether the claims … are precluded by the Securities Litigation Uniform Standards Act ("SLUSA")).)  Each threshold issue warrants dismissal of all four of the Derivative Actions.

*First,* the Derivative Actions do not belong in this Court or the California state court. Here, Facebook, a public corporation organized in Delaware, has an exclusive forum provision in its restated certificate of incorporation ("Certificate") that states with unmistakable clarity that corporate disputes must be resolved in the Delaware Chancery Court.  Facebook's Certificate is a contract between Facebook and its shareholders, and its forum selection clause provides that plaintiffs (with standing) may only file suit in Delaware.  Not only did Facebook's February 1, 2012 Registration Statement disclose to all potential shareholders that such an exclusive forum provision would be included in its Certificate, but the actual provision itself was publicly filed with an amended Registration Statement on April 23, 2012.  Plaintiffs were thus clearly on notice of that provision and agreed to be bound by the forum selection provision when they subsequently purchased shares after Facebook's IPO on May 18, 2012.

*Second,* even if this were the appropriate forum, Plaintiffs do not have standing because (1) they have no excuse for failing to make a demand on Facebook's Board of Directors before claiming to sue on Facebook's behalf, and (2) they fail to allege facts demonstrating that they were shareholders at the time of the alleged wrongdoing.  *See* Fed. R. Civ. P. 23.1; Del. Code Ann. tit. 8, §§ 141(a), 327.  As to the first point, "[a] simple allegation of potential directorial liability is insufficient to excuse demand, else the demand requirement itself would be rendered toothless, and directorial control over corporate litigation would be lost."  *In re Goldman Sachs*

3

*Grp., Inc. S'holder Litig.*, 2011 WL 4826104, at *18 (Del. Ch. Oct. 12, 2011); *see also In re IAC/InterActiveCorp Secs. Litig.*, 478 F. Supp. 2d 574, 599 (S.D.N.Y. 2007). Yet conclusory allegations of potential director liability are all the Complaints have to offer. The Complaints fail to plead facts establishing that a majority of the board was personally interested in alleged IPO-related wrongdoing or that a majority is so lacking in independence that any demand would be futile. These defects are fatal. As to the second point, Plaintiffs fail to allege that they were Facebook shareholders contemporaneously with the alleged wrongdoing. Plaintiffs allegedly purchased Facebook stock "on the open market" on May 18, 2012, ***after*** the allegedly misleading Registration Statement was filed and ***after*** the allegedly improper insider sales had taken place and had been publicly disclosed. Plaintiffs have no standing to seek derivative status to pursue a lawsuit about alleged misdeeds that took place before they were shareholders. *See 7547 Partners v. Beck*, 682 A.2d 160, 163 (Del. 1996); Fed. R. Civ. P. 23.1(b)(1).

***Third***, SLUSA precludes litigation of the Derivative Actions because they raise direct claims premised on the same alleged federal securities violations as the class actions brought against Facebook under the Securities Act of 1933, and thus qualify as "covered class action[s]" that may not "be maintained in any State or Federal court by any private party." 15 U.S.C. § 77p(b).

***Finally***, none of Plaintiffs' claims are ripe because they seek only to recover damages that ***could*** result ***if*** Facebook is found liable in ***another*** proceeding.

## BACKGROUND

The Derivative Actions revolve around events leading up to Facebook's May 18, 2012 IPO. On February 1, 2012, Facebook filed its initial Registration Statement on Form S-1 containing a prospectus for Facebook's intended share offering.[3] (Levy Compl. ¶ 42; Cole Compl. ¶ 39; Childs Compl. ¶ 25.)[4] Following common practice, Facebook amended its Registration Statement numerous times in preparation for the IPO, including on April 23, May 9, and May 16, 2012. (*Id.*) In early May 2012, Facebook and its underwriters also participated in an IPO roadshow to provide potential investors with information about Facebook. (Levy Compl. ¶ 40; Cole Compl. ¶ 39; Childs Compl. ¶ 26.) And on May 17, 2012, the day before the IPO, the SEC declared Facebook's Registration Statement effective. (Levy Compl. ¶ 7.)

Like the securities actions that make up the bulk of the MDL cases pending in this Court, the Derivative Actions take issue with Facebook's alleged disclosure of certain forward-looking projections to analysts employed by underwriters, a customary practice in IPOs. (Levy Compl ¶ 49; Cole Compl. ¶ 48; Childs Compl. ¶¶ 33-40.) Other allegations relate to Facebook's May 9 amendment to the S-1 Registration Statement, which, along with a "free writing" prospectus (the "May 9 Amendment"), disclosed that in the beginning of the second quarter of 2012 growth in the number of Facebook's daily active users continued to outpace growth in the number of ads delivered. (Levy Compl. ¶ 47 ; Cole Compl. ¶ 45; Childs Compl. ¶ 28.) The May 9 Amendment ascribed that continued trend to the increased usage of Facebook on mobile devices, on which

---

[3]   All of Facebook's Form S-1 Disclosures, including amendments, and the SEC's declaration of effectiveness are available at http://www.sec.gov/cgi-bin/browse-edgar?company=Facebook&match=&CIK=&filenum=&State=&Country=&SIC=&owner=exclude&Find=Find+Companies&action=getcompany.

[4]   Because the Cole and Hubuschman complaints are identical, this motion cites just the Cole Complaint, in addition to the Levy and Childs Complaints.

advertising was limited, as well as to certain product changes that affected the volume of advertising. (Levy Compl. ¶¶ 47-49; Cole Compl. ¶¶ 45-46; Childs Compl. ¶ 28.) The May 9 Amendment stated that this trend could "negatively affect" the Company's revenues and financial results. (*Id.*)

On May 18, 2012, Facebook shares debuted on the NASDAQ stock exchange. (Levy Compl. ¶¶ 8, 18; Cole Compl. ¶ 40; Childs Compl. ¶ 32.). As has been widely reported in the press, problems with NASDAQ's systems delayed the commencement of trading in Facebook shares, impaired the orderly execution of trades, and affected price levels. Shortly thereafter, plaintiffs filed dozens of lawsuits raising claims about the adequacy of pre-IPO disclosures under the federal securities laws; other lawsuits were filed against NASDAQ. The JPML ordered all of these actions centralized before this Court. The four actions at issue here are styled as derivative actions but are premised on the same alleged federal securities violations. These Derivative Actions claim that the individual defendants, who are directors of Facebook, breached various duties to shareholders by "caus[ing] Facebook to conduct the IPO in a fashion that violates the federal securities laws." (Levy Compl. ¶ 84; *see also* Childs Compl. ¶ 64; Cole Compl. ¶ 96.) Plaintiff Levy also claims that the three directors who sold stock in the IPO thereby traded on inside information. (Levy Compl. ¶¶ 106-110.) All Plaintiffs have failed to make a demand on the Board, vaguely alleging that director self-interest and Board domination excused such a demand. (Levy Compl. ¶¶ 75-79; Childs Compl. ¶¶ 43-57; Cole Compl. ¶¶ 66-90.)

# ARGUMENT

## I. THE FORUM SELECTION CLAUSE REQUIRES DISMISSAL.

Article IX of Facebook's Certificate contains a mandatory and exclusive forum selection provision requiring that this action be brought in the Delaware Chancery Court.  (Clubok Decl., Ex. B at Art. IX.)[5]  This Court should enforce Facebook's forum selection clause and dismiss the Derivative Actions *before* addressing any of plaintiffs' remand motions.  Courts have repeatedly held that it is in the interest of judicial economy and fairness to dismiss a case before ruling on jurisdiction where, as here, a forum selection clause dictates that the merits of the case should be adjudicated in another court.  *See In re Magi XXI, Inc. v. Stato Della Citta Del Vaticano*, 818 F. Supp. 2d 597, 620 (E.D.N.Y. 2011) ("[C]onsiderations of convenience, fairness, and judicial economy warrant bypassing the question of subject matter jurisdiction in favor of deciding the motion to dismiss for improper venue on the basis of the forum selection clauses."); *Mobil Sales & Supply Corp. v. Rep. of Lithuania*, 1998 WL 196194, at *1 (S.D.N.Y.) (dismissing on grounds of forum selection clause without reaching contested issues of subject matter and personal jurisdiction), *aff'd,* 166 F.3d 1201 (2d Cir. 1998); *see also Sinochem*, 549 U.S. at 432 (recognizing that courts have discretion to bypass jurisdiction and dispose of an action by "a determination that the merits should be adjudicated elsewhere"); *In re LimitNone, LLC*, 551 F.3d 572, 576-77 (7th Cir. 2008) (upholding district court's enforcement of a forum selection clause before determining jurisdiction).  It is plainly more efficient for this Court to resolve the

---

[5]    The Court may take judicial notice of the provisions of a nominal defendant's certificate of incorporation in a shareholder derivative suit.  *See, e.g.*, *La. Mun. Police Employees Ret. Sys. v. Blankfein*, 2009 WL 1422868, at *7 (S.D.N.Y. May 19, 2009) (taking judicial notice of exculpatory provisions applying to directors in nominal defendant's certificate of incorporation); *Ferre v. McGrath*, 2007 WL 1180650, at *8 (S.D.N.Y. Feb. 16, 2007) (where plaintiff "left th[e] significant fact" of provision in certificate of incorporation out of his derivative complaint, "the court may take judicial notice of the existence of this provision").  The Court may also take judicial notice of required disclosure statements on file with the SEC.  *See In re Merrill Lynch & Co.*, 273 F. Supp. 2d 351, 356-57 (S.D.N.Y. 2003), *aff'd,* 396 F.3d 161 (2d Cir. 2005).

enforceability of the forum selection clause for all four Derivative Actions, rather than consider the potential remand of three actions to a California state court that may decide the issue inconsistently with this Court's ruling.  It is also "only fair that [Facebook] should benefit from the forum selection clauses for which it bargained at the earliest possible time." *Magi XXI*, 818 F. Supp. 2d at 621.

As a threshold matter, the forum selection provision is indisputably a contract between Facebook and its shareholders because it was adopted as a provision of Facebook's Certificate. *See M+J Savitt, Inc. v. Savitt*, 2009 WL 691278, at *9 (S.D.N.Y. Mar. 17, 2009) ("[A] company's certificate of incorporation and by-laws in substance are a contract between the corporation and its shareholders and among the shareholders *inter se*.") (citation and internal quotations omitted); *Stolow v. Greg Manning Auctions Inc.*, 258 F. Supp. 2d 236, 249 (S.D.N.Y.) ("The bylaws of a corporation constitute a contract between a corporation and its members."), *aff'd,* 80 F. App'x 722 (2d Cir. 2003); *Centaur Partners, IV v. Nat'l Intergroup, Inc.*, 582 A.2d 923, 928 (Del. 1990) ("Corporate charters and by-laws are contracts among the shareholders of a corporation and the general rules of contract interpretation are held to apply.").  Indeed, Article IX of Facebook's Certificate, which contains the forum selection provision, puts all prospective shareholders, including Plaintiffs, on notice that "[a]ny person or entity purchasing or otherwise acquiring any interest in shares of capital stock of the corporation shall be deemed to have notice of *and consented to* the provisions of this ARTICLE IX."  (Clubok Decl., Ex. B at Art. IX (emphasis added).)

The Second Circuit applies a four-part test in determining whether to enforce a contractual forum selection provision.  "The first inquiry is whether the clause was reasonably communicated to the party resisting enforcement." *Phillips v. Audio Active Ltd*, 494 F.3d 378,

383 (2d Cir. 2007).   The second inquiry requires the Court "to classify the clause as mandatory or permissive, i.e., to decide whether the parties are *required* to bring any dispute to the designated forum or simply *permitted* do so."   *Id.* (emphasis in original).   "Part three asks whether the claims and parties involved in the suit are subject to the forum selection clause."   *Id.* If the forum selection provision satisfies these first three criteria, it is "presumptively enforceable."   *Id.*

The fourth step then applies the rule set forth in *M/S Bremen* that a court need only "ascertain whether the resisting party has rebutted the presumption of enforceability by making a sufficiently strong showing that 'enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching.'"   *Id.* at 383-84 (quoting *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972)).   The forum selection provision in Facebook's certificate of incorporation satisfies all three criteria necessary to create a presumptively enforceable forum selection provision, and Plaintiffs have made no showing (indeed can make no showing) to rebut that presumption.

**First**, Plaintiffs had ample notice of the forum selection provision at the time they purchased stock.   Plaintiffs purchased stock in the open market on May 18, 2012.   (*E.g.*, Levy Compl. ¶ 18; Childs Compl. ¶¶ 5, 32.)   Facebook disclosed to all potential shareholders on February 1, 2012, in a prospectus, that, upon conclusion of its IPO, Facebook would amend the Certificate to include a provision making the Delaware Court of Chancery the exclusive forum for all derivative or intra-corporate disputes:   "Our restated certificate of incorporation will provide that the Court of Chancery of the State of Delaware will be the exclusive forum for any derivative action … any action asserting a breach of fiduciary duty … or any action asserting a claim against us that is governed by the internal affairs doctrine." (Facebook's S-1, 2/1/12, at

9

136 (attached as Clubok Decl., Ex. C).)  Facebook disclosed the precise terms of that provision on April 23, 2012, when it filed an amendment to its Registration Statement attaching as Exhibit 3.3 the actual form of Certificate (containing the exclusive forum selection provision in Article IX) that would be filed with the Delaware Secretary of State upon conclusion of the IPO.  (*See* Facebook's S-1, 4/23/12, at Ex. 3.3 (attached as Clubok Decl., Ex. D).)  Potential investors in Facebook were thus on actual notice as early as February 1, 2012 that the Certificate would contain a forum selection provision and, by no later than April 23, 2012, those prospective shareholders knew the precise terms of that provision and could elect whether to bind themselves to it by purchasing shares.  *See Dodds v. Cigna Secs., Inc.*, 12 F.3d 346, 351 (2d Cir. 1993) (disclosures in registered prospectus deemed to put investor "on notice" of disclosed facts related to investment); *see also Coleman & Co. Secs., Inc. v. Giaquinto Family Trust*, 236 F. Supp. 2d 288, 309 (S.D.N.Y. 2002) (offering materials deemed to put investors on notice).  On May 22, 2012, as previously disclosed, Facebook formally filed the Certificate with the Delaware Secretary of State.  (*See* Clubok Decl., Ex. B.)

Plaintiffs thus bound themselves to the forum selection provision when they subsequently chose to purchase shares.[6]  Where a shareholder purchases stock after an IPO, he is contractually bound by the terms set forth in the prospectus.  *See Mimbre v. New Alliance Bancshares, Inc.*, 206 F. App'x 63, 64 (2d Cir. 2006) (IPO prospectus stated terms of contract, stating "[t]he terms of the offer, and ***thus of the contract formed, were set forth in the prospectus*** issued by New

---

[6]   Notably, because Facebook publicly disclosed the terms of the forum selection provision weeks *before* Plaintiffs purchased shares, and because the provision is in a certificate of incorporation amended with shareholder approval, this case is very different from the one case of which Facebook is aware where a court refused to enforce a forum selection provision contained in corporate governance documents.  *See Galaviz v. Berg*, 763 F. Supp. 2d 1170, 1174-75 (N.D. Cal. 2011).  In *Galaviz*, the directors unilaterally adopted the provision as a bylaw *after* the plaintiffs had purchased shares and *after* the majority of the alleged wrongdoing had taken place; they did so "without the consent of existing shareholders who acquired their shares when no such bylaw was in effect" and when no notice had been given.  *Id.*

Alliance on February 9, 2004 ('Prospectus') as part of its published plan to convert from a mutual savings bank into a publicly-held stock corporation") (emphasis added); *see also In re Gulf Oil*, 725 F. Supp. 712, 728 (S.D.N.Y. 1989) (tender offer prospectus became contract between offeror and parties who tendered shares); *Franklin Life Ins. Co. v. Commonwealth Edison Co.*, 451 F. Supp. 602, 613-15 (S.D. Ill. 1978) (stock redemption creates contract with issuer defined by prospectus), *aff'd*, 598 F.2d 1109 (7th Cir. 1979).

**Second**, the language of the forum selection provision is plainly mandatory, not permissive. The provision states in relevant part that "the Court of Chancery of the State of Delaware shall, to the fullest extent permitted by law, be the **sole and exclusive forum**" for the designated types of actions. (Clubok Decl. Ex. B at Art. IX (emphasis added).) "A forum selection clause is viewed as mandatory when it confers exclusive jurisdiction on the designated forum or incorporates obligatory venue language." *Phillips*, 494 F.3d at 386.

**Third**, the parties and subject matter of the suit are subject to the terms of the forum selection provision. The provision expressly states that it covers "(1) any derivative action or proceeding brought on behalf of the corporation; (2) any action asserting a claim of breach of a fiduciary duty owed by, or other wrongdoing by, any director, officer, employee or agent of the corporation to the corporation or the corporation's stockholders … or (5) any action asserting a claim governed by the internal affairs doctrine." (Clubok Decl., Ex. B at Art. IX.) The Complaints meet all three criteria as they (1) are styled as derivative actions (Complaints ¶ 1); (2) assert claims against Facebook's directors for breach of fiduciary duty (Levy Compl. ¶¶ 80-87, 106-10; Cole Compl. ¶¶ 91-97; Childs Compl. ¶¶ 58-64); and (3) plead claims based on duties allegedly owed to the company by its officers and directors that are governed by the internal affairs doctrine, *see Scottish Air Int'l, Inc. v. British Caledonian Grp., PLC*, 81 F.3d

11

1224, 1234 (2d Cir. 1996).  Because these Derivative Actions all fall within the plain language of the mandatory forum selection provision, and Plaintiffs were on notice of it when they purchased their stock, the provision is presumptively enforceable.  *See Phillips*, at 494 F.3d at 384.

That conclusion is strengthened further by the recognition that Delaware law governs interpretation of this forum selection clause.  *See Scottish Air*, 81 F.3d at 1234 ("[Q]uestions relating to the internal affairs of corporations are decided in accordance with the law of the place of incorporation."); *see also Phillips*, 494 F.3d at 385-86 (declining to decide issue in the absence of briefing, but suggesting that the law "chosen to govern the interpretation of the contract as a whole" applies to "to interpret the meaning and scope of a forum clause, as required by parts two and three of our analysis"); *Abbott Labs. v. Takeda Pharm. Co.*, 476 F.3d 421, 423 (7th Cir. 2007) ("Simplicity argues for determining the validity and meaning of a forum selection clause … by reference to the law of the jurisdiction whose law governs the rest of the contract in which the clause appears.").  Delaware law has interpreted similar provisions to provide for exclusive jurisdiction over intra-corporate disputes in the Delaware Court of Chancery.  "[I]f boards of directors and stockholders believe that a particular forum would provide an efficient and value-promoting locus for dispute resolution, then corporations are free to respond with charter provisions selecting an exclusive forum for intra-entity disputes."  *In re Revlon S'holders Litig.*, 990 A.2d 940, 960 (Del. Ch. 2010); *see also Elf Atochem N. Am., Inc. v. Jaffari*, 727 A.2d 286, 294 (Del. 1999) (dismissing putative derivative suit by enforcing forum selection provision in LLC agreement providing for arbitration or in the alternative the "exclusive jurisdiction" of California state courts); *Baker v. Impact Holding, Inc.*, 2010 WL 1931032, at *3-4 (Del. Ch. May 13, 2010) (upholding forum selection clause in stockholders' agreement selecting Texas courts).

Under this precedent, the Court should enforce the forum selection clause in Facebook's certificate of incorporation by dismissing the Derivative Actions.

**Fourth**, Plaintiffs have pleaded no facts that rebut the presumptive enforceability of the forum selection provision.  Indeed, it is telling that Plaintiffs make no mention of Facebook's certificate of incorporation in general or of Article IX in particular in their Complaints, even though Article IX was specifically discussed in Facebook's SEC Registration Statement. Plaintiffs have provided nothing to suggest that litigation in Delaware will be any less convenient to them than New York, much less that any inconvenience would be so severe as to constitute substantive unfairness.  Plaintiffs cannot make such a showing given that publicly available information indicates that Plaintiff Levy is a resident of Florida and Plaintiff Hubuschman is a resident of Georgia,[7] while Plaintiff Childs has pleaded that he a resident of Pennsylvania (Childs Compl. ¶ 5).  Further, enforcing the forum selection provision would promote the uniform application of a body of corporate law that the internal affairs doctrine is itself designed to facilitate.  *See Revlon*, 990 A.2d at 960 (noting potential problem of frequent derivative filers filing in multiple jurisdictions); *see also In re Allion Healthcare, Inc. S'holders Litig.*, 2011 WL 1135016, *4 (Del. Ch. Mar. 29, 2011) (lamenting problem of multi-forum corporate litigation over same business deals and concluding, "[e]fficiency and comity would be better served if these cases were litigated in one jurisdiction").

Because the forum selection clause selects the Delaware Chancery Court as the only appropriate forum, this case should be dismissed.  *See, e.g.*, *KTV Media Int'l, Inc. v. Galaxy Grp. LA LLC*, 812 F. Supp. 2d 377, 387-88 (S.D.N.Y. 2011) (case should be dismissed rather than

---

[7]   *See Levy v. NASDAQ Stock Mkt. LLC*, No. 12-cv-4315 (S.D.N.Y.) and *Hubuschman v. Blankfein*, No. 10-cv-3476 (S.D.N.Y.), identifying the respective domiciles of Levy and Hubuschman.

transferred under forum selection clause where clause provides plaintiff the option of filing in state court); *TUC Elecs., Inc. v. Eagle Telephonics, Inc.*, 698 F. Supp. 35, 40 (D. Conn. 1988) (dismissing for *forum non conveniens* where contractual forum selection clause provided for exclusive jurisdiction in New York state court).[8]

## II.    PLAINTIFF'S UNEXCUSED FAILURE TO MAKE A DEMAND REQUIRES DISMISSAL.

Because "[w]hether a corporation should bring a lawsuit is a business decision," *RCM Secs. Fund, Inc. v. Stanton*, 928 F.2d 1318, 1326 (2d Cir. 1991), "[b]y its very nature the derivative action impinges on the managerial freedom of directors." *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984) (citing 8 Del. C. § 141(a)), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000)).   Accordingly, the governing Delaware law limits "the right of a stockholder to prosecute a derivative suit … to situations where the stockholder has demanded that the directors pursue the corporate claim and they have wrongfully refused to do so or where demand is excused because the directors are incapable of making an impartial decision." *Rales v. Blasband*, 634 A.2d 927, 932 (Del. 1993).[9]   Where Plaintiffs fail to make the required demand, they must "allege with particularity ... the reasons for ... not making the effort."   Fed. R. Civ. P. 23.1(b)(3); *see also In re Forest Labs., Inc. Derivative Litig.*, 450 F. Supp. 2d 379, 387 (S.D.N.Y. 2006) ("Because Rule 23.1 requires particularized allegations, the pleading standard is

---

[8]    Facebook has brought its motion to dismiss on the basis of the forum selection provision under Rules 12(b)(1), 12(b)(3), and 12(b)(6), because the Second Circuit has recognized them all as bases for dismissal on the grounds of a forum selection provision, and has expressly declined to determine which subsection is the appropriate basis for motion practice.   *See Tradecomet LLC v. Google, Inc.*, 647 F.3d 472, 479 (2d Cir. 2011) ("[W]e express no opinion as to whether a defendant must invoke a particular subsection of Rule 12(b) to seek enforcement of a forum-selection clause ….").

[9]    While Federal Rule Civil Procedure 23.1 supplies the pleading standard for demand futility in federal court, the underlying requirements are governed by the law of the state of incorporation, which for Facebook is Delaware. *See In re Forest Labs., Inc. Derivative Litig.*, 450 F. Supp. 2d 379, 387 (S.D.N.Y. 2006).

higher than the standard applicable to a pleading subject to a motion to dismiss pursuant to Rule 12(b)(6).").  Furthermore, where, as here, "plaintiff does not challenge any specific board action that approved or ratified [the] alleged wrongdoings," demand is excused only if Plaintiffs plead particularized facts showing that the Board could not have "properly exercised its independent and disinterested business judgment in responding to a demand.'" *Seminaris v. Landa*, 662 A.2d 1350, 1354 (Del. Ch. 1995) (quoting *Rales*, 634 A.2d at 934); *see also In re Citigroup Inc. S'holder Derivative Litig.*, 2009 WL 2610746, at *3 (S.D.N.Y. Aug. 25, 2009).

Thus, to survive dismissal, the Complaints must adequately plead that at least four of the seven members of the Board were incapable of objectively responding to a demand because they either (1) "face a sufficiently substantial threat of personal liability," and are thus themselves interested or (2) "are compromised in their ability to act independently of the interested directors." *Desimone v. Barrows*, 924 A.2d 908, 928 (Del. Ch. 2007).  Plaintiffs fail to meet this standard, and accordingly "there is no lawsuit over which to exercise jurisdiction."  *Potter*, 546 F.3d at 1055.  Because "a putative derivative plaintiff can initiate a derivative action only if he or she makes an adequate demand on the Board under applicable state law," the issue of whether Plaintiffs satisfied their demand pleading requirements is "'logically antecedent to' the issue of whether [this Court] ha[s] jurisdiction over" the three removed Derivative Actions.  *Id.* Accordingly, this Court should address derivative standing prior to remand and dismiss all four of the Derivative Actions.

### A.  Plaintiffs Have Inadequately Alleged That A Majority Of The Directors Face A Substantial Threat Of Personal Liability.

Delaware courts excuse demand "based on a possibility of personal director liability only in the rare case when a plaintiff is able to show director conduct that is so egregious on its face that … a substantial likelihood of director liability therefore exists."  *In re Dow Chem. Co.*

*Derivative Litig.*, 2010 WL 66769, at *12 (Del. Ch. Jan. 11, 2010) (internal quotations omitted); *see also Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 96 (1991) (demand is excused only in "extraordinary conditions").  The bar for demonstrating "a substantial likelihood" that Plaintiffs will prevail on their claims is particularly high here because Plaintiffs allege what are typically referred to as *Caremark* claims, which are recognized as "possibly the most difficult [claims] in corporation law upon which a plaintiff might hope to win a judgment." *In re Caremark Int'l Inc. Derivative. Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996).  Rather than allege that the Directors committed any affirmative acts of misconduct, Plaintiffs claim that the Directors "breached their fiduciary duties by failing to take steps to prevent [illegal] conduct from occurring."  (Childs Compl. ¶ 2.)  More specifically, the Complaints allege that the Directors failed to "exercise reasonable control and supervision over [Facebook's] public statements to the securities markets, investors and public shareholders."  (Levy Compl. ¶ 38(i); *see also* Cole Compl. ¶¶ 14-23.)

To establish *Caremark* liability, Plaintiffs must show either that "(a) the directors utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention." *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006).  "In either case, imposition of liability requires a showing that the directors **knew** that they were not discharging their fiduciary obligations." *Id.* (emphasis added); *see also In re Citigroup S'holder Derivative Litig.*, 964 A.2d 106, 123 (Del. Ch. 2009) (*Caremark* "test is rooted in concepts of bad faith; indeed a showing of bad faith is a necessary condition to director oversight liability"); *In re Goldman Sachs*, 2011 WL 4826104, at *20 (dismissing *Caremark* claim because, "[t]o act in bad faith, there must be scienter on the part of the defendant director," and complaint failed to sufficiently allege "that the director[s] **knew**"

16

they were breaching their fiduciary duties). The *Caremark* bar is set even higher in this case because Facebook has adopted a Section 102(b)(7) provision. *See* Del. Code Ann. tit. 8, § 102(b)(7). Section 102(b)(7) allows companies to "exculpate directors from monetary liability for breach of the duty of care." *Stone*, 911 A.2d at 367.[10] Where a company adopts such a provision, plaintiffs must plead scienter—that is, "***particularized facts that, if proven, would show that … the defendants knowingly engaged in fraudulent, or illegal conduct***." *Wood v. Baum*, 953 A.2d 136, 141 (Del. 2008) (internal quotations omitted; emphasis added); *see also Citigroup*, 964 A.2d at 125; *McMillan v. Intercargo Corp.*, 768 A.2d 492, 501-03 n.43 (Del. Ch. 2000).

The Derivative Actions do not come close to meeting this demanding standard. To the contrary, the Complaints ***concede*** that Facebook has a reporting system and detailed procedures designed to ensure compliance with the securities laws. (Levy Compl. ¶¶ 31, 32; Cole Compl. ¶¶ 72-73.)[11] The existence of such policies undercuts any notion that the Directors acted in bad faith. *See* Del. Code Ann. tit. 8, § 141(e) ("A member of the board of directors … shall … be fully protected in relying in good faith upon the records of the corporation and upon such information, opinions, reports or statements presented to the corporation by any of the

---

[10]   Facebook's Section 102(b)(7) provision reads, "To the fullest extent permitted by the Delaware General Corporation Law, … a director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director," and "[t]he Corporation shall indemnify to the fullest extent permitted by law any person made or threatened to be made a party to an action … by reason of the fact that he … is or was a director or officer of the Corporation." (Clubok Decl., Ex. A at Art. VII.)

[11]   For instance, the Levy Complaint admits that Facebook established a "program for promoting and monitoring compliance with applicable legal and regulatory requirements" as well as a specific insider trading policy. (Levy Compl. ¶ 32.) That complaint further concedes that the board established an "Audit Committee" charged with "overseeing Facebook's financial reporting processes, and Facebook's compliance with legal and regulatory requirements." (*Id.* ¶ 31; *see also* Cole Compl. ¶ 73 (admitting that Defendants established an "Audit Committee" which retained an "independent auditor" to assist the board in conducting "periodic reviews of the Company's accounting and financial reporting processes, systems of internal control, … and disclosure controls and procedures.").)

corporation's officers or employees."); *Forsythe v. ESC Fund Mgmt. Co.*, 2007 WL 2982247, at *7 (Del. Ch. Oct. 9, 2007) ("[W]ith an effective compliance system in place, corporate directors are entitled to believe that, unless red flags surface, corporate officers and employees are exercising their delegated corporate powers in the best interests of the corporation.").

The Complaints do not allege that these oversight mechanisms revealed any "red flags" that might have triggered a duty to investigate further. Nor do Plaintiffs suggest any steps the Directors should have taken or how such steps would have prevented the alleged misconduct. *See Talley v. Mann*, 2012 WL 946990, at *12 (C.D. Cal. Feb. 14, 2012) (applying Delaware law) (dismissing *Caremark* claim where the complaint failed to "allege any facts demonstrating that the Outside Directors' purported oversight failures caused the misstatements to be made, or that actions within their capacity to take would have stopped the statements from being made"). Rather, the Complaints simply declare without any supporting factual contentions that the Directors "knowingly participated in, approved, and permitted the wrongs alleged herein" and thereby "knowingly, willfully and/or intentionally breached their duties of loyalty and good faith." (Levy Compl. ¶¶ 78(a), 81; *accord* Childs Compl. ¶ 20; Cole Compl. ¶ 31.)

The "wrong" in which the Directors are alleged to have "knowingly participated" is the filing of a registration statement that was supposedly defective under federal securities laws. (Levy Compl. ¶ 84; Childs Compl. ¶ 64; Cole Compl. ¶¶ 20-23, 96.) But the Complaints do not claim that Facebook's Registration Statement contained any misstatements that any officer or director would have noticed. *See In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*, 757 F. Supp. 2d 260, 340 (S.D.N.Y. 2010) (dismissing fiduciary duty claims because they "were based on omissions, not deliberate misinformation"). Instead, Plaintiffs assert that Facebook's registration statement was defective because it did not include Facebook's internal revenue

projections. (Levy Compl. ¶¶ 10, 49; Cole Compl. ¶¶ 5, 48-51; Childs Compl. ¶¶ 2, 33-36.) The Complaints do not allege, however, that the Directors ignored warnings that the failure to disclose projections could render the Registration Statement misleading or that the Directors had any other reason to believe the company was required to disclose its internal projections. *See Stone v. Ritter*, 2006 WL 302558, at *2 (Del. Ch.) (rejecting *Caremark* claim because plaintiffs alleged no "facts suggesting a conscious decision to take no action in response to red flags"), *aff'd*, 911 A.2d 362 (Del. 2006); *Wood*, 953 A.2d at 142 ("[T]he Complaint alleges many violations of federal securities and tax laws but does not plead with particularity … that the defendants knew that such conduct was illegal.").

Plaintiffs cannot possibly allege that the Directors knowingly breached an obligation to disclose internal projections because there is no such obligation. Indeed, this Court has squarely held that "internal calculations and projections are not material facts that are required to be disclosed" in a registration statement. *Sheppard v. TCW/DW Term Trust 2000*, 938 F. Supp. 171, 177-78 (S.D.N.Y. 1996); *see also In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 458 (S.D.N.Y. 2000) ("The federal securities laws do not obligate companies to disclose their internal forecasts.") (internal quotations omitted). Courts across the country have uniformly agreed.[12] These courts have followed the lead of the SEC which has consistently refused to require issuers to disclose internal revenue projections. *See, e.g., Sec. Offering Reform*, 70 Fed.

---

[12] *See Rubke v. Capitol Bancorp Ltd*, 551 F.3d 1156, 1163 (9th Cir. 2009) ("[T]here is no duty to disclose income projections in a prospectus."); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1432 (3d Cir. 1997) ("Companies are *not* obligated either to produce or disclose internal forecasts …."); *Glassman v. Computervision Corp.*, 90 F.3d 617, 631 (1st Cir. 1996) ("The federal securities laws impose no obligation upon an issuer to disclose forward-looking information such as internal projections, estimates of future performance, forecasts, budgets, and similar data.") (internal quotations omitted); *Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1446 (5th Cir. 1993) ("[A]n issuer … has no generalized duty to volunteer an economic forecast.") (internal quotations omitted); *Arber v. Essex Wire Corp.*, 490 F.2d 414, 421 (6th Cir. 1974) ("[T]he law … does not require an insider to volunteer any economic forecast.").

Reg. 44722, 44739 (Aug. 3, 2005); *In re Ivan F. Boesky Sec. Litig.*, 825 F. Supp. 623, 635 (S.D.N.Y. 1993), *aff'd*, 36 F.3d 255 (2d Cir. 1994).

Plaintiffs also assert that Facebook's revenue projections were selectively disclosed to some investors.  (Levy Compl. ¶ 10; Cole Compl. ¶¶ 5, 48-51; Childs Compl. ¶¶ 2, 33-36.)  But they do not accuse the Directors of participating in those alleged disclosures; rather, the Complaints generically assert that "Facebook" provided this information "to its underwriters, who *in turn* verbally disseminated such information to select institutional investors."  (Childs Compl. ¶ 2 (emphasis added); *see also* Levy Compl. ¶¶ 9, 36; Cole Compl. ¶ 83.)  Nor do the Complaints claim that the Directors preapproved the alleged selective disclosures, much less approved them *knowing* that they were illegal.  Plaintiffs cannot plausibly make such an allegation given that it is standard industry practice for underwriters "to have access to the issuer's internal projections" before an IPO and for underwriters' analysts to "provid[e] projections to investors at road show presentations."  Charles J. Johnson, Jr. & Joseph McLaughlin, *Corporate Finance and the Securities Laws* § 3.04[D] (4th ed. 2011 Supp.).[13] Indeed, the SEC has expressly declined to require that an issuer disclose such oral communications:  "[o]ral communications of an issuer made in connection with a registered offering after the registration statement is filed will continue not to be subject to any filing or public disclosure requirement."  70 Fed. Reg. at 44760.  Given these authorities, Plaintiffs cannot plausibly allege that the Directors "knowingly engaged in fraudulent, or illegal conduct."  *Wood*, 953 A.2d at 141.

Finally, Plaintiff Levy contends that Directors Zuckerberg, Breyer, and Thiel engaged in

---

[13]   *See also* David A. Westenberg, *Initial Public Offerings: A Practical Guide to Going Public* § 19:7.2[B] (PLI Sept. 2011) (noting that proper IPO preparation includes "discussions with management concerning the company's financial model" so analysts can "develop earnings forecasts").

insider trading by selling stock in the IPO without disclosing the company's internal revenue projections. But Levy has not plausibly alleged any "substantial threat of personal liability" that would excuse demand. *Desimone*, 924 A.2d at 928. "Delaware courts," like federal courts, "have been reluctant to require disclosure of information that does not bear reliably on firm value, ***particularly soft information such as projections of performance*** or estimates of value." *In re Oracle Corp. Derivative Litig.*, 867 A.2d 904, 938 n.149 (Del. Ch. 2004) (emphasis added), *aff'd,* 872 A.2d 960 (Del. 2005); *see also Repairman's Serv. Corp. v. Nat'l Intergroup, Inc.*, 1985 WL 11540, at *8 (Del. Ch. Mar. 15 1985) ("Generally, 'soft' information, such as projections and estimates as to value, need not be disclosed due to their lack of reliability.").[14]

The continuity between federal law and Delaware is deliberate. "Delaware's fiduciary disclosure regime is designed with especial sensitivity to the fact that corporate disclosure is an area heavily regulated by a myriad of federal statutes and SEC rules" and has thus sought "to harmonize" its "law with the federal regime." *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 162 (Del. Ch. 2004). Relatedly, Delaware courts have rejected the "argument that there should be a more plaintiff-friendly standard of materiality in the [Delaware] insider trading context than in a situation when this court is weighing the sufficiency of a corporate disclosure document." *In re Oracle Corp.*, 867 A.2d at 940. Thus, under both Delaware and federal law, "internal calculations and projections are not material facts that are required to be disclosed" in advance of an IPO. *Sheppard*, 938 F. Supp. at 177-78. Moreover,

---

[14]  *See also In re Micromet, Inc. S'holders Litig.*, 2012 WL 681785, at *12 (Del. Ch. Feb. 29, 2012) (rejecting argument that a company "should have disclosed [its] projections of how it expected net operating loss carry-forwards to be used in future periods" as "requesting a level of granular disclosure not required under our law"); *In re Orchid Cellmark Inc. S'holder Litig.*, 2011 WL 1938253, at *9 (Del. Ch. May 12, 2011) (rejecting argument that "projections by the Company's management regarding its prospects as a continuing stand-alone entity should have been disclosed"); *In re CheckFree Corp. S'holders Litig.*, 2007 WL 3262188, at *3 (Del. Ch. Nov. 1, 2007) ("[P]laintiffs have failed to establish that management's projections constitute material omitted information.").

insider trading claims "depend importantly on proof that the selling defendants acted with scienter." *In re Oracle*, 867 A.2d at 933-34 (internal quotations omitted).  To plead scienter, a plaintiff must allege "that each sale by each individual defendant was entered into and completed on the basis of, ***and because of***, adverse material non-public information."  *Guttman v. Huang*, 823 A.2d 492, 505 (Del. Ch. 2003) (emphasis added).  But Levy only alleges that the selling Directors had ***knowledge of*** the company's internal revenue projections.  (Compl. ¶ 107.)  She does not and cannot allege that the selling Directors' IPO stock sales were motivated by their knowledge of those projections.  Nor can she plausibly claim that they knew their sales were illegal given that the case law suggests that they were not.  *See Kalnit v. Eichler*, 264 F.3d 131, 143 (2d Cir. 2001) (scienter "cannot be inferred from the failure to disclose" where "the duty to disclose . . . was not so clear").

> **B.**    **Plaintiffs Have Not Adequately Alleged That A Majority Of The Directors Lacked Independence.**

Plaintiffs claim that the Board is dominated and controlled by Mr. Zuckerberg.  (Levy Compl. ¶ 78(c); Cole Compl. ¶ 76; Childs Compl. ¶ 55.)  But that allegation is irrelevant in light of Plaintiffs' failure to allege facts suggesting that Zuckerberg personally engaged in any wrongdoing which would render him "interested" in this lawsuit.  *See Desimone v. Barrows*, 924 A.2d 908, 928 (Del. Ch. 2007) (Plaintiff must allege "particularized facts sufficient to demonstrate that … the underlying conduct being challenged renders any of the directors 'interested' and, ***if so***, [that] the other directors are compromised in their ability to act independently of the interested directors.") (emphasis added).  But even if Plaintiffs could show that Mr. Zuckerberg is interested, the "shorthand shibboleth of 'dominated and controlled directors' is insufficient" to show that the rest of the Board is incapable of acting independently of him.  *Aronson*, 473 A.2d at 816.

1.    **Plaintiffs Cannot Overcome The Presumption Of Directorial Independence.**

"The key principle upon which [Delaware corporate] jurisprudence is based is that the directors are entitled to a *presumption* that they [are] faithful to their fiduciary duties." *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1048 (Del. 2004). Plaintiffs therefore must show, with particularity, why that presumption is overcome with respect to a majority of the Board.  *Id.* at 1049.  The presumption is particularly strong with respect to outside directors, who "tend to be men and women who have considerable investments in reputation."  *Id.* at 1052 n.31 (internal quotations omitted); *see also id.* at 1047 (noting a "reputation for acting as a careful fiduciary is essential to [the] career" of outside directors). Since Facebook's Board is composed of outside directors with successful independent careers,[15] Plaintiff "must plead facts that would support the inference" that these directors would be "willing to risk [their] reputation" by ignoring their obligation to act independently of Mr. Zuckerberg.  *Beam*, 845 A.2d at 1052.  Plaintiffs have failed to do so.

Plaintiffs attempt to rely on the fact that Mr. Zuckerberg controls over half of Facebook's voting shares and thus purportedly determines the composition of the Board.  (Levy. Compl. ¶ 78(e) & n.4; Cole Compl. ¶¶ 76-77, 80; Childs Compl. ¶ 48.)  The Delaware Supreme Court, however, has repeatedly held that "even proof of majority ownership of a company does not strip the directors of the presumption of independence."  *Aronson*, 473 A.2d at 815; *see also Beam*,

---

15    Director Breyer is a partner of Accel Partners, a venture capital firm. (Childs Compl. ¶ 8.)  Director Thiel is a partner of Founders Fund, a venture capital firm, and is the President of Clarium Capital Management, an investment company.  (*Id.* ¶ 9.)  Director Andreessen is a co-founder and general partner of Andreessen Horowitz, a venture capital firm, and serves on the boards of Ebay, Inc., and the Hewlett Packard Company. (Levy Compl. ¶ 22; Childs Compl. ¶ 10.)  Director Bowles is senior advisor to BDT Capital Partners LLC and Carousel Capital LLC and serves on the board of directors at Morgan Stanley.  (Levy Compl. ¶ 23; Childs Compl. ¶ 11.)  Director Graham is the Chairman and CEO of the Washington Post Company.  (Levy Compl. ¶ 25; Childs Compl. ¶ 12.)  Director Hastings is the Chairman and CEO of Netflix, Inc. and also serves on the board of Microsoft.  (Levy Compl. ¶ 26; Childs Compl. ¶ 13.)

845 A.2d at 1054 ("A stockholder's control of a corporation does not excuse presuit demand on the board ...."); *Stroud v. Milliken Enters., Inc.*, 585 A.2d 1306, 1307-09 (Del. Ch. 1988) (holding that the allegation that a corporation is controlled by a majority stockholder is not sufficient to raise a reasonable doubt about the directors' independence); *Talley*, 2012 WL 946990, at *10 (finding "glaringly insufficient" the "allegations that [the company's co-founder] controlled 39.4% of the Company, had a 'stranglehold on the operations of the Company,'" and could "'easily vote any dissenting Board member out of office'").   That Mr. Zuckerberg nominated some of the Directors adds nothing to the analysis.  *See Aronson*, 473 A.2d at 816 (disregarding the "charge that a director was nominated by or elected at the behest of those controlling the outcome of a corporate election" because "[t]hat is the usual way a person becomes a corporate director"); *see also Andreae v. Andreae*, 1992 WL 43924, at *5 (Del. Ch. Mar. 5, 1992) (controlling shareholder's selection of directors is irrelevant because the inquiry "is not how the director got his position, but rather how he comports himself in that position").

Plaintiffs' attempts to bolster these allegations by asserting that each Director has a "long-term relationship with Zuckerberg" and "strong financial and professional ties to, and financial dependence upon, the Silicon Valley venture capital start-up community," the "investment banking community," and the "technology industry" (Levy Compl. ¶¶ 22-23, 25-26; *accord* Cole Compl. ¶ 80; Childs Compl. ¶¶ 49-54), are unavailing.   These strong business community ties only serve to further demonstrate that the Directors have "considerable investments in reputation" that they are likely to protect by honoring their duty to the company. *Beam*, 845 A.2d at 1052 n.31.  But, in any event, "[m]ere allegations that [directors] move in the same business and social circles, or a characterization that they are close friends, is not enough to negate independence for demand excusal purposes."   *Id.* at 1051-52; *see also Green v. Phillips*,

1996 WL 342093, at *5 (Del. Ch. June 19, 1996) ("[L]ongstanding personal and business ties …

are insufficient to overcome the directors' presumption of independence."); *Kohls v. Duthie*, 765

A.2d 1274, 1284 (Del. Ch. 2000) ("[E]vidence of personal and/or business relationships does not

raise an inference of self interest.") (internal quotation omitted).  Instead, "a plaintiff must plead

facts that would support the inference that because of the nature of a relationship or additional

circumstances other than the interested director's stock ownership or voting power, the non-

interested director would be more willing to risk his or her reputation than risk the relationship

with the interested director."  *Beam*, 845 A.2d at 1052; *see id.* at 1050 (Only relationships that

"border on or even exceed familial loyalty and closeness[] may raise a reasonable doubt whether

a director can appropriately consider demand.").  Because the Complaints provide no details

about the Directors' relationships with Mr. Zuckerberg, besides alleging that they do business in

the same general fields (Levy Compl. ¶¶ 22-23, 25-26; Cole Compl. ¶ 80), they fail to rebut the

presumption of directorial independence.  *See Fink v. Weill*, 2005 WL 2298224, at *2 (S.D.N.Y.

Sept. 19, 2005) (applying Delaware law) (holding that allegations of professional connections

did not excuse demand where complaint did not "explain how these connections would likely

impede" the board members' independence).

  *Beam* is indistinguishable.  There, a shareholder of Martha Stewart Living Omnimedia

(MSO) brought a derivative action seeking to recover damages from Martha Stewart arising from

insider trading violations.  Stewart was the company's founder, chairman, CEO, and, with 94%

of the voting power, its lead shareholder.  *See Beam*, 845 A.2d at 1045 n.3.  She also

"personifie[d] MSO's brands and was its primary creative force" and a major player in the

industries which both she and the directors occupied.  *Id.*  The complaint alleged that Stewart and

several directors were "longstanding personal friends," an allegation the complaint supported by

documenting a variety of business and personal connections between the directors and Stewart. *See id.* at 1045-46.  Nonetheless, the Delaware Supreme Court held that the "[a]llegations that Stewart and the other directors moved in the same social circles, attended the same weddings, developed business relationships before joining the board, and described each other as 'friends,' even when coupled with Stewart's 94% voting power, are insufficient, without more, to rebut the presumption of independence."  *Id.* at 1051.

### 2.   Plaintiff's Allegations Of Actual Bias Are Inadequate.

Rather than showing the ***potential*** for bias, a shareholder seeking to establish demand futility must allege facts that would constitute direct evidence that each individual director ***is*** biased.  *See Aronson*, 473 A.2d at 816 ("[A] plaintiff charging domination and control of one or more directors must allege particularized facts manifesting a direction of corporate conduct ....") (internal quotations omitted); *Grobow v. Perot*, 539 A.2d 180, 188 (Del. 1988), *overruled on other grounds*, 746 A.2d 244 (Del. 2000) (plaintiffs failed to "plead any facts tending to show that the … directors' positions were actually threatened by" the alleged controlling person); *In re Goldman Sachs*, 2011 WL 4826104, at *9 (Goldman's extensive donations to a director's charity did not show bias where plaintiff did not allege facts showing that the director's "decision-making was altered by the donations").  Plaintiffs' allegations fall far short.

First, the Complaints allege that Zuckerberg is able to compel the Board "to do his bidding."  (Childs Compl. ¶ 55; *accord* Levy Compl. ¶ 78(q); Cole Compl. ¶ 79.)  The only purported example of this is Plaintiff Cole's claim that Zuckerberg negotiated the acquisition of Instagram, Inc. without giving the Board advance notice.  (Cole Compl. ¶ 79.)  But Cole admits that "[t]he Board reportedly did vote on whether to approve the decision," and chose to approve it.  (*Id.*)  Cole does not allege that this acquisition was against Facebook's interests, nor that any

member of the Board harbored reservations about the deal.  *Cf. Beam*, 845 A.2d at 1056 (rejecting claim that Stewart controlled the Board because plaintiff failed to "review[] the minutes of the board's meetings to determine how the directors handled Stewart's proposals or conduct in various contexts").  And even if Plaintiffs had alleged "that the Board often approved [Mr. Zuckerberg's] proposed decisions," it would not "demonstrate that [Mr. Zuckerberg] so controlled the directors' decisionmaking as to mean they lacked independence to consider a demand."  *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust ex rel. Fed. Nat'l Mortg. Ass'n v. Raines*, 534 F.3d 779, 794 (D.C. Cir. 2008).

Second, the Complaints allege that "[e]ach Director Defendant is, directly or indirectly, the recipient of remuneration and other more important professional perks by virtue of their Facebook Board membership."  (Levy Compl. ¶ 78(u); *accord* Cole Compl. ¶ 80; Childs Compl. ¶ 55.)  But a director can only be beholden to another for benefits that are "of such subjective material importance" to the director that their "threatened loss might create a reason to question whether the director is able to consider the corporate merits of the [demand] objectively."  *Telxon Corp. v. Meyerson*, 802 A.2d 257, 264 (Del. 2002).  And "Delaware law does not assume that directors have a self-interest in preserving their positions."  *RCM Sec. Fund, Inc.*, 928 F.2d at 1330; *see also In re Sagent Tech., Inc.*, 278 F. Supp. 2d 1079, 1089 (N.D. Cal. 2003) ("[D]emand futility cannot be pled merely on the basis of allegations that directors acted or would act to preserve their positions.  If these allegations were sufficient to show lack of independence, every inside director would be disabled from considering a pre-suit demand.").  This rule has even greater force when applied to outside directors who enjoy lucrative careers independent of the company.  *See Beam*, 845 A.2d at 1052.  The Complaints do not allege that Facebook directors receive greater benefits than the directors of any other company, nor that any

individual Facebook director attaches "subjective material importance" to the benefits that he does receive. *See Khanna v. McMinn*, 2006 WL 1388744, at \*16 (Del. Ch. May 9, 2006) ("[T]he mere fact that a director receives compensation for her service as a board member adds little or nothing … unless the pleadings demonstrate, for example, that the status or compensation was somehow 'material' to the director or otherwise outside the norm."); *In re IAC/InterActiveCorp*, 478 F. Supp. 2d at 602 (holding that directors fees are only material if they are critical to a director's livelihood or constitute "a material portion of his income"). The bare allegation that Zuckerberg has the ability to replace a director, without more, is unremarkable.

Third, Plaintiff Childs argues that Director Andreessen is conflicted because his venture capital firm "had a significant private investment in Facebook before it went public" and "also made $78 million from a $250,000 seed investment in Instagram." (Compl. ¶ 52.) But Childs does not allege that Mr. Andreessen's firm sold its Facebook shares in the IPO (it did not); nor does the Complaint explain how these past investments might affect Andreessen's "decision-making process." *In re Goldman Sachs*, 2011 WL 4826104, at \*9; *see also Fink*, 2005 WL 2298224, at \*2 (applying Delaware law) (finding that allegations of various current and prior professional connections did not excuse demand where the complaint did not "explain how these connections would likely impede" the board members' independence).

Fourth, Levy and Childs insist that Directors Graham and Hastings lack independence because they are officers of major Facebook advertisers (*The Washington Post* and Netflix, respectively). (Levy Compl. ¶ 78(k); Childs Compl. ¶¶ 53-54.) But this reverses the direction of dependence Plaintiff would have to demonstrate. These Directors' positions with Facebook advertisers, if anything, **insulate** them from any alleged control by Mr. Zuckerberg. *See Khanna*, 2006 WL 1388744, at \*21 (rejecting argument that director was biased because he was the CEO

of one of the subject company's customers).  After all, one would expect Mr. Zuckerberg to value his relationship with clients who, in the last two years, allegedly purchased almost $17 million in ads on Facebook.  (Levy Compl. ¶ 78(k); Childs Compl. ¶¶ 53-54.)

Fifth, Levy claims that Director Graham is biased because his daughter works at Facebook.  (Compl. ¶ 25.)  But the fact that a director's family member works for the company, standing alone, does not show bias, especially where, as here, that relationship was disclosed. *See In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 808, 823 (Del. Ch. 2005), *aff'd*, 906 A.2d 766 (Del. 2006).  Levy does not state what position Graham's daughter holds or the length of her tenure with Facebook.  Nor does the Complaint provide any reason to believe that the position is so critical to Graham's daughter's career that Graham would risk his own reputation in order to protect it.  *See Telxon Corp.*, 802 A.2d at 264; *see also White v. Panic*, 793 A.2d 356, 366 (Del. Ch. 2000) (plaintiff did not allege particular facts indicating that $33,440 allegedly paid to director or his firm was so material as to taint the director's judgment), *aff'd* 783 A.2d 543 (Del. 2001); *In re Goldman Sachs*, 2011 WL 4826104, at *11 (allegation that Goldman invested $670 million in funds managed by a Goldman director was insufficient without a showing that the director "relies on the management of these funds for his livelihood").  In any event, Levy does not allege that Mr. Zuckerberg has ever threatened or otherwise leveraged Graham's daughter's position at Facebook.  *See Grobow*, 539 A.2d at 188 (rejecting claim of control where Plaintiffs failed to "plead any facts tending to show that the … directors' positions were actually threatened by" the allegedly controlling person).

Last, Plaintiffs claim that Director Bowles is conflicted because he sits on the Board of Morgan Stanley.  (Childs Compl. ¶ 51; Levy Compl. ¶ 78(i); Cole Compl. ¶ 83.)  But Plaintiffs do not explain how Morgan Stanley would be harmed by a lawsuit against

Facebook's officers and directors.   Moreover, just as directors are presumed able to independently consider whether to sue themselves, *see*, *e.g.*, *Aronson*, 473 A.2d at 818, so too are they presumed able to independently consider whether to take action that could cause tangential harm to a company with which they are affiliated, *see Jacobs v. Yang*, 2004 WL 1728521, at *6 (Del. Ch. Aug. 2, 2004) (while the fact that a decision relates to "companies that directors are affiliated with potentially makes the board's decision more difficult, … it does not sterilize the board's ability to decide") (internal quotation omitted), *aff'd*, 867 A.2d 902 (Del. 2005).  Thus, courts have repeatedly rejected such allegations of bias.[16]

Such relationships are irrelevant without "particularized facts" demonstrating how they "influenced [the director's] decision-making."   *In re Goldman Sachs*, 2011 WL 4826104, at *9.  Here, Plaintiffs do not offer a single fact that would suggest that Director Bowles would risk his reputation and career to protect Morgan Stanley's relationship with Facebook.  Plaintiffs do not allege that Director Bowles has a material equity interest in Morgan Stanley or that he derives a significant portion of his income from Morgan Stanley. *See In re IAC/InterActiveCorp*, 478 F. Supp. 2d at 602.  Plaintiffs do not allege that Director Bowles' responsibilities at Morgan Stanley include maintaining relations with Facebook, *see id*; *Khanna*, 2006 WL 1388744, at *17.   Nor do Plaintiffs allege that Bowles has ever made a decision in his capacity as a Facebook director that was influenced by his allegiance to

---

[16]   *See In re Goldman Sachs*, 2011 WL 4826104, at *9-12 (rejecting argument that Goldman director lacked independence because he was the Chairman and CEO of a company that received billons of dollars in financing from Goldman); *Jacobs*, 2004 WL 1728521, at *5-6 (rejecting challenge to Yahoo! directors' independence despite being shareholders and directors of smaller companies that derived substantial revenue and depended on Yahoo! for critical licensing agreements); *Zimmerman v. Braddock*, 2002 WL 31926608, at *10 (Del. Ch. Dec. 20, 2002) (rejecting challenge to Priceline director's independence despite employment with an investment banking company that generated almost $1,000,000 in fees from Priceline); *In re Delta & Pine Land Co. S'holders Litig.*, 2000 WL 875421, at *6-7 (Del. Ch. June 21, 2000) (rejecting claim that Delta directors could not independently consider whether to sue a company which allegedly owned substantial stock in Delta and influenced Delta's management).

Morgan Stanley.  *See Aronson*, 471 A.2d at 816.  Finally, Plaintiffs do not suggest that Zuckerberg or anyone else ever threatened to sever relations with Morgan Stanley, or otherwise used Facebook's relationship with Morgan Stanley to control Bowles.  *See Grobow*, 539 A.2d at 188.  Without such individualized allegations, there is no basis to assume that Bowles' position with Morgan Stanley renders him within Zuckerberg's control.

## III.   PLAINTIFFS' FAILURE TO OWN THEIR SHARES AT THE TIME OF THE ALLEGED WRONGDOING REQUIRES DISMISSAL.

Plaintiffs also lack standing—and cannot establish that there is a "lawsuit over which to exercise jurisdiction," *Potter*, 546 F.3d at 1055—because they were not Facebook shareholders at the time of the alleged wrongdoing.  Delaware law requires that, in order to assert derivative claims, a plaintiff must be a "stockholder of the corporation at the time of the transaction of which such stockholder complains."  Del. Code Ann. tit. 8, § 327; *see also* Fed. R. Civ. P. 23.1 (requiring a derivative plaintiff to allege that he "was a shareholder or member at the time of the transaction complained of"); *In re Bank of N.Y. Derivative Litig.*, 320 F.3d 291, 298 (2d Cir. 2003) "([A] plaintiff must have owned stock in the corporation *throughout* the course of the activities that constitute the *primary basis* of the complaint.") (emphasis in original); *id.* (applying Rule 23.1 in addition to state law limitations on the right to bring derivative claims under contemporaneous ownership rule).  Here, Plaintiffs do not plead that they acquired shares before the day of the IPO, May 18, 2012.  To the contrary, they admit they "purchased shares in the open market the day of Facebook's IPO."  (Levy Compl. ¶ 18; *accord* Childs ¶ 5.)[17]

---

[17]   Plaintiff Cole vaguely alleges that he "was, at times relevant hereto, an owner and holder of Facebook stock." (Compl. ¶ 12.)  This does not satisfy the *Twombly* standard, let alone the requirement that Plaintiff plead specific facts showing continuous and contemporaneous share ownership. *See Metcalf v. Zoullas*, 2012 WL 169874, at *3 (S.D.N.Y. Jan. 19, 2012) ("Because Rule 23.1 requires particularized allegations, the pleading

Plaintiffs allege that Facebook's Directors caused Facebook to violate the federal securities laws when they allowed a misleading Registration Statement to be filed.   (Levy Compl. ¶ 84; Childs Compl. ¶ 64; Cole Compl. ¶ 96.)  Levy adds that selling stock pursuant to such a statement constitutes insider trading.  (Compl. ¶¶ 106-110.)  But this conduct all allegedly occurred prior to the IPO.   The Directors signed Facebook's Registration Statement, and that statement was declared effective by the SEC, *before* Plaintiffs became stockholders.   (Levy Compl. ¶ 7; Facebook's S-1, 5/16/12, at 163-67 (Clubok Decl., Ex. E).)   Indeed, the securities plaintiffs themselves have argued that "the 1933 Act cases seek damages under the federal securities laws against the Company, the Individual Defendants and the underwriters of the IPO for *pre-IPO conduct*," not "for conduct that occurred after the pricing of the IPO."   (Resp. of Cal. State Ct. Secs. Class Action Pltfs. in Opp. to Defs.' Mot. to Transfer at 6 (Clubok Decl., Ex. F) (emphasis modified).)   Likewise, insofar as Levy alleges insider trading based on the IPO stock sales of the three selling defendants (Compl. ¶¶ 101-10), those transactions occurred when the Selling Shareholders sold stock *to the underwriting syndicate*, (*see* Facebook's S-1, 5/16/12, at 163-67 (Clubok Decl., Ex. E)), again *before* Levy allegedly purchased her shares that the syndicate sold "in the open market" on May 18, 2012, (Compl. ¶ 18).   *See generally* P. Schultheis *et al.*, *The Initial Public Offering* 30, 172-73 (2d Ed. 2012) (discussing role of underwriters in purchasing stock from selling shareholder and distributing to public in typical IPO).[18]

---

standard is higher than the standard applicable to a pleading subject to a motion to dismiss pursuant to Rule 12(b)(6)."); *In re Accuray, Inc. S'holder Derivative Litig.*, 757 F. Supp. 2d 919, 926 (N.D. Cal. 2010) ("Plaintiffs generally allege that they were shareholders of 'Accuray at the time of the continuing wrongs complained of herein.' This vague allegation does not satisfy the strict standard of Rule 23.1.").

[18]   Plaintiff Levy also alleges that Defendants' actions hurt Facebook's reputation (Compl. ¶ 12(c)), or subjected it to the costs of defending class action lawsuits (*id.* ¶ 13).  But this does not allege a "continuing wrong" that would excuse Levy from the requirement that she have held shares when the alleged wrongful conduct took

Federal and Delaware courts have held repeatedly that even plaintiffs who acquire shares during an IPO are not permitted to bring derivative actions based on allegedly wrongful conduct that took place before they acquired their shares.  For example, in *Griggs v. Jornayvaz*, the court held that plaintiffs had no derivative standing to allege that a disclosure in the company's form S-1 was rendered misleading by a transaction on the eve of the IPO because they did not acquire their shares until the IPO, after the S-1 was already declared effective.  2010 WL 4932674, at *3-4 (D. Colo. Nov. 29, 2010) ("[Nominal defendant's] stock was not publicly traded until April 22, 2008 .…  As a result, according to the contemporaneous ownership rule, plaintiffs cannot base any of their claims on transactions that took place prior to April 22, 2008."); *see also Lefort v. Black*, 2003 WL 1563997, at *1 (N.D. Cal. Mar. 21, 2003) (plaintiff who purchased shares shortly after IPO lacked standing under Rule 23.1 to allege derivative claims against directors for deliberately underpricing shares in the IPO).

Prospective stockholders are treated quite differently from actual stockholders.  Because "prospective stockholders are not owed fiduciary duties[,] … prospective stockholders would not be considered 'stockholders' for standing purposes."  *Montgomery v. Aetna Plywood, Inc.*, 231 F.3d 399, 407 (7th Cir. 2000) (applying Delaware law).  It follows that where a plaintiff is only a prospective stockholder at the time of disclosures made in advance of an IPO, she cannot assert claims derivatively on behalf of the corporation for alleged misrepresentations in those disclosures.  For example, in *7547 Partners v. Beck*, the plaintiff claimed derivatively that the

---

place.  The Second Circuit has rejected the "expansive definition of the term 'transaction' that is inherent in the continuing wrong doctrine"; instead, the Second Circuit requires a plaintiff to "have owned stock in the corporation *throughout* the course of the activities that constitute *the primary basis* of the complaint" in order to satisfy the contemporaneous ownership rule.  *In re Bank of New York Derivative Litig.*, 320 F.3d at 298.  The alleged harm to Facebook's reputation and litigation costs are supposed ***effects*** of Facebook's alleged pre-May 18 misstatements.  They are certainly not the "***activities*** that constitute ***the primary basis*** of the complaint."  *Id.* (first emphasis added).

board had mispriced the IPO to allow insiders to acquire shares in a simultaneous private placement at an inordinate profit. 682 A.2d 160, 162-63 (Del. 1996). The court determined that "[the plaintiff] [wa]s challenging the terms of the [Private Placement] rather than the technicality of its consummation…Thus, [plaintiff] must establish that it was a stockholder of [nominal defendant] at the time the terms of the Private Placement were established." *Id.* at 163 (internal quotations omitted). The terms of the IPO and private placement, however, were set long before the plaintiff acquired its shares. Accordingly, the Delaware Supreme Court ruled that the plaintiff lacked standing to assert derivative claims. *See id.*

*7547 Partners* controls here. The challenged disclosures were made long before the IPO and appeared in a prospectus declared effective by the SEC the day before Plaintiff acquired her shares. (Levy Compl. ¶¶ 7, 18; Facebook's S-1, 5/16/12, at 163-67 (Clubok Decl., Ex. E).) The prospectus also declared that the Board had approved of the sales to be made by the selling defendants in the IPO. (Facebook's S-1, 5/16/12, at 141-48 (Clubok Decl., Ex. E).) And the selling defendants sold their shares to the underwriting syndicate before they became available on the open market. (Facebook's S-1, 5/16/12, at 163-67 (Clubok Decl., Ex. E).) Plaintiffs did not own shares when these events took place, so Plaintiffs lack standing to bring a derivative complaint. *See 7547 Partners*, 682 A.2d at 162-63; *see also Omnicare, Inc. v. NCS Healthcare, Inc.*, 809 A.2d 1163, 1169 n.11 (Del. Ch. 2002) ("A stockholder-plaintiff is barred from bringing claims when she purchases stock after the board of directors has approved a transaction and the transaction has been publicly disclosed."); *In re Beatrice Cos., Litig.*, 522 A.2d 865 (table), 1987 WL 36708, at *3 (Del. Feb. 20, 1987) (holding in the merger context that, "plaintiff must have been a stockholder at the time the terms of the merger were agreed upon because it is the terms of the merger, rather than the technicality of its consummation, which are challenged.").

## IV.    SLUSA REQUIRES DISMISSAL.

These suits should also be dismissed because SLUSA precludes them from being litigated.[19] SLUSA states that "[n]o covered class action"—a term the statute defines broadly, as discussed below—"may be maintained in any State or Federal court by any private party" if that action purports to arise under state law and involve a misrepresentation or omission of material fact in connection with the purchase or sale of a covered security.  15 U.S.C. § 77p(b).  This provision was enacted to prevent plaintiffs from circumventing federal limitations on securities class actions by pursuing similar but procedurally different actions in state court—precisely what plaintiffs have done here.  *See, e.g.*, *In re NYSE Specialists Sec. Litig.*, 405 F. Supp. 2d 281, 306-07 (S.D.N.Y. 2005) (Sweet, J.), *rev'd on other grounds*, 503 F.3d 89 (2d Cir. 2007); *Felton v. Morgan Stanley Dean Witter & Co.*, 429 F. Supp. 2d 684, 690–91 (S.D.N.Y. 2006).  There can be no dispute that each of the claims in the Derivative Actions is a putative state-law claim that involves an alleged misrepresentation or omission made in connection with the purchase or sale of a covered security.  (*E.g.*, Childs Compl. ¶¶ 2, 23, 35, 38, 39, 61.)  As discussed below, the Derivative Actions also qualify as "covered class action[s]" and accordingly must be dismissed.

### A.    The Derivative Actions Are "Covered Class Action[s]" Under SLUSA.

SLUSA defines the term "covered class action" broadly to include individual actions or groups of actions that seek damages on behalf of more than 50 people:

(i) any single lawsuit in which—

(I) damages are sought on behalf of more than 50 persons or prospective class members, and questions of law or fact common to those persons or members of the prospective class …

---

[19]   This issue — whether the Derivative Actions are "covered class action[s]" under SLUSA — overlaps with the same argument made in the context of the remand briefing.  As Judge Chesney recognized, an action removable under SLUSA is automatically precluded and must be dismissed.  (*See* Lapin Order at 5 n.6.)

> predominate over any questions affecting only individual persons or members; or
>
> (II) one or more named parties seek to recover damages on a representative basis on behalf of themselves and other unnamed parties similarly situated, and questions of law or fact common to those persons or members of the prospective class predominate over any questions affecting only individual persons or members; *or*
>
> (ii) any group of lawsuits filed in or pending in the same court and involving common questions of law or fact, in which—
>
> > (I) damages are sought on behalf of more than 50 persons; and
> >
> > (II) the lawsuits are joined, consolidated, or otherwise proceed as a single action for any purpose.

15 U.S.C. § 77p(f)(2)(A) (emphasis added).  This provision, moreover, was intended to be "interpreted **broadly** to reach mass actions **and all other procedural devices** that might be used to circumvent the class action definition." S. Rep. No. 105-182, at 8 (1998) (emphasis added); *see also In re Refco Inc. Sec. Litig.*, 859 F. Supp. 2d 644, 649 (S.D.N.Y. 2012).

The Derivative Actions meet both definitions of "covered class action." Each is part of a "group of lawsuits … pending in the same court" under Section 77p(f)(2)(A)(ii) in light of the recent transfer decision ordering coordinated or consolidated pretrial proceedings. *See* Transfer Order at 2-3. As courts in this Circuit have held, "SLUSA is triggered where a group of actions are formally consolidated for *any* purpose," including through coordinated pre-trial proceedings pursuant to the MDL process. *In re Fannie Mae 2008 Sec. Litig.*, 2012 WL 3758537, at *12 & n.15 (S.D.N.Y. Aug. 30, 2012) (emphasis in original); *see also In re Refco Inc. Sec. Litig.*, 859 F. Supp. 2d at 648; *Amorosa v. Ernst & Young LLP*, 672 F. Supp. 2d 493, 517 (S.D.N.Y. 2009), *aff'd*, 409 F. App'x 412 (2d Cir. 2011).

Even considered individually, each Derivative Action also qualifies as a "covered class action" because each is a "single lawsuit" that seeks damages on a representative basis. The

36

*Childs* Complaint, for example, was filed "[d]erivatively on behalf of himself and all others similarly situated" (Childs Compl. at 1), and an affidavit attached to that Complaint verifies that Childs is "serving as a ***representative party*** in this ***class action***" and seeking damages "as a member of the ***class***." (*Id.* at 25 ¶ 4 (emphasis added).)

### B. These Cases Are Not "Exclusively Derivative" Under SLUSA.

Although the term "covered class action" has an exception for an "exclusively derivative action," 15 U.S.C. § 77p(f)(2)(B), that exception does not apply here. As an initial matter, the actions here cannot be considered "exclusively derivative" because they are proceeding as a single action together with traditional securities class actions pursuant to the Transfer Order. Because a "covered class action" is defined as ***either*** a "single lawsuit" ***or*** a "group of lawsuits," a derivative lawsuit may qualify as a "covered class action" once it is part of a "group of lawsuits" that includes non-derivative actions, even if it would not have qualified standing alone. *Cf. In re Fannie Mae 2008 Sec. Litig.*, 2012 WL 3758537, at *12 (claims brought by individual defendants qualified as "covered class action[s]" once the individual actions were consolidated or coordinated for pre-trial proceedings as part of an MDL). The "group of lawsuits" pending before this Court plainly does not include ***only*** derivative claims.

Even considering each Derivative Action as a "single lawsuit," the Complaints here are not "exclusively derivative." Plaintiffs' "selective disclosure" theory asserts direct rather than derivative claims. The classic test for a derivative as opposed to direct action is whether the alleged injury affects all shareholders equally. *See*, *e.g.*, *In re Paxson Commc'n Corp. S'holders Litig.*, 2001 WL 812028, at *4 (Del. Ch. July 12, 2001) (unpub). The claims here, however, allege that some shareholders had more information than others, and that institutional investors benefited from this disparity at the expense of individual investors. (*See, e.g.*, Childs Compl. ¶

38.)  This does not affect all shareholders equally and is not a derivative claim.  *See Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *12 (Del. Ch. Aug. 26, 2005) ("Generally, non-disclosure claims are direct claims."); *Brinckeroff v. Jac Holding Corp.*, 782 N.Y.S.2d 58, 60 (1st Dep't 2004) ("Under Delaware law . . . [t]he claim that a transaction was handled in a discriminatory fashion . . . sets forth a form of harm suffered individually rather than by the corporation."); *see also Gentile v. Rossette*, 906 A.2d 91, 103 (Del. 2006).

Notably, it makes sense as a matter of policy to include actions such as the Derivative Actions within the meaning of a "covered class action."  The JPML Panel centralized the Derivative Actions together with the securities class actions because they all "allege that the Facebook and underwriter defendants violated federal securities laws by providing material non-public information to certain preferred investors."  Transfer Order at 2.  These actions all turn on the same common questions of fact and present the same critical question of law, namely, whether the comprehensive scheme of federal regulations relating to IPOs prohibits the selective disclosure of financial projections.  It would make no sense for the Derivative Actions to escape preclusion when these actions are at their core precisely the same as the federal securities class actions pending before this Court.  Congress plainly intended that this type of action be litigated under the federal securities laws, not state law—which is why courts must consider "the realities underlying … claims" and not just their labels for purposes of SLUSA preclusion.  *Romano v. Kazacos*, 609 F.3d 512, 523 (2d Cir. 2010).

## V.   THE COMPLAINTS SHOULD BE DISMISSED AS UNRIPE.

The Derivative Actions also raise claims that are unripe,[20] because the Derivative Actions are predicated on allegations that Directors "caused Facebook to conduct the IPO in a fashion that violates the federal securities laws" (Levy Compl. ¶ 84; *see also* Childs Compl. ¶ 64; Cole Compl. ¶ 96), thereby "subject[ing] the Company to liability for violations of applicable laws and regulations" (Childs Compl. ¶ 64; *see also* Levy Compl. ¶ 95; Cole Compl. ¶ 99.)  Liability and any damages for those alleged violations, however, are directly at issue in the dozens of securities class action lawsuits that were filed shortly after the IPO, and that are currently pending before this Court.  (Transfer Order at 2-3.)  "Where, as here, the claim of damages is contingent on the outcome of a separate, pending lawsuit, the [derivative] claim is not ripe and the complaint must be dismissed."  *In re United Telecomms., Inc., Secs. Litig.*, 1993 WL 100202, at *3 (D. Kan. Mar. 4, 1993) (dismissing derivative claims seeking "damages that are speculative and contingent upon the outcome of the class action").

---

[20]   Because this ground for dismissal is premised on the district court's lack of subject matter jurisdiction over the case, *see Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 807-08 (2003), there should be no dispute that this Court has discretion to consider the ripeness of all Derivative Actions before motions to remand the four removed actions, *see Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999).

## CONCLUSION

For the foregoing reasons, the Derivative Actions should be dismissed.

DATED:  November 14, 2012

/s/ Andrew B. Clubok
_____

Andrew B. Clubok (andrew.clubok@kirkland.com)
Brant W. Bishop, P.C.
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

Susan E. Engel
KIRKLAND & ELLIS LLP
655 Fifteenth St. NW
Washington, DC 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

Richard D. Bernstein
Elizabeth J. Bower
WILLKIE FARR & GALLAGHER LLP
1875 K Street, NW
Washington, DC 20006
Telephone: (202) 303-1000
Facsimile: (202) 303-2000

Tariq Mundiya
Todd G. Cosenza
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8000
Facsimile: (212) 728-8111

*Attorneys for Nominal Defendant Facebook, Inc.*