USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2-13-13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------x

IN RE FACEBOOK, INC., IPO SECURITIES AND
DERIVATIVE LITIGATION,

OPINION & ORDER
MDL No. 12-2389

Case Relates to:
    12 Civ. 4156
    12 Civ. 7549
    12 Civ. 7553
    12 Civ. 7815

------------------------------------------X

A P P E A R A N C E S:

Attorneys for the Plaintiff Edward Childs
GLANCY BINKOW & GOLDBERG LLP
77 Water Street, 7th Floor
New York, NY 10005
By:  Gregory Linkh, Esq.
     Michael M. Goldberg, Esq.

MURRAY FRANK LLP
275 Madison Avenue, Suite 801
New York, NY 10016
By:  Brian Philip Murray, Esq.

BARRACK, RODOS & BACINE
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
By:  Mark Robert Rosen, Esq.
     Stephen R. Basser, Esq.

Attorneys for the Plaintiff Lidia Levy
SCOTT & SCOTT
405 Lexington Avenue, 40th Floor
New York, NY 10174
By:  Joseph P. Guglielmo, Esq.
     Deborah Clark-Weintraub, Esq.

LAW OFFICES OF SCOTT D. EGLESTON
12000 Biscayne Boulevard, Suite 220
North Miami Beach, FL 33181
By:  Scott D. Egleston, Esq.


Attorneys for Plaintiffs William Cole and
Hal Hubuschman
ROBBINS ARROYO, LLP
600 B Street, Suite 1900
San Diego, CA 92101
By:  Shane Sanders, Esq.
     Brian J. Robbins, Esq.
     Felipe J. Arroyo, Esq.
     Gina Stassi, Esq.


Attorneys for the Facebook Defendants
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
By:  Andrew B. Clubok, Esq.
     Brant Warren Bishop, Esq.
     Elizabeth L. Deeley, Esq.
     James Francis Basile, Esq.
     Susan Elisabeth Engel, Esq.

WILLKIE FARR & GALLAGHER LLP
1875 K Street, N.W.
Washington, DC 20006
By:  Richard D. Bernstein, Esq.
     Tariq Mundiya, Esq.
     Todd G. Cosenza, Esq.
     Elizabeth J. Bower, Esq.

**Sweet, D.J.**

Plaintiffs William Cole ("Cole"), Hal Hubuschman ("Hubuschman") and Linda Levy ("Levy") (collectively, the "Plaintiffs") have moved to remand their shareholder derivative actions (the "Removed Actions")[1] to the Superior Court of the State of California, County of San Mateo (the "California State Court"), pursuant to 28 U.S.C. § 1447(c). Plaintiffs originally filed their respective complaints in the California State Court on behalf of shareholders, charging certain officers and directors of Facebook, Inc. ("Facebook" or the "Company") (collectively, the "Facebook Defendants")[2] with breach of their fiduciary duties, waste of corporate assets and unjust enrichment. Facebook Defendants removed the Removed Actions to the Southern District of New York and Plaintiffs now move to remand the case back to California State Court.

Facebook Defendants contend that certain threshold

---

[1] The Derivative Actions include: Cole v. Zuckerberg, et al., No. 12-cv-7549 (removed 6/28/12); Hubuschman v. Zuckerberg, et al., No. 12-cv-7553 (removed 6/28/12); and Levy v. Zuckerberg, et al., No. 12-cv-7815 (removed 7/12/12), which were removed from the Northern District of California; and Childs v. Zuckerberg, et al., No. 12-cv-4156 (filed 5/24/12), which was filed in this District.

[2] The Facebook Defendants include Facebook, Inc.; Mark Zuckerberg ("Zuckerberg"); Sheryl K. Sandberg ("Sandberg"); David A. Ebersman ("Ebersman"); David M. Spillane ("Spillane"); Marc L. Andreessen ("Andreessen"); Erskine B. Bowles ("Bowles"); James B. Breyer ("Breyer"); Donald E. Graham ("Graham"); Reed Hastings("Hastings"); and Peter A. Thiel ("Thiel").

grounds for dismissal should be considered before Plaintiffs'
motions to remand.  Facebook Defendants have accordingly moved
to dismiss Plaintiffs' Removed Actions as well as Plaintiff
Edward Childs' ("Childs," together with the Plaintiffs, the
"Derivative Plaintiffs") derivative action[3] (together with the
Removed Actions, the "Derivative Actions") on the independent
grounds of venue, standing and ripeness, pursuant to Rules
12(b)(1), 12(b)(3) and 12(b)(6) of the Federal Rules of Civil
Procedure, and the standing and demand requirements of Rule 23.1
of the Federal Rules of Civil Procedure.

        Upon the facts and conclusions set forth below,
Facebook Defendants' threshold grounds for dismissal will be
resolved first, and their motion to dismiss is granted on the
basis of standing and ripeness, but denied as to venue.  Having
granted Facebook Defendants' motion to dismiss, the Plaintiffs'
motions to remand are denied as moot.

## I. **Prior Proceedings and Facts**

        The facts and prior proceedings underlying this action
are set out in this Court's May 9, 2012 Opinion, In re Facebook

---

[3] Plaintiff Childs filed his action in the Southern District of New York on
May 24, 2012, basing jurisdiction on diversity pursuant to 28 U.S.C. § 1332
(a)(2).

IPO Secs. & Derivative Litig., 12 MDL No. 2389, --- F.R.D. ---,
2012 WL 6061862 (S.D.N.Y. Dec. 6, 2012), familiarity with which
is assumed.  Accordingly, only facts relevant to this action
will be provided below.

The Derivative Actions arise out of events in
connection with the May 18, 2012 initial public offering ("IPO")
of Facebook.

On February 1, 2012, in preparation for its IPO,
Facebook filed a Form S-1 Registration Statement with the U.S.
Securities Exchange Commission (the "SEC").  Facebook
subsequently amended the registration statement several times,
including on February 1, and April 23, 2012, before filing their
final Form S-1/A on May 16, 2012 (the "Registration Statement").[4]
The Registration Statement expressed caution about revenue
growth due to a rapid shift by users to mobile devices, stating
that,

> Based upon our experience in the second quarter of
> 2012, to date, the trend we saw in the first quarter
> of [daily active users] increasing more rapidly than
> the increase in number of ads delivered has continued.
> We believe this trend is driven in part by increased
> usage of Facebook on mobile devices where we have only

---

[4] All of Facebook's Form S-1 Disclosures, including amendments, and the SEC's
declaration of effectiveness are searchable on the SEC's EDGAR search
platform at http://www.sec.gov/edgar/searchedgar/webusers.htm.

> recently begun showing an immaterial number of
> sponsored stories in News Feed, and in part due to
> certain pages having fewer ads per pages as a result
> of product decisions.

(Clubok Decl. 11/14/12, Ex. E at 57; see also Childs Compl.
¶ 28, Levy Compl. ¶ 47).


On May 15, 2012, General Motors announced that it was
pulling its advertising business from Facebook, stating that
Facebook ads were less effective than other forms of
advertising.  (Childs Compl. ¶ 29).  According to the Derivative
Plaintiffs' complaints, despite such negative news, Facebook's
final Registration Statement stated that the Company, "in
consultation with the underwriters," had increased the IPO price
range from between $28 and $35 to between $34 and $38 per share.
(Cole Compl. ¶ 47).


In early May 2012, Facebook and its underwriters,
including three lead underwriters, Morgan Stanley & Co. LLC
("Morgan Stanley"), J.P. Morgan Securities, LLC ("JP Morgan"),
and Goldman, Sachs & Co. ("Goldman Sachs") (collectively, the
"Lead Underwriters"), participated in an IPO roadshow to provide
potential investors with information about Facebook.  On May 18,
2012, the Company filed a Form 424(b)(4) Prospectus (the
"Prospectus") with respect to the IPO (together with the

Registration Statement, the "Offering Documents"). The

Prospectus warned investors that,

> Growth in use of Facebook through our mobile products,
> where our ability to monetize is unproven, as a
> substitute for use on personal computers may
> negatively affect our revenue and financial results. .
> . .
>
> We generate a substantial majority of our revenue from
> advertising. The loss of advertisers, or reduction in
> spending by advertisers with Facebook, could seriously
> harm our business.

(Clubok Decl. 12/5/12, Ex. 3; see also Levy Compl. ¶¶ 48, 49).


On May 18, 2012, the Company offered 421 million

shares of Facebook common stock to the public at $38.00 per

share on the NASDAQ stock exchange, thereby valuing the total

size of the IPO at more than $16 billion.


On May 19, 2012, the day after the IPO, Reuters

reported that Facebook "altered its guidance for research

earnings last week, during the road show, a rare and disruptive

move."[5]


On May 21, 2012, The New York Times reported that

---

[5] Nadia Damouni, Morgan Stanley Was A Control-Freak On Facebook IPO -- And It
May Have Royally Screwed Itself, BUSINESS INSIDER, May 19, 2012,
http://www.businessinsider.com/morgan-stanley-facebook-ipo-2012-5.

"[r]ivals involved in the Facebook underwriting process say that
Morgan Stanley exerted an enormous amount of control over
important aspects of the process" and "ignored some input about
pricing."[6]  However, the article also stated that "others
involved in the underwriting say that Morgan Stanley and other
advisers held thousands of conversations with potential
investors on what was a fair level, and that the $38 price was
justified."[7]

Then, on May 22, 2012, prior to the start of trading,
Reuters revealed that the Lead Underwriters had cut their
earnings forecasts for the Company prior to the IPO, but that it
was "unclear whether Morgan Stanley only told its top clients
about the revised view or spread the word more broadly."[8]  That
day, Facebook stock closed at $31.00 per share, which was 18.42%
below the IPO price.

On May 22, 2012, Facebook's Restated Certification of
Incorporation (the "Certificate") was filed with the Delaware

---

[6] Michael J. De La Merced, Evelyn M. Rusli and Susanne Craig, As Facebook's
Stock Struggles, Fingers Start Pointing, THE NEW YORK TIMES,
http://dealbook.nytimes.com/2012/05/21/as-facebooks-stock-struggles-fingers-
start-pointing/.

[7] Id.

[8] Alistair Barr, Insight:  Morgan Stanley Cut Facebook Estimates Just Before
IPO, REUTERS, http://www.reuters.com/article/2012/05/22/us-facebook-forecasts-
idUSBRE84L06920120522.

Secretary of State.  The original certificate of incorporation

(the "Original Certificate") had been filed in Delaware under

the corporate name TheFacebook, Inc. on July 29, 2004.  The

Certificate contained some amendments to the Original

Certificate, including Article IX, which contained a "Choice of

Forum" provision, stating:

> Unless the corporation consents in writing to the
> selection of an alternative forum, the Court of
> Chancery of the State of Delaware shall, to the
> fullest extent permitted by law, be the sole and
> exclusive forum for (1) any derivative action or
> proceeding brought on behalf of the corporation, (2)
> any action asserting a claim of breach of a fiduciary
> duty owed by, or other wrongdoing by, any director,
> officer, employee or agent of the corporation to the
> corporation or the corporation's stockholders, (3) any
> action asserting a claim arising pursuant to any
> provision of the General Corporation Law or the
> corporation's Restated Certificate of Incorporation or
> Bylaws, (4) any action to interpret, apply, enforce or
> determine the validity of the corporation's Restated
> Certificate of Incorporation or Bylaws or (5) any
> action asserting a claim governed by the internal
> affairs doctrine, in each such case subject to said
> Court of Chancery having personal jurisdiction over
> the indispensible parties named as defendants therein.
> Any person or entity purchasing or otherwise acquiring
> any interest in shares of capital stock of the
> corporation shall be deemed to have notice of and
> consented to the provisions of this ARTICLE IX.

(Clubok Decl. 11/14/12, Ex. B at Art. IX).


Three out of four of the Derivative Actions were

originally filed in the California State Court.[9]  According to

the Derivative Plaintiffs' complaints, Facebook's executives

selectively disclosed to the Lead Underwriters that certain

negative trends were causing the Company's revenues to fall

short of earlier estimates for the second quarter of 2012 during

the roadshow.  The Lead Underwriters allegedly, in turn, reduced

their own earnings forecasts for the Company, and conveyed this

information to a select group of potential investors, but not to

the public at large.


        The Derivative Plaintiffs maintain that the Facebook

Defendants failed to disclose that the Company was, at the time

of the IPO, experiencing a reduction in revenue growth due to an

increase of users of its Facebook application and website

through mobile devices rather than a traditional personal

computer.  (Cole Compl. ¶ 45, Levy Compl. ¶ 49).  They allege

that the Facebook Defendants, despite knowledge of material,

non-public facts concerning Facebook's reduction in advertising

and declining internal revenue projections, took no action to

stop the IPO from taking place.  Other allegations involve the

---

[9] Plaintiff Hubuschman originally filed his Shareholder Derivative Complaint
for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust
Enrichment in the California State Court on May 30, 2012.  Plaintiff Cole
originally filed his Shareholder Derivative Complaint for Breach of Fiduciary
Duty, Waste of Corporate Assets, and Unjust Enrichment in the California
State Court on May 31, 2012.  Plaintiff Levy originally filed her Shareholder
Derivative Complaint in the California State Court on June 13, 2012.

Offering Documents which allegedly contained improper statements and projections in violation of applicable federal securities and state laws.  In addition, according to the Plaintiffs' complaints, individually-named Facebook Defendants Zuckerberg, Breyer and Thiel (the "Selling Defendants") sold more than $3.9 billion worth of their personally held Facebook stock during the IPO, with knowledge of the non-public facts concerning the Company's declining advertising revenues and reduced earnings forecasts.

On June 28, 2012, Facebook Defendants removed the Removed Actions to the Northern District of California (the "California Federal Court"), asserting that the federal court had original jurisdiction pursuant to 28 U.S.C. § 1331 and as a "covered class action" under the Securities Litigation Uniform Standards Act ("SLUSA").

The following day, Facebook Defendants and the Lead Underwriters filed a Second Amended Motion to Transfer and a Schedule of Actions, which added the Derivative Actions to the cases they sought to be transferred to the Southern District of New York by the United States Judicial Panel on Multidistrict Litigation (the "MDL Panel").  The Facebook Defendants also filed motions to stay the three Removed Actions in California

11

pending the ruling by the MDL Panel on the transfer motion.

Plaintiffs timely filed motions to remand the Removed Actions to California State Court on August 1, 2012.  On August 3, 2012, Facebook Defendants filed a motion to dismiss the Removed Actions.  On August 10, 2012, Plaintiffs filed an administrative motion to extend the briefing schedule and hearing on Facebook Defendants' motion to dismiss until after the stay and the remand motions were decided.  The California Federal Court issued an order granting Plaintiffs' motion on August 15, 2012.

The parties briefed the stay and remand motions simultaneously.  On September 11, 2012, the California Federal Court issued an order granting the stay but declined to hear the remand motions due to the MDL's pending decision on transferring the actions.  The MDL Panel granted the motion to transfer to this Court on October 4, 2012, holding that "the securities and derivative actions allege that the Facebook and underwriter defendants violated federal securities laws by providing material nonpublic information to certain preferred investors, causing Facebook's stock price to decline . . . [and] [c]ertainly these actions share questions of fact."  In re Facebook, 2012 WL 4748325, at *2.

12

On November 7, 2012, this Court ordered a hearing to resolve the outstanding issues pertaining to the Derivative Actions.  (Dkt. No. 15).  On November 14, 2012, Plaintiffs filed the instant remand motions and Facebook Defendants filed the instant motion to dismiss.  Plaintiffs seek to have the Removed Actions remanded to California State Court.  Facebook Defendants seek dismissal of all four Derivative Actions on the independent threshold grounds of venue, standing and ripeness.  All motions were marked fully submitted on December 12, 2012.

## I. **Subject Matter Jurisdiction and The Threshold Grounds for Dismissal**

A "federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit (subject-matter jurisdiction) and the parties (personal jurisdiction)." Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp., 549 U.S. 422, 430-31, 127 S. Ct. 1184, 167 L. Ed. 2d 15 (2007).  "[T]he first and fundamental question is that of jurisdiction . . . This question the court is bound to ask and answer for itself, even when not otherwise suggested, and without respect to the relation of the parties to it." Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 94, 118 S. Ct. 1003, 140 L. Ed. 2d 210 (1998).

The Second Circuit has reiterated that
"[j]urisdictional questions . . . should be addressed in the
first instance by the District Court."  Central States Se. & Sw.
Areas Health & Welfare Fund v. Merck-Medco Manages Care, L.L.C.,
433 F.3d 181, 203 (2d Cir. 2005).  "This is equally true in the
context of removal."  Banco De Santander Central Hispano, S.A.
v. Consalvi Int'l Inc., 425 F. Supp. 2d 421, 424 (S.D.N.Y.
2006); Bakoss v. Certain Underwriters at Lloyds of London
Issuing Certificate No. 0510135, No. 10-CV-1455(DLI)(LB), 2011
WL 4529668, at *4 (E.D.N.Y. Sept. 27, 2011) ("This obligation
extends to removal cases.").

     While Article III courts generally adhere to the
principle "that a federal court may not hypothesize subject-
matter jurisdiction for the purposes of deciding the merits,"
the Supreme Court in Ruhrgas AG v. Marathon Oil Co. declined to
prescribe a strict mandatory "sequencing of jurisdictional
issues."  526 U.S. 574, 577, 119 S. Ct. 1563, 143 L. Ed. 2d 760
(1999).  The Supreme Court noted that "[i]t is hardly novel for
a federal court to choose among threshold grounds for denying
audience to a case on the merits."  Id. at 585.  Thus, there is
"no underlying jurisdictional hierarchy," and a federal court
may adjudicate personal jurisdiction before considering a

14

challenge to subject matter jurisdiction.  Id. at 578.

Plaintiffs assert that their remand motions must be resolved first because this Court lacks subject matter jurisdiction under 28 U.S.C. § 1331 to decide the Facebook Defendants' motion to dismiss.  Plaintiffs contend that "[g]iven the ease with which the jurisdictional question can be adjudicated by this Court," "the Court, need not, and should not, engage in . . . [the] rigorous, complaint and plaintiff-specific analyses of the merits of each derivative action" necessary to resolve the other allegedly threshold issues.  (Hubuschman/ Cole Memo. – Motion to Remand at 10-11).  To support their argument, Plaintiffs Hubuschman and Cole cite to Studebaker-Worthington Leasing Corp. v. Michael Rachlin & Co., LLC, in which the court addressed a plaintiff's remand motion before it considered the defendant's motion to transfer venue, because it "must first decide the threshold question whether it ha[d] subject matter jurisdiction over th[e] case."  357 F. Supp. 2d 529, 533 (E.D.N.Y. 2004).  Plaintiffs urge that their remand motions should similarly be addressed first.

Facebook Defendants, on the other hand, contend that this Court should "address the threshold grounds for dismissal that Facebook raised its Dismissal Motion before it addresses

15

Plaintiffs' Remand Motions, because the dismissal issues are logically antecedent to subject matter jurisdiction and because it is most efficient and convenient to do so." (Def. Opp. – Motion to Remand at 5). The threshold grounds for dismissal advanced by the Facebook Defendants include: (1) improper venue in violation of an exclusive Delaware forum selection provision; (2) lack of standing both for failure to make a demand on Facebook's board of directors (the "Board") and because Plaintiffs cannot allege or demonstrate that they owned Facebook shares at the time of the alleged wrongdoing; and (3) lack of ripeness because Plaintiffs' claims are expressly predicated on speculative, future harm, i.e., that Facebook will lose the civil Securities Act cases filed against it. According to the Facebook Defendants, "[a]ll of these issues can and should be heard before Plaintiffs' Remand Motions." (Id.).

As an initial matter, Studebaker and the other cases on which Plaintiffs rely for the proposition that remand must be decided first, pre-date Sinochem. (See Hubuschman/ Cole Memo. – Motion to Remand at 6-11). In Sinochem, the Supreme Court noted that "[b]oth Steel Co. and Ruhrgas recognized that a federal court has leeway to choose among threshold grounds for denying audience to a case on the merits." Sinochem, 549 U.S. at 431. Such threshold non-merits grounds for dismissing a claim,

16

include determinations as to whether abstention is proper,

Spargo v. New York State Com'n on Judicial Conduct, 351 F.3d 65,

74 (2d Cir. 2003), whether a foreign tribunal is a more suitable

arbiter under the forum non conveniens doctrine, Sinochem, 549

U.S. at 434-35, or the resolution of "justiciability issues

before deciding whether jurisdiction is proper." [10]   Freund v.

Rep. of France, 592 F. Supp. 2d 540, 551 (S.D.N.Y. 2008).


        In Can v. United States, for example, the Second

Circuit noted that "justiciability is also a 'threshold

question,'" which a court may consider before subject matter

jurisdiction.  14 F.3d 160, 162 n.1 (2d Cir. 1994).  The Court

stated that "where, as appears to be true here, justiciability

may be a less knotty question than jurisdiction, we think it not

inappropriate to begin by examining that question."  Id. (citing

to Bi v. Union Carbide Chemicals and Plastics Co., 984 F.2d 582

(2d Cir. 1993)) (rejecting an appeal on consideration of

standing, in advance of consideration of subject matter

jurisdiction); see also Pettus v. Morgenthau, 554 F.3d 293, 298

(2d Cir. 2009) (finding that "standing . . . is intended to be a

threshold issue at least tentatively decided at the outset of

---

[10] "Justiciability . . . is an umbrella-like term which finds beneath its
cover the various doctrines that shape and define our authority to act in
particular cases:  ripeness, standing, mootness, advisory opinion, and
political question."  Jones v. Deutsch, 715 F. Supp. 1237, 1242 (S.D.N.Y.
1989).

the litigation.").

In addition to justiciability, courts have found improper venue to be a non-merits-based determination. See Crotona 1967 Corp. v. Vidu Bro. Corp., No. 09-Civ-10627(NRB), 2010 WL 5299866, at *1 n.1 (S.D.N.Y. Dec. 21, 2010) (finding that "[i]mproper venue is not the type of merits-based dismissal which the Supreme Court has cautioned cannot take place before a court has assured itself of subject matter jurisdiction."); see also Shay v. Sight & Sound Sys., Inc., 668 F. Supp. 2d 80, 82 (D.D.C. 2009) (stating that "a court may decide questions of venue before addressing issues of personal or subject matter jurisdiction."); Fed. R. Civ. P. 41(b) (listing improper venue among non-merits-based dismissals).

Accordingly, precedent indicates that, in appropriate circumstances, a federal court has the discretion and leeway to dismiss a case based on certain threshold issues prior to addressing subject matter jurisdiction. See Sinochem, 549 U.S. at 431; Ruhrgas, 526 U.S. at 584-85; Can, 14 F.3d at 162 n.1. In particular, the issues of venue, derivative standing and ripeness are "the sort of 'threshold question[s]'" that "may be resolved before addressing jurisdiction." Tenet v. Doe, 544 U.S. 1, 6 n.4, 125 S. Ct. 1230, 161 L. Ed. 2d 82 (2005) (citing

18

cases).  The fact that these threshold issues "may [ ] involve a brush with factual and legal issues of the underlying dispute" does not transform them into merits issues.  Sinochem, 549 U.S. at 433.

In addition, procedural convenience, efficiency and judicial economy warrant consideration of the threshold dismissal issues first.  As the Honorable Maxine M. Chesney of the Northern District of California ruled, the three Removed Actions and Childs "give rise to a number of common issues" including "whether the cases are improperly venued in any court other than a state court in Delaware, whether the cases are ripe to the extent they are based on a theory that Facebook, Inc. has suffered any injury by reason of defendants' alleged violation of federal securities laws, and whether plaintiffs lack standing to seek relief on behalf of Facebook, Inc." Hubuschman v. Zuckerberg, No. C-12-3366(MMC), 2012 WL 3985509, at *2 (N.D. Cal. Sept. 11, 2012).

Courts involved in multidistrict litigation have been cognizant of the numerous potential problems that may arise when such common issues are addressed.  See e.g., See In re Integrated Resources, Inc., MDL No. 897, 1995 WL 234975, at *4 (S.D.N.Y. Apr. 21, 1995) ("It is a fundamental assumption of the

19

multidistrict system that having only one court sort out the facts of complex and multi-faced transactions and occurrences which have given rise to many competing legal claims well serves the goal of judicial economy."); In re Allion Healthcare Inc. Shareholders Litig., No. 5022-CC, 2011 WL 1135016, at *4 (Del. Ch. Mar. 29, 2011) (identifying certain problems that may arise in a multi-forum litigation including that "[d]efense counsel is forced to litigate the same case — often identical claims — in multiple courts.  Judicial resources are wasted as judges in two or more jurisdictions review the same documents and at times are asked to decide the exact same motions.  Worse still, if a case does not settle or consolidate in one forum, there is the possibility that two judges would apply the law differently or otherwise reach different outcomes, which would then leave the law in a confused state and pose full faith and credit problems for all involved.").

        These concerns are implicated in the instant case because even if the removed cases were remanded, the forum selection, standing and ripeness issues in the related case Childs would still require adjudication.  Adjudicating one case while remanding others with "common issues" would be duplicative and beget potentially conflicting rulings by this Court and the California State Court.  Avoiding this inefficiency and

inconsistency further warrants the consideration of the justiciability issues before the removal issues. See Deep v. XAC, LLC, No., 2007 WL 1308356, at *2 (W.D. Ky. May 2, 2007) (stating that "since this court's consideration of venue is inevitable, and its determination of personal jurisdiction is not, judicial economy favors deciding the motion to transfer before the motion to dismiss this action for lack of personal jurisdiction."); Fixture Specialists, Inc. v. Global Const. Co., LLC., No. 3:07-CV-570, 2007 WL 3468997, at *1-2 (E.D. Va. Nov. 14, 2007) (citing Sinochem as authority for transferring case to another federal district without considering whether it had jurisdiction over the parties); Rollenhagen v. Int'l Speedway Corp., No. 1:07-CV-818, 2007 WL 4324018, at *2-3 (W.D. Mich. Dec. 7, 2007) (citing Sinochem as authority to rule on venue issues before considering any asserted lack of jurisdiction).

Taken together, considering that district courts have the discretion to address non-merits threshold grounds for dismissal before jurisdiction and that considerations of judicial economy and consistency weigh in favor of the same, the issues concerning venue and justiciability will be considered first.

## II. **The Facebook Defendants' Motion to Dismiss is Granted**

21

Facebook Defendants contend that all four of the Derivative Action should be dismissed pursuant to Rules 12(b)(1), 12(b)(3), 12(b)(6) and 23.1 of the Federal Rules of Civil Procedure. First, Facebook Defendants argue that the Derivative Actions do not belong in this Court or the California State Court, but rather that the forum selection clause mandates that the Delaware Chancery Court must exclusively resolve all corporate disputes. Second, Facebook Defendants advance that the Derivative Plaintiffs lack standing because their claims of alleged misconduct predate their purchase of shares and because they have no excuse for failing to make a demand on Facebook's Board prior to bringing suit on the Company's behalf. Third, Facebook Defendants contend that SLUSA precludes litigation of the Derivative Actions because they raise direct claims premised on the same alleged federal securities violations as the securities class actions pending before this Court and thus qualify as "covered class action[s]" that may not "be maintained in any State or Federal court by any private party." 15 U.S.C. § 77p(b). Lastly, Facebook Defendants maintain that none of the Derivative Plaintiff's claims are ripe because they seek only to recover damages that could result if Facebook is found liable in another proceeding.

In response, Derivative Plaintiffs insist that the forum selection clause is unenforceable as it was unilaterally adopted several days after the Company's IPO and therefore should apply only to shareholders who purchased or acquired their stock after May 22, 2012.  Second, Derivative Plaintiffs contend that they have demonstrated contemporaneous ownership of their stock to establish standing and that demand would have been futile because a majority of the Board lacks independence. Third, Derivative Plaintiffs maintain that SLUSA does not apply as their actions do not constitute covered class actions under the statute.  Finally, Derivative Plaintiffs contend that their claims are ripe because they allege current injuries in the form of reputational and legal costs, and not merely potential future liabilities.

These contentions raise a number of issues.  As discussed above, however, only threshold issues such as venue and justiciability may be considered prior to jurisdiction. Accordingly, Facebook Defendants' venue, standing and ripeness arguments are considered below.  This Court need not, and does not, reach on the other issues raised by the parties.

A) **The Applicable Standards**

23

The Rule 12(b)(3) and 12(b)(6) Standards

Presumably in an abundance of caution, Facebook Defendants have advanced arguments that the forum selection clause is a threshold matter to be dismissed under Rule 12(b)(1), 12(b)(3) and 12(b)(6).  As the Second Circuit noted, there is "no consensus developed as to the proper procedural mechanism to request dismissal of a suit based upon a valid forum selection clause." New Moon Shipping Co., Ltd. v. MAN B & W Diesel AG, 121 F.3d 24, 28 (2d Cir. 1997).  This Circuit has "refused to pigeon-hole" claims based on forum selection into a particular clause of Rule 12(b). Asoma Corp. v. SK Shipping Co., 467 F.3d 817, 822 (2d Cir. 2006).  However, "[a] forum-selection clause does not divest a federal court of subject matter jurisdiction, so it would not be appropriate to dismiss this case pursuant to Rule 12(b)(1)." Chiste v. Hotels.com L.P., 756 F. Supp. 2d 382, 298 (S.D.N.Y. 2010).  "Courts in this Circuit appear to prefer Rule 12(b)(3) as the procedural device used to enforce a forum selection clause." Nippon Express U.S.A. (Ill.), Inc. v. M/V Chang Jiang Bridge, No. 06-CV-694(PKC), 2012 WL 6019280, at *3 (S.D.N.Y. Dec. 13, 2007).  For the sake of clarity and consistency, the Court will therefore consider Facebook Defendants' motion pursuant to Rule 12(b)(3).

Rule 12(b)(3) provides that a defendant may move to dismiss a complaint on the grounds of improper venue. See Fed. R. Civ. P. 12(b)(3). A motion to dismiss for improper venue based on a forum selection clause is properly based on Rule 12(b)(3). See Nippon Express, 2012 WL 6019280, at *3; see also Ferraro Foods, Inc. v. M/V IZZET INCEKARA, No. 01-CV-2682(RWS), 2001 WL 940562, at *3 n.1 (S.D.N.Y. Aug. 20, 2001). A court may consider evidentiary matters outside the pleadings to resolve the jurisdictional issue. See TradeComent.com LLC v. Google, Inc., 693 F. Supp. 2d 370, 375 n.3 (S.D.N.Y. 2010). The burden on the party opposing enforcement of a forum selection clause "is analogous to that imposed on a plaintiff to prove that the federal court has subject matter jurisdiction over his suit or personal jurisdiction over the defendant." New Moon Shipping, 121 F. 3d at 29. Thus, courts apply the standard of review applicable to motions to dismiss for lack of jurisdiction, taking the facts in the light most favorable to the party resisting enforcement of the forum selection clause. See id.

In considering a motion to dismiss pursuant to Rule 12(b)(6), the Court construes the complaint liberally, accepting all factual allegations as true and drawing all reasonable inferences in the plaintiff's favor. Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir. 1993). The issue "is not

25

whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 378 (2d Cir. 1995) (quoting Scheuer v. Rhodes, 416 U.S. 232, 235-36, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)).

        To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)).  Plaintiffs must allege sufficient facts to "nudge[ ] their claims across the line from conceivable to plausible." Twombly, 550 U.S. at 570.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Cohen v. Stevanovich, 772 F. Supp. 2d 416, 423 (S.D.N.Y. 2010).  Though the court must accept the factual allegations of a complaint as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." Iqbal, 556 U.S. at 678. (quoting Twombly, 550 U.S. at 555).

The Rule 23.1 Standard

The derivative form of action permits individual
shareholders of a corporation to bring an action on behalf of
the corporation to protect the corporation's interests from "the
misfeasance and malfeasance of faithless directors and
managers." Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 95,
111 S. Ct. 1711, 114 L. Ed. 2d 152 (1991) (quoting Cohen v.
Beneficial Loan Corp., 337 U.S. 541, 548, 69 S. Ct. 1221, 93 L.
Ed. 1528 (1949)). "To prevent abuse of this remedy, however,
equity courts established as a 'precondition for the suit' that
the shareholder demonstrate that 'the corporation itself had
refused to proceed after suitable demand, unless excused by
extraordinary conditions'" and satisfy the requirement of
standing. Id. (quoting Ross v. Bernhard, 396 U.S. 531, 534, 90
S. Ct. 733, 24 L. Ed. 2d 729 (1970)).

To establish standing nder Rule 23.1,[11] a shareholder's

---

[11] Rule 23.1 of the Federal Rules of Civil Procedure provides as follows:

> In a derivative action brought by one or more shareholders or
> members to enforce a right of a corporation or of an
> unincorporated association, the corporation or association having
> failed to enforce a right which may properly be asserted by it,
> the complaint shall be verified and shall allege (1) that the
> plaintiff was a shareholder or member at the time of the
> transaction of which the plaintiff complains or that the
> plaintiff's share or membership thereafter devolved on the
> plaintiff by operation of law, and (2) that the action is not a
> collusive one to confer jurisdiction on a court of the United
> States which it would not otherwise have. The complaint shall
> also allege with particularity the efforts, if any, made by the
> plaintiff to obtain the action the plaintiff desires from the

derivative complaint must allege that the "plaintiff was a
shareholder or member at the time of the transaction complained
of, or that the plaintiff's share or membership later devolved
on it by operation of law."  Fed. R. Civ. P. 23.1.[12]  In essence,
this "contemporaneous ownership rule" is a procedural
requirement that "denies a derivative plaintiff standing to
challenge transactions that occurred prior to the time the
plaintiff became a shareholder."  Ensign Corp. v. Interlogic
Trace, Inc., No. 90-CV-3497, 1990 WL 213085, at *2 (S.D.N.Y.
Dec. 19, 1990).  "The policies underlying the requirement are
twofold: (1) to prevent potential derivative plaintiffs from
'buying a lawsuit' by purchasing stock; and (2) to insure that
derivative actions are brought by shareholders who have actually
suffered injury and have an interest in the outcome of the
case."  Id.

---

directors or comparable authority and, if necessary, from the
shareholders or members, and the reasons for the plaintiff's
failure to obtain the action or for not making the effort. The
derivative action may not be maintained if it appears that the
plaintiff does not fairly and adequately represent the interests
of the shareholders or members similarly situated in enforcing
the right of the corporation or association. The action shall not
be dismissed or compromised without the approval of the court,
and notice of the proposed dismissal or compromise shall be given
to shareholders or members in such manner as the court directs.

[12] Similarly, section 327 is the only provision in the Delaware General
Corporation Law (the "DGC"), 8 Del. Code § 327, which addresses derivative
actions.  2 Edward P. Welch, et al., Folk on the Delaware General Corporation
Law § 327.1, at GCL-XIII-42 (5th ed. 2010).  It mirrors Rule 23.1 and
provides: "In any derivative suit instituted by a stockholder of a
corporation, it shall be averred in the complaint that the plaintiff was a
stockholder of the corporation at the time of the transaction of which such
stockholder complains or that such stockholder's stock thereafter devolved
upon such stockholder by operation of law."  8 Del. Code § 327.

In addition to the standing requirement, Rule 23.1 provides that the complaint in a derivative suit must "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort."  Fed. R. Civ. P. 23.1.

## B) The Forum Selection Clause is Unenforceable as to the Derivative Plaintiffs

The Second Circuit applies a four-part test in determining whether to enforce a contractual forum selection provision.  "The first inquiry is whether the clause was reasonably communicated to the party resisting enforcement." Phillips v. Audio Active Ltd., 494 F.3d 378, 383 (2d Cir. 2007). The second inquiry requires the Court "to classify the clause as mandatory or permissive, i.e., to decide whether the parties are required to bring any dispute to the designated forum or simply permitted to do so."  Id. (emphasis in original).  Part three asks whether the claims and parties involved in the suit are subject to the forum selection clause."  Id.  If the forum selection clause satisfies these first three criteria, "it is presumptively enforceable."  Id.

29

If a forum selection clause is prima facie valid, the party opposing its operation "bear[s] the heavy burden of making a 'strong showing' in order to overcome the presumption of validity. . . ." Eslwordwide.com, Inc. v. Interland, Inc., No. 06-CV-2503, 2006 WL 1716881, at *2 (S.D.N.Y. June 21, 2006); see also Reed & Barton Corp. v. M.V. Tokio Exp., No. 98-CIV-1079(LAP), 1999 WL 92608, *2 (S.D.N.Y. Feb. 22, 1999). "The fourth, and final, step is to ascertain whether the resisting party has rebutted the presumption of enforceability by making a sufficiently strong showing that 'enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching.'" Id. at 383-84 (quoting M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 15, 92 S. Ct. 1907, 32 L. Ed. 2d 513 (1972)). To the extent that a forum selection clause is vague or ambiguous, it will be construed against the party who drafted it. See JP Morgan Chase Bank, N.A. v. Reijtenbagh, 611 F. Supp. 2d 389, 391 (S.D.N.Y. 2009); Johns Insulation, Inc. v. Siska Const. Co., Inc., 671 F. Supp. 289, 295 (S.D.N.Y. 1987).

Article IX of Facebook's Certificate contains a forum selection provision requiring that the Delaware Chancery Court serve as the sole and exclusive forum for "any derivative action

or proceeding brought on behalf of the corporation." [13] (Clubok Decl. 11/14/12, Ex. B at Art. IX). Facebook Defendants assert that the forum selection provision is indisputably a contract between Facebook and its shareholders because it was adopted as a provision of Facebook's Certificate. See M+J Savitt, Inc. v. Savitt, No. 08-CV-8535(DLC), 2009 WL 691278, at *9 (S.D.N.Y. Mar. 17, 2009) ("[A] company's certificate of incorporation and by-laws in substance are a contract between the corporation and its shareholders and among the shareholders inter se." (citation and internal quotations omitted). They contend that the forum selection provision in Facebook's Certificate satisfies all three criteria necessary to create a presumptively enforceable forum selection provision, and that Derivative Plaintiffs have made no showing to rebut that presumption.

At the outset, some of the Derivative Plaintiffs claim for the first time in their opposition papers that "Facebook did not adopt the relevant forum selection provision until May 22,

---

[13] The Court takes judicial notice of the provisions of the Company's certificate of incorporation for the purposes of this shareholder derivative suit. See, e.g., La. Mun. Police Employees Ret. Sys. v. Blankfein, No. 08-CV-7605(LBS), 2009 WL 1422868, at *7 (S.D.N.Y. May 19, 2009) (taking judicial notice of exculpatory provisions applying to directors in nominal defendant's certificate of incorporation); Ferre v. McGrath, No. 06-CV-1684, 2007 WL 1180650, at *8 (S.D.N.Y. Feb. 16, 2007) (where plaintiff "left th[e] significant fact" of the forum provision in certificate of incorporation out of his derivative complaint, "the court may take judicial notice of the existence of this provision"). A Court may also take judicial notice of required disclosure statements on file with the SEC. See In re Merrill Lynch & Co., 273 F. Supp. 2d 351, 356-57 (S.D.N.Y. 2003), aff'd, 396 F.3d 161 (2d Cir. 2005).

2012 – four days following the IPO and Plaintiff's purchases of
her Facebook shares." (Levy Opp. – Motion to Dismiss at 4);
(see also Hubuschman/ Cole Opp. – Motion to Dismiss at 10)
("Director Defendants adopted the exclusive forum clause after
the alleged wrongdoing occurred."). However, it appears that
these plaintiffs are conflating the date Facebook adopted the
forum selection clause with the date that the Company filed its
Certificate with Delaware's Secretary of State.

Under Delaware General Corporations Law § 242(b), an
amendment to a company's certificate of incorporation must first
be adopted through shareholder approval and only then may be
filed with the Secretary of State. 8 Del. Code Ann. § 242(b).
As disclosed in Facebook's SEC filings, the Company's pre-IPO
shareholders adopted the draft of the restated certificate by
written consent on April 21, 2012, nearly a month before
Derivative Plaintiffs purchased their shares. (Clubok Decl.
12/5/12, Ex. 1). That restated certificate draft included the
actual terms of the forum selection provision. (See Clubok
Decl. 11/14/12, Ex. D, Ex. 3.3 to Apr. 23, 2012 Registration
Statement). The first page of the draft also informed that "the
provisions of the Certificate of Incorporation of this
corporation as heretofore amended and/or restated, has been duly
adopted by the corporation's Board of Directors and by the

32

stockholders in accordance with Sections 242 and 245 of the General Corporations Law of the State of Delaware, with the approval of the corporation's stockholders having been given by written consent without a meeting in accordance with Section 228 of the General Corporation Law of the State of Delaware." (Id. at Ex. B). As such, the forum selection clause was adopted by the Company's Board and shareholders prior to the IPO and Derivative Plaintiffs cannot assert otherwise.

Turning to the four-part analysis to determine whether to dismiss a claim based upon a forum selection clause, the first and second steps of the analysis have been met. Contrary to the Derivative Plaintiffs' contention that they lacked notice of the terms of the forum provision, Facebook Defendants have more than met the first inquiry. On February 1, 2012, Facebook disclosed to all potential shareholders in the Prospectus, that upon conclusion of its IPO, Facebook would amend its Certificate to include a provision making the Delaware Chancery Court, the exclusive forum for all derivative or intra-corporate disputes.[14] Facebook disclosed the precise terms of the forum provision on

---

[14] Specifically:  "Our restated certificate of incorporation will provide that the Court of Chancery of the State of Delaware will be the exclusive forum for any derivative action . . . any action asserting a breach of fiduciary duty . . . or any action asserting a claim against us that is governed by the internal affairs doctrine."  (Facebook's S-1, 2/1/12, at 136 (attached as Clubok Decl., Ex. C).

April 23, 2012, when it filed an amendment to its Registration
Statement and attached as Exhibit 3.3., the actual draft of the
Certificate that would be filed with the Delaware Secretary of
State upon conclusion of the IPO.[15]  (See Facebook's S-1,
4/23/12, at Ex. 3.3 (attached as Clubok Decl. 11/14/12, Ex. D).
The Prospectus also communicated that, "[o]ur restated
certificate of incorporation will provide that the Court of
Chancery of the State of Delaware will be the exclusive forum."
(Clubok Decl. 11/14/12, Ex. E).  Accordingly, the forum
selection clause was repeatedly and reasonably communicated to
Derivative Plaintiffs.

As to the second prong, "[a] forum selection clause is
viewed as mandatory when it confers exclusive jurisdiction on
the designated forum or incorporates obligatory venue language."
Phillips, 494 F. 3d at 386.  Here, the forum selection clause
is mandatory, not permissive.  The provision states, in relevant
part, that "the Court of Chancery of the State of Delaware
shall, to the fullest extent permitted by law, be the sole and
exclusive forum" for the designated types of actions.  (Clubok
Decl. 11/14/12, Ex. B at Art. IX).  The use of the word "shall"

---

[15] At the beginning of the Registration Statement, Facebook expressly stated
that "[u]nless expressly indicated or the context requires otherwise, all
information of this prospectus assumes . . . the filing of our restated
certificate of incorporation . . . in connection with our initial public
offering."  (Clubok Decl. 11/14/12, Ex. E).

has been construed by courts to make such clauses "classically mandatory." Crewe v. Rich Dad Educ., LLC, --- F. Supp. 2d ---, 2012 WL 3240185, at *21 (S.D.N.Y. Aug. 3, 2012).

Facebook Defendants, however, fail to meet the third inquiry because the claims and parties involved in this suit cannot be subject to the forum selection clause. Facebook Defendants contend that the provision expressly states that it covers "(1) any derivative action or proceeding brought on behalf of the corporation; (2) any action asserting a claim of breach of a fiduciary duty owed by, or other wrongdoing by, any director, officer, employee or agent of the corporation to the corporation or the corporation's stockholders . . . or (5) any action asserting a claim governed by the internal affairs doctrine." (Clubok Decl. 11/14/12, Ex. B at Art. IX). They maintain that the Derivative Plaintiffs meet all three criteria as they "(1) are styled as derivative actions (All Complaints ¶ 1); (2) assert claims against Facebook's directors for breach of fiduciary duty (Levy Compl. ¶¶ 80-87, 106-10; Cole Compl. ¶¶ 91-97; Child Compl. ¶¶ 58-64); and (3) plead claims based on duties allegedly owed to the company by its officers and directors that are governed by the internal affairs doctrine." (Defendants' Memo. - Motion to Dismiss at 11).

In opposition, Derivative Plaintiffs maintain that the clause is unenforceable because it was adopted without their consent and therefore constitutes an impermissible unilateral modification, disallowed under Galaviz v. Berg, 763 F. Supp. 2d 1170 (N.D. Cal. 2011).  (Childs Opp. – Motion to Dismiss at 6-8; Hubuschman/ Cole Opp. – Motion to Dismiss at 8-10).  The Derivative Plaintiffs also advance that, under Delaware law and under its express terms, the forum selection clause did not become effective until May 22, 2012, when Defendant Zuckerberg signed the Restated Certificate and filed it with the Delaware Secretary of State.  (Childs Opp. – Motion to Dismiss at 4-6, citing to Clubok Decl., Ex. B at 1; Hubuschman/ Cole Opp. – Motion to Dismiss at 9 n.9).

In Galaviz, a case of first impression, the forum selection clause was "unilaterally adopted" as a bylaw "by the directors who are defendants in this action, after the majority of the purported wrongdoing is alleged to have occurred, and without the consent of existing shareholders who acquired their shares when no such bylaw was in effect." Galaviz, 763 F. 1174. The Galaviz Court denied defendants' motion to dismiss on the grounds of improper venue, holding that "[u]nder these circumstances, there is no basis for the Court to disregard the plaintiffs' choice of forum . . . " Id. at 1174-75.  The Court

reasoned that it would be inequitable to apply the forum clause to plaintiffs, who had purchased their shares before the bylaw was adopted and therefore had no notice of it. The Court also suggested that the result may have been different if the clause were adopted in the company's certificate of incorporation, after a shareholder vote. See id. at 1174-75 & n.6 ("Certainly were a majority of shareholders to approve such a charter amendment, the arguments for treating the venue provision like those in commercial contracts would be much stronger") and ("The comment in Revlon that appears to have precipitated Oracle's bylaw amendment specifically referred to 'charter provision . . .'") (citing In re Revlon, Inc. S'holders Litig., 990 A.2d 940, 960 (Del. Ch. 2010)).

Putting aside whether the reasoning in Galaviz should now extend to certificates of incorporation,[16] the forum selection clause here was adopted by the Board and approved by Facebook's pre-IPO stockholders by written consent without a meeting in accordance with Section 228 of Delaware General Corporation Law. (See Clubok Decl. 11/14/12, Ex. B). As such,

---

[16] The Court recognizes the considerable debate on the efficacy, enforceability and desirability of the use of exclusive forum provisions and declines to advance any position here. See e.g., David Hernand and Thomas Baxter, Under Fire: Continued Attacks on Exclusive Forum Provisions May Slow Adoption, 16 No. 5 M & A Law 12 (2012); Bonnie White, Note, Reevaluating Galaviz v. Berg: An Analysis of Forum-Selection Provisions in Unilaterally Adopted Corporate Bylaws as Requirement Contracts, 160 U. Pa. L. Rev. PENNumbra 390 (2012).

there was no need to obtain consent from these Derivative
Plaintiffs to amend the Certificate, and therefore its adoption
does not constitute an impermissible unilateral modification.

Under Delaware law, however, a certificate of
incorporation, or any amendment to it, becomes effective only
"when filed with the Delaware Secretary of State." Blades v.
Wisehart, No. 5317-VCS, 2010 WL 4638603, at *3 (Del. Ch. Nov.
17, 2010); see also 8 Del. C. § 103(d) ("Any instrument filed in
accordance with subsection (c) of this section shall be
effective upon its filing date."). The Certificate here was
filed and thus became effective on May 22, 2012, four days after
the Company's IPO. (See Clubok Decl. 11/14/12, Ex. B). The
Original Certificate, filed on July 29, 2004, was therefore in
effect until the new filing and on the date of the IPO. In
addition, the fact that a corporation's may amend any proposed
amendment to a certificate of incorporation "at any time prior
to the effectiveness of the filing of the amendment with the
Secretary of State . . . ." further supports that the Original
Certificate was in effect until the Certificate's filing. 8
Del. C. § 242(c).

Facebook's S-1 Forms also stated that the proposed
revision to the Original Certificate, including the forum

38

selection clause, would take place once the Certificate became
effective.  (See Clubok Decl. 11/14/12, Ex. C) (stating that
"[o]ur restated certificate of incorporation will provide that
the Court of Chancery of the State of Delaware will be the
exclusive forum for any derivative action or proceeding brought
on our behalf . . . .") (emphasis added).  While such language
may have provided notice to prospective shareholders, it does
not become part of Facebook's charter until the date of the
Certificate's filing.  See 8 Del. C. § 103(d).

        Accordingly, the claims and parties involved in this
action are not subject to the forum selection clause in the
Certificate.  The Facebook Defendants' motion to dismiss based
on the forum selection clause and venue is therefore denied.


### C) The Derivative Plaintiffs Cannot Establish Standing Nor Adequately Plead Demand Futility

        Courts have reasoned that if "a books and records
demand is to investigate wrongdoing and the plaintiff's sole
purpose is to pursue a derivative suit, the plaintiff must have
standing to pursue the underlying suit to have a proper
purpose."  West Coast Mgmt. & Capital, LLC v. Carrier Access,
914 A.2d 636, 641 (Del. Ch. 2006).  Thus, "[i]f plaintiff would
not have standing to bring suit, plaintiff does not have a

proper purpose to investigate wrongdoing because its stated purpose is not reasonably related to its role as a stockholder." Graulich v. Dell Inc., No. 5846-CC, 2011 WL 1843813, at *5 (Del. Ch. May 16, 2011); see In re Bank of N.Y. Derivative Litig., 320 F.3d 291, 298 (2d Cir. 2003) ("[A] plaintiff must have owned stock in the corporation throughout the course of the activities that constitute the primary basis of the complaint.").

Derivative Plaintiffs do not plead that they acquired their shares before May 18, 2012, the day of the IPO.[17]  To the contrary, Derivative Plaintiffs admit that they purchased shares in the public market the day of Facebook's IPO. (See Levy Compl. ¶ 18; Childs Compl. ¶ 5; Hubuschman/ Cole Opp. – Motion to Dismiss at 21).  Instead, Derivative Plaintiffs contend that they have demonstrated contemporaneous ownership because the IPO itself occurred on May 18, 2012 and that the alleged wrongs happened on the date of the IPO.  (See Childs Opp. – Motion to Dismiss at 16) (stating that the selling of the "IPO shares to

_____

[17] Plaintiffs Hubuschman and Cole alleges that each "was, at times relevant hereto, an owner and holder of Facebook stock." (Hubuschman/ Cole Compl. ¶ 12).  This does not satisfy the Twombly standard.  550 U.S. at 570.  Nor does the vague allegation plead specific facts showing continuous and contemporaneous share ownership.  See Metcalf v. Zoullas, No. 11-CV-3996(AKH), 2012 WL 169874, at *3 (S.D.N.Y. Jan. 19, 2012) ("Because Rule 23.1 requires particularized allegations, the pleading standard is higher than the standard that is higher than the standard applicable to a pleading subject to a motion to dismiss pursuant to Rule 12(b)(6)."); see also In re Accuray, Inc. S'holder Derivative Litig., 757 F. Supp. 2d 919, 926 (N.D. Cal. 2010) ("Plaintiffs generally allege that they were shareholders of 'Accuray at the time of the continuing wrongs complained of herein.' This vague allegation does not satisfy the strict standard of Rule 23.1.").

the public is the core wrongful conduct."); (Hubuschman/Cole

Opp. – Motion to Dismiss at 22-24) (stating that they "do not

challenge the price of the IPO or misconduct that occurred

before the IPO[,]" but instead contend that all "alleged wrong

here happened on the date of the IPO; namely the Director

Defendants' conscious inactions on the date the stock was

issued, not the Board's previous authorization of the IPO.").

Plaintiff Childs adds that the Facebook "Defendants' effort to

restate the Complaint as emphasizing acts preparatory to the IPO

as the core of wrongful conduct should be rejected." (Childs

Opp. – Motion to Dismiss at 15).


        Federal and Delaware courts have repeatedly held that

even plaintiffs who acquire shares during an IPO are not

permitted to bring derivative actions based on allegedly

wrongful conduct that took place before they acquired their

shares. In Grigs v. Jornayvaz, for example, the Court held that

plaintiffs had no derivative standing to allege that a

disclosure in the company's form S-1 was rendered misleading by

a transaction on the eve of the IPO because they did not acquire

their shares until the IPO, after the S-1 was already declared

effective. No. 09-CV-629-PAB-KMT, 2010 WL 4932674, at *3-4 (D.

Colo. Nov. 29, 2010) ("[Nominal Defendant's] stock was not

public until April 22, 2008. . . As a result, according to the

41

contemporaneous ownership rule, plaintiffs cannot base any of
their claims on transactions that took place prior to April 22,
2008").

Additionally, the Delaware Supreme Court in 7547
Partners v. Beck established that, under the contemporaneous
ownership rule, "the timing of the allegedly wrongful
transaction must be determined by identifying the wrongful acts
which [plaintiffs] want remedied and which are susceptible of
being remedied by a legal tribunal."  682 A.2d 160, 162 (Del.
1996) (citation and internal quotations omitted).  The Court
held that the derivative plaintiff lacked standing to challenge
the pricing terms, including an underwriter's discount, set
forth in its prospectus because she must have been a shareholder
at the time the terms "were established."  Id. at 163.  The
Court emphasized that the allegations in the complaint made
clear that the transaction for which the plaintiff sought a
remedy took place at the time of the terms, rather than at the
execution of the sale.  Id. at 161-63.

Similarly, here, the challenged disclosures were made
prior to the IPO and appeared in the Prospectus, which was
declared effective by the SEC, before the Derivative Plaintiffs
acquired their shares.  (Facebook's S-1, 5/16/12, at 141-48

42

(Clubok Decl., Ex. E)).  As stated in the Derivative Plaintiffs'
complaints, Facebook Defendants' alleged failures include, among
other things, permitting Facebook to complete its IPO by
allowing for a misleading documents, including the Registration
Statement, to be filed and disseminated while knowing that a
select group of potential investors were privy to proprietary
information regarding the Company's projected earnings (Levy
Compl. ¶¶ 81-84; Childs Compl. ¶¶ 59-64; Hubuschman/ Cole Compl.
¶¶ 93-96); selling their Facebook stock with knowledge of the
non-proprietary, non-public projections (Levy Compl. ¶ 106-110;
Hubuschman/ Cole Compl. ¶¶ 94, 105); and other claims, such as
waste of corporate assets and insider trading, in connection
with the above (Childs Compl. ¶ 75; Levy Compl. ¶ 95;
Hubuschman/ Cole Compl. ¶ 99).


     It is undisputed that Facebook filed and signed its
Registration Statement, made all amendments to the Registration
Statement, and participated in an IPO roadshow with the Lead
Underwriters prior to May 18, 2012.  (Facebook's S-1, 5/16/12,
at 163-67 (Clubok Decl. 11/14/12, Ex. E)).  The Offering
Documents also declared that the Board had approved of the
Selling Defendants selling their shares to the underwriting
syndicate before they became available in the open market.
(Facebook's S-1, 5/16/12, at 163-67 (Clubok Decl. 11/14/12, Ex.

E).  The Offering Documents' terms were disclosed to investors
on the day of the IPO.  All of the above events occurred before
the Company and the Lead Underwriters issued shares to the
investing public, including the Derivative Plaintiffs, in the
IPO.  The alleged wrongful conduct is therefore not "the
technicality of [the IPO's] consummation" as Derivative
Plaintiffs now assert in their opposition papers, Beck, 682 A.2d
at 163, and they cannot assert that they were shareholders at
the time the terms of the challenged disclosures were made.

        Derivative Plaintiffs attempt to distinguish Beck by
citing to Maclary v. Pleasant Hills, Inc., 109 A.2d 830, 834
(Del. Ch. 1954) and Leung v. Shuler, No. 17089, 2000 WL 264328
(Del. Ch. 2000), an unpublished case, as instructive.  In those
cases, the Delaware Chancery Court held that the plaintiffs had
standing to pursue their claims as the issuance of the stock
itself was the alleged wrong.  Leung, 2000 WL 264328, at *8;
Maclary, 109 A.2d at 834.  They contend that their claims are
similar because, as in those cases, "the alleged wrong [was] the
issuance of the stock . . . rather than its authorization by the
board two months before."  (Hubuschman/ Cole Opp. – Motion to
Dismiss at 24) (citing to Leung, 2000 WL 264328, at *8).

        Specifically, in Maclary, the derivative action sought

44

the cancellation of 100 shares of stock allegedly issued without
consideration, and where the challenged shares had not been
issued until 3 years after the resolution and more than 1 year
after plaintiffs became equitable stockholders. 109 A.2d at
833. Notably, the defendant directors were alleged to have
continued to act culpably after the plaintiffs had acquired
their shares by engaging in the complained-of issuance of
securities. Id. at 833. Moreover, the Beck Court confined
Maclary to the "facts of that case," in which plaintiffs were
seeking cancellation of the stock and alleging that the issuance
of the shares was unlawful. Beck, 682 A.2d at 162. Leung is
also distinguishable as the derivative claims were based on
exchange of shares during a merger, issued at a price allegedly
below fair market value, and in which an insider sale was not
disclosed to shareholders until after their shares had been
automatically converted. Leung, 2000 WL 264328, at *3, 8. In
such instances, the wrongdoing was the issuance of the stock
itself.

By contrast, here, as in Beck, the alleged misconduct
was completed with the approval of the allegedly misleading
Registration Statement, which went into effect the day before
the IPO, and when the Offering Documents were disclosed to
investors on the day of the IPO. For example, all sales of

45

stock by the Selling Defendants were not sold on the open
market, but instead, as the Offering Documents disclosed, sold
to the underwriters.[18]  Given that Plaintiffs Levy and Childs
plead that they acquired their shares on the open market (Levy
Compl. ¶ 18; Childs Compl. ¶ 5), and Plaintiff Cole admits that
he did as well (Cole Opp. – Motion to Dismiss at 21), they
cannot now establish standing through contemporaneous ownership
when all of the alleged wrongs occurred prior to the acquisition
of their shares.

        Plaintiffs Hubuschman and Cole highlight the Board
members' alleged conscious inactions on May 18, 2012 to support
their standing argument.[19]  (Hubuschman/ Cole Opp. – Motion to
Dismiss at 24) (citing to Hubuschman/ Cole Compl. ¶¶ 3, 46-47,
93, 96, 99, 100).  "Where a claim of directorial liability for
corporate loss is predicated upon conscious inaction, '. . .
only a sustained or systematic failure of the board to exercise
such oversight – such as an utter failure to attempt to assure a
reasonable information and reporting system exists – will

---

[18] As Plaintiff Childs explains, that is how IPOs work: "Facebook's investment
bankers, serving as underwriters, were directly responsible for the
distribution of the Facebook shares to the public and the development of the
market for those shares."  (Childs Opp. – Motion to Dismiss at 18).

[19] The Court notes that allegations of conscious inaction are usually reserved
for discussions of demand futility under the standard set in In re Caremark
Int'l Inc. Derivative Litig., 698 A.2d 959 (Del. Ch. 1996), and addresses
them to the extent that such discussion may be applicable to the issue of
standing.

establish the lack of good faith that is a necessary condition to liability.'" In re Veeco Instruments, Inc. Secs. Litig., 434 F. Supp. 2d 267, 276 (S.D.N.Y. June 14, 2006) (citing to Caremark, 698 A.2d at 971). None of the allegations cited in Plaintiffs Hubuschman and Cole's complaint specifically demonstrate how the Facebook Defendants failed to take action in the face of the knowledge of any alleged wrongdoing on the day of the IPO. In fact, most of the cited-to allegations involve alleged wrongdoing in connection with the Registration Statement, (See e.g., Hubuschman/ Cole Compl. ¶¶ 3, 46-47, 99), or are general allegations with no evidence of wrongdoing on May 18, 2012 specifically. (See e.g., Hubuschman/ Cole Compl. ¶¶ 96, 100).

Derivative Plaintiffs also explicitly and implicitly rely on the "continuing wrong" exception to the contemporaneous ownership requirement to contend that the Facebook Defendants engaged in a "continuing wrong" because they failed to cancel the IPO. (Levy Opp. – Motion to Dismiss at 21-22; Childs Opp. – Motion to Dismiss at 20; Cole Opp. – Motion to Dismiss at 23-24). "This doctrine permits a derivative plaintiff to challenge a corporate action that occurred before the plaintiff became a shareholder if that action was part of a continuing fraud or impropriety that was begun but not completed at the time the

47

plaintiff became a shareholder." <u>Ensign</u>, 1990 WL 213085, at *2.


Their complaints, however, are devoid of any specific allegations as to any "continuing fraud or impropriety." Moreover, "[t]he continuing wrong doctrine has not been universally adopted by the federal courts, and it has been invoked sparingly by those courts that have adopted it." <u>Id.</u> at *3. The Second Circuit has conceded that "it is unclear whether the doctrine is the law of this Circuit." <u>In re Bank of N.Y. Derivative Litig.</u>, 320 F.3d at 296; <u>Silverstein ex rel. Tetragon Financial Group Ltd. v. Knief</u>, 843 F. Supp. 2d 441, 445 (S.D.N.Y. 2012) (stating that the Second Circuit has "reject[ed] the continuing wrong doctrine adopted by some courts."). Thus, even if the complaints adequately alleged that they were continuously wronged, this Circuit does not appear to recognize the doctrine and has explicitly rejected the "expansive definition of the term 'transaction' that is inherent to the continuing wrong doctrine." <u>In re Bank of N.Y. Derivative Litig.</u>, 320 F.3d at 298.


Accordingly, because the Derivative Plaintiffs were not stockholders at the time the alleged wrongful transactions took place, they cannot establish standing for their derivative claims.

48

Moreover, even assuming that Derivative Plaintiffs
could establish standing, in addition to the contemporaneous
ownership rule, plaintiffs must also meet the demand
requirement.  Fed. R. Civ. P. 23.  It is well established that
demand requirements for a derivative suit are determined by the
law of the state of incorporation.  See Kamen, 500 U.S. at 98-
101.  Because Facebook is a Delaware corporation, the
sufficiency of the Derivative Plaintiffs' demand futility
allegations is analyzed under Delaware law.

Pursuant to Delaware law, a plaintiff in a shareholder
derivative action must allege either: (1) that he has made a
demand upon the corporation's board of directors to take the
requested action; or (2) the reasons why such a demand upon the
board would be futile.  See Rales v. Blasband, 634 A.2d 927, 930
(Del. 1993); Aronson v. Lewis, 473 A.2d 805, 808 (Del. 1984)
overruled on other grounds by Brehm v. Eisner, 746 A.2d 244
(Del. 2000).  In order to sufficiently allege that a demand upon
the board would have been futile, a plaintiff must present
particularized facts showing that the board is "incapable of
exercising its power and authority to pursue derivative claims
directly."  White v. Panic, 783 A.2d 543, 551 (Del. 2001).  The
plaintiff may not rely on mere conclusory allegations.  In re

49

inforUSA Inc. S'holders Litig., 953 A.2d 963, 985 (Del. Ch. 2007). The pleading burden imposed by Rule 23.1 is a high hurdle for plaintiffs to clear. McPadden v. Sidhu, 964 A.2d 1262, 1269 (Del. Ch. 2008) (noting that this burden "is more onerous than that demanded by Rule 12(b)(6).").

If a decision of the board of directors is being challenged in a derivative suit, a court may apply the Aronson test, under which a plaintiff must plead sufficient facts to raise a reasonable doubt that: "(1) the [majority of the] directors are disinterested and independent and (2) [that] the challenged transaction was otherwise the product of a valid exercise of business judgment." Aronson, 473 A.2d at 814. Thus in order to survive dismissal, a complaint must allege facts that the corporate "officers and directors are under an influence which sterilizes their discretion, [so that] they cannot be considered proper persons to conduct litigation on behalf of the corporation." Id. at 813.

In some cases, however, the Delaware Supreme Court has recognized that the Aronson test does not apply, where a loss eventuates not from a board's decision but rather from considered inaction. In these Caremark cases, "[a] court must determine whether or not the particularized factual allegations

of a stockholder complaint create a reasonable doubt that, as of
the time of the complaint is filed, the board of directors could
have properly exercised its independent and disinterested
business judgment in responding to a demand." Rales, 634 A.2d
at 934.

"Independence is a fact-specific determination made in
the context of a particular case." Beam ex. Rel. Martha Stewart
Living Omnimedia, Inc. v. Stewart, 845 A.2d 1040, 1049-50 (Del.
2004). Specific factual allegations that a director faces a
"substantial likelihood of liability," for example, may
establish a reasonable doubt as to a director's
disinterestedness. Aronson, 473 A.2d at 815; Rales, 634 A.2d at
936. Allegations of facts supporting a reasonable inference
that a director is so beholden to an interested party that his
"discretion would be sterilized" also establish a reasonable
doubt as to the director's independence. Rales, 634 A.2d at
936, citing Aronson, 473 A.2d at 815. A plaintiff is not
required to prove success on the merits to show that a demand
upon the board would have been futile. See Rales, 634 A.2d at
934.

Derivative Plaintiffs contend that Facebook's Board
was not independent or disinterested for demand purposes because

51

(i) Defendants Zuckerberg, Breyer and Thiel face a substantial likelihood of liability for breach of fiduciary duty based on their allegedly improper stock sales and (Levy Compl. ¶ 78; Cole Compl. ¶ 70; Childs Compl. ¶¶ 47-56); (ii) the entire Board is dominated and controlled by Defendant Zuckerberg (Levy Compl. ¶ 78(c); Cole Compl. ¶ 76; Childs Compl. ¶ 55); and (iii) the entire Board has business connections that render them not independent and subject to a substantial likelihood of liability for various alleged misconduct (Levy Compl. ¶ 78; Cole Compl. ¶ 71).

First, Derivative Plaintiffs assert their claims for breach of fiduciary duty of loyalty under Brophy v. Cities Serv. Co., 70 A. 2d 5 (Del. Ch. 1949). They allege claims against the Selling Defendants because they purportedly "sold stock in the IPO on the basis of [material, non-public] information," namely Facebook's mid-quarter internal revenue projections. (Cole Opp. - Motion to Dismiss at 13-14; Levy Opp. - Motion to Dismiss at 13). Specifically, Plaintiffs Hubuschman and Cole contend that the Selling Defendants, as well as the entire Board, "knew that in the months leading up to the IPO, Facebook had experienced increased mobile usage of its website, which had caused negative trends in the Company's advertising business." (Hubuschman/ Cole Opp. - Motion to Dismiss at 13).

To state a claim under Brophy, a plaintiff must allege that: "1) the corporate fiduciary possessed material, nonpublic company information; and 2) the corporate fiduciary used that information improperly by making trades because she was motivated, in whole or in part, by the substance of that information." In re Oracle Corp. Derivative Litig., 867 A.2d 904, 934 (Del. Ch. 2004). "This doctrine is not designed to punish inadvertence, but to police intentional misconduct." Guttman v. Huang, 823 A.2d 492, 505 (Del. Ch. 2003). "The internal information known to the defendant can be hard, in the sense of actual historical operating results, or soft, in the sense of trends or projections." Pfeiffer v. Toll, 989 A.2d 683, 691 (Del. Ch. 2010) abrogated on other grounds by Kahn v. Kolberg Kravis Roberts & Co., L.P., 23 A.3d 831 (Del. Supr. June 20, 2011). Because Brophy claims "depend importantly on proof that the selling defendants acted with scienter[,]" Guttman, 823 A.2d at 505, "Delaware courts . . . have been reluctant to require disclosure of information that does not bear reliably on firm value, particularly soft information such as projections of performance or estimates of value." In re Oracle, 867 A.2d at 938 n. 149; see also Repairman's Serv. Corp. v. Nat'l Intergroup, Inc., No. 7811, 1985 WL 11540, at *8 (Del. Ch. Mar. 15, 1985) (stating that "[g]enerally, 'soft' information, such

as projections and estimates as to value, need not be disclosed
due to their lack of reliability.").

Derivative Plaintiffs aver that their complaints plead
with particularity that the Facebook Defendants knew, when they
knew it, that they hid what they knew from the marketplace and
then used what they knew as a motivation for profit on their
trades. (Hubuschman/ Cole Opp. – Motion to Dismiss at 13).
Facebook Defendants, however, repeatedly made express and
extensive warnings in the Company's Registration Statement,
drafts of the Registration Statement and in its final Offering
Documents about the trend of increased use of mobile
applications. (See e.g., Clubok Decl. 12/15/12, Ex. 2 (April
23, 2012 Registration Statement) at 14; Clubok Decl. 5/9/12, Ex.
3) (stating that "[t]he loss of advertisers, or reduction in
spending by advertisers with Facebook, could seriously harm our
business."). Thus, even if internal projections could be
considered material to the IPO, Derivative Plaintiffs have not
demonstrated that the Facebook projections would have
"significantly altered the total mix of information in the
marketplace[,]" considering that these disclosures were publicly
disseminated. In re Oracle, 867 A.2d at 934 (internal
quotations omitted).

Thus, contrary to their contention, Derivative
Plaintiffs have not alleged particularized facts that support an
inference that the Board possessed information that was
materially different from what existed in the marketplace.  Even
assuming the information was material and non-public, Derivative
Plaintiffs have not adequately alleged the second element of
Brophy to suggesting "that each sale by each individual
defendant was entered into and completed on the basis of, and
because of adverse material non-public information."  Guttman,
823 A.2d at 505 (internal quotations omitted).  According to the
Plaintiffs Hubuschman and Cole, allegations that a defendant
sold stock while in "knowing possession" of material non-public
information are sufficient at the pleading stage to establish
improper motivation and liability under Brody.  (Hubuschman/
Cole Opp. - Motion to Dismiss at 13) (citing cases).  However,
each of their cited cases found that improper motivation can be
inferred where the timing of the sales suggests that defendants
intentionally perpetrated, or took advantage of, a fraud.

For example, in Pfeiffer, the defendants publicly
projected revenue growth of 20 percent for the upcoming years
without any "reasonable basis in fact" and then, during that
same period, sold 14 million shares of their stock.  989 A.2d at
688-89.  The Court found that the defendants' trades were

"sufficiently unusual in timing and amount to support a pleading-stage inference that the sellers took advantage of confidential corporate information." Id. at 694.  Similarly, in In re American Int'l Group, Inc., defendants sold their stock while the company was "permeated by the frauds described earlier, all of which, if known, would have made AIG a much less attractive investment."  965 A.2d 763, 800 (Del. Ch. 2009); see also In re Fossil, Inc., 713 F. Supp. 2d 644, 652 (N.D. Tex. 2010) (finding a strong inference of scienter where, "[s]pecific to each Defendant, the [complaint] allege[d] the approval or acceptance of backdated options, participation in or responsibility for compensation and options as a committee member, oversight of the Company's internal controls, and approval of false financial statements.")

        In contrast, Derivative Plaintiffs here do not explicitly allege any fraud or scienter adequately.  Unlike in the cited cases above, the Selling Directors sold their stock in the IPO.  Without more than generic accusations, "such sales raise no inference of fraud" as "[e]arly investors and promoters routinely sell stock in IPOs."  In re Prestige Brands Holding, Inc., No. 05-CV-6924(CLB), 2006 WL 2147719, at *7 (S.D.N.Y. July 10, 2006).

56

Derivative Plaintiffs also allege that the Board is
dominated and controlled by Zuckerberg, but have not alleged
facts with specificity suggesting that he personally engaged in
any wrongdoing that would render him "interested" for the
purposes of this lawsuit.  See Rales, 634 A.2d at 936 ("To
establish lack of independence, [a plaintiff] must show that the
directors are 'beholden' to the [interested person]."  In
addition, even if Derivative Plaintiffs adequately allege that
Zuckerberg is interested, they must overcome the presumption
that the Board acts independently of him." See Beam, 845 A.2d at
1048-49 (stating that "[t]he key principle upon which this area
of our jurisprudence is based is that the directors are entitled
to a presumption that they were faithful to their fiduciary
duties.  In the context of presuit demand, the burden is upon
the plaintiff in a derivative action to overcome that
presumption.") (emphasis in the original).

In their complaints, Derivative Plaintiffs first rely
on the fact that Zuckerberg controls over half of Facebook's
voting shares and thus purportedly determines the composition of
the Board.  (Hubuschman/ Cole Opp. - Motion to Dismiss at 16).
However, the Delaware Supreme Court has repeatedly held that
"even proof of majority of ownership of a company does not strip
the directors of the presumption of independence." Aronson, 473

57

A.2d at 815; see also Beam, 845 A.2d at 1054 ("A stockholder's
control of a corporation does not excuse presuit demand on the
board . . . .").


          Plaintiffs Hubuschman and Cole concede that
"controlling voting power alone may not be sufficient to
establish that a director lacks independence." (Hubuschman/
Cole Opp. - Motion to Dismiss at 17 n.5). Thus, the Derivative
Plaintiffs bolster their allegations by noting that members of
the Board have had past business dealings with Zuckerberg and
the Company. (Levy Opp. - Motion to Dismiss at 14-16;
Hubuschman/ Cole Opp. - Motion to Dismiss at 17-18; Childs Opp.
- Motion to Dismiss at 13-15). They contend that their
complaints sufficiently allege that the Board has "entangled
alliances with Zuckerberg, including material financial
interests, and that they depend upon Zuckerberg for their
continuing positions on the Board . . . ." (Hubuschman/ Cole
Opp. - Motion to Dismiss at 17) (citing to Hubuschman/ Cole
Compl. ¶¶ 80-84).


          However, "[m]ere allegations that [directors] move in
the same business and social circles, or a characterization that
they are close friends, is not enough to negate independence for
demand excusal purposes.") Beam, 845 A.2d at 1051-42. Instead,

58

"a plaintiff must plead facts that would support the inference
that because of the nature of a relationship or additional
circumstance other than the interested director's stock
ownership or voting power, the non-interested director would be
more willing to risk his or her reputation than risk the
relationship with the interested director."  Id. at 1052.

        Derivative Plaintiffs fail to meet this burden.  They
allege that Zuckerberg's unilateral decision to cause Facebook
to acquire Instagram, Inc. ("Instagram") demonstrates his
domination and control over the Board and that Andreessen felt
"a sense of owingness" to Zuckerberg because Andreessen's
venture capital firm made money on Facebook's acquisition of
Instagram.  (Hubuschman/ Cole Opp. - Motion to Dismiss at 17;
Childs Opp. - Motion to Dismiss at 14).  Derivative Plaintiffs
aver that "[t]his material financial benefit is precisely the
type that courts routinely find may instill in a director 'a
sense of owingness' to another director, disabling him from
considering a demand."  (Hubuschman/ Cole Opp. - Motion to
Dismiss at 17) (citing to In re The Ltd., Inc. S'holder Litig.,
2002 WL 537692, at *7 (Del. Ch. Mar. 27, 2002) (finding a
director beholden to controlling director who gave a $25 million
dollar gift to a university where the director was president.").

However, Derivative Plaintiffs do not allege that Facebook paid more for Instagram than it was worth, or that the acquisition was anything other than a business deal that benefitted both parties.  Unlike a $25 million donation, which is "a gift of  . . . magnitude [that] can reasonably be considered as instilling . . . a sense of 'owingness[,]'"  In re Ltd., 2002 WL 537692, at *7, the Instagram deal was a mutually-beneficial business dealings.  Courts have found that such dealings between two directors do not render one dependent upon the other. See, e.g., In re Goldman Sachs Grp., Inc. S'holder Litig., No. 5215-VCG, 2011 WL 4826104, at *9-12 (Del. Ch. Oct. 12, 2011) (rejecting argument that Goldman director lacked independence because he was the Chairman and CEO of a company that received billons of dollars in financing from Goldman); Zimmerman v. Braddock, No. 18473-NC, 2002 WL 31926608, at *10 (Del. Ch. Dec. 20, 2002) (rejecting challenge to Priceline director's independence despite employment with an investment banking company that generated almost $1 million in fees from Priceline).  Derivative Plaintiffs' conclusory claims that other directors "also received material financial benefits from Zuckerberg and, therefore, lack independence from him," fail for the same reasons. (Cole Opp. - Motion to Dismiss at 18; accord Levy Opp. - Motion to Dismiss at 14-15; Childs Opp. - Motion to Dismiss at 13-15).

Derivative Plaintiffs also assert that Bowles is conflicted because he sits on the board of Morgan Stanley and "cannot be expected to objectively consider a demand, which would undoubtedly focus on wrongdoing by Morgan Stanley, and could jeopardize the business relationship between Facebook and Morgan Stanley."  (Childs Opp. – Motion to Dismiss at 14). Plaintiff Childs also contends that Graham and Hastings are not independent directors because they serve as CEOs of The Washington Post and Netflix respectively, which are "major advertiser[s]" with Facebook.  (Childs Opp. – Motion to Dismiss at 14-15).

Courts, however, have held that directors are presumptively able to consider independently whether to take legal action that could cause tangential harm to a company with which they are affiliated.  See Jacobs v. Yang, No. 206-N, 2004 WL 1728521, at *6 (Del. Ch. Aug. 2, 2004) (while the fact that a decision relates to "companies that directors are affiliated with potentially makes the board's decision more difficult, . . . it does not sterilize the board's ability to decide.") (internal quotation omitted), aff'd, 867 A.2d 902 (Del. 2005). Instead, Plaintiff Childs cites a case under New York law which found that a director lacked independence because "his small,

three attorney law firm earned . . . nearly $1 million [from the company] during the two years prior to the filing of the complaint." Tsutsui v. Barasch, 67 A.D.3d 896, 898 (N.Y. App. Div. 2009). This case is distinguishable because the complaints here do not allege that Bowles, Graham or Hastings derived direct personal benefit from Facebook's relationship with their companies, much less one that is "of such subjective material importance" that its "threatened loss might create a reason to question whether the director is able to consider the corporate merits of the [demand] objectively." Telxon Corp. v. Meyerson, 802 A.2d 257, 264 (Del. 2002). Nor does Plaintiff Levy's allegation that Morgan Stanley is "part of the lending team supporting Facebook's revolving credit facility" bolster Plaintiffs' case against Bowles. (Levy Opp. - Motion to 16; Levy Compl. ¶ 78(i)). There are no facts alleged to suggest that Bowles, Graham or Hastings would risk their reputations and careers to protect their respective companies' relationship with Facebook nor any facts that suggest that any of Facebook's Defendants would have or threatened to severe their relations with any of these companies. Without such individualized allegations, there is no basis to assume that these Facebook Defendants did not act independently.

In addition, to the extent that the Derivative

Plaintiffs assert <u>Caremark</u> claims that "an unconsidered failure of the board to act in circumstances in which due attention would, arguably, have prevented the loss[,]" 698 A.2d at 967; (<u>see</u> Hubuschman/ Cole Opp. – Motion to Dismiss at 24), the Derivative Plaintiffs "must demonstrate that the directors either knew or should have known that violations of the law were occurring, and that they took no steps in a good faith effort to prevent or remedy that situation." <u>In re Vecco</u>, 434 F. Supp. 2d at 276 (citing <u>Caremark</u>, 698 A.2d at 971) (noting that such claims are "possibly the most difficult theory in corporate law upon which a plaintiff might hope to win judgment.").

Courts have found "facts that show [that] the company entirely lacked an audit committee or other important supervisory structures, or that a formally constituted committee failed to meet[,] or "[a] claim that an audit committee or board had notice of serious misconduct and simply failed to investigate, for example, would survive a motion to dismiss." <u>David B. Shaev Profit Sharing Acct. v. Armstrong</u>, No. 1449-N, 2006 WL 391931, at *5 (Del. Ch. Feb. 13, 2006).

Here, no such facts have been alleged except allegations that "Defendants Andreessen, Bowles, and Thiel, as members of the Audit Committee, face a substantial likelihood of

63

personal liability for the issuance of Facebook's Registration Statement." Without more, these allegations are precisely the type of conclusory statements that do not constitute a Caremark claim. Derivative Plaintiffs' complaints do not allege that there was a lack of proper compliance systems in place, that these systems failed to function, or that the Board was ever presented with information which they chose to disregard. Instead, the essence of the Derivative Plaintiffs' complaints is that the Board allowed Facebook to file a Registration Statement that did not disclose its internal revenue projections. (Levy Compl. ¶¶ 10,49; Cole Compl. ¶¶ 5, 48-51; Childs Compl. ¶¶ 2, 33-36). Courts throughout the country have uniformly agreed that "internal calculations and projections are not material facts that are requires to be disclosed" in a registration statement. Sheppard v. TCW/DW Term Trust 2000, 938 F. Supp. 171, 177-78 (S.D.N.Y. 1996); see also In re N. Telecom Ltd. Sec. Litig., 116 F. Supp. 2d 446, 458 (S.D.N.Y. 2000) ("The federal securities laws do not obligate companies to disclose their internal forecasts.") (internal quotations omitted); Rubke v. Capitol Bancorp Ltd., 551 F.3d 1156, 1163 (9th Cir. 2009) ("[T]here is no duty to disclose income projections in a prospectus."); Glassman v. Computervision Corp., 90 F.3d 617, 631 (1st Cir. 1996) ("The federal securities laws impose no obligation upon an issuer to disclose forward-looking

64

information such as internal projections, estimates of future
performance, forecasts, busgets, and similar data.") (internal
quotations omitted).  These courts have followed the lead of the
SEC, which has consistently refused to adopt a rule that would
"require projections or other forward-looking information to be
included in [IPO] registration statements." Sec. Offering
Reform, 70 Fed. Reg. 44722, 44739 (Aug. 3, 2005).  Derivative
Plaintiffs do not cite to any authority holding that internal
revenue projections before an IPO must be disclosed or that such
nondisclosure is a violation of law, which the directors knew or
should have known and then disclosed.

Taken together, Derivative Plaintiffs made no demand
to the Board, failed to rebut the presumption that the majority
of the Board was interested and have not pled sufficient facts
demonstrating the Board's conscious inaction.  Accordingly,
Derivative Plaintiffs' failure to adequately plead demand
futility, as well as their inability to establish standing,
requires dismissal under Rule 23.1.

## D) **Derivative Plaintiffs' Claims are Not Ripe**

Ripeness is a "constitutional prerequisite" to the
exercise of jurisdiction by federal court.  Nutritional Health

65

Alliance v. Shalala, 144 F.3d 220, 225 (2d Cir. 1998).  The
ripeness doctrine provides that a dispute may only be
adjudicated when there is "a real, substantial controversy
between parties having adverse legal interests, a dispute
definite and concrete, not hypothetical or abstract." Motor
Vehicle Mfrs. v. DEC, 79 F.3d 1298, 1305 (2d Cir. 1996)
(citations omitted); see also Pacific Gas & Elec. Co. v. State
Energy Resources Conservation and Dev. Comm'n, 461 U.S. 190,
203, 103 S. Ct. 1713, 75 L. Ed. 2d 752 (1983) (the ripeness
doctrine prevents the premature adjudication of issues that may
never arise.).  Consequently, "when resolution of an issue turns
on whether there are nebulous future events so contingent in
nature that there is no certainty there will ever occur, the
case is not ripe for adjudication." Thomas v. City of New York,
143 F.3d 31, 34 (2d Cir. 1998) (internal quotation omitted).


     "In order to determine whether an issue is ripe for
adjudication, a court must make a fact-specific evaluation of
'both the fitness of the issues for judicial decision and the
hardship to the parties of withholding court consideration.'"
United States v. Fell, 360 F.3d 135, 139 (2d Cir. 2004).  A
claim is fit for review when it requires no further factual
development to crystallize the legal issues and aid the court in
resolving them. Ohio Forestry Ass'n v. Sierra Club, 523 U.S.

726, 737, 118 S. Ct. 1665, 140 L. Ed. 2d 921 (1998); Isaacs v. Bowen, 865 F.2d 468, 478 (2d Cir. 1989) ("The fitness inquiry is concerned with whether the issues sought to be adjudicated are contingent on future events or may never occur.").  In assessing the possible hardship to the parties, the court considers "whether the challenged action creates a direct and immediate dilemma for the parties . . ." outside the "mere possibility of future injury" without the prospect of causing "present detriment."  N.Y. Civil Liberties Union v. Grandeau, 528 F.3d 122, 131 (2d Cir. 2008).

       Derivative Plaintiffs maintain that their claims are ripe because they have alleged damages to Facebook that have already occurred.  (Hubuschman/ Cole Compl. ¶¶ 51-54, 63-64; Levy ¶¶ 68-71; Childs ¶¶ 41-42).  Specifically, expenditures include:

    (a)  Costs incurred in investigating and defending Facebook
         and certain officers and directors in the class actions
         for violations of federal securities laws; and

    (b)  Costs incurred from paying any potential settlement or
         adverse judgment in the already eight filed class actions
         for violations of federal securities laws.

(Hubuschman/ Cole Compl. ¶ 64).  In addition, Derivative Plaintiffs allege reputational harm as well as damages flowing from the sale of Facebook stock by individual Facebook

Defendants. (Hubuschman/ Cole Compl. ¶ 65; Levy Compl. ¶¶ 68-71;
Childs Compl. ¶ 42).


        Courts have found damages unrecoverable where they are
contingent "on the outcome of a class action suit in which no
judgment had been entered or settlement reached." In re Cray
Inc., 431 F. Supp. 2d 1114, 1133 (W.D. Wash. 2006).  In In re
Symbol Technologies Secs. Litig., the plaintiff, like the
Derivative Plaintiffs, contended that defendants should "be
liable for all costs incurred in defending the class action"
against claims of violations of securities laws.  762 F. Supp.
510, 516 (E.D.N.Y. 1991).  The Court held that "no injury has
been sustained for which plaintiff may sue to recover" when "the
damages claims . . . hinge entirely on the outcome of another
pending action. . . ." Id. at 516-17.   Other courts have
similarly found that "derivative claims are foreclosed when they
merely allege damages based on the potential costs of
investigating, defending, or satisfying a judgment or settlement
for what might be unlawful conduct" and therefore "[p]laintiffs'
damage allegations based on potential costs of the [securities]
class action suits are insufficient to state a claim for
relief." In re Cray Inc., 431 F. Supp. 2d at 1133-34; see
Falkenberg v. Baldwin, No. 76-CV-2409, 1977 WL 1025, at *4
(S.D.N.Y. June 13, 1977) (derivative claim stemming from costs

associated with other litigation against company unripe because
merits had yet to be determined).

        In addition, "the showing of reputational harm must be
concrete and corroborated, not merely speculative." Trudeau v.
Federal Trade Comm'n, 384 F. Supp. 2d 281, 297 (D.D.C. 2005).
Here, Plaintiff Childs cites to a Slate.com opinion piece as
indicative of causing "significant reputational harm." (Childs
Compl. ¶ 42). The article refers to "annoyed retail investors,"
and that Facebook "once viewed as a benign force . . . now risks
being synonymous with Wall Street money-grubbing."[20] (emphasis
added). The article speculates as to potential risks and the
harm cited hardly rises to being "concrete and corroborated."
Other alleged harms are similarly forward-looking and
speculative. (See e.g., Cole Compl. ¶ 65 ("Facebook will suffer
from what is known as the "liar's discount" . . . Facebook's
ability to raise equity capital or debt on favorable terms in
the future is now impaired."); Levy Compl. ¶ 71 ("Facebook will
expend significant sums of money . . . .")) (emphasis added).

        Thus, where "the claim of damages is contingent on the
outcome of a separate, pending lawsuit, the claim is not ripe

---

[20] Rob Cox, One Reason for the Facebook IPO Mess: Zuckerberg Didn't Care,
Slate.com,
http://www.slate.com/blogs/breakingviews/2012/05/23/one_reason_for_the_facebo
ok_ipo_mess_zuckerberg_didn_t_care_.html.

and the complaint must be dismissed." <u>In re United Telecomms.</u> <u>Inc., Secs. Litig.</u>, No. 90-2251-EEO, 1993 WL 100202, at *3 (D. Kan. Mar. 4, 1993) (dismissing derivative claims seeking "damages that are speculative and contingent upon the outcome of the class action."). Accordingly, because Derivative Plaintiffs have not demonstrated that the alleged costs were caused by an actual corporate wrong, which is not predicated on the resolution of other litigation, their claims are not ripe and therefore dismissed on this basis.

## III. Conclusion

Based upon the conclusions set forth above, the Facebook Defendants' motion to dismiss is granted in part on the grounds of standing and ripeness, and the Derivative Plaintiffs' complaints are dismissed. Having dismissed the complaints, Plaintiffs' motions to remand are denied as moot. Derivative Plaintiffs are granted leave to replead within twenty days.

New York, NY
February /2, 2013

ROBERT W. SWEET
U.S.D.J.

70