**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE FACEBOOK, INC., IPO SECURITIES AND DERIVATIVE LITIGATION | MDL No. 12-2389 (RWS)<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>This document relates to the Consolidated Securities Action: |

|  |  |
|---|---|
| No. 12-cv-4081 | No. 12-cv-4763 |
| No. 12-cv-4099 | No. 12-cv-4777 |
| No. 12-cv-4131 | No. 12-cv-5511 |
| No. 12-cv-4150 | No. 12-cv-7542 |
| No. 12-cv-4157 | No. 12-cv-7543 |
| No. 12-cv-4184 | No. 12-cv-7544 |
| No. 12-cv-4194 | No. 12-cv-7545 |
| No. 12-cv-4215 | No. 12-cv-7546 |
| No. 12-cv-4252 | No. 12-cv-7547 |
| No. 12-cv-4291 | No. 12-cv-7548 |
| No. 12-cv-4312 | No. 12-cv-7550 |
| No. 12-cv-4332 | No. 12-cv-7551 |
| No. 12-cv-4360 | No. 12-cv-7552 |
| No. 12-cv-4362 | No. 12-cv-7586 |
| No. 12-cv-4551 | No. 12-cv-7587 |
| No. 12-cv-4648 | |

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ........................................................................................ 2

II.    JURISDICTION AND VENUE ................................................................... 9

III.   PARTIES ................................................................................................... 10

       A.     Lead Plaintiffs .............................................................................. 10

       B.     Named Plaintiffs .......................................................................... 11

       C.     Defendants .................................................................................... 12

              1.     Corporate Defendant ......................................................... 12

              2.     The Individual Defendants ................................................ 12

              3.     The Underwriter Defendants ............................................. 15

IV.    OVERVIEW .............................................................................................. 18

       A.     Facebook's Meteoric Rise Creates Unprecedented Market Anticipation
              For Its IPO .................................................................................... 18

       B.     Facebook Files For Its IPO, And The Market Reacts Positively To Its Disclosures
              Concerning Its Revenue, Growth, And Positioning In The Mobile Market ........ 20

       C.     The SEC Questions Facebook's Disclosures ....................................... 23

       D.     As Facebook Prepares For Its Roadshow, The Company Continues To
              Emphasize Its Growth Prospects In The Mobile Market To Investors ................. 24

       E.     As Facebook Begins Its Roadshow, It Determines That Its Revenues For The
              Second Quarter And The Year Have Been Materially Impacted ......................... 30

       F.     Facebook Discloses Its Severe Revenue Declines To A Select Group Of Investors,
              But Not To The Market ............................................................................ 33

       G.     With The Market Unaware Of The Pronounced Deterioration In Facebook's
              Revenue, Facebook Increases The Price And Size Of The Offering, And
              Allocates An Extremely High Number Of Shares To Small Investors ............... 39

       H.     Facebook Conducts Its Historic IPO ................................................... 43

       I.     Facebook's Market Debut Fizzles As Morgan Stanley Is Forced To Desperately
              Prop Up The Company's Stock Price To Prevent A "Broken Issue" .................. 45

       J.     Facebook Stock Collapses On Monday And Tuesday As The Truth Emerges .... 48

       K.     The Financial Media Acknowledges That The Declines In Facebook's Revenue
              Estimates Were Not Conveyed By Facebook's Public Disclosures, And
              Significantly Altered The Total Mix Of Information ........................................ 52

V.     THE NEGATIVE CHANGE IN FACEBOOK'S REVENUE ESTIMATES
       SIGNIFICANTLY ALTERED THE TOTAL MIX OF INFORMATION IN THE
       MARKETPLACE ........................................................................................ 54

VI.     MATERIALLY UNTRUE AND MISLEADING STATEMENTS
AND OMISSIONS ................................................................................ 59

VII.    CLASS ACTION ALLEGATIONS ..................................................... 67

VIII.   THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND
BESPEAKS CAUTION DOCTRINE .................................................... 69

IX.    CAUSES OF ACTION ........................................................................ 70

       COUNT I ................................................................................................ 70

           For Violations Of Section 11 Of The Securities Act (Against Defendants
              Zuckerberg, Ebersman, Spillane, The Facebook Board, And The
              Underwriter Defendants)

       COUNT II ............................................................................................... 72

           For Violations Of Section 12(a)(2) Of The Securities Act (Against Facebook,
              Defendants Zuckerberg, Sandberg, and Ebersman,
              and The Underwriter Defendants)

       COUNT III .............................................................................................. 75

           For Violations Of Section 15 Of The Securities Act (Against the Individual
              Defendants)

X.      PRAYER FOR RELIEF ....................................................................... 77

XI.    JURY TRIAL DEMANDED ................................................................ 77

1.     Court-appointed Lead Plaintiffs, the North Carolina Department of State Treasurer on behalf of the North Carolina Retirement Systems, Banyan Capital Master Fund Ltd., Arkansas Teacher Retirement System, and the Fresno County Employees' Retirement Association (collectively, "Lead Plaintiffs"), and Named Plaintiffs Jose G. Galvan and Mary Jane Lule Galvan, bring this action individually and on behalf of all persons and entities who purchased or otherwise acquired the Class A common stock of Facebook, Inc. ("Facebook" or the "Company") in or traceable to Facebook's initial public offering (the "IPO"), which occurred on or about May 17, 2012, and were damaged thereby (collectively, the "Class").  Excluded from the Class are Defendants (as set forth herein), present or former executive officers of Facebook and their immediate family members (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)).

2.     Lead Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters.  Lead Plaintiffs' information and belief is based on, *inter alia*, the independent investigation of Court-appointed Co-Lead Counsel, Bernstein Litowitz Berger & Grossmann LLP and Labaton Sucharow LLP.  This investigation included, but was not limited to, a review and analysis of: (i) public filings with the Securities and Exchange Commission ("SEC") by Facebook; (ii) research reports by securities and financial analysts; (iii) transcripts of investor conference calls; (iv) publicly available presentations by Facebook; (v) press releases and media reports; (vi) economic analyses of securities movement and pricing data; (vii) publicly available filings in the legal action brought against Morgan Stanley & Co. LLC by the Massachusetts Securities Division (the "Massachusetts Enforcement Action"); (viii) consultations with relevant experts; and (ix) other publicly available material and data identified herein.  Co-Lead Counsel's investigation into the

factual allegations contained herein is continuing, and many of the relevant facts are known only by the Defendants named herein, or are exclusively within their custody or control. Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for further discovery.

3.     As set forth further below, the claims asserted herein arise solely under the Securities Act of 1933 (the "Securities Act"). These Securities Act claims are based solely on strict liability and negligence, and are not based on any reckless or intentionally fraudulent conduct by or on behalf of the Defendants – *i.e.*, these claims do not allege, arise from, or sound in, fraud. Lead Plaintiffs specifically disclaim any allegation of fraud, scienter, or recklessness in these non-fraud Securities Act claims.

## I.     <u>INTRODUCTION</u>

4.     This case is about the integrity of the market for initial public offerings. Facebook, the world's largest online social network, conducted one of the biggest and most highly anticipated initial public offerings in history on May 17, 2012. In the offering, Facebook and its insiders sold more than 421 million shares of common stock to the investing public at $38 per share, reaping more than $16 billion in proceeds – the largest initial public offering ever conducted by a technology company, and the third-largest ever conducted in the United States by any company.

5.     A key factor influencing the value of Facebook's stock was its ability to generate large and rapidly growing amounts of revenue through its core advertising business. Thus, the Registration Statement pursuant to which Facebook conducted its IPO repeatedly represented that the Company had experienced "rapid growth," stating, for example, that its annual revenues had increased from approximately $150 million to more than $3.7 billion in the four years before its IPO. In the months and weeks leading up to the IPO, the financial press repeatedly reported

that the Company's revenue growth had created "extraordinary" and "astronomical" demand for its IPO, and that Facebook was "a must-own stock."

6.      On April 16, 2012, as Facebook was preparing to market the IPO to institutional investors through its roadshow, the Company's CFO, Defendant David Ebersman, provided revenue guidance to the analysts from the investment banks that were underwriting the IPO (the "Syndicate Analysts").  Ebersman informed the Syndicate Analysts that Facebook was estimating that it would report revenue of as much as $1.2 billion for the second quarter of 2012 – the quarter in which Facebook was going public – and $5 billion for the year.  Based on Facebook's guidance, the Syndicate Analysts generated revenue estimates that mirrored the figures Ebersman had provided, and provided their estimates to the large clients of their investment banks that were considering investing in the IPO.

7.      Over the next three weeks, however, Facebook's revenues began to rapidly deteriorate.  Indeed, by no later than May 7, 2012, the day that Facebook began its roadshow in New York, the Company determined that two developments within its core advertising business had materially impaired its ability to generate revenue for both the second quarter of 2012 and the full year.

8.      The first and most damaging change concerned a shift in the way that users accessed Facebook.  In particular, Facebook had determined that its users were increasingly accessing Facebook through mobile devices, such as mobile phones, instead of through traditional desktop computers, and that this had materially impaired the Company's ability to generate revenue.  That is because Facebook displayed large amounts of advertising to its desktop users, but displayed much less advertising to its mobile users.  Thus, as Facebook's users

shifted from desktop computers to mobile devices, the Company was generating far less advertising revenue than it had expected.

9.     At the same time that Facebook determined that its users were increasingly migrating to mobile devices, Facebook also determined that certain "product decisions" it had made – such as decisions concerning the type of the advertisements it displayed – had compounded the steep decline in its expected revenue.  In particular, the Company's product decisions had reduced the number of advertisements per page that Facebook displayed to its users, thereby exacerbating the deterioration in the Company's advertising revenue caused by the shift to mobile devices.

10.     As a direct result, ten days before the IPO was scheduled to occur, Facebook drastically slashed the revenue estimates it had provided to the Syndicate Analysts only three weeks earlier.  Specifically, by no later than May 8, 2012, Facebook cut its estimated revenue for the second quarter of 2012 by as much as $100 million, or more than 8.3%, and for the year by as much as $175 million, or 3.5%.

11.     Facebook's most senior executives immediately recognized that the pronounced deterioration in Facebook's revenue was highly material.  The same day that Facebook cut its revenue estimates, Defendant Ebersman and the head investment banker on the IPO, Michael Grimes of lead underwriter Morgan Stanley, concluded that the decline in Facebook's revenue was so significant that Facebook had to promptly disclose its lowered revenue estimates. However, rather than publicly disclose this information, Facebook decided to disclose it only to a handful of its largest and most significant potential investors.  Thus, on May 9, Facebook filed an amended Registration Statement in which it misleadingly represented that the two factors noted above <u>might</u> have a negative impact on its revenues.  Specifically, in its amended Registration

4

Statement, Facebook merely stated that, as a result of increasing mobile usage and the Company's product decisions, the Company's users were growing more quickly than the number of ads that company was displaying to them. At no time, however, did the Registration Statement disclose that the Company's revenues had been negatively impacted by these factors. To the contrary, the amended Registration Statement stated only that these factors "may negatively affect our revenue and financial results" – the exact same information the Company had disclosed prior to determining that they had negatively impacted its revenue and financial results. Accordingly, the warnings themselves in the amended Registration Statement constituted false statements.

12.     The actions that Facebook's own senior officers took after the amended Registration Statement was filed confirm that they understood that the information regarding the declines in Facebook's revenues was highly material, not conveyed by the amended Registration Statement, and not otherwise part of the total mix of information in the market. Thus, beginning on the evening of May 9 – only twelve minutes after Facebook filed the amended Registration Statement – Facebook's Treasurer, Cipora Herman, began to conduct nineteen separate telephone calls with the Syndicate Analysts. Each of these calls had the same purpose: to inform the Syndicate Analysts of the material facts which the Registration Statement had not disclosed. On these calls, Herman read from a script prepared by Grimes, and told the Syndicate Analysts that the two factors discussed above had already materially impaired Facebook's revenue for the second quarter and year, and that, as a result, Facebook had sharply lowered the revenue estimates it had given them only three weeks earlier.

13.     As Facebook knew they would, the Syndicate Analysts immediately lowered their own internal estimates for Facebook's revenue to mirror Facebook's revised guidance, and

communicated these lowered estimates to a small, select group of institutions that were considering investing in the IPO.  The Syndicate Analysts did not issue any public reports with respect to their lowered estimates of Facebook prior to the completion of the IPO.

14.     The few institutions who received this information immediately recognized that it was new, material information that reflected a highly negative change in Facebook's financial condition.  As *Reuters* would subsequently report after the IPO, these institutions said that the Syndicate Analysts' decision to reduce their estimates during the time period when the roadshow was occurring was "very, very unusual," and they had "never before seen that in 10 years." Similarly, according to *Reuters* and *The Wall Street Journal*, the few investors who were told of the revenue declines were "shocked" by the "deceleration" in Facebook's revenues, which raised a "significant red flag" about Facebook's ability to generate the level of revenue that the market expected, and called the Company's value into serious question.  Indeed, institutions that received this non-public information cancelled or cut their orders for Facebook shares, dropped the price they were willing to pay, or sold their shares immediately after the IPO.

15.     However, because the market had not been put on notice of the fact that Facebook's business had been materially impaired, in the week before the IPO, market demand for Facebook shares reached levels that the financial press described as "astronomical." In response to this surge of demand, days before it went public, the Company and the underwriters significantly increased the price and size of the IPO, boosting the price to $38 per share (from a previously announced range of $28 to $35 per share), and increasing the size of the offering by more than 80 million shares. All of the new shares made available to the public came from selling insiders, including certain of the Company's directors and one of its underwriters,

Goldman Sachs, who each decided to vastly increase the number of shares they were selling to the public.

16.     With the market unaware of Facebook's pronounced revenue deterioration, Facebook completed its IPO as scheduled after the close of the market on May 17.  The IPO not only generated billions of dollars for Facebook, but it made many of the Company's senior executives and directors exceptionally rich.   Based on the IPO price, the stock held by Facebook's 28-year-old CEO, Defendant Mark Zuckerberg, was worth $19 billion, making him one of the wealthiest men in the world.

17.     Facebook stock began publicly trading the next day, Friday, May 18.  After opening at $42.05 on a surge of retail demand, Facebook stock immediately began to plummet, falling back to the IPO price of $38 per share, and ultimately closing at $38.23, a performance that analysts and the financial press concluded was surprising and disappointing.

18.     Beginning on the night of May 18 and continuing over the next several days, news of the decline in Facebook's revenues began to emerge.  On the night of May 18, *Reuters* reported that, days before the IPO, Facebook had taken the "rare and disruptive" step of lowering its guidance to analysts during the time period that its roadshow was occurring.  This news swept through the market and, over the weekend of May 19-20, members of the financial press reported that this information was highly material and fundamentally affected the value of Facebook's stock.  For example, on May 19, *Business Insider* reported that Facebook's decision to reduce its guidance "mid-way through a series of meetings designed for the sole purpose of selling the stock" was "*highly material information.*  [S]uch a late change in guidance would mean that Facebook's business was deteriorating rapidly – between the start of the roadshow and the middle of the roadshow.  Any time a business outlook deteriorates that rapidly, alarm bells start

going off on Wall Street, and stocks plunge." As *Business Insider* further noted, investors who were not informed of this critical new information have "every right to be furious. Because this would have been highly material information that some investors had and others didn't – the exact sort of unfair asymmetry that securities laws are designed to prevent."

19.     On the very next trading day, Monday, May 21, Facebook shares collapsed. Facebook stock opened sharply down from the IPO price and plummeted throughout the day on extremely high trading volume, closing down at $34.03, a decline of nearly 11% from the IPO price.

20.     Prior to the opening of trading on May 22, *Reuters* again shocked the market by reporting that, "while an investor roadshow was underway," lead underwriters Morgan Stanley, J.P. Morgan, and Goldman Sachs had taken the highly unusual step of "significantly" cutting their revenue forecasts for Facebook, but appeared to have told only a few "major clients" about this highly "negative" development.   On Tuesday, May 22, Facebook shares again swiftly plummeted.  Facebook stock opened the day down sharply from the prior close, and ended the trading session at $31 per share, a decrease of approximately 9%, again on extremely high volume.  Thus, in just two trading days over May 21 and 22 – only Facebook's second and third trading days as a public company – its shares had fallen more than 18% from the IPO price, wiping out billions of dollars of Facebook's market capitalization.  As *Bloomberg* reported, the collapse in Facebook's stock on May 21 and 22 was "epic:" based on that two-day decline, Facebook's IPO became the single worst performing initial public offering in 10 years, making it the "flop of the decade."

21.     Following the collapse in Facebook's stock price, numerous market commentators pointedly wrote that the Registration Statement failed to disclose highly material information

regarding Facebook's revenue declines, and that the belated disclosure of this information had significantly altered the total mix of information in the market.  For example, *Business Insider* reported that, "This was *selective disclosure of critical non-public information.*  <u>Facebook's amended prospectus did not say that the company's business had suddenly weakened and management's outlook had changed.  And that information is vastly more important than what the prospectus did say, which was that users are growing faster than revenue</u>."

22.     Similarly, *Venture Beat*, a widely read publication that covers technology and finance, reported that Facebook's amended Registration Statement did <u>not</u> put investors on notice that there had been a material change in Facebook's business in the weeks leading up to the IPO:

> In that May 9 update [referring to the amended Registration Statement], Ebersman decided to use vague language when describing how the company's second quarter was looking.  It was extremely understated, considering what we would later find out.  …  <u>[T]his update itself didn't send any alarm bells to most investors, and it shouldn't have.  …  [T]he reality is that this wording was just too vague to be construed by normal people as meaning anything more than what had already been mentioned before.  …  The fact is, there is nothing within the S-1 update on May 9 that would give normal investors the sense that there had been a material change about Facebook's revenue prospects.</u>

23.     Based on the facts alleged herein, Lead Plaintiffs assert claims under: (i) Section 11 of the Securities Act against Facebook, certain of its senior executives, its directors, and the underwriters of its $16 billion IPO; (ii) Section 12(a)(2) of the Securities Act against Facebook, certain of its senior executives, and the underwriters of its IPO; and (iii) Section 15 of the Securities Act against Facebook's senior executives and directors.

## II.     <u>JURISDICTION AND VENUE</u>

24.     The claims asserted herein arise under Sections 11, 12 and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l, and 77o.

25.     This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States.

26.     Venue is proper in this District pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1391(b), (c) and (d).   Many of the acts and transactions that constitute violations of law complained of herein, including the dissemination to the public of untrue statements of material facts, occurred in this District.

27.     In connection with the acts alleged herein, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of national securities exchanges.

## III.   PARTIES

### A.   Lead Plaintiffs

28.     Lead Plaintiff the North Carolina Department of the State Treasurer on behalf of the North Carolina Retirement Systems ("North Carolina DST") is an arm of the Government of the State of North Carolina, which is entrusted by statute with managing the pooled funds held on behalf of the North Carolina Retirement Systems.   The North Carolina Retirement Systems are statutory retirement and benefit plans that cover more than 850,000 public employees and teachers.   North Carolina DST purchased 685,373 shares of Facebook in the IPO.   On December 6, 2012, this Court appointed North Carolina DST as a Lead Plaintiff for this litigation.

29.     Lead Plaintiff the Arkansas Teacher Retirement System ("Arkansas Teacher") is a state-wide retirement system that provides retirement benefits for the employees of Arkansas' public schools and other educational institutions.   As of June 30, 2011, Arkansas Teacher managed more than $11.7 billion in assets for the benefit of its members.   Arkansas Teacher

purchased 246,849 shares of Facebook in the IPO.  On December 6, 2012, this Court appointed Arkansas Teacher as a Lead Plaintiff for this litigation.

30.     Lead Plaintiff the Fresno County Employees' Retirement Association ("Fresno") provides retirement benefits for the employees of the County of Fresno, Superior Courts of California Fresno, and for other participating agencies.  As of March 31, 2012, Fresno managed over $3.2 billion in assets for the benefit of its members.  Fresno purchased 95,900 shares of Facebook in the IPO.  On December 6, 2012, this Court appointed Fresno as a Lead Plaintiff for this litigation.

31.     Lead Plaintiff Banyan Capital Master Fund Ltd. ("Banyan") is an investment fund that has been in operation since 2004.  Banyan purchased 1,415,862 shares of Facebook common stock traceable to the IPO.  On December 6, 2012, this Court appointed Banyan as a Lead Plaintiff for this litigation.

32.     Lead Plaintiffs purchased Facebook common stock in or traceable to the IPO as detailed in the certifications already on file with the Court and attached hereto as Appendix A, and suffered damages as a result of the violations of the federal securities laws alleged herein.

**B.  <u>Named Plaintiffs</u>**

33.     Named Plaintiffs Jose G. Galvan and Mary Jane Lule Galvan, a married couple, jointly purchased 21,100 shares of Facebook stock on May 18, 2012 that were traceable to the IPO.  Named Plaintiffs' purchases of Facebook common stock traceable to the IPO are detailed in the certification already on file with the Court and attached hereto within Appendix A. Named Plaintiffs suffered damages as a result of the violations of the federal securities laws alleged herein.

C. **Defendants**

1. **Corporate Defendant**

34.     Defendant Facebook is a Delaware corporation headquartered at 1601 Willow Road, Menlo Park, California 94025.   The Company operates the world's largest social networking service through its website at www.facebook.com, which is accessed by more than 900 million active users per month.   Facebook provides a platform for its users to, among other things, create their own profiles, connect with other individuals they identify as "friends," share communications, post photographs, and play games with one another.   On or about May 17, 2012, Facebook conducted its IPO, in which it issued 421,233,615 shares of its Class A common stock to the public, with an underwriter option to issue an additional 63,185,042 shares of Class A common stock, generating total proceeds of more than $16 billion.   The IPO was conducted pursuant to several documents that were filed with the SEC and disseminated to the investing public, including: (i) Facebook's Registration Statement dated February 1, 2012 and filed with the SEC on Form S-1, as amended by eight subsequent amendments, which contained versions of the prospectus (the "Registration Statement"); and (ii) the final prospectus, which was filed with the SEC on May 18, 2012 on Form 424(b)(4) (the "Prospectus").   Facebook securities actively trade on the NASDAQ under the ticker symbol FB and, as of January 29, 2013, there were 1,684,185,170 shares of its Class A common stock outstanding.

2. **The Individual Defendants**

35.     Defendant Mark Zuckerberg is the founder, Chairman and Chief Executive Officer of Facebook.   Zuckerberg signed the Registration Statement filed with the SEC on February 1, 2012 and all subsequent amendments.   He also made numerous statements concerning Facebook's business in Facebook's roadshow video and at Facebook's roadshow meetings with investors, through which the Company marketed its IPO to investors.   Zuckerberg

sold 30.2 million shares of Facebook Class A common stock in the IPO for proceeds of approximately $1.15 billion.  Following the IPO, Zuckerberg retained control of approximately 56% of the voting power of Facebook's capital stock, rendering Facebook a "controlled company" under the corporate governance rules for NASDAQ-listed companies.  Because of his senior position within and control of the Company, Zuckerberg possessed the power and authority to control the contents of the Registration Statement and Prospectus, Facebook's press releases, investor and media presentations, and other SEC filings.

36.     Defendant Sheryl K. Sandberg is Facebook's Chief Operating Officer ("COO"), the Company's most senior officer behind Defendant Zuckerberg.  Sandberg made numerous statements concerning Facebook's business in Facebook's roadshow video and at Facebook's roadshow meetings with investors.  Because of her senior position within and control of the Company, Sandberg possessed the power and authority to control the contents of the Registration Statement and Prospectus, Facebook's press releases, investor and media presentations, and other SEC filings.

37.     Defendant David Ebersman is Facebook's Chief Financial Officer ("CFO").  Ebersman signed the Registration Statement filed with the SEC on February 1, 2012 and all subsequent amendments.  Ebersman also made numerous statements concerning Facebook's business in Facebook's roadshow video and at Facebook's roadshow meetings with investors.  Because of his senior position with the Company, Ebersman possessed the power and authority to control the contents of the Registration Statement and Prospectus, Facebook's press releases, investor and media presentations, and other SEC filings.

38.     Defendant David M. Spillane is Facebook's Director of Accounting ("DOA").  Spillane signed the Registration Statement filed with the SEC on February 1, 2012 and all

subsequent amendments.  Because of his senior position with the Company, Spillane possessed the power and authority to control the contents of the Registration Statement and Prospectus, Facebook's press releases, investor and media presentations, and other SEC filings.

39.     Defendants Zuckerberg, Sandberg, Ebersman, and Spillane are collectively referred to as the "Officer Defendants."

40.     Defendant Marc L. Andreessen is a Director of Facebook.

41.     Defendant Erskine B. Bowles is a Director of Facebook.

42.     Defendant James W. Breyer is a Director of Facebook.

43.     Defendant Donald E. Graham is a Director of Facebook.

44.     Defendant Reed Hastings is a Director of Facebook.

45.     Defendant Peter A. Thiel is a Director of Facebook.

46.     Defendants Andreessen, Bowles, Breyer, Graham, Hastings, and Thiel are collectively referred to as the "Facebook Board" or the "Facebook Board Defendants."

47.     The Facebook Board Defendants approved the IPO, signed the Registration Statement and all subsequent amendments, and were directors of the Company at the time of the IPO.  They further participated in Facebook Board meetings and conference calls.  In their capacities as signatories of the documents set forth above, as well as by virtue of their authority to approve the IPO, the Facebook Board Defendants possessed the power and authority to control the contents of the Registration Statement and Prospectus, Facebook's press releases, investor and media presentations, and other SEC filings.

48.     The Officer Defendants and the Facebook Board Defendants are collectively referred to as the "Individual Defendants."

### 3.  **The Underwriter Defendants**

49.     Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") was the lead underwriter and lead book-running manager of the IPO, selling 162,174,942 shares of Class A common stock in the IPO.

50.     Defendant J.P. Morgan Securities LLC ("J.P. Morgan") was a co-lead underwriter of the IPO, selling 84,878,573 shares of Class A common stock in the IPO.

51.     Defendant Goldman, Sachs & Co. ("Goldman Sachs") was a co-lead underwriter of the IPO, selling 63,185,042 shares of Class A common stock in the IPO.

52.     Defendant Allen & Company LLC was an underwriter of the IPO, selling 8,424,672 shares of Class A common stock in the IPO.

53.     Defendant Barclays Capital Inc. was an underwriter of the IPO, selling 27,380,185 shares of Class A common stock in the IPO.

54.     Defendant Blaylock Robert Van LLC was an underwriter of the IPO, selling 673,974 shares of Class A common stock in the IPO.

55.     Defendant BMO Capital Markets Corp. was an underwriter of the IPO, selling 421,234 shares of Class A common stock in the IPO.

56.     Defendant C.L. King & Associates, Inc. was an underwriter of the IPO, selling 631,850 shares of Class A common stock in the IPO.

57.     Defendant Cabrera Capital Markets, LLC was an underwriter of the IPO, selling 421,234 shares of Class A common stock in the IPO.

58.     Defendant CastleOak Securities, L.P. was an underwriter of the IPO, selling 673,974 shares of Class A common stock in the IPO.

59.     Defendant Citigroup Global Markets Inc. was an underwriter of the IPO, selling 9,477,755 shares of Class A common stock in the IPO.

60.     Defendant Cowen and Company, LLC was an underwriter of the IPO, selling 421,234 shares of Class A common stock in the IPO.

61.     Defendant Credit Suisse Securities (USA) LLC was an underwriter of the IPO, selling 9,477,755 shares of Class A common stock in the IPO.

62.     Defendant Deutsche Bank Securities Inc. was an underwriter of the IPO, selling 9,477,755 shares of Class A common stock in the IPO.

63.     Defendant E*TRADE Securities LLC was an underwriter of the IPO, selling 210,617 shares of Class A common stock in the IPO.

64.     Defendant Itaú BBA USA Securities, Inc. was an underwriter of the IPO, selling 210,617 shares of Class A common stock in the IPO.

65.     Defendant Lazard Capital Markets LLC was an underwriter of the IPO, selling 421,234 shares of Class A common stock in the IPO.

66.     Defendant Lebenthal & Co., LLC was an underwriter of the IPO, selling 673,974 shares of Class A common stock in the IPO.

67.     Defendant Loop Capital Markets LLC was an underwriter of the IPO, selling 673,974 shares of Class A common stock in the IPO.

68.     Defendant M.R. Beal & Company was an underwriter of the IPO, selling 673,974 shares of Class A common stock in the IPO.

69.     Defendant Macquarie Capital (USA) Inc. was an underwriter of the IPO, selling 421,234 shares of Class A common stock in the IPO.

70. Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated was an underwriter of the IPO, selling 27,380,185 shares of Class A common stock in the IPO.

71. Defendant Muriel Siebert & Co., Inc. was an underwriter of the IPO, selling 673,974 shares of Class A common stock in the IPO.

72. Defendant Oppenheimer & Co. Inc. was an underwriter of the IPO, selling 421,234 shares of Class A common stock in the IPO.

73. Defendant Pacific Crest Securities LLC was an underwriter of the IPO, selling 421,234 shares of Class A common stock in the IPO.

74. Defendant Piper Jaffray & Co. was an underwriter of the IPO, selling 421,234 shares of Class A common stock in the IPO.

75. Defendant Raymond James & Associates, Inc. was an underwriter of the IPO, selling 421,234 shares of Class A common stock in the IPO.

76. Defendant RBC Capital Markets, LLC was an underwriter of the IPO, selling 4,212,336 shares of Class A common stock in the IPO.

77. Defendant Samuel A. Ramirez & Company, Inc. was an underwriter of the IPO, selling 631,850 shares of Class A common stock in the IPO.

78. Defendant Stifel, Nicolaus & Company, Incorporated was an underwriter of the IPO, selling 421,234 shares of Class A common stock in the IPO.

79. Defendant Wells Fargo Securities, LLC was an underwriter of the IPO, selling 4,212,336 shares of Class A common stock in the IPO.

80. Defendant The Williams Capital Group, L.P. was an underwriter of the IPO, selling 589,727 shares of Class A common stock in the IPO.

81.    Defendant William Blair & Company, L.L.C. was an underwriter of the IPO, selling 421,234 shares of Class A common stock in the IPO.

82.    The Defendants named in paragraphs 49-81 are collectively referred to as the "Underwriter Defendants."

## IV.    OVERVIEW

### A.    Facebook's Meteoric Rise Creates Unprecedented Market Anticipation For Its IPO

83.    In February 2004, Defendant Zuckerberg founded Facebook in his Harvard University dorm room as a social networking website through which Harvard students could connect to one another and share information about their lives.  In July 2004, Facebook was formally incorporated as a private company.  Facebook soon opened its website to other universities and the general public, and proved to be extremely popular.

84.    Between the time of its founding and its IPO in May 2012, Facebook experienced meteoric growth in its user base and its operations.  Within eight years, Facebook became the largest social network in the world and one of the country's best-known technology companies. As of March 31, 2012, Facebook reported that 901 million "active users" accessed its website each month – nearly half of all people who use the Internet and approximately 13% of the world's population.  At the time of its IPO, Facebook's site was the number one website in the world as measured by the total minutes spent by users on the site and total page views.

85.    In 2011, as Facebook sought to rival cash-rich technology companies such as Google and Apple, the Company began to seriously explore engaging in an IPO.  While the Company's shares traded on private exchanges, accessing the public markets through an IPO would provide the Company with several unique benefits.  Among other things, an IPO would provide the Company with large amounts of cash necessary to compete with the giants in the technology field through acquisitions and expansion of its own operations.  It would also create a

18

highly liquid market for its stock, and had the potential to significantly increase its value by tapping into widespread market demand.

86.    By the end of 2011, reports emerged that Facebook was exploring filing for one of the largest IPOs in history.  For example, in November 2011, *The Wall Street Journal* reported that Facebook was

> exploring raising $10 billion in its IPO – what would be one of the largest offerings ever – in a deal that might assign Facebook a $100 billion valuation, a number greater than twice that of such stalwarts as Hewlett-Packard Co. and 3M Co.  A Facebook IPO has been hotly anticipated for several years, and viewed as a defining moment for the latest Web investing boom.

87.    By January 2012, news had spread that Facebook would file for its IPO on February 1, and market anticipation of the offering reached nearly unprecedented levels.  As reported by *TheStreet.com*, analysts said that Facebook's offering was so significant that it would give the entire market a much-needed lift: "[A]n analyst from GreenCrest Capital said that … 'Facebook is obviously the IPO of the year, maybe the IPO of the decade, likely the largest IPO in dollar value in American history.  The market is a pretty dim environment right now, but you have a very bright light coming in.'" *Reuters* quoted the CEO of investment bank Montgomery & Co. as stating that "[t]he Facebook IPO will be <u>iconic</u>."  Given the significance ascribed to Facebook's IPO, investor demand for Facebook stock was expected to be immense.  As the *Los Angeles Times* reported, "'The minute the IPO is filed, there will be pandemonium,' said [an analyst from] IPO Boutique[], who says he has <u>never seen anything quite like the pent-up demand for Facebook shares</u>."

88.    Against the backdrop of what was expected to be one of the largest and most closely-watched offerings in history, the market was intently focused on the information that would be set forth in Facebook's Registration Statement and Prospectus.  Because Facebook had

operated as a private company, it had never before publicly disclosed detailed information concerning its business and financial condition.  As reported by the *Los Angeles Times*:

> Can Facebook stake its fortune in social networking in the wildly profitable way Google did with the Internet search?  Swarms of investors can't wait to find out.  Even everyday users are looking forward to poring over Facebook's prospectus – the first in-depth glimpse of Facebook's financials ….  How much money the company is making is a closely-guarded secret.  But that will soon change.

**B.   Facebook Files For Its IPO, And The Market Reacts Positively To Its Disclosures Concerning Its Revenue, Growth, And Positioning In The Mobile Market**

89.   On February 1, 2012, Facebook publicly filed its initial Registration Statement with the SEC.  Investor interest in these disclosure documents was so intense that the SEC's "website crashed [] under the pressure of investors seeking access to the Facebook filing document," according to *The Wall Street Journal*.

90.   The Registration Statement highlighted the Company's dominant market position and growth.  It stated that, "[s]ince January 2011, Facebook.com has been the number one website worldwide," with more than 845 million "monthly active users" as of December 31, 2011, who collectively spent on average "9.7 billion minutes per day on Facebook."  It further stated that the Company has consistently "experienced rapid growth in the number of users and their engagement."

91.   As the Registration Statement explained, Facebook generally does not charge its users for any of the social networking services it provides.  Instead, Facebook's business model depends almost entirely on selling advertisements to companies that want to reach Facebook's user base, whose ads Facebook displays to its members as they use its website.  Thus, the key driver of the Company's growth, and the principal determinant of Facebook's value, was its advertising revenue.  Indeed, the Company's advertising revenue accounted for 98%, 95% and 85% of the Company's revenues in 2009, 2010, and 2011.

92.     The Registration Statement disclosed that Facebook's advertising and total revenue grew at a torrid pace in the years before its IPO.  Between 2007 and 2011, Facebook's annual advertising revenue grew from approximately $153 million to $3.2 billion – multiplying more than twenty times.  In turn, during this time period, Facebook's annual revenue grew from $153 million to more than $3.7 billion – a 24-fold increase.  Moreover, in the year before its IPO, Facebook's revenue surged 88%, climbing from almost $2 billion in 2010 to the aforementioned $3.7 billion in 2011, which "was due primarily to a 69% increase in advertising revenue," according to the Registration Statement.

93.     Facebook also described certain factors that were critical to its financial results, two of which are relevant here.  The first and principal factor was the growing usage of Facebook on mobile devices, as opposed to the use of Facebook through traditional, stationary desktop computers.  Mobile devices include those devices through which people access the Internet remotely, such as "smart" mobile phones (like iPhones) and tablets (like iPads).  The usage of Facebook on mobile devices was critical to Facebook's financial performance for three principal reasons.

94.     First, Facebook's mobile market was extremely large.  At the time Facebook filed its initial Registration Statement, 425 million (or approximately half) of Facebook's monthly users accessed the website through their mobile devices, either as a supplement to their use of Facebook through desktop computers or as their only means of accessing Facebook.  Second, Facebook's mobile users were growing more rapidly than the rest of the Company's user base. As Facebook stated, the growth rate for its mobile users "will continue to exceed the growth rate of our overall [member base] for the foreseeable future."  Third, while the Company showed large volumes of advertising to users who accessed its website through desktop computers, it did

not yet show advertisements to its mobile users.  Thus, the mobile market was an untapped revenue stream, and an extremely important engine of Facebook's future growth.

95.     Accordingly, in the Registration Statement, Facebook emphasized that the mobile market was a "critical" area of "growth" and a "significant opportunity" that the Company was actively developing products to capitalize on.  Facebook stated that "[i]mproving our mobile products and increasing mobile usage of Facebook are key company priorities," and it was "devoting substantial resources to developing engaging mobile products and experiences for a wide range of platforms" by "working across the mobile industry … to improve the Facebook experience on mobile devices and make Facebook available to more people around the world."

96.     The second factor that Facebook identified as important to its financial results was the Company's "product decisions."  Facebook's product decisions were decisions that the Company made concerning the design and features of its website, the type of advertising it displayed, and the price of its advertisements.  These product decisions were important to the Company's financial results because they could result in new advertising products, the elimination of certain advertisements, or changes in the price of advertisements – each of which could impact the amount of advertising Facebook displayed and, in turn, its revenues.

97.     The market reacted positively to the disclosures in the Registration Statement, as the financial press reported that Facebook's advertising revenue growth was strong, and the Company was well-positioned to capitalize on the mobile market.  For example, after the Company filed its initial Registration Statement, *Bloomberg* reported that Facebook expected its "next 1 billion users to come mainly from mobile devices," and was therefore "increasing its focus on mobile technology to take advantage of the shift to smartphones and tablets."  The report quoted the director of research at investment-advisory firm Renaissance Capital as stating

that "Investors are still very much willing to pay up for growth.  There's just phenomenal interest in this company and its potential."  Similarly, *The New York Times* reported that "the filing shed some light on how [Facebook's] meteoric run has turned the upstart into a formidable money maker.  …  [M]any analysts believe Facebook's fortunes will rapidly multiply as advertisers direct more and more capital to the Web's social hive."

### C.  The SEC Questions Facebook's Disclosures

98.     On February 28, 2012, the SEC sent the Company a "comment letter" concerning certain of the Company's disclosures in the initial Registration Statement.  Among other things, the SEC questioned certain of Facebook's disclosures about potential factors that might impact its revenues, including growing mobile usage, and instructed the Company to provide additional information to investors on these subjects.

99.     As the SEC noted, Facebook's Registration Statement contained a "risk factor" purporting to warn investors that Facebook's revenue "may" be negatively affected by increasing mobile usage "if" certain contingencies occurred.  Specifically, this disclosure stated as follows

> ***Growth in use of Facebook through our mobile products, where we do not currently display ads, as a substitute for use on personal computers <u>may negatively affect our revenue and financial results</u>.***
>
> We had more than 425 million MAUs [monthly active users] who used Facebook mobile products in December 2011.  We anticipate that the rate of growth in mobile users will continue to exceed the growth rate of our overall MAUs for the foreseeable future, in part due to our focus on developing mobile products to encourage mobile usage of Facebook.  Although the substantial majority of our mobile users also access and engage with Facebook on personal computers where we display advertising, our users could decide to increasingly access our products primarily through mobile devices.  We do not currently directly generate any meaningful revenue from the use of Facebook mobile products, and our ability to do so successfully is unproven.  <u>Accordingly, if users continue to increasingly access Facebook mobile products as a substitute for access through personal computers, and if we are unable to successfully implement monetization strategies for our mobile users, our revenue and financial results may be negatively affected</u>.

100.    The SEC instructed Facebook that, rather than merely saying that its results "may" be negatively affected under certain circumstances, it must "fully address" the potential impact on the Company's revenue if the contingencies concerning mobile usage materialized. Specifically, the SEC comment letter stated that, "assuming that the trend towards mobile continues and your monetization efforts are unsuccessful, ensure that your disclosure fully addresses the potential consequences to your revenue and financial results rather than just saying that they 'may be negatively affected.'"

101.    In addition, the SEC directed Facebook to disclose any trends that were having, or were reasonably expected to have, a material impact on its "revenue growth and advertising revenue growth."  Specifically, the SEC instructed Facebook to disclose, pursuant to Item 303(a) of SEC Regulation S-K, "any known trends or uncertainties that have had, or that you reasonably expect will have, a material favorable or unfavorable impact on sales or results of operations."

102.    On March 7, 2012, Facebook responded to the SEC's comment letter.  In its response, Facebook stated that it could not disclose the potential impact of mobile usage on its revenue because it was unable to determine that impact.  In particular, Facebook asserted that because many of its mobile users also continued to access Facebook through their desktop computers, the Company "cannot specifically determine how mobile use is a substitute for, rather than incremental to, use on personal computers."  Thus, Facebook stated that it was unable to "specifically assess the impact of increasing mobile use on its revenue and financial results" at that time.

D.    **As Facebook Prepares For Its Roadshow, The Company Continues To Emphasize Its Growth Prospects In The Mobile Market To Investors**

103.    During March and April 2012, Facebook was preparing for a critical part of its IPO: its "roadshow," which was scheduled to begin on May 7 and end on May 17.  The

roadshow consisted of a series of meetings, primarily with groups of institutional investors, held across the country.   During these meetings, Facebook's most senior executives – including Defendants Zuckerberg, Sandberg, and Ebersman – made presentations and answered investor questions.   The roadshow was one of the most important parts of the IPO process because it was a principal way that Facebook and the lead underwriters marketed the IPO directly to institutional investors, and thereby increased investor demand for the Company's stock.

104.   To track demand for the Company's stock, during the roadshow, the lead underwriters built the "book" of orders for the IPO.   The book contained the number of shares that each institutional investor wanted to purchase, as well as the price that each investor was willing to pay for the stock.   Based on the orders in the book, at the end of the roadshow, Facebook and the lead underwriters determined how many shares to sell in the IPO and the price per share.   These determinations not only set the value of the IPO, but they also set Facebook's market value as a company.

105.   The two Facebook executives who had principal responsibility for managing Facebook's roadshow were Defendant Ebersman and Facebook's Treasurer, Cipora Herman. Michael Grimes, the Head of Technology Investment Banking at lead underwriter Morgan Stanley, served as the Company's principal advisor on behalf of the Underwriter Defendants.

106.   In preparation for the roadshow, on April 16, 2012, Defendant Ebersman met with the Syndicate Analysts.   The purpose of the meeting was for Facebook to provide the Syndicate Analysts with information about its business, including its estimated revenues for the second quarter of 2012 and the full year.   Based on that information, the Syndicate Analysts would generate estimates of the Company's revenues and financial results.   These estimates would then

be incorporated into "institutional selling memoranda," which the Underwriter Defendants' sales force would use to market the IPO to institutional investors.

107.    At the April 16 meeting, Ebersman informed the Syndicate Analysts that Facebook's internal revenue estimate for the second quarter, which had begun on April 1, ranged from $1.1 to $1.2 billion.  Ebersman further informed the Syndicate Analysts that Facebook's internal revenue estimate for the 2012 fiscal year was $5 billion.  These figures translated into year-over-year growth rates of as much as 34% for the second quarter and 35% for the year.

108.    The Syndicate Analysts incorporated the Company's internal estimates into their financial models and generated estimates that mirrored Facebook's guidance.  For example, the analysts for lead underwriters Morgan Stanley, J.P. Morgan, and Goldman Sachs, as well as Bank of America, concluded that Facebook's revenues for the second quarter would be at the high end of Facebook's range of $1.1 billion to $1.2 billion, and its revenues for the full-year 2012 would be approximately $5 billion.  These estimates, which are set forth below, translated into expected year-over-year growth rates of up to 35% for the second quarter, and 39% for the year:

| Underwriter | 2Q 2012 Revenue | Growth Rate | Annual Revenue | Growth Rate |
|---|---|---|---|---|
| Goldman Sachs | $1.207 billion | 35% | $5.169 billion | 39% |
| J.P. Morgan | $1.182 billion | 32% | $5.044 billion | 36% |
| Morgan Stanley | $1.175 billion | 31% | $5.036 billion | 36% |
| Bank of America | $1.166 billion | 30% | $5.040 billion | 36% |

109.    These estimates were then incorporated into the institutional selling memoranda that these Underwriter Defendants used to market the IPO to investors.

110.    Meanwhile, Facebook continued making positive public statements emphasizing its growth and the steps it was taking to capitalize on the mobile market, which gave rise to similar expectations for Facebook's performance among analysts who published their reports to the market.  For example, in an amended Registration Statement filed on March 7, Facebook disclosed that it had taken a key step toward generating revenue from its mobile users by starting to display advertisements to them.  Specifically, Facebook stated that it was beginning to display one of its principal advertising products, called "Sponsored Stories," to its mobile users.

111.    Facebook also underscored that it was achieving greater penetration in the mobile market, thereby expanding its revenue opportunies there.   In its amended Registration Statement, Facebook stated that its mobile application – the product through which mobile users accessed the Company's website – was the most popular mobile application "among … smartphone users in the United States."  In an amended Registration Statement filed on April 23, 2012, Facebook further stated that, as of March 31, 2012, the number of users who accessed its website through mobile products had grown to 488 million, an increase of 15% over such users as of December 2011.

112.    In the amended Registration Statement filed on April 23, 2012, Facebook also disclosed its first quarter results. Facebook reported more than $1 billion in revenue for the first quarter of 2012, an increase of 45% from the first quarter of 2011, which was driven by a 35% increase in the number of ads delivered.  Although Facebook's revenue had declined from the fourth quarter of 2011, Facebook stated that this was "driven by seasonal trends" in advertising spending, which traditionally surges in the fourth quarter during the holiday season, and decreases in the first quarter.  Facebook stated that this "seasonality" may have been "partially masked" in prior years by "[t]he rapid growth in our business."

27

113.    On May 3, 2012, Facebook filed an amended Registration Statement confirming that it was aiming to conduct an IPO of historic dimensions.  Facebook announced that it was planning to sell more than 337 million shares in the offering (consisting of 180 million shares from Facebook, and more than 157 million from selling shareholders), and was planning to price the shares between $28 and $35.  At these levels, the IPO would raise up to approximately $12 billion in proceeds and result in a market valuation of as much as $96 billion for Facebook – numbers that would make Facebook the largest company to go public in history, and the IPO the largest ever for a technology company (and one of the largest ever for any U.S. company).  The IPO was also slated to make Defendant Zuckerberg one of the richest men in the world: at the top of the price range, his Facebook holdings would be worth $18.7 billion.

114.    That same day, Facebook posted its "roadshow" video presentation on its website, which prominently featured Defendants Zuckerberg, Sandberg, and Ebersman.   In the presentation, Facebook again emphasized its continuing growth, stating that "[o]ur advertising revenue has grown from $272 million in 2008 to $3.2 billion last year," and "we've only just begun."  Facebook also stated that the mobile market was a critical growth opportunity that the Company was well-positioned to capitalize on.  Specifically, COO Sandberg stated that the mobile market was "a key area of growth for Facebook" and that Facebook had "just introduced Sponsored Stories … on mobile devices" to monetize its mobile users.  Sandberg further represented that Facebook was not experiencing challenges in the mobile market, stating that, "[f]or most companies, the mobile environment is a challenge, because it's so small it requires new ad formats, but that's not the case for Facebook.  Since sponsored stories are now available … on mobile, they become a really natural part of the Facebook mobile experience."

115.    Analysts and the financial press again reacted positively to Facebook's disclosures.  For example, on May 4, 2012, the day after Facebook released the roadshow video, *Bloomberg* ran an article with the headline "Facebook's Sandberg Says Mobile Advertising Is Key Growth Area," reporting that Sandberg, "<u>in a video recorded for prospective investors, said one of the company's main sources of revenue gains will be mobile advertising</u>.  'Mobile is a key area of growth for Facebook,' Sandberg said in the video, which Facebook will use to drum up interest in its shares before a planned initial public offering."  On May 7, 2012, after Facebook announced the price range and size of the IPO, *Reuters* reported that "the size of the IPO reflects the company's growth and bullish expectations about its money making potential as a hub for everything from advertising to commerce."  Similarly, on May 4, 2012, *The Wall Street Journal* reported that "Facebook pulled back the curtain on how much it thinks it is worth, targeting a valuation as rich as $96 billion in what would be a record debut for an American company.  … Facebook's IPO will be a watershed moment for Silicon Valley, spawning a new generation of millionaires and a handful of billionaires, including founder and Chief Executive Mark Zuckerberg, whose stake is worth as much as $18.7 billion."

116.    Thus, by the time that Facebook's roadshow was scheduled to begin in early May, demand for Facebook stock remained extremely high.  As *The New York Times* reported on May 3:

> Facebook, which plans to make a market debut this month that could value it at $86 billion, <u>is the stock that everyone seems to want</u>.  …  The excitement over Facebook has come on the back of its <u>rapid growth</u>.  <u>For many, Facebook is the Internet</u>.  After a flurry of eye-popping market debuts by other Internet start-ups, … Facebook's will be the biggest yet.  …  <u>Demand to attend the Facebook [roadshow] presentations has been extraordinarily high, with underwriters already drawing up waiting lists for the meetings</u>[.]

117.    Similarly, on May 1, *Reuters* quoted an analyst from the research firm IPO Boutique as stating that "I have not seen as broad based interest in an IPO since Google.

<u>Investor demand is immense</u>.  I expect a roadshow that will rival all roadshows where investors will be turned away at the door."

### E.   **As Facebook Begins Its Roadshow, It Determines That Its Revenues For The Second Quarter And The Year Have Been Materially Impacted**

118.   On May 7, 2012, Facebook began its roadshow with a presentation to investors in New York City.  As expected, investor interest was overwhelming.  *The Wall Street Journal* reported that "the line leading to a second-floor ballroom where the meeting was scheduled to be held … stretched down the first floor and spilled out of the hotel for nearly half a city block." More than 500 of the country's most prominent investors and analysts were in attendance.

119.   At the roadshow meeting, Facebook played the video presentation, described above in paragraphs 114-115, in which Defendant Sandberg emphasized the Company's strong growth prospects and ability to capitalize on the mobile market.  Afterwards, Defendants Zuckerberg, Ebersman, and Sandberg took the stage and answered investors' questions, including a question concerning the Company's "plans to boost revenue from mobile products," according to *The Wall Street Journal*.

120.   Based on the Company's roadshow presentation and the disclosures in the Registration Statement, analysts widely recommended that investors buy Facebook stock.  On May 8, *The Wall Street Journal* summarized the overwhelmingly positive analyst coverage in an article titled "Facebook Gets Bullish Reception – Wall Street Analysts Sound Positive Notes Before IPO; Valuation of $160 Billion?" which reported that:

> Analysts are starting to chime in with support for the bullish case on social network Facebook Inc. ahead of its initial public offering.  Sterne Agee on Monday initiated coverage at "buy[.]"  …  It isn't typical for analysts to publish research before a company goes public.  But Sterne did so because many clients were considering investing, said initiating analyst Arvind Bhatia in an interview.
>
> [Bhatia] set a one-year <u>price target of $46 for the stock, solidly above the range of $28 to $35 a share targeted by Facebook for its IPO</u>.  "Facebook had 48% of the

world-wide Internet population, and they have half a percent of the advertising market world-wide," Mr. Bhatia.  "We think they have significant runway ahead of them," referencing the company's potential for growth.

121.    Analysts also widely reported that, for the second quarter and year-end 2012, Facebook would experience revenue growth rates of at least 35% year-over-year, based in part on the Company's ability to make money from its mobile users.  For example, the Sterne Agee report described in the above paragraph emphasized Facebook's strong positioning in the mobile market, stating that, "[w]ith 488 million MAUs [monthly active users] using Facebook mobile products in the month of March 2012, FB clearly has the reach on mobile platforms…. Furthermore, the Facebook mobile app was the most downloaded app … in the month of January 2012…."  Thus, Sterne Agee concluded that "mobile monetization [is] a significant long-term growth opportunity for FB" and Facebook could "triple its revenue" in the next 4 years based in part on its "mobile monetization potential."  For 2012, Sterne Agree projected that Facebook would report more than $1.2 billion in revenue for the second quarter (a 36% increase over its revenue for the second quarter of 2011) and more than $5 billion in revenue for the year (a 35% increase over its revenue for full-year 2011).

122.    Unbeknownst to investors, however, within hours of Facebook's first roadshow meeting, Facebook determined that two developments in its business had severely impaired its estimated revenues for the second quarter and the full year, and thus, its revenues were going to be much lower than the Company had led potential investors to believe.  First, during the second quarter of 2012, as the Company's users had increasingly migrated from desktop computers (where the Company displayed large amounts of ads) to mobile devices (where Facebook showed less advertising), the Company was generating far less advertising revenue than it had expected.  Second, the Company had made certain product decisions in the second quarter of 2012 that reduced the average amount of advertisements displayed on each page of Facebook's

website, which, in combination with the shift to mobile usage, had exacerbated the decline in Facebook's expected revenues.

123.    Accordingly, on the evening of May 7, 2012, Defendant Ebersman approached the lead Morgan Stanley banker on the IPO, Michael Grimes, and informed him that, based on second quarter data received to date, Ebersman was no longer confident that Facebook would meet its internal revenue estimates.  According to Grimes' sworn testimony in the Massachusetts Enforcement Action, Ebersman informed Grimes that, "based upon their experience in Q2 to date, [Ebersman] was less confident in his financial projections – in reaching or exceeding his financial projections than previously."  As Grimes testified, Ebersman further informed him that the two developments noted above, *i.e.*, increasing mobile usage and the Company's product decisions, had caused the rapid deterioration in Facebook's revenues.

124.    Indeed, by no later than May 8, Facebook had already materially lowered its internal revenue figures due to these developments.  Specifically, Facebook determined that its revenue for the second quarter would be as low as $1.1 billion, or more than 8.3% below the top of its prior range.  Further, the Company determined that these factors were expected to continue to negatively impact its revenue for the rest of the year.  Thus, Facebook was now estimating that its revenue for 2012 would be between $4.825 billion and $4.85 billion, or as much as $175 million less than previously estimated, a decline of up to 3.5%.  Significantly, Facebook's revised revenue estimates translated into sharply lower year-over-year revenue growth rates of as little as 23% for the second quarter and 30% for the year, as compared to growth rates of as much as 34% for the second quarter and 35% for the year based on the Company's prior estimates.

**F.**   **Facebook Discloses Its Severe Revenue Declines To A Select Group Of Investors, But Not To The Market**

125.   On May 8, 2012, immediately after Facebook had revised its expected revenues for the second quarter and the year materially downward, its most senior executives determined that the change was so significant that it warranted disclosure to the Syndicate Analysts.  Thus, that day, Facebook's Treasurer, Cipora Herman, sent an email to employees in the finance department with the subject line: "Q2 estimates from analysts IMPORTANT PLS THIS MORNING."  Herman wrote that Facebook had "updated our forecast and we're trying to gauge how far off our new forecast is from where the analysts are coming out."  Herman stated that she and Morgan Stanley bankers immediately needed to see "the q2-q4 by quarter revenue estimates from the analysts for whom we have detailed models," and that she was "[c]opying [a Morgan Stanley banker] on this so we can get some efficiency – I don't want to be the bottleneck in getting the info to MS."

126.   As noted above, Facebook's revised revenue figures were far below the Syndicate Analysts' estimates.  Accordingly, later that day, after Morgan Stanley bankers had compared Facebook's revenue figures with the Syndicate Analysts' estimates, Grimes advised Ebersman that Facebook should immediately provide its new revenue figures to the Syndicate Analysts so that they could revise their models based on this new information and provide it to the Company's largest potential investors, thereby informing them of the change in Facebook's financial condition.

127.   As emphasized by the SEC in its February 28, 2012 comment letter to Facebook, Item 303(a) of SEC Regulation S-K requires public disclosure of "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

33

17 C.F.R. § 229.303.  In addition to the identification of such "known trends," Item 303 requires disclosure of (i) whether those trends have had or are reasonably expected to have a material unfavorable impact on revenue; and (ii) the extent of any such impact on revenue.  Moreover, pursuant to SEC Regulation C, registrants have an overarching duty to disclose material information necessary to ensure that representations in a registration statement are not misleading.  Specifically, Rule 408 states that, "In addition to the information expressly required to be included in a registration statement, there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not misleading."  17 C.F.R. § 230.408(a).

128.    However, Facebook did not publicly disclose the information that it had decided to provide the Syndicate Analysts.  Instead, on the night of May 8, 2012, Facebook executives, including Ebersman and Herman, with input from Grimes, decided that the Company would file an amended Registration Statement containing an extremely vague and limited disclosure about certain trends in the Company's business.  Notably, this new disclosure would continue to represent only that increasing mobile usage and the Company's product decisions might have a negative impact on Facebook's revenue.  Accordingly, on May 9, 2012, the Company filed an amended Registration Statement, which stated as follows:

> Based upon our experience in the second quarter of 2012 to date, the trend we saw in the first quarter of DAUs [daily active users] increasing more rapidly than the increase in number of ads delivered has continued.  We believe this trend is driven in part by increased usage of Facebook on mobile devices where we have only recently begun showing an immaterial number of sponsored stories in News Feed, and in part due to certain pages having fewer ads per page as a result of product decisions.  For additional information on factors that may affect these matters, see "Risk Factors—Growth in use of Facebook through our mobile products, where our ability to monetize is unproven, as a substitute for use on personal computers may negatively affect our revenue and financial results" and "Risk Factors—Our culture emphasizes rapid innovation and prioritizes user engagement over short-term financial results."

34

129.    This new disclosure was itself materially false and misleading.  In the amended Registration Statement, Facebook disclosed only that, as a result of increasing mobile usage and its product decisions, the growth in the Company's users was exceeding the growth in the number of ads it was delivering.  Significantly, nowhere in the amended Registration Statement did Facebook state that these factors had already materially impaired its revenue, or otherwise describe the impact they were having on its business.  To the contrary, in the amended Registration Statement, Facebook misleadingly repeated the same purported "risk disclosure" that it had included in its prior registration statements:  namely, that these factors only "may negatively affect our revenue and financial results," when, in reality, Facebook had already determined that they had materially and negatively impacted its revenue and financial results.

130.    The actions that Facebook took after the Company filed the amended Registration Statement confirm that the decline in Facebook's revenue estimates was highly material, not conveyed by the May 9 amended Registration Statement, and not otherwise part of the total mix of information in the market.  Specifically, within minutes after Facebook filed its amended Registration Statement on May 9, Facebook contacted the Syndicate Analysts to tell them what the amended Registration Statement did not provide notice of – namely, that growing mobile usage and the Company's product decisions had already had a material negative impact on the Company's revenues, and that Facebook had cut its guidance as a direct result.  Facebook provided this information to the analysts precisely because it understood that the market was unaware that these factors had negatively impacted its revenues, and that the magnitude of these impacts was significant.  Indeed, had the market been aware of these critical facts, or had these facts been unimportant, there would have been no reason for Facebook to communicate this information to the Syndicate Analysts.

131.    The manner in which Facebook chose to contact the Syndicate Analysts further confirms that the Company's revenue cuts were highly material and not part of the information in the marketplace.  SEC Regulation FD generally provides that, whenever an issuer discloses "material nonpublic information" about its business to an analyst in connection with an offering, the issuer must also disclose that same information to the public.  However, under certain circumstances, Regulation FD provides a limited exception to this disclosure requirement for information that is conveyed through "[a]n oral communication" in connection with an offering.  Because Facebook's senior executives understood that the Company's lowered guidance was "material nonpublic information" that would have to be publicly disclosed if it was communicated in writing, they sought to avail themselves of the exception for "oral communications."  Specifically, in an effort to avoid Regulation FD in the event that it applied, Ebersman, Herman, and Grimes decided that Facebook would not convey the lowered guidance to the Syndicate Analysts in writing, but would do so over the phone, by reading the information to them, in a series of calls that lasted for days.

132.    Accordingly, within twelve minutes after Facebook filed the amended Registration Statement, Treasurer Herman began calling the Syndicate Analysts from her Philadelphia hotel room.  With calls to the Syndicate Analysts scheduled every 15 minutes, Herman called a total of eleven Syndicate Analysts on the night of May 9, including all of the lead underwriters' analysts.  On May 10 and May 15, Herman called an additional eight Syndicate Analysts to inform them of Facebook's lowered guidance.

133.    Herman conducted these nineteen separate phone calls with the aid of a script that Grimes had prepared for her.  This script provides further confirmation that the market was unaware of the fact that growing mobile usage and the Company's product decisions had had a

material negative impact on Facebook's revenue.  Indeed, in contrast to the vague and inadequate disclosure that Facebook made on May 9, the script that Herman used specifically stated that these trends had negatively impacted Facebook's revenue and that Facebook had significantly cut its revenue estimates as a result.  Specifically, the script stated as follows:

> I wanted to make sure you saw the disclosure we made in our amended filing. The upshot of this is that we believe we are going to come in [on] the lower end of our $1.1 to $1.2 bn range for Q2 based upon the trends we described in the disclosure.  A lot of investors have been focused on whether the trend of ad impressions per user declining (primarily as a result of mobile) was a one-time, or continuing, occurrence.  As you can see from our disclosure, the trend is continuing.  You can decide what you want to do with your estimates, our long term conviction is unchanged, but in the near term we see these trends continuing, hence our being at the low end of the $1,100 + $1,200 range.

134.    Although Grimes' original script did not provide the impact of these factors on Facebook's yearly revenues, Herman specifically wrote this information into the script.  Herman wrote that because of "trends/headwinds over the next six to nine months as this run[s] through the rest of the year, [Facebook] could be 3 to 3 and a half percent off the 2012 $5 billion [revenue] target" that was previously given to the Syndicate Analysts.

135.    The actions that the Syndicate Analysts took after being informed of the cuts to Facebook's revenue estimates provide further confirmation that these declines were highly material, and that the market was unaware of this significant information.  Based on the new information provided by Herman, a significant number of the Syndicate Analysts sharply lowered their revenue estimates for Facebook to reflect the impact of the new information they had been told.  Indeed, as Morgan Stanley admitted in a statement issued after news of Facebook's revenue cuts was revealed to the market following the IPO, "a significant number of research analysts in the syndicate who were participating in investor education reduced their earnings views" after May 9 to reflect their estimate of the impact of the new information.

136.    For example, the Syndicate Analysts of the three lead underwriters, as well as Bank of America, produced much lower revenue figures that were all within Facebook's new guidance and reflected significant deterioration in the Company's business.  As set forth below, these analysts cut their estimates of Facebook's annual revenue by as much as 6%, and their estimates of Facebook's second quarter revenue by as much as 7%.

| Underwriter | 2Q 2012 Revenue | Decrease from April Estimate | Annual Revenue | Decrease from April Estimate |
|---|---|---|---|---|
| Goldman Sachs | $1.125 billion | -6.79% | $4.852 billion | -6.13% |
| J.P. Morgan | $1.096 billion | -7.28% | $4.839 billion | -4.06% |
| Morgan Stanley | $1.111 billion | -5.45% | $4.854 billion | -3.61% |
| Bank of America | $1.100 billion | -5.66% | $4.815 billion | -4.46% |

137.    As Facebook understood they would, the Syndicate Analysts immediately provided this new information to some of the Company's most important potential investors – a select, hand-picked group of some of the biggest hedge funds and other institutions on Wall Street.  In particular, in the days immediately following May 9, the Syndicate Analysts made a series of private phone calls to these select investors to inform them of an extraordinary piece of news: in the midst of the Facebook roadshow, these analysts had taken the extremely rare step of cutting their revenue estimates for the Company they were actively promoting as a model of rapid growth.

138.    The chosen few investors who received this critical information reacted with astonishment.  As *Reuters* would later report after Facebook's IPO:

> The sudden caution very close to Facebook's initial public offering – while an investor road show was underway – <u>was a big shock</u> to some, said two investors who were advised of the revised forecast.   …   '<u>This was done during the roadshow – I've never before seen that in 10 years</u>,' said a source at a mutual fund firm who was among those called by Morgan Stanley.

139.   These investors immediately recognized that the lowered revenue estimates meant that there had been a significant negative change in Facebook's financial condition and value.  As was reported by *The Wall Street Journal* after the IPO, the lowered revenue figures raised "a significant red flag" to those investors who received them.  Similarly, according to *Reuters*, "That deceleration [showed by the revised revenue figures] freaked a lot of people out."  This information caused many investors who received it to change their investment decisions by cancelling or reducing orders, or reducing the price they were willing to pay for Facebook stock. For example, after the IPO, *The Wall Street Journal* reported that when the hedge fund Capital Research & Management was "warned" by an Underwriter Defendant "about Facebook's dimming revenue prospects," the fund concluded that the IPO price of $38 per share was "ridiculous," and "slashed the number of shares it intended to buy," while "[s]ome Capital Research fund managers didn't buy into the IPO at all."

### G.  With The Market Unaware Of The Pronounced Deterioration In Facebook's Revenue, Facebook Increases The Price And Size Of The Offering, And Allocates An Extremely High Number Of Shares To Small Investors

140.   Given the misleading nature of the new disclosure in Facebook's May 9 amended Registration Statement, the financial press continued to report only that increasing mobile usage might impact Facebook's revenue depending on the occurrence of future events.  For example, on the night of May 9, *The New York Times* reported that:

> The company [] warned that <u>if</u> Facebook users continued to gain access to the social network on mobile devices, instead of computers, and <u>if</u> Facebook was "unable to successfully implement monetization strategies for our mobile users," the company's revenue growth <u>could be harmed</u>.

141.    Similarly, on May 9, *The Wall Street Journal* reported that the Registration Statement stated only that increasing mobile usage "may" negatively impact revenue:

> [Facebook] has warned that, as more people use Facebook on mobile phones rather than personal computers, that trend "<u>may negatively affect</u>" financial results. … The issues are important as Facebook heads into the final stretch before its IPO, expected on May 18 in an offering that would value the company at as much as $96 billion.  Executives from the [] Company have been pitching the company's stock to would-be investors this week in a roadshow, where they have fielded questions about Facebook's mobile strategy and growth.

142.    Further demonstrating that the market was unaware of the fact that Facebook's business had been materially impacted by increasing mobile usage, analysts other than the Syndicate Analysts, who had not been called by Facebook, continued to widely expect Facebook to report revenues that were in line with the original, higher guidance Facebook had given in April.  As of May 18, 2012, the date that Facebook went public, analysts' consensus estimates according to Thomson's Institutional Brokers' Estimate System were for Facebook to report revenues of more than $1.2 billion for the second quarter and $5 billion for the year – exactly in line with Facebook's original yearly guidance and slightly above its quarterly guidance.

143.    Because the market was unaware of the impact that increasing mobile usage had already had on Facebook's business, investor demand for Facebook stock far exceeded the number of shares being offered in the week before the offering was scheduled to occur.  On May 11, *Reuters* reported that "Facebook Inc.'s record initial public offering is already oversubscribed … days after the world's largest social network embarked on a cross-country roadshow to drum up investor enthusiasm."  On May 14, *Bloomberg* reported that demand for Facebook shares was so intense that the Underwriter Defendants were "swamped" with orders and were going to close the order book days before they had planned to:

> Facebook plans to stop taking orders tomorrow for its initial public offering, two days ahead of schedule…. The offer of 337.4 million shares at $28 to $35 each has been oversubscribed…. "<u>They're swamped with the orders that are in</u>," said

Jon Merriman, chief executive officer at investment firm Merriman Holdings Inc. in San Francisco. "They just need time to determine the price. They can send the message – the books are closing, send in your orders now."

144.     Accordingly, in the week before the IPO, Facebook increased both the price and size of its IPO.  Raising both the price and size of an IPO is exceedingly rare – indeed, it has occurred in only 3.4% of all IPOs since 1995.  Demand for Facebook stock was so extreme that, in the week before the IPO, Facebook was not only able to raise both the price and size of its IPO, but it was able to increase them by very significant amounts.

145.     Specifically, on May 14, *The New York Times* reported that "Facebook is planning to increase the price for its hotly awaited initial public offering to a range of $34 to $38 a share because of rampant investor demand."   The next day, May 15, Facebook filed an amended Registration Statement disclosing that it was indeed increasing the price range from the previous range of $28 to $35, to a new range of $34 to $38 – an increase of more than 21% at the bottom of the range and nearly 9% at the top.  The large size of Facebook's price increase caused the financial press to uniformly conclude that market demand for the Company's stock had reached astronomical levels, with the *The Associated Press* reporting that "[d]emand is obscenely high."

146.     Notably, the financial press reported that Facebook's ability to significantly raise the IPO price demonstrated that the Company had succeeded in "convincing investors that [it] can make money from mobile users."  As *Bloomberg* reported on May 14:

> Chief Executive Officer Mark Zuckerberg, in a roadshow pitch to the IPO investors, may be winning over skeptics who initially balked at buying the shares, said Erik Gordon, a professor at the University of Michigan's Ross School of Business.  "Raising the range would be the best signal of what the underwriters are hearing from their institutional buyers who have seen the roadshow."  … Zuckerberg is celebrating his 28th birthday today, during the final leg of a marketing tour aimed at building demand for the IPO and convincing investors that Facebook can make money from mobile users.

147.    The next day, May 16, Facebook and its insiders increased the size of the offering by nearly 25%, raising the number of shares being offered by approximately 84 million shares. All the additional shares were offered by Facebook insiders, including directors and large, early shareholders.   Director Defendants Breyer and Thiel, and the private equity arm of Defendant Goldman Sachs, each significantly increased the number of shares they were selling in the offering.   Specifically, as reflected in Facebook's final Prospectus, director Defendant Breyer and entities affiliated with his private equity fund, Accel Partners, increased the number of shares they were selling from 38.2 million to 57.7 million, or 51%.   Director Defendant Thiel more than doubled the number of shares his private equity funds were selling in the IPO, increasing it from 7.7 million to 16.8 million, or by approximately 120%.   Similarly, the private equity arm of Defendant Goldman Sachs nearly doubled the number of shares it was selling, increasing it from 13.2 million to 24.3, or by more than 85%.

148.    Then, on May 17, 2012, *Reuters* reported that the underwriters were releasing significantly more shares to retail investors than was previously expected.   For example, the brokerage arm of Defendant Morgan Stanley "previously set a cap of 500 shares per retail client, but e-mailed advisers late on Thursday afternoon [May 17] that it had increased the limit to 5,000 shares."   Similarly, while Merrill Lynch "had sent multiple emails over the last several weeks warning [brokerage] advisers not to expect to receive many shares for [individual] clients," on the morning of May 17, Merrill informed advisers that they would get thousands of shares per retail client.   *Reuters* quoted a Merrill Lynch retail investment adviser as stating that the allocation "was about four times what he had expected.  'It's a hell of a lot more than I would have anticipated.'"   As an analyst from the research firm IPO Boutique confirmed to *Reuters* on

May 18, "[r]etail got a lot more than I thought they did. … [S]ome of the retail clients who called me today said they were getting 15,000 to 20,000 shares."

**H. Facebook Conducts Its Historic IPO**

149.    On the afternoon of May 17, Facebook's Registration Statement became effective. That evening, Defendant Ebersman and representatives from the three lead underwriters, including Grimes, held a conference call to decide on the price of the IPO.  In a highly unusual move, Morgan Stanley's CEO, James Gorman, participated in the conference call.  As *Bloomberg* subsequently reported, "[t]he involvement of an investment bank's CEO in IPO pricing discussions is unusual, and it reflects the importance that Morgan Stanley (MS) ascribed to its role as lead underwriter on the largest-ever technology IPO."  The participants discussed a price range of between $36 and $41 per share, and ultimately decided to price the IPO at $38 per share – the very top of the range that Facebook had publicly disclosed.  As *The New York Times* reported after the IPO occurred, "a banker involved in the process" said that the $38 figure was chosen because "demand was astronomical."

150.    Later that evening, Facebook announced that it had priced its stock at $38 per share and conduced one of the largest IPOs in history, selling more than 421 million shares of the Company's Class A common stock to the public for proceeds of more than $16 billion.  The IPO was extraordinary by any measure.  The IPO was by far the largest ever for a technology company – indeed, it was nearly 10 times larger than the second-largest technology IPO, Google's $1.67 billion offering in 2004.  The IPO also gave the Company a market capitalization of more than $104 billion, the largest ever for a U.S. company at the time it went public, and larger than the market value of such well-established companies as McDonald's and Citigroup. In fact, Facebook's $104 billion valuation was almost double the valuation achieved by the second-largest company to complete an IPO, the $60 billion valuation that United Parcel Service

Inc. reached when it went public in 1999.  The amount of proceeds raised in Facebook's IPO was the third-largest in U.S. history.

151.    The IPO generated huge amounts of wealth for Facebook's executives and directors.  For example, based on the IPO price, Defendant Zuckerberg's Facebook's holdings were worth more than $19 billion, and he instantly became the 23rd richest person in the world.  Similarly, Director Defendant Breyer and his private equity fund, Accel, reaped approximately $2.2 billion in proceeds from the sale of shares in the IPO, and their retained holdings were worth nearly $5.5 billion based on the IPO price.  Director Defendant Thiel and his private equity funds received proceeds of approximately $640 million from the IPO, and the value of their retained holdings was more than $1.05 billion.  Following the IPO, Director Defendant Marc Andreesen possessed holdings worth nearly $251 million, while the stock owned by Defendants Ebersman and Sandberg was worth approximately $91 million and $72 million, respectively.

152.    With Facebook stock set to begin trading on the NASDAQ the next morning, Friday, May 18, analysts and the financial press widely expected that the shares would experience a large "pop" because demand was so "intense," as described above.  For example, on May 15, just after Facebook raised the IPO price, *Reuters* reported that:

> The price increase [to $38] indicates intense market demand, which means Facebook's shares are likely to see a big pop on their first days of trading on Nasdaq on Friday, analysts said.  "It's confounding but the evidence is that if companies raise the range they will pop more," said Josef Schuster, founder of Chicago-based financial services firm IPOX Schuster LLC  "It signals that there is such strong demand that it will create a momentum for other investors to jump on."

153.    On May 17, *Reuters* further reported that analysts expected Facebook's shares to rise as much as 50% on the first day of trading, and that a driving force of this expected pop was

"frenzied" demand from retail investors eager to own a piece of a Company that they knew and used in their everyday lives:

> Frenzied demand, especially from individual investors hoping to buy into an Internet juggernaut that touches hundreds of millions of people every day, is expected to drive Facebook well above its initial public offering price of $38 per share, which was already at the top end of its target of $34 to $38.  Analysts were divided on how high the price might go on the first day of trad[ing], with some expecting a relatively modest gain of 10 percent to 20 percent while others said anything short of a 50 percent jump would be disappointing.  "It will be bananas tomorrow," said Greencrest Capital analyst Max Wolff. …  "The stock could initially rise and then it could go parabolic on a wave of retail investor hope."

## I. Facebook's Market Debut Fizzles As Morgan Stanley Is Forced To Desperately Prop Up The Company's Stock Price To Prevent A "Broken Issue"

154.    On the morning of May 18, Defendant Zuckerberg rang the opening bell on the NASDAQ, ushering in what was expected to be an historic trading day for the Company and the U.S. financial markets.  While trading in Facebook stock was expected to begin at 11 a.m. Eastern Standard Time, it was delayed by approximately half an hour.

155.    Prior to the opening of trading, small investors placed a flood of orders to buy Facebook stock.  *The Associated Press* reported on May 19 that there was a "rush from small investors" as trading was set to begin, and "Steve Quirk, who oversees trading strategy at [giant retail broker] TD Ameritrade, said that about 60,000 orders were lined up before Facebook opened."  Within the first 45 minutes of trading, Facebook accounted for a record 24% of all trades executed by TD Ameritrade, as compared with a norm of between 2% to 5% on the day a company goes public.

156.    Once trading began at 11:30, Facebook stock was buoyed by the swell of retail demand and opened at $42.05, an immediate 11% pop from the IPO price.  Soon after the initial pop occurred, however, the price of Facebook began to drop.  As was subsequently reported, the drop occurred when investors who had been informed of Facebook's deteriorating revenue began

to cash out, selling their shares at $42 in order to capture the quick gain and eliminate their exposure to a stock that, unbeknownst to the market, had become far less valuable.  As *The New York Times* reported on May 22:

> But Facebook shares quickly began to tumble [after opening at $42].  One investor, <u>after being briefed on Facebook's revised forecast</u>, unloaded all of its holdings in the first hour of trading, according to Scott Sweet, the founder of the IPO boutique, who advises mutual funds, hedge funds and individuals.  The investor sold hundreds of thousands of shares at about $42.  "<u>They knew the jig was up</u>," Mr. Sweet said.

157.    Thus, by approximately 11:45 a.m., Facebook stock had dropped close to the IPO price of $38.  Facebook stock was thus swiftly headed below the offering price on the first trading day, and appeared certain to become a broken issue.  To prevent this outcome, the underwriters were forced to aggressively and immediately prop up the share price by buying massive amounts of stock.  Each time the stock came close to dropping below $38 in the face of massive selling, the underwriters were forced to "defend" the IPO price by buying huge blocks of stock at $38 per share to ensure that the stock price never dipped below that line.

158.    As the lead underwriter for the IPO, Morgan Stanley was responsible for leading the effort to "defend" the IPO price by buying tens of millions of Facebook shares in the open market.  The shares that Morgan Stanley purchased were not retained by the underwriters, but rather were used to cover a short position that had been created when the underwriters sold the overallotment into the market at the time of the IPO.  The underwriters sold the overallotment into the market at the time of the IPO without having previously purchased those shares from Facebook, thereby creating a "short" position equal to the size of the overallotment, which was approximately 63 million shares.  To support Facebook's stock price on May 18, Morgan Stanley began to cover this short position by buying back as much as 63 million Facebook shares at

prices of $38 per share or higher.  As *The Wall Street Journal* reported in a May 19, 2012 article

titled "Facebook's Launch Sputters – Underwriters Forced to Prop Up IPO of Social Network:"

> The stock had been widely predicted to soar on its first day.  Instead, up until the closing moments of the trading sessions, Facebook's underwriters battled to keep the stock from slipping below its offering price of $38 per share.  Such a stumble would have been a significant embarrassment, particularly for a prominent new issue like Facebook, the most heavily traded IPO of all time.  … Morgan Stanley was forced to buy Facebook shares as the price slid toward $38 in order to prevent the price from crossing into negative territory….  Morgan Stanley … had to dip into an emergency reserve of around 63 million Facebook shares – worth more than $2.3 billion at the offer price – to boost the price and create a floor around $38 a share….  In successful IPOs, the reserve, known as the "over-allotment" or "green shoe," is used to meet soaring demand but in this case, it was used to prop up Facebook's ailing share price.

159.    As Morgan Stanley battled to keep Facebook's stock price from dipping below

$38, the trading volume in Facebook shares reached enormous levels on May 18.  That day, more

than 573 million shares of Facebook were traded – the largest volume in history for a Company's

IPO.  "For perspective, that is roughly equal to the combined trading volume of 28 of the 30

stocks in the Dow Jones industrial average," *The Associated Press* reported.  Facebook stock

closed essentially flat at $38.23.  As *The Washington Post* reported, "[s]hare prices would have

plunged immediately if not for the intervention of Morgan Stanley."

160.    Facebook's debut was officially a disappointment.  *Reuters* reported that the

"Historic Facebook debut falls short of expectations.  … 'We have got some unhappy guys out

there,' said Wayne Kaufman, chief market strategist at John Thomas Financial, a retail broker on

Wall Street.  'They were hoping for Facebook to be considerably better.  I bet there are a lot of

disappointed people in the market."  Similarly, the *San Jose Mercury News* reported that analysts

had called the trading debut "surprising and disappointing."

**J.   Facebook Stock Collapses On Monday And Tuesday As The Truth Emerges**

161.   After the close of the market on Friday, May 18, and continuing through the next two trading days, news of the decline in Facebook's expected revenues, including the fact that the lead underwriters had cut their revenue estimates in advance of the IPO, began to emerge. Only hours after the close of Facebook's first day of public trading, at approximately 10 p.m. on Friday, May 18, *Reuters* reported a piece of stunning news.  Specifically, *Reuters* revealed that "Facebook [] altered its guidance for research earnings last week, during the road show, a rare and disruptive move."  As *Reuters* further reported, the fact that Facebook cut its guidance contributed to the stock's "rocky first day of trading," and was a reason why "Facebook's shares spent much of the day struggling to stay above the $38 IPO price," and the "underwriters had to absorb mountains of stock to defend the $38 level and keep the market from dipping below it."

162.   Other members of the financial press quickly picked up the *Reuters* report and wrote that news of Facebook's lowered guidance significantly altered the mix of information in the marketplace concerning Facebook's performance and value.  For example, at approximately 7:30 a.m. on Saturday, May 19, *Business Insider* reported that the lowered guidance was "highly material information," and the selective disclosure of that information represented "the exact sort of unfair symmetry that securities laws are designed to prevent:"

> Earnings guidance is *highly material information*.…  Any time any company gives any sort of forecast, stocks move – because the forecast offers a very well informed view of the future by those who have the most up-to-date information about a company's business. … [I]f Facebook really had "reduced guidance" mid-way through a series of meetings designed for the sole purpose of selling the stock this would have been *even more highly material information*.  [S]uch a late change in guidance would mean that Facebook's business was deteriorating rapidly – between the start of the roadshow and the middle of the roadshow.  Any time a business outlook deteriorates that rapidly, alarm bells start going off on Wall Street, and stocks plunge.

> [N]ow Reuters has just reported [that] "Facebook [] altered its guidance for research earnings last week, during the roadshow, a rare and disruptive move."

Hmmm.  If this really happened, anyone who placed an order for Facebook who was unaware that 1) Facebook had issued any sort of earnings guidance, and 2) reduced that guidance during the roadshow, has every right to be furious. Because this would have been highly material information that some investors had and others didn't – the exact sort of unfair asymmetry that securities laws are designed to prevent.

163.     On Monday, May 21, the first trading day after it was revealed that Facebook had cut its guidance during the roadshow, Facebook shares declined significantly on extremely high volume.  Morgan Stanley's efforts to prop up Facebook stock were overwhelmed by the immense selling pressure caused by news of Facebook's reduced guidance, and Facebook opened at $36.53, far below the IPO price, and continued to fall in the opening minutes of trading.  As *Reuters* reported on May 21, Facebook stock declined so rapidly at the open that it triggered NASDAQ's "circuit breakers" banning short sales in order to prevent any additional pressure on the downward spiraling stock:

The drop was so steep that circuit breakers kicked in a few minutes after the open to restrict short sales in the stock, according to a notice from Nasdaq. … Without that same level of defense [from Morgan Stanley], [Facebook] shares fell $4.50 to $33.73 in the first 1-1/2 hours of trading.  That represented a decline of 11.8 percent from Friday's close and 25 percent from the intra-day high of $45 per share.  …  Volume was again massive, with more than 96 million shares trading hands by 11 a.m., making it by far the most active stock on the U.S. market.

164.     Facebook shares closed on May 21 at $34.03, a decline of nearly 11 percent from the Company's IPO price.  Volume for the day was extraordinarily heavy, with more than 168 million shares traded in total.  In a single day, this precipitous decline in the value of Facebook stock wiped out more than $1.6 billion of the Company's market capitalization.

165.     At approximately 1 a.m. on May 22, *Reuters* issued a report which revealed new significant facts about Facebook's lowered revenue estimates.  Specifically, *Reuters* reported that lead underwriters Morgan Stanley, J.P. Morgan, and Goldman Sachs had "significantly" cut their

revenue forecasts for Facebook in the middle of the roadshow, but appeared to have told only a

few "major clients" about this highly "negative" and "shock[ing]" development:

> In the run-up to Facebook's $16 billion IPO, Morgan Stanley, the lead
> underwriter on the deal, <u>unexpectedly delivered some negative news to major
> clients</u>: The bank's consumer Internet analyst, Scott Devitt, was reducing his
> revenue forecasts for the company. The sudden caution very close to the huge
> initial public offering, and while an investor roadshow was underway, was <u>a big
> shock</u> to some, said two investors who were advised of the revised forecast. They
> say it may have contributed to the weak performance of Facebook shares, which
> sank on Monday – their second day of trading – to end 10 percent below the IPO
> price.
>
> The people familiar with the revised Morgan Stanley projections said Devitt cut
> his revenue estimate for the current second quarter significantly, and also cut his
> full-year 2012 revenue forecast.
>
> "<u>That deceleration freaked a lot of people out</u>," said one of the investors.

166. *Reuters* further reported that it was almost unprecedented for a lead underwriter to

significantly cut its revenue estimates in the midst of the roadshow:

> "This was done during the roadshow – <u>I've never seen that before in 10 years</u>,"
> said a source at a mutual fund firm who was among those called by Morgan
> Stanley. Scott Sweet, senior managing partner at the research firm IPO Boutique,
> … said it is unusual for analysts at lead underwriters to make such changes so
> close to the IPO. "<u>That would be very, very unusual for a book runner to do that</u>,"
> he said.

167. These material new facts further confirmed the significance of Facebook's

lowered guidance, and immediately swept through the market. Before the market opened on

May 22, *Business Insider* reported that the news that the lead underwriters' analysts had cut their

revenue estimates during the time period when the roadshow was occurring was a "bombshell."

As *Business Insider* explained, Facebook's reduced revenue estimates obviously were "material

information," that significantly changed the total mix of information available to investors

considering whether to purchase Facebook stock:

> And now comes some news about the Facebook IPO that <u>buyers deserve to be
> outraged about</u>. Reuters [] is reporting that Facebook's lead underwriters … all

cut their earnings forecasts for the company in the middle of the IPO roadshow. This by itself is <u>highly unusual (I've never seen it during 20 years in and around the tech IPO business.)</u>.  But, just as important, news of the estimate cut was passed on only to a handful of big investor clients, not everyone else who was considering an investment in Facebook.  <u>This is a huge problem</u>, for one big reason:

**Selective dissemination**. <u>Earnings forecasts are material information, especially when they are prepared by analysts who have had privileged access to company management</u>. As lead underwriters on the IPO, these analysts would have had much better information about the company than anyone else. So the fact that these analysts suddenly all cut their earnings forecasts at the same time, during the roadshow, and then this information was not passed on to the broader public, is a huge problem.

<u>Any investor considering an investment in Facebook would consider an estimate cut from the underwriters' analysts "material information."</u> … [D]uring the marketing of the Facebook IPO, investors who did not hear about these underwriter estimates were placed at a <u>meaningful and unfair information disadvantage … and they suffered for it</u>.

168.    Similarly, within hours of *Reuters'* report, tech news outlet *Cnet* also reported that Morgan Stanley's lowered earnings estimates for Facebook "came as a huge shock to some, likely contributing to the lackluster performance of the social-networking giant's stock" and "sink[ing] the … much anticipated offering well before its first trade."  During trading on May 22, *The Wall Street Journal* reported that "investors are angry" to learn that Facebook's underwriters lowered "their financial forecasts for the company while it was holding IPO roadshow meetings," and that Facebook shares were "slid[ing] sharply" as a result of this revelation.  Shortly after the market opened on May 22, *Forbes* also reported that, "Particularly troubling is if the underwriters only notified select clients of their more cautious outlook on Facebook's growth, at a time when both the price range and the size of the offering were soon to be increased," and noted that Facebook stock had fallen more than 6.5% "in early trading" after the release of this news.

169.   Indeed, on May 22, Facebook shares plunged once more.  Facebook stock opened

the day down sharply at $32.61, and closed down at $31 per share, a decrease of another 9%, on

extremely high volume of almost 102 million shares traded.  The financial press widely reported

that the "shocking" news of the revenue cuts had caused the nearly unprecedented decline in

Facebook stock between May 21 and 22.  For example, as *Reuters* reported after trading on May

22:

> Investors expressed disappointment, skepticism and even shock on Tuesday after
> learning that an analyst at lead underwriter Morgan Stanley cut his Facebook
> revenue forecasts in the days before the company's initial public offering –
> information that apparently did not reach small investors before the stock went
> public and subsequently tumbled.

170.   In sum, in just two trading days over May 21 and 22, Facebook's second and third

trading days as a public company, its shares had fallen $7 per share – or more than 18% from the

IPO price – wiping out billions of dollars of Facebook's market capitalization.  While the market

had believed less than a week ago that Facebook's IPO would go down as a momentous success,

the IPO was now an historic failure: the collapse in Facebook's stock on May 21 and 22 made

the IPO the single worst performing initial public offering in 10 years, prompting *Bloomberg* to

call it an "epic fail" and label it the "flop of the decade."

**K.   The Financial Media Acknowledges That The Declines In Facebook's Revenue
Estimates Were Not Conveyed By Facebook's Public Disclosures, And Significantly
Altered The Total Mix Of Information**

171.   Following the disclosure of the declines in Facebook's revenue estimates,

contemporaneous market commentators continued to widely report that this highly material

information was not disclosed in Facebook's Registration Statement, and that its belated

disclosure significantly altered the total mix of information in the marketplace.  For example, on

May 23, 2012, *Venture Beat* reported that the Company's revenue cuts were "material

information" and that the disclosures in the Registration Statement were "woefully short on hard

data," causing "institutional and retail investors [to] take the hit as Facebook's stock value tanked" when news about these facts emerged after the IPO.

172.   *Venture Beat* also quoted the CEO of research firm PrivCo, who concluded that the "revisions to Facebook's earnings estimates" were "enormously material changes" that "absolutely" should have been disclosed in the Registration Statement because they "dramatically change the valuation of the company."  As this analyst stated:

> "The reduction to Facebook's forecasts of this magnitude – reducing the revenue growth rate by over 6 percentage points – is so material that it should absolutely have been disclosed in a revised S-1 filing before the IPO pricing," [the analyst] said.  "The combined net effect for Facebook in this case of both the reduction in the financials and the valuation multiple would have lowered Facebook's valuation by at least one third."

173.   Similarly, *Business Insider* reported on May 24 that the purported disclosures in the Registration Statement did not disclose highly material information:

> Every investor on the planet deserved to know about Facebook's sudden business slowdown.  And the fact that only a select group of institutional investors heard about it—verbally—is outrageous.  …  This was *selective disclosure of critical non-public information*.  Facebook's amended prospectus did not say that the company's business had suddenly weakened and management's outlook had changed. And that information is vastly more important than what the prospectus did say, which was that users are growing faster than revenue.

174.   On May 25, *Venture Beat* reported that the purported warnings in the Registration Statement had failed to disclose critical facts that dramatically altered the information that had been provided to investors:

> In that May 9 update, Ebersman decided to use vague language when describing how the company's second quarter was looking. It was extremely understated, considering what we would later find out.  According to the filing, … Facebook said that it was experiencing the same trend in the second quarter that it had seen in the first quarter, that growth in "daily active users" (DAUs) was increasing more rapidly than the growth in ad impressions, driven by many users' shift to mobile devices.
>
> Now Facebook is generally growing quickly – and its ads are growing, even if they are growing more slowly on mobile – and so this update itself didn't send

any alarm bells to most investors, and it shouldn't have. After all, Facebook had
long warned about this mobile problem, ever since the first IPO prospectus filing
on Feb 1, that revenues could be negatively affected by its huge mobile growth,
because monetizing mobile hadn't been proven. …

Facebook's lawyers may, in the wake of the legal mess it has gotten into, try to
argue that the new May 9 language about "DAU's increasing more rapidly than
the increase in number of ads delivered" pointed to something more significant
than what Facebook had released before. But the reality is that this wording was
just too vague to be construed by normal people as meaning anything more than
what had already been mentioned before. … The fact is, there is nothing within
the S-1 update on May 9 that would give normal investors the sense that there had
been a material change about Facebook's revenue prospects.

175.    As the press also widely reported, Facebook's IPO had conclusively demonstrated

that the market was unaware of the highly material information that Facebook had selectively

disclosed, and the market had suffered badly because of it.  As *The Associated Press* reported on

May 24:

> Wall Street appears bent on convincing Main Street that the game is rigged.
> Investor anger is mounting over the initial public offering of Facebook stock last
> week…. Judson Gee, a financial advisor…, placed a call on Wednesday morning
> [May 23] to a client who had plowed $50,000 into Facebook stock on Friday, the
> day of the IPO.  Gee said he called to tell the client, a restaurateur, about reports
> that Morgan Stanley had told only select customers about an analyst's reduction
> of revenue estimates for Facebook just before the IPO.  "I could see his jaw
> dropping on the other side," Gee said.  "A lot of expletives came out."  He said
> his client had asked "How can they give that information to the big boys and not
> give it to the public?"

## V.    THE NEGATIVE CHANGE IN FACEBOOK'S REVENUE ESTIMATES SIGNIFICANTLY ALTERED THE TOTAL MIX OF INFORMATION IN THE MARKETPLACE

176.    The following facts establish that the decline in Facebook's estimated revenue

was highly material and significantly altered the total mix of information in the marketplace

before Facebook's IPO.

177.    First, Facebook's own actions confirm that the declines in the Company's

estimated revenues were highly material and significantly altered the total mix of information in

the market.  As set forth above at paragraphs 125-134, immediately after Facebook filed its amended Registration Statement on May 9, 2012, Facebook's Treasurer made nineteen separate phone calls over the course of three days to the Syndicate Analysts, precisely to inform them of the material information that was omitted from the Registration Statement: namely, that the Company's business had been materially impacted by the shift to mobile devices and, as a result, Facebook had significantly reduced its revenue estimates for the second quarter and the year. Had this information been immaterial, or part of the total mix of information in the market, Facebook obviously would not have felt the need to make these nineteen separate phone calls to the Syndicate Analysts.

178. <u>Second</u>, the actions of the lead underwriters confirm that the declines in Facebook's estimated revenues were material and significantly altered the total mix of information in the market.  As set forth above at paragraphs 125-134, immediately after being informed of Facebook's lowered guidance, the lead underwriters determined that the change in Facebook's financial condition was so significant that it had to be disclosed to the Syndicate Analysts.  Precisely because the amended Registration Statement filed on May 9 did <u>not</u> disclose or otherwise convey the fact that Facebook's business had been materially impaired, lead underwriter Morgan Stanley drafted a detailed script disclosing the declines in Facebook's estimated revenues, which Facebook read from when it provided this new information to the Syndicate Analysts during the 19 separate phone calls that Facebook conducted after filing its amended Registration Statement.  If the information about the declines in Facebook's estimated revenues was immaterial, or had otherwise been conveyed by the amended Registration Statement, Morgan Stanley would not have determined that Facebook needed to provide this information separately to the Syndicate Analysts.

179.   Third, the actions of the Syndicate Analysts upon being informed of Facebook's lowered guidance confirm that this information was highly material and significantly altered the total mix of information in the market.  As set forth above in paragraphs 135-137, immediately after learning of Facebook's lower revenue estimates, the Syndicate Analysts significantly reduced their own estimates of Facebook's revenue to reflect the impact of the new information. The Syndicate Analysts then held a series of calls with a select group of the Company's potential investors and informed them of their lowered estimates.  If the new information concerning Facebook's revenue declines was unimportant or already part of the total mix of information in the market, the Syndicate Analysts would not have significantly lowered their revenue estimates based on that information, and would not have felt the need to hold a series of calls with a select group of Facebook's potential investors specifically to inform them of this development.

180.   Fourth, the reactions of the select investors who were informed of the reductions in the Syndicate Analysts' estimates confirm that the decline in Facebook's revenue was highly material, and significantly altered the total mix of information in the market.  As set forth above at paragraphs 138-139, the financial press reported that the lowered revenue figures were a "big shock" to those investors who received them, raised "a significant red flag" about Facebook's financial condition, and the "deceleration [showed by the lower revenue figures] freaked a lot of people out."  Many investors who were informed of the lowered revenue estimates cancelled or reduced their orders, or reduced the price they were willing to pay for Facebook stock.

181.   Fifth, the contemporaneous reaction of the financial media following the public disclosure of the decline in Facebook's revenue estimates confirms that this information was highly material, and significantly altered the total mix of information.  Significantly, as set forth above at paragraphs 162, 167, 171-174, the financial media specifically reported that the change

in Facebook's revenue estimates was neither disclosed nor conveyed by Facebook's Registration Statement, and that such information significantly altered the total mix of information in the market.  For example, *Business Insider* reported that "Facebook's amended prospectus did not say that the company's business had suddenly weakened and management's outlook had changed.  And that information is vastly more important than what the prospectus did say, which was that users are growing faster than revenue."  Similarly, *Venture Beat* reported that the disclosures in Facebook's May 9 amended Registration Statement were "extremely understated," "vague," and failed to disclose highly material information.  As *Venture Beat* explained, the May 9 Registration Statement merely stated that "the growth in daily active users [] was increasing more rapidly than the growth in ad impressions, driven by many users' shift to mobile devices." Because this disclosure represented that Facebook's ads "are growing, even if they are growing more slowly on mobile … this update itself didn't send any alarm bells to most investors, and it shouldn't have…. [T]he reality is that this wording was just too vague to be construed by normal people as meaning anything more than what had already been mentioned before.  …  The fact is, there is nothing within the S-1 update on May 9 that would give normal investors the sense that there had been a material change about Facebook's revenue prospects."

182.   Sixth, the reaction of the market after Facebook filed the May 9 amended Registration Statement confirms that it did not put the market on notice of the fact that Facebook's business had been materially impaired.  As set forth above at paragraph 142, after Facebook filed its amended Registration Statement on May 9, the analysts who had not been told of the decline in Facebook's estimated revenues continued to widely expect Facebook to report revenues that were in-line with Facebook's original estimates from April.  Indeed, as of May 18, the date that Facebook went public, analysts' consensus estimates according to Thomson's

Institutional Brokers' Estimate System were for Facebook to report revenues of more than $1.2 billion for the second quarter and $5 billion for the year – exactly in line with Facebook's original guidance.  Had the May 9 amended Registration Statement conveyed to the market the fact that increasing mobile usage and Facebook's product decisions had materially impaired the Company's business, these analysts would not have continued to expect Facebook to report revenues that were in line with its original guidance.

183.   Seventh, the reaction of investors following the filing of the amended Registration Statement on May 9 confirms that the amended Registration Statement did not put investors on notice of the fact that Facebook's business had been materially impaired.  As noted above at paragraphs 143-147, in the week before the IPO, investor demand for Facebook shares spiked to "astronomical" and "rampant" levels because Facebook had succeeded in "convincing investors that Facebook can make money from mobile users."  Because of this extraordinary surge in investor demand, on May 15 and 16 – nearly a week after Facebook filed its amended Registration Statement – Facebook significantly increased both the size of the IPO and the price of its shares – something that has been done in only 3.4% of all IPOs since 1995.  Had investors been on notice of the pronounced decline in Facebook's revenues prior to the IPO, investor demand for Facebook shares would not have risen to "astronomical" levels, and Facebook would not have been able to take the extremely rare step of significantly increasing both the size of the IPO and its price days before the offering occurred.

184.   Eighth, the reaction of the market when the news of Facebook's revenue declines was publicly revealed establishes that this information was highly material, and significantly altered the total mix of information that previously existed in the market.  As set forth above at paragraphs 161-170, when news of Facebook's and the Syndicate Analysts' reduced estimates

was disclosed to the market, investors reacted with "shock" and "anger," and Facebook stock fell precipitously, declining nearly 11% on May 21, and approximately 9% on May 22, on extremely high trading volume both days.  This two-day decline destroyed billions of dollars of Facebook's market capitalization.  The financial press specifically attributed these declines to the disclosure of Facebook's and the Syndicate Analysts' reduced estimates, stating that these revelations caused Facebook shares to "slide sharply" on May 21 and 22.  If the information concerning Facebook's revenue declines had been immaterial or otherwise part of the total mix of information in the market, Facebook's stock price would not have collapsed when this information was revealed.

185.    Ninth, Facebook's own disclosures establish the importance of Facebook's undisclosed revenue declines to the market.  As noted above at paragraphs 89-97, the Registration Statement repeatedly highlighted that Facebook's revenue and advertising revenue were Facebook's most significant financial metrics.  Similarly, the declines in these key metrics were driven by a factor – increasing mobile usage – that the Registration Statement identified as "critical" to Facebook's business.  Moreover, Facebook itself recognized that any decline in its future revenues impacted the value of its stock, stating in the Registration Statement that its "business prospects" were a "factor[] [it] considered in determining the initial public offering price."  Accordingly, the disclosures in the Registration Statement demonstrate that the reduction in Facebook's estimated revenues was highly material to investors considering whether to purchase Facebook stock.

## VI.    MATERIALLY UNTRUE AND MISLEADING STATEMENTS AND OMISSIONS

186.    Facebook filed its initial Registration Statement and Prospectus with the SEC on Form S-1 on February 1, 2012.  Facebook amended the Registration Statement and Prospectus eight subsequent times, filing the final amended Registration Statement on May 16, 2012.

Among other things, the Registration Statement described Facebook's business, set forth its financial results, and provided the terms of the IPO.

187.    On May 17, 2012, the Registration Statement became effective.   That day, Facebook and its selling stockholders sold more than 421 million shares of Class A common stock to the public in the Company's IPO, at $38 per share.   Through the IPO, Facebook and its selling stockholders received proceeds of more than $16 billion.   Facebook stock began trading on the NASDAQ on May 18, 2012.

188.    As set forth in detail below, the Registration Statement pursuant to which Facebook's common stock was issued was materially untrue and misleading for several reasons:

   a. First, the Registration Statement contained a series of statements in which Facebook purported to warn investors only that increasing mobile usage "may" negatively affect its revenues.  These statements were materially untrue and misleading because Facebook had already determined that increasing mobile usage had negatively affected its revenues to a material degree.

   b. Second, the Registration Statement contained a series of statements in which Facebook purported to warn investors only that its product decisions "may" negatively affect its revenues.  These statements were materially untrue and misleading because Facebook had already determined that its product decisions had negatively affected its revenues to a material degree.

   c. Third, the Registration Statement failed to disclose the information required by Item 303 of Regulation S-K, which required Facebook to disclose that increasing mobile usage and the Company's product decisions had had a material negative impact on its revenues, and the magnitude of that impact.

   d. Fourth, the Registration Statement failed to disclose the information required by Rule 408 of SEC Regulation C, which also required Facebook to disclose that increasing mobile usage and the Company's product decisions had had a material negative impact on its revenues, and that Facebook had already significantly lowered its estimated revenues as a result.

   e. Finally, in addition to the failure to report known facts concerning the significant negative effects on Facebook's revenues from increasing mobile usage and the Company's product decisions, the Company also failed to disclose that it was going to disseminate this revised financial information to the Syndicate Analysts only.

189.    In a section of the Registration Statement and Prospectus called "Risk Factors,"

Facebook purported to warn investors that:

> ***Growth in use of Facebook through mobile products, where our ability to monetize is unproven, as a substitute for use on personal computers may negatively affect our revenue and financial results.***
>
> We had 488 million MAUs [monthly active users] who used Facebook mobile products in March 2012. While most of our mobile users also access Facebook through personal computers, we anticipate that the rate of growth in mobile usage will exceed the growth in usage through personal computers for the foreseeable future, in part due to our focus on developing mobile products to encourage mobile usage of Facebook. We have historically not shown ads to users accessing Facebook through mobile apps or our mobile website. In March 2012, we began to include sponsored stories in users' mobile News Feeds. However, we do not currently directly generate any meaningful revenue from the use of Facebook mobile products, and our ability to do so successfully is unproven. We believe this increased usage of Facebook on mobile devices has contributed to the recent trend of our daily active users (DAUs) increasing more rapidly than the increase in the number of ads delivered. If users increasingly access Facebook mobile products as a substitute for access through personal computers, and if we are unable to successfully implement monetization strategies for our mobile users, or if we incur excessive expenses in this effort, our financial performance and ability to grow revenue would be negatively affected.

190.    This statement was materially untrue and misleading.   It was misleading to

represent that increasing mobile usage might negatively impact Facebook's revenue when

Facebook had already determined that increasing mobile usage had "negatively affect[ed]" its

"revenue and financial results."  Indeed, prior to the IPO, Facebook had already determined that,

as a direct result of increasing mobile usage, the Company's estimated revenues for the second

quarter of 2012 had declined by as much as 8.33%, and its estimated annual revenues had

declined by as much as 3.5%.  As set forth above at paragraphs 176-185, these declines in

Facebook's expected revenues for the second quarter of 2012 and the year were highly material

and significantly altered the total mix of information in the market.

191.    In the "Risk Factors" section of the Registration Statement and Prospectus, Facebook also purported to warn investors that:

> ***We generate a substantial majority of our revenue from advertising. The loss of advertisers, or reduction in spending by advertisers with Facebook, could seriously harm our business.***
>
> The substantial majority of our revenue is currently generated from third parties advertising on Facebook. In 2009, 2010, and 2011 and the first quarter of 2011 and 2012, advertising accounted for 98%, 95%, 85%, 87%, and 82%, respectively, of our revenue. As is common in the industry, our advertisers typically do not have long-term advertising commitments with us. Many of our advertisers spend only a relatively small portion of their overall advertising budget with us.  In addition, advertisers may view some of our products, such as sponsored stories and ads with social context, as experimental and unproven. Advertisers will not continue to do business with us, or they will reduce the prices they are willing to pay to advertise with us, if we do not deliver ads and other commercial content in an effective manner, or if they do not believe that their investment in advertising with us will generate a competitive return relative to other alternatives. Our advertising revenue <u>could be adversely affected</u> by a number of other factors, including:
>
> …
>
> • increased user access to and engagement with Facebook through our mobile products, where we do not currently directly generate meaningful revenue, particularly to the extent that mobile engagement is substituted for engagement with Facebook on personal computers where we monetize usage by displaying ads and other commercial content;
>
> • product changes or inventory management decisions we may make that reduce the size, frequency, or relative prominence of ads and other commercial content displayed on Facebook;
>
> …
>
> The occurrence of any of these or other factors <u>could</u> result in a reduction in demand for our ads and other commercial content, which <u>may</u> reduce the prices we receive for our ads and other commercial content, or cause advertisers to stop advertising with us altogether, either of which <u>would</u> negatively affect our revenue and financial results.

192.    This statement was materially untrue and misleading.  It was misleading to represent that increasing mobile usage and the Company's product decisions might negatively

impact revenue when Facebook had <u>already determined</u> that these factors <u>had</u> "adversely affected" its advertising revenues.  Indeed, prior to the IPO, Facebook had already determined that, as a direct result of these factors, the Company's estimated revenues for the second quarter of 2012 had declined by as much as 8.33%, and its estimated annual revenues had declined by as much as 3.5%.  As set forth above at paragraphs 176-185, these declines in Facebook's expected revenues for the second quarter of 2012 and the year were highly material and significantly altered the total mix of information in the market.

193.    In the disclosure in the Company's amended Registration Statement and Prospectus filed on May 9 – one day <u>after</u> the Company revised its expected revenues for the second quarter and year sharply downward due to the negative impact of increasing mobile usage and the Company's product decisions – Facebook continued to emphasize that any potentially negative impact of these factors was uncertain.  Specifically, this disclosure stated that:

> Based on our experience in the second quarter of 2012 to date, the trend we saw in the first quarter of DAUs [daily active users] increasing more rapidly than the increase in number of ads delivered has continued.  We believe this trend is driven in part by increased usage of Facebook on mobile devices where we have only recently began showing an immaterial number of sponsored stories in News Feed, and in part due to certain pages having fewer ads per page as a result of product decisions. For additional information on factors that <u>may affect these matters</u>, see "Risk Factors—Growth in use of Facebook through our mobile products, where our ability to monetize is unproven, as a substitute for use on personal computers <u>may negatively affect our revenue and financial results</u>" and "Risk Factors—Our culture emphasizes rapid innovation and prioritizes user engagement over short-term financial results."

194.    This statement was materially untrue and misleading.  It was misleading to represent that increasing mobile usage and the Company's product decisions might negatively impact its revenue when Facebook had <u>already determined</u> that these factors <u>had</u> "negatively affect[ed]" its "revenue and financial results."  Indeed, prior to the IPO, Facebook had already determined that, as a direct result of these factors, the Company's estimated revenues for the

second quarter of 2012 had declined by as much as 8.33%, and its estimated annual revenues had declined by as much as 3.5%.  As set forth above at paragraphs 176-185, these declines in Facebook's expected revenues for the second quarter of 2012 and the year were highly material and significantly altered the total mix of information in the market.

195.    Similarly, in the "Risk Factors" section of the Registration Statement and Prospectus, Facebook also purported to warn investors that its product decisions might negatively impact its revenue, stating:

> [W]e frequently make product decisions that <u>may reduce our short-term revenue or profitability</u> if we believe that the decisions are consistent with our mission and benefit the aggregate user experience and will thereby improve our financial performance over the long term.  As an example, we believe that the recent trend of our DAUs increasing more rapidly than the increase in the number of ads delivered has been due in part to certain pages having fewer ads per page as a result of these kinds of product decisions.  These decisions may not produce the long-term benefits that we expect, in which case our user growth and engagement, our relationships with developers and advertisers, and our business and results of operations could be harmed.

196.    For the reasons set forth above at paragraph 194, this statement was materially untrue and misleading.  In particular, it was materially misleading to state that the Company's product decisions "may reduce" its revenue when Facebook had <u>already determined</u> that its product decisions <u>had</u> reduced its advertising revenues.

197.    The Registration Statement and Prospectus was also materially untrue and misleading because it failed to disclose the information required by Item 303 of Regulation S-K.  Item 303 requires the disclosure of all "known trends … that have had or that the registrant reasonably expects will have a material … unfavorable impact on … revenues."  In addition to the identification of such "known trends," Item 303 specifically requires disclosure of (i) <u>whether</u> those trends have had or are reasonably expected to have a material negative impact on revenue; and (ii) <u>the extent</u> of any such impact on revenue.

198.    Accordingly, as the SEC has repeatedly emphasized, the "specific provisions in Item 303 [set forth above] require disclosure of forward-looking information."  Indeed, the SEC has stated that Item 303 is "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company … with particular emphasis on the registrant's prospects for the future."  *See* Management's Discussion and Analysis of Financial Condition and Results of Operation, Securities Act Release No. 6835, 1989 WL 1092885, at *3 (May 18, 1989).  Thus, "material-forward looking information regarding known material trends and uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects."  *See* Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operation, Securities Act Release No. 8350, 2003 WL 22996757, at *11 (December 29, 2003).

199.    Disclosure of forward-looking information concerning the registrant's revenue is required by Item 303 "where a trend, demand, commitment, event or uncertainty is both [i] presently known to management and [ii] reasonably likely to have material effects on the registrant's financial condition or results of operations."  *See* Management's Discussion and Analysis of Financial Condition and Results of Operation, Securities Act Release No. 6835, 1989 WL 1092885, at *4 (May 18, 1989).

200.    As set forth in detail above, both of these conditions were satisfied here.  First, as set forth above at paragraphs 122-134, the two trends that were negatively impacting Facebook's revenue – namely, increasing mobile usage and the Company's product decisions – were widely "known" to Facebook's management prior to the IPO.  Second, the facts set forth above establish that these two trends were "reasonably likely to have material effects on [Facebook's] financial

condition or results of operations."  Specifically, as set forth above at paragraphs 122-134, as a direct result of the impact of these two trends, Facebook reduced its revenue estimates for the second quarter and the year by material amounts, and immediately provided its lowered guidance to the Syndicate Analysts so that they could inform a select group of Facebook's potential investors of this highly significant development.

201.    Accordingly, pursuant to Item 303, Defendants were required to disclose: (i) whether increasing mobile usage and the Company's product decisions had or were reasonably expected to have a "material … unfavorable impact on … revenues," and (ii) to what extent those trends had impacted or were reasonably expected to impact Facebook's revenue. Nevertheless, Defendants failed to disclose any of this information in the Registration Statement and Prospectus.  Specifically, in violation of Item 303, the Registration Statement and Prospectus failed to disclose that: (i) the known trends of increasing mobile usage and the Company's product decisions had had a material negative impact Facebook's revenue for the second quarter and the year; (ii) as a result of these trends, Facebook had decreased its expected revenue for the second quarter of 2012 by as much as 8.33%, lowering it from as much as $1.2 billion to as little as $1.1 billion; and (iii) as a result of these trends, Facebook had decreased its expected revenue for the year by as much as 3.5%, lowering it from $5 billion to as little as $4.825 billion.

202.    Finally, the Registration Statement and Prospectus were also materially false and misleading because they failed to disclose the information required by Rule 408 of SEC Regulation C.  Rule 408 requires that, "[i]n addition to the information expressly required to be included in a registration statement, there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not misleading."  17 C.F.R. § 230.408(a).  The Registration Statement and

Prospectus in their entirety, and as set forth specifically above, were materially untrue and misleading and omitted to state material information necessary to make them not misleading, in violation of Facebook's duty of disclosure under Rule 408. The Registration Statement and Prospectus specifically failed to disclose: (i) that growing mobile usage and Facebook's product decisions had already had a material unfavorable impact on the Company's revenues; and (ii) that Facebook had significantly lowered its estimated revenues as a direct result of that impact.

## VII. CLASS ACTION ALLEGATIONS

203. Lead Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a Class consisting of all persons and entities who purchased or otherwise acquired the Class A common stock of Facebook in or traceable to Facebook's IPO, and were damaged thereby. Excluded from the Class are Defendants (as set forth herein), and present or former executive officers of Facebook and their immediate family members (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)).

204. The members of the Class are so numerous that joinder of all members is impracticable. For example, Facebook issued 421,233,615 shares of Class A common stock in its IPO, with an underwriter option to issue an additional 63,185,042 shares of Class A common stock. After the IPO, Facebook stock actively traded on the NASDAQ. While the exact number of Class members is unknown to Lead Plaintiffs at this time, Lead Plaintiffs believe that Class members number in the thousands, if not millions.

205. Lead Plaintiffs' claims are typical of the claims of the members of the Class. Lead Plaintiffs and the other members of the Class purchased or otherwise acquired Facebook Class A common stock in the IPO and sustained damages as a result of Defendants' conduct complained of herein.

206.   Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Lead Plaintiffs have no interests that are adverse or antagonistic to the Class.

207.   Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

      a.      whether Defendants violated the Securities Act as alleged herein;

      b.      whether the Registration Statement and Prospectus contained materially untrue statements or failed to disclose material facts; and

      c.      the extent of damages sustained by the Class, and the proper measure of damages.

208.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impracticable for Class members individually to seek redress for the wrongful conduct alleged herein.  There will be no difficulty in managing this action as a class action.

209.   The names and addresses of those persons and entities that purchased or otherwise acquired Facebook's Class A common stock in or traceable to the IPO are available from the Company's transfer agent(s) or other sources.  Notice may be provided to such class members via first-class mail using techniques and a form of notice similar to those customarily used in securities class actions.

## VIII.   THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

210.   The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the untrue and misleading statements pleaded in this Complaint.

211.   First, Section 27(A) of the Securities Act provides that the statutory safe harbor "shall not apply to a forward-looking statement … that is … made in connection with an initial public offering."  15 U.S.C. § 77z-2(b)(2)(D).

212.   Second, none of the misstatements complained of herein were forward-looking statements.  Rather, they were misstatements concerning current facts and conditions existing at the time the statements were made.  Specifically, as set forth above at paragraphs 189-196, Facebook's Registration Statement and Prospectus misleadingly stated that increasing mobile usage and the Company's product decision <u>might</u> negatively impact Facebook's revenue when Facebook had <u>already determined</u> before the IPO that these factors <u>had</u> negatively impacted its estimated revenues for the second quarter of 2012 and the year.  Accordingly, the materially untrue statements and omissions complained of herein concerned the then-existing fact that, as of the time of the IPO, growing mobile usage and the Company's product decisions had had a material negative impact on Facebook's business.

213.   Third, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.  As set forth above in detail, then-existing facts contradicted Defendants' statements regarding the impact of mobile usage and the Company's product decisions on its revenue.  Given the then-existing facts contradicting Defendants' statements, the generalized risk

disclosures made by Defendants were not sufficient to insulate Defendants from liability for their

materially untrue and misleading statements.

## IX.    CAUSES OF ACTION

### COUNT I

### For Violations Of Section 11 Of The Securities Act
### (Against Defendants Zuckerberg, Ebersman, Spillane, The Facebook Board, And The Underwriter Defendants)

214.    This claim does not sound in fraud.  For the purposes of this Section 11 claim,

Lead Plaintiffs do not allege that any Defendant acted with scienter or fraudulent intent, which

are not elements of a claim under Section 11 of the Securities Act.  This claim is based solely on

strict liability as to Facebook, and negligence as to the remaining Defendants.

215.    Lead Plaintiffs repeat and reallege the allegations above as if fully set forth

herein.

216.    This claim is brought against the Defendants Zuckerberg, Ebersman, Spillane, the

Facebook Board, and the Underwriter Defendants pursuant to Section 11 of the Securities Act,

15 U.S.C. § 77k, on behalf of all proposed Class members who purchased or otherwise acquired

Facebook's Class A common stock in or traceable to the IPO, and were damaged thereby.

217.    At the time of the IPO, the Registration Statement, including the Prospectus,

contained untrue statements of material fact, omitted to state facts necessary to make the

statements made therein not misleading, and failed to disclose required material information, as

set forth above at paragraphs 188-202.

218.    Facebook is the issuer of the Class A common stock sold pursuant to the

Registration Statement.  As the issuer of the stock, Facebook is strictly liable to the members of

the Class who purchased Class A common stock in or traceable to the IPO for the materially

untrue statements and omissions that appeared in or were omitted from the Registration Statement.

219.    Defendant Zuckerberg and the Facebook Board were signatories of the untrue and misleading Registration Statement, and were directors of Facebook at the time of the IPO.

220.    Defendants Ebersman and Spillane were signatories of the untrue and misleading Registration Statement.

221.    Each of Defendants Zuckerberg, Ebersman, Spillane and the Facebook Board is unable to establish an affirmative defense based on a reasonable and diligent investigation of the statements contained in the Registration Statement.  These Defendants did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained in the Registration Statement were true and not misleading, and that there were no omissions of any material fact.  Accordingly, these Defendants acted negligently, and are liable to the members of the Class who purchased or otherwise acquired the Class A common stock in or traceable to the IPO.

222.    The Underwriter Defendants were underwriters of the IPO.

223.    Each of the Underwriter Defendants is unable to establish an affirmative defense based on a reasonable and diligent investigation of the statements contained in the Registration Statement.  The Underwriter Defendants did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained in the Registration Statement were true and not misleading, and that there were no omissions of any material fact.  Accordingly, the Underwriter Defendants acted negligently, and are liable to the members of the Class who purchased or otherwise acquired the Class A common stock in or traceable to the IPO.

224.    Lead Plaintiffs and other members of the Class purchased Class A common stock issued under or traceable to the Registration Statement.

225.    Lead Plaintiffs and other members of the Class did not know, or in the exercise of reasonable diligence could not have known, of the inaccurate statements and omissions contained therein when they purchased or otherwise acquired the Class A common stock of Facebook.

226.    Lead Plaintiffs and the other members of the Class who purchased the Class A common stock pursuant to the Registration Statement suffered substantial damages as a result of the untrue statements and omissions of material facts in the Registration Statement, as they either sold these shares at prices below the IPO price of $38 per share or still held shares as of the date of the initial complaint containing claims under the Securities Act, May 22, 2012, when the closing price of the common stock was $31 per share, which was below the IPO price of $38 per share.

227.    This claim is brought within the applicable statute of limitations.

228.    By reason of the foregoing, the Defendants named in this Count have violated Section 11 of the Securities Act.

## COUNT II

### For Violations Of Section 12(a)(2) Of The Securities Act
### (Against Facebook, Defendants Zuckerberg, Sandberg, and Ebersman, and The Underwriter Defendants)

229.    This claim does not sound in fraud.  For the purposes of this Section 12(a)(2) claim, Lead Plaintiffs do not allege that any Defendant acted with scienter or fraudulent intent, which are not elements of a claim under Section 12(a)(2) of the Securities Act.  This claim is based solely on negligence.

230.     Lead Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

231.     This claim is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77*l*(a)(2), on behalf of all members of the Class who purchased Facebook Class A common stock in the IPO, against Defendants Facebook, Zuckerberg, Sandberg, Ebersman, and the Underwriter Defendants.

232.     Each Defendant named in this Count was a seller, offeror, and/or solicitor of sales of the common stock offered pursuant to the Registration Statement and Prospectus.

233.     Facebook was the issuer of 180,000,000 shares in the IPO for which it received approximately $6.8 billion in proceeds.  Facebook solicited the purchase of shares by virtue of issuing the Registration Statement, Prospectus, and roadshow video, and was motived at least in part to serve its own financial interests.

234.     Defendant Zuckerberg sold 30.2 million shares in the IPO for proceeds of approximately $1.15 billion.  Zuckerberg also solicited the purchase of shares by virtue of signing the Registration Statement containing the Prospectus, participating extensively in the roadshow video, and making presentations and answering investor questions at Facebook's roadshow meetings.  In making these solicitations, Zuckerberg was motivated in part to serve Facebook's financial interests and his own.  In addition to receiving $1.15 billion in proceeds from the IPO, the value of Zuckerberg's retained shares was approximately $19 billion based on the IPO price.

235.     Defendant Sandberg solicited the purchase of shares by virtue of participating extensively in the roadshow video, including making statements about Facebook's business and growth prospects, and making presentations and answering investor questions at Facebook's

roadshow meetings.  Defendant Sandberg was motivated in part to serve Facebook's financial interest and her own.  The value of Sandberg's Facebook shares was more than $72 million based on Facebook's IPO price.

236.    Defendant Ebersman solicited the purchase of shares by virtue of signing the Registration Statement containing the Prospectus, participating extensively in the roadshow video, including making statements about Facebook's business, and making presentations and answering investor questions at Facebook's roadshow meetings.  Defendant Ebersman was motivated in part to serve Facebook's financial interest and his own.  The value of Ebersman's Facebook shares was more than $91 million based on Facebook's IPO price.

237.    The Underwriter Defendants transferred title to Facebook stock to Lead Plaintiffs and other members of the Class who purchased shares in the IPO, and transferred title of Facebook stock to other underwriters and/or broker-dealers that sold those securities as agents for the Underwriter Defendants.  The Underwriter Defendants also solicited the purchase of Facebook stock in the IPO by the Lead Plaintiffs and other members of the Class who purchased in the IPO by means of the Registration Statement and Prospectus, motivated at least in part by the desire to serve the Underwriter Defendants' own financial interest and the interests of Facebook, including but not limited to earning commissions on the sale of Facebook stock in the IPO.

238.    The Registration Statement and Prospectus contained untrue statements of material fact or omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading, as set forth more fully above.

239.    Lead Plaintiffs and other members of the Class who purchased Facebook common stock in the IPO made such purchases pursuant to the materially untrue and misleading

Registration Statement and Prospectus, and did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained therein.

240.    Lead Plaintiffs and the other members of the Class who purchased the common stock in the IPO pursuant to the Registration Statement and Prospectus suffered substantial damages as a result of the untrue statements and omissions of material facts in the Registration Statement and Prospectus, as they either sold these shares at prices below the IPO price of $38 per share or still held shares as of the date of the initial complaint containing claims under the Securities Act, when the price of the common stock was below the IPO price of $38 per share.

241.    Members of the Class who purchased the common stock pursuant to the Registration Statement and Prospectus and still hold that stock have sustained substantial damages as a result of the untrue statements of material facts and omissions contained therein, for which they hereby elect to rescind and tender their common stock to the Defendants sued in this Count in return for the consideration paid with interest.  Those members of the Class who have already sold their stock acquired in the IPO pursuant to the materially untrue and misleading Registration Statement and Prospectus are entitled to damages from Defendants.

242.    This claim is brought within the applicable statute of limitations.

243.    By virtue of the foregoing, the Defendants named in this count violated Section 12(a)(2) of the Securities Act.

### COUNT III

### For Violations Of Section 15 Of The Securities Act
### (Against the Individual Defendants)

244.    This claim does not sound in fraud.  For the purposes of this Section 15 claim, Lead Plaintiffs do not allege that any Defendant acted with scienter or fraudulent intent, which

are not elements of a claim under Section 15 of the Securities Act.  This claim is based solely on negligence

245.    This Count is asserted against the Individual Defendants for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of all members of the Class who purchased or otherwise acquired the Class A common stock issued pursuant to the Registration Statement.

246.    At all relevant times, these Defendants were controlling persons of the Company within the meaning of Section 15 of the Securities Act.  Defendant Zuckerberg, at the time of the filing of the Registration Statement and the IPO, served as Chairman of the Board of Directors and Chief Executive Officer.  At all relevant times, Defendant Zuckerberg retained a controlling interest in Facebook and, following the IPO, controlled approximately 56% of the voting power of the Company's capital stock.  Defendant Sandberg was COO of Facebook at the time of the filing of the Registration Statement and the IPO.  Defendant Ebersman was CFO at the time of the filing of the Registration Statement and the IPO.  Defendant Spillane was Facebook's DOA at the time of the filing of the Registration Statement and the IPO.  The Facebook Board approved the IPO and reviewed and approved the Registration Statement and Prospectus.

247.    Defendants Zuckerberg, Sandberg, Ebersman, Spillane and the Facebook Board, prior to and at the time of the IPO, participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of Facebook's business affairs, including the IPO.

248.    As officers and/or directors of a company engaging in an IPO, Defendants Zuckerberg, Sandberg, Ebersman, Spillane and the Facebook Board had a duty to disseminate accurate and truthful information with respect to Facebook's business, financial condition and results of operations.  These Defendants participated in the preparation and dissemination of the

Registration Statement and Prospectus, and otherwise participated in the process necessary to conduct the IPO.  Because of their positions of control and authority as senior officers and/or directors of Facebook, these Defendants were able to, and did, control the contents of the Registration Statement and Prospectus, which contained materially untrue information and failed to disclose material facts.

249.    By reason of the aforementioned conduct, the Individual Defendants are liable under Section 15 of the Securities Act jointly and severally with and to the same extent as Facebook is liable under Sections 11 and 12(a)(2) of the Securities Act, to Lead Plaintiffs and members of the Class who purchased or otherwise acquired common stock issued pursuant to the Registration Statement.

## X.    **PRAYER FOR RELIEF**

250.    **WHEREFORE**, Lead Plaintiffs pray for relief and judgment, as follows:

    a.    Determining that this action is a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

    b.    Awarding all damages and other remedies set forth in the Securities Act in favor of Lead Plaintiffs and all members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

    c.    Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

    d.    Such other and further relief as the Court may deem just and proper.

## XI.    **JURY TRIAL DEMANDED**

251.    Lead Plaintiffs hereby demand a jury trial.

Dated: February 28, 2013
    New York, New York

**BERNSTEIN LITOWITZ**
**BERGER & GROSSMANN LLP**

By: _____

    Steven B. Singer
    John J. Rizio-Hamilton

1285 Avenue of the Americas
New York, NY 10019
Tel: (212) 554-1400
Fax: (212) 554-1444

**LABATON SUCHAROW LLP**

By: _____

    Thomas A. Dubbs
    James W. Johnson
    Louis Gottlieb

140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477

*Court-Appointed Co-Lead Counsel for the Class*

David Kessler
Darren J. Check
**KESSLER TOPAZ MELTZER &**
**CHECK LLP**
280 King of Prussia Road
Radnor, Pennsylvania 19087
Tel: (610) 667-7706
Fax: (601) 667-7056

*Additional Counsel For Lead Plaintiff*
*Banyan Capital Master Fund Ltd.*

Steven E. Fineman
Daniel P. Chiplock
**LIEFF CABRASER HEIMANN &**
**BERNSTEIN**
250 Hudson Street, 8th Floor
New York, NY 10013
Tel: (212) 355-9500
Fax: (212) 355-9592

*Additional Counsel For Named Plaintiffs*
*Jose G. Galvan and Mary Jane Lule Galvan*

APPENDIX A

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Jay Chaudhuri, hereby certify for the North Carolina Department of State Treasurer on behalf of the North Carolina Retirement Systems ("North Carolina DST"), as to the claims asserted under the federal securities laws, that:

1. I am the General Counsel and Senior Policy Advisor of the North Carolina Department of State Treasurer. I have reviewed a complaint filed in this matter. North Carolina DST has authorized the filing of this motion for appointment as lead plaintiff.

2. North Carolina DST did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. North Carolina DST is willing to serve as a lead plaintiff and representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary. North Carolina DST fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the Class.

4. The transactions of North Carolina DST in the Facebook, Inc. securities that are the subject of this action are set forth in the chart attached hereto.

5. North Carolina DST has not sought to serve as a lead plaintiff or representative party on behalf of a class in any action under the federal securities laws filed during the three-year period preceding the date of this Certification.

6. North Carolina DST will not accept any payment for serving as a representative party on behalf of the Class beyond North Carolina DST's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 23rd day of July, 2012.

_____

Jay J. Chaudhuri
General Counsel & Senior Policy Advisor
*North Carolina Department of State Treasurer on*
*behalf of the North Carolina Retirement Systems*

**North Carolina Retirement Systems**
**Transactions in Facebook Inc. (FB)**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 5/17/2012 | 67,600 | 38.0000 |
| Purchase | 5/17/2012 | 618,137 | 38.0000 |
| | | | |
| Sale | 5/18/2012 | (29,900) | 41.3016 |
| Sale | 5/18/2012 | (4,100) | 39.6854 |
| Sale | 5/18/2012 | (18,000) | 42.0000 |
| Sale | 5/18/2012 | (15,600) | 40.3683 |

## CERTIFICATION

I, George Hopkins, as Executive Director of Arkansas Teacher Retirement System ("Arkansas Teacher"), hereby certify as follows:

1.      I am fully authorized to enter into and execute this Certification on behalf of Arkansas Teacher.  I have reviewed a complaint filed against Facebook, Inc. ("Facebook") alleging violations of the federal securities laws;

2.      Arkansas Teacher did not purchase securities of Facebook at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.      Arkansas Teacher is willing to serve as a lead plaintiff or representative party in this matter, including providing testimony at deposition and trial, if necessary;

4.      Arkansas Teacher's transactions in the Facebook securities that are the subject of this action are reflected in Exhibit A, attached hereto;

5.      Arkansas Teacher sought to serve as a lead plaintiff in the following class actions under the federal securities laws during the last three years preceding the date of this certification:

*In re MGM Mirage Securities Litigation*, No. 2:09-cv-1558 (D. Nev.)

*In re Sunpower Corp. Securities Litigation*, No. 3:09-cv-5473 (N.D. Cal.)

*City of Monroe Employees' Retirement System v. Hartford Financial Services Group, Inc.*, No. 1:10-cv-2835 (S.D.N.Y.)

*In re Goldman Sachs Group, Inc. Securities Litigation*, No. 1:10-cv-3461 (S.D.N.Y.)

*Arkansas Teacher Retirement System v. Monsanto Co.*, No. 4:10-cv-1380 (E.D. Mo.)

*Karam v. Corinthian Colleges, Inc.*, No. 2:10-cv-6523 (C.D. Cal.)

*In re Beckman Coulter, Inc. Securities Litigation*, No. 8:10-cv-1327 (C.D. Cal.)

*In re Gentiva Securities Litigation*, No. 2:10-cv-5064 (E.D.N.Y.)

*Pennsylvania Public School Employees' Retirement System v. Bank of America Corp.*, No. 1:11-cv-733 (S.D.N.Y.)

*Gammel v. Hewlett-Packard*, No. 8:11-cv-1404 (C.D. Cal.)

*In re Netflix, Inc. Securities Litigation*, No. 3:12-cv-225 (N.D. Cal.)

*Hoppaugh v. K12 Inc.*, No. 1:12-cv-103 (E.D. Va.)

*Smith v. JPMorgan Chase & Co.*, No. 1:12-cv-3852 (S.D.N.Y.)

6.    Arkansas Teacher is currently serving as a lead plaintiff in the following class actions filed under the federal securities laws during the last three years:

*In re MGM Mirage Securities Litigation*, No. 2:09-cv-1558 (D. Nev.)
*In re Sunpower Corp. Securities Litigation*, No. 3:09-cv-5473 (N.D. Cal.)
*In re Goldman Sachs Group, Inc. Securities Litigation*, No. 1:10-cv-3461 (S.D.N.Y.)
*Arkansas Teacher Retirement System v. Monsanto Co.*, No. 4:10-cv-1380 (E.D. Mo.)
*Gammel v. Hewlett-Packard*, No. 8:11-cv-1404 (C.D. Cal.)
*In re Netflix, Inc. Securities Litigation*, No. 3:12-cv-225 (N.D. Cal.)
*Hoppaugh v. K12 Inc.*, No. 1:12-cv-103 (E.D. Va.)

7.    Beyond its pro rata share of any recovery, Arkansas Teacher will not accept payment for serving as a lead plaintiff on behalf of the Class, except the reimbursement of such reasonable costs and expenses including lost wages as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this ___23rd___ day of July, 2012.

George Hopkins
*Executive Director of*
*Arkansas Teacher Retirement System*

EXHIBIT A

**TRANSACTIONS IN FACEBOOK, INC.**

| Transaction Type | Trade Date | Shares | Price Per Share | Cost / Proceeds |
|---|---|---|---|---|
| Purchase | 05/17/12 | 246,849.00 | $38.00 | ($9,380,262.00) |
| Sale | 05/18/12 | -104,320.00 | $40.07 | $4,179,664.26 |

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Becky Van Wyk, on behalf of the Fresno County Employees' Retirement Association ("FCERA"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am the Assistant Retirement Administrator of FCERA. I have reviewed a complaint filed in this matter. FCERA has authorized the filing of this motion for appointment as lead plaintiff.

2. FCERA did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. FCERA is willing to serve as a lead plaintiff and representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary. FCERA fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the Class.

4. FCERA's transactions in the Facebook, Inc. securities that are the subject of this action are set forth in the chart attached hereto.

5. FCERA has sought to serve and was appointed as a lead plaintiff on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

   *Mallen v. Alphatec Holdings, Inc., et al.,* Case No. 10-cv-1673 (S.D.N.Y.)
   *Steamfitters Local 449 Pension Fund v. Central European Distribution Corporation,*
   Case No. 11-cv-6247 (D.N.J.)

6. FCERA has served as a representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

   *The Fresno County Employees' Retirement Association v. Countrywide Financial Corporation, et al.,* Case No. 11-cv-811 (C.D. Cal.)
   *In re Toyota Motor Corporation Securities Litigation,*
   Case No. 10-cv-922 (C.D. Cal.)

7. FCERA has sought to serve as a lead plaintiff and representative party on behalf of a class in the following action under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motion for lead plaintiff or was not appointed lead plaintiff:

   *In re BP plc Securities Litigation,* Case No. 10-md-2185 (S.D. Tex)

8. FCERA will not accept any payment for serving as a representative party on behalf of the Class beyond FCERA's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.


I declare under penalty of perjury that the foregoing is true and correct. Executed this 19th day of June, 2012.

_____

Becky Van Wyk
Assistant Retirement Administrator
*Fresno County Employees' Retirement Association*

**Fresno County Employees' Retirement Association**
**Transactions in Facebook Inc. (FB)**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 5/17/2012 | 37,800 | 38.0000 |
| Purchase | 5/17/2012 | 58,100 | 38.0000 |
| | | | |
| Sale | 5/18/2012 | (7,900) | 40.0188 |
| Sale | 5/22/2012 | (13,200) | 31.8080 |

**BANYAN CAPITAL MASTER FUND LTD.'S
CERTIFICATION IN SUPPORT OF ITS MOTION
FOR APPOINTMENT AS LEAD PLAINTIFF AND
APPROVAL OF LEAD PLAINTIFF'S SELECTION OF COUNSEL**

Banyan Capital Master Fund Ltd. ("Banyan" or "Plaintiff") declares that:

1.    Banyan did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action under the federal securities laws.

2.    Banyan is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

3.    Attached as Schedule A to this Certification are Plaintiff's transactions in Facebook, Inc. ("Facebook") (NASDAQ: FB) common shares during the Class Period.

4.    Banyan has full power and authority to bring suit to recover for losses suffered as a result of its investment in Facebook.

5.    Banyan has fully reviewed the facts and allegations of a complaint filed in this action and has authorized the filing of a motion for appointment as lead plaintiff on its behalf in this action.

6.    Banyan intends to actively monitor and vigorously pursue this action for the benefit of the Class.

7.    Banyan will endeavor to provide fair and adequate representation and work directly with Class counsel to ensure that the largest recovery for the Class consistent with good faith and meritorious judgment is obtained.

8.    Banyan sought to serve (but was not appointed) as a representative party for a class action filed under the federal securities laws during the three years prior to the date of this Certification in *Joseph Deangelis, et al. v. Jon S. Corzine, et al.,* No. 11-cv-7866-VM (S.D.N.Y.).

9.    Banyan will not accept any payment for serving as a representative party on behalf of the Class beyond Plaintiff's pro rata share of any recovery, except such reasonable

costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

10.    We, Laurence Benedict, Roger Hanson and Alan Turner, serve as Directors of Banyan and are authorized to make legal decisions on behalf of Banyan. We are authorized to sign this Certification on Banyan's behalf and are also authorized to make the representations set forth herein.

We declare under penalty of perjury that the foregoing is true and correct.

**BANYAN CAPITAL MASTER FUND LTD.**

Executed this 12 day of July, 2012.

By: _____
    Laurence Benedict
    Director

Executed this 20 day of July, 2012.

By: _____
    Roger Hanson
    Director

Executed this 13 day of JULY, 2012

By: _____
    Alan Turner
    Director

2

## SCHEDULE A

| Security | Buy/Sell | Date | Quantity | Price |
|----------|----------|------|----------|-------|
| Com Stk | Buy | 5/21/2012 | 620,388 | $35.79 |
| Com Stk | Buy | 5/22/2012 | 795,474 | $32.19 |
| Com Stk | Sell | 5/21/2012 | 446,570 | $34.19 |
| Com Stk | Sell | 5/22/2012 | 524,039 | $31.65 |

**CERTIFICATION OF PROPOSED LEAD PLAINTIFF**

We, Jose G. and Mary Jane Lule Galvan, certify that:

1.  We have reviewed the facts and allegations of the complaint filed in this action.

2.  We did not acquire the common stock that are the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.  We are willing to serve as a Lead Plaintiff either individually or as part of a group. We understand that a Lead Plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include providing testimony at deposition and trial, if necessary.

4.  We represent and warrant that we are authorized to execute this Certification on behalf of the purchasers of the common stock described herein (including, as the case may be, ourselves, any co-owners, any corporations or other entities, and/or any beneficial owners).

5.  We will not accept any payments for serving as a representative party on behalf of the class beyond the purchaser's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

6.  We understand that this is not a claim form and that our ability to share in any recovery as a member of the class is unaffected by our decision to serve as a representative party or Lead Plaintiff.

7.  We have listed all our relevant transactions involving common stock of Facebook, Inc. that are the subject of this action in the attached schedule.

8.  During the three years prior to the date of this Certification, we have not sought to serve and we have not served as a representative party for a class in an action filed under the federal securities laws except (if any):

We declare under penalty of perjury, under the laws of the United States, that the information herein is accurate.

Executed this 2 5 day of July , 2012 _____
Jose G. Galvan

Executed this 2 0 day of July , 2012 _____
Mary Jane Lule Galvan

## SCHEDULE A

Facebook| FB

| Name | Date | Shares Purchased | Share Price | Amount | Date | Shares Sold | Share Price | Amount |
|---|---|---|---|---|---|---|---|---|
| Jose & Mary Galvan | 5/18/2012 | 5,300 | $40.0400 | ($212,212.00) | 5/29/2012 | (12,000) | $28.6950 | $344,340.00 |
| | 5/18/2012 | 4,240 | $40.0100 | ($169,642.40) | 5/29/2012 | (4,700) | $28.6900 | $134,843.00 |
| | 5/18/2012 | 4,000 | $40.0101 | ($160,040.40) | 5/29/2012 | (2,260) | $28.6800 | $64,816.80 |
| | 5/18/2012 | 2,230 | $40.0200 | ($89,244.60) | 5/29/2012 | (2,040) | $28.7050 | $58,558.20 |
| | 5/18/2012 | 1,700 | $40.0401 | ($68,068.17) | 5/29/2012 | (100) | $28.7100 | $2,871.00 |
| | 5/18/2012 | 1,100 | $40.0301 | ($44,033.11) | 5/29/2012 | | | |
| | 5/18/2012 | 1,010 | $40.0000 | ($40,400.00) | 5/29/2012 | | | |
| | 5/18/2012 | 1,000 | $40.0201 | ($40,020.10) | | | | |
| | 5/18/2012 | 520 | $40.0501 | ($20,826.05) | | | | |
| | | | | | | | | |
| | | | | | | | | |
| Total | | 21,100 | | ($844,486.83) | | (21,100) | | $605,429.00 |