**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE FACEBOOK, INC. IPO SECURITIES
AND DERIVATIVE LITIGATION

MDL NO. 12-2389 (RWS)

This document relates to:  NASDAQ Actions



## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Vincent R. Cappucci, Esq.
Robert N. Cappucci, Esq.
Jordan A. Cortez, Esq.
Evan T. Raciti, Esq.
Marc X. LoPresti, Esq. (Of Counsel)
**ENTWISTLE & CAPPUCCI LLP**
280 Park Avenue, 26th Floor West
New York, NY 10017
Telephone:  (212) 894-7200

Douglas G. Thompson, Jr., Esq.
Michael G. McLellan, Esq.
**FINKELSTEIN THOMPSON LLP**
1077 30th Street, Suite 150
Washington, D.C. 20007
Telephone: (202) 337-8000

Christopher Lovell, Esq.
Victor E. Stewart, Esq.
**LOVELL STEWART HALEBIAN
JACOBSON LLP**
61 Broadway, Suite 501
New York, NY 10006
Telephone: (212) 608-1900

*Lead Counsel for the NASDAQ Securities
Actions*

*Co-Lead Counsel for the NASDAQ
Negligence Actions*

## TABLE OF CONTENTS

I. INTRODUCTION ............................................................................................................. 3

    A. Defendants Made Material Misrepresentations, Omitted Material Facts And Failed to Correct And/Or Update Material Statements Made In NASDAQ's Name During The Class Period.......................................................... 8

    B. Summary Of Facts Relating To The Negligence Class Claims............................ 13

II. JURISDICTION AND VENUE ..................................................................................... 16

III. PARTIES ....................................................................................................................... 17

    A. Plaintiffs............................................................................................................... 17

    B. Defendants ........................................................................................................... 19

        1. NASDAQ OMX Group, Inc. ................................................................. 19

        2. The NASDAQ Stock Market LLC ......................................................... 20

        3. Robert Greifeld ...................................................................................... 20

        4. Anna M. Ewing...................................................................................... 20

    C. Duties of Individual Defendants ........................................................................... 21

IV. NASDAQ'S COMMERCIAL ROLE AS A LEADING GLOBAL EXCHANGE GROUP ................................................................................................. 22

V. FACTUAL BACKGROUND ......................................................................................... 33

    A. NASDAQ's Revenues Rely on IPOs.................................................................... 33

    B. Defendants Undertake An Aggressive Campaign To Solicit Facebook To List Its Common Stock On The NASDAQ Stock Market.................................... 36

    C. Defendants Drastically Shorten The Time Period For Facebook To List Its Common Stock On The NASDAQ-100 Index ...................................................... 40

    D. Defendants Change NASDAQ's IPO Procedures To Maximize Trading Volume In Connection With Facebook's Offering But Fail To Design And Test Adequately NASDAQ's Electronic System To Handle The Facebook IPO ....................................................................................................................... 43

    E. The BATS Stock Exchange Halts Its IPO Due To Technical Problems Two Months Prior To The Facebook IPO ............................................................ 47

VI. CLASS PERIOD EVENTS – NASDAQ'S ADMITTED TECHNOLOGY AND TRADING PLATFORM FAILURES DURING THE FACEBOOK IPO ............. 48

    A. NASDAQ's IPO Cross Process ........................................................................... 48

    B. NASDAQ's IPO Cross System Failures In Connection with Facebook's IPO ....................................................................................................................... 50

        1. The Cross Execution Failures ................................................................. 51

        2. The Cross Confirmation Failures............................................................ 53

i

C. NASDAQ's Bid/Offer Quotation Failures During Aftermarket Trading In Connection with Facebook's IPO .......................... 56

VII. DEFENDANTS' VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 PROMULGATED THEREUNDER....................... 58

A. Pre-Class Period Material Statements And False And Misleading Statements of Material Fact ...................... 58

   1. Material Statements in NASDAQ's 2011 Form 10-K ............. 58

   2. Material Statements in NASDAQ's First Quarter 2012 Financial Results ...................... 60

   3. Material Statements on NASDAQ's Website ......................... 63

   4. Materially False and Misleading Statements During NASDAQ's May 10, 2012 Investor Day Conference ................... 64

B. Class Period Materially False And Misleading Statements And Omissions Of Material Fact ...................... 67

   1. Defendants' Failure To Update And/Or Correct Pre-Class Period Material Statements ...................... 67

   2. Materially False and Misleading Statements and Omissions of Material Fact In NASDAQ's Market System Status Messages............... 69

      a. Material Misstatements and Omissions Between 11:13:50 a.m. and 11:30:09 a.m.................... 69

      b. Material Misstatements and Omissions Between 11:30:09 a.m. and 1:57:57 p.m. .................. 72

      c. Material Misstatements and Omissions Between 1:57:57 p.m. and 9:15:10 p.m. .................... 75

C. Additional Scienter Allegations For Claims Under Section 10(b) Of The Exchange Act And Rule 10b-5 Promulgated Thereunder .................. 77

D. Securities Class's Presumption Of Reliance......................... 82

E. Loss Causation For Claims Under Section 10(b) Of The Exchange Act And Rule 10b-5 Promulgated Thereunder............................. 84

F. Group Pleading ...................... 85

G. Control Person Liability...................... 86

H. The Safe Harbor Provision Of The PSLRA Is Inapplicable To Plaintiffs' Claims Under Section 10(b) Of The Exchange Act And Rule 10b-5 Promulgated Thereunder...................... 87

VIII. DEFENDANTS' NEGLIGENCE...................... 89

A. Defendants' Failures Were Reasonably Foreseeable......................... 89

B. Defendants' Negligence Damaged The Cross Confirmation Class..................... 91

C. Defendants' Negligence Damaged The Cross Execution Class ...................... 93

ii

|   | D. | Plaintiffs' Experiences .................................................................... 94 |
|---|---|---|
|   | E. | Defendants' Public Representations Establish Standards Of Care ....... 97 |
|   | F. | Defendants' Revenues From Trading And Trading Profits In Facebook ........... 100 |
| IX. | | POST-CLASS PERIOD REVELATIONS .................................................... 101 |
|   | A. | Market's Reaction to NASDAQ's Botched Facebook IPO And Corresponding SEC Investigation....................................................... 101 |
|   | B. | NASDAQ's Accommodation Proposal ............................................. 107 |
|   | C. | Class Members' Adverse Reaction To NASDAQ's Accommodation Proposal.......................................................................................... 110 |
| X. | | CLASS ACTION ALLEGATIONS ........................................................... 113 |
|   | A. | Securities Plaintiffs Class Action Allegations .................................... 113 |
|   | B. | Negligence Plaintiffs Class Action Allegations................................... 115 |
| XI. | | CAUSES OF ACTION ............................................................................ 118 |
|   | | COUNT I:  Violation Of § 10(b) Of The Exchange Act And Rule 10b-5 Promulgated Thereunder Against NASDAQ OMX Group, Inc., Greifeld and Ewing (On behalf of the Securities Class) .................................................... 118 |
|   | | COUNT II:  Violation Of § 20(a) Of The Exchange Act Against Defendants Greifeld and Ewing (On behalf of the Securities Class).................................... 121 |
|   | | COUNT III:  Ordinary Negligence Against Defendants NASDAQ and NASDAQ LLC (On behalf of the Negligence Class) .......................................... 123 |
|   | | COUNT IV:  Negligence:   Res Ipsa Loquitur Against NASDAQ and NASDAQ LLC (On behalf of the Negligence Class) .......................................... 124 |
|   | | COUNT V:  Ordinary Negligence Against Defendants NASDAQ and NASDAQ LLC (On behalf of the Cross Buyer Confirmation Class) .................................. 125 |
|   | | COUNT VI:  Negligence:  Res Ipsa Loquitur Against NASDAQ and NASDAQ LLC (On behalf of the Cross Buyer Confirmation Class) .................................. 126 |
|   | | COUNT VII:  Ordinary Negligence Against Defendants NASDAQ and NASDAQ LLC (On Behalf of the Cross Execution Class)................................... 127 |
|   | | COUNT VIII:  Negligence:  Res Ipsa Loquitur Against NASDAQ and NASDAQ LLC (On Behalf of the Cross Execution Class)................................... 129 |
|   | | COUNT IX:  Ordinary Negligence Against Defendants NASDAQ and NASDAQ LLC (On Behalf of the Market Trading Class).................................... 130 |
|   | | COUNT X:  Negligence:  Res Ipsa Loquitur Against NASDAQ and NASDAQ LLC (On Behalf of the Market Trading Class).................................... 131 |
| XII. | | PRAYER FOR RELIEF ......................................................................... 132 |

EC.50820.12

Plaintiffs,[1] also referred to herein as the "NASDAQ Claimant Group," bring this action on behalf of themselves and classes and subclasses of persons and entities that entered pre-market and aftermarket orders to purchase and/or sell the common stock of Facebook Inc. ("Facebook") on May 18, 2012 (the "Class Period") in connection with Facebook's initial public offering (the "IPO" or the "Offering"), and who thereby suffered monetary losses as a result of the wrongdoing detailed herein by defendants NASDAQ OMX Group Inc. ("NASDAQ" ), The NASDAQ Stock Market LLC ("NASDAQ LLC"), Robert Greifeld ("Greifeld") and Anna M. Ewing ("Ewing") (collectively, the "Defendants").  Class Members consist of two separate classes of persons and entities:  (i) those alleging claims for violations of the federal securities laws (the "Securities Class"); and (ii) those alleging claims for common law negligence (the "Negligence Class") (collectively, the "Class" or "Class Members").  The precise definitions of each of the classes and subclasses alleged herein are set forth in Section X below.

As further detailed herein, the Securities Class members placed orders for Facebook's common stock relying on the integrity of NASDAQ's technology and trading platforms, including its IPO Cross system, as represented by Defendants in NASDAQ's SEC filings, press conferences, analyst conference calls and conferences, press releases, public statements, and other publications disseminated by and/or concerning NASDAQ.  The Negligence Class members do not make any claims under the federal securities laws or for fraud, nor do they claim reliance on NASDAQ's public representations or statements.  Rather, Negligence Class members make claims based solely on the common law of negligence and allege they placed trade orders for Facebook's common stock in the reasonable expectation that those orders would be handled

---

[1] As set forth in detain in Section III below, Plaintiffs consist of First New York Securities L.L.C., T3 Trading Group, LLC, Avatar Securities, LLC, Philip Goldberg, Steve Jarvis, Atish Gandhi, Colin Suzman, Meredith Bailey, and Faisal Sami.

1

by NASDAQ with the quantum of reasonable care owed to investors by a national stock exchange.

Plaintiffs base the allegations set forth herein upon personal knowledge as to themselves and upon information and belief as to all other matters.  Plaintiffs' information and belief is based on, *inter alia*, the ongoing investigation of their undersigned counsel, Entwistle & Cappucci LLP, Finkelstein Thompson LLP, and Lovell Stewart Halebian Jacobson LLP (collectively, "Lead Counsel").  The investigation includes, but is not limited to, a continued review of:

- Public filings with the U.S. Securities and Exchange Commission ("SEC") by Defendant NASDAQ OMX Group Inc. ("NASDAQ" ) and related submissions to the SEC by non-parties;

- Press conferences, analyst conference calls and conferences, and corresponding transcripts thereof, conducted by or concerning NASDAQ, the other Defendants, Facebook, and related parties;

- Press releases, public statements, news articles, and other publications disseminated by and/or concerning NASDAQ, the other Defendants, Facebook and related parties;

- Analyst reports concerning NASDAQ and its operations;

- The corporate websites of NASDAQ, Facebook, and related parties;

- Submissions in other legal actions involving Defendants, Facebook and related parties;

- Media and economic reports regarding the facts and circumstances surrounding Facebook's IPO;

- Correspondence with industry experts and institutional and retail investors that utilize the NASDAQ Stock Market as a vital part of their respective businesses and trading activities; and

- Other public information concerning NASDAQ and the other Defendants.

EC.50820.12

Lead Counsel's investigation into the factual allegations contained herein is continuing, and Defendants uniquely possess many of the facts supporting Plaintiffs' allegations and/or such facts are exclusively within the Defendants' custody and control. Plaintiffs believe substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. INTRODUCTION

1. This action arises out of Defendants' failure to disclose material information, as well as Defendants' negligent conduct, in connection with the Facebook IPO – the largest initial public offering in NASDAQ's history and the third-largest in U.S. history. As detailed herein, in the time leading up to the Offering, Defendants discovered that unresolved technical issues rendered NASDAQ's electronic trading platforms incapable of executing the highly-anticipated Offering. Despite being aware of the enormous risks facing market participants, Defendants concealed these material facts from Class Members and recklessly moved forward with the IPO, putting NASDAQ's commercial interests ahead of the integrity of the market. Ultimately, on May 18, 2012, NASDAQ's trading platforms experienced a systemic breakdown in connection with the Offering, causing Class Members damages in excess of $500 million.

2. As a global publicly-traded company, NASDAQ competes with other exchanges, such as the New York Stock Exchange ("NYSE"), for new listings and IPOs. Facebook was no exception. Given the magnitude of the Facebook Offering, NASDAQ and the NYSE aggressively competed not only for the significant listing fees and boost in trading, but also for the chance to link their brand to the largest social networking site in the world. For NASDAQ, even more was at stake given its reputation as the "go to" exchange for the world's leading technology companies.

3

3.     Defendants went to extraordinary lengths to persuade Facebook to list its IPO with NASDAQ. Not only did Defendants take the unprecedented move to drastically shorten the "seasoning period" required for companies to qualify for inclusion in the coveted NASDAQ-100 Index, an index of 100 of the largest domestic and international non-financial securities listed on the NASDAQ Stock Market, Defendants also expanded the pre-market order window from fifteen minutes *to four hours*. As detailed in Section V, these decisions, and others, were motivated by Defendants' commercial desire to increase profits and gain a competitive advantage over rival exchanges, including the NYSE.

4.     Indeed, in its Form 10-K filed with the SEC on February 21, 2013 (the "2012 Form 10-K"), NASDAQ acknowledged that the "***intense competition from other exchanges and markets for market share of . . . listings***" requires NASDAQ to "***aggressively pursue[] new listings from companies, including those undergoing IPOs***."[2]  NASDAQ, like other publicly-traded companies in large, competitive industries, raises capital, issues debt, and hosts analyst and investor day conferences to strengthen its business interests and commercial reputation in the marketplace. As detailed below, NASDAQ's alleged wrongdoing in connection with the Facebook IPO was in its capacity as a for-profit, commercial business, intent on maximizing corporate profits.

5.     Nothing about NASDAQ's profit-driven actions reflected a concern for the integrity of the market or otherwise suggested that NASDAQ was acting in a regulatory capacity in connection with the Facebook IPO. As further detailed in Section VII.B.1, on the morning of May 18, 2012, Defendants were fully aware that the technology systems to be used in connection with the Facebook IPO were experiencing significant technical problems. Notwithstanding their

---

[2] Unless otherwise stated herein, emphasis is added to certain quoted statements.

EC.50820.12

knowledge of these issues, Defendants "rolled the dice," pushing the IPO forward with no regard for the chaos these system failures would cause throughout the trading day.

6.     At approximately 11:05 a.m., Defendants attempted to commence open-market trading by executing all pre-market orders placed on NASDAQ's IPO Cross system. However, due to known system limitations, Defendants could not execute the pre-market orders and were forced to push the release time back to 11:30 a.m. Scrambling to avoid the embarrassment of significant delay, Defendants then made an internal, *ad hoc* decision to resort to an untested backup system and inferior failover procedures. During this same time, NASDAQ disseminated vague and incomplete material statements to Class Members through "Market System Status" messages and encouraged Class Members to continue to submit pre-market orders. At approximately 11:30 a.m., NASDAQ forced the IPO Cross to complete and released the Offering for open-market trading with an opening price of $42 per share.

7.     NASDAQ has since conceded that its IPO Cross system failures caused two types of problems for Class Members who placed pre-market orders, modifications and/or cancellations of such orders: (i) orders entered between 11:11:00 a.m. and 11:30:09 a.m. either failed to execute or executed later in the day at inferior prices; and (ii) Cross transaction confirmation messages were not disseminated until 1:50 p.m., when under normal circumstances these confirmations would be disseminated immediately upon the Cross being executed. The unprecedented delay in confirmations for more than two hours left Class Members "flying blind." Without notice as to whether their buy or sell orders were in fact executed in the Cross, Class Members did not know whether they owned or sold Facebook shares, and at what prices.

8.     NASDAQ's ongoing system failures did not end once open-market trading commenced. Indeed, for more than two hours after the open of trading, NASDAQ's system

5

defects caused, among other problems, its Bid/Offer quotations system to become stuck,

preventing Class Members from obtaining the best execution prices for their trades in Facebook

stock as required by SEC Reg. NMS. Additionally, NASDAQ's trading platforms and system

failures directly prevented the majority of NASDAQ's customer base from knowing their true

positions in Facebook until well after the close of trading on Friday, May 18, 2012. Critically, at

no point during the trading day did Defendants provide any specific information about the

breakdown in NASDAQ's systems, or the reckless decisions that caused them.

9.      In the aftermath of the Facebook IPO disaster, NASDAQ's CEO, Defendant

Greifeld, admitted, in no uncertain terms, that "*we did not have enough business judgment in

the process*," and that NASDAQ's "*arrogance*" and "*overconfidence*" contributed to the

Facebook IPO failure. Defendant Greifeld plainly acknowledged that NASDAQ "*was

unprepared for increasing numbers of canceled orders in the hours leading up to Facebook's

debut*," and that NASDAQ's inadequate testing before Facebook's IPO "*didn't account for the

increasing volume at which cancellations can come in*." Moreover, Defendant Greifeld

admitted that NASDAQ "*had a poor design for the Facebook opening cross IPO*."

10.     In July 2012, *after* market participants (including the Plaintiffs herein) filed a

series of lawsuits against Defendants, NASDAQ took the highly unusual step of submitting an

accommodation proposal to the SEC seeking regulatory approval for the payment of $62 million

to its member firms in an attempt to dispose of all claims relating to the Facebook IPO (the

"Accommodation Proposal" or "Proposal"). However, it is clear that NASDAQ's only interest

in submitting the Proposal was to satisfy the public perception that it would take full

responsibility for its reckless decision-making.

6

11.     As detailed below, the Accommodation Proposal was grossly inadequate and insufficient for a number of reasons, including: (i) it did not guarantee that non-NASDAQ members (*e.g.*, retail investors) would receive any compensation for losses suffered in connection with the Facebook IPO; (ii) it contemplated a payment amount that relieves only a small fraction of the actual losses suffered by Class Members; and (iii) it failed to take into account that Defendants' reckless business decisions were the primary cause of the Facebook IPO debacle.

12.     Although the SEC approved the Accommodation Proposal on March 25, 2013, the SEC also reassured investors that it was "not making any determinations regarding the accuracy of the facts as represented by NASDAQ" and was not determining "whether Nasdaq or any other person may have violated the federal securities laws or any other laws" in connection with the Facebook IPO.  Instead, the SEC emphasized that its approval "addresses only whether the proposed change to Nasdaq's existing accommodation rule is consistent with Section 19(b) of the [Securities Exchange Act of 1934]," and is not intended to impact or compromise any claims in the "pending litigation with Nasdaq regarding the Facebook IPO."

13.     Subsequently, on April 24, 2013, NASDAQ disclosed that it had set aside $10 million to resolve the unprecedented penalties it expects to pay once the SEC's Division of Enforcement – tasked with investigating possible violations of federal securities laws – completes its investigation into NASDAQ's handling of the Facebook IPO.  This disclosure is particularly noteworthy given that a $10 million fine would constitute the largest regulatory penalty ever levied against a securities exchange in American history.

14.     Defendants' admissions clearly indicate that the Facebook IPO debacle was not caused by an unforeseeable system error but by Defendants' own business decisions motivated

7

by commercial greed and arrogance.  NASDAQ has acknowledged that it mishandled the

Facebook IPO and caused "***objective, discernible harm***" to market participants.  Accordingly,

there is no doubt that Defendants are liable to Class Members for losses directly attributable to

Defendants' deceptive conduct and grossly negligent actions.

15.    Specifically, the wholesale breakdown in NASDAQ's trading platforms caused

Class Members substantial damages by, *inter alia*:  (i) causing erroneous and failed trade

executions; (ii) blinding Class Members for hours – if not days – as to their then-current

positions in Facebook stock due to late and/or missing trade confirmations; (iii) preventing Class

Members from executing orders at the National Best Bid/Offer ("NBBO") prices for Facebook

stock as required by SEC Reg. NMS; and (iv) exposing Class Members to related failures of the

NASDAQ trading platform, resulting in, among other things, an artificial downward pressure on

the price of Facebook's stock.

16.    Based on the facts alleged herein, Defendants violated Sections 10(b) and 20(a) of

the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and SEC Rule

10b-5 promulgated thereunder, and are also liable under common law negligence.

## A.    Defendants Made Material Misrepresentations, Omitted Material Facts And Failed to Correct And/Or Update Material Statements Made In NASDAQ's Name During The Class Period

17.    As detailed below, NASDAQ and its executives, including Defendants Greifeld

and Ewing, undertook an aggressive marketing and commercial campaign to persuade Facebook

to list its securities on the NASDAQ Stock Market.  These Defendants made a series of business

decisions that ultimately allowed NASDAQ to "win" the battle for Facebook's IPO.  In doing so,

Defendants Greifeld and Ewing caused NASDAQ to promote the reliability and capability of its

technology and electronic trading platform in a variety of SEC filings and conference calls in the

months leading up to the Facebook IPO.  Similarly, Defendants NASDAQ, Greifeld and Ewing

8

acted recklessly by failing to update and/or correct statements concerning the reliability and capability of NASDAQ's technology and electronic trading platform once it became clear that these statements were no longer accurate, complete or true.

18.     NASDAQ, as a for-profit, revenue-dependent enterprise, needed to "win" the highly-anticipated and lucrative Facebook IPO away from competing exchanges, primarily the NYSE. Moreover, in the months leading up to the IPO, Defendants Greifeld and Ewing also had financial incentives in attaining Facebook's business as doing so would likely have increased their overall compensation.

19.     For example, on April 11, 2013, NASDAQ filed its Definitive Proxy Statement on Schedule 14-A with the SEC (the "Proxy Statement") where it discussed, among other things, NASDAQ's executive compensation. NASDAQ's executive compensation program reflects the for-profit and commercial nature of NASDAQ's business and is based primarily on financial performance. The Proxy Statement states that the "primary focus of NASDAQ OMX's executive compensation program is on pay for performance. As a result, a significant portion of compensation is performance-based and varies based on overall NASDAQ OMX performance." Accordingly, Defendants' ability to obtain and successfully launch the Facebook IPO would have provided substantial financial benefits to Defendants Greifeld and Ewing.

20.     During NASDAQ's campaign to obtain Facebook's IPO, Defendants Greifeld and Ewing caused NASDAQ to disseminate a series of material statements through its website and in filings with the SEC. For example, in its Form 10-K filed with the SEC on February 24, 2012 (the "2011 Form 10-K"), NASDAQ stated that it "*provides technology to customers with the speed, scale and reliability required to meet the specific needs of their markets*" and that it "*ensure[s] transparent trading and a fair and orderly market for the benefit of investors*." In

9

the same filing, NASDAQ boasted that its "*platform continues to stand out as a reliable, flexible, and high capacity system delivering high levels of execution quality and speed under even extremely demanding market conditions*."

21.     As detailed below in Sections VII.A.2 and VII.A.3, NASDAQ made similar material statements in its first quarter 2012 financial results and on its website, the latter of which were published continuously both before and during the Class Period, asserting, among other things, that it trading model was the "*standard for markets worldwide*" and "*the fastest trading platform in the world*." Moreover, NASDAQ touted that it "*fuels economies and provides transformative technologies for the entire lifecycle of a trade – from risk management to trade to surveillance to clearing*."

22.     By making material statements in support of its purportedly sophisticated technology and trading platforms, NASDAQ represented to market participants that its systems were robust, reliable, and completely capable of properly handling the Facebook IPO. However, as detailed below, these statements became materially false and misleading long before the Facebook Offering when Defendants' system tests revealed significant problems unbeknownst to market participants.

23.     In the weeks leading up to the IPO, Defendants conducted a series of tests on NASDAQ's trading systems in anticipation of the Facebook IPO. However, these tests were wholly inadequate, simulating less than 10% of the total volume that was expected to trade on the day of the Offering. Industry experts had long predicted that Facebook's IPO would be "the biggest ever to hit Wall Street," with estimates that "day one trading in Facebook shares could see as many as 600 million of its shares change hands." As one senior NASDAQ executive publicly stated before the Offering, "Facebook is obviously the most anticipated IPO in history."

10

24.     Even these inadequate tests revealed to Defendants that NASDAQ's electronic systems were experiencing significant technical problems long before the Offering, according to industry insiders. Despite being aware of this material information, Defendants NASDAQ, Greifeld and Ewing neither updated nor corrected prior material statements regarding the superiority, reliability and speed of NASDAQ's electronic trading platforms.

25.     Notwithstanding Defendants' awareness of the problems affecting NASDAQ's trading systems, on May 10, 2012 – *one week before* Facebook's IPO – NASDAQ proclaimed during an investor day conference that, among other things, "*[n]o trading platform on the planet is faster or more scalable*" and that its "*technology can help trade and clear any and every financial instrument on the planet*." Additionally, NASDAQ stated that it "*delivers innovative products and services that provide transparency to institutional, retail and individual investors*." NASDAQ made – and Defendants Greifeld and Ewing approved – these statements (and others) at a time when Defendants knew or recklessly disregarded the fact that NASDAQ's software systems could not properly handle the trading volume expected for the Facebook IPO, scheduled to be released just days later.

26.     On the day of the IPO itself, NASDAQ also made material misstatements and omissions of fact which caused significant damages to Class Members. Specifically, at 7:00 a.m. on the morning of the May 18, 2012, NASDAQ started accepting pre-market Cross orders for Facebook's IPO. Although open-market trading was scheduled to commence at 11:00 a.m., NASDAQ announced shortly before that time that it was delaying the Facebook IPO until 11:05 a.m. However, because the IPO Cross system was overwhelmed by the volume of orders, order modifications and cancellations, NASDAQ could not initiate the IPO at 11:05 a.m. These problems persisted until approximately 11:30 a.m. when NASDAQ – faced with mounting

11

pressure to launch the hotly anticipated IPO – replaced the malfunctioning system with an untested backup system which it used to commence open-market trading.

27.     During the 25-minute period between 11:05 and 11:30 a.m., NASDAQ did not publicly disclose the known technological issues afflicting its IPO Cross system.  Instead, during this same time, NASDAQ disseminated vague and incomplete material statements to Class Members through "Market System Status" messages and encouraged Class Members to continue to submit pre-market orders.  For example, NASDAQ stated vaguely that, among other things, "*NASDAQ is experiencing a delay in delivering the opening print in Facebook, Inc.*" Incredibly, during this same period, NASDAQ continued to encourage market participants to submit pre-market orders while omitting material facts concerning, among other things, that:  (i) the "delay" was directly caused by a known failure in the IPO Cross system to properly account for all pre-market orders; and (ii) Defendants made the high-risk, *ad hoc* decision to resort to an untested backup system to avoid embarrassment of further delaying the Facebook IPO.

28.     After NASDAQ forced its untested backup system to execute the IPO at approximately 11:30 a.m., NASDAQ continued to conceal the risks facing Class Members by disseminating vague and incomplete statements to market participants.  For example, NASDAQ stated that it was "*investigating an issue in delivering trade execution messages from the IPO Cross in [Facebook]*."  Defendants knowingly and/or recklessly failed to disclose that the unprecedented delay in delivering trade confirmations was the result of their decision to use an untested backup system and that the system failures resulted not only in delayed confirmations, but also in pre-market orders either executing at inferior prices or never executing at all.

29.     The severe problems with NASDAQ's trading platforms continued through 1:50 p.m. – a period of over two hours.  As further detailed below, market participants suffered from a

12

host of additional undisclosed technical problems as the trading day continued. For example, NASDAQ's Bid/Ask quotes were periodically "stuck," preventing Class Members from executing orders at the NBBO prices for Facebook stock as required by SEC Reg. NMS. Moreover, NASDAQ's trading platforms and system failures caused chaos for Class Members throughout the trading day and prevented the majority of NASDAQ's customer base from knowing their true positions in Facebook until well after the close of trading on Friday, May 18, 2012.

30.     As a result of NASDAQ's materially false and misleading statements and omissions of material fact, the price of Facebook's stock plummeted from a high of $45.00 per share in the first 15 minutes of open-market trading to a low of $38.00, finally closing at $38.23 per share. Financial news outlets have reported that Facebook's price may have fallen even lower had Morgan Stanley and other underwriters of Facebook's IPO not bought back large amount of shares in order to keep the stock trading above its initial offering price of $38.00.

31.     As further detailed below, Defendants NASDAQ, Greifeld and Ewing violated the federal securities laws by making materially false and misleading statements and omissions of material fact concerning the speed, readiness, reliability, and scalability of NASDAQ's electronic trading systems in connection with the Facebook IPO. For these reasons, Defendants violated Sections 10(b) and 20(a) of the Exchange Act SEC Rule 10b-5 promulgated thereunder.

### B.     Summary Of Facts Relating To The Negligence Class Claims

32.     As part of a concerted effort to solicit Facebook executives to list the company's stock with NASDAQ, Defendant Greifeld and other NASDAQ executives made a variety of costly business decisions, the consequences of which were borne out on the day of Facebook's IPO. For example, NASDAQ drastically shortened the time period that a company was required to be listed on the exchange prior to qualifying for inclusion in the coveted NASDAQ-100 Index.

13

As noted above, the NASDAQ-100 Index is an index of the 100 largest non-financial securities traded on the NASDAQ stock exchange. Instead of adhering to its longstanding rule that there needed to be a two-year waiting or "seasoning" period prior to any company being eligible for inclusion in the NASDAQ-100 Index, NASDAQ reduced the "seasoning" period to only three months as part of its efforts to attract Facebook.

33.     As the proprietor of a for-profit stock exchange holding itself out to the public as a marketplace for the purchase and sale of equity securities, NASDAQ has duties to exercise reasonable care in the operations conducted through its electronic exchange.

34.     Facebook trades on the NASDAQ under the stock symbol "FB," and has done so since its IPO on May 18, 2012. NASDAQ bid for and won the right to list Facebook and handle its IPO. NASDAQ conducted the pre-opening Cross, in which pre-opening purchase and sale orders were matched and which established the $42 per share opening market price of the stock. The after-market trading of Facebook shares commenced on the NASDAQ exchange on or about 11:30 a.m. on May 18, 2012.

35.     Facebook's IPO was one of the most hotly anticipated and discussed offerings in history. Huge numbers of investors – both retail and institutional – expressed interest in purchasing shares in that IPO and/or trading shares on the first day, a fact widely reported well in advance of the start of trading on May 18, 2012. However, due to Defendants' negligence, certain duties owed by NASDAQ to investors in connection with purchases and sales in the Cross, such as properly executing and confirming Cross buy and sell orders, were badly mishandled by NASDAQ for a large number of trades. In addition, also due to NASDAQ's negligence, NASDAQ's Bid/Offer quotations became stuck during the after-market trading on

14

May 18, 2012, resulting in inferior prices (and failed executions) for buy and sell orders executed on the NASDAQ Stock Market.

36.     NASDAQ's negligence began with its failure properly to design and test the software system used during the Facebook IPO Cross period, which is a pre-IPO auction that NASDAQ uses to set the opening trading price.  When that software malfunctioned in a fashion known as a "race condition" preventing the IPO from starting, NASDAQ switched to an older system in order to complete the Cross.  After a delay, the Cross completed, a $42 per share opening price was established and market trading in Facebook shares commenced on NASDAQ at 11:30 a.m.  Thereafter, according to documents provided to the SEC, NASDAQ has asserted that trading in Facebook shares continued in an orderly fashion.

37.     However, wholly apart from the alleged orderly trading of Facebook shares on the exchange, NASDAQ's negligent design, testing, and implementation of its systems caused a separate and distinct failure to send out timely and accurate reports of trade confirmations.  The confirmation failure affected all trade orders placed during the pre-opening period and executed in the Cross up to 11:30 a.m.  NASDAQ has asserted that it failed to disseminate these trade confirmations until at least 1:50 p.m. on May 18.  As a direct and proximate result of NASDAQ's negligent failure to accurately and promptly to send out trade confirmations, investors who placed and/or cancelled, trade orders did not know whether they owned Facebook stock or, if so, at what price.

38.     In addition, orders for Facebook stock submitted between 11:11:00 a.m. and 11:30:09 a.m. that were eligible for execution at the price of $42 established by the Cross, either did not execute at all or executed later in the day at less favorable prices.  NASDAQ's negligence damaged all Cross Buyer Confirmation Class members in the same way.  As one

15

market participant put it, all persons who traded Facebook were "flying blind." Without notice

that their purchase orders in fact executed in the Cross, class members did not know that they

owned Facebook shares, and at what price. By the time class members belatedly received

confirmations, the Facebook market price had declined. This denied those class members any

opportunity to sell shares and avoid the losses from the falling market price. In other words, by

the time investors were informed they had purchased shares in the opening Cross, those shares

had already declined in value and reflected an embedded, unrealized market loss.

39. NASDAQ additionally damaged all Cross Seller Execution Class members in the

same way. Class members who placed "sell" orders prior to commencement of trading at 11:30

a.m. but whose orders failed to execute at all, or only until later in the day, were denied the

opportunity to sell their shares at the opening price of $42, instead realizing some lesser value for

their shares.

40. Defendants NASDAQ and NASDAQ LLC negligently designed, developed,

tested, and implemented NASDAQ's IPO Cross software and, as a result, breached their

common law duty of care to Class Members in connection with the listing and trading of

Facebook's IPO., and are liable for common law negligence.

## II. JURISDICTION AND VENUE

41. The Securities Class' claims in this action arise under Sections 10(b) of the

Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §

240.10b-5. The Negligence Class' claims arise under the common law.

42. This Court has jurisdiction over the subject matter of the Securities Class' claims

pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1331.

43. This Court also has jurisdiction over the subject matter of both the Securities

Class' claims and Negligence Class' claims presented by this class action complaint because it is

16

a class action arising under the Class Action Fairness Act of 2005 ("CAFA"), 18 U.S.C. §§ 1332(d), 1453, 1711-1715, which explicitly provides for the original jurisdiction of the Federal Courts over any class action in which any member of the plaintiff class is a citizen of a state different from any defendant, and in which the matter in controversy exceeds in the aggregate the sum of $5,000,000.00, exclusive of interest and costs.  Plaintiffs allege that the total claims of the individual members of the Class in this action are in excess of $5,000,000.00 in the aggregate, exclusive of interest and costs, as required by 28 U.S.C. § 1332(d)(2)(A).

44.     Plaintiffs allege that diversity of citizenship exists under CAFA as required by 28 U.S.C. § 1332(d)(2)(A) as there are members of the proposed Class who are citizens of a state other than New York, where NASDAQ maintains citizenship, and that the total number of members of the proposed Class is greater than 100, pursuant to 28 U.S.C. § 1332(d)(5)(B).

45.     Venue is proper in this District pursuant to the provisions of Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  During the Class Period, Defendants' principal place of business was located at One Liberty Plaza, New York, New York 10006, and Defendants transact substantial and ongoing business within the District.  Additionally, many of the acts and transactions giving rise to the violations of law complained of herein, including the preparation and dissemination to the investing public of false and misleading information and material omissions through the means and instrumentalities of interstate commerce, occurred in this District.

## III.   PARTIES

### A.   Plaintiffs

46.     Plaintiff First New York Securities L.L.C. ("First New York") is a proprietary trading firm and NASDAQ member with its principal place of business located in New York, New York.  First New York purchased and/or sold Facebook common stock, as set forth in the

17

certification attached hereto and incorporated herein by reference, in both the pre-market IPO Cross and/or aftermarket on the NASDAQ Stock Market on May 18, 2012, and was damaged thereby.

47.     Plaintiff T3 Trading Group, LLC ("T3 Trading") is a SEC registered broker-dealer and member of the Chicago Board of Options Exchange with its principal place of business located in New York, New York.  T3 Trading purchased and/or sold Facebook common stock, as set forth in the certification attached hereto and incorporated herein by reference, in both the pre-market IPO Cross and/or aftermarket on the NASDAQ Stock Market on May 18, 2012, and was damaged thereby.

48.     Plaintiff Avatar Securities, LLC ("Avatar") is a SEC registered broker-dealer and member of the Chicago Board of Options Exchange with its principal place of business located in New York, New York.  Avatar purchased and/or sold Facebook common stock, as set forth in the certification attached hereto and incorporated herein by reference, in both the pre-market IPO Cross and/or aftermarket on the NASDAQ Stock Market on May 18, 2012, and was damaged thereby.

49.     Plaintiff Philip Goldberg ("Goldberg") is a citizen of the state of Maryland.  On May 18, 2012, Goldberg placed purchase and cancellation orders for Facebook's stock that were not promptly and accurately executed and/or confirmed, and suffered losses thereby.

50.     Plaintiff Steve Jarvis ("Jarvis") is a citizen of the state of New Jersey.  On May 18, 2012, Jarvis placed purchase and cancellation orders for Facebook stock that were not promptly and accurately executed and/or confirmed, and suffered losses thereby.

18

51.     Plaintiff Atish Gandhi ("Gandhi") is a citizen of the state of Texas.  On May 18, 2012, Gandhi placed purchase and cancellation orders for Facebook stock that were not promptly and accurately executed and/or confirmed, and suffered losses thereby.

52.     Plaintiff Colin Suzman ("Suzman") is a citizen of the state of California.  On May 18, 2012, Suzman placed purchase and cancellation orders for Facebook stock that were not promptly and accurately executed and confirmed.  Suzman suffered losses thereby.

53.     Plaintiff Meredith Bailey ("Bailey") is a citizen of the District of Columbia.  On May 18, 2012, Bailey placed purchase and cancellation orders for Facebook stock that were not promptly and accurately executed and/or confirmed, and suffered losses thereby.

54.     Plaintiff Faisal Sami ("Sami") is citizen of the state of Illinois.  On May 18, 2012, Sami placed a purchase order for Facebook stock that was not promptly and accurately executed and/or confirmed, and suffered losses thereby.

## B.     Defendants

### 1.     NASDAQ OMX Group, Inc.

55.     Defendant The NASDAQ OMX Group, Inc. is a publicly-traded Delaware corporation with its principal place of business at One Liberty Plaza, New York, New York 10006.  NASDAQ is a leading global exchange group that delivers trading, clearing, exchange technology, regulatory, securities listing, and public company services across six continents and has a market capitalization of more than $4.7 billion.  NASDAQ's global offerings are diverse and include trading and clearing across multiple asset classes, market data products, financial indexes, capital formation solutions, financial services and market technology products and services.  NASDAQ operates 23 markets, 3 clearinghouses and 5 central securities depositories supporting equities, options, fixed income, derivatives, commodities, futures and structured products.  NASDAQ also offers technology solutions to approximately fifty countries.  As of

19

December 31, 2012, approximately 3,400 listed companies with $6 trillion in market capitalization were listed on NASDAQ's worldwide markets.

### 2.    The NASDAQ Stock Market LLC

56.    Defendant The NASDAQ Stock Market LLC is a Delaware limited liability company with its principal place of business at One Liberty Plaza, New York, New York 10006. NASDAQ LLC is a wholly-owned subsidiary of NASDAQ.  NASDAQ LLC operates the NASDAQ Stock Market.

### 3.    Robert Greifeld

57.    Defendant Robert Greifeld was, at all relevant times, NASDAQ's President and Chief Executive Officer and a member of its Board of Directors.  Defendant Greifeld signed the 2011 Form 10-K, First Quarter 2012 10-Q and related SEC public filings on NASDAQ's behalf. Defendant Greifeld also participated in NASDAQ's April 25, 2012 Earnings Conference Call and May 10, 2012 Investor Day Conference.  Defendant Greifeld made and/or caused to be made materially false and misleading statements and omissions of material fact on behalf of NASDAQ during the Class Period and was responsible for the accuracy and completeness of the information contained and incorporated by reference within NASDAQ's public filings and related statements disseminated on NASDAQ's behalf.  Defendant Greifeld was significantly involved in NASDAQ's aggressive commercial campaign to convince Facebook and its executives to list Facebook's common stock on the NASDAQ Stock Market.

### 4.    Anna M. Ewing

58.    Defendant Anna M. Ewing was, at all relevant times, NASDAQ's Chief Information Officer.  Since January 2013, Defendant Ewing has served as NASDAQ's Executive Vice President, Global Technology Solutions.  Defendant Ewing is responsible for the development and management of NASDAQ's global technology operations and has been

20

credited by NASDAQ as "the technology architect for NASDAQ OMX's transformation from a single U.S. cash equities market to an exchange company with 24 markets around the globe, covering all major asset classes." Defendant Ewing made materially false and misleading statements and omissions of material fact during NASDAQ's May 10, 2012 Investor Day Conference. Defendant Ewing also made and/or caused to be made materially false and misleading statements and omissions of material fact on behalf of NASDAQ during the Class Period and was responsible for the accuracy and completeness of the information contained and incorporated by reference within NASDAQ's public filings and related statements disseminated on NASDAQ's behalf.

59. Defendants Greifeld and Ewing are collectively referred to herein as the "Individual Defendants." Defendants NASDAQ, NASDAQ LLC, Greifeld, and Ewing are collectively referred to herein as "Defendants."

C. **Duties of Individual Defendants**

60. Each of the Individual Defendants had the duty to exercise due care and diligence and the duty of full and candid disclosure of all material facts relating to the financial reporting and results of NASDAQ's operations. To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the dissemination of information concerning NASDAQ's business, operations, and financial reporting, including information pertaining to its technology and trading platforms – *i.e.*, the engine that powers all of NASDAQ's worldwide businesses. By virtue of such duties, the Individual Defendants were required, *among other things*, to:

> (i) conduct and supervise NASDAQ's business in accordance with federal laws;

21

(ii)    supervise the preparation of NASDAQ's SEC filings and related public statements and approve any reports concerning the NASDAQ's operations and results; and

(iii)   ensure that NASDAQ established and followed adequate internal controls.

61.     As officers, directors, and controlling persons of a publicly-held company registered with the SEC, governed by the provisions of the federal securities laws, and whose common stock is traded on the NASDAQ Stock Market, each Individual Defendant had a duty to: (i) promptly disseminate accurate and truthful information with respect to the capability, speed and reliability of NASDAQ's technology and trading platforms, including NASDAQ's IPO Cross system, used in connection with the Facebook IPO; (ii) correct and/or update any previously issued statements that had become materially misleading or untrue so that market participants could have made investment decisions to buy and/or sell shares of Facebook stock during the Class Period based upon truthful, accurate, and complete information.

62.     As a result of the Individual Defendants' failure to fulfill the foregoing obligations, Class Members purchased and/or sold Facebook stock during the Class Period without material information. Such information, which was available to NASDAQ and the Individual Defendants, concerned, among other things, NASDAQ's ongoing trading platform failures, including the breakdown of its IPO Cross system. As a direct and proximate result of the Individual Defendants' wrongdoing, Class Members were damaged.

## IV.    NASDAQ'S COMMERCIAL ROLE AS A LEADING GLOBAL EXCHANGE GROUP

63.     NASDAQ is a leading global exchange group that "delivers trading, clearing, exchange technology, regulatory, securities listing, and public company services across six continents." According to NASDAQ's 2012 Form 10-K, NASDAQ's "global offerings are diverse and include trading and clearing across multiple asset classes, market data products,

22

financial indexes, capital formation solutions, financial services and market technology products
and services." Given the enormity of NASDAQ's global commercial and business activities, it is
no surprise that as of April 29, 2013, the aggregate market value of its common stock (*i.e.*, its
market capitalization) was more than $4.7 billion.

64.     NASDAQ provides a summary of its business formation, including its current
corporate structure, in the 2012 Form 10-K:

> Nasdaq was founded in 1971 as a wholly-owned subsidiary of [the
> Financial Industry Regulatory Authority ("FINRA")] (then known
> as the National Association of Securities Dealers, Inc.). Beginning
> in 2000, FINRA restructured and broadened ownership in Nasdaq
> by selling shares to FINRA members, investment companies and
> issuers listed on The NASDAQ Stock Market.
>
> In connection with this restructuring, Nasdaq applied to the SEC to
> register The NASDAQ Stock Market as a national securities
> exchange. FINRA fully divested its ownership of Nasdaq in 2006,
> and The NASDAQ Stock Market became fully operational as an
> independent registered national securities exchange in 2007. In
> 2006, Nasdaq also reorganized its operations into a holding
> company structure. As a result, our exchange licenses and
> exchange and broker-dealer operations are held by our
> subsidiaries.

65.     NASDAQ LLC, NASDAQ's wholly-owned subsidiary, operates the NASDAQ
Stock Market, the largest single cash equities securities market in the U.S. in terms of listed
companies and in the world in terms of share value traded. In addition to the NASDAQ Stock
Market, in 2008, NASDAQ also expanded its U.S. market services business through the
acquisitions of the Philadelphia Stock Exchange, Inc., or PHLX, and the Boston Stock Exchange,
Incorporated, or BSX. These acquisitions allowed NASDAQ to significantly expand its presence
in the derivative and options markets, and allowed it to create additional equities markets within
the U.S. As of December 31, 2012, The NASDAQ Stock Market was home to 2,577 listed
companies with a combined market capitalization of approximately $5.2 trillion. For the year-

23

ended December 31, 2012, NASDAQ's "exchanges had an average daily trading volume of 6.6 million trades in cash equities, representing a value of approximately $12.4 trillion."

66.     In its 2012 Form 10-K, NASDAQ highlighted the competitive nature of its listing business, stating that "[t]he cash equity securities markets are intensely competitive.  We compete in the U.S. against NYSE Euronext, BATS Global Markets, Direct Edge, regional exchanges and ATSs. . . . Competition also comes from broker-dealers and from off-board, or OTC trading, in the U.S. and elsewhere."

67.     While NASDAQ vigorously competes with other exchanges for new IPOs, the number of new listings on NASDAQ has been steadily declining in recent years.  As NASDAQ disclosed in its 2012 Form 10-K, its new listings per year fell from 89 in 2010, to 78 in 2011, to 72 in 2012.  This drop in new IPOs made winning the high-profile Facebook Offering all the more crucial to NASDAQ's future business success and profitability.

68.     NASDAQ acknowledged the fiercely competitive nature of its business in its 2012 Form 10-K, noting that "[c]ompetition is based on a number of factors, including the quality of our technological and regulatory infrastructure, total transaction costs, the depth and breadth of liquidity, the quality of value-added customer services, reputation and the direct cost of trade execution."

69.     NASDAQ also emphasized how highly competitive its industry is in the "Risk Factors" section of its 2012 Form 10-K, stating:

> We face intense competition from other exchanges and markets for
> market share of trading activity and listings.  In addition, our
> market data, global index, corporate solutions and market
> technology businesses face significant competition from other
> market participants.  This competition includes both product and
> price competition and has continued to increase as a result of the
> creation of new execution and listing venues in the United States
> and Europe.  Increased competition may result in a decline in our

24

share of trading activity, listings and the markets for the products
we offer, thereby adversely affecting our operating results.

70.     In this regard, NASDAQ further elaborated that "[t]he success of our business
depends on our ability to keep up with rapid technological and other competitive changes
affecting our industry.  Specifically, we must complete development of, successfully implement
and maintain electronic trading platforms that have the functionality, performance, capacity,
reliability and speed required by our business, as well as by our customers."  Maintaining
superior technology, including "the quality and reliability of [NASDAQ's] technology platforms
and systems," provides NASDAQ with a strong reputation and brand name.  To the extent there
is any damage to NASDAQ's "reputation or brand name . . . [it] could have a material adverse
effect" on its businesses.

71.     It is evident that NASDAQ engages in a variety of for-profit, business activities
that serve its commercial interests, such as its efforts to attract new IPOs, increase trading
volume, and improve its market share over competing stock exchanges.  With a focus on
expanding worldwide business operations, NASDAQ acknowledges that its for-profit interests
may conflict with "market regulation functions," and, accordingly, its "U.S. cash equities and
options exchanges outsource the majority of their market regulation functions to FINRA."

72.     NASDAQ asserts that its market performance is primarily tied to its for-profit
commercial activities and businesses reputation.  As set forth in NASDAQ's 2012 Form 10-K :

We have self-regulatory obligations and also operate for-profit
businesses, and these two roles may create conflicts of interest.

We have obligations to regulate and monitor activities on our
markets and ensure compliance with applicable law and the rules
of our markets by market participants and listed companies.  In the
U.S., the SEC staff has expressed concern about potential conflicts
of interest of "for-profit" markets performing the regulatory
functions of a self-regulatory organization.  Although our U.S.

25

> cash equities and options exchanges outsource the majority of their
> market regulation functions to FINRA, we do perform regulatory
> functions related to our listed companies and our markets. Any
> failure by us to diligently and fairly regulate our markets or to
> otherwise fulfill our regulatory obligations could significantly
> harm our reputation, prompt SEC scrutiny and adversely affect our
> business and reputation.

73.    On February 27, 2009, NASDAQ filed its Form 10-K with the SEC (the "2008

Form 10-K"), where NASDAQ stated that its regulatory contract with FINRA preserves a

"regulatory separation upon operation as a national securities exchange." The regulatory

separation creates a clear distinction between market regulatory functions and the profit-making

operations of a securities exchange:

> We sought to preserve a regulatory separation upon operation as a
> national securities exchange. FINRA provides regulatory services
> to The Nasdaq Stock Market, including the regulation of trading
> activity on the exchange and surveillance and investigative
> functions. We have a limited direct regulatory role in conducting
> real-time market monitoring through our MarketWatch
> department. This department, among other things, monitors for
> trades whose prices are away from the current market and initiates
> trading halts as necessary. Suspicious trading behavior discovered
> by MarketWatch staff and all other Nasdaq employees is referred
> to FINRA for further investigation. FINRA performs the
> surveillance and investigative functions for Nasdaq. We have
> preserved this regulatory separation now that we are operational as
> a national securities exchange.

74.    The 2008 Form 10-K described the regulatory functions contracted out to FINRA

as follows:

> **Regulatory Services Agreement.** FINRA provides us with
> regulatory services, including the regulation of trading activity on
> The Nasdaq Stock Market and the surveillance and investigative
> functions of The Nasdaq Stock Market, pursuant to a regulatory
> services agreement and a transitional regulatory agreement
> discussed below. The regulatory services agreement became
> effective for Nasdaq-listed securities in August 2006 and for non-
> Nasdaq-listed securities in March 2007. Prior to the effectiveness
> of the regulatory services agreement, FINRA provided regulatory

26

services to us pursuant to the Delegation Plan. We paid FINRA
$28.9 million in 2007, $33.8 million in 2006 and $41.8 million in
2005 for regulatory services.

*       *       *

Under the regulatory services agreement, FINRA:

- reviews and approves new member applications;

- performs automated surveillance of trading on The Nasdaq Stock Market;

- reviews member firm compliance with the rules and regulations applicable to trading and market-making functions in The Nasdaq Stock Market;

- investigates suspicious activity in quoting and trading on The Nasdaq Stock Market;

- conducts examinations of member firms;

- initiates the disciplinary process once it is determined that a potential violation of a federal securities law or rule, or an SRO rule, may have occurred; and

- operates an arbitration program and a mediation program for the resolution of customer, member firm employee, and Nasdaq member-to-member disputes.

75.    After outsourcing the majority of its regulatory functions to FINRA, NASDAQ's remaining regulatory responsibilities are significantly limited. The delegation to FINRA includes the regulation of "trading activity and surveillance," as detailed in NASDAQ's 2012 Form 10-K:

> FINRA provides regulatory services to the markets operated or
> regulated by The NASDAQ Stock Market, NASDAQ OMX PHLX
> and NASDAQ OMX BX, including the regulation of trading
> activity and surveillance and investigative functions. We have a
> limited direct regulatory role in conducting real-time market
> monitoring, certain options surveillance, rulemaking and some
> membership functions through our MarketWatch department. We
> refer suspicious trading behavior discovered by our regulatory staff
> and all other employees of the markets operated or regulated by
> The NASDAQ Stock Market, NASDAQ OMX PHLX and
> NASDAQ OMX BX to FINRA for further investigation.

27

EC.50820.12

76.    NASDAQ has also noted in its 2012 Form 10-K that its contracts with FINRA

have enabled it to "reduce [its] headcount," which in turn reduces NASDAQ's own costs for

regulatory activities and enhances its profitability:

> *Regulatory contractual relationships with FINRA.* The NASDAQ
> Stock Market, NASDAQ OMX PHLX, NASDAQ OMX PSX and
> NASDAQ OMX BX have signed a series of regulatory service
> agreements covering the services FINRA provides to the respective
> [self-regulatory organizations ("SROs")]. Under these agreements,
> FINRA personnel act as our agents in performing the regulatory
> functions outlined above, and FINRA bills us a fee for these
> services. These agreements have enabled us to reduce our
> headcount while ensuring that the markets for which we are
> responsible are properly regulated. However, our SROs retain
> ultimate regulatory responsibility for all regulatory activities
> performed under these agreements by FINRA.

77.    NASDAQ has certain duties as a member of the National Market System

("NMS") as detailed in its 2012 Form 10-K:

> *Regulation NMS and Options Intermarket Linkage Plan.* We are
> subject to Regulation NMS for our cash equities markets, and our
> options markets have joined the Options Intermarket Linkage Plan.
> These are designed to facilitate the routing of orders among
> exchanges to create a national market system as mandated by the
> Exchange Act. One of the principal purposes of a national market
> system is to assure that brokers may execute investors' orders at
> the best market price. Both Regulation NMS and the Options
> Intermarket Linkage Plan require that exchanges avoid trade-
> throughs, locking or crossing of markets and provide market
> participants with electronic access to the best prices among the
> markets for the applicable cash equity or options order.

78.    NASDAQ has three main business segments from which it derived substantially

all of its 2012 yearly revenue: (i) Market Services; (ii) Issuer Services; and (iii) Market

Technology.

79.    As detailed in its 2012 Form 10-K, NASDAQ's Market Services segment

"consists of our U.S. and European Transaction Services businesses, including Access Services,

28

as well as our Market Data business. These businesses are interrelated because our Market Data

business sells and distributes quote and trade information generated by our Transaction Services

businesses to market participants and data distributors.  Market Services also includes our Broker

Services business, which offers technology and customized securities administration solutions to

financial participants in the Nordic markets."

80.    Market Services' revenue includes Transaction Services' revenue, which was

$1.29 billion for the year-ended 2012, earned from listing and trading of securities on

NASDAQ's exchanges, as set forth in NASDAQ's 2012 Form 10-K:

> U.S. cash equity trading revenues are variable, based on individual
> customer share volumes, and recognized as transactions occur.  We
> charge transaction fees for executing cash equity trades in
> NASDAQ-listed and other listed securities on our cash equities
> exchanges as well as on orders that are routed to other market
> venues for execution.

81.    NASDAQ also details in its 2012 Form 10-K that its Market Services' revenue

includes revenue from providing market data, including participation in U.S. Tape Plans and in

selling NASDAQ's own data:

> We collect and process information and earn revenues as a
> distributor of our own data, as well as select third-party content.
> We provide varying levels of quote and trade information to
> market participants and to data distributors, who in turn sell
> subscriptions for this information to the public.  We earn revenues
> primarily based on the number of data subscribers and distributors
> of our data.

82.    According to NASDAQ's 2012 Form 10-K, NASDAQ's Issuer Services segment

"includes our Global Listing Services and Global Index Group businesses. The companies listed

on The NASDAQ Stock Market and our Nordic and Baltic exchanges represent a diverse array

of industries.  This diversity of companies listed on our markets allows us to develop and license

NASDAQ OMX branded indexes, associated derivatives, and financial products as part of our

29

Global Index Group. The Global Listing Services business also includes our Corporate Solutions business, which generates revenues through the sale of our shareholder, directors, newswire, and other services."

83.     Issuer Services revenue includes revenue from U.S. Listing Services, including annual renewal fees, listing of additional shares fees and initial listing fees. NASDAQ stated in its 2012 Form 10-K that 22.5% of NASDAQ 2012 total revenue was from the Issuer Services segment.

84.     NASDAQ's 2011 Form 10-K reported that NASDAQ's operating expenses increased in 2011 by $103 million, despite declines in matched market share trades, trading volume, IPOs and new listings. Nearly all of this $103 million increase had nothing to do with investing in technological improvements; there was only a small $6 million increase associated with computer operations and data communications.

85.     The 2011 Form 10-K also reported that in October 2011, NASDAQ's Board of Directors approved a share repurchase program. In the fourth quarter of 2011, NASDAQ spent $100 million to repurchase 3.9 million shares of its stock. In the first quarter of 2012, NASDAQ reported that it spent $50 million to repurchase shares, and by the end of 2012, NASDAQ had repurchased 11.5 million shares at a price of $275 million.

86.     On April 25, 2012, for the first quarter of 2012, NASDAQ announced that it had spent $100 million to reduce debt. NASDAQ also announced that it had adopted a cost reduction plan under which it saved $25 million in the quarter, and that it expected to realize $50 million in savings by year end.

87.     NASDAQ has also sought to strategically move away from the exchange business. In the letter to shareholders accompanying the 2012 Form 10-K, Defendant Greifeld

30

stated that "[a]lthough historically we have been predominantly known as a U.S. equities exchange, NASDAQ OMX continued on its path of becoming much more than that. We are transforming into a technology services and transaction company, dedicated to helping customers worldwide improve their productivity and manage risks more effectively." NASDAQ's shift to diversify its lines of business reflects that it has reduced incentive to invest in its traditional exchange business—which it acknowledges has been in decline—in favor of other market venues.

88.     In short, in the months preceding the Facebook IPO, NASDAQ spent substantial sums on stock repurchases, debt reduction and a cost-reduction plan, which could have been invested to eliminate technological problems with its trading platform. The failures in NASDAQ's systems on May 18, 2012 thus reflect its strategic move away from the exchange business. These business factors show that NASDAQ's negligence was the result of an attempt to maximize short-term profits, at the expense of the long-term reliability of its exchange systems.

89.     NASDAQ states in the 2012 Form 10-K that its Market Technology business "is the world's leading technology solutions provider and partner to exchanges, clearing organizations and central securities depositories. Our technology business is also the sales channel for our complete global offering to other marketplaces. Market Technology provides technology solutions for trading, clearing, settlement and information dissemination, and also offers facility management integration, surveillance solutions, and advisory services."

90.     Market Technology revenue includes:

> [S]olutions for trading, clearing, settlement, and information
> dissemination, and also . . . facility management integration,
> surveillance solutions and advisory services. Revenues are
> primarily derived from license, support and facility management

31

revenues, delivery project revenues, as well as change request,
advisory and broker surveillance revenues.

91.     In 2012, NASDAQ reported gross revenues of $3.119 billion and operating

income of $690 million. Its total revenue less transaction rebates, brokerage, clearance and

exchange fees was $1.663 billion consisting of $1.104 billion from its Market Services segment,

$375 million from its Issuer Services segment, and $184 million from its Market Technology

segment. NASDAQ's total net income for 2012 was $352 million. While NASDAQ separates

its businesses into three segments, it is clear from its 2012 Form 10-K that NASDAQ "cross-

sells" products and services from all of its businesses segments to its clients.

92.     These business segments were realigned as of January 1, 2013, "as a result of

changes to the organization structure" of NASDAQ's businesses. Specifically, NASDAQ

provided the following reason for the change in its 2012 Form 10-K:

> Software products sold relating to Market Technology and
> Corporate Solutions, previously part of our Issuer Services
> segment, became the responsibility of one segment manager and
> will comprise our new Global Technology Solutions segment. Our
> Market Data products, previously part of our Market Services
> segment, and our Global Index Group business, previously part of
> our Issuer Services segment, became the responsibility of another
> segment manager and will comprise the new Global Information
> Services segment. Both segment managers report to our chief
> executive officer who is also considered our chief operating
> decision maker for financial reporting purposes.

93.     NASDAQ, like other publicly-traded companies in large, competitive industries,

raises capital, issues debt, and hosts analyst and investor day conferences to strengthen its

business interests and commercial reputation in the marketplace. As detailed below, NASDAQ's

alleged wrongdoing in connection with the Facebook IPO was in its capacity as a for-profit,

commercial business, whose purpose was to maximize trading volume and company profits,

32

while enhancing its reputation as the "go to" exchange for the world's largest technology companies.

## V.   FACTUAL BACKGROUND

94.    The Facebook IPO was widely expected to generate record-setting trading volumes. In fact, Facebook accounted for approximately 2.82% of the total volume of shares traded on the NASDAQ Stock Exchange in May 2012 – the first month the stock was listed, and a month in which the stock only traded on 9 of the 22 days the exchange was open. This percentage is significant given that, as of February 2013, Facebook was merely one of 2,720 NASDAQ-listed securities. Since its IPO, Facebook has consistently ranked among the top ten most traded securities on the NASDAQ Stock Exchange. For the period May 2012 through February March 2013, trading in Facebook shares composed approximately 3% of the total volume of the NASDAQ Stock Exchange.

### A.   NASDAQ's Revenues Rely on IPOs

95.    At the time of the Facebook IPO in May 2012, NASDAQ IPOs and new listings had been in a steady decline. NASDAQ's IPOs declined from 89 in 2010, to 78 in 2011, and new listings declined from 195 to 151 over that same period.

96.    Because of the importance of IPOs and new listings to NASDAQ's revenue, reputation and ability to meet competition, NASDAQ aggressively pursued IPOs and new listings in 2012, including the Facebook IPO, as detailed in its 2012 Form 10-K:

> We aggressively pursue new listings from companies, including those undergoing IPOs as well as companies seeking to switch from alternative exchanges. In 2012, The NASDAQ Stock Market attracted 158 new listings. Included in these listings were 72 IPOs, almost 48% of the total U.S. IPOs in 2012.

97.    As detailed below, NASDAQ and the NYSE are engaged in intense competition for new IPOs and seek to poach company listings from other exchanges. For example, in 2012, a

33

total of 16 NYSE-listed companies switched to The NASDAQ Stock Market, representing

approximately $135 billion in market capitalization, including Kraft Foods, Texas Instruments,

Goodyear Tire & Rubber and Analog Devices.

98.     In this regard, NASDAQ acknowledged in its 2012 Form 10-K that its revenue

and financial condition are directly tied to trading volumes on the exchange:

> Because a significant percentage of our revenues is tied directly to
> the volume of securities traded and cleared on our markets, it is
> likely that a general decline in trading and clearing volumes would
> lower revenues and may adversely affect our operating results if
> we are unable to offset falling volumes through our pricing.
> Declines in trading and clearing volumes may also impact our
> market share or pricing structures and adversely affect our business
> and financial condition.

99.     Moreover, according to NASDAQ's 2012 Form 10-K, at the time of the Facebook

IPO, NASDAQ's trading volumes and market share were in decline:

> Our matched market share in NASDAQ-listed securities executed
> on NASDAQ declined from 46.1% in 2007 to 25.6% in 2012 and
> our combined matched market share in all U.S.-listed securities
> executed on all of our platforms declined from 29.1% in 2007 to
> 20.8% in 2012.

100.    Similarly, NASDAQ has acknowledged that it faced intense pricing competition

in its 2012 Form 10-K:

> The securities trading industry is characterized by intense price
> competition. We have in the past lowered prices, and in the U.S.,
> increased rebates for trade executions to attempt to gain or
> maintain market share. These strategies have not always been
> successful and have at times hurt operating performance.
> Additionally, we have also been, and may once again be, required
> to adjust pricing to respond to actions by competitors, which could
> adversely impact operating results.

101.    NASDAQ also noted in its 2012 Form 10-K that the decline in obtaining new

IPOs has had an adverse impact on its revenues:

34

> The market for initial public offerings is dependent on the prosperity of companies and the availability of risk capital, both of which have been severely tested in recent years. Stagnation or decline in the initial public offering market will impact the number of new listings on The NASDAQ Stock Market and the exchanges comprising NASDAQ OMX Nordic and NASDAQ OMX Baltic, and thus our related revenues. We recognize revenue from new listings on The NASDAQ Stock Market on a straight-line basis over an estimated six-year service period. As a result, a stagnant market for initial public offerings could cause a decrease in deferred revenues for future years. Furthermore, as initial public offerings are typically actively traded following their offering date, a prolonged decrease in the number of initial public offerings could negatively impact the growth of our transactions revenues.

102.  NASDAQ is also under financial pressure to develop and implement new or improved technology in the highly competitive markets in which it operates its exchanges:

> The markets in which we compete are characterized by rapidly changing technology, evolving industry standards, frequent enhancements to existing products and services, the adoption of new services and products and changing customer demands. We may not be able to keep up with rapid technological and other competitive changes affecting our industry. For example, we must continue to enhance our electronic trading platforms to remain competitive, and our business will be negatively affected if our electronic trading platforms fail to function as expected. If we are unable to develop our electronic trading platforms to include other products and markets, or if our electronic trading platforms do not have the required functionality, performance, capacity, reliability and speed required by our business, as well as by our customers, we may not be able to compete successfully. Further, our failure to anticipate or respond adequately to changes in technology and customer preferences, especially in our market technology business, or any significant delays in product development efforts, could have a material adverse effect on our business, financial condition and operating results.

103.  As a result of the financial and competitive pressures on NASDAQ at the time of the Facebook IPO, NASDAQ failed to make the expenditures necessary to fully develop and test its electronic systems in advance of the Offering to assure that they would function properly.

35

The proper testing of its electronic systems was even more critical given the environment of the Facebook IPO, including the size and trading volume expected for the Offering.

### B. Defendants Undertake An Aggressive Campaign To Solicit Facebook To List Its Common Stock On The NASDAQ Stock Market

104. On February 1, 2012, after months of media and investor speculation as to when Facebook would go public, Facebook filed its Form S-1 Registration Statement with the SEC in connection with its anticipated public Offering. Facebook's February 1, 2012 Registration Statement indicated the company's goal to raise $5 billion through the Offering.

105. By that time, NASDAQ and its chief competitor, the NYSE, had been engaged in aggressive campaigns to solicit Facebook executives to list the company's securities on their respective exchanges. As detailed in a January 26, 2012 *New York Post* article titled "NYSE, Nasdaq Battle for Facebook Listing," "[b]oth the NYSE and Nasdaq have been campaigning aggressively for the listing for the past year and have delivered pitches to Facebook CFO David Ebersman and others in Facebook's inner circle in recent months, extolling the virtues of selecting one exchange platform over another." A January 27, 2012 *Business Insider* article similarly noted that the "NYSE and NASDAQ have both been vying to be the exchange platform that Facebook ultimately lists on. . . . The two exchanges have been making pitches to Facebook executives over the last couple of months to obtain the listing."

106. Indeed, as the U.S. Department of Justice noted, "NYSE and NASDAQ compete aggressively for listing customers as they are effectively the only companies providing corporate stock listing services in the United States." Competition between the two exchanges reached new heights in connection with the Facebook IPO, which was anticipated to be the biggest technology IPO in history.

36

107.    On January 27, 2012, *The Wall Street Journal* published an article titled "NYSE,

Nasdaq Battle For Big Kahuna Of Stock Listings: Facebook," highlighting the bitter rivalry

between NASDAQ and the NYSE over new IPO listings.  Specifically, *The Wall Street Journal*

article stated the following:

> Both U.S. stock exchanges have been at war with each other over
> listings for as long as anyone can remember.  The intensity picked
> up quite a bit in 2011 amid the wave of Internet listings, such as
> LinkedIn and Groupon.
>
>        \*      \*      \*
>
> Both stock exchanges have battled for years to bring in, or poach,
> listings by offering promotions and other incentives.  Groupon was
> an especially big win for Nasdaq.  Here's what colleagues Brendan
> Conway and Jacob Bunge reported back in October:
>
> Perhaps the courtship of Groupon best illustrates the exchanges'
> tug of war: The competition for the listing, initiated last spring,
> drew the chief executives of both exchange groups to the daily
> deals website's home base of Chicago.  NYSE's Duncan
> Niederauer and Nasdaq OMX's Bob Greifeld both personally
> pitched their markets in June, according to people familiar with the
> matter.
>
> The exchange operators outlined a slew of promotions and co-
> branding opportunities with other companies listed on their
> markets.  Nasdaq secured victory by agreeing to raise visibility of
> Groupon's discount offers across a range of media, including the
> 72-foot billboard on its MarketSite in New York's Times Square,
> according to people familiar with the matter.
>
> ***If both exchanges went to those lengths to court Groupon, one
> can only imagine what they've done to woo Facebook.***

108.    Although the specific communications and substance of the meetings Defendants

had with Facebook have not yet been publicly disclosed, it is apparent that Defendants were

doing all they could to ultimately land Facebook's stock listing, including touting NASDAQ's

technological capabilities and electronic trading platform.  On February 2, 2012, the day after

37

Facebook filed its initial Registration Statement, the *Dow Jones Newswire* noted that Defendant

Greifeld was still in talks with Facebook over its expected IPO. Defendant Greifeld stated that

"[w]e obviously are soliciting interest from Facebook and we look forward to having the

opportunity to present our complete package."

109. The battle between NASDAQ and the NYSE for the Facebook listing was finally

resolved on April 5, 2012, when *The New York Times* reported that Facebook had chosen

NASDAQ. The article stated, in relevant part:

> The social network will list its shares under the ticker symbol FB
> on Nasdaq, according to people with knowledge of the matter, who
> requested anonymity because the discussions were private.
>
> It is a significant coup for the exchange, which has been embroiled
> in a battle with the New York Stock Exchange for the darlings of
> Silicon Valley. While big technology companies, like Apple and
> Google, have traditionally flocked to Nasdaq, the New York
> Exchange has aggressively courted the new crop of Internet
> companies over the last year, grabbing notable offerings like
> LinkedIn and Pandora Media.
>
> "***It's a high-profile win for their listings business***," said Michael
> Adams, an analyst Sandler O'Neill.
>
> *      *      *
>
> For Nasdaq, Facebook is not just any listing.
>
> With more than 800 million users and $3.7 billion in revenue,
> Facebook has come to dominate the social media industry. The
> company is widely expected to go public next month and is on
> track to be the largest offering since Google's debut in 2004. The
> I.P.O. could value the sprawling social network as high as $100
> billion, people familiar with the matter have said, putting it on par
> with some of the world's largest corporations, like McDonald's
> and Citigroup.
>
> ***Based on a possible offering of $5 billion or more, the Facebook
> listing will be the largest in Nasdaq's history, according to data
> from S.& P. Capital IQ.***

38

> In picking Nasdaq, Facebook had to weigh the differences between the exchanges. Nasdaq is a fully electronic marketplace, while the New York Exchange offers a hybrid model, with a floor-based marketplace and an electronic one. The exchange is widely considered a more global brand, compared with Nasdaq. But its pricing structure is more expensive than Nasdaq's.
>
> Several years ago, Nasdaq was the undisputed leader for technology I.P.O.'s. But its lead has since eroded, amid increasing competition from the exchange, which has spent considerable energy courting the new class of high-flying Internet companies.

110.    On that same day, *Bloomberg* emphasized how important NASDAQ's win was for its current and future business prospects in securing more lucrative IPO listings – especially in the technology sector:

> Exchange operators NYSE Euronext and Nasdaq OMX (NDAQ) Group Inc., rivals for virtually every IPO in America, competed for what may be the biggest listing by a technology company. ***Winning the IPO means more fees, a boost in trading revenue and the chance to link an exchange's brand with the largest social-networking website in the world.***
>
> "***There's cachet to winning one of the biggest IPOs ever***," Tim Hoyle, the director of research at Radnor, Pennsylvania- based Haverford Trust Co., which manages $6 billion including NYSE Euronext (NYX) shares, said in a phone interview. "***The straight-up value of this IPO will make for a nice gain in listing fees, which make up a meaningful portion of the revenue stream for exchanges***."
>
> *          *          *
>
> ***Nasdaq OMX had more at stake because of the perception it gets all the technology companies***, according to Sang Lee, managing partner at Boston-based Aite Group LLC. Among Internet IPOs since the start of 2011, LinkedIn Corp. and Pandora Media Inc. picked NYSE, while Nasdaq won Groupon Inc. and Zynga Inc.
>
> "Having that brand name on that listings side would be huge," Lee said of Facebook's selection. "If they're able to do it correctly, the other social-media sites and players would certainly be talking to Nasdaq initially," he said. "It would certainly put them in a very nice position."

39

111.    Similarly, an April 6, 2012 *Bloomberg* article explained the critical impact

Facebook would have on NASDAQ's commercial prospects going forward:

> People are asking about what it means for NYSE to lose it, but it
> was critical for Nasdaq to win," Richard Repetto, an analyst at
> Sandler O'Neill & Partners LP in New York, said in a phone
> interview. "***What it does is it keeps the momentum and likely
> leads to further IPOs in the future. Whatever brand Facebook
> attracts, whether it's tech or social media, it likely helps Nasdaq's
> cause***."
>
> *       *       *
>
> While listings bring in less than a quarter of net revenue and even
> less of profit for NYSE Euronext and Nasdaq OMX, the exchanges
> fight for IPOs because it leads to more trading and brand value,
> said Larry Tabb, founder of financial-market research and advisory
> firm Tabb Group LLC. Listings accounted for 17 percent of NYSE
> Euronext's net revenue last year and 19 percent of Nasdaq OMX's.
>
> Tabb said March 27 that Facebook's trading may translate into
> about $500,000 to $1 million revenue per year, split among the
> exchanges and other venues. That means that NYSE Euronext and
> Nasdaq OMX could get an additional $260,000 in trading and
> market data revenue alone.

112.    It is clear that Defendants aggressively pursued Facebook to further NASDAQ's

business interests and to cement the exchange as the "go to" venue for the biggest U.S.

technology companies.  NASDAQ touted its trading model as being the "standard for markets

worldwide" and "the fastest trading platform in the world," in connection with pitching its

technological capabilities for what would be the largest IPO in the history of NASDAQ.  As

detailed below, Defendants also made a series of self-interested business decisions to convince

Facebook to list with NASDAQ.

### C.    Defendants Drastically Shorten The Time Period For Facebook To List Its Common Stock On The NASDAQ-100 Index

113.    On April 6, 2012, one day after news reports revealed that NASDAQ won the

prized Facebook listing, *Bloomberg* reported that one of the main reasons Facebook chose

40

NASDAQ was because Defendants had made the business decision to drastically shorten the time that a company needed to be listed on the NASDAQ Stock Market prior to qualifying for inclusion in the coveted NASDAQ-100 Index. According to NASDAQ's website, the NASDAQ-100 Index "includes 100 of the largest domestic and international non-financial securities listed on The Nasdaq Stock Market based on market capitalization. The Index reflects companies across major industry groups including computer hardware and software, telecommunications, retail/wholesale trade and biotechnology."

114.    The April 6, 2012 *Bloomberg* article highlighted the value for Facebook in having its securities listed in the NASDAQ-100 Index:

> Inclusion in the Nasdaq-100 Index may have spurred Facebook toward Nasdaq, Josef Schuster, founder of Chicago-based Ipox Schuster LLC, which has about $2 billion tied to indexes that track IPOs, said in a phone interview. The benchmark gauge comprises nonfinancial companies including Apple and Google. `
>
> *The Nasdaq-100 has surged 165 percent since equity markets bottomed in March 2009, beating the 107 percent gain by the Standard & Poor's 500 Index.*
>
> *Should Facebook get a weighting of 4 percent to 5 percent in the Nasdaq-100, the PowerShares QQQ Trust exchange-traded fund that tracks the measure "could create $2 billion to $3 billion of systematic demand" for the stock*, Schuster said. The ETF has a market value of $35.9 billion, according to data compiled by Bloomberg. Other securities tracking the index would need to make similar purchases.
>
> **'Supportive' of Price**
>
> "It would be very supportive for the stock price and may be one of the main reasons Facebook chose Nasdaq," Schuster said. "They'd be with Microsoft, Yahoo and Apple. *Being included would create demand no matter how expensive or cheap the stock is*."

41

115.     On April 14, 2012 – only 9 days after Facebook chose to list its stock on the

NASDAQ stock exchange – NASDAQ issued a press release announcing the change to its

longstanding "seasoning" period for companies to be listed in the NASDAQ-100 Index:

> NASDAQ OMX is changing and applying consistently the
> "seasoning" period for NASDAQ-100 Index® (NDX), NASDAQ
> Financial-100 Index® (IXF) and NASDAQ Biotechnology Index®
> (NBI) eligibility. ***Currently, the NDX and IXF seasoning criteria
> require a security to be listed on a recognized market for at least
> two years*** (NBI requires six months). . . .
>
> *     *     *
>
> ***With the new methodology, a security must have seasoned on
> NASDAQ, NYSE or NYSE Amex for at least three full months***
> (excluding the first month of initial listing) based on current
> month-end data. ***The index eligibility changes will be
> implemented on Monday, April 23, 2012***.

116.     There is little doubt that Defendants purposefully relaxed NASDAQ's long-held

standards to persuade Facebook to choose NASDAQ, instead of its bitter rival, the NYSE, for the

Offering. An April 26, 2012 *Bloomberg* article titled "Facebook Index Early Entry Said Talking

Point With Nasdaq" stated:

> Nasdaq OMX Group Inc. (NDAQ)'s waiting period for entry into
> one of its best-known stock indexes was a negotiating point with
> Facebook Inc. (FB) as the company weighed where to list its
> shares, according to a person with direct knowledge of the matter.
>
> The second-biggest U.S. stock exchange operator said on April 13
> that it was shortening the so-called seasoning period before new
> companies are admitted to the Nasdaq-100 Index to three months
> from at least one year. Facebook confirmed this week it is listing
> on Nasdaq Stock Market. The social-networking website based in
> Menlo Park, California, filed to raise $5 billion in February.
>
> ***Gaining entry to gauges tracked by investors is attractive to
> public companies because it provides a guaranteed shareholder
> base***. Exchange-traded funds and other products linked to the
> Nasdaq-100 managed about $49.4 billion at the end of last year,
> according to data compiled by Nasdaq.

42

> "The more liquidity support that the stock has, the better, in their view," Perry Piazza, director of investment strategy at Contango Capital Advisors in San Francisco, who helps oversee about $3.3 billion, said in a telephone interview. ***Going into the Nasdaq-100 "would help the trading volume of Facebook dramatically,***" he said.

117.    The same *Bloomberg* article also quoted a market participant who stated that if Facebook was included in the NASDAQ-100 Index, its common stock would have "to be bought, whether its high or low, cheap or expensive," reiterating the value for Facebook of being included in the Index.

118.    Given the fierce competition with the NYSE and real risk of losing the most coveted IPO in years, it is clear that Defendants made the for-profit business decision to relax the qualification requirements for the NASDAQ-100 Index as part of their efforts to obtain the Facebook IPO.

### D.    Defendants Change NASDAQ's IPO Procedures To Maximize Trading Volume In Connection With Facebook's Offering But Fail To Design And Test Adequately NASDAQ's Electronic System To Handle The Facebook IPO

119.    In anticipation of the largest IPO in NASDAQ's history, Defendants also sought to maximize profits on its huge Facebook payday by changing its longstanding IPO procedures. Specifically, Defendants expanded the pre-market order window from 15 minutes to *four hours*. By making this change, NASDAQ was able to significantly increase the trading volume – and corresponding revenues – on Facebook's Offering and enhance its commercial profile as the venue of choice for companies seeking to go public.  However, this business decision ultimately led to significant disruptions in Facebook's IPO trading during the Class Period, as NASDAQ's IPO Cross system proved incapable of processing the enormous trading volume resulting in part from the longer pre-market order window.  As detailed in a June 15, 2012 *Reuters* article:

43

*Nasdaq was still testing for the consequences of a significant change to its IPO procedures the evening before Facebook's troubled debut.*

*The change . . . made compelling commercial sense for Nasdaq and was introduced just weeks ahead of Facebook's May 18 IPO.*
. . .

Approval for the change had to be given by the US Securities and Exchange Commission. In its March submission asking for approval, Nasdaq said the change would result "in a greater number of orders being entered prior to the commencement of trading a higher level of order interaction at the open" and increase Nasdaq's "attractiveness as a venue for trading IPO securities."

*The higher the number of orders (and cancellations or changes to those orders), the more income is generated for Nasdaq. The change was introduced on April 20. The fact that the extra time allowed the exchange to gather a greater number of orders which were then fed into the 15-minute bookbuild is significant because Nasdaq acknowledges that the volume of trades taking place during that period exposed a software glitch that caused IPO trading to descend into chaos.*

*The exchange was still testing for the consequences of this change on the eve of the Facebook IPO, inviting its members to participate in trade simulations on May 16 and 17 run specifically to "support the system's recent enhancement."*

\*        \*        \*

The exchange struggled to open Facebook from 11:05 EST until a decision was taken at 11:30 to switch to a secondary matching engine . . . . Orders entered by traders during this time or modifications to orders entered prior to 11:05 were excluded from the opening trade.

*The resulting backlog in trade confirmations was not cleared until [1:50 p.m.] by which time the losses to member firms had moved towards hundreds of millions of dollars.*

120.     While Defendants allegedly conducted tests of NASDAQ's systems prior to the

Facebook IPO, these tests were grossly inadequate given the anticipated trading volume expected

for Facebook's IPO – especially in light of the increased duration of the pre-opening window and

44

the corresponding increase in expected pre-market orders. As *The Wall Street Journal* reported on May 12, 2012 – prior to the May 18 Offering – Facebook's IPO was "***expected to be the biggest ever to hit Wall Street***." Market participants widely believed that the trading volume in Facebook's IPO would be record-setting, with estimates that "***day-one trading in Facebook shares could see any many as 600 million of its shares change hands***." Indeed, even NASDAQ shared this view as one of its senior executives stated prior to the IPO that "Facebook is obviously the most anticipated IPO in history."

121.    Given the record-shattering trading volume expected for Facebook's IPO, NASDAQ's pre-IPO stress and redundancy system tests were wholly inadequate. On June 11, 2012, *The Wall Street Journal* reported that NASDAQ conducted a series of tests prior to Facebook's May 18, 2012 IPO which simulated opening trading at volumes of between 6 and 53 million shares. However, as noted above, trading in Facebook's IPO was expected to – and did – vastly exceed the number of shares NASDAQ simulated in its tests. According to a May 18, 2012 *CNN* report, "[m]ore than 80 million shares changed hands in the first 30 seconds of trading. By the end of the day, volume had spiked to around 567 million shares. That easily set a new volume record for IPOs, smashing the previous record that automaker General Motors set in 2010 with trading of around 450 million shares."

122.    Despite this plainly inadequate testing, and notwithstanding Defendants' knowledge that NASDAQ's trading systems were susceptible to failure, NASDAQ continued to make material misstatements about its technological capabilities and trading platforms, including its IPO Cross system, both before and during the Class Period. Several media outlets have reported that Defendants had knowledge of potentially significant problems with NASDAQ's

45

IPO software in the days leading up to the Facebook IPO, but chose to move ahead with the Facebook IPO before these problems were thoroughly investigated and competently resolved.

123. For example, on May 22, 2012, *Business Insider* interviewed a hedge fund manager who described how NASDAQ "***knew its systems were broken before the Facebook IPO***, and instead of aborting the offering and facing huge embarrassment, it went ahead." Because Defendants concealed material adverse information concerning NASDAQ's trading platforms used for the Offering, traders "lost hundreds of millions of dollars as they tried to buy and sell Facebook stock without getting confirmation that their trades had been executed." *Business Insider* quoted the hedge fund manager, who stated that:

> [T]his was not a market crash. This was alike [sic] a spaceship that was about to launch and a flashing warning light goes off and they say I'd rather launch this thing than say abort this thing. They knew this thing was f---ed and they just went in and did it. This isn't a computer f--k-up. The computers told them it wasn't working. Someone had to pull it. Think about pulling the Facebook IPO? No way. They would never do it.

124. Additionally, on May 25, 2012, *The New York Post*, in an article titled "Nasdaq Bugged FB IPO," reported that "Nasdaq Chief Executive Bob Greifeld pressed ahead with Facebook's initial public offering despite signs that ***the new software [NASDAQ] was using to launch the much-hyped stock sale still had bugs, market veterans said***." The article also reported that "Wall Street insiders said it appears ***Nasdaq used untested software to launch the botched IPO***" and that "***there may have been signs that the system wasn't glitch-free even at the 11th hour and that Nasdaq opted to roll the dice***."

125. As detailed below, NASDAQ decided to line its own coffers with the sizeable fees generated by Facebook's Offering and avoid the embarrassment of delaying the most highly anticipated IPO in NASDAQ's history. Instead of "rolling the dice" and pushing the Facebook

46

IPO forward, Defendants should have followed recent precedent and protected the integrity of the market by halting the Facebook IPO.

### E.     The BATS Stock Exchange Halts Its IPO Due To Technical Problems Two Months Prior To The Facebook IPO

126.    BATS Global Markets ("BATS") operates electronic stock exchanges that provide routing and clearing services for a wide variety of securities. BATS' BZX exchange is the third-largest stock exchange in the United States, behind only the NYSE and NASDAQ in average daily cash equities trading volume.

127.    On March 23, 2012, *two months prior* to Facebook's IPO, BATS attempted to conduct an IPO of its own stock on its BZX Exchange. This IPO was crucial to BATS' future as it was to be the first IPO conducted on the BATS trading platform, and the first corporate security listed on a BATS exchange. As one analyst put it, the event was to be "the biggest day of [BATS'] corporate history."

128.    However, on the day of the IPO, a software error in BATS' IPO system prevented the majority of orders in BATS' own stock from executing, causing its share price to plummet from $15.25 to a fraction of a cent within seconds. The error also affected all other securities traded on BATS with symbols between A and BFZZZ.

129.    In response to this error, BATS immediately halted its IPO and trading in its own stock while it investigated the error, and requested that all quotes from the affected range of symbols be pulled from the consolidated tape.

130.    For the next two hours, BATS worked to resolve the software glitch, and eventually re-opened trading on most affected securities. BATS *did not*, however, re-open trading for its own IPO.

47

131.    Instead, BATS made the prudent decision to protect the integrity of the market and its shareholders and cancel the IPO entirely, halting all executions in its own stock and cancelling all open orders. On March 25, 2012, *The New York Times* reported that BATS' "executives soon decided that too much uncertainty had been built up that would linger over any trading in the shares," leading to the decision to cancel. As BATS' then-chairman and CEO put it, "withdrawing the IPO [was] the appropriate action to take for our company and our shareholders."

132.    The same *New York Times* article also stated that "both regulators and people in the industry said the incident simply illustrated that market safeguards worked as they were intended. *A minor, if embarrassing, market hiccup was prevented from metastasizing into something worse*" by the decision to withdraw the failed IPO.

133.    Despite the direct knowledge of BATS' successful mitigation of investor harm through the cancellation of its own IPO, Defendants made the commercial and for-profit decision to push Facebook's IPO forward notwithstanding the manifest technical problems in NASDAQ's IPO Cross system. Defendants, fearing the reputational and financial consequences that might stem from cancelling "the most anticipated IPO in history," put their own business interests ahead of the interests of NASDAQ's customers and members – and the integrity of the overall marketplace – in failing to halt Facebook's IPO once they knew of the complete breakdown in NASDAQ's systems.

## VI.    CLASS PERIOD EVENTS – NASDAQ'S ADMITTED TECHNOLOGY AND TRADING PLATFORM FAILURES DURING THE FACEBOOK IPO

### A.    NASDAQ's IPO Cross Process

134.    The NASDAQ IPO Cross process is the method by which NASDAQ generates a single opening price for an IPO security, reflecting supply and demand for that security, as

48

represented by pre-market orders submitted to the exchange. The Cross process is integrated with NASDAQ's order book to provide a smooth transition from Cross pre-market orders to continuous trading.

135.    Under normal circumstances, NASDAQ's IPO Cross process provides all NASDAQ members the ability to enter orders (as well as modifications and cancellations of such orders) and observe the evolution of the prospective auction price through NASDAQ's dissemination of auction imbalance information, thereby enabling members (and their customers) to participate in IPO price discovery. In this regard, NASDAQ's IPO Cross system operates as a pre-IPO auction that allows traders to place orders before open-market trading in a stock officially begins on the NASDAQ Stock Market. While investors can place orders during the pre-market Cross period, no trade executions occur until NASDAQ releases the IPO for trading.

136.    NASDAQ begins accepting Cross orders at the system start time of 7:00 a.m., and traders can enter or cancel orders freely. NASDAQ does not publicly disseminate information on Cross orders until the period beginning 15 minutes before the scheduled release time of the IPO. This 15-minute period is referred to as the "Display-Only" period.

137.    Once the Display-Only period begins, NASDAQ disseminates indicative information about the auction price and auction volume at five-second intervals via Net Order Imbalance Indication ("NOII") messages on its public data feeds. As the effects of the order entry and cancellation are disseminated to the public, participants may respond with further order entry, modification, or cancellation instructions. NASDAQ can extend the Display-Only period up to six times (in five minute increments).

EC.50820.12

138.    When the Display-Only period concludes, the Cross application runs its final calculation to match buy and sell interest.  At this point, the IPO Cross executes, NASDAQ disseminates the official opening price, sends a bulk trade execution to the consolidated tape, and sends trade execution messages to market participants confirming individual executions for trades executed in the Cross.

**B.     NASDAQ's IPO Cross System Failures In Connection with Facebook's IPO**

139.    While the above summary provides a description of how NASDAQ's IPO Cross process works under normal conditions, as detailed below, NASDAQ's IPO Cross system broke down completely causing substantial damages to Class Members in connection with Facebook's IPO.

140.    At 10:45 a.m. on May 18, 2012, the Display-Only period for the Facebook IPO began, with a scheduled release time of 11:00 a.m.  The first NOII message disseminating indicative information concerning the upcoming IPO Cross was distributed at 10:45:05 a.m. with an indicative price of $50.00 and indicative volume of 4,461,419 shares.  At approximately 10:57:53 a.m., the initially scheduled release time of 11:00:00 a.m. was extended to 11:05:00 a.m.  There were no further scheduled extensions.

141.    Following this single five-minute extension, NASDAQ's system attempted (at approximately 11:05:10 a.m.) to conclude the quoting period, execute the Cross and print the opening trade to the tape.  In fact, the last NOII message was distributed at 11:05:05 a.m. with an indicative price of $42.00 and indicative volume of 72,189,277 shares.

142.    As discussed above, a necessary step in the close of the quoting period is for NASDAQ's Cross system to run a final calculation to match buy and sell interest.  After the system does so, it checks to see if any additional orders, modifications and/or cancellations of orders were placed between the time of the final calculation and the printing of the opening

50

trade. In other words, NASDAQ's IPO Cross system is designed to ensure that cancellations submitted while the Cross is calculating, and up until the last moment before the Cross is completed, are accounted for in the Cross.

143. While the NASDAQ system was performing the final calculation during the Facebook IPO, the system received additional order modifications and cancellations before the opening trade was printed. The system accordingly re-ran its final calculation to match buy and sell interest; during this re-run, the system again received order modifications before the opening trade was printed. This condition repeated itself until shortly before 11:30 a.m., creating a loop preventing the Cross from calculating a final opening price and executing.

144. In a release disseminated a few days after the IPO, NASDAQ characterized the loop as a "race condition." As one commentator noted, "[a] race condition occurs when two or more parts of a program that rely on each other get locked in an infinite loop, halting forward progress of the program as a whole. The race condition in this case took place between the auction process and the final calculation of the IPO price."

145. As detailed below, NASDAQ's admitted IPO Cross system failures caused two significant problems for Class Members who placed pre-market orders, modifications and/or cancellations of such orders prior to the Cross completing at 11:30:09 a.m.: (i) orders entered between 11:11:00 a.m. and 11:30:09 a.m. did not participate in the IPO Cross and either failed to execute or executed at inferior prices later in the day; and (ii) Cross transaction confirmation messages were not disseminated until 1:50 p.m., leaving Class Members in the dark for hours regarding their positions in Facebook stock.

### 1. The Cross Execution Failures

146. Sometime between approximately 11:11:00 a.m. and 11:30:09 a.m., Defendants made the *ad hoc* decision to switch to a primitive, untested secondary version of the IPO Cross

51

matching engine, and forced the commencement of the IPO 11:30:09 a.m. at the auction price of $42 per share. This secondary back-up system failed to account for orders entered into the Cross system between 11:11:00 a.m. and 11:30:09 a.m. According to NASDAQ, of the orders placed between 11:11:00 a.m. and 11:30:09 a.m.: (i) some orders were cancelled before the Cross by members; (ii) other orders entered into the market at 11:30:09 a.m., and (iii) the remainder were either cancelled or released into the market at 1:50 p.m.

147.    Defendants failed to disclose these known problems affecting the IPO Cross system prior to 11:30 a.m., and failed to exercise reasonable care in the design and testing of its systems. Defendants knew or recklessly disregarded the risk that switching to its back-up system would create "orphan" orders that would not execute in the Cross. Defendants nevertheless failed to take reasonable steps to ensure that such orders were executed at the Cross price. Instead, many of these orders were never executed at all and others were executed at inferior prices when NASDAQ released them into the market.

148.    Indeed, on May 31, 2012, *Huffington Post* issued an article titled "Top 10 Reasons Why Facebook's IPO Went Badly" concluding that the number-one reason for the botched IPO was "***NASDAQ's unforgivable incompetence in not stress-testing in advance its confirmation delivery systems in the face of projected demand, and then going forward with trading when they knew the system wasn't working well at all.***"

149.    On June 6, 2012, in a live television interview with CNBC reporter Maria Bartiromo, (the "Bartiromo Interview"), Defendant Greifeld admitted that NASDAQ had to "revert back to a simpler code base" during the Cross. According to a May 21, 2012 *Wall Street Journal* article, Defendant Greifeld described the problem with the IPO opening cross as "a design flaw in the systems" that "doomed" the "routine but essential chore of lining up trades."

52

In a May 20, 2012 *Financial Times* article, Defendant Greifeld was quoted as saying: "***We had a poor design for the Facebook opening cross IPO . . . it didn't work in this scenario***."

150.     NASDAQ confirmed in its SEC Accommodation Proposal that the Cross trade execution failures resulted from the NASDAQ systems issues.

### 2.     The Cross Confirmation Failures

151.     While NASDAQ's reversion "back to a simpler code base" eventually enabled the Cross to complete at 11:30:09 a.m., NASDAQ failed to disseminate trade confirmations in a timely and accurate manner for all trades executed in the Cross.  NASDAQ admits that it failed to send out trade confirmations until at least 1:50 p.m.  Plaintiffs and other Class Members accordingly could not have received reliable notice of the status of their purchase and cancellation orders until some time after NASDAQ first sent them out at 1:50 p.m., and likely did not receive actual notice of their positions in Facebook shares until after the close of trading on May 18 due to the chaos NASDAQ's IPO Cross system failures inflicted upon the entire market.

152.     NASDAQ's failure to send out accurate and timely trade confirmations arose from problems with NASDAQ's IPO Cross system known prior to 11:30:00 a.m., and Defendants' failure to exercise reasonable care in the design, testing and implementation of NASDAQ's primary and back-up Cross systems in connection with disseminating confirmations for those trades executed in the Cross.  Specifically, Defendants failed to exercise reasonable care in the design and testing of NASDAQ's systems to ensure that the confirmation function would perform satisfactorily in the event of a switch-over to the older back-up system.

153.     Moreover, Defendants failed to notify the marketplace promptly that orders placed during the Cross had in fact executed even though confirmations had not been sent, and that cancellations of many of those orders had not been honored.  Indeed, NASDAQ failed to

53

provide any meaningful communication to investors and market participants, instead leaving

them in the dark concerning the cause and likely duration of the delayed confirmations. This

failure prevented Class Members from taking appropriate action to avoid losses by selling shares.

In this regard, *Reuters*, in a May 26, 2012 article titled "Minute by Minute, Nasdaq Chaos

Engulfed Facebook IPO," described the situation during the 30-minute delay and its impact:

> Dead silence.
>
> For nearly 20 minutes on the morning of Facebook Inc.'s trading debut last Friday, the line Nasdaq had opened up to keep traders informed about the social media company's $16 billion IPO had been mute. Well after the stock was supposed to have opened at 11 a.m. New York time, no one from Nasdaq was talking—and there was still no sign of trading.
>
> Finally, at 11:28 a.m., an unidentified person announced that the shares would open in about 2 minutes. Nasdaq also said orders and cancellations were still being processed, according to several sources listening to the call.
>
> Those crucial 20 minutes created confusion that turned into chaos over the next few hours as market makers—the brokers who quote bid and offer prices—struggled to figure out what was happening. ***They were rebuffed in their attempts to get Nasdaq to halt trading and sort out a growing number of problems***.
>
> ***A lack of communication and, some say, misinformation from Nasdaq may have been central to the failed debut of Facebook's shares***. Market makers—crucial to the smooth operation of stock trading—were unsure about their exposure for hours. Investors were in the dark as to whether their trades had gone through, in some cases for days afterwards.

154.    These problems were not limited to retail investors; professional traders,

brokerage firms and other institutional investors also experienced the same trading issues due to

NASDAQ's known technical and software-related problems. In short, legions of investors

seeking to purchase Facebook stock had no idea if they had successfully done so, and other

investors seeking to cancel trades not yet confirmed as having executed had no idea if they had

54

successfully done so.  A May 18, 2012 *Wall Street Journal* article further detailed these

problems:

> Professional traders who placed big orders on behalf of hedge
> funds, mutual funds, and other institutions waited more than two
> hours after Facebook shares started trading at 11:30 a.m. to hear
> whether the orders would be honored or canceled.  These traders
> said the uncertainty caused some big investors to bail out of
> Facebook stock, because they didn't know for sure what they had
> bought or sold, or at what price.
>
> Meanwhile, small-time buyers . . . who placed orders through
> online brokerages like Fidelity and Scottrade also fretted for hours
> whether their trades or cancellations went through.

155.    Similarly, a May 21, 2012 *Reuters* article stated:

> The Nasdaq Stock Market, where Facebook is listed, had problems
> sending electronic messages back to the brokerages that handled
> orders from individual, or "retail," investors, according to people
> with knowledge of the situation.
>
> Because the electronic acknowledgments didn't come back from
> the exchange the brokers were unable to tell their clients that trades
> had been executed.  Such acknowledgments usually occur almost
> instantaneously.  The delay meant that, in one of the most
> anticipated stock offerings ever, frustrated brokers and investors
> didn't know if orders had actually gone through.

156.    The *Wall Street Journal*, in a May 18, 2012 article titled "Facebook IPO

Sputters," reported that "according to people familiar with the snafus," "[o]ne of the biggest

problems [with the IPO] was that buyers and sellers of Facebook shares weren't provided

confirmation of their trades until 2 p.m.  That's akin to people not knowing how much money is

in their bank account, and therefore not knowing whether to go out and spend more money or

save."  As one market-maker phrased it in the May 26, 2012 Reuters report, investors were

"*flying blind until 2 o'clock.*"

157.    UBS's reported experience illustrates one foreseeable consequence of the delay in

confirming Facebook transactions.  As reported by *CNBC* and *Forbes* on Friday, June 8, 2012,

55

UBS may have lost as much as $350 million. According to the reports, when UBS did not receive confirmations of a buy order, as happened with many investors, UBS repeated its order multiple times.

158.    In comments submitted to the SEC, Citigroup noted that "while Nasdaq purports to believe all member firms should have known their positions at exactly 1:50PM on Friday, May 18 (when Nasdaq first began sending back to its customers execution reports for the IPO Cross that occurred at 11:30AM), the reality is that the vast majority of Nasdaq's customer base did not know their true position until well after the close of business on Friday, May 18." Citigroup further stated, "[i]n fact, it took most member firms weeks - not days - to fully know their true positions in the stock."

159.    NASDAQ confirmed in its SEC Accommodation Proposal that the delayed trade confirmations for orders placed on the Cross were caused by NASDAQ's systems issues.

### C.    NASDAQ's Bid/Offer Quotation Failures During Aftermarket Trading In Connection with Facebook's IPO

160.    As a result of NASDAQ's known failures in the design and testing of its systems, and in particular, the expected operation of the systems in the event of a switch to the back-up system, as occurred with the Facebook offering, NASDAQ's Bid/Offer quotation system failed to function properly for an extended period of time *after the Cross printed to the tape at 11:30:09 a.m.*

161.    At 11:30:10 AM, aftermarket trades began to appear for Facebook. However, according to Nanex LLC ("Nanex"), a provider of a real-time streaming data feed for all quotes and trading transmitted by national exchanges, almost instantly (at 11:30:34 a.m.) and for the next two hours and 20 minutes (until 1:50 p.m.), NASDAQ failed to have an eligible National Best Bid/Offer ("NBBO") quote published for Facebook stock.

56

162.    The NBBO represents the best price available on any market at the time that an order is placed, and investors expect to receive the NBBO when they place a buy or sell order in a security.  NASDAQ represents to investors that they will receive the NBBO on their orders, and that it will route orders to other exchanges if necessary for investors to receive the NBBO, which is a purported advantage of NASDAQ's electronic market system when it is properly functioning.  However, during the Class Period, NASDAQ failed to publish an accurate NBBO disrupting order routing across all exchanges, and as a direct result, investors did not receive accurate information about the market for Facebook shares.

163.    According to Nanex, during this time when NASDAQ had no published NBBO quotation, 272 million shares of Facebook traded.  Because of this failure to maintain an eligible NBBO, there was no way to ensure that investors trading in Facebook shares during this time received a fair and equitable price for their trades.

164.    Specifically, from 11:30:34 a.m. through 1:50 p.m., NASDAQ's Bid was stuck at $42.99.  NASDAQ's Bid failed to update, even though quotes from other exchanges moved higher in Facebook.  During this same time, NASDAQ's Ask was non-firm, so it was not eligible to qualify as an NBBO.  In this regard, at 11:50:06 a.m., NASDAQ's Ask was stuck at $38.01 and did not update, even though quotes from other exchanges moved higher.  NASDAQ's Ask remained stuck at $38.01 and did not update until after 1:50 p.m.

165.    NASDAQ reported to the Securities Information Processor (known as "SIP") a higher Bid (at $42.99) and a lower Ask (at $38.01), from approximately 11:30 a.m. until 1:50 p.m. the day of the IPO.

57

166.    Due to NASDAQ's Bid/Ask quotation failures, Class Members who traded on the

NASDAQ Stock Market received inferior prices upon the execution of their trades during the

time that the Bid/Ask quotes were "stuck" for Facebook's IPO.

167.    Defendants disregarded these known problems, including the inaccurate quotes

for Bids and Offers on NASDAQ's system, and failed to disclose any information prior to and

during the Class Period concerning these known problems.

## VII.    DEFENDANTS' VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER

### A.    Pre-Class Period Material Statements And False And Misleading Statements of Material Fact

#### 1.    Material Statements in NASDAQ's 2011 Form 10-K

168.    On February 24, 2012, NASDAQ filed its 2011 Form 10-K with the SEC where it

reported, among other things, that NASDAQ had net income of $387 million, or $2.15 per

diluted share for its full fiscal 2011, and its total net revenues were $1.69 billion for 2011.  At the

time that NASDAQ issued its 2011 Form 10-K, NASDAQ and its executives, including

Defendants Greifeld and Ewing, were engaged in an aggressive campaign to convince Facebook

to list its securities with NASDAQ instead of the NYSE.  The 2011 Form 10-K provided detailed

statements concerning the purported reliability and speed of NASDAQ's technology and abilities

to execute trades in an efficient manner.

169.    In its 2011 Form 10-K, NASDAQ touted the speed and reliability of its

technology and trading platforms.  Critically, NASDAQ also stated that its trading platforms are

"highly scalable," capable of handling trading volumes at more than "ten times the average daily

volume."  Specifically, NASDAQ stated:

> Our Genium INET technology platforms, based on proven INET
> technology that we originally acquired in the acquisition of INET
> ECN in 2005, *provides technology to customers with the speed,*

58

> *scale and reliability required to meet the specific needs of their*
> *markets.*
>
> \*       \*       \*
>
> *Leader in global exchange technology.* We believe we are the
> leader in global exchange technology. As the world's first
> electronic stock market, we pioneered electronic trading and have
> continued to innovate over the last 40 years. *Our INET platform*
> *processes trades at sub-millisecond transaction speeds with close*
> *to 100% system reliability. In addition, our platforms are highly*
> *scalable with current capacity at ten times the average daily*
> *volume allowing significantly higher transaction volume to be*
> *handled at low incremental cost*. . . . (emphasis in original).

170.     NASDAQ further stated that the soundness and reliability of its technology were

key aspects of its business success.  Specifically, NASDAQ made the following statements:

> *Core Technology.* Technology plays a key role in ensuring the
> growth and reliability of financial markets. *At NASDAQ OMX,*
> *we are committed to innovation through technology to ensure*
> *our position as a driving force in the exchange industry and to*
> *provide the best possible trading experience for our customers*
> *and investors.* Investment decisions are made based on customer
> needs and general market trends.
>
> We continuously improve our core technology with a focus on
> reducing latency and improving capacity and reliability.
> NASDAQ OMX's next generation technology is capable of
> handling multi-million messages per second at an average speed of
> sub-100 microseconds, currently one of the fastest of any exchange
> or alternative trading system in the world.
>
> The foundation for NASDAQ OMX's core technology is INET.
> The INET technology is used across NASDAQ OMX's U.S. and
> European markets. INET is also the main building block of our
> Market Technology offering, Genium INET. Genium INET
> combines innovative functionality with a modular approach to
> manage change and create new advantages for existing and new
> customers, as well as our own marketplaces.

171.     In regard to the purported strengths of NASDAQ's technology, NASDAQ stated

that it continues to "provide leading technology for the world's competitive and demanding

capital markets, which increasingly require that exchanges be able to constantly secure the best

59

price for investors and issuers, a natural strength of our technology and electronic trading platforms."

172.    In its 2011 Form 10-K, NASDAQ also promoted its purported commitment to instilling a fair and orderly trading market for investors, including Class Members. Specifically, NASDAQ boasted about its "[c]ommitment to regulatory integrity" and stated that it is "*always committed to working with regulators, exchanges and market participants to ensure transparent trading and a fair and orderly market for the benefit of investors*."

173.    Finally, NASDAQ provided the investing public, including Class Members, with its "2012 Outlook" which stated that the success NASDAQ experienced in 2011 would continue in 2012. With respect to NASDAQ's technology and trading platforms, NASDAQ stated:

> For the fourth year in a row, more share value traded on The NASDAQ Stock Market than on any other single cash equities exchange in the world. *Our platform continues to stand out as a reliable, flexible, and high capacity system delivering high levels of execution quality and speed under even extremely demanding market conditions.* . . . The standout performance and flexibility of our technology has enabled us to enter new markets with a low cost and highly regarded platform offering strong performance to both existing and new clients and creating additional sales opportunities for both our Transactions Services and Market Data businesses.

## 2.    Material Statements in NASDAQ's First Quarter 2012 Financial Results

174.    In the weeks leading up to Facebook's IPO, NASDAQ continued to issue a series of material statements in documents relating to its First Quarter 2012 financial results that again touted its technology and trading platform capabilities. These statements were made after the public learned that Facebook chose NASDAQ as the exchange to list its securities and to launch the highly-anticipated IPO.

60

175.    On April 25, 2012, NASDAQ filed a Form 8-K attaching a press release announcing its first quarter 2012 financial results (the "April 25, 2012 Press Release"). The April 25, 2012 Press Release reported first quarter net exchange revenues of $411 million, up 1% on a constant currency basis compared to the prior year quarter, and diluted EPS of $0.48. NASDAQ also disclosed that it was declaring an initial quarterly dividend of $0.13 per share. Greifeld commented that NASDAQ's first quarter of fiscal 2012 was "our fourth best quarterly result ever."

176.    The April 25, 2012 Press Release also contained statements that touted NASDAQ's technological capability. Specifically, the April 25, 2012 Press stated that NASDAQ's technology and trading platforms were able to "process more than 1 million messages per second at sub-40 microsecond speeds with 99.999% uptime," and that NASDAQ's "technology drives more than 70 marketplaces in 50 developed and emerging countries into the future, powering 1 in 10 of the world's securities transactions."

177.    That same day, NASDAQ held the April 25, 2012 Earnings Conference Call to discuss its first quarter 2012 financial results with certain financial analysts. During the call, Defendant Greifeld stated that the exchange was "delighted to welcome Facebook to our family of listed companies" and noted that "over 73% of U.S.-listed technology companies have chosen to list with NASDAQ." During the Q&A session, an analyst asked Defendant Greifeld whether the recent technical problems at BATS Global Markets, Inc. was unique to that exchange or "is that something that could potentially happen to NASDAQ?" In response, Defendant Greifeld stated, in relevant part:

> We are technology-based businesses, we have to engineer our
> technologies as best as we can, but certainly, we're sympathetic to
> what BATS when through. We recognize that the business is hard
> and we certainly have excelled at it. We have a wonderful team

61

> and certainly, our experience over the last nine years shows you
> how good that team is. *But we're not over confident, we*
> *recognize that – we've got [to] engineer and be very capital about*
> *how you release product in the marketplace.*

178. In the same response, Defendant Greifeld also touted NASDAQ's technology that

directly pertain to its open and close cross systems – the same technology that was used and

integrated with the IPO Cross system for Facebook's IPO – and stated:

> When we did the Brut and INET acquisitions and we had to take
> SuperMontage and those two platforms and put it together. We
> chose INET and the big gap from functionality is that
> SuperMontage, as a listing venue, always had the ability to run an
> auction to open and close the market. *And INET did not have that*
> *and our team had to build it, they obviously built it successfully*
> *and knock [on] wood, we've gone forward from there.*

179. The above-referenced statements in the April 25, 2012 Earnings Conference Call

were completely at odds with statements made by Defendant Greifeld only two months later. On

June 25, 2012, Defendant Greifeld admitted that "*arrogance*" and "*overconfidence*" among

NASDAQ and its personnel led to NASDAQ being unprepared for the enormous trading volume

in Facebook's Offering. Moreover, while Defendant Greifeld chose to make highlight and tout

NASDAQ's Cross technology, he failed to update and/or correct this statement one he knew that

this same technology was unreliable in connection with the Facebook IPO.

180. On May 8, 2012 – ten days prior to Facebook's IPO – NASDAQ filed its Form

10-Q with the SEC (the "First Quarter 2012 Form 10-Q"). Among other things, the First Quarter

2012 Form 10-Q stated that certain factors contributed to NASDAQ's financial performance for

the first quarter 2012, including its investment in its technology. Specifically, the First Quarter

2012 Form 10-Q stated that certain market trends required the "continued investment in

technology to meet customers' demands for speed, capacity, and reliability as markets adapt to a

EC.50820.12

global financial industry, as increasing numbers of new companies are created, and as emerging countries show ongoing interest in developing their financial markets."

### 3.    Material Statements on NASDAQ's Website

181.    As set forth above, during the approximately three months prior to the Class Period, NASDAQ did not hesitate to boast about its purported cutting-edge technology and trading platform capabilities that were supposed to reliably function at microsecond speeds in executing trades and disseminating related information.  NASDAQ also made similar material statements on its website, which were published to the market on a daily basis.  For example, NASDAQ stated that the company's trading model is the "standard for markets worldwide," accounting for "1 in 10 of the world's securities transactions."  NASDAQ's website also boasts "[o]ur commitment to excellence goes beyond our 99.999% uptime record for mission critical operations.  It includes our passion for flawless execution and our relentless pursuit to anticipate customer requirements."

182.    In detailing its technology market solutions, NASDAQ's website states the following:

> NASDAQ OMX comprehensive trading solutions support everything from traditional equities and fixed income instruments to more complex derivatives in one integrated system, and can simultaneously handle several asset classes, such as currencies, different fixed income instruments and commodities.
>
> Our pre-trade risk management service offers marketplaces proven, integrated risk control.  Existing Genium INET trading and X-stream customers can add the pre-trade risk management function without changing protocols for market access.
>
> We pioneered the world's first integrated derivatives trading and clearing system and *continue to set new standards in exchange trading technology*. Examples of features include:
>
> - Sub-40 microsecond latency
> - Capacity greater than one million quotes per second

63

- Seamless integration to clearing
- Multi-asset class trading on a single platform
- Robust functionality

*Our proven delivery methodology ensures delivery on-time, on-target and ready-to-launch.*

183.    NASDAQ chose to make material statements to the public, including Class

Members, concerning the capability and reliability of its technology and trading platforms.

NASDAQ made the above-referenced statements at the same time that it and its executives,

including Defendants Greifeld and Ewing:  (i) were aggressively campaigning for Facebook's

business; (ii) knew or recklessly disregarded that the trading volume and redundancy tests on

NASDAQ's systems (which only tested a fraction of the volume that would end up trading

during the Class Period) were grossly inadequate given the anticipated record-setting volume in

Facebook's Offering; and (iii) knew or recklessly disregarded that NASDAQ's electronic

systems that were going to be used in connection with Facebook's IPO, including its IPO Cross

system, were experiencing unresolved technical problems and related computer issues.

### 4.    Materially False and Misleading Statements During NASDAQ's May 10, 2012 Investor Day Conference

184.    On May 10, 2012 – *one week prior to Facebook's IPO* – NASDAQ held an

Investor Day conference where it and Defendant Ewing made a series of materially false and

misleading statements and omissions of material fact concerning the purported superiority and

capability of NASDAQ's technology and trading platforms.  These statements were made at a

time when Defendants knew and/or recklessly disregarded the fact that NASDAQ's systems had

significant technical problems that would, and did, severely disrupt proper trade execution in

Facebook's IPO.  Indeed, news reports issued after Facebook's botched IPO detailed

64

Defendants' knowledge of the technical problems it was experiencing in the days leading up to

the Offering.

185.    For example, *The New York Post* reported on May 25, 2012 that:

> **Nasdaq Chief Executive Greifeld pressed ahead with Facebook's**
> **initial public offering despite signs that the new software Nasdaq**
> **was using to launch the much-hyped stock sale still had bugs**,
> market veterans said.
>
> Wall Street insiders said it appears Nasdaq used untested software
> to launch the botched IPO and had been walking the platform
> through its paces in an 'unprecedented' number of simulations in
> the days leading up to Facebook's May 18 debut.
>
> \*          \*          \*
>
> "It's not unusual to test out a new system, but it's unusual to test it
> as many times as they did that week," one source told the Post.
>
> \*          \*          \*
>
> **[S]ources said that there may have been signs that the system**
> **wasn't glitch-free even at the 11th hour and that Nasdaq opted to**
> **roll the dice.**

186.    Despite the known problems with NASDAQ's technology and trading platforms,

NASDAQ made the following material misstatements, among others, at the Investor Day

conference, only days before Facebook's IPO:

- Our business success is built from *our technology excellence*;

- No trading platform on the planet is *faster or more scalable*;

- Our technology can help *trade and clear any and every financial instrument*
  *on the planet*;

- We have *unique capabilities unmatched by any exchange in the world*;

- Our global platform can handle *more than 1M messages/second at sub-40*
  *microsecond speeds*;

- *99.999% uptime record* for mission critical operations;

65

- [NASDAQ] delivers innovative products and services that ***provide transparency to institutional, retail and individual investors***; and

- Intense operational focus on ***efficiency and competitiveness***.

187.    These statements, and others, were graphically presented on PowerPoint slides which were disseminated in connection with NASDAQ's Investor Day conference and which it made publicly available on its website.  Defendants Greifeld and Ewing were provided with copies and drafts of these slides prior to the Investor Day Conference and they participated in drafting, reviewing, and editing them in preparation for the Conference.

188.    Similarly, NASDAQ's Chief Information Officer, Defendant Ewing, stated the following to investors at NASDAQ's Investor Day Conference:

> We really believe that technology is the beating heart at NASDAQ OMX . . . *that our business success is really built from our technology excellence*.  . . .  And if you think of our trading platform, and *we're well known for our technology, no trading platform in the world can operate faster or at the scale that we operate*. And to put it in perspective, *we can operate – we can process, and we do on peak days, more than 1 million messages per second at speeds of sub-40 microseconds. And to put in perspective, for those of you who can remember what a microsecond is, it's 0.000001 second, just to give you some context.*  And you know *our technology can trade and clear really any instrument on the planet.*  And in fact, we power one in ten securities transactions around the world through our own markets and through our market technology customers.
>
> We are the world's largest technology exchange provider, with over 22 years of experience, and that is through our market technology business that we acquired through OMX.  *We have unique capability that is unmatched by any other exchange in the world.  And it's really not just about the technology itself. As Bob said, it's about our ability to execute*. . . .
>
> \*        \*        \*
>
> We process billions of transactions in a day at sub-microsecond speeds to millions of customers.  And as much as that's table stakes, *that's hard work just to make sure you have that reliability and capability.* And we're proud of not just our

66

excellence but *how we set the standard around the world as far as that excellence.*

189.     Class Members relied upon the purported capability of NASDAQ's technology and trading platforms to execute trades in Facebook's IPO during the Class Period. As detailed below, however, due to the material misstatements and omissions of Defendants NASDAQ, Greifeld and Ewing, Class Members executed trades in Facebook's common stock on the day of the Offering without any knowledge of the technical problems and system failures NASDAQ was experiencing.

## B.      Class Period Materially False And Misleading Statements And Omissions Of Material Fact

### 1.      Defendants' Failure To Update And/Or Correct Pre-Class Period Material Statements

190.     As detailed above in ¶¶ 168 - 189, Defendants caused NASDAQ to make and disseminate to the investing public material representations concerning the purported capabilities of NASDAQ's technology and trading platform in the months leading up to Facebook's Offering in its: (i) 2011 Form 10-K; (ii) April 25, 2012 Press Release; (iii) April 25, 2012 Earnings Conference Call; (iv) First Quarter 2012 Form 10-Q; and (v) website. NASDAQ voluntarily and publicly made the above-referenced material statements concerning the purported capabilities, speed and reliability of its technology and trading platform. Accordingly, because NASDAQ chose to make these material statements, which statements Defendants Greifeld and Ewing caused NASDAQ to issue, these Defendants had a duty to update and/or correct these statements once it became apparent that these statements were no longer accurate, true, or complete due to NASDAQ's known technical issues and related system limitations both before and during the Class Period.

67

191. Despite NASDAQ's known technical problems and the failure to provide adequate volume and redundancy stress testing on its systems *prior to the Offering*, Defendants NASDAQ, Greifeld and Ewing chose to push the Offering forward without disclosing these known problems to Class Members. Moreover, Defendants NASDAQ, Greifeld and Ewing failed to update the statements made in NASDAQ's SEC filings that touted the very same technology and trading platforms that were experiencing significant problems prior to and during the Offering.

192. In addition to NASDAQ's material statements referenced above, during its May 10, 2012 Investor Day Conference, Defendants NASDAQ, Greifeld and Ewing also made materially false and misleading statements and omissions of material fact concerning NASDAQ's purported technological capabilities and trading platform reliability, as detailed in ¶¶ 184 to 189.

193. The above-referenced statements made in connection with the May 10, 2012 Investor Day Conference, were materially false and misleading and omitted material facts because these Defendants failed to disclose at the time the statements were made that: (i) NASDAQ was experiencing significant problems with its technology and trading platforms, including its IPO Cross system, that severely limited their capability, speed and reliability to properly execute trades, including the enormous trading volume expected days later in the Facebook's IPO; (ii) Defendants did not provide adequate stress testing on NASDAQ's trading systems to ensure that these systems were reliable and capable of handling the anticipated trading volume in the Facebook IPO; and (iii) the problems with NASDAQ's technology and trading platforms were not fixed prior to Facebook's IPO, thereby making NASDAQ's systems unreliable and incapable of handling the trading volume in the Offering.

68

194.    Defendants NASDAQ, Greifeld and Ewing failed to communicate these known problems to the market resulting in a complete lack of transparency to Class Members concerning their trades in Facebook's IPO.  As a result of these material omissions, Class Members were not aware of NASDAQ's IPO Cross system limitations and resulting crashes prior to and on the day of the IPO.  In addition to the IPO Cross system failures, these Defendants failed to disclose to Class Members NASDAQ's system failures during aftermarket trading for Facebook stock that caused, among other problems, NASDAQ's Bid/Offer quotations to become "stuck," damaging the Securities Class.

### 2.    Materially False and Misleading Statements and Omissions of Material Fact In NASDAQ's Market System Status Messages

195.    As detailed above and documented by numerous news sources, Defendants NASDAQ, Greifeld and Ewing failed to disclose NASDAQ's known technical problems and related system limitations during the morning of the IPO, including the breakdown of its IPO Cross system, and instead pushed the IPO forward to protect NASDAQ's reputation and financial interests.  Instead of disclosing the known technical and software-related problems it was experiencing in connection with Facebook's IPO, Defendants NASDAQ, Greifeld and Ewing sought to conceal this known information by causing NASDAQ to issue a series of incomplete statements to market participants through NASDAQ's "Market System Status" messages.

### a.    Material Misstatements and Omissions Between 11:13:50 a.m. and 11:30:09 a.m.

196.    Due to NASDAQ's SEC rule change, detailed in Section V.D, NASDAQ started accepting pre-market Cross orders for the Facebook IPO starting at 7:00 a.m. on Monday, May 18, 2012.  Although Defendants wanted to capitalize on the largest and most highly anticipated IPO in the history of the NASDAQ exchange, NASDAQ's systems were overwhelmed by the

69

volume of buy/sell orders, and modifications and cancellations of such orders, entered in

NASDAQ's IPO Cross system. Accordingly, NASDAQ's Cross system could not properly run

its final calculation to match buy and sell interests and then print the opening trade to the tape.

197. Despite these, and other known technical problems, NASDAQ disseminated the

following NASDAQ Market System Status message to all market participants at 11:13:50 a.m.:

> **NASDAQ is experiencing a delay in delivering the opening print
> in Facebook, Inc. (FB). NASDAQ will advise.**

198. The above statement was materially false and misleading and omitted material

facts because NASDAQ failed to disclose at the time this statement was made that:

(iv) Defendants knew *prior* to the Class Period that the trading platforms used for Facebook IPO, including the IPO Cross system, were experiencing significant problems that severely limited their capability, speed and reliability to properly execute the enormous volume of trades in the Facebook IPO;

(v) the delay in delivering the opening print in Facebook was directly caused by a known failure in NASDAQ's IPO Cross system to properly account for all orders, and modifications/cancellations of such orders, received by the system;

(vi) NASDAQ's IPO Cross system limitations caused the perpetual recalculation of the Cross to factor in the continuous changes in the auction order book preventing the necessary final calculation to execute the Cross and commence open-market trading;

(vii) NASDAQ encouraged its members to continue submission of pre-market orders through 11:30 a.m., notwithstanding its known breakdown of NASDAQ's IPO Cross system; and

(viii) due to NASDAQ's IPO Cross system failures, Defendants made the high-risk, *ad hoc* decision to resort to an untested backup system and inferior failover procedures in an effort to avoid the embarrassment of delaying or interrupting the Facebook IPO.

199. At 11:28:50 a.m., NASDAQ disseminated another NASDAQ Market System

Status message to market participants, stating:

70

*The first print in Facebook (FB) will open at approximately*
*11:30 ET.  Trading will commence at that time.*

200.    The above statement was materially false and misleading and omitted material

facts because NASDAQ failed to disclose at the time this statement was made that:

(i)      Defendants knew *prior* to the Class Period that the trading platforms used
for Facebook IPO, including the IPO Cross system, were experiencing
significant problems that severely limited their capability, speed and
reliability to properly execute the enormous volume of trades in the
Facebook IPO;

(ii)     the delay in delivering the opening print in Facebook was directly caused
by a known failure in NASDAQ's IPO Cross system to properly account
for all orders, and modifications/cancellations of such orders, received by
the system;

(iii)    NASDAQ's IPO Cross system limitations caused the perpetual
recalculation of the Cross to factor in the continuous changes in the
auction order book preventing the necessary final calculation to execute
the Cross and commence open-market trading;

(iv)    NASDAQ encouraged its members to continue submission of pre-market
orders through 11:30 a.m., notwithstanding its known breakdown of
NASDAQ's IPO Cross system;

(v)     due to NASDAQ's IPO Cross system failures, Defendants made the high-
risk, *ad hoc* decision to resort to an untested backup system and inferior
failover procedures in an effort to avoid the embarrassment of delaying or
interrupting the Facebook IPO; and

(vi)    orders entered between 11:11:00 a.m. and 11:28:50 a.m. did not
participate in the Cross and were not properly executed by NASDAQ.

201.    Despite the known problems with the IPO Cross system, Defendants NASDAQ,

Greifeld and Ewing made the decision to proceed with the IPO and continued to make materially

false and misleading statements and omissions of material fact during the open-market trading

after NASDAQ completed the Cross at 11:30:09 a.m.

71

**b.      Material Misstatements and Omissions
Between 11:30:09 a.m. and 1:57:57 p.m.**

202.    In a scramble to commence open-market trading at 11:30:09 a.m., Defendants

violated NASDAQ's own rules and regulations by making the high-risk gamble to replace the

broken IPO Cross system with a primitive backup system whose capacity and ability to

understand and operate with older code had not been stress tested for use in the Facebook IPO.

At the same time, Defendants NASDAQ, Greifeld and Ewing also failed to disclose material

facts concerning the known technical problems affecting Class Members who placed pre-market

orders in the Cross.  These problems resulted in Cross orders that were not properly executed and

a delay in delivering all trade execution status messages for Cross orders to Class Members until

1:50 p.m. (*i.e.*, confirmations that Class Members' trades were, in fact, executed).

203.    For example, at 11:59:39 a.m. NASDAQ disseminated a NASDAQ Market

System Status message to market participants, stating:

> *NASDAQ is investigating an issue in delivering trade execution
> messages from the IPO Cross in symbol FB.  NASDAQ is
> working to deliver these executions back to customers as soon as
> possible.  NASDAQ will advise.*

204.    Similarly, in a continuing effort to conceal the specific damages caused by

NASDAQ's system failures, Defendants caused NASDAQ to disseminate another NASDAQ

Market System Status message to market participants at 1:05:30 p.m., stating:

> *NASDAQ is working to deliver pending trade execution status
> messages from the Facebook, Inc. (FB) IPO Cross.  NASDAQ
> anticipates providing a manual report to participants containing
> this information shortly.  To be later followed with the electronic
> message summary.  NASDAQ will provide additional
> information when available.*

205.    The above statements were materially false and misleading and omitted material

facts because NASDAQ failed to disclose at the time these statements were made that:

72

(i)    Defendants knew prior to the Class Period that the trading platforms used for Facebook IPO, including the IPO Cross system, were experiencing significant problems that severely limited their capability, speed and reliability to properly execute the enormous volume of trades in the Facebook IPO;

(ii)    due to NASDAQ's IPO Cross system failures, including delivering trade execution messages for orders placed in the IPO Cross, Defendants made the high-risk, *ad hoc* decision to resort to an untested backup system and inferior failover procedures in an effort to avoid the embarrassment of delaying or interrupting the Facebook IPO;

(iii)    additional information regarding Facebook pre-market orders was *already* available, including the fact that only pre-market Cross buy orders placed at $42.00 or higher executed in the Cross and only pre-market Cross sell orders place at $42.00 or less executed in the Cross;

(iv)    only orders received prior to 11:11:00 a.m. participated in the Cross; and

(v)    all orders entered between 11:11:00 a.m. and 11:30:09 a.m. did not participate in the Cross and thereafter were not properly executed by NASDAQ.

206.    The above statements in paragraphs 203 -204 were also materially false and misleading and omitted material facts because NASDAQ failed to disclose that after open-market trading commenced at approximately 11:30 a.m., NASDAQ continued to have systems failures from approximately 11:30 a.m. through 1:50 p.m., when NASDAQ Bid and Ask quotes were often "stuck" at $42.99 and $38.01 respectively and failed to update. While NASDAQ's Bid/Ask quotes were stuck, Class Members were prevented from executing orders at the NBBO prices for Facebook stock, as required by SEC Reg. NMS. During the time when NASDAQ had no published NBBO quotation, it was reported that 272 million shares of Facebook traded on the exchange.

207.    At 1:47:16 p.m. NASDAQ disseminated a Market System Status message to market participants, stating:

73

> *NASDAQ expects to electronically deliver all executions from the*
> *Facebook, Inc. (FB) IPO Cross at approximately 13:50 ET.*
> *NASDAQ will advise when this is complete.*

208.    Ten minutes later, at 1:57:57 p.m., NASDAQ delivered the following Market

System Message:

> *Trade execution messages for the Facebook Inc. (FB) IPO Cross*
> *have been electronically disseminated.  All NASDAQ systems are*
> *operating normally.*

209.    The above statements were materially false and misleading and omitted material

facts because NASDAQ failed to disclose at the time these statements were made that:

   (i)     Defendants knew prior to the Class Period that the trading platforms used
           for Facebook IPO, including the IPO Cross system, were experiencing
           significant problems that severely limited their capability, speed and
           reliability to properly execute the enormous volume of trades in the
           Facebook IPO;

   (ii)    due to NASDAQ's IPO Cross system failures, including delivering trade
           execution messages for orders placed in the IPO Cross, Defendants made
           the high-risk, *ad hoc* decision to resort to an untested backup system and
           inferior failover procedures in an effort to avoid the embarrassment of
           delaying or interrupting the Facebook IPO;

   (iii)   only pre-market Cross buy orders placed at $42.00 or higher executed in
           the Cross and only pre-market Cross sell orders place at $42.00 or less
           executed in the Cross;

   (iv)    only orders received prior to 11:11:00 a.m. participated in the Cross; and

   (v)     all orders entered between 11:11:00 a.m. and 11:30:09 a.m. did not
           participate in the Cross and thereafter were not properly executed by
           NASDAQ.

210.    The above statements in paragraphs 207-208 were also materially false and

misleading and omitted material facts because NASDAQ failed to disclose that after open-

market trading commenced at approximately 11:30 a.m., NASDAQ continued to have systems

failures from approximately 11:30 a.m. through 1:50 p.m., when NASDAQ Bid and Ask quotes

were often "stuck" at $42.99 and $38.01 respectively and failed to update.  While NASDAQ's

74

Bid/Ask quotes were stuck, Class Members were prevented from executing orders at the NBBO

prices for Facebook stock, as required by SEC Reg. NMS.

211.    Moreover, the statements in paragraphs 207-208 were materially false and

misleading and omitted material facts because NASDAQ failed to disclose that its trading

platforms and systems failures directly caused chaos for Class Members during the trading day

and prevented the majority of NASDAQ's customer base to know their positions in Facebook

stock until well after the close of trading on Friday, May 18, 2012.

**c.    Material Misstatements and Omissions
Between 1:57:57 p.m. and 9:15:10 p.m.**

212.    As detailed herein, NASDAQ claimed in its Accommodation Proposal that after

it disseminated all Cross execution reports at 1:50 p.m., its systems were functioning normally

and all Class Members should then have known their positions in Facebook stock.  However,

Defendants were fully-aware that this was not true.  Rather than provide specific details

regarding the known system limitations and how they affected Class Members, Defendants

decided to omit material facts in NASDAQ's Market System Status messages which were

disseminated to market participants throughout the Class Period.

213.    For example, at 4:23:51 p.m., NASDAQ sent out the following Market System

Status message to Class Members:

> *For firms that entered orders in Facebook between 11:11 and
> 11:30 AM and have questions regarding their executions, you
> must call NASDAQ . . . by 5:00 pm with order information if you
> would like to be included in the resolution of any questions.  Our
> intention is to reach resolution of those trades today through an
> offline matching process. . . .*

214.    The above statements were materially false and misleading and omitted material

facts because NASDAQ failed to disclose at the time these statements were made that:

75

(i)     Defendants knew *prior* to the Class Period that the trading platforms used for Facebook IPO, including the IPO Cross system, were experiencing significant problems that severely limited their capability, speed and reliability to properly execute the enormous volume of trades in the Facebook IPO;

(ii)    due to NASDAQ's IPO Cross system failures, including delivering trade execution messages for orders placed in the IPO Cross, Defendants made the high-risk, *ad hoc* decision to resort to an untested backup system and inferior failover procedures in an effort to avoid the embarrassment of delaying or interrupting the Facebook IPO;

(iii)   only pre-market Cross buy orders placed at $42.00 or higher executed in the Cross and only pre-market Cross sell orders place at $42.00 or less executed in the Cross;

(iv)    only orders received prior to 11:11:00 a.m. participated in the Cross; and

(v)     all orders entered between 11:11:00 a.m. and 11:30:09 a.m. did not participate in the Cross and thereafter were not properly executed by NASDAQ.

215.    The above statements in paragraph 213 were also materially false and misleading and omitted material facts because Defendants NASDAQ, Greifeld and Ewing failed to disclose that they knew the majority of NASDAQ's customer base did not know their positions in Facebook stock at the time these statements were made as evidenced by NASDAQ's attempt to run an "offline matching process" (*i.e.*, a post-close cross) in an apparent attempt to help its members ascertain their positions.

216.    Unfortunately, NASDAQ's post-close cross resulted in no shares actually executing. As NASDAQ stated in a 6:18:55 p.m. Market System Status message to Class Members: "*The offline matching process for orders entered in FB between 11:11 and 11:30 AM resulted in nothing done. . . .*" Thus, Defendants knew that the majority of NASDAQ's customers were forced to carry significant positions in Facebook over the weekend, and that they were not able to close those positions until trading began on Monday, May 21, 2012, at inferior prices.

76

217.    In fact, NASDAQ set a deadline of 12:00 p.m. on Monday, May 21 for its

members to submit accommodation requests to NASDAQ. Specifically, the last NASDAQ

Market System Status message on May 18 was disseminated at 9:15:10 p.m., where NASDAQ

stated: "*NASDAQ OMX is currently reviewing Facebook orders that were entered on May*

*18th, between 11:11 and 11:30 a.m., ET, during the IPO. Any accommodation requests*

*should be sent in the normal way, by 12 p.m., ET, on Monday, May 21st. . . .*"

218.    Due to these omissions of material fact, Plaintiffs and Class Members were left in

the dark for hours concerning their transactions in Facebook shares. Defendants' reckless,

profit-oriented behavior prior to and during the Class Period, including their failure to disclose

known, material facts concerning NASDAQ's system problems, obscured Class Members'

market positions and otherwise created complete chaos in the marketplace by disrupting orderly

information flow in Facebook shares, causing substantial damages to Plaintiffs and Class

Members.

## C.    Additional Scienter Allegations For Claims Under Section 10(b) Of The Exchange Act And Rule 10b-5 Promulgated Thereunder

219.    Defendants NASDAQ, Greifeld and Ewing acted with scienter in that they knew

or recklessly disregarded that the public statements and documents issued and disseminated in

NASDAQ's name were materially false and misleading and/or became materially false and

misleading due to subsequent events; knew or recklessly disregarded that such statements and

documents would be issued and disseminated to the investing public, including Plaintiffs and

Class Members; and substantially participated and/or acquiesced in the issuance or dissemination

of such statements and documents as primary violators of the federal securities laws.

220.    In addition to their conscious misbehavior, each of the Individual Defendants had

the opportunity to commit and participate in the wrongful conduct complained of herein. Each

was a senior executive officer and/or director of NASDAQ and, thus, controlled the information disseminated to the investing public in NASDAQ's press releases, SEC filings and communications with analysts, including information and statements disseminated before and during the Class Period in connection with NASDAQ's technology and trading platform capabilities.

221.    Defendants NASDAQ, Greifeld and Ewing were privy to confidential information concerning NASDAQ's operations, including its technology and trading capabilities in connection with Facebook's IPO, and had access to material, nonpublic information concerning the same. As a result, each of these Defendants could falsify and/or conceal information disclosed to the public concerning the known technical problems NASDAQ experienced prior to and during the Offering, and these Defendants' public statements failed to accurately disclose material information known to them. With respect to non-forward looking statements and/or omissions, Defendants NASDAQ, Greifeld and Ewing knew and/or recklessly disregarded the falsity and misleading nature of the information that they caused to be disseminated to the investing public.

222.    As alleged herein, prior to Facebook's IPO, Defendants became aware of certain problems with NASDAQ's technology and trading platforms, including its IPO Cross system, that were going to be used for the Offering. Despite this knowledge, Defendants NASDAQ, Greifeld and Ewing withheld any information from the investing public concerning these problems. Moreover, Defendants failed to properly test NASDAQ's systems to ensure that they were capable of processing the record-setting volume of trading expected for the Facebook IPO.

223.    For example, *The New York Post* reported on May 25, 2012 that "Nasdaq Chief Executive Greifeld pressed ahead with Facebook's initial public offering *despite signs that the*

78

*new software Nasdaq was using to launch the much-hyped stock sale still had bugs*." The article also reported that "Wall Street insiders said it appears *Nasdaq used untested software to launch the botched IPO*" and that "*there may have been signs that the system wasn't glitch-free even at the 11th hour and that Nasdaq opted to roll the dice*."

224.    Similarly, on May 22, 2012, *Business Insider* interviewed a hedge fund manager who described how NASDAQ "*knew its systems were broken before the Facebook IPO*, and instead of aborting the offering and facing huge embarrassment, it went ahead." Due to NASDAQ's concealment of known adverse information concerning its trading platforms used for the Offering, traders "lost hundreds of millions of dollars as they tried to buy and sell Facebook stock without getting confirmation that their trades had been executed." *Business Insider* quoted the hedge fund manager, who stated that:

> [T]his was not a market crash. This was alike [sic] a spaceship that was about to launch and a flashing warning light goes off and they say I'd rather launch this thing than say abort this thing. They knew this thing was f---ed and they just went in and did it. This isn't a computer f--k-up. The computers told them it wasn't working. Someone had to pull it. Think about pulling the Facebook IPO? No way. They would never do it.

225.    On June 15, 2012, *Reuters* also reported that prior to the May 18, 2012 IPO debut, Defendants were conducting a series of tests on the specific systems that were going to be used for the Facebook IPO. Among other things, *Reuters* reported that these system tests revealed that "*Nasdaq was still testing from the consequences of a significant change to its IPO procedures the evening before Facebook's troubled debut. . . . [NASDAQ] invit[ed] its members to participate in trade simulations on May 16 and 17 run specifically to 'support the system's recent enhancement.'*" However, as is now known, NASDAQ's volume testing was wholly inadequate given the anticipated volume of shares that would trade in Facebook's stock.

79

226.     As *The Wall Street Journal* reported on May 12, 2012 – six days *before* the May 18 Offering – Facebook's IPO was "***expected to be the biggest ever to hit Wall Street***." Market participants widely believed that the trading volume in Facebook's IPO would be record-setting, with estimates that "***day-one trading in Facebook shares could see any many as 600 million of its shares change hands***." Indeed, a NASDAQ senior executive acknowledge during the May 10, 2012 Investor day Conference that "Facebook is obviously the most anticipated IPO in history."

227.     Given the enormous trading volume in Facebook's IPO that was expected to shatter all previous records, NASDAQ provided wholly inadequate stress testing of its system prior to the Offering. As *The Wall Street Journal* reported on June 11, 2012, NASDAQ's volume testing only simulated opening trading at volumes between 6 and 53 million shares. However, as noted above, trading in Facebook's IPO was expected to – and did – vastly exceed the number of shares NASDAQ simulated in its tests. According to a May 18, 2012 *CNN* report, "[m]ore than 80 million shares changed hands in the first 30 seconds of trading. By the end of the day, volume had spiked to around 567 million shares. That easily set a new volume record for IPOs, smashing the previous record that automaker General Motors set in 2010 with trading of around 450 million shares."

228.     Indeed, on May 31, 2012, *Huffington Post* issued an article titled "Top 10 Reasons Why Facebook's IPO Went Badly" concluding that the number-one reason for the botched IPO was "***NASDAQ's unforgivable incompetence in not stress-testing in advance its confirmation delivery systems in the face of projected demand, and then going forward with trading when they knew the system wasn't working well at all***."

80

229.   Despite these known adverse issues with NASDAQ's trading systems, Defendants NASDAQ, Greifeld and Ewing failed to disclose any material information concerning these problems during the Class Period.  Instead, Defendants chose to remain silent during the 30-minute delay in opening the IPO from 11:00 a.m. to 11:30 a.m. when NASDAQ's IPO Cross system completely failed.  To make matters worse, during this same time, Defendants made a high-risk gamble to replace the broken system with a primitive backup system – *whose capacity and ability to understand and operate with older code had not been stress tested* – and open trading.  Defendants' radio silence kept Class Members in the dark concerning this material information.

230.   In this regard, on May 30, 2012, *TechCrunch* issued an article titled "NASDAQ's Gamble With Facebook's Fortune" which highlighted the reckless decision of NASDAQ and its executives to push the IPO forward despite the known technical problems with NASDAQ's systems – problems that were never disclosed to Class Members:

> NASDAQ had a choice.  ***When its systems buckled under the titanic volume of Facebook IPO share orders, it could have pushed back trading a day***, or at least recommended as much to Mark Zuckerberg and company.  ***But as the IPO's scheduled time passed, NASDAQ made a cavalier decision to stumble forth on broken legs, pretending like little was wrong rather than halt trading as brokers asked. . . . NASDAQ could have admitted its software was unprepared,*** attempted to halt trading until its systems were sound, and accepted the blow to its reputation.  It could have given Facebook a fair chance. ***Instead, with Facebook's money on the line, it rolled the dice hoping everything would be okay. It wasn't. Now both are worse off.***

231.   Similarly, on May 21, 2012, *CNNMoney* interviewed a trader who was familiar with the events that occurred on the day of the Facebook IPO and placed orders in the IPO Cross. The traders stated:

81

"Nasdaq was inundated with orders, as they should have been because of the magnitude of the issuance, but the problem was that they promised everyone an 11 a.m. start," said the trader. "Then they moved it to 11:05, and *then once they realized they had a real problem, there was radio silence. Instead of telling people what was going on, they opened the stock without resolving the glitch.*"

232.   In fact, NASDAQ's CEO Greifeld has admitted that "*we did not have enough business judgment in the process*," and that NASDAQ's "*arrogance*" and "*overconfidence*" contributed to the Facebook IPO failure.  Defendant Greifeld plainly acknowledged that NASDAQ "*was unprepared for increasing numbers of canceled orders in the hours leading up to Facebook's debut*," and that NASDAQ's inadequate testing before Facebook's IPO "*didn't account for the increasing volume at which cancellations can come in*."

233.   In its Accommodation Proposal, NASDAQ has also plainly admitted its wrongdoing in connection with the Facebook IPO, including allowing the IPO to go forward despite its known technical problems.  Specifically, NASDAQ acknowledged that it commenced the Offering and allowed trading to continue despite experiencing "*unprecedented difficulties*" with its systems, and that its actions "*caused objective, discernible harm*" to market participants.

### D.   Securities Class's Presumption Of Reliance

234.   Plaintiffs and Class Members benefit from a presumption of reliance because, among other things:

a.   Defendants NASDAQ, Greifeld and Ewing had a duty to disclose material information during the Class Period concerning NASDAQ's known technical and software-related problems with its trading platform, including its IPO Cross system failures, that adversely affected Class Members' trading in Facebook's IPO;

82

b. Defendants NASDAQ, Greifeld and Ewing failed to disclose any material information during the Class Period concerning NASDAQ's known technical and software-related problems with its trading platform, including its IPO Cross system failures, in connection with properly processing trading in Facebook's IPO;

c. A reasonable investor would have considered the concealed facts concerning NASDAQ's technical and software-related problems with its trading platform, including its IPO Cross system failures, important in making investment decisions in connection with Facebook's IPO on the NASDAQ Stock Market; and

d. Plaintiffs and Class Members purchased and sold shares of Facebook's common stock during the Class Period between the time Defendants NASDAQ, Greifeld and Ewing failed to disclose material facts and the time the true facts were revealed, without knowledge of the omitted facts.

235. As detailed herein, information concerning the problems NASDAQ experienced with its technology and trading platform, including its IPO Cross system failures, was in the ***sole*** possession of the Defendants both prior to and during the Class Period. While Defendants NASDAQ, Greifeld and Ewing made material statements concerning the capability and reliability of NASDAQ's technology and trading platform, they failed to disclose the known adverse information concerning the same. Consequently, Plaintiffs and Class Members utilized the NASDAQ Stock Market to purchase and sell shares of Facebook's stock completely unaware of the fact that NASDAQ would be unable to properly process and execute trading in Facebook's

83

IPO. Because Defendants NASDAQ, Greifeld and Ewing made omissions of material fact despite having a duty to disclose such material information, a presumption of reliance applies.

**E.      Loss Causation For Claims Under Section 10(b) Of The Exchange Act And Rule 10b-5 Promulgated Thereunder**

236.    During the Class Period, Defendants NASDAQ, Greifeld and Ewing engaged in a scheme to deceive the market and a course of conduct that operated as a fraud and deceit on the Securities Class by failing to disclose to Class Members NASDAQ's known problems with its technology and electronic trading platforms such that NASDAQ was unable to accurately and reliably execute trading and timely deliver confirmation of trades in connection with Facebook's IPO.

237.    By failing to disclose the known technical and software-related problems, Defendants NASDAQ, Greifeld and Ewing concealed the risk that NASDAQ's technology and trading platforms, including its IPO Cross system, would fail to perform properly in connection with Facebook's IPO. Due to Defendants NASDAQ, Greifeld and Ewing's concealment of this adverse information, Class Members were unaware of the true state of these known problems in connection with their trading activities in Facebook's IPO. Therefore, Defendants NASDAQ, Greifeld and Ewing presented a misleading picture of the reliability and capability of NASDAQ's technology and trading platform, including its IPO Cross system. Thus, instead of disclosing prior to and during the Class Period the true state of its technical problems, Defendants NASDAQ, Greifeld and Ewing concealed the truth.

238.    Plaintiffs' and Class Members' damages were foreseeable and directly caused by the materialization of the concealed risks of Defendants NASDAQ, Greifeld and Ewing; namely, NASDAQ's technology and trading platform technical limitations and resulting failures, including the breakdown of its IPO Cross system, and Defendants' failure to properly test

84

NASDAQ's systems prior to the IPO. The materialization of these risks occurred during the Class Period when NASDAQ's systems failed to: (i) properly execute Class Members' buy and sell pre-market Cross orders and aftermarket orders in Facebook's IPO; and (ii) failed to timely deliver confirmations of Class Members pre-market Cross orders, causing Class Members substantial damages.

### F. Group Pleading

239. Defendants Greifeld and Ewing are liable for the materially false and misleading statements pleaded herein in support of Plaintiffs' claim under Section 10(b) and Rule 10b-5 of the Exchange Act that were issued by or in the name of the Company, as each of those statements was "group-published" information, and resulted from the collective actions of these Defendants. It is appropriate to treat Defendants Greifeld and Ewing as a group and to presume that the public filings, press releases and other public statements complained of herein are the product of the collective actions of this narrowly defined group of Defendants.

240. Defendants Greifeld and Ewing, by virtue of their high-level positions within NASDAQ, directly and actively participated in the management and day-to-day operations of the company, and were privy to confidential non-public information concerning the business and operations of NASDAQ, including material information pertaining to NASDAQ's technology and trading platforms. Defendants Greifeld and Ewing were involved in drafting, reviewing and/or disseminating the materially false and misleading statements and omissions of material fact that were issued by NASDAQ, approved or ratified these statements and, therefore, adopted them as their own.

241. Before and during the Class Period, Defendants Greifeld and Ewing, as senior executive officers and/or directors of NASDAQ, were privy to confidential and proprietary information concerning NASDAQ, its operations, finances, financial condition, technology and

85

present and future business prospects.  Defendants Greifeld and Ewing also had access to

material adverse non-public information concerning NASDAQ's business, finances, products,

markets, technology, and present and future business prospects via access to internal corporate

documents, conversations and connections with other corporate officers and employees,

attendance at management and board of directors meetings and committees thereof, and *via*

reports and other information provided to them in connection therewith.  Because of their

possession of such information, and their direct involvement in the everyday business of

NASDAQ, Defendants Greifeld and Ewing knew or recklessly disregarded the fact that the

adverse facts specified herein had not been disclosed to, and were being concealed from, the

investing public.

### G.     Control Person Liability

242.    The Individual Defendants are liable as direct participants with respect to the

wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as

senior executive officers and/or directors, were "controlling persons" within the meaning of

Section 20(a) of the Exchange Act, and each had the power and influence to cause the Company

to engage in the unlawful conduct complained of herein.  Because of their positions of control,

the Individual Defendants were able to and did, directly or indirectly, control the conduct of

NASDAQ's business, and the dissemination of, or failure to disclose, material information

regarding the Company's business prospects.

243.    Specifically, because of their positions within the Company, the Individual

Defendants possessed the power and authority to control the contents of NASDAQ's annual and

quarterly reports, press releases, and presentations to securities analysts, daily NASDAQ Market

System Status messages, money and portfolio managers and institutional investors, *i.e.*, the

market, including those containing the materially false and misleading statements and omissions

86

of material fact alleged herein. Each of the Individual Defendants, by reason of his or her respective management or board positions, had the ability and opportunity to review and/or cause to be corrected copies of the Company's SEC filings, reports and press releases alleged herein to be misleading, prior to, or shortly after their issuance.

244.   By virtue of their positions, the Individual Defendants had access to material non-public information. Each of the Individual Defendants knew or recklessly disregarded the fact that the adverse information specified herein had not been disclosed and was being concealed from the public, and that the positive representations which were being made were then materially false and misleading.

245.   As detailed below, each Individual Defendant was a culpable participant in the fraud:

> (i)   Defendant Greifeld culpably participated in the fraud, as alleged in ¶¶ 16-31, 57, 108, 124, and 168-233; and
>
> (ii)   Defendant Ewing culpably participated in the fraud, as alleged in ¶¶ 16-31, 58, and 168-233.

## H.   The Safe Harbor Provision Of The PSLRA Is Inapplicable To Plaintiffs' Claims Under Section 10(b) Of The Exchange Act And Rule 10b-5 Promulgated Thereunder

246.   As alleged herein, Defendants NASDAQ, Greifeld and Ewing acted with scienter in connection with the materially false and misleading statements and omissions of material fact giving rise to claims under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder because at the time they issued public documents and other statements in NASDAQ's name, each of these Defendants knew or recklessly disregarded the fact that such statements were materially false and misleading or omitted material facts. Moreover, each of these Defendants knew that such documents and statements would be issued or disseminated to the investing public; knew that persons were likely to rely upon those misrepresentations and

87

omissions; and knowingly and/or recklessly participated in the issuance and/or dissemination of such statements and/or documents as a primary violator of the federal securities laws.

247.    As set forth in detail in this Complaint, Defendants Greifeld and Ewing participated in and/or knew of the misconduct alleged herein by virtue of their control over, and/or receipt of, NASDAQ's materially false and misleading statements and/or their association with the company, which made them privy to confidential proprietary information concerning NASDAQ. Defendants Greifeld and Ewing knew and/or recklessly disregarded the falsity and misleading nature of that information, which they caused to be disseminated to the investing public.

248.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the alleged false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants NASDAQ, Greifeld and Ewing are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, each Defendant knew that the particular forward-looking statement was false, and/or the forward looking statement was authorized and/or approved by an executive officer of NASDAQ who knew that those statements were false when made.

88

## VIII.  DEFENDANTS' NEGLIGENCE

### A.    Defendants' Failures Were Reasonably Foreseeable

249.    According to NASDAQ the IPO system failures were, at least in part, the result of an inability to handle, and inexcusable failure to design for, a high volume of quote cancellations during the Cross process. A May 21, 2012 Reuters article reported that "Nasdaq Chief Executive Robert Greifeld said in a conference call with reporters…that there had been a malfunction in the trading system's design for processing order cancellations." Greifeld acknowledged that the system took five milliseconds to calculate the opening price, or two milliseconds longer than it took to receive the cancellations, which occurred more rapidly than the system could handle.

250.    According to a Wall Street Journal article, CEO Greifeld described the problem with the IPO opening cross as "a design flaw in the systems" that "doomed" the "routine but essential chore of lining up trades."

251.    The Huffington Post, in a May 31, 2012 article titled "Top 10 Reasons Why Facebook's IPO Went Badly," concluded that the number-one reason for the botched IPO was "NASDAQ's unforgivable incompetence in not stress-testing in advance its confirmation delivery systems in the face of projected demand . . . ."

252.    From the detailed analysis and reporting that has taken place since the botched Facebook IPO, not only the nature of NASDAQ's failures (outlined above), but also NASDAQ's negligence, has become increasingly clear. In order to further its profit making operations, its profits, and its stock price, NASDAQ consistently and repeatedly followed a pattern of conduct in which it either reduced the costs, or failed to increase the costs, required to operate the stock exchange's computer and technology systems properly. Thereby, NASDAQ, in order to inflate its revenues, profits and stock price, as alleged elsewhere herein, negligently failed to have in

89

place the computer, technology, testing and system implementation procedures that a reasonable person in NASDAQ's place and circumstances as a national stock exchange would have had.

253.    A May 20, 2012 article in the Wall Street Journal quoted CEO Greifeld as saying he was "humbly embarrassed" by NASDAQ's failures, and that the Facebook IPO was not the exchange's "finest hour." A May 21, 2012 TechSpot article reports that CEO Greifeld acknowledged that he was "not happy with our performance." In a May 20, 2012 *Financial Times* article, Defendant Greifeld was quoted as saying: "We had a poor design for the Facebook opening cross IPO....it didn't work in this scenario."

254.    It is well established that the Facebook IPO was easily the most talked-about IPO in years, and that there was a level of interest by both professional traders and retail investors that was both highly unusual and well known in advance, and yet NASDAQ was woefully unprepared.

255.    In the exercise of reasonable care, NASDAQ should have designed and tested its systems to ensure they would be able to handle the potentially unprecedented trading volume on Facebook's opening day, including the ability of the systems to execute and confirm the large number of trade orders and cancellations anticipated for execution in the Cross. The system failures experienced in the course of the Facebook IPO were avoidable. However, due to NASDAQ's declining revenues and profits, NASDAQ made the business decision not to devote the increased expenditures to IPO systems' design, development, testing and implementation that would have avoided the system failures that plagued the Facebook IPO.

256.    In the Bartiromo Interview, CEO Greifeld admitted that NASDAQ's problems lay in new software programs and code. Thus the NASDAQ problems occurring on May 18 were not

90

the result of volume that would have been impossible to handle under normal circumstances, but rather of negligence in the design and testing of the new software and code.

257.    Media outlets have reported that NASDAQ had knowledge of potentially significant problems with its IPO software in the days leading up to the Facebook IPO, but failed to take adequate precautions to ensure that its software functioned properly.

258.    For example, the *New York Post*, in an article titled "Nasdaq Bugged FB IPO," reported that "Wall Street insiders said it appears Nasdaq used untested software to launch the botched IPO" and that there may have been indications that the software was malfunctioning even on the eve of the opening of trading in Facebook stock.

259.    Upon information and belief, NASDAQ did not have a dedicated chief information officer overseeing its technology management and systems prior to the Facebook IPO failures.

260.    On April 23, 2013, *The Wall Street Journal* reported:

> Nasdaq last year hired International Business Machines Corp. to review its technology systems. It also hired a dedicated chief information officer while restructuring how it develops and tests software.

261.    *The Wall Street Journal* reported on April 24, 2013:

> Mr. Greifeld said in an interview that Nasdaq had improved the way the exchange develops its market software following recommendations by International Business Machines Corp., which it hired to review its internal systems after the problems with Facebook.  Nasdaq also reorganized its technology management.

### B.    Defendants' Negligence Damaged The Cross Confirmation Class

262.    As noted in ¶¶ 151 to 159 above, on May 18, 2012, after Facebook opened for trading, investors who placed pre-opening trade orders experienced delays in the confirmations of their trades.  Investors who placed buy orders waited hours before receiving confirmation of

91

their trades, and learning whether or not they owned Facebook shares. Investors who placed buy orders that they tried to cancel after receiving no execution reports had to wait hours before learning that those cancellations had not executed. Normally, exchanges send out trade confirmation reports within seconds, and brokerage services in turn immediately report those confirmations to their retail customers.

263. Investors who placed orders to purchase Facebook shares had no idea if they owned Facebook shares, or how many and at what price. Because of NASDAQ's negligence, investors lacked the ability to make any informed decisions, or to take action to mitigate market losses in the face of a declining market price of Facebook stock. Without confirmation of share ownership, investors could not simply sell shares to reduce losses because that would subject them to the risk of having sold the stock short. Brokerage firms may not have permitted such "short" sales without confirmed covering buys in the customers' accounts.

264. During the period NASDAQ failed to confirm trades, trading took place in Facebook stock on NASDAQ as well as on other markets. The price of Facebook stock declined during this period. After opening trading at a price of $42.00, and briefly increasing, the price of Facebook stock began to fall steadily and closed at $38.23 on Friday, May 18, 2012.The price of the stock opened even lower, at $36.53, the following Monday.

265. Class Members whose buy trades were executed in the Cross at $42 per share, but who did not receive confirmation of those trades, were unaware they owned shares for an extended period of time during a falling market, and held no shares in their brokerage accounts that could be sold. As a direct and proximate result of NASDAQ's negligent confirmation failures, accordingly, those class members were unaware that they needed to take action to avoid market losses as the price of Facebook shares deteriorated. NASDAQ has conceded in its rule

92

change proposal to the SEC that persons whose Cross trade confirmations were delayed were damaged thereby.

### C. Defendants' Negligence Damaged The Cross Execution Class

266.   As described above, NASDAQ's secondary system failed to execute trades placed between 11:11 and 11:30:09. As also described above, according to NASDAQ, of the orders placed between 11:11 and 11:30:09, members canceled some before the Cross, others entered into the market at 11:30:09 a.m., and the remainder either were cancelled or released into the market at 1:50 p.m. This failure to execute damaged investors in a variety of ways.

267.   For example, investors placing sell orders priced less than $42 that failed to execute in the Cross were damaged by their inability to realize $42 per share for their trades in the Cross in light of the fact that the market price of Facebook declined thereafter. Rather, such investors would have realized that their sell orders failed to execute only at some time after 1:50 p.m. (i.e. when NASDAQ belatedly provided electronic confirms) and would have been forced to sell the shares they expected to sell in the Cross at some price below the $42 they could have received in the Cross.

268.   As another example, investors placing sell orders priced at less than $42 that failed to execute in the Cross, but instead entered the market at either 11:30:09 a.m. or 1:50 p.m., suffered losses when their shares sold not at the $42 price in the Cross, but at some inferior price.

269.   Because of NASDAQ's negligence, these investors suffered monetary losses. In its rule change proposal to the SEC, NASDAQ has conceded that persons whose eligible sell orders were not executed in the Cross were damaged thereby.

93

### D. Plaintiffs' Experiences

270. Plaintiffs' experiences were similar to those of the investors described above. Their common experiences with problems occurred despite the fact that each traded through a completely separate and independent brokerage firm.

271. These problems were not limited to retail investors; professional traders, brokerage firms, and other institutional investors also experienced the same problems due to NASDAQ's known technical and computer related problems. In short, legions of investors seeking to purchase Facebook stock had no idea if they had successfully done so, and other investors seeking to cancel trades not yet executed had no idea if they had successfully done so. A May 18, 2012 *Wall Street Journal* article further detailed these problems:

> Professional traders who placed big orders on behalf of hedge funds, mutual funds, and other institutions waited more than two hours after Facebook shares started trading at 11:30 a.m. to hear whether the orders would be honored or canceled. These traders said the uncertainty caused some big investors to bail out of Facebook stock, because they didn't know for sure what they had bought or sold, or at what price.

> Meanwhile, small-time buyers . . . who placed orders through online brokerages like Fidelity and Scottrade also fretted for hours whether their trades or cancellations went through.

272. In some instances, although Class Members timely placed cancellations of prior purchase orders, those cancellations were never processed. One such example was recounted in a May 21, 2012 article in *The Wall Street Journal*:

> George Brady, a 66-year-old recruiter in North Carolina, bought 1,000 shares of Facebook a few minutes after it opened for trading Friday. He said by Monday morning, he sold his holding, taking a $2,770 loss.

> Mr. Brady said he tried not to purchase the shares in the first place, but was unable to withdraw his order on his Charles Schwab account, calling the situation "ridiculous." Technical problems on

94

> the Nasdaq Stock Market prevented some investors from
> confirming their trades or trade cancellations.

273.    Public reports indicated that these problems were the fault of NASDAQ. For

example, a May 21, 2012 *Reuters* article stated:

> The Nasdaq Stock Market, where Facebook is listed, had problems
> sending electronic messages back to the brokerages that handled
> orders from individual, or "retail," investors, according to people
> with knowledge of the situation.
>
> Because the electronic acknowledgments didn't come back from
> the exchange the brokers were unable to tell their clients that trades
> had been executed. Such acknowledgments usually occur almost
> instantaneously. The delay meant that, in one of the most
> anticipated stock offerings ever, frustrated brokers and investors
> didn't know if orders had actually gone through.

274.    Indeed, NASDAQ has acknowledged it was at fault. Specifically, as *Reuters*

reported on May 21, 2012, "Nasdaq Chief Executive Robert Greifeld said in a conference call

with reporters on Sunday that there had been a malfunction in the trading system's design for

processing order cancellations."

275.    On May 25, 2012, *Reuters* published an article providing minute-by-minute detail

of Facebook's IPO fiasco. The article explained the confusion and inability to timely process

orders that occurred in the IPO. The article stated, in relevant part:

> Nasdaq CEO Bob Greifeld pumped his fist at the symbolic opening
> bell ceremony at Facebook's headquarters in Menlo Park,
> California next to Facebook CEO Mark Zuckerberg an hour-and-a-
> half before the company's stock was due to start trading. There
> were no outward signs then of the problems that were about to
> unfold back on Wall Street.
>
> At 10:58 a.m., Nasdaq issued a notice that the Facebook opening
> would be delayed until 11:05 a.m. IPO delays of that nature are not
> unusual, especially with a massive launch like Facebook.

95

But then the revised start time passed without an opening trade on the stock. Minutes passed as traders waited. Nasdaq's next communication came at 11:13 a.m., when it noted in a terse emailed message to people who subscribe to the exchange's alerts that Nasdaq is "experiencing a delay in delivering the opening print in Facebook," with no other details.

*Meanwhile, market-makers were receiving messages about their orders that later proved to be inaccurate. They say they were told during the period between 11:05 and 11:30 a.m., when the stock finally opened, that orders were still being taken for the opening price.*

"*Nasdaq representatives were stating right up until 11:29 that they were still accepting orders in Facebook for the open*," said Turner of Instinet.

But that wasn't the case. Later, Turner said he was told that orders submitted up to 25 minutes before the opening were either canceled or not submitted into the marketplace until about 1:50 p.m. - more than two hours later. Other market makers received similar messages.

*Behind the scenes, the massive order volume was overwhelming Nasdaq's systems.*

Orders that were supposed to be processed in 3 milliseconds were taking 5 milliseconds, said one person familiar with exchange operations. This proved to be a major problem: In the extra two milliseconds new orders flooded in, thwarting the system's ability to establish an opening price for the stock and leading to a backup in unprocessed orders.

\*       \*       \*

Finally, the decision was made to put through a fix to the systems problem and get the stock trading. That move to a secondary matching engine used the order book as it appeared at 11:11 a.m. - but this meant new orders and changes in orders that came in later did not show up in the opening price. A matching engine is a computer that pairs bids and offers to complete trades.

Eric Noll, Nasdaq's head of transaction services, said in a statement earlier this week that the fix instead led to 2-1/2 hours of uncertainty during which brokers were unable to see the results of their trades.

276.    The May 25, 2012, *Reuters* article further details these problems:

> The stock opened at 11:30:09 a.m. at $42.05 a share. An investor looking at a quote screen might have thought the trouble had ended there. In reality, the problems were about to worsen.
>
> After initially heading to a high of $45, the stock soon began to plunge towards its issue price at $38. Lead underwriter Morgan Stanley stepped in to defend the stock while some others - unsure whether their orders had been processed or not - backed away from trading or decided to sell.
>
> If confidence is undermined at the open, people "pull back because their orders are essentially going into a black hole," said former Nasdaq Vice Chairman David Weild.
>
> Clients were telling their brokers they had not received confirmation of orders - which normally come through in seconds.
>
> ***"Multiple market makers called Nasdaq and asked them to halt the stock and said, 'You have a problem and it's getting worse,' and their response was, 'The stock is trading normally,'" said an executive at one market-maker.***
>
> *      *      *
>
> For market-makers, the chaos was particularly problematic because they didn't know what they and their clients owned, and at what price.
>
> ***"Should I be selling stock, should I be buying? And what's my price point?" said another official at a market-making firm. "You just don't know, so you were in effect flying blind until 2 o'clock."***

### E.    Defendants' Public Representations Establish Standards Of Care

277.    NASDAQ OMX and NASDAQ LLC operate and oversee the NASDAQ Stock Market. NASDAQ OMX's website states it has "unparalleled" processes. The website goes on to state that NASDAQ OMX's trading model is the "standard for markets worldwide." It additionally asserts that it is "the power behind 1 in 10 of the world's securities transactions" and that "[s]eventy exchanges in 50 countries trust our trading technology to power their markets."

97

The website also asserts that the NASDAQ stock market is "the fastest trading platform in the world." Finally, it asserts that "[o]ur commitment to excellence goes beyond our 99.999% uptime record for mission critical operations. It includes our passion for flawless execution and our relentless pursuit to anticipate customer requirements."

278. In the NASDAQ OMX Group Form 10-K for 2011, NASDAQ OMX Group held itself out as possessing the following capabilities:

> ***Leader in global exchange technology.*** We believe we are the leader in global exchange technology. As the world's first electronic stock market, we pioneered electronic trading and have continued to innovate over the last 40 years. Our INET platform processes trades at sub-millisecond transaction speeds with close to 100% system reliability. In addition, our platforms are highly scalable with current capacity at ten times the average daily volume allowing significantly higher transaction volume to be handled at low incremental cost.

279. In the NASDAQ OMX Group Form 10-K for 2011, in the section entitled "2012 Outlook," management stated as follows:

> For the fourth year in a row, more share value traded on The NASDAQ Stock Market than on any other single cash equities exchange in the world. Our platform continues to stand out as a reliable, flexible, and high capacity system delivering high levels of execution quality and speed under even extremely demanding market conditions.

280. As recently as April 25, 2012, NASDAQ additionally stressed its ability to process transactions, its speed at processing and its "transformative" technologies in this statement attached to press releases issued that day:

> **About NASDAQ OMX Group**
>
> The inventor of the electronic exchange, The NASDAQ OMX Group, Inc., fuels economies and provides transformative technologies for the entire lifecycle of a trade – from risk management to trade to surveillance to clearing. In the US and Europe, we own and operate 24 markets, 3 clearinghouses and 5

98

central securities depositories supporting equities, options, fixed income, derivatives, commodities, futures and structured products. Able to process more than 1 million messages per second at sub-40 microsecond speeds with 99.999% uptime, our technology drives more than 70 marketplaces in 50 developed and emerging countries into the future, powering 1 in 10 of the world's securities transactions. Our award-winning data products and worldwide indexes are the benchmarks in the financial industry. Home to approximately 3,400 listed companies worth $5.1 trillion in market cap whose innovations shape our world, we give the ideas of tomorrow access to capital today. Welcome to where the world takes a big leap forward, daily. Welcome to the NASDAQ OMX Century.

281.    In its 2011 Annual Report, NASDAQ OMX CEO Greifeld sent a letter to

NASDAQ's own shareholders which stated in part:

Technology is still at the heart of everything we do. We set the bar in 1971 and continue to raise it today, relentlessly redefining the role of the exchange in the global economy. That's why more than 70 marketplaces in 50 countries rely on us to power their markets - from centuries-old bellwethers to newly formed emerging markets.

282.    The 2011 Annual Report also contains a "CEO Interview" with CEO Greifeld in

which he stated:

**John [Sweeney, Nasdaq OMX IRO]**: What are your thoughts on high frequency trading?

**Bob [Greifeld, Nasdaq OMX CEO]**: First, I want to speak about what an exchange uniquely does. An exchange is where price discovery happens. When you look at the price of Apple, we discover that price in the exchange through a fair access standard, inviting all investors with divergent viewpoints into our market to discover what the true price should be. We have investors who will think about it in the nanosecond, which is considered high frequency trading. We have small investors - retail investors – and very large institutional investors coming into the marketplace. We have those who think in a five- or 10-year time frame. They all come together and interact with each other through their orders to discover price. We think it's a fundamental mistake to preclude any investor, regardless of size or priority, from equal and fair access to the marketplace.

99

283.    The Negligence Plaintiffs allege NASDAQ's representations on its website, press releases, annual reports and other filings with the SEC for the sole purpose of establishing and augmenting the standards of care advertised and owed by NASDAQ to investors who are within the reasonably foreseeable zone of persons likely to be injured by NASDAQ system failures. The Negligence Plaintiffs, for purposes of their claims based on state and common law negligence, do not allege that the NASDAQ representations were false or misleading or that the Negligence Plaintiffs have any cause of action based on such representations.

284.    NASDAQ's negligent system failures in the handling of the Facebook IPO, as alleged above, violated commercially reasonable investor expectations, and NASDAQ's own representations regarding the high standards of performance and reliability of its electronic systems.

### F.    Defendants' Revenues From Trading And Trading Profits In Facebook

285.    NASDAQ's negligence is totally unjustified in view of the substantial resources and revenues at its disposal.  In the first quarter of 2012, NASDAQ reported that it earned $411 million in revenues and $53 million from stock transactions.  This revenue is the direct result of the volume of transactions, which NASDAQ handles from its Member brokerage firms and retail investors.

286.    With this substantial revenue it derives from stock trading, NASDAQ should be held accountable for the harm and damage suffered by investors from its negligent system failures.  NASDAQ holds its Member firms responsible for ensuring that they have adequate staffing and resources to handle order executions.  The stock market itself should be held to no less of a standard than its Members.

287.    NASDAQ also reportedly directly profited from trading in Facebook shares during the IPO.  According to a June 5, 2012, New York Post article, NASDAQ purchased so-

100

called "orphan" shares during early trading on May 18, possibly ahead of market participants and investors, and profited by $10.7 million. The "orphan" shares resulted from unmatched orders that NASDAQ could not cross in the Facebook opening. FINRA Rules prevent member firms from trading ahead of customers.

288. Public interest demands market integrity, and a level and fair playing field for all investors. If retail investors are not compensated for damages proximately caused by the negligent operation of a national stock market, then confidence in our nation's financial institutions will continue to erode.

## IX. POST-CLASS PERIOD REVELATIONS

### A. Market's Reaction to NASDAQ's Botched Facebook IPO And Corresponding SEC Investigation

289. In the weeks and months that followed NASDAQ's botched Facebook IPO, it became clear that NASDAQ's known technology failures of its trading platforms and systems caused widespread damage to Class Members and shook the confidence of the marketplace. Numerous media outlets interviewed market participants who were adversely affected by NASDAQ's system failures and outraged that Defendants did not halt trading in Facebook despite knowing of the significant system failures experienced the day of the IPO. On May 25, 2012, *Reuters* published an article providing a detailed timeframe of Facebook's IPO fiasco. The article stated, in relevant part:

> Nasdaq CEO Bob Greifeld pumped his fist at the symbolic opening bell ceremony at Facebook's headquarters in Menlo Park, California next to Facebook CEO Mark Zuckerberg an hour-and-a-half before the company's stock was due to start trading. There were no outward signs then of the problems that were about to unfold back on Wall Street.
>
> At 10:58 a.m., Nasdaq issued a notice that the Facebook opening would be delayed until 11:05 a.m. IPO delays of that nature are not unusual, especially with a massive launch like Facebook.

101

But then the revised start time passed without an opening trade on the stock. Minutes passed as traders waited. Nasdaq's next communication came at 11:13 a.m., when it noted in a terse emailed message to people who subscribe to the exchange's alerts that Nasdaq is "experiencing a delay in delivering the opening print in Facebook," with no other details.

*Meanwhile, market-makers were receiving messages about their orders that later proved to be inaccurate. They say they were told during the period between 11:05 and 11:30 a.m., when the stock finally opened, that orders were still being taken for the opening price.*

"*Nasdaq representatives were stating right up until 11:29 that they were still accepting orders in Facebook for the open,*" said Turner of Instinet.

*But that wasn't the case.* Later, Turner said he was told that orders submitted up to 25 minutes before the opening were either canceled or not submitted into the marketplace until about 1:50 p.m. - more than two hours later. Other market makers received similar messages.

*Behind the scenes, the massive order volume was overwhelming Nasdaq's systems.*

Orders that were supposed to be processed in 3 milliseconds were taking 5 milliseconds, said one person familiar with exchange operations. This proved to be a major problem: In the extra two milliseconds new orders flooded in, thwarting the system's ability to establish an opening price for the stock and leading to a backup in unprocessed orders.

\*　　\*　　\*

Finally, the decision was made to put through a fix to the systems problem and get the stock trading. That move to a secondary matching engine used the order book as it appeared at 11:11 a.m. - but this meant new orders and changes in orders that came in later did not show up in the opening price. A matching engine is a computer that pairs bids and offers to complete trades.

Eric Noll, Nasdaq's head of transaction services, said in a statement earlier this week that the fix instead led to 2-1/2 hours of uncertainty during which brokers were unable to see the results of their trades.

102

290.   As market participants discovered after the Class Period, although Defendants knew NASDAQ was experiencing significant technical problems that were causing delays and inaccuracies in the processing of trades, they nevertheless made the decision to push Facebook's IPO forward and failed to disclose to Class Members any information concerning its known problems.   This decision, motivated by significant financial and reputational concerns, caused investors to "fly blind" as they had no idea how much, if any, Facebook stock they bought, sold and/or cancelled, nor at what prices these transactions took place.   The May 25, 2012 *Reuters* article further details these problems:

> The stock opened at 11:30:09 a.m. at $42.05 a share.   An investor looking at a quote screen might have thought the trouble had ended there.   In reality, the problems were about to worsen.

> After initially heading to a high of $45, the stock soon began to plunge towards its issue price at $38.   Lead underwriter Morgan Stanley stepped in to defend the stock while some others - unsure whether their orders had been processed or not - backed away from trading or decided to sell.

> If confidence is undermined at the open, people "pull back because their orders are essentially going into a black hole," said former Nasdaq Vice Chairman David Weild.

> Clients were telling their brokers they had not received confirmation of orders - which normally come through in seconds.

> ***"Multiple market makers called Nasdaq and asked them to halt the stock and said, 'You have a problem and it's getting worse,' and their response was, 'The stock is trading normally,'" said an executive at one market-maker.***

> \*          \*          \*

> For market-makers, the chaos was particularly problematic because they didn't know what they and their clients owned, and at what price.

> ***"Should I be selling stock, should I be buying? And what's my price point?" said another official at a market-making firm.***

103

> *"You just don't know, so you were in effect flying blind until 2 o'clock."*

291.     Given NASDAQ's blatant wrongdoing, including making material false and misleading statements and omissions of material fact concerning the purported reliability and capability of its trading platforms and technology and failing to properly process trading in connection with Facebook's IPO, on June 11, 2012, *The Wall Street Journal* reported that Greifeld had initially pledged more than $40 million "to compensate investors for losses on the bungled IPO."

292.     The June 11, 2012 *Wall Street Journal* article also noted that the SEC has undertaking an investigation into the breakdown of NASDAQ's technology to determine when and what people knew about these problems:

> The SEC is scrutinizing the glitches as part of an inquiry that includes determining whether financial forecasts and other data Facebook gave to bankers were properly reflected in what bankers told their clients ahead of the $16 billion stock sale, according to people familiar with the matter.
>
> *As for the trading snarls, these people say, SEC officials want to know whether anyone at Nasdaq withheld any information about computer-system problems that might have led officials of the exchange, underwriters or Facebook to postpone trading beyond the 30-minute delay. The agency also is looking into whether Facebook investors were told enough by Nasdaq amid the problems to make informed buy and sell decisions.*
>
> "Every minute of that morning will be dissected" by regulators, said one person close to the SEC's inquiry. Officials plan to sift through calls and emails among Mr. Greifeld and other Nasdaq executives.
>
> *More broadly, some SEC officials have questioned privately whether the breakdown is tied to the transformation of U.S. exchanges over the past decade into profit-focused publicly traded companies from private, member-owned organizations.*

104

293.    Similarly, on June 21, 2012, *The New York Times* noted that the SEC is

"***examining whether NASDAQ failed to properly test its trading systems, which broke down***

***during the I.P.O.***, and whether the exchange violated rules when it rewrote computer code to

jump-start trading." *The New York Times* article further states:

> Nasdaq's lack of communication — and at times, lack of contrition
> — aggravated the situation, according to documents and
> executives, bankers and regulators. On a May 31 call with the
> chairwoman of the S.E.C., Mary L. Schapiro, and other officials,
> Nasdaq's chief executive expressed confusion about the S.E.C.'s
> aggressive approach.
>
> *          *          *
>
> The S.E.C. is examining why Nasdaq lacked an action plan for
> navigating such a crisis, including plans to abort the I.P.O., and
> whether it failed to follow federal guidelines in running system
> tests. . . .
>
> Ultimately, Nasdaq overrode the system manually, switching to a
> backup server. That move, too, has drawn scrutiny. Exchanges
> must follow their own strict trading procedures. In this case,
> Nasdaq changed its procedure on the fly without amending its
> rules.

294.    Not only are the SEC and the U.S. Senate conducting investigations into

NASDAQ's woeful handling of Facebook's IPO, but Facebook itself has blamed NASDAQ for

its trading problems, which caused Facebook's stock price to plummet after the Offering. On

June 14, 2012, Facebook filed a motion with the United States Judicial Panel on Multidistrict

Litigation, seeking to transfer and consolidate all lawsuits against Facebook, certain underwriters

and NASDAQ to the United States District Court for the Southern District of New York arising

out of the Offering. In its motion papers, Facebook blamed NASDAQ for its trading problems,

noting that trading was delayed "as a result of problems with Nasdaq's software systems, which

impaired the orderly executions of trades and price levels." Citing several media reports, the

105

motion goes on to say that these disruptions created a chaotic environment that prompted many investors to sell.

295.    On June 25, 2012, *The Wall Street Journal* reported that, given Defendants' admitted failure to ensure that NASDAQ's systems could properly process orders in connection with Facebook's IPO, Defendant Greifeld finally admitted that "'***arrogance***' and '***overconfidence***' among Nasdaq staffers contributed to problems with Facebook Inc.'s initial public offering last month. . . . *Nasdaq was unprepared for increasing numbers of canceled orders in the hours leading up to Facebook's debut*." The article further quotes Defendant Greifeld's concession that NASDAQ's inadequate testing before Facebook's IPO "***didn't account for the increasing volume at which cancellations can come in***." Moreover, Defendant Greifeld admitted that NASDAQ "***had a poor design for the Facebook opening cross IPO***" and that "*[w]e did not have enough business judgment in the process*."

296.    On July 21, 2012, weeks after NASDAQ admitted fault for the botched Facebook IPO, *The Wall Street Journal* reported that NASDAQ planned to increase compensation to investors who lost money due to its misconduct by now setting aside $62 million. The article noted that NASDAQ will use this money, in part, "to contain the reputational damage from the Facebook snafu." The article quoted Greifeld who admitted that "[w]e failed to meet our own high standards. . . . We have learned from this experience and we will continue to improve our trading platforms." The article also noted that NASDAQ "hired International Business Machines Corp. (IBM) to review its trading systems . . . ."

297.    On April 11, 2013, NASDAQ filed its Proxy Statement where it stated, among other things, that NASDAQ cut Defendant Greifeld's bonus pay by 62% in 2012, from $3.59 million in 2011 to $1.35 million in 2012, due to the botched Facebook IPO. Additionally, the

Proxy Statement also stated that NASDAQ cut Defendant Ewing's bonus pay by 53% in 2012, from $1.21 million in 2011 $574,125 in 2012. The Proxy Statement stated that the "committee and board explicitly considered the Facebook IPO in connection with their review and determination of these reduced payouts."

298.    On April 24, 2013, NASDAQ filed a Form 8-K with the SEC disclosing that it had set aside $10 million to resolve the unprecedented penalties it expects to pay once the SEC's Division of Enforcement – tasked with investigating possible violations of federal securities laws – completes its investigation into NASDAQ's handling of the Facebook IPO. In connection with this disclosure, *The Wall Street Journal* reported on the same day that a $10 million fine would constitute the largest regulatory penalty ever levied against a national exchange in American history.

### B.    NASDAQ's Accommodation Proposal

299.    On July 23, 2012, ***after Plaintiffs initiated this litigation,*** NASDAQ submitted its Accommodation Proposal to the SEC seeking to amend its Rule 4246 to allow NASDAQ to pay $62 million to its member firms for the damages its system failures caused in connection with Facebook's IPO. As detailed below, NASDAQ incorrectly assumes its system failures caused damages to only a restricted group of investors and, accordingly, NASDAQ has limited the types of orders for which it will provide "accommodation payments." Moreover, NASDAQ has set a "benchmark" price limiting payments for certain types of orders. Given market participants' assertions that NASDAQ's members and their customers did not come to know of their true positions in Facebook stock until well-after the close of trading on May 18, 2012, this benchmark price significantly underestimates the actual losses suffered by Class Members.

300.    In its Proposal, NASDAQ limits accommodation payments for pre-market Cross orders to the following four categories of orders:

- SELL Cross orders that were submitted between 11:11 a.m. and 11:30 a.m. on May 18, 2012, that were priced at $42.00 or less, and that did not execute;

- SELL Cross orders that were submitted between 11:11 a.m. and 11:30 a.m. on May 18, 2012, that were priced at $42.00 or less, and that executed at a price below $42.00;

- BUY Cross orders priced at exactly $42.00 and that were executed in the Cross but not immediately confirmed; and

- BUY Cross orders priced above $42.00 and that were executed in the Cross but not immediately confirmed, but only to the extent entered with respect to a customer that was permitted by the member to cancel its order prior to 1:50 p.m. and for which a request to cancel the order was submitted to NASDAQ by the member, also prior to 1:50 p.m.

301.    Despite NASDAQ's hope that the Accommodation Proposal would provide sufficient damage control and hide NASDAQ's wrongdoing in connection with the Facebook IPO, it is clear that the Proposal is wholly inadequate as it plainly fails to compensate investors for their true losses.  First, NASDAQ's categorization of orders it will consider for accommodation is woefully limited and does not account for the majority of damages NASDAQ caused Class Members during the Class Period.  To make matters worse, NASDAQ's fourth category of orders caps the accommodation payment to NASDAQ members at 70% of their losses (as discussed below, this percentage is based upon a set "benchmark" price of $40.527 limiting maximum losses to $1.473 per share).

302.    Second, NASDAQ further limits compensation by establishing a uniform benchmark price of $40.527 to determine members' maximum losses.  According to NASDAQ, this is the price "at which Nasdaq has concluded a reasonably diligent member could have obtained shares to mitigate any unexpected losses or to liquidate unanticipated positions coming out of the Cross."  NASDAQ calculated this price using the volume-weighted average price ("VWAP") of Facebook stock during the first 45 minutes of trading after execution reports were

108

delivered to firms (*i.e.*, 1:50 p.m. to 2:35 p.m.). Using $40.527 as the uniform benchmark price, the maximum loss an investor can obtain accommodation for is $1.473 per share per order.

303.    NASDAQ's assertion that its members and their customers should have known their positions in Facebook no later than 45 minutes after NASDAQ disseminated confirmations to market participants at 1:50 p.m. is dubious at best. As detailed below, based upon NASDAQ's members' own statements commenting on the Proposal, it is grossly unreasonable for NASDAQ to assume that 45 minutes after it allegedly disseminated confirmations at 1:50 p.m. was enough time for its members (let alone *retail* investors) to (i) identify their positions in Facebook stock and (ii) take necessary steps to mitigate the losses caused by NASDAQ's systems failures.

304.    Finally, NASDAQ's Accommodation Proposal does not address losses that NASDAQ's system failures caused investors in aftermarket trading, such as those raised by market participants (including NASDAQ's own members), in various media reports and Nanex. These additional problems resulted from, among other things, NASDAQ's frozen Bid/Ask quotations which caused Class Members to receive inferior prices for their Facebook buy and sell orders from approximately 11:30 a.m. to 1:50 p.m.

305.    While NASDAQ's Accommodation Proposal is "voluntary," all payments to members under the Proposal would be contingent upon the execution and delivery to NASDAQ of a release by the member *of all claims* by it or its affiliates against NASDAQ for losses that arise out of, are associated with, or relate in any way to the Facebook IPO. In other words, while the Accommodation Proposal is designed only to provide payment for a narrow class of claims arising out of the Facebook IPO Cross (and such payments are unilaterally capped by

109

NASDAQ), any member who chooses to participate in the Proposal is mandated to release *all of its claims* against NASDAQ in connection with the IPO.

306.    Given the myriad of deficiencies in NASDAQ's Accommodation Proposal, many market participants, including some of NASDAQ's largest and most influential members, harshly criticized NASDAQ for its Proposal as a flimsy attempt to avoid liability and to pay only a fraction of the actual losses NASDAQ caused to Class Members.

## C.    Class Members' Adverse Reaction To NASDAQ's Accommodation Proposal

307.    In connection with NASDAQ's Proposal, the SEC sought comment from broker-dealers, market makers, and other investors. The SEC received a total of seventeen comment letters on the Accommodation Proposal between August and November 2012. Out of the seventeen letters, fourteen parties raised serious concerns with respect to the Proposal, while only two parties expressed their support for the Proposal and one party addressed the issue of exchange liability more broadly.

308.    Generally, the parties raised concerns in the following areas:  (i) the requirement that market participants release all other potentially valid claims as a condition to participation in the accommodation program; (ii) NASDAQ's calculation and use of a benchmark price of $40.527; (iii) the categories of claim-eligible trading losses; (iv) the amount of the accommodation pool; (v) regulatory immunity from private suits and limitations on liability; (vi) the applicability of NASDAQ Rule 4626; (vii) the impact of approval of the accommodation proposal on pending litigation; and (viii) certain procedural issues.

309.    For example, on August 22, 2012, Citigroup Global Markets, Inc. and its affiliate Automated Trading Desk Financial Services, LLC (collectively, "Citi") submitted their response to the SEC, stating that NASDAQ's compensation proposal is "insufficient for a number of fact-based reasons," including that:  (i) "Nasdaq was grossly negligent in its handling of the Facebook

110

IPO, and as such, Citi should be entitled to recover all of its losses attributable to Nasdaq's gross

negligence, not just a very small fraction as is currently the case under the proposed SEC

Submission"; (ii) "the hundreds of millions of dollars of losses suffered by market participants in

connection with Facebook IPO resulted from a series of hasty, self-interested and high risk

***business*** decisions by Nasdaq, which did not take full account of the negative downstream

effects of those decisions"; and (iii) "[m]arket participants' losses resulted not from the type of

ordinary system failures contemplated by Rule 4626 (*i.e.*, its systems' failure to correctly process

acknowledged orders), but rather from a known design flaw that resulted in a similar technology

issue dating back to Fall 2011, as well as Nasdaq's high-risk, profit-oriented behavior prior to

and during the IPO which had the effect of obscuring participant's market position and otherwise

disrupting information flow in Facebook shares." (emphasis in original).

310.    Similar concerns were expressed by UBS Securities LLC ("UBS"), a registered

broker-dealer and investment advisor that utilizes NASDAQ as an essential part of its business.

In particular, UBS noted in letters dated August 22, 2012 and November 23, 2012 that

NASDAQ's "proposed amendments to Rule 4626 are grossly inadequate to address the harm

caused by its systematic failures and unprecedented actions during the [IPO]" as, among other

things:

> On the day of the Facebook IPO, unbeknownst to the market,
> Nasdaq's systems were incapable of completing the IPO cross.
> Rather than delay the opening of Facebook trading to resolve the
> problem, Nasdaq improvised and untested technological "solution"
> whereby it switched the Facebook IPO to a secondary system ***that
> had never been tested for use in the Facebook IPO***.  Among the
> problems caused by this last-minute and undisclosed change of
> plans was Nasdaq's failure to issue execution reports from the IPO
> Cross, leaving market participants in the dark for hours as to the
> fundamental fact of whether they had bought or sold Facebook
> stock. ***In fact, for the first nearly 30 minutes of trading, market
> participants were not even told that Nasdaq had taken the***

111

> **extraordinary step of commencing trading notwithstanding its
> inability to issue the IPO Cross execution reports—something
> that was unprecedented in the history of the exchange.**

311.    Triad Securities Corp. ("Triad") an SEC registered broker-dealer and member of

NASDAQ and FINRA, submitted a letter to the SEC on August 20, 2012 "vigorously" objecting

to the proposed benchmark price of $40.527.  Triad noted that sixteen of its customers, all retail

investors, were not able to mitigate their position prior to Monday, May 21.  Among other things,

Triad stated:

> The establishment of a benchmark price based on the VWAP from
> 1:50 p.m. to 2:35 p.m. is unreasonable. . . . NASDAQ was issuing
> guidance up until 18:18:55 ET on 5/18/12 that customer orders
> may be filled at the opening price of $42.  A NASDAQ Market
> System Status Message issued at 16:23:51 ET on 5/18/12 stated, in
> part, that NASDAQ's "intention is to reach resolution of those
> trades today through an offline matching process."  This message
> merely confirmed the guidance Triad had been receiving all
> afternoon in response to our inquiries as to the status of unfilled
> Crossing orders.  At 18:18:55 ET the Market System Status
> Message was updated to say that "the offline matching process for
> orders entered in FB between 11:11 and 11:30 AM resulted in
> nothing done."  On Monday 5/21/12, it was apparent that customer
> orders were not going to be filled by NASDAQ at the price of $42.
> . . . Accordingly, it was not until Monday, May 21, 2012, that
> NASDAQ made clear that it would not honor its obligations in the
> Cross.  Triad reacted by taking immediate action to mitigate
> damages and liquidated its customers' positions by 10 am on
> Monday, May 21, 2012, at prices ranging from $36.75 to $34.00.

312.    Vandham Securities Corp. ("Vandham") similarly objected to the benchmark

price of $42.527 in its August 21, 2012 letter to the SEC and stated that no "reasonable market

practitioner" would have sold their shares between 1:50 p.m. and 2:35 p.m. because NASDAQ

indicated to the market that there would be a supplemental cross after the market closed.

Accordingly, it was "[o]nly once the message came back from NASDAQ, that the 'offline

message process' 'resulted in nothing done,' could a reasonable diligent member be expected to

112

mitigate their losses, hence why the calculation of loss should have begun with trading on Monday, May 21, 2012."

313.    Although NASDAQ acknowledged that it commenced the Offering and allowed trading to continue despite experiencing "***unprecedented difficulties***" with its systems, and that its actions "***caused objective, discernible harm***" to market participants, the SEC approved the Accommodation Proposal on March 22, 2013.  The SEC recognized, however, that the Accommodation Proposal "would not compensate all claims of loss suffered by market participants relating to Nasdaq's system difficulties with the Cross."  In approving the Accommodation Proposal, the SEC stated that "the Commission is not reaching any conclusion on the overall adequacy of the amount of the compensation pool, the benchmark price used, or other limitations on eligibility."  The SEC also critically emphasized that it was "not making any determinations regarding the accuracy of the facts as represented by NASDAQ" and was not determining whether "regulatory immunity should apply to Nasdaq in connection with its actions related to the Facebook IPO" or "whether Nasdaq or any other person may have violated the federal securities laws or any other laws" in connection with the Facebook IPO.

## X.    CLASS ACTION ALLEGATIONS

### A.    Securities Plaintiffs Class Action Allegations

314.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) on behalf of themselves and all other persons and entities that entered pre-market and aftermarket orders to purchase and/or sell the common stock of Facebook on May 18, 2012 in connection with Facebook's IPO, and who suffered monetary losses as a result of Defendants' alleged wrongdoing as detailed herein.

315.    The members of the Securities Class are so numerous that joinder of all members is impracticable.  According to *CNN*, approximately 567 million shares of Facebook common

113

stock were traded on the day of its IPO, including more than 75 million shares that traded in the Cross. Upon information and belief, there are thousands of Class Members.

316.    Plaintiffs will fairly and adequately represent and protect the interests of the members of the Securities Class. Plaintiffs have retained competent counsel experienced in class action and securities litigation.

317.    Plaintiffs' claims are typical of the claims of the other members of the Securities Class and Plaintiffs do not have any interests antagonistic to, or in conflict with, the Securities Class.

318.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the damages suffered by individual Class Members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class Members to seek redress for NASDAQ's wrongful conduct absent a class action. Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

319.    Common questions of law and fact exist as to all members of the Securities Class and predominate over any questions affecting solely individual members of the Securities Class. Among the questions of law and fact common to the Securities Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by NASDAQ to the investing public before and during the Class Period misrepresented and/or omitted material facts and whether NASDAQ had a duty to correct and/or update such statements;

114

(c)      whether NASDAQ omitted material facts concerning its technology

and trading platforms, including its IPO Cross system, during the Class Period; and

(d)      whether the Class Members have sustained damages as a proximate result

of NASDAQ's alleged wrongdoing and, if so, the proper measure of such damages.

**B.      Negligence Plaintiffs Class Action Allegations**

320.      The Negligence Plaintiffs bring this class action under rules 23(a) and 23(b)(3) of

the Federal Rules of Civil Procedure, on behalf of a class and three subclasses (collectively,

"Classes"), defined as follows:

(1) a class of all individuals or entities who made retail purchases of Facebook

stock on May 18, 2012, whose retail orders to buy, sell or cancel were not promptly, timely,

correctly and efficiently processed; who did not receive execution at accurate and fair prices;

whose trades and cancellations were not promptly and accurately confirmed; or who otherwise

suffered losses on their purchases or sales of Facebook shares as a proximate result of the events

described herein (*i.e.*, the Negligence Class);

(2) a subclass of persons or entities who placed, directly with NASDAQ or

through a broker, dealer, agent or other intermediary, orders to purchase Facebook stock in the

pre-opening Cross on May 18, 2012, which orders were priced at $42 per share or higher, whose

purchases orders were executed at $42 per share but were not promptly and accurately confirmed

by NASDAQ, and who suffered losses as a result (the "Cross Buyer Confirmation Class");

(3) a subclass of persons  or entities who placed, directly with NASDAQ or

through a broker, dealer, agent or other intermediary, orders to sell Facebook stock in the pre-

opening Cross on May 18, 2012 priced at $42 per share or less, whose orders were eligible for

execution at $42 per share but were not executed by NASDAQ at all, or were executed only after

115

the opening of trading at inferior prices, and who suffered losses as a result (the "Cross Seller Execution Class"); and

(4) a subclass of individuals or entities who traded, directly with NASDAQ or through a broker, dealer, agent or other intermediary, in the aftermarket for Facebook stock on NASDAQ on May 18, 2012, who received inferior prices for their trades because NASDAQ's Bid/Offer quotations became "stuck" and did not properly update, and who suffered losses as a result (the "Market Trading Class").

321.    The Classes are so numerous that joinder of all class members is impracticable. Reports indicate that NASDAQ's negligence affected many millions of Facebook shares. Some 75 million shares were traded in the Cross and some 600 million shares traded on May 18. Upon information and belief, there are thousands of class members.

322.    There are questions of law and fact common to all members of the Classes that predominate over any questions affecting individual members, which include:

(a)    whether the negligence alleged in this Complaint adversely affected and damaged the Plaintiffs and the members of the Classes;

(b)    whether Defendants owed duties to Plaintiffs and members of the Classes to exercise reasonable care in the handling of the Facebook IPO and the trading in Facebook shares;

(c)    whether Defendants were negligent in failing to fulfill their duties to the Plaintiffs and members of the Classes; and

(d)    whether, as a proximate result of Defendants' negligence, Plaintiffs and members of the Classes were damaged and are entitled to relief, and the amount and nature of such relief.

116

323.    Plaintiffs' claims are typical of the claims of the Classes.  Plaintiffs have no interests antagonistic to those of the Classes, and Defendants have no defenses unique to Plaintiffs.

324.    Plaintiffs will fairly and adequately assert and protect the interests of the Classes, and have retained attorneys experienced in class and complex litigation.

325.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy for the following reasons:

      (a)    the Classes are readily definable;

      (b)    it is economically impracticable for members of the Classes to prosecute individual actions, because the amount which may be recovered by each individual class member would be insufficient to support separate actions;

      (c)    the aggregate amount which may be recovered by individual members of the Classes will be large enough in relation to the expense and effort in administering the action to justify a class action;

      (d)    Plaintiffs are seeking relief with respect to the Classes as a whole; and

      (e)    prosecution as a class action will eliminate the possibility of repetitious and possibly contradictory litigation.

326.    This class action presents no difficulties in management that would preclude maintenance as a class action. The Classes are readily definable and is one for which records of class members exist in Defendants' records and in the records of third parties.

117

## XI.    CAUSES OF ACTION

### COUNT I:

#### Violation Of § 10(b) Of The Exchange Act And Rule 10b-5
#### Promulgated Thereunder Against NASDAQ OMX Group, Inc., Greifeld and Ewing
#### (On behalf of the Securities Class)

327.    Plaintiffs incorporate by reference and reallege ¶¶ 1-31, 41-248, and 289-319 as
fully set forth herein.

328.    This Count is brought by Plaintiffs collectively and on behalf of the proposed
Securities Class under Section 10(b) of the Exchange Act and SEC Rule 10b-5 against
Defendants NASDAQ, Greifeld and Ewing.

329.    During the Class Period, Defendants NASDAQ, Greifeld and Ewing carried out a
plan, scheme, and course of conduct which was intended to and, throughout the Class Period,
did:  (i) deceive the investing public, including Plaintiffs and other Class Members, as alleged
herein; and (ii) cause Plaintiffs and other members of the Securities Class to purchase and/or sell
Facebook common stock without any knowledge of NASDAQ's technical and software-related
problems, including its IPO Cross system failures, in executing pre-market and aftermarket trade
orders and in delivering confirmations to Class Members for their pre-market Cross orders in
Facebook stock.  In furtherance of this unlawful scheme, plan, and course of conduct,
Defendants NASDAQ, Greifeld and Ewing took the actions set forth herein.

330.    During the Class Period, Defendants NASDAQ, Greifeld and Ewing:  (i)
employed devices, schemes, and artifices to defraud; (ii) omitted material facts necessary to
make the statements made, in light of the circumstances under which they were made, not
misleading; and/or (iii) engaged in acts, practices, and a course of business which operated as a
fraud and deceit upon Class Members in violation of Section 10(b) of the Exchange Act and Rule
10b-5 promulgated thereunder.

118

331.    Defendants NASDAQ, Greifeld and Ewing are sued as primary participants in the wrongful conduct alleged herein.

332.    Defendants NASDAQ, Greifeld and Ewing, individually and in concert, directly and indirectly, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, made affirmative statements and untrue statements of material fact and/or omitted material facts necessary to make the statements made, in light of the circumstances in which they were made, not misleading, and/or substantially participated in the creation of the alleged misrepresentations, which operated as a fraud and deceit upon Class Members, including the Securities Class, in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

333.    Specifically, Defendants NASDAQ, Greifeld and Ewing made material false and misleading statements and omissions of material fact and failed to update and/or correct prior statements concerning the purported reliability, speed, and capability of NASDAQ's technology and trading platforms in the weeks leading up to Facebook's IPO and during the Class Period, despite knowing that NASDAQ's systems would likely be unable to properly facilitate the record-breaking IPO trading volume in connection with Facebook's Offering. NASDAQ also omitted to state material facts necessary to make statements made not misleading in connection with NASDAQ's technology and trading platforms, including its IPO Cross system, during the Class Period in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5. In this regard, NASDAQ knowingly or recklessly failed to disclose to Plaintiffs and other Class Members that NASDAQ was experiencing significant technical and software-related problems in connection with Facebook's IPO, as alleged more fully above. By relying, directly or indirectly, on the absence of material adverse information omitted by NASDAQ, Plaintiffs and other Class

119

Members purchased Facebook common stock during the Class Period and were damaged thereby due to NASDAQ's material omissions.

334.   In addition to the duties of full disclosure imposed on Defendants NASDAQ, Greifeld and Ewing as a result of them making affirmative statements and reports, or participating in the making of affirmative statements and reports to the investing public, Defendants NASDAQ, Greifeld and Ewing had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including accurate and truthful information with respect to NASDAQ's operations, technologies and trading platforms.

335.   Defendants NASDAQ, Greifeld and Ewing were privy to and participated in the creation, development, and issuance of the materially false and misleading statements alleged herein, and/or were aware of the dissemination of information to the investing public they either knew or recklessly disregarded was materially false and misleading.

336.   Defendants NASDAQ, Greifeld and Ewing acted with scienter in that they had actual knowledge of the material misstatements and omissions of material fact set forth herein, and/or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such material misstatements and omissions were done knowingly and/or recklessly and for the purpose and effect of, among other things, concealing NASDAQ's technical and software-related problems, including its IPO Cross system failures, to push forward the largest IPO in the history of the exchange.  As demonstrated by the material omissions throughout the Class Period, Defendants NASDAQ, Greifeld and Ewing, if they did not have actual knowledge of the material omissions alleged, were reckless in

120

failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether the statements made omitted material facts.

337.    At the time of the material misrepresentations and omissions alleged herein, Plaintiffs and other Class Members were ignorant of their falsity and believed then to be true. Moreover, Plaintiffs and other Class Members were not aware, and could not have been aware, of the facts available to NASDAQ.  Had Plaintiffs and other Class Members known the truth concerning NASDAQ's technical and software-related problems, including the substantial IPO Cross system failures, they would not have placed orders to buy and/or sell Facebook common stock with NASDAQ during the Class Period, or if they had place orders to buy and/or sell Facebook common stock, would not have done so at the same prices for such orders.

338.    By reason of the foregoing, and as a direct and proximate result of the wrongful conduct of Defendants NASDAQ, Greifeld and Ewing, Plaintiffs and Class Members suffered damages in connection with their purchases and sales of Facebook common stock during the Class Period.

## COUNT II:

### Violation Of § 20(a) Of The Exchange Act
### Against Defendants Greifeld and Ewing
### (On behalf of the Securities Class)

339.    Plaintiffs repeat and reallege ¶¶ 1-31, 41-248, and 289-319 as if fully set forth herein.  This Claim is asserted against Defendants Greifeld and Ewing.

340.    During the Relevant Period, Defendants Greifeld and Ewing were senior executive officers and/or directors of NASDAQ and, consistent with their day-to-day control of NASDAQ, were privy to confidential and proprietary information concerning NASDAQ and its business, operations, technology, performance, and prospects, including its compliance with applicable federal, state, and local laws and regulations.

121

341.    Because of their high-level positions and day-to-day management of NASDAQ, Defendants Greifeld and Ewing had regular access to non-public information about its business, operations, technology, performance, and prospects through access to internal corporate documents and information, conversations and connections with other corporate officers and employees, attendance at management meetings and the company's Board of Directors, and committees thereof, and reports and other information provided to them in connection therewith.

342.    Defendants Greifeld and Ewing each acted as a controlling person of NASDAQ within the meaning of Section 20(a) of the Exchange Act, as alleged herein. By virtue of their high-level positions, participation in and/or awareness of the NASDAQ's operations, and/or intimate knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, Defendants Greifeld and Ewing had the power to influence and control and did influence and control, directly or indirectly, the decision-making of NASDAQ, including the content and dissemination of the various statements Plaintiffs allege were materially false and misleading.

343.    Defendants Greifeld and Ewing were provided with, or had unlimited access to, copies of NASDAQ's reports, press releases, public filings and other statements alleged by Plaintiffs to have been misleading prior to and/or shortly after those statements were issued, and had the ability to prevent the issuance of the statements or to cause the statements to be corrected. Accordingly, Defendants Greifeld and Ewing were culpable participants in NASDAQ's violations of Section 10(b) and Rule 10b-5.

344.    Defendants Greifeld and Ewing had direct and supervisory involvement in the day-to-day operations of NASDAQ, especially in the context of obtaining and then preparing for Facebook's IPO, and, therefore had, or are presumed to have had, the power to control or

122

influence the particular transactions and/or statements giving rise to Plaintiffs' claims under

Section 10(b) and Rule 10b-5 of the Exchange Act alleged herein, and exercised the same.

Defendants Greifeld and Ewing had actual knowledge that NASDAQ was disseminating false

and misleading statements or omitting material facts in connection with NASDAQ technology

and trading platforms, including its IPO Cross system, used for the Facebook IPO or recklessly

disregarded the same, and were culpable participants in these violations of Section 10(b) and

Rule 10b-5.

## COUNT III:

### Ordinary Negligence Against Defendants NASDAQ and NASDAQ LLC
### (On behalf of the Negligence Class)

345.     Plaintiffs incorporate by reference only sections I, II, III (except ¶¶ 57-59), IV, V,

VI, VIII, IX(A) (except ¶¶ 292-294), IX(B), IX(C), and X(B) as fully set forth herein.  For

purposes of this claim, Plaintiffs explicitly disclaim any allegations of fraud in this Complaint.

346.     Defendants NASDAQ and NASDAQ LLC owed Negligence Plaintiffs and the

Negligence Class the duty of reasonable care, which they breached.  By operating a stock

exchange on or through which a public securities trading market is maintained, Defendants

NASDAQ and defendant NASDAQ LLC owe the highest duties of reasonable care.

347.     Defendants NASDAQ and NASDAQ LLC were negligent in performing these

duties, rendering them liable and/or strictly liable.

348.     NASDAQ failed to use reasonable care in the design, testing, and implementation

of NASDAQ's primary and back-up Cross systems.

349.     There is a strong public interest in these Defendants' proper and non-negligent

performance of their duties.

123

350.    Because of these Defendants' breach of their legal duties, Plaintiffs and the Class suffered damages as described herein.

351.    The damages suffered by Plaintiffs and the Classes were all general and special damages arising from the natural and foreseeable consequences of Defendants NASDAQ's and NASDAQ LLC's conduct.

352.    New York law applies to the nationwide class alleged herein. In the alternative, the laws of the individual class members' states of residence apply to their claims.

### COUNT IV:

### Negligence:    Res Ipsa Loquitur Against NASDAQ and NASDAQ LLC
### (On behalf of the Negligence Class)

353.    Plaintiffs incorporate by reference only sections I, II, III (except ¶¶ 57-59), IV, V, VI, VIII, IX(A) (except ¶¶ 292-294), IX(B), IX(C), and X(B) as fully set forth herein. For purposes of this claim, Plaintiffs explicitly disclaim any allegations of fraud in this Complaint.

354.    Defendants NASDAQ and NASDAQ LLC owed Negligence Plaintiffs and the Negligence Class the duty of reasonable care, which they breached. By operating a stock exchange on or through which a public securities trading market is maintained, Defendants NASDAQ and NASDAQ LLC owe the highest duties of reasonable care.

355.    As set forth in the preceding Count, Defendants NASDAQ and NASDAQ LLC were negligent in performing these duties, rendering them liable and/or strictly liable.

356.    The breaches of duty that damaged Plaintiffs and the Classes would not have occurred but for these Defendants' negligence.

357.    The trading systems that caused these events were within Defendants NASDAQ's and NASDAQ LLC's exclusive custody and control.

358.    Plaintiffs did not voluntarily contribute to these events.

124

359.     Because of Defendants NASDAQ's and NASDAQ LLC's breach of their duties,

Plaintiffs and the Negligence Class suffered damages as described herein.

360.     The damages suffered by Plaintiffs and the Negligence Class were all general and

special damages arising from the natural and foreseeable consequences of Defendants

NASDAQ's and NASDAQ LLC's conduct.

## COUNT V:

### Ordinary Negligence Against Defendants NASDAQ and NASDAQ LLC
### (On behalf of the Cross Buyer Confirmation Class)

360.     Plaintiffs incorporate by reference only sections I, II, III (except ¶¶ 57-59), IV, V,

VI, VIII, IX(A) (except ¶¶ 292-294), IX(B), IX(C), and X(B) as fully set forth herein.  For

purposes of this claim, Plaintiffs explicitly disclaim any allegations of fraud in this Complaint.

361.     Defendants NASDAQ and NASDAQ LLC owed Negligence Plaintiffs and the

Cross Buyer Confirmation Class the duty of reasonable care, which they breached.  By operating

a stock exchange on or through which a public securities trading market is maintained,

Defendants NASDAQ and defendant NASDAQ LLC owe the highest duties of reasonable care.

These duties include the separate duty to exercise reasonable care to accurately and promptly

send out trade confirmations.

362.     Defendants NASDAQ and NASDAQ LLC were negligent in performing these

duties, rendering them liable and/or strictly liable.

363.     As set forth in ¶¶ 151-159, *supra*, NASDAQ failed to use reasonable care in the

design, testing, and implementation of NASDAQ's primary and back-up Cross systems in

connection with disseminating confirmations for those trades executed in the Cross and, as a

result, failed to timely confirm Facebook trades.

125

364. There is a strong public interest in these Defendants' proper and non-negligent performance of their duties.

365. Because of these Defendants' breach of their legal duties, Plaintiffs and the Class suffered damages as described herein in ¶¶ 262-265. Because of NASDAQ's negligence, Cross Buyer Confirmation Class members lacked the ability to make any informed decisions, or to take action to mitigate market losses in the face of a declining market price of Facebook stock.

366. The damages suffered by Plaintiffs and the Classes were all general and special damages arising from the natural and foreseeable consequences of Defendants NASDAQ's and NASDAQ LLC's conduct.

367. New York law applies to the nationwide class alleged herein. In the alternative, the laws of the individual class members' states of residence apply to their claims.

### COUNT VI:

### Negligence: Res Ipsa Loquitur Against NASDAQ and NASDAQ LLC
### (On behalf of the Cross Buyer Confirmation Class)

368. Plaintiffs incorporate by reference only sections I, II, III (except ¶¶ 57-59), IV, V, VI, VIII, IX(A) (except ¶¶ 292-294), IX(B), IX(C), and X(B) as fully set forth herein. For purposes of this claim, Plaintiffs explicitly disclaim any allegations of fraud in this Complaint.

369. Defendants NASDAQ and NASDAQ LLC owed Negligence Plaintiffs and the Cross Buyer Confirmation Class the duty of reasonable care, which they breached. By operating a stock exchange on or through which a public securities trading market is maintained, Defendants NASDAQ and NASDAQ LLC owe the highest duties of reasonable care. These duties include the separate duties to exercise reasonable care to accurately and promptly send out trade confirmations.

126

370.    As set forth in the preceding Count, Defendants NASDAQ and NASDAQ LLC

were negligent in performing these duties, rendering them liable and/or strictly liable.

371.    The breaches of duty that damaged Plaintiffs and the Classes would not have

occurred but for these Defendants' negligence.

372.    The trading systems that caused these events were within Defendants NASDAQ's

and NASDAQ LLC's exclusive custody and control.

373.    Plaintiffs did not voluntarily contribute to these events.

374.    Because of Defendants NASDAQ's and NASDAQ LLC's breach of their duties,

Plaintiffs and the Cross Buyer Confirmation Class suffered damages as described herein.

375.    The damages suffered by Plaintiffs and the Cross Buyer Confirmation Class were

all general and special damages arising from the natural and foreseeable consequences of

Defendants NASDAQ's and NASDAQ LLC's conduct.

## COUNT VII:

### Ordinary Negligence Against Defendants NASDAQ and NASDAQ LLC
### (On Behalf of the Cross Execution Class)

376.    Plaintiffs incorporate by reference only sections I, II, III (except ¶¶ 57-59), IV, V,

VI, VIII, IX(B), IX(A) (except ¶¶ 292-294), IX(C), and X(B) as fully set forth herein.  For

purposes of this claim, Plaintiffs explicitly disclaim any allegations of fraud in this Complaint.

377.    Defendants NASDAQ and NASDAQ LLC owed Negligence Plaintiffs and the

Cross Execution Class the duty of reasonable care, which they breached.  By operating a stock

exchange on or through which a public securities trading market is maintained, Defendants

NASDAQ and NASDAQ LLC owe the highest duties of reasonable care.  These duties include

the separate duty to exercise reasonable care to accurately and promptly execute trades.

127

378.    Defendants NASDAQ and NASDAQ LLC were negligent in performing these duties, rendering them liable and/or strictly liable.

379.    As set forth in ¶¶ 146-150, *supra*, NASDAQ failed to exercise reasonable care in the design and testing of its systems, resulting in NASDAQ's failure to account for orders entered into the Cross system between 11:11:00 a.m. and 11:30:09 a.m.

380.    There is a strong public interest in these Defendants' proper and non-negligent performance of their duties.

381.    Because of these Defendants' breach of their legal duties, Plaintiffs and the Cross Execution Class suffered damages as described herein in ¶¶ 266-269. Because of NASDAQ's negligence, Cross Execution Class Members were damaged in a variety of ways. *See* ¶ 267 (noting "investors placing sell orders priced less than $42 that failed to execute in the Cross were damaged by their inability to realize $42 per share for their trades in the Cross in light of the fact that the market price of Facebook declined thereafter"); ¶ 268 (noting "investors placing sell orders priced at less than $42 that failed to execute in the Cross, but instead entered the market at either 11:30:09 a.m. or 1:50 p.m., suffered losses when their shares sold not at the $42 price in the Cross, but at some inferior price.")

382.    The damages suffered by Plaintiffs and the Cross Confirmation Class were all general and special damages arising from the natural and foreseeable consequences of Defendants NASDAQ's and NASDAQ LLC's conduct.

383.    New York law applies to the nationwide class alleged herein. In the alternative, the laws of the individual class members' states of residence apply to their claims.

128

## COUNT VIII:

### Negligence:  Res Ipsa Loquitur Against NASDAQ and NASDAQ LLC
### (On Behalf of the Cross Execution Class)

384.    Plaintiffs incorporate by reference only sections I, II, III (except ¶¶ 57-59), IV, V, VI, VIII, IX(A) (except ¶¶ 292-294), IX(B), IX(C), and X(B) as fully set forth herein.  For purposes of this claim, Plaintiffs explicitly disclaim any allegations of fraud in this Complaint.

385.    Defendants NASDAQ and NASDAQ LLC owed Negligence Plaintiffs and the Cross Execution Class the duty of reasonable care, which they breached.  By operating a stock exchange on or through which a public securities trading market is maintained, Defendants NASDAQ and NASDAQ LLC owe the highest duties of reasonable care.  These duties include the separate duty to exercise reasonable care to accurately and promptly execute trades.

386.    As set forth in the preceding Count, Defendants NASDAQ and NASDAQ LLC were negligent in performing these duties, rendering them liable and/or strictly liable.

387.    The breaches of duty that damaged Plaintiffs and the Cross Execution Class would not have occurred but for these Defendants' negligence.

388.    The trading systems that caused these events were within Defendants NASDAQ's and NASDAQ LLC's exclusive custody and control.

389.    Plaintiffs did not voluntarily contribute to these events.

390.    Because of Defendants NASDAQ's and NASDAQ LLC's breach of their duties, Plaintiffs and the Cross Execution Class suffered damages as described herein.

391.    The damages suffered by Plaintiffs and the Cross Execution Class were all general and special damages arising from the natural and foreseeable consequences of these Defendants' conduct.

129

## COUNT IX:

### Ordinary Negligence Against Defendants NASDAQ and NASDAQ LLC
### (On Behalf of the Market Trading Class)

392.    Plaintiffs incorporate by reference only sections I, II, III (except ¶¶ 57-59), IV, V, VI, VIII, IX(B), IX(A) (except ¶¶ 292-294), IX(C), and X(B) as fully set forth herein.  For purposes of this claim, Plaintiffs explicitly disclaim any allegations of fraud in this Complaint.

393.    Defendants NASDAQ and NASDAQ LLC owed Negligence Plaintiffs and the Market Trading Class the duty of reasonable care, which they breached.  By operating a stock exchange on or through which a public securities trading market is maintained, Defendants NASDAQ and NASDAQ LLC owe the highest duties of reasonable care.  These duties include the separate duty to promptly and accurately provide bid and ask quotations and execute trades at the best prices reasonably available in the market place.

394.    Defendants NASDAQ and NASDAQ LLC were negligent in performing these duties, rendering them liable and/or strictly liable.

395.    As set forth in ¶¶ 160-167, *supra*, NASDAQ failed to exercise reasonable care in the design and testing of its systems, resulting in NASDAQ's Bid/Offer system's failure to function properly for an extended period of time after the Cross printed to the tape.

396.    There is a strong public interest in these Defendants' proper and non-negligent performance of their duties.

397.    Because of these Defendants' breach of their legal duties, Plaintiffs and the Market Trading Class suffered damages as described herein in ¶ 166.  Because of NASDAQ's negligence, Market Trading Class Members received inferior prices upon the execution of their trades during the time that the Bid/Ask quotes were "stuck" for Facebook's IPO.

130

398.    The damages suffered by Plaintiffs and the Classes were all general and special damages arising from the natural and foreseeable consequences of Defendants NASDAQ's and NASDAQ LLC's conduct.

399.    New York law applies to the nationwide class alleged herein. In the alternative, the laws of the individual class members' states of residence apply to their claims.

## COUNT X:

### Negligence: Res Ipsa Loquitur Against NASDAQ and NASDAQ LLC
### (On Behalf of the Market Trading Class)

400.    Plaintiffs incorporate by reference only sections I, II, III (except ¶¶ 57-59), IV, V, VI, VIII, IX(A) (except ¶¶ 292-294), IX(B), IX(C), and X(B) as fully set forth herein. For purposes of this claim, Plaintiffs explicitly disclaim any allegations of fraud in this Complaint.

401.    Defendants NASDAQ and NASDAQ LLC owed Negligence Plaintiffs and the Market Trading Class the duty of reasonable care, which they breached. By operating a stock exchange on or through which a public securities trading market is maintained, Defendants NASDAQ and NASDAQ LLC owe the highest duties of reasonable care. These duties include the separate duty to exercise reasonable care to accurately and promptly execute trades.

402.    As set forth in the preceding Count, these Defendants were negligent in performing these duties, rendering them liable and/or strictly liable.

403.    The breaches of duty that damaged Plaintiffs and the Market Trading Class would not have occurred but for these Defendants' negligence.

404.    The trading systems that caused these events were within Defendants NASDAQ's and NASDAQ LLC's exclusive custody and control.

405.    Plaintiffs did not voluntarily contribute to these events.

131

406.   Because of Defendants NASDAQ's and NASDAQ LLC's breaches of their duties, Plaintiffs and the Market Trading Class suffered damages as described herein.

407.   The damages suffered by Plaintiffs and the Market Trading Class were all general and special damages arising from the natural and foreseeable consequences of these Defendants' conduct.

## XII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others Class Members, pray for relief and judgment as follows:

(a)   Determining that this action is a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, and appointing Plaintiffs as Lead Plaintiffs and their counsel as Lead Counsel pursuant to Rule 23(g) of the Federal Rules of Civil Procedure;

(b)   Awarding compensatory damages in favor of Plaintiffs and the other Class Members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including interest thereon;

(c)   Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including a reasonable allowance of fees for Plaintiffs' attorneys and experts; and

(e)   Awarding Plaintiffs and the other Class Members such other and further relief as the Court may deem just and proper.

132

## VIII. JURY TRIAL DEMANDED

Plaintiff demands a jury trial on all issues so triable.

Dated: April 30, 2013      Respectfully Submitted,

Vincent R. Cappucci, Esq.
Robert N. Cappucci, Esq.
Jordan A. Cortez, Esq.
Evan T. Raciti, Esq.
Marc X. LoPresti, Esq. (Of Counsel)
**ENTWISTLE & CAPPUCCI LLP**
280 Park Avenue, 26th Floor West
New York, NY 10017
Telephone: (212) 894-7200
Facsimile: (212) 894-7272

*Lead Counsel for NASDAQ*
*Securities Actions*

*/s/ Douglas G. Thompson, Jr.*
Douglas G. Thompson, Jr., Esq.
Michael G. McLellan, Esq.
**FINKELSTEIN THOMPSON LLP**
1077 30th Street, Suite 150
Washington, D.C. 20007
Telephone: (202) 337-8000
Facsimile: (202) 337-8090

*/s/ Christopher Lovell*
Christopher Lovell, Esq.
Victor E. Stewart, Esq.
**LOVELL STEWART HALEBIAN**
**JACOBSON LLP**
61 Broadway, Suite 501
New York, NY 10006
Telephone: (212) 608-1900
Facsimile: (212) 719-4677

*Co-Lead Counsel for NASDAQ Negligence*
*Actions*

133

EC.50820.12

Jacob H. Zamansky, Esq.
Edward H. Glenn, Jr., Esq.
Kevin D. Galbraith, Esq.
**ZAMANSKY & ASSOCIATES LLC**
50 Broadway, 32nd Floor
New York, New York 10004
Telephone: (212) 742-1414
Facsimile: (212) 742-1177

Kevin I. Goldberg, Esq.
**GOLDBERG, FINNEGAN & MESTER,
LLC**
1010 Wayne Avenue, Suite 950
Silver Spring, Maryland 20910
Telephone: (301) 589-2999
Facsimile: (301) 589-2644

Marvin A. Miller, Esq.
Andrew Szot, Esq.
**MILLER LAW LLC**
115 South LaSalle Street, Suite 2910
Chicago, Illinois 60603
Telephone: (312) 332-3400
Facsimile: (312) 676-2675

Vincent DiTommaso
**DITOMMASO LUBIN**
17W 220 22nd Street, Suite 410
Oakbrook Terrace, Illinois 60181
Telephone: (630) 333-0000
Facsimile: (630) 333-0333

Thomas J. McKenna, Esq.
Gregory D. Egleston, Esq.
**GAINEY MCKENNA & EGLESTON**
440 Park Avenue South, 5th Floor
New York, New York 10016
Telephone: (212) 983-1300
Facsimile: (212) 983-0380

134

Richard J. Schager, Jr., Esq.
Andrew R. Goldenberg, Esq.
**STAMELL & SCHAGER, LLP**
One Liberty Plaza, 35/F
New York, New York 10006
Telephone: (212) 566-4054
Facsimile: (212) 566-4061

*Additional Counsel for NASDAQ Negligence Actions*

135