**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE FACEBOOK, INC., IPO SECURITIES
AND DERIVATIVE LITIGATION

MDL No. 12-2389 (RWS)

**ECF Case**

This document relates to the
Consolidated Securities Action:

| | |
|---|---|
| No. 12-cv-4081 | No. 12-cv-4763 |
| No. 12-cv-4099 | No. 12-cv-4777 |
| No. 12-cv-4131 | No. 12-cv-5511 |
| No. 12-cv-4150 | No. 12-cv-7542 |
| No. 12-cv-4157 | No. 12-cv-7543 |
| No. 12-cv-4184 | No. 12-cv-7544 |
| No. 12-cv-4194 | No. 12-cv-7545 |
| No. 12-cv-4215 | No. 12-cv-7546 |
| No. 12-cv-4252 | No. 12-cv-7547 |
| No. 12-cv-4291 | No. 12-cv-7548 |
| No. 12-cv-4312 | No. 12-cv-7550 |
| No. 12-cv-4332 | No. 12-cv-7551 |
| No. 12-cv-4360 | No. 12-cv-7552 |
| No. 12-cv-4362 | No. 12-cv-7586 |
| No. 12-cv-4551 | No. 12-cv-7587 |
| No. 12-cv-4648 | |

**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...............................................................................................iv

PRELIMINARY STATEMENT ......................................................................................1

    A.    Summary of the Facts Giving Rise to the Securities Law Violations .........................1

    B.    Summary of the Argument ...............................................................................3

    C.    Defendants' Reliance on the Decision In the Derivative Actions Is Misplaced ..........6

BACKGROUND ...........................................................................................................7

    A.    The Registration Statement Established the Importance of Facebook's Ability to Monetize Mobile Usage and Its Product Decisions .................................................7

    B.    Facebook Told the SEC that It Could Not Quantify the Impact of Increasing Mobile Usage on Its Revenues, and It Revised the Registration Statement Accordingly .................................................................................................9

    C.    As Facebook Prepared for Its Roadshow, the Company Continued to Emphasize Its Growth Prospects in the Mobile Market to Investors .........................11

    D.    As Facebook Began Its Roadshow, It Determined that Its Revenues for the Second Quarter and the Year Had Been Materially Impacted .................................12

    E.    Facebook Disclosed the Material Deterioration in Its Revenues to a Select Group of Investors, but Not to the Market ........................................................13

    F.    Facebook Enlarged and Executed the IPO Without Disclosing the Material Deterioration in Its Revenues to the Market .................................................16

    G.    Facebook's Market Debut Fizzled as Morgan Stanley Was Forced to Prop Up the Company's Stock Price to Prevent a "Broken Issue" .................................18

    H.    The Market Reacted Immediately When the Truth Was Revealed ...........................18

    I.    The Financial Media Confirmed that the Material Negative Impact of Increasing Mobile Usage on Facebook's Revenues Was Not Conveyed by the Company's Disclosures ................................................................................21

ARGUMENT ...............................................................................................................22

I.    Defendants Violated Sections 11 and 12 by Failing to Disclose Material Information in the Registration Statement .........................................................23

    A.    Item 303 Required Facebook to Disclose that Increasing Mobile Usage and the Company's Product Decisions Had Already Had a Material Negative Impact on Its Revenues ................................................................................24

B. Under Controlling Second Circuit Authority, Defendants' Mere Identification of a Trend Did Not Satisfy Their Obligations Under Item 303 ...................................28

C. The Complaint Does Not Assert a General Duty to Disclose Revenue Projections or Mid-Quarter Revenue Data........................................................................30

    1. *Litwin* and *Panther Partners* Establish that Under Item 303 Facebook Had a Duty to Disclose the Extent and Impact of the Trends at Issue on Its Future Revenues....................................................................................31

    2. Defendants' Assertion that There Is No General Duty to Disclose Mid-Quarter Revenue Data Is a Straw Man Argument ...............................32

D. Defendants' Assertions of "Industry Practice" Are Irrelevant and Wrong................35

E. This Court's Derivative Opinion Did Not Address Facebook's Duty to Disclose the Extent and Impact of the Trends Under Item 303 ................................36

II. The Registration Statement Contained Material Misrepresentations....................................37

A. Facebook's Registration Statement Made Material False Statements by Warning of a Potential Future Risk to Revenues When that Risk Had Already Materialized ................................................................................................37

B. Facebook's Registration Statement Did Not Disclose the Fact that Mobile Usage Had Already Had a Material Negative Impact on the Company's Revenues ...............................................................................................................39

    1. The Plain Language in the Registration Statement Shows that Facebook Did Not Disclose that Increasing Mobile Usage Had Already Had a Material Negative Impact on the Company's Revenues....................................41

    2. The Fact that Facebook Ultimately Reported Higher Revenues than Expected Does Not Convert Statements that Were False at the Time of the IPO into True Statements .....................................................................45

III. The Alleged Misstatements and Omissions Were Material ...............................................47

A. The Complaint Sets Forth At Least Ten Separate Reasons Demonstrating the Materiality of Defendants' False Statements and Omissions ......................................47

B. This Court's Derivative Opinion Does not Support Defendants' Argument that the Alleged Misstatements and Omissions Are Immaterial as a Matter of Law..........................................................................................................................52

C. Defendants Cannot Establish the Truth on the Market Defense ...............................54

D. Defendants' Remaining Materiality Arguments Fail ...............................................60

IV.    Rule 408 Required Facebook to Disclose that Increasing Mobile Usage and the Company's Product Decisions Had Negatively Impacted Its Revenues ............................ 60

V.    Defendants' Loss Causation Arguments Provide No Basis for Dismissal.......................... 61

CONCLUSION ............................................................................................................................... 65

## **TABLE OF AUTHORITIES**

### CASES

*AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*,
    626 F.3d 699 (2d Cir. 2010) ................................................................ 65

*Arfa v. Mecox Lane Ltd.*,
    No. 10 Civ. 9053, 2012 WL 697155 (S.D.N.Y. Mar. 5, 2012) ............ 52

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................ 22

*In re Bank of America Sec. Corp., Derivative & ERISA Litig.*,
    757 F. Supp. 2d 260 (S.D.N.Y. 2010) ................................................ 34

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988) ............................................................................ 47

*In re Bear Stearns Cos., Inc. Sec., Deriv. & ERISA Litig.*,
    763 F. Supp. 2d 423 (S.D.N.Y. 2011) ................................................ 39

*Blackmoss Investments Inc. v. ACA Capital Holdings, Inc.*,
    No. 07 Civ. 10528, 2010 WL 148617 (S.D.N.Y. Jan. 14, 2010) ......... 63

*In re Citigroup Inc. Bond Litig.*,
    723 F. Supp. 2d 568 (S.D.N.Y. 2010) ................................................ 62

*DeMaria v. Andersen*,
    318 F.3d 170 (2d Cir. 2003) .......................................................... 34, 35

*Dodona I, LLC v. Goldman, Sachs & Co.*,
    847 F. Supp. 2d 624 (S.D.N.Y. 2012) ................................................ 39

*Eckstein v. Balcor Film Investors*,
    8 F.3d 1121 (7th Cir. 1993) ................................................................ 39

*In re Facebook, Inc. IPO Sec. & Deriv. Litig.*,
    MDL No. 12-2389, 2013 WL 525158 (S.D.N.Y. Feb. 13, 2013) ......... 6

*Fait v. Regions Financial Corp.*,
    655 F.3d 105 (2d Cir. 2011) ................................................................ 45

*Feiner v. SS & C Techs.*,
    11 F. Supp. 2d 204 (D. Conn. 1998) .................................................. 46

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    574 F.3d 29 (2d Cir. 2009) .................................................................. 62

*Florida State Bd. of Admin. v. Green Tree Fin. Corp.*,
  270 F.3d 645 (8th Cir. 2001) ............................................................................ 46

*Freeland v. Iridium World Commc'ns, Ltd.*,
  233 F.R.D. 40 (D.D.C. 2006) ............................................................................ 62

*Freudenberg v. E\*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010) ........................................................ *passim*

*In re Fuwei Films Sec. Litig.*,
  634 F. Supp. 2d 419 (S.D.N.Y. 2009) ................................................................ 62

*Ganino v. Citizens Utils. Co.*,
  228 F.3d 154 (2d Cir. 2000) ........................................................................ *passim*

*Gerstle v. Gamble-Skogmo, Inc.*,
  478 F.2d 1281 (2d Cir. 1973) ............................................................................ 59

*In re Giant Interactive Grp., Inc. Sec. Litig.*,
  643 F. Supp. 2d 562 (S.D.N.Y. 2009) .................................................... 61, 62, 64

*Glassman v. Computervision Corp.*,
  90 F.3d 617 (1st Cir. 1996) ............................................................................... 37

*In re IPO Sec. Litig.*,
  358 F. Supp. 2d 189 (S.D.N.Y. 2004) ................................................................ 46

*Iowa Pub. Emps. Ret. Sys. v. MF Global, Ltd.*,
  620 F.3d 137 (2d Cir. 2010) .............................................................................. 54

*Janbay v. Canadian Solar, Inc.*,
  No. 10 Civ. 4430, 2013 WL 1287326 (S.D.N.Y. Mar. 28, 2013) ....................... 65

*Levine v. AtriCure, Inc.*,
  508 F. Supp. 2d 268 (S.D.N.Y. 2007) ................................................................ 62

*Lilly v. State Teachers Ret. Sys. of Ohio Pension Fund*,
  608 F.2d 55 (2d Cir. 1979) ................................................................................ 50

*Litwin v. Blackstone Grp., L.P.*,
  634 F.3d 706 (2d Cir.), *cert. denied*, 132 S. Ct. 242 (2011) ....................... *passim*

*Lyondell Petrochemical Co. Sec. Litig.*,
  984 F.2d 1050 (9th Cir. 1993) ........................................................................... 37

*McKenna v. SMART Technologies Inc.*,
  11 CIV. 7673 KBF, 2012 WL 3589655 (S.D.N.Y. Aug. 21, 2012) ..................... 54

*Milman v. Box Hill Sys. Corp.*,
  72 F. Supp. 2d 220 (S.D.N.Y. 1999) ....................................................... 34, 54

*In re Morgan Stanley Info. Fund Sec. Litig.*,
  592 F.3d 347 (2d Cir. 2010) ....................................................................... 23

*Nanopierce Techs., Inc. v. Southridge Capital Mgmt.*,
  No. 02 Civ. 0767, 2003 WL 22882137 (S.D.N.Y. Dec. 4, 2003) ............... 61

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
  455 F. App'x 10 (2d Cir. 2011) .................................................................. 60

*In re Northern Telecom Ltd. Sec. Litig.*,
  116 F. Supp. 2d 446 (S.D.N.Y. 2000) ........................................................ 37

*Omaha, Nebraska Civilian Employees' Retirement System v. CBS Corp.*,
  679 F.3d 64 (2d Cir. 2012) ......................................................................... 64

*In re Oracle Corp. Derivative Litig.*,
  867 A.2d 904 (Del. Ch. 2004) .................................................................... 37

*In re Omnicom Group, Inc. Sec. Litig.*,
  597 F.3d 501 (2d Cir. 2010) ....................................................................... 64

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
  681 F.3d 114 (2d Cir. 2012) ................................................................*passim*

*Pommer v. Medtest Corp.*,
  961 F.2d 620 (7th Cir. 1992) ...................................................................... 46

*Pontiac Gen. Emps. Ret. Sys. v. Lockheed Martin Corp.*,
  875 F. Supp. 2d 359 (S.D.N.Y. 2012) .................................................... 50, 60

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
  930 F. Supp. 68 (S.D.N.Y. 1996) ............................................................... 39

*In re Regeneron Pharm., Inc. Sec. Litig.*,
  No. 03 Civ. 3111, 2005 WL 225288 (S.D.N.Y. Feb. 1, 2005) ................... 54

*Rubke v. Capitol Bancorp Ltd.*,
  551 F.3d 1156 (9th Cir. 2009) .................................................................... 37

*SEC v. Bank of America Corp.*,
  677 F. Supp. 2d 717 (S.D.N.Y. 2010) ........................................................ 56

*SEC v. Mayhew*,
  121 F.3d 44 (2d Cir. 1997) ......................................................................... 50

*SEC v. Wyly*,
  788 F. Supp. 2d 92 (S.D.N.Y. 2011) .......................................................... 49

*Shah v. Wilco Sys., Inc.*,
 76 F. App'x 383 (2d Cir. 2003) ............................................................ 36

*Sheppard v. TCW/DW Term Trust 2000*,
 938 F. Supp. 171 (S.D.N.Y. 1996) ........................................................ 37

*Staehr v. Hartford Fin. Servs., Grp., Inc.*,
 547 F.3d 406 (2d Cir. 2008) .................................................................. 57

*In re Ulta Salon, Cosmetics & Fragrance, Inc. Sec. Litig.*,
 604 F. Supp. 2d 1188 (N.D. Ill. 2009) ................................................... 35

*United Paperworkers Int'l Union v. Int'l Paper Co.*,
 985 F.2d 1190 (2d Cir.1993) ................................................................. 56

*In re Van der Moolen Holding N.V. Sec. Litig.*,
 405 F. Supp. 2d 388 (S.D.N.Y. 2005) ............................................... 3, 38

*Virginia Bankshares, Inc. v. Sandberg*,
 501 U.S. 1083 (1991) ............................................................................ 59

*Westland Police & Fire Ret. Sys. v. MetLife, Inc.*,
 No. 12 Civ. 056, 2013 WL 775434 (S.D.N.Y. Feb. 28, 2013) ............. 62

## STATUTES

15 U.S.C. § 77k ............................................................................................ 46

15 U.S.C. § 78u-4(b) ................................................................................... 23

## REGULATIONS AND ADMINISTRATIVE GUIDANCE

17 C.F.R. § 229.303(a)(3)(ii) ...................................................................... 24

17 C.F.R. § 230.408(a) ................................................................................ 61

Certain Investment Company Disclosures, Securities Act Release No. 6835,
 54 Fed. Reg. 22,427 (May 24, 1989) .........................................*passim*

SEC Guidance Regarding Management's Discussion and Analysis
 of Financial Condition and Results of Operations,
 Securities Act Release No. 8350, 68 Fed. Reg. 75,056 (Dec. 29, 2003) ........................*passim*

SEC Staff Accounting Bulletin No. 99,
 64 Fed. Reg. 45,150 (Aug. 19, 1999) ................................................... 60

Securities Offering Reform, Securities Act Release No. 8591,
 70 Fed. Reg. 44,722 (Aug. 3, 2005) ..................................................... 26

In re Shared Med. Sys. Corp.,
    SEC Release No. 34-33632, 1994 WL 49960 (Feb. 17, 1994) ..............................................26

## OTHER AUTHORITIES

Charles J. Johnson, Jr. and Joseph McLaughlin,
    Corporate Finance and the Securities Laws
    § 3.04(D) (4th ed. 2012 Supp.) ..............................................................................................54

1 Thomas Lee Hazen, Treatise on Law of Securities Regulation
    § 3.9 (Westlaw updated 2013).................................................................................................31

2 Thomas Lee Hazen, Treatise on Law of Securities Regulation
    § 9.4 (Westlaw updated 2013).................................................................................................61

In the Consolidated Class Action Complaint (the "Complaint"), Court-appointed Lead Plaintiffs, the North Carolina Department of State Treasurer on behalf of the North Carolina Retirement Systems, Banyan Capital Master Fund Ltd., Arkansas Teacher Retirement System, and the Fresno County Employees' Retirement Association (collectively, "Lead Plaintiffs"), and Named Plaintiffs Jose G. Galvan and Mary Jane Lule Galvan (together with Lead Plaintiffs, "Plaintiffs"), bring claims under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act") against (i) Facebook, Inc. ("Facebook" or the "Company"), (ii) Facebook Chairman of the Board and CEO Mark Zuckerberg ("Zuckerberg"), (iii) Facebook CFO David Ebersman ("Ebersman"), (iv) Facebook COO Sheryl K. Sandberg ("Sandberg"), (v) Facebook Director of Accounting David Spillane, (vi) six members of Facebook's Board of Directors, and (vii) 33 entities that served as the underwriters (the "Underwriter Defendants") for Facebook's initial public offering (the "IPO"), on behalf of all persons and entities who purchased or otherwise acquired Class A common stock in or traceable to the IPO, and were damaged thereby.

Lead Plaintiffs submit this memorandum of law in opposition to Defendants' motion to dismiss the Complaint.  As set forth herein, Defendants' motion should be denied.

## PRELIMINARY STATEMENT

### A.    Summary of the Facts Giving Rise to the Securities Law Violations

On May 17, 2012, Facebook conducted one of the largest and most highly anticipated initial public offerings in history, selling more than 421 million shares of common stock at $38 per share, and reaping more than $16 billion in proceeds.  ¶ 4.[1]  In the week leading up to the IPO, investor demand was so great that the Company took the extraordinary step of increasing both the size and the price of the IPO, and market commentators reported that the Underwriter Defendants were "swamped" with orders.  ¶¶ 143-47.  This intense demand existed because Facebook had reported

---

[1] Herein, "¶__" refers to a paragraph of the Complaint.  All emphasis is added unless otherwise noted.

substantial revenue growth in recent years and represented that the Company was poised to capitalize on an increasingly important revenue source: the growing number of users accessing Facebook through mobile devices. ¶¶ 89-97, 110-21, 140-48.

Unbeknownst to investors, however, at least ten days before the IPO occurred, Facebook learned that known trends in its core business had already had a material negative impact on the Company's revenues. Specifically, by no later than May 7, 2012, Facebook had determined that increasing mobile usage and the Company's product decisions had materially impacted Facebook's advertising business and, as a result, the Company dramatically cut its revenue estimates for the second quarter of 2012 (the quarter in which Facebook was going public, which was then already in progress) and the full year. ¶¶ 7-9. Despite the obvious importance of this information to investors, Facebook made no public disclosure of these facts. ¶ 11. Instead, Facebook filed an amended Registration Statement which misleadingly reiterated that mobile usage "*may*" negatively impact the Company's revenues "*if*" certain contingencies occurred in the future. *Id.* Then, immediately thereafter, Facebook's Treasurer made nineteen separate phone calls to analysts affiliated with the Underwriter Defendants (the "Syndicate Analysts") to inform them of the revenue cuts that the Company had failed to disclose publicly. ¶¶ 12, 132. Reading from a script prepared by the lead underwriter, Morgan Stanley, Facebook's Treasurer informed the Syndicate Analysts that mobile usage had materially impacted the Company's revenues and, thus, the Company had cut its revenue estimate for the second quarter of 2012 by as much as 8.3% and for the full year by as much as 3.5%. ¶¶ 10, 132-33.

The truth about Facebook's revenue cuts did not publicly emerge until after Facebook had successfully completed the IPO. After the market closed on May 18, 2012, Facebook's first day as a publicly-traded company, news reports revealed that, during Facebook's roadshow, the Company had made material revenue cuts. ¶¶ 166-67. This news stunned the market and decimated the price

2

of Facebook stock, which fell almost 20% in the next two trading days.  As numerous market

commentators reported, it was extremely "rare," and "very, very unusual," for a company to make

material revenue cuts during its roadshow, and this had "never been seen . . . during 20 years in and

around the tech IPO business."  *Id.*  Significantly, the financial press pointedly noted that

Facebook's public disclosures in no way conveyed this highly material information, reporting that

> [Facebook's amended Registration Statement] didn't send any alarm bells to most
> investors, and it shouldn't have.  [T]he reality is that [its] wording was just too vague
> to be construed by normal people as meaning anything more than what had already
> been mentioned before.  . . .  ***The fact is***, *there is nothing within the S-1 update on*
> *May 9 that would give normal investors the sense that there had been a material*
> *change about Facebook's revenue prospects*.

¶¶ 173-74.

**B.      Summary of the Argument**

Based on these facts, the Complaint alleges that Facebook violated Sections 11 and 12 of the

Securities Act.  First, the Complaint alleges that Facebook's statements purporting to warn only that

increasing mobile usage "may" negatively impact the Company's revenues were false and

misleading because this negative impact had already occurred prior to the IPO.  *See* ¶¶ 186-96.

Courts routinely hold that statements purporting to warn that something "may" occur are materially

misleading where, as here, the purported contingency has already come to pass.  As this Court held

in *In re Van der Moolen Holding N.V. Securities Litigation*, "to warn that the untoward may occur

when the event is contingent is prudent; to caution that it is only possible for the unfavorable events

to happen when they have already occurred is deceit."  405 F. Supp. 2d 388, 400 (S.D.N.Y. 2005).

Second, the Complaint alleges that, in violation of Item 303 of SEC Regulation S-K, 17

C.F.R. § 229.303, Facebook failed to disclose that known trends relating to increasing mobile usage

and certain product decisions had materially impacted the Company's revenues.  *See* ¶¶ 188(c),

197-201.  In two recent seminal decisions, the Second Circuit made clear that Facebook was

required to disclose this information.  *See Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706 (2d Cir.),

3

*cert. denied*, 132 S. Ct. 242 (2011); *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114 (2d Cir. 2012). In both *Litwin* and *Panther Partners*, the Second Circuit held that an issuer is required to disclose in a registration statement "***whether***, ***and to what extent***," any known trends in its business are "expected to materially impact [the issuer's] future revenues" – the exact information that the Complaint alleges Facebook failed to disclose here. *See Litwin*, 634 F.3d at 718-19; *Panther Partners*, 681 F.3d at 121. Remarkably, although *Litwin* and *Panther Partners* are the Second Circuit's two leading decisions on what an issuer is required to disclose in its offering documents under Item 303, Defendants fail to cite either case in their brief. Their failure to do so is telling, and an implicit concession that these decisions fatally undermine their argument that they were not required to disclose these facts.

Defendants' remaining arguments also fail. For example, Defendants argue that, as a matter of law, they were not required to disclose this information because Facebook supposedly had no duty to disclose its internal revenue projections. *See* Defs. Br. at 27-33.[2] This argument is a red herring. Under Item 303, Facebook was required to disclose "whether, and to what extent" the trend of increasing mobile usage had impacted the Company's revenues. Defendants did not need to disclose any numerical internal projection to satisfy this duty: For example, Facebook could have disclosed to investors that mobile usage had already had a materially negative impact on the Company's revenues for the second quarter and year. Moreover, Defendants' argument contradicts *Litwin* and *Panther Partners*, both of which make clear that an issuer is required to disclose the extent to which a known trend is reasonably expected to materially impact "future revenues." *See* Section I.A, *infra*.

Defendants also contend, based on speculative media reports, that investors understood that

---

[2] "Defs. Br." refers to the Memorandum in Support of Defendants' Motion to Dismiss the Consolidated Class Action Complaint (ECF No. 92). Herein, Lead Plaintiffs use the defined terms that Defendants used in their Memorandum.

mobile usage had materially impacted Facebook's revenues prior to the IPO.  *See* Defs. Br. at 10-14.  However, the Second Circuit has unequivocally held that "[t]here are serious limitations on a corporation's ability to charge its stockholders with knowledge of information omitted from a document such as a prospectus on the basis that the information is public knowledge and otherwise available to them."  *Litwin*, 634 F.3d at 718.  Moreover, there are a plethora of facts that contradict Defendants' assertion, including that (i) Facebook made nineteen separate phone calls to the Syndicate Analysts to inform them of the material information that was omitted from Facebook's public disclosures; (ii) the select few investors who were told about Facebook's revenue cuts were "freaked out" by the revenue "deceleration" and cancelled or cut their orders for Facebook shares; (iii) after Facebook filed the amended Registration Statement on May 9, the consensus among analysts other than the Syndicate Analysts was that Facebook's revenues had not been materially impacted; (iv) after May 9, investor demand soared to "rampant" levels, which allowed Facebook to take the extremely rare step of significantly increasing both the size and the price of the IPO; (v) analysts and investors reacted with "shock" and "outrage" when the truth was publicly revealed; (vi) the financial media specifically stated that "there is nothing within [the Registration Statement] that would give normal investors the sense that there had been a material change about Facebook's revenue prospects;" and (vii) Facebook's stock price immediately collapsed when the true facts became known.  *See* ¶¶ 176-85; *see also* Section III.A, *infra*.  Indeed, Defendants' own articles contradict their argument, and specifically state that the information in the market before the IPO about the potential impact of mobile usage on Facebook was pure "rumor," that "nobody really knows anything" about the impact of mobile on Facebook, and that "[y]ou can pick whatever you want to believe, if it makes you feel any better."  Clubok Decl., Ex. F at 23-24.

Defendants also contend that Facebook's revenue cuts were immaterial as a matter of law because they did not significantly alter the total mix of information already in the marketplace.  *See*

Defs. Br. at 40-45.  However, the Second Circuit has warned that this "truth-on-the-market defense is intensely fact-specific" and, therefore, "rarely an appropriate basis for dismissing a . . . complaint."  *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000).  Further, as summarized directly above and set forth at paragraphs 176 through 185 of the Complaint, a multitude of facts demonstrate that the market did ***not*** know at the time of the IPO that increasing mobile usage had already had a material negative impact on Facebook's revenues.

## C.    Defendants' Reliance on the Decision In the Derivative Actions Is Misplaced

Defendants' heavy reliance on the Court's opinion in certain related shareholder derivative actions (the "Derivative Actions") – which did not assert claims under the federal securities laws – is misplaced.  *See In re Facebook, Inc. IPO Sec. & Deriv. Litig.*, MDL No. 12-2389, 2013 WL 525158 (S.D.N.Y. Feb. 13, 2013) (the "Derivative Opinion" or "Derivative Op.").  Significantly, the parties in the Derivative Actions did not raise with the Court the issue of Facebook's disclosure duties under Item 303 either in their briefs or at oral argument on Facebook's motion to dismiss, and did not cite to the Court either of the Second Circuit's controlling decisions in *Litwin* or *Panther Partners*.  Apart from the fact that the Derivative Opinion did not address Defendants' disclosure duties under Item 303, the facts alleged in the Derivative Actions are a far cry from those asserted here.  Unlike the Complaint here, the derivative complaints were barren of any allegations demonstrating the materiality of Facebook's alleged misstatements and omissions – including, among other things, the allegations that (i) immediately after filing the May 9 amended Registration Statement, Facebook made nineteen separate phone calls to inform the Syndicate Analysts of the material information that was omitted from the Registration Statement and, (ii) in the days following the IPO, numerous sophisticated market commentators specifically reported that Facebook did not publicly disclose the highly material fact that its revenues had already been negatively impacted by mobile usage.  In addition, while the derivative complaints alleged that

Facebook was required to disclose its projections, the Complaint is not based on such an allegation. Instead, it alleges that Facebook was required to disclose that increasing mobile usage had already had a material negative impact on the Company's revenues for the second quarter of 2012 and the year – a duty that Defendants could have fulfilled without disclosing Facebook's internal projections, as noted above.

In sum, for the reasons set forth more fully herein, Defendants' motion to dismiss the Complaint should be denied.

## BACKGROUND

**A.     The Registration Statement Established the Importance of
        Facebook's Ability to Monetize Mobile Usage and Its Product Decisions**

Facebook's May 17, 2012 IPO was one of the largest and most anticipated in history.  When information began to emerge beginning at the end of 2011 that Facebook would be going public, the financial press widely reported that there was enormous demand among investors eager to own Facebook's shares.  ¶ 87.  *The Street* reported that the IPO was expected to be the initial public offering "of the year, maybe . . . of the decade."  *Id.*

Facebook filed its initial Registration Statement with the SEC on Form S-1 on February 1, 2012.  ¶ 186.  The Company subsequently amended the Registration Statement and Prospectus eight times, filing the final Registration Statement on May 16, 2012.  *Id.*  The Registration Statement disclosed that Facebook's advertising and total revenues grew at a torrid pace in the years before the IPO.  Between 2007 and 2011, Facebook's annual advertising revenues grew from approximately $153 million to $3.2 billion, and its annual revenues grew from $153 million to more than $3.7 billion – a 24-fold increase.  ¶ 92.

From the outset of the IPO process, Facebook emphasized that the Company's ability to monetize the usage of its product through mobile devices, and its product decisions, were key to its financial performance and ability to continue growing revenue.  The initial Registration Statement

disclosed that approximately half of Facebook's monthly users accessed the website through mobile devices, and that the growth rate for its mobile users would "continue to exceed the growth rate of our overall [member base] for the foreseeable future." ¶¶ 93-94.  Prior to the IPO, the mobile market was a largely untapped revenue stream because – while the Company showed large volumes of advertising to users who accessed its website through desktop computers – it did not show advertisements to its mobile users.  ¶ 94.  Accordingly, the Registration Statement emphasized that the mobile market was a "critical" area of "growth" and a "significant opportunity" for monetization.  ¶ 95.  The Registration Statement further stated that improving mobile products and increasing mobile usage were "key [C]ompany priorities" and that Facebook was "devoting substantial resources to developing engaging mobile products and experiences for a wide range of platforms" by "working across the mobile industry . . . to improve the Facebook experience on mobile devices and make Facebook available to more people around the world."  *Id.*

The initial Registration Statement also disclosed that certain "product decisions," such as decisions that the Company made concerning the design and features of its website, the type of advertising it displayed, and the price of its advertisements, were important to Facebook's financial performance.  ¶ 96.  These product decisions could result in new advertising products, the elimination of certain advertisements, or changes in the price of advertisements – each of which could impact the amount of advertising Facebook displayed and, in turn, its revenues.  *Id.*

The market reacted enthusiastically to Facebook's Registration Statement, and the financial press reported that Facebook was well positioned to capitalize on its expanding user base.  For example, *Bloomberg* quoted an analyst as concluding, "Investors are still very much willing to pay up for growth," and the *New York Times* reported that "many analysts believe Facebook's fortunes will rapidly multiply as advertisers direct more and more capital to the Web's social hive."  ¶ 97.

**B.      Facebook Told the SEC that It Could Not Quantify the Impact of Increasing Mobile Usage on Its Revenues, and It Revised the Registration Statement Accordingly**

On February 28, 2012, the Securities and Exchange Commission (the "SEC") sent Facebook a "comment letter" concerning certain of the Company's disclosures in the initial Registration Statement.  ¶ 98.[3]  Among other things, the SEC noted that Facebook's Registration Statement contained a "risk factor" purporting to warn investors that Facebook's revenues "may" be negatively affected by increasing mobile usage "if" certain contingencies occurred:

> Growth in use of Facebook through our mobile products, where we do not currently display ads, as a substitute for use on personal computers *may* negatively affect our revenue and financial results.
>
> We had more than 425 million MAUs [monthly active users] who used Facebook mobile products in December 2011.  We anticipate that the rate of growth in mobile users will continue to exceed the growth rate of our overall MAUs for the foreseeable future, in part due to our focus on developing mobile products to encourage mobile usage of Facebook.  Although the substantial majority of our mobile users also access and engage with Facebook on personal computers where we display advertising, our users *could* decide to increasingly access our products primarily through mobile devices.  We do not currently directly generate any meaningful revenue from the use of Facebook mobile products, and our ability to do so successfully is unproven.  Accordingly, *if* users continue to increasingly access Facebook mobile products as a substitute for access through personal computers, and *if* we are unable to successfully implement monetization strategies for our mobile users, our revenue and financial results *may* be negatively affected.

¶ 99.

The SEC instructed Facebook that rather than merely stating that its results "may" be negatively affected under certain circumstances, it must "fully address" the potential impact on the Company's revenues if the contingencies concerning mobile usage materialized.  ¶ 100.

---

[3] *See also* Clubok Decl., Ex. L.  The term "comment letter" refers to correspondence from the SEC staff regarding a company's disclosure filings.  Comment letters may request that a company, *e.g.*, (i) provide additional supplemental information so that the SEC staff can better understand the company's disclosure, (ii) revise disclosure in a document on file with the SEC, (iii) provide additional disclosure in a document on file with the SEC, or (iv) provide additional or different disclosure in a future filing with the SEC.  SEC, *Division of Corporation Finance, Filing Review Process*, http://www.sec.gov/divisions/corpfin/cffilingreview.htm.  The SEC makes comment letters public "no earlier than *20 business days* after it has . . . declared a registration statement effective."  *Id.*  Thus, at the time of Facebook's IPO, the market was *not* aware of either the SEC's February 28, 2012 comment letter or the additional correspondence between the SEC and Facebook regarding disclosures in the Registration Statement.  Those documents were not made public by the SEC until about June 15, 2012.

Specifically, the SEC comment letter stated, "assuming that the trend towards mobile continues and your monetization efforts are unsuccessful, ***ensure that your disclosure fully addresses the potential consequences to your revenue and financial results rather than just saying that they '*may be negatively affected*.*'" *Id.*

In addition, the SEC directed Facebook to disclose any trends that were having, or were reasonably expected to have, a material impact on its "revenue growth and advertising revenue growth." ¶ 101.  Specifically, the SEC instructed Facebook to disclose, pursuant to subsection (a)(3)(ii) of Item 303, "any known trends or uncertainties that have had, or that you reasonably expect will have, a material favorable or unfavorable impact on sales or results of operations."  *Id.*

In response, on March 7, 2012, Facebook told the SEC that it was unable to disclose the potential impact of increasing mobile usage on its revenues because it was unable to determine that impact.  ¶ 102.  Facebook asserted that, because many of its mobile users also continued to access Facebook through their desktop computers, the Company "cannot specifically determine how mobile use is a substitute for, rather than incremental to, use on personal computers."  *Id.*  Thus, Facebook stated that it was unable to "specifically assess the impact of increasing mobile use on its revenue and financial results" at that time.  *Id.*

In response to the SEC's request that Facebook include more specific information about the trend of increasing mobile usage, the Company inserted into the Registration Statement the repeated disclaimer that it could not quantify the impact of increasing mobile use:  "We ***cannot quantify*** the extent to which mobile usage of Facebook is substituting for, rather than incremental to, usage of Facebook through personal computers, but we generally expect mobile usage to increase at a faster rate than usage through personal computers for the foreseeable future."  Defs. Br. at 5.

C.      **As Facebook Prepared for Its Roadshow, the Company Continued
        to Emphasize Its Growth Prospects in the Mobile Market to Investors**

The two Facebook executives who had principal responsibility for marketing Facebook's

IPO to institutional investors through its roadshow were Defendant Ebersman and Facebook's

Treasurer, Cipora Herman ("Herman").  ¶ 105.  Michael Grimes ("Grimes"), the Head of

Technology Investment Banking at lead underwriter Morgan Stanley, served as the Company's

principal advisor on behalf of the Underwriter Defendants.  *Id.*

On April 16, 2012, as he was preparing for the roadshow, Ebersman informed the Syndicate

Analysts that Facebook believed it would report revenues of as much as $1.2 billion for the second

quarter of 2012 and $5 billion for the full year 2012.  ¶¶ 6, 106-07.  Based on that revenue guidance,

the Syndicate Analysts generated revenue figures that virtually mirrored the figures Ebersman had

provided, and provided those estimates to clients of their investment banks that were considering

investing in the IPO.  ¶¶ 6, 108-09.  The Syndicate Analysts' predictions translated into expected

year-over-year growth rates of up to 35% for the second quarter and 39% for the year.  ¶ 108.

Two and a half weeks later, on May 3, 2012, Facebook filed an amended Registration

Statement announcing that it was planning to sell more than 337 million shares in the IPO

(consisting of 180 million shares from Facebook, and more than 157 million from selling

shareholders) at a price between $28 and $35 per share, for a total that could have reached almost

$12 billion in proceeds.  ¶ 113.  At that time, Facebook continued to make positive statements to the

market concerning its revenue prospects and its ability to capitalize on the mobile market.  ¶¶ 110-

14.  For example, on May 3, Facebook posted its roadshow video presentation on its website, which

prominently featured Defendants Zuckerberg, Sandberg, and Ebersman.  ¶ 114.  In that

presentation, Sandberg stated that the mobile market was "a key area of growth for Facebook" and

that Facebook was ***not experiencing challenges in the mobile market***, stating that, "[f]or most

companies, the mobile environment is a challenge, because it's so small it requires new ad formats,

11

but that's not the case for Facebook." *Id.*

The market reacted positively to these disclosures.  For example, the *New York Times* described Facebook as "the stock that everyone seems to want" and reported that "[d]emand to attend the [live roadshow] presentations has been extraordinarily high, with underwriters already drawing up waiting lists for the meetings." ¶ 116.

**D.      As Facebook Began Its Roadshow, It Determined that Its Revenues for the Second Quarter and the Year Had Been Materially Impacted**

On May 7, 2012, Facebook held its first live roadshow presentation, and investor interest was overwhelming.  ¶ 118.  The market again reacted favorably to Facebook's presentation.  The next day, the *Wall Street Journal* summarized the overwhelmingly positive analyst coverage in an article titled "Facebook Gets Bullish Reception – Wall Street Analysts Sound Positive Notes Before IPO; Valuation of $160 Billion?" ¶ 120.  In that article, one analyst was described as setting a one-year price target of $46 for the stock, well above the then price range of $28 to $35 per share.  *Id.* Another analyst released a report in which it described mobile as a "significant long-term growth opportunity" for Facebook and predicted that it could "triple its revenue" in the next four years based on mobile.  ¶ 121.  For 2012, that analyst projected that Facebook would report more than $1.2 billion in revenue for the second quarter (a 36% increase over its revenue for the second quarter of 2011) and more than $5 billion in revenue for the year (a 35% increase over its revenue for full-year 2011), exactly in line with Facebook's own projections.  ¶ 121.

Unbeknownst to investors, however, within hours of Facebook's first roadshow meeting – and only four days after Sandberg told investors that the Company was ***not*** experiencing challenges in the mobile market – management determined that increasing mobile usage had already had a material negative impact on the Company's ability to generate revenues for both the second quarter of 2012 and the full year and, thus, its revenues would be much lower than the Company had previously believed.  ¶¶ 7-8, 122-23.  Facebook had also determined that its own product decisions,

12

which had reduced the number of advertisements displayed to users on some pages, had exacerbated the deterioration in its advertising revenues caused by increasing mobile usage.  ¶¶ 9, 122-23.  As a direct result, ten days before the IPO, Facebook slashed the second quarter and full year 2012 revenue figures it had provided to the Syndicate Analysts only three weeks earlier.  ¶¶ 10, 124. Specifically, by May 8, 2012, Facebook cut its revenue figures for the second quarter of 2012 by as much as $100 million, or more than 8.3%, and for the year by as much as $175 million, or 3.5%. *Id.*

**E.     Facebook Disclosed the Material Deterioration in Its Revenues to a Select Group of Investors, but Not to the Market**

On May 8, 2012, immediately after Facebook made its revenue cuts, the Company's most senior executives determined that the change was so significant that it warranted disclosure to the Syndicate Analysts.  ¶ 125.  That day, Herman, Facebook's Treasurer, sent an email to employees of the finance department with the subject line "Q2 estimates from analysts IMPORTANT PLS THIS MORNING."  *Id.*  In the body of the email, Herman requested that employees apprise Morgan Stanley of "how far off our new forecast is from where the analysts are coming out."  *Id.*

After reviewing the discrepancy between Facebook's reduced revenue figures and the Syndicate Analysts' revenue estimates, Grimes advised Ebersman that the Company should provide its reduced figures to the Syndicate Analysts so that they could revise their models based on this new information and provide it to the Company's largest potential investors.  ¶ 126.  However, despite determining that the information was important enough to immediately inform the Syndicate Analysts, Facebook chose not to disclose to investors that increased mobile usage and its product decisions had already had a material negative impact on its revenues for the second quarter and for the year.  ¶ 128.  Instead, on the night of May 8, 2012, Facebook executives, including Ebersman and Herman, with input from Grimes, decided that the Company would file an amended Registration Statement containing an extremely vague and limited disclosure about the above-

13

referenced trends in the Company's business.  *Id.*  Notably, this new disclosure would continue to represent only that increasing mobile usage and the Company's product decisions "***may***" have a negative impact on Facebook's revenues – the same representation that Facebook had made previously.  *Id.*

On May 9, 2012, Defendants filed an amended Registration Statement, stating as follows:

> Based upon our experience in the second quarter of 2012 to date, the trend we saw in the first quarter of DAUs [daily active users] increasing more rapidly than the increase in number of ads delivered has ***continued***.  We believe this trend is driven in part by increased ***usage of Facebook on mobile devices*** where we have only recently begun showing an immaterial number of sponsored stories in News Feed, and in part due to certain pages having ***fewer ads per page*** as a result of product decisions.  For additional information on factors that ***may*** affect these matters, see "Risk Factors—Growth in use of Facebook through our mobile products, where our ability to monetize is unproven, as a substitute for use on personal computers ***may negatively affect our revenue*** and financial results" and "Risk Factors—Our culture emphasizes rapid innovation and prioritizes user engagement over short-term financial results."

¶¶ 11, 128.  Significantly, nowhere in the amended Registration Statement did Facebook state that these factors had ***already*** had a material negative impact on the Company's revenues, or otherwise describe the impact they were having on the Company's business.  To the contrary, in the amended Registration Statement, Facebook misleadingly repeated the same purported "risk disclosure" that it had included in an earlier version of the Registration Statements:  specifically, that these factors only "may negatively affect our revenue and financial results," when, in reality, the Company had determined that they had already had a material negative impact on its revenues.  Moreover, the Registration Statement dated May 9 (like Facebook's March 7, 2012 representations to the SEC) continued to include the disclaimer that Facebook could not "***quantify***" the extent to which mobile usage was substituting for desktop use.  Defs. Br. at 5.

Within twelve minutes of Facebook's filing of this limited disclosure, Herman began making a series of phone calls, during which she informed the Syndicate Analysts of the material facts that the Registration Statement failed to disclose.  ¶¶ 130, 132.  On these calls, Herman read

from a script prepared by Grimes, and essentially told the Syndicate Analysts that the two factors discussed above **had already** had a material negative impact on Facebook's revenues for the second quarter and year, and that, as a result, Facebook had sharply reduced the revenue figures that the Company had provided to them only three weeks earlier.  ¶¶ 12, 133.  Specifically, the script stated as follows:

> I wanted to make sure you saw the disclosure we made in our amended filing.  The upshot of this is that we believe we are going to come in [on] the lower end of our $1.1 to $1.2 bn range for Q2 based upon the trends we described in the disclosure.  A lot of investors have been focused on whether the trend of ad impressions per user declining (primarily as a result of mobile) was a one-time, or continuing, occurrence.  As you can see from our disclosure, the trend is continuing.  You can decide what you want to do with your estimates, our long term conviction is unchanged, but in the near term we see these trends continuing, hence our being at the low end of the $1,100 + $1,200 range.

¶ 133.  Herman also added to the script information concerning the impact of these factors on Facebook's annual revenue, writing that because of "trends/headwinds over the next six to nine months as this run[s] through the rest of the year, [the Company] could be 3 to 3 and a half percent off the 2012 $5 billion [revenue] target" that it had provided to the Syndicate Analysts in April 2012.

¶ 134.

Facebook provided this information to the Syndicate Analysts precisely because the Company understood that its revised Registration Statement failed to inform the market that increasing mobile usage and Facebook's product decisions had already had a material negative impact on the Company's revenues.  ¶ 130.  Indeed, had the market been aware of these critical facts, there would have been no reason for Facebook to communicate this information to the Syndicate Analysts in nineteen separate scripted phone calls.  *Id.*

As Defendants expected, the Syndicate Analysts immediately revised their financial models to reflect Facebook's revenue cuts by cutting their own estimates of the Company's annual revenue

by as much as 6%, and its second quarter revenue by as much as 7%.  ¶ 136.  The Syndicate

Analysts then made a series of private phone calls to relay this information to a select group of

potential investors that included some of the biggest hedge funds and other institutions on Wall

Street.  ¶ 137.  Those investors immediately recognized that the change in Facebook's revenue

prospects was new, material information that reflected a highly negative change in Facebook's

financial condition.  ¶¶ 13-14, 135-37.  For example, as *Reuters* would later report, institutions

described the Syndicate Analysts' decision to reduce their revenue estimates during the time period

when the roadshow was occurring as "***a big shock***," "***very***, ***very unusual***," a "***bombshell***," and

something that they had "***never before seen*** . . . ***in 10 years***."  ¶¶ 14, 138, 166-67.  Similarly,

sophisticated technology analysts stated that they had "never seen" such a reduction in revenue

estimates during a roadshow "during 20 years in and around the tech IPO business."  ¶ 167.

According to both *Reuters* and the *Wall Street Journal*, the few investors who were told of the

revenue cuts were "shocked" by the "deceleration" in Facebook's revenues, which raised a

"***significant red flag***" about the Company's ability to generate the level of revenues that the market

expected, and called its value into serious question.  ¶¶ 14, 139.  Indeed, many investors that

received this non-public information "about Facebook's dimming revenue prospects" cancelled

their orders or "slashed the number of shares" they intended to buy, dropped the price they were

willing to pay, or sold their shares immediately after the IPO.  *Id.*

**F.**     **Facebook Enlarged and Executed the IPO Without Disclosing
the Material Deterioration in Its Revenues to the Market**

Given the misleading nature of the new disclosure in Facebook's May 9 amended

Registration Statement, the financial press continued to report only that increasing mobile usage

***might*** impact Facebook's revenues, depending on the occurrence of future events.  For example,

both the *New York Times* and the *Wall Street Journal* reported after the filing that "the company's

revenue growth ***could*** be harmed" and that migration to mobile "***may*** negatively affect" financial

16

results.  ¶¶ 140-41.  Notably, precisely because the market was unaware of the present negative

impact of mobile usage on Facebook's revenues, most analysts – other than the select few who had

learned otherwise – continued to expect Facebook's financial results to be in line with the

Company's initial estimates.  According to Thomson's Institutional Brokers' Estimate Systems, as

of the date of the IPO, the consensus estimates among analysts who were not Syndicate Analysts

were for Facebook to report revenues of more than $1.2 billion for the second quarter and $5 billion

for the year – at or slightly above Facebook's original guidance.  ¶ 142.

Because Facebook had not disclosed the fact that its revenues had been materially impacted

by known trends, prior to the IPO, demand for Facebook stock reached astronomical levels.  ¶ 145.

On May 11, *Reuters* reported that Facebook's IPO was already "oversubscribed," while *Bloomberg*

reported on May 14 that the Underwriter Defendants were "swamped" with orders.  ¶ 143.  As a

result of this intense demand, Facebook was able to take the extremely rare steps of significantly

increasing both the size and the price of the IPO in the week before the IPO – something that has

been done in only 3.4% of initial public offerings since 1995.  ¶ 144.

On May 15, Facebook announced that it was increasing the price range for its stock from a

range of $28 to $35, to a new range of $34 to $38 – an increase of more than 21% at the bottom of

the range and nearly 9% at the top.  ¶ 145.  As *Bloomberg* reported, Facebook's ability to

significantly raise the IPO price demonstrated that the Company had succeeded in "convincing

investors that [it] can make money from mobile users."  ¶ 146.  The next day, May 16, Facebook

increased the size of the IPO by nearly 25%, or 84 million shares.  ¶ 147.  All the additional shares

were offered by Facebook insiders, including directors and large, early shareholders.  *Id.*

Defendants completed the IPO as scheduled after the close of the market on May 17, 2012.

¶¶ 16, 149.  As noted above, Defendants sold more than 421 million Facebook IPO shares to the

investing public at $38 per share, reaping more than $16 billion in proceeds, in one of the largest

initial public offerings in history.  ¶¶ 4, 150.

### G. Facebook's Market Debut Fizzled as Morgan Stanley Was Forced to Prop Up the Company's Stock Price to Prevent a "Broken Issue"

The next day, Friday, May 18, 2012, Facebook stock began publicly trading.  ¶¶ 17, 156.  In the days leading up to the IPO, numerous market commentators predicted that Facebook would experience a large "pop" on the first day of trading because demand was so "intense."  ¶ 152. *Reuters* predicted that Facebook's share price would rise by at least 50%.  ¶ 153.  Initially, Facebook's price did pop as expected, opening at $42.05.  ¶ 156.  Soon thereafter, however, investors who had been notified of Facebook's revenue cuts began to sell off, exerting downward pressure on Facebook's share price.  *Id.*  Thus, within fifteen minutes of opening, Facebook's share price had dropped close to its $38 IPO price.  ¶ 157.

In order to protect the IPO price, the Underwriter Defendants were forced to step in and buy millions of shares of stock at $38 per share in order to ensure that the stock never dipped below that line.  *Id.*  As a result of the Underwriter Defendants' efforts to prop up the share price, Facebook stock closed at $38.23, a result the market concluded was "surprising and disappointing."  ¶ 159-60.  As the *Washington Post* reported, "[s]hare prices would have plunged immediately if not for the intervention of Morgan Stanley."  ¶ 159.

### H. The Market Reacted Immediately When the Truth Was Revealed

Beginning on the night of May 18, 2012, and continuing over the next several days, news of Facebook's revenue cuts began to emerge.  ¶¶ 18, 161.  On the night of May 18, *Reuters* reported that Facebook had taken the "***rare and disruptive***" step of lowering its guidance to analysts just days before its IPO and during the time period that its roadshow was occurring.  *Id.*

This news swept through the market and, over the weekend of May 19 and 20, members of the financial press reported that this information was highly material and that it fundamentally affected the value of Facebook's stock.  ¶¶ 18, 162.  For example, on May 19, *Business Insider*

18

reported that Facebook's decision to reduce its guidance "mid-way through a series of meetings designed for the sole purpose of selling the stock" was "***highly material information***."  *Id.* *Business Insider* further stated:

> [S]uch a late change in guidance would mean that Facebook's business was deteriorating rapidly – between the start of the roadshow and the middle of the roadshow.  ***Any time a business outlook deteriorates that rapidly, alarm bells start going off on Wall Street, and stocks plunge.***

*Id.*  As *Business Insider* further noted, investors who were not informed of this critical new information have "every right to be furious" because "this would have been ***highly material information*** that some investors had and others didn't – the exact sort of unfair asymmetry that securities laws are designed to prevent."  *Id.*[4]

On the very next trading day, Monday, May 21, Facebook shares collapsed.  Facebook stock opened sharply down from the IPO price of $38 and plummeted on extremely high trading volume, closing down at $34.03, a decline of nearly 11% from the IPO price.  ¶¶ 19, 163-64.

Prior to the opening of trading on May 22, *Reuters* again shocked the market by reporting that the lead underwriters, Morgan Stanley, J.P. Morgan, and Goldman Sachs, all had taken the highly unusual step of "significantly" cutting their revenue figures for Facebook while the IPO roadshow was underway, but appeared to have told only a few "major clients" about this highly "negative" development.  ¶¶ 20, 165.  The report stated:

> In the run-up to Facebook's $16 billion IPO, Morgan Stanley, the lead underwriter on the deal, ***unexpectedly delivered some negative news*** to major clients: The bank's consumer Internet analyst, Scott Devitt, was reducing his revenue forecasts for the company.  The sudden caution very close to the huge [IPO], and while an investor roadshow was underway, was ***a big shock*** to some, said two investors who were

---

[4] The Complaint quotes from articles written by Henry Blodget, an experienced former Wall Street securities analyst, which contextualize the extremely negative market reaction to the alleged corrective disclosures, and underscore the significance of the information concealed by Facebook's misstatements and omissions.  ¶ 162.  Blodget never "retracted" his reports that Facebook failed to disclose highly material information in connection with its IPO, as Defendants claim.  Defs. Br. at 50 n.25.  Indeed, months after the IPO, Blodget continued to report that the Registration Statement failed to disclose the fact that increasing mobile usage had materially impaired Facebook's revenues, stating, "***Buried*** in the [P]rospectus was a risk factor that discussed the growth of Facebook's mobile usage and how this ***might*** affect revenue."  Declaration of Thomas A. Dubbs dated June 14, 2013 ("Dubbs Decl."), Ex. A at 4.

advised of the revised forecast. They say it may have contributed to the weak performance of Facebook shares, which sank on Monday – their second day of trading – to end 10 percent below the IPO price.

The people familiar with the revised Morgan Stanley projections said Devitt cut his revenue estimate for the current second quarter significantly, and also cut his full-year 2012 revenue forecast.

"That deceleration *freaked a lot of people out*," said one of the investors.

¶ 165. *Reuters* further reported that it was virtually unprecedented for the lead underwriters to significantly cut their revenue figures in the midst of a roadshow:

"This was done during the roadshow – *I've never seen that before in 10 years*," said a source at a mutual fund firm who was among those called by Morgan Stanley. Scott Sweet, senior managing partner at the research firm IPO Boutique, . . . said it is unusual for analysts at lead underwriters to make such changes so close to the IPO. "*That would be very, very unusual for a book runner to do that*," he said.

¶ 166.

Before the market opened on May 22, *Business Insider* reported that the news that the Syndicate Analysts had cut their revenue figures during the time period when the roadshow was occurring was a "*bombshell*." ¶ 167. As *Business Insider* explained, Facebook's revenue cuts obviously were "material information" that significantly changed the total mix of information available to investors considering whether to purchase Facebook stock:

And now comes some news about the Facebook IPO that *buyers deserve to be outraged about*. Reuters . . . is reporting that [the Underwriter Defendants] . . . all cut their earnings forecasts for the [C]ompany in the middle of the IPO roadshow. This by itself is *highly unusual (I've never seen it during 20 years in and around the tech IPO business.)*. But, just as important, news of the estimate cut was passed on only to a handful of big investor clients, not everyone else who was considering an investment in Facebook. . . .

Any investor considering an investment in Facebook would consider an estimate cut from the underwriters' analysts "material information." [D]uring the marketing of the Facebook IPO, investors who did not hear about these underwriter estimates were placed at a meaningful and unfair information disadvantage . . . and they suffered for it.

*Id.* Within hours of *Reuters'* report, numerous other members of the financial media widely

reported that news of Morgan Stanley's lowered earnings estimates for Facebook "came as a *__huge__*

*__shock__*" to the market, was "*[p]articularly troubling*" to investors, and that "investors [were] *__angry__*"

to learn that the Syndicate Analysts "their financial forecasts for the [C]ompany while it was

holding IPO roadshow meetings." ¶ 168. The financial press also widely reported that these

revelations had caused Facebook stock to "slide sharply." ¶ 184.

Indeed, Facebook's stock price again plummeted on May 22, opening down sharply from

the prior close and ending the trading session at $31 per share, a decrease of approximately 9%,

again on extremely high volume. ¶ 20. In just two trading days, Facebook's shares had fallen more

than 18% from the IPO price, wiping out billions of dollars in shareholder equity. *Id.*

**I.      The Financial Media Confirmed that the Material Negative Impact of Increasing
          Mobile Usage on Facebook's Revenues Was Not Conveyed by the Company's
          Disclosures**

Following the disclosure of the truth, market commentators widely reported that the material

negative impact of increasing mobile usage on Facebook's revenues was not disclosed in

Facebook's Registration Statement. For example, *Business Insider* observed, "*__Facebook's__*

*__amended prospectus did not say that the company's business had suddenly weakened and__*

*__management's outlook had changed. And that information is vastly more important than what__*

*__the prospectus did say, which was that users are growing faster than revenue.__*" ¶ 173.

*Venture Beat* similarly reported that Facebook's Registration Statement did *__not__* inform

investors that there had been a material change in the Company's revenue prospects:

> *__In that May 9 update, Ebersman decided to use vague language when describing__*
> *__how the company's second quarter was looking. It was extremely understated,__*
> *__considering what we would later find out.__* According to the filing, . . . Facebook
> said that it was experiencing the same trend in the second quarter that it had seen in
> the first quarter, that growth in "daily active users" (DAUs) was increasing more
> rapidly than the growth in ad impressions, driven by many users' shift to mobile
> devices.
>
> *__Now Facebook is generally growing quickly – and its ads are growing, even if they__*
> *__are growing more slowly on mobile – and so this update itself didn't send any__*

21

*alarm bells to most investors, and it shouldn't have*. . . . Facebook's lawyers may, in the wake of the legal mess it has gotten into, try to argue that the new May 9 language about "DAU's increasing more rapidly than the increase in number of ads delivered" pointed to something more significant than what Facebook had released before. ***But the reality is that this wording was just too vague to be construed by normal people as meaning anything more than what had already been mentioned before***. . . . ***The fact is, there is nothing within the S-1 update on May 9 that would give normal investors the sense that there had been a material change about Facebook's revenue prospects.***

¶ 174.

## **ARGUMENT**

Motions to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure ("FRCP") are "generally viewed with disfavor." *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 178 (S.D.N.Y. 2010) (Sweet, J.). When considering a motion to dismiss, the complaint is liberally construed; a court must "accept[ ] all factual allegations in the complaint as true, and draw[ ] all reasonable inferences in the plaintiff's favor." *Id.* at 179. A complaint should not be dismissed if it alleges "enough facts to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 697 (2009).

The Securities Act imposes liability on certain participants in a registered securities offering where, as here, the offering documents contain material misstatements or omissions.

- Section 11 imposes strict liability on issuers and signatories, and negligence liability on underwriters, "[i]n case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading;"

- Section 12(a)(2) imposes liability under similar circumstances for misstatements or omissions in a prospectus; and

- Section 15 imposes liability on individuals or entities that "control[ ] any person liable" under Sections 11 or 12(a)(2).

*Panther Partners*, 681 F.3d at 120 (citing 15 U.S.C. §§ 77k(a), 77l(a)(2), 77o).

Neither scienter, reliance, nor loss causation is an element of Section 11 or Section 12(a)(2) claims. Further, Section 11 cases are "ordinary notice pleading case[s], subject only to the 'short

and plain statement' requirements of [FRCP] 8(a)." *Litwin*, 634 F.3d at 715.  Section 11 claims

need not satisfy the heightened particularity requirements of FRCP 9(b).  *See In re Morgan Stanley*

*Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010).  Nor do the heightened pleading standards

of the Private Securities Litigation Reform Act apply to such claims.  *See* 15 U.S.C. § 78u-4(b)(1)-

(2).

Thus, the Securities Act "places a relatively minimal burden on a plaintiff" to state a claim.

*Litwin*, 634 F.3d at 716.  "So long as plaintiffs ***plausibly*** allege that [the defendant issuer] omitted

material information that it was required to disclose or made material misstatements in its offering

documents, they meet the relatively minimal burden of stating a claim pursuant to Sections 11 and

12(a)(2) . . . ."  *Id.* at 718.

Here, Defendants' motion should be denied because the Complaint more than plausibly

alleges that Facebook's Registration Statement contained material misstatements and omissions.

## I.   Defendants Violated Sections 11 and 12 by Failing to Disclose Material Information in the Registration Statement

The Complaint alleges that Defendants violated Sections 11 and 12 of the Securities Act by,

among other things, failing to disclose the information required by Item 303 of Regulation S-K.  *See*

¶¶ 188(c), 197-201.  As explained further below, under Item 303, Defendants were required to

disclose "(i) whether increasing mobile usage and the Company's product decisions had or were

reasonably expected to have a 'material . . . unfavorable impact on . . . revenues,' and (ii) to what

extent these trends had or were reasonably expected to impact Facebook's revenue."  ¶ 201; *see also*

¶ 197.  In violation of Item 303, "the Registration Statement failed to disclose . . . that increasing

mobile usage and the Company's product decisions had had a material negative impact on its

revenues, and the magnitude of that impact."  ¶ 188(c); *see also* ¶¶ 197-201.  The Complaint's

allegations concerning Defendants' failure to disclose the information required by Item 303 are

more than adequate to state a claim under Sections 11 and 12 of the Securities Act.  *See Panther*

*Partners*, 681 F.3d at 120 ("One of the potential bases for liability under §§ 11 and 12(a)(2) is an omission in contravention of an affirmative legal disclosure obligation," and "Item 303 . . . provides the basis for [such a] disclosure obligation.").

**A.      Item 303 Required Facebook to Disclose that Increasing Mobile Usage and the Company's Product Decisions Had Already Had a Material Negative Impact on Its Revenues**

As the SEC has explained, "[o]ne of the most important elements necessary to an understanding of a company's performance, and the extent to which reported financial information is indicative of future results, is the discussion and analysis of known trends, demands, commitments, events and uncertainties."  SEC Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"), Securities Act Release No. 8350, 68 Fed. Reg. 75,056, 75,061 (Dec. 29, 2003) ("2003 SEC Release").  Therefore, Item 303 requires that a registration statement include a section concerning MD&A, and that the MD&A "provide a narrative explanation of a company's financial statements that *enables investors to see the company through the eyes of management*."  *Id.* at 75,056.

In particular, Item 303 requires disclosure of all "known trends . . . that have had or that the registrant reasonably expects will have a material . . . unfavorable impact on . . . revenues."  17 C.F.R. § 229.303(a)(3)(ii).  For decades, the SEC has made clear that, in addition to the identification of such "known trends," Item 303 specifically requires disclosure of the impact that any such trends are expected to have on a company's prospective financial performance.  The SEC has stated that "Item 303 *require[s] disclosure of forward looking information*," including, at a minimum, disclosure of the "*reasonably likely material effects on operating results* of a known trend."  *See* Certain Investment Company Disclosures, Securities Act Release No. 6835, 54 Fed. Reg. 22,427, 22,429 (May 24, 1989) ("1989 SEC Release"); *see also id.* at 22,428 (Item 303 is "intended to give the investor an opportunity to look at the company through the eyes of

24

management by providing both a short and long-term analysis of the business of the company . . . **_with particular emphasis on the registrant's prospects for the future_**.").

Item 303's disclosure obligations are triggered when there is a trend or development that is "both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operation." *Panther Partners*, 681 F.3d at 120 (quoting 1989 SEC Release, 54 Fed. Reg. at 22,429); *Litwin*, 634 F.3d at 716 (same). Because the Complaint plausibly alleges that these conditions were met (and Defendants do not contend that Item 303's disclosure requirements did not apply) Defendants were required to comply with Item 303's disclosure obligations. *See* ¶¶ 199-200; Defs. Br. at 26-27.

Remarkably, although Defendants argue that they supposedly satisfied their disclosure obligations under Item 303 (*see* Defs. Br. at 27-36), they completely ignore the Second Circuit's two recent seminal decisions addressing Item 303's disclosure obligations in the context of IPOs and secondary offerings, both of which were issued in the past two years: *Litwin*, 634 F.3d 706 and *Panther Partners*, 681 F.3d 114. Defendants' decision to ignore these controlling authorities is no accident, because they clearly establish that Facebook failed to satisfy its disclosure duties under Item 303. In these decisions, consistent with the SEC's longstanding guidance, two Second Circuit panels unanimously held that Item 303 requires a company to specifically disclose "**_whether_**, **_and to what extent_**," any known trends are "**_expected to materially impact [the issuer's] future revenues_**" – the precise information that the Complaint alleges Facebook failed to disclose here. *See* ¶¶ 188(c), 197-201; *see also Litwin*, 634 F.3d at 718-19; *Panther Partners*, 681 F.3d at 121.[5]

_____

[5] As noted above, this Second Circuit precedent is fully consistent with SEC guidance. In addition to the 1989 guidance cited above, in 2003 the SEC expressly cautioned issuers that "disclosures required to address known material trends and uncertainties in [MD&A] should not be confused with optional forward-looking information" because "**_material forward-looking information_** . . . is **_required to be disclosed_** as part of the required discussion of those matters and the analysis of their **_effects_**." 2003 SEC Release, 68 Fed. Reg. at 75,062.

Defendants point out that "[u]ntil the early 1970s, the [SEC] prohibited disclosure of forward-looking information." Defs. Br. at 29 n.16. However, "Since the 1980's, [it has] encouraged issuers to disclose forward-looking

In *Litwin*, the plaintiff alleged that Blackstone violated Sections 11 and 12 of the Securities Act because the registration statement and prospectus for its IPO failed to disclose the extent to which its future revenues were expected to be impacted by certain developments concerning its business, including: (i) downward trends in the real estate market; (ii) a shift toward a more risky strategy by a subsidiary company, FGIC, which insured mortgage-backed securities; and (iii) the fact that another subsidiary, Freescale, had lost its biggest customer.  *See* 634 F.3d at 718-19.  The defendants argued that any potential omissions were immaterial because (i) Item 303 only required disclosure of the developments themselves, and not disclosure of their impact on future revenues; and (ii) the developments enumerated above were matters of public knowledge at the time of Blackstone's IPO.  *See id*.

The Second Circuit rejected those arguments, vacated the district court's dismissal of the complaint, and held that Item 303 required far more than the mere identification of trends that were occurring in Blackstone's business.  To the contrary, the Second Circuit unequivocally held that "Blackstone was required to disclose the manner in which those then-known trends, events, or uncertainties *might reasonably be expected to materially impact Blackstone's future revenues*":

> [T]he key information that plaintiffs assert should have been disclosed is whether, and to what extent, the particular known trend, event, or uncertainty might have been reasonably expected to materially affect Blackstone's investments.  And this potential future impact was certainly not public knowledge*.  . . .  Again, the focus of plaintiffs' claims is the required disclosures under Item 303 – plaintiffs are not seeking the disclosure of the mere fact of Blackstone's investment in FGIC, of the downward trend in the real estate market, or of Freescale's loss of its exclusive contract with Motorola.  *Rather, plaintiffs claim that Blackstone was required to disclose the manner in which those then-known trends, events, or uncertainties might reasonably be expected to materially impact Blackstone's future revenues.*

*Id*.

---

information and, in some situations (*such as the disclosures in MD&A*), *required them to do so*."  Securities Offering Reform, Securities Act Release No. 8591, 70 Fed. Reg. 44,722, 44,736 (Aug. 3, 2005); *see also, e.g.*, In re Shared Med. Sys. Corp., SEC Release No. 34-33632, 1994 WL 49960, at *3 (Feb. 17, 1994) (finding that the issuer violated Item 303 where it failed (1) to disclose a known trend relating to lower than expected sales activity and (2) "to state that [it] reasonably *expected this trend to have a materially unfavorable impact on net sales, revenues and earnings*").

Approximately one year later, another panel of the Second Circuit unanimously reaffirmed *Litwin*'s holding in *Panther Partners*. In *Panther Partners*, the plaintiffs alleged that the defendants failed to disclose the extent of the impact of known product defects on the company's financial results in advance of a secondary offering. *See* 681 F.3d 114-16. The defendants contended that they had satisfied Item 303 by disclosing, similar to what Facebook disclosed here, the fact that the issuer's products "frequently contain defects and bugs;" that "[i]n the past we have experienced, and may in the future experience, defects and bugs in our products;" and that "*[i]f any of our products contains defects [that] could harm our ability to retain existing customers and attract new customers.*" *See id.* at 117. In a decision that was issued before *Litwin* was decided, the district court agreed, and dismissed the complaint.

Based on *Litwin*, the Second Circuit emphatically rejected the defendants' argument and vacated the district court's dismissal. Quoting the language set forth above from *Litwin*, the Second Circuit held that the mere identification of factors that "*may*" impact the issuer's business failed to satisfy the its obligations under Item 303. The Second Circuit again held that the key issue was not whether the issuer had disclosed a trend that might affect its business, but whether it adequately disclosed "*whether*, *and to what extent* the particular known trend, event, or uncertainty . . . *might reasonably be expected to materially impact [the issuer's] future revenues*." *Id.* at 121. The Second Circuit further concluded that "generic cautionary language" in the offering documents "did not fulfill [the issuer's] duty to inform the investing public of the particular, factually-based uncertainties of which it was aware in the weeks leading up to the [s]econdary [o]ffering," and the magnitude of their expected impact on revenues. *Id.* at 122.

In sum, it is black-letter Second Circuit law that Item 303 requires an issuer to disclose not only (i) any trend that is "known and existing at the time of the IPO" that may impact the issuer's financial condition, but also (ii) "whether, and to what extent," that known trend, event, or

27

uncertainty "might reasonably be expected to materially impact [the issuer's] future revenues." *Id.* at 121 (quoting *Litwin*, 634 at 716, 718-19).

Applying these precedents here leaves no doubt that Defendants failed to satisfy their disclosure obligations under Item 303. First, Defendants failed to disclose "whether" increasing mobile usage had already had a material negative impact on Facebook's revenues, or was reasonably expected to do so. Rather than simply stating that Facebook had determined that increasing mobile usage *had* negatively impacted the Company's revenues, the Registration Statement cautioned in only "generalized terms" that increasing mobile usage and certain product decisions "*may* negatively affect our revenue and financial results" "*if*" certain contingencies occurred (¶ 99) – precisely the sort of vague and conditional disclosures that the Second Circuit held was wholly inadequate to satisfy Item 303 in *Panther Partners*.

Second, Defendants also failed to disclose "to what extent" increasing mobile usage and the Company's product decisions had impacted Facebook's ability to generate revenues. Defendants could have satisfied this disclosure obligation in multiple ways. To start, they could have disclosed that the known trends of increasing mobile usage and Facebook's product decisions were expected to have a material negative impact on the Company's revenues for the second quarter and the year. *See* ¶ 201. They also could have disclosed that, as a result of increasing mobile usage and Facebook's product decisions, the Company had cut its revenue figures for the second quarter by as much as 8.3%, and for the year by as much as 3.5%. *Id.* Significantly, neither of these disclosures would have required Facebook to disclose its internal projections. However, they made *no* such disclosure. Defendants' failure to make *any* disclosure of the extent of the impact of increasing mobile usage on Facebook's revenues violated Defendants' disclosure obligations under Item 303.

### B. Under Controlling Second Circuit Authority, Defendants' Mere Identification of a Trend Did Not Satisfy Their Obligations Under Item 303

Defendants first contend that they satisfied their disclosure obligations under Item 303 by

providing a "narrative explanation of the mobile trend." *See* Defs. Br. at 27.  They assert that they

satisfied Item 303 principally by disclosing in the May 9 amendment (i) the trend that "DAUs

[were] increasing more rapidly than the increase in the number of ads delivered," due in part to

increasing mobile usage; (ii) that mobile usage "will [ ] affect our performance, particularly *if*

mobile use substitutes for use on personal computers;" and (iii) that "some of [Facebook's] mobile

usage has been and will continue to be a substitute for use of Facebook through personal

computers." *Id*.  This argument fails.

       As noted above, in *Litwin* and *Panther Partners*, the Second Circuit resoundingly rejected

the argument that mere identification of a trend satisfies a company's disclosure obligations under

Item 303.  Indeed, contrary to what Defendants contend, the Second Circuit held that, in addition to

identification of a trend, Item 303 also requires specific disclosure of "whether, and to what extent,"

the trend had already impacted or was expected to "impact [ ] future revenues." *Litwin*, 634 F.3d at

718-19; *Panther Partners*, 681 F.3d at 121.  None of the statements on which Defendants rely

disclosed that increasing mobile usage and the Company's product decisions *had* already impacted

Facebook's revenues for the second quarter and the year, and none of these statements disclosed the

extent of that impact.

       Indeed, Defendants' argument is directly refuted by the facts.  Had the disclosures on which

Facebook relies adequately conveyed this information, there would have been no need for Facebook

to make nineteen calls to the Syndicate Analysts to inform them of these facts after filing the May 9

amendment.  Nor would the Syndicate Analysts immediately have made material cuts to their

revenue estimates.  Nor would there have been any need for the Syndicate Analysts to make a series

of private calls to their largest clients to inform them of their revenue cuts.  Moreover, as set forth

above and detailed in the Complaint, numerous contemporaneous market commentators specifically

reported that Facebook's disclosures, including the May 9 amendment, did *not* convey the fact that

increasing mobile usage had already had a negative impact on Facebook's revenues, or the extent of that impact.  ¶¶ 171-75.  As *Business Insider* reported, "Facebook's amended prospectus did ***not*** say that the company's business had suddenly weakened and management's outlook had changed.  And that information is vastly more important than what the prospectus did say, which was that users are growing faster than revenue."  ¶ 173.  Similarly, *Venture Beat* reported that "the fact is, there is nothing within the [ ] update on May 9 that would give normal investors the sense that there had been a material change about Facebook's revenue prospects."  ¶ 174.  In short, the vague, limited and conditional statements on which Defendants rely were completely inadequate to disclose the information that the Second Circuit has held is required by Item 303.

C.     **The Complaint Does Not Assert a General Duty to Disclose Revenue Projections or Mid-Quarter Revenue Data**

Defendants next contend that neither the SEC nor the courts have imposed a general duty "to disclose . . . internal forecasts" on issuers.  Defs. Br. at 28.  From this premise, they conclude that companies ***never*** have any duty under Item 303 to "disclose the projected extent of an impact of an existing trend on *future* revenues not yet reported."  *See id.* at 28 & n.14 (emphasis in original).  This argument is incorrect for numerous reasons.

To start, Defendants' assertion that the Complaint must be dismissed because there is no general "duty to disclose revenue projections" is an irrelevant straw man argument that mischaracterizes the Complaint's allegations.  Defs. Br. at 27-33.  The Complaint does ***not*** assert that registrants have a general duty to disclose internal projections or other forward-looking information.  Moreover, as noted, the Complaint does ***not*** assert that Defendants had a duty to disclose Facebook's internal ***numerical*** revenue projections.  Rather, the alleged claims are premised on a specific affirmative duty triggered under Item 303, which required Defendants to disclose to the market the extent that known trends had already impacted Facebook's revenues for the second quarter and the year, which Defendants completely failed to do.  *See* ¶¶ 188(c), 197, 201.

30

As noted above, Defendants could have fulfilled this duty without disclosing Facebook's specific internal projections. The absence of a general duty to disclose projections does not mean that IPO registrants are exempted from complying with the disclosure requirements of Item 303, as *Litwin* specifically held that Item 303's disclosure obligations apply to IPO registration statements. *See* 634 F.3d 706.

1. ***Litwin* and *Panther Partners* Establish that Under Item 303 Facebook Had a Duty to Disclose the Extent and Impact of the Trends at Issue on Its Future Revenues**

Defendants' sweeping contention that, as a matter of law, there is ***never*** any duty to "disclose the projected extent of an impact of an existing trend on *future* revenues not yet reported," is simply wrong. *See* Defs. Br. at 27-33 (emphasis in original). This argument directly contradicts the Second Circuit's holdings in *Litwin* and *Panther Partners* that Item 303 requires an issuer to disclose "whether, and ***to what extent*** the particular known trend, event, or uncertainty . . . ***might reasonably be expected to materially impact [the issuer's] future revenues***." *Litwin*, 634 F.3d at 718-19; *Panther Partners*, 681 F.3d at 121; *see also* 1 Thomas Lee Hazen, Law Sec. Reg. § 3.9 ("[D]isclosure [of internal projections of future performance] would be required if the internal projections were sufficiently convincing to rise to the level of a trend."). Consistent with this controlling authority, the SEC has made clear that Item 303 indeed requires disclosure of the quantitative impact of a known trend or development on an issuer's future revenues if such quantitative, forward-looking information is "reasonably practicable" or "reasonably available," as it undoubtedly was here.

In its 1989 SEC Release, the SEC specifically stated that if "[m]anagement is unable to determine that a material effect . . . is not reasonably likely to occur," then "MD&A ***disclosure of the effects*** of [the known trend, development or uncertainty], ***quantified to the extent reasonably practicable***, ***would be required***." 54 Fed. Reg. at 22,430; *see also* 2003 SEC Release, 68 Fed. Reg.

at 75,062 ("Quantitative disclosure . . . may be required to the extent material if quantitative

information is reasonably available.").  Thus, the "***required disclosure regarding the future impact***

of presently known trends, events or uncertainties [under Item 303] ***may involve some prediction or***

***projection***."  1989 SEC Release, 54 Fed. Reg. at 22,429; *see also* 2003 SEC Release, 68 Fed. Reg.

at 75,059 ("In addressing prospective financial condition and operating performance, there are

circumstances, ***particularly regarding known material trends*** and uncertainties, where ***forward-***

***looking information is required to be disclosed***.").[6]  Accordingly, in circumstances where Item 303

is satisfied, and the quantification of the impact of trend is "reasonably available," as it was here,

disclosure of a revenue projection may be required.  At a minimum, Defendants had a duty to

disclose that the trends at issue had ***already*** had a material negative impact on Facebook's revenues.

### 2. Defendants' Assertion that There Is No General Duty to Disclose Mid-Quarter Revenue Data Is a Straw Man Argument

Defendants next advance a similarly irrelevant argument that issuers have no general duty to

disclose "mid-quarter revenue data," and thus, Facebook had no obligation to disclose the

Company's revenue cuts for the second quarter.  *See* Defs. Br. at 33-36.  Again, however,

Defendants mischaracterize the gravamen of the Complaint and misstate the law.

First, the Complaint does not allege that Defendants were required to disclose numerical

---

[6] Defendants inaccurately characterize the 1989 SEC Release as "drawing a distinction" between required disclosures, on the one hand, and optional disclosures that may involve projections, on the other.  *See* Defs. Br. at 29.  The 1989 SEC Release clearly states that "***Both required disclosure regarding the future impact of presently known trends, events or uncertainties and optional forward-looking information may involve some prediction or projection***.  The distinction between the two rests with the nature of the prediction required."  54 Fed. Reg. at 22,429.  Thus, as noted above, the SEC has expressly advised registrants that "***specific provisions in Item 303 require disclosure of forward-looking information***."  *Id.* at 22,428.  This point was reiterated in the 2003 SEC Release, which states as follows:

As discussed in the 1989 [SEC] Release, the disclosures required to address known material trends and uncertainties in the [MD&A] should not be confused with optional forward-looking information.  Not all forward-looking information falls within the realm of optional disclosure.  ***In particular, material forward-looking information regarding known material trends and uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects***.

68 Fed. Reg. at 75,062.

mid-quarter revenue data.  Rather, the Complaint alleges only that, under Item 303, Defendants were required to disclose the fact that increasing mobile usage and the Company's product decisions had already had a negative impact on its revenues for the second quarter, and the extent of that impact.  *See* ¶¶ 188(c), 197, 201.  As stated above, Defendants could have satisfied this disclosure obligation merely by stating that Facebook had determined that these trends had already had a material negative impact on its second quarter revenue – without disclosing any data reflecting their mid-quarter revenues to date or their reduced second quarter revenue projection.

The fact that Defendants scheduled the IPO to occur in the middle of a quarter (rather than on the first or last day of a quarter) does not absolve them of this disclosure duty under Item 303.  Defendants' disclosures under Item 303 were required to be accurate and complete as of the time the Registration Statement became effective, and there is no exception for registration statements that become effective in the middle of a quarter.  Moreover, as noted above, Item 303 specifically requires disclosure of information concerning future reporting periods.  To hold that Item 303 does not apply to a quarter simply because it is not over would render it a nullity.

Further, Defendants are wrong that, as a matter of law, there is never any duty to disclose mid-quarter financial data.  Courts have held that where, as here, a disclosure document is issued intra-quarter, then it must disclose material negative events that are occurring at the time so that investors may make informed investment decisions – regardless of the fact that the quarter is not over.  For example, in *In re Bank of America Securities Corp., Derivative & ERISA Litigation*, 757 F. Supp. 2d 260 (S.D.N.Y. 2010) (Castel, J.), the plaintiffs alleged that the defendants were required to disclose mid-quarter estimated and projected losses being suffered by Merrill Lynch in advance of a shareholder vote on a merger between Bank of America and Merrill Lynch.  The defendants contended that, "as a matter of law, [they] had no duty to update shareholders as to their financial results on an intra-quarterly basis."  *Id.* at 303.  Judge Castel flatly rejected this argument, holding

33

that the defendants were required to disclose Merrill's interim, estimated losses even though the quarter was not complete, and explaining that courts widely "recognize that intra-quarter updates may be required, if intervening events trigger a duty to disclose." *Id*. at 304; *see also Milman v. Box Hill Sys. Corp.*, 72 F. Supp. 2d 220, 231 (S.D.N.Y. 1999) (Scheindlin, J.) (rejecting the defendants' argument that "the securities laws do not require a company to disclose information regarding sales results for a quarter in progress" where the plaintiffs alleged that, prior to the issuer's initial public offering, the defendants had knowledge of a trend that had already had a material negative impact on the issuer's net sales).

Here, the duty to disclose was triggered because the specific conditions of Item 303 were satisfied before the Registration Statement became effective. In particular, ten days before the IPO, Defendants determined that increasing mobile usage and the Company's product decisions had already had a material negative impact on Facebook's revenues. As explained above, under Item 303, Defendants were required to disclose these facts, regardless of whether the second quarter was complete. *See Milman*, 72 F. Supp. 2d at 231 (holding that Item 303 required disclosure of the fact that mid-quarter "sales were in material decline at the time of the Offering").

Defendants also contend that they were not required to disclose mid-quarter revenue data because, pursuant to SEC Regulation S-X, 17 C.F.R. § 210.3-12(a), the "SEC has made clear that a registration statement need not include revenue data for the fiscal quarter in which the IPO is held." Defs. Br. at 33. However, the Second Circuit has specifically rejected the argument that an issuer is required to disclose only the financial information required by Regulation S-X. In *DeMaria v. Andersen*, 318 F.3d 170 (2d Cir. 2003), the plaintiff alleged that the defendants were required to disclose in a registration statement "interim" financial results from a quarter in progress. *Id*. at 179-80. The defendants argued that they had no duty to disclose such interim financial information as a matter of law because it was not required to be disclosed under Regulation S-X, 17 C.F.R. § 210.3-

34

12(a), just as Defendants argue here.  *Id*.  The Second Circuit rejected this argument, and held that

Regulation S-X "is not the only operative SEC regulation" setting forth the defendants' disclosure

duties, and that defendants would indeed have a "duty to disclose interim financial information in

the prospectus" if such disclosure were required by any other SEC rule or regulation.  *Id.* at 180; *see*

*also In re Ulta Salon, Cosmetics & Fragrance, Inc. Sec. Litig.*, 604 F. Supp. 2d 1188, 1195 (N.D.

Ill. 2009) (relying on *DeMaria* to reject argument that the defendants "had no duty to disclose in the

Prospectus financial data for the still-pending third quarter").

Here, another SEC rule apart from Regulation S-X – namely, Item 303 – obligated

Defendants to disclose the extent to which known trends had already impacted Facebook's revenues

for the second quarter.  This separate disclosure obligation exists independently of, and in addition

to, Regulation S-X.  As explained in detail above, Defendants failed to satisfy their independent

disclosure obligations under Item 303.[7]

**D.      Defendants' Assertions of "Industry Practice" Are Irrelevant and Wrong**

Defendants contend that they cannot be liable as a matter of law because their selective

disclosure of the material negative impact of mobile usage on Facebook's revenues in the middle of

the roadshow supposedly did not "trigger a duty to print that information in [the] registration

statement" and comported with "industry practice."  Defs. Br. at 36-39.  These arguments are

irrelevant and belied by the allegations in the Complaint.

First, while Defendants' selective disclosure of Facebook's revenue cuts clearly

demonstrates materiality, the Complaint does ***not*** allege that Facebook's duty to disclose arose from

its selective dissemination of this information.  Rather, as explained above, Facebook's duty to

---

[7] Relying on two district court cases that pre-dated *Litwin* and *Panther Partners* by more than a decade, Defendants incorrectly contend that they had no duty to disclose the impact of mobile usage on Facebook's second quarter revenue because Facebook's lowered projection reflected growth from prior quarters and, therefore, was not an "extreme departure" from Facebook's previous performance.  *See* Defs. Br. at 35.  This is not the law.  *See Litwin*, 634 F.3d at 716 (Item 303's disclosure requirements are triggered whenever the impact of a known trend is expected to be "material").

disclose arose from Item 303.  Further, Facebook made actionable material misrepresentations in the Registration Statement, as set forth in Section II, *infra*.

Second, whether something is "industry practice" is a "fact-intensive inquir[y]" that cannot be resolved on a motion to dismiss.  *Shah v. Wilco Sys., Inc.*, 76 F. App'x 383, 385 (2d Cir. 2003).  Here, there are extensive facts establishing that what Facebook did was a far cry from "industry practice" – and was a "bombshell" in the words of industry participants.  For example, *Reuters* described Facebook's decision to make revenue cuts during the roadshow as "***rare***" and quoted sources as saying, "***This was done during the roadshow – I've never seen that before in 10 years.***" ¶ 166.  Similarly, analysts who specialized in technology IPOs described Morgan Stanley's decision to reduce its revenue estimates in the middle of a roadshow as "***very***, ***very unusual***," "***highly unusual***" and something that they had "***never seen*** . . . ***during 20 years in and around the tech IPO business***."  ¶¶ 166-67.  Thus, at best, whether Facebook's selective disclosure of the Company's revenue cuts in the middle of its roadshow truly is "industry practice" only raises fact issues that cannot be resolved at this stage.

E.       **This Court's Derivative Opinion Did Not Address Facebook's Duty to Disclose the Extent and Impact of the Trends Under Item 303**

Finally, Defendants' reliance on the Court's Derivative Opinion is misplaced.  In dismissing the Derivative Actions, the Court held that "the essence of the Derivative Plaintiffs' complaints is that the Board allowed Facebook to file a Registration Statement that did not disclose its internal revenue projections."  Derivative Op. at *23.  Here, that is not the "essence" of the Complaint.  Significantly, the parties in the Derivative Actions did not even raise the issue of Facebook's disclosure duties under Item 303 with the Court in their briefs or at oral argument on Defendants' motion to dismiss.  Nor did the parties in the Derivative Actions cite to the Court the Second Circuit's controlling decisions in either *Litwin* or *Panther Partners*.  Therefore, the Derivative Opinion did not address Defendant's disclosure duties under Item 303, and certainly did not hold

36

that Defendants had satisfied those obligations as interpreted by the Second Circuit.[8]

## II.    The Registration Statement Contained Material Misrepresentations

The Complaint also alleges that Defendants violated Sections 11 and 12 of the Securities Act by making material misrepresentations in the Registration Statement concerning the impact of increasing mobile usage and the Company's product decisions on Facebook's revenues.  *See* ¶¶ 188-96.  As explained below, these allegations also state a claim under Sections 11 and 12.

### A.    Facebook's Registration Statement Made Material False Statements by Warning of a Potential Future Risk to Revenues When that Risk Had Already Materialized

The Complaint alleges that the Registration Statement contained statements in which Facebook purported to warn investors only that increasing mobile usage "*may* negatively affect our revenue" "*if*" certain contingencies occurred.  *See* ¶¶ 188(a), 189, 191, 193.  Similarly, the

---

[8] Defendants rely on numerous inapposite authorities for the proposition that they had no duty to disclose Facebook's internal projections.  *See* Defs. Br. at 28-29.  *Sheppard v. TCW/DW Term Trust 2000* did not concern alleged violations of Item 303.  Further, the court reasoned that "plaintiffs do *not* allege that defendants' internal calculations were belied by defendants' actual knowledge of contradictory facts at the time it was made" but only that defendants "fail[ed] to *predict* a rise in interest rates" – a far cry from the claims here.  938 F. Supp. 171, 178 (S.D.N.Y. 1996) (Schwartz, J.).

*In re Northern Telecom Ltd. Securities Litigation* is a summary judgment case that did not involve an IPO.  Further, in that case, the company *did* publicly disclose that its annual earnings were going to be lower than the prior year, and plaintiffs merely contended that this disclosure should have been made earlier.  116 F. Supp. 2d 446, 458 (S.D.N.Y. 2000) (Cedarbaum, J.).  Facebook, in contrast, never disclosed the information required by Item 303.

*Rubke v. Capitol Bancorp Ltd.* did not involve alleged violations of Item 303 or an IPO.  Further, unlike here, the *Rubke* plaintiffs alleged merely that defendants' statement that they "believe[] that [the bank's] profitability will increase" was misleading because it failed to state that they believed the bank's profitability will "dramatically" increase – a mere "squabble about the adverbs used."  551 F.3d 1156, 1163 (9th Cir. 2009).  Moreover, while *Rubke* quoted *In re Lyondell Petrochemical Co. Securities Litigation* for the proposition that "there is no duty to disclose income projections in a prospectus" (*id.*), the *Lyondell* court recognized that "*[t]he outcome of the present case would be entirely different had Plaintiffs alleged Lyondell's internal predictions were based on existing negative factors known only to the company.*"  984 F.2d 1050, 1053 (9th Cir. 1993).

*Glassman v. Computervision Corp.* merely concerned an alleged failure to disclose that the company was supposedly lagging behind its internal forecasts by "less than 1% of the budgeted revenues for that quarter," not a claim that the company failed to disclose that known trends had materially impaired its ability to generate revenue for the quarter and the year.  *See* 90 F.3d 617, 630-31, 632 n.22 (1st Cir. 1996) ("mere fact that intra-quarterly results lagged behind internal projections does not, *without more*, require disclosure").

Although not cited by Defendants, in the Derivative Opinion, this Court relied in part on *In re Oracle Corp. Derivative Litigation*, 867 A.2d 904 (Del. Ch. 2004), a breach of fiduciary duty case, for the proposition that intra-quarter projections are immaterial as a matter of law.  *See* Derivative Op. at *19.  However, *Oracle* did not involve alleged violations of Item 303.  Moreover, it is a summary judgment decision, coming after extensive discovery which showed – unlike the allegations in this case – that at the time the defendants engaged in alleged insider trading, they believed that the issuer would meet or exceed its estimates for earnings and revenue growth.  867 A.2d at 908.

Registration Statement contained statements in which Facebook purported to warn investors only that its product decisions "*may*" negatively affect its revenues.  *See* ¶¶ 188(b), 191, 193, 195.  The Complaint further alleges that on May 9, one day after Facebook made its revenue cuts as a result of the impact of increasing mobile usage and its own product decisions, Facebook filed an amended Registration Statement in which it continued to emphasize that any potentially negative impact of these factors was uncertain, and reiterated its purported prior warnings that these factors "*may* negatively affect our revenue and financial results." ¶ 193.

These statements were materially untrue and misleading.  Specifically, it was misleading to represent that increasing mobile usage and the Company's product decisions *might* negatively impact Facebook's revenues when Facebook had already determined that increasing mobile usage and its product decisions *had* negatively affected its revenues to a material degree.  *See* ¶¶ 188(a)-(b), 190, 192, 194, 196.  Indeed, as noted above, prior to the IPO, Facebook had determined that, as a direct result of these factors, its estimated revenues had declined by as much as 8.3% for the second quarter of 2012 and 3.5% for the year.  The Company's purported risk warnings therefore misleadingly represented that this negative impact was merely possible, when in fact, it had already materialized before the IPO.

This Court and others routinely hold that statements warning that something might occur in the future are misleading where, as here, the purported contingency has already come to pass.  For example, in *Van der Moolen*, this Court held that statements purporting to warn that a company's business "could" be negatively impacted "*if*" it failed to comply with industry regulations were materially misleading where the company was violating industry regulations at the time it issued those purported warnings.  405 F. Supp. 2d at 400, 415.  As the Court explained, "*to warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit*."  *Id*. at 400; *see also*

38

*In re Bear Stearns Cos., Inc. Sec., Deriv. & ERISA Litig.*, 763 F. Sup. 2d 423, 495 (S.D.N.Y. 2011) (Sweet, J.) (same).

Consistent with this Court's holding, courts in this Circuit have long held that a company's purported risk disclosures are misleading where, as here, the company warns only that a risk "may" impact its business when that risk has already materialized.  For example, Judge Pollack held that "***even apparently specific risk disclosures like those in Polaris' prospectus are misleading if the risks are professionally stamped in internal undisclosed analyses (as they were here) as significantly greater or more certain than those portrayed in the prospectus***."  *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996); *see also Dodona I, LLC v. Goldman, Sachs & Co.*, 847 F. Supp. 2d 624, 646 (S.D.N.Y. 2012) (Marrero, J.) ("Since the Offering Circulars contained affirmative representations regarding the risks of investing, . . . Defendants had a duty to ensure that those statements were accurate and complete.").  *Cf. Eckstein v. Balcor Film Investors*, 8 F.3d 1121, 1127 (7th Cir. 1993) (Easterbrook, J.) ("A prospectus stating a risk that such a thing ***could*** happen is a far cry from one stating that this ***had*** happened.  The former does not put an investor on notice of the latter.").[9]

### B.    Facebook's Registration Statement Did Not Disclose the Fact that Mobile Usage Had Already Had a Material Negative Impact on the Company's Revenues

In response to the Complaint's well-pled allegations of falsity and established law, Defendants make a series of arguments in which they contend that their disclosures in the Registration Statement were not misleading because they adequately disclosed the fact "that mobile usage was already affecting revenue growth."  Defs. Br. at 18; *see id.* at 17-23.  This is not what the Registration Statement said, and Defendants' arguments are belied by numerous facts alleged in the Complaint.  For example, Facebook's Treasurer made nineteen phone calls to the Syndicate

---

[9] Thus, contrary to what Defendants suggest, Lead Plaintiffs do not allege that Facebook was "required to characterize its business . . . in pejorative terms."  Defs. Br. at 23.  As the above cases demonstrate, it is materially misleading to state only that a significant negative event "may" occur, when, in fact, it has already happened.

Analysts beginning only minutes after filing the May 9 amendment to tell them of the Company's revenue cuts – which obviously would not have been necessary if the Registration Statement had adequately disclosed that increasing mobile usage had already had a material negative impact on revenues.  Similarly, if Facebook's public disclosures actually had disclosed that increasing mobile usage had materially impacted the Company's revenues, there would have been no need for the Syndicate Analysts to privately contact certain preferred investors to inform them of their reduced estimates.

The reaction of the market when news of Facebook's revenue cuts was publicly revealed confirms that the Registration Statement did not adequately disclose the material negative impact of mobile usage on the Company's revenues.  In the wake of the May 21 and May 22 disclosures revealing Facebook's pre-IPO revenue cuts, market commentators specifically reported that Facebook had *not* previously disclosed that information.  *See, e.g.*, ¶ 173 (*Business Insider* reporting that "Facebook's amended prospectus did not say that the company's business had suddenly weakened and management's outlook had changed.  And that information is vastly more important than what the prospectus did say"); ¶ 174 (*Venture Beat* reporting that "[t]he fact is, there is nothing within the S-1 update on May 9 that would give normal investors the sense that there had been a material change about Facebook's revenue prospects").  Tellingly, Defendants fail to even address these articles in their brief – an implicit concession that there is no way to reconcile their argument with the contemporaneous reaction of sophisticated market observers.  In addition, investors reacted with "shock" and "anger" to the post-IPO revelation of Facebook's revenue cuts, and the Company's stock price collapsed, falling more than 18% in two trading days on extremely high volume.  The Court need look no farther than these facts to determine that the Registration Statement did *not* disclose that increasing mobile usage had already had a material negative impact on Facebook's revenues.  At a bare minimum, these well-pled facts raise a question of fact as to the

adequacy of Facebook's disclosures.

> **1.    The Plain Language in the Registration Statement Shows that Facebook Did Not Disclose that Increasing Mobile Usage Had Already Had a Material Negative Impact on the Company's Revenues**

Defendants spend six pages of their brief arguing that the Registration Statement supposedly disclosed that increasing mobile usage had already had a negative impact on Facebook's revenues. However, they are unable to point to *any* statement disclosing this fact in the Registration Statement.  *See* Defs. Br. at 17-23.  Instead, Defendants attempt to cobble together several conditional and limited disclosures – some of which are 40 pages apart from one another in the Registration Statement – and claim that a so-called "contextual" reading of these disclosures somehow demonstrates, as a matter of law, that the Registration Statement disclosed the material negative impact of mobile usage on Facebook's business.  Their arguments fail.

Ignoring the plain language of their own disclosures, Defendants principally contend that their risk factor stating that increasing mobile usage "*may*" negatively impact Facebook's financial results somehow made clear that mobile usage "*was* currently having a negative impact on revenue."  Defs. Br. at 18-19.  Specifically, Defendants assert that this risk factor (i) stated that revenue "*would* be negatively affected" "*if* users increasingly access Facebook mobile products as a substitute for access through personal computers," and "*if* [Facebook is] unable to successfully implement monetization strategies for our mobile users," and (ii) approximately 40 pages later, the Registration Statement supposedly disclosed that these two conditions were occurring.  In particular, the Registration Statement stated that "some" unspecified portion of mobile usage "has been, and will continue to be, a substitute for use of Facebook through personal computers," and that Facebook does "not currently directly generate any meaningful revenue from the use of Facebook mobile products."  Defs. Br. at 18-19 (quoting the Registration Statement at 14, 95).

Far from stating that increasing mobile usage had already had a material negative impact on

Facebook's revenues, the disclosures quoted above contain highly conditional and uncertain representations about what might potentially occur "*if*" certain contingencies were met. These disclosures do not make clear that these contingencies had, in fact, already been met. Merely stating that "some" portion of mobile usage has been a substitute for desktop use does not disclose whether a significant percentage of mobile usage has been a substitute for desktop use, and certainly does not disclose whether this development has meaningfully impacted Facebook's revenues.

This is particularly true because Facebook specifically informed investors that (i) "*the substantial majority of our mobile users also access and engage with Facebook on personal computers where we display advertising*" (¶ 99) and (ii) Facebook could *not* determine the degree to which mobile use might be substituting for desktop use, stating that "*[w]e cannot quantify the extent to which mobile usage of Facebook is substituting for, rather than incremental to, usage of Facebook through personal computers* . . . ," Registration Statement at 53. Further, merely stating that Facebook did not currently generate meaningful revenue from mobile is a far cry from disclosing that mobile usage was *harming* Facebook's revenues for the quarter and the year. Nor did it mean that Facebook would be unable to generate revenue from mobile usage in the near future.

Indeed, rather than disclosing this information, the Registration Statement contained *positive* statements concerning the impact of mobile usage on Facebook's financial prospects. For example, Facebook repeatedly underscored that it was actively taking steps to capitalize on its mobile users, including that it had introduced paid advertisements on mobile, called "Sponsored Stories," weeks before the IPO – thus opening up a potentially significant mobile revenue stream. *See* ¶¶ 95, 110-11. Notably, in the Registration Statement, Facebook represented that the Company believed that increased mobile usage would have a "*generally positive*" effect on its revenues, stating:

> We experienced growth in DAUs [daily active users] across major markets including the United States, Brazil, and India. *Increased mobile usage was a key contributor*

> ***to this growth.*** DAUs as a percentage of MAUs [monthly active users] increased from 55% in March 2011 to 58% in March 2012, which we believe was ***driven entirely by increased mobile usage*** of Facebook. We believe that increases in DAUs and in DAUs as a percentage of MAUs ***generally positively affect our revenue*** because increases in user engagement may enable us to deliver more relevant commercial content to our users and may provide us with more opportunities for monetization.

Registration Statement at 50.   In short, there is no basis to conclude, as a matter of law, that Facebook's statements that mobile usage "may" impact the Company's revenues somehow disclosed that mobile usage had ***already*** had a material negative impact on its revenues.[10]

Defendants next argue that the Registration Statement "disclosed that mobile usage had increased rapidly" and that "some" of this mobile usage was substituting for desktop use, which Defendants argue had "obvious revenue implications."  Defs. Br. at 20.  However, hinting at potential "revenue implications" does not satisfy Defendants' disclosure obligations under the Securities Act.  Moreover, the "implications" that Defendants suggest exist are far from obvious in light of the Registration Statement's disclosures that mobile usage was driving growth in users that "***generally positively affect[ed] our revenue***;" "***the substantial majority of our mobile users also access and engage with Facebook on personal computers where we display advertising***," ¶ 99; and the Company "cannot quantify the extent to which mobile usage" was occurring as a substitute for, rather than as a supplement to, desktop use, Registration Statement at 50, 53.  Accordingly, there is no basis to conclude, as a matter of law, that the above disclosures created the supposedly "obvious" impression that mobile usage had already had a material negative impact on Facebook's revenues.

Defendants next contend that their May 9 trend disclosure – which stated that, "[b]ased on

---

[10] The Registration Statement also contained positive statements about the impact of Facebook's product decisions, including that certain of its product decisions led to an ***increase*** in price per ad, *see* Registration Statement at 53; the number of ads it was delivering in the second quarter of 2012 was ***increasing***, *see id.* at 57 (noting "the ***increase*** in number of ads delivered"); and average revenue per user was ***increasing***, *see id.* at 52 ("During the first quarter of 2012, worldwide ARPU [average revenue per user] was $1.21, an increase of 6% from the first quarter of 2011.").

our experience in the second quarter of 2012 to date, the trend we saw in the first quarter of DAUs increasing more rapidly than the increase in number of ads delivered has continued" – revealed a trend that "necessarily affects revenue" negatively.  *See* Defs. Br. at 20-21.  Again, however, nowhere does this disclosure actually state that Facebook's revenues had been negatively impacted by increasing mobile usage, and the securities laws do not require investors to guess at what the company might intend to mean.  *See Freudenberg*, 712 F. Supp. 2d at 180 ("The purpose of the disclosure requirements is to inform, not to challenge the reader's critical wits.").  ¶ 131.  Contrary to what Defendants contend, this "trend disclosure" merely reiterated Defendants' earlier misleading disclosures by stating only that Facebook's revenues "***may***" be negatively impacted by mobile usage, when it already had been.  ¶¶ 128-29, 193-94.

Further, Defendants' assertion that the disclosed trend "necessarily affects revenue" negatively is wrong.  Defs. Br. at 21.  This disclosure explicitly stated that the number of ads Facebook was delivering in the second quarter of 2012 – and hence its revenues – was ***increasing***. *See id.* (noting "the ***increase*** in number of ads delivered").  Indeed, as set forth in detail above, immediately after Facebook's revenue cuts came to light, sophisticated market commentators specifically stated that this disclosure did ***not*** communicate to investors that the Company's revenues were being negatively impacted.  *See* ¶ 174 ("The fact is, there is nothing within the S-1 update on May 9 that would give normal investors the sense that there had been a material change about Facebook's revenue prospects."); ¶ 173 ("Facebook's amended prospectus did not say that the company's business had suddenly weakened and management's outlook had changed.").

After extensively arguing that they disclosed the fact that increasing mobile usage had negatively impacted Facebook's revenues, Defendants switch course and essentially argue that it was impossible for Facebook to have disclosed this information because "the extent to which mobile usage substituted for personal computer usage . . . was unknown and perhaps unknowable."

44

Defs. Br. at 22.  But, of course, the problem with that argument is that it simply was not true as of

May 8, 2012, the date on which Facebook significantly cut its revenue estimates for the second

quarter and the year.

Defendants also argue that their purported risk warnings were mere forward-looking

"opinions" under *Fait v. Regions Financial Corp.*, 655 F.3d 105 (2d Cir. 2011), which are not

actionable because Lead Plaintiffs have disclaimed any allegations of fraud or scienter, and

therefore have not alleged that Defendants did not believe those opinions at the time of the IPO.

Defs. Br. at 24.  However, Facebook's purported risk warnings were misstatements of present fact.

A company makes a misstatement of ***present fact*** where, as here, it warns that something "may"

occur when, in reality, the contingency has ***already materialized***.  *See* Section II.A, *supra*.

Moreover, even if the alleged misstatements could be considered opinions, which they

cannot, the Complaint's allegations easily satisfy *Fait*'s requirements.  In that case, the Second

Circuit explicitly rejected the argument that a plaintiff asserting a Section 11 claim must plead

scienter in order to allege the falsity of an opinion.  *See Fait*, 655 F.3d at 112 n.5 ("[T]he standard

applied here does ***not*** amount to a requirement of scienter.  We do not view a requirement that a

plaintiff plausibly allege that defendant misstated his truly held belief and an allegation that

defendant did so with fraudulent intent as one and the same.").  Here, because the Complaint alleges

that Facebook's senior officers knew that increasing mobile usage and the Company's product

decisions had materially impacted its revenues as of the time of the IPO, it adequately alleges that

Facebook "misstated its truly held belief" as to the alleged misstatements.

### 2. The Fact that Facebook Ultimately Reported Higher Revenues than Expected Does Not Convert Statements that Were False at the Time of the IPO into True Statements

Finally, Defendants suggest that Facebook's disclosures at the time of the IPO are not

actionable because – ***after the IPO took place*** – the Company ultimately reported revenues in line

with its original estimates.  Defs. Br. at 14-15, 23.  Courts have recognized that such reasoning amounts to an "innocence by hindsight" defense, and fails as a matter of law.  As courts have held, this argument "disregards a fundamental principle in securities law analysis: the statements in a [p]rospectus are to be judged as of the effective date of the offering."  *Feiner v. SS & C Techs.*, 11 F. Supp. 2d 204, 209 (D. Conn. 1998); *see also* 15 U.S.C. § 77k (any part of a registration statement is actionable if it contains an untrue statement or material omission "when such part became effective"); *In re IPO Sec. Litig.*, 358 F. Supp. 2d 189, 205 (S.D.N.Y. 2004) (Scheindlin, J.) ("The truth of a statement made in the registration statement is judged by the facts as they existed when the registration statement became effective.").  *Cf. Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 662 (8th Cir. 2001) ("Just as we cannot countenance pleading fraud by hindsight, neither can we infer innocence by hindsight").

For example, the *Feiner* court rejected the defendants' suggestion that "the absence of an action or event in the post-offering period amounts to dispositive evidence that the [p]rospectus was not misleading because, if the [p]rospectus was in fact misleading . . . the event should have occurred."  11 F. Supp. at 209.  There, the court recognized that, "[t]he fact that actual results [ ] *may* suggest that the undisclosed or misstated risk was not realized does not in turn yield the conclusion that the risk was immaterial as a matter of law."  *Id.* (emphasis in original) (quoting *Pommer v. Medtest Corp.*, 961 F.2d 620, 623 (7th Cir. 1992) (Easterbrook, J.) ("The securities laws approach matters from an *ex ante* perspective: just as a statement true when made does not become fraudulent because things unexpectedly go wrong, so a statement materially false when made does not become acceptable because it happens to come true.")).

In sum, the Complaint adequately alleges that Defendants made materially untrue and misleading statements in the Registration Statement.

### III.     The Alleged Misstatements and Omissions Were Material

Defendants contend that the Complaint fails to allege materiality because "the additional

information Plaintiffs want would be at best cumulative" in light of Facebook's existing disclosures,

and thus, "[t]he alleged misrepresentations and omissions . . . add nothing to the 'total mix of

information' when viewed in context."  Defs. Br. at 41-42.  Defendants are wrong.

Materiality is sufficiently pled "by alleging a statement or omission that a reasonable

investor would have considered significant in making investment decisions."  *Ganino v. Citizens*

*Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000); *see also Basic Inc. v. Levinson*, 485 U.S. 224, 231-32

(1988) (information is material if there is a "substantial likelihood" that it would be "viewed by the

reasonable investor as having significantly altered the 'total mix' of information made available").

As this Court has held, "[m]aterial facts include . . . ***facts which affect the probable future of the***

***company*** and those which may affect the desire of investors to buy, sell, or hold the company's

securities."  *Freudenberg*, 712 F. Supp. 2d at 181.

The Second Circuit has recently emphasized that, in Section 11 cases, "[w]here the principal

issue is materiality, an ***inherently fact-specific finding***, the burden on plaintiffs to state a claim is

***even lower***" than the "relatively minimal burden" applicable to other elements of their claims under

FRCP 8.  *Litwin*, 634 F.3d at 718.  A "complaint may not properly be dismissed . . . on the ground

that the alleged misstatements or omissions are not material unless they are ***so obviously***

***unimportant*** to a reasonable investor that ***reasonable minds could not differ*** on the question of

their importance."  *Ganino*, 228 F.3d at 162; *see also Freudenberg*, 712 F. Supp. 2d at 181 ("[T]he

trier of fact usually decides the issue of materiality.").

### A.     The Complaint Sets Forth At Least Ten Separate Reasons Demonstrating the Materiality of Defendants' False Statements and Omissions

Here, there is no question that the Complaint adequately alleges the materiality of the

negative impact of mobile usage on Facebook's revenues.  *See* ¶¶ 176-85.  ***First***, Facebook's

revenue cuts were of a magnitude that the Second Circuit has held to be material.  The Company cut

its revenue figures for the second quarter of 2012 by as much as $100 million, or more than 8.3%,

and for the year by as much as $175 million, or 3.5%.  ¶ 10; *see also Litwin*, 634 F.3d at 713 & n.8,

717-22 (write-down equal to nearly 4% of annual revenue material); *Ganino*, 228 F.3d at 162-66

(1.7% decrease in annual revenue was material when viewed in context).

*Second*, the Registration Statement repeatedly highlighted that Facebook's advertising

revenue was Facebook's most significant financial metric.  ¶¶ 89-97.  The declines in this key

metric were driven by a trend – increasing mobile usage – that the Registration Statement stated

was "critical to Facebook's business." ¶ 185.  Thus, Facebook's own disclosures demonstrate that

the revenue cuts the that the Company made as a result of mobile usage was significant to investors.

*See Litwin*, 634 F.3d at 720 ("[O]ne factor affecting . . . materiality is whether the misstatement or

omission relates to a segment that plays a 'significant role' in the registrant's business.").

*Third*, Facebook's own actions and the actions of the lead underwriters confirm that the

impact of shifting mobile usage on Facebook's business was highly material.  ¶¶ 177-78.

Immediately after determining that its revenues for the quarter and the year were being negatively

impacted by shifting mobile usage, Facebook and Morgan Stanley both determined that this

information was so significant that it had to be disclosed to the Syndicate Analysts and Grimes

drafted a detailed script containing this information for Herman to use in a series of private phone

calls with the Syndicate Analysts.  ¶¶ 125-34, 178.  Beginning just minutes after Facebook filed its

amended Registration Statement on May 9, 2012, Herman made nineteen scripted phone calls to the

Syndicate Analysts, solely to inform them of the material information that was omitted from the

Registration Statement: specifically, that the Company's business already had been negatively

impacted by the shift to mobile devices and, as a result, Facebook had cut its revenue figures for the

second quarter and the year.  *Id.*  If the information about the negative impact of mobile usage on

Facebook's business was immaterial, or had been conveyed by the amended Registration Statement, there would have been no need to make these nineteen phone calls after the amended Registration Statement was filed. ¶ 177; *see also SEC v. Wyly*, 788 F. Supp. 2d 92, 123 (S.D.N.Y. 2011) (Scheindlin, J.) ("[T]he [defendants] themselves demonstrated the importance they attached to [the information] by acting on that nonpublic information in short order" and, "[g]iven the importance that the [defendants] attached to this information, it is hard for them now to protest at the motion to dismiss stage that no reasonable investor could have found it material.").

*Fourth*, the manner in which Ebersman, Herman, and Grimes chose to contact the Syndicate Analysts further confirms that the revenue cuts were highly material and not part of the information in the marketplace.  SEC Regulation FD generally provides that, when an issuer discloses "material nonpublic information" about its business to an analyst, the issuer must also publicly disclose that information.  However, under certain circumstances, Regulation FD provides a limited exception for information that is conveyed through "[a]n oral communication" in connection with an offering.  Due to the possible application of Regulation FD, Facebook provided this information to the Syndicate Analysts *orally*.  Facebook did so because it understood that the pronounced downturn in its business was "material nonpublic information" and that, if Regulation FD were applicable, this information would have to be publicly disclosed if it was communicated in writing. ¶ 131.

*Fifth*, the actions of the Syndicate Analysts upon being informed of Facebook's revenue cuts also confirm that the information was highly material, and had not been conveyed by the Registration Statement. ¶ 179.  Immediately after learning of Facebook's revenue cuts, many of the Syndicate Analysts significantly reduced their own estimates of Facebook's revenue to reflect the impact of the new information, cutting second quarter revenue by as much as 7% and annual revenue by as much as 6%. ¶¶ 135-37, 179.  The Syndicate Analysts then held a series of calls with a select group of the Company's potential investors and informed them of their reduced estimates.

Again, if the impact of mobile usage on Facebook's revenues were unimportant or already part of the total mix of information in the market, the Syndicate Analysts would not have significantly cut their own revenue figures based on that information, and would not have made calls to their clients specifically to inform them of these developments. *Id.*; *see also Pontiac Gen. Emps. Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 368 (S.D.N.Y. 2012) (Rakoff, J.) (reasoning that the reactions of securities analysts supported an inference of materiality at the motion to dismiss stage).[11]

**Sixth**, the reactions of many of the select investors who were informed of Facebook's revenue cuts by the Syndicate Analysts further confirm that the decline in Facebook's revenues was highly material. ¶ 180. The financial press reported that the revenue cuts were a "big shock" to the investors who learned them and raised "a significant red flag" about Facebook's financial condition, and that the "deceleration" in Facebook's revenues "freaked a lot of people out." ¶¶ 138-39, 180. Indeed, many investors who were informed of Facebook's revenue cuts prior to the IPO cancelled or reduced their IPO orders, or reduced the price they were willing to pay for the Company's stock. *Id.*; *see also SEC v. Mayhew*, 121 F.3d 44, 52 (2d Cir. 1997) ("[A] major factor in determining whether information was material is the importance attached to it by those who knew about it."); *Lilly v. State Teachers Ret. Sys. of Ohio Pension Fund*, 608 F.2d 55, 58 (2d Cir. 1979) ("[T]he manner in which the information was regarded by those privy to it and the importance attached to the information by the recipients . . . were entirely consistent with a conclusion that the information was material information.").

---

[11] Defendants argue that the fact that Facebook provided the revised projections to the Syndicate Analysts does not demonstrate materiality because Facebook was "simply follow[ing] industry custom." *See* Defs. Br. at 43. However, as explained above, when the revised projections were disclosed, highly experienced industry participants stated that what Facebook did here was "very, very unusual," "rare," and something they had "never seen [] during 20 years in and around the tech IPO business." ¶¶ 161, 166-67. Moreover, Defendants cannot show any so-called industry custom of updating syndicate analysts through scripted phone calls when the underlying information was not important to investors or could be found in the registration statement. At best, Defendants' conclusory assertions about "industry custom" raise fact issues. *See* Section I.D *supra*.

**Seventh**, the reaction of the market after Facebook filed its amended Registration Statement on May 9 further confirms that Facebook's disclosures did not convey the fact that the trend towards mobile usage had already had a material negative impact on the Company's revenues. After Facebook filed its amended Registration Statement, the consensus of analysts who had not been told of the Company's revenue cuts was that Facebook would report revenues of more than $1.2 billion for the second quarter and $5 billion for the year – exactly in line with the Company's original guidance. ¶ 142.  Had Facebook's disclosures conveyed to the market the fact that increasing mobile usage had already had a material negative impact on the Company's revenues during the 2012 second quarter, these analysts – like the Syndicate Analysts – would not have continued to expect Facebook to report revenues that were in line with the Company's original guidance.

**Eighth**, the reaction of investors after Facebook filed the May 9 amended Registration Statement establishes that Facebook's disclosures did not put investors on notice of the fact that increasing mobile usage had negatively impacted the Company's revenues.  In the week before the IPO, investor demand for Facebook shares spiked to "astronomical" and "rampant" levels because Facebook had succeeded in "*convincing investors that Facebook can make money from mobile users*."  ¶¶ 143-147, 183.  Thus, on May 15 and 16 – nearly a week *after* Facebook filed its amended Registration Statement – Facebook significantly increased both the size of the IPO and the price of its shares – something that has been done in only 3.4% of all IPOs since 1995.  *Id.*

**Ninth**, the contemporaneous reaction of the financial media after the truth was revealed conclusively demonstrates materiality.  ¶¶ 162, 167, 171-74, 181.  The financial media specifically reported that Facebook's revenue cuts represented "*highly material information*" that had **not** been disclosed in the Registration Statement, and which significantly altered the total mix of information in the marketplace prior to the IPO.  *See* ¶ 172 (analyst stating that Facebook's revenue cuts were

"*enormously material changes*" that "*absolutely*" should have been disclosed in the Registration Statement because they "*dramatically change the valuation of the company*"); ¶ 173 (*Business Insider* reporting that "Facebook's amended prospectus did *not* say that the company's business had suddenly weakened and management's outlook had changed.  And that information is *vastly more important* than what the prospectus did say . . . ."); ¶ 174 (*Venture Beat* reporting that "[t]he fact is, *there is nothing within the S-1 update on May 9 that would give normal investors the sense that there had been a material change about Facebook's revenue prospects*").

Tenth, the reaction of the market when the news of Facebook's revenue cuts was publicly revealed establishes that this information was highly material.  ¶ 184.  When news of the revenue cuts was disclosed to the market, investors reacted with "shock," "anger," and "outrage[]."  ¶¶ 161-70.  Facebook's stock price immediately collapsed, declining nearly 11% on May 21, and approximately 9% on May 22, on extremely high trading volume both days, making Facebook the worst-performing IPO in a decade.  ¶¶ 161-70; *see also Ganino*, 228 F.3d at 166-67 (holding that a "precipitous drop" in share price is evidence of materiality).  In sum, all these facts, taken together, easily satisfy Lead Plaintiffs' "minimal burden" in pleading the highly fact-intensive issue of materiality under FRCP 8.[12]

## B.   This Court's Derivative Opinion Does not Support Defendants' Argument that the Alleged Misstatements and Omissions Are Immaterial as a Matter of Law

Defendants' sole support for their argument that the omitted and misstated information is immaterial as a matter of law is the Court's Derivative Opinion.  Defendants' reliance on that Opinion is misplaced for several reasons.  First, in the Derivative Opinion, the Court applied a much more exacting pleading standard that does not govern Securities Act claims, requiring the plaintiffs

---

[12] Defendants' reliance on *Arfa v. Mecox Lane Ltd.*, No. 10 Civ. 9053, 2012 WL 697155 (S.D.N.Y. Mar. 5, 2012) (Sweet, J.), is misplaced.  That case did not involve any facts analogous to the host of materiality allegations set forth above.  Further, unlike here, the defendant in that case made detailed quantitative disclosures concerning the magnitude and impact of the allegedly undisclosed trends.  *Id.* at *6-7, 8-10.

to "present particularized facts" demonstrating materiality, and observing that this "pleading burden
. . . is a high hurdle for plaintiffs to clear."  Derivative Op. at *17.  Here, in pleading materiality,
Lead Plaintiffs need only satisfy a burden that the Second Circuit has held is "even lower" than the
"relatively minimal burden" imposed by FRCP 8.  *Litwin*, 634 F.3d at 718.

More significantly, the facts alleged here are a far cry from the facts alleged in the
Derivative Actions.  As the Court noted in the Derivative Opinion, the Derivative Plaintiffs did not
assert any particularized facts establishing materiality.  Derivative Op. at *19.  Indeed, the bare-
bones complaints filed in the Derivative Actions contained only conclusory materiality allegations.
*See, e.g.*, Complaint, *Levy v. Zuckerberg*, No. 12-CV-7815, ¶ 40 (merely asserting that "a reduction
in earnings guidance is plainly material information that must be, and was not, shared with all of the
public").  Among other things, the derivative complaints did not allege that:

- Immediately after being informed of Facebook's revenue cuts, Facebook and the lead
  underwriters determined that the change in Facebook's financial condition was so significant
  that it had to be disclosed to the Syndicate Analysts;

- Within minutes of filing the amended Registration Statement on May 9, 2012, Facebook's
  Treasurer made nineteen phone calls to the Syndicate Analysts to inform them of the
  material information that was omitted from the Registration Statement;

- The consensus among analysts who had not learned of Facebook's revenue cuts was that the
  May 9 disclosure in no way indicated a change in Facebook's revenue prospects;

- In the week before the IPO, investor demand rose to "rampant" levels because Facebook had
  not disclosed the impact of mobile usage on its business, thus allowing the Company to take
  the extremely rare step of significantly increasing the size and price of the IPO;

- Numerous sophisticated market commentators specifically reported that Facebook had not
  disclosed publicly the highly material fact that its revenues had been negatively impacted by
  mobile usage; and

- Facebook's revenue and advertising revenue were the Company's most significant financial
  metrics, and the declines in these key metrics were caused by a known trend of increasing
  mobile usage that the Registration Statement identified as "critical" to Facebook's business.

*See* ¶¶ 177-85.  In short, this Complaint, unlike the complaints filed in the Derivative Actions,
amply alleges that Defendants' misstatements and omissions significantly altered the total mix of
information in the marketplace.

Finally, as noted above, the Court held that "the essence" of the derivative complaints was that Facebook failed to "disclose its internal revenue projections" – a pure forward-looking statement.  Derivative Op. at *23.  In contrast, the Complaint here alleges that Defendants failed to disclose that known trends had *already* had a material impact on Facebook's revenues at the time of the IPO.  Accordingly, unlike in the Derivative Actions, Defendants here cannot avail themselves of the "bespeaks caution" doctrine by claiming that their risk warnings rendered any omission immaterial.  Indeed, the Second Circuit has emphasized that the doctrine applies only to statements to the extent that they are forward-looking, and cannot apply to "alleged omissions of information concerning existing financial and operational difficulties," as the Complaint alleges here.  *Iowa Pub. Emps. Ret. Sys. v. MF Global, Ltd.*, 620 F.3d 137, 142 (2d Cir. 2010).  Similarly, as this Court has held, "discussing hypothetical risks that *might* occur in the future does not adequately disclose actual problems that *already* have materialized."  *In re Regeneron Pharm., Inc. Sec. Litig.*, No. 03 Civ. 3111, 2005 WL 225288, at *19 (S.D.N.Y. Feb. 1, 2005) (Sweet, J.); *see also McKenna v. SMART Technologies Inc.*, 11 CIV. 7673 KBF, 2012 WL 3589655, at *6 (S.D.N.Y. Aug. 21, 2012) (holding cautionary language insufficient where the defendants were aware of "indications" that government funding would be "less than in prior years" but disclosed only the mere possibility of a decrease); *Milman*, 72 F. Supp. 2d at 231 ("[H]ypothetical warnings will not eliminate liability based on the failure to disclose present knowledge."); Charles J. Johnson, Jr. and Joseph McLaughlin, Corp. Fin. & Sec. Laws § 3.04(D) (4th ed. 2012 Supp.) ("All the cautionary language in the world will not protect an issuer or an underwriter from misrepresentations or omissions relating to historical *or current data*.").

In sum, the Complaint more than adequately alleges materiality.

## C.    Defendants Cannot Establish the Truth on the Market Defense

Defendants next assert a "truth on the market" defense, in which they argue that their

alleged misstatements and omissions were immaterial as a matter of law because: (1) the fact that Facebook made revenue cuts and shared that information with analysts was supposedly publicized in sixteen media reports prior to the IPO and (2) certain other media reports supposedly stated that Facebook's disclosure in the May 9 amended Registration Statement meant that mobile usage was negatively impacting Facebook's revenues. *See* Defs. Br. at 10-13.  Defendants are wrong.

The "truth on the market" defense is a corollary to the "fraud on the market" doctrine, under which "a misrepresentation is immaterial if the information is already known to the market because the misrepresentation cannot then defraud the market." *Ganino*, 228 F.3d at 167.  In order for the truth on the market defense to be successful, "the corrective information must be conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements." *Id.*  The Second Circuit has warned that "[t]he truth-on-the-market defense is ***intensely fact-specific***" and therefore "***rarely an appropriate basis for dismissing a*** [ ] ***complaint***." *Id.*

First, as noted above, the Complaint contains a host of allegations which demonstrate that the negative impact of mobile usage on Facebook's revenues was a highly material fact that was not known to the market prior to the IPO – including the fact that numerous market commentators contemporaneously reported that Facebook had ***not*** disclosed that information prior to the IPO. *See* ¶¶ 176-85.  These well-pleaded allegations preclude the Court from finding that the truth was on the market as a matter of law.

Second, Second Circuit law is clear that Facebook cannot rely on press reports to demonstrate that the market supposedly knew something that the Company chose to omit from its Registration Statement.  The Second Circuit has repeatedly held that "[t]here are serious limitations on a corporation's ability to charge its stockholders with knowledge of information omitted from a document such as a prospectus on the basis that the information is public knowledge and otherwise

55

available to them." *Litwin*, 634 F.3d at 718 (quoting *Kronfeld v. Trans World Airlines, Inc.*, 832

F.2d 726, 736 (2d Cir. 1987)); *see also United Paperworkers Int'l Union v. Int'l Paper Co.*, 985

F.2d 1190, 1199 (2d Cir.1993) ("[T]he mere presence in the media of sporadic news reports . . .

should not be considered to be part of the total mix of information that would clarify or place in

proper context the company's representations in its proxy materials."). As these cases recognize,

Defendants' argument contravenes the central purpose of the securities laws – to require full

disclosure from the issuer itself in the registration statement so that investors do not have to attempt

to parse through a myriad of potentially uninformed and often conflicting reports from third parties

who do not have direct access to accurate company data.

This principle applies with special force here because Facebook specifically instructed

investors to ***disregard accounts in the media***, such as the ones upon which Defendants now attempt

to rely, precisely because they were inherently speculative and unreliable:

> ***In making your investment decision, you should not rely on information in public
> media that is published by third parties. You should rely only on statements made
> in this prospectus in determining whether to purchase our shares.*** . . . We have in
> the past received, and may continue to receive, a high degree of ***media coverage,
> including coverage that is not directly attributable to statements made by our
> officers and employees, that incorrectly reports on statements made by our officers
> or employees, or that is misleading as a result of omitting information provided by
> us, our officers, or employees.***

Registration Statement at 31.

As Judge Rakoff held in *SEC v. Bank of America Corp.*, no reasonable investor would

regard press reports as a reliable source of information after having read such advice. 677 F. Supp.

2d 717, 719 (S.D.N.Y. 2010) ("[S]ince the [company] itself warned investors not to rely on the

media, it would be unreasonable for a shareholder to consider the media pronouncements to be part

of the relevant mix of information."). That reasoning applies with equal force here. In sum,

Defendants' articles cannot be considered on a motion to dismiss.

Third, even if the Court could consider Defendants' articles, they are speculative,

contradictory, and, at best, demonstrate that there were a multiplicity of views regarding Facebook's financial condition in the marketplace.  This falls far short of establishing truth on the market as a matter of law.  Significantly, all of the sixteen articles that Defendants cite in support of their argument that the market supposedly knew that Facebook made revenue cuts prior to the IPO (*see* Defs. Br. at 13 & n.6) are based on a single *Bloomberg* report, published on May 10, 2012, which reported that "Facebook is also telling analysts that sales *may* not meet their most optimistic projections, two people said."  *See* Clubok Decl., Ex. F at 32.  That *Bloomberg* report was then parroted by the fifteen other sources on which Defendants rely.[13]

The *Bloomberg* report was completely speculative, stating that Facebook informed analysts that it "may" not meet analysts' projections.  It did not say that Facebook had, in fact, already cut its own estimates.  It does not identify which analysts' projections were potentially too optimistic or what those projections were.  And it attributes this vague speculation not to Facebook, but rather to "two [unnamed] people" – an anonymous, unreliable source that cannot provide the basis to establish a truth on the market defense.  Moreover, the *Bloomberg* article actually discredits the speculation that Facebook "may" not meet analysts' revenue projections, stating, "According to researcher EMarketer Inc., revenue may increase 64 percent to *$6.1 billion* this year."  *See id.*, Ex. F at 32.  In turn, four of the fifteen other media reports cited by Defendants echoed this inflated revenue figure.  *See id.* at 19, 28, 73, 78.

Significantly, Defendants' own articles establish that contemporaneous market commentators dismissed the speculation contained in the *Bloomberg* report as mere "*rumor*."  *Id.*, Ex. F at 23.  As a commentator correctly concluded after examining the *Bloomberg* report and other

---

[13] Defendants may request that the Court take judicial notice of media reports only to show that there was press coverage of an issue.  However, it is improper to cite such sources for the truth of their contents, as Defendants do, *see* Defs. Br. at 8-9 & n.4, in support of the proposition that "underwriters typically provide [revenue] forecasts to their clients as part of the IPO process."  *Staehr v. Hartford Fin. Servs., Grp., Inc.*, 547 F.3d 406 (2d Cir. 2008).

information in the marketplace concerning the impact of mobile usage on Facebook, "***In summary, nobody really knows anything.  You can pick whatever you want to believe, if it makes you feel any better***."  *Id.*  Similarly, in another article on which Defendants rely, the author specifically concluded that the *Bloomberg* report was not credible, and that if it were somehow true, Facebook "***should certainly disclose this to the public***":

> ***That last report – the warning that Facebook won't meet the most optimistic projections – is bizarre.  It's hard to believe Facebook is reviewing and reacting to specific projections on the roadshow.  And if it is, it should certainly disclose this to the public.***  What projections is Facebook saying it won't meet?  How could that not be something a reasonable investor would want to know?  . . .
>
> ***So take this report with a grain of salt***.

*See id.* at 111.  Notably, the author of another media report cited by Defendants acknowledged in a subsequent report that the market was ***not*** aware of Facebook's decreased financial projections prior to the IPO.  That article stated, "The company had issued a revised prospectus on May 9 in which it cautioned about the ***possible negative impact*** of Facebook users shifting to mobile platforms, but ***the vague language fell well short of an explicit warning of lower revenues or earnings***."  Dubbs Decl., Ex. B.

Similarly, the articles that supposedly reported that Facebook's May 9 disclosure meant that mobile usage was having a material negative impact on the Company's revenues fall far short of establishing truth on the market as a matter of law.  *See* Defs. Br. at 10-11 & n.5.  Indeed, many of these media reports simply echoed the language of the Registration Statement by stating that the financial impact of the trends at issue was a mere possibility or noted that Facebook was actually well-positioned to capitalize on its mobile users.  *See, e.g.*, Clubok Decl., Ex. F at 15 (stating that, in March 2012, Facebook introduced Sponsored Stories on mobile "as a way to make money from mobile users"); *id.* at 22 (stating that Facebook has "room to grow" in the "mobile advertising space"); *id.* at 42 ("The company also warned that . . . revenue growth ***could*** be harmed."); *id.* at 34

(stating that "mobile represents . . . a *possible* threat"); *id.* at 39 (Facebook "warned that [the] trend '*may* negatively affect' financial results"); *id.* at 47 ("mobile growth *may* negatively affect the company's earnings"). Such speculative reports are insufficient to establish – as a matter of law – that the market uniformly knew that shifting mobile usage had already had a material impact on Facebook's revenues.

Only one report cited by Defendants, issued by the analyst firm PrivCo, suggested that the trend identified in the May 9 amended Registration Statement had already had *any impact at all* on Facebook's second quarter 2012 revenues, much less a material impact. *See id.*, Ex. F at 9; *see also Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991) ("[N]ot every mixture with the true will neutralize the deceptive. If it would take a financial analyst to spot the tension between the one and the other, whatever is misleading will remain materially so, and liability should follow.") (citing *Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281, 1297 (2d Cir. 1973) ("[I]t is not sufficient that overtones might have been picked up by the sensitive antennae of investment analysts.")). Significantly, Defendants ignore the fact that this same analyst firm later concluded that the Registration Statement failed to disclose material information stating, "*The reduction to Facebook's forecasts of this magnitude – reducing the revenue growth rate by over 6 percentage points – is so material that it should absolutely have been disclosed in a revised S-1 filing before the IPO pricing*." ¶ 172. PrivCo further recognized that the Registration Statement offered only "a bare minimum disclosure" regarding increasing mobile usage and "*potentially* decreasing revenues," and that the fact that mobile use had already significantly impaired Facebook's revenues was "*material* insider information" that was not available to the market. Dubbs Decl., Ex. C. Similarly, in another PrivCo report that was issued after Facebook's correspondence with the SEC relating to the mobile usage trend became public, PrivCo's CEO stated that "the SEC let Facebook slide with what PrivCo feels was *less than full and complete disclosure on the adverse impact on*

*Facebook's business from the rapid shift to mobile-device access*." Dubbs Decl., Ex. D. In sum,

Defendants' media reports cannot establish the truth on the market defense as a matter of law.

### D.      Defendants' Remaining Materiality Arguments Fail

Defendants' remaining materiality arguments can be swiftly rejected. First, Defendants

argue that Facebook's revenue cuts were not material because they were too small. However, as

noted above, revenue declines of 8.33% for the quarter and 3.5% for the year fall comfortably

within the ranges that the Second Circuit has held to be material. *See* Section III.A, *supra*.

Defendants also argue that the market reaction to the alleged corrective disclosures does not

support an inference of materiality because "such speculation about market reactions are too blunt

an instrument to be depended on in considering whether a fact is material." *See* Defs. Br. at 44-45.

However, the quoted passage from SEC Staff Accounting Bulletin No. 99 actually states,

"Consideration of potential market reaction to disclosure of a misstatement is *by itself* too blunt an

instrument to be depended on in considering whether a fact is material." 64 Fed. Reg. 45,150,

45,152 (Aug. 19, 1999). Thus, at the motion to dismiss stage, allegations of a sharply negative

market reaction can be used to augment other well-pleaded allegations of materiality. *See New*

*Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 16 (2d Cir. 2011) (summary order)

(allegations of a "precipitous decrease in share price that occurred after [the issuer] disclosed the

tru[th]" support an inference of materiality at the motion to dismiss stage); *Pontiac Gen. Emps. Ret.*

*Sys.*, 875 F. Supp. 2d at 368 (alleged misstatements were not immaterial as a matter of law where,

*inter alia*, the issuer's "share price declined by almost 10%" after the alleged corrective disclosure).

For all the reasons above, the Complaint adequately alleges that the negative impact of

mobile usage on Facebook's revenues was material information.

### IV.      Rule 408 Required Facebook to Disclose that Increasing Mobile Usage and the Company's Product Decisions Had Negatively Impacted Its Revenues

The Complaint also alleges that the Registration Statement failed to disclose material

information required to be disclosed by Rule 408 of SEC Regulation C.  ¶¶ 188, 197-202.  Rule

408(a) reflects the principle that an issuer's disclosures must be complete and accurate.  *See*

*Nanopierce Techs., Inc. v. Southridge Capital Mgmt.*, No. 02 Civ. 0767, 2003 WL 22882137, at *4

(S.D.N.Y. Dec. 4, 2003) (Sand, J.).  Specifically, Rule 408 states that, "In addition to the

information expressly required to be included in a registration statement, there shall be added such

further material information, if any, as may be necessary to make the required statements, in the

light of the circumstances under which they are made, not misleading."  17 C.F.R. § 230.408(a).

Accordingly, in evaluating whether Defendants "were under a duty to disclose interim financial

information in the [Registration Statement]," the Court "must determine whether the [undisclosed]

information was material in light of the financial information already disclosed to investors."

*Nanopierce*, 2003 WL 22882137, at *4 (quoting *DeMaria*, 318 F.3d 1 at 180); *see also* 2 Thomas

Lee Hazen, Law Sec. Reg. § 9.4 ("[W]ith respect to matters that are material, disclosure is required

[under Rule 408] even in the absence of a particular specific line item disclosure requirement.").

    For all the reasons set forth in Sections I to III, *supra*, Facebook's Registration Statement

and Prospectus were materially incomplete and misleading because they failed to disclose known

financial effects related to increasing mobile usage and certain product decisions.  Accordingly, the

Complaint adequately alleges Securities Act claims arising from omissions in contravention of

affirmative legal disclosure obligations created by Rule 408(a).

**V.**    **Defendants' Loss Causation Arguments Provide No Basis for Dismissal**

    Defendants contend that the Complaint must be dismissed because "plaintiffs cannot

establish loss causation."  *See* Defs. Br. at 46-51.  Defendants' arguments contradict the law, ignore

the Complaint's detailed allegations, and raise fact issues that cannot be decided on this motion.

    It is black-letter law that "***loss causation is not an element of a claim under either Section

11 or 12***."  *In re Giant Interactive Grp., Inc. Sec. Litig.*, 643 F. Supp. 2d 562, 571 (S.D.N.Y. 2009)

(Sweet, J.) (collecting cases).  Thus, "***Plaintiffs are not required to plead loss causation in the***

***Complaint***."  *Id.* at 572; *see also Levine v. AtriCure, Inc.*, 508 F. Supp. 2d 268, 273 (S.D.N.Y.

2007) (Holwell, J.).  For this reason alone, Defendants' arguments fail.  *See, e.g.*, *Giant*, 643 F.

Supp. 2d at 571-72; *Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, No. 12 Civ. 0256, 2013 WL

775434, at *8 (S.D.N.Y. Feb. 28, 2013) (Kaplan, J.) ("Plaintiff  is not required to allege loss

causation in order to withstand a motion to dismiss claims under Sections 11 and 12(a)(2)."); *In re*

*Citigroup Inc. Bond Litig.*, 723 F. Supp. 2d 568, 588 n.5 (S.D.N.Y. 2010) (Stein, J.) (same).

Defendants' "loss causation" arguments are merely an attempt to prematurely assert the fact-

intensive affirmative defense of "negative causation" at the pleading stage, which they cannot do.

Under Section 11(e) of the Securities Act, "[t]he absence of loss causation is an affirmative

defense" known as "negative causation," pursuant to which a defendant may reduce damages to the

extent it can "***prove***[]" that the plaintiff's losses were attributable to causes other than the

defendant's misstatements or omissions.  *Freeland v. Iridium World Commc'ns, Ltd.*, 233 F.R.D.

40, 46 (D.D.C. 2006) (citing 15 U.S.C. § 77k(e)).  The Second Circuit has emphasized that

defendants bear a "heavy burden" in proving this affirmative defense.  *In re Flag Telecom*

*Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 36 (2d Cir. 2009).  Courts, including this one, universally

hold that negative causation arguments cannot be decided on a motion to dismiss because they raise

highly "fact-intensive" issues about what caused a stock price to decline, which cannot be resolved

without detailed fact and expert evidence.  *See Giant*, 643 F. Supp. 2d at 572 (negative causation

arguments are "not properly raised on a Rule 12(b)(6) motion," but are reserved for "summary

judgment or at trial due to [their] fact-intensive nature"); *In re Fuwei Films Sec. Litig.*, 634 F. Supp.

2d 419, 444 (S.D.N.Y. 2009) (Sullivan, J.) (same); *Citigroup*, 723 F. Supp. 2d at 588 n.5 (same).

In addition, even if the Court could consider Defendants' negative causation defenses at the

pleading stage, they fall woefully short of establishing negative causation as a matter of law.

Defendants first assert, without any explanation, that the "absence of causation" is supposedly "apparent on the face of the complaint." Defs. Br. at 46. This argument is absurd. The Complaint contains abundant allegations demonstrating that the revelation of information concerning Facebook's revenue cuts caused Facebook's stock price to precipitously decline on May 21 and May 22. *See* ¶¶ 161-74. Lead Plaintiffs allege that, in response to the May 18 *Reuters* report breaking the news that Facebook had taken the "rare and disruptive" step of making revenue cuts during the roadshow, market commentators reacted with "shock" at the revelation of this "highly material information." ¶¶ 161-62. The next trading day, May 21, Facebook's stock price immediately collapsed, falling 11% on trading volume so high that Facebook was "by far the most active stock on the U.S. stock market." ¶¶ 163-64.

Similarly, immediately following the May 22 *Reuters* report revealing that the lead underwriters had "significantly" cut their revenue estimates during the roadshow, but told only a few major clients about this "very, very unusual" development, the market again reacted with astonishment. ¶¶ 165-70. The financial press reported that the news was a "bombshell," and Facebook's stock price immediately declined another 9% on extremely high trading volume. *Id.* In the wake of these disclosures, numerous market commentators specifically linked those declines to the news concerning the Company's revenue cuts. ¶¶ 168-69. These allegations foreclose any possibility of establishing negative causation as a matter of law at the pleading stage.[14]

Relying on the same speculative and contradictory news articles discussed in Section III.C, *supra*, Defendants next contend that negative causation is established because, prior to the IPO, the market supposedly knew that "Facebook had lowered its guidance and shared its revised projections with analysts" and thus, the May 18 and May 22 *Reuters* reports "did not reveal any new material

---

[14] Defendants' reliance on this Court's decision in *Blackmoss Investments Inc. v. ACA Capital Holdings, Inc.*, No. 07 Civ. 10528, 2010 WL 148617 (S.D.N.Y. Jan. 14, 2010) (Sweet, J.), is misplaced. Defs. Br. at 17, 45, 48. There, unlike here, the complaint alleged that the company's share price continued to trade *above* its IPO price when the company disclosed the omitted and misstated facts. 2010 WL 148617, at *11.

facts to the market." *See* Defs. Br. at 46-48.[15]  This argument fails.  First, the news articles on which Defendants rely "fall outside of the Complaint" and "cannot be considered in deciding the instant motion."  *Giant*, 643 F. Supp. 2d at 573; *see also Litwin*, 634 F.3d at 718.  Second, even if the Court could consider these articles, they are merely a rehash of Defendants' truth on the market defense, which fails for the reasons explained in Section III.C, *supra*.

Defendants also assert that the Court must conclude, as a matter of law, that the May 21 and May 22 stock price declines were caused exclusively by "NASDAQ trading errors."  Defs. Br. at 50.  Defendants do not provide a shred of evidence to support their speculation that these events caused 100% (or, indeed, any) of the decline in Facebook's stock price.  At best, Defendants' alternate theory of loss causation raises fact issues that are inappropriate for resolution on a motion to dismiss.  *See Giant*, 643 F. Supp. 2d at 573 ("Defendants will have the opportunity to prove, at the appropriate stage of the proceedings, that a portion of the damages suffered by Plaintiffs was caused by the theory they advance").[16]

Finally, Defendants argue that, because the alleged corrective disclosures do not specifically mention "Facebook's product decisions, . . . Plaintiffs' own allegations show the absence of any tie between the May 21 and 22 stock drops and the revelation of any new information about such decisions."  Defs. Br. at 46.  However, because Lead Plaintiffs are not required to allege loss causation, the mere fact that the articles cited in the Complaint do not reference "product decisions" is irrelevant.  Further, it is well-established that loss causation may exist whenever "the 'truth' ***about the company's underlying condition***, when revealed, causes the 'economic loss.'"

---

[15] *In re Omnicom Group, Inc. Securities Litigation*, 597 F.3d 501 (2d Cir. 2010) is inapposite, as that was a case alleging claims under Section 10(b) of the Securities Exchange Act of 1934, which was decided at summary judgment based on extensive fact and expert evidence.  Similarly, *Omaha, Nebraska Civilian Employees' Retirement System v. CBS Corp.*, 679 F.3d 64 (2d Cir. 2012) was a Section 10(b) case where the "Plaintiffs conceded" that the undisclosed facts "were matters of public knowledge."  *Id.* at 69.

[16] Defendants also assert that negative causation is established for the May 22 decline because it is supposedly "common knowledge" that "when analysts receive issuer projections [they] use the projections to make forecasts that are shared with large institutional investors."  Defs. Br. at 48-49.  Obviously, Defendants' bare assertion about what is supposedly "common knowledge" cannot establish negative causation as a matter of law.

*Freudenberg*, 712 F. Supp. 2d at 202.  By stating that product decisions "may" negatively affect Facebook's revenues, Defendants misled investors about the fact that those product decisions already had negatively impacted Facebook's financial condition.  When Facebook's revenue cuts became public, they revealed the truth about the negative impact of product decisions on the Company's financial condition, which in turn caused its stock price to decline.[17]

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied in its entirety. To the extent that the Court grants the motion, in whole or in part, Lead Plaintiffs respectfully request leave to amend pursuant to Fed. R. Civ. P. 15(a).  *See AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 725 (2d Cir. 2010).[18]

Dated:   June 14, 2013
        New York, New York

| | |
|---|---|
| By: _____/s/ Steven B. Singer_____ | By: _____/s/ Thomas A. Dubbs_____ |
| Max W. Berger | Thomas A. Dubbs |
| Steven B. Singer | James W. Johnson |
| John J. Rizio-Hamilton | Louis Gottlieb |
| Catherine E. McCaw | Thomas G. Hoffman, Jr. |
| **BERNSTEIN LITOWITZ** | **LABATON SUCHAROW LLP** |
| **BERGER & GROSSMANN LLP** | 140 Broadway |
| 1285 Avenue of the Americas | New York, NY 10005 |
| New York, NY 10019 | Tel: (212) 907-0700 |
| Tel: (212) 554-1400 | Fax: (212) 818-0477 |
| Fax: (212) 554-1444 | |

*Court-Appointed Co-Lead Counsel for Co-Lead Plaintiffs and the Class*

---

[17] Defendants' citation to this Court's decision in *Janbay v. Canadian Solar, Inc.*, No. 10 Civ. 4430, 2013 WL 1287326 (S.D.N.Y. Mar. 28, 2013), is to no avail, as that was a Section 10(b) case.  Defs. Br. at 46.

[18] Defendants argue that Lead Plaintiffs' Section 12(a)(2) claims fail because Lead Plaintiffs "do not allege that any communications outside of the Registration Statement were misleading."  Defs. Br. at 51.  However, the Prospectus incorporated the misstatements and omissions in the Registration Statement.  Prospectus at 12.  While Defendants also argue that "several plaintiffs admit that they did not purchase shares in the IPO," and therefore lack standing to assert Section 12(a)(2) claims (Defs. Br. at 51), several Lead Plaintiffs have Section 12(a)(2) standing because they **did** purchase Facebook stock in the IPO.  *See* ¶¶ 28-30.  Defendants also argue that Lead Plaintiffs' Section 15 claims fail because the Complaint fails to allege primary violations of Sections 11 or 12(a)(2).  Defs. Br. at 52.  However, because Lead Plaintiffs have properly alleged Section 11 and 12(a)(2) claims, the Section 15 claims should be sustained as well.

David Kessler
Darren J. Check
**KESSLER TOPAZ MELTZER &
CHECK LLP**
280 King of Prussia Road
Radnor, Pennsylvania 19087
Tel: (610) 667-7706
Fax: (601) 667-7056

*Additional Counsel for Co-Lead Plaintiff
Banyan Capital Master Fund Ltd.*


Steven E. Fineman
Daniel P. Chiplock
**LIEFF CABRASER HEIMANN &
BERNSTEIN**
250 Hudson Street, 8th Floor
New York, NY 10013
Tel: (212) 355-9500
Fax: (212) 355-9592

*Additional Counsel for Named Plaintiffs
Jose G. Galvan and Mary Jane Lule Galvan*

66

**CERTIFICATE OF SERVICE**

I, Thomas A. Dubbs, hereby certify that, on June 14, 2013, I caused a true and correct copy

of the foregoing to be filed using the Court's CM/ECF system, which will send notification of such

filing to all counsel of record.

*/s/ Thomas A. Dubbs*
Thomas A. Dubbs
