**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| IN RE FACEBOOK, INC., IPO SECURITIES | : | MDL NO. 12-2389 |
| AND DERIVATIVE LITIGATION | : | |

**This document relates to the
Consolidated NASDAQ Actions:**

| | |
|---|---|
| No. 12-cv-4054 | No. 12-cv-4600 |
| No. 12-cv-4200 | No. 12-cv-4716 |
| No. 12-cv-4201 | No. 12-cv-5549 |
| No. 12-cv-4315 | No. 12-cv-5630 |
| No. 12-cv-4403 | No. 12-cv-6882 |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE
CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

William A. Slaughter (PA Bar No. 30637)*
Stephen J. Kastenberg (PA Bar No. 70919)*
Paul Lantieri III (PA Bar No. 88160)*
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Tel: 215.665.8500
Fax: 215.864.8999
slaughter@ballardspahr.com
kastenberg@ballardspahr.com
lantierip@ballardspahr.com

*Attorneys for Defendants
The NASDAQ OMX Group, Inc., The
NASDAQ Stock Market LLC, Robert
Greifeld, and Anna M. Ewing*

*Admitted pro hac vice

## <u>TABLE OF CONTENTS</u>

*Page*

I.    INTRODUCTION ................................................................................................. 1

II.   BACKGROUND .................................................................................................. 3

      A.    NASDAQ Is a Self-Regulatory Organization Exercising Federally
            Delegated Rulemaking Authority Under Close SEC Supervision......................... 3

      B.    NASDAQ's Cross Process for Opening Trading After an IPO Is a
            Quintessentially Regulatory Function Governed by SEC-Approved Rules ........... 4

      C.    NASDAQ Exercised Its Regulatory Authority to Ensure There Was a
            Market for Trading Facebook Stock When Systems Issues Affected the
            Facebook IPO Cross ............................................................................................. 9

            1.    Systems Issues Delayed the Completion of the Facebook IPO
                  Cross ............................................................................................................. 9

            2.    NASDAQ Determined to Proceed with a Minor System
                  Modification Rather than Postpone the Opening of Secondary
                  Trading ......................................................................................................... 10

            3.    Although the System Modification Permitted Secondary Trading to
                  Open, NASDAQ Experienced Further Systems Issues ........................... 11

            4.    NASDAQ Determined Not to Halt Trading While the
                  Dissemination of Cross Confirmation Reports Was Delayed.................. 12

      D.    The SEC Exercised its Supervisory Authority by Investigating
            NASDAQ's Handling of the Facebook IPO and Instituting an
            Enforcement Proceeding ..................................................................................... 13

      E.    With SEC Approval, NASDAQ Established an Accommodation Plan for
            Facebook IPO Losses By Amending NASDAQ Rule 4626, Which Strictly
            Limits NASDAQ's Liability for Systems Issues ................................................ 15

III.  ARGUMENT ...................................................................................................... 17

      A.    Plaintiffs' Claims Are Barred by the Doctrine of SRO Immunity....................... 17

            1.    Defendants Are Immune from Liability for Claims Arising Out of
                  Their Regulatory Functions ....................................................................... 17

            2.    Plaintiffs' Negligence Claims Arise from NASDAQ's Regulatory
                  Functions and Should Be Dismissed......................................................... 22

3.      Plaintiffs' Securities Fraud Claims Arise from NASDAQ's
        Regulatory Functions and Should Be Dismissed....................................... 31

B.      The Complaint Fails to State a Claim for Negligence ........................................... 34

        1.      The Negligence Claims Asserted by the Non-Member Plaintiffs
                Are Barred by the Economic Loss Doctrine .............................................. 35

        2.      The Claims Asserted by Member Plaintiff First New York Are
                Barred by NASDAQ Rule 4626 ................................................................. 40

C.      The Complaint Fails to State a Claim Under the Securities Laws....................... 43

        1.      The Complaint Fails to Allege any Misrepresentation or Omission
                of Material Fact................................................................................ 45

        2.      The Complaint Fails to Allege Scienter.................................................... 51

        3.      The Complaint Fails to Allege Reliance................................................... 55

        4.      The Complaint Fails to Allege Loss Causation ....................................... 58

IV.     CONCLUSION........................................................................................... 62

# TABLE OF AUTHORITIES

*Page(s)*

## CASES

*532 Madison Avenue Gourmet Foods, Inc. v. Finlandia Center, Inc.*,
  750 N.E.2d 1097 (N.Y. 2001) .................................................................................36, 37

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co., Inc.*,
  No. 08-7508, 2013 U.S. Dist. LEXIS 31157 (S.D.N.Y. Mar. 6, 2013) ..................................36

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*,
  269 F.R.D. 252 (S.D.N.Y. 2010) ..........................................................................56

*Acito v. IMCERA Group, Inc.*,
  47 F.3d 47 (2d Cir. 1995) ................................................................................55

*Affiliated Ute Citizens of Utah v. United States*,
  406 U.S. 128 (1972) ..............................................................................56, 57, 58

*American Agricultural Movement, Inc. v. Board Of Trade*,
  977 F.2d 1147 (7th Cir. 1992) ............................................................................20

*Anschutz Corp. v. Merrill Lynch & Co.*,
  690 F.3d 98 (2d Cir. 2012) ...............................................................................36

*Arfa v. Mecox Lane Ltd.*,
  No. 10-9053, 2012 WL 697155 (S.D.N.Y. Mar. 5, 2012) ...................................................50

*Barbara v. New York Stock Exchange*,
  99 F.3d 49 (2d Cir. 1996) .............................................................................17, 20

*Barnett Bank v. Nelson*,
  517 U.S. 25 (1996) ......................................................................................20

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) .................................................................................49, 55

*Berwecky v. Bear, Stearns & Co.*,
  197 F.R.D. 65 (S.D.N.Y. 2000) ...........................................................................56

*Billhofer v. Flamel Technologies, S.A.*,
  No. 07-9920, 2012 WL 3079186 (S.D.N.Y. July 30, 2012) ..............................................45, 48

*Boca Raton Firefighters & Police Pension Fund v. Bahash*,
  50 Fed. App'x 32 (2d Cir. 2012) .........................................................................50

*Bocre Leasing Corp. v. General Motors Corp.*,
  645 N.E.2d 1195 (N.Y. 1995) .............................................................................40

*Bogan v. Scott-Harris*,
    523 U.S. 44 (1998) ........................................................................................21

*Campo v. Sears Holdings Corp.*
    371 Fed. App'x 212 (2d Cir. 2010) ..............................................................53

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council*,
    467 U.S. 837 (1984) ......................................................................................24

*Chiarella v. United States*,
    445 U.S. 222 (1980) ......................................................................................57

*Chill v. General Electric Co.*,
    101 F.3d 263 (2d Cir. 1996) ..........................................................................55

*D'Alessio v. New York Stock Exchange, Inc.*,
    258 F.3d 93 (2d Cir. 2001) .....................................................................*passim*

*DGM Investments v. New York Futures Exchange, Inc.*,
    No. 01-11602, 2002 WL 31356362 (S.D.N.Y. Oct. 17, 2002) ......................20

*DL Capital Group, LLC v. Nasdaq Stock Market, Inc.*,
    409 F.3d 93 (2d Cir. 2005) .....................................................................*passim*

*Dura Pharmaceuticals, Inc. v. Broudo*,
    544 U.S. 336 (2005) ....................................................................44, 52, 59, 60

*ECA and Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009) .......................................................45, 48, 49, 50

*Eckstein v. Balcor Film Investors*,
    8 F.3d 1121 (7th Cir. 1993) ..........................................................................56

*Emergent Capital Investment Management., LLC v. Stonepath Group, Inc.*,
    343 F.3d 189 (2d Cir. 2003) ....................................................................58, 59

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    --- U.S. ---, 131 S. Ct. 2179 (2011) ..............................................................55

*Freeman v. Laventhol & Horwath*,
    915 F.2d 193 (6th Cir. 1990) ........................................................................56

*Ganino v. Citizens Utilities Co.*,
    228 F.3d 154 (2d Cir. 2000) ..........................................................................61

*Gurfein v. Ameritrade, Inc.*,
    312 Fed. App'x 410 (2d Cir. 2009) ...............................................................38

*Hamilton v. Beretta U.S.A. Corp.*,
  750 N.E.2d 1055 (N.Y. 2001) ........................................................................35, 36

*Hines v. Davidowitz*,
  312 U.S. 52 (1941) ....................................................................................................20

*Hunter v. Bryant*,
  502 U.S. 224 (1991) ..................................................................................................22

*In re Aegon N.V. Securities Litigation*,
  No. 03-603, 2004 WL 1415973 (S.D.N.Y. June 23, 2004) ...................................54

*In re Bank of America Corp. Securities, Derivative, & Employee Retirement Income Security Act Litigation*,
  757 F. Supp. 2d 260 (S.D.N.Y. 2010) ...............................................................46, 48

*In re Bristol–Myers Squibb Securities Litigation*,
  312 F. Supp. 2d 549 (S.D.N.Y. 2004) ................................................................46, 49

*In re Facebook, Inc., IPO Securities & Derivative Litig*,
  MDL No. 12-2389, Civ. No. 12-6439, --- F. Supp. 2d ---, 2013 WL 525191 (S.D.N.Y. Feb. 13, 2013) ........................................................................................................5

*In re IBM Securities Litigation*,
  163 F.3d 102 (2d Cir. 1998) .....................................................................................49

*In re Initial Public Offerings Securities Litigation*,
  471 F.3d 24 (2d Cir. 2006) .......................................................................................56

*In re Intelligroup Securities Litigation*,
  468 F. Supp. 2d 670 (D.N.J. 2006) ..........................................................................59

*In re Moody's Corp. Securities Litigation*,
  274 F.R.D. 480 (S.D.N.Y. 2011) ..............................................................................57

*In re NYSE Specialists Securities Litigation*,
  503 F.3d 89 (2d Cir. 2007).............................................................................. *passim*

*In re NYSE Specialists Securities Litigation*,
  405 F. Supp. 2d 281 (S.D.N.Y. 2005)............................................................. *passim*

*In re Refco, Inc. Securities Litigation*,
  503 F. Supp. 2d 611 (S.D.N.Y. 2007) .....................................................................49

*In re Salomon Analyst Metromedia Litigation*,
  236 F.R.D. 208 (S.D.N.Y. 2006) .............................................................................57

*In re Sept. 11 Property Damage and Business Loss Litigation,*
    468 F. Supp. 2d 508 (S.D.N.Y. 2006)....................................................37

*In re Tower Automotive Securities Litigation,*
    483 F. Supp. 2d 327 (S.D.N.Y. 2007)..............................................48, 50

*King County v. IKB Deutsche Industriebank AG,*
    863 F. Supp. 2d 288 (S.D.N.Y. 2012)...............................35, 36, 37, 39

*Klaxon Co. v. Stentor Electrical Manufacturing Co.,*
    313 U.S. 487 (1941)..........................................................................35

*Krull v. Securities & Exchange Commission,*
    248 F.3d 907 (9th Cir. 2001) .............................................................24

*Lentell v. Merrill Lynch & Co., Inc.,*
    396 F.3d 161 (2d Cir. 2005)...........................................................58, 59

*Merrill Lynch & Co. Research Reports Securities Litigation,*
    No. 02 MDL 1484, 2008 WL 2324111 (S.D.N.Y. 2008).......................59

*Miller v. Miller,*
    237 N.E.2d 877 (N.Y. 1968)..............................................................35

*Milliken & Co. v. Consolidated Edison Co. of New York, Inc.,*
    644 N.E.2d 268 (N.Y. 1994)..............................................................37

*Mitchell v. Forsyth,*
    472 U.S. 511 (1985)..........................................................................22

*Nadoff v. Duane Reade, Inc.,*
    107 Fed. App'x 250 (2d Cir. 2004)......................................................45

*Ockerman v. May Zima & Co.,*
    27 F.3d 1151 (6th Cir. 1994) .............................................................56

*Palka v. Servicemaster Management Services Corp.,*
    634 N.E.2d 189 (N.Y. 1994)..............................................................36

*Pani v. Empire Blue Cross Blue Shield,*
    152 F.3d 67 (2d Cir. 1998).................................................................22

*Rombach v. Chang,*
    355 F.3d 164 (2d Cir. 2004)...............................................................45

*Rombach v. Chang,*
    No. 00-cv-958, 2002 WL 1396986 (E.D.N.Y. June 7, 2002).................54

*Rosenzweig v. Azurix Corp.*,
  332 F.3d 854 (5th Cir. 2003) ...............................................................53

*Roth ex rel. Beacon Power Corp. v. Perseus L.L.C.*,
  552 F.3d 242 (2d Cir. 2008)................................................................24

*Scher v. National Association of Securities Dealers, Inc.*,
  218 Fed. App'x 46 (2d Cir. 2007)........................................................17

*Schiavone Construction Co. v. Mayo Corp.*,
  436 N.E.2d 1322 (N.Y. 1982)................................................35, 36, 37

*Securities Investor Protection Corp. v. BDO Seidman*,
  222 F.3d 63 (2d Cir. 2000)...................................................................37

*Shema Kolainu-Hear Our Voices v. Providersoft, LLC*,
  832 F. Supp. 2d 194 (S.D.N.Y. 2010)..................................................37

*Slayton v. American Express Co.*,
  604 F.3d 758 (2d Cir. 2010).................................................................44

*Solow v. Citigroup, Inc.*,
  827 F. Supp. 2d 280 (S.D.N.Y. 2011) (Sweet, J.)................................59

*Sparta Surgical Corp. v. National Assocation of Securities Dealers, Inc.*,
  159 F.3d 1209 (9th Cir. 1998) ..................................................... *passim*

*Starr ex rel. Estate of Sampson v. Georgeson Shareholder, Inc.*,
  412 F.3d 103 (2d Cir. 2005).................................................................57

*Standard Investment Chartered, Inc. v. National Association of Securities Dealers, Inc.*,
  637 F.3d 112 (2d Cir. 2011)...............................................17, 20, 25

*Stern v. Leucadia National Corp.*,
  844 F.2d 997 (2d Cir. 1988).................................................................53

*Strauss v. Belle Realty Co*,
  482 N.E.2d 34 (N.Y. 1985)..................................................................37

*Suez Equity Investors, L.P. v. Toronto Dominion Bank*,
  250 F.3d 87 (2d Cir. 2001)...................................................................59

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)..............................................................................52

*Travelers Casualty and Surety Co. v Dormitory Authority-State of New York*,
  734 F. Supp. 2d 368 (S.D.N.Y. 2010)...........................................37, 39

*TSC Industries, Inc. v. Northway, Inc.,*
    426 U.S. 438 (1976).....................................................................................49

*Weissman v. National Association of Securities Dealers, Inc.,*
    500 F.3d 1293 (11th Cir. 2007) .................................................................22

*Weissman v. National Association of Securities Dealers, Inc.,*
    468 F.3d 1306 (11th Cir. 2006) .................................................................33

*Westpac Banking Corp. v Deschamps,*
    484 N.E.2d 1351 (N.Y. 1985)....................................................................37

*White v. Guarente,*
    372 N.E.2d 315 (N.Y. 1977).......................................................................37

*Woodward v. Raymond James Financial, Inc.,*
    732 F. Supp. 2d 425 (S.D.N.Y. 2010).........................................................55

### STATUTES & REGULATIONS

15 U.S.C. § 78c ........................................................................................3, 8

15 U.S.C. § 78f .......................................................................3, 4, 7, 26, 43

15 U.S.C. § 78s .............................................................................3, 4, 40

15 U.S.C. § 78j ..............................................................................................43

15 U.S.C. § 78k-1 .................................................................3, 11, 12, 26

15 U.S.C. § 78o-3 ..........................................................................................8

15 U.S.C. § 78u-4 ..........................................................................45, 52, 58

15 U.S.C. § 78u ..............................................................................................4

17 C.F.R. § 240.10b-5 ..................................................................................44

17 C.F.R. § 240.12f-2 ....................................................................................5

17 C.F.R. § 240.19b-4 ....................................................................................4

17 C.F.R. § 242.601 ......................................................................................12

17 C.F.R. § 242.602 ......................................................................................12

17 C.F.R. § 242.603 ......................................................................................12

SELF REGULATORY ORGANIZATION RULES & RULEMAKING

BATS Exchange Rule 11.16 ....................................................................................................41

BATS Y-Exchange Rule 11.16 ...............................................................................................41

C2 Options Exchange Rule 6.42 ............................................................................................41

Chicago Board Options Exchange Rule 6.7 .........................................................................41

Chicago Mercantile Exchange Rule 578................................................................................41

EDGA Exchange Rule 11.12 ..................................................................................................41

EDGX Exchange Rule 11.12 ..................................................................................................41

International Securities Exchange Rule 705 .........................................................................41

NASDAQ OMX PHLX Rule 3226...........................................................................................41

NASDAQ OMX BX Rule 4626 ...............................................................................................41

NASDAQ Stock Market Rule 4120........................................................................................ *passim*

NASDAQ Stock Market Rule 4611........................................................................................40

NASDAQ Stock Market Rule 4626........................................................................................ *passim*

NASDAQ Stock Market Rule 4751........................................................................................6, 15

NASDAQ Stock Market Rule 4752........................................................................................10

NASDAQ Stock Market Rule 4753........................................................................................5, 6, 7

NASDAQ Stock Market Rule 4754........................................................................................10

NASDAQ Stock Market Rule 4757........................................................................................14

NASDAQ Stock Market Rule 4758........................................................................................5

NASDAQ Stock Market Rule 7011........................................................................................12

NASDAQ Stock Market Rule 11890......................................................................................5, 26

New York Stock Exchange Rule 17 ......................................................................................41

New York Stock Exchange Rule 18 ......................................................................................41

NYSE Arca (Equity) Rule 13.2 .............................................................................................41

NYSE Arca (Options) Rule 14.2 ...............................................................................41

NYSE MKT Rule 905NY ...........................................................................................41

One Chicago Rule 421 ...............................................................................................41

Miami International Securities Exchange Rule 527 ...................................................41

*CBOE Proposed Rule Change*, Exchange Act Release No. 14,777 (May 17, 1978), 43
     Fed. Reg. 22,471 (May 25, 1978) ..............................................................................42

*CBOE, Order Approving Proposed Rule Change*, Exchange Act Rel. No. 14,982 (July
     20, 1978), 43 Fed. Reg. 32,480 (July 27, 1978) ..............................................41, 42

*Findings, Opinion, and Order of the Commission*, Exchange Act Release No. 53,128
     (January 13, 2006), 71 Fed. Reg. 3,550 (Jan. 23, 2006)...........................................3, 4, 41, 42

*In re NYSE LLC & NYSE Euronext*, Exchange Act Rel. No. 67,857, 2012 WL 4044880
     (Sept. 14, 2012)........................................................................................................11

*In re The NASDAQ Stock Market, LLC & NASDAQ Execution Services, LLC*, Exchange
     Act Rel. No. 69,655, 2013 WL 2326683 (May 29, 2013) .............................. *passim*

*Joint Industry Plan; Order Approving NASDAQ UTP Plan*, Exchange Act Release No
     28,146, 55 Fed. Reg. 27,917 (July 6, 1990)...............................................................12

*NYSE Proposed Rule Change Related to Vendor Liability*, Exchange Act Release No.
     58,137 (July 10, 2008), 73 Fed. Reg. 41,145, 41,146 (July 17, 2008) ....................43

*Order Approving Proposed Rule Change To Establish the Nasdaq Halt Cross*, Exchange
     Act Release No. 53,687 (April 20, 2006), 71 Fed. Reg. 24,878 (April 27, 2006)................6, 8

*Order Granting Accelerated Approval of Proposed Rule Change Relating to the
     NASDAQ Pre-Trading Quotation Period for IPOs*, Exchange Act Release No. 40,968
     (January 22, 1999), 64 Fed. Reg. 4729 (January 29, 1999).......................................5

*Order Granting Approval of a Proposed Rule Change to Amend NASDAQ Rule 4626 –
     Limitation of Liability*, Exchange Act Release No. 69,216 (Mar. 22, 2013), 78 Fed.
     Reg. 19,040 (March 28, 2013) ....................................................................16, 17, 25

*Proposed Rule Change to Amend NASDAQ Rule 4120*, Exch. Act Rel. No. 66,652
     (March 23, 2012), 77 Fed. Reg. 19,044 (March 29, 2012)....................................6, 7

*Proposed Rule Change to Amend NASDAQ Rule 4626 – Limitation of Liability*,
     Exchange Act Release No. 67,507 (July 26, 2012), 77 Fed. Reg. 45,706 (August 1,
     2012) ........................................................................................................... *passim*

x

*Proposed Rule Change to Codify Nasdaq's Existing Authority To Implement a "Quote-Only Period" Before the Start of Trading in IPOs*, Exchange Act Release No. 48,468 (September 10, 2003), 68 Fed. Reg. 54,256 (September 16, 2003).........................................6, 8

*Proposed Rule Change to Establish the Nasdaq Halt Cross*, Exchange Act Release No. 53,488 (March 15, 2006), 71 Fed. Reg. 14,272 (March 21, 2006)............................................6

*Proposed Rule Change to Extend the Pre-Market Hours of the NASDAQ Exchange to 4:00 a.m.*, Exchange Act Release No. 69,151 (March 15, 2013), 78 Fed. Reg. 17,464 (March 21, 2013) ................................................................................................................6

*Proposed Rule Change to Modify the NASDAQ Halt Cross Process*, Exchange Act Release No. 56,348 (August 31, 2007), 72 Fed. Reg. 51,693 (September 10, 2007)...............6

*Proposed Rule Change Relating to Initial Quotations of IPOs on NASDAQ*, Exchange Act Release No. 34,254 (June 24, 1994), 59 Fed. Reg. 33,808 (June 30, 1994)..................5, 8

*Proposed Rule Change Relating to the NASDAQ Market Center*, Exchange Act Rel. No. 53,583 (March 31, 2006), 71 Fed. Reg. 19,573, 19,574, 19,584 (April 14, 2006)...................6

*Regulatory Systems Compliance and Integrity*, Exchange Act Release No. 69,077, 78 Fed. Reg. 18,084 (March 25, 2013) ................................................................................. 25-26

## OTHER AUTHORITIES

16 N.Y. Practice, *Torts* § 21:13.10 ...............................................................................36

Asli Demirgüç-Kunt & Ross Levine, *Bank-Based and Market-Based Financial Systems: Cross-Country Comparisons* 51 (The World Bank Working Paper No. 2143, July 1999) .............................................................................................................................42

Federal Rule of Civil Procedure 9(b) ................................................................................53

House of Representatives Report No. 123, 94th Congress, 1st Session (1975) .............................20

Ian Domowitz et al., *Liquidity, Volatility, and Equity Trading Costs Across Countries & Over Time*, 4 International Finance 221 (2001)........................................................42

Michael S. Pagano, *Which Factors Influence Trading Costs in Global Equity Markets?*, 4 Journal of Trading 7 (2009) ......................................................................................42

Senate Report No. 75, 94th Congress 1st Session  (1975) .............................................19

## I.      INTRODUCTION

In these consolidated class actions, plaintiffs[1] assert two distinct theories of liability against defendants[2] arising out of the commencement of trading following the initial public offering ("IPO") of Facebook, Inc., common stock.

First, in Counts III through X of their consolidated amended complaint ("Complaint," or "CAC"), plaintiffs assert state law claims for "ordinary negligence" and "negligence *res ipsa loquitur*" against NASDAQ on behalf of four putative sub-classes of investors whose Facebook trades they assert were not properly executed or timely confirmed as a result of systems issues experienced by NASDAQ in the Facebook IPO.  They claim that NASDAQ owed a duty of care to such investors and breached that duty by proceeding with the IPO notwithstanding the systems issues it experienced and not halting trading in Facebook stock.

Second, in Counts I and II of the Complaint, plaintiffs assert claims against NASDAQ OMX and the individual defendants under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated by the SEC thereunder.  They also sue the individual defendants as "controlling persons" of NASDAQ under Section 20(a) of the Exchange Act.  Plaintiffs bring these claims on behalf of a putative class of investors who purchased Facebook stock in the IPO on the theory that they were defrauded into purchasing Facebook in reliance upon materially misleading statements allegedly made not about Facebook,

---

[1]     The named plaintiffs consist of six individual retail investors and two broker-dealers who are not members of the NASDAQ exchange, and one trading firm – First New York Securities LLC ("First New York") – which is a member of the NASDAQ exchange. (CAC ¶¶ 46-54.)

[2]     The defendants are The NASDAQ Stock Market LLC (the "Exchange"), its parent, The NASDAQ OMX Group, Inc. ("NASDAQ OMX," and collectively with the Exchange, "NASDAQ"), Robert Greifeld, NASDAQ OMX's Chief Executive Officer, and Anna M. Ewing, NASDAQ OMX's highest-ranking technology officer.  (*See* CAC ¶¶ 55-58.)

but about the quality of the systems of the exchange on which Facebook was to be listed, and

who suffered losses when the price of Facebook stock declined after the IPO.

        All of plaintiffs' claims arise out of actions taken (or not taken) by NASDAQ

within the scope of its regulatory responsibilities as a self-regulatory organization ("SRO")

registered with the SEC as a national securities exchange under the Exchange Act, and

accordingly are precluded by the doctrine of SRO immunity.  Indeed, as the SEC found in

connection with its investigation of NASDAQ's handling of the Facebook IPO:

> The orderly initiation of secondary market trading after an IPO is
> one of the most fundamental functions of a national securities
> exchange, and affects not only the market for those individual
> companies but also investor confidence in the markets as a whole.

*In re The NASDAQ Stock Mkt., LLC & NASDAQ Execution Servs., LLC*, Exch. Act Rel. No.

69,655, 2013 WL 2326683, at *1, ¶ 2 (May 29, 2013) ("Enforcement Order").[3]  These are

precisely the kinds of regulatory functions for which an SRO has immunity.  And because

immunity is a shield from litigation and not merely a defense to liability, it is appropriately

determined on a motion to dismiss.

        Although the Court need not reach any other grounds for dismissal, plaintiffs'

claims also fail for the following additional reasons:

- The negligence claims of the non-member plaintiffs, who have no contractual relationship with NASDAQ, are barred by the economic loss doctrine, under which a plaintiff cannot recover in tort for purely economic losses caused by the negligence of a defendant with whom the plaintiff is not in privity.

- The claims of First New York, which is a member of the Exchange and thus bound by NASDAQ's rules, are barred by NASDAQ Rule 4626, which provides that "Nasdaq and its affiliates shall not be liable for any losses, damages, or other claims arising out of the Nasdaq Market Center or its use."

---

[3]    A copy of the Enforcement Order is attached as Exhibit D to the Declaration of Paul Lantieri III submitted herewith ("Lantieri Decl.").

- The Complaint also fails to allege the requisite elements of a securities fraud claim under the standards mandated by the Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737 (the "PSLRA"). It does not allege any material misrepresentation or omission; it does not adequately allege scienter; it does not allege reliance or facts from which reliance may be presumed; and it does not allege any colorable theory of loss causation.

Accordingly, the Complaint should be dismissed.

## II.    BACKGROUND

### A.    NASDAQ Is a Self-Regulatory Organization Exercising Federally Delegated Rulemaking Authority Under Close SEC Supervision

The Exchange, which is owned and operated by NASDAQ OMX, is a self-regulatory organization ("SRO") registered as a national securities exchange under Section 6 of the Exchange Act. *See* 15 U.S.C. §§ 78f & 78c(a)(26); *Findings, Opinion, and Order of the Comm'n*, Exch. Act Rel. No. 53,128 (Jan. 13, 2006), 71 Fed. Reg. 3,550 (Jan. 23, 2006) ("*Exchange Registration Approval Order*"). The Exchange Act establishes a system of cooperative regulation under which private SROs like NASDAQ conduct the day-to-day regulation and administration of the nation's securities markets under the close supervision of the SEC. Together, they share responsibility to maintain fair and orderly markets. *See* 15 U.S.C. § 78f(b)(5); *see also, e.g.*, 15 U.S.C. § 78k-1(a)(1)(C) (the national market system created by the Exchange Act furthers the "maintenance of fair and orderly markets").

Before it may permit the registration of an exchange as an SRO, the SEC must determine, among other things, that the exchange has a set of rules that are "consistent with the requirements" of the Exchange Act, 15 U.S.C. §78s(b)(2), and thus that are designed

> to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, to foster cooperation and coordination with persons engaged in regulating, clearing, settling, processing information with respect to, and facilitating transactions in securities, to remove impediments to and perfect the mechanism of a free and open market and a national market

3

system, and, in general, to protect investors and the public interest
. . . .

15 U.S.C. § 78f(b)(5).  With limited exceptions, the SEC approves all exchange rules, policies,

and practices prior to implementation, 15 U.S.C. §§ 78f & 78s, and also approves any proposed

changes to exchange rules, 15 U.S.C. §78s(b); 17 C.F.R. § 240.19b-4.  Even after approval, the

SEC retains the right to "abrogate, add to, and delete from" any exchange rule as it "deems

necessary or appropriate to insure the fair administration of the [exchange], to conform its rules

to requirements of [the Exchange Act] and the rules and regulations thereunder applicable to

such organization, or otherwise in furtherance of the purposes of [the Exchange Act.]"  15 U.S.C.

§ 78s(c).

        In addition, the SEC enforces exchanges' compliance with the Exchange Act, the

SEC's rules, and the exchanges' own rules.  Thus, the SEC may bring an action to enjoin any

activity by an exchange that violates the Exchange Act or any rules promulgated thereunder.  15

U.S.C. § 78u(d).  The SEC also may suspend or revoke the registration of an exchange, censure

it, or restrict its activities, functions, and operations.  15 U.S.C. § 78s(h)(1).  And the SEC can

remove from office or censure an officer or director of an exchange responsible for such failure.

15 U.S.C. § 78s(h)(4).

**B.    NASDAQ's Cross Process for Opening Trading After an IPO Is a
        Quintessentially Regulatory Function Governed by SEC-Approved Rules**

        Plaintiffs' Complaint focuses on NASDAQ's commencement of secondary

market trading after the Facebook IPO.  (*See* CAC ¶ 1.)  As the SEC emphasized in the

Enforcement Order, the commencement of secondary market trading after an IPO is a

fundamental function of a national securities exchange.  Enforcement Order ¶ 2.  Thus, when the

SEC approved NASDAQ's system of rules governing the operation of the Exchange, it approved

rules relating to the processing of trades on the Exchange and the opening and halting of trading

4

in individual securities.  *See Exch. Reg. Approval Order*, 71 Fed. Reg. at 3551, 3558-65 (finding

NASDAQ's proposed rules consistent with Sections 6 and 11A of the Exchange Act and

discussing NASDAQ's trading system); *see also* NASDAQ Rules 4120 ("Limit Up-Limit Down

Plan and Trading Halts"), 4753 ("Halt and Imbalance Crosses"), 4758 (establishing a procedure

for cancelling orders in the event of a system issue and a procedure governing error positions), &

11890 (providing for NASDAQ review and discretion to nullify "clearly erroneous" transactions

"with a view toward maintaining a fair and orderly market and the protection of investors and the

public interest").

        Until trading in a company's security opens on its listing market on the day of its

IPO, secondary market trading may not commence on any other market.  *See* 17 C.F.R. §

240.12f-2.  NASDAQ's process for commencing trading in an IPO security listed on its

Exchange – known as the "IPO Cross" – was developed in consultation with market participants

and is designed to identify a single price for the opening of trading in a security that is the

subject of an IPO.  The price is determined based on supply and demand as represented by orders

submitted before the execution of the Cross.  (CAC ¶ 134; *see also* NASDAQ Rules 4120 &

4753.[4])  The Cross process is governed principally by NASDAQ Rules 4120 and 4753.  As this

Court has described, each of these rules has an extensive public rulemaking history.  *See In re*

*Facebook, Inc., IPO Sec. & Deriv. Litig*, MDL No. 12-2389, Civ. No. 12-6439, --- F. Supp. 2d

---, 2013 WL 525191, at *9 & *9 n.4 (S.D.N.Y. Feb. 13, 2013) ("*Zack*") (denying motion to

remand).[5]

---

[4]     All of NASDAQ's current rules are available at http://nasdaq.cchwallstreet.com. Copies
        of Rules 4120 and 4753 are attached as Exhibits A and C to the Lantieri Declaration.

[5]     *See also Proposed Rule Change Relating to Initial Quotations of IPOs*, Exch. Act Rel.
        No. 34,254 (June 24, 1994), 59 Fed. Reg. 33,808 (June 30, 1994); *Order Granting*
        *Accelerated Approval of Proposed Rule Change Relating to the Pre-Trading Quotation*

By rule, on the day of an IPO Cross NASDAQ members may place buy and sell orders for execution in the Cross well in advance of the opening of trading.[6]  (CAC ¶ 136; Rule 4120(c)(7)(B).)  The Exchange places those orders in a "holding bin" until the beginning of the "Display Only Period."  (*See id.*)  During the Display Only Period, members can enter, modify, and cancel orders and "observe the evolution of the prospective auction price through NASDAQ's dissemination of auction imbalance information, thereby enabling members (and

*Period for IPOs*, Exch. Act Rel. No. 40,968 (Jan. 22, 1999), 64 Fed. Reg. 4729 (Jan. 29, 1999) (approving extension of the pre-opening quotation period for IPOs from five minutes to fifteen minutes); *Proposed Rule Change to Codify Nasdaq's Existing Authority To Implement a "Quote-Only Period" Before the Start of Trading in IPOs*, Exch. Act Rel. No. 48,468 (Sept. 10, 2003), 68 Fed. Reg. 54,256 (Sept. 16, 2003) (codifying the Quote Only Period, which is now known as the Display Only Period); *Proposed Rule Change To Establish the Nasdaq Halt Cross*, Exch. Act Rel. No. 53,488 (Mar. 15, 2006), 71 Fed. Reg. 14,272 (Mar. 21, 2006) (proposing to establish an opening cross for the trading of NASDAQ-listed securities that have been the subject of a "trading halt," which includes securities opening for trading in an IPO, and describing the Cross process in detail); *Proposed Rule Change Relating to the NASDAQ Mkt. Ctr.*, Exch. Act Rel. No. 53,583 (Mar. 31, 2006), 71 Fed. Reg. 19,573, 19,574, 19,584 (Apr. 14, 2006) (proposing, among other Exchange rules, Rule 4753 governing the IPO Cross, and proposing to provide for the possibility of three extensions of the Display Only Period preceding a Cross ); *Order Approving Proposed Rule Change To Establish the Nasdaq Halt Cross*, Exch. Act Rel. No. 53,687 (Apr. 20, 2006), 71 Fed. Reg. 24,878 (Apr. 27, 2006); *Proposed Rule Change To Modify the Halt Cross Process*, Exch. Act Rel. No. 56,348 (Aug. 31, 2007), 72 Fed. Reg. 51,693 (Sept. 10, 2007) (proposing to authorize up to three additional extensions of the Display Only Period); *Proposed Rule Change To Amend Rule 4120*, Exch. Act Rel. No. 66,652 (Mar. 23, 2012), 77 Fed. Reg. 19,044 (Mar. 29, 2012) ("*IPO Order Holding Bin Rule Filing*") (amending Rule 4120 to permit IPO orders to be entered prior to the start of the Display-Only Period on the day of an IPO).

[6]   Only members of NASDAQ can submit orders to NASDAQ; individual investors, such as the plaintiffs other than First New York, may only submit orders through NASDAQ members.  *See* NASDAQ Rules 4751(a) & (c); *see also* CAC ¶ 270 (plaintiffs "each traded through a completely separate and independent brokerage firm).

At the time of the Facebook IPO, Rule 4120(c)(7)(B) permitted orders for the IPO Cross to be submitted beginning at 7 a.m.  Subsequently the Rule was amended to permit such orders to be submitted beginning at 4 a.m.  *See Proposed Rule Change to Extend the Pre-Market Hours of the Exchange to 4:00 a.m.*, Exch. Act Rel. No. 69,151 (Mar. 15, 2013), 78 Fed. Reg. 17,464 (Mar. 21, 2013).

their customers) to participate in IPO price discovery." (CAC ¶ 135; *see also id.* ¶¶ 136-37.) The Display Only Period lasts at least 15 minutes, and may be extended in five-minute intervals.[7] (CAC ¶¶ 136-37; *see also* NASDAQ Rules 4120(c)(7)(B) & (C).)

After the Display Only Period, the remaining steps in the Cross process typically take a small fraction of a second. (*See* CAC ¶ 249; *see also* Enforcement Order ¶ 7 ("The electronic calculation . . . usually takes approximately one to two milliseconds to complete.").) NASDAQ's IPO Cross Application analyzes buy and sell interest and determines the price at which the largest number of shares will trade. (CAC ¶ 138; *see also* NASDAQ Rule 4753(b).) After performing this calculation, the system checks whether, in the very brief intervening moment, NASDAQ received any cancellations of orders that would be included in the Cross. (CAC ¶ 142.) If this "validation check" fails, the system re-calculates the price and volume of the Cross, taking into account orders and order modifications received since the initial calculation. (*See* CAC ¶ 143.) If the validation check passes, NASDAQ sends the opening "bulk" trade to the consolidated tape, disseminates the opening price, and sends Cross transaction confirmation reports to its members. (CAC ¶ 138.)

NASDAQ designed the validation check to protect the integrity of the IPO process. As plaintiffs' acknowledge, "NASDAQ's IPO Cross system is designed to ensure that

---

[7] Plaintiffs incorrectly assert that NASDAQ made a "business decision" to expand the "pre-market order window" from 15 minutes to four hours specifically for the Facebook IPO. (*See* CAC ¶¶ 119-125.) In fact, the "holding bin" was implemented by amending Rule 4120 through the Exchange Act's public rulemaking process before the Facebook IPO. *See IPO Order Holding Bin Rule Filing*, 77 Fed. Reg. 19,044. It applies to the opening of trading after the IPO of any security listed on NASDAQ, not just Facebook. *See* Rule 4120(c)(7)(B). It reflects NASDAQ's regulatory judgment that allowing earlier order entry for all IPOs would "result[] in a higher level of order interaction at the open" and thus, in furtherance of the goals of the Exchange Act, "remove impediments to and perfect the mechanism of a free and open market." *See IPO Order Holding Bin Rule Filing*, 77 Fed. Reg. at 19,045 (citing 15 U.S.C. § 78f(b)(5)).

cancellations submitted while the Cross is calculating, and up until the last moment before the

Cross is completed, are accounted for in the Cross." (CAC ¶ 142; *see also Proposed Rule*

*Change to Amend Rule 4626 – Limitation of Liability*, Exch. Act Rel. No. 67,507 (July 26,

2012), 77 Fed. Reg. 45,706, 45,709 (Aug. 1, 2012) ("Accommodation Proposal"); *id.* at 45,708

("[T]he benefits of the Cross include optimizing an opening price and allowing investors to

cancel their orders at the last possible moment.").)

Indeed, in approving the Cross process, the SEC found that it "should provide useful

information to market participants and increase transparency and order interaction at the

opening," and "result in the public dissemination of information that more accurately reflects

trading in a particular security." *Exch. Registration Approval Order*, 71 Fed. Reg. at 24,879.

The SEC further concluded that the Cross process was designed to promote just and equitable

principles of trade, to remove impediments to and perfect the mechanism of a free and open

market and a national market system, and, in general, to protect investors and the public interest.

*Id.* at 24,878-79 (finding the process consistent with Section 15A of the Exchange Act, 15 U.S.C.

§ 78o-3, in general, and Section 15A(b)(6) of the Act, 15 U.S.C. § 78o-3(b)(6) in particular).  In

addition, "[i]n approving the proposed rule change, the Commission . . . considered its impact on

efficiency, competition, and capital formation."  *Id.* at 24,878 n.5 (citing 15 U.S.C. § 78c(f)).

*See also, e.g.*, 59 Fed. Reg. at 33,808 (the Display Only Period should allow NASDAQ "to

present a better quotation when the market opens for trading"); 68 Fed. Reg. at 54,257 ("Market

participants are better able to digest and respond to market price indications before an IPO is

released for trading, and thus to provide better information upon which to make trading

decisions.").

**C.**     **NASDAQ Exercised Its Regulatory Authority to Ensure There Was a Market for Trading Facebook Stock When Systems Issues Affected the Facebook IPO Cross**

**1.**     **Systems Issues Delayed the Completion of the Facebook IPO Cross**

The Facebook IPO was one of the most eagerly anticipated public offerings in history. (*See, e.g.*, CAC ¶¶ 2, 254.)  Consistent with its SEC-approved rules, on May 18, 2012 NASDAQ began accepting orders for the Facebook IPO Cross into its trading system's holding bin at 7 a.m., and announced that the Display Only Period for the Cross would begin at 10:45 a.m., such that secondary trading would begin at 11:00 a.m.  (CAC ¶¶ 136, 140.)  At 10:58 a.m., NASDAQ extended the Display Only Period by five minutes at the request of Facebook's lead underwriter.  (CAC ¶ 140; *see also* Enforcement Order ¶ 14.)

At 11:05 a.m., NASDAQ attempted to execute the Facebook IPO Cross, print the opening trade to the tape, and initiate secondary trading, but the Cross process did not operate as expected.  (CAC ¶¶ 141-43.)  During that calculation, NASDAQ received a cancellation of an order that would have been included in the Cross.  Accordingly, the validation check triggered a recalculation.  (CAC ¶ 143.)  During the few milliseconds of the recalculation, NASDAQ received additional cancellations, which triggered additional recalculations.  (CAC ¶ 143.)  This pattern continued, "creating a loop preventing the Cross from calculating a final opening price" and commencing secondary trading at the scheduled time.  (CAC ¶ 143.)  At 11:13 a.m., NASDAQ issued a Market System Status message advising the public that it was experiencing a delay in delivering the opening print in Facebook stock.  (CAC ¶ 197.)

Given the speed of the Cross calculation, the system typically incorporates any last-moment cancellations and produces a calculation that satisfies the validation check without causing any perceptible delay.  Indeed, NASDAQ had conducted all of its IPO Crosses since December 2010 using the same validation check – and millions of market opening and closing

crosses since 2006 using similar functionality (which NASDAQ conducts for each nationally-listed stock at the beginning and end of each trading day to determine opening and closing prices) – without any such incident.  *See* NASDAQ Rules 4752 ("Opening Process") & 4754 ("Nasdaq Closing Cross"); Enforcement Order ¶¶ 8, 11; Accommodation Proposal, 77 Fed. Reg. at 45,709.  Had the first Facebook cancellation been received before or after the few thousandths of a second NASDAQ's system took to perform the initial calculation of the price and volume of the Cross, the Cross would have been completed and trading would have opened without incident.  (*See* CAC ¶ 249; *see also* Enforcement Order ¶¶ 17-18.)

> ### 2.      NASDAQ Determined to Proceed with a Minor System Modification Rather than Postpone the Opening of Secondary Trading

Shortly before 11:30 a.m., NASDAQ decided to "fail over" to a backup system from which it had removed the few lines of code providing for the validation check.  This allowed the Cross to complete and secondary trading to open.  (*See* CAC ¶¶ 146, 149, 151, 199.) Based on its assessment of the information available at that time, NASDAQ determined to proceed with the Cross at approximately 11:30 a.m., and so advised the public.  (*See* CAC ¶¶ 146, 151, 199.)

The switch to the failover system allowed the Cross to complete, and at 11:30:09 a.m. NASDAQ released the opening trade at $42.  (CAC ¶ 146.)  Continuous trading in Facebook then commenced on NASDAQ and ten other markets.  Thereafter, trading on the continuous market operated normally; orders were executed and confirmed promptly.  (*See* CAC ¶¶ 146, 151, 163, 264; Accommodation Proposal, 77 Fed. Reg. at 45,709; Enforcement Order ¶¶ 26, 32.)

### 3. Although the System Modification Permitted Secondary Trading to Open, NASDAQ Experienced Further Systems Issues

NASDAQ's determination to proceed with the modified Cross at 11:30 a.m. had unanticipated consequences. New order, cancel, and replace messages received before 11:11 a.m. were acknowledged and incorporated into the Cross order book in real time (*see* CAC ¶ 205(v); *see also* CAC ¶¶ 145-56), but the issue created by the validation check caused other system issues.

The IPO Cross Application fell behind incoming orders such that orders entered between 11:11 and 11:30 a.m. were not included in the Cross. Some were cancelled by members before the Cross; some were correctly entered into the market at 11:30 a.m.; and the remainder were cancelled or released into the market at 1:50 p.m. (CAC ¶¶ 7, 28, 145-46.) In addition, NASDAQ's system did not immediately disseminate confirmation reports for orders executed in the IPO Cross. (CAC ¶¶ 7, 37, 145, 151.)

NASDAQ also experienced an issue with the dissemination of Facebook quoting data through its public and proprietary data feeds. Like other exchange functions, NASDAQ's provision of market data is highly regulated.[8] In furtherance of the Congressional mandate to link all securities markets "through communication and data processing facilities," 15 U.S.C. § 78k-1(a)(1)(D), the SEC, through Regulation NMS, requires all national securities exchanges to send to the Securities Information Processor ("SIP"): (i) the exchanges' "top of book" (*i.e.*, best

---

[8]     Indeed, the SEC recently brought an enforcement action against the NYSE on that very subject. *In re NYSE LLC & NYSE Euronext*, Exch. Act Rel. No. 67,857 (Sept. 14, 2012), 2012 WL 4044880, at *1 (Order Instituting Proceedings) (noting that required market data dissemination ensures that "the public has ready access to a comprehensive, accurate, and reliable source of information for the prices and volume of any NMS stock at any time during the trading day," "assure[s] the public is aware of the best displayed prices for a stock, no matter where they may arise in the national market system," and "play[s] an important role in price discovery and compliance functions") (citations omitted).

bids and offers ("BBOs")); and (ii) reports of executed trades.  The SIP consolidates and makes

the data available to the public.[9]  *See* 17 C.F.R. §§ 242.601, 602 & 603.  After the Facebook IPO

Cross, trading occurred on NASDAQ and other markets.  (*See* CAC ¶ 121 (more than 80 million

shares of Facebook traded in the first 30 seconds of trading and approximately 567 million

shares traded on May 18).)  NASDAQ accurately and timely reported its executed Facebook

trades to the SIP (plaintiffs do not allege otherwise), but temporarily did not deliver accurate

Facebook quoting data to the SIP or to NASDAQ's proprietary data feeds.  (CAC ¶¶ 164-65; *see*

*also* Enforcement Order ¶ 31.)  NASDAQ did, however, designate its faulty quote as "non-firm"

so that it was ignored in the SIP's calculation of the NBBO, as Regulation NMS directs

exchanges to do in such circumstances.[10]  *See* 17 C.F.R. § 242.602(a)(3)(i); *see also*

Enforcement Order ¶ 31.

### 4. NASDAQ Determined Not to Halt Trading While the Dissemination of Cross Confirmation Reports Was Delayed

Aware of the issues with Cross transaction reports and NASDAQ's data feeds,

NASDAQ considered whether to halt Facebook trading.  (*See* CAC ¶¶ 276, 290;

Accommodation Proposal, 77 Fed. Reg. at 45,709; Enforcement Order ¶¶ 32-33.)  NASDAQ's

---

[9]    The Nasdaq Unlisted Trading Privileges Plan ("the NASDAQ UTP Plan") governs the collection, processing, and distribution of all UTP SIP data.  In accordance with Section 11A of the Exchange Act, 15 U.S.C. 78k-1(a)(1), the Plan has been approved by the SEC and amendments to the Plan are filed with the SEC.  *See Joint Industry Plan; Order Approving NASDAQ UTP Plan*, Exch. Act Rel. No 28,146 (June 26, 1990), 55 Fed. Reg. 27,917 (July 6, 1990).  The UTP SIP provides two data feeds:  (i) the UTP Quote Data Feed, which distributes BBOs for each market trading NASDAQ-listed securities, and uses those BBOs to calculate a national BBO ("NBBO") for each security; and (ii) the UTP Trade Data Feed, which provides continuous last sale information from all markets trading NASDAQ-listed securities.  *See* NASDAQ Rule 7011.

[10]   Plaintiffs thus misapprehend the nature of NASDAQ's market data feeds when they allege that the issue "prevent[ed] Class Members from obtaining the best execution prices for their trades in Facebook stock as required by SEC Reg. NMS."  (CAC ¶ 8; *see also, e.g.*, CAC ¶¶ 15, 29, 160-67, 206, 210, 304, 320(4), 393.)

regulatory authority to halt trading is defined by NASDAQ Rule 4120, which provides in pertinent part that "[i]n circumstances in which [NASDAQ] deems it necessary to protect investors and the public interest," NASDAQ "may halt trading in a security listed on Nasdaq when"

    (A)    extraordinary market activity in the security is occurring, . . . [and]

    (B)    Nasdaq determines that such extraordinary market activity is likely to have a material effect on the market for the security . . . .

NASDAQ Rule 4120(a)(6).  Neither condition was satisfied.  As plaintiffs acknowledge, Facebook stock was trading normally.  (*See* CAC ¶¶ 276, 290.)  Indeed, there was an orderly, liquid, deep, and active market in Facebook stock, with more than 560 million shares of Facebook traded on May 18 on NASDAQ and other markets.  (*See, e.g.*, CAC ¶ 121.)  Accordingly, NASDAQ concluded, in its regulatory judgment, that the conditions after 11:30 a.m. did not warrant a halt of trading under Rule 4120.  (*See* CAC ¶ 121; NASDAQ Rule 4120(a)(6).)

NASDAQ issued further system status reports at 11:59 a.m. and 1:05 p.m. advising the public that it was aware of and working on the delayed confirmation reports.  (CAC ¶¶ 203-204.)  At 1:47 p.m., NASDAQ advised the public that it would be delivering electronic confirmation reports at approximately 1:50 p.m.  (CAC ¶ 207.)  At 1:57 p.m., NASDAQ confirmed that it had done so.  (CAC ¶ 208.)

    **D.**    **The SEC Exercised its Supervisory Authority by Investigating NASDAQ's Handling of the Facebook IPO and Instituting an Enforcement Proceeding**

    Confirming that the Exchange was performing a regulatory function in its handling of the Facebook IPO and that the SEC supervises that function, in the months following the Facebook IPO, the SEC investigated NASDAQ's handling of the IPO.  (*E.g.*, CAC ¶¶ 13,

292-93.)  The investigation culminated in the SEC instituting an enforcement proceeding against

the Exchange and an Exchange affiliate.  Exercising its supervisory authority, the SEC

"deem[ed] it necessary and appropriate in the public interest and for the protection of investors

that public administrative proceedings and cease-and-desist proceedings be . . . instituted

pursuant to Section[s] 19(h)(1) and 21C of the [Exchange Act]."  Enforcement Order § I.

       Based on detailed findings covering NASDAQ's system design, NASDAQ's

preparedness for the IPO, and the events of May 18, the SEC concluded that "[t]he decisions

made by NASDAQ in response to trading disruptions that resulted from the design limitation led

to further downstream systems issues and caused NASDAQ to violate a fundamental rule

governing order priority as well as several other Commission and NASDAQ rules."

Enforcement Order ¶ 3.  More specifically, the SEC found that NASDAQ violated "Rule

4757(a)(1) when it failed to execute equally priced or better priced trading interest in Facebook

in price/time priority" in connection with the orders that were not executed in the IPO Cross.  *Id.*

¶ 58(a); *see also id.* ¶¶ 58(c)-(d), 63-64.[11]  Thus, while the SEC concluded that technical

regulatory violations flowed from the Exchange's decision to proceed with the Cross, it did not

---

[11]    The SEC also found that:  (i) NASDAQ violated Rule 4120(c)(7) insofar as NASDAQ:
did not "immediately initiate trading in Facebook at the conclusion of the [Display Only
Period]"; (ii) NASDAQ violated Rule 4120(c)(7) by agreeing to extend the Display Only
Period at the request of Facebook's lead underwriter consistent with longstanding and
publicly disclosed practice, *id.* ¶ 14, but in the absence of explicit authority for granting
such a request; (iii) in connection with the error position in Facebook stock that
NASDAQ incurred in the Facebook IPO, NASDAQ and a NASDAQ affiliate violated
NASDAQ's rules and the Exchange Act's net capital requirements, respectively; (iv)
NASDAQ violated its price/time priority rule in connection with a halt cross for another
stock that was impacted by NASDAQ's systems issues with the Facebook IPO; and (v) in
separate incidents wholly unrelated to the Facebook IPO in October 2011 and August
2012, NASDAQ committed technical violations of the SEC's Regulation SHO
(concerning short sales) and Regulation NMS (concerning "trade throughs") arising from
human errors with respect to NASDAQ's systems for enforcing compliance with those
regulations.  *Id.* ¶¶ 46-55, 58-62.

conclude that that decision itself – or the Exchange's subsequent decision not to halt continuous market trading in Facebook stock – violated any law or regulation.  In light of the technical violations, the SEC imposed a civil monetary penalty, censured the Exchange, ordered the Exchange to cease and desist from committing violations of the Exchange Act and SEC regulations thereunder, and ordered the Exchange to comply with specified remedial undertakings.  *Id.* § IV.  The Exchange consented to the entry of the Enforcement Order "[s]olely for purposes of [the SEC] proceedings" and without admitting or denying the SEC's findings. *Id.* § II.  Nevertheless, the SEC's findings reflect the scope of the SEC's oversight of the issues giving rise to plaintiffs' Complaint.

> **E.  With SEC Approval, NASDAQ Established an Accommodation Plan for Facebook IPO Losses By Amending NASDAQ Rule 4626, Which Strictly Limits NASDAQ's Liability for Systems Issues**

NASDAQ Rule 4626(a) provides that "[e]xcept as provided for in paragraph (b) below, Nasdaq and its affiliates shall not be liable for any losses, damages, or other claims arising out of the Nasdaq Market Center or its use. . . .  [Such losses] shall be absorbed by the member . . . ."  Prior to the Facebook IPO, paragraph (b) of Rule 4626 permitted NASDAQ to compensate members up to a maximum aggregate of $500,000 per month for losses sustained in that month by members related to their use of the Exchange.  *See* NASDAQ Rule 4626(b)(1).[12] (*See also* § III(B)(2), *poste* (concerning applicability of Rule 4626 here).)

On July 23, 2012, NASDAQ filed with the SEC a proposal to amend NASDAQ Rule 4626 to permit NASDAQ to pay its members up to $62 million for losses relating directly

---

[12]     A copy of the full text of Rule 4626 is attached as Exhibit B to Lantieri Declaration.

NASDAQ's rules define "Nasdaq Market Center" and "System" as "the automated system for order execution and trade reporting owned and operated by The NASDAQ Stock Market LLC."  NASDAQ Rule 4751(a).

to the systems issues experienced by NASDAQ in the Facebook IPO.  (CAC ¶¶ 10, 299-306; Accommodation Proposal, 77 Fed. Reg. 45,706.)  After considering public comments – including three comment letters submitted by counsel for plaintiffs asserting the same objections they repeat here (CAC ¶¶ 299-306) – the SEC approved the Accommodation Proposal on March 22, 2013 as consistent with the requirements of the Exchange Act and "in the public interest." *See Order Granting Approval of a Proposed Rule Change to Amend Rule 4626 – Limitation of Liability*, Exch. Act Rel. No. 69,216 (Mar. 22, 2013), 78 Fed. Reg. 19,040, 19,045-47 (Mar. 28, 2013) ("*Accommodation Program Approval Order*") (Lantieri Decl. Ex. E); *id.* at 19,044-46 & nn. 63, 64, 66, 71, 82, 83, 88, 89, 95 (addressing plaintiffs' comments); *see also* CAC ¶ 12.

As approved by the SEC, Rule 4626(b)(3) provides a specific procedure for claims related to the system issues NASDAQ experienced with the Facebook IPO.  Claims must be submitted to and verified by another SRO, the Financial Industry Regulatory Authority, under criteria specified in the Accommodation Proposal.  Rule 4626(b)(3).  The Rule identifies the specific types of Facebook IPO orders eligible for accommodation and the formula for calculating members' eligible losses, along with procedures for the submission, consideration, and payment of claims.  *Id.*  The criteria create a framework that seeks to replicate what the expected execution prices of orders would have been had NASDAQ not experienced systems issues, on the assumption that members would exercise reasonable diligence to mitigate losses once made aware that their Cross orders had not executed, or had executed at unexpected prices. *See id.*; *see also* Accommodation Proposal, 77 Fed. Reg. at 45,710-11.  Among other things, the Rule makes payment contingent on members' submission of an attestation detailing the amount of compensation they have provided to their customers, and prioritizes payments to members who compensate their customers.  Rules 4626(b)(3)(F)(i) & 4626(b)(3)(G).

16

The SEC found that the Rule "sets forth objective and transparent processes to determine eligible claims and how such claims would be paid," and that the Rule "should encourage members to compensate their customers for customer losses related to the Facebook IPO." *Accommodation Program Approval Order*, 78 Fed. Reg. at 19,046.

## III.   ARGUMENT

### A.   Plaintiffs' Claims Are Barred by the Doctrine of SRO Immunity

#### 1.   Defendants Are Immune from Liability for Claims Arising Out of Their Regulatory Functions

As a national securities exchange registered by the SEC under Section 6 of the Exchange Act, NASDAQ is an SRO possessing absolute immunity "in connection with the discharge of [its] regulatory responsibilities." *Std. Inv. Chartered, Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.*, 637 F.3d 112, 115 (2d Cir. 2011) (citing five prior Second Circuit holdings: *DL Capital Group, LLC v. Nasdaq Stock Market, Inc.*, 409 F.3d 93, 96 (2d Cir. 2005); *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 96 (2d Cir. 2007); *D'Alessio v. N.Y. Stock Exch., Inc.*, 258 F.3d 93, 105 (2d Cir. 2001); *Barbara v. New York Stock Exchange*, 99 F.3d 49, 59 (2d Cir. 1996); and *Scher v. Nat'l Ass'n of Sec. Dealers, Inc.*, 218 Fed. App'x 46, 47-48 (2d Cir. 2007) (summary order).) The individual defendants are likewise protected from plaintiffs' claims because agents of an SRO are immune to the same extent as the SRO.[13] The scope of this immunity has been well developed in a line of decisions by and within the Second Circuit and in other circuits, and encompasses all of the actions (or inactions) complained of here.

---

[13]   *See DL Capital*, 409 F.3d at 97 ("There is no question that an SRO and its officers are entitled to absolute immunity when they are, in effect, 'acting under the aegis' of their regulatory duties.") (quoting *Sparta Surgical Corp. v. Nat'l Ass'n of Sec. Dealers, Inc.*, 159 F.3d 1209, 1214 (9th Cir. 1998)); *D'Alessio*, 258 F.3d at 98 (evaluating employee immunity by asking whether exchange is immune).

SROs like NASDAQ perform "quasi-governmental functions pursuant to broad authority delegated to them by the Exchange Act." *D'Alessio*, 258 F.3d at 105. This settled regulatory structure dates to the 1930s, when Congress elected a system of exchange "self-regulation with strong SEC oversight" instead of the "pronounced expansion of the SEC." *Sparta Surgical*, 159 F.3d at 1213 (internal quotation marks and citation omitted). The 1938 Maloney Act amended the Exchange Act to provide for the establishment of SROs and, in so doing, "established a system of 'cooperative regulation' in the over-the-counter securities market, under which self-regulatory organizations would exercise a primary supervisory role subject to ultimate SEC control." *Id.* at 1213-1214 (citation omitted). Then-SEC Chairman William O. Douglas described co-regulation with national securities exchanges as

> letting the exchanges take the leadership with Government playing
> a residual role. Government would keep the shotgun, so to speak,
> behind the door, loaded, well oiled, cleaned, ready for use but with
> the hope it would never have to be used.

*Id.* at 1214 n.1 (quoting W. Douglas, Democracy and Finance 82 (1940)).

The fundamentals of co-regulation have not changed: less than two-months ago, addressing an SEC-hosted conference of SROs, SEC Commissioner Elisse B. Walter stated that

> [a]s compatriots in regulation . . . [the SEC and the SROs] share
> important statutory responsibilities and a mission to promote fair
> and orderly markets, protect investors and the public interest,
> eliminate unfair discrimination between market participants, and
> further the purposes of the Exchange Act.

Hon. Elisse B. Walter, Remarks at SRO Outreach Conference (May 13, 2013), *avail. at* http://www.sec.gov/news/speech/2013/spch051313ebw.htm ("Our securities markets are a valuable national asset, and [the SEC and the SROs] – collectively – are its guardians."). Similarly, the SEC's Enforcement Order addressing NASDAQ's handling of the Facebook IPO

starts with the SEC's recognition of this model of self-regulation by the national securities

exchanges:

> National securities exchanges, which are registered by the
> Commission under Section 6 of the Exchange Act, are critical
> components of the National Market System, which provides the
> foundation for investor confidence in the integrity and stability of
> the United States' capital markets.  The Exchange Act establishes a
> regulatory scheme that combines self-regulation by the exchanges
> with oversight by the Commission.

Enforcement Order ¶ 1.

Indeed, the SEC's oversight role has only strengthened with time.  The 1975

Amendments to the Exchange Act bolstered the "'essential and continuing role of the federal

government' in regulating the securities industry," *Sparta Surgical*, 159 F.3d at 1214 (quoting S.

Rep. No. 75, 94th Cong. 1st Sess., 22 (1975)), with SROs today "hav[ing] no governmentally

derived authority to act independently of SEC oversight," *id.* (quoting H.R. Rep. No. 123, 94th

Cong., 1st Sess., 48-49 (1975)); *see also DL Capital*, 409 F.3d at 95 ("[T]he SEC has extensive

involvement with, and broad oversight of, SROs, including the responsibility to approve or reject

any rule, practice, [or] policy . . . proposed by an SRO.").  As this Court has put it,

> [t]he Exchange Act provides the SEC with broad and exclusive
> authority to oversee (1) [exchanges'] compliance with the
> Exchange Act, the rules and regulation thereunder, and [their] own
> rules; and (2) [exchanges'] enforcement of its members
> compliance with these provisions.  The Exchange Act also
> empowers the SEC to take adverse action against [an exchange]
> should it fail to fulfill these duties, including such far-reaching
> measures as a revocation of [the exchange's] registration as an
> SRO, suspension for period of up to 12 months, and censure.

*In re NYSE Specialists Sec. Litig.*, 405 F. Supp. 2d 281, 302-03 (S.D.N.Y. 2005) (internal

citations omitted), *aff'd in part and rev'd in part*, 503 F.3d 89 (2d Cir. 2007).

Thus, absolute immunity "is particularly appropriate in the unique context of the

self-regulation of the national exchanges . . . [because exchanges] perform[] a variety of

regulatory functions that would, in other circumstances, be performed by a government agency."
*Barbara*, 99 F.3d at 59.  Indeed, every time it has tackled questions of SRO immunity, the
Second Circuit has reaffirmed that "an SRO and its officers are entitled to absolute immunity
when they are, in effect, 'acting under the aegis' of their regulatory duties."[14] *DL Capital*, 409
F.3d at 97 (quoting *Sparta Surgical*, 159 F.3d at 1214).  "This immunity extends both to
affirmative acts as well as to an SRO's omissions or failure to act."  *Std. Inv.*, 637 F.3d at 115
(gathering cases).  The immunity likewise encompasses not just conduct within the regulatory
ambit, but also "specific acts and forbearances . . . ***incident*** to the exercise of regulatory power."
*NYSE Specialists*, 503 F.3d at 98 (emphasis added).  And it encompasses not only claims by
members, but also those by investors or others.  *See DL Capital*, 409 F.3d at 99-100.

---

[14]     As the Second Circuit noted in *Barbara*, the doctrine of federal conflict preemption
further supports SROs' immunity from suits arising from SROs' regulatory functions.  99
F.3d at 59.  The *Barbara* court recognized that allowing such suits would "'stand[] as an
obstacle to the accomplishment and execution of the full purposes and objectives of
Congress' . . . , namely, to encourage forceful self-regulation of the securities industry."
*Barbara*, 99 F.3d at 59 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941), and citing
*Barnett Bank v. Nelson*, 517 U.S. 25 (1996)); *see also Sparta Surgical*, 159 F.3d at 1215
(allowing a breach of contract claim against NASD "would allow states to define by
common law the regulatory duties of [an SRO]," a result that "cannot co-exist with the
Congressional scheme of delegated authority under the Exchange Act").

Accordingly, "[o]ther courts have relied upon this rationale in holding that state law
claims against self-regulatory organizations are preempted by the Exchange Act."
*Barbara*, 99 F.3d at 59 (citing, *inter alia, Am. Agricultural Movement, Inc. v. Bd. Of
Trade*, 977 F.2d 1147, 1154-57 (7th Cir. 1992) (holding that the Commodities Exchange
Act ("CEA") preempts state law claims that "would directly affect trading on or the
operation of a futures market" (citing *Hines*, 312 U.S. at 67)).  Indeed, this Court
followed the reasoning of *American Agricultural Movement* in holding that a
commodities trader's state law claims for gross negligence, bad faith, and *respondeat
superior* against the New York Futures Exchange, its parent company, its corporate
affiliate, and a committee of the exchange and its members were preempted by the CEA
because the claims were based on allegations that the defendants and their directors,
officers, and employees "failed to fulfill their obligation to regulate the market."  *DGM
Invs. v. N.Y. Futures Exch., Inc.*, 2002 WL 31356362, at *5 (S.D.N.Y. Oct. 17, 2002)
(Sweet, J.).  Conflict preemption thus provides an alternate basis for dismissing plaintiffs'
negligence claims here.

The Second Circuit has emphasized that "absolute immunity must be absolute." *DL Capital*, 409 F.3d at 95. "After all, the purpose of the immunity is to give governmental officials – or those acting with the express delegation of the government, as with SROs – breathing room to exercise their power without fear that their discretionary decisions may engender endless litigation." *NYSE Specialists*, 503 F.3d at 97. Otherwise, exchanges will "feel constrained in making every decision by the consequences in terms of [their] own potential liability in a suit for damages." *Id.* at 95 (internal quotation marks and citation omitted). This "breathing room" is critical because exchanges constantly make regulatory determinations that benefit some members or public investors while disadvantaging others. Although often guided by SEC or exchange rules, those decisions frequently require exchanges to apply the broad discretion they are delegated by the SEC. *See D'Alessio*, 258 F.3d at 106.

Accordingly, in assessing the applicability of absolute immunity to a given claim, courts do not scrutinize the SRO's motive and reasonableness. *See NYSE Specialists*, 503 F.3d at 95-96 ("The doctrine's nature is such that it accords protection from any judicial scrutiny of the motive for and reasonableness of official action.") (internal quotation, alteration, and citation omitted); *DL Capital*, 409 F.3d at 98-99. *See also, e.g.*, *Bogan v. Scott-Harris*, 523 U.S. 44, 54 (1998) (applicability of absolute immunity accorded to government officials "turns on the nature of the act, rather than on the [officials'] motive or intent"). It is likewise irrelevant whether the complained of conduct complied with the securities laws. *See NYSE Specialists*, 503 F.3d at 98 n.3; *id.* at 96 ("[T]he central question … is not whether the SRO is acting (or not acting) 'consistent with' the laws it is supposed to apply but rather whether the plaintiff's allegations concern the exercise of power within the bounds of the government functions delegated to it.").

21

Finally, a court should strive to dispose of claims barred on grounds of immunity on a Rule 12(b)(6) motion because immunity "becomes meaningless if not effectuated as early as possible in the proceedings."  *Weissman v. Nat'l Ass'n of Sec. Dealers, Inc.*, 500 F.3d 1293, 1306 (11th Cir. 2007) (Tjoflat, J., dissenting) (citing cases for the proposition that immunity functions as a shield from litigation, rather than as a defense to liability, and therefore must be evaluated and enforced at the earliest possible stage).  *Cf. Hunter v. Bryant*, 502 U.S. 224, 227 (1991) ("[B]ecause '[t]he entitlement is an immunity from suit rather than a mere defense to liability,' we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation.") (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)); *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir. 1998) ("[It is] well established that an affirmative defense of official immunity should be resolved as early as possible by the court.").

Accordingly, the only relevant question in determining whether the plaintiffs' claims are barred by SRO immunity is whether NASDAQ's complained-of conduct was an exercise of or incident to NASDAQ's regulatory responsibilities.  Because it was, the Complaint should be dismissed.

### 2. Plaintiffs' Negligence Claims Arise from NASDAQ's Regulatory Functions and Should Be Dismissed

Plaintiffs' negligence claims arise from NASDAQ's commencement of trading in Facebook.  They are thus directed to "one of the most fundamental functions" of a national securities exchange.  *See* Enforcement Order ¶ 2.

Plaintiffs summarize NASDAQ's alleged negligence as follows:  "NASDAQ failed to use reasonable care in the design, testing and implementation of NASDAQ's primary

and back-up Cross systems."  (CAC ¶ 348, 355.[15])  Plaintiffs also claim that NASDAQ "rolled

the dice" by "pushing the IPO forward with no regard for the chaos these system failures would

cause."  (CAC ¶ 5; *see also* CAC ¶ 1 (NASDAQ "recklessly moved forward with the IPO").[16])

Plaintiffs thus direct their negligence claims at the design, testing, and implementation of

NASDAQ's systems for the operation of the IPO Cross, and NASDAQ's decisions to proceed

with and not to halt trading in Facebook on May 18.  Each falls squarely within the scope of

NASDAQ's regulatory responsibilities as a national securities exchange registered with the SEC

under the Exchange Act.

---

[15]    *See also* CAC ¶¶ 363, 370 (NASDAQ "failed to use reasonable care in the design,
testing, and implementation of NASDAQ's primary and back-up Cross systems in
connection with disseminating confirmation for those trades executed in the Cross and, as
a result, failed to timely confirm Facebook trades"); ¶¶ 379, 386 (NASDAQ "failed to
exercise reasonable care in the design and testing of its systems, resulting in NASDAQ's
failure to account for orders entered into the Cross system between 11:11:00 a.m. and
11:30:09 a.m."); ¶¶ 395, 402 (NASDAQ "failed to exercise reasonable care in the design
and testing of its systems, resulting in NASDAQ's Bid/Offer system's failure to function
properly for an extended period of time after the Cross printed to the tape").

[16]    *See also* CAC ¶ 6 (criticizing NASDAQ's "internal, *ad hoc*, decision to resort to an
untested backup system and inferior failover procedures" to complete the Cross for the
Facebook IPO); ¶ 14 ("[T]he Facebook IPO debacle was not caused by an unforeseeable
system error but by Defendants' own business decisions motivated by commercial greed
and arrogance.  NASDAQ has acknowledged that it mishandled the Facebook IPO and
caused 'objective, discernible harm' to market participants."); ¶ 125 ("Defendants should
have followed recent precedent and protected the integrity of the market by halting the
Facebook IPO.").

A side narrative of plaintiffs' Complaint reinforces that plaintiffs' allegations arise from
NASDAQ's decisions on May 18.  Section III(E) of the Complaint contrasts NASDAQ's
decision to proceed with the IPO and the decision of another SRO, BATS, when BATS
had earlier commenced trading – on its own exchange – immediately following its own
IPO.  Faced with system problems, according to plaintiffs, "BATS made the prudent
decision to protect the integrity of the market and its shareholders and cancel the IPO
entirely, halting all executions [i.e. trading] in its own stock and cancelling all orders."
(CAC ¶ 131; *see also* CAC ¶ 133 (NASDAQ jeopardized "the integrity of the overall
marketplace . . . in failing to halt Facebook's IPO").)

When NASDAQ governs trading, it "stands in the shoes of the SEC." *D'Alessio*, 258 F.3d at 105; *DL Capital*, 409 F.3d at 95.  Addressing the particular claim that NASDAQ's systems for the execution of an IPO Cross were negligently designed and tested, the SEC in its Enforcement Order in this matter unequivocally found:

> ***The orderly initiation of secondary market trading after an IPO is one of the most fundamental functions of a national securities exchange***, and affects not only the market for those individual companies but also investor confidence in the markets as a whole. Until trading in a company's security opens on its listing market on the day of its IPO, secondary market trading may not commence in any other market.  ***When initiating an IPO, an exchange has an obligation to ensure that its systems, processes and contingency planning are robust and adequate to manage the IPO without disruption to the market, and that it complies with all rules regarding, among other things, order price and time priority.***

Enforcement Order ¶ 2 (emphasis added).  Those findings are entitled to deference.  *See Roth ex rel. Beacon Power Corp. v. Perseus L.L.C.*, 552 F.3d 242, 249 (2d Cir. 2008) ("The SEC's views are entitled to 'controlling weight' unless . . . 'arbitrary, capricious, or manifestly contrary to the statute.'") (quoting *Chevron, U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 843-44 (1984)); *Krull v. SEC*, 248 F.3d 907, 911-12 (9th Cir. 2001) ("Congress granted the Commission broad supervisory responsibility over self-regulatory organizations such as NASD and requires the Commission to approve all rules, policies, practices, and interpretations prior to implementation.  Because of the Commission's expertise in the securities industry, we owe deference to its construction of NASD's Rules of Fair Practice.").

The SEC's finding that the initiation of trading after an IPO is "one of the most fundamental functions of a national securities exchange" is dispositive of the Exchange's entitlement to immunity for claims arising out of the exercise of that function.  As this Court has summarized, "'it is the SRO's *function* as a quasi-governmental authority that entitles it to absolute immunity,'" and not "the nature of the plaintiffs' claims." *NYSE Specialists*, 405 F.

Supp. 2d at 304 (quoting *DL Capital*, 409 F.3d at 99), *aff'd* 503 F.3d at 98.  *See also, e.g.*, *Std. Inv.*, 637 F.3d at 116 (absolute immunity adheres to the "exercise of the SRO's delegated regulatory functions").  Indeed, the specific design element that gave rise to the problems with the Facebook IPO – the validation check – reflected a regulatory choice.  As plaintiffs admit, "NASDAQ's IPO Cross system is designed to ensure that cancellations submitted while the Cross is calculating, and up until the last moment before the Cross is completed, are accounted for in the Cross."  (CAC ¶ 142; *see also* § II(B), *ante*.)  Trading system design is thus central to NASDAQ's regulatory functions.

        The systems that NASDAQ uses to implement the Cross and other trading processes, including those it uses to commence trading in a security, are a major focus of SEC regulation and oversight.  The SEC approved NASDAQ's rules governing and relating to the Cross.  (*See* § II(B), *ante*.)  The SEC's Enforcement Order also requires undertakings of NASDAQ that involve technical changes to its IPO Cross and modifications to its technology design change and incident management processes.  Enforcement Order ¶¶ 65, 70-73.  And, the SEC recently approved modifications to Rule 4626, while affirming its core limitation of liability for members' use of NASDAQ's trading systems.  *Accommodation Program Approval Order*, 78 Fed. Reg. at 19,040.  More broadly, the agency recently proposed Regulation Systems Compliance and Integrity ("Regulation SCI"), a comprehensive set of rules designed "to enhance the Commission's regulatory supervision of [SROs and other key entities] and thereby further the goals of the national market system by helping to ensure the capacity, integrity, resiliency, availability, and security, and enhance compliance with federal securities laws and regulations, of automated systems relating to the U.S. securities markets."  *Regulatory Systems Compliance and Integrity*, Exch. Act Rel. No. 69,077, 78 Fed. Reg. 18,084, 18,092 (Mar. 25, 2013).  The

regulation further updates and extends the SEC's oversight of SROs' software design and reliability.  It imposes new requirements on SROs concerning systems policies and procedures, testing of backup systems and continuity plans, reporting of systems disruptions and material systems changes, and systems reviews.  *See id.* at 18,084-87 (discussing the history and evolution of the SEC's oversight of exchanges' automated systems dating back to Securities Acts Amendments of 1975, and citing the SEC's obligations under Section 11A(a)(2) of the Exchange Act, 15 U.S.C. 78k–1(a)(2), and SROs' obligations under Section 6(b) of the Exchange Act, 15 U.S.C. 78f(b)(1)).  NASDAQ's SEC-approved rules, the Enforcement Order, and proposed Regulation SCI thus confirm that the design and testing of automated trading systems are key parts of the regulatory structure delegated – with SEC supervision – to SROs.

By the same token, NASDAQ's determination to complete the Facebook IPO Cross rather than postpone it, and its decisions not to halt continuous market trading and not to cancel any allegedly impacted trades, were quintessentially regulatory functions.  Accordingly, they are also shielded from liability by the doctrine of SRO immunity.

On this point, this case is on all fours with *DL Capital*.  That case arose from NASDAQ's determination to halt trading in the stock of Corinthian Colleges, Inc. (symbol COCO), based on NASDAQ's judgment that a dramatic price drop in the stock due to "misuse or malfunction of an electronic trading system" constituted "extraordinary market activity."  *DL Capital*, 409 F.3d at 96.  NASDAQ ultimately cancelled certain trades, but not others, under its Rule 11890, which permits NASDAQ to cancel a trade "where such a transaction is 'clearly erroneous' or cancellation is 'necessary for the maintenance of a fair and orderly market or [for] the protection of investors and the public interest.'"  *Id.* at 95 (quoting Rule 11890).  DL Capital sued NASDAQ and its CEO, Robert Greifeld, asserting that NASDAQ had defrauded DL

Capital by failing to announce timely that it was canceling certain COCO stock purchases but not

certain stock sales; DL Capital claimed that this required it to buy COCO stock at a loss under

short sale rules.  *Id.* at 96.  In affirming the dismissal of the complaint on the grounds of

immunity, the Second Circuit confirmed that "announcing the suspension or cancellation of

trades is as much a part of defendants' regulatory duties as is the actual suspension or

cancellation of trades."  *Id.* at 98.

        Nor can plaintiffs fairly distinguish *NYSE Specialists*.  The claims in that case,

like those here, focused on the defendant's regulation of stock trading on its exchange.

Specifically, the plaintiffs accused NYSE of working with its members to defraud investors and

engage in self-dealing regarding certain categories of trading and trade-related behavior.  *NYSE

Specialists*, 405 F. Supp. 2d at 298.  NYSE allegedly did so to increase its profits.  *Id*.  This

Court dismissed those claims based on SRO immunity and the Second Circuit affirmed.  The

Court of Appeals reasoned that the claims "all involve the NYSE's action or inaction with

respect to trading on the Exchange, which is indisputably within the NYSE's regulatory powers."

*NYSE Specialists*, 503 F.3d at 99.  Because "[t]he power to exercise regulatory authority

necessarily includes the power to take no affirmative action," *NYSE Specialists*, 503 F.3d at 97,

NASDAQ decisions not to postpone the IPO Cross, halt trading, or cancel trades – from which

all of plaintiffs' alleged harms flow – are subject to absolute immunity.

        Similarly, in *Sparta Surgical*, the claims focused on the plaintiff's secondary

public offering on NASDAQ.  159 F.3d at 1211.  Immediately after the SEC approved Sparta's

offering, trading in the newly issued stock commenced.  "Later that morning, NASDAQ de-listed

Sparta's stock and suspended trading on the offering without explanation.  The suspension was

lifted the following day, and trading on the offering resumed."  *Id*.  Sparta sued NASDAQ for

damages.  After delineating the history and scope of the absolute immunity doctrine, the Ninth

Circuit concluded:

> [C]ontrary to Sparta's view that NASD's role is one simply of a market facilitator bound to exercise salesmanship on behalf of an issuing company, NASD is charged with the duty and responsibility of monitoring its market carefully to protect the investing public.  ***When it acts in this capacity to suspend trading, NASD is performing a regulatory function cloaked in immunity.***  All of the damage Sparta claims flows from the trading suspension and temporary de-listing.  Accordingly, defendants are immune from Sparta's claims.
>
> The case at bar underscores the importance of regulatory immunity.

*Id.* at 1215 (emphasis added).  Indeed, "there are few functions more quintessentially regulatory

than suspension of trading."  *Id.* at 1214.

Plaintiffs attempt to avoid the application of SRO immunity by claiming that

NASDAQ acted unreasonably and in its commercial self-interest in connection with the

Facebook IPO.[17]  But as a matter of law, those assertions are irrelevant to the determination of

SRO immunity.  *See* pp. 21-22, *ante*.

Nor can plaintiffs circumvent NASDAQ's immunity by pointing to the SEC's

findings that NASDAQ violated certain of its own rules, such as the rule governing price/time

priority, in connection with the Facebook IPO.  This Court properly rejected that same argument

when it found SRO immunity applicable to the claims asserted against the New York Stock

Exchange in *NYSE Specialists*, notwithstanding similar SEC findings of rule violations.  *See* 503

F.3d at 97-98.  As the Second Circuit explained in affirming this Court's decision, the plaintiffs'

---

[17]     *E.g.*, CAC § V(A) at pp. 33-36 (NASDAQ's revenues rely on IPOs), § V(B) at pp. 36-40 (NASDAQ aggressively campaigned to solicit Facebook to list its stock on NASDAQ), and § V(C) at pp. 40-43 (NASDAQ promised Facebook earlier than usual inclusion in the NASDAQ 100 Index to obtain its listing).

28

argument "has superficial appeal, but when scrutinized, its flaws become evident" because the immunity doctrine "depends only on whether specific acts and forbearances were incident to the exercise of regulatory power, not on the propriety of those actions or inactions." *Id*. Refusing to apply SRO immunity in those circumstances "would all but swallow the doctrine whole." *Id*.

The same logic applies here. The SEC's investigation and enforcement proceeding, and the SEC's approval of the Facebook IPO accommodation policy amendments to Rule 4626, underscore the applicability of SRO immunity. *See id.* at 101 ("[W]e have cautioned before that courts confronted with claims of absolute immunity should consider whether there exist alternatives to damage suits against the official as a means of redressing wrongful conduct if absolute immunity applies.") (internal quotes and citations omitted).[18] The SEC comprehensively considered NASDAQ's preparation for the Facebook IPO, the design of the Cross, NASDAQ's decision to implement a technology fix and proceed with the Cross, NASDAQ's decision not to halt trading, the delayed dissemination of Cross confirmation reports, NASDAQ's untimely execution of certain orders, the remedial steps NASDAQ implemented, and the regulatory duties of NASDAQ as an SRO in connection with all of the foregoing. *See* Enforcement Order ¶¶ 6-42, 57. And the Enforcement Order requires implementation of remedial measures related to these issues, and certification to the SEC when those measures are complete. *Id.* ¶¶ 65-74. Moreover, the Enforcement Order does not stand alone. As the Order recognizes, the SEC also approved NASDAQ's proposal to provide compensation to members (and to retail investors through its members) for losses caused by

---

[18]   The Second Circuit continued: "As the facts here pellucidly illustrate, the SEC did intervene and investigate the Exchange and the Specialist Firms and extracted from them considerable settlements, which not only garnered widespread public attention but included significant monetary penalties and implemented new methods of market regulation and oversight." *NYSE Specialists*, 503 F.3d at 102.

NASDAQ's systems issues.  (*See* § II(E), *ante*.)  While an SEC-sanctioned compensation system is certainly not required for the application of the immunity doctrine, it further demonstrates the highly regulatory nature of the conduct giving rise to plaintiffs' claims.

Faced with an unexpected and unprecedented problem, NASDAQ exercised its regulatory discretion to move forward with an IPO that had drawn "the eyes of the investing world."  Enforcement Order ¶ 3.  Whereas NASDAQ had available a simple system modification that it believed would allow the Cross to complete without further incident, halting the Cross process for the Facebook IPO could have had potentially huge costs for the public and the market.  As the plaintiff issuer in *Sparta Surgical* put it, "in the world of public offerings and labile investor confidence, the regulatory action and trading hiatus [imposed on its stock] rendered the offering unmarketable."  159 F.3d at 1211.  As a result of NASDAQ's decision, secondary trading in Facebook commenced on NASDAQ and ten other markets, with more than 560 million shares traded that day – and NASDAQ experienced the consequences of which plaintiffs complain.  But NASDAQ's handling of the Facebook IPO is precisely the kind of regulatory function that must be accorded "breathing room" by the absolute immunity doctrine, and addressed instead – as it has been – through SEC oversight.  In *Sparta Surgical* and *DL Capital*, NASDAQ was sued for halting trading and cancelling trades; here it is being sued for not halting trading and not cancelling trades.  As this Court observed in *NYSE Specialists*, "absolute immunity was motivated, in large measure, by an interest in ensuring that the exercise of SROs' quasi-governmental functions would not be unduly hampered by disruptive and recriminatory lawsuits."  405 F. Supp. 2d at 304 (internal quotation marks, citations, and alterations omitted).

Accordingly, the Court should dismiss plaintiffs' negligence claims as barred by the doctrine of SRO immunity.

### 3. Plaintiffs' Securities Fraud Claims Arise from NASDAQ's Regulatory Functions and Should Be Dismissed

The SRO immunity doctrine applies with equal force to plaintiffs' securities claims. Very simply, when the underlying conduct is within the scope of SRO immunity, representations about that conduct are equally within the scope of that immunity. *See, e.g., NYSE Specialists*, 503 F.3d at 100-01; *DL Capital*, 409 F.3d at 98.

Plaintiffs' securities claims are based upon misrepresentations and omissions they claim NASDAQ made before the IPO concerning the capabilities of its exchange technology systems, and on the day of the IPO concerning the system issues NASDAQ was then experiencing. (*See* pp. 46-48, *poste*). With respect to the statements made by NASDAQ on the day of the Facebook IPO, the Second Circuit's decision in *DL Capital* is directly on point and controlling. As noted, that case arose out of regulatory decisions made by NASDAQ concerning trading in COCO stock. The Second Circuit rejected the plaintiffs' claim that

> absolute immunity does not here apply because the instant suit concerns activities that fall outside the scope of Nasdaq's regulatory duties, in that plaintiff is challenging *not* Nasdaq's regulatory decisions to suspend trading, resume trading, or cancel trades, but rather the manner in which Nasdaq publicly *announced* those decisions.

*DL Capital,* 409 F.3d at 98. The Court of Appeals held that SRO immunity applies to statements made incident to an SRO's discharge of its regulatory functions because "inform[ing] the public of those actions it has undertaken in the interest of maintaining a fair and orderly market or protecting investors and the public interest" is a "critical and necessary part" of an SRO's regulatory powers. *Id.* (citation omitted); *see also id.* ("[A]nnouncing the suspension or cancellation of trades is as much a part of [the] regulatory duties as the actual suspension or

cancellation of trades."); *see also NYSE Specialists*, 503 F.3d at 100 (SRO immune from liability

for the timing and method of announcing official investigations because those actions were

"central to effectuating the [Exchange's] regulatory decisionmaking").

>Indeed, any other rule would permit an enterprising plaintiff to circumvent the

immunity bar simply by recasting claims involving protected SRO conduct as arising from the

SRO's statements concerning that conduct.  *See DL Capital*, 409 F.3d at 99 (if such exceptions to

absolute immunity existed, a plaintiff would "concoct some claim of fraud in order to circumvent

the absolute immunity doctrine," and thus rejecting exceptions is "a matter not simply of logic

but of intense practicality since otherwise the SRO's exercise of its quasi-governmental functions

would be unduly hampered by disruptive and recriminatory lawsuits") (internal quotations

omitted); *see also NYSE Specialists*, 503 F.3d at 98 (if immunity exception existed for actions

alleging violations of the Exchange Act, its rules, or exchange rules, "the immunity doctrine

would be effectively subverted" as the exception "would all but swallow the doctrine whole").

>By the same reasoning, NASDAQ's allegedly fraudulent statements made before

the Facebook IPO regarding the Exchange's trading platform, system reliability, and

commitment to working with regulators are also protected by SRO immunity.  In *NYSE

Specialists*, this Court found that public statements made by NYSE concerning its "capacity to

operate an efficient market" "appear[ed to be] primarily promotional in nature" and therefore did

"not appear to be protected by NYSE's absolute immunity for quasi-governmental functions,"

although the Court ultimately dismissed those claims for lack of standing.  *NYSE Specialists,* 405

F. Supp. 2d at 304-305.  On appeal, however, the Second Circuit reversed the Court's ruling on

standing and directed the Court to reconsider the applicability of immunity to NYSE's alleged

misrepresentations.[19]  *NYSE Specialists,* 503 F.3d at 102-03.  And in considering allegations that

NYSE helped falsify reports of members and also tipped members to an SEC investigation, the

Second Circuit explicitly found NYSE's conduct to be within its regulatory sphere:

> At first glance, none of these actions appears to fall within the
> ambit of powers delegated to the Exchange.  The gravamen of the
> Lead Plaintiffs' claims, however, centers on the functions
> performed by NYSE in its supervisory and regulatory role . . . .

*Id.* at 100.  Accordingly, the Second Circuit found those claims barred by absolute immunity.  *Id.*

at 102.

Here, regardless of whether statements that, for example, NASDAQ's "trading

model is the 'standard for markets worldwide'" (CAC ¶ 181) give rise to a colorable claim (*see* §

III(C)(1), *poste*), or could be considered commercial in another context, the "gravamen of

[p]laintiffs' [securities] claims" arises from and are centered on the harms caused by NASDAQ's

alleged Facebook IPO deficiencies – all of which involve NASDAQ's regulatory functions.  (*See*

§ III(A)(2), *ante*; *see also* CAC ¶ 1 ("This action arises out of Defendants' failure to disclose

material information, as well as Defendants' negligent conduct, in connection with the Facebook

IPO.").)  As plaintiffs allege, "[b]y making material statements in support of its purportedly

sophisticated technology and trading platforms, NASDAQ represented to market participants

that its systems were robust, reliable, and completely capable of properly handling the Facebook

IPO." (CAC ¶ 22; *see also* CAC ¶¶ 329-37.)  But it is exactly that "obligation to ensure that its

---

[19]      The Second Circuit cited not only *DL Capital*, but also the initial panel decision in
*Weissman*, 468 F.3d 1306 (11th Cir. 2006), *reh'g en banc granted*, 481 F.3d 1295 (11th
Cir. 2007), and specifically to the dissent of Judge Tjoflat, 468 F.3d at 1313.  In his
dissent, Judge Tjoflat stated that to determine immunity, "we must look not at the manner
in which [the plaintiff] casts his claims, but instead at the nature of the specific actions
alleged by [the plaintiff] to have caused him injury."  468 F.3d at 1317 (citing *D'Alessio*,
258 F.3d at 105-06).  This is in accord with the Second Circuit's requirement that the
Court consider the core regulatory conduct to which the allegations relate, not plaintiffs'
creative pleading.  (See p. 22 & n.14, *ante*.)

systems, processes, and contingency planning are robust and adequate to manage the IPO without disruption to the market" that the SEC found to be within NASDAQ's regulatory duties. Enforcement Order ¶ 2.

Thus, plaintiffs cannot separate their securities claims from NASDAQ's handling of the commencement of trading in Facebook and the alleged harms arising therefrom.

*        *        *

In short, SRO immunity protects NASDAQ from liability for claims relating to its allegedly negligent handling of the commencement of trading in Facebook stock and alleged misrepresentations because all of those claims arise out of NASDAQ's regulatory functions. Congress and the SEC have vested SROs with significant regulatory obligations that could not give rise to government liability by virtue of sovereign immunity. NASDAQ and other national securities exchanges cannot adequately shoulder those regulatory responsibilities without SRO immunity, and that immunity must – as a "matter not simply of logic but of intense practicality" – be sufficiently robust to defeat efforts at artful pleading and avoid recriminatory lawsuits, *D'Alessio*, 258 F.3d at 105 (quoting district court opinion).

Accordingly, all of plaintiffs' claims are precluded by the immunity to which NASDAQ is entitled as an SRO acting within the scope of its regulatory responsibilities under the Exchange Act, and they should be dismissed for that reason.

**B.      The Complaint Fails to State a Claim for Negligence**

In Counts III through X of the Complaint, plaintiffs allege claims against NASDAQ for "ordinary negligence" and "negligence: *res ipsa loquitur*" on behalf of each of four classes or subclasses of Facebook investors who claim to have suffered economic harm as a result of the systems issues experienced by NASDAQ in the Facebook IPO. Even if plaintiffs could overcome the immunity NASDAQ enjoys as an SRO, the Complaint fails to state a claim

34

for negligence under applicable state law[20] and Counts III through X of the Complaint should be dismissed for that reason as well.

With the exception of First New York, which is a member of NASDAQ, none of the plaintiffs has or is alleged to have any contractual relationship with NASDAQ.  The negligence claims of non-member plaintiffs are barred by the economic loss doctrine, under which "a plaintiff cannot recover in tort for purely economic losses caused by a defendant's negligence."  *King County v. IKB Deutsche Industriebank AG,* 863 F. Supp. 2d 288, 302 (S.D.N.Y. 2012) (citing *Schiavone Constr. Co. v. Mayo Corp.*, 436 N.E.2d 1322 (N.Y. 1982), among other cases).  The claims of NASDAQ member First New York are barred by NASDAQ Rule 4626, which unequivocally provides that "Nasdaq and its affiliates shall not be liable for any losses, damages, or other claims arising out of the Nasdaq Market Center or its use."  NASDAQ Rule 4626(a).

**1.     The Negligence Claims Asserted by the Non-Member Plaintiffs Are Barred by the Economic Loss Doctrine**

It is axiomatic that to maintain a claim for negligence, a plaintiff must plead and prove the existence of a recognized duty of care owed to him by the defendant.  *See, e.g.*, *Hamilton v. Beretta U.S.A. Corp.*, 750 N.E.2d 1055, 1060 (N.Y. 2001).  The existence of such a duty is a legal question appropriately addressed in the context of a motion to dismiss.  As the New York Court of Appeals has noted:

---

[20]     Plaintiffs assert that their negligence claims are governed by New York law.  (CAC ¶ 352).  This Court, of course, applies New York choice of law principles.  *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496-97 (1941).  Under New York's choice of law rules, the law of the jurisdiction having the greatest interest governs plaintiffs' negligence claims.  *Miller v. Miller*, 237 N.E.2d 877, 879 (N.Y. 1968).  For purposes of this motion, NASDAQ concurs that New York law applies to plaintiffs' state law negligence claims.

> The existence and scope of a tortfeasor's duty is, of course, a legal
> question for the courts, which "fix the duty point by balancing
> factors, including the reasonable expectations of parties and
> society generally, the proliferation of claims, the likelihood of
> unlimited or insurer-like liability, disproportionate risk and
> reparation allocation, and public policies affecting the expansion or
> limitation of new channels of liability."

*532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*, 750 N.E.2d 1097, 1101 (N.Y.

2001) (quoting *Hamilton*, 750 N.E.2d at 1060, and *Palka v. Servicemaster Mgt. Servs. Corp.*,

634 N.E.2d 189, 193 (N.Y. 1994)).  In determining the existence of a duty giving rise to a claim

sounding in negligence, New York subscribes to the economic loss doctrine, under which a

plaintiff cannot recover in tort for purely economic losses caused by the negligence of a

defendant with whom the plaintiff has no contractual privity.  *See Schiavone Constr.*, 436 N.E.2d

at 1323 (adopting economic loss doctrine); 16 N.Y. Prac., *Torts* § 21:13.10 ("Pursuant to the

'economic loss rule,' there can be no recovery in tort when the only damages alleged are for

economic loss.").

    While New York courts have not addressed the applicability of the economic loss

doctrine in the context of negligence claims asserted against a securities exchange by members

of the investing public, they have consistently refused to impose a duty of care to protect such a

broad and amorphous class of potential plaintiffs from economic loss in analogous contexts.  For

example, under the rubric of the economic loss doctrine New York courts have held that:

- sellers of financial products do not have a duty of care to protect
  downstream investors from economic losses, *King County*, 863 F. Supp.
  2d at 303;

- rating agencies and banks that pass on such agencies' securities ratings
  owe no duty of care to members of the investing public who rely upon
  such agencies' ratings in their securities purchases, *Anschutz Corp. v.
  Merrill Lynch & Co.*, 690 F.3d 98, 115 (2d Cir. 2012); *Abu Dhabi
  Commercial Bk. v. Morgan Stanley & Co., Inc.*, No. 08-7508, 2013 U.S.
  Dist. LEXIS 31157, at *19-22 (S.D.N.Y. Mar. 6, 2013);

- a public utility is not liable to non-customers for losses sustained as the consequence of a negligent interruption in service, *Milliken & Co. v. Cons. Edison Co. of N.Y., Inc.*, 644 N.E.2d 268, 271 (N.Y. 1994); *Strauss v. Belle Realty Co*, 482 N.E.2d 34, 38 (N.Y. 1985);

- a negligent landholder is not liable for economic losses suffered by adjacent businesses as a result of a building collapse, *532 Madison Ave.*, 750 N.E.2d at 1103;

- a manufacturer is not liable in tort to intermediate purchasers for economic loss caused by the negligent production or design of a product, *Schiavone Constr.*, 436 N.E.2d at 1323;

- a software designer is not liable in tort for economic loss sustained as a result of a negligent software design, *Shema Kolainu-Hear Our Voices v. Providersoft, LLC,* 832 F. Supp. 2d 194, 205-08 (S.D.N.Y. 2010); and

- professionals are not liable to plaintiffs with whom they are not in privity for economic losses sustained as a result of the negligent performance of their work, *see, e.g., Sec. Investor Protection Corp. v. BDO Seidman, LLP*, 222 F.3d 63, 75 (2d Cir. 2000) (accountants); *Westpac Banking Corp. v Deschamps*, 484 N.E.2d 1351, 1352-53 (N.Y. 1985) (same); *In re Sept. 11 Property Damage and Business Loss Litig.,* 468 F. Supp. 2d 508, 533 (S.D.N.Y. 2006) (architects and engineers); *Travelers Cas. and Surety Co. v Dormitory Auth.-State of New York,* 734 F. Supp. 2d 368, 378-79 (S.D.N.Y. 2010) (architects and construction managers).

Thus, while "[a] duty may arise from a special relationship that requires the defendant to protect against the risk of harm to plaintiff . . . [such a] duty  . . . does not extend to members of the general public.  Liability is in this way circumscribed, because the special relationship defines the class of potential plaintiffs to whom the duty is owed." *532 Madison Ave.*, 750 N.E.2d at 1101 (citations omitted).  "In the absence of actual contractual privity, plaintiffs alleging a special relationship sufficient to give rise to a duty face a 'heavy burden.'" *King County*, 863 F. Supp. 2d at 307.  The plaintiff must establish that he is part of "a known group possessed of vested rights, marked by a definable limit and made up of certain components" rather than a "faceless or unresolved class of persons." *BDO Seidman*, 222 F.3d at 74 (quoting *White v. Guarente*, 372 N.E.2d 315 (N.Y. 1977)).

The non-member plaintiffs in this case do not come close to meeting this standard.  They do not allege any "special relationship" that would impose upon NASDAQ a duty to protect them from the risk of economic harm.  To the contrary, plaintiffs seek recovery on behalf of "all individuals or entities who made retail purchases of Facebook stock on May 18, 2012," either directly through NASDAQ or (as is the case for all non-member plaintiffs) "through a broker, dealer, agent or other intermediary."  (CAC ¶ 320.)  Plaintiffs allege only that "[b]y operating a stock exchange on or through which a public securities trading market is maintained, Defendants NASDAQ and defendant [*sic*] NASDAQ LLC owe [plaintiffs] the highest duties of reasonable care."  (CAC ¶ 346.)  In other words, plaintiffs base their negligence claims on the far-reaching contention that simply because NASDAQ operates a securities exchange, New York law imposes on it a duty of care to any and every investor whose broker or other financial intermediary executes a trade on the investor's behalf on the Exchange.  This is precisely the kind of duty, unlimited in scope, that the economic loss doctrine precludes and New York courts have refused to impose.[21]

The policy considerations that have led New York courts to adopt the economic loss doctrine apply with particular force in the context of the operation of a securities exchange like NASDAQ.  The *Travelers Casualty* court, for example, summarized the reasoning behind the economic loss doctrine in part as follows:

> [T]o the extent that "economic loss" is difficult to quantify, but also a highly foreseeable outcome of negligence in the commercial context, the economic loss doctrine reflects a policy interest in

---

[21]   To be sure, the Exchange Act imposes federal obligations on NASDAQ with respect to its operation of the Exchange.  (*See* §§ II(A) & (B), *ante*.)  Plaintiffs have not attempted to bring a claim for an alleged violation of those obligations because it is well settled that there is no express or implied private right of action for such a claim.  *See, e.g.*, *Gurfein v. Ameritrade, Inc.*, 312 Fed. App'x 410, 414 (2d Cir. 2009) (exchange rules do not provide investors a private right of action) (citing cases).

> protecting defendants from disproportionate, and potentially
> limitless, liability.  "[R]elying solely on foreseeability to define the
> extent of liability in cases involving economic loss, while generally
> effective, could result in some instances in liability so great that, as
> a matter of policy, courts would be reluctant to impose it."  As a
> result, to avoid "crushing exposure" to suits by countless parties
> who have suffered economic loss, New York courts have
> concluded that "[a]bsent a duty running directly to the injured
> person there can be no liability in damages, however careless the
> conduct or foreseeable the harm."

*Travelers*, 734 F. Supp. 2d at 379 (citations omitted).  It is difficult to imagine a context in which

the danger of such unlimited liability is greater, and the policy against imposing such liability

stronger, than in the operation of a national securities exchange.  Hundreds of millions of shares

of stock valued in the tens of billions of dollars are traded on NASDAQ every day.  To impose a

duty of care upon a securities exchange like NASDAQ in favor of every investor whose trades

are executed on the exchange would expose the exchange to precisely the kind of

"disproportionate," "potentially limitless," "crushing exposure" the economic loss doctrine was

adopted to avoid.  Indeed, such policy considerations – which are similar to some of those

justifying SRO immunity (*see* § III(A)(1), *ante*) – weigh particularly heavily in the context of a

national securities exchange like NASDAQ, whose failure would have disastrous consequences

for financial markets worldwide (*see* § III(B)(2), *poste*).  The SEC has also confirmed its support

for this public policy consideration in approving NASDAQ's Rule 4626.  That rule not only

protects NASDAQ from liability to its members (as discussed immediately below), but also

makes clear that "[a]ny losses, damages, or other claims, related to a failure of the Nasdaq

Market Center . . .  shall be absorbed by the member," *i.e.*, not the Exchange.[22]

---

[22]    Courts have noted that the economic loss doctrine "disentangles contract and tort law by
restricting plaintiffs who suffer economic losses to the benefits of their bargains."  *King
County,* 863 F. Supp. 2d at 302 (citing *Travelers Cas.*, 734 F. Supp. 2d at 379).  That
consideration also applies to the claims of the non-member plaintiffs in this case.  Those
plaintiffs contracted not with NASDAQ, but rather with the "broker, dealer, agent or

Because the non-member plaintiffs seek recovery only of economic losses and do not allege any contractual or other "special relationship" with NASDAQ sufficient to impose a duty of care, their negligence claims are barred by the economic loss doctrine and should be dismissed for that reason.

### 2. The Claims Asserted by Member Plaintiff First New York Are Barred by NASDAQ Rule 4626

As a member of the Exchange (CAC ¶ 46), plaintiff First New York is bound by the rules promulgated by the Exchange and approved by the SEC pursuant to Section 6 of the Exchange Act.[23]  NASDAQ Rule 4611(a)(3) ("Participation in the Nasdaq Market Center . . . requires . . . compliance with all applicable rules and operating procedures of Nasdaq and the [SEC] in their use of the System."); 15 U.S.C. §§ 78f(b)(1) & 78s(g)(1) (requiring exchanges to enforce compliance with their rules by their members).

---

other intermediary" with whom they placed their Facebook orders.  Their rights with respect to such transactions are therefore appropriately defined and circumscribed by the terms of the contracts they agreed to with such intermediaries.  *See id.* at 303; *Bocre Leasing Corp. v. Gen. Motors Corp.*, 645 N.E.2d 1195, 1196 (N.Y. 1995) (purchaser of a product not in privity with the manufacturer may not "fall back on tort when it has failed to preserve its . . . remedies" contractually) (citation omitted).

[23]    NASDAQ's rules are also binding upon First New York under the provisions of its Membership and Services Agreements with NASDAQ.  The Membership Agreement obligates members "[t]o comply with the federal securities laws, the rules and regulations thereunder, the NASDAQ rules and all rulings, orders, directions and decisions issued and sanctions imposed under the NASDAQ rules[.]"  Membership Agreement (Lantieri Decl. Ex. F; available publicly at http://www.nasdaqtrader.com/content/AdministrationSupport/AgreementsTrading/nonmember_app.pdf).  Similarly, the Services Agreement incorporates "NASDAQ OMX Requirements," which are defined to include NASDAQ Rules, and explicitly provides that "[i]n the event of any conflict between the provisions of the Services Agreement, the Attachments [thereto] or the NASDAQ OMX Requirements, the order of preference shall be the NASDAQ OMX Requirements, the Attachments, and the [Services Agreement]."  Services Agrmt. § 17 (Lantieri Decl. Ex. G; available publicly at https://www.nasdaqtrader.com/content/administrationsupport/AgreementsTrading/nasdaq_access_agreement.pdf).

One of those rules is NASDAQ Rule 4626(a).  Approved by the SEC as

consistent with Section 6 of the Exchange Act, Rule 4626(a) provides:

> Except as provided for in paragraph (b) below, Nasdaq and its
> affiliates shall not be liable for any losses, damages, or other
> claims arising out of the Nasdaq Market Center or its use.  Any
> losses, damages, or other claims, related to a failure of the Nasdaq
> Market Center to deliver, display, transmit, execute, compare,
> submit for clearance and settlement, adjust, retain priority for, or
> otherwise correctly process an order, Quote/Order, message, or
> other data entered into, or created by, the Nasdaq Market Center
> shall be absorbed by the member, or the member sponsoring the
> customer, that entered the order, Quote/Order, message, or other
> data into the Nasdaq Market Center.

NASDAQ Rule 4626(a); *see Exch. Reg. Approval Order*, 71 Fed. Reg. at 3551.[24]

Limitation of liability rules are common among United States exchanges.[25]  The

SEC recognizes that it is consistent with the purposes of the Exchange Act for an SRO to limit its

liability with respect to the use of exchange facilities by its members through rules such as Rule

4626.  *See, e.g.*, *CBOE, Order Approving Proposed Rule Change*, Exch. Act Rel. No. 14,982

(July 20, 1978), 43 Fed. Reg. 32,480 (July 27, 1978) ("CBOE Order") ("[I]t is consistent with

the purposes of the act for a self-regulatory organization to limit its liability with respect to the

use of such facilities by its members.").

Such rules exist precisely because of the possibility of events such as the system

difficulties that occurred during the Facebook IPO.  They reflect the regulatory policy objectives

---

[24]   Paragraph (a) of Rule 4626 has not been amended since the SEC initially approved Rule
4626 in the Exchange Registration Approval Order in 2006.

[25]   *See, e.g.*, BATS Exch. and BATS Y-Exch. Rules 11.16; C2 Options Exch. Rule 6.42;
CBOE Options Exch. Rule 6.7; CME Rule 578; EDGA Exch. and EDGX Exch. Rules
11.12; ISE Rule 705; NASDAQ OMX PHLX Rule 3226; NASDAQ OMX BX Rule
4626; NYSE Rules 17 and 18; NYSE MKT Rule 905NY; NYSE Arca (Options) Rule
14.2; NYSE Arca (Equity) Rule 13.2; One Chicago Rule 421; and Miami Int'l Sec. Exch.
Rule 527.

of ensuring that exchanges are not the financial guarantors of specific outcomes with respect to

the hundreds of billions of dollars of orders that exchanges process every day, and that the risks

associated with system malfunctions should be allocated among all exchange members, rather

than being borne solely by the exchange. *See, e.g.,* CBOE Order, 43 Fed. Reg. 32,480;

Accommodation Proposal, 77 Fed. Reg. at 45,714. Exchanges perform vital functions that are

unique to their regulatory status, including, among other things, providing a framework for

capital formation through the IPO process, providing trading venues that are available to all

interested market participants on a non-discriminatory basis, maintaining fair and orderly

markets, and performing price discovery functions. *See, e.g.*, *Exch. Reg. Approval Order*, 71

Fed. Reg. at 3551. Because they perform these functions, they are subject to pervasive

regulation by the SEC. In the absence of rules such as Rule 4626, a single catastrophic event

could bankrupt one or multiple exchanges, thereby imperiling the performance of their unique

functions, with attendant consequences for investor confidence, investor protection, and

macroeconomic stability. Alternatively, the cost of providing exchange services would have to

rise dramatically for all investors to cover this material and new risk.[26] In addition, exchanges

would be less inclined to implement innovative systems consistent with the goals of the

Exchange Act if they bore all the risk. *See CBOE Proposed Rule Change*, Exch. Act Rel. No.

14,777 (May 17, 1978), 43 Fed. Reg. 22,471, 22,471–72 (May 25, 1978) (in proposing a

limitation on liability, CBOE explained that an exchange "cannot proceed with innovative

---

[26]      Trading costs in the United States are among the lowest in the world, and thus a
contributor to economic growth. *See, e.g.*, Michael S. Pagano, *Which Factors Influence
Trading Costs in Global Equity Markets?*, 4 J. of Trading 7 (2009); Ian Domowitz et al.,
*Liquidity, Volatility, and Equity Trading Costs Across Countries & Over Time*, 4 Int'l
Fin. 221 (2001); Asli Demirgüç-Kunt & Ross Levine, *Bank-Based and Market-Based
Financial Systems: Cross-Country Comparisons* 51 (The World Bank Working Paper
No. 2143, July 1999). (Lantieri Decl. Exs. J-L.)

systems and procedures for the execution, clearance, and settlement of Exchange transactions . . . unless it is protected against losses which might be incurred by members as a result of their use of such systems"); 15 U.S.C. § 78f(b)(5) (requiring exchanges to have rules designed, among other things, to "remove impediments to and perfect the mechanism of a free and open market and a national market system"); *see also NYSE Proposed Rule Change Related to Vendor Liability*, Exch. Act Rel. No. 58,137 (July 10, 2008), 73 Fed. Reg. 41,145, 41,146 (July 17, 2008) (explaining that an exchange's limitation of liability rule encourages vendors to provide services to the exchange, which results in faster and more innovative products for order entry, execution, and dissemination of market data).

The negligence claims (indeed all of the claims) of First New York indisputably arise out of its use of the NASDAQ Market Center.  They are accordingly barred by Rule 4626 and should be dismissed for that reason.

### C.    The Complaint Fails to State a Claim Under the Securities Laws

In Counts I and II of the Complaint, plaintiffs attempt to recast their state law negligence claims against NASDAQ as federal securities fraud claims on the farfetched theory that Facebook investors were defrauded into purchasing shares of Facebook in reliance upon allegedly false representations made by NASDAQ – not about Facebook – but about the qualities and status of NASDAQ's systems for the operation of the exchange on which Facebook was listed.  Plaintiffs cannot and do not allege the requisite elements of a securities fraud claim.

Section 10(b) of the Exchange Act makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance."  15 U.S.C. § 78j(b).  Rule 10b-5 forbids, in relevant part, making "any untrue statement of a material fact" or omitting "a material fact necessary in order

43

to make the statements made, in the light of the circumstances under which they were made, not

misleading." 17 C.F.R. § 240.10b-5.  Thus, to sustain a claim under Section 10(b) and Rule 10b-

5 plaintiffs must plead facts sufficient to demonstrate, among other elements:  (i) "a material

misrepresentation (or omission)," *i.e.,* a misrepresentation or omission material to a reasonable

investor's decision to purchase a security, (ii) "scienter, *i.e.*, a wrongful state of mind;" (iii)

"reliance, often referred to in cases involving public securities markets (fraud-on-the-market

cases) as 'transaction causation'"; and (iv) "loss causation, *i.e.*, a causal connection between the

material misrepresentation and the loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42

(2005) (citations omitted).

> Plaintiffs do not and cannot allege facts sufficient to demonstrate that:

- NASDAQ made any misrepresentation of fact cognizable as such under established 10b-5 precedent, much less a misrepresentation of a fact material to a reasonable investor's decision to purchase Facebook stock;

- NASDAQ made any of the statements identified in the complaint with the intent to defraud plaintiffs under the standards for pleading scienter mandated under the PSLRA;

- plaintiffs actually relied on the statements NASDAQ made about the quality of its systems in their decisions to purchase Facebook stock, or could be presumed to have so relied under a "fraud on the market" or *Affiliated Ute* theory of reliance; or

- the decline in the price of Facebook shares after the IPO (and therefore plaintiffs' losses) were caused by the disclosure of the issues experienced by NASDAQ in the execution of the Facebook IPO, rather than other market forces or disclosures.

For all or any one of these failures, Counts I and II of the Complaint should be dismissed.[27]

---

[27]   Count I asserts a claim against NASDAQ and the individual defendants under Section 10(b) of Exchange Act and Rule 10-5 promulgated thereunder.  Count II of the Complaint asserts a claim against the individual defendants as "controlling persons" of NASDAQ under Section 20(a) of the Exchange Act.  To state a claim under Section 20(a), plaintiffs must first state a claim under Section 10(b).  Because plaintiffs have failed to state a claim under Section 10(b), their Section 20(a) claim fails as well.  *See, e.g.*, *Slayton v. Am. Express Co.*, 604 F.3d 758, 778 (2d Cir. 2010).

1.      **The Complaint Fails to Allege any Misrepresentation or Omission of Material Fact**

To satisfy the first element for pleading a securities fraud claim (material misrepresentation), it is not sufficient generally to allege that plaintiffs were misled into purchasing a security or simply to recite the statements on which plaintiffs claim to have relied. Under the PSLRA, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).  To satisfy this pleading standard, "plaintiffs must do more than say that the statements in the press releases were false and misleading; they must demonstrate with specificity why and how that is so." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004).

Axiomatically, a statement cannot be actionable under Rule 10b-5 if it is not alleged to be false or misleading.  *See, e.g., Nadoff v. Duane Reade, Inc.*, 107 Fed. App'x 250, 252 (2d Cir. 2004) ("Accurate statements about past performance are self evidently not actionable under the securities laws . . . .").  Nor can a statement be actionable if it is merely "puffery," *i.e.,* a generally optimistic assertion about a company's quality or prospects, because such statements are not sufficiently capable of objective verification to justify reliance and "companies must be permitted to operate with a hopeful outlook."  *Rombach*, 355 F.3d at 174. *See also, e.g., ECA and Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (statements characterizing bank's risk management as "highly disciplined" and extolling its "standard-setting reputation for integrity" held insufficiently specific to support 10b-5 claim); *Billhofer v. Flamel Tech., S.A.*, No. 07-9920, 2012 WL 3079186, at *9 (S.D.N.Y. July 30, 2012) (allegation that issuer falsely asserted that a

corporate project was "moving forward well" held insufficient to plead an actionable misrepresentation under Rule 10b-5); *In re Bank of Am. Corp. Sec., Deriv., & Employee Retirement Income Sec. Act Litig.*, 757 F. Supp. 2d 260, 314 (S.D.N.Y. 2010) (statements that company "was 'uniquely positioned to win market share' with its 'significantly enhanced' capabilities," held insufficient to support Rule 10b-5 claim); *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 555-56 (S.D.N.Y. 2004) (statement that a drug was "one of the most important advances in cancer medicine" held mere "puffery" insufficient to support Rule 10b-5 claim).

All of the allegations of NASDAQ representations contained in the Complaint fall into one of these two categories:  they are either factual assertions about the performance of NASDAQ's systems that are demonstrably true and not alleged to be false; or they are general statements about the quality of NASDAQ's exchange that are properly characterized as "puffery," insufficiently specific to support a claim for securities fraud under Rule 10b-5. Moreover, none of the statements plaintiffs rely upon meets the objective standard of materiality.

Plaintiffs allege that NASDAQ made the following specific factual representations concerning the capabilities of its trading systems before the Facebook IPO:

- NASDAQ's "technology and trading platforms were able to 'process more than 1 million messages per second at sub-40 microsecond speeds with 99.999% uptime.'"  (CAC ¶ 176; *see also* CAC ¶¶ 181, 182, 186, 188.)

- NASDAQ's "'technology drives more than 70 marketplaces in 50 developed and emerging countries into the future, powering 1 in 10 of the world's securities transactions.'" (CAC ¶ 176.)

- NASDAQ's technology "platform processes trades at sub-millisecond transaction speeds with close to 100% system reliability. . . [and has] current capacity at ten times the average daily volume allowing significantly higher transaction volume to be handled at low incremental cost.'"  (CAC ¶ 169.)

- "'Over 73% of U.S.-listed technology companies have chosen to list with NASDAQ.'"  (CAC ¶ 177.)

46

All of these statements were demonstrably true.  NASDAQ's systems do process trades at sub-millisecond transaction speeds with close to 100% system reliability; NASDAQ does operate in more than 70 markets in 50 countries worldwide and transacts one in ten of the world's securities transactions; and nearly three quarters of U.S. technology companies shares are listed on NASDAQ.  Plaintiffs do not allege otherwise and do not contend that any of these statements was untrue.

Similarly, the Complaint recites, as allegedly false representations on which plaintiffs relied, several market system status messages made by NASDAQ on the day of the Facebook IPO concerning the systems issues NASDAQ was then experiencing:

- At 11:13:50 a.m. on May 18, NASDAQ disseminated a Market System Status message stating "NASDAQ is experiencing a delay in delivering the opening print in Facebook, Inc. (FB).  NASDAQ will advise."  (CAC ¶ 197; *see also* CAC ¶ 27.)

- At 11:28:50 NASDAQ disseminated another Market System Status message stating "The first print in Facebook (FB) will open at approximately 11:30 ET.  Trading will commence at that time."  (CAC ¶ 199.)

- At 11:59:39 NASDAQ disseminated a Market System Status message stating that "NASDAQ is investigating an issue in delivering trade execution message from the IPO Cross in symbol FB.  NASDAQ is working to deliver these executions back to customers as soon as possible."  (CAC ¶ 203; *see also* CAC ¶¶ 28, 204, 207.)

- At 1:57:58 NASDAQ disseminated a Market System Status message stating that "Trade execution messages for the Facebook, Inc. (FB) IPO Cross have been electronically disseminated.  All NASDAQ systems are operating normally." (CAC ¶ 208.)

All of these statements were also factually true.  Far from alleging otherwise, the Complaint confirms their truthfulness.  NASDAQ did experience a delay in the execution of the Cross for the Facebook IPO (CAC ¶ 26); the Facebook Cross did execute and trading commenced at 11:30 a.m. (CAC ¶ 34); NASDAQ did experience a delay in delivering trade confirmations (CAC ¶ 37); and those confirmations were ultimately delivered at approximately 1:57 p.m. (CAC ¶ 37).

None of these demonstrably truthful statements is a misrepresentation that could support plaintiffs' purported claims under Rule 10b-5.

The Complaint also recites numerous statements made before the Facebook IPO generally extolling the quality of the Exchange and its capabilities as a trading platform:

- NASDAQ's technology platform "provides technology to customers with the speed, scale and reliability required to meet the specific needs of their markets." (CAC ¶ 169; *see also* CAC ¶¶ 20, 180.)

- NASDAQ is "committed to innovation through technology to ensure [its] position as a driving force in the exchange industry."  (CAC ¶ 170.)

- NASDAQ "provide[s] leading technology for the world's competitive and demanding capital markets."  (CAC ¶ 171.)

- NASDAQ is "committed to working with regulators, exchanges and market participants to ensure transparent trading and a fair and orderly market for the benefit of investors."  (CAC ¶ 172.)

- NASDAQ's "trading model is the 'standard for markets worldwide.'"  (CAC ¶ 181; *see also* CAC ¶ 21.)

- "No trading platform on the planet is faster or more scalable," and NASDAQ has "unique capabilities unmatched by any exchange in the world."  (CAC ¶ 186; *see also* CAC ¶ 25.)

These are all classic examples of the sort of "puffery" courts regularly refuse to find actionable under the securities laws because "they are not capable of objective verification."  *In re Tower Automotive Sec. Litig.,* 483 F. Supp. 2d 327, 336 (S.D.N.Y. 2007) (Sweet, J.).  They are no different than assertions that a company has "'highly disciplined' risk management" or a "standard-setting reputation for integrity," *ECA & Local 134*, 553 at 205; that a project is "moving forward well," *Billhofer*, 2012 WL 3079186, at *9; that a company is "'uniquely positioned to win market share' with its 'significantly enhanced' capabilities," *Bank of Am.*, 757 F. Supp. 2d at 314; or that a drug is "one of the most important advances in cancer medicine,"

*Bristol–Myers Squibb*, 312 F. Supp. 2d at 559, none of which was found actionable under Rule 10b-5.

Moreover, all of these statements about the quality of NASDAQ's systems are alleged to have been made before the class period, and are not actionable for that reason as well. *In re IBM Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998) ("A defendant . . . is liable only for those statements made during the class period."); *accord In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 643 (S.D.N.Y. 2007).  Plaintiffs appear to recognize this defect and accordingly assert that NASDAQ had a duty to "correct" such pre-class period statements when the system issues affecting the Facebook IPO became apparent on May 18.  (*See* CAC ¶¶ 190-194.)  But there is no duty to update or to correct such vague statements of optimism or expressions of opinion as plaintiffs allege here.  *See IBM*, 163 F.3d at 110.

In addition, to be actionable under Rule 10b-5, a misrepresentation or omission must also be material.  The standard of materiality under the securities laws is objective:

> The materiality of a misstatement depends on whether "'there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act].'"  . . .  In other words, in order for the misstatement to be material, "'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'"

*ECA & Local 134*, 553 F.3d at 197 (quoting *Basic Inc. v. Levinson,* 485 U.S. 224, 231-32 (1988), and *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449 (1976)).  Under this objective standard requiring "a substantial likelihood" that a fact would be considered "important," courts have regularly dismissed on Rule 12(b)(6) motions Rule 10b-5 claims when the statements allegedly relied upon by plaintiffs were found insufficiently material in the context of the "total mix" of information available about the security at issue to affect a reasonable investor's

decision about whether to purchase that security. *See, e.g., Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 Fed. App'x 32, 34 (2d Cir. 2012) (general statements about company's business practices and integrity held immaterial puffery); *ECA & Local 134*, 553 F.3d at 202 (alleged misclassification of transactions affecting small percentage of issuer's business held immaterial); *Arfa v. Mecox Lane Ltd.*, No. 10-9053, 2012 WL 697155, at *8-9 (S.D.N.Y. Mar. 5, 2012) (Sweet, J.) (allegedly misleading general statements about issuer's store expansion activities held immaterial in light of specific disclosures of number of store openings and closings), *aff'd*, 504 Fed. App'x 14 (2d Cir. 2012); *Tower Auto.*, 483 F. Supp. at 337 ("[R]hetorical puffery statements by their very nature are immaterial.").

   The "misrepresentations" purportedly relied upon by plaintiffs in this case were far less important to their decisions to purchase Facebook stock than the misrepresentations held insufficiently material in the above-cited cases.  Indeed the "misrepresentations" plaintiffs here claim to have relied upon did not even relate to Facebook or to any fact that could remotely affect the value of that company or the price of its shares.  They did not concern Facebook's business, its revenues, its profits, its assets, its operations, its future prospects, its risks, its opportunities, or even the industry in which it operates.  They did not concern Facebook at all.  They concerned NASDAQ.  While such statements theoretically might be material to the decision of an investor to purchase NASDAQ stock,[28] they could not have been material to any

---

[28] Even as to NASDAQ, it is doubtful whether the statements on which plaintiffs contend to have relied would be considered material in the context of the "total mix" of information available about NASDAQ's systems, including NASDAQ's consistent disclosures of the risk that its trading systems could fail.  For example, in its 2011 Annual Report on Form 10-K NASDAQ OMX cautioned:

   ***System limitations or failures could harm our business.***

   Our businesses depend on the integrity and performance of the computer and communications systems supporting them.  If our systems cannot expand to cope

reasonable investor's decision to purchase Facebook.  No court has ever sustained a Rule 10b-5

claim in anything remotely like this context, where the alleged representations do not concern the

security plaintiffs purchased, but the exchange on which such securities were traded.[29]

        For all of these reasons, the Complaint fails to allege a material misrepresentation

actionable under Rule 10b-5, and Counts I and II of the Complaint should be dismissed for that

reason.

### 2.    The Complaint Fails to Allege Scienter

        To maintain a claim under Section 10(b) and Rule 10b-5, a purchaser of a security

must prove not only that the defendant made a material misrepresentation but also that the

defendant made the misrepresentation with the intent to defraud the plaintiff, or with a state of

---

> with increased demand or otherwise fail to perform, we could experience
> unanticipated disruptions in service . . . .  These consequences could result in
> trade outages, lower trading volumes, financial losses, decreased customer service
> and satisfaction and regulatory sanctions.  Our markets have experienced
> occasional systems failures and delays in the past and could experience future
> systems failures and delays.
>
> Although we currently maintain and expect to maintain multiple computer
> facilities that are designed to provide redundancy and back-up to reduce the risk
> of system disruptions and have facilities in place that are expected to maintain
> service during a system disruption, such systems and facilities may prove
> inadequate. . . .
>
> While we have programs in place to identify and minimize our exposure to
> vulnerabilities . . . we cannot guarantee that such events will not occur in the
> future.

NASDAQ OMX Annual Report (Form 10-K), at 25-26 (Feb. 24, 2012); *see also, e.g.*,
NASDAQ OMX Annual Report (Form 10-K), at 25-26 (Feb. 24, 2011) (Lantieri Decl.
Exs. H & I).

[29]    In *NYSE Specialists*, the Second Circuit held that investors allegedly harmed by
fraudulent practices of NYSE specialists had standing to assert a 10b-5 claim for an
alleged misrepresentation concerning NYSE's oversight of such specialists, but expressly
declined to consider whether the elements of a 10b-5 claim had been adequately pled in
that case.  503 F.2d at 103.

mind akin to such an intent.  The plaintiff must, in other words, prove scienter.  *Dura Pharms*.,

544 U.S. at 341.

      While Rule 9(b) of the Federal Rules of Civil Procedure would otherwise permit

pleading of intent generally, to allege scienter in the context of a fraud claim under the federal

securities laws, the PSLRA requires that a complaint must, "with respect to each act or omission

alleged to violate this chapter, state with particularity facts giving rise to a strong inference that

the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A).  To determine

whether a complaint meets this heightened pleading standard, the court must consider "plausible

opposing inferences."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321, 323

(2007).  "[T]he court must," the Supreme Court has instructed,

> consider plausible nonculpable explanations for the defendant's
> conduct, as well as inferences favoring the plaintiff. . . . [T]he
> inference of scienter must be more than merely reasonable or
> permissible – it must be cogent and compelling, thus strong in light
> of other explanations.  A complaint will survive, we hold, only if a
> reasonable person would deem the inference of scienter cogent and
> at least as compelling as any opposing inference one could draw
> from the fact alleged.

*Id.* at 324.  To survive dismissal, the Complaint in this case must therefore allege facts from

which a reasonable person would cogently infer that NASDAQ misrepresented the technological

strength of its systems deliberately or recklessly in order to defraud plaintiffs, and that such an

inference is "at least as compelling" as other inferences that may be drawn from the facts.

      The Complaint in this case does not come close to meeting the standard

demanded by the PSLRA and *Tellabs*.  To the contrary, instead of pleading facts from which a

"cogent and compelling" inference of scienter might be drawn, in the section of their Complaint

purporting to allege scienter for purposes of their securities fraud claims, plaintiffs merely assert,

in the most conclusory fashion, that:

> Defendants NASDAQ, Greifeld and Ewing acted with scienter in
> that they knew or recklessly disregarded that the public statements
> and documents issued and disseminated in NASDAQ's name were
> materially false and misleading and/or became materially false and
> misleading due to subsequent events; knew or recklessly
> disregarded that such statements and documents would be issues
> and disseminated to the investing public, including Plaintiffs and
> Class Members; and substantially participated and/or acquiesced in
> the issuance or dissemination of such statements and documents as
> primary violators of the federal securities laws.

(CAC ¶ 219.)  Such a general and conclusory statement of intent is precisely what the PSLRA

was enacted to prohibit.  Nor can plaintiffs overcome this deficiency by citing press and other

media reports containing similarly conclusory assertions about defendants' states of mind.[30]  (*See*

CAC ¶¶ 223-33.)  *See, e.g., Campo v. Sears Holdings Corp.*, 371 Fed. App'x 212, 215 (2d Cir.

2010) (news article attributing admission of scienter to defendant held insufficient to satisfy

PSLRA scienter pleading requirement); *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 865 (5th Cir.

2003) (conclusory statements in news articles do not meet the pleading requirements of the

PSLRA); *Stern v. Leucadia Nat'l Corp.,* 844 F.2d 997, 1004 (2d Cir. 1988) ("It is not enough to

quote press speculation about defendants' motives. . . .  Such allegations simply do not provide .

. . specific well-pleaded facts. . . .").

---

[30]     The media reports on which plaintiffs rely to support their conclusory allegations of
scienter are not only conclusory themselves, they constitute multiple hearsay of the most
unreliable kind.  For example, to support their assertion that "NASDAQ 'knew its
systems were broken before the Facebook IPO,'" plaintiffs cite an interview conducted
by the on-line publication *Business Insider* of an unnamed "hedge-fund manager."  (CAC
¶ 224.)  To support their allegation that "Nasdaq used untested software" and "there may
have been signs the system wasn't glitch-free even at the 11th hour," plaintiffs rely on a
*New York Post* report sourced to unnamed "Wall Street insiders."  (CAC ¶ 223; *see also*
CAC ¶ 230 (relying on an undocumented article on the website "*TechCrunch*") & ¶ 231
(relying on a *CNNMoney* interview with an unnamed "trader").)   There is no suggestion
that plaintiffs themselves conducted any investigation independently to verify the truth of
these allegations.

        To be sure, plaintiffs do allege (and NASDAQ has acknowledged) that NASDAQ

experienced systems issues in connection with the Facebook IPO that delayed the execution of

the Cross for that IPO for 25 minutes, caused some Facebook orders not to be executed when

they should have been, and delayed the dissemination of confirmation messages for the trades

executed in that Cross.  (CAC ¶¶ 26, 37.)  Plaintiffs contend that such systems issues

demonstrate that the generally positive statements made by NASDAQ about the quality of its

systems were false and misleading.  (CAC ¶¶ 179, 183, 189.)  But the fact that NASDAQ's

systems did not operate as intended in the Facebook IPO does not give rise to the inference that

the prior statements made by NASDAQ about the quality of its systems were fraudulent or

reckless, any more than a decline in the price of a stock upon an earnings release gives rise to the

inference that prior statements about the issuer's prospects were fraudulent or reckless.  *See, e.g.,*

*Rombach v. Chang*, No. 00-958, 2002 WL 1396986, at *9-10 (E.D.N.Y. June 7, 2002) (scienter

not properly inferred from statements showing "honest assessments of the increasingly more

pessimistic outlook . . . regarding the Company's financial health"), *aff'd*, 355 F.3d 164 (2d Cir.

2004); *In re Aegon N.V. Sec. Litig.*, No. 03-603, 2004 WL 1415973, at *19 (S.D.N.Y. June 23,

2004) (Sweet, J.) (scienter not properly inferred from fact that corporation missed earnings

projections).  The far more likely inference to be drawn from the facts alleged in the Complaint

in this case is that the system issues NASDAQ experienced in the Facebook IPO were

unanticipated, and disappointed the expectations of NASDAQ just as much as they disappointed

the expectations of Facebook and the plaintiffs.[31]

---

[31]        To the extent plaintiffs allege that defendants were motivated to overstate the quality of
        NASDAQ's systems in order to enhance NASDAQ's reputation or profitability (*see* CAC
        ¶ 170 ("soundness and reliability of [NASDAQ's] technology were key aspects of its
        business success") & ¶ 218 (NASDAQ's actions were "profit-oriented")), courts have
        consistently held such allegations to be insufficient to satisfy the requirements for

Because it fails to allege any facts from which a reasonable person could cogently infer that defendants misrepresented the quality of NASDAQ's systems deliberately or recklessly to defraud plaintiffs, much less facts from which such an inference would be "at least as compelling" as other inferences, the Complaint does not adequately plead the essential element of scienter under the standard mandated by the PSLRA, and Counts I and II should be dismissed for that reason as well.

### 3.    The Complaint Fails to Allege Reliance

Reliance is also an essential element of a securities fraud claim because it "provides the requisite causal connection between a defendant's misrepresentation and a plaintiff's injury."  *Basic*, 485 U.S. at 243.  "The traditional (and most direct) way a plaintiff can demonstrate reliance is by showing that he was aware of a company's statement and engaged in a relevant transaction – *e.g.*, purchasing common stock – based on that specific misrepresentation."  *Erica P. John Fund, Inc. v. Halliburton Co.*, --- U.S. ---, 131 S. Ct. 2179, 2185 (2011).  There is no such allegation of direct reliance in the Complaint in this action.  Indeed, there is no allegation that any of the plaintiffs even read or heard any of the statements about NASDAQ's

---

pleading scienter.  *See, e.g.*, *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996) ("[S]uch a generalized [profit] motive, one which could be imputed to any publicly-owned, for-profit endeavor, is not sufficiently concrete for purposes of inferring scienter."); *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) (If a profit motive were sufficient to satisfy the standard for pleading scienter, "virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions.").  Likewise, courts have routinely held allegations of individuals' motivation to increase their compensation – such as plaintiffs' allegation here that "Defendants' ability to obtain and successfully launch the Facebook IPO would have provided substantial financial benefits to Defendants Greifeld and Ewing" (CAC ¶ 19) – insufficient to satisfy the scienter requirement.  *See, e.g.*, *Acito*, 47 F.3d at 54 ("[I]ncentive compensation can hardly be the basis on which an allegation of fraud is predicated.'") (citation omitted); *Woodward v. Raymond James Fin., Inc.*, 732 F. Supp. 2d 425, 436 (S.D.N.Y. 2010) ("[T]he desire to keep stock prices high to increase officer compensation . . . [does] not constitute 'motive' for purposes of this inquiry.") (citation omitted).

systems plaintiffs now allege were false or misleading, must less that plaintiffs relied upon those statements in their decisions to purchase Facebook stock.

Instead, plaintiffs assert that they and the members of the class should "benefit from a presumption of reliance." (CAC ¶ 234.) Significantly, however, plaintiffs do not contend that they are entitled to such a presumption of reliance on a "fraud-on-the-market" theory. They know they can make no such claim. A "fraud-on-the-market" presumption cannot apply to the purchase of shares in the context of an IPO, because in an *initial* public offering there is no "well-developed market in offered securities."[32] *In re Initial Public Offerings Sec. Litig.,* 471 F.3d 24, 42 (2d Cir. 2006) (quoting *Berwecky v. Bear, Stearns & Co.,* 197 F.R.D. 65, 68 n.5 (S.D.N.Y. 2000)). *See also Freeman v. Laventhol & Horwath*, 915 F.2d 193, 199 (6th Cir. 1990)); *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 269 F.R.D. 252, 260 (S.D.N.Y. 2010) (citing *Ockerman v. May Zima & Co.*, 27 F.3d 1151, 1160 (6th Cir. 1994), and *Eckstein v. Balcor Film Investors*, 8 F.3d 1121 (7th Cir. 1993)).

Recognizing that they cannot invoke a fraud-on-the-market theory of reliance, plaintiffs instead appear to rest their claim on the theory of reliance first articulated by the Supreme Court in *Affiliated Ute*, applicable in cases "involving primarily a failure to disclose," where reliance cannot be proved directly. *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 153 (1972). (*See* CAC ¶¶ 235-238.) In such cases,

---

[32] Plaintiffs are not entitled to a fraud-in-the-market presumption of reliance for another reason: the representations about which they complain do not relate to the value of security they purchased. As the Second Circuit observed in *NYSE Specialists*, where the New York Stock Exchange was sued for having allegedly misled investors concerning the allegedly fraudulent trading activities of specialists on that exchange, such claims are "not . . . of the nature where the fraud-on-the-market theory would apply, where the misrepresentation itself affects the market price of the security purchased." *NYSE Specialists,* 503 F.3d at 103.

> involving primarily a failure to disclose, positive proof of reliance
> is not a prerequisite to recovery.  All that is necessary is that the
> facts withheld be material in the sense that a reasonable investor
> might have considered them important in the making of this
> decision . . . . This obligation to disclose and this withholding of a
> material fact establish the requisite element of causation in fact.

*Id.* (citations omitted).  The *Affiliated Ute* presumption of reliance is inapplicable to this case for

several reasons.

First, this is not a case "involving primarily a failure to disclose."  To the

contrary, the Complaint rests primarily on affirmative statements by NASDAQ and its officers

that plaintiffs assert were false and misleading.  (*See generally* CAC ¶¶ 168-218.)  "Where

positive statements form a central part of the alleged fraud such that the evidentiary problems

inherent in proving reliance on a non-disclosure are not present, the *Affiliated Ute* exception does

not apply."  *In re Salomon Analyst Metromedia Litig.*, 236 F.R.D. 208, 218-19 (S.D.N.Y. 2006),

*vacated on other grounds*, 544 F.3d 474 (2d Cir. 2008).  *See also Starr ex rel. Estate of Sampson*

*v. Georgeson S'holder, Inc.*, 412 F.3d 103, 109 n.5 (2d Cir. 2005) (declining to apply *Affiliated*

*Ute* exception to case where alleged omissions only "exacerbated the misleading nature of . . .

affirmative statements"); *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 494 (S.D.N.Y. 2011)

(declining to  apply *Affiliated Ute* presumption to a case "primarily built around

misrepresentations" and in which "omissions, if any, merely serve to exacerbate and bolster [the]

misrepresentation claims").

Second, NASDAQ had no affirmative duty to disclose facts relating to the

capabilities of its trading systems to stock purchasers (like plaintiffs) with whom it had no

fiduciary or similar relationship of trust.  *See, e.g.*, *Chiarella v. U.S.*, 445 U.S. 222, 235 (1980)

("When an allegation of fraud [under Section 10(b)] is based upon nondisclosure, there can be no

fraud absent a duty to speak."). Thus, plaintiffs can state no claim against NASDAQ for nondisclosure.

Finally, even if this were a case of omission in the context of a duty to disclose, it would still be necessary for plaintiffs to allege that the facts not disclosed were "material in the sense that a reasonable investor might have considered them important in the making of [his investment] decision." *Affiliated Ute*, 406 U.S. at 153-54. As discussed above (pp. 49-51, *ante*), plaintiffs cannot meet that standard of materiality for the simple reason that the representations and omissions on which they claim to have relied do not relate to the value of the security they purchased.

In short, the Complaint does not allege that plaintiffs actually relied on any statement made by NASDAQ in deciding to purchase Facebook stock and such reliance may not be presumed. For that additional reason, Counts I and II of the Complaint should be dismissed.

### 4.     The Complaint Fails to Allege Loss Causation

To maintain a Rule 10b-5 claim, it is well-settled that a purchaser of a security must prove not only transaction causation (*i.e.,* that "but for" the alleged misrepresentations or omission he would not have purchased the security), but also loss causation (*i.e.,* a "causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff"). *Lentell v. Merrill Lynch & Co., Inc.,* 396 F.3d 161, 172 (2d Cir. 2005) (quoting *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.,* 343 F.3d 189, 197 (2d Cir. 2003)). This long-established principle is codified in the PSLRA as follows:

> In any private action arising under this chapter, the plaintiff shall
> have the burden of proving that the act or omission of the
> defendant alleged to violate this chapter cause the loss for which
> the plaintiff seeks to recover damages.

15 U.S.C. § 78u-4(b)(4).

To establish loss causation, "the damages suffered by plaintiff must be a foreseeable consequence of any misrepresentation or material omission." *Emergent Capital,* 343 F.3d at 197 (quotation omitted).  In other words,

> a misstatement or omission is the "proximate cause" of an investment loss if the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations and omissions alleged by a disappointed investor. . . .
>
> Thus to establish loss causation, "a plaintiff must allege. . . that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered," . . . *i.e.,* that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security.

*Lentell,* 396 F.3d at 173 (quoting *Suez Equity Investors, L.P. v. Toronto Dominion Bk.*, 250 F.3d 87, 95 (2d Cir. 2001)).  *See also, e.g., Solow v. Citigroup, Inc.,* 827 F. Supp. 2d 280, 291-92 (S.D.N.Y. 2011) (Sweet, J.).  Moreover, to plead such proximate causation it is not sufficient for a securities investor to allege that a decline in the price of a security *coincided* with the disclosure of previously undisclosed information; she must allege facts showing why the disclosure *caused* the decline.  *See, e.g., Dura Pharms.,* 544 U.S. at 343 (stating that "lower share price may reflect[] not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions or other events"); *Merrill Lynch & Co. Research Reports Sec. Litig.,* No. 02-9690, 2008 WL 2324111, at *8 (S.D.N.Y. 2008) (dismissing complaint that failed to allege "*why* [Internet company's] precipitous stock price decline during the period when Defendants were issuing the falsely optimistic projections was due to the alleged fraud, rather than to the well-documented bursting of the Internet bubble") (emphasis added); *In re Intelligroup Sec. Litig.,* 468 F. Supp. 2d 670, 692 (D.N.J. 2006) ("[E]xistence of a causal connection cannot be made solely on the basis of temporal proximity where the stock price decline might be attributable to other forces, events or

announcements that took place prior to or contemporaneously with the public airing of the alleged fraud but had nothing to do with the challenged conduct by the defendant.").

Although the Complaint is far from a model of clarity on this point, the loss the securities class plaintiffs seek to recover appears to be the decline in the value of their shares on the day of the Facebook IPO.  (*See* CAC ¶ 30 ("As a result of NASDAQ's materially false and misleading statements and omissions of material fact, the price of Facebook's stock plummeted from a high of $45.00 per share in the first 15 minutes of open-market trading to a low of $38.00, finally closing at $38.23 per share."); CAC ¶ 15 ("[T]he wholesale breakdown in NASDAQ's trading platforms caused Class Members substantial damages by, *inter alia*, . . . an artificial downward pressure on the price of Facebook's stock.")).  The Complaint, however, is devoid of any allegation as to why the NASDAQ systems issues that became apparent on May 18 "negatively affected the value" of Facebook stock.  The absence of any such explanation of plaintiffs' theory of loss causation is fatal to the Complaint.

Any contention that the value of Facebook stock was artificially inflated by statements about the quality of the Exchange and that it was the materialization of the NASDAQ systems issues on May 18 (rather than other factors or disclosures) that caused the price of Facebook stock to decline (*see* CAC ¶ 238) is fundamentally implausible.  As the Supreme Court has observed, a "tangle of factors" affect the price of any security, *Dura Pharms* 544 U.S. at 343, including factors affecting markets generally and factors affecting the value of the particular security.  But neither logic nor precedent supports plaintiffs' contention that the exchange on which the security is traded is a relevant factor affecting its value.  Indeed, there is no allegation that plaintiffs' orders placed after the IPO Cross were even executed on NASDAQ, as opposed to any of the other 10 markets that were trading Facebook stock.  Plaintiffs' theory of loss causation

60

is even more implausible in this case, where members of the same plaintiff class who here assert

the decline in the value of Facebook on May 18 was attributable to NASDAQ, in the lawsuits

against Facebook and its underwriters attribute such decline to new disclosures made about

Facebook.  *See* Consolidated Class Action Compl. (Consolidation Facebook Sec. Action), *In re*

*Facebook, Inc., IPO Sec. & Derivative Litig.*, MDL No. 12-2389 (Doc. No. 71) ¶¶ 8-22 (decline

in price of Facebook stock caused by disclosures reflecting disappointing results in revenue from

use of Facebook on mobile devices).  Even more damaging to plaintiffs' theory of loss causation

is the fact that after NASDAQ's systems issues were corrected and trading resumed normally,

the price of Facebook stock did not rebound, but continued to decline.[33]  If the system issues

experienced by NASDAQ (rather than other factors or disclosures) were what caused the price of

Facebook stock to decline on May 18, one would have expected the price of the stock to have

returned to a higher level once those systems issues were resolved.  The absence of such a

"bounce-back" belies plaintiffs' theory of loss causation.

        In short, the Complaint does not adequately plead why purported

misrepresentations about NASDAQ's trading systems inflated the value of Facebook stock or

why the materialization of the systems issues experienced by NASDAQ in the Facebook IPO

proximately caused the price of Facebook shares to decline.  For that additional reason, Counts I

and II of the Complaint should be dismissed.

---

[33]     The price of Facebook stock closed at $38.23 on Friday, May 18.  (CAC ¶ 30).  That
price continued to decline when trading resumed after the weekend, closing at $34.03 on
May 21 and at $31.00 on May 22.  Indeed, in the year since the IPO, Facebook stock has
continued to trade below the level at which its IPO was priced.  Six months after the IPO,
on November 12, 2012, Facebook closed at $20.07, and a year after the IPO, on May 13,
2013, Facebook closed at $26.82.  *See* Yahoo! Finance, Facebook, Inc., Historical Prices,
http://finance.yahoo.com/q/hp?s=FB+Historical+Prices (last visited July 1, 2013).  This
Court may properly take notice of such published stock prices.  *See Ganino v. Citizens*
*Utils. Co.,* 228 F.3d 154, 167 n.8 (2d Cir. 2000).

## IV.      CONCLUSION

For all the reasons set forth above, plaintiffs' Complaint should be dismissed with

prejudice, and defendants should be allowed such other and further relief as the Court finds just

and proper.


Date:  July 2, 2013                                    Respectfully submitted,


                                                       /s/ Stephen J. Kastenberg
                                                       William A. Slaughter (PA Bar No. 30637)*
                                                       Stephen J. Kastenberg (PA Bar No. 70919)*
                                                       Paul Lantieri III (PA Bar No. 88160)*
                                                       BALLARD SPAHR LLP
                                                       1735 Market Street, 51st Floor
                                                       Philadelphia, PA 19103
                                                       Tel:  215.665.8500
                                                       Fax:  215.864.8999
                                                       slaughter@ballardspahr.com
                                                       kastenberg@ballardspahr.com
                                                       lantierip@ballardspahr.com

                                                       *Attorneys for Defendants
                                                       The NASDAQ OMX Group, Inc., The
                                                       NASDAQ Stock Market LLC, Robert
                                                       Greifeld, and Anna M. Ewing*

                                                       *Admitted pro hac vice*