**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE FACEBOOK, INC. IPO SECURITIES AND DERIVATIVE LITIGATION | MDL No. 12-2389 (RWS) |
| This document relates to:  NASDAQ Actions | |

---

**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE CONSOLIDATED AMENDED
CLASS ACTION COMPLAINT**

---

EC.52935.4

## TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................... 1

BACKGROUND ....................................................................................................... 6

    A.    NASDAQ OMX, A For-Profit, Publicly-Traded Holding Company, Engages In Commercial, Non-Regulatory Activity In An Effort To Obtain The Facebook Listing ............................................................................................... 6

    B.    The Securities Defendants Make Numerous Material Statements Concerning NASDAQ's Technology And Trading Platforms Prior To The Facebook IPO ..... 8

    C.    Unbeknownst To Class Members, In The Pre-IPO Period, Defendants Undertake A Series Of Tests Which Reveal System Issues That Would Paralyze The Facebook IPO ....................................................................................... 9

    D.    NASDAQ Experiences Catastrophic System Failures And NASDAQ OMX Fails To Disclose Material Facts Concerning These Failures And Related Reckless Conduct ........................................................................................ 10

        1.    IPO Cross System Failures and NASDAQ OMX's Material Omissions Prior to 11:30 a.m. ..................................................................... 10

        2.    Continuing System Problems and NASDAQ OMX's Material Omissions After 11:30 a.m. ................................................................ 11

        3.    Additional System Problems at 1:50 p.m. and NASDAQ OMX's Related Material Omissions ................................................................. 12

    E.    The SEC Conducts A Year-Long Investigation Into The Facebook IPO And Imposes Record-Setting Penalties And Substantial Remedial Measures ............ 13

    F.    NASDAQ LLC Agrees To Pay Its Member Firms Up To $62 Million For Losses Caused By The System Failures .............................................................. 14

ARGUMENT ......................................................................................................... 15

I.    STANDARD OF REVIEW ................................................................................ 15

II.    DEFENDANTS ARE NOT ENTITLED TO SRO IMMUNITY ..................................... 16

    A.    The SRO Immunity Doctrine Applies Only To Quasi-Judicial Functions ........... 17

    B.    Defendants NASDAQ OMX, Greifeld, And Ewing Are Not Afforded SRO Immunity In Connection With The Allegations Giving Rise To Lead Plaintiffs' Federal Securities Claims ................................................................. 19

        1.    NASDAQ OMX Is Not an SRO Entitled To SRO Immunity .................. 19

2.      The Securities Defendants' Misconduct Was in Connection With NASDAQ OMX's For-Profit Commercial Interests Where No SRO Immunity Applies .................................................................. 21

C.      The Negligence Claims Arise From The Failures Of For-Profit Commercial Systems, Not From Delegated SRO Functions ...................................... 24

1.      The Failed Software Systems Were an Integral Part of NASDAQ's For-Profit Business Activity ...................................... 24

2.      The Negligence Claims Arise Directly From the System Failures .......... 25

3.      NASDAQ Is Not Entitled To Immunity Simply Because It Engages in Regulated Activities ................................................ 27

4.      The SEC Enforcement Action Does Not Support the Claim of Immunity ................................................................. 28

a.      The SEC Findings Relate to the Activities of NASDAQ As a For-Profit Business ............................. 28

b.      The SEC Found that the System Failures Resulted in the "Stuck" Orders, Delayed Confirmations and Inaccurate Price Quotes that Give Rise to the Negligence Claims......................... 30

c.      NASDAQ Did Not Make a Regulatory Decision Not to Halt Trading .................................................................... 31

5.      The NASDAQ LLC Accommodation Proposal Contradicts the Claim of Immunity ................................................................. 33

6.      The Policy Reasons for a Grant of Immunity Do Not Apply to NASDAQ's Handling of the Facebook IPO ............................. 34

III.     LEAD PLAINTIFFS STATE SECTION 10(b) CLAIMS AGAINST THE SECURITIES DEFENDANTS .................................................. 36

A.      Lead Plaintiffs Adequately Allege The Securities Defendants Made Material Omissions Of Fact .................................................. 36

1.      Standard for Pleading Materiality Under Section 10(b) of the Exchange Act ................................................................. 36

2.      The Securities Defendants Had a Duty to Correct And/Or Update Their Pre-Class Period Statements Concerning the Capability and Reliability of NASDAQ's Technology and Trading Platforms................ 37

EC.52935.4

3.      NASDAQ OMX Failed to Disclose Material Facts Concerning Its System Failures and Defendants' Reckless Conduct On The Day Of The Facebook IPO .......................................................................... 42

        a.     NASDAQ OMX Had a Duty to Disclose the Known Technical Failures with Its IPO Cross System Prior to Commencing Secondary Market Trading ............................................ 43

        b.     NASDAQ OMX Had a Duty to Disclose Continuing System Problems After Commencing Secondary Market Trading .......... 45

        c.     NASDAQ OMX Had a Duty to Disclose the Realization of Additional Problems Upon The Delivery of Confirmations......... 47

B.     Lead Plaintiffs Adequately Allege Scienter ........................................................ 48

    1.      Pleading Scienter Under the PSLRA ........................................................ 48

    2.      The CAC Alleges Facts That Constitute Strong Circumstantial Evidence Of Conscious Misbehavior And/Or Recklessness ................... 49

        a.     The Securities Defendants Knew Facts and/or Had Access to Information Contradicting Their Public Statements .................... 50

        b.     The Securities Defendants Failed to Verify Information They Had a Duty to Monitor......................................................... 52

C.     Lead Plaintiffs Adequately Allege Reliance........................................................ 54

D.     Lead Plaintiffs Adequately Allege Loss Causation .............................................. 56

IV.    THE NEGLIGENCE CLAIMS ARE NOT BARRED BY THE ECONOMIC LOSS DOCTRINE .......................................................................... 59

CONCLUSION.................................................................................................................... 64

iii

# TABLE OF AUTHORITIES

## Cases

*17 Vista Fee Assocs. v. Teachers Ins. & Annuity Assoc. of Am.*,
   259 A.D.2d 75 (N.Y. 1999) ........................................................................ 63

*532 Madison Avenue Gourmet Foods, Inc. v. Finlandia Center, Inc.*,
   750 N.E.2d 1097 (N.Y. 2001) .............................................................. 60, 62

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co., Inc.*,
   No. 08 Cv. 7508 (SAS), 2013 WL 837536 (S.D.N.Y. Mar. 6, 2013) ..................................... 61

*Affiliated Ute Citizens of Utah v. United States*,
   406 U.S. 128 (1972) .......................................................................... 54, 56

*American Agricultural Movement, Inc. v. Board of Trade*,
   977 F.2d 1147 (7th Cir. 1992) ..................................................................... 27

*Anschutz Corp. v. Merrill Lynch & Co.*,
   690 F.3d 98 (2d Cir. 2012) ....................................................................... 61

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007) ................................................................... 15, 49

*Austin Mun. Sec. v. Nat'l Ass'n of Sec. Dealers, Inc*,
   757 F.2d 676 (5th Cir. 1985) ..................................................................... 17

*Avazpour Networking Servs., Inc. v. Falconstor Software, Inc.*,
   No. CV 12-3574, 2013 WL 1386264 (E.D.N.Y. Apr. 3, 2013) ............................................. 63

*Barbara v. NY Stock Exch., Inc.*,
   99 F.3d 49 (2d Cir. 1996) ................................................................. 18, 19, 27

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988) ...................................................................... 37, 41, 48

*Bayerische Landesbank v. Alladin Capital Mgmt. LLC*,
   692 F.3d 42 (2d Cir. 2012) ....................................................................... 63

*Bellevue S. Assoc. v. HRH Constr. Corp.*,
   579 N.E.2d 195 (N.Y. 1991) ...................................................................... 59

*Bradley v. Fisher*,
   80 U.S. 335 (1871) ............................................................................... 17

*Bullmore v. Ernst & Young Cayman Is.*,
   45 A.D.3d 461 (N.Y. 2007) ....................................................................... 63

iv

*Butz v. Economou*,
    438 U.S. 478 (1978)..................................................................................... 17

*Caiola v. Citibank, N.A.*,
    295 F.3d 312 (2d Cir. 2002) ........................................................... passim

*Campo v. Sears Holdings Corp.*,
    371 F. App'x 212 (2d Cir. 2010) ................................................................ 51

*Casella v. Webb*,
    883 F.2d 805 (9th Cir. 1989) ..................................................................... 40

*Castellano v. Young & Rubicam, Inc.*,
    257 F.3d 171 (2d Cir. 2001) ...................................................................... 37

*Castro v. Covenant Aviation Sec., LLC*,
    No. 12 Civ. 3037 (PAC), 2013 WL 3811474 (S.D.N.Y. Jul. 22, 2013).................. 51

*Commerce & Industry Ins. Co. v. Vulcraft, Inc.*,
    No. 97 Civ. 2578, 1998 WL 823055 (S.D.N.Y. Nov. 20, 1998) ............................. 63

*Conway v. Icahn & Co.*,
    16 F.3d 504 (2d Cir. 1994). ....................................................................... 62

*Cyber Media Grp., Inc. v. Island Mortg. Network, Inc.*,
    183 F. Supp. 2d 559 (E.D.N.Y. 2002) ........................................................ 37

*D.H. Blair & Co., v. Gottdiener*,
    462 F.3d 95 (2d Cir. 2006) ........................................................................ 51

*D'Alessio v. N.Y. Stock Exch., Inc.*,
    258 F.3d 93 (2d Cir. 2001) ........................................................... passim

*DGM Investments, Inc. v. New York Futures Exchange, Inc.*,
    01 CIV. 11602 (RWS), 2002 WL 31356362 (S.D.N.Y. Oct. 17, 2002).................. 27

*DL Capital Group, LLC v. NASDAQ Stock Market, Inc.*,
    409 F.3d 93 (2d Cir. 2005) ........................................................... passim

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005).......................................................................... 56, 57

*ECA, Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009) .............................................................. 37, 50

*Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*,
    551 F. Supp. 2d 210 (S.D.N.Y. 2008) ........................................................ 42

EC.52935.4

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*,
343 F.3d 189 (2d Cir. 2003) ........................................................................ 59

*Escott v. BarChris Constr. Corp.*,
283 F. Supp. 643 (S.D.N.Y. 1968) ............................................................... 41

*Flagler v. Trainor*,
663 F.3d 543 (2d Cir. 2011) ........................................................................ 16

*Fogarazzo v. Lehman Bros., Inc.*,
341 F. Supp. 2d 274 (S.D.N.Y. 2004) .......................................................... 45

*Forrester v. White*,
484 U.S. 219 (1988)..................................................................................... 16

*Freudenberg v. E\*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010) .......................................................... 15

*Ganino v. Citizens Utils. Co.*,
228 F.3d 154 (2d Cir. 2000) ........................................................................ 37

*Glazer v. Formica Corp.*,
964 F.2d 149 (2d Cir. 1992) ........................................................................ 36

*Hall v. The Children's Place Retail Stores, Inc.*,
580 F. Supp. 2d 212 (S.D.N.Y. 2008) .......................................................... 46

*Halperin v. eBanker USA.com, Inc.*,
295 F.3d 352 (2d Cir. 2002) ........................................................................ 41

*Heller v. Goldin Restructuring Fund, L.P.*,
590 F. Supp. 2d 603 (S.D.N.Y. 2008) .......................................................... 52

*Helwig v. Vencor, Inc.*,
251 F.3d 540 (6th Cir. 2001) ....................................................................... 43

*In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*,
741 F. Supp. 2d 511 (S.D.N.Y. 2010) ............................................ 57, 58, 59

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
324 F. Supp. 2d 474 (S.D.N.Y. 2004) .......................................................... 51

*In re Bank of Am. Corp. Sec., Derivative & ERISA Litig.*,
757 F. Supp. 2d 260 (S.D.N.Y. 2010) .......................................................... 42

*In re Beacon Assoc. Litig.*,
745 F. Supp. 2d 386 (S.D.N.Y. 2010) .......................................................... 39

EC.52935.4

*In re Bear Stearns Cos. Inc. Sec. Derivative, & ERISA Litig.*,
    763 F. Supp. 2d 423 (S.D.N.Y. 2011) ................................................................. 57

*In re Bristol Myers Squibb Co. Sec. Litig.*,
    586 F. Supp. 2d 148 (S.D.N.Y. 2008) ................................................................. 46

*In re Check Point Software Tech. Ltd. Sec. Litig.*,
    No. 03 Civ. 6594 (KMB), 2006 WL 1116699 (S.D.N.Y. Apr. 26, 2006) .............................. 51

*In re Computer Assocs. Class Action Sec. Litig.*,
    75 F. Supp. 2d 68 (E.D.N.Y. 1999) ................................................................. 40

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
    439 F. Supp. 2d 692 (S.D. Tex. 2006) ................................................................. 57

*In re Initial Pub. Offering Sec. Litig.*,
    241 F. Supp. 2d 281 (S.D.N.Y. 2003) ................................................... 36, 45, 48

*In re J.P. Jeanneret Assoc., Inc.*,
    769 F. Supp. 2d 340 (S.D.N.Y. 2011) ................................................................. 39

*In re K-Tel Int'l, Inc. Sec. Litig.*,
    300 F.3d 881 (8th Cir. 2002) ................................................................. 43

*In re New Century*,
    588 F. Supp. 2d 1206 (C.D. Cal. 2008) ................................................................. 51

*In re NovaGold Res. Inc. Sec. Litig.*,
    629 F. Supp. 2d 272 (S.D.N.Y. 2009) ................................................................. 39

In re NYSE Specialist Sec. Litig.,
    405 F. Supp. 2d 281 (S.D.N.Y. 2005),
    *aff'd in part, vacated in part on other grounds*, 503 F.3d 89 (2d Cir. 2007) ........................ 19

*In re NYSE Specialists Sec. Litig.*,
    503 F.3d 89 (2d Cir. 2007) ................................................... 16, 18, 26, 43

*In re Providian Fin. Corp. Sec. Litig.*,
    152 F. Supp. 2d 814 (E.D. Pa. 2001) ................................................................. 43

*In re Quintel Entm't Inc. Sec. Litig.*,
    72 F. Supp. 2d 283 (S.D.N.Y. 1999) ................................................... 39, 40

*In re Regeneron Pharm., Inc. Sec. Litig.*,
    No. 03 Civ. 3111 (RWS), 2005 WL 225288 (S.D.N.Y. Feb. 1, 2005) ................................... 41

*In re Sadia, S.A. Sec. Litig.*,
    269 F.R.D. 298 (S.D.N.Y. 2010) ................................................................. 59

EC.52935.4

*In re Salomon Analyst Metromedia Litig.*,
    544 F.3d 474 (2d Cir. 2008), *abrogated on other grounds by*
    *Amgen v. Conn. Ret. Plans & Trust*, 133 S.Ct. 1184 (2013) .................................... 37

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001) .................................................................. 53

*In re Sept. 11 Prop. Damage & Business Loss Litig.*,
    468 F. Supp. 2d 508 (S.D.N.Y. 2006) ...................................................... 61

*In re Silicon Image, Inc. Sec. Litig.*,
    No. C-050456 MMC, 2006 WL 1709424 (N.D. Cal. June 21, 2006) ..................... 57

*In re Smith Barney Transfer Agent Litig.*,
    290 F.R.D. 42 (S.D.N.Y. 2013) ................................................. 54, 55, 56

*In re Time Warner Inc. Sec. Litig.*,
    9 F.3d 259 (2d Cir. 1993) .................................................... 39, 40, 41

*In re Top Tankers, Inc. Sec. Litig.*,
    528 F. Supp. 2d 408 (S.D.N.Y. 2007) ...................................................... 49

*In re UBS Auction Rate Sec. Litig.*,
    No. 08 Civ. 2967 (LMM), 2010 WL 2541166 (S.D.N.Y. June 10, 2010) ................ 2

*Joseph v. Wiles*,
    223 F.3d 1155(10th Cir. 2000) .............................................................. 54

*King Cnty. v. IKB Deutsche Industriebank AG*,
    863 F. Supp. 2d 288 (S.D.N.Y. 2012) ...................................................... 60

*King v. Simpson*,
    189 F.3d 284 (2d Cir. 1999) .............................................................. 16

*Krebs v. NYS Div. of Parole*,
    No. 9:08-CV-255(NAM/DEP), 2009 WL 2567779, at *6 (N.D.N.Y. Aug. 17, 2009) ........... 16

*Kronfeld v. Trans World Airlines, Inc.*,
    832 F.2d 726 (2d Cir. 1987) .............................................................. 41

*Lapin v. Goldman Sachs Grp., Inc.*,
    506 F. Supp. 2d 221 (S.D.N.Y. 2006) ...................................................... 42

*Lattanzio v. Deloitte & Touche LLP*,
    476 F.3d 147 (2d Cir. 2007) .............................................................. 59

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005) ................................................ 36, 56, 58, 59

viii

*Lucia v. Prospect St. High Income Portfolio, Inc.,*
    36 F.3d 170 (1st Cir. 1994) ................................................................. 43

*Manavazian v. Atec Grp., Inc.,*
    160 F. Supp. 2d 468 (E.D.N.Y. 2001) .................................................. 40

*Mandelblatt v. Devon Stores,*
    521 N.Y.S.2d 672 (App. Div. 1987) ...................................................... 63

*McMahan & Co. v. Wherehouse Entm't, Inc.,*
    900 F.2d 576 (2d Cir. 1990) ............................................................ 42, 44

*Milliken & Co. v. Consol. Edison Co. of N.Y., Inc.,*
    644 N.E.2d 268 (N.Y. 1994) ................................................................. 61

*Milman v. Box Hill Sys. Corp.,*
    72 F. Supp. 2d 220 (S.D.N.Y. 1999) ...................................................... 41

*Nathel v. Siegal,*
    592 F. Supp. 2d 452 (S.D.N.Y. 2008) ........................................ 52, 57, 59

*New York Univ. v. Cont'l Ins. Co.,*
    639 N.Y.S.2d 283 (1995) ....................................................................... 63

*Novak v. Kasaks,*
    216 F.3d 300 (2d Cir. 2000) ........................................................... passim

*Ong v. Sears, Roebuck & Co.,*
    459 F. Supp. 2d 729 (N.D. Ill. 2006) ..................................................... 57

*Opulent Fund L.P. v. NASDAQ Stock Mkt., Inc.,*
    No. C-07-03683 RMW, 2007 WL 3010573 (N.D. Cal. Oct. 12, 2007) ........... passim

*Oran v. Stafford,*
    226 F.3d 275 (3d Cir. 2000) .................................................................. 40

*Overton v. Todman & Co.,*
    478 F.3d 479 (2d Cir. 2007) .................................................................. 39

*People Express Airlines v. Consol. Rail Corp.,*
    495 A.2d 107 (N.J. 1985) ...................................................................... 62

*Phillips v. Reed Grp., Ltd.,*
    No. 07 Civ. 3417 (RO) (DF), 2013 WL 3340293 (S.D.N.Y. July 1, 2013) ........... 60

*Robinson Redevelopment Co. v. Anderson,*
    155 A.D.2d 755 (N.Y. 1989) ................................................................. 63

ix

*Rosenzweig v. Azurix Corp.,*
    332 F.3d 854 (5th Cir. 2003) ............................................................. 51

*Rothman v. Gregor,*
    220 F.3d 81 (2d Cir. 2000) ................................................................ 53

*Sacher v. Beacon Assoc. Mgt. Corp.,*
    910 N.Y.S.2d 765 (Table), 2010 WL 1881951 (Sup. Ct. Apr. 26, 2010) ............... 63

*Schiavone Constr. Co. v. Elgood Mayo Corp.,*
    56 N.Y.2d 667 (1982) ....................................................................... 61

*Scritchfield v. Paolo,*
    274 F. Supp. 2d 163 (D.R.I. 2003) ...................................................... 40

*SEC v. Capital Gains Research Bureau, Inc.,*
    375 U.S. 180 (1963) ........................................................................ 36

*SEC v. Texas Gulf Sulphur Co.,*
    401 F.2d 833 (2d Cir. 1968) .............................................................. 37

*Sec. Investor Prot. Corp. v. BDO Seidman, LLP,*
    222 F.3d 63 (2d Cir. 2000) ................................................................ 61

*Shapiro v. UJB Fin. Corp.,*
    964 F.2d 272 (3d Cir. 1992) .............................................................. 43

*Shema Kolainu-Hear Our Voices v. ProviderSoft, LLC,*
    832 F. Supp. 2d 194 (E.D.N.Y. 2010) ................................................... 61

*Sommer v. Federal Signal Corp.,*
    79 N.Y.2d 540 (N.Y. 1992) ........................................................... 62, 63

*South Cherry Street, LLC v. Hennessee Group LLC,*
    573 F.3d 98 (2d Cir. 2009) .......................................................... 50, 53

*Sparta Surgical Corp. v. Nat'l Ass'n of Secs. Dealers, Inc.,*
    159 F.3d 1209 (9th Cir. 1998) ................................................. 19, 26, 27

*Standard Inv. Chartered, Inc. v. Nat'l Ass'n of Secs. Dealers, Inc.,*
    637 F.3d 112 (2d Cir. 2011) .............................................................. 19

*Stern v. Leucadia Nat'l Corp.,*
    844 F.2d 997 (2d Cir. 1988) .............................................................. 51

*Stewart v. Lattanzi,*
    832 F.2d 12 (2d Cir. 1987) ............................................................... 16

x

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
    552 U.S. 148 (2008) ................................................................................ 54

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
    531 F.3d 190 (2d Cir. 2008) .................................................................... 15

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ............................................................................ 48, 49

*Tolin v. AMBAC Fin. Grp., Inc.*,
    No. 08 Civ. 11241(CM), 2010 WL 431971 (S.D.N.Y. Feb. 5, 2010) ................... 43

*Travelers Cas. & Sur. Co. v. Dormitory Auth.*,
    734 F. Supp. 2d 368 (S.D.N.Y. 2010) .................................................... 60, 61

*TRW Inc. v. Andrews*,
    534 U.S. 19 (2001) .................................................................................... 33

*TSC Indus., Inc. v. Northway, Inc.*,
    426 U.S. 438 (1976) ............................................................................ 37, 42

*Wallace v. IntraLinks*,
    No. 11 CV 8861 (TPG), 2013 WL 1907685 (S.D.N.Y. May 8, 2013) ................... 57

*Weissman v. Nat'l Ass'n of Secs. Dealers, Inc.*,
    500 F.3d 1293 (11th Cir. 2007) ........................................................... passim

*Westpac Banking Corp. v. Deschamps*,
    66 N.Y.2d 16 (1985) .................................................................................. 61

*Wilson v. Comtech Telecomms. Corp.*,
    648 F.2d 88 (2d Cir. 1981) ................................................................... 54, 55

*Wyeth v. Levine*,
    555 U.S. 555 (2009) .................................................................................. 27

## Statutes

15 U.S.C § 78f (b)(1) ...................................................................................... 28

15 U.S.C. § 78c(a)(26) ....................................................................................... 6

15 U.S.C. § 78f ................................................................................................. 6

15 U.S.C. § 78f(b)(6) ...................................................................................... 28

15 U.S.C. § 78f(b)(7) ...................................................................................... 28

15 U.S.C. § 78f(d) ........................................................................................... 28

EC.52935.4

15 U.S.C. § 78j(b) ............................................................................ *passim*

15 U.S.C. §§ 78s(d)-(f). ............................................................................ 28

15 U.S.C. § 78s(g)(1) ............................................................................ 28

15 U.S.C. § 78s(g)(1)(A) ............................................................................ 28

15 U.S.C. § 78u-4 ............................................................................ 15

15 U.S.C. § 78u-4(b)(1) ............................................................................ 56

15 U.S.C. § 78u-4(b)(4) ............................................................................ 56

**Rules**

Fed. R. Civ. P. 12(b)(6) ............................................................................ 15, 16, 59

Fed. R. Civ. P. 8 ............................................................................ 57

Fed. R. Civ. P. 8(a) ............................................................................ 15

Fed. R. Civ. P. 9(b) ............................................................................ 15

Rule 10b-5 ............................................................................ 37, 42, 47

**SEC Regulations and Adjudications**

Concept Release Concerning Self-Regulation,
  69 Fed. Reg. 71,256 (S.E.C. Dec. 8, 2004) ............................................ 22, 35

Nasdaq Stock Market, LLC,
  71 Fed. Reg. 3,550 (Jan. 23, 2006) ............................................ 6, 7, 20, 32

Order Approving a Proposed Rule to Amend the By-Laws of The NASDAQ
  OMX in Connection with the Acquisitions of Boston Stock Exch. &
  Philadelphia Stock Exch., Inc.,
  Rel. No. 58183, 2008 WL 2986566 (S.E.C. July 17, 2008) ................................ 3, 20

Order Approving Proposed Rule Change to Amend the By-Laws NASDAQ OMX,
  Rel. No. 60,183, 2009 WL 1884076 (S.E.C. June 26, 2009) ................................ 20

Order Disapproving NASDAQ LLC's Proposed Rule Change
  Relating to "Benchmark Orders,"
  Rel. No. 68,629, 2013 WL 139471 (S.E.C. Jan. 11, 2013) ................................ 33

Order Granting Accelerated Approval to a Proposed Rule Change Relating to Changes to
  PHLX's Governing Documents,
  Rel. No. 58,179, 2008 WL 2986563 (S.E.C. July 17, 2008) ................................ 20

EC.52935.4

Order Granting Approval of a Proposed Rule Change to
  Amend Rule 4626 – Limitation of Liability,
  78 Fed. Reg. 19,040-01 (Mar. 28, 2013) ............................................................ 2, 14, 28, 33

Order Granting Approval of a Proposed Rule Change
  to Amend the Articles of Organization and By-Laws of
  Boston Stock Exch. Clearing Corp.,
  Rel. No. 59,839, 2008 WL 6113328 (S.E.C. Apr. 28, 2008) ................................................. 20

The NASDAQ Stock Mkt., LLC & NASDAQ Execution Servs., LLC,
  Rel. No. 69,655, 2013 WL 2326683 (May 29, 2013) ...................................................... *passim*

## NASDAQ Administrative Rules

NASDAQ LLC Rule 4120 .......................................................................................................... 31, 32

NASDAQ LLC Rule 4120(a) ..................................................................................................... 31, 45

NASDAQ LLC Rule 4626 .............................................................................................................. 32

## Other Authorities

Daniel M. Gallagher, Comm'r, SEC,
  Market 2012: Time for a Fresh Look at Equity Market Structure and Self-Regulation,
  Speech at the SIFMA's 15th Annual Market Structure Conference (Oct. 4, 2012),
  available at http://www.sec.gov/News/Speech/Detail/Speech/1365171491376 .................... 34

Press Release, SEC, SEC Charges NASDAQ for Failures During Facebook IPO
  (May 29, 2013), available at http://www.sec.gov/News/PressRelease/Detail/PressRelease/
  1365171575032#.UgKUeNLqmSo ........................................................................................ 28

Public Statement, Luis A. Aguilar, The Need for Robust SEC Oversight of SROs
  (May 8, 2013), available at http://www.sec.gov/News/PublicStmt/Detail/PublicStmt/
  1365171515546 ..................................................................................................................... 35

Rohit A. Nafday,
  *From Sense To Nonsense and Back Again: SRO Immunity,*
  *Doctrinal Bait-and-Switch, and a Call For Coherence,*
  77 U. Chi. L. Rev. 847 (2010) ........................................................................................ 16, 17

SIFMA letter to Mary Jo White, Chair, SEC,
  Re: Self-Regulatory Structure of the Securities Markets (July 31, 2013),
  available at http://www.sifma.org/issues/allactivity.aspx ................................................ 34, 35

EC.52935.4

Lead Plaintiffs respectfully submit this Memorandum of Law in Opposition to Defendants'

Motion to Dismiss the Consolidated Amended Class Action Complaint ("CAC").[1]

## PRELIMINARY STATEMENT

The May 18, 2012 Facebook IPO was one of the largest and most highly anticipated initial

public offerings in U.S. history, with millions of investors from around the world seeking to acquire

shares in the $16 billion equity offering (the "IPO" or "Offering").  Defendants[2] viewed the Facebook

IPO as a "must win" listing for NASDAQ's exchange business as it would significantly increase its

trading profits and secure NASDAQ's commercial reputation as the "go to" venue for the largest

technology companies.  However, both prior to and on the day of the IPO, Defendants knew of

significant system limitations, including design deficiencies in the IPO Cross system, that severely

threatened the reliability of NASDAQ's trading platforms required to properly conduct the Offering.

Defendants also knew that "stress tests" conducted prior to the IPO which accounted for only a

fraction of the total trading volume for the Offering were wholly inadequate.  At no time did

Defendants disclose to investors material information necessary to assess the risks of placing orders

on NASDAQ's exchange for the Facebook IPO.  Predictably, on May 18, 2012, NASDAQ's trading

platforms experienced a systemic breakdown causing Class Members hundreds of millions of dollars

in damages.

In its investigation of the facts and circumstances surrounding NASDAQ's system failures in

connection with the Facebook IPO, the Securities and Exchange Commission ("SEC" or

"Commission") assessed a $10 million penalty on NASDAQ LLC, the largest fine ever levied against

---

[1] Capitalized terms not otherwise defined herein shall have the same meanings ascribed to them in the CAC, filed on April 30, 2013.  (ECF No. 95.)  Citations to Defendants' Memorandum in Support of their Motion to Dismiss the CAC will be referred to herein as "MTD Br."

[2] The Defendants are The NASDAQ OMX Group, Inc. ("NASDAQ OMX"), its wholly-owned subsidiary, The NASDAQ Stock Market LLC ("NASDAQ LLC") (collectively, "NASDAQ"), Robert Greifeld ("Greifeld"), NASDAQ OMX's Chief Executive Officer, and Anna M. Ewing ("Ewing"), NASDAQ OMX's highest-ranking technology officer.  (CAC ¶¶ 55-58).  Defendants NASDAQ OMX, Greifeld, and Ewing are collectively referred to as the "Securities Defendants."

1

a national exchange, and made innumerable factual findings directly supportive of the claims pled herein.[3]  The SEC's numerous findings detail, *inter alia*:  (i) the IPO Cross system failures preventing the opening of trading; (ii) NASDAQ's reckless switch to an untested, primitive backup system; (iii) NASDAQ's failure to deliver premarket order confirmations for hours after open trading began, which blinded investors to their positions in Facebook; and (iv) NASDAQ recklessly flooding the market with 13,000 "stuck" orders causing "a 93-cent decrease in Facebook's share price."  (SEC Order at ¶¶ 17-20, 26, 38, 39.)  In further settlement with the SEC, NASDAQ LLC was required to implement significant remedial governance measures necessary to cure serious internal control deficiencies at the exchange.[4]

NASDAQ LLC has also agreed to pay member firms up to $62 million for losses directly caused by the system failures in the Facebook IPO.[5]  In approving payment to NASDAQ LLC member firms, the SEC emphasized that ***it was not deciding whether "regulatory immunity should apply to Nasdaq in connection with its actions related to the Facebook IPO" or "whether Nasdaq or any other person may have violated the federal securities laws or any other laws***.***"***[6] (Accommodation Approval Order at 24-25.)  Moreover, the $62 million Accommodation Proposal covers only a fraction of the total losses suffered by Class Members and does not guarantee that non-NASDAQ LLC member firms (*i.e.*, retail investors) will receive any compensation for their losses.

---

[3] Pending before the Court is Lead Plaintiff's Motion for an Order Partially Lifting the PSLRA Discovery Stay and for Leave to Amend the CAC seeking limited discovery of the documents and materials Defendants provided to the SEC in connection with its investigation.  (ECF No. 117.)  For the reasons set forth in the accompanying memoranda of law in support of this motion, Lead Plaintiffs respectfully request that the Court grant the limited discovery and permit amendment.  (*See* ECF Nos. 118, 136.)

[4] *See* The NASDAQ Stock Mkt., LLC & NASDAQ Execution Servs., LLC, Rel. No. 69,655, 2013 WL 2326683 (May 29, 2013 (the "SEC Order").  A copy of the SEC Order is attached as Exhibit A to the accompanying Affidavit of Vincent R. Cappucci (the "Cappucci Aff.").  The Court may take judicial notice of SEC materials.  *See In re UBS Auction Rate Sec. Litig.*, No. 08 Civ. 2967 (LMM), 2010 WL 2541166, at *12 n.9 (S.D.N.Y. June 10, 2010) (noting that it is proper to take judicial notice of SEC materials, including SEC releases).

[5] *See* Order Granting Approval of a Proposed Rule Change to Amend Rule 4626 – Limitation of Liability, 78 Fed. Reg. 19,040-01 (Mar. 28, 2013) ("Accommodation Approval Order").  A copy of the Accommodation Approval Order is attached as Exhibit C to the Cappucci Aff.

[6] Except where otherwise noted, all emphases are added and internal quotation marks and citations are omitted.

2

The gravamen of Defendants' motion to dismiss rests on the contention that Lead Plaintiffs' claims are barred by the doctrine of self-regulatory organization ("SRO") immunity.  (MTD Br. at 17-34.)  However, Lead Plaintiffs' securities claims under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), are asserted against NASDAQ OMX, a global publicly-traded holding company which the SEC has repeatedly affirmed "*is not itself an SRO*" and "*does not . . . carry out regulatory functions*."[7]  Moreover, the securities claims against Defendants Greifeld and Ewing arise from their failure to disclose material facts in connection with commercial statements made *in their capacities as officers and control persons of NASDAQ OMX* for its own corporate benefit and, therefore, they are not entitled to immunity.  As detailed below, the securities claims arise solely out of the Securities Defendants' alleged misrepresentations in connection with NASDAQ OMX's for-profit commercial activities – not in furtherance of any purported regulatory function.  Accordingly, SRO immunity does not bar the securities claims.  (*See* Section II.B, *infra*.)

Defendants further contend that the CAC fails to allege the requisite elements of Plaintiffs' securities fraud claim.  (MTD Br. at 43-61.)  Lead Plaintiffs, however, adequately set forth sufficient facts supporting each element of their Section 10(b) claim.

First, the CAC adequately alleges that the Securities Defendants made numerous material statements prior to the IPO assuring investors that NASDAQ provided a transparent, open, and orderly market and that its technology and trading platforms were the fastest, most reliable exchange systems in the world.  (CAC ¶¶ 168-89.)  These statements were grossly misleading as proven in the pre-IPO testing period, when Defendants knew of unresolved system issues that thwarted NASDAQ's ability to properly execute the largest IPO in its history.  (CAC ¶¶ 1, 5, 24, 119-25, 223-

---

[7] *See, e.g.*, Order Approving a Proposed Rule to Amend the By-Laws of The NASDAQ OMX in Connection with the Acquisitions of Boston Stock Exch. & Philadelphia Stock Exch., Inc., Rel. No. 58,183, 2008 WL 2986566, at *2 (S.E.C. July 17, 2008) ("NASDAQ OMX By-Law Amendment Order") ("*NASDAQ OMX does not itself carry out regulatory functions for [NASDAQ LLC]*.").  A copy of the NASDAQ OMX By-Law Amendment Order is attached as Exhibit B to the Cappucci Aff.

3

33.)  The Securities Defendants failed to correct and/or update these factual representations no later than the morning of May 18, and instead concealed this adverse information to the detriment of Class Members.  (*See* Section III.A.2, *infra*.)  To make matters worse, on the day of the failed IPO, NASDAQ OMX disseminated materially incomplete and vague "Market System Status" messages to market participants that omitted material facts concerning NASDAQ's wholesale system failures and Defendants' reckless conduct that further damaged Class Members.  (CAC ¶¶ 195-218; *see* Section III.A.3, *infra*.)

Second, the allegations set forth in the CAC give rise to a strong inference of scienter.  The CAC details how NASDAQ undertook a series of tests on its systems prior to the Offering that revealed unresolved system issues that would prevent it from reliably executing the IPO – material information that the Securities Defendants failed to disclose to Class Members.  Moreover, on the day of the IPO, NASDAQ OMX failed to disclose material information concerning, *inter alia*, NASDAQ's IPO Cross system failures and Defendants' recklessness in putting their own commercial interests ahead of the integrity of the market and moving forward with the IPO.  (CAC ¶¶ 23-24, 121-24, 195-233.)  In addition, the CAC pleads facts demonstrating that the Securities Defendants failed to provide adequate tests to ensure NASDAQ's systems were capable of executing the enormous trading volume for the Facebook IPO.[8]  (CAC ¶¶ 120-22, 225-28; *see* Section III.B, *infra*.)

Third, although Defendants make the assertion that the CAC "rests primarily on affirmative representations," a true reading of the CAC shows that Lead Plaintiffs' allegations are based upon the Securities Defendants' material omissions entitling Plaintiffs to a classwide presumption of reliance under the *Affiliated Ute* doctrine.  The CAC's allegations demonstrate that the Securities Defendants had a duty:  (i) to correct and/or update previous material statements that were misleading due to

---

[8] NASDAQ's lack of internal controls to properly verify the capabilities of its systems is further evidenced by the significant remedial measures undertaken by NASDAQ pursuant to the SEC Order.  *See* SEC Order at ¶¶ 65-74.

NASDAQ's unresolved system problems with its trading platforms in the days leading up to, and on the morning of, the Facebook IPO (CAC ¶¶ 168-94); and (ii) to disclose material information necessary to make their statements not misleading in connection with NASDAQ OMX's "Market System Status" messages.  (CAC ¶¶ 190-235; *see* Section III.C, *infra.*)

Finally, Lead Plaintiffs have adequately pled loss causation.  The CAC details how the Securities Defendants concealed the risk that NASDAQ's technology and trading platforms would fail in connection with the IPO, and how such risk materialized on the day of the Offering subjecting Class Members to significant losses.  The CAC also demonstrates how the Securities Defendants' material omissions caused Class Members further damages by concealing the true nature and extent of NASDAQ's trading platforms failures.  (*See* CAC ¶¶ 195-218.)  As a result of the Securities Defendants' wrongdoing, the price of Facebook stock plummeted from a high of $45.00 per share in the first 15 minutes of open-market trading to a low of $38.00, finally closing at $38.23 per share. (CAC ¶ 30; *see* Section III.D, *infra.*)

Lead Plaintiffs also adequately allege state-law negligence claims. SRO immunity does not bar the negligence claims as they arise out of NASDAQ's for-profit, commercial conduct, including the design, testing and implementation of NASDAQ's IPO Cross systems.  Each of the three Negligence Subclasses suffered a distinct type of loss proximately caused by the system failures:  (i) "stuck" sell orders that received inferior prices later in the day (CAC ¶ 146); (ii) delayed confirmation of buy orders that prevented mitigation of losses as the market declined (CAC ¶¶ 151-52); and (iii) orders that received inferior prices caused by the dissemination of inaccurate price quotes (CAC ¶¶ 160-67).  These failures were in connection with NASDAQ's market facilitating activities and related commercial efforts to maximize premarket orders for the Offering, not protected SRO regulatory conduct.  (*See* Section II.C, *infra.*)

Defendants' substantive challenge to the negligence claims based upon the "economic loss" doctrine is equally unpersuasive.  (MTD Br. at 34-43.)  New York's "economic loss" doctrine applies *only* in products liability actions.  Moreover, the CAC establishes that NASDAQ has a special relationship with retail investors, imposing a duty to exercise reasonable care to protect them against economic losses resulting from system failures in the processing and execution of trade orders.  (CAC ¶¶ 63-93, 134-67, 249-88.)  The CAC demonstrates that NASDAQ's "negligently designed, developed, tested, and implemented" IPO Cross system caused losses on Class Members' premarket orders when the systems failed to properly and promptly execute and confirm those orders.  (*See* CAC ¶¶ 249-88; *see* Section IV, *infra*.)

For these reasons, and for the reasons set forth below, Lead Plaintiffs respectfully submit that the Court should deny Defendants' Motion in its entirety.

## BACKGROUND

**A.** **NASDAQ OMX, A For-Profit, Publicly-Traded Holding Company, Engages In Commercial, Non-Regulatory Activity In An Effort To Obtain The Facebook Listing**

NASDAQ OMX is a global publicly-traded company whose wholly-owned subsidiaries operate securities exchanges around the world.  (CAC ¶¶ 63-65.)  One of those subsidiaries is NASDAQ LLC which operates the NASDAQ Stock Market in the U.S.  (CAC ¶ 65.)  NASDAQ LLC is registered as a national securities exchange under Section 6 of the Exchange Act and, therefore, is considered an SRO.  *See* 15 U.S.C. §§ 78f & 78c(a)(26).

NASDAQ OMX, however, is not an SRO.  *See, e.g.*, Nasdaq Stock Market, LLC, 71 Fed. Reg. 3,550, 3,551 (Jan. 23, 2006) (Findings, Opinion, and Order regarding exchange registration) ("Exchange Registration Approval Order")[9] (explicitly noting that NASDAQ OMX "***will not itself carry out regulatory functions***").  Indeed, since the SEC approved NASDAQ LLC's registration as a

---

[9] A copy of the Exchange Registration Approval Order is attached as Exhibit D to the Cappucci Aff.

national securities exchange, the Commission has repeatedly affirmed that "***NASDAQ OMX is not itself an SRO***." At all relevant times, Defendants Greifeld and Ewing were officers of NASDAQ OMX, not NASDAQ LLC.[10]

As detailed in the CAC, NASDAQ OMX routinely competes for new listings and overall market share of trading in order to increase revenue and profits. (CAC ¶¶ 63-93.) Specifically, NASDAQ OMX competes against NYSE Euronext ("NYSE"), other exchanges and broker-dealers to secure new listings of securities and to increase its overall market share in trading activity.[11] (*Id.* at ¶¶ 66-69.) It was in this competitive commercial environment that Defendants undertook an aggressive campaign and engaged in a fierce competition with NASDAQ's rival, the NYSE, for the Facebook IPO. (*Id.* at ¶¶ 104-10.)

Defendants viewed the Facebook IPO as a "must win" listing for NASDAQ's exchange business. (CAC ¶¶ 104-10.) The Facebook IPO was crucial to Defendants as: (i) the Offering was expected to be (and indeed became) the largest IPO in NASDAQ's history; and (ii) capturing Facebook would cement NASDAQ's commercial reputation as the "go to" venue for the biggest U.S. technology companies. (*Id.* at ¶ 112.) As part of their aggressive campaign, Defendants drastically shortened, from two years to three months, the "seasoning" period required for inclusion in the coveted NASDAQ-100 Index. (*Id.* at ¶¶ 113-18.) Multiple news reports observed that "[i]nclusion in the Nasdaq-100 Index may have spurred Facebook toward Nasdaq," because it "could create $2

---

[10] In 2006, the predecessor of NASDAQ OMX, The Nasdaq Stock Market, Inc. ("Nasdaq"), adopted NASDAQ OMX's current holding structure by completing a public offering of its securities and reorganizing its itself such that NASDAQ LLC became a wholly owned subsidiary. *See* 2011 Form 10-K at 2; Exchange Registration Approval Order at 7-8. That same year, the SEC approved NASDAQ LLC's registration as a national securities exchange and in 2007, Nasdaq acquired OMX AB (publ) and changed its named to The NASDAQ OMX Group, Inc. *Id.* Currently, only NASDAQ OMX's subsidiaries possess exchange licenses, and all exchange operations and broker-dealer business are conducted by these subsidiaries. *Id.*

[11] NASDAQ will, in fact, be losing its position as one of the leading securities exchange operators in the U.S. by reason of the merger between BATS Global Markets Inc. and Direct Edge Holding LLC, announced on August 26, 2013, as this merger will make the combined company the second-largest exchange operator in the U.S. The pending merger demonstrates that the business environment for national exchanges has significantly changed since the SEC approved the registration of NASDAQ LLC as a national securities exchange in 2006.

7

billion to $3 billion of systematic demand for the stock . . . no matter how expensive or cheap the stock is." (*Id.* at ¶ 114; *see also* ¶¶ 109-12.)

After "winning" the significant Offering, Defendants sought to capitalize on worldwide investor demand by expanding the premarket window for investors to place orders for an IPO from 15 minutes to 4 hours. (CAC ¶¶ 119-125.) This change to NASDAQ's IPO procedures made commercial sense as the "higher the number of orders (and cancellations or changes to those orders), the more income is generated for Nasdaq." (*Id.* at ¶ 119.) While NASDAQ was able to significantly increase the volume of orders for Facebook's IPO by making this change, it ultimately led to significant disruptions in the Offering as NASDAQ's systems proved incapable of processing the drastically increased volume. (*Id.* at ¶¶ 119-125.)

B.     **The Securities Defendants Make Numerous Material Statements Concerning NASDAQ's Technology And Trading Platforms Prior To The Facebook IPO**

The Securities Defendants chose to make numerous material statements prior to the Offering touting the purported capability and reliability of NASDAQ's technology and trading platforms (CAC ¶¶ 168-89), including, among other statements:

- NASDAQ is "always committed to working with regulators, exchanges and market participants to ensure transparent trading and a fair and orderly market *for the benefit of investors.*" (CAC ¶ 172 (citing 2011 Form 10-K));

- "[NASDAQ] provides technology to customers with the speed, scale and reliability required *to meet the specific needs of their markets*" (*Id.* at ¶ 169 (citing 2011 Form 10-K));

- "[O]ur platforms are highly scalable with current capacity at ten times the average daily volume allowing significantly higher transaction volume to be handled at low incremental cost." (*Id.*)

- "Our platform continues to stand out as a reliable, flexible, and high capacity system *delivering high levels of execution quality and speed under even extremely demanding market conditions*." (*Id.* at ¶ 173 (citing 2011 Form 10-K));

- NASDAQ's "continued investment in technology to meet customers' demands for speed, capacity, and reliability as markets adapt to a global financial industry, as increasing numbers of new companies are created, and as emerging countries show ongoing interest in developing their financial markets." (*Id.* at ¶ 180 (citing First Quarter 2012 Form 10-Q));

8

- "No trading platform on the planet *is faster or more scalable*." (*Id.* at ¶ 186 (citing May 11, 2012 Investor Day Conference));

- "Our technology can help trade and clear any and every financial instrument on the planet." (*Id.*);

- "We have unique capabilities unmatched by any exchange in the world." (*Id.*);

- "[NASDAQ] delivers innovative products and services *that provide transparency to institutional, retail and individual investors*" (*Id.*);

- "[W]e're well known for our technology, *no trading platform in the world can operate faster or at the scale that we operate*. . . . [O]ur technology can trade and clear really any instrument on the planet." (*Id.* at ¶ 188 (citing May 11, 2012 Investor Day Conference)); and

- "We process billions of transactions in a day at sub-microsecond speeds to millions of customers.  And as much as that's table stakes, that's hard work just to make sure you have that reliability and capability." (*Id.*)

These statements assured investors, including Class Members, that NASDAQ provided a transparent, open, and orderly market and that its technology and trading platforms were the fastest, most reliable exchange systems in the world, capable of executing enormous trading volumes in any security.  These statements were grossly misleading as proven in the pre-IPO test period, when Defendants learned of the existing system limitations thwarting the reliability of NASDAQ's trading platforms.  (*Id.* at ¶¶ 1, 5, 24, 119-25, 223-33.)  Despite knowing of numerous system issues afflicting these platforms, the Securities Defendants concealed this material information prior to and on the day of the IPO.

### C.     Unbeknownst To Class Members, In The Pre-IPO Period, Defendants Undertake A Series Of Tests Which Reveal System Issues That Would Paralyze The Facebook IPO

Prior to the Facebook IPO, Defendants undertook a series of tests on NASDAQ's systems. (CAC ¶¶ 119-125, 225-27, 230-33.)  Defendants' testing revealed serious system limitations, including design deficiencies in the IPO Cross system, that threatened the reliability of NASDAQ's

EC.52935.4

trading platforms to properly execute the Offering.[12]  (CAC ¶¶ 119-125, 225-27, 230-33, 309.)

Additionally, Defendants conducted "stress tests" on NASDAQ's systems – however, these tests

accounted for only a fraction of the anticipated total trading volume for the IPO.  Specifically,

NASDAQ's testing simulated trading volumes of 6 to 53 million shares and simulated 40,000 pre-

market orders.  (CAC ¶¶ 120-22, 225-28; SEC Order at ¶ 12.)  In the Facebook IPO, more than 80

million shares traded in the *first 30 seconds* of trading with total trading volume of 567 million shares

(CAC ¶¶ 120-22, 225-28), and "over 496,000 orders [were entered] into the Cross."  (SEC Order at ¶

12.)  Accordingly, Defendants failed to verify whether NASDAQ's systems could, in fact, reliably

execute the largest IPO in its history, instead opting to "roll the dice" and proceed with the Offering.

(*Id.* at ¶¶ 124, 223-25.)

### D.     NASDAQ Experiences Catastrophic System Failures And NASDAQ OMX Fails To Disclose Material Facts Concerning These Failures And Related Reckless Conduct

NASDAQ's systems completely broke down on the day of the IPO, causing substantial

damages to Class Members.  (CAC ¶¶ 139-67.)  To make matters worse, Defendants concealed the

nature and magnitude of NASDAQ's system failures by issuing incomplete and vague "Market

System Status" messages, which further damaged the Class.  (CAC ¶¶ 190-218.)

### 1.     IPO Cross System Failures and NASDAQ OMX's Material Omissions Prior to 11:30 a.m.

On May 18, 2012, NASDAQ began accepting premarket orders for Facebook stock at 7:00

a.m.  (CAC ¶ 136.)  Although secondary market trading was set to begin at 11:05 a.m., NASDAQ's

IPO Cross system failed to execute all premarket orders and open trading because a large number of

order cancellations caused the system's "validation check" to enter a "loop," preventing the

---

[12] This deficiency was later acknowledged by Defendant Greifeld, who admitted that NASDAQ "*had a poor design for the Facebook opening cross IPO.*"  As such, NASDAQ "*was unprepared for increasing numbers of canceled orders in the hours leading up to Facebook's debut,*" and its inadequate testing before Facebook's IPO "*didn't account for the increasing volume at which cancellations can come in.*"  (CAC at ¶¶ 9, 232.)

10

calculation of a final opening price.  (CAC ¶¶ 141-43; MTD Br. at 9; SEC Order at ¶¶ 10, 15-20.)

Immediately thereafter, certain executives of NASDAQ OMX, including Defendant Greifeld, held a

"Code Blue" conference call.  (SEC Order at ¶¶ 23-25.)  The participants on this call made the high

risk, *ad hoc* business decision to resort to an untested backup system and inferior failover procedures

to complete the Cross.  (CAC ¶¶ 198, 200; MTD Br. at 10; SEC Order at ¶¶ 23-25.)  These

participants also knew that switching to this untested backup system would cause, *inter alia*,

NASDAQ to fail to process a number of cancellations and to assume an unauthorized "error" position

in Facebook.  (SEC Order at ¶¶ 23-25.)

Despite the problems known to NASDAQ OMX and its executives, including Defendant

Greifeld, concerning the IPO Cross system failures and the reckless conduct undertaken by these

executives, NASDAQ OMX disseminated two messages to market participants that vaguely stated

that there was a "delay in delivering the opening print" for Facebook and that the "first print in

Facebook [would] open at approximately 11:30 ET."  (CAC ¶¶ 196-201.)  Among other things, these

messages omitted material facts concerning:  (i) the IPO Cross system failures; (ii) the decision to

switch to an untested backup system; and (iii) the then-known problems associated with switching to

the backup system.  (*Id.*)

### 2. Continuing System Problems and NASDAQ OMX's Material Omissions After 11:30 a.m.

Defendants' reckless switch to an untested backup system led to additional system failures.

Immediately after secondary market trading began, NASDAQ's Chief Economist noticed a

discrepancy between the final indicative volume total (82 million) and the actual volume in the print

(75.7 million).  (SEC Order at ¶ 27.)  This discrepancy indicated that certain Cross-eligible orders

were not handled properly; however, "***NASDAQ did not address this issue during the minutes and***

***hours following the cross***."  *Id.*  In fact, the backup system had failed to account for orders placed

between 11:11 a.m. and 11:30 a.m.  (CAC ¶¶ 7, 146.)  Although Defendants could have run a "real-

11

time status check" of NASDAQ's systems that would have revealed the problem, they failed to do so. (SEC Order at ¶ 27.)

The switch to the untested backup system also caused all premarket orders to be marked in error, preventing the dissemination of electronic transaction confirmations until 1:50 p.m.  (CAC ¶¶ 7, 37, 145, 151-59; SEC Order at ¶ 30.)  As a result, during the same time, NASDAQ's proprietary feed ("Prop Feed") and the Securities Information Processor quotations data feed ("SIP Quotation Data Feed") displayed erroneous, inaccurate quoting data.[13]  (SEC Order at ¶ 31.)

Far from disclosing the details of the known problems after Defendants forced the Cross to complete at 11:30 a.m., NASDAQ OMX again disseminated two messages to market participants, stating only that NASDAQ was "investigating an issue in delivering trade execution messages" for the Facebook IPO Cross and that it was "working to deliver" such confirmations.  (CAC ¶¶ 202-06.) These statements omitted material information concerning:  (i) the factual details concerning the delayed confirmations; (ii) the inaccurate price data feeds; and (iii) the failure to execute certain eligible, pre-market orders.

### 3.  Additional System Problems at 1:50 p.m. and NASDAQ OMX's Related Material Omissions

NASDAQ finally delivered premarket order confirmations at 1:50 p.m.  (CAC ¶ 207; SEC Order at ¶ 36.)  At this time, NASDAQ also learned that the system failures caused more than 30,000 Cross-eligible orders entered between 11:11 and 11:30:09 a.m. to remain "stuck" and unexecuted. (CAC ¶ 209; SEC Order at ¶ 38.)  Approximately 13,000 "stuck" orders were released into the secondary market at 1:49:49 p.m., causing "***a 93-cent decrease in Facebook's share price between 1:50 p.m. and 1:51 p.m.***"  *Id.*

---

[13] At approximately 11:35 a.m., "the participants on the Code Blue call discussed whether to halt trading in Facebook." (SEC Order at ¶ 32; MTD Br. at 12-13.)  While NASDAQ LLC's Rule 4120(a) provides the exchange with the authority to halt trading under certain circumstances, including when NASDAQ LLC determines that there is "extraordinary market activity" which is likely to have a "material effect on the market for the security," the participants on the Code Blue call found that no such condition existed and did not halt trading.  (SEC Order at ¶ 32.)

12

Instead of disclosing this material information, NASDAQ OMX disseminated two messages to market participants stating only that NASDAQ expected "to deliver all executions from the [Facebook IPO Cross]" at 1:50 p.m. and, later, that such confirmations had "been electronically disseminated." (CAC ¶¶ 207-08.) These vague and incomplete statements once again concealed material information from investors, including Class Members.

> ### E.      The SEC Conducts A Year-Long Investigation Into The Facebook IPO And Imposes Record-Setting Penalties And Substantial Remedial Measures

Shortly after Defendants caused the overwhelming market disruptions in the Facebook IPO, the SEC commenced an investigation into the facts and circumstances surrounding NASDAQ's system failures and reckless conduct which caused substantial losses to investors on the day of the IPO. This investigation resulted in the SEC: (i) ordering NASDAQ LLC to cease and desist from further violations of the Exchange Act and its own rules; (ii) censuring NASDAQ LLC; (iii) requiring NASDAQ LLC to comply with numerous remedial undertakings; and (iv) sanctioning NASDAQ LLC with a civil monetary penalty of $10 million – the largest penalty ever imposed on a securities exchange in U.S. history. (SEC Order at ¶¶ 19-20.)

As detailed in Section III, *infra*, the SEC made numerous factual findings that provide substantial factual support for Lead Plaintiffs' claims that Defendants failed to disclose material information, and acted recklessly, in connection with the Facebook IPO. Among other critical findings, the SEC Order details: (i) the IPO Cross system failures preventing the commencement of open trading; (ii) NASDAQ's switch to an untested, primitive backup system that recklessly "failed to include 19 minutes of orders in its price/volume calculation," resulting in over 30,000 premarket orders being either cancelled or executing hours later at inferior prices; (iii) NASDAQ's failure to deliver premarket order confirmations for hours, keeping investors from determining "whether their orders had been included in the cross . . . [and] what position they held in Facebook securities;" and

(iv) NASDAQ's reckless flooding of the market with 13,000 "stuck" orders at approximately 1:50 p.m. that caused "a 93-cent decrease in Facebook's share price."  (SEC Order ¶¶ 17-20, 26, 38, 39.)

The SEC also ordered NASDAQ LLC to undertake a variety of remedial measures to implement new internal controls, including:  (i) "enhance its technology change process"; (ii) "deploy new standardized global change management software"; (iii) "dedicate a system and performance engineering team to daily monitoring and analysis of system performance, and [to] establish a new quality assurance organization. . . ."; and (iv) "make technical changes . . . designed to prevent a recurrence of the persistent recalculation problem that affected the Facebook IPO."  (SEC Order at ¶¶ 65-74.)

### F.   NASDAQ LLC Agrees To Pay Its Member Firms Up To $62 Million For Losses Caused By The System Failures

On March 23, 2013, the SEC approved NASDAQ LLC's Accommodation Proposal to allow it to pay up to $62 million to its members for losses caused by the system failures in connection with the Facebook IPO.  (CAC ¶¶ 299-306.)  Critically, in approving the Accommodation Proposal, the SEC emphasized that *it was not deciding whether "regulatory immunity should apply to Nasdaq in connection with its actions related to the Facebook IPO" or "whether Nasdaq or any other person may have violated the federal securities laws or any other laws"* in connection with the Facebook IPO.  (Accommodation Approval Order at 24-25.)

As detailed in the CAC, the Accommodation Proposal: (i) does not guarantee that non-NASDAQ LLC members (*i.e.*, retail investors) will receive any compensation for losses suffered in the Offering; (ii) covers only a small fraction of the actual losses that were caused by the system failures; and (iii) fails to account for any of the alleged wrongdoing committed by the Securities Defendants.  (CAC ¶¶ 10-11, 299-313.)

14

## ARGUMENT

### I.  STANDARD OF REVIEW

Under Fed. R. Civ. P. 12(b)(6), a complaint that provides factual allegations sufficient "to raise a right to relief above the speculative level" should not be dismissed.  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 & n.2 (2d Cir. 2007).  Once a claim has been adequately stated, it may be supported by showing any set of facts consistent with the allegations in the complaint.  *Id.* at 98.  On a motion to dismiss, the Court should accept as true all of the allegations in the CAC and draw all reasonable inferences in Plaintiffs' favor.  *See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 194 (2d Cir. 2008).  Moreover, the Court may consider "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI*, 493 F.3d at 98.

A Section 10(b) claim must also satisfy the heightened pleading standards of Rule 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4.  The heightened pleading standard under the PSLRA applies only to the element of scienter; all other elements of a Section 10(b) claim are governed by traditional pleading standards under Federal Rules of Civil Procedure 8(a) or 9(b).  *See Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 179 (S.D.N.Y. 2010).  Rule 9(b) requires that a complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statement were made, and (4) explain why the statements were fraudulent." *Id.*  A plaintiff is not, however, required to plead evidence. *Id.*

## II. DEFENDANTS ARE NOT ENTITLED TO SRO IMMUNITY

The "rare and exceptional" doctrine of SRO immunity exempts SROs from suit solely for **delegated** governmental functions. *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 96 (2d Cir. 2007). Due to the extraordinary protection it affords, the Supreme Court has been "quite sparing" in conferring absolute immunity. *Forrester v. White*, 484 U.S. 219, 224 (1988).[14] In determining whether a governmental or quasi-governmental entity is entitled to immunity, courts utilize a "functional" approach, focusing on "the nature of the function performed, not the identity of the actor who performed it." *Weissman v. Nat'l Ass'n of Secs. Dealers, Inc.*, 500 F.3d 1293, 1314 (11th Cir. 2007); *see also D'Alessio v. N.Y. Stock Exch., Inc.*, 258 F.3d 93, 105 (2d Cir. 2001) (exchange immune when "performing functions delegated to it"). Courts apply this functional test on a case-by-case basis, *DL Capital Group, LLC v. NASDAQ Stock Market, Inc.*, 409 F.3d 93, 97 (2d Cir. 2005), and the party asserting the immunity defense bears the burden of demonstrating it applies. *D'Alessio*, 258 F.3d at 104. The issue of immunity is rarely appropriate for a Rule 12(b)(6) motion and requires development of a factual record. *See King v. Simpson*, 189 F.3d 284, 288 (2d Cir. 1999).[15]

No court has ever held an SRO immune from suit: (i) for profit-making business activities; (ii) where it was regulating itself (as opposed to a third party); or (iii) because it was required to comply with governmental regulations. *Cf. Weissman*, 500 F.3d at 1298-99 (no immunity for claims arising from marketing and advertising); *Opulent Fund L.P. v. NASDAQ Stock Mkt., Inc.*, No. C-07-03683 RMW, 2007 WL 3010573, at *5 (N.D. Cal. Oct. 12, 2007) (no immunity for mispricing

---

[14] *See also* Rohit A. Nafday, *From Sense To Nonsense and Back Again: SRO Immunity, Doctrinal Bait-and-Switch, and a Call For Coherence*, 77 U. Chi. L. Rev. 847, 855 (2010) ("Nafday"). Because absolute immunity "frees the recipient of its protection from civil liability unconditionally," it is "fraught with potential for abuse." *Id.*

[15] *See also Stewart v. Lattanzi*, 832 F.2d 12, 13 (2d Cir. 1987) ("Some factual inquiry must be made to determine whether the duties of the defendants were judicial or prosecutorial in nature entitling them . . . to absolute immunity."); *Flagler v. Trainor*, 663 F.3d 543, 550 (2d Cir. 2011) ("[W]ithout fuller development of the issue by thoughtful briefing and factual development in the district court, we are unwilling to draw a line as to how long absolute immunity shields a prosecutor for withholding/preserving evidence."); *Krebs v. NYS Div. of Parole*, 9:08-CV-255(NAM/DEP), 2009 WL 2567779, at *6 (N.D.N.Y. Aug. 17, 2009) ("In deciding whether absolute immunity should apply, there must be a factual inquiry to determine the particular acts or responsibilities that each official performed.")

16

index).  Indeed, "every case that has found an SRO absolutely immune from suit has done so for activities involving an SRO's performance of regulatory, adjudicatory, or prosecutorial duties in the stead of the SEC."  *Weissman,* 500 F.3d at 1298 (collecting cases); *see Opulent Fund*, 2007 WL 3010573, at *5.

A.     **The SRO Immunity Doctrine Applies Only To Quasi-Judicial Functions**

Immunity rests on a policy of protecting the independence of judicial decision makers from the risk of recriminatory lawsuits.  The Supreme Court first applied immunity to judges in *Bradley v. Fisher*, 80 U.S. 335, 357 (1871).  "The justification for granting such protection to judges tracked that expressed by the English judges of centuries past," *i.e.* that "guaranteeing judges freedom from recriminatory lawsuits was the only means of ensuring" independence.  Nafday at 856; *see also Butz v. Economou*, 438 U.S. 478 (1978) (extending immunity to quasi-judicial administrative proceedings).  More recently, the Fifth Circuit first granted immunity to an SRO disciplinary proceeding.  *See Austin Mun. Sec. v. Nat'l Ass'n of Sec. Dealers, Inc*, 757 F.2d 676, 689 (5th Cir. 1985).  The court adopted the three-pronged, "functional" test set forth in *Butz*:  (i) the function in question must "share the characteristics of the judicial process;" (ii) the official's activities must be "likely to result in recriminatory lawsuits by disappointed parties;" and (iii) there must be "sufficient safeguards . . . in the regulatory framework to control unconstitutional conduct."  *Austin,* at 688 (citing *Butz*, 438 U.S. at 510-13).[16]

Similarly, in *D'Alessio*, the Second Circuit granted immunity because the claims involved the function of regulatory oversight of floor brokers, noting "[t]he NYSE, as a SRO, stands in the shoes of the SEC in interpreting the securities laws for its members and in monitoring compliance with

---

[16] In 1996, the Second Circuit followed suit, holding that "the [NYSE] is absolutely immune from damages claims arising out of the performance of its federally-mandated conduct of disciplinary proceedings." *Barbara v. NY Stock Exch., Inc.*, 99 F.3d 49, 51-52, 58 (2d Cir. 1996) (citations omitted) (noting Exchange Act imposes on exchanges "a duty to promulgate and enforce rules governing the conduct of its members").  The *Barbara* and *Austin* decisions are grounded on the policy of preserving the independence of judicial or quasi-judicial decision-making.

17

those laws." 258 F.3d at 105.  The conduct fell within the NYSE's "quasi-public adjudicatory" duties, involved "quasi-prosecutorial" functions, and was analogous to the exercise of delegated adjudicatory and prosecutorial functions in *Barbara*.  *D'Alessio,* at 106 (quoting *Barbara*, 99 F.3d at 59).

More recently, in *DL Capital*, NASDAQ LLC cancelled certain purchases of a stock because of "extraordinary market activity" involving a precipitous price drop caused by multiple, erroneous sell orders.  409 F.3d at 96.  The cancellations were pursuant to an express rule that delegated authority to cancel trades "where such a transaction is 'clearly erroneous' or cancellation is 'necessary for the maintenance of a fair and orderly market or [for] the protection of investors and the public interest.'"  *Id.* at 95 (alteration in original).  The oversight function in *DL Capital* is analogous to the adjudicatory roles of prior decisions:  monitoring and enforcing trading rules with respect to improper trading activity by a third party.

*NYSE Specialists* also involved enforcing compliance by third-parties operating on the floor of an exchange. 503 F.3d at 89.  The key element was the ***existence*** of a regulatory power falling "within the ambit of the quasi-governmental functions the SEC has delegated."  *Id.* at 99.  Thus, the Court held only that "[i]f an SRO's exercise of a governmental power delegated to it deserves absolute immunity, the SRO's nonexercise of that power also entitles it to immunity."  *Id*. at 97.

In sum, courts granting SRO immunity have done so in the context of quasi-judicial, regulatory oversight of third parties.  In contrast, courts considering conduct that was part of the for-profit business operations of NASDAQ have denied the defense of immunity.  *See Weissman*, 500 F.3d at 1297; *Opulent Fund,* 2007 WL 3010573, at *1.

EC.52935.4

**B.      Defendants NASDAQ OMX, Greifeld, And Ewing Are Not Afforded SRO Immunity In Connection With The Allegations Giving Rise To Lead Plaintiffs' Federal Securities Claims**

### 1.      NASDAQ OMX Is Not an SRO Entitled To SRO Immunity

Defendants' contention that SRO immunity applies to Defendants NASDAQ OMX, Greifeld and Ewing (*i.e.*, the Securities Defendants) for their alleged wrongdoing giving rise to the securities claims is unavailing.  (MTD Br. at 31-34.)  Defendant NASDAQ OMX *is not* an SRO and is not entitled to immunity for the securities claims (or, for the same reason, the negligence claims).  Moreover, the securities claims against Defendants Greifeld and Ewing arise from their failure to disclose material facts in connection with commercial statements to market participants in their capacities as *officers and control persons of NASDAQ OMX* and, therefore, they are not entitled to SRO immunity.  (CAC ¶¶ 168-89.)  The SRO immunity decisions cited by Defendants (MTD Br. at 20, 31) all involve either registered SROs under the Exchange Act or an entity explicitly delegated regulatory duties by an SRO in a rule approved by the SEC.[17]

Far from having quasi-governmental SRO status, Defendant NASDAQ OMX is a for-profit, publicly-traded holding company with numerous domestic and international subsidiaries, including NASDAQ LLC.  Indeed, in approving the registration of NASDAQ LLC as a national securities exchange, the SEC explicitly noted that NASDAQ OMX "*will not itself carry out regulatory functions*" and that its corporate documents "include certain provisions that are designed to maintain

---

[17] *See, e.g.*, *Standard Inv. Chartered, Inc. v. Nat'l Ass'n of Secs. Dealers, Inc.*, 637 F.3d 112, 114 (2d Cir. 2011) (defendants were "SROs registered with the [SEC] . . . as national securities associations pursuant to the . . . Exchange Act"); *DL Capital*, 409 F.3d at 99 n.4 (defendant was delegated regulatory authority by a registered SRO and "the SEC . . . explicitly blessed" such delegation of authority); *D'Alessio*, 258 F.3d at 96 (defendant was a "nonprofit . . . corporation registered with the [SEC] as a national securities exchange pursuant to section 6 of the [Exchange Act]") (alterations in original); *Sparta Surgical Corp. v. Nat'l Ass'n of Secs. Dealers, Inc.*, 159 F.3d 1209, 1210 (9th Cir. 1998) (defendant was "a non-profit, self-regulatory organization registered pursuant to the . . . Securities Exchange Act of 1934"); *Barbara*, 99 F.3d at 51 (defendant was "a nonprofit New York corporation registered with the . . .SEC . . . as a national securities exchange pursuant to section 6" of the Exchange Act, and as such was "a 'self-regulatory organization.'"); *In re NYSE Specialist Sec. Litig.*, 405 F. Supp. 2d 281, 302 (S.D.N.Y. 2005) (defendant was "registered with the SEC as a national securities exchange pursuant to Section 6 of the Exchange Act . . .  As such, it is a self-regulatory organization"), *aff'd in part, vacated in part on other grounds*, 503 F.3d 89 (2d Cir. 2007).

the independence of [NASDAQ LLC's] self-regulatory function from [NASDAQ OMX]."[18] (Exchange Registration Approval Order at *9.)  The Commission has consistently reaffirmed that NASDAQ OMX is not an SRO.[19]

Defendants rely on *DL Capital* for the proposition that statements made "incident to an SRO's discharge of its regulatory functions" are afforded SRO immunity.  (MTD Br. at 31 (citing 409 F.3d at 98).)  Defendants' reliance is misplaced.  First, commercial statements by the Securities Defendants touting NASDAQ's technology and trading platforms (and Defendants' subsequent failure to update such statements) do not relate to any purported regulatory function of NASDAQ LLC.  Indeed, Defendants concede this point when they limit their reliance on *DL Capital* to "the statements made by NASDAQ *on the day of the IPO*."  (*Id.*)  Second, in *DL Capital*, the statements in question were limited to the announcement of the regulatory decision to suspend trading, and plaintiffs there acknowledged that the decision itself was immune from liability.  409 F.3d at 98.  Here, however, the system failures did not involve regulatory activity.  Moreover, it was the non-SRO Securities Defendants who made vague and incomplete statements, concealing the truth regarding the technology issues and the reckless conduct on the day of the IPO.  (*See* Section III.A, *infra*; CAC ¶¶ 190-211.)  Finally, the court in *DL Capital* recognized that the then-NASD "ha[d] delegated some of its regulatory powers and responsibilities as an SRO to [NASDAQ LLC]."  *DL Capital*, 409 F.3d at 95.  The Securities Defendants, however, have not been delegated any SRO

---

[18] The SEC's affirmation that only NASDAQ LLC is an SRO is consistent with the Exchange Act's definition of what entities are afforded SRO status.  *See* 15 U.S.C. § 78c(a)(26) ("The term 'self-regulatory organization' means any *national securities exchange*, registered securities association, or registered clearing agency. . . .").

[19] *See, e.g.*, NASDAQ OMX By-Law Amendment  Order at *1, *2 ("***NASDAQ OMX is not itself an SRO***," "***NASDAQ OMX does not itself carry out regulatory functions for [NASDAQ LLC]***"); Order Approving Proposed Rule Change to Amend the By-Laws NASDAQ OMX, Rel. No. 60,183, 2009 WL 1884076, at *3 (S.E.C. June 26, 2009) ("Currently, NASDAQ OMX directors, officers, and employees, as well as agents, are required by the By-Laws to give due regard to the preservation of the independence of each self-regulatory subsidiary of NASDAQ OMX. . . ."); Order Granting Accelerated Approval to a Proposed Rule Change Relating to Changes to PHLX's Governing Documents, Rel. No. 58,179, 2008 WL 2986563 (S.E.C. July 17, 2008) (same); Order Granting Approval of a Proposed Rule Change to Amend the Articles of Organization and By-Laws of Boston Stock Exch. Clearing Corp., Rel. No. 59,839, 2008 WL 6113328 (S.E.C. Apr. 28, 2008) (same).

authority.[20]  *Cf. id.* at 99 n.4 (finding that the SEC had explicitly blessed the "NASD-Nasdaq 'chain' of regulatory responsibilities").[21]

Accordingly, the Securities Defendants do not possess SRO status under the Exchange Act, and cannot claim to be protected by its immunity.

> **2.    The Securities Defendants' Misconduct Was in Connection With NASDAQ OMX's For-Profit Commercial Interests Where No SRO Immunity Applies**

Even assuming, *arguendo*, that the Securities Defendants were SROs, the defense of immunity would still not apply.  The Securities Defendants' alleged wrongdoing was in connection with NASDAQ OMX's for-profit commercial interests as a publicly-traded company.  The Securities Defendants made material statements concerning the capability and reliability of technology and trading platforms in NASDAQ OMX's SEC public filings (CAC ¶¶ 168-80), on NASDAQ OMX's website (CAC ¶¶ 181-83), and during NASDAQ OMX's May 10, 2012 Investor Day Conference (CAC ¶¶ 184-89).  These statements were intended to "serve [NASDAQ OMX's] private business interests, such as its efforts to increase trading volume and company profit."  *Weissman*, 500 F.3d at 1296.  Given that the Securities Defendants were "acting in [NASDAQ OMX's] own interest as a private entity" in touting the quality of NASDAQ's technology, and failing to correct their statements once it became obvious they were no longer true, "absolute immunity from suit ceases to obtain."  *Id.* at 1297; *see also Opulent Fund*, 2007 WL 3010573, at *4 ("'[W]hen conducting private business, [an SRO] remains subject to liability.'" (second alteration in original).).

---

[20] Defendants mistakenly assert that Defendants Greifeld and Ewing are afforded SRO immunity.  (MTD Br. at 17.)  However, as Defendants acknowledge, only "an SRO and its officers are entitled to absolute immunity when they are, in effect, 'acting under the aegis' of their regulatory duties."  (*Id.* at 17 n.13 (citing *DL Capital*, 409 F.3d at 97).)  At all relevant times, Defendant Greifeld and Ewing were officers of NASDAQ OMX.  Moreover, the claims asserted against Defendants Greifeld and Ewing arise from their failure to disclose material information in connection with NASDAQ OMX's commercial statements about the reliability of its technology and trading platforms – conduct that falls outside any purported regulatory function.  (*See* CAC ¶¶ 168-94.)

[21] The SEC also lists all SROs on its website, which notably includes only NASDAQ OMX's registered "national securities exchange" subsidiaries, not NASDAQ OMX itself.  *See* http://www.sec.gov/rules/sro.shtml.

Courts have consistently recognized that immunity does not apply to commercial conduct.  In *Weissman*, the Eleventh Circuit held that NASDAQ was not immune from suit for securities fraud arising from its commercial actions taken to promote a particular security.  Specifically, the court found that "[a]bsolute immunity is not appropriate unless the relevant conduct constitutes a delegated quasi-governmental prosecutorial, regulatory, or disciplinary function," and does not apply "[w]hen an SRO is . . . acting in its own interest as a private entity."  *Id.* at 1297.  The court noted that the "dual nature of SROs as private companies that carry out governmental functions is similar to that of municipal corporations," which enjoy immunity when "acting in their governmental capacity," but not for activities "for their own corporate benefit."  *Id.* at 1296-97.  In this regard, "as a private corporation, NASDAQ may engage in a variety of non-governmental activities that serve its private business interests," and that such SROs can operate "as both quasi-regulators and private businesses."  *Id.* at 1296.  Accordingly, the court denied immunity for advertisements intended "to increase trading volume and, as a result, company profits," as such activity was "in the service of NASDAQ's own business, not the government's, and such distinctly non-governmental conduct is not protected by absolute immunity."  *Id.* at 1299.   The Eleventh Circuit concluded that NASDAQ's conduct in promoting certain securities was "in no sense coterminous with the regulatory activity contemplated by the Exchange Act. . . . NASDAQ represents no one but itself when it entices investors to trade on its exchange. . . ."  *Id.*[22]

Similarly, in *Opulent Fund*, the court held that NASDAQ's marketing and pricing of an index was not a regulatory function that would otherwise be carried out by the SEC.  2007 WL 3010573, at *5 ("The SEC regulates the securities markets, but it would not create an index and volunteer to disseminate pricing data if Nasdaq did not exist.").  Although the SEC had reviewed and approved

---

[22] The "SEC has stated explicitly that '[a]s competition among markets grows, the markets that SROs operate will continue to come under increased pressure to attract order flow.  This business pressure can create a strong conflict between the SRO regulatory and market operations functions.'" *Weissman*, 500 F.3d at 1296 n.4 (citing Concept Release Concerning Self-Regulation, 69 Fed. Reg. 71,256, 71,261-62 (S.E.C. Dec. 8, 2004)).

the creation of the NASDAQ-100 Index, the method of its calculation, and options trading based on it, those SEC rule approvals did not transform publishing the Index from a business function to a regulatory function.  *Id.*  Rather, NASDAQ created and promoted the NASDAQ-100 Index "because it profits from selling the market price data," and this for-profit business function rendered immunity improper.  *Id.*

The *Opulent Fund* court reasoned that NASDAQ's collection and dissemination of "an index price does not function to protect investors; instead, Nasdaq's actions function to create a market and increase trading."  *Id.*, 2007 WL 3010573, at *5.  Moreover, the court specifically rejected NASDAQ's argument that SEC approval of the "pricing formula against which Nasdaq's conduct will be judged" would "automatically convert Nasdaq's conduct into an immunized 'regulatory function.'"  *Id.*  Critically, the court noted that "SEC approval of a rule imposing a duty on an SRO is not the *sine qua non* of SRO immunity; engaging in regulatory conduct is."  *Id.*  Accordingly, the court concluded that "Nasdaq's market facilitating actions at issue . . . were non-regulatory, and hence there is no absolute immunity."  *Id.*

As the courts recognized in *Weissman* and *Opulent Fund*, an SRO is afforded immunity only when it engages in delegated regulatory conduct.  The Securities Defendants' alleged misrepresentations were in connection with NASDAQ OMX's for-profit, commercial activities – not in furtherance of any purported regulatory function.  Accordingly, no SRO immunity would apply to the Securities Defendants' commercial conduct, even if they were SROs.  *See, e.g.*, *Weissman*, 500 F.3d at 1299 ("NASDAQ represents no one but itself when it entices investors to trade on its exchange.").

23

C.    **The Negligence Claims Arise From The Failures Of For-Profit Commercial Systems, Not From Delegated SRO Functions**

1.    **The Failed Software Systems Were an Integral Part of NASDAQ's For-Profit Business Activity**

The Negligence Claims arise from NASDAQ's negligent design, testing, and implementation of its pre-opening software system, including its switch to an untested backup system, before Facebook trading commenced.[23]  Those functions relate to NASDAQ's for-profit business of handling an IPO, and involve NASDAQ "acting in its own interest as a private entity," *Weissman*, 500 F.3d at 1297, and "represent[ing] no one but itself."  *Id.* at 1299; *Opulent Fund*, 2007 WL 3010573, at *1.  As set forth herein, such actions are not entitled to immunity.

NASDAQ aggressively sought the Facebook listing in competition with the NYSE, pursuing its purely private, profit-making business.  NASDAQ knew that Facebook would generate substantial new-listing and transactions fees and – in fact – Facebook has remained a market volume leader on the NASDAQ.  (*See* CAC ¶¶ 94-111.)  NASDAQ also knew that securing the Facebook IPO would enhance its reputation and generate even more new IPO business.  (*Id.* at ¶¶ 95-112.)  NASDAQ's design and implementation of its IPO software systems was an integral part of its overall business package for attracting new, revenue-producing IPO business.  (*Id.* at ¶ 178.)  As in *Weismann*, the system failures alleged in the CAC do "not serve an adjudicatory, regulatory, or prosecutorial function," and the purposes of the immunity doctrine do not apply here.  500 F.3d at 1299.

To paraphrase *Opulent Fund*, NASDAQ wished to create an IPO market for companies to be newly listed and traded on its exchange.  Accordingly, NASDAQ proposed, and the SEC authorized, a set of rules for conducting an opening Cross and designed, implemented and tested electronic systems to perform the opening Cross function.  NASDAQ encouraged companies to bring new IPOs to its exchange, and encouraged investors to participate in those IPOs.  NASDAQ took this course of

---

[23] Negligence Plaintiffs join Section II(B)(1), *supra* ("NASDAQ OMX Is Not an SRO Entitled To SRO Immunity").

24

action because it profits from the listing and trading of high profile IPOs like Facebook.  (*See, e.g.*,

CAC ¶¶ 105-118.)  In choosing to conduct the business of facilitating IPOs, NASDAQ represents no

one but itself.  The SEC has never itself engaged in those business aspects of exchange operation, nor

has Congress authorized it do so, and accordingly could not have delegated such functions to

NASDAQ.[24]

## 2.    The Negligence Claims Arise Directly From the System Failures

As discussed above, immunity rests on a policy of protecting the independence of judicial

decision makers from the risk of recriminatory lawsuits, and courts carefully limit SRO immunity to

delegated, quasi-judicial tasks.  Here, the Negligence Claims do not relate to a disciplinary

proceeding, or to monitoring or enforcing compliance by third parties.  NASDAQ's own negligence

in the design, testing and implementation of is own software systems cannot be stretched to equate,

even remotely, to a quasi-judicial activity.

NASDAQ mischaracterizes the CAC, stating the "negligence claims arise from the

commencement of trading in Facebook" or from "NASDAQ's decisions to proceed with and not to

halt trading in Facebook." (MTD Br. at 22-23.)  None of the CAC's alleged negligent acts or injuries

flows from the secondary market trading.  (*See* CAC ¶¶ 249-269.)[25]  Rather, the negligence claims

focus solely on negligent software system design, testing and implementation occurring well *before*

---

[24] *Opulent Fund* distinguished functions undertaken to "protect investors" from those intended to "create a market and increase trading."  2007 WL 3010573, at *5.  Here, NASDAQ's IPO systems do not function to protect investors, they function to create a market for IPO business for NASDAQ and increase trading.  "[A]ctions taken to 'increase trading volume' are non-regulatory."  *Id.* (quoting *Weissman*, 500 F.3d at 1296).  Automated software systems for the execution, processing and confirmation of trade orders are quintessentially business functions of a for-profit exchange.  The SEC has never itself engaged in those business aspects of exchange operation, nor has Congress authorized it do so, and accordingly it could not have delegated such functions to NASDAQ.

[25] All of NASDAQ's citations to the CAC either fall outside Section VII (*see* MTD Br. 4, 23 (quoting CAC ¶¶ 1, 5)), or are limited to allegations concerning NASDAQ's Cross system design, testing, and implementation.  (*See* MTD Br. at 22-23, 23 n.15 (quoting CAC ¶¶ 348, 355).)  NASDAQ takes out of context the allegation that "Defendants should have followed the recent precedent and protected the integrity of the market by halting the Facebook IPO."  (*See* MTD Br. at 23 n.16; CAC ¶ 125.)  This allegation describes stopping the broken IPO Cross process, as part of a larger discussion of how the sizeable fees generated by the Facebook IPO, and the desire to save the embarrassment, compromised and conflicted NASDAQ's business decision to complete the Cross.

25

the commencement of secondary market trading.  Business decisions, made before the opening of

trading, about the design, testing and implementation of operational software systems, differ

fundamentally from market surveillance decisions, made after active trading is already underway.

The root causes of the injuries alleged by each defined negligence subclass lie in the design of

NASDAQ's system software, which failed to execute "stuck" orders (CAC ¶ 146), failed to generate

trade confirmations (*Id.* at ¶¶ 151-52), and led to the dissemination of inaccurate price quotes (*Id.* at

¶¶ 160-67). The claims of the Cross Buyer and Cross Seller Classes are limited to persons who placed

orders that were executed or eligible for execution directly in the pre-opening period, not in the

subsequent secondary market trading.  (*Id.* at ¶ 320(2) & (3).)  The claims of the Market Trading

Class arise from a mispricing error directly resulting from, and traceable to, the pre-opening system

failures.  (*Id.* at ¶ 320(4).)  Pricing and dissemination of price information are not regulatory

functions.  *See Opulent Fund*, 2007 WL 3010573, at *5.

NASDAQ argues that *DL Capital* and *NYSE Specialists* compel a different conclusion.

(MTD Br. at 26-27.)  But both cases involved quasi-judicial oversight of third-parties.[26]  *DL Capital*

involved a traditional, quasi-judicial function:  enforcing a rule against improper trading by third

parties.  NASDAQ overstates *NYSE Specialists* when it argues the decision broadly focused "on the

defendant's regulation of stock ***trading*** on its exchange." (MTD Br. at 27).  The case is limited to a

third-party, oversight function:  regulating the conduct of ***persons*** who are "trading on its exchange."

As the *NYSE Specialists* court stated (and as NASDAQ acknowledges), "the central question . . . is

not whether the SRO is acting (or not acting) 'consistent with' the laws it is supposed to apply but

rather whether the plaintiff's allegations concern the exercise of powers within the bounds of the

government functions delegated to it." *Id.* at 98  The quasi-judicial nature of regulating Specialists

---

[26] *Sparta Surgical,* 159 F.3d at 1209, is also distinguishable because the NASD rules at issue in that case expressly delegated "enormous discretionary authority concerning stock listing and delisting" – a quasi-judicial task requiring independence from a potential recriminatory suit by the company whose stock is affected.  *Id.* at 1214.

26

operating on the floor of an exchange is clearly distinguishable from NASDAQ's **own errors and omissions** in the design and implementation of its own operational systems.[27]

### 3. NASDAQ Is Not Entitled To Immunity Simply Because It Engages in Regulated Activities

NASDAQ's Motion conflates two fundamentally different concepts: the performance of a **regulated activity**, and the performance of a **delegated regulatory function**. (*See* MTD Br. at 3-4, 17-22.) By operating a registered exchange, NASDAQ is subjected to rules and regulations adopted and approved by the SEC. But operation of a for-profit business pursuant to SEC-approved rules does not by itself confer immunity. "SEC approval of a rule imposing a duty on an SRO is not the *sine qua non* of SRO immunity; engaging in regulatory conduct is." *Opulent Fund*, 2007 WL 3010573, at *5 ("Nasdaq's actions do not partake of the same 'regulatory' character as suspending trading, banning traders, or carrying out disciplinary actions. These actions all involve oversight of the market to protect investors; facilitating derivative trading does not.").

The Eleventh Circuit rejected the argument that NASDAQ is "immune for all activity that is 'consistent with' its powers and functions under the Exchange Act and SEC regulations." *Weissman*, 500 F.3d at 1297-98 (holding that immunity exists "only when an SRO is '**acting in its capacity as a[n] SRO**." (alteration in original)) (quoting *D'Alessio*, 258 F.3d at 106). Indeed, limiting exchange immunity to quasi-judicial, disciplinary functions is consistent with the dichotomy of function preserved in the Exchange Act, which provides that a registered exchange: (i) must comply with the

---

[27] In a footnote, NASDAQ argues conflict preemption as an alternative ground for dismissal. (MTD Br. at 20, n.14.) There is a strong presumption against preemption, which requires a clear showing of Congressional intent to supplant state law. *Wyeth v. Levine*, 555 U.S. 555, 565 (2009). Decisions cited by NASDAQ stand only for the unremarkable proposition that conflict preemption may apply if the state law claims would interfere with delegated regulatory functions. Thus, the preemption argument fails for the same reason that the immunity defense fails – it is inapplicable to the performance of NASDAQ's business functions. The *Barbara* and *Sparta Surgical* cases cited by NASDAQ involved delegated core regulatory functions for the reasons set forth above. As Defendants acknowledge, this Court's opinion in *DGM Investments, Inc. v. New York Futures Exchange, Inc.*, 01 CIV. 11602 (RWS), 2002 WL 31356362 (S.D.N.Y. Oct. 17, 2002) turned on its finding that the defendants "failed to fulfill their obligation to regulate the market." (MTD Br. at 20.) And *DGM Investments* noted that *American Agricultural Movement, Inc. v. Board of Trade*, 977 F.2d 1147 (7th Cir. 1992) stood in part for the proposition that "'[o]nly in the context of market regulation does the need arise for uniform legal rules." *DGM Inv.* at *5

27

Exchange Act, rules and regulations; and (ii) must enforce compliance by its members.  *See* 15 U.S.C § 78f (b)(1) (national security exchanges must "comply, and . . . ***enforce compliance by its members and persons associated with its members***, with the provisions of this chapter, the rules and regulations thereunder, and the rules of the exchange").[28]

### 4. The SEC Enforcement Action Does Not Support the Claim of Immunity

NASDAQ argues that the SEC enforcement action confirms "the Exchange was performing a ***regulatory*** function in its handling of the Facebook IPO."  But, in reality, it confirms only that NASDAQ is a regulated entity performing ***regulated*** functions.  (MTD Br. at 13.)  The SEC Order nowhere states that any of NASDAQ's system failures were incident to the performance of any delegated regulatory power.[29]  And the SEC explicitly disclaimed any ruling or views whatsoever on the immunity issue or the civil litigation in its prior order approving NASDAQ's accommodation plan.  (*See* Accommodation Approval Order at *9.)

### a. The SEC Findings Relate to the Activities of NASDAQ As a For-Profit Business

The SEC Order recites business facts about NASDAQ acting as a stock exchange, not facts about NASDAQ acting as an SRO:  "NASDAQ . . . is one of the ***largest national securities exchanges***;" "[m]ore than 2,500 companies are listed on NASDAQ and it is ***one of the most active exchanges*** in listing companies that have just held their Initial Public Offering;" "[t]he orderly

---

[28] The SRO provisions are similar.  *See* 15 U.S.C. § 78s(g)(1) & (g)(1)(A) (SROs "shall comply with the provisions of this chapter, the rules and regulations thereunder, and its own rules" and, "in the case of a national securities exchange, with such provisions by its members and persons associated with its members.").  The Exchange Act contains additional, detailed requirements and procedures for exchange and SRO enforcement of member compliance.  *See, e.g.*, 15 U.S.C. §§ 78f(b)(6), (b)(7) and (d); §§ 78s(d)-(f).

[29] NASDAQ's characterization of its violations as merely "technical" conflicts with the views of SEC enforcement officials, as stated in an SEC press release: "***Too often in today's markets, systems disruptions are written off as mere technical 'glitches' when it's the design of the systems and the response of exchange officials that cause us the most concern*** . . .  This action against NASDAQ tells the tale of how ***poorly designed systems and hasty decision-making*** not only disrupted one of the largest IPOs in history, but produced serious and pervasive violations of fundamental rules governing our markets.'"  Press Release, SEC, SEC Charges NASDAQ for Failures During Facebook IPO (May 29, 2013), available at http://www.sec.gov/News/PressRelease/Detail/PressRelease/1365171575032#.UgKUeNLqmSo.

initiation of secondary market trading after an IPO is *one of the most fundamental functions of a national securities exchange*."  (SEC Order, at ¶¶ 1-2.)  The Order also defines NASDAQ's duties in terms of its business obligations as a regulated exchange:  "When initiating an IPO, an exchange has an obligation to ensure that its systems, processes and contingency planning are robust and adequate to manage the IPO without disruption to the market, and that it complies with all rules regarding, among other things, order price and time priority."  (SEC Order at ¶ 2; *cf.* CAC ¶¶ 33, 35, 40.)  Like the CAC, the SEC findings are limited to NASDAQ's business functions – the adequacy of "its *systems, processes and contingency planning* . . . *to manage the IPO* without disruption to the market." (SEC Order at ¶ 2; *cf.* CAC ¶¶ 23-24, 27-29, 134-167.)

The SEC Order describes how the "design" of NASDAQ's system "created the risk [at its greatest during high-volume crosses] that if orders continued to be cancelled during each re-calculation, a repeated cycle of validation checks and re-calculations – known as a 'loop' – would occur, preventing" normal secondary market trading.  (SEC Order at ¶ 10; *cf.* CAC ¶¶ 134-167.)  The SEC focused on one particular, badly designed routine in NASDAQ's system:  the "validation check."  (SEC Order at ¶ 8; MTD Br. at 7-9.)  But the SEC never found that the validation check, or any other aspect of NASDAQ's system software design was a delegated *regulatory* function of an SRO, as opposed to a *regulated* function of an exchange operating as a business.[30]

The SEC also found inadequacies in NASDAQ's system testing:  "NASDAQ anticipated that the Facebook IPO cross would be the largest IPO cross in its history in terms of the number of orders," but NASDAQ's system tests "limited the total number of orders that could be received in the test security to 40,000 orders."  On opening day, "NASDAQ members entered over 496,000 orders

---

[30] NASDAQ argues that the SEC's approval of NASDAQ's rules governing the Cross transform the design and implementation of its software systems into a delegated regulatory function.  (MTD Br. at 4-8.)  The SEC-approved Cross rules did not cause the system failures; the SEC found NASDAQ's own flawed system design was the cause.

29

into the Facebook IPO cross." (SEC Order at ¶ 12.) Proper testing of critical operational systems is a business function, not a core regulatory function.[31]

      **b.**      **The SEC Found that the System Failures Resulted in the "Stuck" Orders, Delayed Confirmations and Inaccurate Price Quotes that Give Rise to the Negligence Claims**

It was not until after 1:49:49 p.m. – well after trading commenced at 11:30:09 a.m. – that NASDAQ belatedly discovered that its system failures caused more than 30,000 remaining "stuck" orders not to execute in the Cross. (SEC Order at ¶¶ 38-40.) At approximately 11:30 a.m., NASDAQ observed trade volume discrepancy information indicating "that there was still a problem with the cross, and that some cross-eligible orders may not have been handled properly in the cross but . . . did not address this issue during the minutes and hours following the cross." (SEC Order at ¶ 27.) The SEC found that NASDAQ could "have run a real-time status check of its applications, which would have indicated that the cross executed at 11:30 a.m. did not include any orders entered after 11:11 a.m.," but did not do so. (*Id.*) At 1:49:49 p.m., NASDAQ "released into the market or cancelled the more than 30,000 cross-eligible 'stuck' orders." (SEC Order at ¶ 38.) Approximately 13,000 "stuck" orders were released into the secondary market, causing "a 93-cent decrease in Facebook's share price between 1:50 p.m. and 1:51 p.m." (SEC Order at ¶ 39.) NASDAQ points to no delegated regulatory function immunizing either the initial system errors that caused the "stuck" orders, or the subsequent, belated release of those orders into the market.[32]

Moreover, seconds after commencement of secondary market trading, NASDAQ "determined that confirmations were not being delivered to members that placed orders into the cross." (SEC Order at ¶ 29.) The SEC found that the delivery failures "meant that NASDAQ members . . . were

---

[31] The SEC also found that NASDAQ had not tested the use of "failover systems" leading up to the Facebook IPO. (SEC Order at ¶ 23.)

[32] "[B]y not releasing or canceling these stuck orders until approximately 1:50 p.m., NASDAQ violated its own Rule 4757(a)(1) concerning price/time priority. Each of the more than 30,000 "stuck" orders was not given priority over same or worse-priced orders executed in secondary trading between 11:30:09 a.m. and 1:49:49 p.m." (SEC Order at ¶ 38.)

EC.52935.4

not able to determine whether their orders had been included in the cross **and, therefore did not know what position they held in Facebook securities**." (*Id.*; CAC ¶¶ 7, 38-39.)  At no point does the SEC indicate that delivery of trade confirmations is a delegated regulatory function.[33]

### c. NASDAQ Did Not Make a Regulatory Decision Not to Halt Trading

NASDAQ argues that it made a regulatory judgment not to halt secondary market trading in Facebook stock. (MTD Br. at 13.)  This argument is contradicted by the SEC findings that NASDAQ did not have delegated authority to halt trading under the circumstances.  Of critical importance, shortly after trading began NASDAQ senior leadership "decided that 'extraordinary market activity' was not occurring, and the EVP/Transactions concluded that **NASDAQ therefore did not have the authority to halt trading**." (SEC Order at ¶ 32.)  Rule 4120 is a limited delegation of authority to halt trading only in certain enumerated cases, including when "extraordinary market activity in the security is occurring," such as the execution of a series of transactions for a significant dollar value at prices substantially unrelated to the current market.  *Id.* (quoting NASDAQ LLC Rule 4120(a)).  The SEC did not find that NASDAQ had exercised any regulatory judgment in this matter.  The SEC merely found that, since active market trading was proceeding normally, NASDAQ concluded that the rule was inapplicable on its face because its preconditions were not satisfied.  Further, the negligence claims are not based on any allegation that NASDAQ was negligent in concluding that there was no "extraordinary market activity," and therefore Rule 4120 is irrelevant.  In short, the rule does not delegate any authority to halt normal market trading in order to correct software system

---

[33] The SEC also found that the system failures "prevented accurate quoting data from being delivered to NASDAQ's Prop Feed and the SIP Quotation Data Feed. (SEC Order at ¶ 31; *cf.* CAC ¶ 165.)  The inaccurate pricing data was caused by operational, software system design and implementation errors, not by the exercise of any delegated regulatory function.

errors that occurred before trading began, but that have not resulted in "extraordinary market activity."[34]

Moreover, the executives who participated in the discussions were officers of the for-profit parent company, NASDAQ OMX (which is not entitled to immunity, *see* Section II.B, *supra*), and not of the SRO.[35]  As such, NASDAQ itself treated the system failures as business issues appropriate for discussion by officers of the holding company, and not issues reserved for independent, separated decision-making solely by the regulatory arm of the exchange.  Indeed, NASDAQ's unsupported assertion that its decisional process was regulatory should not be credited because it is completely incompatible with the strict separation of regulatory and business functions on which the SEC based its approval of NASDAQ LLC's registration as a stock exchange.  (*See* Exchange Registration Approval Order at *3) (NASDAQ OMX "***will not itself carry out regulatory functions***").)

NASDAQ also argues that its "determination to complete the Facebook IPO Cross rather than postpone it, and its decisions not to halt continuous market trading and not to cancel any allegedly impacted trades," was quintessentially regulatory.  (MTD Br. at 26.)  But NASDAQ lumps together two very different decisions made at different times.  The switch to a failover system was a matter of software engineering done before trading began.  At that time, there was not even a discussion about cancelling or postponing the IPO, and there was no active market trading.  The discussion about the inapplicability of Rule 4120 did not occur until after activation of the ill-fated failover system, and

---

[34] The SEC further observed that "NASDAQ's Bylaws grant[] NASDAQ the authority to take action in an emergency to fulfill its mandate under the Exchange Act.," but that "[w]hile trading disruptions arising from internal technology problems may in certain circumstances constitute" such an emergency "the events of May 18, 2012 within NASDAQ ***did not***."  (SEC Order at ¶ 57.)

[35] The participants on the call included, among other senior executives from various disciplines, NASDAQ OMX's Chief Executive Officer; the Executive Vice-President for Transaction Services (U.S.) ("EVP/Transactions"); the Senior Vice-President for INET, Regulatory, and Data Services ("SVP/INET"); the Senior Vice-President, Equity Market Management and Strategy; the Senior Vice President and Head of Market Regulation for the U.S. Markets operated by NASDAQ; and the Executive Vice President, General Counsel and Chief Regulatory Officer of NASDAQ OMX.  (SEC Order at ¶ 21.)

EC.52935.4

after secondary market trading commenced.[36]  By that time the damage caused by the system failures

to the pre-opening orders had already been done.

### 5.      The NASDAQ LLC Accommodation Proposal Contradicts the Claim of Immunity

NASDAQ LLC's accommodation plan to pay only limited compensation, for only limited

types of claims, and then only to NASDAQ LLC members, not retail investors, is a tacit recognition

that NASDAQ LLC does not enjoy immunity for the system failures.  (*See* MTD Br. at 15-17.)  That

plan amends NASDAQ LLC Rule 4626, a rule that binds only NASDAQ LLC and its member firms,

that provides that "Nasdaq and its affiliates shall not be liable for any losses, damages or other claims

arising out of the Nasdaq Market Center or its use."  Order Disapproving NASDAQ LLC's Proposed

Rule Change Relating to "Benchmark Orders," Rel. No. 68,629, 2013 WL 139471, at *6 (S.E.C. Jan.

11, 2013).  The implied premise of a contractual limitation-of-liability is that NASDAQ LLC would

not otherwise be immune for claims arising from system failures.  If immunity applied, there would

be no "liability" to "limit," and the rule would violate the "cardinal principal of statutory

construction" warning against interpretations creating superfluity. *See TRW Inc. v. Andrews*, 534 U.S.

19, 31 (2001).  Moreover, NASDAQ LLC itself responded to comments from interested parties

(including SIFMA and certain member firms) arguing that it was "not entitled to immunity from

liability because it was acting in its 'for profit' capacity in its handling of the Facebook IPO" by

arguing that the "Commission does not need to address the issue of regulatory immunity," and that it

did not design the accommodation plan to "compensate all claims of loss . . . relating to NASDAQ's

system difficulties," and the SEC agreed.  (Accommodation Approval Order, at *6, *9.)  Given

---

[36] Rule 4120 highlights the importance of distinguishing between a business decision regarding the suitability of operational systems to complete a pre-opening Cross and a regulatory decision to halt active, ongoing trading.  When there is an active trading market, any decision to halt the trading, or cancel trades can potentially cause loss to one or another group of market participants.  Before trading commences those risks are not in play.  Hence, Rule 4120 imposes strictly limited conditions under which NASDAQ LLC may exercise its discretion to consider a trading halt.  But no part of Rule 4120 addresses operational business decisions such as the completion or postponement of the Cross prior to the commencement of trading.  Decisions about the readiness and functionality of business systems, and how to fix them, are not traditional core regulatory or governmental functions.

33

NASDAQ LLC's representations to the SEC, and the SEC's assurance that approval would have no bearing on issues of immunity in pending litigation, NASDAQ LLC cannot claim that the SEC approval somehow bolsters its immunity defense.

> **6.   The Policy Reasons for a Grant of Immunity Do Not Apply to NASDAQ's Handling of the Facebook IPO**

Plaintiffs advocate the caution expressed in *Opulent Fund* that "'grants of immunity must be narrowly construed' because they deprive injured parties of remedies."  2007 WL 3010573, at *5 n.2. The rationale for granting immunity has always been the preservation of independence for quasi-judicial decision-making.  The rationale does not apply, however, when an exchange is simultaneously prosecutor and defendant, asking for immunity for its own internal operational and systems errors.

Our securities markets have changed dramatically since the 1930s.[37]  Exchanges, like NASDAQ, have converted from non-profit mutual associations owned by their members to for-profit, publicly traded corporations owned by shareholders.[38]  As exchanges have evolved into for-profit enterprises, an irreconcilable conflict has arisen, rendering independence unattainable in the context of an exchange regulating its own, for-profit business conduct.  The increasing competitive business pressures for listings and order flow have led to a heightened concern, such as that expressed this year by SEC Commissioner Aguilar, about the "***inherent conflicts of interests*** between the SROs'

---

[37] As SEC Commissioner Gallagher stated in 2012, "the basic premises on which the self-regulatory framework . . . [was] put into place almost eighty years ago - private, mutualized, self-regulating exchanges and a simple association of dealers – [are] no longer true."  (Daniel M. Gallagher, Comm'r, SEC, Market 2012: Time for a Fresh Look at Equity Market Structure and Self-Regulation, Speech at the SIFMA's 15th Annual Market Structure Conference (Oct. 4, 2012), available at http://www.sec.gov/News/Speech/Detail/Speech/1365171491376, attached as Exhibit E to the Cappucci Aff.)

[38] SIFMA has recently noted that "the interests, incentives and functions of the member-owned cooperative exchange of 1934 bear little resemblance to those of the for-profit publicly traded exchange of today.  Since the wave of demutualizations, exchanges have rightly focused their efforts on the part of their business that earns profits to maximize the return for their shareholders, and, in some cases, minimized their actual performance of regulatory functions."  (*See* SIFMA letter to Mary Jo White, Chair, SEC, Re: Self-Regulatory Structure of the Securities Markets (July 31, 2013), available at http://www.sifma.org/issues/allactivity.aspx ("SIMFA Letter"), attached as Exhibit F to the Cappucci Aff.)

34

regulatory functions and its members, market operations, issuers, and shareholders."[39]  In 2005 the

SEC issued a Concept Release to examine, among other issues, "the inherent conflicts of interest"

between an SRO's regulatory obligations and its for-profit commercial functions, recognizing that

"SROs face increasing competitive pressure to gain and retain listings" and "with SRO competition

for members and order flow, *competition for issuers may cause an SRO to fail to discharge its self-*

*regulatory responsibilities properly*."[40]

Today, exchanges concentrate their attention on their business functions, and they outsource

to FINRA most of their regulatory functions, including market surveillance.  As noted by SIFMA,

"FINRA conducts virtually all member regulation for the securities markets, and FINRA performs

market regulation for more than 90% of equity market trading (including the NYSE Euronext,

*NASDAQ OMX*, and Direct Edge exchange complexes)."  (SIMFA Letter at 4.)  In light of the

inherent conflict, courts must be diligent not to extend the doctrine of immunity beyond those limited

situations in which the salutary benefit of preserving judge-like independence makes sense.  It makes

no sense to apply immunity when NASDAQ's own system failures are at the center of the dispute.

Preserving exchange liability for negligent system failures promotes the exercise of due care in

system design, testing and implementation and deters exchanges from neglecting system integrity in

pursuit of profit.

---

[39] Public Statement, Luis A. Aguilar, The Need for Robust SEC Oversight of SROs (May 8, 2013), available at http://www.sec.gov/News/PublicStmt/Detail/PublicStmt/1365171515546, attached as Exhibit G to Cappucci Aff. *See also* SIFMA Letter at 4 ("Now that they have become for-profit entities, *exchanges face an irreconcilable conflict of interest in the performance of their SRO responsibilities*.  On the one hand, they are bound by a fiduciary duty to maximize profits for their corporate shareholders.  On the other hand, they are required to be fair and impartial regulators of the broker-dealers with which they compete.")

[40] Concept Release Concerning Self-Regulation, 69 Fed. Reg. at 71,261-63 ("As competition among markets grows, the markets that SROs operate will continue to come under increased pressure to attract order flow. This business pressure can create a strong conflict between the SRO regulatory and market operations functions.")  The SEC also stated that "[a]nother significant conflict of interest for SRO responsibilities is with SRO shareholders. SRO demutualization raises the concern that the profit motive of a shareholder-owned SRO could detract from proper self-regulation." *Id.* at 71,263.

35

### III.    LEAD PLAINTIFFS STATE SECTION 10(b) CLAIMS AGAINST THE SECURITIES DEFENDANTS

To state a claim under Section 10(b), Plaintiff must allege that Defendants:  "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury."  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005).  Defendants do not challenge the "in connection with" element under Section 10(b).  Defendants' challenges to the remaining elements are addressed below.

#### A.    Lead Plaintiffs Adequately Allege The Securities Defendants Made Material Omissions Of Fact

"The 'fundamental purpose' of the securities laws is 'to substitute a philosophy of *full disclosure* for the philosophy of *caveat emptor*[.]'"  *In re Initial Pub. Offering Sec. Litig.* (*IPO*), 241 F. Supp. 2d 281, 382 (S.D.N.Y. 2003) (citing *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 186 (1963)).  To that end, issuers of public statements are subject to liability under Section 10(b) when they either:  (1) make a false statement; or (2) withhold information that they had a duty to disclose.  *See IPO*, 241 F. Supp. 2d at 381 (citing *Glazer v. Formica Corp.*, 964 F.2d 149, 156 (2d Cir. 1992)).

The Securities Defendants' material omissions during the Class Period can be divided into two categories:  (1) the failure to update pre-Class Period statements touting the reliability and capability of NASDAQ's technology and trading platforms; and (ii) the failure to speak completely and accurately in connection with disseminating "Market System Status" messages to market participants during the Class Period.

#### 1.    Standard for Pleading Materiality Under Section 10(b) of the Exchange Act

Whether a statement or omission is material turns on whether "there is a substantial likelihood" that:  (i) "a reasonable shareholder would consider it important in deciding how to [act]";

36

or (ii) "the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)); *see also In re Salomon Analyst Metromedia Litig.*, 544 F.3d 474, 482 (2d Cir. 2008), *abrogated on other grounds by Amgen v. Conn. Ret. Plans & Trust*, 133 S.Ct. 1184 (2013).  Material facts include those that "may affect the desire of investors to buy, sell, or hold the company's securities." *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 180 (2d Cir. 2001) (citing *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 849 (2d Cir. 1968)).  Moreover, the "materiality of a statement or omission cannot be determined in a vacuum," *Cyber Media Grp., Inc. v. Island Mortg. Network, Inc.*, 183 F. Supp. 2d 559, 570 (E.D.N.Y. 2002), because materiality "necessarily depends on all relevant circumstances."  *ECA, Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009).

Plaintiff's burden in establishing materiality is modest.  "At the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b-5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000).

### 2. The Securities Defendants Had a Duty to Correct And/Or Update Their Pre-Class Period Statements Concerning the Capability and Reliability of NASDAQ's Technology and Trading Platforms

In the pre-IPO period, the Securities Defendants made, or caused to be made, material statements concerning the capability and reliability of NASDAQ's technology and trading platforms. (CAC ¶¶ 168-89.)  These statements were made at a time when NASDAQ was aggressively competing with NYSE for one of the largest and most anticipated IPOs in U.S. history, and undertaking a variety of commercial activities designed to solicit Facebook's executives to list the IPO with NASDAQ.  Among other business decisions, NASDAQ expanded its pre-market window

37

to place orders from 15 minutes to four hours, and drastically shortened the time a stock needed to be listed before being eligible for inclusion in the NASDAQ-100 Index.  (CAC ¶¶ 104-25.)  These significant commercial endeavors ensured "victory" for NASDAQ:  on April 5, 2012, multiple news outlets reported that Facebook had chosen NASDAQ for its IPO.  (CAC ¶¶ 109-11.)  With the "eyes of the investing world" focused on the Facebook IPO and NASDAQ's role as the exchange for the Offering, the Securities Defendants made, inter alia, the following material statements concerning NASDAQ's technology and trading platforms:

- NASDAQ is "always committed to working with regulators, exchanges and market participants to ensure transparent trading and a fair and orderly market *for the benefit of investors.*" (CAC at ¶ 172 (citing 2011 Form 10-K));

- "[NASDAQ] provides technology to customers with the speed, scale and reliability required *to meet the specific needs of their markets*" (*Id.* at ¶ 169 (citing 2011 Form 10-K));

- "[O]ur platforms are highly scalable with current capacity at ten times the average daily volume allowing significantly higher transaction volume to be handled at low incremental cost."  (*Id.*)

- "Our platform continues to stand out as a reliable, flexible, and high capacity system *delivering high levels of execution quality and speed under even extremely demanding market conditions*."  (*Id.* at ¶ 173 (citing 2011 Form 10-K));

- NASDAQ's "continued investment in technology to meet customers' demands for speed, capacity, and reliability as markets adapt to a global financial industry, as increasing numbers of new companies are created, and as emerging countries show ongoing interest in developing their financial markets."  (*Id.* at ¶ 180 (citing First Quarter 2012 Form 10-Q));

- "No trading platform on the planet *is faster or more scalable*."  (*Id.* at ¶ 186 (citing May 11, 2012 Investor Day Conference));

- "Our technology can help trade and clear any and every financial instrument on the planet."  (*Id.*);

- "We have unique capabilities unmatched by any exchange in the world."  (*Id.*);

- "[NASDAQ] delivers innovative products and services *that provide transparency to institutional, retail and individual investors*"  (*Id.*);

- "[W]e're well known for our technology, *no trading platform in the world can operate faster or at the scale that we operate*. . . . [O]ur technology can trade and clear really any instrument on the planet."  (*Id.* at ¶ 188 (citing May 11, 2012 Investor Day Conference)); and

38

- "We process billions of transactions in a day at sub-microsecond speeds to millions of customers.  And as much as that's table stakes, that's hard work just to make sure you have that reliability and capability."  (*Id.*)

The Securities Defendants had a duty to correct and/or update these statements concerning the capabilities of NASDAQ's technology and trading platforms no later than the morning of May 18, 2012 as they knew or should have known that these statements were materially misleading due to NASDAQ's unresolved systems problems paralyzing the proper execution of the Facebook IPO. (CAC ¶¶ 223-31.)  At that moment, the Securities Defendants' prior statements became materially misleading.  *See, e.g., In re J.P. Jeanneret Assoc., Inc.*, 769 F. Supp. 2d 340, 375 (S.D.N.Y. 2011) (having represented an enterprise as legitimate, defendant had a continuing obligation to apprise the class of information that rendered its assessment incorrect); *In re Beacon Assoc. Litig.*, 745 F. Supp. 2d 386, 410 (S.D.N.Y. 2010) (defendant had a "continuing duty to update or correct past statements when they became known to be misleading"); *In re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 301 (S.D.N.Y. 2009) ("duty to update applies to 'a statement made misleading by intervening events, even if the statement was true when made.'" (citing *Overton v. Todman & Co.*, 478 F.3d 479, 487 (2d Cir. 2007)); *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993) (noting that in certain circumstances, an issuer may have "a duty to update opinions and projections . . . if the original opinions or projections have become misleading as the result of intervening events"); *In re Quintel Entm't Inc. Sec. Litig.*, 72 F. Supp. 2d 283, 292 (S.D.N.Y. 1999) (same); (CAC ¶ 190).

Defendants contend that they had no duty to correct or update any of the above-referenced statements based on the assertion that all of these statements were immaterial "puffery."  (MTD Br. at 49-50.)  Defendants, however, conspicuously ignore the context of the events alleged in the CAC.

*See Oran v. Stafford*, 226 F.3d 275, 286 (3d Cir. 2000) (a duty to disclose arises when prior statements "become misleading *when viewed in the context of subsequent events*").[41]

First, the above-referenced statements, among others, gave the impression that NASDAQ's technology and trading platforms were robust, capable of reliably executing enormous volumes of orders at sub-microsecond speeds.  These statements contained factual representations that remained "alive" in the mind of investors.  *See, e.g.*, *Quintel*, 72 F. Supp. 2d at 291-92.  For example, NASDAQ expressly stated that its systems were "highly scalable with current capacity at ten times the average daily volume allowing significantly higher transaction volume," that its trading platform was a "high capacity system delivering high levels of execution quality and speed under even extremely demanding market conditions," and that "[n]o trading platform on the planet is faster or more scalable."  (CAC ¶¶ 169, 173, 186.)  As such, once these Securities Defendants knew that NASDAQ's technology and trading platforms were incapable of properly executing the *largest IPO in NASDAQ's history*, they had a duty to correct and/or update these material statements.  *See Quintel*, 72 F. Supp. 2d at 292 (duty to update prior statements that "publicly hyped" defendants' "unique" and "exciting" partnership when defendants "received information that rendered that hype misleading").[42]

Second, the Securities Defendants' omissions concerning the unresolved problems with NASDAQ's systems were clearly material.  Reasonable investors would undoubtedly have

---

[41] *See generally Casella v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989) ("What might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such representation."); *Scritchfield v. Paolo*, 274 F. Supp. 2d 163, 175-76 (D.R.I. 2003) (stressing that "a company's statements about its current and future performance were actionable as defendants failed to disclose materially misleading adverse business trends); *In re Computer Assocs. Class Action Sec. Litig.*, 75 F. Supp. 2d 68, 73 (E.D.N.Y. 1999) (statements that company's "business is stronger than ever," that there was "strong worldwide demand" for its products, and that company's "business fundamentals are strong" were non-puffery, actionable statements).

[42] *See also Time Warner*, 9 F.3d at 268 (same); *Manavazian v. Atec Grp., Inc.*, 160 F. Supp. 2d 468, 480-81 (E.D.N.Y. 2001) (company's "extremely positive" statements about its current and future performance were actionable as defendants failed to disclose materially misleading adverse business trends); *In re Computer Assocs. Class Action Sec. Litig.*, 75 F. Supp. 2d 68, 73 (E.D.N.Y. 1999) (statements that company's "business is stronger than ever," that there was "strong worldwide demand" for its products, and that company's "business fundamentals are strong" were non-puffery, actionable statements).

considered this information highly relevant in deciding whether to purchase, sell, or hold Facebook stock on NASDAQ's exchange, and the resulting chaos caused by the foreseeable breakdown in NASDAQ's systems during the Offering underscores the materiality of this information to reasonable investors. *See Basic*, 485 U.S. at 231-32 (1988); *Kronfeld v. Trans World Airlines, Inc.*, 832 F.2d 726, 732 (2d Cir. 1987) (material facts include those facts "which may affect the desire of investors to buy, sell, or hold the company's securities"); *Cf. Milman v. Box Hill Sys. Corp.*, 72 F. Supp. 2d 220, 230 (S.D.N.Y. 1999) ("Reasonable investors might certainly consider data from the initial market tests of an important new product line to be significant in their evaluation of the firm's prospects.").[43]

Given the fact that NASDAQ's proprietary technology powered the only channel through which investors could place premarket orders for Facebook's IPO, and because NASDAQ was the primary exchange for secondary market trading, Class Members made investment decisions to buy or sell Facebook stock with the expectation that NASDAQ's systems would reliably and predictably function.  (CAC ¶ 189.)  Unfortunately, far from ensuring "transparent trading and a fair and orderly market for the benefit of investors" (*Id.* at ¶ 172), NASDAQ kept investors in the dark regarding its system issues.  Consequently, these omissions "significantly altered the total mix of information available" to Class Members.  *Time Warner*, 9 F.3d 267-78; *see also In re Regeneron Pharm., Inc. Sec. Litig.*, No. 03 Civ. 3111 (RWS), 2005 WL 225288, at *21 (S.D.N.Y. Feb. 1, 2005) (Sweet, J.) ("[I]t would be a sad day when [a] court could determine that misstatements about whether a

---

[43] Defendants collect cases for the unremarkable proposition that optimistic statements that are not capable of objective verification are non-actionable "puffery."  (MTD Br. at 48-49.)  Here, however, the CAC alleges that Defendants did, in fact, objectively verify that NASDAQ's systems were experiencing system issues in the days leading up to the IPO. (CAC ¶¶ 1, 17, 22-26, 122-24, 184-85, 333.)  Moreover, disputes over the materiality of allegedly false or misleading statements are generally reserved for the trier of fact.  *See Basic*, 485 U.S. at 236; *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002) ("Recognizing that the materiality of an omission is a mixed question of law and fact, courts often will not dismiss a securities fraud complaint at the pleading stage of the proceedings, unless reasonable minds could not differ on the importance of the omission."); *cf. Escott v. BarChris Constr. Corp.*, 283 F. Supp. 643, 682 (S.D.N.Y. 1968) ("Since no one knows what moves or does not move the mythical 'average prudent investor,' it comes down to a question of judgment, *to be exercised by the trier of the fact* as best he can in light of all circumstances.").

EC.52935.4

company's primary product worked did not alter the 'total mix' of information available in the market." (alteration in original)); *cf. TSC Indus.*, 426 U.S. at 450 (plaintiffs need not show that the omission would have been outcome determinative).[44]

### 3.     NASDAQ OMX Failed to Disclose Material Facts Concerning Its System Failures and Defendants' Reckless Conduct On The Day Of The Facebook IPO

As detailed above, the Securities Defendants failed to disclose NASDAQ's known technical problems and system limitations prior to, and during the morning of, the Offering, and instead pushed the IPO forward to protect NASDAQ's reputational and financial interests.  During the Class Period, NASDAQ OMX further concealed Defendants' reckless conduct and additional system issues by disseminating a series of vague and incomplete statements to market participants through its "Market System Status" messages.  (CAC ¶¶ 195-218.)

It is well established that when one chooses to speak, one must speak truthfully, accurately, and completely about material issues.  *See, e.g.*, *Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002) ("[T]he lack of an independent duty is not . . . a defense to Rule 10b-5 liability because upon choosing to speak, one must speak truthfully about material issues."); *In re Bank of Am. Corp. Sec., Derivative & ERISA Litig.*, 757 F. Supp. 2d 260, 295 (S.D.N.Y. 2010) ("Rule 10b-5 creates a statutory duty to speak the full truth when a defendant undertakes to say anything."); *Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 237 (S.D.N.Y. 2006) ("[T]he lack of an independent duty to speak in the first instance becomes irrelevant once a party chooses to discuss material issues, because upon choosing to speak one has a 'duty to be both accurate and complete'"); *see also McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990) ("[S]tatements,

---

[44] Defendants' contention that the boilerplate risk disclosures in their SEC filings render their pre-class statements immaterial is without merit, as when "a party is aware of an actual danger or cause for concern, the party may not rely on a generic disclaimer to avoid liability."  *Edison Fund v. Cogent Inv. Strategies Fund, Ltd.,* 551 F. Supp. 2d 210, 226 (S.D.N.Y. 2008) (collecting cases).

although literally accurate, can become, through their context and manner of presentation, devices which mislead investors.").[45]

NASDAQ OMX had a duty to disclose material information at the times when it chose to speak about its system failures, including the breakdown of NASDAQ's IPO Cross system, in connection with the Facebook IPO.  Upon choosing to speak, NASDAQ OMX put the issue of its technical problems "in play," and was required to speak truthfully and completely.  *See Caiola*, 295 F.3d at 331; *see also In re Providian Fin. Corp. Sec. Litig.*, 152 F. Supp. 2d 814, 824-25 (E.D. Pa. 2001) (finding material omissions when defendants put a subject "in play" but did not speak truthfully or completely on that subject) (citing *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 281-82 (3d Cir. 1992)).[46]

> ### a.  NASDAQ OMX Had a Duty to Disclose the Known Technical Failures with Its IPO Cross System Prior to Commencing Secondary Market Trading

Prior to 11:30 a.m., when Defendants forced commencement of secondary market trading for the Facebook IPO, NASDAQ OMX disseminated two "Market System Status" messages that misrepresented and concealed material facts concerning the known problems with its IPO Cross System and the reckless conduct undertaken to commence secondary market trading in Facebook's

---

[45] *Accord In re K-Tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 898 (8th Cir. 2002) ("[T]he [securities] law[s] require[] 'an actor to provide complete and non-misleading information with respect to the subjects *on which he undertakes to speak.*'") (emphasis in original); *Helwig v. Vencor, Inc.*, 251 F.3d 540, 561 (6th Cir. 2001) ("[E]ven absent a duty to speak, a party who discloses material facts in connection with securities transactions 'assume[s] a duty to speak fully and truthfully on those subjects.'"); *Lucia v. Prospect St. High Income Portfolio, Inc.*, 36 F.3d 170, 175 (1st Cir. 1994) ("[T]he fact that a statement is literally accurate does not preclude liability under [the] federal securities laws.").

[46] Defendants argue that the material omissions giving rise to Lead Plaintiffs' Section 10(b) claims "could not have been material to any reasonable investor's decision to purchase Facebook" as the omissions concerned NASDAQ and not Facebook.  (MTD Br. at 50-51.)  Defendants' contention misses the mark.  First, as noted above, Defendants fail to take into account the context in which the material omissions were made.  NASDAQ's stock exchange was the *only* means to place premarket orders for Facebook securities, and the primary market to engage in secondary trading in connection with one of the most highly anticipated and largest IPOs in U.S. history.  Second, courts have routinely found that false and misleading statements made by a non-issuer are actionable under Section 10(b).  *See, e.g., Tolin v. AMBAC Fin. Grp., Inc.*, No. 08 Civ. 11241(CM), 2010 WL 431971, at *2 (S.D.N.Y. Feb. 5, 2010) (explicitly rejecting argument that Section 10(b) precluded suit against "someone other than the issuer of the security that is the subject of the lawsuit"); *NYSE Specialists*, 503 F.3d at 102 (plaintiffs had standing to assert a Section 10(b) claim when the company whose stock they purchased was negatively impacted by the material misstatement of another party).

EC.52935.4

stock.  (CAC ¶¶ 196-201.)  Specifically, NASDAQ OMX disseminated the following messages at

11:13 a.m. and 11:28 a.m., respectively:

- NASDAQ is experiencing a delay in delivering the opening print in Facebook, Inc. (FB). NASDAQ will advise.
- The first print in Facebook (FB) will open at approximately 11:30 ET.  Trading will commence at that time.

Though Defendants contend that these statements were "factually true" (MTD Br. at 47), it is what

NASDAQ OMX did not say that made these statements materially incomplete and, therefore,

misleading.

At the time NASDAQ OMX disseminated these statements, Defendants knew that

NASDAQ's IPO Cross system was overwhelmed with the enormous volume of orders and

cancellations received for Facebook's IPO, preventing it from:  (i) completing the Cross; (ii)

reporting the price and volume of the executions in the Cross; and (iii) commencing secondary

market trading.  (CAC ¶¶ 198, 200; SEC Order at ¶¶ 10, 15-20.)  Additionally, at approximately

11:05 a.m., several members of NASDAQ OMX's "leadership team," including Defendant Greifeld,

commenced a "Code Blue" conference call where these members made the "high risk, *ad hoc*

decision to resort to an untested backup system and inferior failover procedures" to complete the

Cross.  (CAC ¶¶ 198, 200; SEC Order at ¶¶ 23-25.)  This decision caused NASDAQ to fail to process

a number of order cancellations and to assume an unauthorized "error" position in Facebook.  (SEC

Order at ¶¶ 23-25.)

Accordingly, NASDAQ OMX's statements that there was a "delay in delivering the opening

print" for Facebook and that the first print for Facebook would "open at approximately 11:30 ET"

were materially incomplete and misleading because NASDAQ OMX failed to disclose this known

adverse information to Class Members.  Half-truths like NASDAQ OMX's statements are actionable

under Section 10(b).  *See, e.g.*, *McMahan*, 900 F.2d at 579 ("[T]he disclosure required by the

44

securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers."); *Fogarazzo v. Lehman Bros., Inc.*, 341 F. Supp. 2d 274, 294 (S.D.N.Y. 2004) ("A statement can also be misleading, though not technically false, if it amounts to a half-truth by omitting some material fact."); *IPO*, 241 F. Supp. 2d at 380 ("An 'untrue statement,' *i.e.*, a misstatement that comprises a half-truth or a whole lie . . . is *always* misleading because a speaker, having begun to speak, is obliged to do so completely and truthfully.") (citing *Caiola*, 295 F.3d at 329-31).

### b.    NASDAQ OMX Had a Duty to Disclose Continuing System Problems After Commencing Secondary Market Trading

After Defendants forced the commencement of secondary market trading by switching to an untested backup system (a fact which was never disclosed), NASDAQ OMX continued to disseminate vague and incomplete "Market System Status" messages that concealed the host of system issues that occurred after 11:30 a.m.  (CAC ¶¶ 202-18.)  NASDAQ OMX disseminated the following messages at 11:59 a.m. and 1:05 p.m., respectively:

- NASDAQ is investigating an issue in delivering trade execution messages from the IPO Cross in symbol FB.  NASAQ is working to deliver these executions back to customers as soon as possible.  NASDAQ will advise.
- NASDAQ is working to deliver pending trade execution status messages from the Facebook, Inc. (FB) IPO Cross.  NASDAQ anticipates providing a manual report to participants containing this information shortly.  To be later followed with the electronic message summary.  NASDAQ will provide additional information when available.

While NASDAQ OMX continued to conceal the known technical failures with the IPO Cross System that were discovered prior to 11:30 a.m., new information came to light concerning additional system failures that NASDAQ OMX also failed to disclose.  For example, immediately after the Cross completed, "NASDAQ executives, including its Senior Vice President and Chief Economist . . . . noticed the approximately 6.3 million share difference between the final indicative volume total (82 million) and the actual volume in the print (75.7 million).  This discrepancy indicated to NASDAQ's

45

Chief Economist *that there was still a problem with the cross and that some cross eligible orders may not have been handled properly in the cross but NASDAQ did not address this issue during the minutes and hours following the cross*."  (SEC Order at ¶ 27.)  Additionally, Defendants' decision to switch to an untested backup system caused NASDAQ's "Execution Application" to mark all premarket Cross orders as being in error which prevented NASDAQ's system from disseminating confirmations for these orders.  (*Id.* at ¶ 30.)  This error also prevented accurate quoting data from being delivered to NASDAQ's Prop Feed and the SIP Quotation Data Feed.  (*Id.* at ¶ 31.)

In light of the numerous system problems that NASDAQ was experiencing – and the resulting chaos these problems caused investors – at approximately 11:35 a.m., "the participants on the Code Blue call discussed whether to halt trading in Facebook."  (*Id.* at ¶ 32.)  NASDAQ LLC's Rule 4120(a) provides the exchange with the authority to initiate trading halts under various circumstances, including when NASDAQ LLC determines that "extraordinary market activity in the security is occurring."  (*Id.*)  Despite the fact that NASDAQ's trading platforms, including the IPO Cross System and the untested backup system, were not functioning properly, the participants on the Code Blue call determined that "extraordinary market activity" was not occurring and allowed trading to continue.  (*Id.*)

Instead of disclosing these material facts (and others), NASDAQ OMX vaguely stated that it was "investigating an issue in delivering" IPO Cross confirmations and that it was "working to deliver" such confirmations.  Consequently, NASDAQ OMX's incomplete statements left investors, including Class Members, in the dark.  *See e.g.*, *Caiola,* 295 F.3d at 331; *Hall v. The Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 226 (S.D.N.Y. 2008) ("Once defendants chose to speak about their company, they undertake a duty 'to speak truthfully and to make such additional disclosures as . . . necessary to avoid rendering the statements misleading.'" (alteration in original)); *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148,159-60 (S.D.N.Y. 2008) ("Once a

46

corporation has elected to speak, however, Rule 10b-5 mandates that its speech must be truthful, accurate, and complete.").

**c.      NASDAQ OMX Had a Duty to Disclose the Realization of Additional Problems Upon The Delivery of Confirmations**

From approximately 12:00 to 1:45 p.m., NASDAQ's engineers worked on finding a solution to successfully deliver confirmations.  (*See* SEC Order at ¶ 36.)  During this time, "NASDAQ's member call center continued to receive numerous complaints from members who were seeking to determine their position in Facebook securities."  (*Id.*)

At approximately 1:45 p.m., NASDAQ found a way to deliver the missing confirmations, and disseminated the following messages at 1:47 p.m. and 1:57 p.m., respectively:

- NASDAQ expects to electronically deliver all executions from the Facebook, Inc. (FB) IPO Cross at approximately 13:50 ET.  NASDAQ will advise when this is complete.
- Trade execution messages for the Facebook Inc. (FB) IPO Cross have been electronically disseminated.  All NASDAQ systems are operating normally.

(CAC ¶¶ 207-08.)  As detailed in the CAC, and as confirmed by the SEC, these messages omitted material information concerning additional problems that adversely affected Class Members.  (*Id.* at ¶¶ 209-11.)

For example, upon delivering all confirmation messages for orders executed in the IPO Cross, NASDAQ learned that more than 30,000 Cross-eligible "stuck" orders entered between 11:11 a.m. and 11:30:09 a.m. were not included in the Cross.  (*Id.* at ¶ 209; SEC Order at ¶ 38.)  Moreover, of the more than 30,000 "stuck" orders, approximately 13,000 were released into the secondary market at 1:49:49 p.m. (the other "stuck" orders were canceled).[47]  (SEC Order at ¶ 39.)  The release of these 13,000 orders into the market "altered the composition of the resting order book in Facebook (across

---

[47] By not releasing or canceling these stuck orders until approximately 1:50 p.m., NASDAQ LLC violated its own Rule 4757(a)(1) concerning price/time priority as "[e]ach of the more than 30,000 stuck orders was not given priority over same or worse-priced orders executed in secondary trading between 11:30:09 a.m. and 1:49:49 p.m."  (SEC Order at ¶ 38.)

47

all public markets), such that there were orders for approximately 3 million more shares on the sell

side" causing "the largest sell imbalance in the aggregated order book over the course of the entire

trading day, ***and correlated with a 93-cent decrease in Facebook's share price between 1:50 p.m.***

***and 1:51 p.m.***"  (*Id.*)

While NASDAQ OMX's above statements informed Class Members of the time that they

could expect to receive confirmations for their IPO Cross orders, NASDAQ OMX failed to disclose

that there were more than 30,000 orders that did not execute in the Cross.  NASDAQ OMX also

failed to inform market participants that due to its system failures, 13,000 orders flooded the market

at 1:50 p.m. causing a $0.93 per share drop in the price of Facebook's stock.  (SEC Order at ¶ 39.)

This fact would undoubtedly have altered the "total mix" of information available to investors.  *See*,

*e.g.*, *Basic*, 485 U.S. at 231-32; *IPO*, 241 F. Supp. 2d at 382 ("[A] major congressional policy behind

the securities laws in general, and the antifraud provisions in particular, is the protection of investors

who rely on the completeness and accuracy of information made available to them.").

For all of these reasons, the CAC adequately alleges that NASDAQ OMX failed to disclose

material information when it chose to disseminate messages concerning its system problems in

connection with the Facebook IPO.

> **B.**     **Lead Plaintiffs Adequately Allege Scienter**
>
> **1.**     **Pleading Scienter Under the PSLRA**

The PSLRA requires that a complaint plead facts sufficient to show a strong inference that a

defendant acted with an intent to "deceive, manipulate, or defraud."  *Tellabs, Inc. v. Makor Issues &*

*Rights, Ltd.*, 551 U.S. 308, 319 (2007); *see also Novak v. Kasaks*, 216 F.3d 300, 307-08 (2d Cir.

2000).  In applying this standard, courts must "accept all factual allegations in the complaint as true,"

and determine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of

scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Tellabs*,

EC.52935.4

551 U.S. at 323 (emphasis in original).  "The inference that the defendant acted with scienter need not be irrefutable . . . or even 'the most plausible of competing inferences.'"  *Id.* at 324.  Rather, the inference need only be at least as compelling as any plausible opposing inference from the facts, and if they are equally likely, the action should be permitted to move forward.  *Id.* at 324 n.5; *In re Top Tankers, Inc. Sec. Litig.*, 528 F. Supp. 2d 408, 413-14 (S.D.N.Y. 2007).

Plaintiffs can establish a strong inference of scienter by alleging facts showing either (a) defendant's "motive and opportunity" to commit the alleged fraud, or (b) strong circumstantial evidence of conscious misbehavior or recklessness.  *ATSI*, 493 F.3d at 99.  Courts have determined that a "strong inference of scienter" exists when the facts demonstrate that defendants:  (i) benefited in a "concrete and personal way" from the alleged fraud; (ii) engaged in "deliberately illegal" behavior; (iii) "knew facts or had access to information suggesting that their public statements were not accurate"; or (iv) failed to verify information that Defendants had a duty to monitor.  *See Novak*, 216 F.3d at 311.  The CAC alleges such facts.

### 2.    The CAC Alleges Facts That Constitute Strong Circumstantial Evidence Of Conscious Misbehavior And/Or Recklessness

Defendants contend that the CAC fails to adequately allege scienter because it cites to publicly available information (such as news reports, articles, and SEC releases) that amount to "conclusory assertions about defendants' states of mind."  (MTD Br. at 53.)  However, Defendants erroneously focus on isolated allegations and incorrectly frame the scienter analysis under *Tellabs*, which requires courts to examine a complaint's allegations holistically and in their totality.  *See Tellabs*, 551 U.S. at 323.  Moreover, it is not necessary to plead facts establishing that the Securities Defendants had actual knowledge of the falsity of their statements.  It is sufficient if Lead Plaintiffs allege "facts that constitute strong circumstantial evidence of conscious misbehavior or

49

recklessness."[48]  *Novak*, 216 F.3d at 307.  Consistent with the Second Circuit's decision in *Novak*,

Lead Plaintiffs have satisfied this standard by alleging facts demonstrating that the Securities

Defendants "knew facts or had access to information" contrary to their public statements and "failed

to verify information" they had a duty to monitor.  *Novak*, 216 F.3d at 311.

> a.  **The Securities Defendants Knew Facts and/or Had Access to Information Contradicting Their Public Statements**

As detailed in the CAC, in the days leading up to the Facebook IPO, NASDAQ undertook a

series of tests on its systems that revealed unresolved technical issues calling into serious doubt the

reliability of NASDAQ's systems in executing the enormous trading volume anticipated for the

Offering.  (CAC ¶¶ 23-24, 121-24, 219-33.)  These tests arose out of Defendants' decision to expand

NASDAQ's premarket window for investors to place orders for Facebook securities from 15 minutes

to four hours.  (CAC ¶¶ 119-125.)  While this "change . . . made compelling commercial sense for

NASDAQ" as the "higher the number of orders (and cancellations or changes to those orders), the

more income is generated for NASDAQ," Defendants were "still testing for the consequences of this

change" on May 16 and 17, 2012.  (CAC ¶¶ 119, 225; *see also* ¶ 223 (*New York Post* reporting that

NASDAQ's software used for the IPO "still had bugs" and that "the system wasn't glitch free even at

the 11th hour and that Nasdaq opted to roll the dice"); ¶ 224 (*Business Insider* interviewed hedge

fund manager who described how NASDAQ "knew its systems were broken before the Facebook

---

[48] Scienter based upon recklessness – *i.e.,* "an extreme departure from the standards of ordinary care to the extent that *the danger was either known to the defendant or so obvious that the defendant must have been aware of it,*" (*South Cherry Street, LLC v. Hennessee Group LLC,* 573 F.3d 98, 109 (2d Cir. 2009) (emphasis in original)) is a "sufficiently culpable mental state for securities fraud"(*JP Morgan*, 553 F.3d at 198).

IPO".).)[49]  It was at this point when the Securities Defendants knew or should have known of

contemporaneous conditions making their prior statements touting NASDAQ's technology and

trading platforms – *i.e.,* its core operations – materially misleading.  *See, e.g.*, *In re New Century*, 588

F. Supp. 2d 1206, 1228 n.21 (C.D. Cal. 2008) (scienter properly pled based upon allegations that

senior management knew of "contemporaneous conditions . . . crucial to the core operations of the

company" contrary to what their statements conveyed); *In re Check Point Software Tech. Ltd. Sec.

Litig.*, No. 03 Civ. 6594 (KMB), 2006 WL 1116699, at *4 (S.D.N.Y. Apr. 26, 2006) (misstatements

and omissions concerning the "*core operations* of the company support[] the inference that the

defendant knew or should have known the statements were false when made"); *In re Atlas Air

Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004) (same).

Similarly, during the Class Period, it is clear that NASDAQ OMX knew facts or had access to

information making its statements materially misleading.  NASDAQ OMX chose to disseminate

vague and incomplete "Market System Status" messages that failed to disclose known information

concerning, *inter alia*:  (i) the IPO Cross system failures resulting in erroneously executed orders and

delayed confirmations for all premarket orders; (ii) Defendants' reckless use of an untested backup

system and inferior failover procedures to force the Cross to complete at 11:30 a.m.; and (iii) the

---

[49] None of the cases Defendants cite to in their motion to dismiss in an attempt to discredit the CAC's scienter allegations are on point.  (MTD Br. at 53.)  In *Campo v. Sears Holdings Corp.*, 371 F. App'x 212 (2d Cir. 2010), the Second Circuit noted that press speculation concerning opinions held by a defendant several years prior did not constitute "admissions" of an intent to defraud by that defendant.  *Id.* at 215.  In *Rosenzweig v. Azurix Corp.*, 332 F.3d 854 (5th Cir. 2003) the Fifth Circuit, in affirming the district court's denial of leave to amend the complaint, noted that news articles plaintiffs cited in their motion for leave to amend simply reiterated defendant's "well-documented woes [already alleged in original complaint] . . . leaving the district court to speculate as to how these seemingly redundant facts might amount to a legal claim."  *Id.* at 865.  In *Stern v. Leucadia Nat'l Corp.*, 844 F.2d 997 (2d Cir. 1988), the Second Circuit noted that the press reports relied on by plaintiffs focused on defendant allegedly engaging in misconduct in other merger deals, instead of the deal at issue.

Moreover, Defendants' contention that the media reports cited in the CAC "constitute multiple hearsay" (MTD Br. at 53 n.30), is entirely irrelevant, as allegations in a complaint are not tested against the rules of evidence.  *See, e.g.*, *Castro v. Covenant Aviation Sec., LLC*, No. 12 Civ. 3037 (PAC), 2013 WL 3811474, at *2 (S.D.N.Y. Jul. 22, 2013) (noting that, prior to answer or discovery "the Federal Rules of Evidence are inapposite," because, "[a]t this stage, . . . 'the court . . . has only allegations and no evidence before it.'") (citing *D.H. Blair & Co., v. Gottdiener*, 462 F.3d 95, 107 (2d Cir. 2006)).

"Code Blue" call where, immediately after the Cross completed, NASDAQ learned that "there was still a problem with the [C]ross," but "NASDAQ never addressed this issue." (CAC ¶¶ 195-211; SEC Order ¶¶ 15-27.) Indeed, far from all "NASDAQ systems . . . operating normally," after NASDAQ delivered the confirmations at 1:50 p.m., Defendants knew that more than 30,000 Cross-eligible "stuck" orders entered between 11:11 a.m. and 11:30:09 a.m. were not included in the Cross and that 13,000 orders were released into the market at 1:50 p.m. causing a $0.93 decrease in Facebook's share price. (CAC ¶ 209; SEC Order at ¶¶ 38-39; *See* Section III.A.3.c, *supra*.)

Accordingly, Lead Plaintiff's allegations are sufficient to support a strong inference of scienter. *See, e.g.*, *Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 622 (S.D.N.Y. 2008) (allegations that "Defendants had knowledge of facts . . . that explicitly contracted their public statements . . . alone are enough to satisfy the pleading requirement for scienter"); *Nathel v. Siegal*, 592 F. Supp. 2d 452, 465 (S.D.N.Y. 2008) (allegations gave rise to strong inference of scienter where defendants had access to internal documents that contradicted their public statements); *Novak,* 216 F.3d at 308 ("[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements.").

**b.    The Securities Defendants Failed to Verify Information They Had a Duty to Monitor**

The CAC also pleads facts demonstrating that the Securities Defendants failed to verify information concerning whether NASDAQ's systems were reliable and capable of properly handling the enormous trading volume in the Facebook IPO. As discussed above, NASDAQ's volume testing in the week leading up to the IPO only simulated trading volumes of 6 to 53 million shares and replicated only 40,000 pre-market orders in a test security. (CAC ¶¶ 120-22, 225-28; SEC Order at ¶ 12.) On May 18, 2012, more than 80 million shares traded in the *first 30 seconds* of trading with total trading volume of 567 million shares. (CAC ¶¶ 120-22, 225-28.) Likewise, "NASDAQ members

52

entered over 496,000 orders into the Cross." SEC Order at ¶ 12. By failing to provide adequate tests to ensure NASDAQ's systems were capable of executing the record-setting trading volume for the Facebook IPO, the Securities Defendants failed to verify information that they were obligated to monitor, which demonstrates scienter on its own. *See Novak*, 216 F.3d at 311; *see also S. Cherry*, 573 F.3d at 113 (scienter demonstrated when defendants fail to verify information that they have a duty to monitor).

Moreover, it is clear that NASDAQ did not have the necessary internal controls before or during the Class Period to verify whether its systems could reliably handle the anticipated enormous trading volume in the Facebook IPO. As noted in the SEC Order, NASDAQ agreed to undertake a variety of remedial measures to strengthen its internal controls. Among other remedial undertakings, NASDAQ agreed to: (i) "enhance its technology change process by . . . expanding and formalizing participation by stakeholders across NASDAQ – including technology, business, legal, and regulatory personnel – in the product development lifecycle to promote greater transparency and communication, and enhanced supervision, in the design, deployment, project management, and approval phases"; (ii) "deploy new standardized global change management software to provide . . . enhanced risk management capability and expedited incident response/management"; (iii) "dedicate a system and performance engineering team to daily monitoring and analysis of system performance, and will establish a new quality assurance organization. . . ."; and (iv) "make technical changes to its IPO/Halt Crosses, and to its Opening and Closing Crosses, designed to prevent a recurrence of the persistent recalculation problem that affected the Facebook IPO." (SEC Order at ¶¶ 65-74); *see also In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 73 (2d Cir. 2001) ("[P]ost-class period data may be relevant to determining what a defendant knew or should have known during the class period.") (citing *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000) and *Novak*, 216 F.3d at 312-13).

53

Accordingly, because the CAC alleges facts that demonstrate that the Securities Defendants failed to verify information concerning the reliability of NASDAQ's technology and trading platforms in connection with the Facebook IPO, Lead Plaintiffs have adequately plead scienter against these Defendants.

## C.      Lead Plaintiffs Adequately Allege Reliance

The Supreme Court's landmark decision in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) provides a presumption of reliance in securities actions "involving primarily a failure to disclose." *Id.* at 153.  This presumption may be invoked in cases where plaintiffs plead "an omission of a material fact by one with a duty to disclose."  *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 159 (2008).  Indeed, courts have long recognized that the *Affiliated Ute* presumption of reliance applies in situations where the gravamen of a complaint's allegations concern material omissions because "reliance as a practical matter is impossible to prove."  *Wilson v. Comtech Telecomms. Corp.*, 648 F.2d 88, 93 (2d Cir. 1981); *see also In re Smith Barney Transfer Agent Litig.*, 290 F.R.D. 42, 47 (S.D.N.Y. 2013) ("The *Affiliated Ute* doctrine, in other words, is a pragmatic one. . . .   Accordingly, reliance is presumed when it would be impossible to prove"); *Joseph v. Wiles*, 223 F.3d 1155, 1162 (10th Cir. 2000) ("Requiring a plaintiff to show a speculative set of facts, i.e., how he would have behaved if omitted material information had been disclosed, places an unrealistic evidentiary burden on the 10(b) plaintiff").

Although Defendants acknowledge that the *Affiliated Ute* presumption of reliance applies in situations where plaintiffs' claims rest primarily on a failure to disclose, they make the baseless assertion that "the [CAC] rests primarily on affirmative statements . . . that plaintiffs assert were false and misleading."[50]  (MTD Br. at 57.)  Contrary to Defendants' self-serving contention, the CAC's

---

[50] Defendants cite to cases standing for the unremarkable proposition that the *Affiliated Ute* presumption does not apply to allegations that "rest primarily on affirmative statements."  (MTD Br. at 57 (collecting cases).)  None of these cases is applicable here as the CAC allegations against the Securities Defendants are solely based upon their material omissions.

54

allegations against the Securities Defendants are based *solely* upon material omissions concerning NASDAQ's known system problems in connection with the Facebook IPO.  Further, as detailed in Section III.A, *supra*, the CAC demonstrates that the Securities Defendants omitted material facts which they had a duty to disclose.

Here, the CAC identifies certain affirmative statements in order to demonstrate that the Securities Defendants had a duty:  (i) to correct and/or update previous material statements that were misleading due to NASDAQ's unresolved system problems with its trading platforms in the days leading up to, and the morning of, the Facebook IPO) (CAC ¶¶ 168-94); and (ii) to disclose material information necessary to make their statements not misleading in connection with NASDAQ OMX's "Market System Status" messages (*Id.* at ¶¶ 190-235).  *See Smith Barney*, 290 F.R.D. at 47-48 ("Plaintiffs' identification of certain affirmative representations does not, by itself, show that this is primarily a misstatements case.  Rather, Plaintiffs claim that the challenge statements are misleading because they fail to [disclose material information].").

For example, the CAC alleges that, no later than the morning of the IPO, the Securities Defendants had a duty to update various statements touting the capabilities and reliability of NASDAQ's trading technology once it became clear that these statements were no longer true. (CAC ¶¶ 168-194; *see also* Section III.A.2, *supra*.)  Contrary to Defendants' blanket assertions, these portions of the CAC do not "rest[] primarily on affirmative statements," but rather on the Securities Defendants' material omissions, upon which "reliance as a practical matter is impossible to prove."[51] *Wilson*, 648 F.2d at 93.

_____

[51] Even Defendants' citations to the CAC demonstrate that Lead Plaintiffs' securities claims arise out of the Securities Defendants' material omissions.  (*See* MTD Br. at 57 (citing CAC ¶¶ 168-218).)  While Defendants contend that "NASDAQ had no affirmative duty to disclose facts relating to the capabilities of its trading systems," (MTD Br. at 57), as discussed in Section III.A.2 *supra*, it is clear that the Securities Defendants had an affirmative duty to update their pre-Cass Period statements.

Moreover, the CAC further alleges that NASDAQ OMX made material omissions in connection with its "Market System Status" messages throughout the Class Period.  (CAC at ¶¶ 195-218.)  As discussed above in Section III.A.3, having chosen to speak to investors about its system problems in connection with the Facebook IPO, NASDAQ OMX had a duty to speak truthfully, accurately, and completely about these material issues.  *See, e.g.*, *Caiola*, 295 F.3d at 331.  In this regard, the CAC explicitly details each incomplete and vague statement NASDAQ OMX disseminated during the Class Period and provides the numerous omitted material facts making each particular statement misleading, in accordance with the PSLRA.  *See* 15 U.S.C. § 78u-4(b)(1); *Smith Barney*, 290 F.R.D. at 48 (noting that certain "disclosures are truthful, as far as they go.  But what makes them misleading is what they do not say:" the statements do not reveal numerous material facts). (CAC ¶¶ 195-218.)

Accordingly, because the CAC allegations against the Securities Defendants involve "primarily a failure to disclose" that presents a situation where "reliance as a practical matter is impossible to prove," reliance may be presumed under the *Affiliated Ute* doctrine.  *Smith Barney,* 290 F.R.D. at 47.

    **D.**    **Lead Plaintiffs Adequately Allege Loss Causation**

In order to state a claim for securities fraud, a plaintiff must allege "that the act or omission of defendant . . . caused the loss for which the plaintiff seeks to recover damages."  15 U.S.C. § 78u-4(b)(4); *see also Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005).  Consistent with *Dura*, the Second Circuit has noted that:

> the damages suffered by plaintiff must be a foreseeable consequence of any misrepresentation or material omission . . . .  Put another way, a misstatement or omission is the "proximate cause" of an investment loss if the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations and omissions alleged . . . .

*Lentell*, 396 F.3d at 172-73.

Loss causation can be pled by "alleging either a corrective disclosure of a previously undisclosed truth that causes a decline in the stock price *or the materialization of a concealed risk that causes a stock price to decline*." *In re Am. Int'l Grp., Inc. 2008 Sec. Litig.* (*AIG*), 741 F. Supp. 2d 511, 534 (S.D.N.Y. 2010). With "respect to the latter, 'where *some or all of the risk* is concealed by the defendant's misrepresentation or omission, courts have found loss causation sufficiently pled.'" *AIG*, 741 F. Supp. 2d at 534 (quoting *Nathel*, 592 F. Supp. 2d at 467). Additionally, pleading loss causation "is governed by Rule 8 notice pleading, and therefore a complaint only needs to provide 'some indication of the loss and the causal connection that the plaintiff has in mind.'" *Wallace v. IntraLinks*, No. 11 CV 8861 (TPG), 2013 WL 1907685, at *9 (S.D.N.Y. May 8, 2013) (quoting *Dura*, 544 U.S. at 346-47); *see also In re Bear Stearns Cos. Inc. Sec. Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 505 (S.D.N.Y. 2011) (Sweet, J.) ("The pleading of loss causation under Section 10(b) is governed by Rule 8 notice pleading standards. . . .").[52]

The allegations set forth in the CAC satisfy the pleading standards for loss causation. Specifically, the CAC details how the "[the Securities Defendants] concealed the risk that NASDAQ's technology and trading platforms, including its IPO Cross system, would fail to reliably perform in connection with Facebook's IPO." (CAC ¶ 237; *see also* CAC ¶¶ 25-29, 122-24.) The CAC further alleges that "[t]he materialization of these risks occurred during the Class Period when NASDAQ's systems: (i) failed to properly execute Class Members' buy and sell pre-market Cross orders and aftermarket orders in Facebook's IPO; and (ii) failed to timely deliver confirmations of Class Members' pre-market Cross orders." (CAC ¶ 238; *see also* CAC ¶¶ 139-59.) As detailed in the CAC, the materialization of these concealed risks:

---

[52] *Accord Ong v. Sears, Roebuck & Co.*, 459 F. Supp. 2d 729, 742-43 (N.D. Ill. 2006) (*Dura* "impos[ed] no heightened pleading standard for loss and causation."); *In re Silicon Image, Inc. Sec. Litig.*, No. C-050456 MMC, 2006 WL 1709424, at *3 (N.D. Cal. June 21, 2006) ("loss causation . . . need not be pleaded with specificity"); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 439 F. Supp. 2d 692, 714 (S.D. Tex. 2006) (pleading loss causation is governed "under the notice standard of Rule 8").

> caused Class Members substantial damages by, *inter alia*:  (i) causing
> erroneous and failed trade executions; (ii) blinding Class Members for hours –
> if not days – as to their then-current positions in Facebook stock due to late
> and/or missing trade confirmations; (iii) preventing Class Members from
> executing orders at the National Best Bid/Offer ("NBBO") prices for Facebook
> stock as required by SEC Reg. NMS; and (iv) exposing Class Members to
> related failures of the NASDAQ trading platform, resulting in, among other
> things, an artificial downward pressure on the price of Facebook's stock.

(CAC ¶ 15.)  In addition, Defendants' material omissions caused Class Members further damages by

concealing the true nature and extent of NASDAQ's system issues, leaving Class Members in the

dark as to the magnitude of NASDAQ's technical failures and related reckless conduct.  (*See* CAC ¶¶

195-218.)  As a result of the Securities Defendants' material omissions, the price of Facebook stock

"plummeted from a high of $45.00 per share in the first 15 minutes of open-market trading to a low

of $38.00, finally closing at $38.23 per share."  (CAC ¶ 30.)

These damages are all within the "zone of risk *concealed* by" the Securities Defendants'

material omissions which proximately caused Class Members damages.  Indeed, the Securities

Defendants' failure to disclose NASDAQ's system issues concealed the risk that NASDAQ's trading

platforms were incapable of properly handling the enormous volume of the Facebook IPO.  Thus,

investors placed orders in the IPO completely unaware of NASDAQ's disastrous system failures.  *See*

*Lentell*, 396 F.3d at 173; *AIG*, 741 F. Supp. 2d at 534.

Defendants contend that it is "implausible" that the "materialization of the NASDAQ system

issues on May 18" could cause the price of Facebook stock to decline.  (MTD Br. at 60.)

Defendants' contention is belied, however, by the fact that NASDAQ LLC has agreed to pay $62

million in accommodation payments for certain categories of IPO Cross orders in which Defendants

have recognized that investors suffered losses directly attributable to NASDAQ's system issues.

Additionally, while Defendants suggest that the decline in Facebook's stock price is attributable to

factors other than the materialization of the NASDAQ system issues during the Class Period, "'the

existence of intervening events that break the chain of causation, such as a general fall in the price of

stocks in a certain sector, is a matter of proof at trial and *not to be decided on a Rule 12(b)(6) motion to dismiss.*'"[53]  *AIG*, 741 F. Supp. 2d at 534 (emphasis added) (quoting *Nathel*, 592 F. Supp. 2d. at 467); *see also Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003) (same).  In this regard, Defendants have confused *pleading* loss causation with *proving* total damages.  The latter requires a fact-intensive analysis after the completion of meaningful fact and expert discovery, inappropriate for adjudication at the motion to dismiss stage.[54]

Accordingly, for the reasons set forth above, the CAC adequately alleges loss causation.

## IV.    THE NEGLIGENCE CLAIMS ARE NOT BARRED BY THE ECONOMIC LOSS DOCTRINE

NASDAQ argues that because it does not have a contractual relationship directly with retail investors, it owes them no duty of care in handling their trade orders once those are sent to the exchange by the brokers.  (MTD Br. at 38-40.)  In a classic "Catch-22," NASDAQ would relegate retail investors to non-existent contract remedies against brokers who were not at fault, and deny any remedy against NASDAQ, whose systems caused the losses.  (MTD Br. at 39-40.)

NASDAQ relies on the New York "economic loss" doctrine,[55] which is designed to prevent a plaintiff from circumventing the limitations of available contractual remedies by also pursuing damages in tort.  Here, Plaintiffs do not have any available contractual remedies for the NASDAQ

---

[53] To the extent Defendants' argue that Lead Plaintiffs must allege that the "value of Facebook stock was artificially inflated by" their material omissions (MTD Br. at 60), no such requirement exists.  There is no "controlling precedent" requiring plaintiffs to establish that "a misstatement or omission artificially inflated the value of a security."  *In re Sadia, S.A. Sec. Litig.*, 269 F.R.D. 298, 316 (S.D.N.Y. 2010) ("The Second Circuit only requires evidence that the misstatement and/or omission 'conceal something from the market that, *when disclosed*, negatively affected the value of the security.'" (emphasis in original)) (citing *Lentell*, 396 F.3d at 176); *see also Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 157-58 (2d Cir. 2007) (loss causation requires that the misstatement be "the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations . . . alleged by a disappointed investor" and making no mention of artificial inflation (alteration in original).).

[54] For this same reason, Defendants' contention that Lead Plaintiffs in the Facebook Actions have asserted a different loss causation theory or that Facebook's stock price continued to fall after May 18, (MTD Br. at 61), is of no moment at the Rule 12(b)(6) stage without the benefit of any discovery.  *See AIG*, 741 F. Supp. at 534.

[55] *See, e.g. Bellevue S. Assoc. v. HRH Constr. Corp.*, 579 N.E.2d 195, 200 (N.Y. 1991) (barring claims where "plaintiff's remedy lies in the enforcement of contract obligations, not the enlargement of strict products liability. . . .")

EC.52935.4

system failures.[56]  That aside, the "economic loss" doctrine is wholly inapposite because it applies

solely to products liability cases.  As the New York Court of Appeals stated in *532 Madison Avenue*

*Gourmet Foods, Inc. v. Finlandia Center, Inc.*, 750 N.E.2d 1097 (N.Y. 2001), "[t]he 'economic loss'

rule . . . stands for the proposition that ***an end-purchaser of a product*** is limited to contract remedies

and may not seek damages in tort for economic loss against a manufacturer."  *Id.* at 1101 n.1[57]

King Cnty. v. IKB Deutsche Industriebank AG*, 863 F. Supp. 2d 288 (S.D.N.Y. 2012),

involved claims for economic losses in the purchase of a structured investment vehicle ("SIV").  The

Court did not bar the claims under the "economic loss" doctrine but held, as a matter of law, that an

SIV "cannot be negligently structured" because "even a low-quality financial product with a high

level of risk and low expected return would have an appropriate price, albeit a low one."  *Id.* at 303.

Here, Negligence Plaintiffs are not seeking economic loss for decline in value of an

investment vehicle structured by NASDAQ.  Rather, they claim losses for mishandling of their trade

orders unrelated to the investment value of Facebook stock.  As the *King County* court made clear the

focus of the analysis must be "whether a defendant had a duty to protect a plaintiff against purely

economic losses." *King Cnty.,* 863 F. Supp. 2d at 302.

NASDAQ argues that New York courts have "consistently refused to impose a duty of care to

protect such a broad and amorphous class of potential plaintiffs from economic loss."  (MTD Br. at

---

[56] Despite Defendants' contention that First New York's negligence claims are barred by NASDAQ LLC Rule 4626 (MTD Br. at 40-43), First New York is part of the Securities Class and, accordingly, is asserting only securities claims against the Securities Defendants in this action.  Prior to the Court's consolidation of the NASDAQ securities action and negligence actions (*see* ECF No. 52), First New York, along with certain other plaintiffs, filed an action against NASDAQ asserting only claims under Section 10(b) of the Exchange Act.  *See First New York Sec. LLC et al. v. The NASDAQ OMX Group, Inc. et al.*, No 12-5630 (RWS) (S.D.N.Y.).  Given that the securities claims arise out of the Securities Defendants material omissions concerning NASDAQ's known system failures in connection with the Facebook IPO (and not out of the use of the NASDAQ Market Center) NASDAQ LLC Rule 4626 is completely inapplicable to Lead Plaintiffs' securities claims.

[57] *See also Phillips v. Reed Grp., Ltd.*, No. 07 Civ. 3417 (RO) (DF), 2013 WL 3340293, at *31 n.18 (S.D.N.Y. July 1, 2013) ("New York's economic loss rule . . . applies only in products liability actions" [citations omitted]); *King Cnty.*, 863 F.Supp.2d at 302 (In New York, "[t]he 'economic loss rule' has no application outside of the product-liability context."); *Travelers Cas. & Sur. Co. v. Dormitory Auth.*, 734 F. Supp. 368, 378 n.15 (S.D.N.Y. 2010) (in New York, "the 'economic loss rule' should not be used outside of the product-liability context").

36.)  New York courts, however, have never addressed the duty of care owed to investors by a securities exchange, and NASDAQ relies largely on cases not remotely applicable to this one,[58] or on inapposite negligent misrepresentation cases.[59]  (MTD Br. at 36-37.)  As the court observed in *Abu Dhabi*, under New York law "negligent misrepresentation requires . . . a special or privity-like relationship imposing a duty . . . to impart correct information," arising from "'some identifiable source of a special duty of care.'"  2013 WL 837536, at *3.

Negligence Plaintiffs, however, do not claim economic loss from reliance on incorrect information, such as a faulty audit report, inflated investment rating, or construction contract.  (*See supra* n.58.)  Plaintiffs' orders for Facebook shares were entered directly into NASDAQ's systems, and NASDAQ's systems improperly processed those orders leading directly to economic loss.  The trade orders were squarely within the zone of danger for potential economic loss in the event of system failures.  That aside, even assuming *arguendo* the strict New York negligent misrepresentation test, the fact that NASDAQ accepted the trade orders for processing and execution, and received revenue from the order flow creates "a relationship so close as to approach that of privity."  *Id.*  That the trade orders were sent to the exchange by the investors' brokers does not sever

---

[58] *See, e.g.*, *Milliken & Co. v. Consol. Edison Co. of N.Y., Inc.*, 644 N.E.2d 268, 271 (N.Y. 1994) (declining to extend liability to utility for commercial tenants who did not have service contracts); *Schiavone Constr. Co. v. Elgood Mayo Corp.*, 56 N.Y.2d 667, 669 (1982) (Court held that New York would not permit cause of action based on strict products liability against a remote manufacturer who made no representations to plaintiffs and who had no privity of contract with plaintiffs); *Shema Kolainu-Hear Our Voices v. ProviderSoft, LLC*, 832 F. Supp. 2d 194, 206-07 (E.D.N.Y. 2010) (court applied economic loss doctrine because plaintiff bought software license from defendant and had contractual remedies); *In re Sept. 11 Prop. Damage & Business Loss Litig.*, 468 F. Supp. 2d 508, 533 (S.D.N.Y. 2006) (court found no liability where "strong policy considerations counseling against the imposition of a duty of care on design defendants where no privity or special relationship exists as between the plaintiff and the defendants").

[59] *See, e.g. Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 115 (2d Cir. 2012) (negligent misrepresentation claims against rating agencies); *Abu Dhabi Commercial Bank v. Morgan Stanley & Co., Inc.*, No. 08 Cv. 7508 (SAS), 2013 WL 837536, at *3 (S.D.N.Y. Mar. 6, 2013) (same)*; Sec. Investor Prot. Corp. v. BDO Seidman, LLP*, 222 F.3d 63, 75 (2d Cir. 2000) (accountants); *Westpac Banking Corp. v. Deschamps*, 66 N.Y.2d 16, 19 (1985) (same); *Travelers,* 734 F. Supp. 2d at 378-79 (construction managers).

EC.52935.4

the special relationship with NASDAQ.  Brokers act as agents for their customers,[60] who are the real parties in interest and who assume the full risk of economic loss from exchange system failures.

Decisions limiting the scope of the duty of care for remote geographic losses are distinguishable.  For example, *532 Madison,* 750 N.E.2d 1097 (N.Y. 2001), involved the collapse of a Manhattan building construction project; as a matter of policy, it permitted recovery from close-by neighbors suffering personal injury or property damage.  *Id.*  Nevertheless, the court's discussion of *People Express Airlines v. Consolidated Rail Corp.*, 495 A.2d 107 (N.J. 1985) is instructive:

> Allowing the plaintiff to seek damages for purely economic loss, the New Jersey court reasoned that the extent of liability and degree of foreseeability stand in direct proportion to one another: the more particular the foreseeability that economic loss would be suffered as a result of the defendant's negligence, the more just that liability be imposed and recovery permitted.

*532 Madison*, 750 N.E.2d at 1103.

Economic loss is ***particularly foreseeable*** from stock exchange system failures.  The retail investor has a special relationship with the exchange, because he or she is the real financial party at risk, and the exchange has a duty to process ***all*** trade orders with due care.[61]  The duty here is analogous to that in *Sommer v. Federal Signal Corp.*, 79 N.Y.2d 540 (N.Y. 1992), where the court sustained a negligence claim for economic loss against a fire alarm company, noting that the company's duty of care was "not only a function of private contract" but also from "the nature of its services . . . affected with a significant public interest."  *Id.* at 552-53.  Many New York courts after

---

[60] *Conway v. Icahn & Co.*, 16 F.3d 504, 510 (2d Cir. 1994).

[61] The CAC alleges that economic loss from system failures was foreseeable (CAC ¶¶ 249-61), and that NASDAQ's own public representations about its systems establish duties of care. (CAC ¶¶ 277-84; *see also* CAC ¶¶ 63-93, ¶¶ 94-133, and ¶¶ 134-67.)

EC.52935.4

*Sommer* have found an "economic loss" duty of care independent of contractual duties.[62]  Like a fire alarm, a failure of exchange systems to handle investor trade orders "carefully and competently can have catastrophic consequences" in the form of economic loss. The SEC described NASDAQ's duties to protect investors from improper functioning of its systems in similar terms. (*See* Section II.C.4, *infra*.)

The instant case satisfies the focused duty standard for recovery of economic losses. Plaintiffs do not seek consequential downstream economic losses, from an event remote in time or distance.  Direct monetary losses were incurred on the very trade orders mishandled by NASDAQ's systems, orders that were invited and accepted by the exchange.  NASDAQ was aware of, promoted and profited from the widespread public interest in the Facebook IPO. The retail investors are ultimately the persons whose pocketbooks are directly at risk, and who contribute materially to NASDAQ's order flow and revenues.[63]  It is not required that NASDAQ know the identity of each particular plaintiff, so long as "they are members of a 'settled and particularized class,' as opposed to an 'indeterminate class.'"  *Kings Cnty.*, 863 F. Supp. 2d at 308.[64]

---

[62] *See, e.g.*, *Bullmore v. Ernst & Young Cayman Is.*, 45 A.D.3d 461 (N.Y. 2007) (fund liquidator against fund's former manager); *17 Vista Fee Assocs. v. Teachers Ins. & Annuity Assoc. of Am.*, 259 A.D.2d 75, 83 (N.Y. 1999) ("Professionals . . . may be subject to tort liability for failure to exercise reasonable care, irrespective of their contractual duties.'"); *Commerce & Industry Ins. Co. v. Vulcraft, Inc.,* No. 97 Civ. 2578, 1998 WL 823055, at *12 (S.D.N.Y. Nov. 20, 1998) (same); *New York Univ. v. Cont'l Ins. Co.*, 639 N.Y.S.2d 283, 287 (1995) (a "defendant may be liable in tort when it has breached a duty of reasonable care distinct from its contractual obligations,") *Robinson Redevelopment Co. v. Anderson,* 155 A.D.2d 755, 757  (N.Y. 1989) (relationship "gave rise to two distinct wrongs, one contractual and the other grounded in professional malpractice."); *Mandelblatt v. Devon Stores,* 521 N.Y.S.2d 672, 676 (App. Div. 1987) (conduct breaching contract may also breach duty arising out of relationship created by contract); *see also Bayerische Landesbank v. Alladin Capital Mgmt. LLC*, 692 F.3d 42, 58 (2d Cir. 2012) ("Where an independent tort duty is present, a plaintiff may maintain both tort and contract claims."); *Avzapour Networking Servs., Inc. v. Falconstor Software, Inc.*, No. CV 12-3574, 2013 WL 1386264, at *6 (E.D.N.Y. Apr. 3, 2013) (same).

[63] It is because of the important role of the retail investor in our nation's capital market systems, that Plaintiffs allege "[t]here is a strong public interest in these Defendants' proper and non-negligent performance of their duties." (*See* CAC ¶¶ 349, 364, 380 and 396.)

[64] *See also Sacher v. Beacon Assoc. Mgt. Corp.*, 910 N.Y.S.2d 765 (Table), 2010 WL 1881951 (Sup. Ct. Apr. 26, 2010) (finding claims for negligence and breach of fiduciary duty based upon an independent duty of care arising from investment consultant role).

EC.52935.4

NASDAQ argues the negligence claims are "open-ended," subjecting NASDAQ to unlimited and crushing liability. (*See generally* MTD Br. at 37-40.) Nothing could be further from the truth. Plaintiffs meticulously identify three limited subclasses, each with a separate, carefully defined claim,[65] and each comprising an identifiable and determinate group of Facebook IPO retail investors on a single day. NASDAQ represented in its Accommodation Proposal that it processed approximately 75.7 million shares in the pre-opening Cross, which appears to be the maximum number of shares that could have been impacted by the delayed confirmation error, a fraction of the 567 million Facebook shares traded that day. (*See* Accommodation Approval Order at 12.) The SEC Order also found that the "stuck order" error impacted about 30,000 orders, 13,000 of which were released into the market at 1:50 p.m. (SEC Order at ¶ 38.) Thus, the losses here are determinate and identifiable, not unlimited or open-ended, and would not result in "crushing" liability.

## CONCLUSION

For all the reasons set forth above, Defendants' motion to dismiss the CAC should be denied in its entirety.

Dated:  August 27, 2013                    Respectfully Submitted,

*/s/ Vincent R. Cappucci*
Vincent R. Cappucci, Esq.
Jordan A. Cortez, Esq.
Evan T. Raciti, Esq.
Marc X. LoPresti, Esq. (Of Counsel)
**ENTWISTLE & CAPPUCCI LLP**
280 Park Avenue, 26th Floor West
New York, NY 10017
Telephone:  (212) 894-7200
Facsimile:  (212) 894-7272

***Lead Counsel for NASDAQ
Securities Actions***

---

[65] Cross Buyer Confirmation Class (CAC ¶¶ 360-75), Cross Execution Class (CAC ¶¶ 376-91), and Market Trading Class (CAC ¶¶ 392-407).

EC.52935.4

*/s/ Douglas G. Thompson, Jr.*

Douglas G. Thompson, Jr., Esq.
Michael G. McLellan, Esq.
**FINKELSTEIN THOMPSON LLP**
1077 30th Street, Suite 150
Washington, D.C. 20007
Telephone: (202) 337-8000
Facsimile: (202) 337-8090

*/s/ Christopher Lovell*

Christopher Lovell, Esq.
Victor E. Stewart, Esq.
**LOVELL STEWART HALEBIAN
JACOBSON LLP**
61 Broadway, Suite 501
New York, NY 10006
Telephone: (212) 608-1900
Facsimile: (212) 719-4677

***Co-Lead Counsel for NASDAQ Negligence
Actions***

Jacob H. Zamansky, Esq.
Edward H. Glenn, Jr., Esq.
Kevin D. Galbraith, Esq.
**ZAMANSKY & ASSOCIATES LLC**
50 Broadway, 32nd Floor
New York, New York 10004
Telephone: (212) 742-1414
Facsimile:  (212) 742-1177

Kevin I. Goldberg, Esq.
**GOLDBERG, FINNEGAN
 & MESTER, LLC**
1010 Wayne Avenue, Suite 950
Silver Spring, Maryland 20910
Telephone:  (301) 589-2999
Facsimile:  (301) 589-2644

Marvin A. Miller, Esq.
Andrew Szot, Esq.
**MILLER LAW LLC**
115 South LaSalle Street, Suite 2910
Chicago, Illinois 60603
Telephone:  (312) 332-3400
Facsimile:  (312) 676-2675

65

Vincent DiTommaso
**DITOMMASO LUBIN**
17W 220 22nd Street, Suite 410
Oakbrook Terrace, Illinois 60181
Telephone:  (630) 333-0000
Facsimile:  (630)  333-0333

Thomas J. McKenna, Esq.
Gregory D. Egleston, Esq.
**GAINEY MCKENNA & EGLESTON**
440 Park Avenue South, 5th Floor
New York, New York 10016
Telephone:  (212) 983-1300
Facsimile:  (212) 983-0380

Richard J. Schager, Jr., Esq.
Andrew R. Goldenberg, Esq.
**STAMELL & SCHAGER, LLP**
One Liberty Plaza, 35/F
New York, New York 10006
Telephone:  (212) 566-4054
Facsimile:  (212) 566-4061

*Additional Counsel for NASDAQ Negligence Actions*