## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| IN RE FACEBOOK, INC., IPO SECURITIES | : | MDL NO. 12-2389 |
| AND DERIVATIVE LITIGATION | : | |

**This document relates to the Consolidated NASDAQ Actions:**

| | |
|---|---|
| No. 12-cv-4054 | No. 12-cv-4600 |
| No. 12-cv-4200 | No. 12-cv-4716 |
| No. 12-cv-4201 | No. 12-cv-5549 |
| No. 12-cv-4315 | No. 12-cv-5630 |
| No. 12-cv-4403 | No. 12-cv-6882 |

## REPLY MEMORANDUM IN FURTHER SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

William A. Slaughter (PA Bar No. 30637)*
Stephen J. Kastenberg (PA Bar No. 70919)*
Paul Lantieri III (PA Bar No. 88160)*
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Tel:  215.665.8500
Fax:  215.864.8999
slaughter@ballardspahr.com
kastenberg@ballardspahr.com
lantierip@ballardspahr.com

*Attorneys for Defendants
The NASDAQ OMX Group, Inc., The
NASDAQ Stock Market LLC, Robert
Greifeld, and Anna M. Ewing*

*Admitted pro hac vice

## TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ........................................................................................................ ii

I.  INTRODUCTION ..................................................................................................... 1

II.  ARGUMENT ............................................................................................................ 1

    A.  Plaintiffs' Claims Are Barred by the Doctrine of SRO Immunity ......................... 1

        1.  An SRO Is Immune When It Exercises, or Engages in Conduct Incident to, Its Full Range of Regulatory Responsibilities ........................ 2

        2.  All of Plaintiffs' Claims Arise from NASDAQ's Regulatory Functions ......................................................................................................... 5

            a.  Plaintiffs' Negligence Claims Arise from NASDAQ's Regulatory Functions ........................................................................ 5

            b.  Plaintiffs' Securities Fraud Claims Arise from NASDAQ's Regulatory Functions .................................................................... 13

        3.  NASDAQ OMX and the Individual Defendants Are Immune from Plaintiffs' Claims to the Same Extent as the Exchange ........................... 15

    B.  Plaintiffs' Negligence Claims Are Barred by the Economic Loss Doctrine ........ 18

    C.  The Complaint Fails to Allege Critical Elements of Plaintiffs' Securities Fraud Claims ........................................................................................................ 23

        1.  Failure to Allege Any Material Misrepresentation or Omission ............. 23

            a.  Statements Before the Facebook IPO ........................................... 23

            b.  Statements on the Day of the Facebook IPO. .............................. 28

        2.  Failure to Allege Scienter ....................................................................... 30

        3.  Failure to Allege Reliance ....................................................................... 34

        4.  Failure to Allege Loss Causation ............................................................ 36

    D.  First New York's Claims Are Also Barred by NASDAQ Rule 4626 .................. 37

III.  CONCLUSION ........................................................................................................ 38

i

# TABLE OF AUTHORITIES

*Page(s)*

## CASES

*532 Madison Avenue Gourmet Foods, Inc. v. Finlandia Center, Inc.*,
   750 N.E. 2d 1097 (N.Y. 2001)..................................................................... 29-20, 21

*Affiliated Ute Citizens of Utah v. United States*,
   406 U.S. 128 (1972).............................................................................34, 35, 36

*Anschutz Corp. v. Merrill Lynch & Co.*,
   690 F.3d 98 (2d Cir. 2012)..............................................................................9

*Austin Municipal Securities, Inc. v. National Association of Securities Dealers, Inc.*,
   757 F.2d 676 (5th Cir. 1985) ...........................................................................2

*Backman v. Polaroid Corp.*, 910 F.2d 10 (1st Cir. 1990).........................................29

*Barbara v. New York Stock Exchange*,
   99 F.3d 49 (2d Cir. 1996) .....................................................................2, 3, 4, 10

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988).................................................................................. 26-27

*Caiola v. Citibank, N.A.*,
   295 F.3d 312 (2d Cir. 2002) ........................................................................ 30f

*Campo v. Sears Holdings Corp.*,
   371 Fed. App'x 212 (2d Cir. 2010)....................................................................32

*Casella v. Webb*,
   883 F.2d 805 (9th Cir. 1989) ..........................................................................24

*Chiarella v. United States*,
   445 U.S. 222 (1980)......................................................................................35

*Chill v. General Electric Co.*,
   101 F.3d 263 (2d Cir. 1996)............................................................................33

*City of Roseville Employees' Retirement System v. Nokia Corp.*,
   No. 10-967, 2011 WL 7158548 (S.D.N.Y. Sept. 6, 2011) ...........................................29 – 30

*D'Alessio v. New York Stock Exchange, Inc.*,
   258 F.3d 93 (2d Cir. 2001)..................................................................3, 4, 7, 14, 16

*DGM Investments v. New York Futures Exchange, Inc.*,
   No. 01-11602, 2002 WL 31356362 (S.D.N.Y. Oct. 17, 2002)......................................... 4, 9-10

ii

*DL Capital Group, LLC v. Nasdaq Stock Market, Inc.*,
  409 F.3d 93 (2d Cir. 2005) ................................................................................ *passim*

*Drayer v. Krasner*,
  572 F.2d 348 (2d Cir. 1978) ................................................................................ 5

*Dura Pharmaceuticals, Inc. v. Broudo*,
  544 U.S. 336 (2005) ........................................................................................... 37

*ECA and Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009) ............................................................................... 24, 26-27

*Federal Deposit Insurance Corporation v. National Association of Securities Dealers*,
  *Inc.*, 582 F. Supp. 72 (S.D. Iowa 1984) ............................................................. 21

*Fogarazzo v. Lehman Brothers, Inc.*,
  341 F. Supp. 2d 274 (S.D.N.Y. 2004) ................................................................ 30

*Forrester v. White*,
  484 U.S. 219 (1988) ........................................................................................... 16

*Hydro Investors, Inc. v. Trafalgar Power, Inc.*,
  227 F.3d 8 (2d Cir. 2000) ................................................................................... 21

*In re Bank of America Corp. Securities, Derivative, & Employee Retirement Income
  Security Act Litigation*,
  757 F. Supp. 2d 260 (S.D.N.Y. 2010) ................................................................ 25, 30

*In re Bristol-Myers Squibb Securities Litigation*,
  312 F. Supp. 2d 549 (S.D.N.Y. 2004) ................................................................ 29

*In re Carter-Wallace, Inc. Securities Litigation*,
  220 F.3d 36 (2d Cir. 2000) ................................................................................. 33

*In re Computer Associates Class Action Securities Litigation*,
  75 F. Supp. 2d 68 (E.D.N.Y. 1999) .................................................................... 25

*In re Duane Reade Inc. Securities Litigation*,
  No. 02-6478, 2003 WL 22801416 (S.D.N.Y. Nov. 25, 2003) ............................ 25

*In re IBM Securities Litigation*,
  163 F.3d 102 (2d Cir. 1998) ............................................................................... 25

*In re NYSE Specialists Securities Litigation*,
  503 F.3d 89 (2d Cir. 2007) ................................................................................. *passim*

*In re Quintel Entertainment, Inc. Securities Litigation*,
  72 F. Supp. 2d 283 (S.D.N.Y. 1999) .................................................................. 25-26

*In re Regeneron Pharmaceuticals Securities Litigation*,
No. 03-3111, 2005 WL 225288 (S.D.N.Y. Feb. 1, 2005)......................................27

*In re Salomon Analyst Metromedia Litigation*,
236 F.R.D. 208 (S.D.N.Y. 2006) ................................................. 34-35

*In re Smith Barney Transfer Agent Litigation*,
290 F.R.D. 42 (S.D.N.Y. 2013) ...................................................36

*In re Time Warner Inc. Securities Litigation*,
9 F.3d 259 (2d Cir. 1993) ........................................................26, 27

*In re Tower Automotive Securities Litigation,*
483 F. Supp. 2d 327 (S.D.N.Y. 2007).............................................24

*King County v. IKB Deutsche Industriebank AG*,
863 F. Supp. 2d 288 (S.D.N.Y. 2012)......................................... 18, 19-20

*Kleinman v. Elan Corp., PLC*,
706 F.3d 145 (2d Cir. 2013)......................................................29

*Kronfeld v. Trans World Airlines, Inc.*,
832 F.2d 726 (2d Cir. 1987)..................................................... 27-28

*Lapin v. Goldman Sachs Group, Inc.*,
506 F. Supp. 2d 221 (S.D.N.Y 2006)..............................................30

*Lentell v. Merrill Lynch & Co., Inc.,*
396 F.3d 161 (2d Cir. 2005)......................................................36-37

*Logan v. Empire Blue Cross & Blue Shield*,
714 N.Y.S.2d 119 (N.Y. App. Div. 2000) ..........................................22

*Manavazian v. Atec Group, Inc.*,
160 F. Supp. 2d 468 (E.D.N.Y. 2001) .............................................25

*McMahan & Co. v. Wherehouse Entertainment, Inc.*,
900 F.2d 576 (2d Cir. 1990)......................................................30

*Milliken & Co. v. Consolidated Edison Co. of New York, Inc.*,
644 N.E. 2d 268 (N.Y. 1994)....................................................19, 22

*Milman v. Box Hill Systems Corp.*,
72 F. Supp. 2d 220 (S.D.N.Y. 1999).............................................. 27-28

*New York University v. Continental Insurance Co.*,
662 N.E. 2d 763 (N.Y. 1995)......................................................22

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) ....................................31, 32, 33

*Opulent Fund, L.P. v. The Nasdaq Stock Market, Inc.*,
  No. 07-3683, 2007 WL 3010573 (N.D. Cal. Oct. 12, 2007) ...................................6, 7, 8, 14

*Oran v Stafford*,
  226 F.3d 275 (3d Cir. 2000)...................................................................... 24-25, 26

*Phillips v. Reed Group, Ltd.*,
  No. 07-3417, 2013 WL 3340293 (S.D.N.Y. July 1, 2013).............................. 20-21

*Rosenzweig v. Azurix Corp.*,
  332 F.3d 854 (5th Cir. 2003) ........................................................................ 31-32

*Schiavone Construction Co. v. Mayo Corp.*,
  436 N.E. 2d 1322 (N.Y. 1982).............................................................................18

*Scritchfield v. Paolo*,
  274 F. Supp. 2d 163 (D.R.I. 2003)........................................................................24

*South Cherry Street LLC v. Hennessee Group LLC*,
  573 F.3d 98 (2d Cir. 2009).............................................................................32, 33

*Sommer v. Federal Signal Corp.*,
  593 N.E. 2d 1365 (N.Y. 1992).......................................................................21, 22

*Sparta Surgical Corp. v. National Association of Securities Dealers, Inc.*,
  159 F.3d 1209 (9th Cir. 1998) ................................................................... *passim*

*Standard Investment Chartered, Inc. v. National Association of Securities Dealers, Inc.*,
  637 F.3d 112 (2d Cir. 2011)........................................................................ *passim*

*Standard Investment Chartered, Inc. v. National Association of Securities Dealers, Inc.*,
  No. 07-2014, 2010 WL 749844 (S.D.N.Y. Mar. 1, 2010)......................................15

*Stern v. Leucadia National Corp.*,
  844 F.2d 997 (2d Cir. 1988)........................................................................31, 32

*Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*,
  552 U.S. 148 (2008)..................................................................................... 34-35

*Travelers Casualty & Surety Co. v Dormitory Authority-State of New York*,
  734 F. Supp. 2d 368 (S.D.N.Y. 2010)..............................................................20, 21

*Verizon New York, Inc. v. Optical Communications Group, Inc.*,
  936 N.Y.S. 2d 86, 90 (N.Y. App. Div. 2011) .......................................................22

*Weissman v. National Association of Securities Dealers, Inc.*,
  500 F.3d 1293 (11th Cir. 2007) .................................................................7, 8, 14

*Wilson v. Comtech Telecommunications Corp.*,
   648 F.2d 88 (2d Cir. 1981).............................................................. 35-36

## STATUTES & REGULATIONS

15 U.S.C. § 78f ...............................................................................5, 14

15 U.S.C. § 78k-1 ...............................................................................5

15 U.S.C. § 78o-3 ...............................................................................9

15 U.S.C. § 78s ...............................................................................5

15 U.S.C. § 78u-4 ......................................................................... 30-31

17 C.F.R. § 240.12f-2 .......................................................................7, 12

## SELF REGULATORY ORGANIZATION RULES & RULEMAKING

NASDAQ OMX Group By-Laws Article XII ....................................... 16-17

NASDAQ Stock Market Rule 4626........................................................10, 38

*Findings, Opinion, and Order of the Commission*, Exchange Act Release No. 53,128
   (January 13, 2006), 71 Fed. Reg. 3,550 (January 23, 2006)......................................17

*In re The NASDAQ Stock Market, LLC & NASDAQ Execution Services, LLC*, Exchange
   Act Release No. 69,655, 2013 WL 2326683 (May 29, 2013) .........................................7, 8, 14

*Order Approving Proposed Rule Change To Establish the Nasdaq Halt Cross*, Exchange
   Act Release No. 53,687 (April 20, 2006), 71 Fed. Reg. 24,878 (April 27, 2006)................. 8-9

*Order Granting Approval of a Proposed Rule Change to Amend NASDAQ Rule 4626 –
   Limitation of Liability*, Exchange Act Release No. 69,216 (March 22, 2013), 78 Fed.
   Reg. 19,040 (March 28, 2013) .................................................................1

I.     INTRODUCTION

        In this action, plaintiffs seek to recover losses they claim to have sustained as a result of systems issues NASDAQ encountered in the execution of one of its core regulatory functions as a national securities exchange – the commencement of trading in a listed security following an IPO.  The doctrine of SRO immunity bars such claims, whether fashioned as negligence claims or securities fraud claims.  Even if not barred by SRO immunity, the economic loss doctrine bars plaintiffs' negligence claims, and plaintiffs cannot plead the requisite elements of a securities fraud claim.  Moreover, the claims of Exchange member First New York are also barred by NASDAQ Rule 4626.

        In their response to defendants' motion, plaintiffs disregard or mischaracterize numerous points of controlling law.  Yet, none of plaintiffs' attempts to avoid controlling precedent that is fatal to their claims can withstand scrutiny.  For all the reasons set forth herein and in defendants' initial memorandum, the Court should dismiss plaintiffs' Complaint with prejudice.

II.    ARGUMENT

        A.     **<u>Plaintiffs' Claims Are Barred by the Doctrine of SRO Immunity</u>**

        In their initial memorandum (Mem. in Support of Defs. Motion to Dismiss (Doc. No. 127) ("Defs. Mem.")), defendants demonstrated that the doctrine of SRO immunity shields SROs and their agents from liability for claims incident to their regulatory functions, and that all of plaintiffs' claims arise out of actions taken (or not taken) by NASDAQ within the scope of its regulatory responsibilities as an SRO.  Plaintiffs make three arguments in response:  (i) SRO immunity applies only when SROs perform "quasi-judicial" functions in disciplinary matters, not when they exercise the full range of their federally delegated responsibilities to regulate the nation's securities markets; (ii) NASDAQ's handling of the Facebook IPO and related alleged

1

misrepresentations arose from purely commercial and not regulatory functions; and (iii)

NASDAQ OMX and its officers are not entitled to SRO immunity because NASDAQ OMX is

not an SRO.  (*See* Lead Pls. Mem. of Law in Opp'n to Defs. Motion to Dismiss (Doc. No. 147)

("Pls. Mem.") at 16.)  Each argument fails under well-established precedent.[1]

### 1.     An SRO Is Immune When It Exercises, or Engages in Conduct Incident to, Its Full Range of Regulatory Responsibilities

Aware that their claims cannot otherwise survive, plaintiffs first argue that "courts

carefully limit SRO immunity to delegated, quasi-judicial tasks."  (*See* Pls. Mem. at 25; *see also*

*id.* at 18, 27.)  This contention, however, is flatly contradicted by well-established precedent,

which gives SROs the "breathing room" afforded by immunity for the full range of their

regulatory responsibilities, including those implicated by plaintiffs' claims.

While it is true that SRO immunity evolved from the longstanding doctrine of

judicial immunity, and that the early SRO immunity cases involved claims concerning SROs'

adjudicatory functions, *see, e.g.*, *Austin Mun. Sec., Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.*, 757

F.2d 676 (5th Cir. 1985), *Barbara*, 99 F.3d 49, the Second Circuit and other courts of appeals

have consistently held in subsequent cases that "an SRO and its officers are entitled to absolute

---

[1]     Consistent with the policy underlying the SRO immunity doctrine, the Court should dispose of claims precluded by immunity on a motion to dismiss.  (*See* Defs. Mem. at 21-22.)  Plaintiffs' assertion that immunity is "rarely appropriate for a Rule 12(b)(6) motion and requires development of a factual record" rests entirely on non-SRO immunity cases in which the courts observed that in certain governmental immunity cases, factual evidence might be needed to determine whether the alleged conduct was protected by immunity.  (*See* Pls. Mem. at 16 and 16 n.15.)  No factual inquiry is necessary here.  Moreover, plaintiffs ignore the host of cases dismissing claims on grounds of SRO immunity on motions to dismiss.  *See, e.g.*, *Std. Inv. Chartered, Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.*, 637 F.3d 112, 114, 117 (2d Cir. 2011); *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 91, 103 (2d Cir. 2007); *DL Capital Grp., LLC v. Nasdaq Stock Mkt., Inc.*, 409 F.3d 93, 94-95, 99-100 (2d Cir. 2005); *Sparta Surgical Corp. v. Nat'l Ass'n of Sec. Dealers, Inc.*, 159 F.3d 1209, 1210, 1215 (9th Cir. 1998); *Barbara v. N.Y. Stock Exch.*, 99 F.3d 49, 51, 59 (2d Cir. 1996).

immunity when they are, in effect, 'acting under the aegis' of their regulatory duties." *DL Capital* 409 F.3d at 97 (quoting *Sparta Surgical*, 159 F.3d at 1214).  Such immunity encompasses not just conduct within the regulatory ambit, but also "specific acts and forebearances . . . incident to the exercise of regulatory power." *NYSE Specialists*, 503 F.3d at 98.  (*See also* Defs. Mem. at 17-22 (discussing the development and scope of SRO immunity).)  Thus, the Second Circuit has squarely rejected the argument, made by plaintiffs here, that immunity applies only to quasi-judicial conduct:

> [A]lthough the immunity inquiry in *Barbara* was confined to the NYSE's conduct with disciplinary proceedings, *Barbara* stood for the broader proposition that a SRO . . . may be entitled to immunity from suit for conduct falling within the scope of the SRO's regulatory and general oversight functions.

*D'Alessio v. N.Y. Stock Exch., Inc.*, 258 F.3d 93, 105 (2d Cir. 2001).

Acordingly, plaintiffs' attempt to cabin the Second Circuit's decisions in *DL Capital* and *NYSE Specialists* within the framework of what they call "quasi-judicial" immunity fails.  Contrary to plaintiffs' characterization (Pls. Mem. at 18), the claims in *DL Capital* did not arise from NASDAQ's "adjudicatory" role.  DL Capital's claims arose from NASDAQ's regulatory determinations to halt trading in a particular stock and to cancel certain trades (but not others) in that stock.  *DL Capital*, 409 F.3d at 95-96.  (*See also* Defs. Mem. at 26-27.)  DL Capital, which had purchased and sold shares of the stock, did not allege that NASDAQ wrongly enforced a rule against it, but rather that NASDAQ committed fraud by failing timely to announce the cancellations of certain purchases but not certain sales.  *DL Capital*, 409 F.3d at 96.  The Second Circuit affirmed the dismissal of DL Capital's complaint on grounds of immunity.  *Id.* at 98.   Similarly, in *NYSE Specialists*, the Second Circuit observed that, as here, all of the claims in that case "involve[d] the [SRO's] action or inaction with respect to trading on the Exchange, which is indisputably within the [SRO's] regulatory powers," and therefore

3

affimed this Court's dismissal based on SRO immunity.  503 F.3d at 99 (holding that if the alleged conduct is "within the ambit of the SRO's delegated power, immunity presumptively attaches, even where the SRO wrongly exercises that power").  Plaintiffs likewise disregard the Ninth Circuit's decision in *Sparta Surgical*, in which the claims arose not from NASDAQ's "quasi-judicial" conduct, but from NASDAQ's suspension of trading and temporary de-listing of the plaintiff's stock after its secondary offering.[2]  *See Sparta Surgical*, 159 F.3d at 1211, 1215.

Moreover, plaintiffs ignore almost the entire range of regulatory functions delegated to the national securities exchanges when they contend that "limiting exchange immunity to quasi-judicial, disciplinary functions is consistent with the dichotomy of function preserved in the Exchange Act."  (*See* Pls. Mem. at 27-28 (selectively citing only the provisions requiring national securities exchanges to comply with and to enforce compliance with the Exchange Act).)  To the contrary, so limiting the scope of SRO immunity would be inconsistent with the Exchange Act's broad delegation of regulatory responsibilities to SROs.[3]  *See, e.g.*, *NYSE Specialists*, 503 F.3d at 91 (the SEC has delegated "substantial authority" to the SROs); *DL Capital*, 409 F.3d at 97; *Barbara*, 99 F.3d at 59 (recognizing the "special status and

---

[2]     The Second Circuit has often relied on *Sparta Surgical* in its SRO immunity decisions. *See NYSE Specialists*, 503 F.3d at 98 n.3; *DL Capital*, 159 F.3d at 97, 98; *D'Alessio*, 258 F.3d at 105, 106.

[3]     Permitting claims against SROs arising from their non-"quasi-judicial" regulatory conduct would also hinder the Congressional objective of "forceful self-regulation of the securities industry," and therefore is barred by conflict preemption.  *See Barbara*, 99 F.3d at 59.  (*See also* Defs. Mem. at 20 n.14.)  Plaintiffs acknowledge (Pls. Mem. at 27 n.27) that, as this Court held in *DGM Investments v. New York Futures Exchange, Inc.*, No. 01-11602, 2002 WL 31356362, at *5 (S.D.N.Y. Oct. 17, 2002) (Sweet, J.), claims against an exchange may be preempted if based on allegations that the exchange and its affiliates "failed to fulfill their obligation to regulate the market."  Thus, plaintiffs concede that if their negligence claims here arise from NASDAQ's market regulatory functions – which they do, as discussed further in the next section of this Reply – conflict preemption provides an alternative basis for dismissing those claims.

connection" between SROs and the SEC); *Drayer v. Krasner*, 572 F.2d 348, 358 (2d Cir. 1978)

(matters "germane to the goal of market efficiency" fall within the responsibilities of national

securities exchanges delegated pursuant to Section 6(b) of the Exchange Act, 15 U.S.C. §

78s(b)); 15 U.S.C. §§ 78f(b)(5) (requiring that national securities exchanges, among other things,

"remove impediments to and perfect the mechanism of a free and open market and a national

market system"), 78k-1(a)(1)(C) (providing that the national market system created by the

Exchange Act furthers the "maintenance of fair and orderly markets"), 78s(b)(2)(C)(i) (requiring

exchange rules to be "consistent with the requirements" of the Exchange Act).  (*See also* Defs.

Mem. at 3-4 (discussing the regulatory functions delegated to national securities exchanges by

the Exchange Act), 17-22 (further discussing the self-regulatory scheme).)

   In short, plaintiffs' argument that SRO immunity only applies in the "quasi-

judicial" context is contrary to controlling precedent and entirely without support.

   **2.  All of Plaintiffs' Claims Arise from NASDAQ's Regulatory Functions**

     ***a.  Plaintiffs' Negligence Claims Arise from NASDAQ's Regulatory Functions***

   Plaintiffs' negligence claims are directed at (i) the design, testing, and

implementation of the IPO Cross, and (ii) NASDAQ's decisions to proceed with and not to halt

trading in Facebook stock on May 18.  (*See* Defs. Mem. at 22-23 & 23 nn.15-16 (citing CAC).)

Plaintiffs argue that the design, testing, and implementation of NASDAQ's IPO Cross system are

for-profit business activities, and not regulatory functions (Pls. Mem. at 24-31), and that

NASDAQ "did not make a regulatory decision not to halt trading" or not to cancel trades (*id.* at

31-33).  Neither argument withstands scrutiny.

   Plaintiffs' notion that NASDAQ's design, testing, and implementation of its IPO

Cross process relate solely to NASDAQ's "for-profit business of handling an IPO" (*id.* at 24) –

and not the exercise of a delegated regulatory function – is fundamentally flawed.  First, it rests

on a false distinction between for-profit and regulatory conduct.  NASDAQ exercises its

regulatory authority while operating a for-profit business.  As the Second Circuit recognized in

*DL Capital*, the fact that NASDAQ is a for-profit corporation does not provide "a justification

for depriving Nasdaq of absolute immunity when it is performing regulatory duties."  409 F.3d at

99 n.4.  *See also Opulent Fund, L.P. v. The Nasdaq Stock Market, Inc.*, No. 07-3683, 2007 WL

3010573, *5 n.1 (N.D. Cal. Oct. 12, 2007) ("That Nasdaq happens to profit from its activities is

not critical.  The immunity turns on the nature of the challenged conduct, not its profitability

because . . . if the action is taken under the 'aegis of the Exchange Act's delegated authority,' the

[SRO] is protected by absolute immunity from money damages.").  Holding otherwise would

undermine the sound policy bases for the immunity doctrine, which apply regardless of whether

an SRO is organized as a nonprofit or for-profit organization.[4]  (*See* Defs. Mem. at 21-22, 29-30,

34 (discussing policy underpinnings of SRO immunity).)

        Second, plaintiffs misapprehend NASDAQ's role in the regulation of trading

generally, and in the regulation of the commencement of secondary trading after an IPO more

specifically.  Indeed, NASDAQ's registration as a national securities exchange under Section 6

of the Exchange Act is not merely a "business fact," as plaintiffs call it (Pls. Mem. at 28); rather,

that registration vests NASDAQ with regulatory authority concerning the administration of the

nation's securities markets, and subjects NASDAQ to extensive oversight and supervision of the

SEC as it discharges that authority.  (*See* Defs. Mem. at 3-4.)  Thus, NASDAQ "stands in the

---

[4]     When plaintiffs nevertheless argue that policy reasons militate against affording
NASDAQ immunity here, they cite comments from an industry group and individual
SEC commissioners about the for-profit nature of the securities industry but make no
effort to distinguish, much less to cite, any of the Second Circuit cases that are directly on
point.  (*See* Pls. Mem. at 34-35.)

6

shoes of the SEC" when it governs trading.  *D'Alessio*, 258 F.3d at 105.  As the Second Circuit

noted in *DL Capital*, the development, operation, and maintenance of the NASDAQ Stock

Market are "regulatory powers and responsibilities."  409 F.3d at 95.  Indeed, the SEC confirmed

in its Enforcement Order in the Facebook matter that the orderly initiation of secondary market

trading after an IPO is a fundamental aspect of NASDAQ's regulatory powers and

responsibilities.  *In re The NASDAQ Stock Mkt., LLC & NASDAQ Execution Servs., LLC*, Exch.

Act Rel. No. 69,655, 2013 WL 2326683, at ¶ 2 (May 29, 2013).  SEC regulations similarly

recognize the importance of a stock exchange's regulation of trading in connection with IPOs by

providing that no secondary market trading in the stock of a company may take place on the day

of its IPO before trading begins on its listing market.  *See* 17 C.F.R. § 240.12f-2.

   In this regard, plaintiffs' reliance on the decision of the Eleventh Circuit in

*Weissman v. National Association of Securities Dealers, Inc.*, 500 F.3d 1293 (11th Cir. 2007),

and on the decision of the Northern District of California in *Opulent Fund*, is misplaced.

   In *Weissman*, the plaintiff was an investor in the stock of WorldCom, Inc., who

had suffered a loss when WorldCom collapsed.  500 F.3d at 1294.  The plaintiff alleged that

NASDAQ had defrauded him into purchasing WorldCom stock by publishing commercial

advertisements identifying WorldCom, among other NASDAQ-listed companies, as succesful

companies with good character and trustworthy accounting practices.  *Id.* at 1294-95, 1298-99.

While recognizing that "NASDAQ's status as a money-making entity does not foreclose absolute

immunity for any number of its activities," the Eleventh Circuit found that the allegedly

fraudulent advertisements were aimed only at increasing NASDAQ's business and did not serve

any quasi-governmental function.  *Id.* at 1299.  Seeking to shoehorn their case into the reach of

*Weissman*, plaintiffs here point to NASDAQ's efforts to obtain the Facebook listing.  (*See* Pls.

Mem. at 24).  But as plaintiffs concede (*id.*), their claims do not arise from NASDAQ's efforts to list Facebook, but from NASDAQ's design, testing, and implementation of its IPO Cross. Plaintiffs are wrong as a matter of law when they suggest that "[a]s in *Weissman*" (*id.*), NASDAQ's implementation of its IPO Cross process did not serve a regulatory purpose.

*Opulent Fund* is no more availing for plaintiffs.  In that case, the plaintiff was an investor in options tied to the NASDAQ-100, an index of the 100 largest non-financial securities listed on NASDAQ.  *Opulent Fund*, 2007 WL 3010573, at *1.  The plaintiff alleged that it suffered losses when NASDAQ posted an incorrect price for the index.  *Id.*  Notwithstanding that the SEC approved the pricing formula for the index – and even though the court correctly noted that the "immunity inquiry turns on the nature of the challenged conduct, not its profitability," *id.* at *5 n.1 – the court found that NASDAQ's conduct was not regulatory, and thus not protected by immunity, *id.* at *5.  Putting aside that *Opulent Fund* defines SRO immunity more narrowly than controlling Second Circuit precedent (*see* § II(A)(1), *ante*), it is distinguishable on its facts. Even assuming the court correctly held that the NASDAQ-100 index is merely a commercial product aimed at bringing NASDAQ more business, the index is fundamentally different than NASDAQ's IPO Cross.  Unlike the NASDAQ-100 index, which is not necessary to trading on the Exchange, the orderly commencement of trading after an IPO is a core regulatory function of any national securities exchange.  (*See* Enforcement Order ¶ 2.)  In fact, NASDAQ's IPO Cross is governed by the same SEC-approved rules and systems governing the commencement of trading after a regulatory trading halt.  (*See* Defs. Mem. at 4-8 (discussing NASDAQ Rules 4120, 4753, and 4758).)  Contrary to plaintiffs' assertion that "NASDAQ's IPO systems do not function to protect investors [but rather] to create a market for IPO business for NASDAQ and increase trading" (Pls. Mem. at 25 n.24), the SEC specifically found that NASDAQ's IPO Cross

process is designed to protect investors – and to serve the other regulatory objectives of the

Exchange Act.  *See Order Approving Proposed Rule Change To Establish the Nasdaq Halt*

*Cross*, Exch. Act Rel. No. 53,687 (Apr. 20, 2006), 71 Fed. Reg. 24,878, 24,879 (Apr. 27, 2006).[5]

Thus, contrary to plaintiffs' contention that "NASDAQ represent[ed] no one but itself" when it

designed, tested, and implemented its IPO Cross (Pls. Mem. at 25), NASDAQ acted squarely

within its delegated regulatory responsibilities.

        Plaintiffs also miss the point when they argue that defendants conflate the

performance of a "regulated activity" with the performance of a "delegated regulatory function."

(*See* Pls. Mem. at 27.)  Defendants are not immune because they are regulated by the SEC; they

are immune because their conduct at issue arose from delegated regulatory functions.  That

NASDAQ's IPO Cross is governed by a set of SEC-approved rules that NASDAQ must interpret

and enforce, under the oversight of the SEC, only underscores that NASDAQ's handling of the

opening of trading after the Facebook IPO is precisely the kind of regulatory function protected

by immunity.[6]  *See Std. Inv.*, 637 F.3d at 116 (finding that "it is significant [to the court's

---

[5]     As set forth at greater length in defendants' initial memorandum (at page 8), the SEC
        found that the IPO Cross process "should provide useful information to market
        participants and increase transparency and order interaction at the opening," and "result
        in the public dissemination of information that more accurately reflects trading in a
        particular security," and concluded that the Cross process was designed to promote just
        and equitable principles of trade, to remove impediments to and perfect the mechanism of
        a free and open market and a national market system, and, in general, to protect investors
        and the public interest, all in accordance with NASDAQ's obligations under the
        Exchange Act.  71 Fed. Reg. at 24,878-79 (finding the process consistent with Section
        15A of the Exchange Act, 15 U.S.C. § 78o-3, in general, and Section 15A(b)(6) of the
        Act, 15 U.S.C. § 78o-3(b)(6), in particular).

[6]     Even if NASDAQ's conduct was more "regulated" than "regulatory" (though it was not),
        that would mean only that conflict preemption more strongly applies to bar plaintiffs'
        claims.  (*See* p. 4 n.3, *ante*.)  As this Court previously recognized, when state law would
        "directly affect trading on or the operation of" a highly federally regulated market,
        preemption applies because the state law "would stand 'as an obstacle to the

immunity analysis] that NASD cannot alter its bylaws without approval from the SEC, that the

SEC is authorized to develop its own procedure for receiving input on new [SRO] rules from

those affected by any proposed changes, . . . and that the SEC retains discretion to amend the

rules of any SRO") (citiations omitted).  Indeed, it is the basic structure of the Exchange Act's

regulatory scheme, in which SROs "exercise a primary supervisory role subject to ultimate SEC

control," that renders absolute immunity particularly appropriate for national securities

exchanges.[7] *Sparta Surgical*, 159 F.3d at 1213-14; *see also Barbara*, 99 F.3d at 59.

       Plaintiffs take a different tack with respect to their allegations that NASDAQ

acted negligently on May 18.  Defendants demonstrated in their initial memorandum that

NASDAQ's determinations not to halt the Facebook IPO Cross process when the completion of

the Cross was delayed, not to halt continuous market trading while the dissemination of Cross

confirmation reports was delayed and NASDAQ experienced an issue with the dessmination of

Facebook quoting data, and not to cancel any allegedly impacted trades were all regulatory

---

accomplishment and execution of the full purposes and objectives of Congress.'" *DGM Investments*, 2002 WL 31356362, at *5 (citation omitted).

[7]    NASDAQ's Facebook IPO accommodation policy, as approved the by the SEC, further demonstrates the highly regulatory nature of the conduct giving rise to plaintiffs' claims. (*See* Defs. Mem. at 15-17, 29-30.)  It does not in any way undermine NASDAQ's immunity, as plaintiffs suggest (Pls. Mem. at 33-34).  This very case belies plaintiffs' argument that the limitation of liability provision of NASDAQ Rule 4626 would be superfluous if NASDAQ is immune from plaintiffs' claims – only one of the plaintiffs is a member bound by Rule 4626.  (*See* Defs. Mem. at 40-43; § II(D), *poste*.)  And the SEC's approval of the accommodation policy has no bearing on NASDAQ's immunity. Several commenters to the proposed policy raised the issue of immunity. *See Order Granting Approval of a Proposed Rule Change to Amend NASDAQ Rule 4626 – Limitation of Liability*, Exch. Act Rel. No. 69,216 (Mar. 22, 2013), 78 Fed. Reg. 19,040, 19,044 & 19,044 nn.82-83 (Mar. 28, 2013).  In response, NASDAQ advised the SEC that the applicability of immunity to civil claims arising from the Facebook IPO, such as plaintiffs' claims here, was not before the SEC; rather, it is a question for this Court. *See id.*, 78 Fed. Reg. at 19,044 & 19,044 n.84.  The SEC agreed. *See id.* at 19,046.

decisions falling squarely within the holdings of *DL Capital*, *NYSE Specialists*, and *Sparta Surgical*.  (*See* Defs. Mem. at 26-28.)

In their response, plaintiffs first attempt to disavow their allegations that NASDAQ was negligent on May 18.  For example, they say that defendants "take[] out of context [plaintiffs'] allegation that 'Defendants should have followed the recent precedent and protected the integrity of the market by halting the Facebook IPO.'"  (Pls. Mem. at 25 n.25 (quoting CAC ¶ 125).)  But even putting aside their unconvincing explanation that that allegation was only "part of a larger discussion" concerning NASDAQ's alleged business interests (*see id.*), the very first paragraph of the Complaint alleges that NASDAQ "recklessly moved forward with the IPO."  (CAC ¶ 1; *see also, e.g.*, CAC ¶ 5 (alleging that NASDAQ "rolled the dice" by "pushing the IPO forward with no regard for the chaos these system failures would cause"); CAC ¶¶ 126-133 (alleging that NASDAQ jeopardized "the integrity of the overall marketplace . . . in failing to halt Facebook's IPO"); CAC ¶¶ 6, 123-24, 153, 201-02, 229-30, 275-76, 289-90; Defs. Mem. at 23 & 23 n.16.)  Indeed, there can be no serious question that all of plaintiffs' alleged harms flow from the regulatory decisions that NASDAQ made on May 18.

Plaintiffs next contend that while the halting of trading in a listed security may be within the ambit of an exchange's regulatory functions, NASDAQ's decisions ***not*** to postpone the IPO, ***not*** to halt trading, and ***not*** to cancel trades were not.  For example, plaintiffs contend that NASDAQ's determination to proceed with a modified Cross – which was a decision not to postpone the Cross process – was not regulatory, but "a matter of software engineering done before trading began."  (Pls. Mem. at 32.)  NASDAQ made that decision, however, after the Cross had begun, and when it determined to proceed, NASDAQ exercised its delegated

11

regulatory authority to ensure there was a market for trading Facebook stock.[8]  (*See* Defs. Mem. at 6-10.)  Similarly, plaintiffs argue that NASDAQ's decision not to halt trading was not regulatory.  (*See* Pls. Mem. at 31 ("NASDAQ Did Not Make a Regulatory Decision Not to Halt Trading").)  But NASDAQ's conclusion that conditions after the Cross was completed did ***not*** warrant a halt of trading under NASDAQ Rule 4120 reflects just as much a regulatory judgment as a decision that conditions ***did*** warrant a halt would have reflected.  Plaintiffs equally untenably argue that NASDAQ did not engage in regulatory conduct because it did ***not*** cancel allegedly impacted trades.  (*See* Pls. Mem. at 30 and 30 n.32.)  The law is to the contrary.  *See Std. Inv.*, 637 F.3d at 115 (2d Cir. 2011) ("[I]mmunity extends both to affirmative acts as well as to an SRO's omissions or failure to act."); *NYSE Specialists*, 503 F.3d at 99 (immunity applies to claims involving SRO's action or inaction with respect to trading).

Thus, controlling authority compels dismissal of plaintiffs' negligence claims on the ground of absolute immunity.  *See DL Capital*, 409 F.3d at 98 ("[A]nnouncing the suspension or cancellation of trades is as much a part of defendants' regulatory duties as is the actual suspension or cancellation of trades.") (quotation omitted); *NYSE Specialists*, 503 F.3d at 99 (holding that claims involving an SRO's "action or inaction with respect to trading on the Exchange" are "indisputably within the [SRO's] regulatory powers" and therefore subject to absolute immunity); *Sparta Surgical*, 159 F.3d at 1214-15 (noting that "there are few functions more quintessentially regulatory than suspension of trading," and rejecting the argument

---

[8]     Contrary to plaintiffs' suggestion that there would have been no risks to market participants had NASDAQ determined to halt the Cross process (Pls. Mem. at 33 n.36), such a halt would have prevented secondary market trading in Facebook from opening on any market, *see* 17 C.F.R. § 240.12f-2, and presented potentially huge costs for the public and the market, *see Sparta Surgical*, 159 F.3d at 1211.  (*See also* Defs. Mem. at 30.)

plaintiffs borrow here that NASDAQ was acting simply as a "market facilitator" and not as a regulator).

> ### b.    Plaintiffs' Securities Fraud Claims Arise from NASDAQ's Regulatory Functions

Plaintiffs likewise cannot salvage their securities fraud claims from dismissal on the ground of SRO immunity.  Those claims are based on misrepresentations and omissions plaintiffs claim NASDAQ made before the Facebook IPO concerning the capabilities of its exchange technology systems, and on the day of the IPO concerning the system issues NASDAQ was then experiencing.  (*See* Defs. Mem. at 46-48.)  *DL Capital* and *NYSE Specialists* dispose of those claims.  (*See* Defs. Mem. at 31-33.)  In *DL Capital*, the Second Circuit held that statements made incident to an SRO's discharge of its regulatory functions are protected by immunity.  409 F.3d at 98.  And in *NYSE Specialists*, after this Court noted in dicta that public statements made by NYSE concerning its "capacity to operate an efficient securities market" "appear[ed to be] primarily promotional in nature" and thus not subject to SRO immunity, 405 F. Supp. 2d at 304-05, the Second Circuit directed the Court to reconsider the applicability of immunity to those alleged misrepresentations – a point plaintiffs ignore in their response.  503 F.3d at 102-03.  (*See also* Defs. Mem. at 32-33 & 33 n.19.)

With respect to the statements NASDAQ made on the day of the IPO, plaintiffs argue that the system issues NASDAQ experienced that day "did not involve regulatory activity."  (Pls. Mem. at 20.)  That attempt to distinguish *DL Capital* fails for the reasons discussed above:  just as in *DL Capital*, the conduct underlying NASDAQ's statements on May 18 was regulatory.  (*See* § II(A)(2)(a), *ante*.)  Accordingly, NASDAQ is absolutely immune from securities claims based on those statements.  As the Second Circuit held, "inform[ing] the public of those actions [an SRO] has undertaken in the interest of maintaining a fair and orderly market

or protecting investors and the public interest" is a "critical and necessary part" of an SRO's regulatory powers. *DL Capital*, 409 F.3d at 98 (noting further that "reporting its regulatory actions to the public is, at the very least, certainly '*consistent* with [Nasdaq's] quasi-governmental powers' as an SRO, given that safeguarding the integrity of market information was one of the purposes behind the regulation of the securities markets in the first place") (quoting *D'Alessio*, 258 F.3d at 106)).

With respect to NASDAQ's allegedly fraudulent statements made before the IPO, plaintiffs do not address NASDAQ's dispositive argument: plaintiffs' securities claims are based on alleged misrepresentations regarding NASDAQ's regulatory "obligation to ensure that its systems, processes and contingency planning are robust and adequate to manage the [commencement of trading after an] IPO without disruption to the market," which the SEC found to be within NASDAQ's regulatory duties, *see* Enforcement Order ¶ 2. *See also NYSE Specialists*, 503 F.3d at 100; 15 U.S.C. § 78f(b)(5) (a national securities exchange must "remove impediments to and perfect the mechanism of a free and open market and a national market system"). (*See also* Defs. Mem. at 33 & 33 n.19 (citing cases for the point that the Court must consider the nature of the allegedly harmful conduct, not plaintiffs' creative pleading, to determine applicability of immunity).) Instead, again invoking *Weissman* and *Opulent Fund* while disregarding Second Circuit precedent, plaintiffs argue that immunity does not apply because the statements concerned NASDAQ's "for-profit commercial interests." (Pls. Mem. at 21-23.) Even if NASDAQ's alleged statements touting its technology could give rise to a colorable claim (*see* Defs. Mem. § III(C)(1)) or could be considered commercial in another context, however, all of plaintiffs' claims arise from harms caused by NASDAQ's alleged Facebook IPO deficiencies, all of which involve NASDAQ's regulatory functions. (*See* Defs.

14

Mem. at 33-34; *see also* CAC ¶ 22 (alleging that "NASDAQ represented to market participants that its systems were robust, reliable, and completely capable of handling the Facebook IPO"); CAC ¶¶ 329-37.)

Judge Rakoff rejected a similar argument in *Standard Investment* when finding NASD and its officers immune from claims based on alleged misstatements in a proxy solicitation through which NASD sought to amend its bylaws in connection with the creation of FINRA.  The plaintiffs claimed that the alleged misstatements "related to defendants' finances, not their regulatory functions."  *Std. Inv. Chartered, Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.*, No. 07-2014, 2010 WL 749844, at *1 (S.D.N.Y. Mar. 1, 2010), *aff'd*, 637 F.3d 112 (2d Cir. 2011). Although misstatements in a proxy solicitation could give rise to viable claims in another context, the court found "this attempt to parse the proxy in order to separate 'financially-related' statements from 'regulatory-related' statements . . . artificial and unconvincing," and reasoned that "[t]o focus on the fact that amendment to the by-laws also encompassed a financial component would be to miss the entire purpose of the reorganization – a regulatory purpose to which immunity applies."  *Id*.  Likewise, plaintiffs here cannot artificially parse their securities claims from NASDAQ's handling of the opening of trading after the Facebook IPO without missing the point that all of their alleged harms arise from NASDAQ's regulatory functions.

Accordingly, NASDAQ is absolutely immune from all of plaintiffs' claims.

### 3.   NASDAQ OMX and the Individual Defendants Are Immune from Plaintiffs' Claims to the Same Extent as the Exchange

Plaintiffs assert that the defendants named in their securities claims – NASDAQ OMX and two of its officers – are not immune from plaintiffs' claims because NASDAQ OMX itself is not an SRO.  (Pls. Mem. at 19-21.)  Plaintiffs misapprehend both the law and the SEC-approved relationship between NASDAQ OMX and the Exchange, its SRO subsidiary.

As plaintiffs acknowledge (Pls. Mem. at 16), courts apply a functional test to determine immunity, focusing on the nature of the function at issue and not the identity of the actor.  *See, e.g.*, *Std. Inv.*, 637 F.3d at 116; *D'Alessio*, 258 F.3d at 105; *see also Forrester v. White*, 484 U.S. 219, 229 (1988) ("[I]t was the nature of the function performed, not the identity of the actor who performed it, that informed our immunity analysis.").  Accordingly, "[t]here is no question that an SRO *and its officers* are entitled to absolute immunity when they are, in effect, 'acting under the aegis' of their regulatory duties."  *DL Capital*, 409 F.3d at 97 (quoting *Sparta Surgical*, 159 F.3d at 1214, and finding NASDAQ's CEO, Mr. Greifeld, immune from the plaintiff's claims arising from the Exchange's reporting of its regulatory decisions to halt trading and cancel certain trades) (emphasis added); *see also Std. Inv.*, 637 F.3d 112 (SRO's officers are immune to same extent as SRO); *D'Alessio*, 258 F.3d at 95 n.1, 98 (same).  Notably, the defendants in *DL Capital* were Mr. Greifeld and the Nasdaq Stock Market, Inc., which at the time was not itself an SRO; it was a for-profit subsidiary of the National Association of Securities Dealers, Inc. ("NASD").  *DL Capital*, 409 F.3d at 95.  Only NASD was an SRO at that time, but it had delegated to the Nasdaq Stock Market the regulatory responsibility to develop, operate, and maintain the Exchange.  *Id.*  Applying the functional test, the Second Circuit rejected the contentions that the Stock Market's for-profit, non-SRO status had any bearing on the applicability of immunity to it or its CEO.  *Id.* at 99 n.4.

Moreover, notwithstanding the corporate separation between NASDAQ OMX and the Exchange, the bylaws of NASDAQ OMX provide that NASDAQ OMX and its officers exercise delegated regulatory functions, and that NASDAQ OMX's officers are "deemed to be" officers of the SRO, when their activities are related to the Exchange:

> To the extent they are related to the activities of a Self-Regulatory
> Subsidiary [including the Exchange], the books, records, premises,

> officers, Directors, and employees of [NASDAQ OMX] shall be
> deemed to be the books, records, premises, officers, directors, and
> employees of such Self-Regulatory Subsidiary for the purposes of,
> and subject to oversight pursuant to, the [Exchange] Act.

NASDAQ OMX By-Law Article XII, § 12.1(c); *see also id.* § 12.2(b) (requiring NASDAQ

OMX officers, directors, and employees to cooperate with the Exchange in respect of its "self-

regulatory functions and responsibilities").[9]  This bylaw was endorsed and approved by the SEC.

*See Findings, Opinion, and Order of the Comm'n*, Exch. Act Rel. No. 53,128 (Jan. 13, 2006), 71

Fed. Reg. 3,550, 3,552 (Jan. 23, 2006) (approving bylaw) ("*Exchange Reg. Approval Order*").

Although plaintiffs selectively quote from the Exchange Registration Approval Order for the

unremarkable point that NASDAQ OMX is not an SRO (*see* Pls. Mem. at 19-20), the Order

required NASDAQ OMX to submit to the SEC's jurisdiction "with respect to activities relating

to [the Exchange]" and to ensure that NASDAQ OMX's "activities with respect to the operation

of [the Exchange] . . . [be] consistent with, and not interfere with, the Exchange's self-regulatory

obligations." *Exch. Reg. Approval Order*, 71 Fed. Reg. at 3,552.[10]

        Here, plaintiffs' securities claims are based on conduct of NASDAQ OMX and its

officers that arises from the Exchange's regulatory functions – that is, making statements about

the capabilities of the Exchange's systems for commencing trading after an IPO, about the

system issues the Exchange experienced on the day of the IPO, and about the decisions the

---

[9]     A copy of Article XII of the NASDAQ OMX By-Laws is attached as Exhibit A to the
        Declaration of Paul Lantieri III submitted herewith.

[10]    Separately, plaintiffs also disregard the publicly available fact that Ms. Ewing is also an
        officer of the Exchange.  *See* http://ir.nasdaqomx.com/nasdaq-stock-market-llc.cfm
        ("Officers" tab) (last visited Sept. 26, 2013).

Exchange made on the day of the IPO.[11]  Accordingly, plaintiffs' securities claims should be dismissed on the ground of SRO immunity.

### B.    Plaintiffs' Negligence Claims Are Barred by the Economic Loss Doctrine

Plaintiffs concede they have no contractual relationship with NASDAQ and that their negligence claims seek recovery of only economic losses.[12]  Such claims are accordingly barred by the economic loss doctrine, which holds that "a plaintiff cannot recover in tort for purely economic losses caused by defendant's negligence."  *King County v. IKB Deutsche Industrie Bank AG*, 863 F. Supp. 2d 288, 302 (S.D.N.Y. 2012) (citing *Schiavone Constr. Co. v. Mayo Corp.*, 436 N.E. 2d 1322 (N.Y. 1982) (adopting the economic loss rule), among other cases).  Plaintiffs cite no case since the adoption of the economic loss doctrine in which a New York court has imposed negligence liability on a securities exchange in favor of retail investors, and none of plaintiffs' attempts to circumvent application of the economic loss rule to bar their negligence claims can withstand scrutiny.

First, plaintiffs argue that "the 'economic loss' doctrine is wholly inapposite because it applies solely to products liability cases."  (Pls. Mem. at 60.)  That assertion is untrue.  While New York courts have applied the economic loss doctrine in the products liability context, they have also applied the doctrine or its equivalent to bar claims for economic loss in numerous

---

[11]    When expedient, plaintiffs baselessly attribute to NASDAQ OMX conduct of the Exchange.  For example, they allege that "the Securities Defendants failed to provide adequate tests" of NASDAQ's systems (Pls. Mem. at 4); that Mr. Greifeld and other "certain executives of NASDAQ OMX" held an emergency conference call on May 18 and "made the high risk, *ad hoc* business decision to resort to an untested backup system" (Pls. Mem. at 11); and that NASDAQ OMX made the alleged misstatements in the Exchange's May 18 system status messages (Pls. Mem. at 21).  All of these activities were activities of the Exchange.

[12]    Plaintiff First New York is a member of the Exchange and a party to the standard NASDAQ Member and Services Agreements.  First New York, however, does not assert any negligence claim.  (*See* Pls. Mem. at 60 n.56.)

other contexts.[13]  Indeed, the very cases cited by plaintiffs for the proposition that the economic

loss doctrine applies only in the context of defective products belie their argument.  Thus, for

example, in *Finlandia*, the New York Court of Appeals refused to hold a negligent landowner

liable to owners of adjacent businesses for economic losses caused by a building collapse.  *See*

750 N.E.2d at 1103.  While the Court analyzed plaintiffs' claims under the rubric of the scope of

the landowners' duty and noted, *obiter dictum,* that the economic loss rule as initially adopted in

the *Schiavone* decision applied only to purchasers of products, it nevertheless concluded "that

plaintiffs' negligence claims based on economic loss alone fall beyond the scope of the duty

owed them by defendants and should be dismissed."  *Id.* at 1101 n.1, 1103.  As explained by

Judge Scheindlin in *King County*, also cited by plaintiffs:

> In . . . *Finlandia* . . . , the New York Court of Appeals cautioned
> that the "economic loss rule" has no application outside of the
> product-liability context.  And yet, in practice the principle has
> been applied broadly, and has been referred to interchangeably as
> the "economic loss rule" and the "economic loss doctrine."  The
> approach taken in *Finlandia* is instructive – rather than apply a
> "rule" baring plaintiffs from recovering for purely economic
> losses, the Court of Appeals conducted a duty analysis and
> determined that "plaintiffs' negligence claims based on economic
> loss alone fall beyond the scope of the duty owed them by
> defendants."  It is this focused duty analysis – this policy-driven
> scrutiny of whether a defendant had a duty to protect the plaintiff
> against purely economic losses – that can best be termed "the
> economic loss doctrine."

---

[13]     *See, e.g.*, *532 Madison Ave. Gourmet Foods, Inc. v Finlandia Ctr., Inc.,* 750 N.E. 2d 1097
(N.Y. 2001) (negligent landowner not liable for economic losses suffered by owners of
adjoining properties for economic losses caused by building collapse); *Milliken & Co. v.
Consol. Edison Co. of N.Y., Inc.,* 644 N.E. 2d 268, 271 (N.Y. 1994) (utility not liable for
economic losses sustained as a result of a negligent interruption in service); *Anschutz
Corp. v. Merrill Lynch & Co.,* 690 F.3d 98, 115 (rating agencies not liable to members of
investing public for economic losses caused by negligent rating of securities).  (*See also*
Defs. Mem. at 36-37 (citing additional cases).)

19

863 F. Supp. 2d at 302.  Applying just such an analysis, Judge Scheindlin held that sellers of

financial products do not have a duty of care to protect downstream investors from economic

losses, and dismissed such investors' negligence claims in that case.[14]  *Id.* at 303.  In numerous

other cases, New York courts have applied the same analysis and consistently held that a

defendant is not liable to juridical strangers for purely economic losses caused by the defendant's

negligence.  (*See* Defs. Mem. at 36-37.)  The same reasoning applies here.

Second, plaintiffs argue that the economic loss doctrine should not be applied to

bar their negligence claims because the potential for economic loss arising from the negligent

operation of a securities exchange is "particularly foreseeable."  (Pls. Mem. at 62.)  But New

York courts have found that foreseeability alone is not a sufficient limiting principle to define the

scope of an alleged tortfeasors' duty.  It is precisely for that reason that New York follows the

economic loss doctrine:

---

[14]   Plaintiffs' argument that Judge Scheindlin "did not bar the claims under the 'economic loss' doctrine but held, as a matter of law, that a structured investment vehicle 'cannot be negligently structured'" (Pls. Mem. at 60) reflects a misreading of the court's decision. Far from finding the economic loss doctrine inapplicable, after discussing the doctrine at length, the court concluded:

> As a matter of law, creators and structurers of investment vehicles – even risky or "low quality" ones – do not have a duty of care to protect investors against economic loss.

*King County*, 863 F. Supp. 2d at 303.

The other cases plaintiffs cite to support their assertion that the economic loss rule does not apply outside of the context of products liability also belie plaintiffs' position.  In *Travelers Casualty & Surety Company v. Dormitory Authority-State of New York*, 734 F. Supp. 2d 368, 385 (S.D.N.Y. 2010), the court held that architects and construction managers could not be held liable in tort to a construction contractor for economic losses suffered by the contractor as a result of their allegedly negligent work performance.  And in *Phillips v. Reed Group, Ltd.*, No. 07-3417, 2013 WL 3340293, *32 (S.D.N.Y. July 1, 2013), the court did not even consider whether the economic loss doctrine applied.

> [T]o the extent that "economic loss" is difficult to quantify, but
> also a highly foreseeable outcome of negligence in the commercial
> context, the economic loss doctrine reflects a policy interest in
> protecting defendants from disproportionate, and potentially
> limitless, liability.  "Relying solely on foreseeability to define the
> extent of liability in cases involving economic loss, while generally
> effective, could result in some instances in liability so great that, as
> a matter of policy, courts would be reluctant to impose it."  As a
> result, to avoid "crushing exposure" to suits by countless parties
> who have suffered economic loss, New York courts have
> concluded that absent a duty running directly to the injured person
> there can be no liability in damages, however careless the conduct
> or foreseeable the harm.

*Travelers*, 734 F. Supp. 2d at 379 (citing *Hydro Investors, Inc. v. Trafalgar Power, Inc.*, 227

F.3d 8, 16 (2d Cir. 2000), and *Finlandia,* 750 N.E. 2d at 1101).  As noted in defendants' initial

memorandum, while New York courts have not yet addressed the question of the applicability of

the economic loss doctrine specifically in the context of negligence claims against a securities

exchange, the policy considerations behind the doctrine apply with particular force in that

context, where billions of dollars of transactions occur every day.[15]  (*See* Defs. Mem. at 38-39.)

Finally, citing *Sommer v. Federal Signal Corp.*, 593 N.E. 2d 1365 (N.Y. 1992),

plaintiffs argue that New York courts "have found an 'economic loss' duty of care independent

of contractual duties."  (Pls. Mem. at 62-63.)  The *Sommer* decision has no bearing here.  In that

case, the plaintiff and the defendant were parties to a contract.  *Sommer*, 593 N.E. 2d at 1367.

The issues before the court were whether the defendant had a duty to the plaintiff to carry out its

---

[15]     Although not decided under New York law, *Federal Deposit Insurance Corporation v.
National Association of Securities Dealers, Inc.*, 582 F. Supp. 72, 74 (S.D. Iowa 1984),
concluded there was no authority that would impose a common law duty of care on a
securities exchange in favor of individual investors:

> Plaintiff FDIC has not provided, nor is the court aware of, any case
> law indicating the existence of a common law cause of action for
> negligence by an individual customer of a member of a national
> securities association or stock exchange against the association or
> exchange.

contractual undertakings carefully, and whether as a matter of public policy the defendant could disclaim liability for damages arising out of the grossly negligent performance of those contractual duties.  *Id.* at 1368, 1370.  The court did not address whether any duty could have been imposed on the defendant in the absence of a contract between the parties, and did not discuss (much less limit) the economic loss doctrine.  Here, there is no contractual relationship between the plaintiffs and NASDAQ that could give rise to such a duty of care.  Further, as subsequent cases have noted, the defendant's negligence in the *Sommer* case resulted in catastrophic physical damage, and "the Court of Appeals has declined to extend *Sommer* to cases involving only economic harm."  *Verizon N.Y., Inc. v. Optical Commc'ns Grp., Inc.,* 936 N.Y.S. 2d 86, 90 (N.Y. App. Div. 2011) (telecommunications carrier not liable to competing carrier for economic losses suffered by wrongful failure to share conduit).  *See also N.Y. Univ. v. Cont'l Ins. Co.,* 662 N.E. 2d 763, 768 (N.Y. 1995) (insurance company not liable in tort for economic losses sustained due to wrongful denial of coverage); *Logan v. Empire Blue Cross & Blue Shield*, 714 N.Y.S.2d 119, 123-24 (N.Y. App. Div. 2000) (same); *Milliken,* 644 N.E. 2d at 271 (utility not liable in tort for economic losses sustained as a result of a negligent interruption in service).

In short, plaintiffs cite no case imposing negligence liability on a securities exchange in favor of retail investors having no contractual relationship with the exchange, and they offer no rational basis to distinguish such exchanges from public utilities, financial institutions, insurers, rating agencies, telecommunications providers, product manufacturers, landowners, and service providers, all of whom New York courts have held are not liable in negligence for purely economic harm.  The economic loss doctrine bars all such claims, and it bars plaintiffs' negligence claims against NASDAQ as well.

C.      **The Complaint Fails to Allege Critical Elements of Plaintiffs' Securities Fraud Claims**

The theory of plaintiffs' securities fraud claim in this case is unprecedented. Plaintiffs assert that they were defrauded into purchasing shares of Facebook on the day of its IPO, not in reliance upon any statement about Facebook, its value, or its prospects, but in reliance upon general statements they never read or heard about the technical capabilities of the exchange on which Facebook shares were listed.  Plaintiffs' theory of liability is an attempt to force a square peg into a round hole – to cloak a negligence claim as a fraud claim.  Not surprisingly, plaintiffs do not and cannot allege critical elements of a viable claim for securities fraud, including:  the existence of any misrepresentation or omission material to the value of Facebook; facts giving rise to a "strong inference" that NASDAQ acted with scienter; reliance by plaintiffs on any statements made by NASDAQ or any basis upon which such reliance could be presumed; and any proximate causal link between the statements and omissions on which the plaintiffs base their claim and the losses they claim to have suffered.

Plaintiffs' memorandum in response to defendants' motion to dismiss cures none of these defects.

1.      **Failure to Allege Any Material Misrepresentation or Omission**

a.      ***Statements Before the Facebook IPO***

With respect to pre-Facebook IPO statements, plaintiffs argue that defendants "had a duty to correct and/or update these statements concerning the capabilities of NASDAQ's technology and trading platforms no later than the morning of May 18, 2012 [because] . . . [a]t that moment, the . . . statements became materially misleading."  (Pls. Mem. at 39.)  But, as defendants demonstrated in their initial brief, the pre-IPO statements plaintiffs cite are puffery – general statements of opinion concerning the quality and capabilities of the Exchange, of the

23

kind that courts (including this Court and the Second Circuit) have consistently held not to be

actionable under the securities laws.  *See, e.g.*, *ECA and Local 134 IBEW Jt. Pension Trust of

Chicago v. J.P. Morgan Chase Co.*, 553 F.3d 187, 205-06 (2d Cir. 2009); *In re Tower Auto. Sec.

Litig.*, 483 F. Supp. 2d 327, 336-37 (S.D.N.Y. 2007) (Sweet, J.).  (*See also* Defs. Mem. at 48-49

(citing cases).)

> Plaintiffs do not seriously argue otherwise.  Indeed, the examples plaintiffs cite

only reinforce this point:

- NASDAQ is "committed to working with regulators, exchanges and market participants."

- NASDAQ "provides technology to customers with the speed, scale and reliability required to meet the specific needs of their markets."

- NASDAQ platforms are "highly scalable," "reliable, flexible, and high capacity," "deliver[] high level of execution quality and speed under . . . demanding market conditions," and "no trading platform on the planet is faster or more scalable."

- NASDAQ has "unique capabilities unmatched by any exchange in the world."

- NASDAQ "delivers innovative products and services."[16]

(Pls. Mem. at 38-39 (emphasis and citations omitted).)  These are all classic examples of the type

of puffery courts have consistently refused to recognize as sufficiently specific or verifiable to

give rise to a claim of misrepresentation under the securities laws.[17]

---

[16]   The Complaint also cites several pre-IPO statements that were factual (*e.g.*, statements about processing speed and uptime, number of markets and market penetration, and number of listed securities).  Those statements were demonstrably true, and plaintiffs do not allege otherwise.  (*See* Defs. Mem. at 46-47.)  Plaintiffs do not even mention those statements in their response brief.

[17]   They are not at all like the statements at issue in the cases cited in footnotes 41 and 42 of plaintiffs' response brief.  In *Casella v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989), the statement that an investment was a "sure thing" was "coupled with . . . specific misrepresentations of fact as to the future profitability . . . and the tax benefits that would flow from the investment."  In *Scritchfield v. Paolo*, 274 F. Supp. 2d 163, 175 (D.R.I. 2003), statements that the defendant was the "premier" and "dominant" provider of DSL

Plaintiffs nevertheless argue that such statements created an "impression" concerning the capabilities of the Exchange which NASDAQ "had a duty to correct and/or update" based upon the principle that "a duty to disclose arises when prior statements 'become misleading when viewed in the context of subsequent events.'"  (Pls. Mem. at 40 (quoting *Oran v Stafford*, 226 F.3d 275, 286 (3d Cir. 2000)) (emphasis omitted).)  But there is no duty to "update" or to "correct" puffery.  *In re IBM Sec. Litig.,* 163 F.3d 102, 110 (2d Cir. 1998); *In re Bank of Am. Corp. Sec., Deriv. & ERISA Litig.*, 757 F. Supp. 2d 260, 313 (S.D.N.Y. 2010); *In re Duane Reade Inc. Sec. Litig.*, No. 02-6478, 2003 WL 22801416, at *7 (S.D.N.Y. Nov. 25, 2003).  By their nature, such general and unverifiable statements of opinion are not subject to "correction" or "update."

The cases cited by plaintiffs do not remotely support their argument that defendants had a duty to update or to correct the general statements they cite relating to the capabilities of NASDAQ's technology systems, even if the plaintiffs had seen or read such statements (which, as discussed below, they had not).  *In re Quintel Entertainment, Inc. Sec. Litig.*, 72 F. Supp. 2d 283 (S.D.N.Y. 1999), the principal authority cited by plaintiffs, illustrates the distinction between specific factual statements that are capable of verification and can give rise to a duty to correct, and general statements of opinion that cannot give rise to any such duty.  In *Quintel*, the defendants represented that customer charge-backs were declining when they knew or soon after discovered "that there was 'rampant customer dissatisfaction,'" and

---

services were found actionable because they communicated a specific and verifiable comparison with competitors.  In the same vein, in *Manavazian v. Atec Group, Inc.*, 160 F. Supp. 2d 468, 480 (E.D.N.Y. 2001), the statement that the defendant was poised for "hyper-growth" was held actionable when the company knew that a "paradigm shift" in its industry "hobbl[ed] the [c]ompany's basic health."  And in *In re Computer Associates Class Action Securities Litigation*, 75 F. Supp. 2d 68, 73 (E.D.N.Y. 1999), statements concerning the financial strength of the defendant were held actionable when alleged to be based on accounting statements prepared in violation of GAAP.

represented that a partnership with AT&T was generating "significant increases in net revenues,"
when shortly thereafter they modified the terms of the partnership so as severely to curtail future
revenues. *Id*. at 291. The court acknowledged that "there is no duty to update mere expressions
of opinion or exclusively forward-looking statements," but correctly ruled in that case that "the
statements made by defendants both prior to and during the Class Period were not vague
forward-looking expressions of optimism," but rather specific and verifiable statements on
subjects directly material to the issuer's prospects that defendants did have a duty to correct
when they were proven to be untrue. *Id.* at 292. Here, by contrast, the statements plaintiffs cite
are not specific verifiable statements of fact but rather general statements of opinion that are
neither capable of objective verification nor subject to "update" or "correction."[18] The Third
Circuit's decision in *Oran*, also relied upon by plaintiffs (*see* Pls. Mem. at 39-40), is even less
helpful to their position. There, the court held the defendants had ***no*** duty to correct or to update
statements concerning litigation risks associated with the diet drug Phen-Fen, even after
receiving credible reports linking the drug to heart valve abnormalities. *Oran,* 226 F.3d at 286.

       Plaintiffs also fail to present any cogent argument as to why the statements and
omissions on which their claims are based were material to their investment decisions to
purchase Facebook. To be "material" within the context of the securities laws, a statement or
omission must be sufficiently important in the "total mix" of information about a security to
create the "substantial likelihood that a reasonable shareholder would consider it important in

---

[18]    *In re Time Warner Inc. Securities Litigation*, 9 F.3d 259 (2d Cir. 1993), also illustrates
this distinction. There, the Second Circuit found that Time Warner did not have any duty
to correct or to update general statements concerning its negotiation of a strategic alliance
with Paramount when such discussions did not proceed well, but that it might have a duty
to update specific statements concerning its pursuit of one business plan when it
undertook an entirely different plan inconsistent with the one it had previously
announced. *Id.* at 267-68.

deciding how to [act]." *ECA & Local 134*, 553 F.3d at 197 (quoting *Basic Inc. v. Levinson,* 485

U.S. 224, 231-32 (1988)). Here, none of the statements or omissions plaintiffs cite concerned the

security plaintiffs purchased. The statements and omissions did not relate to Facebook, its

revenues, or its future prospects, or to any other factor that could affect that company or the

value of its stock. They related to NASDAQ and its trading systems. Plaintiffs do not allege that

they even considered the fact that Facebook would be listed on NASDAQ in valuing the stock.

The notion that plaintiffs or any reasonable investor purchased Facebook stock on the day of its

IPO because they thought highly of NASDAQ is, quite frankly, preposterous. They purchased

Facebook stock because they thought highly of Facebook.

   The cases plaintiffs cite on this issue are inapposite because they all concern

statements or omissions about the issuer whose securities the plaintiffs purchased. For example,

plaintiffs cite this Court's decision in *Regeneron*, in which the Court noted that "it would be a

sad day when [a] court could determine that misstatements about whether a company's primary

product worked did not alter the 'total mix' of information available to the market." *In re

Regeneron Pharm., Inc. Sec. Litig.*, No. 03-3111, 2005 WL 225288, at *21 (S.D.N.Y. Feb. 1,

2005) (Sweet, J.) (citation omitted) (cited at pages 41 to 42 of plaintiffs' memorandum).

*Regeneron* only illustrates the flaw in plaintiffs' reasoning: the statements held material to the

value of Regeneron's stock in that case concerned the efficacy of ***Regeneron's*** principal product,

not that of any other company and certainly not the exchange on which Regeneron stock was

traded. *See id.* The same observation can be made about the other cases cited by plaintiffs in

support of their argument on materiality: each concerned a representation or omission about the

issuer whose securities plaintiffs purchased. *See Time Warner*, 9 F.3d at 267-68 (statements

about Time Warner's business plans); *Milman v. Box Hill Sys. Corp.,* 72 F. Supp. 2d 220, 230

27

(S.D.N.Y. 1999) (statements about Box Hill's product line); *Kronfeld v. Trans World Airlines, Inc.,* 832 F.2d 726, 730 (2d Cir. 1987) (statements about TWA's corporate reorganization plans).

Moreover, even if the capabilities of an exchange on which an issuer's securities are traded could be deemed material to a shareholder's decision to purchase the issuer's securities, plaintiffs ignore that the "total mix" of information available about the Exchange included specific and repeated disclosure of the risk that NASDAQ's trading systems "could experience unanticipated disruptions in service," and that NASDAQ "markets have experienced occasional systems failures and delays in the past and could experience future systems failures and delays." *See, e.g.,* NASDAQ OMX Annual Report (Form 10-K), at 25-26 (Feb. 24, 2012). (*See* Defs. Mem. at 50-51 n.28.)  General statements extolling the quality of NASDAQ's technology such as those cited by plaintiffs were not materially misleading when read in context of NASDAQ's specific disclosures concerning the risk of technology failures.  While plaintiffs argue that "generic" disclaimers cannot be used to avoid liability (*see* Pls. Mem. at 42 n.44), the risk disclosures here were specific and precisely on point.

### b.       Statements on the Day of the Facebook IPO.

With respect to the "market system status" messages disseminated by NASDAQ to its members on the day of the Facebook IPO, plaintiffs concede (as they must) that each of those statements was truthful and accurate.  They argue instead that while the statements were true, they were nevertheless misleading because they did not disclose details concerning the nature of the systems difficulties NASDAQ was experiencing.  Thus, for example, plaintiffs argue that while NASDAQ truthfully reported that it was "experiencing a delay" in opening trading in Facebook, it did not also report that the delay related to issues concerning execution of the IPO Cross for Facebook.  (Pls. Mem. at 44-45.)  Similarly, plaintiffs argue that when NASDAQ announced truthfully that it was experiencing "an issue in delivering trade execution

messages from the IPO cross in symbol FB," and was "working to deliver pending trade executions status messages from the Facebook, Inc. (FB) IPO cross," NASDAQ misled investors by failing also to disclose the reasons for the delay. (Pls. Mem. at 45-46.)

As the principal decision cited by plaintiffs acknowledges, however, the duty to be "truthful, accurate, and complete" when speaking "does not mean that 'by revealing one fact . . . one must reveal all others that, too, would be interesting . . . but means only such others, if any, that are needed so that what was revealed would not be so incomplete as to mislead.'" *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 159-60 (S.D.N.Y. 2008) (quoting *Backman v. Polaroid Corp.*, 910 F.2d 10, 16 (1st Cir. 1990)). In *Bristol Meyers Squibb*, for example, defendant's statement that it was vigorously pursuing its patent rights was rendered misleading by its failure to disclose the inconsistent fact that it had relinquished some of those patent rights. *Bristol Meyers Squibb,* 586 F. Supp. 2d at 160-61. Here, by contrast, the details omitted from NASDAQ's market system messages on May 18 were not in any way inconsistent with the facts those messages conveyed. Omitting to describe the cause of the delays experienced by NASDAQ in the commencement of trading and delivery of trade confirmations following the Facebook IPO did not render the statements NASDAQ made to inform members of the fact of those delays misleading. *See, e.g., Kleinman v. Elan Corp., PLC,* 706 F.3d 145, 153-54 (2d Cir. 2013) (omission of facts about a drug study was not misleading when they did not directly contradict anything in company's statement); *City of Roseville Employees' Ret. Sys. v. Nokia Corp.,* No. 10-967, 2011 WL 7158548 at *8-9 (S.D.N.Y. Sept. 6, 2011) (failure to disclose

production delays not material when omission did not relate to or contradict affirmative statements).[19]

On the day of the Facebook IPO, NASDAQ faced an emergent situation that required it to identify and to resolve unanticipated systems issues.  In the midst of such an emergency, attempting to provide more detailed information would be problematic:  it would increase the likelihood of a mistaken explanation and it would divert resources from the substantive task at hand.  In that context, NASDAQ's systems status messages did exactly what they were intended to do:  they factually and accurately reported the status of the NASDAQ's market systems.  They did not omit any material fact necessary to make such status messages not misleading.

### 2.        Failure to Allege Scienter

To plead scienter under the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."

---

[19]     The cases relied upon by plaintiffs do not support their contention that NASDAQ had a duty to disclose additional information in its "market system status" messages.  Rather, in each of these cases the court found that information was omitted that directly contradicted a verifiable affirmative statement.  *See, e.g.*, *McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 578 (2d Cir. 1990) (statement promoting a right to tender was misleading because the company knew that the right was "illusory"); *Fogarazzo v. Lehman Bros., Inc.*, 341 F. Supp. 2d 274, 294 (S.D.N.Y. 2004) (company's buy recommendations were misleading because company stated that stock would outperform the market when company did not in fact believe that the stock would outperform the market).  Plaintiffs also cite several cases holding that a defendant has a duty to speak truthfully even when there is no independent duty of disclosure.  *See, e.g.*, *Caiola v. Citibank, N.A.*, 295 F.3d 312, 330-31 (2d Cir. 2002) (Citibank could not disclaim its duty to speak honestly about its hedging strategy when it chose to do so); *Bank of Am.*, 757 F. Supp. 2d at 297-98 (by choosing to speak about bonuses, company had a duty to speak truthfully even in the absence of SEC regulations requiring disclosure of bonuses); *Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 238 (S.D.N.Y 2006) (disclaimer in research report did not adequately disclose the conflict alleged).  Such cases have no bearing here, where the statements at issue are not alleged to be untrue.

15 U.S.C. § 78u-4(b)(2)(A).  Plaintiffs argue they have met this standard by "alleging facts

demonstrating that the [NASDAQ] Defendants 'knew facts or had access to information'

contrary to their public statements and 'failed to verify information' they had a duty to

monitor."[20]  (Pls. Mem. at 50 (citation omitted).)  The allegations of the Complaint do not

remotely meet PSLRA or Second Circuit standards under either of these theories.

    With respect to their first theory of scienter, plaintiffs do not contend that the

statements they attribute to defendants concerning the capabilities of NASDAQ's trading

systems were knowingly false when made.  Rather, they argue that in testing NASDAQ's

systems shortly before the Facebook IPO, defendants learned that those systems were not

capable of handling the anticipated volume of trading.  (Pls. Mem. at 50-51.)  But plaintiffs'

Complaint and response brief allege no ***facts*** to support the proposition that NASDAQ's pre-IPO

testing revealed any technical flaws.  They refer only to conclusory and unattributed statements

in the media that NASDAQ knew its software "still had bugs" and "knew its systems were

broken before the Facebook IPO."  (Pls. Mem. at 50-51 (quoting one article published in the *New

York Post* attributing an unnamed "Wall Street insider," and another article in *Business Insider*

attributing an unnamed "hedge fund manager").)  Such allegations are woefully inadequate.  As

the Second Circuit observed in *Novak*, the principal authority relied upon by plaintiffs:

> As long as the public statements are consistent with reasonably
> available data, corporate officials need not present an overly
> gloomy or cautious picture of current performance and future
> prospects . . . . ***Where plaintiffs contend defendants had access to
> contrary facts, they must specifically identify the reports or
> statements containing this information***.  *See San Leandro*,
> 75 F.3d at 812 ("Plaintiffs' unsupported general claim of the
> existence of confidential company sales reports that revealed the

---

[20]  Plaintiffs do not seek to allege scienter under a theory of "motive and opportunity" to
defraud.  (*See* Pls. Mem. at 49-54.)

> larger decline in sales is insufficient to survive the motion to
> dismiss").

*Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) (emphasis added; internal citation omitted).

Plaintiffs do not "specifically identify" any such "report or statement" suggesting that NASDAQ

knew its systems were inadequate to handle the Facebook IPO.  They cite only triple hearsay

unattributed to any person with actual knowledge of NASDAQ's testing of its systems.  Such

allegations do not meet the heightened standards demanded by the PSLRA.  As the Second

Circuit observed in *Stern*, "[i]t is not enough to quote press speculation about defendants'

motives [because] . . . [s]uch allegations simply do not provide . . . specific well-pleaded facts . .

. ."[21] *Stern v. Leucadia Nat'l Corp.*, 844 F.2d 997, 1004 (2d Cir. 1988) (internal quotation marks

omitted).  *See also Campo v. Sears Holdings Corp.*, 371 Fed. App'x 212, 215 (2d Cir. 2010);

*Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 865 (5th Cir. 2003).

    Plaintiffs' second theory of scienter (inconsistent with their first theory) is that

NASDAQ did not perform adequate testing of its systems before the Facebook IPO "to verify. . .

whether NASDAQ's systems were reliable and capable of properly handling the enormous

trading volume in the Facebook IPO" and that "NASDAQ did not have the necessary internal

controls . . . to verify whether its systems could reliably handle . . . the Facebook IPO."  (Pls.

Mem. at 52-53.)  Plaintiffs argue that by failing adequately to test its systems, NASDAQ "failed

to verify information that they were obligated to monitor, which demonstrates scienter on its

own."  (Pls. Mem. at 53.)   While such allegations conceivably might be sufficient to state a

---

[21]   Plaintiffs concede their allegations of defendants' state of mind based upon news media
reports are inadmissible hearsay, but argue that "is entirely irrelevant, as allegations in
the complaint are not tested against the rules of evidence."  (Pls. Mem. at 51 n.49.)  That
argument misses the point.  Plaintiffs are obliged under the PSLRA to plead "facts" and
to plead them "with particularity."  Such conclusory and unsubstantiated speculation as
that on which plaintiffs rely would not constitute well-pleaded fact, even if it were
admissible.

claim of simple negligence under state law, they do not support a claim of fraud under the federal securities laws.

To plead scienter on the theory of "conscious misbehavior or recklessness" plaintiffs advance, a plaintiff must plead facts sufficient to give rise to a strong inference that defendants acted with "a reckless disregard for the truth," which the Second Circuit has held to mean "conscious recklessness – *i.e.*, a state of mind ***approximating actual intent [to defraud], and not merely a heightened form of negligence***."  *South Cherry St. LLC v. Hennessee Grp. LLC,* 573 F.3d 98, 109 (2d Cir. 2009) (quoting *Novak,* 216 F.3d at 312) (emphasis in *South Cherry Street*).  It is not sufficient for a plaintiff to allege that a defendant was negligent in failing to conduct the sort of investigation that would have uncovered the truth:

> [R]ecklessness in the context of a private securities fraud action [requires] . . . conduct that "'at the least . . . is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that ***the danger was either known to the defendant or so obvious that the defendant must have been aware of it***;'" or to evidence that the "defendants failed to review or check ***information that they had a duty to monitor***, or ignored ***obvious*** signs of fraud," and hence "should have known that they were misrepresenting material facts."

*Id.* (quoting *In re Carter-Wallace, Inc. Securities Litigation,* 220 F.3d 36, 39 (2d Cir. 2000), *Novak*, 216 F.3d at 308, and *Chill v. General Electric Co.*, 101 F.3d 263, 269 (2d Cir 1996)) (emphasis in *South Cherry Street*).

On this point, plaintiffs do not contend that NASDAQ knew its technology systems were inadequate to manage the volume of trading anticipated in the Facebook IPO.  Nor do they argue that it was so obvious that NASDAQ's technology would fail that NASDAQ should have been aware of that danger.  Plaintiffs assert only that NASDAQ's pre-IPO testing of its systems was not sufficiently robust to uncover the issues that emerged following the Facebook IPO.  (Pls. Mem. at 52-53.)  Even if such criticisms were merited (which they are not),

or if better testing would have uncovered the problem that caused the Facebook IPO Cross to loop (which it would not have), any shortfalls in NASDAQ's testing or controls were not intentional or consciously reckless. Even accepting these allegations as true, at most they aver negligence. Such allegations of negligence simply do not support a claim of fraud under the securities laws.

### 3.    Failure to Allege Reliance

As noted above, plaintiffs' securities fraud claims are based upon what plaintiffs argue were false and misleading statements made by defendants (i) before the Facebook IPO concerning the capabilities of NASDAQ's trading systems, and (ii) on the day of the Facebook IPO concerning the systems issues NASDAQ experienced in commencing trading. (Pls. Mem. at 55-56.) Plaintiffs do not allege that they ever read (much less actually relied upon) the pre-IPO statements attributed to the securities fraud defendants concerning the capabilities of NASDAQ's trading systems, and they do not allege that they ever received (much less actually relied upon) the market systems status messages issued by NASDAQ on the day of the Facebook IPO. Nor do plaintiffs contend that the critical element of reliance may be presumed under a "fraud on the market" theory, as there was no market for Facebook before its IPO. Instead, they argue that the Court should presume reliance under the principles of *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153-54 (1972), applicable to cases of fraud by omission. (Pls. Mem. at 54-56.) *Affiliated Ute* has no applicability here.

First, this is not a case based primarily upon fraud by omission. Plaintiffs' Complaint is rife with allegations of affirmative misrepresentations attributed to the NASDAQ defendants. Indeed, the Complaint contains no fewer than 44 paragraphs purporting to allege such misrepresentations. (*See* CAC ¶¶ 168-89, 197-218.) As defendants noted in their Initial Memorandum, "[w]here positive statements form a central part of the alleged fraud such that the

34

evidentiary problems inherent in proving reliance on a non-disclosure are not present, the

*Affiliated Ute* exception does not apply."  *In re Salomon Analyst Metromedia Litig.,* 236 F.R.D.

208, 218-19 (S.D.N.Y. 2006).  For that threshold reason, plaintiffs' attempt to side-step the

requirement of reliance by contending their Complaint is based upon omissions is not warranted.

    Second, and equally fundamentally, omissions are only actionable under the

securities laws if the defendant has a duty to speak.  *See, e.g., Chiarella v. U.S.*, 445 U.S. 222,

235 (1980) ("When an allegation of fraud [under section 10(b)] is based upon non-disclosure,

there can be no fraud absent a duty to speak.").  *See also Stoneridge Inv. Partners, LLC v.*

*Scientific-Atlanta, Inc.*, 552 U.S. 148, 159 (2008) (*Affiliate Ute* applicable to cases when

plaintiffs plead "an omission of a material fact by one with a duty to disclose").  Here, plaintiffs

do not contend that the defendants had any independent duty to speak to them concerning

NASDAQ's systems capabilities or issues.  They only contend that the defendants had such a

duty to speak in order to correct or to render not misleading affirmative statements they claim

NASDAQ made.  As plaintiffs explicitly concede in their response brief:

> the CAC identifies certain affirmative statements in order to
> demonstrate that the Securities Defendants had the duty (1) to
> correct and/or update previous material statements. . . and (2) to
> disclose material information necessary to make their statements
> not misleading. . . .

(Pls. Mem. at 55.)  Thus, plaintiffs' argument on reliance is circular.  They attempt to avoid

pleading reliance by asserting a duty to disclose based upon affirmative statements on which they

never relied.  The Second Circuit squarely rejected such circular reasoning in *Wilson v. Comtech*

*Telecomm'cns Corp.*, 648 F.2d 88, 93-94 (2d Cir. 1981), which plaintiffs incongruously cite in

their response brief:

> We have in the case at bar informational statements that earnings
> for the first half of fiscal 1977 "would be flat" and for the second
> half "could be flat". . . .  These statements were reasonable and

> were believed to be true when made.  However, they later became
> misleading, if treated as current, when the company failed to
> disclose the new information. . . .  If we assume, as Wilson argues,
> that appellees had the duty to correct the projections once new
> information made them inaccurate, then, perforce, those statements
> were still current in March 1977 and Wilson must demonstrate that
> he relied on them in making his purchases of Comtech stock.

In other words, because the *Affiliated Ute* presumption exists only to alleviate a plaintiff's

burden of proving reliance on statements that were never made, and because a defendant can

have no duty to correct a statement unless the plaintiff heard it and relied upon it, the *Affiliated*

*Ute* presumption cannot apply to a claim of the type plaintiffs assert here, where the only basis

for the purported duty to speak is to correct an affirmative statement on which the plaintiff does

not claim to have relied.[22]

Because neither *Affiliated Ute* nor "fraud on the market" provides a presumption

of reliance applicable here, plaintiffs' failure to plead actual reliance is fatal to their securities

fraud claims.

### 4.     Failure to Allege Loss Causation

Finally, plaintiffs' complaint fails to allege the requisite proximate causal

connection between the losses plaintiffs claim to have suffered by virtue of the decline in the

price of Facebook stock following its IPO, and any representation or omission made by

defendants concerning NASDAQ trading systems.  In their response brief, plaintiffs

acknowledge that they must plead and prove "that the misstatement and/or omission 'conceal

something from the market that, *when disclosed,* negatively affected the value of the security.'"

---

[22]     By contrast, in *In re Smith Barney Transfer Agent Litigation*, 290 F.R.D. 42, 47-48
(S.D.N.Y. 2013), also cited by plaintiffs, the defendant was a fund manager who had an
affirmative duty to fund investors to disclose the fees it charged its funds, independent of
any statements the fund manager may have made.  Thus, the fund manager's concealment
of the fees it charged gave rise to a claim fund investors could maintain without proving
actual reliance.

36

(Pls. Mem. at 59 n.53 (quoting *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 176 (2d Cir.

2005)).)  They then argue that "[a]s a result of the Securities Defendants' material omissions, the

price of Facebook stock 'plummeted from a high of $45.00 per share in the first 15 minutes of

open-market trading to a low of $38.00, finally closing at $38.23 per share.'"  (Pls. Mem. at 58

(quoting CAC ¶ 30).)

But plaintiffs do not explain in their Complaint or in their response brief how or

why the disclosure of the asserted shortcomings of NASDAQ's trading systems caused the value

of Facebook stock to decline.  At best, plaintiffs' allegations show that a decline in the price of

Facebook stock coincided with the systems issues experienced by NASDAQ following the

Facebook IPO.  Coincidence, however, does not demonstrate causation.  *See Dura Pharms., Inc.

v Broudo,* 544 U.S. 336, 342-43 (2005).  (*See also* Defs. Mem. at 59-60 (citing cases).)  Many

other factors were negatively influencing the value of Facebook following its IPO, including

general market conditions and then recent disclosures of disappointing revenues from Facebook

customers' mobile devices.  (*See* Defs. Mem. at 61.)  The reliability of NASDAQ's trading

platforms simply has no bearing on the value of Facebook as a company, as demonstrated by the

fact that Facebook stock continued to decline in price after the NASDAQ systems issues were

corrected.  (*See* Defs. Mem. at 61 n.33.)

Thus, plaintiffs' allegation that the decline in the price of Facebook following its

IPO coincided with the issues experience by NASDAQ in commencing trading following the

IPO is not sufficient to plead loss causation.  For that additional reason, plaintiffs' securities

claims should be dismissed.

**D.**      **First New York's Claims Are Also Barred by NASDAQ Rule 4626**

Realizing that as a member of the Exchange it is bound by the limitations of

NASDAQ Rule 4626, First New York disavows asserting any negligence claim against

NASDAQ.  (Pls. Mem. at 60 n.56.)  First New York nevertheless contends that it may pursue a securities fraud claim on the argument that "the securities claims arise out of the Securities Defendants' material omissions concerning NASDAQ's known systems failures in connection with the Facebook IPO (and not out of the use of the NASDAQ Market Center). . . ."  (*Id.*)

Its parenthetical denial notwithstanding, First New York's claims ***do*** arise out of its use of the NASDAQ Market Center.  But for its use of the NASDAQ Market Center to purchase shares of Facebook stock, it would have no claim to assert.  Rule 4626 draws no distinction based upon the nature of a member's claim against the Exchange.  It simply states that "Nasdaq and its affiliates shall not be liable for any losses, damages, or other claims arising out of the Nasdaq Market Center or its use."  NASDAQ Rule 4626(a).  Accordingly, First New York's securities claims are barred just as completely as its negligence claims, and should be dismissed for that reason as well.

## III.   CONCLUSION

As further set forth in defendants' response to plaintiffs' pending motion for leave further to amend the Complaint in light of the SEC's Enforcement Order, no newly pled facts could change the Court's analysis of any of the threshold legal defenses set forth above and in defendants' initial memorandum.  (*See* Doc. No. 132.)  Indeed, plaintiffs' inability to cure any of the defects of their Complaint despite their extensive reliance on the Enforcement Order in their response (*see* Pls. Mem. at 1-2, 4 n.8, 10-14, 28-33, 44-48, 52-53, 64) demonstrates that nothing in the Enforcement Order lessens the applicability of SRO immunity, the economic loss doctrine, or NASDAQ Rule 4626 to plaintiffs' claims, or supplies any of the missing elements of plaintiffs' securities fraud claims.  Accordingly, the Court should dismiss the Complaint with prejudice, and allow defendants such other and further relief as the Court finds just and proper.

Date:  September 26, 2013

Respectfully submitted,

/s/ Stephen J. Kastenberg
William A. Slaughter (PA Bar No. 30637)*
Stephen J. Kastenberg (PA Bar No. 70919)*
Paul Lantieri III (PA Bar No. 88160)*
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Tel:  215.665.8500
Fax:  215.864.8999
slaughter@ballardspahr.com
kastenberg@ballardspahr.com
lantierip@ballardspahr.com

*Attorneys for Defendants
The NASDAQ OMX Group, Inc., The
NASDAQ Stock Market LLC, Robert
Greifeld, and Anna M. Ewing*

*Admitted pro hac vice*

DMEAST #17560811

39