# LOVELL STEWART HALEBIAN JACOBSON LLP

61 Broadway, Suite 501
New York, New York 10006
www.lshllp.com

Telephone
212.608.1900

Facsimile
212.719.4775

October 2, 2013

**BY ECF AND FACSIMILE**
Honorable Robert W. Sweet
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:     *In re Facebook, Inc. IPO Securities and Derivatives Litig.*, MDL No. 12-2389

Dear Judge Sweet:

As an attorney for the Negligence Plaintiffs, I am writing this letter in order to alert the Court to the parties' disagreement about whether Plaintiffs' prior motion to compel document production and for leave to amend the complaint (Docket Entry No. 117) should be heard first tomorrow during oral argument.  Plaintiffs so assert.  Defendants believe that their later motion to dismiss (Docket Entry No. 126) should have priority in the argument.

Also, the Negligence Plaintiffs have respectfully enclosed and are providing copies to Defendants of slides they propose to use during oral argument tomorrow.  The slides are attached to the ECF version of this letter, and the first eight pages of the slides are included with the Chambers copy of this letter.

Thank you very much.

Respectfully submitted,

*/s/ Christopher Lovell*
Christopher Lovell

Encl.

cc:     Counsel of Record (by ECF)

*In re Facebook, Inc. IPO Sec. and Deriv. Litig.*, MDL No. 12-2389:

Oral Argument, October 3, 2012,

before the

Honorable Robert W. Sweet

Slides of Negligence Plaintiffs

Slide 1. There are no immunized OR OTHER government powers to design exchange computer software, test computer software, or to fix computer software when it is malfunctioning. Those acts are the acts of negligence revealed here by the Securities Exchange Commission ("SEC") Order, *In the Matter of the NASDAQ Stock Market, LLC, et al*, Admin. Proc. File No. 3-15339, Exchange Act Release No. 69655 (May 29, 2013), *available at* http://www.sec.gov/litigation/admin/2013/34-69655.pdf

("**SEC Order**").

***Standard Inv. Chartered, Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.*,** 637 F.3d 112, 115-116(2d Cir. 2011) *cert. denied*, 132 S. Ct. 1093, 181 L. Ed. 2d 1008 (U.S. 2012), the most recent Second Circuit case on immunity

As we recognized in *NYSE Specialists*, we have found stock exchange SROs absolutely immune from suit where the alleged misconduct concerned

   – (1) disciplinary proceedings against exchange members, *Barbara*, 99 F.3d at 59;

   – (2) the enforcement of security rules and regulations and general regulatory oversight over exchange members, *D'Alessio*, 258 F.3d at 106;

   – (3) the interpretation of the securities laws and regulations as applied to the exchange or its members, *id.*;

   – (4) the referral of exchange members to the SEC and other government agencies for civil enforcement or criminal prosecution under the securities laws, *id.*; and

   – (5) the public announcement of regulatory decisions, *DL Capital Group*, 409 F.3d at 98.

Today, we add to that list an SRO's amendment of its bylaws where, as here, the amendments are inextricable from the SRO's role as a regulator.

NONE of the foregoing circumstances is present in what the SEC Order reveals are the acts of negligence here. *See* Slides 2–3B.

1

# Slide 2

The SEC Order reveals multiple instances of two types of ANTECEDENT NEGLIGENCE:

- Negligence which occurred before May 18, 2012 the date of the Facebook IPO, and is a proximate cause of Plaintiffs' damages.

- ADDITIONAL ANTECEDENT NEGLIGENCE which occurred during the pre-cross period on May 18 and also is a proximate cause of Plaintiffs' damages.

These completed negligent acts and omissions precede the start of trading on May 18, and proximately caused the damages to the Negligence Plaintiffs ("Plaintiffs").

2

# Slide 3. The SEC Order Reveals Antecedent Negligence Prior To May 18 That Proximately Caused Damages On May 18.

- Pre-May 18, asymmetric design of the procedure for re-calculating the cross. Incomprehensibly, this design caused the computer to take into account only one cancellation, the first cancellation, that had occurred before the re-calculation was made.  ¶¶18-20.

- It was very foreseeable that, if more than one cancellation had been received prior to the "re-calculation", the re-calculation would have to be repeated.  And so on continuously in a "loop" such that the market could not open. ¶20.

- The SEC found that NASDAQ had never tested how to escape this "loop" situation or what would happen if NASDAQ disabled the validation check in order to escape the loop. ¶23.

- Such pre-May 18, negligent testing of the system as did occur was based upon volumes that were less than one 1/12 (40,000 orders v. 490,000 orders) of the number of orders for Facebook stock in fact received on May 18.  The high volume of orders on May 18 was very foreseeable based upon the facts recited in the SEC Order. ¶¶11-12.

- In fact, the facts recited in the SEC Order show that this antecedent negligence prior to the start of trading on May 18 is the proximate cause of Plaintiffs' damages.

3

# Slide 3B. The SEC Order Reveals Antecedent Negligence During The Cross Period On May 18

- During the cross period, the foregoing negligent design and negligent failure to test proximately caused the NASDAQ computer system foreseeably to go into the "loop." This loop delayed the pre-open cross and the market opening. This delay occurred because the re-calculation of the cross price had to be made repeatedly to catch up with and capture previous cancellations. BUT each time, it could only recalculate one cancellation. ¶¶18-20.

- In order to escape the loop, NASDAQ disabled the validation check routine which allowed the cross to complete automatically and enabled Facebook trading to open at 11:09 a.m. on May 18. But this untested "solution" caused certain system malfunction side effects. ¶¶29-42.

- **First**, all the earlier negligence caused a malfunction that damaged the Cross Buyer Confirmation subclass who purchased Facebook shares on the pre-open cross. Due to such malfunction, these subclass members did not receive confirmations for hours of such purchases. ¶¶ 29-30. These persons were deprived of the ability to sell at higher prices in a rapidly falling market because they had no confirmation that they had purchased. See Counts V and VI of Plaintiffs' complaint.

- **Second**, persons in the cross execution subclass had entered orders to sell as part of the pre-open cross. Due to all the earlier negligence, their sales were not executed and they did not receive the $42.00 per share cross price. ¶¶ 38-39. They suffered a loss after 1:50 pm when their stock, which should have been sold at the $42.00 pre-opening cross price, was belatedly sold at the lower prices then prevailing. Counts VII and VIII of Plaintiffs' Complaint.

- **Third**, persons in the market trading subclass were also harmed due to all the earlier negligence which caused yet another system malfunction. This prevented accurate quoting data from being delivered to NASDAQ's proprietary feed. ¶¶31. The feed showed a stale cross quote for a bid price higher than the ask price. Counts IX and X of Plaintiffs' Complaint.

4

# Slide 4. Immunity Depends On The Delegation To An SRO Of An Immunized Government Power

- **Standard Investment**, 637 F.3d 112 (2nd Cir 2011)
  - amendment of the by-laws itself falls within the parameters of NASD's statutory rule-making authority. *Id.* 116 at *citing* 15 U.S.C. §§ 78s(b), 78c(a)(27)

- **NYSE Specialist**, 503 F.3d 89, 91 (2nd Cir. 2007)
  - "Exchange "has a duty to promulgate and enforce rules governing the conduct of its members."

- **DL Capital Group**, 409 F.3d 93 (2d Cir. 2005)
  - "NASD has in Rule 11890, a rule approved by the SEC, authorized Nasdaq to cancel any Nasdaq Stock Market transaction...." *Id.* at 95
  - ""The instant lawsuit arises out of Nasdaq's decision, pursuant to NASD Rule 11890, to cancel certain trades of Corinthian Colleges, Inc." *Id.* at 96

- **D'Alessio**, 258 F.3d 93 (2nd Cir. 2001)
  - action arose out of the gov't suspecting floor brokers of engaging in illegal schemes of trading on the NYSE floor...." and the NYSE's interpretive and referral functions. *Id.* at 96-97, 96 n2, 105.

- **Sparta Surgical**, 159 F.3d 1209 (9th Cir. 1998)
  - ""NASD's association rules govern its decision to list, not to list, or to de-list an offering" *Id.* at. 1212. citing internal NASD rule
  - SPARTA relied specifically upon association rules. *Id.* at 1212
  - ""NASD rules, which were approved by the SEC, establish listing guidelines, but also invest in the NASD enormous discretionary authority concerning stock listing and de-listing." *Id.* at 1214

5

## Slide 5. Defendants fail their burden to show that their negligence is cloaked by any immunity to consider whether to halt trading.

- As with airlines, food processors and other businesses, some of NASDAQ's business was regulated. But Defendants negligence here did not occur in executing an immunized government function that the government had assigned to the NASDAQ, including any function to adjudicate, investigate, regulate, or otherwise.

- The antecedent negligence prior to May 18, clearly occurred prior to the trading on May 18.

- The negligence during the cross clearly occurred prior to the trading on May 18.

- The foregoing negligence proximately caused the damages here. *See* Slides 1-3B.

- Therefore, consideration of a trading halt is, factually, irrelevant to the NASDAQ's negligence.

- Also, the SEC finds that NASDAQ concluded that the limited circumstances in which NASDAQ could halt trading under Rule 4120, were not present on May 18. ¶32. The SEC apparently agreed.

- Further, the SEC found that the circumstances on May 18 did not rise to the level of an emergency which would invoke NASDAQ's emergency powers to halt trading. ¶57.

- Therefore, legally, the NASDAQ's limited, delegated powers to halt trading, also did not come into play EVEN during trading on May 18.

- Suppose the issue of whether the existing circumstances qualified as circumstances in which a trading halt was permitted, was considered by NASDAQ on May 18. If so, then the SEC findings indicate that business executives may have made such decision and done so for business reasons. ¶¶21, 32. Without obtaining the documents that Defendants produced to the SEC, the extent of any immunity relating to such consideration cannot be understood or decided.

- Suppose that the evidence ultimately shows that NASDAQ SRO itself, rather than the business people, determined that the circumstances in which a trading halt could be made, did **not** exist. This would not change one iota all the previous acts of negligence that NASDAQ committed nor cloak the earlier non-immune conduct with some retroactive immunity.

- If that sufficed, then every time an exchange committed an unlawful act, the exchange could purport to consider whether some emergency power existed and retroactively try to immunize themselves from damages for the earlier non-immune conduct.

6

7

Slide 6. *Weissman v. Nat'l Ass'n of Sec. Dealers, Inc.*, 500 F.3d 1293 (11th Cir. 2007), *Opulent Fund v. NASDAQ*, No. 07 Civ. 3683, 2007 WL 3010573 (N.D. Cal. Oct. 12, 2007), and *Platinum Partners Value Arbitrage Fund, Ltd. P'ship v. Chicago Bd. Options Exch.*, 2012 IL App (1st) 112903, 976 N.E.2d 415, 421 *appeal denied*, 981 N.E.2d 1003 (Ill. 2012)

- NASDAQ undertook an aggressive campaign to obtain the Facebook IPO because it knew that Facebook would generate substantial new-listing and transaction fees (Complaint ¶¶94-111.). By avoiding extensive testing, consultants, and other overhead for a Chief Technology Officer, NASDAQ similarly increased its profits from such revenues. Complaint ¶¶1259-61, 296.

  – The *Platinum Partners* court recognized that the Chicago exchanges run a for-profit business and when the exchanges made the private disclosure of the price adjustment, the exchanges were acting in their private capacity for their own benefit.

  – Although in *Opulent Fund* the creation of the index and calculation of the price were undertaken pursuant to SEC rule, the Court found that NASDAQ profited from selling the market price data at issue which was regulated but not regulatory.

  – In *Weissman*, the court found that no quasi-government function was served by the advertisements in question, the advertisements were not coterminous with regulated activity contemplated by the Exchange Act, and, simply put, the advertisements were private business activity in the service of NASDAQ not the government.

- NASDAQ's design and implementation of its IPO software systems was an integral part of its overall business package for attracting new, revenue-producing IPO business. (Complaint ¶178.)

  – The *Weissman* court found that NASDAQ represented no one but itself when enticing investors with advertisements.

  – The *Opulent Fund* court concluded that NASDAQ represented no one but itself in choosing to create a price index and disseminate price information.

# Slide 7. Defendants argue:

- "Indeed, the SEC confirmed in its Enforcement Order in the Facebook matter that the orderly initiation of secondary market trading after an IPO is a fundamental aspect of NASDAQ's **regulatory powers and responsibilities.**  [Emphasis supplied] *In re The NASDAQ Stock Mkt., LLC & NASDAQ Execution Servx., LLC,* Exch. Act. Rel. No. 69,655, 2013 WL 2326683, at ¶2 (May 29, 2013)." Defendants' Reply Mem. ISO Defendants' Motion to Dismiss, Dkt. No. 153, p. 7.

- But the SEC actually said:

    – "When initiating an IPO, an exchange has an **obligation to ensure that its systems, processes and contingency planning are robust and adequate to manage the IPO** without disruption to the market, and **that it complies with all rules regarding, among other things, order price and time priority.**"  SEC Order, at ¶2; *cf.* CAC ¶¶33, 35, 40.

8

Slide 7A. **Standard Investment Chartered Inc. v. Nat'l Ass'n of Sec. Dealers, 637 F.3d 112 (2d Cir. 2011); 15 U.S.C.§78s(b)(1)**

- SEC granted NASD right to exercise regulatory power.

- "…the consolidation that transferred NASD's and NYSE's regulatory powers to the resulting FINRA is, on its face, an exercise of the SRO's delegated regulatory functions." *Id.* at 116.

- "…the approval of the by-law amendments was not only a necessary prerequisite to the completion of that consolidation, but also was promoted as such in the proxy itself." *Id.*

9

# Slide 7B. NYSE Specialist Sec. Litig, 503 F.3d 89 (2d Cir. 2007); 15 U.S.C.§78s(g)(1)(2)

- Every self-regulatory organization **shall** comply with the provisions of this chapter, the rules and regulations thereunder, and its own rules, and (subject to the provisions of section 78q(d) of this title, paragraph (2) of this subsection, and the rules thereunder) absent reasonable justification or excuse **enforce compliance--**

- **(A)** in the case of a national securities exchange, **with such provisions by its members and persons associated with its members;**

- **(B)** in the case of a registered securities association, with such provisions and the provisions of the rules of the Municipal Securities Rulemaking Board by its members and persons associated with its members; and

- **(C)** in the case of a registered clearing agency, with its own rules by its participants.

- **(2)** The Commission, by rule, consistent with the public interest, the protection of investors, and the other purposes of this chapter, <u>may</u> relieve any self-regulatory organization of any responsibility under this chapter to enforce compliance with any specified provision of this chapter or the rules or regulations thereunder by any member of such organization or person associated with such a member, or any class of such members or persons associated with a member. [Emphasis supplied].

10

# Slide 7C. DL Capital Group v. Nasdaq Stock Market, 409 F.3d 93 (2d Cir. 2005); NASDAQ RULE 11890

- Authorizes NASD to act as an adjudicator when

- "A member that receives an execution on an order that was submitted erroneously to Nasdaq for its own or customer account may request that Nasdaq review the transaction under this rule. **An official of Nasdaq shall review the transaction under dispute and determine whether it is clearly erroneous, with a view toward maintaining a fair and orderly market and the protection of investors and the public interest. ...."**

- "Once a party has applied to Nasdaq for review and the transaction has been determined to be eligible for review, the transaction **shall be reviewed and a determination rendered,...."**

- Rule 118990(b) authorizes Nasdaq to cancel transactions that are "clearly erroneous." 409 F.2d 93, 95.

11

# Slide 7D. D'Alessio v. New York Stock Exchange, 258 F.3d 93 (2d Cir. 2001); 15 U.S.C. §§ 78f(b), 78s(g)

- SROs have the duty to promulgate and enforce rules governing the conduct of its members.

- Such exchange is so organized and has the capacity to be able to carry out the purposes of this chapter and to comply, and ... to **enforce compliance by its members and persons associated with its members**, with the provisions of this chapter, the rules and regulations thereunder, and the rules of the exchange. 15 U.S.C. §§ 78f(b)(1).

- Every self-regulatory organization **shall** comply with the provisions of this chapter, the rules and regulations thereunder, and its own rules, and (subject to the provisions of section 78q(d) of this title, paragraph (2) of this subsection, and the rules thereunder) absent reasonable justification or excuse enforce compliance--15 U.S.C. §§ 78f(s)(g).

12

# Slide 7E. Sparta Surgical v. Nat. Ass'n of Sec. Dealers, 159 F.3d 1209 (9ᵗʰ Cir. 1998); RULE 5000 Series

- NASDAQ granted discretionary authority by SEC

- Nasdaq, therefore, in addition to applying the enumerated criteria set forth in the Rule 5000 Series, has broad discretionary authority over the initial and continued listing of securities in Nasdaq in order to maintain the quality of and public confidence in its market, to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, and to protect investors and the public interest. **Nasdaq may use such discretion to deny initial listing, apply additional or more stringent criteria for the initial or continued listing of particular securities, or suspend or delist particular securities based on any event, condition, or circumstance that exists or occurs that makes initial or continued listing of the securities on Nasdaq inadvisable or unwarranted in the opinion of Nasdaq, even though the securities meet all enumerated criteria for initial or continued listing on Nasdaq**

13

# Slide 8. New Facts that Plaintiffs could allege based on the SEC order

- If granted leave to amend, Plaintiffs would add the following types of allegations: MULTIPLE TYPES OF (pre-trading) antecedent negligence

- Absence of a grant of discretionary regulatory authority to halt trading under the "normal" market trading circumstances of the Facebook trading or under the emergency or other powers.

- While "internal technology problems may in certain circumstances constitute" an emergency "the event of May 18, 2012 within NASDAQ *did not*." SEC Order at ¶57.

- Intimate and direct involvement of officers of the non-SRO, business parent company (OMX) in the decisions of May 18 renders them non-regulatory.

14

Slide 9. SEC Approval of NASDAQ Stock Market Registration, SEC Rel. No. 53128, January 13, 2006.

- Self-Regulatory Function of the Exchange; Relationship between Nasdaq Holding Company and the Nasdaq Exchange; Jurisdiction over Nasdaq Holding Company

- Although **Nasdaq Holding Company will not itself carry out regulatory functions, its activities with respect to the operation of the Exchange must be consistent with, and not interfere with, the Exchange's self-regulatory obligations.** The proposed Nasdaq Holding Company corporate documents include certain provisions that are **designed to maintain the independence of the Nasdaq Exchange's self-regulatory function from the Nasdaq Holding Company,** enable the Exchange to operate in a manner that complies with the federal securities laws, including the objectives of Sections 6(b) and 19(g) of the Exchange Act, and facilitate the ability of the Exchange and the Commission to fulfill their regulatory and oversight obligations under the Exchange Act. **For example, the Nasdaq Holding Company submitted to the Commission's jurisdiction with respect to activities relating to the Nasdaq Exchange, and agreed to provide the Commission with access to its books and records.** Nasdaq Holding Company also agreed to keep confidential non-public information relating to the self-regulatory function of the Exchange and not to use such information for any non-regulatory purpose. In addition, **the board of directors of the Nasdaq Holding Company, as well as its officers, employees, and agents are required to give due regard to the preservation of the independence of the Exchange's self-regulatory function.**

- Citing See Nasdaq Holding Company By-Laws Article XI, Section 11.3; Article XII, Sections 12.1, 12.2, 12.3, 12.4, and 12.5;

15