
**Labaton Sucharow**

James W. Johnson
Partner
212 907 0859 direct
212 883 7059 fax
jjohnson@labaton.com

October 7, 2013

**VIA HAND DELIVERY**

Honorable Robert W. Sweet
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

Re:   *In re Facebook, Inc. IPO Sec. & Deriv. Litig.*
      MDL No. 12-2389 (RWS)

Dear Judge Sweet:

Together with Bernstein Litowitz Berger & Grossman LLP, we represent Lead Plaintiffs in the
above-referenced Consolidated Securities Action.  We have respectfully enclosed and are providing
copies to Defendants of slides Lead Plaintiffs propose to use during oral argument tomorrow.  The
slides are attached to the ECF version of this letter, and also to the copy being submitted to
Chambers.

Respectfully submitted,

James W. Johnson

Encls.

cc:    Counsel of Record (by ECF)

**Labaton Sucharow**



# *In re Facebook, Inc., IPO Securities and Derivative Litigation*

Lead Plaintiffs' Opposition to the Motion to Dismiss

# Key Facts

- Facebook's IPO was the largest in tech industry history.  Compl. ¶ 149.

- Minutes after filing Facebook's May 9 Registration Statement, Facebook Treasurer Cipora Herman began to make **_nineteen_** separate, scripted phone calls to the Syndicate Analysts.  ¶ 132.

- Herman told the Syndicate Analysts that the mobile usage trend was negatively affecting revenue and that, in response, Facebook had materially lowered the Company's revenue estimates for the second quarter by as much as $100 million and for the full year by as much as $175 million.  ¶¶ 133-34.

**Labaton Sucharow**



# Defendants Disclosed the Full Truth to Syndicate Analysts

- Herman's May 9 script, which was prepared by Morgan Stanley banker Michael Grimes, stated:

  *"I wanted to make sure you saw the disclosure we made in our amended filing. The upshot of this is that we believe we are going to come in [on] the lower end of our $1.1 to $1.2 bn range for Q2 based upon the trends we described in the disclosure. A lot of investors have been focused on whether the trend of ad impressions per user declining (primarily as a result of mobile) was a one-time, or continuing, occurrence. As you can see from our disclosure, the trend is continuing. You can decide what you want to do with your estimates, our long term conviction is unchanged, but in the near term we see these trends continuing, hence our being at the low end of the $1,100 + $1,200 range."* ¶ 133.

- Herman added:

  Because of "trends/headwinds over the next six to nine months as this run[s] through the rest of the year, [Facebook] *could be 3 to 3 and a half percent off the 2012 $5 billion [revenue] target* . . . ." ¶ 134.



3



# Key Facts

- As expected, the Syndicate Analysts incorporated the revenue cuts into their models and communicated them to their clients.  Many of those investors "*freaked out*" and cancelled or cut their orders.  ¶¶ 135-39.

- When the truth was publicly revealed after the market closed on May 18, analysts and investors reacted with "*shock*" and "*outrage*" to the "*rare*" and "*very, very unusual*" revenue cuts during the roadshow. ¶¶ 161-69.

  – "This was done during the roadshow – *I've never before seen that in 10 years*."  ¶ 166 (citing *Reuters*, quoting a source at a mutual fund firm who was among those called).

- Facebook's stock price immediately collapsed by *18% over two days* on extremely high volume, wiping out billions of dollars in shareholder equity.  ¶ 170.



4



## Two Primary Theories of Liability

I.    Affirmative Misrepresentations
        "May/If" Conceals Known Reduction in Current
        Revenue


II.   Omissions or Falsity as to Item 303
      Disclosures





Two Primary Theories of Liability
    I.   Affirmative Misrepresentations –
        "May/If" Conceals Known Reduction in Current Revenue

- Facebook made a series of statements in which Facebook purported to warn investors only that increasing mobile usage "*may*" negatively affect its revenues "*if*" certain contingencies occurred in the future.  ¶ 188.



## Two Primary Theories of Liability
### I.   Affirmative Misrepresentations –
         "May/If" Conceals Known Reduction in Current Revenue

**<u>Prospectus (as amended on May 9)</u>:**

***Growth in use of Facebook through our mobile products, where our ability to monetize is unproven, as a substitute for use on personal computers*** <span style="color:red">***may***</span> ***negatively affect our revenue and financial results.***

We had 488 million MAUs [Monthly Average Users] who used Facebook mobile products in March 2012. While most of our mobile users also access Facebook through personal computers, we anticipate that the rate of growth in mobile usage will exceed the growth in usage through personal computers for the foreseeable future, in part due to our focus on developing mobile products to encourage mobile usage of Facebook. We have historically not shown ads to users accessing Facebook through mobile apps or our mobile website. In March 2012, we began to include sponsored stories in users' mobile News Feeds. However, we do not currently directly generate any meaningful revenue from the use of Facebook mobile products, and our ability to do so successfully is unproven. <span style="color:red">*<u>We believe this increased usage of Facebook on mobile devices has contributed to the recent trend of our daily active users (DAUs) increasing more rapidly than the increase in the number of ads delivered.</u> If users increasingly access Facebook mobile products as a substitute for access through personal computers, and if we are unable to successfully implement monetization strategies for our mobile users, or if we incur excessive expenses in this effort, our financial performance and ability to grow revenue would be negatively affected.*</span>

Prospectus at 14 (underlined text first added on May 9).



7



## Two Primary Theories of Liability
### I.   Affirmative Misrepresentations –
### "May/If" Conceals Known Reduction in Current Revenue

- These statements were materially untrue and misleading because Facebook had ***already*** determined that increasing mobile usage was ***in fact*** negatively affecting the Company's revenues to a material extent.

    – "[T]o warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit."  *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400 (S.D.N.Y. 2005).

- Facebook's calls with Syndicate Analysts is an admission that the revenue cuts were material and had not been disclosed.

- Because of the trend, the Company had made material revenue cuts of as much as $100M for the second quarter and as much as $175M for fiscal year 2012.  ¶ 124.



8



# Two Primary Theories of Liability
## II. Omissions or Falsity as to Item 303 Disclosures

- Item 303(a)(3)(ii) requires a registrant to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably *expects will have a material favorable or unfavorable impact on net sales or revenues* or income from continuing operations."

- Defendants recognize the applicability of Item 303.  Def. Br. at 18-19.

- Facebook's Offering Documents state:

  "Based upon our experience in the second quarter of 2012 to date, the *trend* we saw in the first quarter . . . has *continued*.  We believe *this trend* is driven *[1]* in part by increased usage of Facebook on mobile devices . . . and *[2]* in part due to certain pages having fewer ads per page as a result of product decisions."

  Prospectus at 57.





# Two Primary Theories of Liability
## II.  Omissions or Falsity as to Item 303 Disclosures

- Facebook failed to disclose "**whether, and to what extent** the particular known trend, event, or uncertainty might have been reasonably expected to materially affect" the Company's revenues.

  - *See Litwin v. Blackstone Grp.*, 634 F.3d 706, 718-19 (2d Cir.), *cert. denied*, 132 S. Ct. 242 (2011).

  - *See also Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114 (2d Cir. 2012) (same).

- Facebook failed to provide narrative disclosure as to the "**the manner in which** those then-known **trends, events, or uncertainties** might reasonably be expected to materially **impact** [the Company's] **future revenues.**"  *Id.*



10



# Two Primary Theories of Liability
## II. Omissions or Falsity as to Item 303 Disclosures

*Litwin*:

"In this case, the key information that plaintiffs assert should have been disclosed is ***whether, and to what extent***, the particular known trend, event, or uncertainty might have been reasonably expected to materially affect Blackstone's investments.  And this potential ***future impact*** was certainly not public knowledge, particularly in the case of FGIC . . . .  Again, the focus of plaintiffs' claims is the required disclosures under Item 303—plaintiffs are not seeking the disclosure of the mere fact of Blackstone's investment in FGIC, of the downward trend in the real estate market, or of Freescale's loss of its exclusive contract with Motorola.  Rather, ***plaintiffs claim that Blackstone was required to disclose the manner in which those then-known trends, events, or uncertainties might reasonably be expected to materially impact Blackstone's future revenues***."

634 F.3d at 718-19; *see also Panther Partners*, 681 F.3d at 120 (quoting *Litwin*, 634 F.3d at 718-19).



11



## Two Primary Theories of Liability
### II.  Omissions or Falsity as to Item 303 Disclosures

- "The discussion and analysis shall focus specifically on material events and uncertainties known to management that . . . would have an ***impact on future operations*** . . . ." Instructions to Item 303(a).

- The "***required disclosure regarding the future impact*** of presently known trends, events or uncertainties [under Item 303] ***may involve some prediction or projection***."  Securities Act Release No. 6835, 54 Fed. Reg. 22,427, 22,430 (May 24, 1989) ("1989 SEC Release").





## Two Primary Theories of Liability
### II.  Omissions or Falsity as to Item 303 Disclosures

• "Not all forward-looking information falls within the realm of optional disclosure.  ***In particular, material forward-looking information* regarding known material trends and uncertainties is required to be disclosed as part of the required discussion of those matters *and the analysis of their effects*."  Securities Act Release No. 8350, 68 Fed. Reg. 75,056, 75,063 (Dec. 29, 2003) ("2003 SEC Release").





## Two Primary Theories of Liability
### II.  Omissions or Falsity as to Item 303 Disclosures

- Defendants failed to disclose that a known *trend* was *already* negatively affecting Facebook's revenues.

  - Never told investors that management had, in fact, calculated the actual impact on revenue from growth in mobile usage.

- Defendants should have "described" that the known trend of increasing mobile usage was having a material negative impact on Facebook's revenues, and the "extent" of such impact.

- *Plaintiffs do not allege that Defendants were required to disclose their internal, numerical estimates.*



14



# Two Primary Theories of Liability
## II.  Omissions or Falsity as to Item 303 Disclosures

- Quantitative disclosure required where reasonably practicable.

    – "MD&A disclosure of the *effects* of [the known trend], *quantified to the extent reasonably practicable*, would be required."  1989 SEC Release at 22,430.

    – "Quantitative disclosure . . . may be required *to the extent material if quantitative information is reasonably available*."  2003 SEC Release at 75,061.



15



## Two Primary Theories of Liability
### II.  Omissions or Falsity as to Item 303 Disclosures

2 Thomas Lee Hazen, Law of Securities Regulation § 3.9[7]:

"Although item 303 requires disclosure of 'known trends or uncertainties,' it does not alter the basic rule that projections are not required.  Thus, a failure to make a projection is not actionable unless there is a nondisclosure of facts or known trends that were 'known only to the company.'  Similarly, in contrast to the MD & A mandate that management make timely disclosure of known trends, it is clear that *standing alone* there is no duty to disclose internal projections of future performance.  *On the other hand, disclosure would be required if the internal projections were sufficiently convincing to rise to the level of a trend.*  It was a violation of Item 303 to fail to disclose that for over a year the company had been considering a write down of good will to reflect significant losses in that segment of its business.  Failure to discuss the decision to rely on volume discounts to make up for revenue shortfalls can violate the MD & A requirement."





# Defendants' Disclosures Were Incomplete and Inadequate

- Defendants argue that the Offering Documents revealed a trend that "necessarily affects revenue" negatively.  Defs. Br. at 20-21.

- This argument fails because there were too many variables that were unknown to investors, including, for example:

  - any change (upwards or downwards) in the number of Daily Active Users who were using Facebook's desktop website,

  - how much time, on the average, each user was spending on the desktop website, and

  - Facebook's pricing for each of its ads at that time.

- In short, investors reading Facebook's disclosures simply had no way of knowing what effect on revenue, if any, the Company was currently experiencing as a result of the mobile usage trend.



17



# Revenue Trends Affected by
# Numerous Factors Not Disclosed to Investors

  *Management of Ad Inventory*.  Our revenue trends are also affected by ad inventory management changes affecting the number, size, or prominence of ads we display. For example, ***in the fourth quarter of 2010, we significantly increased the number of ads on many Facebook pages***. As another example, ***in the fourth quarter of 2011, we increased the reserve price*** (i.e., the minimum price threshold) in our advertising auction system in order to reduce the frequency with which low quality ads are displayed to users.  ***This change caused a reduction in the overall number of ads shown*** and increased the average price per ad as a result of factors including the removal of ads with bids that were below the reserve price and some advertisers raising their bids in response to this change.  ***For this particular change, we estimate that the decrease in the number of ads displayed and the increase in average price per ad approximately offset each other such that the impact on total revenue was minimal.***

Prospectus at 53.



18



# Materiality Standard

- "Where the principal issue is materiality, an ***inherently fact-specific finding***, the burden on plaintiffs to state a claim is ***even lower***" than the "relatively minimal burden" applicable to other elements of their claims under Rule 8 of the Federal Rules of Civil Procedure.
  - *Litwin*, 634 F.3d at 718.

- A "complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are ***so obviously unimportant*** to a reasonable investor that ***reasonable minds could not differ*** on the question of their importance."
  - *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 162 (2d Cir. 2000).



19



## Quantitative Materiality Shown by the Syndicate Analysts' Revised Revenue Estimates for the Then-Current Quarter

- On May 9, 2012, Facebook cut its revenue estimate for 2Q'12 from $1.1 - $1.2 billion range to $1.1 billion; this cut was greater than 5%.*

| Syndicate Analyst | Pre-May 9 Estimate | Post-May 9 Revised Estimate | % Change |
|---|---|---|---|
| Goldman Sachs | $1.207 billion | $1.125 billion | -6.79% |
| J.P. Morgan | $1.182 billion | $1.096 billion | -7.27% |
| Morgan Stanley | $1.175 billion | $1.111 billion | -5.45% |
| Bank of America | $1.166 billion | $1.100 billion | -5.66% |

* *See Litwin*, 634 F.3d at 713 & n.8, 717-22 (holding that a write-down equal to less than 4% of annual revenue was material under SEC Staff Accounting Bulletin No. 99).

**Labaton Sucharow**



# After May 9, the Analysts' Consensus Estimates Remained at or Above Facebook's Original Guidance

- Analysts other than the Syndicate Analysts, who had not been called by Facebook, continued to widely expect Facebook to report revenues that were in line with the original, higher guidance Facebook had given in April. ¶ 142.

- As of May 18, 2012, the date that Facebook went public, analysts' consensus estimates according to Thomson's Institutional Brokers' Estimate System were for Facebook to report revenues of more than $1.2 billion for the second quarter and $5 billion for the year – exactly in line with Facebook's original yearly guidance and slightly above its quarterly guidance.  *Id.*



21



## Falsity Shown by Contemporaneous Commentary by Financial Media

### *Business Insider*

- "Facebook's amended prospectus did ***not*** say that the company's business had suddenly weakened and management's outlook had changed.  ***And that information is vastly more important than what the prospectus did say, which was that users are growing faster than revenue***."  ¶ 173.



22



# Falsity Shown by Contemporaneous Commentary by Financial Media

## *Venture Beat*

- "In that May 9 update, [Facebook CFO] Ebersman decided to use *vague language* [that] was *extremely understated*, considering what we would later find out. . . . Facebook said that it was experiencing *the same trend in the second quarter that it had seen in the first quarter* . . . . *[T]his update itself didn't send any alarm bells to most investors, and it shouldn't have*." ¶ 174.

- "Facebook's lawyers may, in the wake of the legal mess it has gotten into, try to argue that the new May 9 language about '[Daily Active Users] increasing more rapidly than the increase in number of ads delivered' pointed to something more significant than what Facebook had released before.  But the reality is that this wording was just *too vague* to be construed by normal people as meaning anything more than what had already been mentioned before.  . . .  *The fact is, there is nothing within the S-1 update on May 9 that would give normal investors the sense that there had been a material change about Facebook's revenue prospects*." ¶ 174.



23



## It Is Irrelevant that, Long After the Class Period, Facebook Ultimately Reported Higher Revenues

- The Securities Act provides that a registration statement is actionable if it contains an untrue statement or material omission "when such part became effective."  15 U.S.C. § 77k.

- "The securities laws approach matters from an *ex ante* perspective: just as a statement true when made does not become fraudulent because things unexpectedly go wrong, so a statement materially false when made does not become acceptable because it happens to come true."
  - *Pommer v. Medtest Corp.*, 961 F.2d 620, 623 (7th Cir. 1992) (Easterbrook, J.).



24



# The Derivative Actions Are Distinguishable

- The Derivative Actions alleged claims for breach of fiduciary duty of loyalty under *Brophy v. Cities Service Co.*, 70 A.2d 5 (Del. Ch. 1949).

  – The Court found that "[e]ven assuming the information was material and non-public, Derivative Plaintiffs ha[d] not adequately alleged the second element of *Brophy* [by] suggesting that each sale by each individual defendant was entered into and completed on the basis of, and because of adverse material non-public information" and that sales of stock in an IPO, without more, "raise no inference of fraud."  Derivative Op. at 55, 56.

  – Here, Lead Plaintiffs do not allege fraud or scienter.

- The Derivative Actions did ***not*** assert claims under federal securities laws.

  – Neither the parties nor the Court addressed Facebook's disclosure duties under Item 303 or the Second Circuit's controlling decisions in *Litwin* and *Panther Partners*.

- The Derivative Actions were based on the allegation that Facebook was required to disclose its internal revenue projections.



25



# The Derivative Actions Are Distinguishable

The Derivative Actions do *not* allege that:

- Immediately after being informed of Facebook's revenue cuts, Facebook and the lead underwriters determined that the change in the Company's financial condition was so significant that it had to be disclosed to the Syndicate Analysts, ¶¶ 126, 131;

- Within minutes of filing the amended Registration Statement on May 9, 2012, Facebook's Treasurer made ***nineteen*** phone calls to the Syndicate Analysts to inform them of the material information that was omitted from the Registration Statement, ¶ 132;

- The analyst consensus after the May 9 disclosure was that Facebook would report revenues at or above its original April guidance, ¶ 142;

- The week before the IPO, investor demand rose to "rampant" levels because Defendants had not disclosed the impact of mobile usage on its business, thus allowing Facebook to take the extremely rare step of significantly increasing the size and price of the IPO, ¶ 145; and

- Numerous sophisticated market commentators reported that Facebook had not publicly disclosed the highly material fact that its revenues had been negatively impacted by mobile usage, ¶¶ 171-75.



