**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE FACEBOOK, INC., IPO SECURITIES AND DERIVATIVE LITIGATION | MDL No. 12-2389<br><br>ECF Case |
| ROBERT LOWINGER,<br><br>    *Plaintiff*,<br><br>  v.<br><br>MORGAN STANLEY & CO. LLC, J.P. MORGAN SECURITIES LLC, GOLDMAN, SACHS & CO., and FACEBOOK, INC.,<br><br>    *Defendants*. | This document relates to:<br>  13 Civ. 4016 |

## MEMORANDUM OF LAW IN SUPPORT OF
## <u>LEAD UNDERWRITERS' MOTION TO DISMISS</u>

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York  10017
(212) 450-4000

*Attorneys for Defendants Morgan Stanley*
*& Co. LLC, J.P. Morgan Securities LLC and*
*Goldman, Sachs & Co.*

# TABLE OF CONTENTS

P<small>AGE</small>

PRELIMINARY STATEMENT ...................................................................................... 1

BACKGROUND AND COMPLAINT ALLEGATIONS ............................................ 4

    1.    Facebook's Initial Public Offering and the Alleged "Lock-Up" Agreements ...... 4

    2.    The Over-Allotment Option ................................................................................ 5

    3.    The Underwriters' Alleged Conduct in Connection with the Facebook IPO ....... 8

    4.    Goldman Sachs' Alleged Transactions During the Third Quarter of 2012 ........ 10

    5.    Demand Allegations .......................................................................................... 11

ARGUMENT ................................................................................................................ 11

    I.    THE STATUTORY AND REGULATORY FRAMEWORK OF
        SECTION 16 ...................................................................................................... 12

        A.    "Beneficial Ownership" ......................................................................... 14

        B.    Exemption of Underwriting Transactions from Section 16 .................... 15

    II.    THE LEAD UNDERWRITERS WERE NOT BENEFICIAL OWNERS
        SUBJECT TO SECTION 16 .............................................................................. 16

    III.    THE UNDERWRITERS' PURCHASES AND SALES IN CONNECTION
        WITH THE FACEBOOK IPO ARE EXEMPT FROM SECTION 16 ............. 21

        A.    The IPO-Related Transactions Are Exempted Pursuant
            to Rule 16a-7 ......................................................................................... 21

        B.    Even if They Were Relevant, Plaintiff's Allegations Fail to
            Plead with Particularity that the Facebook IPO Was Not
            Conducted in Good Faith. ...................................................................... 24

    IV.    THE COMPLAINT FAILS TO PLEAD THAT GOLDMAN SACHS
        OBTAINED PROFITS FROM ITS ALLEGED AFTERMARKET
        PURCHASES AND SALES ............................................................................. 33

CONCLUSION ............................................................................................................. 35

# TABLE OF AUTHORITIES

PAGE

CASES

*Arfa v. Mecox Lane Ltd.*, No. 10 Civ. 9053 (RWS),
2012 WL 697155 (S.D.N.Y. Mar. 5, 2012), *aff'd*, 504 F. App'x 14 (2d Cir. 2012) ..............27

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) .......................25

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ...........................................34

*In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410 (3d Cir. 1997) ....................27

*Campaniello Imps., Ltd. v. Saporiti Italia S.p.A.*, 117 F.3d 655 (2d Cir. 1997) ...........................25

*Chechele v. Morgan Stanley*, 896 F. Supp. 2d 297 (S.D.N.Y. 2012) ...........................34

*Chechele v. Scheetz*, 819 F. Supp. 2d 342 (S.D.N.Y. 2011),
*aff'd*, 466 F. App'x 39 (2d Cir. 2012) ...............................................17, 34

*Cohen v. Stevanovich*, 722 F. Supp. 2d 416 (S.D.N.Y. 2010) .......................................31

*Credit Suisse Sec. (USA) LLC v. Simmonds*, 132 S. Ct. 1414 (2012) .....................13, 20

*CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP*,
654 F.3d 276 (2d Cir. 2011).................................................14, 15, 16, 18

*Cummings v. Comm'r*, 506 F.2d 449 (2d Cir. 1974) ........................................22

*Donaghue v. Accenture Ltd.*, No 03 Civ. 8329 (NRB),
2004 WL 1823448 (S.D.N.Y. Aug. 16, 2004) .......................................17

*In re Duane Reade Inc. Sec. Litig.*, No. 02 Civ. 6478 (NRB),
2003 WL 22801416 (S.D.N.Y. Nov. 25, 2003).......................................29

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
922 F. Supp. 2d 445 (S.D.N.Y. 2013)............................................. *passim*

*Foremost-McKesson, Inc. v. Provident Sec. Co.*, 423 U.S. 232 (1976)........................13

*Ganino v. Citizens Utils. Co.*, 228 F.3d 154 (2d Cir. 2000) ........................................33

*Gibbons v. Malone*, 703 F.3d 595 (2d Cir. 2013) ................................................13, 22

*Gibbons v. Malone*, 801 F. Supp. 2d 243 (S.D.N.Y. 2011),
*aff'd*, 703 F.3d 595 (2d Cir. 2013) ................................................22

PAGE

*Glassman v. Computervision Corp.*, 90 F.3d 617 (1st Cir. 1996) ................................27

*Gollust v. Mendell*, 501 U.S. 115 (1991) ..................................13

*Gwozdzinsky v. Zell/Chilmark Fund, L.P.*, 156 F.3d 305 (2d Cir. 1998) ......................13

*Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001) ..................................32

*Kinsey v. Cendant Corp.*, No. 04 Civ. 582 (RWS),
   2005 WL 1907678 (S.D.N.Y. Aug. 10, 2005) ..................................25

*In re LaBranche Sec. Litig.*, 405 F. Supp. 2d 333 (S.D.N.Y. 2005) ........................32

*Ladmen Partners, Inc. v. Globalstar, Inc.*, No. 07 Civ. 0976 (LAP),
   2008 WL 4449280 (S.D.N.Y. Sept. 30, 2008) ..................................25

*Levy v. Southbrook Int'l Invs., Ltd.*, 263 F.3d 10 (2d Cir. 2001) ........................14

*Litzler v. CC Invs., L.D.C.*, 411 F. Supp. 2d 411 (S.D.N.Y. 2006) ........................14

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
   No. 12 Civ. 3723 (RJS), 2013 WL 1294668 (S.D.N.Y. Mar. 28, 2013) ................31

*Magma Power Co. v. Dow Chem. Co.*, 136 F.3d 316 (2d Cir. 1998) ..........................13

*Mercer v. Gupta*, 712 F.3d 756 (2d Cir. 2013) ..................................19, 21

*Morales v. Freund*, 163 F.3d 763 (2d Cir. 1999) ..................................20

*Morales v. New Valley Corp.*, 999 F. Supp. 470 (S.D.N.Y. 1998) ..........................20

*Morales v. Quintel Entertainment, Inc.*, 249 F.3d 115 (2d Cir. 2001) ...................17

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) ..................................26

*In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446 (S.D.N.Y. 2000) .................27

*In re Quintel Entm't Inc. Sec. Litig.*, 72 F. Supp. 2d 283 (S.D.N.Y. 1999) ..............30

*Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418 (1972) ..........................13

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004) ..................................25, 26

*Roth ex rel. Leap Wireless Int'l, Inc. v. Goldman Sachs Grp., Inc.*,
   873 F. Supp. 2d 524 (S.D.N.Y. 2012), *appeal docketed*,
   *Roth v. The Goldman Sachs Grp., Inc.*, No. 12-2509 (2d Cir. June 25, 2012) ........12

PAGE

*Roth v. Jennings*, 489 F.3d 499 (2d Cir. 2007) ..............................................................15, 16

*Roth v. Reyes*, No. C 06-2786 (CRB), 2007 WL 518621 (N.D. Cal. Feb. 13, 2007) .............24, 26

*Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156 (9th Cir. 2009)...........................................27

*Segen v. CDR-Cookie Acquisitions, L.L.C.*, No. 05 Civ. 3509 (RWS),
    2006 WL 59550 (S.D.N.Y. Jan. 4, 2006) ...............................................13, 14, 21

*Sheppard v. TCW/DW Term Trust 2000*, 938 F. Supp. 171 (S.D.N.Y. 1996) ......................22, 27

*Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124 (2d Cir. 1994) .............................................25, 26

*Simmonds v. Credit Suisse Sec. (USA) LLC*, 638 F.3d 1072 (9th Cir. 2010),
    *vacated*, 132 S. Ct. 1414 (2012) ....................................................................20

*Simms v. City of New York*, 480 F. App'x 627 (2d Cir. 2012)........................................31

*Wellman v. Dickinson*, 682 F.2d 355 (2d Cir. 1982) .............................................19, 20

*In re WRT Energy Sec. Litig.*, No. 96 Civ. 3610 (JFK), 3611 (JFK),
    1997 WL 576023 (S.D.N.Y. Sept. 15, 1997),
    *rev'd on other grounds*, 75 F. App'x 839 (2d Cir. 2003) ......................................32


STATUTES

15 U.S.C. § 78m(d)(3) ......................................................................................14

15 U.S.C. § 78p ..............................................................................................12

15 U.S.C. § 78p(a) ..........................................................................................12

15 U.S.C. § 78p(b) ..........................................................................................13


RULES AND ADMINISTRATIVE GUIDANCE

17 C.F.R. § 210.3-12(a) ....................................................................................27

17 C.F.R. § 210.3-12(g)(1)(ii) ............................................................................27

17 C.F.R. § 240.13d-3(a) ..................................................................................14

17 C.F.R. § 240.13d-3(d)(4) ........................................................................15, 20

17 C.F.R. § 240.13d-5(b)(1) ........................................................................14, 16

PAGE

17 C.F.R. § 240.16a-1 ...........................................................................................14

17 C.F.R. § 240.16a-7 .................................................................................... *passim*

17 C.F.R. § 240.16a-10 .........................................................................................16

17 C.F.R. § 240.16c-2 ...........................................................................................30

17 C.F.R. § 242.104 ................................................................................................6

17 C.F.R. § 243.100(b)(2)(iii) ...............................................................................29

Fed. R. Civ. P. 9(b) ...............................................................................................25

Fed. R. Civ. P. 12(b)(6) .....................................................................................1, 35

Amendments to Regulation M:  Anti-Manipulation Rules Concerning Securities Offerings,
     Release No. 33-8511, 69 Fed. Reg. 75774 (Dec. 17, 2004) ............................6, 7, 30

Commission Guidance Regarding Prohibited Conduct in Connection with IPO Allocations,
     Release No. 33-8565, 2005 WL 1641394 (Apr. 7, 2005) .........................................29

Ownership Reports and Trading by Officers, Directors and Principal Shareholders,
     53 Fed. Reg. 49997 (Dec. 13, 1988) .......................................................................23

Sec. Offering Reform, 70 Fed. Reg. 44722 (Aug. 3, 2005) .................................27, 29


OTHER AUTHORITIES

Johnson, Jr., Charles J. & Joseph McLaughlin,
     *Corporate Finance and the Securities Laws* (4th ed. 2012 Supp.) ..............................28, 29, 30

Loss, Louis, *et al.*, *Fundamentals of Securities Regulation* (6th ed. 2011) ....................................6

NYSE/NASD IPO Advisory Comm., Report and Recommendations of a committee
     convened by the New York Stock Exchange, Inc. and NASD at the request of the
     U.S. Securities and Exchange Commission, May 2003, *available at*
     http://www.finra.org/web/groups/rules_regs/documents/ rules_regs/p010373.pdf.................19

Romeo, Peter J. & Alan L. Dye, *Section 16 Treatise and Reporting Guide* (4th ed. 2012) ..........16

Schultheis, Patrick J., *et al.*, *The Initial Public Offering:*
     *A Guidebook For Executives & Boards of Directors* (Bowne 3d ed. 2008)..........................28

Westenberg, David A., *Initial Public Offerings:*
     *A Practical Guide to Going Public* (1st ed. 2011)...................................................6, 7, 19, 28

Defendants Morgan Stanley & Co. LLC, J.P. Morgan Securities LLC and Goldman, Sachs & Co. (collectively, the "Lead Underwriters") respectfully submit this memorandum of law in support of their motion to dismiss the complaint in this action pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

The complaint advances an unprecedented and deeply flawed claim under Section 16(b) of the Securities Exchange Act of 1934 seeking disgorgement of "short-swing" profits allegedly earned by the Lead Underwriters from underwriting activities performed in connection with the May 18, 2012 initial public offering of Facebook, Inc.  Among many problems, this claim suffers from the core defect that Section 16, which governs stock trading by corporate "insiders," is inapplicable to the underwriting activity at issue in this case.  Plaintiff's allegations that the Lead Underwriters earned profits in covering short positions created in conjunction with the IPO – a common consequence of market-support practices expressly permitted by the SEC that are routinely employed by underwriters during IPOs – do not state a claim under Section 16(b), and this action accordingly must be dismissed.

This case is a far cry from the scenario envisioned by Section 16(b), which polices short-term trading by insider officers, directors and shareholders with greater than ten percent of a corporation's stock.  The Lead Underwriters were not Facebook insiders under Section 16, but rather unaffiliated third-party financial institutions engaged in the distribution of Facebook's securities.  Plaintiff's attempt to extend Section 16(b)'s strict disgorgement rule to reach ordinary-course underwriting activities is unsupported by the text or purposes of Section 16(b) and the corresponding SEC rules and, indeed, runs counter to the regulatory regime governing securities distributions.  Simply stated, the special restrictions on trading by "insiders" under

Section 16(b) are inapplicable to underwriting syndicates acting as conduits for the distribution of securities, and this Court should reject plaintiff's unwarranted attempt to apply Section 16(b) in a context for which it was never intended.

As a threshold matter, the Lead Underwriters were not beneficial owners of more than ten percent of Facebook stock, and were thus not subject to Section 16. Plaintiff contends that the Lead Underwriters were part of a "group" with various pre-IPO shareholders having greater than ten percent of Facebook's stock by virtue of those shareholders' execution of "lock-up" agreements not to sell their remaining Facebook stock for certain periods following the IPO (the "Selling Shareholders"). But underwriters engaged in securities distributions do not "act together" with selling shareholders "for the purpose of acquiring, holding, voting or disposing" of securities, the test for treating them as a "group" under Section 16. The "lock-up" agreements that underwriters negotiate with selling shareholders – in order to protect public investors from the downward price pressure of additional stock sales – reflect their arm's-length relationship, and have never been a basis for treating underwriters engaged in securities distributions as "insiders" for purposes of Section 16. Indeed, plaintiff's limitless theory that underwriters invariably constitute an "insider" group with selling shareholders is incompatible with SEC rules that expressly exclude securities acquired by underwriters for distribution from the computation of their beneficial ownership for purposes of Section 16.

Plaintiff's specious "group" theory fails to establish that the Lead Underwriters were beneficial owners of Facebook stock, and the Court should dismiss the complaint on that basis alone. But even if the Court considers the complaint's remaining allegations, plaintiff's Section 16(b) claim fails for the additional reason that the transactions that allegedly earned the Lead Underwriters short-swing profits – open market purchases made to cover over-allotment short

positions created in the IPO – are exempted from Section 16 by SEC Rule 16a-7.  That rule expressly provides that purchases-and-sales or sales-and-purchases by underwriters participating in good faith as conduits in securities distribution activities are not subject to Section 16(b)'s disgorgement rule, and it is apparent from the face of the complaint that the Lead Underwriters were engaged in a bona fide distribution of securities.  Plaintiff asserts that Rule 16a-7 is inapplicable on the purported ground that the Lead Underwriters were not acting in good faith, but the allegations that plaintiff contends demonstrate a lack of good faith – the same basic narrative, familiar to this Court from other cases in these MDL proceedings, about Facebook's updating of its internal projections and the underwriters' sharing of their analysts' revised forecasts with investor clients – go to disclosure matters governed by securities laws other than Section 16(b).  They raise no question as to the only issues relevant to Rule 16a-7:  whether the underwriters were participants in a valid distribution of Facebook stock, or were engaged in securities distribution activities instead of acting as investors when they purchased stock on the open market to cover over-allotment short sales in accordance with approved underwriting practices.  The complaint thus raises no issue that would render Rule 16a-7 inapplicable.

Moreover, even if plaintiff were correct in contending that the applicability of the exemption somehow depends on the Lead Underwriters' subjective good faith belief as to the adequacy of Facebook's disclosures, the complaint raises no question on that subject that this Court has not already addressed in its dismissal of four derivative actions.  *See In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 922 F. Supp. 2d 445 (S.D.N.Y. 2013).  In contrast to the complaint in the consolidated securities class action, where the plaintiffs have expressly disclaimed fraud, the complaint here plainly sounds in fraud and knowing misconduct in its effort to impugn the Lead Underwriters' subjective good faith.  Plaintiff conclusorily alleges that

the Lead Underwriters deliberately withheld material information about Facebook from all but their "favored" investors, sold over-allotment shares short in the IPO at a price allegedly inflated by nondisclosures and then profited when those short positions were covered with open-market purchases as the stock fell below the offering price.  As to J.P. Morgan and Goldman Sachs, it further alleges that they encouraged the stock price decline by lending shares to short-selling clients in the ordinary course.  These allegations of intentional misconduct, however, fail to meet the heightened standard for satisfying Rule 9(b) and pleading scienter that plaintiff has set for himself.  Indeed, they fail to plead an absence of subjective good faith measured by any standard, even short of scienter, because these alleged actions that purportedly evidence bad faith are all well-settled industry practices that are entirely customary and have been accepted by the SEC.

The complaint asserts an additional Section 16(b) claim against Goldman Sachs based on alleged secondary market trading between May and September 2012, but the conclusory allegations advanced by plaintiff similarly fail to state a claim.  First, as already noted, the complaint's "lock-up" theory for treating Goldman Sachs as a part of a group beneficially owning more than ten percent of Facebook's stock is invalid.  Further, plaintiff does not even allege when any Goldman Sachs entity actually bought or sold Facebook shares, at what prices, or for what accounts (firm versus customer).  He supplies only overlapping price ranges at which Facebook stock allegedly traded during the second and third quarters of 2012, and thus fails to allege facts that would be needed to show that Goldman Sachs earned a profit.

## BACKGROUND AND COMPLAINT ALLEGATIONS

### 1.     Facebook's Initial Public Offering and the Alleged "Lock-Up" Agreements

On May 18, 2012, Facebook made a registered initial public offering of approximately 421 million shares of Class A common stock to investors at $38.00 per share.  *See In re*

*Facebook*, 922 F. Supp. 2d at 451.  Plaintiff does not allege that any of the Lead Underwriters themselves directly owned any Facebook stock prior to the May 18, 2012 Facebook IPO.  Rather, he alleges that, prior to the IPO, the Lead Underwriters entered into "lock-up" agreements with each of the Selling Shareholders (only one of whom is identified in the complaint) who together allegedly held greater than ten percent of Facebook's common stock.  (Compl. ¶¶ 15, 17.)  The lock-up agreements committed the Selling Shareholders "not to sell or otherwise dispose" of any Facebook common stock for periods of time following the IPO without Morgan Stanley's prior consent.  (Compl. ¶ 15.)

The complaint does not allege that the lock-up agreements imposed any obligation on the Lead Underwriters, gave them any rights as to the voting or economics of the locked-up shares or involved any commitment by the Lead Underwriters with regard to acquiring, holding, voting or disposing of Facebook stock, other than as distributors of the stock being sold in the IPO.  Nor does the complaint deny that such lock-up agreements are customary in connection with IPOs, or that they were negotiated at arm's length.  Nonetheless, plaintiff asserts that the "common purpose" of the lock-up agreements "was to control the supply of Facebook shares available to the market, which, in turn, was expected to provide support for the trading price of Facebook common stock."  (Compl. ¶ 16.)  Plaintiff contends that the Lead Underwriters and the Selling Shareholders agreed "to act together" to achieve this common purpose, and that the Lead Underwriters were therefore beneficial owners of the Facebook shares owned by the Selling Shareholders.  (Compl. ¶ 18.)

**2.      The Over-Allotment Option**

The offering's Registration Statement and Prospectus, which are referenced in the complaint, each explained that, in addition to the 421 million shares being sold to investors

through the underwriting syndicate, Facebook and the Selling Shareholders had granted the underwriters "an option, exercisable for 30 days from the date of this prospectus, to purchase up to 63,185,042 additional shares of common stock at the public offering price . . . for the purpose of covering over-allotments, if any, made in connection with the offering . . . ."  Rouhandeh Decl. Ex. A (Facebook, Inc., Registration Statement (Form S-1/A) (May 16, 2012) ("Final S-1")) at 164; Rouhandeh Decl. Ex. B (Facebook, Inc., Prospectus (May 17, 2012) ("Prospectus")) at 163.[1]  This option – called the "over-allotment option" or "Green Shoe" – is a common feature of underwritten offerings.  *See* Amendments to Regulation M:  Anti-Manipulation Rules Concerning Securities Offerings, Release No. 33-8511, 69 Fed. Reg. 75774, 75780 (Dec. 17, 2004) ("In the typical offering, the syndicate agreement allows the managing underwriter to 'oversell' the offering, *i.e.*, establish a short position beyond the number of shares to which the underwriting commitment relates."); *id* at n.65 ("Underwriters frequently receive an overallotment option ('Green Shoe'), which is the right, but not the obligation, to purchase securities from the issuer in addition to those initially underwritten by the syndicate, which may constitute up to 15% of the initial underwritten amount." (internal quotation marks omitted)).

The principal purpose of over-allotments is to assist the lead manager in stabilizing and supporting the newly issued security offering.  *See* David A. Westenberg, *Initial Public Offerings: A Practical Guide to Going Public* § 19:3.4 (1st ed. 2011); Louis Loss *et al.*, *Fundamentals of Securities Regulation* Ch. 2A, at 107 (6th ed. 2011).[2]  Short positions created by over-allotments

---

[1] Citations to "Rouhandeh Decl." refer to the Declaration of James P. Rouhandeh in Support of Lead Underwriters' Motion to Dismiss, and the exhibits thereto.

[2] Formal aftermarket price stabilization by underwriters is regulated by specific SEC rules.  *See* 17 C.F.R. § 242.104 (setting forth rules regarding "[s]tabilizing and other activities in connection with an offering").  Such formal stabilization "has been largely supplanted in IPO underwritings by the use of over-allotments," which enable the lead manager to stabilize and
(....continued)

may "be covered by exercising the [over-allotment] option or by purchasing shares in the market once secondary trading begins."  Amendments to Regulation M, 69 Fed. Reg. at 75780.  The option of covering the short sales with market purchases enables the lead manager to stabilize and support an offering.  "If the stock price declines immediately after the offering, the stabilization agent purchases shares in the aftermarket in order to cover the syndicate short position, and these purchases generate market demand and help support the price."  Westenberg, *Initial Public Offerings* § 19:3.4.  If the share price does not decline below the offering price, there is no need to support the price with market purchases, and the lead manager can "exercise the over-allotment option (at the IPO price) . . . and cover the syndicate short position with the additional shares purchased from the company."  *Id.*

Consistent with these accepted practices, the Registration Statement advised that "the underwriters may engage in transactions that stabilize, maintain or otherwise affect the price of the Class A common stock."  Rouhandeh Decl. Ex. A (Final S-1) at 166.  It explained that the underwriters could "sell more shares than they are obligated to purchase under the underwriting agreement, creating a short position" that they could cover either by exercising the over-allotment option and purchasing additional shares from Facebook and the Selling Shareholders at the fixed option price, or by purchasing shares in the open market at the market trading price.  *Id.* Facebook advised investors that the underwriters' decision whether to cover their short position by exercising the over-allotment option or by purchasing in the market would be based on, among other things, "the open market price of shares compared to the price available under the over-allotment option."  *Id.*  It explained that open-market purchases to cover over-allotment

---

(continued….)

support the post-IPO price of a security through short positions and covering purchases. Westenberg, *Initial Public Offerings* § 19:3.4.

short positions, together with other transactions available to the underwriters, "may raise or maintain the market price of the Class A common stock above independent market levels or prevent or retard a decline in the market price of the common stock." *Id.*

   **3.     The Underwriters' Alleged Conduct in Connection with the Facebook IPO**

   As explained further below, purchase-and-sale and sale-and-purchase transactions by underwriters in the course of distributing securities are exempt from Section 16 if made by underwriters participating in good faith in the distribution. *See* 17 C.F.R. § 240.16a-7. In an effort to avoid this exemption, plaintiff contends that the Lead Underwriters did not conduct the Facebook IPO in good faith.

   Nothing in the complaint disputes that a bona fide distribution in fact occurred. Instead, plaintiff attempts to premise lack of good faith on the same disclosure deficiencies alleged in the securities class action and rejected in the Court's derivative opinion. Plaintiff alleges that, prior to the IPO, in April 2012, the underwriters received second-quarter and full-year revenue projections for 2012 from Facebook, which the underwriters' analysts then used to create their own revenue estimates that were then incorporated into materials provided to "investor clients." (Compl. ¶¶ 20-21.) Later, on May 7, 2012, Facebook allegedly revised its internal revenue projections. (Compl. ¶ 22.) It also allegedly noted a continued trend of daily active users increasing more rapidly than the number of ads delivered, which Facebook attributed to increasing mobile usage among users and certain product decisions. (*Id.*)

   Plaintiff concedes that on May 9, 2012, Facebook amended its Registration Statement, informing investors of the continuing trend that Facebook had identified:

> Based upon our experience in the second quarter of 2012 to date, the trend we saw
> in the first quarter of [daily active users] increasing more rapidly than the increase
> in number of ads delivered has continued. We believe this trend is driven in part
> by increasing usage of Facebook on mobile devices where we have only recently

begun showing an immaterial number of sponsored stories in News Feed, and in part due to certain pages having fewer ads per page as a result of product decisions.

(Compl. ¶ 25.)  However, similar to the consolidated complaint filed in the securities class action, plaintiff alleges that this disclosure was false and misleading because it failed to disclose "that these factors had already materially impaired Facebook's revenue."  (Compl. ¶ 26; *see also* Consol. Class Action Compl. ("Securities Compl."), *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, MDL No. 12-2389 (RWS), Dkt. No. 71, ¶¶ 129-30, 194.)

After filing the May 9 amendment, Facebook allegedly called "select investment bankers and their securities analysts" to discuss Facebook's revision to its revenue projections.  (Compl. ¶¶ 27, 29.)  These calls allegedly followed a script prepared by Morgan Stanley and advised the analysts that Facebook believed that its second-quarter revenue would be at the "lower end of our $1.1 to $1.2 [billion] range . . . based upon the trends we described in the disclosure."  (Compl. ¶ 30 (emphasis omitted).)  Following the calls, analysts for the Lead Underwriters allegedly revised their second-quarter and full-year revenue estimates downward in response, but told "only a few 'major clients'" of the changes.  (Compl. ¶¶ 31-32, 38.)  Plaintiff asserts that, in December 2012, Morgan Stanley was fined $5 million by the Massachusetts Securities Division "for giving analysts information with respect to Facebook that was not provided to all investors."  (Compl. ¶ 40.)[3]

---

[3] As discussed *infra* at 30-31, the consent order issued in connection with the Massachusetts Securities Division's investigation into Morgan Stanley's role in the IPO nowhere suggests that Morgan Stanley acted improperly by giving analysts information not provided to all potential investors.  Nor did Morgan Stanley admit any of the allegations actually made in the consent order.  *See* Rouhandeh Decl. Ex. C (Consent Order, *In re Morgan Stanley & Co. LLC*, Dkt. No. 2012-0042 (Dec. 17, 2012) ("Consent Order")) at 1.

According to the complaint, during the May 18, 2012 IPO, the Lead Underwriters collectively sold at least 310,238,557 shares of Facebook common stock at $38.00 per share, including over-allotment shares.[4]  (Compl. ¶ 34.)  The complaint alleges that, between the close of trading on May 18 and May 22, it became known that Facebook had revised its revenue projections prior to its IPO, and that analysts for the Lead Underwriters had been informed of those revisions and had revised their own revenue estimates and communicated them to "favored" investors.  (Compl. ¶¶ 2, 36-38.)  The complaint also alleges that J.P. Morgan and Goldman Sachs obtained fees by lending out Facebook shares to short-selling clients "at the very same time" that they were acting as underwriters for the IPO (Compl. ¶ 35),  although the complaint fails to explain how such lending could possibly occur *during* the IPO given that secondary market activity (including short selling) by definition did not commence until the IPO had occurred and the syndicate was broken.  As of May 22, the closing price of Facebook stock was $31.00.  (Compl. ¶ 39.)

Over the period of May 18 to 22, the Lead Underwriters, acting through Morgan Stanley as lead manager, allegedly purchased an unspecified number of Facebook shares on the open market to cover short positions created by over-allotments, allegedly at prices lower than $38.00 per share, thereby earning a short-swing profit.  (Compl. ¶¶ 2, 41-42.)

### 4.  Goldman Sachs' Alleged Transactions During the Third Quarter of 2012

Plaintiff contends that as of June 30, 2012, Goldman Sachs owned 9,507,859 shares of Facebook common stock, all purportedly purchased in May 2012 following the IPO, and that as

---

[4] The complaint alleges that the underwriters sold IPO shares to investors "at prices ranging from $38 to $42.05 per share."  (Compl. ¶ 34.)  The underwriters were obligated to sell (and, in fact, sold) all shares in the IPO at the $38.00 offering price.  *See* Rouhandeh Decl. Ex. B (Prospectus) at 163 (reflecting that the public offering price was $38.00 per share for all shares, including those sold short as over-allotments).

of September 30, 2012, Goldman Sachs had sold 5,591,649 of those shares.  (Compl. ¶¶ 43-45.)

The complaint does not allege whether the positions and transactions occurred in firm or

customer accounts, or the prices at which these shares were bought or sold, but rather only the

ranges of trading prices for Facebook stock during the May-June and July-September periods.

The complaint merely asserts in conclusory fashion that the stock was sold at prices higher than

those at which they were acquired.  (Compl. ¶ 45.)  The complaint also asserts that Goldman

Sachs transacted in call and put options during this same period (again, failing to provide details

or distinguish between firm and customer accounts).  (Compl. ¶¶ 43-45.)

###### 5.      Demand Allegations

Plaintiff alleges that he is a Facebook shareholder and that, on September 12, 2012, he

made a demand on Facebook that it seek disgorgement of the profits obtained by the Lead

Underwriters based on the facts alleged in the complaint.  (Compl. ¶ 47.)  Facebook declined to

bring suit, and this action was filed on June 12, 2013.  (Compl. ¶ 49.)

## **ARGUMENT**

Plaintiff's unprecedented claim improperly attempts to impose Section 16(b)'s strict-

liability "insider" disgorgement regime on ordinary-course underwriting transactions that plainly

fall outside the scope of the statute and which are facets of virtually every underwriting.

Underwriters' securities distribution activities do not make them "insiders" subject to the short-

swing profit rule.  Nor can underwriting syndicates be treated as forming a "group" with selling

shareholders for purposes of Section 16 simply by virtue of standard agreements incident to

securities distributions.  This conclusion follows from the plain language of Section 16 and its

implementing rules adopted by the SEC, case law and common sense.

Beyond this, the alleged over-allotment short sales and corresponding price-supporting open-market purchases are expressly exempted by the SEC from Section 16. Plaintiff's position that this exemption is inapplicable because of purported disclosure deficiencies associated with the IPO ignores the exclusive determinant under the exemption of whether the IPO was a bona fide *distribution of securities*, which it plainly was. Plaintiff's attempt to inject into this lawsuit matters wholly outside the scope of Section 16 that are, instead, regulated by other provisions of the securities laws and would potentially nullify the exemption for every IPO based on alleged disclosure deficiencies, raises no issue as to the validity of the Lead Underwriters' securities distribution activities, and thus no question that they are exempted from Section 16(b). And in any event, even if plaintiff's disclosure theory were sufficient to vitiate the exemption, plaintiff's allegations that the Lead Underwriters did not believe in good faith in the adequacy of Facebook's disclosures fail on their own terms, because they do not substantiate plaintiff's assertion of fraud.

## I.     THE STATUTORY AND REGULATORY FRAMEWORK OF SECTION 16

Section 16 imposes obligations on specified insiders relating to their ownership of an issuer's equity securities registered pursuant to Section 12 of the Securities Exchange Act. *See* 15 U.S.C. § 78p. Section 16(a) mandates that any director, officer or "beneficial owner of more than 10 percent of any class of any equity security (other than an exempted security)" of a company must report to the SEC the amount of all equity securities beneficially owned and must disclose any changes in such ownership. *See id.* § 78p(a); *Roth ex rel. Leap Wireless Int'l, Inc. v. Goldman Sachs Grp., Inc.*, 873 F. Supp. 2d 524, 529 (S.D.N.Y. 2012), *appeal docketed*, *Roth v. The Goldman Sachs Grp., Inc.*, No. 12-2509 (2d Cir. June 25, 2012).

Section 16(b) polices trading of securities by statutorily defined insiders. It provides:

> For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) . . . within any period of less than six months . . . shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction . . . .

15 U.S.C. § 78p(b).  As the Second Circuit has explained, Section 16(b) serves to "deter 'insiders,' who are presumed to possess material information about the issuer, from using such information as a basis for purchasing or selling the issuer's equity securities at an advantage over persons with whom they trade."  *Gwozdzinsky v. Zell/Chilmark Fund, L.P.*, 156 F.3d 305, 308 (2d Cir. 1998) (footnote omitted).  To state a claim for disgorgement of short-swing profits under Section 16(b), a plaintiff must allege:  (1) a non-exempt purchase and subsequent non-exempt sale (or a non-exempt sale and subsequent non-exempt purchase) of a class of an issuer's equity securities (2) within a six-month period (3) by a statutory insider.  *See id.*

Congress designed Section 16(b) to be "'capable of easy administration'" and "to create *rules* that can be mechanically applied."  *Gibbons v. Malone*, 703 F.3d 595, 603 (2d Cir. 2013) (quoting *Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418, 422 (1972)).  To further that design, the statute "'imposes a form of strict liability' and requires insiders to disgorge these 'short-swing' profits 'even if they did not trade on inside information or intend to profit on the basis of such information.'"  *Credit Suisse Sec. (USA) LLC v. Simmonds*, 132 S. Ct. 1414, 1417 (2012) (quoting *Gollust v. Mendell*, 501 U.S. 115, 122 (1991)); *see Gibbons*, 703 F.3d at 599 (explaining that Section 16(b) "operates mechanically, with no required showing of intent" (internal quotation marks omitted)).  But because Section 16(b) operates as a "blunt instrument" to further its deterrent effect, *Magma Power Co. v. Dow Chem. Co.*, 136 F.3d 316, 321 (2d Cir. 1998), courts have recognized that its strict-liability regime must be confined within "narrowly drawn limits," *Foremost-McKesson, Inc. v. Provident Sec. Co.*, 423 U.S. 232, 251 (1976); *Segen*

*v. CDR-Cookie Acquisitions, L.L.C.*, No. 05 Civ. 3509 (RWS), 2006 WL 59550, at *5 (S.D.N.Y. Jan. 4, 2006) (Sweet, J.).

### A.    "Beneficial Ownership"

Under the SEC's rules, the threshold question in determining whether a person is subject to reporting and disgorgement under Section 16 is whether the person is "a beneficial owner of more than ten percent of any class of equity securities" under Section 13(d) of the Securities Exchange Act and the rules thereunder.  17 C.F.R. § 240.16a-1; *see also Levy v. Southbrook Int'l Invs., Ltd.*, 263 F.3d 10, 14-15 (2d Cir. 2001).  Any person who has voting or investment power over securities is deemed the beneficial owner of those securities.  *See* 17 C.F.R. § 240.13d-3(a).

Section 13(d) also provides that:

> When two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a "person" for the purposes of this subsection.

15 U.S.C. § 78m(d)(3); *see also* 17 C.F.R. § 240.13d-5(b)(1) (group is formed "[w]hen two or more persons agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer").  Each group member is deemed to beneficially own all equity securities owned by all other members of the group.  *See* 17 C.F.R. § 240.13d-5(b)(1); *Litzler v. CC Invs., L.D.C.*, 411 F. Supp. 2d 411, 414 (S.D.N.Y. 2006).

As the Second Circuit has explained, the "touchstone" of a group is that "the members combined in furtherance of a common objective" to acquire, hold, vote or dispose of securities.  *CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP*, 654 F.3d 276, 283 (2d Cir. 2011) (internal quotation marks omitted); *see also id.* at 284 (rejecting the district court's finding that a group had formed "with respect to" an issuer's securities because the court failed to "find a group

formed *for the purpose of acquiring* [those] securities." (emphasis added)); *Roth v. Jennings*, 489 F.3d 499, 508 (2d Cir. 2007).

In addition, Rule 13d-3(d)(4) provides that any underwriter "who acquires securities through his participation in good faith in a firm commitment underwriting registered under the Securities Act of 1933 shall not be deemed to be the beneficial owner of such securities until the expiration of forty days after the date of such acquisition."  17 C.F.R. § 240.13d-3(d)(4). Recognizing this exception, plaintiff does not contend that the Lead Underwriters became beneficial owners as a result of their acquisition of Facebook stock from the Selling Shareholders as part of the underwriting.

### B.    Exemption of Underwriting Transactions from Section 16

In addition to the exemption of underwriters under Rule 13d-3(d)(4), the SEC has also exempted sale-and-purchase and purchase-and-sale transactions incident to the distribution of securities by underwriters from the reporting and disgorgement obligations of Section 16, including underwriters' purchases of stock for purposes of post-offering price support and to cover short positions created in connection with the offering.

Even in circumstances where an underwriter may be a beneficial owner, Rule 16a-7 exempts sales and purchases "made in connection with the distribution of a substantial block of securities" where:  (1) "[t]he person effecting the transaction is engaged in the business of distributing securities and is participating in good faith, in the ordinary course of such business, in the distribution of such block of securities"; and (2) the security involved is

> (i) Part of such block of securities and is acquired by the person effecting the transaction, with a view to distribution thereof, from the issuer or other person on whose behalf such securities are being distributed or from a person who is participating in good faith in the distribution of such block of securities; or
>
> (ii) A security purchased in good faith by or for the account of the person effecting the transaction for the purpose of stabilizing the market price of

securities of the class being distributed or to cover an over-allotment or other short position created in connection with such distribution.

17 C.F.R. § 240.16a-7(a).

A transaction exempt from the disclosure obligations of Section 16(a) is also exempt from the disgorgement obligations of Section 16(b). *See id.* § 240.16a-10 ("Except as provided in § 240.16a-6, any transaction exempted from the requirements of section 16(a) of the Act, insofar as it is otherwise subject to the provisions of section 16(b), shall be likewise exempt from section 16(b) of the Act.").

## II.   THE LEAD UNDERWRITERS WERE NOT BENEFICIAL OWNERS SUBJECT TO SECTION 16

The complaint fails to plead that the Lead Underwriters beneficially owned more than ten percent of Facebook's Class A stock at the time of the alleged transactions.  Plaintiff's allegations that the Lead Underwriters beneficially owned stock held by the Selling Shareholders by virtue of the lock-up agreements do not plead the existence of a "group" under Section 16, and the Court should dismiss the complaint on this basis alone.

A group is formed "[w]hen two or more persons agree ***to act together*** for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer."  17 C.F.R. § 240.13d-5(b)(1) (emphasis added).  The members of the group must have "'***combined*** in furtherance of a common objective'" specified under the rules.  *CSX Corp.*, 654 F.3d at 283 (emphasis added) (quoting *Roth*, 489 F.3d at 508); *see also* Peter J. Romeo & Alan L. Dye, *Section 16 Treatise and Reporting Guide* § 2.03[6][d][iii] (4th ed. 2012) ("A [Section 16(b)] group will be deemed to exist ***only*** if the alleged members had an intention to ***act in concert*** with respect to the issuer's securities." (emphasis added)).  The complaint fails to plead a "group" under Section 16 because it does not demonstrate any agreement by the Lead Underwriters "to act together" or "combine" with the Selling Shareholders.  *See CSX Corp.*, 654 F.3d at 283; 17 C.F.R. § 240.13d-5(b)(1).

Plaintiff's assertion of group status rests solely on the existence of the lock-up agreements, but courts in this Circuit have recognized that the mere existence of such agreements is, by itself, insufficient to establish a Section 16(b) group.  In *Chechele v. Scheetz*, 819 F. Supp. 2d 342 (S.D.N.Y. 2011), *aff'd*, 466 F. App'x 39 (2d Cir. 2012), the Court held that allegations that various shareholders had executed lock-up agreements with underwriters in connection with stock offerings were inadequate "standing alone" to plead a group among those shareholders for purposes of Section 16.  *Id.* at 349.  The Court explained that the "plausibility of a group inference based on the Lock-Up Agreements stands and falls with the factual content of the *supporting allegations*," which were deficient.  *Id.* (emphasis added); *see also Donaghue v. Accenture Ltd.*, No. 03 Civ. 8329 (NRB), 2004 WL 1823448, at *1, *3-4 (S.D.N.Y. Aug. 16, 2004) (allegations of lock-up and voting agreements imposed on employees insufficient to establish a group).[5]

The complaint here similarly pleads no supporting allegations that would sustain the "plausibility of a group inference."  *Scheetz*, 819 F. Supp. 2d at 349.  The alleged lock-up agreements were entirely adversarial and arm's length in nature, and commit each Selling Shareholder "not to sell or otherwise dispose" of any Facebook common stock for periods of time following the IPO to protect public investors (Compl. ¶ 15); there is no allegation that the Lead Underwriters reciprocally agreed not to sell or dispose of Facebook stock.  Plaintiff asserts

---

[5] In *Morales v. Quintel Entertainment, Inc.*, 249 F.3d 115 (2d Cir. 2001), the Second Circuit observed that lock-up provisions "may bear upon" the "existence of a concerted agreement," but expressly declined to decide whether they are sufficient by themselves to support a group inference under Section 16.  *Id.* at 127.  The court held that such an inference was warranted based on supporting allegations that three shareholders had simultaneously deposited shares into, and then later simultaneously redeemed their shares from, three simultaneously created identical trusts.  *Id.*  Again, no comparable allegations support an inference that the Lead Underwriters had combined with the Selling Shareholders to act together for one of the purposes set forth in Rule 13d-5.

that the Lead Underwriters "act[ed] together" with the Selling Shareholders to limit the supply of shares of Facebook stock in the market (Compl. ¶¶ 16, 18), but the only parties alleged to have acted to limit the supply of Facebook shares were the Selling Shareholders, by individually binding themselves not to sell more stock for the prescribed periods.  None of the Lead Underwriters allegedly agreed to take any action itself that would limit the supply of Facebook stock.  Indeed, there is no allegation that any of the Lead Underwriters possessed any pre-IPO Facebook stock.

Plaintiff's "group" contention also fails for the additional reason that the complaint does not allege a combination "for the purpose of acquiring, holding, voting or disposing" of stock. Plaintiff asserts a group purpose "to control the supply of Facebook shares available to the market" in order to "provide support for the trading price of Facebook common stock."  (Compl. ¶ 16.)  This conclusory assertion does not even plead that the Lead Underwriters and Selling Shareholders had "combined in furtherance of a common objective" specified by Section 13(d) or the SEC's rule.  *CSX Corp.*, 654 F.3d at 283 (internal quotation marks omitted); *see also id.* at 284 (rejecting group allegations where facts did not demonstrate "a group formed *for the purpose of acquiring* [the] securities" (emphasis added)).  While the Selling Shareholders and Lead Underwriters were each separately interested in ensuring a successful underwriting and a stable initial trading market for the stock, that common desire does not make a group for purposes of Rule 13d-5 and Section 16.

The absence of a "group" is evident, moreover, from the differences in their circumstances and purposes in joining efforts around the IPO, which are reflected in the documents incorporated by reference in the complaint.  The Selling Shareholders' evident objective was to monetize part of their equity holdings in Facebook through a public offering

that would also create a liquid market for their remaining holdings.  The Lead Underwriters, by contrast, were seeking to provide securities distribution services.  The lock-ups did not in themselves achieve any benefit for either of them, but rather were simply a structural feature that assisted marketability by assuring investors that the Selling Shareholders' remaining holdings would not be immediately sold into the market.  Indeed, each lock-up agreement expressly states that the Selling Shareholder's purpose in entering into the agreement was to "induce" the underwriters to participate in the IPO – not some purpose common to the underwriters and Selling Shareholders.  *See* Rouhandeh Decl. Ex. D (Form of Lock-up Letters) at A-1, B-1. Allegations of a mere "agreement" are not enough.  Indeed, as the Second Circuit noted – albeit not in the context of group allegations – in rejecting another recent attempt to extend Section 16(b) to novel circumstances, "[b]usiness dealings alone do not establish beneficial ownership." *Mercer v. Gupta*, 712 F.3d 756, 760 (2d Cir. 2013).[6]

The absence of adequate group allegations here is highlighted by a comparison to cases where a Section 16(b) group *was* adequately alleged.  Plaintiff does not allege, for example, that the Lead Underwriters and the Selling Shareholders acted together to dispose of stock in order to promote a corporate takeover of Facebook.  *See, e.g.*, *Wellman v. Dickinson*, 682 F.2d 355, 363

---

[6] Lock-up agreements are common in IPOs and serve the important purpose of "maintain[ing] an orderly market in the company's common stock while the distribution of shares is completed and initial trading develops."  Westenberg, *Initial Public Offerings* § 18:12. "In the absence of lockup agreements, many pre-IPO shares typically would be eligible for immediate sale in the public market, potentially flooding the market and exerting substantial downward pressure on the market price of the newly issued shares." *Id.*; *see also* NYSE/NASD IPO Advisory Comm., Report and Recommendations of a committee convened by the New York Stock Exchange, Inc. and NASD at the request of the U.S. Securities and Exchange Commission, May 2003, at 16, *available at* http://www.finra.org/web/groups/rules_regs/documents/rules_regs/p010373.pdf ("Underwriters routinely require directors, officers and certain pre-IPO shareholders of an issuer to enter into lock-up agreements that restrict their sale of company shares for a specified period . . . .").

(2d Cir. 1982) (finding a Section 13(d) group where members agreed to act in concert to dispose

of shares to bring about third party's acquisition of issuer).  Nor does he allege coordinated

conduct to obtain voting control over Facebook's stock.  *See, e.g.*, *Morales v. Freund*, 163 F.3d

763, 767 (2d Cir. 1999) (holding that Section 16(b) group existed where members agreed to act

together to obtain voting control of issuer's stock).  There are also no allegations that the Lead

Underwriters had a right of first refusal to purchase any securities that the Selling Shareholders

desired to sell.  *See, e.g.*, *Morales v. New Valley Corp.*, 999 F. Supp. 470, 475 (S.D.N.Y. 1998).

Plaintiff's group theory should be rejected for the additional reason that it is inconsistent

with the SEC's determination under Rule 13d-3(d)(4) that underwriters who acquire securities

through their good-faith participation in underwritings shall not be deemed to be beneficial

owners of those securities until forty days after the acquisition.  *See* 17 C.F.R. § 240.13d-3(d)(4).

It necessarily follows that underwriters cannot be deemed beneficial owners of those securities

by entering into underwriting agreements or other agreements, such as "lock-up agreements,"

incident to such underwriting activities.  Plaintiff's group theory of underwriter beneficial

ownership seeks to end-run the Rule 13d-3(d)(4) exemption.[7]

Plaintiff's failure to allege the existence of a group under Section 13(d) defeats his claim

under Section 16(b) and requires dismissal of the complaint.

---

[7] This action is not the first effort by a plaintiff to expand the reach of Section 16(b) to routine underwritings by arguing that underwriters had formed a Section 16 group with pre-IPO shareholders as a result of standard IPO lock-up agreements.  *See Simmonds v. Credit Suisse Sec. (USA) LLC*, 638 F.3d 1072, 1085 (9th Cir. 2010) (affirming dismissal of certain claims that underwriters formed a "group" with selling shareholders for lack of standing and reversing dismissal of other claims on statute of limitations grounds), *vacated*, 132 S. Ct. 1414 (2012) (vacating statute of limitations dismissal and remanding for consideration of equitable tolling). None of the decisions in *Simmonds* reached the fundamental issue presented here, namely whether underwriting syndicates become "insiders" whenever selling shareholders execute lock-up agreements, and as explained above, plaintiff offers no valid reason for extending Section 16(b) based on this novel theory.

III.    **THE UNDERWRITERS' PURCHASES AND SALES IN CONNECTION WITH THE FACEBOOK IPO ARE EXEMPT FROM SECTION 16**

A.    **The IPO-Related Transactions Are Exempted Pursuant to Rule 16a-7.**

Even if the Court were to credit plaintiff's group theory and concludes that the Lead Underwriters were beneficial owners subject to Section 16 at the time of the alleged sales and purchases of Facebook stock in the IPO, those *transactions* do not fall within the scope of Section 16.  As discussed above, Rule 16a-7 exempts from Section 16(a) "[a]ny purchase and sale, or sale and purchase, of a security that is made in connection with the distribution of a substantial block of securities," such as an underwriting, if two conditions are met:  (1) the person effecting the transaction "is engaged in the business of distributing securities and is participating in good faith, in the ordinary course of such business" in an underwriting; and (2) the security at issue is either (i) acquired by the underwriter with the intent to distribute it in the underwriting or (ii) purchased in good faith by the underwriter to stabilize the market price of the security or to cover an over-allotment or other short position.  17 C.F.R. § 240.16a-7.

The complaint includes no particularized allegations that could bring the alleged stock transactions between May 18 and 22 outside the exemption from Section 16(b) by Rule 16a-7. These transactions related either to the distribution of securities in the IPO or to coverage of over-allotments.  And, the complaint makes plain that the Lead Underwriters were engaged in the business of distributing securities and were participating in good faith, in the ordinary course of business, in such distribution.  Accordingly, dismissal is mandated.  *See, e.g.*, *Mercer*, 712 F.3d at 759 (dismissing Section 16(b) claim based on safe harbor created by Rule 16a-1 and explaining that an affirmative defense "may be raised on a motion to dismiss if the defense is based on facts appearing on the face of the complaint"); *Segen*, 2006 WL 59550, at *6-8 (granting motion to dismiss Section 16(b) claim based on Rule 16b-3 exemption).

21

Plaintiff's sole basis for contending that the transactions are not exempt is that the Lead Underwriters purportedly "deliberately withheld" certain "material adverse information" about Facebook from all but a few "favored investors," which allegedly enabled the Lead Underwriters to sell short millions of shares of Facebook stock in the IPO at an "inflated" price and then cover those short sales in the market at prices well below the offering price when the purportedly adverse information emerged and the stock price dropped, thereby making a substantial profit. (Compl. ¶¶ 2-3.)  This Court has already held that this supposedly "adverse information" – Facebook's revised internal revenue projections – is not material information that was required to be disclosed.  *See In re Facebook*, 922 F. Supp. 2d at 472 ("Courts throughout the country have uniformly agreed that 'internal calculations and projections are not material facts that are require[d] to be disclosed' in a registration statement." (quoting *Sheppard v. TCW/DW Term Trust 2000*, 938 F. Supp. 171, 177-78 (S.D.N.Y. 1996))).  Moreover, these allegations – which turn on the adequacy of Facebook's *disclosures* – have no bearing on whether the transactions are exempted from Section 16(b)'s short-swing profit regime, which turns solely on whether a bona fide distribution occurred.

Section 16(b) is designed "to create *rules* that can be mechanically applied."  *Gibbons*, 703 F.3d at 603.  Plaintiff's fact-specific, hindsight attempt to impugn the Lead Underwriters' subjective state of mind during the IPO is inconsistent with the broader principle that Section 16(b) be applied in a straight-forward way and would "lead to a blurring of the bright-line rule established by Section 16(b), which was specifically 'designed for easy application' by Congress."  *Gibbons v. Malone*, 801 F. Supp. 2d 243, 249 (S.D.N.Y. 2011) (quoting *Cummings v. Comm'r*, 506 F.2d 449, 452 (2d Cir. 1974)), *aff'd*, 703 F.3d 595 (2d Cir. 2013).  Consistent with Congress's intention that Section 16(b) be readily administrable, the "good faith" language

22

of Rule 16a-7 merely requires that underwriters are actually participating in a genuine

distribution of securities.  Indeed, in considering amendments to Rule 16a-7 in 1988, the SEC

explained that the concerns of Section 16 are not implicated in genuine underwriting

transactions:

> Distributions by underwriters and selling group dealers would be excluded for
> reasons similar to those supporting exclusion of transactions by liquidating
> agents.  ***Underwriters and selling group dealers are conduits for securities in a
> distribution and their ownership is generally brief***.  Although they may have
> access to inside information in some cases, ***their market activity generally is
> constrained by other rules***.  As long as they act in those capacities, rather than as
> investors, there is no need for a report.

Ownership Reports and Trading by Officers, Directors and Principal Shareholders, 53 Fed. Reg.

49997, 50004 (Dec. 13, 1988) (emphasis added) (footnote omitted).  The only question is

whether the purchase-and-sale or sale-and-purchase that might otherwise be covered by Section

16 – the acquisition from the issuer or seller, or in the open market to support the price or cover a

short – was truly an underwriting activity, as opposed to a transaction to acquire a principal

position in the stock.

 The complaint's allegations raise no questions as to whether the Lead Underwriters were

participating in a bona fide distribution of Facebook stock (which plainly occurred), or were

acting as conduits instead of investors in covering over-allotment short sales pursuant to

approved underwriting practices (as they plainly were).  The complaint makes plain that the Lead

Underwriters acted in the same capacity as conduits during the Facebook IPO as they do in every

underwriting:  they distributed shares from Facebook and the Selling Shareholders to investors,

as well as over-allotment shares, which were covered in the open market in order to support

Facebook's stock and, as plaintiff alleges, to cover short positions created in connection with the

distribution.  There is no allegation to the contrary.  These distribution and covering transactions

in connection with the IPO fall squarely within the exemption of Rule 16a-7.

Plaintiff attempts to plead around that exemption by alleging shortcomings in connection with Facebook's disclosures, but Section 16 is not the mechanism to police the adequacy of disclosures.  There is no authority finding a lack of good faith based on alleged disclosure deficiencies.  As this Court well knows, claims under those other provisions have been asserted in the consolidated securities class action currently before this Court (*compare* Compl. ¶¶ 20-38 *with* Securities Compl. ¶¶ 106-09, 123-25, 128-33, 136, 155, 162-66), as well as the individual shareholder actions (consolidated into the class action) that formerly asserted claims under Section 20A of the Securities Exchange Act based on the purchases to cover over-allotment short positions, *see Corneck v. Morgan Stanley & Co. LLC, et al.*, No. 12 Civ. 4215 (RWS), Dkt. No. 1, Compl. ¶ 4; *Stricker v. Morgan Stanley & Co. LLC, et al.*, No. 12 Civ. 4763 (RWS), Dkt. No. 1, Compl. ¶ 4.  These cases demonstrate that the underwriter conduct alleged by plaintiff falls within the ambit of other securities laws and regulations and is not appropriately the concern of Section 16(b).  There is no requirement in Rule 16a-7 that, for the exemption to apply, the distribution of securities must have comported with all other applicable laws and rules, which encompass matters having nothing to do with the short-swing profits by insiders.  *See Roth v. Reyes*, No. C 06-2786 (CRB), 2007 WL 518621, at *7 (N.D. Cal. Feb. 13, 2007) (explaining that plaintiff was "attempting to fit a square peg into a round hole" by challenging options backdating under Section 16(b) where other securities laws regulated the conduct, and noting that "Section 16(b) should not be pressed into service whenever insiders behave badly").

### B.  Even if They Were Relevant, Plaintiff's Allegations Fail to Plead with Particularity that the Facebook IPO Was Not Conducted in Good Faith.

Even if the exemption under Rule 16a-7 could be vitiated based on allegations of an underwriter's lack of subjective good-faith belief as to the adequacy of an issuer's disclosures – which it cannot – the complaint allegations fail to plead such a theory adequately under Rule

9(b).  In averring subjective bad faith, plaintiff goes beyond the allegations in the consolidated securities class action, which expressly disavows any claim of fraud.  Plaintiff, by contrast, alleges that the Lead Underwriters deliberately withheld material information from investors in order to profit when the over-allotment short sales were covered in a declining market.  (Compl. ¶¶ 3, 26.)  Those assertions plainly sound in fraud and knowing misconduct, and plaintiff must thus satisfy the heightened pleading standard of Rule 9(b).  *See Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) ("By its terms, Rule 9(b) applies to 'all averments of fraud'" and is "not limited to allegations . . . expressed in terms of the constituent elements of a fraud cause of action." (quoting Fed. R. Civ. P. 9(b))); *Ladmen Partners, Inc. v. Globalstar, Inc.*, No. 07 Civ. 0976 (LAP), 2008 WL 4449280, at *13 (S.D.N.Y. Sept. 30, 2008) ("[A]llegations of knowing and deliberate misrepresentations fundamentally sound in fraud.").

To plead scienter, the complaint must allege, among other things, "particularized facts that 'give rise to a strong inference' of scienter."  *Kinsey v. Cendant Corp.*, No. 04 Civ. 582 (RWS), 2005 WL 1907678, at *3 (S.D.N.Y. Aug. 10, 2005) (quoting *Campaniello Imps., Ltd. v. Saporiti Italia S.p.A.*, 117 F.3d 655, 663 (2d Cir. 1997)); *cf. ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007) (explaining that the PSLRA requirement of pleading with particularity facts giving rise to a strong inference of scienter "is particularly important in manipulation claims because in some cases scienter is the only factor that distinguishes legitimate trading from improper manipulation").  A "strong inference" of scienter may be established "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128

(2d Cir. 1994); *see also Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) (defining "conscious misbehavior" as "encompass[ing] deliberate illegal behavior").[8]

Plaintiff's allegations fall well short of satisfying this pleading burden – or, indeed, any lesser burden applicable to pleading subjective bad faith (even assuming that standard applies under Rule 16a-7). As this Court has already acknowledged, Facebook "repeatedly made express and extensive warnings . . . about the trend of increased mobile usage." *In re Facebook*, 922 F. Supp. 2d at 469.[9] Plaintiff contends that the Registration Statement should have disclosed that the trend of daily active users growing more rapidly than ads delivered "had already materially impaired Facebook's revenues." (Compl. ¶ 26.) But such a disclosure would have been false. There had been no known material impairment of Facebook's second-quarter or full-year revenues for 2012. Rather, Facebook merely had revised its *internal projections* of future revenues, projections that proved overly conservative compared to Facebook's actual revenue results of $1.184 billion for the second quarter and $5.089 billion for the full year. *See*

---

[8] Plaintiff must meet this standard even though scienter is not an element of a Section 16(b) claim. *See Rombach*, 355 F.3d at 171 (purposes behind imposition of Rule 9(b)'s heightened pleading standard "apply with equal force" whether or not plaintiff's claim requires proof of fraud as an element, and applying Rule 9(b) to Section 11 and 12 claims sounding in fraud); *Reyes*, 2007 WL 518621, at *8 & n.2 (applying Rule 9(b) to Section 16(b) claim).

[9] For example, the Registration Statement described "increasing usage of Facebook on mobile devices" first in its list of the two causes that Facebook believed had "driven" the trend of users increasing faster than ads delivered. (Compl. ¶ 25; *see also* Rouhandeh Decl. Ex. A (Final S-1) at 53 ("Increasing use of Facebook on mobile devices will also affect our performance . . . ."); *id.* at 14 (linking negative effect on "our financial performance and ability to grow revenue" to Facebook's being "unable to successfully implement monetization strategies for our mobile users").) Likewise, widespread pre-IPO media reports focused on the fact that drafts of the Registration Statement had plainly disclosed declining revenue growth "as a result of the shift to mobile devices." *See In re Facebook*, MDL No. 12-2389 (RWS), Mem. of Law in Supp. of Defs. Mot. to Dismiss the Consol. Class Action Compl. ("Defs. Securities Br."), Dkt. No. 92, at 10-13 & nn.5-6 (quoting articles); *In re Facebook*, MDL No. 12-2389 (RWS), Reply Mem. in Supp. of Defs.' Mot. to Dismiss the Consol. Class Action Compl., Dkt. No. 134, at 21 n.13.

Rouhandeh Decl. Ex. E (Facebook, Inc., Form 10-Q (July 31, 2012)) at 5; *id.* Ex. F (Facebook, Inc., Form 10-K (Feb. 1, 2013)) at 34.

Moreover, plaintiff does not – and, indeed, cannot – contend that the Registration Statement should have disclosed Facebook's internal projections or mid-quarter revenue data. "Courts throughout the country have uniformly agreed that 'internal calculations and projections are not material facts that are require[d] to be disclosed' in a registration statement." *In re Facebook*, 922 F. Supp. 2d at 472 (quoting *Sheppard*, 938 F. Supp. at 177-78).[10]  And, the SEC has expressly rejected a rule "requir[ing] projections or other forward-looking information to be included in [IPO] registration statements."  Sec. Offering Reform, 70 Fed. Reg. 44722, 44739 (Aug. 3, 2005).  Courts and the SEC similarly do not require disclosure of revenue data for a quarter in progress.  *See, e.g.*, *Arfa v. Mecox Lane Ltd.*, No. 10 Civ. 9053 (RWS), 2012 WL 697155, at *12 (S.D.N.Y. Mar. 5, 2012), *aff'd*, 504 F. App'x 14 (2d Cir. 2012) (noting that the issuer had no "obligation to disclose the results of a quarter in progress"); 17 C.F.R. §§ 210.3-12(a), (g)(1)(ii) (explaining that registration statements for certain issuers (like Facebook) must contain financial statements that are no more than 135 days old); *see also* Defs. Securities Br. at 33-36 & n.17.  Consequently, plaintiff's allegations about purported deficiencies in Facebook's disclosures fail to plead either fraud or subjective bad faith.

---

[10] *See Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1163 (9th Cir. 2009) ("[T]here is no duty to disclose income projections in a prospectus."); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1432 (3d Cir. 1997) ("Companies are *not* obligated either to produce or disclose internal forecasts . . . ." (emphasis added)); *Glassman v. Computervision Corp.*, 90 F.3d 617, 631 (1st Cir. 1996) ("The federal securities laws impose no obligation upon an issuer to disclose forward-looking information such as internal projections, estimates of future performance, forecasts, budgets, and similar data." (internal quotation marks omitted)); *In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 458 (S.D.N.Y. 2000) ("The federal securities laws do not obligate companies to disclose their internal forecasts." (internal quotation marks omitted)); *see also* Defs. Securities Br. at 27-33 & nn.14-16.

Plaintiff's contention that the Lead Underwriters acted with fraudulent intent or in bad faith because they did not provide information they learned from Facebook about its internal projections to "all public investors" is baseless.  (Compl. ¶ 3); *see also In re Facebook*, 922 F. Supp. 2d at 472.  Issuers typically generate revenue projections and provide that information to underwriters prior to an IPO.  *See* Westenberg, *Initial Public Offerings* § 19:7.2[B] (explaining that proper pre-IPO analyst diligence includes "discussions with management concerning the company's financial model . . . in order to help [the analyst] develop earnings forecasts").  The underwriters utilize those projections to create models to generate their own estimates of the issuer's future revenue, which are then used to facilitate price discovery with potential investors.  *See* Charles J. Johnson, Jr. & Joseph McLaughlin, *Corporate Finance and the Securities Laws* § 3.04[A][6] (4th ed. 2012 Supp.) (noting that disclosure of revenue projections to underwriters "serve[s] the valid corporate purpose[] of assisting in the price discovery process").  Plaintiff's allegations therefore are entirely consistent with widely accepted industry practices and are insufficient to plead fraud or subjective bad faith.

Plaintiff's allegations that the Lead Underwriters subsequently communicated with investors to market the IPO (including at Facebook's road show events), and shared their own revenue estimates with those investors, similarly reflect standard and widespread industry practices and do not plead fraud or bad faith.  *See* Patrick J. Schultheis *et al.*, *The Initial Public Offering:  A Guidebook For Executives & Boards of Directors* 183 (Bowne 3d ed. 2008) ("The primary purpose of the road show is to sell the offering shares to institutional investors."); Johnson & McLaughlin, *Corporate Finance and the Securities Laws* § 3.04[A][6] (noting the typical practice of "lead underwriter[s] orally providing estimates to institutional investors").  Underwriters use these conversations to gauge investor interest and engage in price discovery,

28

which is key information as underwriters prepare for the IPO.  *See* Commission Guidance

Regarding Prohibited Conduct in Connection with IPO Allocations, Release No. 33-8565, 2005

WL 1641394, at *5 (Apr. 7, 2005) ("[U]nderwriters seek information from investors that will

assist them in determining particular investors' interest in the company, assessing demand for the

offering, and improving pricing accuracy for the offering.").  Underwriters provide estimates to

institutional investors during these discussions to assist in the price discovery process, because

such information is helpful to making a decision on valuation.  *See* Johnson & McLaughlin,

*Corporate Finance and the Securities Laws* § 3.04[A][6] ("[T]he 'clearing price' for the IPO will

be established on the basis of what the institutional customers are willing to pay for the IPO

shares.").[11]

Plaintiff does not allege (nor could he) that Facebook or the Lead Underwriters were

obligated to communicate initial forecasts to all investors.  Rather, he contends that they failed to

disclose revised forecasts to all investors.  But, having not disclosed earlier forecasts, Facebook

and the Lead Underwriters certainly had no duty to disclose revisions to those non-public

figures.  *See, e.g.*, *In re Duane Reade Inc. Sec. Litig.*, No. 02 Civ. 6478 (NRB), 2003 WL

22801416, at *7 (S.D.N.Y. Nov. 25, 2003) (finding no duty to disclose updated projections, even

---

[11] Plaintiff intimates that there was something nefarious about Facebook's decision to communicate its revised projections orally to analysts, an approach plaintiff alleges was taken to avoid Regulation FD.  (Compl. ¶ 28.)  But Regulation FD does not prohibit such communications.  To the contrary, it expressly permits issuers to engage in oral communications in connection with initial public offerings without having to disclose the contents of those communications to all potential investors.  *See* 17 C.F.R. § 243.100(b)(2)(iii); *see also* Sec. Offering Reform, 70 Fed. Reg. at 44760 ("Regulation FD will not apply to . . . [a]n oral communication made in connection with the registered securities offering after filing of the registration statement."); Defs. Securities Br. at 36-39 & nn.18-19.  As recently as 2005, the SEC expressed its continued belief that "subjecting oral communications that occur in connection with a registered offering in a capital formation transaction to a public disclosure requirement could adversely affect the capital formation process."  Sec. Offering Reform, 70 Fed. Reg. at 44760.  Facebook acted in a manner entirely consistent with the federal securities laws.

where "defendants may have learned before the close of the second quarter that their prior predictions would prove incorrect"); *In re Quintel Entm't Inc. Sec. Litig.*, 72 F. Supp. 2d 283, 292 (S.D.N.Y. 1999) ("[T]here is no duty to update mere expressions of opinion or exclusively forward-looking statements."). And Facebook did not become obligated to broadly disclose its revised projections simply because it communicated that information to certain analysts who, in turn, allegedly spoke with institutional investors. *See* Johnson & McLaughlin, *Corporate Finance and the Securities Laws* § 3.04[A][6] ("Having received earlier estimates, the institutional customers should of course receive any updated estimates.").

Nor can plaintiff premise a lack of good faith on allegations about the short position resulting from over-allotments. As shown above, over-allotment short sales are permitted under SEC regulations and are a regular, even essential, aspect of underwriters' price-support activities. (*Supra* at 5-8.) The SEC expressly recognizes that such short positions may "be covered by exercising the [over-allotment] option or by purchasing shares in the market once secondary trading begins." Amendments to Regulation M, 69 Fed. Reg. at 75780. And, the SEC has exempted short sales and covering purchases in share offerings from Section 16. *See* 17 C.F.R. § 240.16a-7(a)(2)(ii) (exempting from Section 16(a) any transaction "to cover an over-allotment or other short position created in connection with [an offering]"); *see also id.* § 240.16c-2 (exempting over-allotment short sales from prohibition against short selling by Section 16 insiders). These rules are designed to ensure an orderly market for a new issue; any profit or loss resulting from activity permitted by the rules is incidental.

The complaint also alleges that Morgan Stanley was fined $5 million by the Massachusetts Securities Division "for giving analysts information with respect to Facebook that was not provided to all investors." (Compl. ¶ 40.) As a threshold matter, Morgan Stanley did

not admit any of the allegations in the consent order.  *See* Rouhandeh Decl. Ex. C (Consent

Order) at 1.  Moreover, the consent order supplies no indication whatsoever that the settlement

related to a failure to communicate with all investors in the IPO.  *See id.* at 4-8, 19-21 (citing

alleged violation of 2003 consent order that nowhere suggests that information given to analysts

must be provided to all investors).  Indeed, plaintiff alleges no facts to support this conclusory

assertion about the basis for the penalty.  Such conclusory allegations need not be credited.  *See,*

*e.g.*, *Simms v. City of New York*, 480 F. App'x 627, 629 (2d Cir. 2012).

    Plaintiff's allegation that J.P. Morgan and Goldman Sachs obtained fees by lending out

Facebook stock to short-selling clients in the ordinary course also fails to show fraud or bad-faith

conduct in connection with the underwriting.  (Compl. ¶¶ 3, 35.)  Plaintiff does not allege that

such share lending is prohibited, or even unusual.  To the contrary, as plaintiff's own source for

this allegation makes plain, such share lending is a common industry practice.  *See* Rouhandeh

Decl. Ex. G (Tom Lauricella *et al.*, *Short Sellers Find Friends in Banks*, Wall St. J., May 25,

2012) (explaining that "it isn't uncommon for Wall Street firms to make shares available for

shorting on IPOs they manage").  In any event, to the extent that plaintiff attempts to plead

scienter by alleging that any of the Lead Underwriters earned profits through ordinary-course

IPO underwriting practices (Compl. ¶¶ 35, 42), such allegations are insufficient to plead a strong

inference of scienter.  *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, No. 12 Civ.

3723 (RJS), 2013 WL 1294668, at *14 (S.D.N.Y. Mar. 28, 2013) (desire to earn transactional

fees insufficient to allege scienter); *Cohen v. Stevanovich*, 722 F. Supp. 2d 416, 429 (S.D.N.Y.

2010) (Sweet, J.) (rejecting allegation that defendants "engaged in short selling for profit in their

own accounts" as "exactly the kind[] of generalized profit-seeking motive[] that courts have

repeatedly rejected").

At bottom, the complaint allegations are simply implausible and would potentially vitiate the Rule 16a-7 exemption for virtually every IPO. It would be contrary to the Lead Underwriters' long-term economic interests to jeopardize their franchises as market leaders for securities distribution services by seeking to profit improperly from one of the most closely watched IPOs (*see* Compl. ¶ 13), particularly where the amounts involved would "likely amount[] to only a small percentage of their annual revenues." *In re WRT Energy Sec. Litig.*, No. 96 Civ. 3610, 3611 (JFK), 1997 WL 576023, at *12 (S.D.N.Y. Sept. 15, 1997), *rev'd on other grounds*, 75 F. App'x 839 (2d Cir. 2003); *see also Kalnit v. Eichler*, 264 F.3d 131, 140-41 (2d Cir. 2001) ("Where plaintiff's view of the facts defies economic reason . . . [it] does not yield a reasonable inference of fraudulent intent." (internal quotation marks omitted)). Nor do the complaint allegations create any inference of recklessness on the part of the Lead Underwriters. *See In re LaBranche Sec. Litig.*, 405 F. Supp. 2d 333, 358 (S.D.N.Y. 2005) (Sweet, J.) ("In the context of securities fraud claims, the Second Circuit has defined recklessness as an *egregious refusal* to see the obvious, or to investigate the doubtful." (emphasis added) (internal quotation marks omitted)).

In short, the complaint, measured against any pleading standard, raises no question as to whether the transactions at issue are exempt under Rule 16a-7. The only nonconclusory allegations that the Lead Underwriters acted with fraudulent intent are indistinguishable from the allegations asserted in the consolidated securities class action pending before this Court, which *disclaims* any allegation of fraud or subjective bad faith on the part of the defendant participants in the Facebook IPO, instead asserting claims under Sections 11 and 12 of the Securities Act. Whatever the merits of those assertions, disclosure violations have no bearing on the applicability of Section 16(b) or the exemption of Rule 16a-7, which are limited only by the

requirement of "good faith" participation in securities distributions, not by any requirement that an offering be fully compliant with every applicable statute or rule. Putting fraud to the side, plaintiff's allegations simply identify standard industry practices, approved by the SEC, and thus do not support any inference of subjective bad faith.

## IV.    THE COMPLAINT FAILS TO PLEAD THAT GOLDMAN SACHS OBTAINED PROFITS FROM ITS ALLEGED AFTERMARKET PURCHASES AND SALES

The complaint does not state a claim under Section 16(b) against Goldman Sachs based on amorphous allegations about trading in the third quarter of 2012.

As explained above, the complaint fails to plead that Goldman Sachs was a beneficial owner of Facebook's stock under Section 16(b) at the times of the transactions at issue. (*Supra* at 16-20.) For this reason alone, the claim against Goldman Sachs is deficient and must be dismissed.

The claim is also defective because it fails to plead facts sufficient to state a plausible claim that Goldman Sachs earned short-swing profits under Section 16(b). Plaintiff alleges that Goldman Sachs purchased approximately 9.5 million shares of Facebook common stock in May 2012, when the share price ranged from $45.00 to $26.83 per share.[12]  (Compl. ¶ 43.) It also alleges that Goldman Sachs sold approximately 5.6 million shares between July 1 and September 30, 2012, when the price ranged from $32.88 to $17.55. (Compl. ¶ 45.) Notwithstanding the overlapping price ranges during these periods, and without any allegation as to when shares were actually bought or sold, or at what price or for whose account (firm proprietary, firm market-making or customer), plaintiff contends that Goldman Sachs earned short-swing profits on the

---

[12] The complaint alleges a share price range between May 18 and June 30, 2012 (Compl. ¶ 43), but the Court can take judicial notice of the Facebook share price for the period during May when plaintiff alleges the purchases were made. *See Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 166 n.8 (2d Cir. 2000).

shares it allegedly had acquired in May 2012 and sold in the third quarter.  (Compl. ¶ 45.)[13]  The speculation that is the basis for the claim falls short of the plausible showing necessary to state a claim.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ("Because the plaintiffs here have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed."); *Chechele v. Morgan Stanley*, 896 F. Supp. 2d 297, 304-05 (S.D.N.Y. 2012) (dismissing Section 16(b) claim because allegations about certain purchases and sales constituted "mere speculation"); *cf. Scheetz*, 819 F. Supp. 2d at 350 (dismissing Section 16(b) claim where allegations regarding group status were "commingled conclusion and speculation").

---

[13] Plaintiff's conclusory allegation that Goldman Sachs acquired its shares in May 2012 fails to account for Facebook's express disclosure in its Registration Statement that The Goldman Sachs Group, Inc. owned approximately 14.21 million shares stemming from a pre-IPO investment and would sell approximately 6.18 million shares in the IPO, leaving approximately 8.03 million of the pre-IPO shares after the IPO.  *See* Rouhandeh Decl. Ex. A (Final S-1) at 144 nn.22-23.

## **<u>CONCLUSION</u>**

The Court should dismiss the complaint for failure to state a claim under Rule 12(b)(6) of

the Federal Rules of Civil Procedure.

Dated:   New York, New York
       October 16, 2013

                                  DAVIS POLK & WARDWELL LLP

                    By:   /s/ James P. Rouhandeh

                                  James P. Rouhandeh
                                  Charles S. Duggan
                                  Andrew Ditchfield

                                  450 Lexington Avenue
                                  New York, New York 10017
                                  Telephone:     (212) 450-4000
                                  Facsimile:      (212) 701-5800

                                  *Attorneys for Defendants Morgan Stanley
                                  & Co. LLC, J.P. Morgan Securities LLC,
                                  and Goldman, Sachs & Co.*