UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------X

IN RE FACEBOOK, INC., IPO SECURITIES AND
DERIVATIVE LITIGATION,                        OPINION
                                              MDL No. 12-2389


-------------------------------------X        Case Relates to:
                                                13 Civ. 2830
GAYE JONES, and HOLLY MCCONNAUGHEY,
Derivatively on Behalf of
FACEBOOK, INC.,

                    Plaintiffs,

      -against-

MARK ZUCKERBERG, MARC L. ANDREESSEN,
ERSKINE B. BOWLES, JAMES W. BREYER,
DONALD E. GRAHAM, REED HASTINGS,
SHERYL K. SANDBERG, PETER A. THIEL,
DAVID EBERSMAN, CIPOLA HERMAN, MORGAN
STANLEY & CO. LLC, J.P. MORGAN
SECURITIES LLC and GOLDMAN, SACHS
& CO.,

                    Defendants.

      - and –

FACEBOOK, INC., a Delaware corporation,

                    Nominal Defendant.

-------------------------------------X


A P P E A R A N C E S:


            Attorneys for Plaintiffs

            ROBBINS GELLER RUDMAN & DOWD LLP
            58 South Service Road, Suite 200
            Melville, New York 11747

```
By:   Samuel H. Rudman, Esq.
      Darren J. Robbins, Esq.
```

PRICKETT, JONES & ELLIOTT, P.A.
1310 N. King Street
Wilmington, Delaware 19801
By:  Michael Hanrahan, Esq.
     Paul A. Fioravanti, Jr., Esq.
     Patrick W. Flavin, Esq.


Attorneys for Nominal Defendant Facebook

KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
By:  Andrew B. Clubok, Esq.
     Brant W. Bishop, Esq.
     Susan E. Engel, Esq.
     Joseph Cascio, Esq.
     Kellen S. Dwyer, Esq.

WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019
By:  Richard D. Bernstein, Esq.
     Tariq Mundiya, Esq.
     Todd G. Cosenza, Esq.
     Elizabeth J. Bower, Esq.
     Sameer Advani, Esq.

**Sweet, D.J.**

Pursuant to the transfer order from the United States Judicial Panel on Multidistrict Litigation (the "MDL Panel"), entered on October 4, 2012, 41 actions stemming from the May 18, 2012 initial public offering ("IPO") of Facebook, Inc. ("Facebook") are presently before this Court.

The instant motions relate to Plaintiffs Gaye Jones ("Jones") and Holly McConnaughey ("McConnaughey") (collectively, the "Plaintiffs") shareholder derivative actions against the named Defendants[1] and Nominal Defendant Facebook, Inc. ("Facebook," the "Company" or "Nominal Defendant") (collectively, the "Defendants") alleging breaches of fiduciary duty, insider trading, unjust enrichment and other violations of Delaware corporate law.

Plaintiffs move to remand their shareholder derivative actions ("Removed Actions") to the Court of Chancery of the

---

[1] The named defendants include Mark Zuckerberg ("Zuckerberg"), Marc L. Andreessen ("Andreessen"); Erskine B. Bowles ("Bowles"); James B. Breyer ("Breyer"); Donald E. Graham ("Graham"); Reed Hastings ("Hastings"); Peter A. Thiel ("Thiel"); Sheryl K. Sandberg ("Sandberg") (collectively the "Director Defendants"); David A. Ebersman ("Ebersman"); Cipora Herman ("Herman") (collectively with Sandberg, the "Officer Defendants"); Morgan Stanley & Co. LLC ("Morgan Stanley"); J.P. Morgan Securities LLC ("J.P. Morgan"); and Goldman, Sachs & Co. ("Goldman Sachs") (collectively the "Lead Underwriters" or "Underwriter Defendants").

State of Delaware, pursuant to 28 U.S.C. § 1447(c).  Plaintiffs
originally filed the Removed Actions in the Delaware Chancery
Court, asserting claims against the Defendants for breaches of
fiduciary duty, insider trading, unjust enrichment and other
violations of Delaware corporate law.  Defendants removed the
Removed Actions to the District Court of Delaware, and the MDL
Panel transferred the Removed Actions to this Court.[2]

Nominal Defendant contends that certain threshold
grounds for dismissal should be considered before Plaintiffs'
motion to remand.  Facebook has accordingly moved to dismiss the
Removed Actions on the grounds of standing and ripeness pursuant
to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil
Procedure, and the standing and demand requirements of Rule 23.1
of the Federal Rules of Civil Procedure.

Upon the facts and conclusions set forth below,
Facebook's threshold grounds for dismissal will be resolved
first, and their motion to dismiss is granted in part and denied
in part.  Having granted Facebook's motion to dismiss in part,

---

[2] The Jones and MacCaughney actions were consolidated on April 2, 2013 by the
Court of Chancery of the State of Delaware.  As noted below, Defendants
removed the actions to the United States District Court for the District of
Delaware on April 5, 2013, claiming that this Court has original jurisdiction
pursuant to 28 U.S.C. § 1331, and the MDL panel transferred the Removed
Actions to this Court on April 18, 2013.  The Jones action was deemed the
operative complaint, and all cites to the Removed Actions' compliant is in
reference to the Jones Complaint (the "Complaint" or "Compl.").

Plaintiffs' motion to remand is denied as moot.

## I. **Prior Proceedings**

Actions stemming from the May 18, 2012 IPO of Facebook are presently before this Court. Pursuant to this Court's December 6, 2012 Opinion, the actions alleging violations of the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act") were consolidated (collectively, the "Securities Class Actions") and Lead Plaintiffs were appointed. The class actions against the NASDAQ OMX Group Inc. and The NASDAQ Stock Market LLC (collectively "NASDAQ") were also consolidated alleging federal securities (the "NASDAQ Securities Actions") and negligence claims (the "NASDAQ Negligence Actions") (collectively, the NASDAQ Actions"). The cases alleging derivative claims (the "Derivative Actions") are currently not consolidated, and individual plaintiffs in the Derivative Actions have brought separate actions. The instant motions relate to two of the Derivative Actions.

On February 13, 2013, the first four of the Derivative Actions, filed by Plaintiffs Childs, Levy, Cole and Hubuschman were dismissed (the "Dismissed Derivative Actions"). In re

Facebook. IPO Sec. & Derivative Litig., 922 F. Supp. 2d 445, 475
(S.D.N.Y. 2013) ("Derivative Opinion" or "Derivative Op.").
Those Dismissed Derivative Actions were dismissed on standing
and ripeness grounds. Id. The plaintiffs' leave to replead
within twenty days was granted. Id. The parties then entered
into a stipulation, approved by the Court on March 7, 2013,
which permitted those four plaintiffs to "either file an amended
complaint or notify Defendants that such Plaintiff does not
intend to file an amended complaint by 20 days after this
Court's resolution of Defendants' forthcoming motion(s) to
dismiss" the consolidated securities class action. (Cascio
Decl. Ex. B).

A fifth plaintiff, Robert Crocitto, filed another
shareholder derivative suit in this Court on February 4, 2013,
claiming that he owned an "interest[]" in Facebook shares before
the IPO based on his alleged purchase of units in an investment
vehicle that converted into stock "upon the IPO." Crocitto v.
Zuckerberg Compl., No. 13-cv-0786, ¶ 7. In light of the
February 13, 2013 dismissal of the Childs, Levy, Cole, and
Hubuschman actions, the parties entered into a similar
stipulation with Plaintiff Crocitto, deferring the filing of an
amended complaint until 20 days after the resolution of the
motion to dismiss the consolidated Securities Class Actions.

(Cascio Decl. Ex. B.)

On March 1, 2013, Plaintiffs Jones and McConnaughey commenced the instant Removed Actions in the Delaware Court of Chancery.  On April 2, 2013, the cases were consolidated, with the Jones action deemed the operative complaint.  The Jones Complaint alleges breaches of fiduciary duty, insider trading, unjust enrichment and other violations of Delaware corporate law by Defendants.  (Compl. ¶ 1.)  Defendants removed to the United States District Court for the District of Delaware on April 5, 2013, and the MDL panel transferred Jones to this Court on April 18, 2013, after Plaintiffs filed no opposition to the Conditional Transfer Order.

On April 23, 2013, Plaintiffs filed their motion to remand to the Delaware Court of Chancery.  The hearing for the motion to remand was scheduled for September 25, 2013.  Nominal Defendant filed its motion to dismiss the Removed Actions on June 7, 2013.

Oral arguments were held on October 8, 2013, and the motions were marked fully submitted on the same day.

II.  **Allegations of the Complaint**

7

The allegations in the Complaint involve the events surrounding and arising out of Facebook's May 18, 2012 IPO.[3]  On February 1, 2012, in preparation for its IPO, Facebook filed a Form S-1 Registration Statement (the "Feb 1 Registration Statement") with the U.S. Securities Exchange Commission (the "SEC").   Facebook subsequently amended the registration statement several times before filing their final Form S-1/A on May 16, 2012 (the "Registration Statement").[4]

From the Feb 1 Registration Statement to the final Registration Statement, Facebook emphasized the importance of the increased use of mobile devices to access Facebook.  (Compl. ¶ 53); see also Registration Statement, at 4 ("We believe that mobile usage of Facebook is critical to maintaining user growth and engagement over the long term.").

The Registration Statement noted:

Worldwide mobile MAUs [monthly active users] increased by 69% from 288 million as of March 31, 2011 to 488

---

[3] Information from Securities and Exchange Commission ("SEC") filings by Facebook, in particular its Form S-1 Registration Statement and amended Form S-1/A Registration Statements are noted where relevant.

[4] All of Facebook's Form S-1 Disclosures, including amendments, and the SEC's declaration of effectiveness are searchable on the SEC's EDGAR search platform at http://www.sec.gov/edgar/searchedgar/webusers.htm.

million as of March 31, 2012.  In all regions, an
increasing number of our MAUs [monthly active users]
are accessing Facebook through mobile devices, with
users in the United States, India, Indonesia, and
Brazil representing key sources of mobile growth over
this period.  We estimate that approximately 83
million mobile MAUs [monthly active users] accessed
Facebook solely through mobile apps or our mobile
website during the month ended March 31, 2012, and we
believe that mobile-only users increased relative to
the same period in the prior year.  The remaining 405
million mobile MAUs [monthly active users] accessed
Facebook from both personal computers and mobile
devices during that month. . . . Improving our mobile
products and increasing mobile usage of Facebook are
key company priorities that we believe are critical to
help us maintain and grow our user base and engagement
over the long term.

Registration Statement, at 50.


     The Registration Statement also stated that:


While most of our mobile users also access Facebook
through personal computers, we anticipate that the
rate of growth in mobile usage will exceed the growth
in usage through personal computers for the
foreseeable future . . . .

Id., at 14.


     The Registration Statement included warnings regarding

its Facebook's business risks including:

9

- Growth in use of Facebook through our mobile products, where our ability to monetize is unproven, as a substitute for use on personal computers may negatively affect our revenue and financial results. Id., at 5.

- We had 488 million MAUs [monthly active users] who used Facebook mobile products in March 2012. While most of our mobile users also access Facebook through personal computers, we anticipate that the rate of growth in mobile usage will exceed the growth in usage through personal computers for the foreseeable future, in part due to our focus on developing mobile products to encourage mobile usage of Facebook. We have historically not shown ads to users accessing Facebook through mobile apps or our mobile website. In March 2012, we began to include sponsored stories in users' mobile News Feeds. However, we do not currently directly generate any meaningful revenue from the use of Facebook mobile products, and our ability to do so successfully is unproven. We believe this increased usage of Facebook on mobile devices has contributed to the recent trend of our daily active users (DAUs) increasing more rapidly than the increase in the number of ads delivered. If users increasingly access Facebook mobile products as a substitute for access through personal computers, and if we are unable to successfully implement monetization strategies for our mobile users, or if we incur excessive expenses in this effort, our financial performance and ability to grow revenue would be negatively affected. Id., at 14.

- Increasing Mobile Usage. Increasing use of Facebook on mobile devices will also affect our performance, particularly if mobile use substitutes for use on personal computers. Historically, we have not shown ads to users accessing Facebook through mobile apps or our mobile website and we cannot be certain that our mobile monetization approaches will be successful in generating meaningful revenue. We cannot quantify the extent to which mobile usage of

Facebook is substituting for, rather than incremental to, usage of Facebook through personal computers, but we generally expect mobile usage to increase at a faster rate than usage through personal computers for the foreseeable future. Id., at 53.

- [I]ncreased user access to and engagement with Facebook through our mobile products, where we do not currently directly generate meaningful revenue, particularly to the extent that mobile engagement is substituted for engagement with Facebook on personal computers where we monetize usage by displaying ads and other commercial content. Id., at 13.

- Growth trends in MAUs [monthly active users], DAUs [daily active users], and mobile MAUs [monthly active users] are critical variables that affect our revenue and financial results by influencing the number of ads we are able to show, the value of those ads, the volume of Payments transactions, as well as our expenses and capital expenditures. Id., at 52.

The Registration Statement disclosed that advertising revenue grew 69% in 2011 compared to 2010 due to a 42% increase in ads delivered and an 18% increase in average price per ad delivered. Registration Statement, at 60-61.

On April 16, 2012, an analyst diligence session (the "Analyst Session") was held at Facebook's corporate offices. (Compl. ¶ 37.) At that session, Ebersman, Facebook's Chief

11

Financial Officer ("CFO") told the analysts present that Facebook's internal revenue forecasts for the second quarter of 2012 was from $1.1 billion to $1.2 billion and that 2012 revenues were forecasted to be $5 billion. (Id.) Following the Analyst Session, Morgan Stanley, J.P. Morgan and Goldman Sachs prepared revenue and earnings estimates for Facebook, which took into account the estimates Ebersman had provided for the Analyst Session. (Id. ¶ 38.)

Facebook added a discussion of revenue for the first quarter of 2012 into its fourth amended Registration Statement, filed on April 23, 2012 (the "April 23 Registration Statement"). (Compl. ¶ 60.) The April 23 Registration Statement stated that a 37% increase in advertising revenue for the first quarter of 2012 compared to the first quarter of 2011 was said to be "due to a 35% increase in the number of ads delivered. The increase in ads delivered was driven primarily by user growth; MAUs [monthly active users] grew 33% from March 31, 2011 to March 31, 2012 and average DAUs [daily active users] grew 41% from March 2011 to March 2012." April 23 Registration Statement, at 56.

Facebook filed a fifth amended Registration Statement on May 3, 2012 (the "May 3 Registration Statement"). (Id. ¶ 39.) The Registration Statement indicated that Facebook

12

anticipated the IPO offering price to be between $28 and $35 per share. (Id.)  The May 3 Registration Statement did not contain any comment regarding Facebook's experiences to date in the second quarter of 2012. (Id.)

On May 7, 2012, Facebook began its roadshow for the IPO.  During the evening of May 7, 2012, Facebook advised Morgan Stanley that Facebook's estimates for its second quarter revenue were going to be at the low end of the $1.1 to $1.2 billion previous estimate.  (Compl. ¶ 40.)  On that night, Ebersman informed Michael Grimes ("Grimes"), a Managing Director and Co-Head of Global Technology Investment Banking at Morgan Stanley, that user growth was outpacing ad growth because Facebook had only recently begun showing mobile sponsored stories, and certain product decisions had resulted in fewer ads per page. (Id. ¶ 40.)  Following this meeting, Grimes informed others at Morgan Stanley about Facebook's reduction in revenue projections. (Id.)

By May 8, 2012, Facebook had lowered its revenue estimates for the second quarter and decreased its revenue estimate for the 2012 year by 3 to 3.5% (i.e., $150 to $175 million) below the previously forecasted $5 billion. (Id. ¶¶ 4, 41.)

On or around May 8, 2012, Grimes advised Ebersman that Facebook should update its analyst guidance given the uncertainty Facebook had about meeting its revenue projections. Grimes spoke with counsel and Ebersman about a "potential solution that would update analyst guidance without creating the appearance of not providing the underlying trend information to all [i]nvestors." (Id. ¶ 42.) The solution was to file an amendment to the Registration Statement with updated second quarter trend information with a subsequent communication to analysts offering them updated guidance based upon the public filing. (Id.)

In the evening of May 8, 2012, Facebook management, Grimes and others from Morgan Stanley, Facebook's counsel and Morgan Stanley's counsel had a discussion regarding updating Facebook's Registration Statement. During this discussion, Ebersman expressed concern that if Facebook were to provide guidance to analysts then it could create an appearance that the underlying business information wasn't shared with all investors. (Compl. ¶ 43.)

On May 9, 2012, Ebersman emailed Facebook's Board of Directors that an amended Registration Statement would be filed.

14

He noted that "for Q2 we are forecasting $1.14B while analysts are forecasting $1.18B and some investors have told us they believe the analysts' numbers are 'sandbagged' and they are expecting higher [sic] . . . . We believe this additional disclosure will help us to continue to deliver accurate messages at the road show meetings (without someone claiming we are providing any selective disclosure to big accounts only) . . . ." (Id. ¶ 44.)

On May 9, 2012, Facebook filed an amended Registration Statement (the "May 9 Registration Statement"). (Compl. ¶ 45.) The May 9 Registration Statement contained a description that indicated the trend of daily active users was increasing more rapidly than ads delivered was continuing. (Id.) As with the May 3 Registration Statement, the May 9 Registration Statement made no mention about trends beyond the second quarter or the reduced estimates for 2012 yearly revenue and earnings. (Id.)

The May 9 Registration Statement included a discussion on first quarter 2012 revenue:

> Based upon our experience in the second quarter of 2012 to date, the trend we saw in the first quarter of DAUs [daily active users] increasing more rapidly than the increase in number of ads delivered has continued. We believe this trend is driven in part by increased

15

usage of Facebook on mobile devices where we have only
recently begun showing an immaterial number of
sponsored stories in News Feed, and in part due to
certain pages having fewer ads per page as a result of
product decisions.

May 9 Registration Statement, at 57.

Minutes after filing the May 9 Registration Statement,
Defendant Herman, Facebook's Treasurer, made several scripted
calls to analysts at Morgan Stanley, J.P. Morgan, Goldman Sachs
and other brokerages.  The script for the call stated:

> I wanted to make sure you saw the disclosure we made
> in our amended filing.  The upshot of this is that we
> believe we are going to come in [on] the lower end of
> our $1.1 to $1.2 bn range for Q2 based upon the trends
> we described in the disclosure.  A lot of investors
> have been focused on whether the trend of ad
> impressions per user declining (primarily as a result
> of mobile) was a one-time, or continuing, occurrence.
> As you can see from our disclosure, the trend is
> continuing.  You can decide what you want to do with
> your estimates, our long term conviction is unchanged,
> but in the near term we see these trends continuing,
> hence our being at the low end of the $1,100 + $1,200
> range.

(Compl. ¶ 46.)  Herman also noted that the decrease in revenues
could run "over the next six to nine months as this run[s]
through the rest of the year," which would amount to "3 to [3.5]
off the 2012 $5 billion target."  (Id.)

As a result of the calls from Facebook, the Lead Underwriters cut their second quarter 2012 and 2012-year estimates. The Lead Underwriters then advised certain of their respective clients about these revisions. (Compl. ¶ 48.) The Lead Underwriters revised their own projections for the Company from their previous analysis as follows: Morgan Stanley reduced its second quarter revenues by 3.61% and 2012 revenues by 5.45%; J.P. Morgan reduced its second quarter revenues by 4.06% and 2012 revenues by 7.28%; and Goldman Sachs reduced its second quarter revenues by 6.13% and 2012 revenues by 6.79%. (Id. ¶ 49.)

On May 15, 2012, the price range for the IPO was increased, and on May 16, 2012, the number of shares in the IPO was increased. On May 17, 2012, Facebook's pricing committee determined to offer the shares at $38 per share. (Compl. ¶ 51.) On May 18, 2012, the Company offered 421 million shares of Facebook common stock to the public at $38.00 per share on the NASDAQ stock exchange, thereby valuing the total size of the IPO at more than $16 billion. (Id. ¶ 3.)

After the IPO, the financial media began to report on Morgan Stanley's influence on the Company's IPO. (Compl. ¶ 68.)

17

On May 21, 2012, The New York Times reported that "[r]ivals involved in the Facebook underwriting process say that Morgan Stanley exerted an enormous amount of control over important aspects of the process" and "ignored some input about pricing."[5] Morgan Stanley also "contacted other bankers to discuss raising the offering price as high as $38 a share, up from the original estimates of $28 to $35 a share," but "[s]ome of the firms resisted, arguing that the company's fundamentals did not justify a higher valuation."[6]  (Compl. ¶ 69.)


Forbes further reported on May 21, 2012:


> Facebook must now contend with a supply-demand imbalance because it increased the size of the offering by 25%, says Wedbush Securities analyst Michael Pachter.  "This is a good lesson in what happens when underwriters and companies are greedy and believe their own hype," he says.  "The market simply was unprepared to absorb $18 billion worth of stock, and the underwriters should have told Facebook to limit the offering, to probably below $10 billion."[7]


(Compl. ¶ 79.)

---

[5] Michael J. De La Merced, et al., As Facebook's Stock Struggles, Fingers Start Pointing, THE NEW YORK TIMES, May 21, 2012, http://dealbook.nytimes.com/2012/05/21/as-facebooks-stock-struggles-fingers-start-pointing/.

[6] Id.

[7] Abram Brown, Facebook Plunges Below IPO Price in Frenetic Trading, FORBES, May 21, 2012, http://www.forbes.com/sites/abrambrown/2012/05/21/facebook-drops-below-ipo-price-in-pre-market-trading/.

On May 22, 2012, <u>Reuters</u> revealed:

> In the run-up to Facebook's $16 billion IPO, Morgan Stanley, the lead underwriter on the deal, unexpectedly delivered some negative news to major clients: The bank's consumer Internet analyst, Scott Devitt, was reducing his revenue forecasts for the company.  The sudden caution very close to Facebook's initial public offering - while an investor road show was under way - was a big shock to some, said two investors who were advised of the revised forecast. . . .  The people familiar with the revised Morgan Stanley projections said Devitt lowered his revenue estimate for the second quarter and also cut his full-year 2012 revenue forecast. . . .  "That deceleration freaked a lot of people out," the investor added.  Scott Sweet, senior managing partner at the research firm IPO Boutique, said he was also aware of the reduced estimates.   "They definitely lowered their numbers and there was some concern about that," he said.  "My biggest hedge fund client told me they lowered their numbers right around mid-road show."   That client, he said, still bought the issue but "flipped his IPO allocation and went short on the first day."[8]

(Compl. ¶¶ 70-72.)

Subsequent to the <u>Reuters</u> report, other commentators noted the unusual conduct of Defendants leading up to the IPO. <u>Business Insider</u> reported that the reduction in revenue estimates during the roadshow was something that they have never

---

[8] Alistair Barr, <u>Insight:  Morgan Stanley Cut Facebook Estimates Just Before</u> <u>IPO</u>, Reuters, May 22, 2012, http://www.reuters.com/article/2012/05/22/us-facebook-forecasts-idUSBRE84L06920120522.

seen "during 20 years in and around the tech IPO business."[9]   The

article continued:

> But, just as important, news of the estimate cut was
> passed on only to a handful of big investor clients,
> not everyone else who was considering an investment in
> Facebook.   This is a huge problem, for one big reason:
> Selective   dissemination.     Earnings   forecasts   are
> material   information,   especially   when   they   are
> prepared by analysts who have had privileged access to
> company management.   As lead underwriters on the IPO,
> these analysts would have had much better information
> about the company than anyone else.   So the fact that
> these   analysts   suddenly   all   cut   their   earnings
> forecasts at the same time, during the roadshow, and
> then this information was not passed on to the broader
> public, is a huge problem.[10]

(Compl. ¶ 75.)

On May 23, 2012, <u>Reuters</u> reported that:

> [Facebook]   advised   analysts   for   underwriters   to   reduce
> revenue   and   earnings   forecasts   .  .  .  .   around   May   9,   the
> day   the   company   published   an   amended   prospectus   that
> included a cautionary note about how Facebook's users were
> increasingly   using   mobile   devices,   which   generate   less
> advertising   revenue   for   the   company. .  .  .   [I]n   the
> following days, the analysts for lead underwriter Morgan
> Stanley and at least three other underwriters reduced their
> forecasts   for   Facebook's   second-quarter   and   full-year
> revenue,   and   communicated   this   to   at   least   some   of   their

---

[9]  Henry Blodget, <u>BOMBSHELL: Facebook Bankers Secretly Cut Forecasts For Company In Middle Of IPO Roadshow</u>, BUS. INSIDER, May 22, 2012, http://www.businessinsider.com/facebook-bankers-earnings-forecasts-2012-5#ixzz2mRSwyuUN.

[10]  <u>Id.</u>

institutional clients. . . . Two sources said Morgan
Stanley advised Facebook to urge analysts to lower
forecasts.  "Morgan Stanley bankers were telling the
company how to handle the research analysts," said a source
from one of the underwriting firms with knowledge of the
situation.  "Facebook changed the numbers - they didn't
forecast their business right and they changed their
numbers and told analysts," said another source at one of
the underwriters with knowledge of the situation. "The
underwriters' analysts then all changed their numbers based
on what management was telling them."[11]

(Compl. ¶ 77.)

As the facts emerged regarding Facebook's reduction in

projected revenues, the Company's stock price began to fall.  By

May 30, 2012, the Company's stock price fell to $28.84 per share

from the initial IPO price of $38 per share, a 24% drop.

(Compl. ¶ 79.)  By June 2012, Facebook's stock had lost nearly

30% of its IPO value.  In July 2012, when Facebook announced

second quarter results in line with the lowered revenue

estimates, its stock dropped sharply to more than 40% lower than

the IPO price.  (Id.)

Plaintiffs assert that the Registration Statement

contained untrue and misleading statements of material facts and

omitted to state facts necessary to make the statements not

---

[11] Olivia Oran & Nadia Damouni, Facebook told analysts to cut forecasts before
IPO, REUTERS, May 23, 2013, http://uk.reuters.com/article/2012/05/23/uk-
facebook-analysts-idUKBRE84M0TW20120523.

misleading by failing to disclose (i) up-to-date figures on Facebook's second quarter performance; (ii) Facebook's estimates of the quantitative impact of the trend of increasing mobile usage on its revenues and earnings; and (iii) the revised revenue and earnings estimates of the Lead Underwriters' analysts and analysts for other underwriters who received non-public information concerning the Company's declining second quarter 2012 and year-end 2012 revenue. (Compl. ¶¶ 5, 52.) Plaintiffs also allege that with knowledge of the non-public facts that Facebook had cut its second quarter 2012 and 2012-year financial projections, Defendants Zuckerberg, Breyer and Thiel (the "Selling Directors") sold over $3.9 billion of their personally held Facebook shares in the IPO. (Compl. ¶¶ 3, 9, 86(a).) Plaintiffs contend that the Lead Underwriters and the other Director and Officer Defendants also realized profits as a result of the sale of Facebook shares in the IPO. (Compl. ¶¶ 9-11.)

### III. Subject Matter Jurisdiction And The Threshold Grounds for Dismissal

A "federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit (subject-matter jurisdiction)

and the parties (personal jurisdiction)." Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp., 549 U.S. 422, 430-31, 127 S. Ct. 1184, 167 L. Ed. 2d 15 (2007). "[T]he first and fundamental question is that of jurisdiction . . . This question the court is bound to ask and answer for itself, even when not otherwise suggested, and without respect to the relation of the parties to it." Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 94, 118 S. Ct. 1003, 140 L. Ed. 2d 210 (1998).

The Second Circuit has reiterated that "[j]urisdictional questions . . . should be addressed in the first instance by the District Court." Central States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Manages Care, L.L.C., 433 F.3d 181, 203 (2d Cir. 2005). "This is equally true in the context of removal." Banco De Santander Central Hispano, S.A. v. Consalvi Int'l Inc., 425 F. Supp. 2d 421, 424 (S.D.N.Y. 2006); Bakoss v. Certain Underwriters at Lloyds of London Issuing Certificate No. 0510135, No. 10-CV-1455(DLI)(LB), 2011 WL 4529668, at *4 (E.D.N.Y. Sept. 27, 2011) ("This obligation extends to removal cases.").

Article III courts generally adhere to the principle "that a federal court may not hypothesize subject-matter jurisdiction for the purposes of deciding the merits;" however,

23

the Supreme Court in Ruhrgas AG v. Marathon Oil Co. declined to prescribe a strict mandatory "sequencing of jurisdictional issues." 526 U.S. 574, 577, 119 S. Ct. 1563, 143 L. Ed. 2d 760 (1999). "It is hardly novel for a federal court to choose among threshold grounds for denying audience to a case on the merits." Id. at 585. There is "no underlying jurisdictional hierarchy," and a federal court may adjudicate personal jurisdiction before considering a challenge to subject matter jurisdiction. Id. at 578.

Plaintiffs contend that remand is required before resolution of Nominal Defendant's motion to dismiss since this Court lacks subject matter jurisdiction under 28 U.S.C. § 1331 or supplemental jurisdiction under 28 U.S.C. § 1367. Plaintiffs' central argument is that federal question jurisdiction, and thus subject matter jurisdiction, does not exist since they have pled only Delaware state law causes of action. (Pl. Reply - Motion to Remand, at 3.) In certain cases, courts have chosen to examine motions to remand before other competing motions. In Gibraltar Trading Corp. v. PMC Specialties Group, Inc., 851 F. Supp. 2d 437 (E.D.N.Y. 2011), the District Court granted plaintiff's motion to remand the case to state court rather than decide defendant's motion to transfer the case to a different federal district court. Id. at 441-42.

24

The Gibraltar court noted that "deciding [the transfer motion] first would not result in dismissal, but would improperly maintain federal jurisdiction and transfer the action to the [Southern District of] Ohio Court" and concluded that the remand issue should be examined first. Id. at 441; see also, In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liability Litig., 488 F.3d 112, 123-24 (2d Cir. 2007) [hereinafter MTBE] (where a ruling on the competing motion "would not result in the dismissal of the complaints; . . . we have an obligation to determine whether the district court has subject matter jurisdiction to go forward" first); Consol Energy, Inc. v. Berkshire Hathaway, Inc., 252 F. App'x 481, 483-84 (3d Cir. 2007) (affirming district court's decision to remand rather than addressing other purportedly threshold issues because "the resolution of [the competing] motion would not change the end result - remand to the state court."). Plaintiffs contend that Nominal Defendant has not presented clear grounds for dismissal, and since the Removed Actions would survive Nominal Defendant's motion to dismiss, the motion to remand should be examined first.

Plaintiffs also contend that supplemental jurisdiction under 28 U.S.C. § 1367 is unavailable since courts may only exercise supplemental jurisdiction over non-federal, non-diverse

causes of action that are presented within that same action.
See Mendez v. Roman, No. 3:05-CV-1257, 2006 WL 276976, at *2 (D.
Conn. Feb 2, 2006) (noting that 28 U.S.C. § 1367 "does not
authorize a court to use one case as a platform for 'pulling-up'
claims and parties in another, separate case. Rather, as the
concluding sentence of the statute indicates, supplemental
jurisdiction may be exercised only over claims and parties that
have been joined in a single civil action"). Summarily,
"[s]ection 1367 does not confer original jurisdiction." Divens
v. Avemco Ins. Co., No. 02-1498, 2002 WL 34698097, at *5 (W.D.
Pa. Nov. 20, 2002).


     In contrast, Nominal Defendant asserts that the common
justiciability grounds for dismissal, standing and ripeness,
should be addressed before Plaintiffs' motion for remand.
Nominal Defendant notes that the Derivative Opinion dismissed
the first four Derivative Actions and denied as moot the
associated remand motions, Derivative Op., 922 F. Supp. 2d at
475, and "[a]djudicating [the other derivative] case[s] while
remanding [this one] would be duplicative and beget potentially
conflicting rules by this Court and a state court." (Def. Reply
- Motion to Dismiss, at 2 (quoting Derivative Op., 922 F. Supp.
2d at 456) (internal quotations removed).) Since the Court has
already addressed the issues in the Derivative Opinion, Nominal

26

Defendant contends there is every reason for this Court to address the substantially similar issues in the Removed Actions. (Id., at 6.)

Nominal Defendant further asserts that a federal question will necessarily arise in the Removed Actions, and "federal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." Gunn v. Minton, 133 S. Ct. 1059, 1065 (2013) (quoting Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg., 545 U.S. 308, 313-14 (2005)).

Nominal Defendant also contends that under 28 U.S.C. § 1367(a), the Removed Actions "are so related" to the other Derivative Actions that the Court has jurisdiction over the Removed Actions since the claims "form part of the same case or controversy." (Def. Op. - Motion to Remand, at 21.) Nominal Defendant points out that the "existence of subject matter jurisdiction in one action" can be used "to provide supplemental jurisdiction over claims in a related action" where the underlying facts "substantially overlap." Achtman v. Kirby, McInerney & Squire, LLP, 464 F.3d 328, 335 (2d Cir. 2006).

27

Nominal   Defendant   further   contends   that   the   Securities
Litigation   Uniform   Standards   Act   (the   "SLUSA")   authorizes
removal.   (Def. Op. - Motion to Remand, at 25-29.)


The Court in Gibraltar acknowledged that "'a federal
court has leeway to choose among threshold grounds for denying
audience  to  a  case  on  the  merits.'"  851  F.  Supp.  2d  at  440
(quoting  Sinochem,  549  U.S.  at  431).   Notably,  the  Gibraltar
court saw that "the jurisdictional questions in Sinochem and
Ruhrgas . . . were not easily resolved."  Gibraltar, 851 F.
Supp. 2d at 441.  In contrast, "the [Gibraltar] Court [did] not
find that resolution of subject matter jurisdiction [was] an
'arduous inquiry' that requires the Court to decide . . . [the]
motion to transfer first."[12]   Id. at 441.   A possible "arduous
inquiry"  regarding  subject  matter  jurisdiction  arises  here,
since issues of Delaware law and whether a federal question will
necessarily arise under Plaintiffs' claims, as well as issues
arising under the SLUSA, would have to be addressed.[13]

---

[12] The MTBE Court similarly found that it would first examine removal issues
upon the determination that denying plaintiffs' claims of sovereign immunity
would not result in the dismissal of the complaint.  488 F.3d at 123-24.

[13] While Plaintiffs may characterize their claims as arising solely under
Delaware law, courts must scrutinize each claim and "the allegations in the
complaint," not the plaintiff's characterization of his or her claims.  In re
Rezulin Prods. Liab. Litig., 168 F. Supp. 2d 136, 141 (S.D.N.Y. 2001); see
Vera v. Saks & Co., 335 F.3d 109, 116 n.2 (2d Cir. 2003) (denying remand
because  plaintiff  cannot  "disavow  or  at  least  minimize"  federal  law
allegations).

The Supreme Court noted in Sinochem that "[b]oth Steel Co. and Ruhrgas recognized that a federal court has leeway to choose among threshold grounds for denying audience to a case on the merits." Sinochem, 549 U.S. at 431.  Such threshold non-merits grounds for dismissing a claim include "the resolution of 'justiciability issues before deciding whether jurisdiction is proper.'"  Derivative Op., 922 F. Supp. 2d at 454-55 (quoting Freund v. Rep. of France, 592 F. Supp. 2d 540, 551 (S.D.N.Y. 2008)).  "Justiciability . . . is an umbrella-like term which finds beneath its cover the various doctrines that shape and define our authority to act in particular cases:  ripeness, standing, mootness, advisory opinion, and political question." Jones v. Deutsch, 715 F. Supp. 1237, 1242 (S.D.N.Y. 1989).

The conclusions in the Derivative Opinion for deciding justiciability apply equally to the Removed Actions.  "Avoiding . . . inefficiency and inconsistency . . . warrants the consideration of the justiciability issues before the removal issues."  Derivative Op., 922 F. Supp. 2d at 456.  Even if the Removed Actions were remanded, this Court would still be required to address the same justiciability issues of derivative standing and ripeness in the Dismissed Derivative Actions upon amendment of those complaints and when Defendants move to dismiss Crocitto v. Zuckerberg, et al., 13-cv-0786 (S.D.N.Y.

Feb. 4, 2013). Two justiciability issues, demand futility and ripeness, are identical in all of the Derivative Actions, including the Removed Actions. Adjudicating the Dismissed Derivative Actions and remanding the Removed Actions with its "common issues" "would be duplicative and beget potentially conflicting rulings by this Court" and the Delaware Chancery Court. Derivative Op., 922 F. Supp. 2d at 456.

Given that district courts have the discretion to address non-merits threshold grounds for dismissal before jurisdiction and that considerations of judicial economy and consistency weigh in favor of the same, the issues concerning standing and ripeness will be considered first.

## IV.  **Nominal Defendant's Motion to Dismiss is Granted**

Facebook contends that the Removed Actions should be dismissed pursuant to Fed. R. Civ. P. 12(b)(1), 12(b)(6) and 23.1. First, Nominal Defendant contends that Plaintiffs have not pled specific facts demonstrating that they owned Facebook stock at the time the alleged wrongful transactions took place and therefore cannot establish standing. Second, Nominal Defendant asserts that Plaintiffs' claims are predicated on the resolution of other litigation since the Removed Actions seek to

recover the amounts for which Facebook is liable under the Securities Class Actions, which are currently pending in this Court.     Third, Facebook asserts that the Plaintiffs lack derivative standing since Plaintiffs did not make a pre-suit demand to the Facebook board and have not sufficiently pled demand futility.     Fourth, Nominal Defendant contends that since the Plaintiffs are represented by counsel that previously sued Facebook and sought lead counsel status in the Securities Class Actions, but now are trying to sue derivatively on behalf of Facebook, Plaintiffs are inadequate representatives under Fed. R. Civ. P. 23.1.

     In response, Plaintiffs allege they have demonstrated contemporaneous ownership of Facebook's stock prior to the IPO which establishes standing.     Second, Plaintiffs assert that the Complaint alleges damages other than the costs incurred in the Securities Class Actions or reputational damages, including disgorgement of profits from insider trading, and these new allegations are independent from the resolution of other litigation.     Third, Plaintiffs contend that demand would have been futile since the Directors Defendants had a financial interest in the Facebook IPO and incomplete disclosure.     Fourth, Plaintiffs contend that the Removed Actions do fairly and adequately represent the interests of the shareholders.

As discussed above only threshold issues such as venue and justiciability will be considered prior to jurisdiction.

## A) The Applicable Standards

The Rule 12(b)(1) and 12(b)(6) Standards

Fed. R. Civ. P. 12(b)(1) provides that a defendant may move to dismiss a complaint on the grounds of lack of subject-matter jurisdiction. See Fed. R. Civ. P. 12(b)(1). Dismissal of a case for lack of subject matter jurisdiction under Rule 12(b)(1) is proper "when the district court lacks the statutory or constitutional power to adjudicate it." Makarova v. U.S., 201 F.3d 110, 113 (2d Cir. 2000).

On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), all factual allegations in the complaint are accepted as true, and all inferences are drawn in favor of the pleader. Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir. 1993). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." County of Suffolk, N.Y. v. First Am. Real Estate Solutions, 261 F.3d 179, 187 (2d Cir. 2001) (quoting

Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 378 (2d Cir. 1995), cert. denied, 519 U.S. 808, 117 S. Ct. 50, 136 L. Ed. 2d 14 (1996)).

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 663, 129 S. Ct. 1937, 1940, 173 L. Ed. 2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). This is not intended to be an onerous burden, as plaintiffs need only allege facts sufficient in order to "nudge[] their claims across the line from conceivable to plausible." Twombly, 550 U.S. at 570.

The Rule 23.1 Standard

The derivative form of action permits individual shareholders of a corporation to bring an action on behalf of the corporation to protect the corporation's interests from "the misfeasance and malfeasance of faithless directors and managers." Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 95, 111 S. Ct. 1711, 114 L. Ed. 2d 152 (1991) (quoting Cohen v. Beneficial Loan Corp., 337 U.S. 541, 548, 69 S. Ct. 1221, 93 L.

33

Ed. 1528 (1949)). "To prevent abuse of this remedy, however, equity courts established as a 'precondition for the suit' that the shareholder demonstrate that 'the corporation itself had refused to proceed after suitable demand, unless excused by extraordinary conditions'" and satisfy the requirement of standing. Id. (quoting Ross v. Bernhard, 396 U.S. 531, 534, 90 S. Ct. 733, 24 L. Ed. 2d 729 (1970)).

To establish standing under Rule 23.1,[14] a shareholder's derivative complaint must allege that the "plaintiff was a shareholder or member at the time of the

---

[14] Rule 23.1 of the Federal Rules of Civil Procedure provides as follows:

> (a) Prerequisites.  This rule applies when one or more shareholders or members of a corporation or an unincorporated association bring a derivative action to enforce a right that the corporation or association may properly assert but has failed to enforce.   The derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of shareholders or members who are similarly situated in enforcing the right of the corporation or association.

> (b) Pleading Requirements. The complaint must be verified and must: (1) allege that the plaintiff was a shareholder or member at the time of the transaction complained of, or that the plaintiff's share or membership later devolved on it by operation of law; (2) allege that the action is not a collusive one to confer jurisdiction that the court would otherwise lack; and (3) state with particularity: (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) the reasons for not obtaining the action or not making the effort.

> (c) Settlement, Dismissal, and Compromise. A derivative action may be settled, voluntarily dismissed, or compromised only with the court's approval. Notice of a proposed settlement, voluntary dismissal, or compromise must be given to shareholders or members in the manner that the court orders.

transaction complained of, or that the plaintiff's share or membership later devolved on it by operation of law." Fed. R. Civ. P. 23.1.[15]   In essence, this "contemporaneous ownership rule" is a procedural requirement that "denies a derivative plaintiff standing to challenge transactions that occurred prior to the time the plaintiff became a shareholder." Ensign Corp. v. Interlogic Trace, Inc., No. 90-CV-3497, 1990 WL 213085, at *2 (S.D.N.Y. Dec. 19, 1990).   "The policies underlying the requirement are twofold: (1) to prevent potential derivative plaintiffs from 'buying a lawsuit' by purchasing stock; and (2) to insure that derivative actions are brought by shareholders who have actually suffered injury and have an interest in the outcome of the case." Id.

In addition to the standing requirement, Rule 23.1 provides that the complaint in a derivative suit must "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or

---

[15] Similarly, Section 327 is the only provision in the Delaware General Corporation Law (the "DGCL"), 8 Del. Code § 327, which addresses derivative actions. 2 Edward P. Welch, et al., Folk on the Delaware General Corporation Law § 327.1, at GCL-XIII-42 (5th ed. 2010).   It parallels Rule 23.1's contemporaneous ownership requirement and provides: "In any derivative suit instituted by a stockholder of a corporation, it shall be averred in the complaint that the plaintiff was a stockholder of the corporation at the time of the transaction of which such stockholder complains or that such stockholder's stock thereafter devolved upon such stockholder by operation of law." 8 Del. Code § 327.

members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort." Fed. R. Civ. P. 23.1.

## B) **The Plaintiffs Have Established Derivative Standing**

If "a books and records demand is to investigate wrongdoing and the plaintiff's sole purpose is to pursue a derivative suit, the plaintiff must have standing to pursue the underlying suit to have a proper purpose." West Coast Mgmt. & Capital, LLC v. Carrier Access, 914 A.2d 636, 641 (Del. Ch. 2006). Thus, "[i]f plaintiff would not have standing to bring suit, plaintiff does not have a proper purpose to investigate wrongdoing because its stated purpose is not reasonably related to its role as a stockholder." Graulich v. Dell Inc., No. 5846-CC, 2011 WL 1843813, at *5 (Del. Ch. May 16, 2011); see also In re Bank of N.Y. Derivative Litig., 320 F.3d 291, 298 (2d Cir. 2003) ("[A] plaintiff must have owned stock in the corporation throughout the course of the activities that constitute the primary basis of the complaint.").

Unlike the plaintiffs in the Dismissed Derivative Actions, Plaintiffs have pled that they were stockholders during the alleged misconduct and have been continuous stockholders to this day. The Jones Complaint alleges that Jones owns

36

approximately 2,500 shares of Facebook and has held Facebook
continuously since February 15, 2012.     (Compl.  ¶ 15.)
McConnaughey alleges that she held Facebook shares continuously
since March 14, 2012. (McConnaughey Compl.  ¶ 15.)    These
pleadings must satisfy both the <u>Twombly</u> standards, 550 U.S. at
570, and the heightened pleading standards of Rule 23.1.   <u>See</u>
<u>Metcalf v. Zoullas</u>, No. 11-CV-3996(AKH), 2012 WL 169874, at *3
(S.D.N.Y. Jan. 19, 2012) ("Because Rule 23.1 requires
particularized allegations, the pleading standard is higher than
the standard applicable to a pleading subject to a motion to
dismiss pursuant to Rule 12(b)(6)."); <u>see also</u> <u>In re Accuray,</u>
<u>Inc. S'holder Derivative Litig.</u>, 757 F. Supp. 2d 919, 926 (N.D.
Cal. 2010) ("Plaintiffs generally allege that they were
shareholders of 'Accuray at the time of the continuing wrongs
complained of herein.'  This vague allegation does not satisfy
the strict standard of Rule 23.1.").


        However, Nominal Defendant alleges that Plaintiffs
were not actually stockholders since February 15, 2012 and that
Plaintiffs became stockholders only after the IPO.   Nominal
Defendant notes that Facebook "has no record of either Plaintiff
Jones or Plaintiff McConnaughey being a shareholder at any time
between February 15 and May 18, 2012." (Def. Mem. – Motion to
Dismiss, at 18).  Nominal Defendant alleges that Plaintiffs did

not own direct legal title to Facebook shares prior to the IPO:
Plaintiffs participated in auctions held by SharesPost Financial
Corporation ("SharesPost") and purchased units in a SharesPost
special purpose investment vehicle ("SPV") managed by SharesPost
that held Facebook shares pre-IPO.[16]  (Id.)

Plaintiffs contend that SharesPost acknowledge receipt
of funds from Jones "TO PURCHASE FACEBOOK STOCK," (Rudman Decl.
Ex. I (emphasis in original)), and the SharesPost publicly
available materials stated that it provides "the largest, most
diverse, and most active network of qualified investors . . . to
help selling shareholders efficiently close on the sale of their
shares," (Cascio Decl. Ex. J).  SharesPost also wrote, in a
March 30, 2012 e-mail, that "successful auction bidders will
hold an indirect interest in the shares of Facebook,Inc."
(Rudman Decl. Ex. K.)

However, SharesPost informed subscribers including the
Plaintiffs that they would not hold shares of Facebook stock
until after the IPO: "Members who have purchased units in

---

[16] Nominal Defendant and Plaintiffs have submitted extra-complaint materials
for the motion to dismiss.  While Plaintiffs insist that such extra-complaint
materials compels the Court to convert the motion to dismiss to one of
summary judgment, (Pl. Op. - Motion to Dismiss, at 25), a court may consider
"any documents that are 'integral' to the plaintiff's allegations even if not
explicitly incorporated by reference" in the motion to dismiss stage.  In re
Avon Prods., Inc. Secs. Litig., No. 05 Civ. 6803(LAK)(MHD), 2009 WL 848083,
at *2 (S.D.N.Y. Mar. 3, 2009).

special purpose investment vehicles through a SharesPost auction are distributed shares following the IPO." (Cascio Decl. Ex. J.) The SharesPost investment fund remained the owner of the Facebook shares until six months after the IPO. The SharesPost Subscription Agreement stated that "[t]he Subscriber acknowledges that it has no direct interest in any Facebook Securities, and that Facebook Securities are held solely by [SharesPost]." (Cascio Decl. Ex. 5.) Section 4.2(b) of the agreement further provides that Plaintiffs themselves would not become Facebook shareholders until after the IPO and "the expiration of . . . transfer restrictions." Id. SharesPost was also under no obligation to distribute Facebook stock to Plaintiffs; rather, any post-IPO distribution "shall be made, according to the discretion of [SharesPost], in the form of (i) all of the [Facebook stock], (ii) Available Cash from [SharesPost's] sale of all the [Facebook stock], or (iii) any combination of (i) and (ii)." (Id.) Thus, Plaintiffs owned shares in a SharesPost investment fund that had the option to divest its held Facebook stock to investors.

Plaintiffs assert that even if Jones and McConnaughey did not directly own Facebook stock, they are equitable owners of Facebook stock under Delaware law, the state of incorporation of the Company, and equitable ownership of a stock can confer

39

derivative standing.  See Rosenthal v. Burry Biscuit Corp., 30
Del. Ch. 299, 308-13 (Del. Ch. 1948) ("an equitable owner of
stock can maintain a stockholder's derivative action" and that
any "motion to dismiss" such action "on the ground that the
plaintiff was not a stockholder of record at the time of the
transaction of which he complains [should be] denied").
Plaintiffs point to Pennington v. Neukomm, 1973 WL 463 (Del. Ch.
Oct. 3, 1973), aff'd, 344 A.2d 386 (Del. 1975), and Jones v.
Taylor, 348 A.2d 188 (Del. Ch. 1975) [hereinafter Taylor], for
the proposition that even though Plaintiffs did not directly own
Facebook stock prior to and on the date of the IPO, Plaintiffs
purchased rights to future ownership of Facebook stock, and
Plaintiffs' eventual ownership of that stock bequeathed
equitable ownership at the time of the IPO.  See Pennington,
1973 WL 463 at *3; Taylor, 348 A.2d at 192.


     Plaintiffs were stockholders who owned shares of the
SharesPost SPV before the IPO up until the time SharesPost
divested its held Facebook shares to Plaintiffs: in other words,
Plaintiffs contracted for the future receipt of Facebook stock.
While Plaintiffs did eventually own Facebook stock after the SPV
distribution of Facebook shares, contracts for future
acquisition of stock does not necessarily confer an interest
that may be said to satisfy the continuous ownership requirement

under Delaware law or Rule 23.1.   See In re Nine Sys. Corp
S'holders' Litig., No. 3940-VCN, 2013 WL 771897, at *8 (Del. Ch.
Feb. 28, 2013) (rejecting direct shareholder action asserting
"equitable ownership" because "[a]greeing to purchase stock does
not make one a stockholder, especially if the stock will not
even be issued until the consummation of the challenged series
of actions"); In re New Valley Corp. Derivative Litig., No. C.A.
17649-NC, 2004 WL 1700530, at *6 (Del. Ch. June 28, 2004)
(noting that a warrant agreement for shares "[did] not confer an
interest that may be said to satisfy the continuous ownership
requirement"); Montgomery v. Aetna Plywood, Inc., 231 F.3d 399,
407 (7th Cir. 2000) ("That prospective stockholders are not owed
fiduciary duties under Delaware law leads us to conclude that
prospective stockholders would not be considered 'stockholders'
for standing purposes.").


     Indeed, in Pennington, a divorce separation agreement
required defendant husband to transfer certain stock to his ex-
wife at the end of a six-year period.   1973 WL 463, at *1.
Defendant husband was contractually obligated to deliver the
stock to plaintiff, and plaintiff was obligated to accept legal
title upon the shares' delivery.   See id., at *3.   Similarly, in
Taylor, the shares at issue were required to pass to plaintiff
via a will.   348 A.2d at 191-92.   In both cases, future

                                41

ownership of shares was a contractual certainty.[17]

Equitable or "beneficial ownership" of stock "is contextually defined, and has become a term of art for purposes of establishing fiduciary duties under Delaware law." Anadarko Petroleum Corp. v. Panhandle E. Corp., 545 A.2d 1171, 1176 (Del. 1988). Here, unlike in Pennington and Taylor, Plaintiffs' future ownership of Facebook shares at the time they purchased shares in the SharesPost SPV was not a certainty. The SharesPost SPV could distribute Facebook shares, cash or a combination of the two after the IPO at the discretion of SharesPost. (Cascio Decl. Ex. 5.) Moreover, before the IPO, Facebook had a right of first refusal under its bylaws before any proposed transfer of its shares. (Cascio Decl. Ex. N., art. 8.15(a) ("Before any Shares held by a Stockholder may be sold or otherwise transferred (including transfer by gift or operation of law), the corporation or its assignee(s) shall have a right of first refusal to purchase the Shares . . . .").)

Thus, Plaintiffs are not stockholders in the same situation as the stockholders contemplated in Pennington and

---

[17] The Plaintiff in Rosenthal, 30 Del. Ch. 299, actually owned shares of the defendant corporation before bringing a derivative suit against the defendants. Id. at 301. The purchased stock was represented by street certificates standing in the names of brokers, and plaintiff was not a stockholder of record. The Court held this was sufficient to constitute the Plaintiff as an equitable owner of the stock. Id. at 302-03.

Taylor; they are, instead, prospective stockholders with an uncertain contractual right to future shares. Prospective stockholders are not "'stockholders' for standing purposes." Montgomery v. Aetna Plywood, Inc., 231 F.3d 399, 407 (7th Cir. 2000) (interpreting 8 Del. § 327); see also Harff v. Kerkorian, 324 A.2d 215, 220 (Del. Ch. 1974) (contractual rights to acquire stock are inadequate to establish contemporaneous ownership under 8 Del. C. § 327), aff'd in relevant part, rev'd in part on other grounds, 347 A.2d 133 (Del. 1975). Facebook had no fiduciary obligations to Plaintiffs as stockholders before they came "into actual possession of stock, regardless of how certain the stockholder's future ownership was when the challenged transaction took place," Montgomery, 231 F.3d at 407, and Plaintiffs cannot now claim derivative standing for the time when they were prospective stockholders.

Plaintiffs have previously suggested that Plaintiffs had direct legal title to Facebook shares because it had "devolved [to] plaintiff[s] by operative law." (See Cascio Decl. Ex. B); see also 8 Del. C. § 327. The "operation of law" provision is a "narrow exception to the contemporaneous ownership rule," and the "acquisition of . . . shares through contracts . . . does not qualify." Parfi Holding AB v. Mirror Image Internet, Inc., 954 A.2d 911, 937 (Del. Ch. 2008); cf.

Chan v. Louis, 303 A.D.2d 151, 152 (N.Y. App. Div. 2003) (plaintiff administratrix who was also 50% beneficiary of husband's estate, could bring derivative suit against company in which her late husband owned shares). Plaintiffs did not allege in their Complaint that stock ownership devolved by operation of law, and the Court declines to so hold.

Plaintiffs also assert that "[t]he sole purpose of the continuous ownership requirement of § 327 and Rule 23.1 is to prevent the evil of a person purchasing shares in order to maintain a derivative action attacking a transaction that occurred prior to the purchase of the stock." (Pl. Op. – Motion to Dismiss, at 24.) However, "the statute does not include any provisions exempting 'good faith' purchasers from its terms. [Plaintiffs are] asking this Court to ignore the clear language of the statute under the guise of a 'liberal construction.'" 7547 Partners v. Beck, 682 A.2d 160, 163 (Del. 1996).

Given that Plaintiffs were not actual or equitable owners of Facebook stock at the time of the alleged transgression, Plaintiffs lack standing to bring its derivative claim.

**C) Plaintiffs Have Not Adequately Pled Demand Futility**

In addition to the requirement of standing, Plaintiffs must also meet the demand requirement. Fed. R. Civ. P. 23. The law of the state of incorporation determines the demand requirement and futility for a derivative suit. See Kamen, 500 U.S. at 98-101. Because Facebook is a Delaware corporation, the sufficiency of the Derivative Plaintiffs' demand futility allegations is analyzed under Delaware law.

Pursuant to Delaware law, a plaintiff in a shareholder derivative action must allege either: (1) that he has made a demand upon the corporation's board of directors to take the requested action; or (2) the reasons why such a demand upon the board would be futile. See Rales v. Blasband, 634 A.2d 927, 930 (Del. 1993); Aronson v. Lewis, 473 A.2d 805, 808 (Del. 1984) overruled on other grounds by Brehm v. Eisner, 746 A.2d 244 (Del. 2000). In order to sufficiently allege that a demand upon the board would have been futile, a plaintiff must present particularized facts showing that the board is "incapable of exercising its power and authority to pursue derivative claims directly." White v. Panic, 783 A.2d 543, 551 (Del. 2001). The plaintiff may not rely on mere conclusory allegations. In re inforUSA Inc. S'holders Litig., 953 A.2d 963, 985 (Del. Ch. 2007). The pleading burden imposed by Rule 23.1 is a high

hurdle for plaintiffs to clear.   McPadden v. Sidhu, 964 A.2d 1262, 1269 (Del. Ch. 2008) (noting that this burden "is more onerous than that demanded by Rule 12(b)(6).").

    When a decision of the board of directors is being challenged in a derivative suit, two tests are available to determine whether demand is futile. Wood v. Baum, 953 A.2d 136, 140 (Del. 2008). The Aronson test "applies to claims involving a contested transaction i.e., where it is alleged that the directors made a conscious business decision in breach of their fiduciary duties." Id. Under the Aronson test, a plaintiff must plead sufficient facts to raise a reasonable doubt that: "(1) the [majority of the] directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." Aronson, 473 A.2d at 814. Thus, in order to survive dismissal, a complaint must allege facts that the corporate "officers and directors are under an influence which sterilizes their discretion, [so that] they cannot be considered proper persons to conduct litigation on behalf of the corporation." Id. at 814.

    In some cases, however, the Delaware Supreme Court has recognized that the Aronson test does not apply, where a loss eventuates not from a board's decision but rather from

46

considered inaction.  The second test, the Rales test, "applies where the subject of a derivative suit is not a business decision of the Board but rather a violation of the Board's oversight duties."  Wood, 953 A.2d at 140.  In these cases, Plaintiffs must offer "'particularized factual allegations'" which "'create a reasonable doubt that, as of the time . . . the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand.'"  Derivative Op., 422 F. Supp. 2d at 467 (quoting Rales, 634 A.2d at 934 (Del. 1993)).  Under the Rales test, "[i]ndependence is a fact-specific determination made in the context of a particular case."  Beam ex. Rel. Martha Stewart Living Omnimedia, Inc. v. Stewart, 845 A.2d 1040, 1049-50 (Del. 2004).  A key inquiry "is whether the plaintiffs have pled facts that show that [the] directors face a sufficiently substantial threat of personal liability" to render them "interested" for purposes of considering demand.  Guttman v. Huang, 823 A.2d 492, 502 (Del. Ch. 2003); see also Desimone v. Barrows, 924 A.2d 908, 928 (Del. Ch. 2007) (where a derivative plaintiff does not challenge a specific transaction approved by the board, the plaintiff must adequately plead that a majority of the company's board of directors were incapable of objectively responding to a demand because they either (1) "face a sufficiently substantial threat of personal liability," and

47

are thus themselves interested, or (2) "are compromised in their ability to act independently of the interested directors"); In re Citigroup Inc. S'holder Derivative Litig., No. 07 Civ. 9841, 2009 WL 2610746, at *3 (S.D.N.Y. Aug. 25, 2009) (plaintiff must plausibly allege that the board of directors could not "'have properly exercised its independent and disinterested business judgment in responding to a demand'") (quoting Rales, 634 A.2d at 934).

Plaintiffs contend that Facebook's board of directors (the "Board") consisted of eight directors at the time the Jones complaint was filed, and they need only show demand futility for four of the eight directors if they can show that the Board was evenly divided between independent and non-independent directors. See Beam v. Stewart, 845 A.2d 1040, 1046 n.8 (Del. 2004) ("If three directors of a six person board are not independent and three directors are independent, there is not a majority of independent directors and demand would be futile."); Gentile v. Rosette, C.A. No. 20213-VCN, 2010 WL 2171613, at *7 n.36 (Del. Ch. May 28, 2010) ("A board that is evenly divided between conflicted and non-conflicted members is not considered independent and disinterested."). At the time of the filing of the McConnaughey action, Facebook added a ninth director, Susan Desmond-Hellman. Plaintiff McConnaughey must show that five

48

members of Facebook nine-person board would have been unable to independently consider shareholder demand. See In re Prudential Secs. Inc. Ltd. P'ships Litig., 158 F.R.D. 562, 571 (S.D.N.Y. 1994) ("[C]onsolidation will have no effect on the substance of the plaintiffs' allegations[.]"); Ogden v. Collins, No. 540, 2009, 2010 WL 4816059, at *5 (Del. Nov. 29, 2010) (same).

The Jones Complaint challenges the Board's independence and disinterestedness by alleging: (i) the Selling Directors (Zuckerberg, Breyer and Theil) obtained significant improper financial profits from the IPO and derived other financial benefits, including increase in share value, share distributions and stock sales (Compl. ¶¶ 3, 17, 20, 23); (ii) Defendants Andreessen, Graham, Hasting and Sandberg received substantial personal financial benefits including from vesting and settling of restricted stock units, increased equity value, subsequent stock sales and other events (id. ¶¶ 10, 18, 21-22, 26); (iii) Defendant Graham's independence is further compromised by his daughter's employment with Facebook (id. ¶ 86(f)(iii)); (iv) Defendant Sandberg's independence and disinterestedness is further compromised in that she is an executive officer and subordinate to Zuckerberg (CEO of the Company) and cannot be deemed to act independently of her boss in objectively considering an action against him (Pl. Op. –

49

Motion to Dismiss, at 15 n.23); (v) Defendant Bowles is interested and incapable of considering demand because he is a director of Morgan Stanley, and faces litigation against Morgan Stanley, where he is also a fiduciary (Compl. ¶ 19); and (vi) all Director Defendants have strong financial incentives to maintain the status quo in order to avoid disgorgement damages sought by Plaintiffs (id., at 16).

Plaintiffs' pleadings in the Complaint fail to satisfy the Rales test. Plaintiffs' allegation that the Director Defendants were interested because they expected to derive personal financial benefits from the IPO fails. Directors are presumed to act in "good faith." In re Walt Disney Co. Derivative Litig., 906 A.2d 27, 52 (Del. 2006). The mere fact that the Director Defendants sold stock, or otherwise benefitted from, an IPO is unremarkable. Mere sales of corporate stock by a director that is not a self-dealing transaction does not establish that he or she is "interested" for purposes of finding demand. Guttman, 823 A.2d at 502; see also, In re Dow Chem. Co. Derivative Litig., No. 4349-CC, 2010 WL 66769, at *14 n.88 (Del. Ch. Jan. 11, 2010) ("[A] director is not deemed interested whenever a derivative plaintiff cursorily alleges that he made sales of company stock.") (internal quotations omitted); Continuing Creditors' Comm. of Star Telecomm. v. Edgecomb, 385

50

F. Supp. 2d 449, 461 (D. Del. 2004) (same).

However, Plaintiffs contend that Director Defendants did not merely gain personal financial benefits:  Plaintiffs allege that "the Board signed on to misleading and materially incomplete amendments to the Registration Statement after having been made aware of the second quarter [2012] results . . . and the revised revenue estimates; and . . . the Board decided that Facebook should proceed with a larger, higher-priced IPO . . . ." (Pl. Op. – Motion to Dismiss, at 13-14.)  Plaintiffs further allege that the Selling Directors, who sold Company stock in the IPO, "knew that the material non-public second quarter results and revised Facebook and analyst estimates could reduce the size, price and prospects for success of the IPO" and that they made "misleading partial disclosure while withholding the critical results and revised estimates in order to facilitate their sales of Facebook shares in the IPO." (Compl. ¶ 94.)

The crux of the Complaint is that the Defendants were "aware" of the revenue projections but did not disclose it. However, pleading "awareness" is not enough. Plaintiffs must allege particularized facts showing that the Director Defendants "knew" that not disclosing was illegal. Wood, 953 A.2d at 142

(Del. 2008); see also Harold Grill 2 IRA v. Chenevert, No. 7999-CS, 2013 WL 3014120, at *3 (Del. Ch. June 18, 2013) (no substantial likelihood of liability where "complaint does not allege that the directors . . . were aware [that the company's nondisclosures] had broken the law"); La. Mun. Police Emps.' Ret. Sys. v. Hesse, No. 12 Civ. 4017, 2013 WL 4516427, at *11 (S.D.N.Y. July 26, 2013) (rejecting allegation that directors faced liability for approving company's "tax strategy" that "had not been adjudicated as illegal"). None of the facts alleged by Plaintiffs pled with sufficient particularity that Defendants knew it was illegal to not disclose the projections.

Plaintiffs also fail to show that the three Selling Directors' stock sales were illegal and thus created a sufficient likelihood of personal liability on the Selling Directors that rendered them interested. Plaintiffs' claims for disgorgement based on insider trading by the Selling Directors are insufficient. To state a Brophy insider trading claim, a plaintiff must allege that: "1) the corporate fiduciary possessed material, nonpublic company information; and 2) the corporate fiduciary used that information improperly by making trades because she was motivated, in whole or in part, by the substance of that information." In re Oracle Corp. Derivative Litig., 867 A.2d 904, 934 (Del. Ch. 2004). "This doctrine is

not designed to punish inadvertence, but to police intentional misconduct." Guttman, 823 A.2d at 505.


Plaintiffs have not made sufficient allegations to satisfy the second prong of the Brophy test.[18]   As previously noted, Plaintiffs merely allege that the Selling Directors sold stock while in knowing possession of material non-public information.   Such simple allegations do not support a plausible inference that the sales were "entered into and completed on the basis of, and because of" such information.   Derivative Opinion, 922 F. Supp. 2d at 469 (quoting Guttman, 823 A.2d at 505). While suspicious timing of sales may support an inference of insider trading, see Strougo v. Carroll, Civ. A. No. 8040, 1991 WL 9978, at *5 (Del. Ch. Jan. 29, 1999) (suspicious timing of director defendants' stock sales supported inference that they "took advantage of their inside information by selling their . . . stock before material adverse information was disclosed") (internal   quotations   omitted),   Plaintiffs'   conclusory

---

[18]  Regarding the first prong of the Brophy test, the Derivative Opinion previously noted that "'internal calculations and projections are not material facts that are require[d] to be disclosed' in a registration statement."   Derivative Op., 922 F. Supp. 2d at 472 (quoting Sheppard v. TCW/DW Term Trust 2000, 938 F. Supp. 171, 177-78 (S.D.N.Y. 1996)).  The Jones Complaint provides more particularized allegations as to why the general warnings that increased mobile use "may" reduce revenue and financial results were misleading without disclosure of the actual reduction of revenue during the second quarter of 2012 and the resulting revision of revenue estimates. (Pl. Op. - Motion to Dismiss, at 18.)   Given that Plaintiffs' pleadings are insufficient to meet the second prong of Brophy, the Court declines to opine on the "material, nonpublic information" portion of the test.

allegations have not shown how the timing of the Selling Directors' sale of Facebook stock in the IPO was suspicious. Plaintiffs have not shown how private shareholders of a company selling shares in an IPO, a process where the private shareholders are supposed to sell shares to the public, constitutes suspicious timing. Plaintiffs' conclusory allegations, without more, are insufficient. The situation here is not analogous to the situation in Strougo, where the sale of shares occurred in the context of buyout discussions between companies and just before material adverse information was disclosed. 1991 WL 9978, at *1, *5.

Plaintiffs also fail to show director interest among the Director Defendants who did not sell stock in the IPO. Plaintiffs allege that these Director Defendants "benefitted from the inflated price and stock offering's effect on the vesting or value of their [restricted stock units]." (Pl. Op. – Motion to Dismiss, at 21.) Some Director Defendants were eligible to, and did, sell Facebook stock in November 2012, six months after the IPO. See Registration Statement, at 54; (Compl. ¶¶ 10, 18, 21, 26). Plaintiffs have not alleged that these sales were illegal, and the mere fact that a director gains some benefit from the challenged conduct does not excuse demand. See supra. Moreover, even if the Defendant Directors

54

"expanded the size of the IPO and raised the IPO price" as a result of their allegedly illegal conduct, the restricted stock units would have been sold in November 2012 at a price between $22-$28, well below the IPO price.

Plaintiffs' contentions that Graham and Bowles lack independence due to Graham's daughter's employment at Facebook and Bowles' relationship with Morgan Stanley similarly fails. Graham's daughter was not employed by Facebook at the time the Jones Plaintiffs filed this lawsuit, (Cascio Decl., Ex. 2 (4/26/13 Facebook Form Def.14/A (filed with SEC) at 40 ("Molly Graham, the daughter of Donald E. Graham, a member of our board of directors, was employed by us until December 2012."))), and demand futility is calculated at the time of the filing of the litigation, see Rales, 634 A.2d at 934 n.8 ("What, in the end, is relevant is not whether the board that approved the challenged transaction was or was not interested in that transaction but whether the present board is or is not disabled from exercising its right and duty to control corporate litigation."). Plaintiffs' contention regarding Bowles was rejected in the Derivative Opinion, as "directors are presumptively able to consider independently whether to take legal action that could cause tangential harm to a company with which they are affiliated." Derivative Op., 922 F. Supp. 2d at

55

471.  Plaintiffs' allegations regarding Bowles are the same as those in the Derivative Opinion, and they similarly are incapable of showing lack of independence or disinterestedness.

The contention that Sandberg is not disinterested due to her subordination to Zuckerberg is unconvincing.  In order to "challenge a director's independence," a plaintiff must provide particularized "allegations that raise a reasonable inference that a given director . . . is so beholden to an interested director that his or her discretion would be sterilized" under both the Aronson and Rales tests.  In re INFOUSA, Inc. S'holders Litig., 953 A.2d 963, 985 (Del. Ch. 2007) (internal quotations omitted).  Delaware law presumes directorial independence, and "Delaware law does not assume that directors have a self-interest in preserving their positions."  RCM Secs. Fund, Inc. v. Stanton, 928 F.2d 1318, 1330 (2d Cir. 1991).  Plaintiffs merely allege Sandberg's lack of independence and do not providing any pleadings that would call into question Sandberg's directorial independence; as such, Sandberg's presumption of independence stands.

Analysis of Plaintiffs' allegations under the Aronson test does not lend further support to demand futility.  Passing the Aronson test requires a plaintiff to plead demand futility

56

either by alleging particularized facts that satisfy the Rules test or by alleging facts that plausibly suggest the "challenged transaction was [not] the product of a valid exercise of business judgment." Aronson, 473 A.2d at 814. Challenging the board's valid exercise of business judgment requires a showing that the transaction was "so egregious on its face that board approval cannot meet the test of business judgment." Id. at 815. The business judgment rule presumes that "absent evidence of fraud, bad faith, or self-dealing, the court should presume that in making a business decision directors acted in [good faith]." Adams v. Calvarese Farms Maint. Corp., Civil Action No. 4262-VCP, 2010 WL 3944961, at *18 (Del. Ch. Sept. 17, 2010).

As previously noted, Plaintiffs' conclusory allegation that "a majority of the Facebook Board expected to derive personal financial benefits from the IPO" is insufficient to allege "self-dealing." (Pl. Op. - Motion to Dismiss, at 15.) The term "self-dealing" "describes the situation when a [corporate fiduciary] is on both sides of a transaction." Cinerama, Inc. v. Technicolor, Inc., 663 A.2d 1156, 1169 (Del. 1995) (internal quotations omitted) (citing 8 Del. C. § 144(a)). Here, the Directors did not sell stock to Facebook; rather, the Selling Directors sold shares in an IPO. The Selling Directors' interests were aligned with Facebook and other shareholders, all

of whom were selling stock to the IPO syndicate and, ultimately, the public. These trades, which were made between the Director Defendants and market buyers, do not rebut the presumption of proper business judgment or otherwise excuse demand. See Guttman, 823 A.3d at 502 (alleged trades not "self-dealing" and demand not excused because the challenged sales were "not between the defendant-directors and [the company], but between the defendant-directors and marketplace buyers"); In re Dow Chem., 2010 WL 66769, at *14 n.88 ("a director is not deemed interested 'whenever a derivative plaintiff cursorily alleges that he made sales of company stock in the market at a time when he possessed material, non-public information.'") (quoting Guttman, 823 A.3d at 502).

The cases Plaintiffs cite are inapposite. All but one involved actual self-dealing in which a director was on both sides of a transaction. Heineman v. Datapoint Corp., 611 A.2d 950, 952-54 (Del. 1992) (plaintiffs alleged that "directors funnel[ed] corporate assets to their private use," by, for instance, authorizing "payments from [the company] to a number of directors"); Harbor Fin. Partners v. Huizenga, 751 A.2d 879, 887 (Del. Ch. 1999) (director's interest in the target of a merger "clearly implicate[d] the literal terms of 8 Del. C. § 144"); Weiss v. Swanson, 948 A.2d 433, 448 (Del. Ch. 2008)

(holding that "demand is excused where the challenged decision is the directors' decision to award themselves compensation, and there are allegations supporting an inference that the decision breached fiduciary duties").  The one case that did not involve a director who was on both sides of a transaction involved an insider trading scheme where the complaint pled actual fraud that resulted in guilty pleas "to criminal charges arising out of . . . SEC and criminal investigations of the trading scheme." In re Cooper Co., No. 12584, 2000 WL 1664167, at *4 (Del. Ch. Oct. 31, 2000).    Plaintiffs    have    also    not    pled    any particularized allegations demonstrating bad faith or fraud. Given these circumstances, demand futility under Aronson is unavailable.

Given the reasoning and authorities assessed above, Plaintiffs' merely conclusory allegations are not sufficient to plead demand futility under either Rales or Aronson.

## D) The Plaintiffs' Claims Are Not Ripe For Adjudication

Ripeness is a "constitutional prerequisite" to the exercise of jurisdiction by federal court.  Nutritional Health Alliance v. Shalala, 144 F.3d 220, 225 (2d Cir. 1998).  The ripeness doctrine provides that a dispute may only be

adjudicated when there is "a real, substantial controversy between parties having adverse legal interests, a dispute definite and concrete, not hypothetical or abstract." Motor Vehicle Mfrs. v. DEC, 79 F.3d 1298, 1305 (2d Cir. 1996) (citations omitted); see also Pac. Gas & Elec. Co. v. State Energy Res. Conservation and Dev. Comm'n, 461 U.S. 190, 203, 103 S. Ct. 1713, 75 L. Ed. 2d 752 (1983) (the ripeness doctrine prevents the premature adjudication of issues that may never arise). Consequently, "when resolution of an issue turns on whether there are nebulous future events so contingent in nature that there is no certainty they will ever occur, the case is not ripe for adjudication." Thomas v. City of New York, 143 F.3d 31, 34 (2d Cir. 1998) (internal quotations omitted).

"In order to determine whether an issue is ripe for adjudication, a court must make a fact-specific evaluation of 'both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" U.S. v. Fell, 360 F.3d 135, 139 (2d Cir. 2004). A claim is fit for review when it requires no further factual development to crystallize the legal issues and aid the court in resolving them. Ohio Forestry Ass'n v. Sierra Club, 523 U.S. 726, 737, 118 S. Ct. 1665, 140 L. Ed. 2d 921 (1998); Isaacs v. Bowen, 865 F.2d 468, 478 (2d Cir. 1989) ("The fitness inquiry is concerned

with whether the issues sought to be adjudicated are contingent on future events or may never occur."). In assessing the possible hardship to the parties, the court considers "whether the challenged action creates a direct and immediate dilemma for the parties . . ." outside the "mere possibility of future injury" without the prospect of causing "present detriment." New York Civil Liberties Union v. Grandeau, 528 F.3d 122, 131 (2d Cir. 2008).

In the Derivative Opinion, the Court found that the Dismissed Derivative Actions were not ripe because "Plaintiffs [in the Dismissed Derivative Actions had] not demonstrated that the alleged costs were caused by an actual corporate wrong, which is not predicated on the resolution of other litigation." Derivative Op., 922 F. Supp. 2d at 474-75. Plaintiffs' Complaint, like the Dismissed Derivative Actions, also alleges that the Director Defendants "exposed Facebook to billions of dollars in liability for violations of the federal securities laws, as the company is now the target of numerous securities class actions," (Compl. ¶ 11), and Plaintiffs "seek[] to recover . . . all amounts for which Facebook is liable . . . in the event the Company is found liable in the federal securities class action litigation . . . ," (id. ¶ 14). As the Derivative Opinion previously noted: "where 'the claim of damages is

61

contingent on the outcome of a separate, pending lawsuit, the claim is not ripe and the complaint must be dismissed.'" Derivative Op., 922 F. Supp. 2d at 474 (quoting In re United Telecomms. Inc., Secs. Litig., No. 90-2251-EEO, 1993 WL 100202, at *3 (D. Kan. Mar. 4, 1993)).  Any liability for those alleged federal securities law violations has yet to be established, damages, if any, have yet to be determined, and such claims by Plaintiffs are not ripe.

Plaintiffs contend that the Removed Actions differ from the Dismissed Derivative Actions in that they seek disgorgement of "the unlawful insider trading proceeds from the Selling Directors," (see Compl. ¶ 14), and disgorgement of financial benefits is a distinct remedy that is not dependent on damages to a corporation, (Pl. Op. - Motion to Dismiss, at 31). However, Plaintiffs' allegations of insider trading are not new and do not solve their ripeness problem or distinguish them from the Dismissed Derivative Actions.  See Derivative Op., 922 F. Supp. 2d at 474 ("Derivative Plaintiffs allege . . . damages flowing from the sale of Facebook stock by individual Facebook Defendants.") (citing Hubuschman/Cole Compl. ¶ 65; Levy Compl. ¶¶ 68-71; Childs Compl. ¶ 42).  Plaintiffs here make identical insider trading allegations as those alleged in the Dismissed Derivative Actions, (see Levy Compl. ¶¶ 81-84; Cole Compl.

¶¶ 55-62; Hubuschman Compl. ¶¶ 55-62), and the Dismissed
Derivative Actions sought the same disgorgement remedy as that
sought by Plaintiffs here, (see Levy Compl., Prayer for Relief
§ C (demanding judgment "disgorging . . . the proceeds of the
Selling Defendants' trading activities"); Cole Compl., Prayer
for Relief § D (demanding "disgorgement of all profits . . .
including all ill-gotten gains from the Insider Selling
Defendants"); Hubuschman Compl., Prayer for Relief § D (same)).
Plaintiffs allege such liability based on the Defendants' non-
disclosure of the second quarter 2012 and 2012-year projections
"in the Registration Statement," (Pl. Op. - Motion to Dismiss,
at 18; see also Compl. ¶ 5), but Congress has mandated that
federal law governs the content of registration statements or
prospectuses for a national securities offering. See National
Securities Markets Improvement Act of 1996 ("NSMIA"), 15 U.S.C.
§ 77r(a); Report of Committee on Commerce, H.R. Rep. 104-622, at
16, reprinted in 1996 U.S.C.C.A.N. 3877, 3878 (NSMIA
"designat[es] the Federal government as the exclusive regulator
of national offering of securities"); H.R. Conf. Rep. 104-864,
at 40 (1996), reprinted in 1996 U.S.C.C.A.N. 3920, 3921 (NSMIA
preserves a state's "power to prevent fraud and brokerdealer
sales practice abuses," but it does not allow a state to
"impos[e] requirements on the contents of prospectuses").
Plaintiffs' insider trading claims are ultimately contingent on

the federal Securities Class Actions litigation.[19]   As such, Plaintiffs' claims fare no better than those in the Dismissed Derivative Actions.

Accordingly, Plaintiffs have not demonstrated that the alleged damages were caused by a corporate wrong which is not predicated on the resolution of other litigation, and their claims are not ripe and therefore dismissed on this basis.

## E) The Plaintiffs Are Not Inadequate Representatives Of The Class Under Rule 23.1

Adequacy of representation is a threshold issue which can be appropriately decided before remand.   See Potter v. Hughes, 546 F.3d 1051, 1055 (9th Cir. 2008) ("[T]he satisfaction of the requirements of Rule 23.1 is a logical antecedent to federal jurisdictional questions.") (citing Ortiz v. Fibreboard Corp., 527 U.S. 815, 831, 119 S. Ct. 2295, 144 L. Ed. 2d 715 (1999)).   When a shareholder brings a derivative action "to enforce a right that the corporation or association may properly assert but has failed to enforce," such an action "may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of shareholders . . . who are

---

[19]

similarly situated in enforcing the right of the corporation."
Fed. R. Civ. P. 23.1(a).  "Where a plaintiff is found to have
been an inappropriate representative of the shareholders, a
judgment entered in that derivative litigation will not preclude
a later-filed derivative action brought by a shareholder who can
fairly represent the shareholders."  In re JPMorgan Chase & Co.
S'holder Derivative Litig., No. 08 Civ. 974(DLC), 2008 WL
4298588, at *7 (S.D.N.Y. Sept. 19, 2008).  The requirement of
fair and adequate representation is analogous to the requirement
that a representative party in a class action must "fairly and
adequately protect the interests of the class."  Fed. R. Civ. P.
23(a)(4).

          "Inherent in any class action is the potential for
conflicting interests among the class representatives, class
counsel, and absent class members."  Maywalt v. Parker & Parsley
Petroleum Co., 67 F.3d 1072, 1077 (2d Cir. 1995).  Thus, "[t]he
ultimate responsibility to ensure that the interests of class
members are not subordinated to the interests of either the
class representatives or class counsel rests with the district
court."  Id. at 1078.  See also Baffa v. Donaldson, Lufkin &
Jenrette Secs. Corp., 222 F.3d 52, 61 (2d Cir. 2000).
"[P]laintiffs attempting to advance derivative and direct claims
in the same action face an impermissible conflict of interest."

65

St. Clair Shores Gen. Emps. Ret. Sys. v. Eibeler, No. 06 Civ. 688(SWK), 2006 WL 2849783, at *7 (S.D.N.Y. Oct. 4, 2006). "As a result of this impermissible conflict, some courts have refused to certify a plaintiff as a class representative, while others have refused to allow the derivative action to proceed." Id. However, "[i]n the context of a derivative suit under Rule 23.1, courts have generally found that the defendant has the burden of showing that the plaintiff is an inadequate representative." In re JPMorgan Chase, 2008 WL 4298588, at *8.

Nominal Defendant contends that Plaintiffs' claims are barred since they "do not 'fairly and adequately represent the interests of shareholders' under Rule 23.1(a) because their counsel represented plaintiffs in IPO-based securities actions against Facebook but now bring claims derivatively on behalf of Facebook." (Def. Mem. – Motion to Dismiss, at 24 (emphasis in original).)

However, Plaintiffs' attorneys are not concurrently bringing securities actions and derivate claims against and for Facebook. Cf, e.g., Stull v. Baker, 410 F. Supp. 1326, 1336-37 (S.D.N.Y. 1976) (questioning "how an attorney can properly represent" both direct and derivative plaintiffs "without compromising his independence of professional judgment and

66

loyalty to these two groups of clients with potentially conflicting interests" where the action contained both class action and derivative claims); St. Clair Shores, 2006 WL 2849783, at *7 (noting that plaintiffs were "advance[ing] derivative and direct claims in the same action"); Ryan v. Aetna Life Ins. Co., 765 F. Supp. 133 (S.D.N.Y. 1991) (holding that shareholder could not simultaneously pursue derivative and class actions because of conflict of interest). Plaintiffs' lead counsel filed motions to withdraw from representation in the securities class actions before filing suit for the Plaintiffs. (Pl. Op. - Motion to Dismiss, at 34.) At no time did Plaintiffs' attorneys actually bring conflicting actions against Defendants.

Nominal Defendant points out that Plaintiffs are claiming as an injury to Facebook in the Removed Actions the costs and damages from the class action litigation Plaintiffs' lead counsel instigated by filing the first securities class action arising out of Facebook's IPO. (Def. Reply - Motion to Dismiss, at 21 (citing Ryan, 765 F. Supp. 133).) Nominal Defendant, however, has not quantified the costs and damages Plaintiffs' lead counsel has caused on the Company. Moreover, Plaintiffs currently seek injury and damages from litigation arising out of the Defendants' alleged wrongful acts. Bringing

litigation to hold a defendant liable for an alleged wrong in this instance does not, without more, compel a finding of inadequate representation.

## I. Conclusion

Based on the conclusions set forth above, (1) Nominal Defendant's motion to dismiss is denied in part and granted in part; and (2) Plaintiffs' motion to remand is denied as moot.

It is so ordered.

New York, NY
December 20 , 2013

ROBERT W. SWEET
U.S.D.J.