**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE FACEBOOK, INC., IPO SECURITIES
AND DERIVATIVE LITIGATION

MDL No. 12-2389

ECF Case

This document relates to the
Consolidated Securities Action:

| | |
|---|---|
| NO. 12-CV-4081 | NO. 12-CV-4763 |
| NO. 12-CV-4099 | NO. 12-CV-4777 |
| NO. 12-CV-4131 | NO. 12-CV-5511 |
| NO. 12-CV-4150 | NO. 12-CV-7542 |
| NO. 12-CV-4157 | NO. 12-CV-7543 |
| NO. 12-CV-4184 | NO. 12-CV-7544 |
| NO. 12-CV-4194 | NO. 12-CV-7545 |
| NO. 12-CV-4215 | NO. 12-CV-7546 |
| NO. 12-CV-4252 | NO. 12-CV-7547 |
| NO. 12-CV-4291 | NO. 12-CV-7548 |
| NO. 12-CV-4312 | NO. 12-CV-7550 |
| NO. 12-CV-4332 | NO. 12-CV-7551 |
| NO. 12-CV-4360 | NO. 12-CV-7552 |
| NO. 12-CV-4362 | NO. 12-CV-7586 |
| NO. 12-CV-4551 | NO. 12-CV-7587 |
| NO. 12-CV-4648 | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO AMEND
AND CERTIFY DECEMBER 12, 2013 ORDER FOR INTERLOCUTORY APPEAL
PURSUANT TO 28 U.S.C. § 1292(b)**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................1

QUESTIONS JUSTIFYING CERTIFICATION FOR IMMEDIATE APPEAL ..........................4

ARGUMENT ...............................................................................................................4

    I.     THE COURT'S DECEMBER 12 ORDER INVOLVES CONTROLLING QUESTIONS OF LAW. ...................................................................5

          A.    Favorable Appellate Review of the December 12 Order Would Result in Dismissal of this Action. .............................................5

          B.    Appellate Review of the December 12 Order Will Have Precedential Value for a Large Number of Cases. .......................6

    II.    THERE IS SUBSTANTIAL GROUND FOR DIFFERENCE OF OPINION ON QUESTIONS IMPLICATED BY THE COURT'S DECEMBER 12 ORDER. ...................................................................9

          A.    There Is Substantial Ground for Difference of Opinion on Whether, Absent an Extreme Departure From Prior Results, Item 303(a)(ii) Requires Issuers To Disclose the Extent to Which a Known Trend Has Affected the Issuer's Revenues for the Quarter in Progress. ........................................................................10

          B.    There Is Substantial Ground for Difference of Opinion on Whether a Warning that a Trend "May" Impact Future Reported Revenue Is Misleading Simply Because the Trend Appears To Be Affecting Intra-Quarter Revenues. ..........................................16

    III.    AN IMMEDIATE APPEAL MAY MATERIALLY ADVANCE THE ULTIMATE TERMINATION OF THIS LITIGATION. .....................19

CONCLUSION ..........................................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arfa v. Mecox Lane Ltd.*,
  2012 WL 697155 (S.D.N.Y.) ............................................................................ 7, 13

*Balintulo v. Daimler AG*,
  727 F.3d 174 (2d Cir. 2013) ...................................................................................... 4

*Blackmoss Invs. Inc. v. ACA Capital Holdings, Inc.*,
  2010 WL 148617 (S.D.N.Y. 2010) .......................................................................... 11

*Blum v. Semiconductor Packaging Materials Co.*,
  1998 WL 254035 (E.D. Pa. 1998) ........................................................................... 12

*Century Pac., Inc. v. Hilton Hotels, Corp.*,
  574 F. Supp. 2d 369 (S.D.N.Y. 2008) ..................................................................... 19

*Colonial Realty Corp. v. Bache & Co.*,
  358 F.2d 178 (2d Cir. 1966) ...................................................................................... 7

*DeMaria v. Andersen*,
  318 F.3d 170 (2d Cir. 2003) ....................................................................... 2, 12, 16

*Glassman v. Computervision Corp.*,
  90 F.3d 617 (1st Cir. 1996) ..................................................................................... 12

*Glatt v. Fox Searchlight Pictures Inc.*,
  2013 WL 5405696 (S.D.N.Y. 2013) ...................................................................... 6, 9

*Gulino v. Board of Educ. of City School Dist. of City of New York*,
  907 F.Supp.2d 492 (S.D.N.Y. 2012) ......................................................................... 9

*Higginbotham v. Baxter Int'l., Inc.*,
  495 F.3d 753 (7th Cir. 2007) .............................................................................. 8, 13

*In re Air Crash off Long Island, N.Y. on July 17, 1996*,
  27 F. Supp. 2d 431 (S.D.N.Y. 1998) .................................................................. 4, 19

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
  2013 WL 6665399 (S.D.N.Y. Dec. 12, 2013) ................................................. 1, 3, 20

*In re FBR Inc. Secs. Litig.*,
  544 F. Supp. 2d 346 (S.D.N.Y. 2008) ............................................................ 9, 16, 19

*In re Focus Media Holding Ltd. Litig.*,
  701 F. Supp. 2d 534 (S.D.N.Y. 2010) ..................................................................... 12

*In re Leapfrog Enters., Inc. Secs. Litig.*,
  527 F. Supp. 2d 1033 (N.D. Cal. 2007) .................................................................. 16

*In re Lloyd's American Trust Fund Litig.*,
  1997 WL 458739 (S.D.N.Y. 1997) ................................................................ 5, 9, 20

i

*In re N2K, Inc. Secs. Litig.*, 82 F. Supp. 2d 204 (S.D.N.Y.),
    *aff'd on the district court opinion*, 202 F.3d 81 (2d Cir. 2000) ........................................ 2, 12, 18

*In re Noah Educ. Holdings, Ltd. Sec. Litig.*,
    2010 WL 1372709 (S.D.N.Y. 2010) .................................................................. passim

*In re Turkcell Iletisim Hizmetler A.S. Secs. Litig.*,
    202 F. Supp. 2d 8 (S.D.N.Y. 2001) .................................................................. passim

*In re Van der Moolen Holding N.V. Secs. Litig.*,
    405 F. Supp. 2d 388 (S.D.N.Y. 2005) ............................................................. 17

*In re WorldCom, Inc. Sec. Litig.*,
    2003 WL 22953644 (S.D.N.Y. 2003) ........................................................... 9, 10, 20

*In re Worlds of Wonder Sec. Litig.*,
    35 F.3d 1407 (9th Cir. 1994) ......................................................................... 12

*Kapps v. Torch Offshore, Inc.*,
    379 F.3d 207 (5th Cir. 2004) .......................................................................... 11

*Klinghoffe v. S.N.C. Achille Lauro*,
    921 F.2d 21 (2d Cir. 1990) ........................................................................... 6, 19

*Litwin v. Blackstone Grp., L.P.*,
    634 F.3d 706 (2d Cir. 2011) ........................................................................... 2, 14

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*,
    547 U.S. 71 (2006) ...................................................................................... 7

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
    681 F.3d 114 (2d Cir. 2012) ........................................................................... 2, 14

*Transport Workers Union of Am., Local 100, AFL-CIO v. New York City Transit Auth.*,
    358 F. Supp. 2d 347 (S.D.N.Y. 2005) ............................................................ 6

*Univ. of Texas Sw. Med. Ctr. v. Nassar*,
    133 S. Ct. 2517 (2013) ................................................................................ 15

*Yamaha Motor Corp., U.S.A. v. Calhoun*,
    516 U.S. 199 (1996) ..................................................................................... 5

*Zucker v. Quasha*,
    891 F. Supp. 1010 (D.N.J. 1995) .................................................................. 12

**Statutes**

28 U.S.C. § 1292(b) ........................................................................................ 4

**Other Authorities**

Charles J. Johnson, Jr. & Joseph McLaughlin,
    *Corporate Finance and the Securities Laws* (4th ed. 2012 Supp.) ............................................ 8

David A. Westenberg,
    *Initial Public Offerings: A Practical Guide to Going Public* (PLI Sept. 2011) ........................ 8

S. Rep. 104-98 (1995) ................................................................................................................. 20

**Rules**

Fed. R. App. P. 5(a)(3) ................................................................................................................. 5

**Regulations**

17 C.F.R. § 229.10(a) ................................................................................................................... 7

17 C.F.R. § 229.303 ................................................................................................................... 15

65 Fed. Reg. 51716 (Aug. 24, 2000) ........................................................................................... 8

70 Fed. Reg. 44722 (Aug. 3, 2005) ............................................................................................. 8

## INTRODUCTION

The Court's December 12 decision denying Defendants' motion to dismiss rests on two holdings that warrant immediate review under 28 U.S.C. § 1292(b). *First*, the Court held that Item 303 of Regulation S-K requires issuers to disclose not only "known trends," but also the "*extent*" to which such trends "ha[ve] impacted … revenues" for the quarter in progress at the time of an IPO. *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 2013 WL 6665399, at *18 (S.D.N.Y. Dec. 12, 2013) ("Op." or "Order") (emphasis added). Based on this interpretation, the Court concluded that the Complaint stated a claim for allegedly inadequate disclosures because, while Facebook had disclosed the trend of increased mobile usage, *see, e.g.*, *id.* at *17, Facebook "should have disclosed more" about the "extent" to which the trend "was already" affecting Facebook's revenues during the first six weeks of the second quarter. *See id.* at *18. *Second*, the Court held that a warning that a risk may affect future reported revenues can be misleading where that risk allegedly had already negatively affected revenue growth for the quarter in progress. Accordingly, the Court ruled that the Complaint stated a claim based on Plaintiffs' allegations that although Facebook warned that increasing mobile usage "may" negatively affect future reported revenues, it failed to provide an intra-quarter update that the trend of increased mobile usage appeared to be negatively affecting revenue for the quarter in progress.[1]

There are substantial grounds for difference of opinion on both of those legal issues. Until now, no court has ever held (in the absence of an extreme departure from past performance) that Item 303 or anything else requires issuers to disclose the "extent" to which known trends "ha[ve] impacted … revenues" for the quarter in progress. Indeed, the Second

---

[1]   As the Court noted, because it was addressing a motion to dismiss, it assumed the alleged facts were true for purposes of its decision. *See* Op. *2. Defendants make the same assumption for purposes of this motion.

Circuit's opinions in *Litwin* and *Panther Partners*, upon which the Court relied, did not say anything about providing updates on intra-quarter revenues; rather, even the dicta in those cases referred, at most, to a duty to discuss a "potential ***future*** impact" on revenue.   *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 719 (2d Cir. 2011) (emphasis added); *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 121 (2d Cir. 2012) (same).   Certainly the Second Circuit did not suggest that it was overruling the decisions in this District that have specifically rejected the argument that Item 303 imposes any obligation to provide an update on revenues mid-quarter, or even on a recently completed quarter, absent an extreme departure.   *See, e.g.*, *In re Noah Educ. Holdings, Ltd. Sec. Litig.*, 2010 WL 1372709, at *7-8 (S.D.N.Y. 2010); *In re Turkcell Iletisim Hizmetler A.S. Secs. Litig.*, 202 F. Supp. 2d 8, 12-13 (S.D.N.Y. 2001).

Nor has a court ever held that a warning about a potential impact on future reported revenues may be misleading simply because the risk warned about is allegedly affecting revenues in the quarter in progress.   Again, the Second Circuit and courts within this District have rejected such a claim, even where revenues were (unlike here) for a *completed quarter*.   *See DeMaria v. Andersen*, 318 F.3d 170, 181-82 (2d Cir. 2003) (even though the company warned that it "*may* incur operating losses in the future," it "can hardly be said that, by having not been explicitly told of the company's actual first quarter losses, a reasonable investor would have been misled") (internal quotations omitted and emphasis added); *In re N2K, Inc. Secs. Litig.*, 82 F. Supp. 2d 204, 209 (S.D.N.Y.), *aff'd on the district court opinion*, 202 F.3d 81 (2d Cir. 2000) (warning that "it is possible that in some future quarter … the Company's operating results will be below [analysts'] expectations" was not misleading simply because the unreported results of the recently-completed quarter "*were* below analysts' expectations") (emphasis in original); *In re*

*Noah Educ. Holdings*, 2010 WL 1372709, at *7-8 (risk warnings "did not imply that none of these risks … would affect [Defendant's] most recent [and as-yet unreported] fiscal quarter").

Immediate review of these issues is warranted because if the Second Circuit disagrees with this Court's decision, Plaintiffs' Complaint cannot survive.  Interlocutory review thus may eliminate the burdens of unnecessary discovery, class certification, and other proceedings for the parties as well as the Court.  This consideration is particularly strong here given that discovery on the causation issues in this case is likely to overlap with related issues in the NASDAQ cases. *See In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 2013 WL 6621024, at *32 n.25 (S.D.N.Y. 2013).  Because discovery in the NASDAQ cases may be affected by NASDAQ's impending appeal of this Court's immunity ruling, allowing this case to go forward without an interlocutory appeal creates the real prospect of duplicative discovery.  Immediate review is also warranted here because the novel disclosure duties announced by the Court are inconsistent with the disclosure structure created by the SEC and therefore will generate substantial uncertainty for issuers regarding what "more" they must disclose about the impact a known, disclosed trend appears to be having on intra-quarter revenues, even though (as here) those trends may turn out to have no material impact on the issuer's ultimate performance for even one quarter.

The intra-quarter disclosure duty that this Court's decision imposes (even in the absence of an extreme departure) is likely to result in hurried and potentially incomplete or inaccurate disclosures.  As this case shows, it is difficult, if not impossible, to determine exactly what impact an observed trend a few weeks into any quarter will ultimately have on the future reported results for the completed quarter or year, particularly for a company in a rapidly changing business environment and industry like Facebook.  Here, Facebook's mid-quarter prediction that it would come in on the "low-end" of the second quarter and below the full year

projection that it had made just three weeks before, turned out to be wrong, as the company's ultimate performance met and exceeded the earlier projections. Indeed, the Court's decision may well have an exaggerated effect in shaping the conduct of other issuers and generate confusion across the capital markets given that it involves one of the largest and most publicized IPOs in history. Other issuers will likely look to the decision in this case for guidance on disclosure obligations concerning intra-quarter revenue impacts in future IPOs, and even in Form 10-K and 10-Q filings, to which Item 303 also applies. Accordingly, apart from possibly ending this litigation, immediate review and a decision from the Second Circuit would provide clarity for the entire securities industry on important disclosure issues where this Court's decision is at odds with the SEC's disclosure structure and existing Southern District case law.

### QUESTIONS JUSTIFYING CERTIFICATION FOR IMMEDIATE APPEAL

1.  In the absence of an extreme departure from prior reported results, does Item 303 of Regulation S-K require an issuer to disclose the extent to a which known (and disclosed) trend allegedly appears to be affecting intra-quarter revenues?

2.  In the absence of an extreme departure from prior reported results, is a warning that a trend "may" affect future reported revenue misleading simply because the trend appears to be affecting intra-quarter revenues?

### ARGUMENT

"Section 1292(b) provides that a district court may certify an interlocutory order for appeal if it is of the opinion that: (1) the order 'involves a controlling question of law'; (2) 'as to which there is a substantial ground for difference of opinion,' and (3) an immediate appeal 'may materially advance the ultimate termination of the litigation.'" *In re Air Crash off Long Island, N.Y. on July 17, 1996*, 27 F. Supp. 2d 431, 433 (S.D.N.Y. 1998) ("*In re Air Crash*") (Sweet, J.) (quoting 28 U.S.C. § 1292(b)); *see also Balintulo v. Daimler AG*, 727 F.3d 174, 186 (2d Cir. 2013). Here, all three of section 1292(b)'s requirements are met. Respectfully, therefore, the

Court should "amend its order … to include … permission" to appeal, as the Federal Rules allow.  Fed. R. App. P. 5(a)(3).

## I.   THE COURT'S DECEMBER 12 ORDER INVOLVES CONTROLLING QUESTIONS OF LAW.

Although only one controlling question is necessary to certify an order under section 1292(b), *see Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 204-05 (1996), as noted above, the Order from which Defendants seek certification for immediate appellate review involves at least two controlling legal questions.  A controlling question of law exists if "reversal of the district court's opinion could result in dismissal of the action" or if "the certified issue has precedential value for a large number of cases."  *In re Lloyd's American Trust Fund Litig.*, 1997 WL 458739, at *4 (S.D.N.Y. 1997) (Sweet, J.).  The two questions of law raised in this motion satisfy either standard.

### A.   Favorable Appellate Review of the December 12 Order Would Result in Dismissal of this Action.

The Court reached two holdings in its decision, each of which is based on the same fundamental question of law about an issuer's obligation to provide an intra-quarter update about revenues (in the absence of any alleged "extreme departure" from reported revenues).  The Court first held that Item 303 may require Facebook to disclose not only the trend of increasing mobile usage (and the fact that this trend might affect future reported revenue), but also "the extent the increased mobile usage seen by the Company was already affecting Facebook's revenues" in the first six weeks of the second quarter.  Op. *18.  This plainly presents a controlling question of law.  If the Second Circuit holds that Item 303 required disclosure solely of the "trends" themselves, but not the *extent* to which those trends were affecting intra-quarter revenues, Plaintiffs' claim that Facebook failed to satisfy Item 303 would be dismissed.  Likewise, the

5

holding that Plaintiffs stated a claim by alleging that Facebook's warnings that mobile usage might affect future reported revenue "misleadingly represented that" such an impact "was merely possible when, in fact, it had already materialized" in the early weeks of the second quarter, *id.* at *22, also presents a controlling question of law.  If the Second Circuit holds that a warning of a future effect on reported revenue does not become misleading simply because the warned-of risk allegedly appears to be affecting intra-quarter revenues, then Plaintiffs' claim that Facebook's warnings misled investors fails.[2]

### B.     Appellate Review of the December 12 Order Will Have Precedential Value for a Large Number of Cases.

The December 12 Order also presents a controlling question of law for the independent reason that the ruling will have "precedential value for a large number of cases."  *Glatt v. Fox Searchlight Pictures Inc.*, 2013 WL 5405696, at *2 (S.D.N.Y. 2013); *see also Klinghoffe v. S.N.C. Achille Lauro*, 921 F.2d 21, 24 (2d Cir. 1990) ("[T]he impact that an appeal will have on other cases is a factor that [the court] may take into account in deciding whether to accept an appeal that has been properly certified by the district court."); *Transport Workers Union of Am., Local 100, AFL-CIO v. New York City Transit Auth.*, 358 F. Supp. 2d 347, 353 (S.D.N.Y. 2005) (certifying order for interlocutory appeal because "this case raises a novel issue of great importance to many other employers," and "may therefore have considerable precedential value").  This case concerns one of the largest and most visible IPOs ever and raises fundamental questions regarding the alleged duty to disclose revenue information in the middle of a quarter. The Court's opinion is likely to have widespread and unsettling effects on the capital markets,

---

[2]   The Court's holding that the Complaint stated a claim for "fail[ing] to disclose material information required to be disclosed by Rule 408," was explicitly based on the Court's Item 303 and misrepresentation rulings.  Op. at *27-28.  Accordingly, a reversal of the Item 303 and misrepresentation rulings would also require dismissal of the dependent Rule 408 claim.

because its inconsistency with the SEC's disclosure regime and other case law in the Southern District creates uncertainty regarding the obligations of issuers and underwriters to disclose intra-quarter revenue information.  The interest in ensuring a consensus of authority on these questions is extraordinarily strong.  *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71, 78 (2006) ("The magnitude of the federal interest in protecting the integrity and efficient operation of the market for nationally traded securities cannot be overstated."); *Colonial Realty Corp. v. Bache & Co.*, 358 F.2d 178, 180 (2d Cir. 1966) (Friendly, J.) ("[W]e granted leave under § 1292(b) … in order to eliminate any doubt as to our ability to reach an issue of general importance under the securities laws.").  In particular, immediate review is warranted here because the Court's opinion suggests that three standard industry practices could result in enormous liability.

*First*, under the Court's opinion, to avoid liability under Item 303, companies will be compelled to provide updates whenever a disclosed trend or risk appears to be having an intra-quarter impact on revenues.  This result is directly contrary to "[t]he disclosure structure set out by the SEC," which "recognizes how unworkable and potentially misleading a system of instantaneous disclosure out [of] the normal reporting periods would be."  *Arfa v. Mecox Lane Ltd.*, 2012 WL 697155, at *9 n.1 (S.D.N.Y.), *aff'd*, 2012 WL 5954124 (2d Cir. 2012).  In addition to affecting IPOs, the Court's novel view of Item 303 may well affect the conduct of thousands of seasoned issuers making routine SEC filings.  Because Item 303 applies to 10-Qs, 10-Ks, proxy statements, and myriad other SEC filings, *see* 17 C.F.R. § 229.10(a), any publicly traded company disclosing trends in such filings will have to grapple with the conflicting directions prescribed by this Court, on the one hand, and by the SEC and other courts, on the other hand.  Indeed, the Court's decision threatens to upend long-settled practice in securities

disclosures by requiring issuers to constantly re-evaluate whether there have been any potentially material changes to their revenues or projections, positive or negative, between the results for the last quarter reported in the document and the later date of the filing.  This conflicts with standard industry practice in which "[f]irms regularly learn financial information between quarterly reports, and they keep it under their hats until the time arrives for disclosure."  *Higginbotham v. Baxter Int'l., Inc.*, 495 F.3d 753, 760 (7th Cir. 2007).

      *Second*, the Court relies on Facebook's alleged disclosures of revised internal projections to the underwriters as a basis for potentially requiring the company to disclose intra-quarter revenue information to the public at large.  *See, e.g.*, Op. at *19 ("[T]he Company's changes in its internal projections and subsequent calls to the Syndicate Analysts establish that the Company had identified a trend leading up to its IPO alleged to be material.").  That novel approach is flatly at odds with the SEC's considered view.  It is common practice for issuers to share sensitive information (including revenue projections based on intra-quarter data) with their underwriters prior to an IPO to help them accurately price the offering and reduce post-IPO volatility.  *See, e.g.*, David A. Westenberg, *Initial Public Offerings: A Practical Guide to Going Public* § 19:7.2[B] (PLI Sept. 2011); Charles J. Johnson, Jr. & Joseph McLaughlin, *Corporate Finance and the Securities Laws* § 3.04[A][6] (4th ed. 2012 Supp.); Mem. in Supp. of Defs.' Mot. to Dismiss the Consolidated Class Action Compl., at 8-14 (collecting authorities on standard IPO practice).  The SEC too rejected a proposed rule that would require issuers to disclose to the public any material information that they share with their underwriters before an IPO.  *See* 70 Fed. Reg. 44722, 44760 (Aug. 3, 2005) ("Regulation FD will not apply to … [a]n oral communication made in connection with the registered securities offering after filing of the registration statement …."); 65 Fed. Reg. 51716, 51719 (Aug. 24, 2000) (same).  In the wake of

the Court's December 12 decision, however, any issuer that shares nonpublic information with its underwriters prior to an IPO may do so at its peril.  Based on the precedent set here, a subsequent lawsuit may characterize such disclosures as involving material information that triggers a disclosure obligation under Item 303 or other provisions governing IPOs.

*Third*, even though cautionary statements about future reported results are "ubiquitous in securities filings," numerous courts have rejected any effort to find such statements "to be actionable by themselves" on the theory that they somehow imply that something has not yet happened in a quarter in progress.  *In re FBR Inc. Secs. Litig.*, 544 F. Supp. 2d 346, 360-62 (S.D.N.Y. 2008).  Again, the Court's December 12 Order likely will affect countless issuers, underwriters, and publicly-traded companies as they evaluate whether cautionary statements require them to disclose intra-quarter revenue information (even in the absence of an extreme departure from prior reported results).

## II.   THERE IS SUBSTANTIAL GROUND FOR DIFFERENCE OF OPINION ON QUESTIONS IMPLICATED BY THE COURT'S DECEMBER 12 ORDER.

Substantial ground for difference of opinion exists where the decision under review is in tension with other decisions within the same district.  *See e.g.*, *Glatt*, 2013 WL 5405696, at *2 (certifying order for interlocutory review because an "intra-district split and decisions from other circuits clearly show a substantial basis exists for difference of opinion"); *Gulino v. Board of Educ. of City School Dist. of City of New York*, 907 F.Supp.2d 492, 526 (S.D.N.Y. 2012) (same).  Courts also find substantial ground for difference of opinion where the decision under review is in tension with the holdings of other circuits.  *See, e.g.*, *In re Lloyd's American Trust Fund Litig.*, 1997 WL 458739, at *7; *In re WorldCom, Inc. Sec. Litig.*, 2003 WL 22953644, at *6 (S.D.N.Y. 2003).  Here, there is substantial ground for difference of opinion because this Court's decision

conflicts both with decisions in the Southern District of New York and with the decisions of courts in other circuits on at least two controlling issues.

>    **A.    There Is Substantial Ground for Difference of Opinion on Whether, Absent an Extreme Departure From Prior Results, Item 303(a)(ii) Requires Issuers To Disclose the Extent to Which a Known Trend Has Affected the Issuer's Revenues for the Quarter in Progress.**

The Court found that the Complaint alleged a violation of Item 303(a)(3)(ii) because Facebook failed to "denote the extent the increased mobile usage seen by the Company was already affecting Facebook's revenues" for the second quarter and the year, "as evidenced by the Company's second quarter internal projections."  *Id.* at *18-19.  In the Court's view, to satisfy Item 303(a)(3)(ii), Facebook "should have disclosed more" about this alleged intra-quarter impact.  *Id.* at *18.  But such a disclosure obligation squarely conflicts with decisions from this District that have specifically rejected a duty under Item 303 to disclose interim revenue information.

In *Noah Educational Holdings*, for instance, the plaintiffs made the same types of arguments as Plaintiffs here, claiming that the issuer was required to disclose that a trend of increasing raw material costs had affected the company's profit margins for the quarter that was completed just weeks before the IPO.  2010 WL 1372709, at *6-7.  Indeed, the *Noah* plaintiffs were arguing about disclosure of information from a quarter that was completed, albeit more recently than the 45 days necessary to require disclosure under SEC regulations.  Judge Sullivan nonetheless found no obligation to disclose financial information from an "interim" quarter, rejecting the argument as "an end-run around the carefully delineated SEC regulations that specify what financial data must be disclosed in offering documents."  *Id.* at *7 ("the SEC's financial reporting regulations, … at least in the absence of an extreme deviation from past

performance, do not require publicly traded companies to disclose interim financial data").[3] Likewise, the plaintiffs in *Turkcell* alleged that Item 303 required the disclosure of a 9% drop in operating income that occurred during an interim quarter completed ten days before the IPO. 202 F. Supp. 2d at 12-13. Judge Buchwald rejected that theory because it was inconsistent with "the disclosure structure set out by the SEC and the case law." *Id.* at 13.

To the extent the Court's decision requires disclosure of revenues from an uncompleted quarter, this Court's decision also creates substantial tension with case law from the Second Circuit and this District holding that the "only … circumstance[]" in which "courts have mandated disclosure of interim financial information" is "when the interim results represent an extreme departure from the range of results which could be anticipated based on currently available information." *Id.* at 12 (internal quotations omitted). While the Court's opinion distinguishes some of these cases as rejecting merely a "general" duty to disclose intra-quarter "results," there is at least a substantial difference of opinion whether the Second Circuit would interpret Item 303 as creating a significant exception to this well-established rule. In affirming the *N2K* decision "on the opinion of Judge Baer," the Second Circuit agreed with Judge Baer that the omission of interim financial information from a registration statement is not actionable

---

3  In fact, *Noah* held that plaintiff's allegation of a spike in the cost of raw materials during two months of the interim quarter was of too short a duration even to establish a trend for purposes of Item 303 disclosures. 2010 WL 1372709, at *6. Plaintiffs here similarly alleged a "sudden weaken[ing]" in Facebook's intra-quarter revenues. Compl. ¶ 21. To the extent the Court held that Facebook did not disclose the supposed *trend* of an intra-quarter revenue impact, numerous courts in addition to *Noah* have held that "[a]s a matter of law, a two-month period of time does not establish a 'trend' for purposes of the disclosures required by Item 303." *Blackmoss Invs. Inc. v. ACA Capital Holdings, Inc.*, 2010 WL 148617, at *10 (S.D.N.Y. 2010) (Sweet, J.); *see also, e.g.*, *Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 217-218 (5th Cir. 2004) (sixty percent drop in the price of natural gas over the two-month period before the prospectus was filed was not a trend under Item 303).

11

under Section 11 absent "an 'extreme departure' from the range of anticipated results about [the defendant's] revenues and losses."  82 F. Supp. 2d at 208, *aff'd on the district court opinion*, 202 F.3d 81 (2d Cir. 2000); *see also DeMaria*, 318 F.3d at 180 (company was not required to disclose results of completed quarter before SEC-mandated reporting period because that quarter was not a "dramatic reversal" from prior quarters); *In re Focus Media Holding Ltd. Litig.*, 701 F. Supp. 2d 534, 539 (S.D.N.Y. 2010) (rejecting an attempt "to hold Defendants liable for [their] failure to disclose financial information about the third quarter before that quarter had concluded").[4]

Instead of applying a narrow "extreme departure" exception,[5] the Court created a much broader disclosure obligation by holding that Item 303 may require an issuer to disclose the extent to which a "known trend" allegedly appears to be affecting an issuer's intra-quarter

---

[4]   Cases outside the Second Circuit are in accord.  *See, e.g.*, *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1419 (9th Cir. 1994) (no duty "to disclose the extent to which [a] quarter['s] sales lagged behind … internal projections" when "[t]he quarter … was not yet complete"); *Glassman v. Computervision Corp.*, 90 F.3d 617, 631 (1st Cir. 1996) ("Plaintiffs' nondisclosure claims fail because they base their allegations solely on … intra-quarterly information…"); *Zucker v. Quasha*, 891 F. Supp. 1010, 1019 (D.N.J. 1995), *aff'd*, 82 F.3d 408 (3d Cir. 1996) ("Defendants did not have a duty to disclose data from an ongoing fiscal quarter"); *Blum v. Semiconductor Packaging Materials Co.*, 1998 WL 254035, at *3 (E.D. Pa. 1998) ("[T]here was no duty to disclose fourth quarter earnings before the end of the fourth quarter").

[5]   There is no basis for applying the "extreme departure" exception here, and the Court did not do so.  Plaintiffs alleged an 8.3% downward change in Facebook's projections for second quarter revenue growth (a figure Plaintiffs reached by treating a revision from the "upper-end" of a $1.1-1.2 billion range to the "lower-end" of that same range, as though it were a revision from $1.2 to $1.1 billion).  There is no case holding that an 8.3% shift in revenue *growth*, as opposed to a revenue decline, amounts to an "extreme departure."  To the contrary, the Second Circuit agreed in *In re N2K* that even a *loss* 8.6% greater than analysts' expectations is not "an 'extreme departure' from the range of anticipated results.  *See In re N2K*, 82 F. Supp. 2d at 205, 208, *aff'd on the district court opinion*, 202 F.3d 81 (2d Cir. 2000); *see also In re Turkcell*, 202 F. Supp. at 13 (9% decline in reported operating income is not an "extreme departure" trigging a disclosure obligation)).

revenues.  *See* Op. *18 (Facebook's registration statement failed to "denote the extent the increased mobile usage seen by the Company was already affecting Facebook's revenues"); *id.* ("That Facebook identified the trend intra-quarter is of no issue; under Item 303, Defendants were required to disclose the issues even though it arose intra-quarter.").  The Court applied that obligation notwithstanding its holding that there was no duty to disclose Facebook's internal projections or the change in the projections that allegedly resulted from any intra-quarter revenue effect.  *See id.* at *19 (Facebook "did not violate Item 303 when it decided not to disclose its updated second quarter and yearly internal projections").

Such a mid-quarter disclosure obligation is contrary to the "disclosure structure set out by the SEC [which] recognizes how unworkable and potentially misleading a system of instantaneous disclosure out [of] the normal reporting periods would be."  *Arfa*, 2012 WL 697155, at *9 n.1 (internal quotations omitted), *aff'd*, 2012 WL 5954124 (2d Cir. 2012); *see also In re Turkcell*, 202 F. Supp. 2d at 13 (rejecting an attempt to require "the immediate release of data without the benefit of reflection or certainty provided by the traditionally recognized reporting periods").  "The securities laws create a system of periodic rather than continual disclosures," in order to give companies "the time necessary to get things right … rather than jump the gun with half-formed stories as soon as a problem comes to their attention." *Higginbotham*, 495 F.3d at 760-61.  This very case demonstrates how such an "instantaneous" disclosure requirement might result in misleading disclosures:  Facebook's prediction, based on its experience in the early weeks of the second quarter, that it would "come in [on] the lower end of our $1.1 to $1.2 bn range for Q2," Compl. ¶ 133, turned out to be wrong, as the company ultimately reported revenue at the high end of the original $1.1-1.2 billion range (*i.e.*, $1.184 billion).  *See* Op. Br. 15-16.

No case has ever held that Item 303(a)(ii) creates an exception to the rule against disclosure of intra-quarter revenue information. *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706 (2d Cir. 2011) and *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114 (2d Cir. 2012), upon which the Court relied, did not say anything about disclosing the impacts of known (and disclosed) trends on intra-quarter revenues.  Rather, both cases involved entirely negative trends that were not disclosed at all.   Even the dicta in those cases referred, at most, to a duty to discuss a "potential *future* impact," not to a duty to disclose revenue impacts occurring during a quarter in progress.  *See Litwin*, 634 F.3d at 718-19 ("[T]he key information that plaintiffs assert should have been disclosed is whether, and to what extent, the particular known trend … might have been reasonably expected to materially affect Blackstone's investments.  And this potential *future* impact was certainly not public knowledge ….") (emphasis modified); *Panther Partners*, 681 F.3d at 120 ("[W]hat is at issue … is the manner in which uncertainty surrounding that defect rate … might reasonably be expected to have a material impact on *future revenues*.") (emphasis added).  This Court's ruling expands *Litwin* and *Panther Partners*'s dicta to require discussion of a trend's alleged impact on intra-quarter revenues.  As this Court noted in its Opinion, Facebook disclosed that increasing mobile usage and product decisions may have both positive and negative effects on revenues; both brought new customers and increased use to Facebook — some on PCs with ads, some on mobile, without ads as of May 18, 2012 but potentially with ads thereafter.  Nothing in *Litwin* or *Panther Partners*, which both involved entirely negative trends, requires what would be an extremely difficult task of evaluating and then disclosing the *net* impact of trends just six weeks into a quarter.

The language and structure of Item 303 itself provides further grounds for differing opinions on this Court's view of disclosure duties.  Item 303(a)(3)(ii) requires issuers only to

14

"[d]escribe [i] any known trends or uncertainties that [ii] have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. § 229.303(a)(3)(ii).  In other words, the fact that a trend has impacted or will impact revenues merely triggers a duty to disclose the trend itself, not "the extent" of the impact.  In stark contrast, the other subsections in Item 303(a)(3) expressly require discussion of "the extent to which" other events have had an impact, and then only on past *reported* revenues.  Specifically, subsections (a)(3)(i), (iii), and (iv) require an issuer to "indicate the extent to which" "any unusual or infrequent events … materially affected the amount of *reported* income from continuing operations," *id.* § 229.303(a)(3)(i) (emphasis added); if "*the financial statements* disclose material increases in net sales or revenues, provide a narrative discussion of the extent to which such increases are attributable to" three specified factors, *id.* § 229.303(a)(3)(iii) (emphasis added); and "[f]or the three *most recent fiscal years* … , discuss the impact of inflation and changing prices on the registrant's net sales and revenues and on income from continuing operations," *id.* § 229.303(a)(3)(iv) (emphasis added).  The Court's opinion not only imports the "extent to which" language found only in Items 303(a)(3)(i), (iii) and (iv) into Item 303(a)(3)(ii), it also drops the express limitation to impacts on past *reported* results.  Such a reading contradicts fundamental rules of statutory and regulatory construction.  *See Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2529 (2013) (where rule makers choose to use specific language in one provision, but not another, courts "must give effect to [that] choice").

**B.      There Is Substantial Ground for Difference of Opinion on Whether a Warning that a Trend "May" Impact Future Reported Revenue Is Misleading Simply Because the Trend Appears To Be Affecting Intra-Quarter Revenues.**

There is also substantial ground for a difference of opinion on the Court's ruling that Facebook's "purported risk warnings misleadingly represented that" an effect on revenue from increased mobile usage "was merely possible when, in fact, it [allegedly] had already materialized" in the first weeks of the second quarter.  Op. *22.  The Court's holding on this point is a rare instance of allowing a plaintiff to wield a defendant's cautionary language "as a sword to impose liability."  *In re FBR Inc. Secs. Litig.*, 544 F. Supp. 2d 346, 361 (S.D.N.Y. 2008).  It conflicts with several prior cases holding that words like "may" and "could" that warn of a potential impact on future reported revenues do not imply the absence of any past impact — let alone a current impact — on intra-quarter revenue.  *See, e.g.*, *DeMaria*, 318 F.3d at 181-82 (holding that, even though the company warned that it "*may* incur operating losses in the future," it "can hardly be said that, by having not been explicitly told of the company's actual first quarter losses, a reasonable investor would have been misled") (internal quotations omitted and emphasis added); *In re Noah Educ. Holdings*, 2010 WL 1372709, at *7-8 (prospectus said "could" but the "forward-looking recitation of risks facing [Defendant] did not imply that none of these risks … would affect [Defendant's] most recent [unreported] fiscal quarter"); *In re FBR*, 544 F. Supp. 2d at 360-63 (rejecting plaintiff's argument that the company's warning that "any failure to comply [with securities regulations] could have a material effect on our operating results" misleadingly "implied that [the company] had complied with its regulatory obligations"); *In re Leapfrog Enters., Inc. Secs. Litig.*, 527 F. Supp. 2d 1033, 1048 (N.D. Cal. 2007) (rejecting claim that "defendants should have stated that the adverse factors 'are' affecting financial results rather than 'may' affect financial results").  Facebook's risk disclosures in the

16

Registration Statement, in fact, noted that the conditions that could negatively affect future reported revenues already existed.[6]

Indeed, this Court itself recognized the conflict between its approach, on the one hand, and *Noah*, *FBR*, and *Leapfrog*, on the other. *See* Op. *21 (citing these cases as contrary, "*but cf.*" authority). And those cases recognized the conflict between their approach and the approach this Court took in *In re Van der Moolen Holding N.V. Secs. Litig.*, 405 F. Supp. 2d 388 (S.D.N.Y. 2005), and again in this case. *FBR,* for instance, explicitly "decline[d] to adopt the approach employed" in *Van der Moolen* in which "cautionary language generally inserted as a shield against liability is wielded as a sword to impose liability on the theory that a boilerplate warning about risks of loss necessarily implies to investors that no loss has ever transpired." 544 F.3d at 361-62. *Noah* and *Leapfrog* likewise declined to follow *Van der Moolen* on this issue.

---

[6] The Registration Statement stated that Facebook's "ability to grow revenue *would* be negatively affected" by increased mobile usage *if* two conditions were met: (1) "users increasingly access Facebook mobile products as a substitute for access through personal computers," and (2) Facebook is "unable to successfully implement monetization strategies for our mobile users." (Final S-1, at 14.) It further disclosed that these two conditions existed and were ongoing, as it stated that "some of this mobile usage *has been*, and will continue to be, a substitute for use of Facebook through personal computers," Final S-1, at 51 (emphasis added), and that "we do not *currently* directly generate any meaningful *revenue* from the use of Facebook mobile products," *id.* at 14 (emphasis added); *see also id.* at 53 ("Increasing use of Facebook on mobile devices *will* also affect our performance, particularly if mobile use substitutes for use on personal computers.") (emphasis added). The company also emphasized, in its May 9 Free Writing Prospectus, that the increased mobile usage trend had continued into the second quarter and was contributing to an ongoing reduction in the number of ads delivered per user. *See* Facebook's Free Writing Prospectus, May 9, 2012 ("Based upon our experience in the second quarter of 2012 to date, the trend we saw in the first quarter of DAUs increasing more rapidly than the increase in number of ads delivered has continued. We believe this trend is driven in part by increased usage of Facebook on mobile devices where we have only recently begun showing an immaterial number of sponsored stories in News Feed, and in part due to certain pages having fewer ads per page as a result of product decisions.").

*See In re Noah Educ. Holdings*, 2010 WL 1372709, at \*7 n.7; *In re Leapfrog*, 527 F. Supp. 2d at 1048 n.13.

      This Court's approach also conflicts with the regulations and cases, discussed above, holding that an issuer's revenue disclosures need only address reported financial information from completed quarters. *See, e.g.*, *In re N2K*, 82 F. Supp. 2d at 209, *aff'd on the district court opinion*, 202 F.3d 81 (2d Cir. 2000) (a warning that "it is possible that" operating results will be below expectations "in some future quarter" was not misleading even though defendant knew its financial results for the unreported interim quarter *were* below analysts' expectations); *In re Noah Educ. Holdings*, 2010 WL 1372709, at \*7-8 (risk warnings "did not imply that none of these risks … would affect [Defendant's] *most recent [unreported] fiscal quarter*") (emphasis added). The plaintiff in *Noah*, like Plaintiffs here, argued that the company's nondisclosure of an intra-quarter increase in raw material costs and the resulting effect on profit margin, not only violated its affirmative disclosure obligations under Item 303, but also rendered misleading its warnings about the potential future effects of an increase in material costs. *Noah* rejected both theories because they would have imposed liability based on the nondisclosure of information from an interim quarter, yet liability can only be imposed in such circumstances where that information represents an extreme departure from the issuer's previously-reported past performance. *Id.* at \*7; *see also N2K*, 82 F. Supp. 2d at 209-10, *aff'd on the district court opinion*, 202 F.3d 81 (2000) (interim financial data not required to be disclosed).

      Just as a rule requiring the affirmative disclosure of a trend's mid-quarter impacts would be "an end-run around the carefully delineated SEC regulations," 2010 WL 1372709, at \*7, so too would a rule that finds an issuer's cautionary statements misleading whenever the issuer failed to disclose such mid-quarter impacts. Because cautionary statements are "ubiquitous in

securities filings," *In re FBR*, 544 F. Supp. 2d at 360, the latter rule would require an issuer to spend the weeks leading up to registration statements and other SEC filings poring over fresh data to determine whether any of the risk factors appear to be occurring and, if so, how to describe that short-lived impact.  Such an instantaneous disclosure system would require "the immediate release of data without the benefit of reflection or certainty provided by the traditionally recognized reporting periods," in contravention of SEC policy and applicable case law.  *In re Turkcell*, 202 F. Supp. at 13.

## III.   AN IMMEDIATE APPEAL MAY MATERIALLY ADVANCE THE ULTIMATE TERMINATION OF THIS LITIGATION.

An immediate appeal materially advances the ultimate termination of a case where it may "result in the saving of judicial resources or otherwise avoid protracted litigation." *Century Pac., Inc. v. Hilton Hotels, Corp.*, 574 F. Supp. 2d 369, 373 (S.D.N.Y. 2008); *see also In re Air Crash off Long Island, N.Y. on July 17, 1996*, 27 F. Supp. 2d at 434 (certification is warranted where early appellate review "might avoid protracted and expensive litigation") (internal quotations omitted).  In assessing whether an appeal will save judicial resources, the Court should consider "system-wide costs and benefits of allowing the appeal." *Klinghoffer v. S.N.C. Achille Lauro*, 921 F.2d 21, 24 (2d Cir. 1990).

Here, an interlocutory appeal may allow this case to be dismissed on threshold legal issues without resort to protracted class action litigation.  Without such an appeal, the parties and the Court will be forced to endure burdensome and expensive discovery related to one of the largest IPOs in history.  The Court, the parties, and third parties will have to litigate complicated class certification issues (*e.g.*, questions concerning the extent of individual investors' knowledge of the allegedly concealed information), and contentious merits issues (*e.g.*, untangling the various causes of market declines in Facebook's stock in the days after its IPO).

19

Certifying an appeal here could avoid this significant expenditure of judicial resources and burdensome impositions on third parties for their evidence, while denying the appeal will ensure that those costs are incurred (perhaps needlessly if this Court's rulings are later reversed) and will impose an enormous expense on the company and its shareholders.  *See* S. Rep. 104-98, at 9 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 688 (collecting evidence of "the enormous expense of discovery and trial" in securities class actions).

Here, moreover, at a minimum, the causation issues in this case overlap with causation issues that are likely to arise in the NASDAQ cases also before this Court.  *See In re Facebook, Inc. IPO Sec. & Derivative Litig*., 2013 WL 6621024, at *31-32 (S.D.N.Y  Dec. 12, 2013).  But discovery and other proceedings in NASDAQ may be stayed as NASDAQ appeals the immunity ruling.  *See* Mot. to Amend & Certify Order Entered Dec. 16, 2013 for Interlocutory Appeal Pursuant to 28 U.S.C. § 1292(b), Dec. 30, 2013, Dkt. No. 178.  Avoiding the real prospect of conducting overlapping causation discovery twice provides further support for permitting Facebook to take an immediate appeal.

An interlocutory appeal of a controlling question of law is particularly appropriate in multidistrict securities litigation cases because such cases implicate the rights of dozens of parties, generate protracted discovery and motion practice, and hold the potential for extraordinary liability.  Indeed, "[b]ecause the district court's efficiency concerns are greatest in large, complex cases, certification may be more freely granted in so-called 'big' cases."  *In re Lloyd's Am. Trust Fund Litig.*, 1997 WL 458739, at *4.  Other courts within this district have followed this Court's approach and granted interlocutory appeal more freely in the multidistrict securities litigation context.  *See In re WorldCom, Inc. Sec. Litig.*, 2003 WL 22953644, at *8 (S.D.N.Y. 2003) ("In multidistrict litigation … it is important to view the 'ultimate termination'

20

of litigation in broad perspective ….   In multidistrict litigation, as the Honorable Robert W. Sweet has noted, the better practice may be to allow appeal of appropriate issues").

## CONCLUSION

For the foregoing reasons, the December 12 Order should be amended to permit an immediate interlocutory appeal under 28 U.S.C. § 1292(b).

DATED:  January 10, 2014

|  | /s/ *Andrew B. Clubok* |
|---|---|
| Susan E. Engel | Andrew B. Clubok |
| Kellen S. Dwyer | (andrew.clubok@kirkland.com) |
| Bob Allen | Brant W. Bishop, P.C. |
| KIRKLAND & ELLIS LLP | KIRKLAND & ELLIS LLP |
| 655 Fifteenth St. NW | 601 Lexington Avenue |
| Washington, DC 20005 | New York, NY 10022 |
| Telephone: (202) 879-5000 | Telephone: (212) 446-4800 |
| Facsimile: (202) 879-5200 | Facsimile: (212) 446-4900 |
|  |  |
| Richard D. Bernstein | Tariq Mundiya |
| Elizabeth J. Bower | Todd G. Cosenza |
| WILLKIE FARR & GALLAGHER LLP | Sameer Advani |
| 1875 K Street, NW | WILLKIE FARR & GALLAGHER LLP |
| Washington, DC 20006 | 787 Seventh Avenue |
| Telephone: (202) 303-1000 | New York, NY 10019-6099 |
| Facsimile: (202) 303-2000 | Telephone: (212) 728-8000 |
|  | Facsimile: (212) 728-8111 |

*Attorneys for Facebook, Inc. and Individual Facebook Defendants*

James P. Rouhandeh
Charles S. Duggan
Andrew Ditchfield
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800

*Attorneys for Underwriter Defendants*

21