# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| IN RE FACEBOOK, INC., IPO SECURITIES AND DERIVATIVE LITIGATION | : | No. 1:12-md-2389 (RWS) |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : | This document relates to the |
|  | : | Consolidated Securities Action |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : |  |

# LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO AMEND AND CERTIFY DECEMBER 12, 2013 ORDER FOR INTERLOCUTORY APPEAL PURSUANT TO 28 U.S.C. § 1292(b)

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ........................................................................................... ii

INTRODUCTION ........................................................................................................1

LEGAL ARGUMENT ..................................................................................................3

I.  THERE CAN BE NO SUBSTANTIAL DOUBT THAT THE COURT'S
    LEGAL ANALYSIS IN THE DECEMBER 12 ORDER WAS CORRECT ......................4

    A.  The Court Correctly Applied *Litwin* and *Panther Partners* .............................5

    B.  The Court's Analysis of Lead Plaintiffs' Affirmative
        Misrepresentation Claim Was Correct ...................................................10

II. THE QUESTIONS DEFENDANTS SEEK TO CERTIFY ARE NOT
    CONTROLLING QUESTIONS OF LAW ..............................................................14

    A.  Defendants' Assertion that Reversal Would Result in Dismissal
        Provides No Basis for Granting the Extraordinary Relief of
        Interlocutory Review, and Is Incorrect ...................................................14

    B.  The December 12 Order Merely Applied Previously Existing Legal
        Standards to a Unique Set of Facts .......................................................18

III. AN IMMEDIATE APPEAL WOULD NOT MATERIALLY ADVANCE
     THE ULTIMATE OUTCOME OF THE LITIGATION ..............................................23

CONCLUSION...........................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Adelphia Commc'ns Corp. v. Lucent Tech. Inc.*,
No. 02-41729, 2008 WL 361082 (S.D.N.Y. Feb. 11, 2008).....................................3

*Adkins v. Stanley*,
No. 12 CIV. 7667, 2013 WL 6585389 (S.D.N.Y. Dec. 13, 2013)......................6, 14

*In re Ambac Fin. Grp., Inc. Sec. Litig.*,
693 F. Supp. 2d 241 (S.D.N.Y. 2010)...................................................................3

*Auer v. Robbins*,
519 U.S. 452 (1997)..............................................................................................9

*Bishop v. Best Buy, Co.*,
No. 08-8427, 2011 WL 4011449 (S.D.N.Y. Sept. 8, 2011) ...................................15

*Blackmoss Invs. Inc. v. ACA Capital Holdings, Inc.*,
No. 07 Civ. 10528, 2010 WL 148617 (S.D.N.Y. Jan. 14, 2010)............................24

*In re Blech Sec. Litig.*,
No. 94-7696, 2003 WL 134988 (S.D.N.Y. Jan. 17, 2003) ....................................18

*Casey v. Long Island R.R.*,
406 F.3d 142 (2d Cir. 2005).....................................................................................3

*Consub Del. LLC v. Schahin Engenharia Limitada*,
476 F. Supp. 2d 305 (S.D.N.Y. 2007), *aff'd*, 543 F.3d 104 (2d Cir. 2008) .............4

*Coopers & Lybrand v. Livesay*,
437 U.S. 463 (1978)............................................................................................14, 24

*Degulis v. LXR Biotechnology, Inc.*,
No. 95 Civ. 4204, 1997 WL 20832 (S.D.N.Y. Jan. 21, 1997)................................17

*DeMaria v. Andersen*,
318 F.3d 170 (2d Cir. 2003)..........................................................................7, 12, 16

*In re Facebook Inc. IPO Sec. & Deriv. Litig.*,
2013 WL 6665399 (S.D.N.Y. Dec. 12, 2013) ..............................................*passim*

*Fed. Hous. Fin. Agency v. UBS Americas Inc.*,
712 F.3d 136 (2d Cir. 2013)....................................................................................15

*In re Flor*,
  79 F.3d 281 (2d Cir. 1996).........................................................................4

*Hoffenberg v. United States*,
  No. 00-1686, 2004 WL 2338144 (S.D.N.Y. Oct. 18, 2004).........................6

*Litwin v. Blackstone Group, L.P.*,
  634 F.3d 706 (2d Cir. 2011).................................................... *passim*

*Litzler v. CC Invs., L.D.C.*,
  362 F.3d 203 (2d Cir. 2004)....................................................................15

*McNeil v. Aguilos*,
  820 F. Supp. 77 (S.D.N.Y. 1993) (Sotomayor, J.)................................3, 18

*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*,
  399 F. Supp. 2d 320 (S.D.N.Y. 2005)......................................................6

*Multi-Juice, S.A. v. Snapple Beverage Corp.*,
  No. 02 CIV. 4635, 2003 WL 21998970 (S.D.N.Y. Aug. 21, 2003) ......................19

*In re N2K, Inc. Sec. Litig.*,
  82 F. Supp. 2d 204 (S.D.N.Y. 2000), *aff'd*, 202 F.3d 81 (2d Cir. 2000) ................13

*In re New Times Sec. Servs., Inc.*,
  371 F.3d 68 (2d Cir. 2004)........................................................................9

*In re Noah Educ. Holdings, Ltd. Sec. Litig.*,
  No. 08 Civ 9203, 2010 WL 1372709 (S.D.N.Y. Mar. 31, 2010) ..........................12

*In re Pall Corp.*,
  No. 07-cv-3359, 2009 WL 4282081 (E.D.N.Y. Nov. 24, 2009) ...........................14

*Panther Partners v. Ikanos Communications, Inc.*,
  681 F.3d 114 (2d Cir. 2012)..................................................... *passim*

*Penn. Pub. Sch. Emps' Ret. Sys. v. Bank of Am. Corp.*,
  874 F. Supp. 2d 341 (S.D.N.Y. 2012)......................................................10

*S.E.C. v. Credit Bancorp, Ltd.*,
  103 F. Supp. 2d 223 (S.D.N.Y. 2000).............................................13, 17, 18

*S.E.C. v. Gruss*,
  No. 11-2420, 2012 WL 3306166 (S.D.N.Y. Aug. 13, 2012)................1, 4, 16, 18

*Shaw v. Digital Equipment Corp.*,
  82 F.3d 1194 (1st Cir. 1996)....................................................................6

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
   531 F.3d 190 (2d Cir. 2008)..............................................................................15

*Transp. Workers Union of Am., Local 100 v. N.Y.C. Transit Auth.*,
   358 F. Supp. 2d 347 (S.D.N.Y. 2005)...................................................................4

*W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche, LLP*,
   549 F.3d 100 (2d Cir. 2008)..............................................................................15

*Wasau Bus. Ins. Co. v. Turner Constr. Co.*,
   151 F. Supp. 2d 488 (S.D.N.Y. 2001)...................................................................4

*In re World Trade Ctr. Disaster Site Litig.*,
   469 F. Supp. 2d 134 (S.D.N.Y. 2007)...................................................................3

*In re Worldcom, Inc. Secs. Litig.*,
   No. 02-3288, 2003 WL 22533398 (S.D.N.Y. Nov. 7, 2003)................................15

**Statutes**

28 U.S.C. § 1292(b) ....................................................................................................3

**Other Authorities**

Alison Frankel, *How Facebook IPO Class
   Action Lawyers Changed Judge's Mind*,
   Reuters (Dec. 20, 2013) ...................................................................................20

THE BLUEBOOK: A UNIFORM SYSTEM
   OF CITATION R. 1.2(c) Columbia Law Review
   Ass'n et al. eds., 19th ed. (2010)......................................................................13

# INTRODUCTION

On December 12, 2013, the Court issued a detailed 83-page Opinion and Order denying Defendants' motion to dismiss the Complaint in all respects.  *See In re Facebook Inc. IPO Sec. & Deriv. Litig.*, 2013 WL 6665399 (S.D.N.Y. Dec. 12, 2013) (the "December 12 Order" or the "Order").  In that Order , the Court exhaustively addressed all of the arguments set forth in 150 pages of briefing, amplified by hundreds more pages of accompanying declarations and exhibits, and expounded upon during approximately two hours of oral argument.  Specifically, in sustaining Lead Plaintiffs' claims under the Securities Act of 1933 (the "Securities Act"), the Court held that Defendants: (i) violated their disclosure duties under Item 303 of Securities and Exchange Commission ("SEC") Regulation S-K ("Item 303") when they failed to disclose the negative impact of increasing mobile usage on Facebook's revenues; and (ii) made materially false and misleading statements by representing that increasing mobile usage "may" negatively affect Facebook's revenues when, in reality, increasing mobile usage already had negatively affected Facebook's revenue.

Defendants now seek certification of an interlocutory appeal of this Court's December 12 Order, contending that "this Court's decision is at odds with the SEC's disclosure structure and existing Southern District case law."  Defs.' Mem. of Law in Supp. of Mot. to Amend & Certify Dec. 12, 2013 Order for Interlocutory Appeal Pursuant to 28 U.S.C. § 1292(b) (ECF No. 181) ("Defs.' Br.") at 4.  As the Court is aware, a motion for certification of an interlocutory appeal may not be used to simply "repeat arguments made in [a] motion to dismiss."  *S.E.C. v. Gruss*, No. 11-2420, 2012 WL 3306166, at *4 (S.D.N.Y. Aug. 13, 2012) (Sweet, J.).  Yet that is precisely what Defendants do here.  Indeed, Defendants recycle a series of arguments that they unsuccessfully raised in connection with their motion to dismiss, and cite to the same cases that they cited to the Court previously—all of which the Court fully considered and rejected in the December 12 Order.  For this reason alone, Defendants' motion should be denied.

Moreover, Defendants cannot establish the central statutory requirement for interlocutory review—that there is "substantial ground for difference of opinion" regarding the Court's analysis—where the December 12 Order closely hewed to controlling Second Circuit authority, SEC guidance, and well-settled case law.  In sustaining Lead Plaintiffs' Item 303 claim, the Court applied the clear legal standard set forth in the Second Circuit's leading decisions on the scope of an issuer's disclosure obligations under Item 303, *Litwin v. Blackstone Group, L.P.*, 634 F.3d 706, 716 (2d Cir. 2011), and *Panther Partners v. Ikanos Communications, Inc.*, 681 F.3d 114, 121 (2d Cir. 2012).  As the Court correctly explained, these unanimous Second Circuit decisions explicitly hold that:  (1) "an issuer has a duty to disclose any trend, event or uncertainty that is 'known and existing at the time of the IPO' that 'was reasonably likely to have a material impact' on the issuer's financial condition"; and (2) "an issuer also has a duty to disclose 'whether, and to what extent' that known trend, event or uncertainty 'might reasonably be expected to materially impact . . . future revenues.'"  Order at *17 (quoting *Litwin*, 634 F.3d at 716, and *Panther Partners*, 681 F.3d at 121).

Similarly, the Court sustained Lead Plaintiffs' affirmative misrepresentation claims based on Facebook's purported cautionary language under firmly established case law, noting that "Courts in this Circuit have held that a company's purported risk disclosures are misleading where the company warns only that a risk may impact its business when that risk had already materialized."  *Id.* at *22. The Court also relied on "well-settled" Second Circuit authority holding that material "half-truths"—*i.e.*, "literally true statements that create a materially misleading impression"—are actionable under the federal securities laws. *Id.* *20-21 (citing *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 130 (2d Cir. 2011)).  Again, all of the arguments that Defendants raise were carefully considered by the Court at the motion to dismiss stage, and rejected.

For these reasons, and those set forth more fully herein, the Court should deny Defendants' motion.

## LEGAL ARGUMENT

The certification of a non-final order pursuant to 28 U.S.C. § 1292(b) is an extraordinary procedure that may be granted only in "exceptional circumstances." *In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 282 (S.D.N.Y. 2010). Indeed, "federal practice strongly disfavors discretionary interlocutory appeals [as they] prolong judicial proceedings, add delay and expense to litigants, burden appellate courts, and present issues for decisions on uncertain and incomplete records, tending to weaken the precedential value of judicial opinions." *In re World Trade Ctr. Disaster Site Litig.*, 469 F. Supp. 2d 134, 144 (S.D.N.Y. 2007) (quoting *Koehler v. Bank of Bermuda Ltd.*, 101 F.3d 863, 865 (2d Cir. 1996)). Courts in this Circuit routinely deny motions for interlocutory appeal, recognizing that "movants cannot invoke the appellate process 'as a vehicle to provide early review [even] of difficult rulings in hard cases.'" *In re Adelphia Commc'ns Corp. v. Lucent Tech. Inc.*, No. 02-41729, 2008 WL 361082, at *1 (S.D.N.Y. Feb. 11, 2008).

Consistent with the strong judicial policy disfavoring interlocutory appeals, Section 1292(b) provides that an interlocutory order may be appealed only when all three strict statutory criteria are met: "[1] [the] order involves a controlling question of law [2] as to which there is substantial ground for difference of opinion and [3] that an immediate appeal from the order may materially advance the ultimate termination of the litigation . . . ." 28 U.S.C. § 1292(b). "These three prerequisites create a significant hurdle to certification, and the barrier is elevated by the mandate that section 1292(b) be 'strictly limited' because 'only ***exceptional circumstances*** [will] justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment.'" *McNeil v. Aguilos*, 820 F. Supp. 77, 79 (S.D.N.Y. 1993) (Sotomayor, J.).[1]

As the proponents of an interlocutory appeal, Defendants have the burden of showing that all three of the substantive Section 1292(b) criteria are met. *See Casey v. Long Island R.R.*, 406 F.3d

---

[1] Herein, all emphasis is added unless otherwise indicated.

142, 146 (2d Cir. 2005).  "Moreover, these criteria supply only the **minimum** standard that movants must meet" and "[d]istrict court judges have broad discretion to deny certification even where the statutory criteria are met."  *Gruss*, 2012 WL 3306166, at *2.  Indeed, "even where the three legislative criteria of section 1292(b) appear to be met, district courts have **unfettered discretion** to deny certification if other factors counsel against it."  *Transp. Workers Union of Am., Local 100 v. N.Y.C. Transit Auth.*, 358 F. Supp. 2d 347, 350-51 (S.D.N.Y. 2005) (internal quotations omitted).

Here, Defendants cannot satisfy **any** of the three criteria, and fall far short of showing the requisite "exceptional circumstances."

## I.   THERE CAN BE NO SUBSTANTIAL DOUBT THAT THE COURT'S LEGAL ANALYSIS IN THE DECEMBER 12 ORDER WAS CORRECT

The law is clear that a "substantial ground for a difference of opinion" is one that must arise "out of a genuine doubt as to whether the district court applied the correct legal standard in its order."  *Consub Del. LLC v. Schahin Engenharia Limitada*, 476 F. Supp. 2d 305, 309 (S.D.N.Y. 2007), *aff'd*, 543 F.3d 104 (2d Cir. 2008), *abrogated in part on other grounds by Shipping Corp of India, Ltd. v. Jaldhi Overseas Pte Ltd.*, 585 F.3d 58 (2d Cir. 2009).  Significantly, "[a] mere claim that the district court's ruling was incorrect does not demonstrate a substantial ground for difference of opinion."  *Wasau Bus. Ins. Co. v. Turner Constr. Co.*, 151 F. Supp. 2d 488, 491 (S.D.N.Y. 2001) (Sweet, J.).  Rather, the issue must be one as to which there is "truly . . . a **substantial** ground for dispute."  *In re Flor*, 79 F.3d 281, 284 (2d Cir. 1996) (emphasis in original).

Here, there is no question that the Court applied the correct legal standards in its detailed and well-reasoned December 12 Order, holding that:  (1) under controlling Second Circuit authority bolstered by clear SEC guidance, Item 303 requires issuers to disclose the "extent" to which known trends might reasonably be expected to **materially** impact future revenues (*see* Section I(A), *infra*) and, (2) under the specific facts presented, cautionary language warning that a risk "may" affect

4

future reported revenues can be misleading where that risk allegedly had already had a ***material*** negative impact on its revenues for the quarter in progress (*see* Section I(B), *infra*).

### A.     The Court Correctly Applied *Litwin* and *Panther Partners*

In holding that Defendants violated their disclosure duties under Item 303, the Court applied the legal standard set forth in the Second Circuit's two recent seminal decisions on the scope of an issuer's Item 303 disclosure duties in connection with public offerings: *Litwin* and *Panther Partners*. In order to determine the scope of Defendants' "disclosure obligations under Item 303," the Court conducted a detailed analysis of *Litwin* and *Panther Partners*, and then quoted extensively from those two cases in setting forth the Second Circuit's controlling legal standard:

> Taking *Litwin* and *Panther Partners* together, an issuer has a duty to disclose any trend event or uncertainty that is "known and existing at the time of the IPO" that "was reasonably likely to have a material impact" on the issuer's financial condition. *Panther Partners*, 681 F.3d at 121 (quoting *Litwin*, 634 F.3d at 716). Moreover, an issuer also has a duty to disclose "whether, and to what extent" that known trend, event or uncertainty [ ] "might reasonably be expected to materially impact . . . future revenues." *Panther Partners*, 681 F.3d at 121 (quoting *Litwin*, 634 F.3d at 716).

Order at *17. The Court then conducted a straightforward application of these established rules to the facts of this case, and concluded that "Facebook's disclosures did not denote the extent the increased mobile usage seen by the Company was already affecting Facebook's revenues." *Id.* at *18.

Significantly, Defendant's current brief, like their motion to dismiss, virtually ignores *Litwin* and *Panther Partners*. Their failure to meaningfully address these cases is telling, because the Court's December 12 Order was perfectly in accord with them. Instead, Defendants principally rely on a handful of district court cases—all of which pre-date *Litwin* and *Panther Partners*—to argue that courts "have specifically rejected a duty under Item 303 to disclose interim revenue information" unless that information represents "an extreme departure from prior results." Defs.' Br. at 10.

The cases on which Defendants rely are irrelevant, were thoroughly considered by the Court at the motion to dismiss stage, and provide no basis for granting interlocutory appeal. Defendants

cannot manufacture a substantial ground for difference of opinion by relying on district court cases when this Court's holding was based on clear, controlling Second Circuit law.  This is especially so because, as noted above, all of the district court decisions on which Defendants rely **predate** the Second Circuit's 2011 and 2012 decisions in *Litwin* and *Panther Partners*.  *See* Defs.' Br. at 10-15 (citing *In re Focus Media Holding Ltd. Litig.*, 701 F. Supp. 2d 534, 539 (S.D.N.Y. 2010); *In re Noah Educ. Holdings, Ltd. Sec. Litig.*, No. 08 Civ. 9203, 2010 WL 1372709 (S.D.N.Y. Mar. 31, 2010); *In re Turkcell Iletisim Hizmetler A.S. Secs. Litig.*, 202 F. Supp. 2d 8 (S.D.N.Y. 2001)).[2]

Moreover, the Court was well aware of these decisions, and fully considered and rejected Defendants' arguments based on them.  Relying on these same cases in their motion to dismiss, Defendants argued extensively that they were not required to disclose the impact of increasing mobile usage on Facebook's revenues—an assertion that the Court found to be without merit.  *See* Mem. in Supp. of Defs.' Mot. to Dismiss the Consol. Class Action Compl. ("MTD") at 27-40 (ECF No. 92).  Indeed, in rejecting this position, the Court specifically cited Defendants' cases, and found them to be inapposite in light of *Litwin* and *Panther Partners*.  *See* Order at *20, *24.  Defendants cannot point to any change in the law since the December 12 Order, or any fact that the Court potentially overlooked in rejecting their arguments the first time around.  As noted above, there is no basis for review of an interlocutory order where, as here, the party seeking review merely reiterates arguments previously rejected by this Court.  *See Hoffenberg v. United States*, No. 00-1686, 2004 WL 2338144, at *5 (S.D.N.Y. Oct. 18, 2004); *see also In re Methyl Tertiary Butyl Ether Prods. Liab.*

---

[2] The "extreme departure" standard championed by Defendants originated with the First Circuit's 1996 decision in *Shaw v. Digital Equipment Corp.*, 82 F.3d 1194, 1209 (1st Cir. 1996).  *Shaw* is inapt because the offering at issue was conducted pursuant to a "shelf" registration statement not subject to Item 303.  *Shaw*, 82 F.3d at 1205.  Moreover, to the extent Defendants rely on *Shaw* and other out-of-Circuit cases (Defs.' Br. at 12 n.4), Lead Plaintiffs note that "[d]isagreement among courts outside the circuit . . . does not alone support the certification of an interlocutory appeal."  *Adkins v. Stanley*, No. 12 CIV. 7667, 2013 WL 6585389, at *2 (S.D.N.Y. Dec. 13, 2013) (citing cases; internal quotation marks omitted).

*Litig.*, 399 F. Supp. 2d 320, 324 (S.D.N.Y. 2005) ("[A] holding that a party that offers only arguments rejected on the initial motion does not meet the second requirement of § 1292(b).").

Defendants point out that in a single Second Circuit case, *DeMaria v. Andersen*, 318 F.3d 170 (2d Cir. 2003), the Second Circuit held that the issuer was not required to disclose results of a completed quarter before the SEC-mandated reporting period, and noted that the quarterly results were not a "dramatic reversal" from prior quarters. Defs.' Br. at 12 (citing *DeMaria*, 318 F.3d at 180). However, again, Defendants cited this case at the motion to dismiss stage (*see* Reply Mem. in Supp. of Defs.' Mot. to Dismiss the Consol. Class Action Compl. ("MTD Reply") at 14 (ECF No. 134), and the Court considered it and rejected it, *see* Order at *19 n.26. Further, *DeMaria* did **not** involve a "trend" under Item 303 and, therefore, has no bearing on this case or the Second Circuit's holdings in *Litwin* and *Panther Partners*.[3] Moreover, like all the district court cases on which Defendants rely, *DeMaria* pre-dated both *Litwin* and *Panther Partners*, and does nothing to alter the clear language of those more recent decisions.

Indeed, the reason that Defendants essentially ignore *Litwin* and *Panther Partners* is because, as the Court acknowledged in rejecting their arguments at the motion to dismiss stage, Defendants' argument flatly contradicts these controlling cases. Although the Second Circuit was clearly aware of the cases on which Defendants rely when it decided *Litwin* and *Panther Partners* (including its own decision in *DeMaria*), it did not adopt the "extreme departure" standard that Defendants advocate, but applied a **materiality** standard instead. As noted in the December 12 Order, in *Litwin*, a unanimous Second Circuit panel upheld the plaintiffs' claims, holding that "the relevant question under Item 303 is whether [the company] reasonably expects the impact to be **material**":

---

[3] In addition, as the Court noted in the December 12 Order, the Second Circuit "rejected the argument that an issuer is required to disclose only the financial information required by Regulation S–X" in *DeMaria*, explicitly noting that the defendants "would have a 'duty to disclose interim financial information in the prospectus' if such disclosure were required by any other SEC rule or regulations," such as Item 303. December 12 Order at *19 n.26 (quoting *DeMaria*, 318 F.3d at 180).

> [T]he key information that plaintiffs assert should have been disclosed is whether, **and to what extent**, the particular known trend, event, or uncertainty might have been reasonably expected to **materially** affect Blackstone's investments. And this potential future impact was certainly not public knowledge . . . and thus cannot be considered part of the "total mix" of information already available to investors. Again, the focus of plaintiffs' claims is the required disclosures under Item 303— plaintiffs are not seeking the disclosure of the mere fact of Blackstone's investment in FGIC, of the downward trend in the real estate market, or of Freescale's loss of its exclusive contract with Motorola. **Rather, plaintiffs claim that Blackstone was required to disclose the manner in which those then—known trends, events, or uncertainties might reasonably be expected to materially impact Blackstone's future revenues.**

Order at *15 (citing *Litwin*, 634 F.3d at 718-19 (Miner, Cabranes, Straub, JJ.)). The December 12 Order further noted, "In holding for the plaintiff, the [*Litwin*] court emphasized that . . . the alleged misstatements and omissions regarding Blackstone's real estate 'were qualitatively **material** because they masked a potential change in earnings or other trends." *Id.* at *16 (citing *Litwin*, 634 F.3d at 721-22 ("[A]ll Item 303 requires in order to trigger a disclosure obligation [is] a known trend that [defendant] reasonably expected would **materially** affect its investments and revenues.")).

Approximately one year later, in *Panther Partners*, another unanimous Second Circuit panel upheld *Litwin*. As noted in the December 12 Order, *Panther Partners* also emphasized that Item 303 requires disclosure of the "extent" of the impact of "material" trends:

> In *Panther Partners*, the plaintiffs alleged that the defendants failed to disclose the **extent** of the impact of known product defects on the company's financial results in advance of a secondary offering. . . . The defendants contended that they had satisfied Item 303 by disclosing the fact that issuer's products 'frequently contain defects and bugs;' that '[i]n the past we have experienced, and may in the future experience, defects and bugs in our products;' and that '[i]f any of our products contains defects [that] could harm our ability to retain existing customers and attract new customers.' . . . In holding that the plaintiffs did adequately plead a violation of Item 303's disclosure obligations, the Second Circuit looked not just at the omission alleged by plaintiffs but also at the circumstances surrounding the omission: "We believe that, viewed in the context of Item 303's disclosure obligations, the defect rate [the alleged omission], in a vacuum, is not what is at issue. **Rather, it is the manner in which uncertainty surrounding that defect rate, generated by an increasing flow of highly negative information from key customers, might reasonably be expected to have a material impact on future revenues.**"

Order at *15 (citing *Panther Partners*, 681 F.3d at 114-20 (Jacobs, C.J., B.D. Parker, Hall, JJ.)).

Moreover, as the December 12 Order noted, "The SEC's commentary on Item 303 further supports [the Court's] reading of *Litwin* and *Panther Partners*," and, in particular, the materiality standard those Second Circuit decisions applied.  Order at *17 (citing, *e.g.*, Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations, Securities Act Release No. 33-8350, 68 Fed. Reg. 75,056, 75,062 (Dec. 29, 2003) ("Quantitative disclosure . . . may be required to the extent ***material*** if quantitative information is reasonably available."); Management's Discussion and Analysis of Financial Condition and Results of Operations, Securities Act Release No. 6835, 54 Fed. Reg. 22427, 22430 (May 18, 1989) (the "1989 SEC Release") (providing that if "[m]anagement is unable to determine that a ***material*** effect . . . is not reasonably likely to occur," then "disclosure of the effects of the known trend, development or uncertainty, quantified to the extent reasonably practicable, would be required."); *id.* ("In addressing prospective financial condition and operating performance, there are circumstances, particularly regarding known ***material*** trends and uncertainties, where forward-looking information is required to be disclosed.")).[4]

While Defendants contend that *Litwin* and *Panther Partners* are supposedly inapposite because they "did not say anything about disclosing the impacts of known . . . trends on intra-quarter revenues" (Defs.' Br. at 14), but only concerned "negative trends that were not disclosed at all," (*id.*) this argument is wrong and provides no basis for interlocutory appeal.  Once again, Defendants

---

[4] Defendants argue that canons of statutory interpretation should be applied to interpret Item 303 so that it does not require disclosure of "the extent" of a trend's impact on revenues.  *See* Defs.' Br. at 14-15 ("The language and structure of Item 303 itself provides further grounds for differing opinions on this Court's view of disclosure duties.").  However, Defendants' argument contradicts *Litwin* and *Panther Partners*. Further, an agency's interpretation of its own regulations is entitled to deference unless it is plainly erroneous or inconsistent with the regulation.  *See Auer v. Robbins*, 519 U.S. 452, 461 (1997).  This applies to the SEC's interpretation of its own rules.  *See, e.g., In re New Times Sec. Servs., Inc.*, 371 F.3d 68, 87 (2d Cir. 2004).

Thus, the Court properly considered SEC guidance when interpreting Item 303.  *See* Order at *17. Indeed, when interpreting Item 303, the Second Circuit relied on the same guidance.  *See Panther Partners*, 681 F.3d at 120 (citing the 1989 SEC Release).

made this exact same argument in their motion to dismiss, and it was thoroughly considered and
rejected by the Court.  *See* MTD Reply at 2, 5-8.  Moreover, this argument directly contradicts the
clear language of *Litwin* and *Panther Partners*, which explicitly held that an issuer is indeed required to
disclose the trend's "impact on future revenues," and make no exception for a quarter in progress.
Finally, even if the December 12 Order were written on a blank slate—which it was not—"the mere
presence of a disputed issue that is a question of first impression, standing alone, is insufficient to
demonstrate a substantial ground for difference of opinion."  *Penn. Pub. Sch. Emps' Ret. Sys. v. Bank of
Am. Corp.*, 874 F. Supp. 2d 341, 372 (S.D.N.Y. 2012) (quoting *In re Flor*, 79 F.3d at 284).

Thus, there is no substantial ground for difference of opinion as to whether the Court
correctly held that Item 303 requires issuers to disclose the "extent" to which known "material"
trends might reasonably be expected to impact "future revenues."

**B.** **The Court's Analysis of Lead Plaintiffs'
Affirmative Misrepresentation Claim Was Correct**

Defendants next argue that there is "substantial ground for a difference of opinion on the
Court's ruling that Facebook's 'purported risk warnings misleadingly represented that' an effect on
revenue from increased mobile usage 'was merely possible when, in fact, it allegedly had already
materialized' in the first weeks of the second quarter."  Defs.' Br. at 16.

Again, Defendants are wrong.  As it did in reaching its holding as to Item 303, the Court
applied well-established law to the facts of this case by holding that Facebook made materially
misleading statements by purporting to warn that its financial performance "may" be negatively
impacted by increasing mobile usage when, in reality, Facebook's financial performance already had
been negatively impacted by increasing mobile usage.  In reaching this holding, the Court specifically
noted that for nearly 20 years, "Courts in this Circuit have held that a company's purported risk
disclosures are misleading where the company warns only that a risk may impact its business when
that risk had already materialized."  December 12 Order at *22.  The Court further relied on "well-

10

settled" Second Circuit authority holding that "half-truths"—*i.e.*, "literally true statements that create

a materially misleading impression"—are actionable under the federal securities laws. *Id.* at \*20-22

(citing *Wilson*, 671 F.3d at 130).

Indeed, as the Court observed in the December 12 Order, since at least 1996, a litany of

courts—including this Court in multiple prior decisions—have embraced and applied this clear legal

principle. *See id.* at \*21-22 (citing *In re Prudential Secs. Inc. Ltd. P'ship Litig.*, 930 F. Supp. 68, 72

(S.D.N.Y. 1996); *In re Van der Moolen Holding N.V. Secs. Litig.*, 405 F. Supp. 2d 388, 400 (S.D.N.Y.

2005) (Sweet, J.); *In re Bear Stearns Cos., Inc. Sec. Litig.*, 763 F. Supp. 2d 423, 495 (S.D.N.Y. 2011)

(Sweet, J.); *Dodona I, LLC v. Goldman, Sachs & Co.*, 847 F. Supp. 2d 624, 646 (S.D.N.Y. 2012)).

Defendants have not cited any case holding that such purported risk warnings are misleading only

where there has been an "extreme departure" from prior results.

Again, Defendants seek interlocutory appeal of this holding by relying on a handful of

district court cases that the Court was fully familiar with at the time it issued the December 12

Order.  The Court considered each of the cases cited by Defendants, specifically cited each of them,

and found them to be inapposite on their facts.  For example, this Court reasoned that the two cases

on which Defendants principally rely—*In re Noah* and *In re FBR* (Defs.' Br. at 2, 16-18)—were

factually distinguishable.  "While *In re Noah* and *In re FBR* found defendants not liable for its

cautionary statements in its security disclosures, ***the facts in those cases are distinct from those***

***in the instant action***."  Order at \*24.  Specifically, the Court distinguished *In re Noah* on the

grounds that the cautionary statements at issue there were not misleading because (unlike the

Facebook IPO offering documents) they did not suggest that other variables could mitigate the

effect of the trend at issue:

> Unlike in *In re Noah*, . . . the Registration Statements included statements regarding
> mobile usage and revenue, including positive statements, that clashed with the
> Company's risk warnings on the same issues. . . . ***The company in Noah did not***
> ***state that there were other variables which could mitigate the effects of***

11

> ***increasing cost of raw materials. By contrast, the Registration Statement suggested that the Company's product decisions and ads on personal computers could militate revenue cuts caused by mobile usage.***

Order at \*24 (citing *In re Noah*, 2010 WL 1372709, at \*7-8) (internal quotations and citations omitted). Similarly, the Court distinguished *In re FBR* on the grounds that the cautionary language at issue in that case (unlike Facebook's cautionary language) was too vague to be actionable:

> ***[T]he regulatory filings and risk factor warnings at issue in In re FBR . . . "said nothing company-specific,"*** and the Court reasoned that "no reasonable investor would infer anything about the state of [the company's regulatory] compliance" from the specifics-less warning. ***In contrast, Facebook's Registration Statement did contain specific representations regarding mobile usage risks that construed a present certainty as a future possibility.***

*Id.* (citing *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 362 (S.D.N.Y. 2008)) (internal quotations and citations omitted).[5]

The other in-Circuit authorities that Defendants cite—which were all decided based on highly fact-specific contextual analyses of the cautionary language at issue—are similarly distinguishable on their facts. For example, in both *DeMaria* and *N2K*, the issuer explicitly warned investors that they expected "substantial" or "significant" future losses. *DeMaria*, 318 F.3d at 181-82

---

[5] *In re Noah* is further distinguishable on the grounds that the court held that the plaintiff's allegation of a spike in the cost of raw materials during two months of the interim quarter was of too short a duration even to establish a "trend" under Item 303. 2010 WL 1372709, at \*6. In their brief, Defendants suggest for the first time that the "supposed trend" of increasing mobile usage was perhaps not a "trend" at all, stating, "To the extent the Court held that Facebook did not disclose the supposed ***trend*** of an intra-quarter revenue impact, numerous courts in addition to *Noah* have held that "[a]s a matter of law, a two-month period of time does not establish a 'trend' for purposes of the disclosures required by Item 303." Defs.' Br. at 11 n.3 (emphasis in original). However, that argument is unavailing to Defendants where they admit in their current brief that "the increased mobile usage ***trend*** . . . was contributing to an ***ongoing*** reduction in the number of ads delivered per user" through the first quarter of 2012 and continuing until at least the date of the May 9, 2012 Free Writing Prospectus. Defs.' Br. at 17 n.6. Indeed, in their briefs supporting their motion to dismiss, Defendants argued extensively that Facebook had disclosed this ongoing "***trend***." *See, e.g.*, MTD Reply at 1 ("Prior to its IPO, Facebook disclosed that the ***first-quarter trend*** of daily active users (DAUs) growing more rapidly than ads delivered (which had been thoroughly discussed in the Registration Statement) ***had continued into the first few weeks of the second quarter of 2012***"); MTD at 1 ("Facebook . . . disclosed that increased mobile usage, along with certain product decisions, had caused an ***ongoing*** decrease in the number of ads delivered per user—a ***trend*** with obvious implications for revenue growth.").

(reasoning that the prospectus at issue "explicitly disclosed net loss information for every quarter through the end of 1998 and stated an ***expectation of substantial future losses***," and "[i]n light of these cautionary statements and the specific, prominent disclosures . . . of more than $4.5 million in losses in the [first quarter of] 1999, the statements in the prospectus do not paint an unrealistically optimistic picture of ILife's future performance"); *In re N2K, Inc. Sec. Litig.*, 82 F. Supp. 2d 204, 209 (S.D.N.Y. 2000), *aff'd*, 202 F.3d 81 (2d Cir. 2000) (reasoning that "N2K's prospectus is replete with warnings and explanations of risks associated with the company's past financial history ***and future expectations*** [including that] 'The Company has incurred significant losses and ***expects to continue to incur significant losses on a quarterly and annual basis for the foreseeable future*** . . . .'") (emphasis in original). [6]

   While Defendants may believe that the facts presented are more analogous to certain cases that they claim support their arguments, this Court found otherwise, and Defendants may not use Section 1292(b) to take a "second bite at the apple." Thus, as with the first question, there is no substantial ground for difference of opinion as to the second question Defendants seek to certify,

---

[6] Defendants argue that the Court "recognized the conflict" between its December 12 Order and certain opinions in other cases because the Court cited those opinions as "*but cf.*" authority. Defs.' Br. at 17 (citing Order at *21). However, the opposite is true. If the Court believed that those cases were on point, it would have used a "*but see*" citation. *See* THE BLUEBOOK: A UNIFORM SYSTEM OF CITATION R. 1.2(c), at 55 Columbia Law Review Ass'n et al. eds., 19th ed. (2010) (stating that a "*but see*" means that the "[c]ited authority ***clearly supports*** a proposition contrary to the main proposition"). The Court's use of "*but cf.*" actually means that it considers those opinions to be distinguishable. *See id.* (stating that "*but cf.*" means that the "[c]ited authority supports a proposition that is ***analogous*** to the contrary of the main proposition"). Indeed, the Court explicitly distinguished certain of those opinions. *See* Order at *24.

   Moreover, "[t]he fact that there is a some level of disagreement among the courts does not mean, however, that the standards of 1292(b) are necessarily satisfied." *S.E.C. v. Credit Bancorp, Ltd.*, 103 F. Supp. 2d 223, 227 (S.D.N.Y. 2000) (denying certification even where the Court cited contrary authority in a "*but see*" citation) (citing *S.E.C. v. Credit Bancorp, Ltd.*, 194 F.R.D. 457, 465 (S.D.N.Y. 2000)).

*i.e.*, whether, in the absence of an "extreme departure," cautionary language warning that a risk "may" affect future revenues can be misleading where that risk had already had a material impact.[7]

## II.   THE QUESTIONS DEFENDANTS SEEK TO CERTIFY ARE NOT CONTROLLING QUESTIONS OF LAW

A question of law is "controlling" only if it is a "pure question of law that the reviewing court could decide quickly and cleanly without having to study the record."  *In re Pall Corp.*, No. 07-cv-3359, 2009 WL 4282081, at *2 (E.D.N.Y. Nov. 24, 2009).  Further, to qualify as a "controlling question of law" under Section 1292(b), the issue must importantly affect the outcome of an action. *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 475 n.27 (1978); *see also Pall*, 2009 WL 4282081, at *2 (issue must "materially affect the litigation's outcome").

Here, Defendants claim that the questions they seek to certify for interlocutory appeal are controlling questions of law because (1) "reversal of the district court's opinion could result in dismissal of the action;" and (2) the issues have "precedential value for a large number of cases." Defs.' Br. at 5-6.  As explained below, for numerous reasons, each of these contentions is wrong.

### A.   Defendants' Assertion that Reversal Would Result in Dismissal Provides No Basis for Granting the Extraordinary Relief of Interlocutory Review, and Is Incorrect

As noted above, Defendants first assert that interlocutory review is warranted because reversal of the December 12 Order would result in dismissal.  Defs.' Br. at 5-6.  However, even assuming this is correct (which it is not, as set forth below), this contention fails to satisfy the strict requirements for obtaining interlocutory appeal.  Obtaining reversal of an opinion denying a motion to dismiss would ***always*** result in dismissal.  If this were sufficient to justify interlocutory review,

---

[7] Again, to the extent Defendants rely on out-of-Circuit cases, "[d]isagreement among courts outside the circuit . . . does not alone support the certification of an interlocutory appeal."  *Adkins*, 2013 WL 6585389, at *2.

then interlocutory review of motion to dismiss denials would be commonplace. That is clearly not the law, as interlocutory review is strictly reserved for exceptional cases.

This is particularly true with respect to securities cases. Indeed, Second Circuit interlocutory review of motion to dismiss decisions in securities cases is almost never granted. Counsel's research has uncovered only four cases in the last 13 years where the Second Circuit entertained a Section 1292(b) appeal from an order denying a motion to dismiss in a federal securities case and, even in those exceedingly rare instances, the Second Circuit's review is almost always limited to true threshold issues that go directly to the court's ability to hear the case or the plaintiff's ability to bring a claim, such as jurisdiction, standing, and statute of limitations—issues which have no relevance to this motion.[8] In short, the mere fact that reversal of the Court's motion to dismiss opinion might result in dismissal does not come close to establishing the "exceptional circumstances" necessary to grant interlocutory review.

In addition, Defendants are incorrect that a successful appeal would result in dismissal of this case, or otherwise materially advance its termination. It is well-settled that certification of an interlocutory appeal cannot materially advance the termination of the litigation where even a successful appeal would not dispose of **all claims** based on the same factual predicate. *See In re Worldcom, Inc. Secs. Litig.*, No. 02-3288, 2003 WL 22533398, at *7-8 (S.D.N.Y. Nov. 7, 2003) (denying motion under Section 1292(b) to certify an order addressing the plaintiffs' claims under the Securities Exchange Act of 1934 ("Exchange Act"), but not addressing the plaintiffs' Securities Act claims, which were based on similar facts); *see also Bishop v. Best Buy, Co.*, No. 08-8427, 2011 WL

---

[8] *See Fed. Hous. Fin. Agency v. UBS Americas Inc.*, 712 F.3d 136 (2d Cir. 2013) (reviewing the Federal Housing Finance Agency's standing to bring claims on behalf of Fannie Mae and Freddie Mac and the timeliness of its claims); *W.R. Huff Asset Mgmnt. Co. v. Deloitte & Touche, LLP,* 549 F.3d 100 (2d Cir. 2008) (appeal of an investment adviser's standing to assert claims on behalf of clients); *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190 (2d Cir. 2008) (appeal concerning pleading of scienter against a corporate defendant); *Litzler v. CC Invs., L.D.C.*, 362 F.3d 203 (2d Cir. 2004) (appeal concerning the statute of limitations under Section 16 of the Securities Exchange Act of 1934 (the "Exchange Act")).

4011449, at *15 (S.D.N.Y. Sept. 8, 2011) ("In particular, if other claims will continue regardless of the disposition of this issue, certification would not materially advance the termination of this litigation.") (internal quotations marks omitted).

Here, even if the Court were to certify the question regarding Item 303, which is the core of Defendants' motion, Lead Plaintiffs' claims regarding Facebook's affirmative misrepresentations would continue unimpeded. Contrary to what Defendants contend, Lead Plaintiffs' claims based on Facebook's misleading risk warnings do not present any "pure" question of law that the Second Circuit could answer "quickly and clearly without having to study the record," *see Gruss*, 2012 WL 3306166, at *2 (internal quotation marks omitted), and are therefore inappropriate for interlocutory review. Rather, as the Court held in the December 12 Order, whether Facebook's risk warnings were materially misleading is "a fact-specific inquiry" and, therefore, entirely inappropriate for interlocutory review. *See* Order at *21 ("Whether or not a statement is materially misleading is a fact-specific inquiry.").

Moreover, in addition to Lead Plaintiffs' claims based on Item 303 and affirmative misrepresentations, Lead Plaintiffs asserted a co-extensive but independent claim alleging that Facebook's IPO offering documents failed to disclose material information required to be disclosed by Rule 408 of SEC Regulation C ("Rule 408"). *See* Order at *27 (citing ¶¶ 188, 197-202);[9] *see also* ¶ 127. Defendants do not seek certification on the Court's decision upholding Lead Plaintiffs' Rule 408 claim. Because Lead Plaintiffs' Rule 408 claim is an independent basis of liability, favorable appellate review of the questions Defendants seek to certify would ***not*** result in dismissal of this case. *See DeMaria*, 318 F.3d at 180 (acknowledging a duty to disclose under Rule 408 in the context of a Securities Act case).

---

[9] Herein, "¶__" and "¶¶__" refer to paragraphs of the Consolidated Class Action Complaint (ECF No. 71).

Defendants address Rule 408 in only a footnote in their brief, asserting, "The Court's holding that the Complaint stated a claim for 'fail[ing] to disclose material information required to be disclosed by Rule 408,' was explicitly based on the Court's Item 303 and misrepresentation rulings. . . . Accordingly, a reversal of the Item 303 and misrepresentation rulings would also require dismissal of the dependent Rule 408 claim." Defs.' Br. at 6 n.2 (citing Order at *27-28).

This argument misinterprets the December 12 Order. After a brief discussion of the applicable legal standard, the Court sustained Lead Plaintiffs' Rule 408 allegations, holding, "As previously noted, the Registration Statement contained material omissions and misrepresentations that rendered it misleading to investors, and Defendants failed to adequately disclose all required material information to make the Registration Statement not misleading." Order at *27-28. The Court did ***not*** state that its holding with respect to Rule 408 was dependent on Defendants' liability under the other alleged claims. At most, the Court acknowledged that Lead Plaintiffs' Item 303 and Rule 408 allegations are based on the same operative facts.

Given that Lead Plaintiffs' claims based on Facebook's false statements and violations of Item 408 would proceed regardless of the outcome of any interlocutory appeal as to Item 303, it is clear that the interlocutory appeal would not materially advance the outcome of the litigation. *See Credit Bancorp*, 103 F. Supp. 2d at 227 ("Although technically the question of whether there is a controlling issue of law is distinct from the question of whether certification would materially advance the ultimate termination of the litigation, in practice the two questions are closely connected."). Indeed, for the reasons noted directly above, regardless of the outcome of an interlocutory appeal as to Item 303, "the scope of discovery and the proof at trial will remain essentially the same." *Degulis v. LXR Biotechnology, Inc.*, No. 95 Civ. 4204, 1997 WL 20832, at *7 (S.D.N.Y. Jan. 21, 1997) (Sweet, J.).

Consequently, contrary to Defendants' assertions that an interlocutory appeal would further efficiency, an appeal at this stage would cause needless cost and delay. *See In re Blech Sec. Litig.*, No. 94-7696, 2003 WL 134988, at *3 (S.D.N.Y. Jan. 17, 2003) (Sweet, J.) (holding that interlocutory appeal would not "promote the efficient litigation of this case, but [would] only serve to delay it" because, among other reasons, there remained another claim against the defendant); *see also Gruss*, 2012 WL 3306166, at *2 ("It does not normally advance the interests of sound judicial administration or efficiency to have piecemeal appeals that require two (or more) three-judge panels to familiarize themselves with a given case, instead of having the trial judge, who sits alone and is intimately familiar with the whole case, revisit a portion of the case if he or she has erred in part and that portion is overturned following the adjudication of the whole case.") (quoting *Harriscom Svenska AB v. Harris Corp.*, 947 F.2d 627, 631 (2d Cir. 1991)); *McNeil*, 820 F. Supp. at 80 ("Since the chances are overwhelming that the [movant] would not prevail in an interlocutory appeal, certification would far more likely delay the case than hasten its disposition.").

**B.    The December 12 Order Applied Previously
        Existing Legal Standards to a Unique Set of Facts**

Defendants also advance several arguments contending that that the "precedential value" of the December 12 Order justifies interlocutory appeal. Defs.' Br. at 6-9. While the Order is a significant decision, Defendants are wrong that it requires interlocutory review.

To start, the mere fact that an opinion has precedential value is not sufficient to establish the extraordinary circumstances necessary to justify interlocutory review. This is because ***all*** opinions have some precedential value. Thus, as this Court has specifically held, "[p]recedential value . . . is not in this Court's view *per se* sufficient to meet the 'controlling issue of law' standard." *Credit Bancorp*, 103 F. Supp. 2d at 227.

Moreover, here, while the December 12 Order is clearly an important decision, it does not require interlocutory review because the Court applied clear and well-established legal standards to a

unique set of facts.  As noted above, in reaching its holding as to Item 303, the Court adhered to the

standard set forth in the Second Circuit's controlling decisions in *Litwin* and *Panther Partners*.

Similarly, as also noted above, in concluding that Facebook made materially misleading statements,

the Court applied a well-established body of law to the facts before it.  Accordingly, the Court's

application of established precedent to the facts of this case does not implicate any "exceptional

circumstances" that might justify interlocutory review.

In addition, the facts of this case are highly unique.  Indeed, as sophisticated market

participants such as institutional investors and research analysts uniformly stated, the fact that

Facebook made material revenue cuts during a roadshow and selectively disclosed this information

was unprecedented.  In particular, these market participants stated that Facebook's behavior was

"very, very unusual," "a big shock," a "bombshell," and something that they had not seen "during

20 years in and around the tech IPO business."  ¶¶ 14, 138, 166-67.  The highly unique facts at issue

in this case further demonstrate that interlocutory review is not warranted.  *See Multi-Juice, S.A. v.*

*Snapple Beverage Corp.*, No. 02 CIV. 4635, 2003 WL 21998970 (S.D.N.Y. Aug. 21, 2003) (holding that

"reversal of this Court's opinion would not have precedential value for a large number of cases,

because this Court's determination was based on a fact-specific analysis that would likely not apply

in future cases").

As the Court explained in the December 12 Order, the exact same facts undercut

Defendants' argument (*see* Defs.' Br. at 8) that the Court's supposedly "novel approach" is "flatly at

odds with the SEC's considered view" because "[i]t is common practice for issuers to share sensitive

information (including revenue projections based on intra-quarter data) with their underwriters prior

to an IPO to help them accurately price the offering and reduce post-IPO volatility."  *See* Order at

*25 n.30 (holding that Defendants' "industry custom" argument was undercut by the fact that, here,

"when the revised projections were disclosed, highly experienced industry participants stated that

what Facebook did was 'very, very unusual,' 'rare,' and something they had 'never seen [ ] during 20 years in and around the tech IPO business.'").

Defendants' hyperbolic assertion that the December 12 Order will cause "widespread and unsettling effects on the capital markets because its inconsistency with the SEC's disclosure regime and other case law in the Southern District creates uncertainty" (Defs.' Br. at 6-7) is wholly speculative and wrong. Far from having "widespread and unsettling effects on the capital markets," the Court's decision means only that this case will proceed into discovery, and these particular Defendants will have to litigate the case on the merits—an ordinary occurrence in litigation that bears no resemblance to the "extraordinary circumstances" that would warrant interlocutory review. Moreover, Defendants cite no evidence to support their broad speculation that the "capital markets" actually considered the Court's application of previously existing legal standards to be "unsettling." Indeed, in the wake of the Court's Order, media reports simply commented that "IPO defendants *have to be careful that their representations to investors match what they actually know*"— hardly the sort of "widespread and unsettling" impact that Defendants attempt to conjure in their brief. Alison Frankel, *How Facebook IPO Class Action Lawyers Changed Judge's Mind*, Reuters (Dec. 20, 2013), *available at* http://blogs.reuters.com/alison-frankel/2013/12/20/how-facebook-ipo-class-action-lawyers-changed-judges-mind/ (on file with Co-Lead Counsel Labaton Sucharow LLP).

Further, Defendants' assertion that "uncertainty" arises from a supposed "inconsistency" between the December 12 Order and the "SEC's disclosure regime" is incorrect, and has already been thoroughly considered and rejected by the Court. As noted above, in its Order, the Court conducted an extensive analysis of numerous SEC regulations and guidance issued as far back as 1989 and concluded that "[t]he SEC's commentary on Item 303 *further supports* [the Court's] reading of *Litwin* and *Panther Partners.*" Order at *14 (noting that, consistent with the Court's holding, the SEC has stated in multiple releases that "disclosure of the effects [of the known trend,

development or uncertainty], quantified to the extent reasonably practicable, would be required," and that "the required disclosure regarding the future impact of presently known trends, events, or uncertainties may involve some prediction or projection"). Defendants have not cited any change in SEC rules or its interpretive releases that could conceivably undermine the Court's well-considered conclusion.

Defendants also make a series of arguments contending that "immediate review is warranted here because the Court's opinion suggests that three standard industry practices could result in enormous liability." Def. Br. at 7. Each of these arguments fails. Defendants first argue unconvincingly that, "under the Court's opinion, to avoid liability under Item 303, companies will be compelled to provide updates whenever a disclosed trend or risk appears to be having an intraquarter impact on revenues," which supposedly threatens to upend the system of periodic disclosure. *Id.*

However, contrary to Defendants' assertion, the Court clearly did ***not*** impose a general duty to make intra-quarter disclosures. Indeed, the Court specifically stated that "[a] company has no general 'obligation to disclose the results of a quarter in progress,'" and endorsed several previously-existing authorities to this effect. *See* Order at *19. The Court merely recognized that this principle is not absolute, and is subject to two well-settled limitations: specifically, that (i) "intra-quarter updates may be required if intervening events trigger a duty to disclose," and (ii) "disclosures under Item 303 were required to be accurate and complete as of the time [the] Registration Statement became effective," which in this case happened to be (by Facebook's own choice) in the middle of the second quarter of 2012. *Id.* (collecting cases).

The Court also made clear that, even where these two limitations apply, updated disclosures are not required automatically, but are required only where the issuer has identified a ***material*** trend:

> The Defendants did ***not*** violate Item 303 when it decided not to disclose its updated second quarter and yearly internal projections. However, the Company's changes in

> its internal projections and subsequent calls to the Syndicate Analysts establish that
> the Company had identified a trend leading up to its IPO alleged to be **material**.
> Item 303 does require the disclosure of a company's analysis of the future impact of
> a **material** trend or the impact such trend currently has on an issuer.  . . .  The
> absence of a general duty to disclose projections does not mean that IPO registrants
> are exempt from disclosing the analysis and trends underlying their internal
> projections if a disclosure obligation arises.

Order at *19.  As noted above, that reading of Item 303 is nothing new.  To the contrary, the

December 12 Order explained that it is compelled by controlling Second Circuit precedent and clear

SEC guidance.  *Id.*

Next, Defendants incorrectly assert that the "Court relies on Facebook's alleged disclosures

of revised internal projections to the underwriters as a basis for potentially requiring the company to

disclose intra-quarter revenue information to the public at large," which threatens to undermine the

supposedly "common practice" of selectively disclosing lowered revenue projections in the midst of

a roadshow.  *See* Defs.' Br. at 8.  However, as noted above, the Court never held that Facebook had

any duty to disclose its internal projections.  To the contrary, the Court specifically held that

"Defendants did **not** violate Item 303 when [they] decided not to disclose [Facebook's] updated

second quarter and yearly internal projections."  *See* Order at *19.

Further, the Court never held that Facebook's calls to the Syndicate Analysts triggered a duty

to disclose a projection or any other "intra-quarter revenue information."  Indeed, Defendants

simply ignore the Court's clear statement that "Facebook's choice to make the Herman calls to a

select group of investors just a few days before its IPO **does not, by itself, trigger a disclosure**

**obligation**," but merely demonstrated materiality.  *Id.*  In addition, as noted above, Facebook's

selective disclosure of its revenue cuts in the midst of its roadshow was far from a "common

practice" that the December 12 Order might undermine, but was unprecedented—a "bombshell" in the words experienced analysts.[10]

Finally, Defendants argue that "even though cautionary statements about future reported results are 'ubiquitous in securities filings,' numerous courts have rejected any effort to find such statements 'to be actionable by themselves' on the theory that they somehow imply that something has not yet happened in a quarter in progress." Defs.' Br. at 9 (citing *In re FBR*, 544 F. Supp. 2d at 360-62). However, the December 12 Order addressed that argument at length and rejected it. As noted above, after surveying the law, the Court correctly held that "[c]ourts in this Circuit have held that a company's purported risk disclosures are misleading where the company warns only that a risk may impact its business when that risk has already materialized." Order at *21-22.

In sum, because the December 12 Order merely applied previously-existing Second Circuit precedent to a unique set of facts, interlocutory review is not appropriate.

## III.   AN IMMEDIATE APPEAL WOULD NOT MATERIALLY ADVANCE THE ULTIMATE OUTCOME OF THE LITIGATION

As discussed in Sections I(A)-(B), *supra*, because there is no legitimate basis for reversal of this Court's well-reasoned application of established Second Circuit law to the facts alleged in the Complaint, an immediate appeal would neither promote the conservation of judicial resources nor materially advance the resolution of this litigation.

Defendants argue that interlocutory review "may eliminate the burdens of unnecessary discovery, class certification, and other proceedings for the parties as well as the Court." Defs.' Br. at 3. However, because that would be true in any class action, Defendants fail to demonstrate that,

---

[10] Further, as the Court recognized at the motion to dismiss stage, Defendants' assertion that their selective disclosures to the Syndicate Analysts accorded with "industry practice" is highly fact-intensive and cannot be accepted. *See* Order at *19 (holding that the question of what constitutes an industry practice is "a fact-intensive issue that the Court declines to resolve at this current stage"). Defendants certainly cannot establish the existence of a "controlling question of law" by rehashing fact intensive assertions about "industry practice" that the Court has already held cannot be decided at this stage.

in this case, any "**_exceptional circumstances_** justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment." _Livesay_, 437 U.S. at 475.

Defendants further argue that "discovery on the causation issues in this case is likely to overlap with related issues in the NASDAQ cases" and, thus, it would be inefficient to proceed with discovery in this case if discovery in the NASDAQ cases is stayed pending appeal. _See_ Defs.' Br. at 3, 20. However, Defendants utterly fail to explain how this could be so, where they are not even parties to the NASDAQ cases, which allege fraud claims under the Exchange Act against NASDAQ and related defendants based on technical issues with NASDAQ's electronic trading platform. _See generally_ Consol. Am. Class Action Compl. (ECF No. 95).

Moreover, the causation theories and stock price declines at issue in this case are entirely distinct from those alleged in the NASDAQ cases. The NASDAQ plaintiffs allege that, on the first day of public trading in Facebook stock, "May 18, 2012, NASDAQ's trading platforms experienced a systematic breakdown in connection with the [IPO], causing . . . damages in excess of $500 million." _Id._ ¶ 1. The NASDAQ plaintiffs nowhere assert that the alleged fraud had any effect on Facebook stock after its first day of trading (and they certainly would have done so if they had any reasonable basis).

In contrast, Lead Plaintiffs' Securities Act claims are based on material misstatements and omissions that did not come to light until **_after the close of trading on May 18_**. ¶ 18.[11] Lead Plaintiff further alleges that class members were damaged by a resulting drop in Facebook's stock price "over May 21 and 22"—declines that are not at issue in the NASDAQ cases. _See_ ¶ 20.

---

[11] Lead Plaintiffs do not have the burden of pleading and proving the element of "loss causation"; however, Lead Plaintiffs' Securities Act claims are subject to an affirmative defense of "negative causation." _Blackmoss Invs. Inc. v. ACA Capital Holdings, Inc._, No. 07 Civ. 10528, 2010 WL 148617, at *11 (S.D.N.Y. Jan. 14, 2010) (Sweet, J.).

Finally, the parties to this case and the NASDAQ cases will retain their own experts on damages and causation, each of which will separately opine on those issues.  Accordingly, there should be little if any overlap in discovery on causation issues and the status of the NASDAQ cases have no bearing on this case.

Because an immediate appeal would delay, rather than materially advance, this litigation, the Court should deny the motion.

## CONCLUSION

Defendants' motion should be denied in its entirety because they have not shown any extraordinary circumstances or satisfied any of the three statutory criteria to warrant immediate interlocutory review of this Court's conclusion that the Complaint properly pled Securities Act claims against them.


Dated: January 24, 2014

                                                        Respectfully submitted,


BERNSTEIN LITOWITZ BERGER &            LABATON SUCHAROW LLP
GROSSMANN LLP

By:   _/s/ Steven B. Singer_                    By:   _/s/ Thomas A. Dubbs_
        Steven B. Singer                                Thomas A. Dubbs
        _steven@blbglaw.com_                      _tdubbs@labaton.com_
        John J. Rizio-Hamilton                       James J. Johnson
        _johnr@blbglaw.com_                         _jjohnson@labaton.com_
        1285 Avenue of the Americas             Louis Gottlieb
        New York, NY 10019                         _lgottlieb@labaton.com_
        Tel:  (212) 554-1400                          Thomas G. Hoffman, Jr.
        Fax: (212) 554-1444                          _thoffman@labaton.com_
                                                               140 Broadway
                                                               New York, NY 10005
                                                               Tel:  (212) 907-0700
                                                               Fax: (212) 818-0477


                            *Attorneys for Lead Plaintiffs*