UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------X

IN RE FACEBOOK, INC., IPO SECURITIES AND
DERIVATIVE LITIGATION,

                                              MDL No. 12-2389

----------------------------------------X

ROBERT LOWINGER,

                Plaintiff,

                                    13 Civ. 4016 (RWS)

   - against -

                                    OPINION

MORGAN STANLEY & CO. LLC, J.P. MORGAN
SECURITIES LLC, GOLDMAN SACHS & CO., and
FACEBOOK, INC.,

                Defendants.

----------------------------------------X

A P P E A R A N C E S:

        Attorneys for the PLAINTIFF
        ABRAHAM, FRUTCHTER & TWERSKY, LLP
        One Penn Plaza, Suite 2805
        New York, NY 10119
        By:  Jeffrey S. Abraham, Esq.
             Jack G. Fruchter, Esq.
             Mitchell M.Z. Twersky, Esq.
             Philip T. Taylor, Esq.


        Attorneys for DEFENDANTS
        DAVIS POLK & WARDWELL, LLP
        450 Lexington Avenue
        New York, NY 10017
        By:  James P. Rouhandeh, Esq.
             Charles S. Duggan, Esq.
             Andrew Ditchfield, Esq.

USDC SDNY
DOCUMENT
ELECTRONICALLY
DOC #:
DATE FILED: 5/2/14

**Sweet, D.J.**

This case arises out of the litigations stemming from the May 18, 2012 initial public offering ("IPO") of Facebook, Inc. ("Facebook"). Pursuant to the transfer order from the United States Judicial Panel on Multidistrict Litigation (the "MDL Panel"), entered on October 4, 2012, 41 actions relating to this underlying event are presently before this Court.

In the instant motion, Defendants Morgan Stanley & Co. LLC ("Morgan Stanley"), J.P. Morgan Securities LLC ("J.P. Morgan"), and Goldman Sachs & Co. ("Goldman") (collectively, the "Lead Underwriters") move pursuant to Rule 12(b)(6) to dismiss the complaint (the "Complaint") filed by Plaintiff Robert Lowinger ("Plaintiff" or "Lowinger"), which seeks disgorgement of "short-swing" profits allegedly earned by the Defendants from underwriting activities performed in connection with the IPO under Section 16(b) of the Securities Exchange Act of 1934.

For the reasons set forth below, the motion is granted.

**Prior Proceedings**

1

The procedural history of this litigation has been detailed extensively in various opinions by this Court. *See, e.g.*, *In re Facebook, Inc., IPO Sec. & Deriv. Litig*, MDL No. 12-2389, Civ. No. 12-6439, --- F. Supp. 2d ---, 2013 WL 525191, at *9 & *9 n.4 (S.D.N.Y. Feb. 13, 2013).

With respect to the instant motion, Plaintiff alleges that he is a Facebook shareholder and that, on September 12, 2012, he made a demand on Facebook that it seek disgorgement of the profits obtained by the Lead Underwriters based on the facts alleged in the Complaint.  (Compl. ¶ 47.)

When Facebook declined to bring suit, the instant action was filed on June 12, 2013.  (Compl. ¶ 49.)

On October 16, 2013, the Leader Underwriters moved to dismiss Plaintiff's Complaint.  This motion was heard and marked fully submitted on April 9, 2014.

**Facts**

Familiarity with the general background of this case is assumed.  Certain allegations and facts are repeated in part as relevant to the issues presented by the instant motion.

On May 18, 2012, Facebook made a registered initial public offering of approximately 421 million shares of Class A common stock to investors at $38.00 per share. *See In re Facebook, Inc., IPO Sec. & Deriv. Litig*, MDL No. 12-2389, Civ. No. 12-6439, --- F. Supp. 2d ---, 2013 WL 525191, at *9 & *9 n.4 (S.D.N.Y. Feb. 13, 2013).

Prior to the IPO, the Lead Underwriters entered into "lock-up" agreements with each of the Selling Shareholders, who together allegedly held greater than ten percent of Facebook's common stock. (Compl. ¶¶ 15, 17.) The lock-up agreements committed the Selling Shareholders "not to sell or otherwise dispose" of any Facebook common stock for periods of time following the IPO without Morgan Stanley's prior consent. (Compl. ¶ 15.) Plaintiff alleges that the "common purpose" of these lock-up agreements was "to control the supply of Facebook shares available to the market, which, in turn, was expected to provide support for the trading price of Facebook common stock." (Compl. ¶ 16.) Plaintiff further contends that the Lead Underwriters and the Selling Shareholders agreed to "act together" to achieve this common purpose, and that the Lead Underwriters were therefore beneficial owners of the Facebook shares owned by the Selling Shareholders. (Compl. ¶ 18.)

3

In April 2012, Facebook purportedly shared internal revenue projections with the Lead Underwriters of this agreement which were incorporated into research reports prepared by the underwriters and also shared at road shows marketing Facebook's IPO.  (Compl. ¶¶ 20-21.)  On May 7, 2012, Facebook allegedly revised its internal revenue projections and noted a continued trend of daily active users increasing more rapidly than the number of ads delivered, which Facebook attributed to increasing mobile usage among users and certain product decisions.  (Compl. ¶ 22.)  Facebook purportedly shared this concern with Morgan Stanley.  (Compl. ¶¶ 22, 26.)

On May 9, 2012, Facebook amended its Registration Statement, informing investors of the continuing trend that Facebook had identified:

> Based upon our experience in the second quarter of 2012 to date, the trend we saw in the first quarter of [daily active users] increasing more rapidly than the increase in number of ads delivered has continued.  We believe this trend is driven in part by increasing usage of Facebook on mobile devices where we have only recently begun showing an immaterial number of sponsored stories in News Feed, and in part due to certain pages having fewer ads per page as a result of product decisions.

(Compl. ¶ 25.)

4

Similar to the consolidated complaint filed in the securities class action, Plaintiff alleges that this disclosure was false and misleading because it failed to sufficiently disclose "that these factors had already materially impaired Facebook's revenue." (Compl. ¶ 26; *see also* Consol. Class Action Compl. ("Securities Compl."), *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, MDL No. 12-2389 (RWS), Dkt. No. 71, ¶¶ 129-30, 194.)

In addition, after filing the May 9 amendment, the Complaint alleges that Facebook called "select investment bankers and their securities analysts" to discuss Facebook's revision to its revenue projections. (Compl. ¶¶ 27, 29.) These calls purportedly followed a script prepared by Morgan Stanley and advised the analysts that Facebook believed that its second-quarter revenue would be at the "lower end of our $1.1 to $1.2 [billion] range . . . based upon the trends [] described in the disclosure." (Compl. ¶ 30 (emphasis omitted).) Following the calls, the Complaint alleges that analysts for the Lead Underwriters then revised their second-quarter and full-year revenue estimates downward in response, but told "only a few 'major clients'" of the changes. (Compl. ¶¶ 31-32, 38.)

According to Plaintiff, retail investors, not knowing these facts, purchased an unusually large proportion of the shares sold in the IPO driving up the price of Facebook's stock to as high as $45 on May 18, 2012, the first day of trading[1]. (Compl. ¶¶ 33, 34.)  Simultaneously, the Lead Underwriters purportedly sold Facebook stock short at $38.00 per share and facilitated massive short-sales by better informed institutional investors[2].  (Compl. ¶¶ 33-35.)

The Complaint alleges that after these sales on the day of the IPO, the adverse facts were disclosed after the market's close on Friday, May 18, 2012.  On May 21, 2012, the first trading opportunity following the disclosure, Facebook's stock declined to close at $34.03 and the next day at $31.00 per share, more than 20% below the $38.00 IPO price within three trading days.  (Compl. ¶¶ 37, 39.)  The Complaint alleges that by selling Facebook stock short at $38.00 per share and then

[1] In December 2012, Morgan Stanley was fined $5 million by the Massachusetts Securities Division "for giving analysts information with respect to Facebook that was not provided to all investors." (Compl. ¶ 40.)  Morgan Stanley did not admit that it acted improperly by giving analysts information not provided to all potential investors. (See Rouhandeh Decl. Ex. C (Consent Order, In re Morgan Stanley & Co. LLC, Dkt,. No. 2012-0042 (Dec. 17, 2012) ("Consent Order")) at 1.)

[2] During the actual IPO, the Lead Underwriters collectively sold at least 310,238,557 shares of Facebook common stock at $38.00 per share, including over-allotment shares. (Compl. ¶ 34 (alleging that the underwriters sold IPO shares to investors "at prices ranging from $38 to $42.02 per share.").)  The Lead Underwriters were obligated to sell all shares in the IPO at the $38.00 offering price. (See Rouhandeh Decl. Ex. B (Prospectus) at 163 (reflecting that the public offering price was $38.00 per share for all shares, including those sold short as over-allotments).)

6

buying back stock in the open market at well below the $38.00 per share IPO price, the Defendants secured an additional $100 million profit.  (Compl. ¶ 42.)

Independently, the Complaint alleges additional violations against J.P. Morgan and Goldman Sachs, and against Goldman individually.

First, Plaintiff maintains that J.P. Morgan and Goldman purportedly obtained fees by lending out Facebook shares to short-selling clients "at the very same time" that they were acting as underwriters for the IPO[3].  (Compl. ¶ 35.)

Second, the Complaint alleges that as of June 30, 2012, Goldman owned 9,507,859 shares of Facebook common stock, all purportedly purchased in May 2012 following the IPO, and that as of September 30, 2012, Goldman had sold 5,591,649 of those shares at prices higher than those at which they were acquired.  (Compl. ¶¶ 43-45.)  The Complaint also asserts that Goldman transacted in call and put options during this same period.  (*Id.*)  Plaintiff uses this activity to support the inference that Goldman engaged in short-swing profits.  (*Id.*)

---

[3] By definition secondary market activity (including short selling) did not commence until the IPO had occurred and the syndicate was broken.

In turn, Defendants maintain that their actions regarding sales of stock prior to, during and following the IPO were commercially standard practice and in accordance with the relevant agreements and statutes.

The offering's Registration Statement and Prospectus, which are referenced in the Complaint, each explain that, in addition to the 421 million shares being sold to investors through the underwriting syndicate, Facebook and the Selling Shareholders had granted the underwriters "an option, exercisable for 30 days from the date of [the] prospectus, to purchase up to 63,185,042 additional shares of common stock at the public offering price . . . for the purpose of covering over-allotments, if any, made in connection with the offering . . . ."  (James P. Rouhandeh Declaration, "Rouhandeh Decl."; Ex. A (Facebook, Inc., Registration Statement (Form S-1/A) (May 16, 2012) ("Final S-1")) at 164; Ex. B (Facebook, Inc., Prospectus (May 17, 2012) ("Prospectus")) at 163); see also Amendments to Regulation M: Anti-Manipulation Rules Concerning Securities Offerings, Release No. 33-8511, 69 Fed. Reg. 75774, 75780 (Dec. 17, 2004) ("Amendments to Regulation M") ("In the typical offering, the syndicate agreement allows the managing underwriter to 'oversell' the offering, i.e., establish a short position beyond the number of shares to which the underwriting

8

commitment relates."); *id.* at n.65 ("Underwriters requently receive an overallotment option ('Green Show'), which is the right, but not the obligation, to purchase securities from the issuer in addition to those initially underwritten by the syndicate, which may constitution up to 15% of the initial underwritten amount.").

Under the Prospectus, short positions created by over-allotments could also "be covered by exercising the [over-allotment] option or by purchasing shares in the market once secondary trading begins." Amendments to Regulation M, 69 Fed. Reg. at 75780.  According to Defendants, this option of covering the short sales with market purchases enables the lead manager to stabilize and support an offering. "If the stock price declines immediately after the offering, the stabilization agent purchases shares in the aftermarket in order to cover the syndicate short position, and these purchases generate market demand and help support the price." Westenberg, *Initial Public Offerings* § 19:3.4.  If the share price does not decline below the offering price, the lead manager can "exercise the over-allotment option (at the IPO price) . . . and cover the syndicate short position with the additional shares purchased from the company."  *Id.*

The Registration Statement similarly advised that "the underwriters may engage in transactions that stabilize, maintain or otherwise affect the price of the Class A common stock." (Rouhandeh Decl. Ex. A (Final S-1) at 166.)  It explained that the underwriters could "sell more shares than they are obligated to purchase under the underwriting agreement, creating a short position" that they could cover either by exercising the over-allotment option and purchasing additional shares from Facebook and the Selling Shareholders at the fixed option price, or by purchasing additional shares from Facebook and the Selling Shareholders at the fixed option price, or by purchasing shares in the open market at the market trading price.  *Id.*

Facebook advised investors that the underwriters' decision whether to cover their short position by exercising the over-allotment option or by purchasing in the market would be based on, among other things, "the open market price of shares compared to the price available under the over-allotment option."  *Id.*  It further explained that open-market purchases to cover over-allotment short positions, together with other transactions available to the underwriters, "may raise or maintain the market price of the Class A common stock above independent market levels or prevent or retard a decline in market price of the common stock."  *Id.*

10

The Defendants maintain that their sales and purchases during the the relevant periods, and in particular during the distribution, were in compliance with such principles and regulations. (*See* Defendants' Memorandum in Support of Motion to Dismiss, "Def. Mem."; at 7-8 ("Nothing in the complaint disputes that a bona fide distribution in fact occurred.").)

## The Applicable Legal Standards

A.  *Rule 12(b)(6) Motion to Dismiss*

In considering a motion to dismiss pursuant to Rule 12(b)(6), the Court construes the complaint liberally, accepting all factual allegations as true and drawing all reasonable inferences in the plaintiff's favor.  *SEC v. Gruss*, 859 F. Supp. 2d 653, 659 (S.D.N.Y. 2012) (citations omitted); *see also Anderson News, L.L.C. v. Am Media, Inc.*, 680 F.3d 162, 168 (2d Cir. 2012) (all conflicts and ambiguities are to be resolved in plaintiff's favor).  The issue is not whether "a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."  *Gruss*, 680 F.3d at 168.

However, a plaintiff must allege sufficient facts to

11

"nudge[ ] its claims across the line from conceivable to plausible." *Twombly,* 550 U .S. at 570. Though the court must accept the factual allegations of a complaint as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal,* 129 S.Ct. at 1949 (quoting *Twombly,* 550 U.S. at 555).

B. *Section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b) (2013)*

Section 16 imposes obligations on specified insiders relating to their ownership of an issuer's equity securities registered pursuant to Section 12 of the Securities Exchange Act. *See* 15 U.S.C. § 78p.

Section 16(a) mandates that any director, officer or "beneficial owner of more than 10 percent of any class of any equity security (other than an exempted security)" of a company must report to the SEC the amount of all equity securities beneficially owned and must disclose any changes in such ownership. *See id.* § 78p(a); *Roth ex rel. Leap Wireless Int'l, Inc. v. Goldman Sachs Grp., Inc.*, 873 F. Supp. 2d 524, 529 (S.D.N.Y. 2012), *appeal docketed*, *Roth v. The Goldman Sachs Grp., Inc.*, No. 12-2509 (2d Cir. June 25, 2012).

Section 16(b) polices trading of securities by statutorily defined insiders. It provides in relevant part:

> For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) . . . within any period of less than six months . . . shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction . . . .

15 U.S.C. § 78p(b).

As the Second Circuit has explained, Section 16(b) serves to "deter 'insiders,' who are presumed to possess material information about the issuer, from using such information as a basis for purchasing or selling the issuer's equity securities at an advantage over persons with whom they trade." *Gwozdzinsky v. Zell/Chilmark Fund, L.P.*, 156 F.3d 305, 308 (2d Cir. 1998) (footnote omitted).

To state a claim for disgorgement of short-swing profits under Section 16(b), a plaintiff must allege: (1) a non-exempt purchase and subsequent non-exempt sale (or a non-exempt sale and subsequent non-exempt purchase) of a class of an

13

issuer's equity securities (2) within a six-month period (3) by a statutory insider. *See id.*

Congress designed Section 16(b) to be "'capable of easy administration'" and "to create *rules* that can be mechanically applied." *Gibbons v. Malone*, 703 F.3d 595, 603 (2d Cir. 2013)(quoting *Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418, 422 (1972)). To further that design, the statute "'imposes a form of strict liability' and requires insiders to disgorge these 'short-swing' profits 'even if they did not trade on inside information or intend to profit on the basis of such information.'" *Credit Suisse Sec. (USA) LLC v. Simmonds*, 132 S. Ct. 1414, 1417 (2012) (quoting *Gollust v. Mendell*, 501 U.S. 115, 122 (1991)); *see Gibbons*, 703 F.3d at 599 (explaining that Section 16(b) "operates mechanically, with no required showing of intent") (internal quotation marks omitted). But because Section 16(b) operates as a "blunt instrument" to further its deterrent effect, *Magma Power Co. v. Dow Chem. Co.*, 136 F.3d 316, 321 (2d Cir. 1998), courts have recognized that its strict-liability regime must be confined within "narrowly drawn limits." *Foremost-McKesson, Inc. v. Provident Sec. Co.*, 423 U.S. 232, 251 (1976); *Segen v. CDR-Cookie Acquisitions, L.L.C.*, No. 05 Civ. 3509 (RWS), 2006 WL 59550, at *5 (S.D.N.Y. Jan. 4, 2006).

14

**Plaintiff Fails to Adequately Allege a Claim under Section 16(b)**

The Complaint alleges both that (1) the Lead Underwriters, acting as a "group" with the Selling Shareholders, violated Section 16 and (2) Goldman individually, as a beneficial owner, engaged in short-swing profits prohibited under the statute.   Each assertion will be addressed in turn.

## I. The Lead Underwriters do not constitute a "Group" under Section 16 and as such are not Subject to Liability

Under the SEC's rules, the determinative inquiry in deciding whether a person is subject to reporting and disgorgement under Section 16 is whether the person is "a beneficial owner of more than ten percent of any class of equity securities" under Section 13(d) of the Securities Exchange Act and the rules thereunder. 17 C.F.R. § 240.16a-1; *see also Levy v. Southbrook Int'l Invs., Ltd.*, 263 F.3d 10, 14-15 (2d Cir. 2001). Any person who has voting or investment power over securities is deemed the beneficial owner of those securities. *See* 17 C.F.R. § 240.13d-3(a).

15

Section 13(d) also provides that:

> When two or more persons act as a partnership, limited
> partnership, syndicate, or other group for the purpose
> of acquiring, holding, or disposing of securities of
> an issuer, such syndicate or group shall be deemed a
> "person" for the purposes of this subsection.

15 U.S.C. § 78m(d)(3); *see also* 17 C.F.R. § 240.13d-5(b)(1)

(group is formed "[w]hen two or more persons agree to act

together for the purpose of acquiring, holding, voting or

disposing of equity securities of an issuer").  Each group

member is deemed to beneficially own all equity securities owned

by all other members of the group. *See* 17 C.F.R. § 240.13d-

5(b)(1); *Litzler v. CC Invs., L.D.C.*, 411 F. Supp. 2d 411, 414

(S.D.N.Y. 2006).

Morgan Stanley and J.P. Morgan as individual parties

are not alleged to have owned the more than ten percent of

Facebook's Class A stock required to qualify as "beneficial

owners" for purposes of Section 16 during the relevant period[4].

Thus, to ensure that Defendants qualify under the statute,

Plaintiff alleges that the underwriters, together with the

---

[4] The allegations with respect to Goldman's ownership status are separate and
will be addressed independently.  *See infra* at 24-26; *see also* (Declaration
of Jeffrey S. Abraham in support of Plaintiff's Opp'n to the Lead
Underwriters' Mot. To Dismiss. (Dkt. No. 18) ("Abraham Decl."), Ex. A at 141,
143 nm. 22-23.)

Selling Shareholders, formed a "group" through their joint lock-up Agreements.

According to Plaintiff, because the purpose of the lock-up agreements, which required that a specified amount of Facebook securities be held by the Selling Shareholders for specified periods of time (*see* Compl. ¶ 15), was to facilitate the successful sale of Facebook stock in the IPO, the Lead Underwriters "combined" with the Selling Shareholders in "furtherance of a common objective" to hold the securities. *See CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP*, 654 F.3d 276, 283 (2d Cir. 2011).

As noted, the statute and the implementing rule are both concerned with groups formed for the purpose of acquiring shares of an issuer. *See* 15 U.S.C. § 78m(d)(3); 17 C.F.R. § 240.13d-5(b)(1). Whether a group exists under section 13(d)(3) "turns on 'whether there is sufficient direct or circumstantial evidence to support the inference of a formal or informal understanding between [members] *for the purpose of acquiring, holding, or disposing of securities*.'" *CSX I,* 562 F.Supp.2d at 552 (quoting *Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.,* 286 F.3d 613, 617 (2d Cir. 2002)) (emphasis added).

Plaintiff's allegations establish that both the Lead Underwriter and the Selling Shareholders shared the *intent* of the lock-up agreements, namely to protect the stability of the stock and the investing public[5], but nowhere does the Complaint plead or allege that the Lead Underwriters combined with the shareholders under the lock-up agreements or otherwise to *acquire, hold or dispose* of securities[6].  *See also id.* at 284 (rejecting the district court's finding that a group had formed "with respect to" an issuer's securities because the court failed to "find a group formed *for the purpose of acquiring* [those] securities.") (emphasis added).

To the contrary, the lock-up agreements did not bind the two groups as to either their roles and interests during the IPO, or with respect to their conduct in relation to the

---

[5] In any event, Plaintiff's contention on the one hand that the Lead Underwriters and Selling Shareholders shared a common purpose "to provide support for the trading price of Facebook common stock" (Compl. ¶ 16) is contradicted by Plaintiff's assertion, on the other hand, that the Lead Underwriters intentionally permitted Facebook's stock price to "plummet" after the IPO, in order to earn a profit by covering over-allotment sales with purchases below the offering price. (Pl. Opp. at 30.) "The Lead Underwriters could not have 'acted together' with a 'common purpose' to support the price of Facebook stock if, as [Plaintiff also] asserts, the Lead Underwriters intentionally permitted the share price to plummet, in order to make a profit." (Defendant's Reply Memorandum, "Reply Mem."; at 7.)

[6] Because Rule 13d-3(d)(4) provides that any underwriter "who acquires securities through his participation in good faith in a firm commitment underwriting registered under the Securities Act of 1933 shall not be deemed to be the beneficial owner of such securities until the expiration of forty days after the date of such acquisition," 17 C.F.R. § 240.13d-3(d)(4), Plaintiff does not contend that the Lead Underwriters became beneficial owners as a result of their acquisition of Facebook stock from the Selling Shareholders as part of the underwriting.

Facebook shares.  Though the lock-up agreements did commit each
Selling Shareholder "not to sell or otherwise dispose of" any
Facebook common stock for periods of time following the IPO,
(Compl. ¶ 15), the Lead Underwriters were under no reciprocal
agreement. Instead, Goldman directly sold stock during the
restricted periods, and J.P. Morgan and Morgan Stanley neither
owned pre-IPO stock which they were required to hold nor took
any action that would limit the supply of Facebook stock in
conjunction with the shareholders.  *See Roth v. Jennings*, 489
F.3d 499, 508 (2d Cir. 2007).  The lock-up agreements themselves
also did not confer any combined benefit on the parties, but
rather were a standard structural feature that assisted
marketability by assuring investors that the Selling
Shareholders' remaining holdings would not be immediately sold
into the market. *Cf. Wellman v. Dickinson*, 682 F.2d 355, 363 (2d
Cir. 1982) (finding a Section 13(d) group where members agreed
to act in concert to dispose of shares to bring about third
party's acquisition of issuer to the benefit of both sides).

     In short, the lock-up agreements did not create any
kind of "single unit":  The Selling Shareholders were sellers
and holders of Facebook stock, whereas the Lead Underwriters
functioned as distributors, and the two groups acted entirely

independently in relation to the acquiring or selling the
Facebook stock prior to, during and following the IPO.

Regardless, the lock-up agreements by themselves are
not sufficient to create joined liability under the statute.
Because lock-up agreements are standard industry practice[7] and
can join groups with divergent interests, as here, the Second
Circuit has determined that the existence of a lock-up
agreement, "standing alone", is insufficient to establish a
Section 16(b) group. *Chechele v. Scheetz*, 819 F. Supp. 2d 342
(S.D.N.Y. 2011), *aff'd*, 466 F. App'x 39 (2d Cir. 2012). As the
court in *Chechele* explained, "the plausibility of a group
inference based on [] Lock-Up Agreements stands and falls with
the factual content of the *supporting allegations*." *Id.*
(emphases added); *see also Donaghue v. Accenture Ltd.*, No. 03
Civ. 8329 (NRB), 2004 WL 1823448, at *1, *3-4 (S.D.N.Y. Aug. 16,
2004) (allegations of lock-up and voting agreements imposed on
employees insufficient to establish a group on a motion to
dismiss). Such supporting allegations have been found
sufficient where, for instance, the lead underwriters to the

---

[7] *See* NYSE/NASD IPO Advisory Comm., Report and Recommendations of a committee
convened by the New York Stock Exchange, Inc. and NASD at the request of the
U.S. Securities and Exchange Commission, May 2003, at 16, *available at*
http://www.finra.org/web/groups/rules_regs/documents/
rules_regs/p010373.pdf ("Underwriters routinely require directors, officers
and certain pre-IPO shareholders of an issuer to enter into lock-up
agreements that restrict their sale of company shares for a specified period
. . . .")

agreement had a right of first refusal to purchase any

securities the Selling Shareholders desired to sell, thereby

aligning the parties, *see, e.g.*, *Morales v. New Valley Corp.*,

999 F. Supp. 470, 475 (S.D.N.Y. 1998), or where independent

facts evidenced coordinated conduct by the group with respect to

the acquisition, purchase or disposal of stock.  *See, e.g.*,

*Morales v. Quintel Entertainment, Inc.*[8], 249 F.3d 115 (2d Cir.

2001) (supporting allegations included three shareholders had

simultaneously deposited shares into, and then later

simultaneously redeemed their shares from, three simultaneously

created identical trusts); *Morales v. Freund*, 163 F3d 763, 767

(2d Cir. 1999) (a group was formed where parties coordinated to

obtain voting control over stock).

    Even presuming all of Plaintiff's allegations as true,

here, no such comparable commonalities exist.  The Complaint

alleges that the Lead Underwriters and Selling Shareholders had

a common intent governing the lock-up agreement, but not that

the agreement coordinated the two parties in any way with

---

[8] Plaintiff cites *Morales v. Quintel Entertainment, Inc.*, 249 F.3d 115 (2d Cir. 2001) for the proposition that lock-up agreements in and of themselves may serve as the basis for a "group" formation under the statute.  In that case, though, while the Second Circuit observed that lock-up provisions "may bear upon" the "existence of a concerted agreement," it expressly declined to decide whether such agreements are sufficient by themselves to support a group inference under Section 16.  *Id.* at 127.  *Morales* ultimately determined that a group inference was appropriate based on the supporting allegations establishing significant coordinated conduct; as established, no such cohesion exists here.

respect to their conduct regarding securities, or that the
parties had any independent connection aligning their behavior.
Precedent has established that such common intent, even where
the Defendants were "true insiders," without more to combine the
interests or actions of the parties, is insufficient to
establish liability. *See, e.g.*, *Morales v. New Valley Corp.*, 999
F. Supp. 470, 476 (S.D.N.Y. 1998) ("defendants were not only
beneficial owners, they were true insiders. They were advisors
to a very large block of shareholders in a distressed
corporation, and they agreed to become very familiar with that
corporation in order to serve those shareholders. They intended
to play a large role in the reorganization of the company. All
of this, without more, would not make them beneficial owners of
any shares. But defendants also held a right of first refusal
and a share in the profits in hundreds of thousands of
shares."). Thus, Plaintiff fails to plead any basis on which to
infer the formation of a "group" subject to Section 16 and
dismissal is appropriate. *See Chechele v. Scheetz*, 819 F. Supp.
2d 342, 346 (S.D.N.Y. 2011) ("While the facial plausibility of
the alleged shareholder group does not turn on the existence of
a *particular* agreement, bare allegations that the parties agreed
that they . . . would maintain control of [the company]" will
not, without more, suffice") (citing *Iqbal,* 129 S.Ct. at 1949
(holding that a pleading that only "offers labels and

22

conclusions or a formulaic recitation of the elements of a cause of action will not do")); *Starr v. Sony BMG Music Entm't,* 592 F.3d 314, 319 n.2 (2d Cir. 2010) ("The allegation that defendants agreed . . . is obviously conclusory, and is not accepted as true.")).

Whether, if beneficial owners, the Lead Underwriters would be exempt from Section 16 liability under Rule 16a-7 presents certain complex and unprecedented issues, for instance, whether Defendants' creation of informational disparities accompanied by unusually high levels of short selling, though compliant with the letter of the law, may still be "indecent" or "dishonest" for purposes of determining "good faith."   The Court declines to reach these issues at this time, because even if the Lead Underwriters are not exempt under the statute, they lack the prerequisite "beneficial owner" status for Section 16 to apply. *See U.S. v. Bulluck*, 2014 WL 684992 (2d Cir. Feb. 24, 2014) (declining to reach an unprecedented issue of the case because the outcome could be disposed of on alternate grounds); *see also Segura v. United States,* 468 U.S. 796, 104 S. Ct. 3380, 82 L.Ed.2d 599 (1984) (seven Justices decline to address this issue because case does not require its resolution).

**II.  Goldman is not Alleged to have had more than 10%
       Ownership in the Facebook Stock During the Relevant**

23

**Trades and as such is not a "Beneficial Owner" under Section 16**

Plaintiff contends that even if the Lead Underwriters are not a "group" under Section 16, Goldman was a beneficial owner of 10% of Facebook's stock on May 17, 2012 and made additional short-swing profits between May 17, 2012 and September 30, 2012. (*See* Compl. ¶¶ 43-45.) More specifically, Plaintiff alleges that Goldman sold 5,591,649 shares of Facebook stock between June 30, 2012 and September 30, 2012 (Compl. ¶ 45), and that some selling occurred at prices higher than paid for purchases causing Goldman to earn additional short-swing profits from trading Facebook securities. (Compl. ¶ 45.) According to Plaintiff, because Goldman sold 5,243,185 shares of Facebook stock at $37.582 per share, (*see* Prospectus at 143 fn. 23(I); *see also* Goldman Form 4 (Abraham Decl. Ex. D)), in order for Goldman to have owned 9,507,859 shares of Facebook stock on June 30, 2012 (Compl. ¶ 43), it must have acquired 536,237 shares beyond the 8,917,622 shares it reported owning on May 17, 2012. (*See* Goldman Form 4.)

Section 16 does not cover any transaction where the defendant was not a beneficial owner "both at the time of the purchase and sale, or the sale and purchase, of the security involved . . . ." *Foremost-McKesson, Inc. v. Provident*

24

*Securities Co.*, 423 U.S. 232, 234 (1976).  As such, for Goldman

to be a "beneficial owner" subject to liability under the

statute, it would have to have been a 10% beneficial owner both

at the time of the May 17 sale, and at the time of at least one

subsequent purchase during the June through September time

period.


Goldman's Form 4 signed May 17, 2012[9], states that at

the time of the sale, Goldman's "relationship to reporting

person(s) to issuer" was a 10% owner.  (*See* Abraham Decl. Ex. D

at 1.)  On the second page of the form, under the "Reporting

Owners" box, Goldman Sachs Group Inc. and Goldman Sachs & Co.

are listed as 10% beneficial owners under "relationship."  (*Id.*

at 2.)  Also on the form is a checked box, which specifies

"Check this box if no longer subject to Section 16," indicating

that after the May 17 sale, Goldman was no longer a 10% owner.

(*Id.* at 1.)


Though Plaintiff alleges that Goldman was a 10%

beneficial owner on May 17, 2012, there is no allegation in the

Complaint as to Goldman's ownership status during the subsequent

activity—and in fact the Form 4 indicates that as of May 17,

2012, Goldman was no longer a beneficial owner.  Because the

---

[9] The Court can take judicial notice of this fact pursuant to Fed. R. Evid.
201.  *See, e.g.*, *SEC v. Power*, 525 F. Supp. 2d 415, 416 (S.D.N.Y. 2007).

statute requires that the entity be a 10% owner both at the time
of the sale and subsequent purchase of the security, Plaintiff
has not adequately alleged that Goldman was a beneficial owner
subject to liability under the statute.  Accordingly, dismissal
is also appropriate as to Goldman individually.

Because Goldman is not subject to Section 16
liability, the Court need not address whether Plaintiff's
allegations as to short-swing profits are adequate.

**Conclusion**

Based on the conclusions set forth above, Defendants'
motion to dismiss the Complaint is granted.

**It is so ordered.**

New York, NY
May  1 , 2014

ROBERT W. SWEET
U.S.D.J.

26