**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

IN RE FACEBOOK, INC. IPO SECURITIES
AND DERIVATIVE LITIGATION

MDL No. 12-2389 (RWS)

This document relates to the
Consolidated Securities Action:

| | |
|---|---|
| No. 12-cv-4081 | No. 12-cv-4763 |
| No. 12-cv-4099 | No. 12-cv-4777 |
| No. 12-cv-4131 | No. 12-cv-5511 |
| No. 12-cv-4150 | No. 12-cv-7542 |
| No. 12-cv-4157 | No. 12-cv-7543 |
| No. 12-cv-4184 | No. 12-cv-7544 |
| No. 12-cv-4194 | No. 12-cv-7545 |
| No. 12-cv-4215 | No. 12-cv-7546 |
| No. 12-cv-4252 | No. 12-cv-7547 |
| No. 12-cv-4291 | No. 12-cv-7548 |
| No. 12-cv-4312 | No. 12-cv-7550 |
| No. 12-cv-4332 | No. 12-cv-7551 |
| No. 12-cv-4360 | No. 12-cv-7552 |
| No. 12-cv-4362 | No. 12-cv-7586 |
| No. 12-cv-4551 | No. 12-cv-7587 |
| No. 12-cv-4648 | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF
CLASS REPRESENTATIVES AND CLASS COUNSEL**

# TABLE OF CONTENTS

Page

I.      PRELIMINARY STATEMENT ................................................................................1

II.     STATEMENT OF FACTS ......................................................................................8

        A.      Facebook's Ability To Monetize Its Increasing Mobile
                Users Was Critical To Investors And The Success Of Its
                Historic IPO ..............................................................................................8

        B.      Facebook Provides Its Initial Estimates To The Syndicate
                Analysts, Who Create Their Own Models ..................................................9

        C.      Facebook Determines That Increasing Mobile Usage Has
                Negatively Impacted Its Business ...........................................................10

        D.      Facebook Discloses The Material Deterioration In Its
                Revenues To The Syndicate Analysts, But Not To The
                Market .....................................................................................................11

        E.      Facebook Stock Declines As The Truth Is Revealed................................14

III.    ARGUMENT ....................................................................................................16

        A.      The Proposed Class Action Satisfies Rule 23(a) .................................17

                1.      Numerosity Is Established ..............................................................17

                2.      Commonality Is Established ............................................................18

                3.      Typicality Is Established.................................................................19

                4.      Adequacy Is Established.................................................................20

        B.      The Requirements Of Rule 23(b) Are Satisfied.....................................21

                1.      Predominance Is Established ..........................................................21

                2.      Superiority Is Established ...............................................................33

IV.     CONCLUSION.................................................................................................34

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*A.I. Trade Fin., Inc. v. Altos Hornos de Vizcaya, S.A.*,
  840 F. Supp. 271 (S.D.N.Y. 1993) ...................................................................24

*Amgen Inc. v. Conn. Ret. Plans and Trust Funds*,
  133 S. Ct. 1184 (2013)..............................................................................8, 30

*In re Bank One Sec. Litig./First Chi. S'holder Claims*,
  2002 WL 989454 (N.D. Ill. May 14, 2002) .........................................................16

*Bd. of Trustees of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*,
  269 F.R.D. 340 (S.D.N.Y. 2010) .....................................................................34

*Billhofer v. Flamel Techs., S.A.*,
  281 F.R.D. 150 (S.D.N.Y. 2012) .........................................................18, 19, 20, 21

*In re Blech Sec. Litig.*,
  187 F.R.D. 97 (S.D.N.Y. 1999) ...................................................................25, 33

*In re Constar Int'l Inc. Sec. Litig.*,
  585 F.3d 774 (3d Cir. 2009)..........................................................................22

*Dietrich v. Bauer*,
  192 F.R.D. 119 (S.D.N.Y. 2000) ...............................................................17, 18, 32

*In re DJ Orthopedics, Inc., Sec. Litig.*,
  2003 U.S. Dist. LEXIS 21534 (S.D. Cal. Nov. 17, 2003) .......................................31

*Dodona I, LLC v. Goldman, Sachs & Co.*,
  296 F.R.D. 261 (S.D.N.Y. 2014) .....................................................................19

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
  986 F. Supp. 2d 487 (S.D.N.Y. 2013)............................................................ *passim*

*Fed. Hous. Fin. Agency v. HSBC N. Am. Holdings Inc.*,
  2014 WL 3702587 (S.D.N.Y. July 25, 2014) ..............................................6, 28, 29

*In re Flag Telecom Holding, Ltd. Sec. Litig.*,
  574 F.3d 29 (2d Cir. 2009)...........................................................................20

*Globus v. Law Research Serv., Inc.*,
  418 F.2d 1276 (2d Cir. 1969)........................................................................17

*Herman & MacLean v. Huddleston*,
  459 U.S. 375 (1983)...........................................................................................4, 17

*Hevesi v. Citigroup Inc.*,
  366 F.3d 70 (2d Cir. 2004).........................................................................................20

*In re Initial Pub. Offering Sec. Litig.*,
  471 F.3d 24 (2d Cir. 2006)....................................................................................32, 33

*In re Moody's Corp. Sec. Litig.*,
  274 F.R.D. 480 (S.D.N.Y. 2011) ..........................................................................26, 32

*Jordan v. Can You Imagine, Inc.*,
  485 F. Supp. 2d 493 (S.D.N.Y. 2007)........................................................................24

*Korn v. Franchard Corp.*,
  456 F.2d 1206 (2d Cir. 1972)........................................................................4, 18, 22

*Litwin v. Blackstone Grp., L.P.*,
  634 F.3d 706 (2d Cir. 2011).................................................................................24, 26

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
  2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009) ............................................................18

*N.J. Carpenters Health Fund v. Rali Series 2006-Q01 Trust*,
  477 F. App'x 809 (2d Cir. 2012) ................................................................................29

*In re NASDAQ Market-Makers Antitrust Litig.*,
  172 F.R.D. 119 (S.D.N.Y. 1997) ....................................................................6, 25, 34

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
  693 F.3d 145 (2d Cir. 2012)..........................................................................................4

*In re NYSE Specialists Sec. Litig.*,
  260 F.R.D. 55 (S.D.N.Y. 2009) ....................................................................... *passim*

*Pa. Ave. Funds v. Inyx Inc.*,
  2011 WL 2732544 (S.D.N.Y. July 5, 2011) ..........................................................17, 18

*Paese v. Hartford Life & Accident Ins. Co.*,
  449 F.3d 435 (2d Cir. 2006)..........................................................................................24

*Pub. Emps. Ret. Sys. of Miss. v. Merrill Lynch & Co.*,
  277 F.R.D. 97 (S.D.N.Y. 2011) ....................................................................... *passim*

*Schleicher v. Wendt*,
  618 F.3d 679 (7th Cir. 2010) ......................................................................................30

*SEC v. Bank of Am. Corp.*,
    677 F. Supp. 2d 717 (S.D.N.Y. 2010)................................................................24, 27

*STMicroelectronics, N.V. v. Credit Suisse Sec. (USA) LLC*,
    648 F.3d 68 (2d Cir. 2011)..........................................................................................24

*United Paperworkers Int'l Union v. Int'l Paper Co.*,
    985 F.2d 1190 (2d Cir.1993).......................................................................................26

**Statutes**

Fed. R. Civ. P. 23(b)(3)....................................................................................21, 33

**Other Authorities**

5 Disclosure & Remedies Under the Sec. Laws § 3:46 ..............................................28

H.R. Conf. Rep. No. 104-369 (1995)
    *reprinted in* 1995 U.S.C.C.A.N. 730 (1995).......................................................20

William B. Rubenstein, *Newberg on Class Actions* §4.50 (5th ed.)................................22, 25, 27

Court-appointed Lead Plaintiffs North Carolina Department of State Treasurer on behalf of the North Carolina Retirement Systems ("North Carolina DST"), Arkansas Teacher Retirement System ("Arkansas Teacher"), and Fresno County Employees' Retirement Association ("Fresno"), as well as Individual Named Plaintiffs Jose G. Galvan and Mary Jane Lule Galvan (the "Galvans"), and additional proposed individual class representatives Eric Rand ("Rand"), Paul and Lynn Melton (the "Meltons"), and Sharon Morley ("Morley") (collectively, "Plaintiffs"), respectfully submit this memorandum in support of their motion, pursuant to Federal Rules of Civil Procedure 23(a), (b)(3), (c)(5), and (g), seeking: (i) certification of a Class, as defined herein, of investors in the initial public offering (the "IPO") of Facebook, Inc. ("Facebook" or the "Company"); (ii) appointment as Class Representatives; and (iii) appointment of Lead Counsel[1] as Class Counsel.

## I.   PRELIMINARY STATEMENT

This case arises from one of the largest and most anticipated IPOs in history: Facebook's May 17, 2012 IPO, in which the Company went public at $38 per share and raised $16 billion from the investing public.  ¶¶4, 150, 187.[2]  At the time of the IPO, Facebook's ability to monetize its mobile users was critical to its financial performance and its investors because an important industry-wide shift was underway by which users increasingly accessed Facebook through their mobile phones.  ¶¶89-97, 110-21, 140-44.  Unbeknownst to investors, about two weeks prior to the IPO, Facebook determined that this mobile usage trend had materially

---

[1] Court-appointed Lead Counsel are Bernstein Litowitz Berger & Grossmann LLP and Labaton Sucharow LLP.

[2] Herein, "¶__" refers to paragraphs of the Consolidated Class Action Complaint (ECF No. 71) (the "Complaint"), and "Ex._" refers to the exhibits attached to the December 23, 2014 Declaration of Salvatore J. Graziano filed herewith.  All capitalized terms have the same meanings as set forth in the Complaint unless otherwise defined herein.   All internal quotations and citations are omitted and emphases are added unless otherwise noted.

impaired its ability to generate revenue.  Accordingly, after the Registration Statement was filed, Facebook took the extraordinary step of slashing its revenue estimates in the midst of its road show, reducing its estimate for the second quarter of 2012 by as much as 8% and the full year by as much as 3.5%.  ¶¶10, 132-33.

Facebook made no public disclosure of these facts.   ¶11.   Rather than inform the investing public that the mobile usage trend had already caused a material decline in Facebook's revenues, on May 9, 2012, the Company filed a materially misleading amendment to the Registration Statement in the form of a "Free Writing Prospectus," which stated that mobile usage "*may* negatively affect our revenue and financial results."  This was the exact same information the Company had disclosed prior to determining that mobile usage already *had* negatively impacted its revenue and financial results.

Well aware of the materiality of its undisclosed revenue cuts, within minutes of filing this misleading disclosure, Facebook began to make a series of 19 phone calls to the analysts employed by certain of the Underwriter Defendants (the "Syndicate Analysts"), and informed them of the Company's revenue cuts.  The Syndicate Analysts, in turn, revised the inputs to their own proprietary research models, and then provided the results of those varying models to certain institutional investors considering investing in the IPO.  Those institutional investors considered the Syndicate Analysts' model revisions, estimated their intended purchases in the IPO, and then submitted "indications of interest" to the Underwriter Defendants reflecting their orders for Facebook stock.

The truth about Facebook's revenue cuts did not publicly emerge until after Facebook had completed the IPO.  Over the course of two business days starting after the close of the first day of trading on Friday, May 18, 2012, news reports revealed that, during Facebook's road

show, the Company had made material revenue cuts and, based on that information from Facebook, the Syndicate Analysts made model revisions that the Underwriter Defendants communicated to certain institutional investors.  ¶¶161, 166-67.  This news adversely impacted the price of Facebook's stock, which fell almost 20% in the two trading days immediately after the IPO.  In the wake of these revelations, market commentators widely reported that Facebook's IPO-related disclosures were materially misleading, stating that "there is nothing within the [ ] update on May 9 that would give normal investors the sense that there had been a material change about Facebook's revenue prospects."  ¶174.

Based on the above facts, Lead Plaintiffs and Named Plaintiffs brought claims against Facebook, certain of its executives and directors, and the Underwriter Defendants under Sections 11, 12, and 15 of the Securities Act of 1933 ("Securities Act").  On December 12, 2013, the Court issued an 83-page order sustaining the Complaint in its entirety, holding that it sufficiently alleged that the Registration Statement was materially false and misleading because: (1) it falsely represented that mobile usage "*may*" impact revenues, even though mobile usage already had negatively impacted Facebook's revenues; and, (2) in violation of Item 303 of Securities and Exchange Commission Regulation S-K, Facebook failed to disclose that mobile usage had materially impacted its revenue, and the extent of the impact.  As the Court put it, "investors reading Facebook's disclosures had no way of knowing what effect on revenue, if any, the Company was currently experiencing as a result of the mobile usage trend," and thus, Facebook's disclosures "***did constitute a misrepresentation***."  *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 512, 517 (S.D.N.Y. 2013).

### Plaintiffs' Claims Are Well-Suited For Class Treatment

This case is well-suited for class treatment under Federal Rule of Civil Procedure 23. As this Court has recognized, "class actions are a particularly appropriate and desirable means to resolve claims based on the securities laws." *In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 80 (S.D.N.Y. 2009) (Sweet, J.) (citation omitted). Securities Act claims, like those here, are "especially amenable to class action resolution." *Pub. Emps. Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 277 F.R.D. 97, 101 (S.D.N.Y. 2011). This is so because Section 11 plaintiffs "need only show a material misstatement or omission to establish [their] *prima facie* case." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983). No proof of scienter, reliance, market efficiency, or loss causation is required. *See NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 156-57 (2d Cir. 2012).

Here, because the two main issues in this case—the existence and materiality of the alleged misrepresentations—"obviously present important common issues," class certification is appropriate. *Korn v. Franchard Corp.*, 456 F.2d 1206, 1210 (2d Cir. 1972).

### Defendants Purported Knowledge Defense Cannot Defeat Class Certification

Plaintiffs expect Defendants to contend that class certification is inappropriate because individualized issues relating to their purported affirmative defense of actual knowledge under Section 11 supposedly predominate. Defendants likely will contend that certain institutional investors had "actual knowledge" of the alleged misstatements and omissions based on the Syndicate Analysts' model revisions and that retail investors had such "actual knowledge" based on media or analyst reports. Determining which investors had actual knowledge, Defendants will assert, could require numerous individualized inquiries that would overwhelm the host of core common questions in this case.

-4-

These arguments are without merit.  Significantly, the basis of Plaintiffs' claims in this case is that the offering documents for the Facebook IPO were misleading because they failed to disclose that Facebook determined that the mobile usage trend had already had a material negative impact on the Company's revenue for the second quarter and the year, as evidenced by the fact that Facebook cut its own revenue estimates.  No class members were told of this fact. Moreover, as discussed in Section III.B.1, *infra*, Defendants directed prospective investors in the Facebook IPO to disregard information received from third parties, and to rely only on the information contained in the Prospectus in determining whether to invest in the Company's stock.  Ex. 41 at 31 ("You should rely only on the information contained in this prospectus in determining whether to purchase our shares of Class A common stock.").

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████

These facts undermine any argument that investors could be charged with "actual knowledge" of information omitted from the Prospectus based on their communications with the Syndicate Analysts or receipt of media reports.  Accordingly, Plaintiffs request certification of the class definition contained in the Complaint:

> "[A]ll persons and entities who purchased or otherwise acquired the Class A common stock of Facebook, Inc. ("Facebook" or the "Company") in or traceable to Facebook's initial public offering (the "IPO"), which occurred on or about May 17, 2012, and were damaged thereby."  ¶1.[3]

---

[3] Excluded from the Class and each subclass discussed *infra* are Defendants, present or former executive officers of Facebook and their immediate family members (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)).  *See* ¶1.

Alternatively, Plaintiffs request certification of subclasses of individual retail investors and institutional investors.  By proposing such subclasses, Plaintiffs further define the common issues each subclass will seek to litigate.  Thus, Plaintiffs alternatively request certification of a Class comprised of the following two Subclasses:

1) The Institutional Investor Subclass, consisting of the institutional investors that purchased or otherwise acquired Facebook Class A common stock in or traceable to the Company's IPO, including those institutional investors that received IPO allocations as listed in Exhibit 42.  The proposed Class Representatives for this Subclass are North Carolina DST, Arkansas Teacher, and Fresno.

2) The Retail Investor Subclass, consisting of all retail investors who purchased or otherwise acquired Facebook Class A common stock in or traceable to the Company's IPO, and were damaged thereby.  The proposed Class Representatives for this Subclass are the Galvans, Rand, the Meltons, and Morley.

The power of a district court to create subclasses is a broad one, and courts are encouraged to create subclasses to minimize potential individualized issues.  *See In re NASDAQ Market-Makers Antitrust Litig.*, 172 F.R.D. 119, 130 (S.D.N.Y. 1997) (Sweet, J.).  The creation of subclasses in this case does precisely that by enabling the Court to assess the differing nature of the affirmative defense as it applies to the two types of investors.

***First***, even assuming that members of the Institutional Investor Subclass were widely provided the Syndicate Analysts' varying model revisions, that information is not sufficient to establish the knowledge defense as to that Subclass.  Defendants' burden for proving their purported knowledge defense is exceptionally high, and they must show that Plaintiffs had knowledge of the precise information that was allegedly misrepresented or omitted.  *See, e.g.*, *Fed. Hous. Fin. Agency v. HSBC N. Am. Holdings Inc.*, 2014 WL 3702587, at *20 (S.D.N.Y. July 25, 2014) (holding that a knowledge defense failed as a matter of law where the plaintiffs lacked "actual, specific knowledge of the falsity of the particular statements at issue") (quoting

*Fed. Hous. Fin. Agency v. UBS Americas Inc.*, 2013 WL 3284118, at *14-15 (S.D.N.Y. June 28, 2013)).

As noted above, the basis of Plaintiffs' claims in this case is that the offering documents for the Facebook IPO were misleading because they failed to disclose that Facebook determined that the mobile usage trend had already had a material negative impact on the Company's 2012 second-quarter and year-end revenues – and the members of the Institutional Investor Subclass were ***not*** told of this fact. ███████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████ Thus, under well-established law, mere knowledge of the Syndicate Analysts' model revisions is not sufficient to establish the knowledge defense where the key information at issue—Facebook's own revenue cuts—was not disclosed.  This is a common issue across the Institutional Investor Subclass.

Significantly, regardless of how the Court or a jury ultimately decides this issue on the merits, it raises no individualized questions that predominate at this stage.  If the fact-finder were to ultimately decide that knowledge of the Syndicate Analysts' model revisions was not sufficient to establish the knowledge defense, the claims of the Institutional Investor Subclass would survive.  Conversely, if the fact-finder were to conclude the opposite, the Institutional Investor Subclass's claims would fail, again as a whole.  The critical point for the purposes of this motion is that, in all events, ***the common claims of this Subclass are adjudicated together***. As the Supreme Court recently held in a seminal class certification decision, "therefore, the class is entirely cohesive:  It will prevail or fail in unison.  In no event will the individual

circumstances of particular class members bear on the inquiry." *Amgen Inc. v. Conn. Ret. Plans and Trust Funds*, 133 S. Ct. 1184, 1191 (2013).

**Second**, the Underwriter Defendants did not provide the Syndicate Analysts' model revisions to the members of the Retail Investor Subclass; therefore, individual issues of knowledge do not exist, let alone predominate, with respect to that Subclass.

For the reasons more fully set forth herein, Plaintiffs' motion should be granted.

## II.   STATEMENT OF FACTS

### A.   Facebook's Ability To Monetize Its Increasing Mobile Users Was Critical To Investors And The Success Of Its Historic IPO

In the months before Facebook went public, the financial media widely reported that the IPO was expected to be the initial public offering "of the year, maybe … of the decade."  ¶87. The key factor driving investor enthusiasm for the IPO was Facebook's historic ability to rapidly grow its revenues.  Analysts reported that investors are "very much willing to pay up for growth," and the *New York Times* reported that "many analysts believe Facebook's fortunes will rapidly multiply as advertisers direct more and more capital to the Web's social hive."  ¶97.

At the time of the IPO, the Company's ability to effectively monetize its mobile users was tremendously important to Facebook and its investors.  This was because, in mid-2012, a sea change was occurring in the way consumers accessed the Internet: more people were accessing the web through mobile devices instead of desktop computers.  Thus, from the outset of the IPO process, Facebook emphasized that its ability to monetize mobile users was key to its financial performance.  ¶¶94-95.  As the Court noted in denying Defendants' motion to dismiss, "the Registration Statement repeatedly highlighted that Facebook's revenue and advertising revenue was Facebook's most significant financial metric," and that trends in mobile were "'critical' to Facebook's business." *Facebook*, 986 F. Supp. 2d at 519.

**B.** **Facebook Provides Its Initial Estimates To The Syndicate Analysts, Who Create Their Own Models**

On April 16, 2012, Facebook executives, including Facebook's then-CFO, Defendant David Ebersman, met with the Syndicate Analysts in advance of the Company's road show to provide them with information about Facebook, including its revenue estimates for the second quarter of 2012 and the full year.  ¶¶6, 106.  At that time, "Facebook's internal revenue estimate for the second quarter, which had begun on April 1, ranged from $1.1 to $1.2 billion," and its "internal revenue estimate for the 2012 fiscal year was $5 billion."  ¶¶6, 106-07.

The Syndicate Analysts input Facebook's internal revenue estimates in their financial models for the Company in order to forecast its future revenues.  ¶108.  Each Syndicate Analyst's estimates of Facebook's 2012 second-quarter and year-end revenues were different from those of the other Syndicate Analysts.  *See id.* (citing second quarter and annual revenue forecasts by Goldman Sachs ($1.207 billion and $5.169 billion); J.P. Morgan ($1.182 billion and $5.044 billion); Morgan Stanley ($1.175 billion and $5.036 billion); and Bank of America ($1.166 billion and $5.040 billion)).

**C.**   **Facebook Determines That Increasing Mobile Usage Has Negatively Impacted Its Business**

---

[4] Beginning on May 7, 2012, Facebook made a number of presentations to potential institutional investors at events known as "road shows."  ¶103.  Road shows are important parts of the IPO process because they allow issuer and underwriters to market an IPO directly to institutional investors.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████

    **D.**    **Facebook Discloses The Material Deterioration In Its Revenues To The Syndicate Analysts, But Not To The Market**

The investing public was not told that the mobile usage trend had already had a material negative impact on Facebook's 2012 quarterly and annual revenues, causing the Company to make revenue cuts in the middle of its road show.  Rather than disclose to investors these material facts, Facebook executives filed the May 9, 2012 Free Writing Prospectus, which stated only that mobile usage "***may*** negatively affect our revenue."  ¶193.  However, as this Court found in denying Defendants' motion to dismiss the Complaint, the Registration Statement "***misleadingly represented that this revenue cut was merely possible when, in fact, it had already materialized . . .  [T]he Registration Statement, read as a whole, and despite its warnings regarding mobile usage, did constitute a misrepresentation***."  *Facebook*, 986 F. Supp. at 516-17.

Within minutes of filing the Free Writing Prospectus, Facebook Treasurer Cipora Herman began making a series of 19 phone calls to the Syndicate Analysts to inform them of the material facts that the Free Writing Prospectus failed to disclose.  *See, e.g.*, ████████████ ████████████████████████  Reading from a script, Herman told the Syndicate Analysts that the factors discussed above had ***already*** negatively impacted Facebook's revenues for the 2012 second-quarter and full-year, and that, as a result, Facebook had reduced its internal revenue estimates.  ¶¶12, 133. ████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████  ████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████

Accordingly, no Facebook investors knew the critical fact that the Company, on the eve of one of the most anticipated IPOs in history, had determined that the mobile usage trend had had a material negative impact on its quarterly and annual revenues, and had cut its internal

_____

[5] ████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████

revenue estimates materially based on this significant adverse trend in its business.  By not disclosing these facts, Facebook was able to take the extremely rare steps of significantly increasing both the size and the price of the IPO in the week before the offering took place. ¶144.  On May 15, Facebook announced that it was increasing the price range for its stock from a range of $28 to $35, to a new range of $34 to $38, and the next day Facebook increased the size of the IPO by nearly 25%, or 84 million shares.  ¶¶145, 147.

A significant portion of these additional shares were allocated to retail investors.  Retail investors, as noted above, were neither told that Facebook had cut its revenue estimates **nor** that the Syndicate Analysts had revised the revenue input in their independent models.  ███████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████

### E.      Facebook Stock Declines As The Truth Is Revealed

On Friday, May 18, 2012, Facebook completed the IPO by selling $16 billion worth of stock to institutional and retail investors at $38 per share, and its stock began publicly trading. ¶¶17, 156.  Hours after the close of trading, *Reuters* surprised investors by reporting for the first time that Facebook had slashed its own revenue estimates shortly before the IPO.  ¶161.  *Reuters* reported that "Facebook [] altered its guidance for research earnings last week, during the road

show, a rare and disruptive move." *Id.* This news stunned the market. As numerous market commentators reported, it was extremely "rare" and "very, very unusual" for a company to make material revenue cuts during its road show, and this had "never [been] seen . . . during 20 years in and around the tech IPO business." ¶¶161, 166-67. The news swept through the market over the weekend. The next day, Saturday, May 19, *Business Insider* further reported how "*Reuters* has just reported [that] 'Facebook [] altered its guidance for research earnings last week, during the roadshow, a rare and disruptive move.'" ¶162. *Business Insider* stated that Facebook's revenue cuts represented "highly material information," and "any time a business outlook deteriorates that rapidly, alarm bells start going off on Wall Street, and stocks plunge." *Id.*

As a result of these disclosures, Facebook shares declined the next trading day, opening down at $36.53 and closing down at $34.03 on extremely high trading volume, a decline of nearly 11% from the IPO price. *See id.*; ¶¶163-64. Subsequently, on Tuesday, May 22, 2012, *Reuters* reported that the Syndicate Analysts from Morgan Stanley, J.P. Morgan, and Goldman Sachs also "significantly" cut their revenue estimates for Facebook in the middle of the road show, but told only certain institutional investors about this highly "negative" and "shock[ing]" development. ¶¶165-66. *Reuters* further reported that it was virtually unprecedented for a lead underwriter to significantly reduce its revenue estimate in the midst of a road show, and that the "deceleration [in Facebook's revenues] freaked a lot of people out." *Id.*

The market again reacted with surprise. *Business Insider* wrote that the news was a "***bombshell***" that "***buyers deserve to be outraged about***." ¶167. The tech news outlet *CNET* called it "a huge shock to some," and the *Wall Street Journal* reported that "investors are angry." ¶168. Facebook's stock further declined. On May 22, 2012, the Company's stock opened down at $32.61, and closed down at $31 per share, a decrease of another 9%. ¶169. In just two trading

-15-

days, Facebook's shares plummeted more than 18%, wiping out billions of dollars in shareholder equity. ¶20.

In the aftermath of the IPO, market commentators widely concluded that the Free Writing Prospectus did not disclose the material negative impact of increasing mobile usage on Facebook's revenues. For example, *Business Insider* observed, "***Facebook's amended prospectus did not say that the company's business had suddenly weakened and management's outlook had changed***. And that information is vastly more important than what the prospectus did say, which was that users are growing faster than revenue." ¶173. *Venture Beat* similarly reported that the Free Writing Prospectus did not inform investors that there had been a material change in the Company's revenue prospects, aptly stating: "***The fact is, there is nothing within the S-1 update on May 9 that would give normal investors the sense that there had been a material change about Facebook's revenue prospects***." ¶174.

## III.   <u>ARGUMENT</u>

As this Court has recognized, "class actions are a particularly appropriate and desirable means to resolve claims based on the securities laws." *In re NYSE Specialists*, 260 F.R.D. at 80. Claims brought under Section 11 of the Securities Act are, by their very nature, "especially amenable to class action resolution." *Merrill Lynch*, 277 F.R.D. at 101. Such claims are "particularly well-suited to class treatment . . . because Section 11 claims require only a material misstatement or omission in a Registration Statement to prove liability." *In re Bank One Sec. Litig./First Chi. S'holder Claims*, 2002 WL 989454, at *4 (N.D. Ill. May 14, 2002) (citation omitted). "Neither scienter, reliance nor loss causation is an element of Section 11 or Section 12(a)(2) claims." *Facebook*, 986 F. Supp. 2d at 506 (citing *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012)). As the Supreme Court has explained, "Section 11 places a relatively minimal burden on a plaintiff," with liability "virtually absolute,

even for innocent misstatements." *Herman & MacLean*, 459 U.S. at 381-83.  The statute's aim is "not so much to compensate the defrauded purchaser as to promote enforcement of the [Securities] Act and to deter negligence by providing a penalty for those who fail in their duties." *Globus v. Law Research Serv., Inc.*, 418 F.2d 1276, 1288 (2d Cir. 1969).

### A.    The Proposed Class Action Satisfies Rule 23(a)

Each of Rule 23(a)'s requirements is met here: (i) the Class is so numerous that joinder of all members is impracticable; (ii) there are questions of law or fact common to the Class; (iii) Plaintiffs' claims or defenses are typical of those asserted by the absent class members; and (iv) Plaintiffs will adequately protect the interests of the Class.

### 1.    Numerosity Is Established

The "numerosity" requirement of Rule 23(a)(1) is satisfied if "the class is so numerous that joinder of all members is impracticable." *Dietrich v. Bauer,* 192 F.R.D. 119, 123 (S.D.N.Y. 2000) (Sweet, J.).  Impracticability of joinder "is presumed when a class consists of forty members or more." *In re NYSE Specialists*, 260 F.R.D. at 70 (citing *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995)).  To satisfy the numerosity requirement, plaintiffs need not provide "a precise calculation of the number of class members," but instead "may rely on reasonable inferences drawn from the available facts in order to estimate the size of the class." *Dietrich*, 192 F.R.D. at 123 (citation omitted).  Accordingly, "courts in this district have certified plaintiff classes based on the volume of outstanding shares." *Pa. Ave. Funds v. Inyx Inc.*, 2011 WL 2732544, at *3 (S.D.N.Y. July 5, 2011) (collecting cases).

Defendants sold over 420 million shares of common stock in the IPO alone.  *See* ██████ ████████████████  Accordingly, numerosity is readily established here.

### 2.      <u>**Commonality Is Established**</u>

The "commonality" requirement of Rule 23(a)(2) "is generally considered a low hurdle easily surmounted." *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 2009 WL 5178546, at *9 (S.D.N.Y. Dec. 23, 2009).  It is satisfied if there are "questions of law or fact common to the class" and "has been applied permissively by courts in the context of securities fraud litigation." *Dietrich*, 192 F.R.D. at 124.  "Commonality does not mandate that all class members make identical claims and arguments or that the circumstances of their securities purchase be identical." *Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 156 (S.D.N.Y. 2012) (Sweet, J.) (citation and internal quotations omitted).  Rather, "a single common question of law or fact may suffice." *Inyx*, 2011 WL 2544, at *4.

In securities cases, "[c]ommon questions of law and fact are present where . . . the alleged fraud involves material misrepresentations and omissions in documents circulated to the investing public." *Billhofer*, 281 F.R.D. at 156.  As the Second Circuit has recognized, the "commonality" requirement is "plainly satisfied" in cases like this one, because "the alleged misrepresentations in the prospectus relate to all the investors" and "the existence and materiality of such misrepresentations obviously present important common issues." *Korn*, 456 F.2d at 1210; *see also Merrill Lynch*, 277 F.R.D. at 105 (same).

Common questions of fact and law abound in this case.  The Complaint and Defendants' Answers raise dozens of common questions, including, to name just a few:

1.  Do the offering documents contain any misrepresentations or omissions?

2.  Are those misrepresentations or omissions material?

3.  Can Defendants establish their Class-wide defense of negative causation?

4.  Did the Underwriter Defendants perform adequate due diligence prior to the IPO?

5.  Are the Individual Defendants controlling persons of Facebook?

Each of these questions are common to the members of the Class and readily satisfy Rule 23(a)(2)'s "commonality" requirement.

### 3.   <u>Typicality Is Established</u>

Like the commonality requirement, the "typicality" requirement of Rule 23(a)(3) is "not demanding." *Dodona I, LLC v. Goldman, Sachs & Co.*, 296 F.R.D. 261, 267 (S.D.N.Y. 2014) (citation omitted). Rule 23(a)(3) simply requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed R. Civ. P. 23(a)(3). It is satisfied so long as "each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Billhofer*, 281 F.R.D. at 157 (quoting *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 245 (2d Cir. 2007)). "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *In re NYSE Specialists*, 260 F.R.D. at 73 (quoting *Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993)).

Here, all Plaintiffs assert the same claims under the Securities Act based on the same misstatements and omissions in the same offering documents, and assert the same allegations of "control person" liability. By itself, this establishes typicality. *See id.* at 71 (citing *Robinson v. Metro–North Commuter R.R. Co.*, 267 F.3d 147, 155 (2d Cir. 2001)). To further ensure that typicality is established, Plaintiffs have, in the alternative, proposed dividing the Class into two separate subclasses. Facebook therefore cannot defeat typicality by arguing that the proposed Class Representatives possess differing levels of knowledge. Indeed, as to that point, the Class Representatives of the Institutional Investor Subclass and the Retail Investor Subclass assert claims that are factually typical of the claims asserted by the members of their respective

-19-

Subclasses.  In addition, the defenses that Defendants seek to assert against the representatives of the two Subclasses are the same as those they seek to assert against the members of the two respective Subclasses.  In short, typicality exists.

### 4.     Adequacy Is Established

Rule 23(a)(4) requires Plaintiffs to establish that "the representative parties will fairly and adequately protect the interests of the class."  Fed R. Civ. P. 23(a)(4).  Adequacy entails an inquiry as to whether "1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *In re Flag Telecom Holding, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) (citation omitted).

Here, based upon their purchases of Facebook common stock, Plaintiffs' interests are directly aligned with the interests of the Class, which was injured by the same materially untrue statements and omissions.  *See Billhofer*, 281 F.R.D. at 157 ("none of Plaintiff's interests are antagonistic" when "all members of the proposed class allege claims arising from the same wrongful conduct that are based on the same legal theories as Plaintiff's claims").  That is clearly the case here: Plaintiffs will prove the Class's claims when they prove their own claims, thus satisfying the adequacy requirement.  *See id.*; *In re NYSE Specialists*, 260 F.R.D. at 74.

Further, Lead Plaintiffs include large public pension funds, collectively with billions of dollars under management, and are precisely the type of institutional investors Congress sought to empower when enacting the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *See* H.R. Conf. Rep. No. 104-369, at *28 (1995) *reprinted in* 1995 U.S.C.C.A.N. 730 (1995). They have, consistent with the PSLRA, selected additional plaintiffs who are adequate to serve as representatives.  *See Hevesi v. Citigroup Inc.*, 366 F.3d 70, 83 (2d Cir. 2004) ("[T]he PSLRA does not in any way prohibit the addition of named plaintiffs to aid the lead plaintiff in representing a class.").  Plaintiffs also have demonstrated their commitment to monitor and

supervise the prosecution of this Action on behalf of the Class.  Lead Plaintiffs have retained experienced counsel, receive status updates, review drafts of significant pleadings, participate in strategic decisions, and are actively engaged in discovery.  All Plaintiffs have a considerable interest in obtaining a recovery for the Class, and thus easily satisfy the adequacy requirement of Rule 23(a)(4).  Finally, proposed Class Counsel are highly qualified and capable of prosecuting this Action.  *See* Exs. 43-44 (Firm Resumes).

In sum, the requirements of Rule 23(a) are satisfied.

### B.    The Requirements Of Rule 23(b) Are Satisfied

Having met each of the four requirements of Rule 23(a), Plaintiffs seek certification under Rule 23(b)(3), which provides that an action is maintainable as a class action if "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  Plaintiffs meet this burden.

#### 1.    Predominance Is Established

This Action satisfies the requirement of Rule 23(b)(3) that common questions of fact and law predominate over individualized ones.  "Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof."  *Billhofer*, 281 F.R.D. at 158 (quoting *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002)).  To satisfy the requirement, common questions merely need to "predominate"—they do not need to be exclusive or dispositive.  *See In re NYSE Specialists*, 260 F.R.D. at 75 ("predominance does not require a plaintiff to show that there are no individual issues").  As courts in this District, including this one, have explained, while individual issues arise "***in all class action cases, … to allow various***

*secondary issues of plaintiffs' claim[s] to preclude certification of a class would render the rule an impotent tool for private enforcement of the securities laws.*"  *Merrill Lynch*, 277 F.R.D. at 111 (citation and internal quotations omitted).

Plaintiffs' burden to establish predominance in a Securities Act case is extremely limited. As noted above, because Section 11 claims focus on the contents of the Registration Statement, they are ideally suited for class treatment.  As the Third Circuit explained in a careful discussion of the propriety and benefits of certification of a Section 11 class:

> The crucial questions are: '[W]as there a misrepresentation? And, if so, was it objectively material?'  Since reliance is irrelevant in a § 11 case, a § 11 case will never demand individualized proof as to an investor's reliance or knowledge. . . . Further, because a misrepresentation is material if a reasonable investor would have considered a fact important, the effect of a material misrepresentation is felt uniformly across the class of investors, regardless of whether the market is efficient.  Since this is an objective standard, materiality is not determined . . . by the 'mix of information' available to each individual plaintiff. . . .  We also note that, although loss causation is an affirmative defense in a § 11 case, this defense would not defeat predominance. . .  Any affirmative defense on this ground would present a common issue-not an individual one.

*In re Constar Int'l Inc. Sec. Litig.*, 585 F.3d 774, 784-85 (3d Cir. 2009).  The Second Circuit has similarly recognized that the "existence and materiality" of the misrepresentations in a registration statement "undoubtedly present significant common questions" fit for class certification.  *See Korn*, 456 F.2d at 1212.

As discussed above, there are a number of questions common to the members of the Class.  (*See* Section III.A.2, *supra*) (listing examples of common questions of law and fact). These common questions include, most notably, whether the Registration Statement contains untrue statements or material omissions.  The common legal and factual questions are at the core of this litigation and are focused on Defendants' actions and the issue of liability.   These questions predominate over any conceivable "individualized" issues.  *See* William B. Rubenstein, *Newberg on Class Actions* §4.50 (5th ed.) (hereinafter "*Newberg*") (The predominance analysis is

"more of a qualitative than quantitative analysis.").

As noted above, Defendants have asserted the defense that "Plaintiffs knew of any alleged untruth or omission, at the time they acquired Facebook stock, or had constructive knowledge of the same . . . because the allegedly omitted information . . . *was otherwise publicly available and/or widely known to the market and to the investing community*."   ECF No. 232 (Facebook Defendants' Answer) at 50; *see also* ECF No. 235 (Underwriter Defendants' Answer) at 44 (same).  Plaintiffs anticipate that Defendants will argue that no Class or Subclass can be certified in this Action because individualized issues related to Defendants' purported knowledge defense predominate over the common issues at the core of the case.  Specifically, according to Defendants, the Court should ignore the myriad common issues in the case (*see* above) because the Syndicate Analysts disclosed their model revisions to certain institutional investors.

For the reasons discussed below, Defendants' argument fails.

### (a) Defendants' Purported Knowledge Defense Cannot Defeat Certification Of The Class

For two reasons, Defendants cannot defeat certification of the Class by contending that certain institutional investors were told of the Syndicate Analysts' model revisions.  First, as noted above, Class members were not told the information that forms the basis of Plaintiffs' claims: that Facebook determined that the mobile usage trend had materially impacted its revenues prior to the IPO, and slashed its own revenue estimates as a result.  ████████

████████████████████████████████████████████

████████████████████████████████████████████

████████  The fact that Class members were not told about this critical fact unifies the Class for which certification is sought, and further demonstrates that common issues predominate.

-23-

Second, in its Prospectus, Facebook specifically instructed prospective investors to disregard information supplied by third parties, and to "rely only on statements made in this prospectus":

> ***In making your investment decision, you should not rely on information in public media that is published by third parties.  You should rely only on statements made in this prospectus in determining whether to purchase our shares.***
>
> You should carefully evaluate all of the information in this prospectus. We have in the past received, and may continue to receive, a high degree of media coverage, including coverage that is not directly attributable to statements made by our officers and employees, that incorrectly reports on statements made by our officers or employees, or that is misleading as a result of omitting information provided by us, our officers, or employees.  ***You should rely only on the information contained in this prospectus in determining whether to purchase our shares of Class A common stock***.

Ex. 41 at 31.[6]

Here, because Facebook directed prospective investors that they should rely only on the Prospectus, Facebook cannot now contend that investors obtained "actual knowledge" of Facebook's revenue deterioration because they were informed of the Syndicate Analysts' model revisions or certain media reports were available to them.  *See Facebook*, 986 F. Supp. 2d at 522 (reasonable investors do not regard third-party "reports as a reliable source of information" where a corporate issuer expressly advises investors not to heed such reports); *SEC v. Bank of Am. Corp.*, 677 F. Supp. 2d 717, 719 (S.D.N.Y. 2010) (same); *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 718 (2d Cir. 2011) ("there are serious limitations on a corporation's ability to

---

[6]  It is well established that common law defenses apply under the securities laws.  *See STMicroelectronics, N.V. v. Credit Suisse Sec. (USA) LLC*, 648 F.3d 68, 80 (2d Cir. 2011).  Waiver is one such defense, which, in turn, may be used as a defense against an affirmative defense.  *See Paese v. Hartford Life & Accident Ins. Co.*, 449 F.3d 435, 438 (2d Cir. 2006) ("an affirmative defense [is] subject to waiver, estoppel, futility, and similar equitable considerations."); *Jordan v. Can You Imagine, Inc.*, 485 F. Supp. 2d 493, 499 (S.D.N.Y. 2007) ("Waiver may be established by affirmative conduct or by a failure to act that evinces the intent to abandon the right."); *A.I. Trade Fin., Inc. v. Altos Hornos de Vizcaya, S.A.*, 840 F. Supp. 271, 275 (S.D.N.Y. 1993) (waiver of defense that notes not negotiable where confirmation stated "nothing in the commercial contract impairs the negotiability of the financial obligation").

charge its stockholders with knowledge of information omitted from a document such as a prospectus on the basis that the information is public knowledge and otherwise available to them").  Thus, individual issues of knowledge cannot defeat predominance and the Class should be certified.

> **(b)    Defendants' Purported Knowledge Defense Cannot Defeat Certification Of The Subclasses**

To the extent the Court finds that it is necessary, Plaintiffs propose in the alternative the creation of the Institutional Investor Subclass and the Retail Investor Subclass in order to eliminate any individual issues of knowledge.  Courts may create subclasses to address the possibility of individualized issues, including varying levels of class member knowledge.  *See, e.g.*, *In re NASDAQ Market*-Makers, 172 F.R.D. at 130 (recognizing that the "court may avoid potential conflict regarding nature of relief by creating subclasses" between retail and institutional investors); *In re Blech Sec. Litig.*, 187 F.R.D. 97, 104 (S.D.N.Y. 1999) (explaining that the power of a district court to create subclasses is "a broad one").[7]

> **(i)    Defendants' Purported Knowledge Defense Cannot Defeat Certification Of The Retail Investor Subclass**

Defendants' purported knowledge defense has no bearing on whether the Court should certify the Retail Investor Subclass because the members of that Subclass were not told prior to the IPO that either Facebook or the Syndicate Analysts cut their revenue estimates.  Accordingly,

---

[7] If subclasses have conflicting interests, each must independently meet the requirements for class certification; but if sub-classes are created for management purposes, they may proceed with unified representatives and counsel.  As set forth in the leading class action treatise:

> Subclassing is not necessary but is permitted to assist a court in managing complex litigation in a variety of circumstances in which subclasses would promote efficiency. Rule 23(d) – which grants a court significant leeway in managing a class suit – governs permissive subclassing.  Because there is no conflict of interest at issue, there is no necessity that each subclass have different representation and independently comply with all of the requirements of Rule 23(a), (b), and (g), and hence, Rule 23(c)(5) is inapplicable. *Newberg* §7.29.

individual issues of knowledge do not exist—let alone, predominate—with respect to the Retail Investor Subclass.[8]

To the extent that Defendants seek to argue that the Retail Investor Subclass gained "actual knowledge" of the undisclosed information through media or other third-party reports, such a defense would fail as a matter of law and certainly provides no basis to deny class certification.  First, Second Circuit law is crystal clear that Facebook cannot rely on press or other third-party reports to demonstrate that the market supposedly knew something that the Company chose to omit from its Registration Statement.  As noted above, the Second Circuit has repeatedly held that "[t]here are serious limitations on a corporation's ability to charge its stockholders with knowledge of information omitted from a document such as a prospectus on the basis that the information is public knowledge and otherwise available to them." *Litwin*, 634 F.3d at 718 (quoting *Kronfeld v. Trans World Airlines, Inc.*, 832 F.2d 726, 736 (2d Cir. 1987)); *see also United Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1199 (2d Cir.1993) ("[T]he mere presence in the media of sporadic news reports . . . should not be considered to be part of the total mix of information that would clarify or place in proper context the company's representations in its proxy materials.").

Second, as noted above, in its Prospectus, Facebook specifically instructed prospective investors to disregard media reports when considering whether to invest in the IPO, precisely because such reports were ***not*** reliable.  The Court has already found that reasonable investors would not "regard press reports as a reliable source of information" here: at the motion to

---

[8] This remains true even if Defendants seek to show that some small number or percentage of the members of the Retail Investor Subclass knew of either the Syndicate Analysts' model revisions or Facebook's revenue cuts.  *See In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 492 (S.D.N.Y. 2011) (reasoning that "[i]f only 12% of the class has such knowledge and the other 88% traded in ignorance, individual questions of knowledge do not 'predominate' over common questions.").

dismiss stage, the Court cited this portion of the Prospectus and the Second Circuit law above in rejecting Defendants' argument that class members were informed of Facebook's revenue cuts via certain media reports. *See Facebook*, 986 F. Supp. 2d at 522; *SEC v. Bank of Am. Corp.*, 677 F. Supp. 2d at 719 ("[S]ince the [company] itself warned investors not to rely on the media, it would be unreasonable for a shareholder to consider the media pronouncements to be part of the relevant mix of information."). Given that Facebook's argument is incorrect, it cannot stand in the way of class certification.

Finally, even if members of the Retail Investor Subclass could even arguably be charged with "actual knowledge" of the undisclosed information based on third-party media reports, which they cannot, any such argument would be ***common*** to this Subclass given that the reports were publicly available. *See Merrill Lynch*, 277 F.R.D. at 119 ("[T]o the extent Defendants argue that actual knowledge can be inferred from the slew of newspaper articles and public reports they have submitted to the Court, this again is an issue subject to generalized proof.")

Thus, Defendants' purported knowledge defense cannot defeat certification of the Retail Investor Subclass.

### (ii)   Defendants' Purported Knowledge Defense Cannot Defeat Certification Of The Institutional Investor Subclass

Defendants' purported knowledge defense also does not defeat certification of the Institutional Investor Subclass because it applies to the entire Institutional Investor Subclass.[9]

---

[9] ████████████████████████████████████████████████████████████████████
████████████   The members of the Institutional Investor Subclass are therefore ascertainable via discovery and proofs of claim submitted by class members. *See Newberg* § 9:19 ("Proof of claim forms are generally used following a settlement or judgment of liability in the class's favor. At that point, '[c]lass members must usually file claims forms providing details about their claims and other information needed to administer the settlement [or judgment].'") (quoting the Manual for Complex Litigation, § 21.66 (4th ed. 2004)).

*First*, the legal significance, if any, of the information provided to the Institutional Investors before the IPO—specifically, the Syndicate Analysts' model revisions—presents a common (***not*** an individualized) question for members of the Institutional Investor Subclass.  *See* 5 Disclosure & Remedies Under the Sec. Laws § 3:46 ("The defense of plaintiffs' knowledge [under Section 11] is a ***common question*** in a class action.") (citation omitted); Courts similarly hold that questions of "market knowledge," including any "truth-on-the-market defense," present common issues that support class certification.  *See Merrill Lynch*, 277 F.R.D. at 119 ("[T]o the extent Defendants argue that actual knowledge can be inferred …, this again is an issue subject to generalized proof").

These principles apply here.  In this action, Defendants assert that they have an "actual knowledge" defense because all institutional investors knew about the Syndicate Analysts' model revisions, and that is tantamount to knowledge of the alleged misstatements and omissions.  In response, Plaintiffs will not dispute whether the members of the Institutional Investor Subclass were widely informed of the Syndicate Analysts' model revisions, but will instead argue that this fact, even if true, is insufficient to establish the knowledge defense.

Indeed, the knowledge defense is a very narrow affirmative defense that applies only where the plaintiff has "actual, specific knowledge of the falsity of the particular statements at issue."  *HSBC N. Am. Holdings*, 2014 WL 3702587, at *20 (quoting *UBS Americas*, 2013 WL 3284118, at *14-15; *id.* at *17 (granting plaintiffs' motion for summary judgment after disposing of the defendants' "knowledge" defense as a matter of law and holding that, while plaintiffs knew of facts that caused concern about the disclosures, there was no evidence they had the actual "files or data that would give them knowledge").  As the Second Circuit has held, "The statutory language leaves no ambiguity: For the knowledge affirmative defense to succeed on the

merits, the defendant must show the purchaser's actual knowledge of the specific untruth or

omission." *N.J. Carpenters Health Fund v. Rali Series 2006-Q01 Trust*, 477 F. App'x 809, 813

(2d Cir. 2012) (citing 15 U.S.C. § 77k(a)).  Mere ***constructive*** knowledge is insufficient:

> A plaintiff under Sections 11 and 12(a)(2) is under no duty to investigate a seller's
> representations. Accordingly, ***constructive knowledge cannot bar a purchaser's***
> ***recovery*** under Sections 11 or 12(a)(2). . . . While circumstantial evidence of
> actual knowledge can be just as probative as direct evidence . . . , that evidence
> must be directed to actual knowledge; ***a case for constructive knowledge, on a***
> ***record that establishes no actual knowledge, will not suffice***.  Actual knowledge
> of falsity means just that. Mere awareness of the ever-present risk that an issuer is
> mistaken, and that certain representations might be inaccurate, will not support a
> finding of actual knowledge of falsity.  ***Even suspicion of falsity, before it ripens***
> ***into actual knowledge, will not suffice***.

*HSBC N. Am. Holdings Inc.*, 2014 WL 3702587, at *21 (citations and internal quotations

omitted).

Here, as discussed above, the gravamen of Plaintiffs' claims is that ***Facebook determined***

***that mobile usage had had a material negative impact on its revenues, and therefore cut its***

***own revenue estimates***, and this information was not disclosed to institutional investors.

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

Indeed, as noted above, the Prospectus specifically instructed all investors that "***You should rely***

***only on statements made in this prospectus in determining whether to purchase our shares***"

(emphasis in original) – an instruction that fatally undermines the argument that investors gained

"actual knowledge" of facts omitted from the Prospectus through conversations with third parties.  Thus, investors cannot, as a matter of law, be charged with actual knowledge of the true facts about **Facebook's** revenue cuts based on knowledge of the **Syndicate Analysts'** model revisions.

The key point for this motion is that, regardless of how this question is ultimately resolved on the merits, it impacts the entire Institutional Investor Subclass in the same way.  Should Plaintiffs win the argument, the collective claims of this Subclass will survive; should Defendants win the argument, the claims of this Subclass will fail together.  "[T]herefore, the class is entirely cohesive:  It will prevail or fail in unison.  In no event will the individual circumstances of particular class members bear on the inquiry."  *Amgen*, 133 S. Ct. at 1191; *see also Schleicher v. Wendt*, 618 F.3d 679, 685-86 (7th Cir. 2010) (Easterbrook, C.J.) ("[A] certified class can go down in flames on the merits. . . .  Rule 23 allows certification of classes that are fated to lose as well as classes that are sure to win.").

As the Supreme Court put it in *Amgen*, "This is not a case in which the asserted problem"—*i.e.*, that certain institutional investors knew of the Syndicate Analysts' model revisions—"exhibits some fatal dissimilarity among [sub]class members that would make use of the class-action device inefficient or unfair."  *Amgen*, 133 S. Ct. at 1197 (citation and internal quotations omitted).  Rather, Facebook asserts "a fatal **similarity**" between the members of the Institutional Investor Subclass, *i.e.*, that their claims are subject to the knowledge defense because they were told of the Syndicate Analysts' model revisions.  *Id*.  "**Such a contention is properly addressed at trial or in a ruling on a summary-judgment motion.  The allegation should not be resolved in deciding whether to certify a proposed class**."  *Id*.

-30-

*In re DJ Orthopedics, Inc., Securities Litigation*, 2003 U.S. Dist. LEXIS 21534 (S.D. Cal. Nov. 17, 2003) ("*DJ Orthopedics*") is instructive.  In that Section 11 case involving the IPO of DJ Orthopedics, in the days before the IPO, the company determined that its sales were slowing markedly, thereby threatening its revenue prospects—as Facebook determined here.  *Id*. at *4. The "'underwriter sales teams' contacted some of the investors and told them of new (decreased) estimates for the quarter's earnings and 2001 revenues," but did not include this material information in the Registration Statement.  *Id*.  At class certification, the court rejected Defendants' argument that the underwriters' phone calls to certain investors selectively disclosing the purportedly omitted information from the Registration Statement created individualized issues of fact that predominated over the common issues in the case.  *Id*. at *9-11.  Rather, the Court certified a class consisting of two subclasses: (i) a subclass of purchasers who "defendants contacted [] before the IPO regarding the information omitted from the Prospectus"; and (ii) a subclass of purchasers in the IPO who did not speak to the underwriters' sales force before the IPO.  *Id*.  The Court found that the "inquiry into knowledge [was] ***common*** to the subclass" of investors who received calls from members of the underwriters' sales force before the IPO.  *Id*. at *24.  As the Court explained, "Plaintiffs dispute that the disclosure made to members of th[is] subclass was adequate to immunize defendants from liability," which raised a ***common*** legal question to the members of the subclass that "cannot be dispensed with at this point."  *Id*. at *15.[10]  The same is true here.

---

[10] The *DJ Orthopedics* court further held that, while there may be "slight differences among the subclass members" who did not receive calls from the underwriters' sales force, these differences did "not defeat certification in this case."  *Id*. at *8.  As the Court explained, "the proof regarding the individualized issue [of whether the investors had knowledge under Section 11] would rely as much on information common to all subclass members (*e.g*., how widespread was the public dissemination of the information) as it would on individual information (*e.g*., to what sources of information was each subclass member exposed)."  *Id*. at *8.

***Second***, common issues predominate for the Institutional Investor Subclass even if Facebook can show that some small number or percentage of institutional investors were told that Facebook itself cut its own revenue estimates.  This is because the test under Rule 23(b)(3) is not whether ***someone*** in the Class knew the truth; rather, the relevant test is whether individualized questions of knowledge "***predominate***" over the common questions, which they do not in this case.  Faced with a similar challenge to class certification in *In re Moody's Corp. Securities Litigation*,  District Court Judge Daniels explained that, "[i]f only 12% of the class has such knowledge and the other 88% traded in ignorance, individual questions of knowledge do not 'predominate' over common questions."  274 F.R.D. at 491 n.8.  District Court Judge Rakoff also rejected a similar challenge to class certification based on a knowledge defense in *Merrill Lynch*, explaining that "[c]ourts generally focus on the liability issue," rather than potentially available defenses, "in deciding whether the predominance requirement is met, and if the liability issue is common to the class, common questions are held to predominate over individual questions."  277 F.R.D. at 117 (citation omitted); *see also Dietrich*, 192 F.R.D. at 127 ("In determining whether common questions of fact predominate, a court's inquiry is directed primarily toward whether the issue of liability is common to members of the class.").

While Defendants will attempt to rely on *In re Initial Public Offering Securities Litigation* ("*IPO*") to argue that Plaintiffs cannot establish predominance for a class of investors here, the *IPO* case is very different from this one.  *IPO* stands for the unremarkable proposition that a class cannot be certified where the plaintiffs established in their own pleading that huge portions of the class ***themselves*** were active participants in an alleged fraud of multi-industry and issuer scope.  *IPO*, 471 F.3d 24, 43 (2d Cir. 2006).  Indeed, in that sprawling case—involving 310 different actions, 309 distinct IPOs and 500 separate defendants—it was undisputed that

nearly 11,000 class members *participated in the fraud* by entering into illegal kick-back agreements with the underwriters.  *Id.* at 43 n.13.  By contrast, this case involves a single IPO in which no investor participated in the fraud, and Plaintiffs have proposed Subclasses that significantly reduce, if not eliminate, the need for any "individualized" inquiries.

In short, common questions predominate over any individual questions as to both the Institutional Investor Subclass and the Retail Investor Subclass.

### 2.   Superiority Is Established

Finally, Rule 23(b)(3) requires that a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  In general, "securities suits ... easily satisfy the superiority requirement of Rule 23."  *In re Blech*, 187 F.R.D. at 107; *see also Merrill Lynch*, 277 F.R.D. at 120 (same).  As this Court and other courts in this District have explained:

> Most violations of the federal securities laws, such as those alleged in the Complaint, inflict economic injury on large numbers of geographically dispersed persons such that the cost of pursuing individual litigation to seek recovery is often not feasible. Multiple lawsuits would be costly and inefficient, and the exclusion of class members who cannot afford separate representation would neither be "fair" nor an adjudication of their claims. Moreover, although a large number of individuals may have been injured, no one person may have been damaged to a degree which would induce him to institute litigation solely on his own behalf.

*In re Blech*, 187 F.R.D. at 107 (quoted in *Merrill Lynch*, 277 F.R.D. at 120).

Here, a class action is plainly superior to a multitude of individual actions.  To start, the putative Class consists of a large number of geographically dispersed investors in Facebook's common stock, many of whose individual damages are small enough to render individual litigation prohibitively expensive, and who would lack a means of redress without the

-33-

availability of a class action.[11]   Additionally, concentrating Class members' claims in a single action and forum is the most efficient use of judicial resources.   In short, superiority is established.

## IV.   CONCLUSION

For all the reasons stated herein, the Court should grant Plaintiffs' Motion in all respects.

---

[11] A class action is superior to individual actions for both retail and institutional investors.  *See Bd. of Trustees of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, 269 F.R.D. 340, 355 (S.D.N.Y. 2010) (even "smaller institutional investors may not be willing and able to hire counsel to battle against the collective resources of the nation's largest financial industry firms"); *In re NASDAQ Market-Makers*, 172 F.R.D. at 130 ("[S]maller institutional investors could be forced to choose between foregoing their claims against the Defendants or incurring the cost of individual litigation," which is "an outcome [that] would undermine the goals of efficiency and fairness set forth in Rule 23(b)(3).").

Dated:   December 23, 2014
         New York, New York

BERNSTEIN LITOWITZ
BERGER & GROSSMANN LLP

By: _____

Max W. Berger
Salvatore J. Graziano
John J. Rizio-Hamilton
1285 Avenue of the Americas
New York, NY 10019
Tel:  (212) 554-1400
Fax: (212) 554-1444

*Co-Lead Counsel For Lead Plaintiffs
And The Proposed Class*

Thomas A. Dubbs
James W. Johnson
Thomas G. Hoffman, Jr.
LABATON SUCHAROW LLP
140 Broadway
New York, NY 10005
Tel:  (212) 907-0700
Fax: (212) 818-0477

*Co-Lead Counsel For Lead Plaintiffs,
Proposed Class Representative Sharon
Morley And The Proposed Class*

Steven E. Fineman
Nicholas Diamand
LIEFF CABRASER
HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013
Tel:  (212) 355-9500
Fax: (212) 355-9592

*Additional Counsel For Additional Named
Plaintiffs And Proposed Class
Representatives Jose G. Galvan And Mary
Jane Lule Galvan*

-35-

Frank R. Schirripa
HACH ROSE SCHIRRIPA
& CHEVERIE LLP
185 Madison Ave
New York, New York 10016
Tel:  (212) 213-8311
Fax: (212) 799-0028

*Additional Counsel For Proposed Class
Representatives Eric Rand, And Paul And
Lynn Melton*