**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE FACEBOOK, INC. IPO SECURITIES AND DERIVATIVE LITIGATION | MDL No. 12-2389 (RWS) |
| This document relates to:  NASDAQ Actions | |

---

**JOINT DECLARATION OF VINCENT R. CAPPUCCI AND CHRISTOPHER LOVELL IN SUPPORT OF LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF THE SETTLEMENT AND PLAN OF ALLOCATION AND CO-LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES**

---

EC.59114.1

Vincent R. Cappucci, an attorney duly admitted to practice before the bar of this Court, and Christopher Lovell, an attorney duly admitted to practice before the bar of this Court, hereby jointly declare, under penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:

1. We, Vincent R. Cappucci and Christopher Lovell, are partners of the law firms Entwistle & Cappucci LLP ("Entwistle & Cappucci") and Lovell Stewart Halebian Jacobson LLP ("Lovell Stewart"), respectively.[1] On December 6, 2012, the Court appointed Entwistle & Cappucci as lead counsel for the Nasdaq Securities Actions and Lovell Stewart, along with Finkelstein Thompson LLP ("Finkelstein Thompson"), as co-lead counsel for the Nasdaq Negligence Actions. (*See* ECF No. 52.) Entwistle & Cappucci, Lovell Stewart, and Finkelstein Thompson (together, "Co-Lead Counsel") represent the Court-appointed Lead Plaintiffs, T3 Trading Group, LLC, Avatar Securities, LLC, Philip Goldberg, Steve Jarvis, Atish Gandhi, Colin Suzman, Meredith Bailey, and Faisal Sami (collectively, "Lead Plaintiffs" or "Plaintiffs") in the Consolidated Nasdaq Actions. We have personal knowledge of the matters set forth herein based on our active supervision of and participation in the investigation, prosecution, and resolution of the claims asserted on behalf of the Class in the Consolidated Nasdaq Actions.[2]

2. We respectfully submit this joint declaration ("Joint Declaration"), pursuant to Federal Rule of Civil Procedure 23(e), in support of: (i) Plaintiffs' request for final approval of the proposed Settlement of the Consolidated Nasdaq Actions ("Settlement") on the terms and

---

[1] Unless otherwise defined herein, capitalized terms used herein shall have the same meanings ascribed to them in the Supplemental Stipulation of Settlement dated August 12, 2015 (the "Stipulation"), which is attached hereto as Exhibit A. The Stipulation reflects a modification made to the Stipulation of Settlement dated May 22, 2015 by including Erskine B. Bowles in the definition of "Non-Settling Defendants." (*See* Stipulation ¶ 1.9.) Mr. Bowles's name was inadvertently omitted from the list of names under that definition in the original May 22, 2015 Stipulation of Settlement.

[2] By its Order Preliminarily Approving Settlement and Providing for Notice entered June 25, 2015 (the "Preliminary Approval Order"), the Court certified the Class for purposes of the Settlement only. (*See* ECF No. 297.)

1

conditions set forth in the Stipulation; (ii) Plaintiffs' request for final approval of the Plan of

Allocation of Net Settlement Fund to Class Members ("Plan of Allocation"); and (iii) Co-Lead

Counsel's application for an award of attorneys' fees and reimbursement of expenses ("Fee and

Expense Application").[3]

## I.     TERMS OF THE SETTLEMENT AND NOTICE

3.     The Settlement provides for the payment of $26,500,000 in cash for the benefit of

the Class, which, in accordance with paragraphs 3.1 through 3.4 of the Stipulation, will be

deposited into an interest-bearing Settlement Administration Account within ten business days of

entry of the [Proposed] Order and Final Judgment.[4]

4.     As set forth herein, the Settlement is the result of an extensive investigation

including, among other things: (i) interviews of persons with knowledge, including Exchange

member firms, of the allegations contained in the CAC;  (ii) analysis of filings by Nasdaq with

the Securities and Exchange Commission ("SEC"); (iii) analysis of press releases and other

public statements issued by Defendants; (iv) analysis of Nasdaq's conference calls, press

conferences, corporate website, and related statements and materials; (v) analysis of, and active

---

[3] Lead Plaintiffs' request for final approval of the Settlement and the Plan of Allocation is set forth in the accompanying Memorandum of Law in Support of Motion for Final Approval of Settlement and Plan of Allocation (the "Settlement Memorandum").  Co-Lead Counsel's request for approval of the Fee and Expense Application is set forth in the separate accompanying Memorandum of Law in Support of Motion for an Award of Attorneys' Fees and Reimbursement of Expenses (the "Fee Memorandum").

[4] The [Proposed] Order and Final Judgment has been revised since Lead Plaintiffs submitted the original version in connection with their Consent Motion for Preliminary Approval of Settlement (*See* Exhibit B attached to the May 22, 2015 Stipulation of Settlement, ECF No. 282-1.)  The revised [Proposed] Order and Final Judgment reflects agreed upon revisions to the bar order provisions based upon discussions between counsel for the Nasdaq Defendants, counsel for the Facebook Defendants, and lead counsel for the Facebook plaintiffs in the related Facebook "Securities Actions."  Attached hereto as Exhibits B and C, respectively, are a redline and clean version of the [Proposed] Order and Final Judgment reflecting changes that were made to the original Order.

EC.59114.1

participation in, the proceedings before the SEC to amend Nasdaq Stock Market Rule 4626(b)(3) in which Nasdaq compensated Exchange member firms for losses on certain types of transactions in Facebook shares on May 18, 2012; (vi) analysis of the findings and conclusions of the SEC enforcement proceeding related to the system failures during the Facebook IPO that resulted in the SEC Order; (vii) analysis of all filings, exhibits, documents, transcripts, and other submissions to the Court and the Second Circuit in this and related judicial and administrative proceedings during this ongoing litigation; (viii) analysis of trading data and related information provided by the Nasdaq Defendants[5] to Co-Lead Counsel in connection with the parties' mediation; (ix) research of the applicable law with respect to Plaintiffs' claims and Defendants' potential defenses; and (x) consultation with damages, industry and technology experts.

5.      In addition to the efforts and resources devoted to Co-Lead Counsel's investigative activities and processes, the Settlement was reached after Co-Lead Counsel performed the following work in this litigation, including:  (i) drafting the comprehensive Consolidated Amended Class Action Complaint ("CAC") setting forth the Class's claims and the facts in support thereof; (ii) defending the CAC against Defendants' motion to dismiss; (iii) drafting various motions seeking limited discovery and dismissal of Defendants' appeal to the United States Court of Appeals for the Second Circuit (the "Second Circuit"); (iv) conducting a lengthy investigation into Nasdaq's system operations, IPO Cross procedures, trade confirmation procedures, transaction activity on the day of the IPO, and the resulting system failures; (v) complex analysis of damage models, reports and expert analysis arising out of Nasdaq system failures on the day of the IPO; (vi) preparing and participating in a full appellate process,

---

[5] The Nasdaq Defendants or "Defendants" are The NASDAQ OMX Group, Inc. ("Nasdaq"), The NASDAQ Stock Market LLC (the "Exchange"), Robert Greifeld ("Greifeld") and Anna M. Ewing ("Ewing").

EC.59114.1

including drafting all briefing and related documents, in connection with Defendants' appeal to the Second Circuit; (vii) preparing and participating in a formal mediation and lengthy settlement discussions with counsel for the Nasdaq Defendants; and (viii) negotiating and agreeing to the Settlement, including all documentation, with Defendants.

6.      We respectfully submit that the Settlement provides an excellent recovery for the Class, especially when viewed in light of the risks and delays of continued litigation.  Namely, Plaintiffs face significant risks in connection with the Nasdaq Defendants' appeal to the Second Circuit concerning the threshold issue of whether Plaintiffs' claims were barred, in their entirety, under the doctrine of immunity for self-regulatory organizations ("SRO").  Additionally, even if the Second Circuit affirmed this Court's SRO immunity determinations, in view of the seriousness of this threshold issue – *i.e.*, the scope and extent of SRO immunity afforded to national securities exchanges – the U.S. Supreme Court may well have deemed it appropriate to grant a writ of certiorari.  Defendants' appeal further presented significant challenges to Plaintiffs' substantive claims pursuant to the federal securities laws and negligence under New York common law.

7.      Assuming Lead Plaintiffs successfully prevailed on appeal and the Second Circuit affirmed, in whole or in part, this Court's December 12, 2013 Opinion and Order partially denying Defendants' motion to dismiss the CAC (the "MTD Order") (ECF No. 171), Plaintiffs would then be faced with engaging in continued complex fact and expert discovery and further proceedings in this Court.  Lead Plaintiffs would have the burden of proving issues warranting class certification (which would require Plaintiffs to prove, among other things, loss causation) as well as proving issues of first impression relating to the securities and negligence claims asserted in the CAC.  Given the complexity of the factual and legal issues involved in the

4

Consolidated Nasdaq Actions, both parties would undoubtedly proffer expert submissions and testimony at summary judgment followed by an ultimate trial on the merits.

8.     Without question, the probable continued course of this litigation would be protracted, adding additional expense and delay, in comparison to the certainty that the Settlement now affords Class Members.  The Settlement, which Lead Plaintiffs believe is in the best interests of the Class, enables a resolution of the Consolidated Nasdaq Actions and ensures a recovery for the Class while conserving the parties' and the Court's resources.

9.     The terms of the Settlement are fully set forth in the Stipulation, which this Court preliminarily approved on June 25, 2015.  (*See* ECF No. 297.)  In the Order Preliminarily Approving Settlement and Providing for Notice (the "Preliminary Approval Order") (ECF No. 297), the Court appointed The A.B. Data Group, Ltd. ("A.B. Data") as the Claims Administrator for the Settlement to, among other things, provide and monitor notice to Class Members of the Settlement and the right to request exclusion from the Class or object to the Settlement.  To that end, beginning on July 1, 2015, 645,626 copies of the Notice and Proof of Claim form (the "Notice Packet") have been mailed to potential Class Members and nominees, pursuant to paragraph 8 of the Court's Preliminary Approval Order.[6]  In addition, the Publication Notice was published in the national edition of *The Wall Street Journal* on July 10, 2015, pursuant to paragraph 9 of the Court's Preliminary Approval Order.  (*See* Schachter Decl., ¶ 9.)  Moreover, on July 1, 2015, A.B. Data posted information and deadlines in connection with the Settlement on the website created for the Settlement, www.nasdaqfbsettlement.com, including downloadable copies of the Notice, Proof of Claim, the Stipulation, the Preliminary Approval

---

[6] *See* paragraph 8 of the Declaration of Eric S. Schachter on Behalf of A.B. Data, Ltd. Regarding Mailing of Notice to Potential Settlement Class Members and Publication of Publication Notice ("Schachter Decl.") submitted on behalf of A.B. Data, attached as Exhibit D hereto.

5

EC.59114.1

Order, and electronic claims filing guidelines.  (Schachter Decl., ¶ 12.)  A.B. Data also established a toll-free number to respond to potential Class Member inquiries.  (Schachter Decl., ¶ 10.)

10.     The Notice Packet apprises potential Class Members of, *inter alia*:  (i) the pendency of the Consolidated Nasdaq Actions; (ii) an explanation of the nature of the litigation and the Class's claims; (iii) the essential terms of the Settlement; (iv) the proposed Plan of Allocation; (v) a description of Class Members' rights to request exclusion from the Class or object to the Settlement, the Plan of Allocation, or the request for attorneys' fees or expenses; (vi) notice of the binding effect of a judgment on Class Members; and (vii) information regarding Co-Lead Counsel's motion for an award of attorneys' fees and expenses.  The Notice also provides specific information regarding the date, time, and place of the Settlement Fairness Hearing, and sets forth the procedures and deadlines for:  (i) submitting a Proof of Claim; (ii) requesting exclusion from the Class; (iii) objecting to any aspect of the Settlement, including the Plan of Allocation; and (iv) objecting to Co-Lead Counsel's request for attorneys' fees and expenses.  As of the date of this Joint Declaration, only one objection has been filed pertaining to Co-Lead Counsel's anticipated request for an award of attorneys' fees, and only 19 valid requests for exclusion from the Class have been received from a person or entity that demonstrated that he, she or it is a Class Member.[7]

11.     If the Court approves the Settlement, and it becomes Final as that term is defined

---

[7] As reported in the Schachter Decl., A.B. Data has received 19 valid requests for exclusion and 4 invalid requests for exclusion.  (*See* Schachter Decl., ¶¶ 15-16.)  Moreover, as further detailed in the Fee Memorandum, the one objection received to date is without weight.  (*See* Fee Memorandum at 20-22.)  Pursuant to paragraphs 12 and 14 of the Preliminary Approval Order, the deadline for submitting objections or requests for exclusion from the Class is August 19, 2015.  Co-Lead Counsel will address any further objections received by that date in a separate submission to be filed prior to the September 16, 2015 Settlement Fairness Hearing.

EC.59114.1

in the Stipulation, the claims asserted in the Consolidated Nasdaq Actions against the Released

Parties shall be dismissed with prejudice, subject to the terms of the Stipulation and the

[Proposed] Order and Final Judgment entered by the Court.  For the reasons set forth below and

in the accompanying Settlement Memorandum and Fee Memorandum, Co-Lead Counsel

respectfully submit that: (i) the terms of the Settlement and Plan of Allocation are fair,

reasonable and adequate in all respects and, pursuant to Rule 23(e) of the Federal Rules of Civil

Procedure, should be approved by this Court; and (ii) the Fee and Expense Application is fair

and reasonable and should be awarded in full.

## II.      FACTUAL BACKGROUND

### A.       Overview of the Lead Plaintiffs' Claims

12.      Plaintiffs assert claims under Sections 10(b) and 20(a) of the Securities Exchange

Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder,

against Defendants Nasdaq, Greifeld and Ewing, and negligence under New York common law

against Nasdaq and the Exchange.  Plaintiffs' claims arise from events that occurred prior to and

on the day of the May 18, 2012 initial public offering ("IPO" or "Offering") of Facebook, Inc.

("Facebook") in connection with Defendants' non-regulatory, commercial activities to secure

and manage one of the largest and most highly anticipated IPOs in U.S. history.  Plaintiffs allege

that before the commencement of public trading in Facebook shares, Nasdaq experienced several

catastrophic system failures caused by faulty design and testing of its computer systems.

Defendants allegedly were well aware of system flaws prior to the IPO that rendered Defendants

incapable of handling the enormous volume of orders placed prior to the commencement of open

market trading.  Defendants, however, failed to disclose these known problems or correct

Nasdaq's system flaws prior to the commencement of secondary market trading in Facebook on

7

the day of the IPO.

### 1. Defendants Engaged in an Aggressive Commercial Campaign to Secure the Facebook IPO

13. Plaintiffs allege that in the months leading up to the IPO, Defendants waged an aggressive campaign against Nasdaq's rival, the New York Stock Exchange, for the Facebook IPO. (CAC ¶¶ 104-10.) Defendants viewed the Facebook IPO as a "must win" listing for Nasdaq's exchange business. (CAC ¶¶ 104-10.) The Facebook IPO was crucial to Defendants as: (i) the Offering was expected to be (and indeed became) the largest IPO in Nasdaq's history; and (ii) capturing Facebook would cement Nasdaq's commercial reputation as the "go to" venue for the biggest U.S. technology companies. (CAC ¶ 112.)

14. To secure the IPO, Plaintiffs allege that Defendants offered numerous incentives to Facebook, including shortening the "seasoning" period required for inclusion in the NASDAQ-100 Index from two years to three months. (CAC ¶ 109-12.) Additionally, Defendants allegedly sought to capitalize on worldwide investor demand for the Offering by expanding the premarket window for investors to place orders for an IPO from 15 minutes to 4 hours. (CAC ¶¶ 119-125.) While Nasdaq was able to significantly increase the volume of orders for Facebook's IPO by making this change, it ultimately led to significant disruptions in the Offering as Nasdaq's systems proved incapable of processing the drastically increased volume. (CAC ¶¶ 119-125.)

### 2. Defendants Made Numerous Material Statements Touting the Reliability and Capability of Nasdaq's Technology

15. Prior to the IPO, Plaintiffs allege that Defendants made numerous material statements touting the purported capability and reliability of Nasdaq's technology and trading platforms in the months lead up to the Offering. (CAC ¶¶ 168-89.) For example, in its 2011 Form 10-K, Nasdaq stated, "[o]ur platform continues to stand out as a reliable, flexible, and high

8

EC.59114.1

capacity system delivering high levels of execution quality and speed under even extremely demanding market conditions." (CAC ¶ 173.) At Nasdaq's May 10, 2012 Investor Day Conference, held only one week before the Facebook IPO, Defendants assured investors that "[n]o trading platform on the planet is faster or more scalable" than Nasdaq's, and that Nasdaq can "process billions of transactions in a day at sub-microsecond speeds to millions of customers. And . . . that's hard work just to make sure you have that reliability and capability." (CAC ¶ 186, 188.)

16.    Plaintiffs allege that these statements (among others) assured investors, including Class Members, that Nasdaq provided a transparent, open, and orderly market and that its technology and trading platforms were the fastest, most reliable exchange systems in the world, capable of executing enormous trading volumes in any security. However, in the days between making these statements and the Facebook IPO, Defendants allegedly learned of significant system limitations thwarting the reliability of Nasdaq's trading platforms. (CAC ¶¶ 1, 5, 24, 119-25, 223-33.) Despite knowing of numerous system issues afflicting these platforms, Defendants allegedly concealed this material information from investors prior to and on the day of the IPO.

### 3.    Defendants' Pre-IPO Testing Revealed System Issues That Prevented Nasdaq from Properly Executing the Facebook IPO

17.    Plaintiffs allege that Defendants undertook a series of tests on Nasdaq's systems in the weeks leading up to the IPO. (CAC ¶¶ 119-125, 225-27, 230-33.) Defendants' testing allegedly revealed serious system limitations, including design deficiencies in the IPO Cross system, that threatened the reliability of Nasdaq's trading platforms to properly execute the Offering. (CAC ¶¶ 119-125, 225-27, 230-33, 309.) Plaintiffs alleged that despite knowing that

9

EC.59114.1

Nasdaq's trading systems were susceptible to failure, Defendants continued to publicly promote its technology and proceeded with the IPO.  (CAC ¶¶ 121-22.)

18.     Additionally, Defendants conducted "stress tests" on Nasdaq's systems – however, these tests accounted for only a fraction of the anticipated total trading volume for the IPO.  Specifically, Nasdaq's testing simulated trading volumes of 6 to 53 million shares and simulated 40,000 pre-market orders.  (CAC ¶¶ 120-22, 225-28; SEC Order at ¶ 12.)[8]  In the Facebook IPO, more than 80 million shares traded in the *first 30 seconds* of trading with total trading volume of 567 million shares (CAC ¶¶ 120-22, 225-28), and "over 496,000 orders [were entered] into the Cross."  (SEC Order at ¶ 12.)

### 4.     Nasdaq's System Failures On the Day of the Facebook IPO

19.     On May 18, 2012, Nasdaq began accepting premarket orders for Facebook stock at 7:00 a.m.  (CAC ¶ 136.)  Although secondary market trading was set to begin at 11:05 a.m., Nasdaq's IPO Cross system failed to execute all premarket orders and open trading because a large number of order cancellations caused the system's "validation check" to enter a "loop," preventing the calculation of a final opening price.  (CAC ¶¶ 141-43; SEC Order at ¶¶ 10, 15-20.)  Immediately thereafter, certain executives of Nasdaq, including Defendant Greifeld, held a "Code Blue" conference call.  (SEC Order at ¶¶ 23-25.)  The participants on this call made the decision to resort to an untested backup system and inferior failover procedures to complete the Cross.  (CAC ¶¶ 198, 200; SEC Order at ¶¶ 23-25.)

20.     Defendants' switch to an untested backup system led to additional system failures.  Immediately after secondary market trading began, Nasdaq's Chief Economist noticed a

---

[8] The "SEC Order" refers to the SEC's cease-and-desist order arising from its enforcement proceeding and related investigation into the facts and circumstances surrounding Nasdaq's system failures on the day of Facebook's IPO.  *See* The NASDAQ Stock Mkt., LLC & NASDAQ Execution Servs., LLC, Rel. No. 69,655, 2013 WL 2326683 (May 29, 2013).

EC.59114.1

discrepancy between the final indicative volume total (82 million) and the actual volume in the print (75.7 million). (SEC Order at ¶ 27.) This discrepancy indicated that certain Cross-eligible orders were not handled properly; however, "NASDAQ did not address this issue during the minutes and hours following the cross." (*Id.*) In fact, the backup system had failed to account for orders placed between 11:11 a.m. and 11:30 a.m. (CAC ¶¶ 7, 146.) The switch to the untested backup system also caused all premarket orders to be marked in error, preventing the dissemination of electronic transaction confirmations until 1:50 p.m. (CAC ¶¶ 7, 37, 145, 151-59; SEC Order at ¶ 30.) As a result, during the same time, Nasdaq's proprietary feed and the Securities Information Processor quotations data feed displayed erroneous, inaccurate quoting data. (SEC Order at ¶ 31.)

21.    At 1:50 p.m., Nasdaq finally delivered premarket order confirmations. (CAC ¶ 207; SEC Order at ¶ 36.) At that same time, Nasdaq also learned that the system failures caused more than 30,000 Cross-eligible orders entered between 11:11 and 11:30:09 a.m. to remain "stuck" and unexecuted. (CAC ¶ 209; SEC Order at ¶ 38.) Approximately 13,000 "stuck" orders were released into the secondary market at 1:49:49 p.m., causing "a 93-cent decrease in Facebook's share price between 1:50 p.m. and 1:51 p.m." (*Id.*)

**B.    The SEC's Investigation Into And Enforcement Proceeding Against Nasdaq's Handling Of The Facebook IPO**

22.    In the aftermath of the Facebook IPO, the SEC commenced an investigation into the facts and circumstances surrounding Nasdaq's system failures and reckless conduct which caused substantial losses to investors on the day of the IPO. This investigation resulted in the SEC: (i) ordering the Exchange to cease and desist from further violations of the Exchange Act and its own rules; (ii) censuring the Exchange; (iii) requiring the Exchange to comply with numerous remedial undertakings; and (iv) sanctioning the Exchange with a civil monetary

11

EC.59114.1

penalty of $10 million – the largest penalty ever imposed on a securities exchange in U.S. history.  (SEC Order at ¶¶ 19-20.)  Additionally, the SEC made numerous factual findings which, Lead Plaintiffs contend, supported Class's claims that Defendants failed to disclose material information, acted recklessly, and negligently designed and tested its systems, in connection with the Facebook IPO.  (SEC Order at ¶¶ 6-42.)  The SEC Order, however, did not explicitly adopt the position advanced by Lead Plaintiffs that immunity traditionally afforded to SRO exchanges should not apply here.

C.      **The Exchange Agrees To Pay Its Member Firms Up To $62 Million For Losses Caused By The System Failures**

23.      On March 23, 2013, the SEC approved the Exchange's "Accommodation Proposal" to allow it to pay up to $62 million to its members for losses caused by the system failures in connection with the Facebook IPO.  (CAC ¶¶ 299-306.)[9]  On December 17, 2013, the SEC issued a release (the "December 17 Release") giving notice that the Financial Industry Regulation Authority ("FINRA") had completed processing and evaluating all claims submitted to it by the Exchange's member firms.  The December 17 Release also summarized FINRA's analysis noting that the maximum payout for all eligible claims as approved by FINRA was $44,029,901.61.[10]

---

[9] *See* Order Granting Approval of a Proposed Rule Change to Amend Rule 4626 – Limitation of Liability, 78 Fed. Reg. 19,040-01 (Mar. 28, 2013) (the "Accommodation Program").  In approving the Accommodation Program, the SEC emphasized that it was not deciding whether "regulatory immunity should apply to Nasdaq in connection with its actions related to the Facebook IPO" or "whether Nasdaq or any other person may have violated the federal securities laws or any other laws" in connection with the Facebook IPO.  *Id.* at 24-25.

[10] Only 75 member firms of the Exchange submitted claims in connection with the Accommodation Program which, in total, represented 48,063 eligible premarket Cross orders. (*See* December 17 Release at 4-12.)  The eligible orders that received compensation amounted to approximately 9% of the total orders (496,000) entered into the Cross.  (*See* SEC Order at ¶ 12.)

EC.59114.1

## III.    PROCEDURAL HISTORY

### A.    District Court Proceedings

24.    On December 6, 2012, after the MDL Panel transferred 41 pending actions asserted against the Nasdaq defendants, Facebook and related defendants, and certain underwriter defendants, this Court appointed Entwistle & Cappucci as lead counsel for the "NASDAQ Securities Actions" and Lovell Stewart and Finkelstein Thompson and co-lead counsel for the "NASDAQ Negligence Actions."  (ECF No. 52.)

25.    On April 30, 2013, Lead Plaintiffs filed the CAC.  (ECF No. 95.)  Approximately one month later, on May 29, 2013, the SEC issued its Order in the enforcement proceeding against the Exchange and a related entity in connection with the Facebook IPO.  (*See* footnote 8, *supra*.)  In light of the SEC Order, on June 25, 2013, Lead Plaintiffs moved this Court to enter an order partially lifting the discovery stay imposed by the Private Securities Litigation Reform Act of 1995 "(PSLRA"), 15 U.S.C. § 78u-4(b)(3)(B), to obtain limited discovery consisting of documents and testimony that Nasdaq, and any of its affiliates, parents, subsidiaries, agents and/or employees, provided to the SEC in connection with its investigation which resulted in the SEC Order.  (ECF No. 117.)

26.    On July 2, 2013, Defendants filed a motion to dismiss Plaintiffs' securities and negligence claims alleged in the CAC.  (ECF No. 126.)  In Defendants' motion to dismiss, Defendants argued, among other things, that all of their alleged conduct fell within the scope of the Exchange's delegated regulatory responsibilities and was protected under the doctrine of SRO immunity.  Defendants also argued that the CAC failed to adequately allege a claim under Section 10(b) of the Exchange Act and that the negligence claims were barred by the economic loss doctrine under New York law.

13

27.     On December 12, 2013, the Court issued its Order granting in part and denying in part Defendants' motion to dismiss.  (ECF No. 171.)  Specifically, the Court held that while SRO immunity did bar some of Plaintiffs' claims, it did not bar those claims that arose out of non-regulatory, commercial activity, *i.e.*:  (i) the securities claims in connection with Defendants' alleged failure to update and/or correct material statements touting and detailing the purported reliability and speed of Nasdaq's technology and trading platform capabilities; and (ii) the state-law claims in connection with the alleged negligent design, testing, and touting of Nasdaq's software.  The Court also held that the CAC adequately pled each element of a claim under Section 10(b) of the Exchange Act and that the negligence claims were not barred by New York's economic loss doctrine.

28.     On December 30, 2013, Defendants advised the Court that they intended to appeal the December 12 Order's partial denial of SRO immunity.  (ECF No. 175.)  Defendants simultaneously filed a motion pursuant to 28 U.S.C. § 1292(b) to certify two issues for interlocutory appeal:  (i) whether Plaintiffs may invoke the presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) in connection with their federal securities claims; and (ii) whether New York's economic loss doctrine bars Plaintiffs' common law negligence claims.  (ECF No. 177.)  On February 14, 2014, the Court issued an Order denying Defendants' Section 1292(b) motion in its entirety.  (ECF No. 206.)  That same day, Defendants filed their notice of appeal with the Second Circuit.  (ECF No. 207.)

14

## B.     Defendants' Appeal To The Second Circuit

29.     On February 18, 2014, the Second Circuit docketed Defendants' notice of appeal filed with this Court – *In re Facebook, Inc. IPO Sec. and Derivative Litig.*, No. 14-457-cv (2d. Cir.).

30.     On April 24, 2014, Plaintiffs moved to dismiss the appeal for lack of appellate jurisdiction, on the grounds that it was premature.  (*See id.*, ECF No. 64.)  On July 28, 2014, the Second Circuit denied the motion.  (*See id.*, ECF No. 113.)

31.     Defendants filed their opening brief on May 30, 2014.  (*See id.*, ECF No. 83; corrected brief filed at ECF No. 118.)  Defendants argued principally that:  (i) this Court erred in failing to find that all claims asserted in the CAC are barred by SRO immunity; (ii) Plaintiffs cannot invoke the *Affiliated Ute* presumption of reliance in connection with their federal securities claims; and (iii) New York's economic loss doctrine bars Plaintiffs' negligence claims. On November 21, 2014, Plaintiffs filed their opposition brief (*see id.*, ECF No. 140), and on December 19, 2014, Defendants filed their reply brief (*see id.*, ECF No. 160).

32.     After Defendants' appeal had been fully briefed, the Second Circuit scheduled oral argument for May 7, 2015.  (*See id.*, ECF No. 171.)  As discussed below, prior to oral argument, the parties entered into a memorandum of understanding and, on April 24, 2015, jointly moved to postpone the oral argument of the appeal and to hold the case in abeyance, pending approval of the parties' Settlement by this Court.  (*See id.*, ECF No. 179.)  On April 27, 2015, the Second Circuit granted the parties' motion.  (*See id.*, ECF No. 182.)

## C.     Settlement Negotiations

33.     Prior to the SEC approving Nasdaq's Accommodation Program on March 23, 2013, Co-Lead Counsel and counsel for the Nasdaq Defendants began discussions concerning

EC.59114.1

possible resolution of the Consolidated Nasdaq Actions.  No resolution was reached by the parties at that time.

34.    In early 2014, after the Court issued its MTD Order partially sustaining Plaintiffs' claims as alleged in the CAC, Co-Lead Counsel and counsel for the Nasdaq Defendants held meetings telephonically and in-person to explore a possible resolution of the Consolidated Nasdaq Actions.  Although these negotiations did not result in any resolution, the parties agreed to have a formal mediation with the assistance of an experienced mediator, David Geronemus, Esq. from JAMS.

35.    Prior to the scheduled July 17, 2014 mediation, Co-Lead Counsel requested and obtained copies of confidential documentation and information from Nasdaq related to the trading activity on Nasdaq on the opening day of the IPO.  The parties also prepared and exchanged detailed mediation statements setting out their respective positions on the relevant law and facts and addressing the strengths and weaknesses of the claims and defenses.  In connection with the mediation, Co-Lead Counsel engaged a damages expert to prepare confidential class-wide damages calculations employing different factual and legal assumptions.

36.    The parties' full-day mediation session took place on July 17, 2014 at JAMS' offices in New York, New York, and involved hours of intense discussions, proposals, and counterproposals.  Although the parties did not reach an agreement to resolve the litigation at the conclusion of the mediation, the parties did agree to continue settlement discussions and, if necessary, utilize Mr. Geronemus's services in connection with such further negotiations.

37.    Subsequently, while Defendants' Second Circuit appeal was pending, Co-Lead Counsel and counsel for the Nasdaq Defendants continued efforts to attempt to resolve the litigation which required many rounds of meetings and discussions centered on respective

EC.59114.1

assessments of complex liability and damages issues.  These discussions were held telephonically and in-person and were made in good faith and at arm's-length.  Over the course of this time, the potential parameters and terms of any settlement were vigorously debated and intensely discussed.

38.     Ultimately, on April 21, 2015, the parties reached and executed a memorandum of understanding to resolve this litigation in exchange for a payment of $26.5 million in cash to be made by Nasdaq or one of its insurers.  Thereafter, Co-Lead Counsel and counsel for the Nasdaq Defendants spent considerable time negotiating the specific terms of their agreement and entered into the Stipulation.

**D.     Lead Plaintiffs and Co-Lead Counsel Obtain Preliminary Approval of Settlement**

39.     On May 22, 2015, Lead Plaintiffs filed their motion for preliminary approval of the settlement, including all necessary settlement documentation, with the Court. (ECF Nos. 280-282.)  Co-Lead Counsel filed a supplemental declaration with the Court on May 27, 2015 attaching certain revised settlement documents.  (ECF No. 283.)

40.     On June 25, 2015, the Court entered the Preliminary Approval Order:  (i) preliminarily approving the Settlement and Plan of Allocation; (ii) preliminarily certifying the Class pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure for purposes of Settlement only; (iii) directing the Claims Administrator to commence the notice program, including mailing the Notice and Proof of Claim to all members of the Class who can be identified with reasonable effort; (iv) setting dates for Class Members to submit Proofs of Claim as well as the date to request exclusion from the Class or to submit any objection to the Settlement; (vi) directing that all initial papers in support of final approval of the Settlement, the Plan of Allocation, and any application for attorneys' fees and expenses be filed on August 12,

17

2015; and (v) providing that the Court will hold the Settlement Fairness Hearing on September 16, 2015.

## IV.    THE FACTORS FAVORING APPROVAL OF THE SETTLEMENT

41.    The Settlement now before this Court is a highly favorable result for the Class when evaluated in light of the risks of continued litigation and, as detailed below, the other factors that courts consider when determining whether to grant final approval of a proposed class action settlement under Rule 23(e) of the Federal Rules of Civil Procedure.  At the time the Settlement was reached, Co-Lead Counsel had a thorough understanding of the strengths and weaknesses of Plaintiffs' claims as well as the risks of further litigation.  While Plaintiffs and Co-Lead Counsel believe that the claims asserted against Defendants have merit, they also recognize that there were considerable challenges to continuing to pursue the litigation against Defendants, including, but not limited to, the risks in obtaining an adverse ruling by the Second Circuit in connection with Defendants' appeal.  We respectfully submit that the Settlement results from a realistic assessment by both sides of the strengths and weaknesses of their respective claims and defenses as well as the risks of further litigation, and is a fair, reasonable, and adequate resolution of the Consolidated Nasdaq Actions.

42.    The following factors have been cited by the Second Circuit as the pertinent criteria for evaluating the fairness of a proposed class action settlement:  (i) the complexity, expense and likely duration of the litigation; (ii) the reaction of the class to the settlement; (iii) the stage of the proceedings and the amount of discovery completed; (iv) the risks of establishing liability; (v) the risks of establishing damages; (vi) the risks of maintaining the class action through the trial; (vii) the ability of the defendants to withstand a greater judgment; (viii) the range of reasonableness of the settlement fund in light of the best possible recovery; and (ix) the

EC.59114.1

range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation. *See City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974). Moreover, courts have recognized that a proposed settlement may be fair, reasonable, and adequate even if each of the foregoing *Grinnell* factors does not weigh in favor of settlement. Under the foregoing factors, the terms of the Settlement before the Court are fair, reasonable and adequate and warrant the Court's final approval.

### A. The Complexity, Expense And Likely Duration Of The Litigation

43.     The complexity, expense, and likely duration of the litigation were important factors in deciding to settle the Consolidated Nasdaq Actions. The Consolidated Nasdaq Actions involve numerous complex legal and factual issues under the federal securities laws and New York common law that would require expert discovery and testimony if the Consolidated Nasdaq Actions further proceeded in litigation. Moreover, this litigation involved the threshold issue of whether the Nasdaq Defendants are entitled to SRO immunity for the claims asserted in the CAC. Indeed, the gravamen of Defendants' appeal to the Second Circuit focused on this very issue and was the jurisdictional basis for Defendants' ability to bring an interlocutory appeal as of right under the collateral order doctrine and 28 U.S.C. § 1291 of this Court's non-final MTD Order.

44.     If the Second Circuit affirmed, in whole or in part, this Court's order partially denying Defendants' motion to dismiss the CAC, this case would be remanded back to this Court for further proceedings. Extensive and complex fact and expert discovery, motions for class certification and summary judgment, motions *in limine*, and possible appeals of any further decisions by this Court, would likely extend this litigation for years – adding considerable expense. Moreover, even if the Class could recover a larger judgment after a trial, the additional

19

delay posed by the trial itself, as well as post-trial motions, and the appellate process could deny the Class any recovery for years, reducing any such recovery's value.  Thus, this factor weighs strongly in favor of the Settlement.

### B.     The Reaction Of The Class To The Settlement

45.     To date, the reaction of the Class to the Settlement has been exceedingly positive. Pursuant to the terms of the Preliminary Approval Order, A.B. Data mailed copies of the Notice to 645,626 potential Class Members and nominees, and the Publication Notice was published in *The Wall Street Journal* on July 10, 2015.  (Schachter Decl., ¶¶ 8-9.)  The Court-approved Notice sets forth the essential terms of the Settlement and informs potential Class Members of, among other things, their right to request exclusion from the Class or object to any aspect of the Settlement, as well as the procedure for submitting a Proof of Claim in order to be potentially eligible to recover a payment from the Settlement.

46.     The deadline for Class Members to exclude themselves from the Class or object to the Settlement, including the Plan of Allocation and/or the request for an award of attorneys' fees and expenses is August 19, 2015.  To date, there have been only 19 valid requests for exclusion, no objections to the Settlement, and only one objection to Co-Lead Counsel's request for attorneys' fees.  (Schachter Decl., ¶¶ 13-18.)  As detailed in the Fee Memorandum, the objection to Co-Lead Counsel's request for attorneys' fees is without weight and should be denied.  (*See* Fee Memorandum at 20-22.)  Co-Lead Counsel will address any other objections received by August 19, 2015 in a separate submission to be filed prior to the September 16, 2015 Settlement Fairness Hearing.

### C.     The Stage Of The Proceedings

47.     As noted above, the parties entered into the Stipulation while Defendants' appeal

EC.59114.1

of this Court's MTD order was still pending in the Second Circuit.  Co-Lead Counsel negotiated a favorable settlement for the Class after spending more than three years litigating the Consolidated Nasdaq Actions and after an extensive factual and legal investigation including, among other things:  (i) interviews of persons with knowledge, including Exchange member firms, of the allegations contained in the CAC; (ii) analysis of SEC filings by Nasdaq; (iii) analysis of press releases and other public statements issued by Defendants; (iv) analysis of Nasdaq's conference calls, press conferences, corporate website, and related statements and materials; (v) analysis of, and active participation in, the proceedings before the SEC to amend Nasdaq Stock Market Rule 4626(b)(3) in which Nasdaq compensated Exchange member firms for losses on certain types of transactions in Facebook shares on May 18, 2012; (vi) analysis of the findings and conclusions of the SEC enforcement proceeding related to the system failures during the Facebook IPO that resulted in the SEC Order; (vii) analysis of all briefs, exhibits, documents, transcripts, and other submissions to the Court and the Second Circuit during this ongoing litigation; (viii) analysis of trading data and related information provided by the Nasdaq Defendants to Co-Lead Counsel in connection with the parties' mediation; (ix) research of the applicable law with respect to Plaintiffs' claims and Defendants' potential defenses; and (x) consultation with damages experts.

48.     In addition to the efforts and resources devoted to Co-Lead Counsel's investigative activities and processes, work performed in this litigation included:  (i) drafting the comprehensive CAC; (ii) defending the CAC against Defendants' motion to dismiss; (iii) drafting various motions seeking limited discovery and dismissal of Defendants' appeal to the Second Circuit; (iv) conducting a lengthy investigation into Nasdaq's system operations, IPO Cross procedures, trade confirmation procedures, transaction activity on the day of the IPO, and

21

the resulting system failures; (v) complex analysis of damage models, reports and expert analysis arising out of Nasdaq system failures on the day of the IPO; (vi) preparing and participating in a full appellate process, including drafting all briefing and related documents, in connection with Defendants' appeal to the Second Circuit; (vii) preparing and participating in a formal mediation and lengthy settlement discussions with counsel for the Nasdaq Defendants; and (viii) negotiating and agreeing to the Settlement, including all documentation, with Defendants.

49.     As a result of the foregoing, Co-Lead Counsel have a clear picture of the strengths and weaknesses of the case and of the legal and factual defenses that Defendants would likely raise at summary judgment and trial.

**D.     This Risks Of Establishing Liability And Damages**

50.     Plaintiffs faced substantial risks if the Consolidated Nasdaq Actions continued, and these potential risks were thoroughly considered and analyzed in determining whether to enter into the Settlement.  In light of such risks, Plaintiffs and Co-Lead Counsel believe the Settlement to be in the best interests of the Class.

51.     If the litigation were to proceed, the Class would face significant hurdles with respect to establishing liability.  Defendants raised a considerable challenge as to whether any of Plaintiffs' claims could be asserted against them given Defendants' position that Plaintiffs' claims are barred, in their entirety, by SRO immunity.  In fact, the Nasdaq Defendants' appeal as of right pending before the Second Circuit is premised on this very issue, the outcome of which is far from certain.  Indeed, the Second Circuit itself has repeatedly held that self-regulatory organizations and their officers have absolute immunity from claims arising from their regulatory conduct.  *See, e.g.*, *Standard Inv. Chartered, Inc. v. NASD, Inc.*, 637 F.3d 112, 115 (2d Cir. 2011) (per curiam); *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 96 (2d Cir. 2007); *DL*

22

*Capital Grp. LLC v. NASDAQ Stock Mkt., Inc.*, 409 F.3d 93, 96 (2d Cir. 2005); *D'Alessio v. NYSE, Inc.*, 258 F.3d 93, 105 (2d Cir. 2001); *Barbara v. NYSE, Inc.*, 99 F.3d 49, 59 (2d Cir. 1996). To be sure, an exchange is "entitled to immunity from suit when it engages in conduct consistent with the quasi-governmental powers delegated to it pursuant to the Exchange Act and the regulations and rule promulgated thereunder." *D'Alessio*, 258 F.3d at 106.

52. Specifically, Defendants argued that they are immune from claims based on the design, testing and implementation of Nasdaq's trading systems given that these claims allegedly arise out of the Exchange's delegated regulatory responsibilities of "develop[ing], operat[ing], and maintain[ing]" its markets, *see DL Capital Grp.*, 409 F.3d at 95, including regulating trading on the Exchange. *See, e.g.*, *NYSE Specialists*, 503 F.3d at 99-100; *D'Alessio*, 258 F.3d at 104-106. Similarly, Defendants also argued that they are immune from claims based on their statements concerning Nasdaq's electronic trading system because SRO immunity extends beyond conduct that is itself regulatory, to activities that are "consistent with" or "incident to" regulatory activity. *Standard Inv. Chartered*, 637 F.3d at 114; *DL Capital Grp.*, 409 F.3d at 98-99. According to Defendants, because the statements at issue concerned Nasdaq's electronic trading platforms, they were all incident to the Exchange's regulatory function in perfecting the mechanism of a free and open market.

53. If the Second Circuit concluded that the Nasdaq Defendants' alleged wrongdoing was in connection with, or incident to, the Exchange's delegated regulatory conduct, the litigation could end, providing no recovery for the Class with the only avenue of redress through filing of a writ of certiorari with the Supreme Court. And were the Second Circuit to affirm this Court's immunity determinations, it is likely that Defendants would similarly seek an appeal to the Supreme Court adding further delay, expense, and uncertainty with respect to the Class's

ability to recover.

54.     Defendants also challenged the Class's federal securities and state-law negligence claims, including whether the Class can invoke the presumption of reliance under the *Affiliated Ute* doctrine and whether New York's economic loss doctrine bars the Class's negligence claims. Specifically, Defendants argued that the Class is not entitled to the *Affiliated Ute* presumption of reliance because the securities claims are allegedly premised on affirmative statements and not on material omissions of fact.  Additionally, Defendants argued that the economic loss doctrine bars the Class's negligence claims because Plaintiffs seek to recover for purely economic losses unaccompanied by harm to persons or property.  An adverse decision on appeal on any of these issues could have foreclosed, or severely crippled, the litigation for the Class and raised the very real risk that the Class will ultimately recover nothing.

55.     If the Second Circuit affirmed, in whole or in part, this Court's MTD Order, Defendants would have an opportunity to continue to develop their defenses in connection with further proceedings in this litigation, including at summary judgment and trial.  Presentation of evidence and the parties' differing arguments on liability and damages would hinge upon extensive expert discovery and testimony.

56.     In particular, it is likely that Defendants would seek to prove that their alleged wrongdoing did not cause the Class damages given that the Class consists of non-member Exchange firms who were customers of the Exchange's broker-dealer member firms.  Because only the Exchange member firms can submit orders to the Exchange, Defendants would likely argue that they did not owe any duty of care to Class Members whose broker or other financial intermediary executed a trade on his or her behalf on the Exchange.  Defendants would further seek to challenge Plaintiffs' securities claims by contending that Plaintiffs cannot prove:  (i)

24

Defendants made any misrepresentations or omissions of material fact; (ii) Defendants acted with the requisite scienter; and (iii) Defendants' alleged material misrepresentations or omissions caused any losses for which Plaintiffs seek to recover damages.

57.    In addition to challenging Plaintiffs' substantive claims, Defendants would likely seek to limit liability to only orders that were placed prior to secondary market trading at 11:30 a.m. on the day of the IPO.  Indeed, this Court held in its MTD Order that Plaintiffs securities and negligence claims arising after the commencement of secondary market trading were barred by SRO immunity.  (*See* ECF No. 171, at 46-49 (holding that Plaintiffs' negligence claims pertaining to the decision not to halt trading were barred by SRO immunity); 54-59 (holding that Plaintiffs' securities claims pertaining to Nasdaq's "market system status messages" were barred by SRO immunity).)  The SEC also noted that Nasdaq's system issues did not impact the secondary market trading on the day of the IPO.  (*See* SEC Order at ¶ 26.)

58.    With respect to damages, while Plaintiffs believe that they would be able to present expert testimony to meet their burden on damages, Defendants would be expected to assert that there were no damages or substantially smaller damages.  At a minimum, Defendants would seek to limit Plaintiffs' damages to only pre-market orders placed for the IPO in light of the Court's MTD Order.  Additionally, Defendants would likely contend that the majority of damages for all investors who traded in Facebook on the day of the IPO was sustained by the Exchange's member firms that are not a part of the Class.  Defendants would also likely highlight the fact that the price of Facebook stock stabilized after the 1:50 p.m. release of confirmations for premarket orders in further asserting that damages should be limited.

59.    Ultimately, the crucial element of damages would likely be reduced to a "battle of the experts."  Co-Lead Counsel have sufficient experience to recognize that in such a battle there

exists the substantial possibility that a trier of fact could be swayed by Defendants' experts, who would seek to minimize or eliminate the amount of the Class's losses by showing that any losses were attributable to factors other than the Defendants' alleged wrongdoing.

60.     As the foregoing demonstrates, had the litigation proceeded, there existed real uncertainties concerning proof of liability and damages.  That Class Members can obtain a financial recovery now without enduring the foregoing risks and inherent delays weighs heavily in favor of the Settlement.

**E.     The Risks Of Maintaining The Class Through Trial**

61.     Here, the Class, as defined in the Stipulation, has only been certified for settlement purposes.  Without the Settlement, Defendants likely would have contested a motion by Plaintiffs for class certification.  Even if this Court issued an order certifying the Class, Defendants may have filed a petition pursuant to Rule 23(f) of the Federal Rules of Civil Procedure seeking the Second Circuit's review of this Court's class certification order.  Further, even if the Court granted class certification and the Second Circuit denied any petition for review that Defendants filed (or granted any such petition and affirmed the Court's class certification order) there is no assurance of maintaining status as a class since courts may exercise their discretion to reevaluate the appropriateness of class certification at any time pursuant to Rule 23(c)(1)(C) of the Federal Rules of Civil Procedure.

**F.     The Ability Of Defendants To Withstand A Greater Judgment**

62.     While the Nasdaq Defendants may be able to withstand a greater judgment, courts have found that "a defendant is not required to 'empty its coffers' before settlement can be found adequate." *In re Sony SXRD Rear Projection Television Class Action Litig.*, No 06 Civ. 5173 (RPP), 2008 WL 1956267, at *8 (S.D.N.Y. May 1, 2008) (*quoting McBean v. City of New York*,

233 F.R.D. 377, 388 (S.D.N.Y. 2006)).  The Settlement provides the Class with a substantial, certain and immediate payment.  Where, as here, the other *Grinnell* factors weigh in favor of appeal, this factor alone does not suggest the Settlement is unfair.

> **G.    The Range Of Reasonableness Of The Settlement In Light Of The Best Possible Recovery And Potential Risks Of Litigation**

63.    The $26,500,000 Settlement is a substantial result for the Class, especially in light of the risks associated with continued litigation of this complex class action, including the Nasdaq Defendants' pending appeal to the Second Circuit.  As noted above, while Lead Plaintiffs believe that the claims in the CAC as to which the Court did not dismiss are meritorious, they also recognize that this case is legally and factually complex and that there is a real possibility of little to no recovery for the Class if litigation proceeds.  Moreover, the Settlement avoids the significant expense and duration of complex fact and expert discovery should the Second Circuit affirm, in whole or in part, the Court's MTD Order.

64.    Lead Plaintiffs damages expert concluded that the immediate cash benefit of the Settlement represents a recovery of approximately 22-27% of recoverable damages which could be reasonably proven (which Plaintiffs estimate to be approximately $182.3 million) before reduction for trading by the Exchange's member firms which have represented as much as 56% of the aggregate trading volume on the day of the IPO.[11]  Such a recovery is well above the average recovery when compared to actual investor losses based upon Cornerstone Research

---

[11] Lead Plaintiffs' recoverable damages estimates are based upon certain trading information extrapolated from institutional proprietary trading firms as well as industry trade reports which examined the percentage of proprietary traders in the market versus retail investors. *See What Percentage of U.S. Equity Trades Are High Frequency Trades*, WashingtonsBlog (Oct. 28, 2010), http://www.washingtonsblog.com/2010/10/what-percentage-of-u-s-equity-trades-are-high-frequency-trades.html

EC.59114.1

analysis of estimated investor losses in complex securities class action litigation. *See* Laarni T. Bulan, Ellen M. Ryan & Lauren E. Simmons, *Securities Class Action Settlements: 2014 Review and Analysis,* at 8-9 (Cornerstone Research 2015). Given the already protracted nature of the litigation in its early stages, the Settlement is eminently reasonable in light of the attendant risks and delay should the case continue – indeed, it is an excellent result.

65.    In considering the totality of the facts and circumstances in connection with the Consolidated Nasdaq Actions, we respectfully submit that the Settlement is fair, reasonable, and adequate and in the best interests of the Class and therefore should be finally approved by the Court.

## V.    THE PLAN OF ALLOCATION IS FAIR AND REASONBLE

66.    The proposed Plan of Allocation, as set forth in the Notice, provides the manner in which the Settlement Fund, plus interest, less Court-approved attorneys' fees and expenses and the costs of claims administration, and Taxes (the "Net Settlement Fund"), shall be distributed to Authorized Claimants.[12] Distributions from the Net Settlement Fund will be made to Authorized Claimants after all Proofs of Claim have been processed and after the Court has finally approved the Settlement.

67.    Here, the Plan of Allocation was prepared by Co-Lead Counsel after consulting with their economic and damages expert and after careful consideration and analysis of the damages that could have potentially been recovered by Class Members had Plaintiffs fully prevailed on all issues and all claims at trial. The Plan of Allocation was disclosed in the Notice that, to date, has been mailed to 645,626 potential Class Members and nominees. (Schachter Decl., ¶ 8.) As of the filing of this Joint Declaration, no Class Member has filed an objection to

---

[12] "Authorized Claimant" is defined in the Stipulation as a member of the Class who submits a timely and valid Proof of Claim to the Claims Administrator.

EC.59114.1

the Plan of Allocation.

68.    The Plan of Allocation seeks to disburse the monies from the Net Settlement Fund to Authorized Claimants who have recognized losses based upon their purchases and sales of Facebook common stock on May 18, 2012.  In formulating this Plan of Allocation, Co-Lead Counsel have taken into account Nasdaq Stock Market Rule 4626(b)(3), as approved by the SEC in connection with the Accommodation Program, which accounts for certain categories of losses for purchases and sales of Facebook common stock due to the Exchange's system issues on the day of Facebook's IPO.

69.    Co-Lead Counsel, in consultation with their economic and damages expert, have concluded that retail customers who submitted the following categories of orders for the purchase or sale of Facebook common stock on May 18, 2012 suffered compensable damages caused by the alleged misconduct:

(i)    **Pre-Opening Orders to sell Facebook common stock at a price of $42 or less that did not execute or that executed later in the day at a price less than $42.**  Lead Plaintiffs allege that such sellers were damaged to the extent they received an amount less than $42 for their shares.

(ii)    **Pre-Opening Orders to purchase Facebook common stock that were executed at a price of $42 but for which confirmations were delayed until later in the day.**  Lead Plaintiffs allege that such buyers were damaged to the extent they did not know they owned shares or at what price they had purchased shares, and were denied the opportunity to sell their shares during a period in which the market price declined.

(iii)    **Continuous market purchases of Facebook common stock executed before 1:50:10 p.m. on May 18, 2012.**  Lead Plaintiffs allege that such buyers were damaged to the extent the market price declined from 1:50:10 p.m. to 2:35 p.m. following the delayed entry into the market of certain pre-opening sell orders.[13]

70.    In formulating the Plan of Allocation, Co-Lead Counsel, after consultation with

---

[13] All references to time in the Plan of Allocation with respect to orders for Facebook common stock entered or executed on behalf of Class Members on May 18, 2012 shall be construed as U.S. Eastern Time.

EC.59114.1

their expert, have concluded that the 1:50:10 p.m. release into the marketplace of certain delayed pre-opening orders, as well as the belated delivery of confirmations for pre-opening orders, constituted a corrective disclosure and/or corrective price event that caused a statistically significant decline in market price and should also be compensated.  Under the federal securities laws, persons who purchased Facebook common stock may recover, in general, only for losses caused by disclosures correcting a prior misleading statement, and may not recover for price declines caused by general market factors or by the disclosure of other information that is not alleged to be the subject of a prior misstatement.   Persons who both purchased and sold Facebook common stock prior to a corrective disclosure or between corrective disclosures may not have recoverable damages resulting from those transactions.  Similarly, for purposes of common law negligence claims, persons may recover damages only for losses that were proximately caused by the alleged negligent conduct.  Although the price of Facebook common stock declined on May 18, 2012 from an intraday high of $45.00 to $38.23 at the close of trading, Plaintiffs' Co-Lead Counsel, in consultation with their expert, have concluded that for most of the trading day the price decline was not directly attributable or causally tied to Nasdaq's misconduct, except for the price decline from 1:50:10 p.m. to 2:35 p.m.

71.     Accordingly, pursuant to the Plan of Allocation, only those Class Members who engaged in the transaction categories specified above and in paragraph 2(b) of the Plan of Allocation, and who meet all other conditions of the Plan of Allocation, will be eligible to receive a distribution from the Net Settlement Fund.

72.     Under the Plan of Allocation, the Court-appointed Claims Administrator, A.B. Data, will determine each Authorized Claimant's *pro rata* share of the Net Settlement Fund based upon each Authorized Claimant's "Recognized Claim."  All Recognized Claims shall be reduced

30

dollar-for-dollar by any compensation or reimbursement related to transactions in Facebook common stock on May 18, 2012 paid to the Authorized Claimant by the claimant's brokerage firm or by an Exchange member firm.  For Recognized Claims in more than one category, the reduction shall be applied *pro rata* based on the amounts of the Recognized Claims in each category.  In order to recover under the Plan of Allocation, a Class Member must have had a net loss on their overall transactions in Facebook common stock on May 18, 2012.

73.      Additionally, the Plan of Allocation reflects Co-Lead Counsel's determination, in consultation with their economic and damages expert, of the merits and the relative strengths and weaknesses (including recoverable damages) of Class Members' claims pursuant to each claim category.  (*See* Plan of Allocation ¶ 15, ECF No. 283-2.)

74.      Co-Lead Counsel believe that the Plan of Allocation is fair and reasonable and respectfully submit that it should be approved by the Court.

## VI.      CO-LEAD COUNSEL'S APPLICATION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES IS FAIR AND REASONABLE

75.      In addition to seeking final approval of the Settlement and Plan of Allocation, Co-Lead Counsel are also making an application to the Court for an award of attorneys' fees and reimbursement of expenses incurred during the course of the litigation.  Specifically, Co-Lead Counsel respectfully request an award of attorneys' fees in the amount of 33% of the Settlement Fund and litigation expenses in the amount of $268,380.58, plus interest thereon, to be paid from the Settlement Fund.  A cross-check of the attorney lodestar in this case supports the percentage of attorneys' fees requested.  Co-Lead Counsel have incurred a total of $8,576,998 in time from the inception of the litigation through June 25, 2015, the date the Court entered the Preliminary Approval Order.  Thus, the total requested fee, if awarded, would yield a multiplier of 1.02 on the total lodestar.

31

76.     Courts in the Second Circuit apply either the "percentage-of-the-fund" or "lodestar" method, or a combination thereof, when determining awards of attorneys' fees in common fund recoveries.  Therefore, Co-Lead Counsel are presenting the information necessary for the Court to use either method for its analysis.

77.     Courts in the Second Circuit also consider the factors enumerated in *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43 (2d Cir. 2000), when determining an award of attorneys' fees.  The six *Goldberger* factors are:  (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.  *See id.* at 50.  Co-Lead Counsel respectfully submit that their request for attorneys' fees is fair and reasonable when considered under the Goldberger factors.

78.     Although the *Goldberger* factors do not specifically include the reaction of the class to the fee request, courts in the Second Circuit nevertheless consider the class's reaction when deciding whether to award the requested fee.  Here, the Notice advised Class Members that Co-Lead Counsel would be applying to the Court for attorneys' fees not to exceed one-third of the Settlement Fund and for reimbursement of litigation expenses, plus interest thereon, to be paid from the Settlement Fund.  As of the filing of this Joint Declaration, only a single objection to the maximum amount of attorneys' fees and expenses set forth in the Notice has been received.[14]

### A.     The Labor And Time Expended By Co-Lead Counsel

79.     An analysis of the labor and time expended by counsel in this litigation supports

---

[14] As further detailed in the Fee Memorandum, this objection is unfounded.  (*See* Fee Memorandum at 20-22.)  The deadline for submitting objections or requests for exclusion from the Class is August 19, 2015.  Co-Lead Counsel will address any objections received by that date in a separate submission to be filed prior to the September 16, 2015 Settlement Fairness Hearing.

EC.59114.1

the fee award requested.  As detailed above, during the pendency of the Consolidated Nasdaq Actions Co-Lead Counsel conducted an extensive investigation of the claims and defenses in this Action, which included, among other things:  (i) interviews of persons with knowledge, including Exchange member firms, of the allegations contained in the CAC; (ii) analysis of SEC filings by Nasdaq; (iii) analysis of press releases and other public statements issued by Nasdaq; (iv) analysis of Nasdaq's conference calls, press conferences, corporate website, and related statements and materials; (v) analysis of, and active participation in, the proceedings before the SEC to amend Nasdaq Stock Market Rule 4626(b)(3) in which Nasdaq compensated Exchange member firms for losses on certain types of transactions in Facebook shares on May 18, 2012; (vi) analysis of the findings and conclusions of the SEC enforcement proceeding related to the system failures during the Facebook IPO resulting in the SEC Order; (vii) analysis of all briefs, exhibits, documents, transcripts, and other submissions to the Court and the Second Circuit in this and related parallel proceedings during this litigation; (viii) analysis of certain trading data and related information provided by the Nasdaq Defendants to Co-Lead Counsel in connection with the parties' mediation; (ix) research of the applicable law with respect to Plaintiffs' claims and Defendants' potential defenses; and (x) consultation with damages experts.

80.    In addition to the efforts and resources devoted to Co-Lead Counsel's investigative activities and processes, work performed in this litigation included:  (i) drafting the comprehensive CAC; (ii) defending the CAC against Defendants' motion to dismiss; (iii) drafting various motions seeking limited discovery and dismissal of Defendants' appeal to the Second Circuit; (iv) conducting a lengthy investigation into Nasdaq's system operations, IPO Cross procedures, trade confirmation procedures, transaction activity on the day of the IPO, and the resulting system failures; (v) complex analysis of damage models, reports and expert analysis

33

arising out of Nasdaq system failures on the day of the IPO; (vi) preparing and participating in a full appellate process, including drafting all briefing and related documents, in connection with Defendants' appeal to the Second Circuit; (vii) preparing and participating in a formal mediation and lengthy settlement discussions with counsel for the Nasdaq Defendants; and (viii) negotiating and agreeing to the Settlement, including all documentation, with Defendants.  By the time the parties entered into the Settlement, Lead Plaintiffs and Co-Lead Counsel had a sophisticated and detailed understanding of the strengths and weaknesses of the claims asserted in the Consolidated Nasdaq Actions and were fully informed and qualified to enter into the Settlement which accounted for the risks and uncertainties in this litigation which at the same time amounted a very favorable monetary recovery based on what Co-Lead Counsel believe were reasonably provable damages at trial.

81.     As set forth in the lodestar and expense submissions attached hereto, Co-Lead Counsel and their para-professionals have devoted 14,378.64 hours to this litigation, yielding a lodestar of $8,576,998 in fees.  (*See* Exhibits E-G attached hereto.)  The amount of attorneys' fees requested by Co-Lead Counsel herein, 33% of the Settlement Fund, or $8,745,000, plus interest, represents lodestar multiplier of 1.02 to counsel's aggregate lodestar.  As noted in the Fee Memorandum, the requested multiplier in this litigation is well within the range of multipliers commonly awarded in complex class action litigation.  (Fee Memorandum at 18-20.) Co-Lead Counsel pursued the litigation and invested substantial resources to prosecuting the Class's claims without any promise of payment.  Co-Lead Counsel respectfully submit that the requested fee representing 2% more than Co-Lead Counsel's lodestar demonstrates that the requested award of attorneys' fees is fair and reasonable under the lodestar cross-check.

34

EC.59114.1

**B.       The Magnitude, Complexities And The Risk Of The Litigation**

82.     The magnitude, complexities and the risk of the litigation also weigh in favor of the Court's approval of the requested award of attorneys' fees.  The legal challenges assumed by Co-Lead Counsel in bringing these claims to a successful conclusion are described in detail above.  (*See supra* ¶¶ 50-59.)  These risks are also highly relevant to an award of attorneys' fees.

83.     Co-Lead Counsel undertook all of the risks of litigating the Consolidated Nasdaq Actions on a contingent fee basis.  From the outset, Co-Lead Counsel understood that they were embarking on a complex, expensive and likely lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require.  In undertaking that responsibility, Co-Lead Counsel were obligated to ensure that sufficient resources were dedicated to the prosecution of the Consolidated Nasdaq Actions, and that adequate funds were available to compensate outside professionals and to cover the other considerable costs that a case such as this requires.  With an average lag time of several years for these cases to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis.  Indeed, Co-Lead Counsel have received no compensation for their efforts during the course of this litigation.

84.     Co-Lead Counsel also bore the risk that no recovery would be achieved.  Even with the most vigorous and competent of efforts, success in contingent-fee litigation, such as this, is never assured.  In fact, there have been many hard-fought lawsuits where, because of: (i) the discovery of facts unknown when the case was commenced; (ii) changes in the law while the case was pending; or (iii) decisions on summary judgment or following a trial on the merits, that excellent professional efforts produced no fee for counsel.  (*See* Fee Memorandum at 10-12.)  Thus, there was a real risk throughout the Litigation that Co-Lead Counsel would invest

35

substantial resources and efforts and receive nothing.

85.     As detailed above and in the Settlement Memorandum, while Lead Plaintiffs remain confident in their ability to prove their claims and to rebut Defendants' defenses, they recognize that their ability to prove liability was far from certain.  Defendants presented significant defenses to both this Court and to the Second Circuit, the latter of which would have to be defeated before continuing with fact and expert discovery and further proceedings in this Court.  For instance, Defendants' appeal as of right pending before the Second Circuit raises a question of first impression as to the applicability of SRO immunity to automated trading system failures, the outcome of which was far from certain.  The immunity claim is coupled with other challenges to the Class's federal securities and state-law negligence claims, including whether the Class can invoke the presumption of reliance under *Affiliated Ute*, 406 U.S. at 128 (1972) and whether New York's economic loss doctrine bars the Class's negligence claims.  If any of the Defendants' arguments prevailed, the Class's ability to obtain a recovery could be jeopardized – if not completely eliminated.  (*See* Settlement Memorandum at 12-15.)

86.     Moreover, Plaintiffs' ability to prove damages was also unsettled.  Defendants strenuously disagreed with Plaintiffs' damages estimates.  In order for the Class to recover damages at the level estimated by Lead Plaintiffs' damages expert, they would need to prevail on each and every one of the claims alleged.  The damage assessments of the parties' respective trial experts would be sure to vary substantially, and trial would become a "battle of experts."  The outcome of such battles is never predictable, and there existed the very real possibility that a jury could be swayed by experts for the Defendants to minimize the Class's losses or to show that the losses were attributable to factors other than the alleged wrongdoing.  Thus, even if Plaintiffs prevailed as to liability at trial, the judgment obtained could well have been only a fraction of the

36

damages claimed.  (*See* Settlement Memorandum at 15-16.)

### C.     Quality of Representation

87.     An analysis of the quality of representation involved in the prosecution of the Nasdaq Consolidated Actions further supports the requested fee award.  Co-Lead Counsel are experienced in complex litigation, and worked diligently and efficiently in prosecuting the Consolidated Nasdaq Actions.  As demonstrated by the firm resumes, Co-Lead Counsel have successfully litigated these types of complex class actions in courts throughout the country, and these firms have successful track records in such cases.  (*See* Firm Resumes for Co-Lead Counsel attached to Exhibits E through G.)

88.     The quality of the work performed by Co-Lead Counsel in negotiating and obtaining the Settlement should also be evaluated in light of the quality of the lawyers opposing Co-Lead Counsel's efforts.  *See In re KeySpan Corp. Sec. Litig.*, No. 01 CV 5852 (ARR), 2005 WL 3093399, at *11 (E.D.N.Y. Sept. 30, 2005).  Here, the Nasdaq Defendants were represented by the prominent law firms of Ballard Spahr LLP and Williams & Connolly LLP.  The ability of Co-Lead Counsel to obtain this favorable Settlement for the Class while opposed by such experienced counsel further reflects the high quality of counsel's work.

### D.     The Requested Fee In Relation To The Settlement

89.     An analysis of the requested fee in relation to the Settlement also favors approval of the present fee request.  While the percentage of fees awarded in complex class actions have varied substantially, courts in the Second Circuit and around the country have consistently awarded percentage fees to plaintiff's counsel equal to the fee requested by Co-Lead Counsel herein.  (*See* Fee Memorandum at 16-18.)  Thus, Co-Lead Counsel's fee request falls within the range of fee awards in these cases.

E.      **Public Policy Considerations**

90.      An analysis of public policy considerations also supports the requested fee award. Co-Lead Counsel committed substantial resources to the prosecution and resolution of the Nasdaq Consolidated Actions, notwithstanding significant uncertainty as to whether the litigation would ultimately succeed.  Here, this Settlement is providing the only monetary recovery for the Class and is clearly serving as a necessary supplement to government enforcement.  The SEC, a vital government agency, does not have the budget or personnel to ensure complete enforcement of the securities laws.  Therefore, if this important work by private counsel for plaintiffs is to be carried out, the courts should award fees that will adequately compensate plaintiffs' counsel, taking into account the risks undertaken with a clear view of the economics of the situation. Further, courts recognize that in contingent fee class action litigation, where counsel expends sizable resources to obtain a recovery for an aggrieved class, and few individual class members have sufficient motivation to pursue litigation independently, public policy dictates sufficient payment to counsel to ensure the continued pursuit of recoveries for the benefit of such individuals.  Indeed, as detailed herein, Co-Lead Counsel have devoted substantial time and resources to the investigation, prosecution and settlement of the Nasdaq Consolidated Actions, and through their efforts have obtained a substantial monetary recovery for the Class.

F.      **Co-Lead Counsel's Request for Expenses**

91.      Co-Lead Counsel also request an award of litigation expenses in the amount of $268,380.58 incurred in connection with the prosecution and resolution of the Consolidated Nasdaq Actions on behalf of the Class, plus interest thereon.  It is well-settled that attorneys who have created a common fund for the benefit of a class are entitled to an award of expenses incurred in creating the fund so long as the submitted expenses are reasonable, necessary and

EC.59114.1

directly related to the prosecution of the litigation.  (*See* Fee Memorandum at 22.)

92.     The expenses incurred by Co-Lead Counsel in this litigation are detailed in the individual firm lodestar and expense submissions attached hereto as Exhibits E through G.  As attested to, these expenses are reflected on the books and records maintained by Co-Lead Counsel.  These expenses are billed separately and such charges are not duplicated in the respective firms' billing rates.

93.     A significant portion of Co-Lead Counsel's expenses were incurred for professional services rendered by Lead Plaintiff's experts and ordinary and necessary expenses attributable to investigating and prosecuting the litigation, including computerized research, document management, mediation expenses, travel, and copying expenses.  (*See* Exhibits E-G attached hereto.)

94.     All of the expenses incurred were necessary to the successful prosecution and resolution of the Class's claims against the Nasdaq Defendants.

95.     To date, no objections have been received regarding the expense figure set forth in the Notice.

96.     Finally, Co-Lead Counsel respectfully seek a modest award of $1,250 for each Lead Plaintiff for their service in agreeing to act as Class representatives and representing time and expenses that were reasonably and necessarily incurred in prosecuting and resolving the Consolidated Nasdaq Actions against Defendants.  Lead Plaintiffs collected and produced all relevant documents to their counsel, provided Co-Lead Counsel with valuable information regarding their factual investigation, participated in telephonic and in-person meetings and interviews with Co-Lead Counsel, reviewed all relevant pleadings, and regularly monitored the litigation and approved the Settlement.  These efforts justify the award sought here, which is

EC.59114.1

significantly less than that paid in other cases to class representatives making similar efforts. *See, e.g. In re Colgate-Palmolive Co. ERISA Litig.*, 36 F. Supp. 3d 344, 354 (S.D.N.Y. 2014) (granting $5,000 incentive award to representatives who "reviewed draft pleadings and motions, searched for and produced relevant documents, reviewed filings, and communicated regularly with Class Counsel"). The Notice informed Class Members that Lead Plaintiffs would seek such an award and, to date, there has been no objection.

## VII.   CONCLUSION

97.     For the reasons set forth more fully above, we respectfully submit that: (i) the $26.5 million Settlement of the claims asserted in the Consolidated Nasdaq Actions is fair, reasonable, and adequate and in the best interests of the Class; (ii) the Plan of Allocation is fair, reasonable, adequate and in the best interests of the Class in all respects; and (iii) Co-Lead Counsel's application for attorneys' fees and reimbursement of expenses is fair and reasonable and appropriate under all of the circumstances presented by this litigation. As a result, we respectfully request that the Court: (i) enter the [Proposed] Order and Final Judgment submitted concurrently herewith; and (ii) enter the [Proposed] Order Awarding Attorneys' Fees and Reimbursement of Expenses also submitted concurrently herewith.

98.     We declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  New York, New York        */s/ Vincent R. Cappucci*
        August 12, 2015              Vincent R. Cappucci

Dated:  New York, New York        */s/ Christopher Lovell*
        August 12, 2015              Christopher Lovell

40

EC.59114.1