**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE FACEBOOK, INC., IPO SECURITIES AND DERIVATIVE LITIGATION | MDL No. 12-2389<br><br>ECF Case<br><br>This document relates to the Consolidated Securities Action: |

| | |
|---|---|
| NO. 12-CV-4081 | NO. 12-CV-4763 |
| NO. 12-CV-4099 | NO. 12-CV-4777 |
| NO. 12-CV-4131 | NO. 12-CV-5511 |
| NO. 12-CV-4150 | NO. 12-CV-7542 |
| NO. 12-CV-4157 | NO. 12-CV-7543 |
| NO. 12-CV-4184 | NO. 12-CV-7544 |
| NO. 12-CV-4194 | NO. 12-CV-7545 |
| NO. 12-CV-4215 | NO. 12-CV-7546 |
| NO. 12-CV-4252 | NO. 12-CV-7547 |
| NO. 12-CV-4291 | NO. 12-CV-7548 |
| NO. 12-CV-4312 | NO. 12-CV-7550 |
| NO. 12-CV-4332 | NO. 12-CV-7551 |
| NO. 12-CV-4360 | NO. 12-CV-7552 |
| NO. 12-CV-4362 | NO. 12-CV-7586 |
| NO. 12-CV-4551 | NO. 12-CV-7587 |
| NO. 12-CV-4648 | |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'**
**MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS**
**REPRESENTATIVES AND CLASS COUNSEL**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ..................................................................................................1

BACKGROUND ...................................................................................................5

ARGUMENT .........................................................................................................9

I.     CLASS MEMBERS' KNOWLEDGE OF THE ALLEGED OMISSION AND MISREPRESENTATION PRECLUDES CLASS CERTIFICATION. ...........................11

     A.     Class Members Had Actual Knowledge That Facebook Revised Its Revenue Projections Because Of The Impact Increased Mobile Usage Was Already Having On Revenues. ..................................................14

         1.     Many Investors Knew That Facebook Revised Its Revenue Projections Because Increased Mobile Usage Had Already Impacted Revenues. ..................................................15

         2.     Underwriters' Representatives Discussed With Investors The Fact That Facebook Revised Its Revenue Projections. ....................................22

         3.     The Media Reported That Facebook Revised Its Revenue Projections Because Of The Impact Of Increased Mobile Usage..............26

         4.     Other Investors Knew That Facebook Revised Its Revenue Projections Based On Knowing Underwriters' Revised Projections Of Facebook's Revenues. ..................................................30

         5.     There Is A Reasonable Inference That Many Other Investors Knew That Facebook Revised Its Revenue Projections Because Mobile Usage Had Already Impacted Revenues, Requiring Individual Inquiries. ..................................................36

     B.     Even Without Knowing Facebook Itself Revised Its Revenue Projections, Class Members Still Had Actual Knowledge Of The Alleged Omission And Misrepresentation...............................................38

         1.     Many Investors Knew About The Impact Increased Mobile Usage Was Already Having On Revenues, Including By Knowing Underwriters Revised Their Projections Of Facebook's Revenues To Reflect That Impact. ..................................................40

         2.     The Media Reported That Increased Mobile Usage Was Already Harming Revenues...................................................46

i

C.    Retail Investors Also Had Actual Knowledge Of The Alleged Omission And Misrepresentation. ...........................................................49

II.    THE VARIETY OF INFORMATION PROVIDED TO DIFFERENT INVESTORS ALSO CREATES INDIVIDUAL CAUSATION, DAMAGES, AND MATERIALITY ISSUES THAT PRECLUDE CERTIFICATION. ....................54

A.    *Comcast* Precludes Certification. ...............................................................54

1.    Plaintiffs Seek Damages Inconsistent With Their Class-wide Liability Theory. ...........................................................55

2.    Plaintiffs Have Not Met Their Burden Of Enabling The Court To Weigh The Impact Of Individualized Causation And Damages Issues. ...........................................................56

B.    Investors' Widely Varied Knowledge Creates Individual Materiality Issues. ...........................................................60

C.    Plaintiffs' Inconsistent Arguments Create Impermissible Conflicts ....................61

III.    NAMED PLAINTIFFS HAVE FAILED TO DEMONSTRATE THAT PROPOSED CLASS REPRESENTATIVES ARE TYPICAL OR ADEQUATE. ............64

A.    Proposed Class Representatives Are Subject To A Knowledge Defense. .............65

B.    Plaintiffs Have Failed To Prove That Proposed Class Representatives Are Typical Or Adequate Representatives. ...................................................66

IV.    THE PROPOSED CLASSES ARE NOT PROPERLY DEFINED. ................................68

A.    The Proposed Classes Are Overbroad. ...........................................................69

B.    The Proposed Class And Subclasses Are Not Ascertainable. ...............................70

1.    "Damaged Thereby" Would Require Merits Determinations. ...................71

2.    The Subclasses Are Not Ascertainable. ...........................................................72

C.    *Morrison* Bars Certification Of A Class That Neither Excludes Extraterritorial IPO Allocations Nor Traces Aftermarket Transactions To Domestic Allocations. ...........................................................74

V.    A CLASS ACTION IS NOT SUPERIOR TO OTHER METHODS. ..............................76

CONCLUSION ...........................................................77

**TABLE OF AUTHORITIES**

<u>**Page(s)**</u>

**CASES**

*Absolute Activist Value Master Fund Ltd. v. Ficeto,*
  677 F.3d 60 (2d Cir. 2012) ................................................................................... 74

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co.,*
  269 F.R.D. 252 (S.D.N.Y. 2010) ..................................................................... 54, 57

*Aetna Ins. Co. v. Kennedy,*
  301 U.S. 389 (1937) .............................................................................................. 29

*Akerman v. Oryx Commc'ns Inc.,*
  810 F.2d 336 (2d Cir. 1987) .................................................................................. 62

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds,*
  133 S. Ct. 1184 (2013) .................................................................................... 35, 60

*Auscape Int'l v. Nat'l Geographic Soc'y,*
  2003 U.S. Dist. LEXIS 27663 (S.D.N.Y. 2003),
  *adopted by* 2003 U.S. Dist. LEXIS 17104 (S.D.N.Y. 2003) ..................................... 7

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.,*
  222 F.3d 52 (2d Cir. 2000) .................................................................................... 68

*Chris-Craft Indus., Inc. v. Piper Aircraft Corp.,*
  480 F.2d 341 (2d Cir. 1973) .................................................................................. 33

*Comcast Corp. v. Behrend,*
  133 S. Ct. 1426 (2013) ................................................................................... passim

*Denney v. Deutsche Bank AG,*
  443 F.3d 253 (2d Cir. 2006) .................................................................................. 69

*Dietrich v. Bauer,*
  192 F.R.D. 119 (S.D.N.Y. 2000) ........................................................................... 11

*Ernst Haas Studio, Inc. v. Palm Press, Inc.,*
  164 F.3d 110 (2d Cir. 1999) .................................................................................... 7

*Fed. Hous. Fin. Agency v. HSBC N. Am. Holdings, Inc.,*
  33 F. Supp. 3d 455 (S.D.N.Y. 2014) ......................................................... 25, 27, 28

*Fed. Hous. Fin. Agency v. Nomura Holding Am. Inc.,*
  2014 WL 7232443 (S.D.N.Y. 2014) ...................................................................... 33

*Fed. Hous. Fin. Agency v. UBS Americas Inc.,*
  2013 WL 3284118 (S.D.N.Y. 2013) ........................................................... 1, 35, 38

*Fort Worth Emps. Ret. Fund v. J.P. Morgan Chase & Co.,*
  301 F.R.D. 116 (S.D.N.Y. 2014) ..................................................................... 54, 57

*Gary Plastic Packaging Corp. v. Merrill, Lynch, Pierce, Fenner & Smith Inc.,*
  903 F.2d 176 (2d Cir. 1990) .................................................................................. 64

*Halliburton Co. v. Eric P. John Fund, Inc.*,
134 S. Ct. 2398 (2014) ........................................................................................ 76

*IBEW Local 90 Pension Fund v. Deutsche Bank AG*,
2013 WL 5815472 (S.D.N.Y. 2013) ................................................................... 70

*In re Am. Int'l Grp., Inc. Sec. Litig.*,
265 F.R.D. 157 (S.D.N.Y. 2010),
*vacated and remanded on other grounds*, 689 F.3d 229 (2d Cir. 2012) ................................. 69

*In re Bear Stearns Cos., Inc. Securities, Derivative, & ERISA Litig.*,
763 F. Supp. 2d 423 (S.D.N.Y. 2011) ........................................................... 60, 61

*In re BP p.l.c. Sec. Litig.*,
2013 WL 6388408 (S.D. Tex. 2013) ................................................................... 55

*In re BP p.l.c. Sec. Litig.*,
2014 WL 2112823 (S.D. Tex. 2014) ................................................................... 57

*In re Constar Int'l Inc. Sec. Litig.*,
585 F.3d 774 (3d Cir. 2009) ................................................................................ 9

*In re Facebook Inc. IPO Sec. & Deriv. Litig.*,
922 F. Supp. 2d 445 (S.D.N.Y. 2013) ................................................................... 8

*In re Facebook, Inc. IPO Sec. & Deriv. Litig.*,
986 F. Supp. 2d 487 (S.D.N.Y. 2013) ........................................................... passim

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
574 F.3d 29 (2d Cir. 2009) ............................................................................ 69, 70

*In re IPO Sec. Litig.*,
227 F.R.D. 65 (S.D.N.Y. 2004),
*rev'd on other grounds*, 471 F.3d 24 (2d Cir. 2006),
*clarified on denial of reh'g,* 483 F.3d 70 (2d Cir. 2006) ........................................... 75

*In re IPO Sec. Litig.*,
471 F.3d 24 (2d Cir. 2006),
*clarified on denial of reh'g,* 483 F.3d 70 (2d Cir. 2006) ...................................... passim

*In re IPO Sec. Litig.*,
483 F.3d 70 (2d Cir. 2006) .......................................................................... 12, 70

*In re Kosmos Energy Ltd. Sec. Litig.*,
299 F.R.D. 133 (N.D. Tex. 2014) ........................................................ 9, 29, 57, 68

*In re Literary Works in Elec. Databases Copyright Litig.*,
654 F.3d 242 (2d Cir. 2011) ........................................................................ 63, 64

*In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*,
2013 WL 396117 (D.N.J. 2013) ........................................................................ 71

*In re Moody's Corp. Sec. Litig.*,
274 F.R.D. 480 (S.D.N.Y. 2011) ........................................................................ 36

*In re Omnicom Grp., Inc. Sec. Litig,.*
597 F.3d 501 (2d Cir. 2010) ............................................................................. 62

iv

*In re Puda Coal Sec. Inc. Litig.,*
2013 WL 5493007 (S.D.N.Y. 2013) ................................................................. 76

*In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL,* No. 1869,
725 F.3d 244 (D.C. Cir. 2013) ......................................................................... 55

*In re Sanofi Sec. Litig.,*
2015 WL 365702 (S.D.N.Y. 2015) ................................................................... 60

*In re Superior Offshore Int'l, Inc. Sec. Litig.,*
2010 WL 2305742 (S.D. Tex. 2010) ..................................................... 13, 15, 29

*In re U.S. Foodservice Inc. Pricing Litig.,*
729 F.3d 108 (2d Cir. 2013) ......................................................................... 5, 54

*In re WorldCom, Inc. Sec. Litig.,*
388 F. Supp. 2d 319 (S.D.N.Y. 2005) ............................................................. 62

*Intellivision v. Microsoft Corp.,*
484 F. App'x 616 (2d Cir. 2012) ..................................................................... 39

*Iowa Pub. Emps.' Ret. Sys. v. MF Global, Ltd.,*
620 F.3d 137 (2d Cir. 2010) ............................................................................ 62

*Jacob v. Duane Reade, Inc.,*
2015 WL 525697 (2d Cir. 2015) ....................................................................... 5

*Kendler v. Federated Dep't Stores, Inc.,*
88 F.R.D. 688 (S.D.N.Y. 1981) ....................................................................... 77

*Klein v. A.G. Becker Paribas Inc.,*
109 F.R.D. 646 (S.D.N.Y. 1986) ............................................................... 61, 70

*Landry v. Price Waterhouse Chartered Accountants,*
123 F.R.D. 474 (S.D.N.Y. 1989) ..................................................................... 65

*Leyva v. Medline Indus. Inc.,*
716 F.3d 510 (9th Cir. 2013) ........................................................................... 56

*Litwin v. Blackstone Grp.,*
634 F.3d 706 (2d Cir. 2011) ....................................................................... 27, 60

*London v. Wal-Mart Stores, Inc.,*
340 F.3d 1246 (11th Cir. 2003) ....................................................................... 68

*Maywalt v. Parker & Parsley Petroleum Co.,*
67 F.3d 1072 (2d Cir. 1995) ............................................................................ 68

*Mazzei v. Money Store,*
288 F.R.D. 45 (S.D.N.Y. 2012) ....................................................................... 65

*McBean v. City of N.Y.,*
260 F.R.D. 120 (S.D.N.Y. 2009) ..................................................................... 71

*McLaughlin v. Am. Tobacco Co.,*
522 F.3d 215 (2d Cir. 2008) ..................................................................... passim

*Meyer v. Greene,*
710 F.3d 1189 (11th Cir. 2013) ...................................................................................... 58

*Mooney v. City of New York,*
219 F.3d 123 (2d Cir. 2000) .......................................................................................... 29

*Morrison v. Nat'l Australia Bank Ltd.,*
561 U.S. 247 (2010) ........................................................................................... 74, 75, 76

*Myers v. Hertz Corp.,*
624 F.3d 537 (2d Cir. 2010) .......................................................................... 11, 13, 37, 76

*N.J. Carpenters Health Fund v. Rali Series,*
2006-Q01 Trust, 477 F. App'x 809 (2d Cir. 2012) .................................... 12, 13, 25, 36

*N.J. Carpenters Health Fund v. Residential Capital, LLC,*
2012 WL 4865174 (S.D.N.Y. 2012) ............................................................................. 59

*N.J. Carpenters Health Fund v. Residential Capital, LLC,*
2013 WL 6839093 (S.D.N.Y. 2013) ............................................................................. 59

*N.J. Carpenters Health Fund v. Residential Capital, LLC,*
272 F.R.D. 160 (S.D.N.Y. 2011) ............................................................................. 12, 65

*N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp.,*
709 F.3d 109 (2d Cir. 2013) .......................................................................................... 28

*NASDAQ OMX Grp., Inc. v. UBS Secs. LLC,*
957 F. Supp. 2d 388 (S.D.N.Y. 2013),
*aff'd* 770 F.3d 1010 (2d Cir. 2014) .............................................................................. 59

*Nat'l Air Traffic Controllers Ass'n. v. Dental Plans, Inc.,*
2006 WL 584760 (N.D. Ga. 2006) ............................................................................... 64

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.,*
693 F.3d 145 (2d Cir. 2012) .......................................................................................... 67

*New Hampshire v. Maine,*
532 U.S. 742 (2001) ...................................................................................................... 39

*NLRB v. New York Tel. Co.,*
930 F.2d 1009 (2d Cir. 1991) ........................................................................................ 29

*Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP,*
322 F.3d 147 (2d Cir. 2003) .......................................................................................... 32

*Philip Morris USA Inc. v. Scott,*
131 S. Ct. 1 (2010) ........................................................................................................ 61

*Police & Fire Ret. Sys. of Detroit v. Indymac MBS, Inc.,*
721 F.3d 95 (2d Cir. 2013) ............................................................................................ 61

*Public Employees' Ret. Sys. of Miss. v. Goldman Sachs Grp., Inc.,*
280 F.R.D. 130 (S.D.N.Y. 2012) ............................................................................... 5, 40

*Public Employees' Ret. Sys. of Miss. v. Merrill Lynch & Co.,*
277 F.R.D. 97 (S.D.N.Y. 2011) ........................................................................ 11, 27, 28

*Rahman v. Mott's LLP,*
2014 WL 6815779 (N.D. Cal. 2014) ......................................................................... 56

*Ramirez v. Riverybay Corp.,*
39 F. Supp. 3d 354 (S.D.N.Y. 2014) .................................................................. 10, 68

*Randolph v. J.M. Smucker Co.,*
303 F.R.D. 679 (S.D. Fla. 2014) ............................................................................. 57

*Roach v. T.L. Cannon Corp.,*
2015 WL 528125 (2d Cir. 2015) .............................................................................. 56

*Ross v. Warner,*
1980 WL 1474 (S.D.N.Y. 1980) .............................................................................. 70

*Schuh v. HCA Holdings, Inc.,*
2014 WL 4716231 (M.D. Tenn. 2014) ..................................................................... 71

*SEC v. Bank of Am. Corp.,*
677 F. Supp. 2d 717 (S.D.N.Y. 2010) ..................................................................... 29

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.,*
293 F.R.D. 287 (E.D.N.Y. 2013) ............................................................................... 5

*Shemian v. Research In Motion Ltd.,*
570 F. App'x 32 (2d Cir. 2014) ............................................................................... 60

*Sheppard v. TCW/DW Term Trust* 2000,
938 F. Supp. 171 (S.D.N.Y. 1996) ............................................................................ 8

*Shockley v. Adams Golf, Inc.,*
2005 WL 3654346 (D. Del. 2005) ............................................................................ 70

*Sicav v. Wang,*
2015 WL 268855 (S.D.N.Y. 2015) .................................................................... passim

*Spagnola v. Chubb Corp.,*
264 F.R.D. 76 (S.D.N.Y. 2010) ............................................................................... 66

*Tsereteli v. Residential Asset Securitization Trust 2006-A8,*
283 F.R.D. 199 (S.D.N.Y. 2012) .......................................................... 3, 19, 50, 65

*U.S. D.I.D. Corp. v. Windstream Commc'ns Inc.,*
775 F.3d 128 (2d Cir. 2014) .................................................................................... 29

*U.S. Foods, Inc. v. Catholic Healthcare West,*
134 S. Ct. 1938 (2014) .............................................................................................. 5

*United Paperworks Int'l Union v. Int'l Paper Co.,*
985 F.2d 1190 (2d Cir. 1993) .................................................................................. 27

*Valley Drug Co. v. Geneva Pharm., Inc.,*
350 F.3d 1181 (11th Cir. 2003) ......................................................................... 63, 64

*Wal-Mart Stores, Inc. v. Dukes,*
131 S. Ct. 2541 (2011) .................................................................................. 11, 27, 35

vii

*Wang v. Bear Sterns Cos.,*
    14 F. Supp. 3d 537 (S.D.N.Y. 2014) ................................................................ 60, 61

*Westfall v. City of Cohoes,*
    1988 WL 79202 (N.D.N.Y. 1988) ........................................................................... 29

*Whitehurst v. 230 Fifth, Inc.,*
    998 F. Supp. 2d 233 (S.D.N.Y. 2014) .................................................................... 33

*Young v. Nationwide Mut. Ins. Co.,*
    693 F.3d 532 (6th Cir. 2012) .................................................................................. 71

*Zimmerman v. Bell,*
    800 F.2d 386 (4th Cir. 1986) .................................................................................. 61

## STATUTORY AUTHORITIES

15 U.S.C. § 77k(a) ...................................................................................................... 11, 59

15 U.S.C. § 77l(a)(2) .................................................................................................. 11, 59

15 U.S.C. § 78u-4(a)(2)(A) ............................................................................................... 66

28 U.S.C. § 2072(b) ......................................................................................................... 11

## RULES AND REGULATIONS

70 Fed. Reg. 44722, Securities Offering Reform .......................................................... 8

Fed. R. Civ. P. 23 ..................................................................................................... passim

Fed. R. Civ. P. 23(a)(4) ................................................................................................... 66

Fed. R. Civ. P. 23(b)(3) ................................................................................................... 11

Fed. R. Civ. P. 23(c)(4) ................................................................................................... 54

Fed. R. Civ. P. 23(c)(5) ................................................................................................... 10

## TREATISES

Charles Alan Wright & Arthur R. Miller,
    *Federal Practice & Procedure* (3d ed. 2014) ........................................................ 71

Charles J. Johnson, Jr. & Joseph McLaughlin,
    *Corporate Finance and the Securities Laws* (4th ed. 2012 Supp.) ......................... 18

**INTRODUCTION**

The crux of Plaintiffs' Complaint is that underwriters passed along to a "small, select group" of investors material information that was allegedly omitted from and misrepresented in Facebook's Registration Statement, namely, revised projections that reflected the impact increasing mobile usage was having on Facebook's revenues. Compl. ¶ 13. The Complaint alleged that "these investors immediately recognized that the lowered revenue estimates meant that there had been a significant negative change in Facebook's financial condition and value." *Id.* ¶ 139.[1] That "selective disclosure" allegation turned out to be wrong. After even preliminary discovery, Plaintiffs are forced to admit that underwriters did not disclose this information only to a "small, select group." Mem. at 28. Rather, underwriters disclosed it broadly to hundreds of investors, and the information spread to countless other investors, including both institutions and individuals. Because investors' "actual," "specific knowledge" of the allegedly omitted or misrepresented fact precludes liability, *Fed. Hous. Fin. Agency v. UBS Americas Inc.*, 2013 WL 3284118, at *14–15 (S.D.N.Y. 2013), this widespread disclosure requires individual inquiries into each putative class member's knowledge and precludes class certification. *See In re IPO Sec. Litig.,* 471 F.3d 24, 43-44 & n.14 (2d Cir. 2006) (reversing class certification order where "widespread knowledge" of the alleged scheme "would precipitate individual inquiries as to the knowledge of each member of the class"), *clarified on denial of reh'g,* 483 F.3d 70 (2d Cir. 2006).

---

[1] Defendants are filing a paginated Appendix ("A-#") with the large volume of declarations, deposition transcripts, and other previously unfiled documents cited herein. Plaintiffs' Memorandum of Law in Support of their Motion for Class Certification and Appointment of Class Representatives and Class Counsel (ECF No. 256) is referred to as "Mem."; the Consolidated Class Action Complaint (ECF No. 71) as "Complaint" or "Compl."; and Lead Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Consolidated Class Action Complaint (ECF No. 114) as "Pls.' MTD Opp."

Recognizing all this, Plaintiffs have pivoted away from their selective disclosure theory. Instead, they now assert that "the basis of" their claims is "that *Facebook determined* that the mobile usage trend had already had a material negative impact" on revenues, and they argue that "the key information at issue—Facebook's *own* revenue cuts—was not disclosed" by underwriters telling investors about *underwriters'* revisions of Facebook's projected revenues. Mem. at 7 (emphasis added).[2]  Plaintiffs say knowledge of underwriters' revisions is insufficient to "charge" class members with knowledge of the purportedly critical "facts about *Facebook's* revenue cuts." Mem. at 5-7, 30.

Plaintiffs' eleventh hour pivot fails.  Even under Plaintiffs' new theory that only Facebook's projections count, a class cannot be certified here in light of the voluminous record now before the Court.  Defendants have compiled unrebutted evidence showing that *thousands* of class members, *including both institutional and individual investors*, obtained actual knowledge—through phone calls, emails, memos, in-person conversations, press articles, and other means, including their own advisors—of precisely the information that Plaintiffs say "no one knew," namely, that Facebook itself revised its revenue projections because of the impact

---

[2]  Plaintiffs underscore this point throughout their brief, insisting their claims are about the failure to disclose that Facebook itself made a determination about the mobile usage revenue impact and that Facebook itself changed its internal projections.  Mem. at 5 ("Significantly, the basis of Plaintiffs' claims in this case is that the offering documents for the Facebook IPO were misleading because they failed to disclose that Facebook determined that the mobile usage trend had already had a material negative impact on the Company's revenue for the second quarter and the year, as evidenced by the fact that Facebook cut its own revenue estimates. No class members were told of this fact."), 12 ("Significantly, neither Facebook nor the Syndicate Analysts provided Facebook's own revised estimates to investors."), 23 ("Class members were not told the information that forms the basis of Plaintiffs' claims: that Facebook determined that the mobile usage trend had materially impacted its revenues prior to the IPO, and slashed its own revenue estimates as a result."); 29 (""[T]he gravamen of Plaintiffs' claims is that *Facebook determined that mobile usage had had a material negative impact on its revenues, and therefore cut its own revenue estimates,* and this information was not disclosed to institutional investors.") (emphasis in original).

2

increased mobile usage was already having on revenues.  By way of limited example:

- Investment advisors for each of the ***Lead Plaintiffs*** understood from discussions with different underwriters' representatives that "Facebook was cutting its projections in advance of the IPO due to the trend in mobile."  (A-89 (Shilling Supp. Aff. ¶ 5) (Wellington Management Company ("Wellington")); *see also* A-86 (Nell Decl. ¶ 2) (UBS Global Asset Management ("UBS")); A-81 (Kapoor Decl. ¶ 4) (Waddell & Reed ("Waddell")).) ███████████████████████████ ████████████████████████████████████ ██████████████████████████████—is imputed to Lead Plaintiffs.  *See Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 283 F.R.D. 199, 213 & n.109 (S.D.N.Y. 2012).

- Individual proposed class representatives also ████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████

- An analyst at Jennison Associates LLC ("Jennison"), ████████████ ████████████████████████ ████████ testified that she understood from discussions with several underwriter analysts that "Facebook was cutting its projections … because mobile traffic was growing faster than previously anticipated."  (A-203-06 (Kuhlkin Dep. Tr. 32-35.)  The same Jennison analyst shared this information with other "other fellow buy side colleagues or friends" (A-224 (Kuhlkin Dep. Tr. 103)), including analysts at Fidelity Investments ("Fidelity") and Allen & Company ("Allen & Co."), and her husband at Deutsche Bank.  (*See* Excerpt from Ghose Report (attached hereto as Exhibit A) (illustrating how Jennison served as an "information hub" and "information source" for the spread of information to underwriters, other investors, and the general public).)

- An individual IPO allocant, Ian DelBalso, learned through email communications with his father (an employee of Jennison) that Facebook revised its revenue projections and bought 400 shares in the IPO.  (A-555-56 (JENN 0001357-58); A-560 (JENN 0006925).)

- All 20 to 30 analysts at retail brokerage firm, Gilder Gagnon Howe & Co., LLC ("Gilder"), learned that Morgan Stanley was "taking down the numbers" because of a "new disclosure from the company that the reason for increasing daily average user numbers is mobile use - which is also pressuring revenue."  (A-70-72 (Haupt Decl. ¶ 3 & Ex. A).)  Gilder purchased 500,000 shares in the IPO "on behalf of ***2150 individual investors*** on a discretionary basis."  (A-69-70 (*Id.* ¶ 2) (emphasis added).)  Gilder's knowledge is imputed to those 2,150 individual class members. *Tsereteli*, 283 F.R.D. at 213 & n.109.

- Another individual allocant, Connie Prater, wrote on a consumer news website about the Facebook IPO and was aware of pre-IPO articles by Henry Blodget, who reported about

3

Facebook telling underwriters its revised revenue projections. (A-1246 (http://blogs .creditcards.com/2012/05/good-news-or-bad-i-got-the-facebook-ipo-stock.php (last visited on April 9, 2015); A-1260 (Henry Blodget, *UH OH*: *Facebook IPO Seeing 'Weak Demand,'"* Business Insider (May 10, 2012)).)

- An analyst at TPG-Axon Capital Management LP ("TPG-Axon"), which purchased 2.5 million shares in the IPO (A-373 (FB-IPO 0005203), knew that Facebook was "'calling all analysts pulling down num[ber]s,'" and he received an internal email forwarding a May 11 Bloomberg article, which reported that "Facebook is telling analysts that sales may not meet their most optimistic projections," and that "[a]lready the company's growth has shown signs of slackening." (A-94-95 (Ter-Grigoryan Decl. ¶¶ 3-4).)

- An expert in information diffusion explained further that news about Facebook's mobile revenue impact was "broadly disseminated" in the traditional, online, and social media prior to the IPO, and included reports that "(1) mobile usage was already adversely affecting Facebook's revenue, not just that it had the potential to do so, and (2) Facebook had reduced its own internal revenue forecasts." (A-1364-65 (Ghose Report ¶¶ 11-14).)

This evidence is just the tip of the iceberg. As one investor put it several days before the IPO, "[p]eople are buzzing about" Facebook "calling sell-side analysts up and telling them that the[ir] 2Q12 revenue is heading towards the lower end of the range they previously gave them." (A-964 (TROW-00016); *see also* A-64 (Gaonkar Decl. ¶ 3) ("In the days preceding the Facebook IPO, I heard what can best be described as 'market chatter' that either Facebook or the underwriters were revising their internal projections downward.").) And even investors who may not have known precisely how Facebook had revised its projections nonetheless "understood that **Facebook had determined** that these [mobile] trends had negatively impacted and would continue to negatively impact revenue growth." (A-91 (Simonds Decl. ¶ 4) (emphasis added).) In the end, no matter how much Plaintiffs attempt to shift their theory of liability, they cannot escape the simple fact that what they call "the missing key information that's at the heart of this case" was known by thousands of institutional and individual investors.

This record easily creates the kind of "reasonable inference" of widespread actual

knowledge that requires individual inquiries and precludes class certification. *In re IPO*, 471 F.3d at 43-44 & n.14; *see also Public Employees' Ret. Sys. of Miss. v. Goldman Sachs Grp., Inc.*, 280 F.R.D. 130, 138 (S.D.N.Y. 2012). Plaintiffs' burden is not satisfied by "conclusory assertions," *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 293 F.R.D. 287, 308 (E.D.N.Y. 2013), or citations to the Complaint, *see Jacob v. Duane Reade, Inc.*, 2015 WL 525697, at *1 (2d Cir. 2015). A class action may proceed only if Plaintiffs affirmatively demonstrate "through evidentiary proof" that Rule 23 is satisfied. *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 117 (2d Cir. 2013), *cert. denied sub nom. U.S. Foods, Inc. v. Catholic Healthcare West*, 134 S. Ct. 1938 (2014) (quotation omitted). But on the key point of knowledge, Plaintiffs do not offer *any*, let alone persuasive, evidence and instead rest on bald assertions. By contrast, Defendants have compiled unrebutted evidence that thousands of ████████████████████████████████████████████████████ from different sources at different times that revealed, in one form or another, the impact mobile usage was having on revenues. Accordingly, mini-trials would be necessary to determine each potential class member's knowledge, as well as individual loss causation and materiality issues. Class certification therefore should be denied for the original proposed class and the subclasses.

## BACKGROUND

Plaintiffs alleged in their Complaint that Facebook should have disclosed in its Registration Statement what Facebook and the underwriters allegedly disclosed only to a "select" group of investors: that Facebook's projected revenues for the second quarter and the year were lower than initially projected because Facebook users were increasingly using Facebook on mobile devices where no meaningful revenue was yet being generated. Compl. ¶¶ 12-15. The proposed class representatives denied knowledge of that information prior to the IPO, *id.* ¶ 225,

and the Complaint alleged two corrective disclosures after the IPO:  (i) *Reuters* reported after trading on May 18, 2012 that "***Facebook*** [] altered ***its*** guidance for research earnings last week, during the road show," *id.* ¶ 161 (emphasis added); *see also id.* ¶¶ 18-19; *see In re Facebook, Inc. IPO Sec. & Deriv. Litig.*, 986 F. Supp. 2d 487, 504 (S.D.N.Y. 2013) ("*MTD Decision*"), and (ii) a different *Reuters* article disclosed at 1 a.m. on May 22, 2012 that ***underwriters*** had lowered their revenue projections prior to the IPO, Compl. ¶ 165; *see also id.* ¶ 20; *MTD Decision*, 986 F. Supp. 2d at 504-505.  Plaintiffs alleged that both of these disclosures caused Facebook's stock to decline.  Compl. ¶¶ 163-70.  Indeed, Plaintiffs emphasized that the second corrective disclosure on May 22 was a so-called "'bombshell'" because it reported "that the lead underwriters' analysts had cut their revenue estimates during the time period when the roadshow was occurring," and they alleged that "'the fact that these analysts suddenly all cut their earnings forecasts at the same time, during the roadshow, and this information was not passed on to the broader public, is a huge problem.'"  Compl. ¶ 167 (quoting May 22, 2012 article).

Plaintiffs now move to certify a class of "[a]ll persons and entities who purchased or otherwise acquired the Class A common stock of Facebook, Inc. … in or traceable to Facebook's initial public offering (the "IPO"), which occurred on or about May 17, 2012, and were damaged thereby."  Mem. at 5.  In the alternative, they propose two subclasses "of individual retail investors and institutional investors," *id.* at 6, without defining "retail" or "institutional."

In a turnabout, however, Plaintiffs say they "will not dispute whether the members of the Institutional Investor Subclass [which Plaintiffs identify as including at least 900 IPO allocants, Mem. at 27 n.9] were widely informed of the Syndicate Analysts' model revisions."  *Id.* at 28.  In a last-ditch effort to avoid the inevitable consequence of such widespread knowledge, Plaintiffs argue in their brief for the first time that "the basis" of their claims is that Facebook

6

failed to disclose "that ***Facebook determined*** that the mobile usage trend had already had a material negative impact on the Company's revenue for the second quarter and the year, as evidenced by the fact that Facebook cut its own revenue estimates."  Mem. at 5 (emphasis added); *see also id.* at 7, 12, 23, 29.[3]  They say further that the ***only*** evidence that Defendants can rely upon to show knowledge of that omission and misrepresentation is "Facebook's own revenue cuts," *id.* at 7, which Plaintiffs claim no one knew.  *Id.* at 28-30; *see also id.* at 7 (arguing that Defendants cannot prevail on knowledge defense because class members did not know Facebook's "own revenue estimates[4]").

The problem for Plaintiffs, however, is that Defendants have compiled a record showing that ***thousands*** of proposed class members knew exactly what Plaintiffs say "[n]o class members were told," *id.* at 5.  Following Facebook's filing of the Free Writing Prospectus ("FWP") on May 9, 2012, and following calls from Facebook's Treasurer Cipora Herman to underwriters' analysts, many investors not only learned about underwriters' revised revenue projections, but they also learned about ***Facebook's*** revised revenue projections and the impact increased mobile usage was having on Facebook's revenues.  (A-4-5 (Anmuth Decl. ¶ 8); A-11-12 (Bellini Decl. ¶ 8); A-46 (Devitt Decl. ¶ 9); (A-77-78 (Herman Decl. ¶¶ 5-6)).)  News spread rapidly to thousands of investors, both institutional and individual, and these investors learned different

---

[3]  Notably, in seeking class certification Plaintiffs do not mention their alleged claim that Facebook failed to sufficiently disclose the impact of the Company's "product decisions," Compl. ¶¶ 9, 188(b), and cannot raise it on reply.  *See Ernst Haas Studio, Inc. v. Palm Press, Inc.*, 164 F.3d 110, 112 (2d Cir. 1999) (per curiam); *Auscape Int'l v. Nat'l Geographic Soc'y*, 2003 U.S. Dist. LEXIS 27663, at *6-7 n.3 (S.D.N.Y. 2003), *adopted by* 2003 U.S. Dist. LEXIS 17104 (S.D.N.Y. 2003).

[4]  ███████████████████████████████████████████

information through different sources.[5]  The preliminary record for just a small fraction of the proposed class includes hundreds of thousands of pages of information, including: call records from underwriters' employees; scripts and talking points from those employees' calls with investors; emails between allocants and individual investors; internal emails between underwriters and allocants; emails between investors and their clients, families, and friends; and thousands of other documents showing that hundreds of investors discussed Facebook's revised revenue projections and the impact of increased mobile usage on Facebook's revenues.  The record also includes thousands of pages of varied deposition and written testimony from

---

[5]  Of course, investors also learned about the impact mobile usage was having on revenues directly from the FWP, which disclosed that the trend of users increasing more rapidly than ads being viewed had continued in "***the second quarter to date***," and attributed the continuation of that trend "in part" to "increased usage of Facebook on mobile devices," where Facebook did not show a meaningful number of ads and did not generate revenue.  (A-1006 (FWP at 1) (emphasis added); A-1069 (Registration Statement at 57) (emphasis added).)  The FWP did not disclose Facebook's (or underwriters') revised revenue projections, but it was not required to do so.  *See In re Facebook Inc. IPO Sec. & Deriv. Litig.*, 922 F. Supp. 2d 445, 472 (S.D.N.Y. 2013) ("Courts throughout the country have uniformly agreed that 'internal calculations and projections are not material facts that are require[d] to be disclosed' in a registration statement.") (quoting *Sheppard v. TCW/DW Term Trust 2000*, 938 F. Supp. 171, 177-78 (S.D.N.Y. 1996)); *see also* Securities Offering Reform, 70 Fed. Reg. 44722, 44739 (Aug. 3, 2005) (rejecting a rule that would have "require[d] projections or other forward-looking information to be included in [IPO] registration statements" because companies engaging in IPOs "are generally untested" and thus especially likely to produce uncertain projections).  Indeed, it would have been imprudent for Facebook to disclose in its Registration Statement the projections that Plaintiffs now come back to arguing should have been disclosed.  Facebook was a young, quickly growing company, and did not have a high degree of certainty in its revenue projections.  What Facebook did disclose in its Registration Statement about projections was that it is "***difficult to forecast our future results***" because "we have a limited operating history" and operate in "rapidly evolving markets."  (A-1030 (Registration Statement at 18 (emphasis added)).)  This statement proved very accurate.  At the end of the second quarter, Facebook's $1.184 billion results came in at the high end of its original $1.1 to $1.2 billion range, rather than at the low end, as it had advised its underwriters in the updated projections.  (A-995 (Facebook's Form 10-Q, July 31, 2012, at 5).)  Plaintiffs' lawsuit is thus based on Facebook's purported failure to disclose in its Registration Statement that Facebook changed its uncertain projections nine days before the IPO, even though that change was widely known in the market and turned out to be inaccurately low.

underwriters' representatives, investors' representatives, proposed class representatives, and their investment advisors about what articles individual investors read, who each spoke to about investing in Facebook stock, and what each representative or advisor learned about Facebook's revised revenue projections and the impact of increased mobile usage on Facebook's revenues. And the record includes dozens of news articles, thousands of Twitter feeds, and other online social media comments (each of which were viewed by some class members and not others), as well as an expert analysis of the spread of information about Facebook's revised revenue projections and the impact of increased mobile usage on Facebook's revenues.

All of this evidence, set forth in detail *infra* Section I, shows that thousands of individual inquiries into each proposed class member's actual knowledge of the omitted or misrepresented information are required, thereby precluding class certification.

## ARGUMENT

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013) (quotation omitted). Contrary to Plaintiffs' contention,[6] a plaintiff's burden is no different in securities cases or Section 11 cases. *See In re IPO,* 471 F.3d at 41 (reversing certification of a Section 11 class action because plaintiffs failed to "satisfy the predominance requirement for a (b)(3) class action"); *In re Kosmos Energy Ltd. Sec. Litig.*, 299 F.R.D. 133, 151

---

[6] Plaintiffs rely on *In re Constar Int'l Inc. Sec. Litig.*, 585 F.3d 774 (3d Cir. 2009), in arguing that Section 11 cases are "ideally suited for class treatment." Mem. at 22. But that case rejected an argument not raised here—that, before certifying a Section 11 class, a court must find an efficient market to ensure that materiality, loss causation, and damages can be established through generalized proof. *In re Constar*, 585 F.3d at 782. While the court noted that a plaintiff need not present "individualized proof as to an investor's reliance or knowledge," *id.* at 784, that does not help Plaintiffs here because **Defendants** have raised a knowledge defense to the Section 11 claims (citing mountains of evidence of individual knowledge) and because Section 12 requires each plaintiff to show lack of knowledge.

(N.D. Tex. 2014) (expressly rejecting argument that "a court should relax its certification analysis" in a Section 11 or Section 12 case) (quotation omitted). The district court "must receive enough evidence, by affidavits, documents, or testimony, to be satisfied that each Rule 23 requirement has been met." *In re IPO*, 471 F.3d at 41; *see also McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 221 (2d Cir. 2008). And the requirements of Rule 23 must be established for *each* proposed class and subclass, *see* Fed. R. Civ. P. 23(c)(5); *see also Ramirez v. Riverybay Corp.*, 39 F. Supp. 3d 354, 361 (S.D.N.Y. 2014), including where subclasses are created to avoid potential conflict between retail and institutional investors.[7]

Plaintiffs cite precious little evidence at all—particularly on the critical knowledge issues this Court will have to address—and have accordingly failed to satisfy Rule 23. Common issues do not predominate because the issue of class members' actual knowledge requires individual inquiries that would overwhelm any common issue, *see infra* Section I, and because the variation in class members' knowledge independently creates individual issues of causation, materiality and damages, *see infra* Section II. The proposed class representatives, not all of whom are even named plaintiffs in this action, are subject to individual knowledge and loss causation defenses that make them inadequate and their claims atypical. *See infra* Section III. And the proposed class and subclasses are overbroad and not ascertainable. *See infra* Section IV. Given the numerous individual issues and the sizeable amounts of investors' purported damages claims, a class action is not a superior method of litigation. *See infra* Section V.

---

[7] Plaintiffs note that sub-classes proposed merely "for management purposes," Mem. at 25 n.7, need not satisfy Rule 23. But that is not the case here, where Plaintiffs propose subclasses "in the alternative," Mem. at 25, that is, in the event this Court finds that their original proposed class should not be certified. Plaintiffs' "alternative" proposed subclasses cannot be certified unless they satisfy each requirement of Rule 23, which Plaintiffs have failed to demonstrate. *See Casale v. Kelly*, 257 F.R.D. 396, 409 (S.D.N.Y. 2009).

10

## I.   WIDESPREAD KNOWLEDGE OF THE ALLEGED OMISSION AND MISREPRESENTATION PRECLUDES CLASS CERTIFICATION.

Because Plaintiffs are seeking to certify a class under Rule 23(b)(3), Compl. ¶ 203, Plaintiffs must demonstrate that "more 'substantial' aspects of th[e] litigation will be susceptible to generalized proof for all class members than any individualized issues." *Myers v. Hertz Corp.*, 624 F.3d 537, 551 (2d Cir. 2010). They have failed to do so, because for each plaintiff's Section 11 claim, Defendants are entitled to "prove[] that at the time of [] acquisition [the purchaser] knew of such untruth or omission," 15 U.S.C. § 77k(a); *see also* Defendants' Answer at 50 (ECF No. 232), and for each plaintiff's Section 12(a)(2) claim the lack of such knowledge is that plaintiff's own burden, 15 U.S.C. § 77l(a)(2).

This actual knowledge "defense" under Section 11 is entitled to the same weight as any other substantive issue in determining whether Plaintiffs have proved predominance. *See Myers*, 624 F.3d at 551 (it is "well established that courts must consider potential defenses in assessing the predominance requirement"); *see also Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2561 (2011) ("[A] class cannot be certified on the premise that [the defendant] will not be entitled to litigate its statutory defenses to individual claims.") (citing Rules Enabling Act, 28 U.S.C. § 2072(b)).[8]  And the Second Circuit has recognized that, unlike an issue of constructive

---

[8]   Plaintiffs rely on *Public Employees' Ret. Sys. of Miss. v. Merrill Lynch & Co.,* 277 F.R.D. 97, 119 (S.D.N.Y. 2011), and *Dietrich v. Bauer*, 192 F.R.D. 119, 127 (S.D.N.Y. 2000), in arguing that a knowledge defense cannot defeat predominance "if the liability issue is common to the class." Mem. at 32. To begin with, Plaintiffs have also raised Section 12 claims, where knowledge is a necessary element that each class member has the burden of proving. 15 U.S.C. § 77l(a)(2); *see also* Facebook's Answer at 50 (ECF No. 232). In any event, *Dietrich* did not involve a Section 11 claim, and *Merrill Lynch* is not good law. The Supreme Court and the Second Circuit have made clear that a district court should not "give[] the 'defense' less weight in determining whether overall class certification would serve the goals of the predominance requirement." *Myers*, 624 F.3d at 551 (collecting cases); *see also Wal-Mart*, 131 S. Ct. at 2561; *Rali Series*, 477 F. App'x at 813 n.1 (holding that which side bears the burden of proof on a particular issue "does not change [the] analysis at the certification

11

knowledge, class members' "actual" knowledge is an individual issue that renders class certification inappropriate. *McLaughlin*, 522 F.3d at 233 & n.10. Moreover, Defendants need not prevail on "the merits" of whether class members had actual knowledge at the class certification stage. *See id.* at 221; *N.J. Carpenters Health Fund v. Rali Series 2006-Q01 Trust*, 477 F. App'x 809, 813 (2d Cir. 2012). The question is merely whether the record raises a "reasonable inference" that at least some investors had actual knowledge of the omission or misrepresentation, such that individualized inquiries would be required. *See In re IPO*, 471 F.3d at 43-44 n.14; *N.J. Carpenters Health Fund v. Residential Capital*, *LLC,* 272 F.R.D. 160, 169 (S.D.N.Y. 2011), *aff'd Rali Series*, 477 F. App'x at 813.

Plaintiffs insist that knowledge does not require individual inquiries because (i) "[n]o class members knew" Facebook cut its own revenue projections, Mem. at 5; *see also id.* at 7, and (ii) class members' widespread knowledge that **underwriters** revised projections raises a common question of whether investors who knew underwriters' revisions can be charged with knowledge of Facebook's revisions, *id.* at 27-30. Plaintiffs' arguments are meritless.

As set forth *infra*, Section I.A, Defendants have compiled an extensive record showing that **thousands** of class members, including some of the Lead Plaintiffs and proposed class representatives, had actual knowledge that Facebook revised its projections because increased mobile usage was already impacting revenues. That record emphatically rebuts Plaintiffs'

---

stage"). *Merrill Lynch* pre-dated *Wal-Mart*; it did not cite *Myers*; and it distinguished the Second Circuit's holding in *In re IPO* as mistakenly stating that a plaintiff bears the burden of proving knowledge in a Section 11 case, a point which the court subsequently clarified, *In re IPO Sec. Litig.*, 483 F.3d 70, 73 n.1 (2d Cir. 2006). *In re IPO*'s clarifying order underscores that the knowledge defense must be considered in the predominance analysis, because in its clarifying order, the court reaffirmed its conclusion that knowledge *did* defeat predominance. *Id.* at 73.

unsupported assertion that no one knew. *See Sicav v. Wang*, 2015 WL 268855, at \*6 (S.D.N.Y. 2015) ("[T]he Court must ensure that there is a basis in admissible evidence for each factual representation made in support of class certification to assure that a class is not certified based on conjecture as opposed to provable facts."). And, as set forth *infra* Section I.B, Defendants have also compiled an extensive record showing that many of those who may not have known that Facebook itself revised revenue projections still had actual knowledge of the "effect on revenue … the Company was currently experiencing as a result of the mobile usage trend," Mem. at 3 (quoting *MTD Decision*, 986 F. Supp. 2d at 512), because they either learned it through underwriters, media reports, or a variety of other sources.

Given this record, knowledge is not an issue that can be resolved "in one stroke," *Wal-Mart*, 131 S. Ct. at 2551, with "evidence generally applicable to the class," *Myers*, 624 F.3d at 549. Because the record demonstrates the need for individualized inquiry into each putative class member's actual knowledge, class certification is precluded. *See In re IPO*, 471 F.3d at 43-44 (reversing class certification order where "widespread knowledge" of the alleged scheme "would precipitate individual inquiries as to the knowledge of each member of the class"); *Rali Series*, 477 F. App'x at 813 (affirming denial of motion for class certification where the district court made a "permissible [] inference … that individual knowledge inquiries might be necessary"); *see also McLaughlin,*, 522 F.3d at 233 & n.10 (denying class certification for RICO claims because defense of "actual notice" was not "susceptible to common proof" and there was "no doubt that a substantial number of class members were on notice"); *In re Superior Offshore Int'l, Inc. Sec. Litig.*, 2010 WL 2305742, at \*5 (S.D. Tex. 2010) (denying class certification based on individual knowledge issues arising from "analyst" communications, information given in connection with "IPO Roadshow," and "public" information).

13

A.    **Class Members Had Actual Knowledge That Facebook Revised Its Revenue Projections Because Of The Impact Increased Mobile Usage Was Already Having On Revenues.**

Plaintiffs' new theory that only Facebook's projections count is based on an *assumption* that Facebook's projections remained a "*state secret*," and that non-disclosure agreements prevented their disclosure. Mem. at 7. That assumption is thoroughly undermined by concrete evidence that many investors were specifically told (by various sources) that Facebook revised its projections to reflect the impact increased mobile usage was already having on revenues.[9] The record already shows—and certainly supports a "reasonable inference," *In re IPO,* 471 F.3d at 43-44 & n.14—that institutional investors, who received 73.9 percent of the IPO allocation

---

[9]    While the factual record of disclosure moots the point, Plaintiffs' assumption is belied by the very documents upon which they rely. They point to Facebook's investor relations policy which instructed employees ███████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████ Facebook may have been subject to other restrictions as to what it disclosed publicly before the IPO, but it certainly was not prohibited from disclosing its revenue projections to underwriters, and it expressly contemplated that underwriters would pass the information along to their clients for purposes of pricing the IPO. ████████ ████████████████████████████████████████████████████████████████ Nor did the non-disclosure agreements prohibit underwriters from telling investors that the reason they revised their projections of Facebook's revenues was that Facebook had given them updated projections. To the contrary, ██████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████ The stand-alone fact that Facebook (as opposed to the underwriters) revised projections was immaterial, because it did not alter a total mix of information that included underwriters' revised projections and that included sophisticated investors' knowledge that underwriters rely on information from an issuer to develop their own projections. (A-1338-39, 1346-47 (Womack Report ¶¶ 28-30, 44-45).) Indeed, Cipora Herman specifically told underwriters' analysts that "[y]ou can decide what you want to do with your estimates," Compl. ¶ 133, and did not purport to preclude underwriters from calling up their clients and telling them the reason underwriters had updated their projections was because Facebook had done so.

14

(A-425-27 (FB-IPO 0115979-80)), as well as thousands of individual investors, face knowledge defenses.  Plaintiffs' assertion that "[n]o class members" knew is wishful thinking, not "provable fact[]."  *Sicav*, 2015 WL 268855, at \*6.  Accordingly, even if Facebook must rely only on evidence that investors knew Facebook had revised projections (which it need not, *see infra* Section I.B), knowledge is still "an issue that must be determined on an individualized basis as to each investor."  *In re Superior Offshore*, 2010 WL 2305742, at \*5 (citing *In re IPO*, 471 F.3d at 43-44).

1. Many Investors Knew That Facebook Revised Its Revenue Projections Because Increased Mobile Usage Had Already Impacted Revenues.

Preliminary discovery shows that thousands of putative class members, including both institutional and individual investors, learned from various sources that ***Facebook itself*** revised its projections because increased mobile usage had already impacted revenues.

A prime example is Jennison, ███████████████████████████ ███████████████████████████████ ***Less than two hours*** after Facebook's Treasurer, Cipora Herman, began calling the underwriters, Natasha Kuhlkin, a Jennison analyst (whom Ms. Herman did not call), had learned that "***Facebook*** was cutting its projections … because mobile traffic was growing faster than previously anticipated."  (A-203-05 (Kuhlkin Dep. Tr. 32-35) (emphasis added); *see also* A-545 (JENN 0001309); A-546 (JENN 0001310); A-547 (JENN 0001313).)  By 8:03 p.m. on May 9—before Ms. Herman was even halfway done with her 19 calls—Ms. Kuhlkin told all Jennison Portfolio Managers, Investment Research personnel and Trading personnel that ***Facebook was revising its revenue projections***, citing the exact numbers Ms. Herman referenced in her calls to underwriter analysts:

> In an amended S-1 filing, Facebook said that growth in mobile may negatively affect its revenues and results as the number of average users is increasing faster than the number of ads since they are currently not monetizing mobile traffic.

> *They are calling the underwriters tonight to translate this commentary into q2 revenue "guidance" which will now fall at the lower end of the $1.1-1.2b range … For the full year 2012 this means that we will shave a couple points of growth* … They are also saying this is a 6-9 month headwind which will begin to abate as sponsored stories are rolled out in mobile.

(A-547 (JENN 0001313) (emphasis added).).  Later that night, Ms. Kuhlkin discussed the same information with an analyst at Fidelity, which ultimately received 30 million shares, *over 7 percent* of the shares sold sold in the IPO.  (A-550-51 (JENN 0001343-44); A-373 (FB-IPO 0005203) (Fidelity allocation); A-1019 (Registration Statement at 7) (Facebook offered 421,233,615 shares in the IPO).)  And she discussed it with "other fellow buy side colleagues or friends" (A-224 (Kuhlkin Dep. Tr. 103)), including a business contact at underwriter Allen & Co., whom Ms. Herman never called (A-548 (JENN 0001330)).  Word spread further, moreover, along family and friend networks.  For example, Ms. Kuhlkin relayed the information to her husband at Deutsche Bank (A-553 (JENN 0001346)), and Jennison's director of research for growth equity further discussed Facebook's revisions with his sons, Ian DelBalso (a sales manager for HP Software) and Eric DelBalso (founder and general partner of Ignite Advisors, a digital marketing advisor) (A-555-56 (JENN 0001357-58)).  Knowing that Facebook had revised its projections, Ian DelBalso, purchased 400 shares in the IPO on his own behalf through Charles Schwab.  (A-560 (JENN 0006925).)

Plaintiffs undoubtedly will try to dismiss the Jennison evidence by characterizing it as knowledge of just a few investors.  Far from it.  The Jennison evidence illustrates how news about Facebook's revised projections spread along many different channels to IPO allocants, their clients, the "many thousands of people employed by the institutional investors," *In re IPO*,

471 F.3d at 43, as well as family and friends.[10]    (*See* Excerpt from Ghose Report (attached hereto as Exhibit A) (illustrating how Jennison served as an "information hub" and "information source" for the spread of information to underwriters, other investors, and the general public); A-1385-91 (Ghose Report ¶¶ 52-58 (discussing same).)

Like Jennison, Schroder Investment Management North America Inc. ("Schroder"), which purchased 300,000 shares in the IPO, knew by 10:44 p.m. on May 9, 2012 that Facebook was ███████████████████████████████████████████ ██████████████████ A-98 (Ward Decl. ¶¶ 6).)    And T. Rowe Price, which purchased █████ shares in the IPO █████████████████ and another 20 million shares in the weeks following the IPO (A-1225 (S&P Capital IQ, Facebook Public Ownership History, Feb. 24, 2015)), knew that "the company's Treasurer/IR has been calling sell-side analysts up and telling them they're 2Q12 revenue is heading towards the lower end of the range they previously gave them." (A-964 (TROW-00016).)    As Ms. Kuhlkin stated, "the fact that Facebook had cut its projections" was "fairly widely known." (A-210-11 (Kuhlkin Dep. Tr. 51-52); *see also* A-64 (Gaonkar Decl. ¶ 3) (managing director at Lone Pine Capital LLC "heard what can best be described as 'market chatter'" from "multiple sources" at "buy-side firms" about revisions before the IPO and understood "the revisions were made because the use of Facebook on mobile devices was already impacting revenue growth").)

At the time of Ms. Herman's analyst calls, Facebook was in the middle of its roadshow. (A-77-78 (Herman Decl. ¶¶ 5-6).)    As is typical, Facebook and its underwriters relied on

---

[10]  Contrary to Plaintiffs' argument, Mem. at 32-33, *In re IPO* is not limited to cases where class members were "participants" in the alleged fraud.  Rather, *In re IPO* held that even excluding participants from the class would not "lessen the broad extent of knowledge of the scheme ***throughout the community of market participants and watchers***." 471 F.3d at 44 (emphasis added).

communications with potential investors about Facebook's financial performance in order to price the IPO. (A-1336-39, 1345-46 (Womack Report ¶¶ 26-31, 43) (discussing book-building process).) *See also* Charles J. Johnson, Jr. & Joseph McLaughlin, *Corporate Finance and the Securities Laws* § 3.04[A][6] (4th ed. 2012 Supp.) ("[T]he 'clearing price' for the IPO will be established on the basis of what the institutional customers are willing to pay for the IPO shares. Having received earlier estimates, the institutional customers should of course receive any updated estimates."). Facebook's management was holding daily individual and group meetings with potential investors to discuss the IPO and answer questions. (A-394-414 (FB-IPO 0006491-6511).) At those meetings, it was clear that many investors already knew Facebook had revised its projections because increased mobile usage was already affecting revenues. (A-77-78 (Herman Decl. ¶ 6).)

Take Fidelity as just one example. Apart from having spoken to the Jennison analyst, its own analysts also spoke with at least four different underwriters—(A-462 (GS_FB_00000951); A-885 (MS_FB_00014993); A-419 (FB-IPO 0063791); A-415 (FB-IPO 0063532))—and reported to Goldman Sachs that they were "[n]ot surprised by increasing mobile usage and impact on monetization [and] revenues." (A-418 (FB-IPO 0063645).) When they later had a conference call directly with Ms. Herman and Facebook's Chief Financial Officer David Ebersman (A-421 (FB-IPO 0069695)), Fidelity's analysts wanted to discuss the Company's "revised guidance," "near-term visibility in the model," and "comfort with the 'new' numbers." (A-882 (MS_FB_00014990).) As Fidelity makes clear in a sworn declaration, it was well aware in advance of the IPO "that Facebook had reduced its guidance." (A-15-16 (Burke Decl. ¶ 4).) And contrary to Plaintiffs' theory that this information somehow indicated a "rapidly deteriorat[ing]" business that scared off knowledgeable investors (Compl. ¶¶ 7, 14), Fidelity

18

became the largest allocant in the IPO, asking for 43 million shares and receiving 30 million shares.  (A-373 (FB-IPO 0005203).)  Fidelity's portfolio managers (who were managing more than 100 mutual funds, investment trusts, and separately managed accounts), had this information as they bought Facebook shares in the IPO and aftermarket.  (A-15 (Burke Decl. ¶¶ 2- 3).)

Notably, the record also shows that the ***Lead Plaintiffs'*** investment advisors—whose knowledge is imputed to the Lead Plaintiffs, *Tsereteli*, 283 F.R.D. at 213 & n.109, ███████

█████████████████████████████████████████████████████████

█████████████████████████████████████—knew that Facebook revised its projections because of the impact increased mobile usage was already having on revenues, and nonetheless bought large IPO allocations on behalf of the Lead Plaintiffs and other clients.

- North Carolina DST's portfolio manager, Andrew Shilling, at Wellington admits he "was aware in the period prior to the IPO that Facebook was cutting its projections in advance of the IPO due to the trend in mobile."  (A-89 (Shilling Supp. Aff. ¶ 5).)  Wellington bought 6 million shares in the IPO, some of which were allocated to North Carolina DST. (A-373 (FB-IPO 0005203).)

- Sands Capital Management, LLC ("Sands"), another investment advisor for North Carolina DST, also knew by May 10, 2012 that Facebook had changed its "opinion on this year."  (A-886 (MS_FB_00014994) (email from one Morgan Stanley employee to other Morgan Stanley employees, reporting that Sands knew about "***them*** chang[ing] ***their*** opinion on this year") (emphasis added).)  Sands bought 11 million shares in the IPO and at least 649,292 in the secondary market before June 30, 2012.  (A-373 (FB-IPO 0005203); A-1225 (Facebook Public Ownership History).)

- The Chief Investment Officer of Winslow Capital Management, LLC ("Winslow"), an investment advisor for Lead Plaintiff Fresno, also knew before the IPO of Facebook's "$170 million" reduction in projected 2012 revenues, a revenue cut described to him as the "[f]astest negative EPS revision in corporate history."  (A-972 (WINS-FB-0013250, 0013583.)  Winslow bought 11 million shares in the IPO.  (A-373 (FB-IPO 0005203).)

- Waddell, another investment advisor for Fresno, also "was aware that Facebook Inc. had [] revised its revenue projections for 2012 due to increased use of Facebook on mobile

devices which was negatively impacting revenues more than had been previously expected." (A-81 (Kapoor Decl. ¶ 4).) Waddell bought 2.5 million shares in the IPO. (A-373 (FB-IPO 0005203).)

- Finally, UBS, the investment manager for Lead Plaintiff Arkansas Teacher, knew "that Facebook's revenue projections had been revised downward due to the impact that the shift to mobile usage was already having on Facebook's revenues." (A-86 (Nell Decl. ¶ 2).) UBS bought 12 million shares in the IPO. (A-373 (FB-IPO 0005203).)

Those are just the investment advisors for the Lead Plaintiffs. Many more investors learned that Facebook had revised its projections. Plaintiffs admit that "Capital Research & Management was 'warned' by an Underwriter Defendant 'about Facebook's dimming revenue prospects.'" Compl. ¶ 139. In fact, its investment divisions—Capital World Investors and Capital Research Global Investors—knew about *Facebook's* revised revenue projections and subsequently bought 9.5 million shares in the IPO. (A-18 (Casey Decl. ¶ 6); A-7 (Barrett Decl. ¶ 7).)[11] By May 10, a Capital World Investors analyst understood "that Facebook had recently lowered its internal projections of future revenues to reflect a newly anticipated decline in revenue growth," which "reflected the growing use of mobile devices to access Facebook, and the limited number of ads displayed on those devices compared with those displayed on Facebook pages accessed via personal computer." (A-17-18 (Casey Decl. ¶ 4).) A few days later, on May 15, the Capital World Investors' analyst relayed that information to his portfolio managers, telling them that "*[t]he company lowered revenue guidance during the middle of the roadshow* … the reduction wasn't all that great. Just a few percent. … The stated explanation is that people are shifting usage from the PC to the phone … There is every reason to think usage will keep shifting to mobile phones, in which case this headwind will persist for a while." (A-18

---

[11] Capital Research & Management is an investment adviser that has three equity investment divisions, including Capital World Investors and Capital Research Global Investors, both of whom independently make investment decisions on behalf of mutual funds advised by Capital Research & Management. (A-6 (Barrett Decl. ¶ 2); A-17 (Casey Decl. ¶¶ 1-2).)

20

(*id.* ¶ 5) (emphasis added).)  Similarly, a partner at Capital Research Global Investors "spoke with a number of analysts at firms acting as underwriters" and "[c]ertain of those analysts informed [him] that Facebook recently lowered its revenue projections to reflect an anticipated decline in Facebook's revenue growth."  (A-6-7 (Barrett Decl. ¶¶ 5-6).)  He then published an internal report on May 15 that said: "*[m]anagement* actually lowered guidance for the year last week[.] [P]reviously they had told the sell-side they expected post $5b revenue[;] now they think they will be $150m light because the business is shifting faster than expected to mobile."  (*Id.* (emphasis added).)

Nor was it just the largest IPO allocants who learned about Facebook's revised projections.  For example, a portfolio manager at Chilton Investment Company, which purchased 50,000 shares in the IPO, knew around May 10, 2012 that "Facebook had been calling its underwriters to inform them that Facebook had lowered its internal projections for the second quarter and full year of 2012, primarily due to mobile."  (A-61-62 (Foster Decl. ¶¶ 1, 3, 4).)  Teachers Insurance Annuity Association of America, which purchased 500,000 shares, also knew that "Facebook had revised its internal numbers to project decreased growth in 2012," and that its revisions "reflect[ed] the fact that the shift to mobile and related product decisions were already having an adverse impact on revenue growth."  (A-79 (Hirsch Decl. ¶ 3).)  And all of the analysts at retail brokerage firm Gilder, which purchased 500,000 shares in the IPO on behalf of *2150 individual investors* on a discretionary basis, knew on May 10 that the Company had disclosed that mobile use was "pressuring revenue."  (A-70-72 (Haupt Decl. ¶ 3 & Ex. A) ("Morgan Stanley is taking down the numbers today for ad revenue" because of "new disclosure from the company that the reason for increasing daily average user numbers is mobile use - which is also pressuring revenue.").)

2.      Underwriters' Representatives Discussed With Investors The Fact That Facebook Revised Its Revenue Projections.

One reason so many class members knew that Facebook revised its revenue projections is because hundreds of representatives at multiple underwriters called hundreds of investors to update them about the impact of increased mobile usage on Facebook's revenues, so that underwriters could gather additional feedback in order to price the IPO.  (A-3-4 (Anmuth Decl. ¶¶ 6-7); A-11 (Bellini Decl. ¶ 7); A-45-46 (Devitt Decl. ¶¶ 7-8).)  As the underwriters' testimony shows, and as contemporaneous notes further confirm, investors made clear during many of these calls that they knew *Facebook* had revised its revenue projections to reflect the impact of increased mobile usage.  (A-4-5 (Anmuth Decl. ¶ 8) (senior research analyst at J.P. Morgan) ("Many of them were aware that Facebook had called underwriter analysts to highlight the May 9 filing and provide[d] them with an updated revenue outlook for the second quarter of 2012 and full 2012 year."); *see also* A-11-12 (Bellini Decl. ¶ 8) (senior research analyst at Goldman Sachs) ("From the conversations that I had with analysts, portfolio managers and other representatives at institutional investors between May 10 and May 17, 2012, it was apparent to me that many institutional investors understood that Facebook had revised its revenue projections for the second quarter of 2012 and the full 2012 year, and that many investors understood that Facebook's revenues were being affected during the second quarter of 2012 by the increase in usage of Facebook on mobile devices.").)

For example, on May 10, 2012, in an internal email, a Morgan Stanley managing director reported that investors, including Fidelity, Jennison, Och-Ziff Capital Management Group LLC ("Och-Ziff"), Sands, T. Rowe Price, Criterion Capital Management, LLC ("Criterion"), and "Franklin," "think *management* got the impression that investors were getting ahead of themselves and *purposely reset the bar/expectations* to get the 'near term upside' thinking

22

crowd away from the deal"; the managing director noted that investors' "questions are all about what to pay … given near term metrics are decelerating" and "a numbers haircut during the roadshow." (A-885-86 (MS_FB_00014993-94) (emphasis added).) He also explained that T. Rowe Price was "concerned about the change last night," and that Och-Ziff thinks "*they* are trying to be as transparent as possible so as [to] not have IPO and then miss the numbers." (*Id.* (emphasis added).) Surveyor Capital believed "*they* deliberately took down #s" (A-662 (JPM_FB_00012934) (emphasis added)), and Schroder knew about "the other night's revision" (A-867 (MS_FB_00014081)), even before all the underwriters did (A-950 (SIMNA 0000132)). Loews Corporation asked "Have you ever seen *management* change guidance in the middle of a roadshow?" (A-867 (MS_FB_00014081) (emphasis added).) These May 10 references to "management," "they," and "last night's announcement," as used in internal Morgan Stanley emails, clearly refer to Facebook, and reflect investors' knowledge that Facebook itself had "reset the bar." (A-885 (MS_FB_00014993).)

Other underwriter feedback documents show that underwriters' analysts discussed "revisions" and "changes" with many investors. A Credit Suisse managing director reported on May 11, 2012 that his conversations with potential allocants were centered around, *inter alia*, "estimates," including his discussion of the "numbers" with ████ and the "changes" with ████. (A-415 (FB-IPO 0063532).) And a JP Morgan analyst noted that he was "[t]alking to a ton of investors" about "[r]ecent trends, decel[eration], revision" in "[b]ack to back calls every 1/2 hr," and that "[m]ost people [were] willing to look beyond the recent revisions and view it as a continuation of the recent trend but something that doesn't change the L[ong]-T[erm] structure." (A-667 (JPM_FB_00012939).) Goldman Sachs analysts also noted that they spoke with numerous investors, including Invesco Advisers, Inc. ("Invesco"), about "what people were

making of 2q numbers." (A-462 (GS_FB_00000951).) Pacific Crest analysts had a "[f]ollow-up call post FWP and amendment" on May 10 to "[d]iscuss[] [the] new estimates" with ███████ ████████████████████████, entities which bought over 15 million shares in Facebook's IPO (A-373-79 (FB-IPO 0005203-09)). And shortly before receiving Ms. Herman's call, a ████████████████████████████████████████████████ ██ ██ ████ █████ █ █ ██ ███ █ ██ █ ████ ████ ████████████ Morgan Stanley analysts also noted that Columbia Management Investment Advisers, LLC was "not hung up on the changes," and Carrhae Capital LLP was "[s]urprised by revisions." (A-889-90 (MS_FB_00015081-82).) There are many more examples. Alliance Bernstein L.P., Aleyeska Investment Group, L.P., American Century Investment Management, Inc. ("American Century"), Canada Pension Plan Investment Board, Citadel, Clearbridge Advisors, Guggenheim Global Trading, LLC, Invesco, Och-Ziff, SAC Capital Advisors ("SAC Capital"), UBS, Winslow, and others, all discussed with underwriters' analysts the "numbers" or "revisions." (A-661-73 (JPM_FB_00012933-45); A-453-61 (GS_FB_00000915).)

Individual investor discovery conducted so far has further demonstrated that the "revisions" to which many investors referred included *Facebook's* revisions. For example, an analyst at American Century, with whom an underwriter's representative discussed "revisions" (A-664 (JPM_FB_00012936), has stated unequivocally in a sworn declaration that he learned that "primarily due to a continued trend of increased mobile usage, *Facebook's* projected revenue ha[d] been reduced from a range of $1.1 to $1.2 billion dollars for the second quarter of 2012 to the low end of that range and from $5 billion for the full year 2012 to less than $5 billion." (A-14 (Brown Decl. ¶¶ 2-3) (emphasis added).) American Century bought 750,000

24

shares in the IPO.  (A-374 (FB-IPO 0005204).)  And an analyst at Schroder, with whom an underwriter discussed "the other night's revision" (A-867 (MS_FB_00014081)) has testified that he "acquired information and believed that Facebook personnel had informed analysts to lower revenue projections to the low-end of the prior forecasted range for the quarter."  (A-98 (Ward Decl. ¶ 6).)

Plaintiffs will surely try to dispute whether investors really knew about Facebook's "revisions" as opposed to the underwriters' "revisions," and they will insist that such a distinction somehow matters now (even though they conflated the two repeatedly in their Complaint and in their opposition to the motion to dismiss).  Indeed, in response to this submission, Plaintiffs' attorneys may seek to depose the declarants, presumably to challenge each investor's knowledge, case by case.  But that just proves the critical point.  The very case upon which Plaintiffs rely so heavily, *Fed. Hous. Fin. Agency v. HSBC N. Am. Holdings, Inc.*, 33 F. Supp. 3d 455, 480 (S.D.N.Y. 2014), makes clear that knowledge is an inquiry into individuals' subjective understanding of the omitted information that requires individual discovery.  *Id.* at 475-76 (noting that "Defendants were granted extensive discovery" to "establish actual knowledge," including "more than 19 million pages of documents" and "depositions over 46 days, questioning 29 … witnesses").  Facebook is not now required to prevail in showing that each class member was told about Facebook's revisions by one of the many different representatives from the different underwriters who had hundreds of separate phone calls with different investors; it need only show that individual inquiry is warranted to determine whether each class member (and which ones) in fact learned about the purported omission, which Plaintiffs now say is "Facebook's own revenue cuts," Mem. at 7.  *See Rali Series*, 477 F. App'x at 813.  Thus, even assuming that it matters whether an investor learned that Facebook revised its

25

projections as distinct from underwriters revising their projections (which it does not, *see infra* Section I.A.4), evidence showing that an investor discussed "revisions" with an underwriter analyst warrants individual inquiry to determine *which* revisions they discussed.[12]

> 3. The Media Reported That Facebook Revised Its Revenue Projections Because Of The Impact Of Increased Mobile Usage.

After the FWP disclosure, there was such widespread dissemination about Facebook revising its revenue projections that it was quickly reported in widely-followed media reports that many class members read. As an analyst at TPG-Axon put it ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *see also* A-367 (FB_GGHC_010178) ("Looks like [underwriter who revised projections post-FWP] read today's WSJ.").) Business Insider reported that "[t]he company is also said to have to have told investors that *it won't meet their most optimistic projections.*" (A-1260 (Henry Blodget, *UH OH*: *Facebook IPO Seeing 'Weak Demand,'"* Business Insider (May 10, 2012) (emphasis added).) The next day, Bloomberg similarly reported that "*Facebook is also telling analysts* that sales may not meet their most optimistic projections," and that "[a]lready the company's growth has shown signs of slackening." (A-1285 (Serena Saitto, et al., *Facebook IPO Said to Get Weaker-Than-Forecast Demand*, Bloomberg (May 11, 2012)).)[13] Later that week, just weeks

---

[12] Moreover, if individual inquiry shows that some investors only learned about underwriters' revisions, further individual inquiry is required for those investors to determine whether and to what extent they understood that underwriters had revised their projections based on Facebook revising its own projections, as discussed *infra* Section I.A.4.

[13] At least 12 other media outlets reported the same information over the next few days, writing: "Facebook is also telling analysts that sales may not meet their most optimistic projections." (*See, e.g.*, A-1247-1288 (Emil Protalinski, *Facebook IPO Demand is Strong and Weak (Rumors)*, ZDNet (May 10, 2012); Newsmax, *Facebook IPO Demand Said Weaker Than Expected* (May 10, 2012); *Facebook IPO: 'Expectations on Facebook are Way Too High*, WASH. POST (May 11, 2012); Kim Peterson, *Is Facebook IPO Hot or Not?*, MSN Money (May 11, 2012); Juliette Garside, *Facebook IPO Overvalued at $96bn, Say Investors*, The

into the second quarter, a commentator on Bloomberg TV reported that "I'm hearing [Facebook's] second quarter numbers are not blowing anybody away."  (A-1396-98 (Ghose Report ¶ 65).)

Plaintiffs' only response to these reports is that they raise a "common question."  Mem. at 26-27.  But "[w]hat matters to class certification ... is not the 'the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation.'"  *Wal-Mart* , 131 S. Ct. at 2551 (citation omitted).  Whether or not class members may be "charged" with knowledge of publicly available reports is not a relevant question to resolving Plaintiffs claims, *see id.*, because Defendants are not seeking to charge investors with knowledge of anything, as Plaintiffs wrongly anticipated.  Mem. at 26-27 (relying on *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 718 (2d Cir. 2011); *United Paperworks Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1199 (2d Cir. 1993), and *Public Employees' Ret. Sys. of Miss.*, 277 F.R.D. at 119).  Rather, Defendants **agree** with Plaintiffs (Mem. at 28-29) that, as *Federal Hous. Fin. Agency*, 33 F. Supp. 3d at 480, explains, the inquiry is whether each investor had **actual (not constructive)** knowledge of the specific information.[14]

---

Guardian (May 11, 2012); Serena Saitto, *Not Many Likes for Facebook IPO*, *The Calgary Herald* (May 11, 2012); N.Y. POST, *Street Snub for Facebook* (May 11, 2012); Serena Saito, *Institutions Unfriendly to Facebook*, *The Gazette* (May 12, 2012); Sunday Business Post, *Is Facebook Really Worth $96bn* (May 13, 2013); Domain-B, *Facebook Offering Seeing Lower than Expected Demand* (May 14, 2012); Douglas MacMillan, *et al.*, *Facebook's Mobile Shortcomings Loom over Thursday IPO* (May 14, 2012); Jim Kim, *Assessing Demand for Facebook Shares*, Fierce Finance (May 14, 2012)).)

[14] ████████████████████████████████████████████

27

In contrast to *Public Employees Retirement Systems of Mississippi* where the defendant pointed only to "speculation" and "conjecture" about what investors "must have known," 277 F.R.D. at 119, Defendants here have compiled volumes of evidence already showing individual investors' "'actual knowledge[]' [of the media reports,] not just that information was 'available.'" *Fed. Hous. Fin. Agency*, 33 F. Supp. 3d at 480 (citing *N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp.,* 709 F.3d 109, 127 n. 12 (2d Cir. 2013)).  For example, the founder and CEO of TPG-Axon, which purchased 2.5 million shares in the IPO (A-373 (FB-IPO0005203)), circulated to employees the Bloomberg article cited above.  (A-94-95 (Ter-Grigoryan Decl. ¶ 3).)  Based on the Bloomberg article, a TPG-Axon analyst immediately wrote that Facebook was "calling all analysts pulling down num[ber]s" and that revenue growth was now expected to be 30%, or 3.5% below $5 billion, the exact number Ms. Herman told the underwriters.  (A-95 (Ter-Grigoryan Decl. ¶ 4); ███████████████  Portfolio managers at Fidelity (which invests on behalf of over 23 million individual investors) had the same Bloomberg article.   (A-15 (Burke Decl. ¶ 3.b.i); A-1258 (https://www.fidelity.com/about-fidelity/our-customers (last visited on 4/9/2015)).)  And analysts at Gilder, whose knowledge is imputed to over two thousand individual IPO allocants, also learned through a news alert on May 11, 2012 that Bloomberg was reporting that "Facebook is telling analysts that sales may not meet the top end of their projections."  (A-364-66 (FB_GGHC_000503-05).)  Defendants have also submitted an expert report explaining that information about Facebook acknowledging mobile

28

usage's negative impact on revenue was so widely disseminated and discussed—on traditional media, online news sites such as TechCrunch and Business Insider, and social media such as Twitter—that many other investors would also have read it in one form or another before the IPO.  (A-1364-65 (Ghose Report ¶¶ 11-14).)

Defendants are entitled to ask each investor what it knew about the media reports following the FWP disclosure and probe whether they thereby learned that Facebook revised its projections.  *See In re IPO,* 471 F.3d at 43-44 (relying on reports by "two cable television networks, MSNBC and CNBC," to hold that "widespread knowledge … would precipitate individual inquiries as to the knowledge of each member of the class ");*In re Kosmos Energy,* 299 F.R.D. at 153-54 (relying in part on "conference calls or press releases issued by Kosmos" and  "negative news about production at the field from news sources" to hold that individualized inquiries would be necessary); *In re Superior Offshore*, 2010 WL 2305742, at *5 (relying in part on evidence in the "public record" that was available to potential investors to hold that individualized inquiries would be necessary).[15]

---

[15] Facebook also did not *waive* its Section 11 knowledge defense (much less Plaintiffs' burden to establish an element of Section 12) by urging investors to "rely on statements made in the prospectus," as Plaintiffs claim.  Mem. at 24 & n.6, 26.  A court "cannot infer acquiescence to the deprivation of [a] statutory … right," *Westfall v. City of Cohoes*, 1988 WL 79202, at *5 n.14 (N.D.N.Y. 1988) (quoting *Aetna Ins. Co. v. Kennedy,* 301 U.S. 389, 393 (1937)), unless "the conduct said to constitute a waiver [is] clear and unequivocal," *Mooney v. City of New York*, 219 F.3d 123, 131 (2d Cir. 2000) (internal quotation omitted); *see also NLRB v. New York Tel. Co.*, 930 F.2d 1009, 1011 (2d Cir. 1991).  Here, Facebook's statement "include[d] no mention of the [Section 11 knowledge defense or Section 12's knowledge element] … [and] evince[d] no conscious or unequivocal choice to forgo [that defense or that element of Plaintiffs' burden]." *U.S. D.I.D. Corp. v. Windstream Commc'ns Inc.*, 775 F.3d 128, 136 (2d Cir. 2014).  *SEC v. Bank of Am. Corp.*, 677 F. Supp. 2d 717, 719 (S.D.N.Y. 2010), on which Plaintiffs rely, pointed to such an instruction in evaluating materiality; it did not say anything to suggest Plaintiffs' nonsensical proposition, namely, that an investor who knows every fact purportedly omitted can still prevail on a Section 11 or Section 12 claim if the issuer includes such language in the prospectus.

29

4.      Other Investors Knew That Facebook Revised Its Revenue Projections Based On Knowing Underwriters' Revised Projections Of Facebook's Revenues.

Plaintiffs now admit (contrary to their Complaint) that it was widely known, at least among institutional investors, that underwriters revised their projections of Facebook's revenues. Mem. at 28. In light of this fatal admission, they are left to premise their entire argument for class certification on an illusory distinction between Facebook's own revised revenue projections and underwriters' revised projections, arguing that whether knowledge of the latter can be deemed knowledge of the former is a common question. There is no meaningful distinction between the two, and even if there were, individual inquiry would still be required to determine which of the many investors who were told about underwriters' revised projections understood that the reason for those revisions was because Facebook had revised its own projections.

To start, the underwriters' revised projections did not differ materially from the revised projections that Ms. Herman gave underwriters, which was that Facebook would be at "the lower end" of the $1.1 to $1.2 billion range for the second quarter of 2012 and 3 to 3.5 percent off the $5 billion target for the full year 2012 (which implied projected revenues of $4.825 to $4.85 for 2012). (A-428 (FB-IPO 0126601).) The underwriters revised their projections in line with this guidance:

30

| Revenue Projections ($ billions) | | | | |
|---|---|---|---|---|
| | Pre-FWP | | Post-FWP | |
| | Q2 2012 | FY 2012 | Q2 2012 | FY 2012 |
| Facebook[16] | 1.1 - 1.2 | 5.0 | "lower end" of 1.1 - 1.2 range | 4.825 - 4.85 |
| Morgan Stanley[17] | 1.174 | 5.036 | 1.111 | 4.854 |
| Goldman Sachs[18] | 1.2 | 5.2 | 1.125 | 4.852 |
| JP Morgan[19] | 1.182 | 5.044 | 1.096 | 4.839 |
| Bank of America Merrill Lynch[20] | 1.166 | 5.04 | 1.1 | 4.815 |

Consistent with this evidence, Plaintiffs repeatedly alleged in their Complaint that underwriters' revisions were "based on," "mirrored," and "informed" investors of Facebook's own revisions. Compl. ¶¶ 6, 13, 14, 135-37. Specifically, they alleged that after Facebook disclosed in the FWP that mobile usage had continued to increase in the second quarter, Facebook updated its revenue projections and gave those revisions to underwriters, who "incorporated the Company's internal estimates into their financial models and generated estimates that *mirrored* Facebook's guidance" and then shared that information with select investors. Compl. ¶ 108; *see also id.* ¶¶ 6, 13 (emphasis added); *MTD Decision*, 986 F. Supp. 2d at 502 (recognizing that the underwriters "revised their financial models to reflect Facebook's reduction in its revenue projections" and "immediately provided this new information to some of Facebook's most important potential investors"). The projections underwriters shared with investors were allegedly "based on" Facebook's revised projections, Compl. ¶ 126, "reflect[ed]

---

[16]  (A-428 (FB-IPO 0126601).)

[17]  (A-780 (MS_FB_00008882).)

[18]  (A-483 (GS_FB_00024644); (A-539 (GS_FB_00044259).)

[19]  (A-564 (JPM_FB_00009084).)

[20]  ██████████████████████████████

31

their estimate of the impact of the new information," *id.* ¶ 135, **and informed investors of Facebook's revisions**, *id.* ¶¶ 155-57.  Plaintiffs underscored this latter point—the information selectively disclosed to investors gave those investors a "meaningful and unfair information []advantage" by informing them of **Facebook's** revised projections.  *Id.* ¶ 167 (emphasis omitted) (discussing May 22, 2012 *Business Insider* article about underwriters' revised projections); *see also id.* ¶¶ 133-39.  And Plaintiffs relied on that selective disclosure again in arguing materiality.  Compl. ¶¶ 179-80 ("If the new information concerning Facebook's revenue declines was unimportant or already part of the total mix of information in the market, the Syndicate Analysts … would not have felt the need to hold a series of calls with a select group of Facebook's potential investors specifically to inform them of this development."); *see also MTD Decision*, 986 F. Supp. 2d at 520 (holding Plaintiffs had sufficiently plead materiality because "the revenue cuts were a 'big shock' to the investors who learned of them" and "raised 'a significant red flag' about Facebook's financial condition").

This allegation that some but not all investors knew that Facebook's revenue projections were revised because of the impact increased mobile usage was having on revenues remains the core of Plaintiffs' merits allegations.  Plaintiffs chose not to amend their Complaint on February 9, 2015—the last date for amendment.  It thus is indisputable by Plaintiffs' own words that some class members knew about Facebook's revised revenue projections because they were told about underwriters' projections.  Plaintiffs' allegations are "judicial admission[s] by which [Plaintiffs are] bound[.]" *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 167 (2d Cir. 2003) ("'plaintiff can plead himself out of court by alleging facts which show that he has no claim, even though he was not required to allege those facts' and 'judicial efficiency demands that a party not be allowed to controvert what it has already

32

unequivocally told a court by the most formal and considered means possible'") (citation omitted); *see also Whitehurst v. 230 Fifth, Inc.*, 998 F. Supp. 2d 233, 248 (S.D.N.Y. 2014). That in itself is enough to entitle Facebook to ask each class member who learned about underwriters' projections whether it knew that Facebook revised its projections.

Moreover, Plaintiffs' allegations are consistent with investors' experience with the typical IPO process. As Professor Womack explains:

> Underwriters serve a critical intermediary role throughout the IPO process by helping the issuer prepare its registration statement and prospectus and by communicating with institutional investors during the book-building process. …
> In order to educate potential investors about the issuer and the offering, it is typical for underwriter salespeople to discuss their research analysts' financial models with institutional investors. The revenue and profit estimates that come from these models are commonly called "street estimates." Although street estimates are provided to institutional investors by the underwriters (as opposed to directly by the issuer), investors generally understand that these estimates are developed by the underwriters based on information from, and in consultation with, the issuer.

(A-1329, 1337 (Womack Report ¶¶ 14, 27).) "Prospective investors look to the underwriter–a fact well known to all concerned and especially to the underwriter–to pass on the soundness of the security and the correctness of the registration statement and prospectus." *Chris-Craft Indus., Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 370 (2d Cir. 1973); *see also Fed. Hous. Fin. Agency v. Nomura Holding Am. Inc.*, 2014 WL 7232443, at *26 (S.D.N.Y. 2014) ("Congress recognized that underwriters occupied a unique position that enabled them to discover and compel disclosure of essential facts about the offering.") (quotation omitted). Indeed, "[t]he representations in the registration statement are those of the underwriter as much as they are those of the issuer." *Chris-Craft Indus.*, 480 F.2d at 370.

The evidence shows that investors in the Facebook IPO were no different. Jennison's analyst testified that she understood that underwriters' projections are generally based on an

issuer's projections, and in the Facebook IPO, in particular. (A-220-21 (Kuhlkin Dep. Tr. 98-99) ("Q. … did you also know that the underwriters developed their own models in which they estimate paid revenues? A. Yes. Based on Facebook projections. Q. … when you're looking at IPO companies, is it fairly routine for you to get underwriter projections that reflect guidance or projections from the company that is trying to go public? A. Generally, yes.").) Lead Plaintiff Arkansas Teacher acknowledged that ████████████████████████████████ ████████████████████████████████████████ ████████████████████████    ████████████████████████  Other investors in the Facebook IPO have admitted that they did not distinguish between the two sets of projections. (A-64 (Gaonkar Decl. ¶ 3) ("In the days preceding the Facebook IPO, I heard what can best be called 'market chatter' that either Facebook *or* underwriters were revising their internal projections downward. My belief was that *the revisions* were made because the use of Facebook on mobile devices was already impacting revenue growth….") (emphasis added).) They "would have assumed that the analysts were basing these projections on information received from Facebook." (A-46.2 (Ettinger Decl. ¶ 4).) Still others were aware that numerous underwriters revised their projections at the same time in the middle of Facebook's roadshow, right after the FWP disclosure about increased mobile usage. (A-15-16 (Burke Decl. ¶¶ 3.c, 4); A-886 (MS_FB_00014994) (SAC Capital thought Morgan Stanley's changes were the "highest in the syndicate").) Some even knew that underwriters called investors right after Facebook had called underwriters to highlight the FWP disclosure. (A-203-04 (Kuhlkin Dep. Tr. 32-33).) There would have been no reason for underwriters (all at the same time) to change their projections of Facebook's revenues, except for the fact that Facebook had changed its projections, and there is a reasonable inference that many investors understood exactly that,

34

thereby entitling Defendants to make individualized inquiries.

Without offering any basis for distinguishing between the two sets of projections, Plaintiffs say only that it is a common question whether knowledge of underwriters' projections is enough to charge investors with knowledge of Facebook's projections.  Again, however, "[r]eciting [common] questions is not sufficient to obtain class certification."  *Wal-Mart*, 131 S. Ct. at 2551.  Rather, the only relevant common question is one "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Id.*  And again, as noted, Defendants are not relying in opposing class certification on an argument that "a 'reasonable person' would have known" Facebook's projections, if he also knew underwriters' projections (whether or not that is in fact true).  *McLaughlin*, 522 F.3d at 233 n.10 (discussing constructive notice).  Rather, the question of each investor's subjective understanding of the different information each received, *see Fed. Hous. Fin. Agency*, 2013 WL 3284118, at *13, is a question that cannot be resolved in "one stroke."  *Wal-Mart*, 131 S. Ct. at 2551.[21]

Therefore, even under Plaintiffs' new theory that only Facebook's own revised projections count, Facebook is entitled to discover whether each individual investor who learned

---

[21]  Plaintiffs' reliance (Mem. at 30) on *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1191 (2013), is thus flawed.  *Amgen* held that a plaintiff need not prove materiality at the class certification stage in order to invoke a presumption of reliance in a securities fraud action because a failure of proof on materiality would not only preclude the named plaintiff from invoking the reliance presumption but also would defeat each class member's individual claim.  *Id.* at 1197.  Here, not only is the question Plaintiffs want to litigate—whether class members who know underwriters' projections should be charged with knowledge of Facebook's projections—irrelevant in light of the actual knowledge standard, but it is also not a question on which each class member's claim will "prevail or fail in unison."  *Id.* at 1191.  Plaintiffs cannot prevail in unison because Facebook is still entitled to show that each individual class member actually knew about Facebook's projections or the mobile usage trend's impact on Facebook's revenues.

that underwriters revised their projections also knew or in fact inferred that Facebook had revised

its projections.  *See In re IPO*, 471 F.3d at 44 n. 14 (evidence that an investor knew of facts that

raised "a reasonable inference" of the alleged undisclosed information was sufficient to

precipitate individual inquiries as to each class member's knowledge); *see also Rali Series*, 477

F. App'x at 814 (relying on "circumstantial evidence of individual purchaser knowledge").

          5.       There Is A Reasonable Inference That Many Other Investors Knew That Facebook Revised Its Revenue Projections Because Mobile Usage Had Already Impacted Revenues, Requiring Individual Inquiries.

Oddly, after emphatically claiming early in their brief that "no class members knew,"

Plaintiffs begrudgingly acknowledge later in their brief that Defendants may be able to show that

"some" institutional investors were told that Facebook cut its own revenue estimates.  Mem. at

32.  Plaintiffs then hope the Court will ignore this, pointing to *In re Moody's Corp. Sec. Litig.*,

274 F.R.D. 480, 491 n.8 (S.D.N.Y. 2011), which they seem to think stands for the proposition

that individualized questions do not predominate if "only" 12 percent of the class has knowledge.

Mem. at 32.  But they misunderstand *Moody's*.  There, the court noted in a footnote that there

was "a reasonable inference that these institutions [who sought ratings from Moody's] had

sufficient knowledge [of Moody's lack of independence] to warrant individualized inquiries," for

"institutions [that] ma[de] up only 12% of the putative class" and that those investors "should not

be included in the class."  *In re Moody's Corp.*, 274 F.R.D. at 491 n.8 (denying class certification

on other grounds).  There was no evidence in *Moody's* that other institutions, which had *not*

sought ratings from Moody's, knew of its lack of independence.

In stark contrast to *Moody's*, the relevant knowledge here is not limited to a small,

discrete or readily identifiable subset of Plaintiffs' proposed class or subclasses.  Rather, as

discussed *supra*, the evidence demonstrates that many institutions, their clients, and individuals

36

had actual knowledge that Facebook revised its projections to reflect the impact increased mobile usage was already having. Of course, at the class certification stage, Facebook has no burden to demonstrate exactly how many class members will ultimately lose based on individual issues. Rather, the issue is whether a dispositive issue "might require 'individual factual analysis' to resolve." *Myers*, 624 F.3d at 550 (sustaining this conclusion based on one deposition). The record in this case shows that "[t]here is a reasonable inference" that many of the institutional investors (to whom 73.9 percent of the shares were allocated (A-425-27 (FB-IPO 0115979-80)), as well as an untold number (at least in the thousands) of individual investors, knew Facebook had revised its revenue projections based on conversations with different representatives at different underwriters, other investors or family members, or from media reports. *See In re IPO*, 471 F.3d at 44 n.14. Defendants are entitled to discover, on an individual basis, which investors had actual knowledge and prove it as a defense to claims for damages, just as if each putative class member had sued individually.

Plaintiffs also rely on *DJ Orthopedics*, 2003 U.S. Dist. LEXIS 21534 at *7-8 (S.D. Cal. 2003), in support of their proposed subclasses. But in that case, the district court certified a subclass of all stock purchasers in an IPO who had "received a uniform disclosure of information" from underwriters," and the only disputed knowledge question was whether that disclosure immunized the issuer from liability. *Id.* at *15, *24. Here, the evidence shows that investors did not receive a "uniform disclosure," and Plaintiffs do not allege that they did. Some institutional investors (but not all) spoke with any one of hundreds of representatives at different underwriters, and each conversation involved a distinct exchange; some investors spoke with Facebook management, others did not; and some read media reports about the mobile usage trend's impact on revenues. (*E.g.*, A-63-64 (Gaonkar Decl. ¶ 2 (investment advisor who learned

37

Facebook's revisions "had a large number of conversations concerning Facebook and its [IPO] with a wide variety of market participants, including Facebook officers and employees during the road show, representatives of the various investment banking firms who were acting as underwriters … and individuals associated with a variety of different institutional investors (including other advisors to unrelated hedge funds and other 'buy side' participants').) Thus, even if all members of the proposed Institutional Investor Subclass knew about the underwriters' projections, as Plaintiffs now say they will not dispute, many of them *also* knew *other* information, including that Facebook revised its projections and that mobile usage had negatively impacted Facebook's revenues, or both.  In short, the disclosure is far from uniform.

**B.      Even Without Knowing Facebook Itself Revised Its Revenue Projections, Class Members Still Had Actual Knowledge Of The Alleged Omission And Misrepresentation.**

Plaintiffs are also wrong in arguing that Defendants can only prove a knowledge defense with evidence that investors knew that Facebook *itself* revised its revenue projections.  Mem. at 27-30.  On the merits, Defendants are entitled to present a defense that each investor had "actual," "specific knowledge" of the alleged omission or misrepresentation.  *Fed. Hous. Fin. Agency*, 2013 WL 3284118, at \*14–15.  The relevant omission and misrepresentation are not of Facebook's projections, as Plaintiffs newly argue.  This Court has made clear that Facebook was not required to disclose projections; rather, the Court held that Plaintiffs adequately alleged Facebook failed to disclose "what effect on revenue, if any, the Company was currently experiencing as a result of the mobile usage trend," *MTD Decision*, 986 F. Supp. 2d at 512, and that increased mobile usage "had already had" a negative revenue impact, *id.* at 516.  Plaintiffs themselves argued "that Facebook was required to disclose that increasing mobile usage had already had a material negative impact on the Company's revenues for the second quarter of

2012 and the year—a duty that Defendants could have fulfilled without disclosing Facebook's internal projections." Pls.' MTD Opp. at 7; *see also MTD Decision*, 986 F. Supp. 2d at 508. And Plaintiffs made clear that investors who learned about ***underwriters'*** revised projections learned about this "highly negative change in Facebook's financial condition." Compl. ¶ 14; *see also id.* ¶¶ 137-38 ("some of the biggest hedge funds and other institutions" knew the "critical information" omitted because underwriters' analysts told them about ***underwriters'*** revised projections). Knowledge of either Facebook's or underwriters' revised projections would be ***sufficient*** to alert investors of the supposedly critical information; but neither is ***necessary.***

Accordingly, far from being limited to showing knowledge of Facebook's revised projections, Defendants can also establish a knowledge defense against each proposed class member with (i) evidence that even if investors knew ***neither*** Facebook's ***nor*** underwriters' projections they still knew about the impact increasing mobile usage was already having on Facebook's revenues, or (ii) evidence that investors knew underwriters revised their projections because of the impact mobile usage was already having on Facebook's revenues. Plaintiffs are precluded from arguing otherwise. *See Intellivision v. Microsoft Corp.*, 484 F. App'x 616, 620-21 (2d Cir. 2012) ("judicial estoppel ''generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.'") (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001)).

The record Defendants have compiled shows both of those things. Some investors who may not have known that Facebook itself revised its projections still learned from a variety of sources, including underwriters, investment advisors, colleagues, and media reports, the dispositive knowledge that "mobile usage was already affecting revenue growth," *MTD Decision*, 986 F. Supp. 2d at 517. Others learned that mobile headwinds were already impacting

39

Facebook's revenues based on the underwriters' revised projections. Again, at the class certification stage, the point is not whether Defendants will universally prevail on a defense based on proving sufficient knowledge of the impact of mobile headwinds, but that the evidence is sufficient to support a "reasonable inference" of proposed class members' actual knowledge such that individualized inquiries are required. *In re IPO*, 471 F.3d at 43-44 & n.14; *see also Public Employees' Ret. Sys. of Miss.*, 280 F.R.D. at 138.

> 1. Many Investors Knew About The Impact Increased Mobile Usage Was Already Having On Revenues, Including By Knowing Underwriters Revised Their Projections Of Facebook's Revenues To Reflect That Impact.

The evidence that Plaintiffs are trying to avoid by focusing only on Facebook's revisions is that hundreds of representatives at different underwriters called hundreds of investors to give them updated revenue information based on the increased mobile usage Facebook disclosed in the FWP. (A-3-4 (Anmuth Decl. ¶¶ 6-7); A-11-12 (Bellini Decl. ¶¶ 7-8); A-45-46 (Devitt Decl. ¶¶ 7-8).) Regardless of whether underwriters' analysts directly told investors that Facebook revised its own projections (as investors testified), or whether investors inferred that Facebook had revised its own projections because there was no other reason why all of the underwriters would have revised theirs at the same time in the middle of the roadshow after the FWP disclosure, it is now largely undisputed that underwriters' analysts at least disclosed to investors that underwriters had revised their projections of Facebook's revenues to reflect the impact that mobile usage was already having on revenues. Mem. at 28.

Take lead underwriter Morgan Stanley as an example. The morning after receiving Ms. Herman's call, Morgan Stanley lead analyst Scott Devitt told Morgan Stanley's sales team that Morgan Stanley had "update[d] [its] numbers" because "the transition that [Facebook is] going through, in terms of mobile mix, and the very earlier stage that sponsored stories advertisements

40

are in is continuing to have an impact on the business." (A-893.2 (Certified Tr. of MS FB 00015393 (Audio Recording)).) Devitt told the sales team to "begin communicating these new numbers on calls this morning," and also "communicate the changes to clients that we have already spoken to." (*Id.*) Over the next week, numerous Morgan Stanley employees discussed Morgan Stanley's revised projections and the mobile revenue impact in numerous "varied" calls with potential investors and reported their feedback. (A-45-46 (Devitt Decl. ¶ 8); A-867-68 (MS_FB_00014081-82); A-885-88 (MS_FB_00014993-96).)

The same process played out at other underwriters who received calls from Ms. Herman. Using numbers that mirrored the numbers Ms. Herman gave underwriters, the lead Goldman Sachs analyst, Heather Bellini, told the sales team—including representatives from Goldman's Private Wealth Management Group, which has individual clients (A-10-11 (Bellini Decl. ¶ 6))— that "our" revenue expectations of $1.1 to $1.2 billion for the second quarter were being revised to be "closer to $1.1 billion" "primarily because the shift to mobile is happening." (A-526-29 (Certified Tr. of GS FB 00029411 (Audio Recording)); A-10-11 (Bellini Decl. ¶ 6) (described her updated revenue estimates as "changing from a range of $1.1 to $1.2 billion to closer to $1.1 billion").)[22] The Goldman Sachs research analysts had numerous "varied" calls with investors and likewise discussed Goldman Sachs's revised estimates and the impact increased mobile usage was having on revenues. (A-11 (Bellini Decl. ¶ 7).) In internal notes, the Goldman Sachs research team noted that they discussed revisions with investors including SAC Capital, Thornburg Investment Management, Coatue Management, Boston Company Asset Management, LLC, and Fred Alger Management, Inc. (A-453-61 (GS_FB_00000915); A-467-68

---

[22] Those numbers match Facebook's original projected range and revised number; Goldman Sachs's original projection for Facebook's second quarter revenues was $1.207 billion, which was revised to $1.125 billion, Compl. ¶¶ 108, 136.

41

(GS_FB_00001432-33).)

These calls are only a small sample of the communications between underwriters' representatives and investors.  Other underwriters' analysts made similar calls to other potential investors.  (*See, e.g.*, A-4 (Anmuth Decl. ¶ 7); A-930-36 (PAC_FB_00001534) (call log of 22 calls made by Pacific Crest analysts to potential investors between May 11 and May 15, 2012); A-937-49 (PAC_FB_00001607) (call log of 31 calls made by Pacific Crest analysts to potential IPO investors between May 10 and May 14, 2012); A-391-93 (FB-IPO 00062987-89).)  By May 10, 2012, Barclays reported that its sales team had already made "over 60 calls to date" including a call with North Carolina DST's investment advisor Wellington.  (A-358 (BCI_FB_00000042).)

Not only did each underwriter's sales team make individual calls to investors, but they also held conference calls with groups of potential investors that specifically tied their revised projections to Facebook's FWP and the impact mobile usage was already having on revenues.  In one example, on May 10, 2012, an analyst at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ hosted a conference call to which 140 investors dialed in, including two investment advisors for Lead Plaintiffs, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮ *see also* A-67 (Green Decl. ¶ 4).)  During that call, the analyst shared ▮▮▮ ▮▮▮▮ updated revenue projections for 2012, ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Hundreds of IPO allocants thus learned directly from different representatives at different underwriters that projections were revised, and they learned that the revisions were because of

the impact increased mobile usage was having on revenues.  This includes the investment advisors for the Lead Plaintiffs.  (*E.g.*, A-983-88 (WMC_FB005594) (Wellington); A-41-42 (Clarke Decl. ¶¶ 3-8) (Sands); A-83 (Kelly Decl. ¶ 7) (Winslow); A-990 (WRAF00017817) (Waddell); A-881 (MS_FB_00014655) A-67 (Green Decl. ¶ 4) (UBS).)  And it includes other investors who have already given declarations stating unequivocally their actual knowledge.  (A-48 (Fairbanks Decl. ¶ 5) (Och-Ziff "was aware that the underwriters had revised their revenue projections around the time of the May 9 S-1 Amendment because the trends described in the amendment were causing Facebook to experience slower than expected revenue growth in 2012."); A-92-93 (Tennant Aff. ¶¶ 6-7) (Invesco learned from several "third-party financial analysts," some of whom were employed by the underwriters, that the analysts had "revised their financial projections concerning Facebook downward prior to the IPO" "based on trends identified by Facebook in its amended S-1."); A-91 (Simonds Decl. ¶ 4) (Blue Ridge Capital, L.L.C. "was aware of the trends described in the S-1 amendment" and "understood that Facebook had determined that these trends had negatively impacted and would continue to negatively impact revenue growth."); A-87 (Searle Decl. ¶ 4) (Franklin Advisers, Inc. "received revised projections from analysts at firms that were acting as underwriters" and "understood that the change in projections was in response to the S-1 Amendment, including the report of 'increased usage of Facebook on mobile devices.'"); A-50 (Fortune Decl. ¶ 5) (a Morgan Stanley analyst informed Criterion "of a 3% reduction in his estimated Facebook revenues for the full-year 2012" and "that the estimated revenue growth for Facebook for the second quarter of 2012 was approximately 25%-30%"); A-46.2 (Ettinger Decl. ¶ 4) ("I was aware of these revised revenue projections at the time [Federated Kauffmann] purchased its shares in Facebook's IPO.").)

Take one example, KKR Asset Management LLC ("KKR"), which acquired 330,000 shares in the IPO.  KKR knew that "Facebook had determined that a shift to mobile usage had been having, and was expected in the future to continue having, a negative impact on Facebook revenue for 2nd Quarter and full year 2012."  (A-19, 26 (Chiche Decl. ¶¶ 1, 14).)  After calls with five underwriters,[23] a KKR analyst circulated an internal memorandum that emphasized the negative short-term impact of increasing mobile usage on Facebook's revenues:

> Despite near-term headwinds driven, primarily, by mobile penetration (discussed in detail below), once this impact is lapped revenue growth should accelerate to prior levels … We believe the recent slowdown in growth (and negative growth in advertising per daily average user) is due to a one-time improvement of the mobile experience and will lap at the end of this year.  We're conservatively assuming the absolute impact getting worse in the next quarter (due to timeline as well as mobile), then stabilizing.

(A-470 (GS_FB_00001543).)  Knowing this, KKR increased its order on May 15, 2012 from 230,000 shares to 330,000 shares.  (A-476 (GS_FB_00001865).)

KKR is just one of many investors who were well aware before the IPO that mobile usage "headwinds" were already impacting Facebook's revenues.  Documents show that many other investors knew about those mobile headwinds, regardless of whether they also knew that Facebook or the underwriters had revised projections.

- Lakewood Capital Management, L.P. knew that "Facebook's inability to monetize the increased mobile usage was negatively impacting Facebook's revenue growth."  (A-80 (Jackson Decl. ¶ 4).)  It purchased 300,000 shares in the IPO.  (A-375 (FB-IPO 0005205).)

- Kingdon "understood that Facebook's revenue growth had already been reduced based on the mobile usage trends."  (A-78.1 (Hilal Decl. ¶ 6).)  It purchased 500,000 shares in the IPO.  (A-375 (FB-IPO 0005205).)

---

[23]  (A-642 (JPM_00011459); A-465 (GS_FB_00001395); A-639 (JPM_FB_00011287); A-873 (MS_FB_00014200); ██████████████████████

44



- Legg Mason, Inc. knew that "[m]obile is a challenge to monetize" and that "[t]he mobile shift is happening faster," which was was creating "a short term disconnect[.]" (A-677-78 (LM-0008-09).)  It purchased 1.5 million shares in the IPO.  (A-374 (FB-IPO 0005204).)

- Federated Kaufmann was "[c]oncerned about decelerating growth and trying to understand how much from mobile[.]"  (A-375 (MS_FB_00014169).)  It purchased 5 million shares in the IPO.  (A-373 (FB-IPO 0005203).)

- Canada Pension Plan Investment Board did not "seem to be getting hung on [] slowing growth in the near term and thinks mobile is a huge opportunity down the line[.]"  (A-452 (GS_FB_00000833).)  It purchased 500,000 shares in the IPO.  (A-375 (FB-IPO 0005205).)

- Maple Lane Capital, LLC believed that "investors should be bullish on the long-term implications of the shift to mobile despite the short-term hiccups in growth from the lack of mobile monetization.  (A-889 (MS_FB_00015081).)  It purchased 200,000 shares in the IPO (A-376 (FB-IPO 0005206), and another 350,000 shares in the weeks following the IPO (A-1225-43 (S&P Capital IQ, Facebook Public Ownership History, Feb. 24, 2015)).

- Turner Investment Partners "walked through mobile impact on revenue" with Goldman Sachs.  (A-459 (GS_FB_00000915).)  It purchased 1.7 million shares in the IPO.  (A-374 (FB-IPO 0005204).)

These are just a handful of examples that Defendants have compiled from the limited discovery to date.  The record clearly shows that investors had different information from different sources, and many knew more than the simple, stand-alone fact that underwriters revised projections.  Many investors learned that underwriters revised projections right after the FWP disclosure in order to reflect the revenue impact of increasing mobile usage that was already occurring.  Others knew about the impact of mobile usage, even if they did not also know about underwriters' revisions.  One research service provider, Susquehanna Financial

Group, LLP, learned about the impact based on Facebook's FWP disclosure, not based on any knowledge of Facebook's or underwriters' projections. (A-1294-1301 (Susequehanna Report, May 14, 2012).)  It reduced its own projections over $100 million, more than underwriters' reductions. (*Id.*)  Numerous investors, including Fresno's two investment advisors, were aware of the Susequehanna Report's disclosure of its own reduction.  (A-989 (WRAF00016418) (Waddell); A-975-77 (WINS-FB-0007694-96) (Winslow); A-542-44 (JCM_E00001944-46) (Janus); A-558-59 (JENN 0002672-73) (Jennison); ███████████████████████ ; A-917-18 (NB00005972-73) (Neuberger Berman); ████████ ████████████████████████████████ Information about the revenue impact, not Facebook's or underwriters' projections, is what this Court ruled is the allegedly critical undisclosed information, *see MTD Decision*, 986 F. Supp. 2d at 512 (Facebook allegedly did not disclose "what effect on revenue, if any, the Company was currently experiencing as a result of the mobile usage trend"), and is therefore the crux of the knowledge issue.  Rather than being discounted, the evidence that so many investors knew underwriter's revisions and the impact of mobile usage on revenues shows that Defendants are entitled to inquire into each individual investor's actual knowledge.

        2.      The Media Reported That Increased Mobile Usage Was Already Impacting Revenues.

Information about the impact of increased mobile usage was so widespread that the media quickly picked up on the story.  As one of the largest and most scrutinized IPOs in history, Facebook's activities in the weeks leading up to the IPO were widely discussed through nearly every old and new media channel available.  (A-1364, 1392-99, 1401-07 (Ghose Report ¶¶ 11-12, 60-67, 75-82).)  In addition to the articles that specifically disclosed that Facebook itself had revised its projections, *see supra* Section I.A.3, the media also widely reported the negative

impact mobile usage was having on Facebook's revenues, including that underwriters had revised their projections after the FWP disclosure about increased mobile usage in the second quarter.  Facebook's expert, Dr. Anindya Ghose, has opined that information about the negative impact mobile usage was having on revenues spread widely through a number of different media channels.  Traditional media such as CNN, CNBC, and Bloomberg covered the mobile revenue impact, disseminating information to millions and millions of viewers.  (A-1364, 1392-99 (Ghose Report ¶¶ 11, 60-67).)  Online media—through blogs and online articles—covered it on a real-time basis, exposing millions more potential investors to precisely the information Plaintiffs claim was omitted and misrepresented.  (A-1364, 1401-07 (*id.* ¶¶ 12, 75-82).)  Dr. Ghose opines that "[t]weets" by influential Twitter users exposed up to 1.68 million individuals directly to discussions about Facebook's mobile revenue impact.  (A-1416-17 (*id.* ¶ 107).)

In some instances, all class members had to do was read article titles to learn the supposedly "critical" information at the crux of this case.  In an article titled, "Facebook warns potential investors that ***mobile is an even bigger risk than originally disclosed***," the Washington Post reported on May 10, 2012 that Facebook "amended its prospectus" to warn potential investors about the impact of mobile, explaining that "the revised mobile warning seems especially pertinent after Facebook reported a disappointing first quarter."  (A-1257 (emphasis modified).)  And on May 9, 2012, *PrivCo* reported that Facebook "Effectively Warns Investors That Facebook ***Will Miss Its Second-Quarter Projections*** … Serious Blow Hitting Mid-IPO-Roadshow."  (A-1278-81 (PRIVCO, *Facebook Admits Mobile Shift Damaging Business Faster Than Expected In New SEC Filing; Will Miss Q2 Projections* (May 9, 2012) (Facebook admits that rapid shift to mobile "***is now badly harming the current quarter as well***") (emphases added).)  The Financial Times also reported that "Facebook said the migration of its users to

47

mobile platforms *is compromising* its ability to make money from them."  (A-1244-45 (April Dembosky, *Facebook admits to mobile weakness*, Fin. Times (May 9, 2012) (emphasis added).)[24]

The mobile usage trend was also reported widely on television and radio.  For instance, during a May 10, 2012 panel that aired on CNBC, a panelist stated that "[Facebook's] business is *decelerating fast*" because "the mobile thing is a big deal" and Facebook has not "figured out how to make a lot of money there, and that's a big transition."  (A-1394-96 (Ghose Report ¶ 64); *see also* A-1396-99 (*id.* ¶¶ 65, 66 (citing additional television reports)).)  The day before, on National Public Radio an investor-commentator explained Facebook's mobile vulnerability by saying that "***right now they [Facebook] are losing money every time a user accesses Facebook via a mobile device***."  (*Amid Facebook IPO Hype, Some Doubt Company's Future,* Here & Now (May 9, 2012) (audio at http://hereandnow.wbur.org/2012/05/09/facebook-ipo-companies, at 7:17 of 7:46)); *see also* A-1393-94 (Ghose Report ¶ 63).)  And such discussions were Tweeted about, as the investor-commentator distributed links to his NPR interview through Twitter.  (A-1419-24 (Ghose Report ¶ 112).)

An expert on information diffusion, Dr. Ghose, opines that each media report was viewed by thousands of potential Facebook investors, and each story was shared and discussed among even more individuals.  (A-1392-93 (Ghose Report ¶ 62).)  Take one story published by TechCrunch on May 12, 2012, which stated that "'the street' has picked up on the fact that the

---

[24] Similar articles appeared in widely read sources in the week between the issuance of the FWP and the IPO.  (A-1276-77 (Paul Sloan, *Facebook Amends IPO Filing: Mobile a Growing Problem*, CNET (May 9, 2012) ("Facebook today amended its S-1 filing with the SEC… to emphasize how the shift of its users to mobile devices is hurting what it can charge for ads, threatening its long-term revenue. …. The trend has continued to date in the second quarter.")).)

rate of ***revenue growth is declining*** as traffic migrates to mobile." (A-1269-71 (Keith Teare, *Mobile Facebook and Google Can't Live With It and They Can't Live Without It*, TechCrunch (May 12, 2012) (emphasis added)).) The story further explained that Facebook had acknowledged "the ***actuality*** of the [mobile] trend" and that, as a result of this trend Facebook is experiencing "declining APRU (average revenue per user) … in [the] current quarter." (A-1269 (*id.*).) This article was shared by over 2,100 TechCrunch users on social media and posted on Twitter by over 970 Twitter users who had a total of 8 million followers that may have been exposed to the Tweets. (A-1471-72, 1475 (Ghose Report at Exs. 4 & 7.1).) For example, one Twitter user with extensive ties in the financial world posted the TechCrunch article and commented "Facebook Amends IPO S-1 To Admit Advertising ***Biz Hurt By Increasing Shift To Mobile***." (A-1418, 1419-24 (*id.* ¶¶ 110, 112) (emphasis added).) Given the various channels through which articles like this were diffused, Dr. Ghose opines that such articles were "broadly disseminated" to many potential IPO investors through various means. (A-1365 (*id.* ¶ 14).)

Not surprisingly then, Defendants have already obtained a declaration from an analyst at KKR, which purchased 330,000 shares in the IPO, stating that this TechCrunch article "reinforced" his "understanding that increased mobile usage and product decisions ***had*** negatively affected Facebook's revenues[.]" (A-19, 24 (Chiche Decl. ¶¶ 1, 10).) Fidelity likewise had the same article. (A-15 (Burke Decl. ¶ 3.b.ii).)

This widespread media discussion, as well as the the evidence showing that investors in fact read the media reports and learned about the negative impact mobile usage was having on revenues, further demonstrates the need for individualized inquiries.

**C.      Retail Investors Also Had Actual Knowledge Of The Alleged Omission And Misrepresentation.**

Recognizing that their argument that only Facebook's projections count rests on shaky

49

ground, and recognizing that institutional investors who were involved in the IPO pricing process and purchased the bulk of the IPO allocation had widespread knowledge, Plaintiffs "[a]lternatively" propose a retail subclass. Mem. at 6. They insist that even though institutional investors may have had knowledge, there is somehow a wall between the "900 institutional investors" in the Institutional Investor Subclass, Mem. at 27 n.9, and that members of the Retail Investor Subclass definitely "were not told prior to the IPO that either Facebook or the Syndicate Analysts cut their revenue estimates." Mem. at 25. This assertion too has no evidence to support it; this alone is sufficient reason to reject it. *Sicav*, 2015 WL 268855, at *6. And, in any event, the record emphatically refutes it—over two thousand individual investors are subject to individual knowledge defenses based on just one retail brokerage firm's knowledge. (A-69-75 (Haupt Decl. & Ex. A).)

Plaintiffs themselves allege that many retail investors purchased stock in the IPO. Compl. ¶ 148. Many of them did so ***through accounts managed by investment advisors*** who knew that Facebook revised its revenue projections because of the impact increasing mobile usage was having on revenues. The knowledge of these advisors is imputed to their clients. *See Tsereteli*, 283 F.R.D. at 213 & n.109. Examples of such knowledge, many of which have already been discussed *supra*, include Gilder, which "purchased 500,000 shares in [Facebook's IPO] on behalf of 2150 individual investors on a discretionary basis." (A-69-70 (Haupt Decl. ¶ 2).) As Gilder's Chief Compliance Officer explains in a declaration, "all of Gilder's 20-30 analysts, who were closely involved in Gilder's decision to purchase Facebook IPO stock on behalf of individual investors," learned from a colleague on May 10 that "Morgan Stanley is taking down the numbers today for ad revenue, quoting new disclosure from the company that the reason for increasing daily average user numbers is mobile use - which is also pressuring

50

revenue." (*Id.* ¶ 3 & Ex. A.)   Gilder had "a four-on-one meeting with [Facebook's] COO" just two days after the FWP disclosure. (*Id.* Ex. A.)

Other money managers that knew about Facebook's revised projections and the impact increased mobile usage was already having on revenues also bought shares in the IPO on behalf of individuals (*i.e.*, those presumably intended to be members of the "retail" subclass). ████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

Wellington bought stock in the IPO not just for Lead Plaintiff North Carolina DST but for other clients (A-88 (Shilling Supp. Aff. ¶ 1)), which include "large single- and multi-family offices, family foundations, and independent wealth advisers" (A-1302 (https://www.wellington.com/en/family-offices (last visited on April 9, 2015)).

In addition, Defendants have already discovered that some individual investors learned the information directly.   Individual investors are not typically involved in the IPO pricing process and are "price takers." (A-1334-35 (Womack Report ¶ 24).)[25]  Nonetheless, some seek IPO allocations, which underwriters typically give in greater concentrations to wealthy, sophisticated investors whose brokers have access to IPO shares and conclude that such an

---

[25] That retail investors are price takers also means it does not matter whether retail investors have independent knowledge of the omitted information, given that Plaintiffs alleged that the omitted information was disclosed to institutional investors as part of the pricing process, and therefore would have been incorporated into the IPO price. (A-1345-46 (Womack Report ¶ 43).)  This is underscored by the individual proposed class representatives, most of whom have admitted that they would have purchased Facebook stock regardless of the IPO price ████

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

investment is suitable for the investor. (A-1282 (http://www.sec.gov/answers/ipoelig.htm (brokerage firms may only allocate IPO shares to eligible individuals "in light of [their] income and net worth, investment objectives, other securities holdings, risk tolerance, and other factors"); ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████ Such sophisticated individual investors are more likely to have connections through which they may have learned about Facebook's revised projections and the impact mobile usage was having on Facebook's revenues.

For example, one individual IPO allocant, Ian DelBalso, learned from his father, an employee of an institutional IPO allocant, that Facebook revised its projections because of the impact of increasing mobile usage (A-555-56 (JENN 0001357-58)); he was allocated Facebook stock through Charles Schwab (A-560 (JENN 0006925)). Another IPO allocant, Larry Kim, purchased shares through a Morgan Stanley broker and he knew—and published numerous articles on his blog leading up to the Facebook IPO—about the impact of increasing mobile usage on revenue, writing that "Facebook doesn't offer mobile advertising (a huge hole, especially with mobile use growing so fast)," "Facebook simply hasn't yet figured out how to successfully integrate Facebook ads into the mobile app," and "figuring out mobile Facebook ads will be crucial to capitalize on ad revenue." (A-1310 (http://www.wordstream.com/articles/facebook-vs-google-display-network, and (A-1314-21) http://www.wordstream.com/blog/ws/2012/05/17/why-i-bought-facebook-shares (last visited on April 9, 2015)).) Another example is Connie Prater. A writer on a consumer news website, Ms. Prater wrote about the Facebook IPO and referred readers to articles by Henry Blodget, who highlighted Facebook's decelerating revenue growth and its telling underwriters of revised

revenue projections.   (A-1260 (Henry Blodget, *UH OH*: *Facebook IPO Seeing 'Weak Demand,'"* Business Insider (May 10, 2012)); A-1246 (http://blogs.creditcards.com/2012/05/good-news-or-bad-i-got-the-facebook-ipo-stock.php (last visited on April 8, 2015)).) Ms. Prater was allocated 50 shares in the IPO through e*Trade and wrote after the IPO that she knew that analysts had "warned about overvaluation and low chances of future earnings growth," and that she "went in to it knowing the risks." (A-1246.1 (*id.* at comments section).)

Plainly Defendants are entitled to take individual discovery of Mr. DelBalso, Mr. Kim, and Ms. Prater, as well as the 20-30 analysts at Gilder who were involved in the decision to purchase Facebook stock in the IPO on behalf of thousands of class members, and then present evidence that each individual investor (or advisor) knew enough about the revenue impact of increasing mobile usage to preclude liability.  And Defendants are entitled to ask the same of other investors who received a portion of, *inter alia,* Morgan Stanley's retail allocation, which was 53 million shares (A-895 (MS_FB_00016101)), e*Trade's retail allocation (4.5 million shares (*id.*)), or Charles Schwab's allocation (1.5 million shares (*id.*)).  Thousands of investors also were exposed to news articles and social media like Mr. Kim's blog and Ms. Prater's articles, to say nothing of the many print, TV and radio reports that highlighted Facebook's mobile vulnerability.  *See supra* Section I.B.2 (discussing media reports of omitted information and Ghose expert analysis of media dissemination).  Indeed, two proposed "typical" retail class representatives testified that before the IPO they █████████████████████████

███████████████████████████████████████████████

████████████████████████████████

This record amply supports a reasonable inference that, like institutional investors, many

thousands of individual investors learned the allegedly omitted and misrepresented information—through their investment advisors, employees at institutional allocants, or the media—sufficient to warrant individualized inquiry.

## II. THE VARIETY OF INFORMATION PROVIDED TO DIFFERENT INVESTORS ALSO CREATES INDIVIDUAL CAUSATION, DAMAGES, AND MATERIALITY ISSUES THAT PRECLUDE CERTIFICATION.

The same knowledge issues independently demonstrate that Plaintiffs have not carried their burden to prove that causation and damages are class-wide issues, *Comcast*, 133 S. Ct. 1426, and that materiality will be a common question. Indeed, the conflicting positions within the proposed class on these issues create impermissible conflicts. This provides an additional reason why class certification must be denied.

### A. *Comcast* Precludes Certification.

As the Second Circuit has recognized, *Comcast* emphasized that "[c]ourts should examine the proposed damages methodology at the certification stage to ensure that it is [1] consistent with the class-wide theory of liability and [2] capable of measurement on a class-wide basis." *In re U.S. Foodservice*, 729 F.3d at 123 n.8. These inquiries apply to Securities Act cases. *See Fort Worth Emps. Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 137 (S.D.N.Y. 2014) (denying certification of a damages class).[26] Plaintiffs' class certification motion does not pass either examination.

---

[26] *Fort Worth* granted limited class certification for liability purposes only, pursuant to Rule 23(c)(4). 301 F.R.D. at 142. Here, Plaintiffs have not requested such limited certification, and they cannot raise a new argument in a reply brief. *Ernst Haas Studio*, 164 F.3d at 112; *Auscape Int'l*, 2003 U.S. Dist. LEXIS 27663, at *6-7. In addition, Plaintiffs may not use Rule 23(c)(4) as an end-run around the predominant individual issues presented here. *See Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, 269 F.RD. 252, 266 & n.114 (S.D.N.Y. 2010) (when investors present "significant, individualized issues of reliance, causation, and damages," a liability class "would not meaningfully reduce the range of issues in dispute or promote judicial economy") (citing Second Circuit cases), *aff'd*, 772 F.3d 111 (2d Cir. 2014).

1.     Plaintiffs Seek Damages Inconsistent With Their Class-wide Liability Theory.

A class cannot be certified unless plaintiffs propose a damages methodology that "must measure only those damages attributable to [plaintiff's] theory" of class-wide liability.  *Comcast*, 133 S. Ct. at 1433.  Under *Comcast*, when a class-wide damages methodology "detects injury" to some class members from a cause that is not part of the class-wide liability theory, this "would shred the plaintiffs' case for certification."  *In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No. 1869*, 725 F.3d 244, 252-53 (D.C. Cir. 2013); *see In re BP p.l.c. Sec. Litig.*, 2013 WL 6388408, at *15-17 (S.D. Tex. 2013) (denying class certification where the class-wide damages theory did not "track" Plaintiffs' liability theories).

The Complaint alleges that the May 22 *Reuters* story about the underwriters' revised projections caused Facebook's stock price decline on May 22—nearly half of the alleged class damages.  *E.g.*, Compl. ¶ 184 ("[W]hen news of Facebook's *and the Syndicate Analysts' reduced estimates* was disclosed to the market … Facebook stock fell precipitously, declining nearly 11% on May 21, *and approximately 9% on May 22* ….  The financial press specifically attributed these decline*s* to the disclosure of Facebook's *and the Syndicate Analysts'* reduced estimates.") (emphasis added); MTD Opp. at 18-21 (making same two corrective disclosures argument); *see also MTD Decision*, 986 F. Supp. 2d at 523 ("the May 19 [sic] and May 22 *Reuters* reports constituted corrective disclosures").[27]

---

[27] While some Plaintiffs suggested that the May 22 *Reuters* report contained ███████ ████████████████████████████████████████████████████████████ it is clear by Plaintiffs' own allegations and the May 22 *Reuters* report itself, that the new information that Plaintiffs alleged in their Complaint was a corrective disclosure was "that it was almost unprecedented for a *lead underwriter* to significantly cut its revenue estimates in the midst of the roadshow."  Compl. ¶ 166 (emphasis added); *see also id.* ¶ 167.

But Plaintiffs' class certification motion has stripped this cause out of their class-wide liability theory.  Under their new theory, the "Syndicate Analysts' model revisions"—*i.e.*, the only information in the second corrective disclosure—does ***not*** "form[] the basis of Plaintiffs' claims."  Mem. at 7, 23, 28.  Rather, to avoid Facebook's knowledge defense, Plaintiffs seek to certify a class based on the premise that "the critical fact" that was concealed is only that "***Facebook*** determined that the mobile usage trend had materially impacted its revenues prior to the IPO, and slashed *its* ***own*** revenue estimates as a result."  Mem. at 13-14, 23 (emphasis added).  This mismatch between the broad class damages alleged and their current liability theory is exactly what *Comcast* forbids.

2.    Plaintiffs Have Not Met Their Burden Of Enabling The Court To Weigh The Impact Of Individualized Causation And Damages Issues**.**

As the Second Circuit has noted, "the fact that damages may have to be ascertained on an individual basis [is] simply one factor that we [had to] consider in deciding whether issues susceptible to generalized proof 'outweigh' individualized issues when certifying the case as a whole."  *Roach v. T.L. Cannon Corp.*, 2015 WL 528125, at *3 (2d Cir. 2015) (brackets in original, quotation omitted).  Although individualized damages inquiries "are not ***necessarily*** inconsistent with class certification," the Court "must understand, concretely, how plaintiffs propose to reliably establish damages" in order to evaluate predominance and superiority.  *Sicav*, 2015 WL 268855, at *6.  Class certification should be denied when Plaintiffs do not show how "'damages [can] ***feasibly*** and ***efficiently*** be calculated once the common liability questions are adjudicated.'"  *Rahman v. Mott's LLP*, 2014 WL 6815779, at *8 (N.D. Cal. 2014) (emphasis added) (quoting *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013)).  This showing requires "evidentiary proof."  *Comcast*, 133 S. Ct. at 1431-33 (emphasis added).

56

Here, however, Plaintiffs do not even provide a conclusory description of their damages methodology, much less the required evidentiary submissions.  This failure by itself warrants denying class certification, in light of the mismatch between their new liability theory and alleged class-wide damages theory.  *See Sicav*, 2015 WL 268855, at \*6 (denying class certification where plaintiffs failed to explain how damages would be proven when there were logical inconsistencies within the plaintiffs' pleadings); *Fort Worth*, 301 F.R.D. at 141 (denying class certification for damages where the plaintiff's expert in a Section 11 case failed to create a damages model); *Randolph v. J.M. Smucker Co.*, 303 F.R.D. 679, 698 (S.D. Fla. 2014) (denying class certification in the absence of a damages model supported by "hard-and-fast evidence"); *In re Kosmos Energy*, 299 F.R.D. at 152 (plaintiffs' mere "prediction that common proof *will be* offered at a later stage in the proceedings" does not suffice).  Nor can Plaintiffs belatedly use their reply to provide their damages methodology.  *See supra* at notes 3, 26.

It is no surprise that Plaintiffs' motion did not even hint at their damages methodology, because such a methodology would reveal that Plaintiffs improperly lump investors with very different levels of pre-purchase knowledge into one loss causation basket.  But, as here, where "individuals may have relied on defendants' misrepresentation to varying degrees in deciding to invest …, loss causation cannot be resolved by way of generalized proof." *Abu Dhabi Commercial Bank*, 269 F.R.D. at 265; *accord McLaughlin*, 522 F.3d at 226.  This is illustrated by *In re BP P.L.C. Sec. Litig.*, 2014 WL 2112823, at \*11-12 & n.14 (S.D. Tex. 2014).  *BP* denied certification because Plaintiffs could not use the same price decline after an actual event to measure loss causation for both (i) those who purchased with knowledge of the actual event but alleged that the company minimized how bad the actual event was, and (ii) those who

57

purchased before the event and alleged that the company concealed the risk of a possible event. *Id.*

Here, the Plaintiffs' motion did not even attempt to meet their burden of explaining how they can use the price decline after the May 18 *Reuters* story to measure both the loss causation from allegedly shocking new information for an uninformed investor and the loss causation from a re-reporting of information previously known to many institutional investors. Indeed, according to the Complaint, institutional investors had "a ***meaningful and unfair*** information []advantage" before the IPO, Compl. ¶ 167 (emphasis added), and many purchased nonetheless. As Plaintiffs' counsel admitted, institutional investors had "a whole bunch of different reactions" to the pre-IPO forecast reductions. Mot. to Dismiss Hr'g Tr. at 39 (Oct. 8, 2013) (ECF No. 164). Those who purchased nonetheless cannot claim loss causation even if there was a more negative reaction by some other investors or bloggers to information in the May 18 *Reuters* story that institutional investors knew before the IPO. *See Meyer v. Greene*, 710 F.3d 1189, 1199 (11th Cir. 2013).

Nor is the variance in pre-purchase information the only source of individualized loss causation issues. Some class members will have losses attributable to the May 18 NASDAQ trading system failures. For example, one of the Lead Plaintiffs, Fresno, faces a serious loss causation problem because one of its investment advisors, Winslow, on May 18 tried to sell and ***believed it had sold*** 6 million shares at $41.25 (a $3.25 profit) on behalf of its clients, including Fresno. Because of NASDAQ trading errors, however, only 1.5 million of those shares were sold, and at a lower price of $40.0188. (A-978 (WINS-FB-0010706); A-978.1 (WINS-FB-0014305).) But for NASDAQ's trading errors, in other words, Winslow's May 18 sale at $40.0188 of Fresno's 7,900 shares could instead have been four times as many shares (31,600) at

a higher price ($41.25).  In fact, UBS (a proposed

class member) has filed its own claims alleging that NASDAQ is to blame for its losses. *See*

*NASDAQ OMX Grp., Inc. v. UBS Secs. LLC*, 957 F. Supp. 2d 388 (S.D.N.Y. 2013), *aff'd* 770

F.3d 1010 (2d Cir. 2014) (discussing UBS's claims against NASDAQ).

An individual inquiry is thus needed to

determine to what extent NASDAQ's trading system failures prevented Fresno, UBS, and many

other putative class members from selling shares at a profit on May 18, or from purchasing

shares at a lower price, which would preclude or limit liability for those shares under Sections 11

and 12. *See* 15 U.S.C. § 77k(e); 15 U.S.C. § 77l(b).

Given the broad variance of pre-purchase knowledge among investors, as well as the

individual NASDAQ trading issues, the individual loss causation and damages issues contribute

substantially to the predominance of individualized issues. *See In re Smart Techs.*, 295 F.R.D. at

60 (excluding a group of investors from the class where adjudicating negative loss causation

defenses "would create an unnecessary 'sideshow'").[28]

---

[28] By contrast, *N.J. Carpenters Health Fund v. Residential Capital, LLC*, 2013 WL 6839093, at *5 (S.D.N.Y. 2013), is distinguishable there was no evidence that some investors had significant pre-purchase information. Instead, "even the most sophisticated class members did not have access" to any of the information on which damages were based. *N.J. Carpenters Health Fund v. Residential Capital, LLC*, 2012 WL 4865174, at *3 (S.D.N.Y. 2012). There were also no intervening cause issues like the NASDAQ debacle.

**B.**      **Investors' Widely Varied Knowledge Creates Individual Materiality Issues.**

By the same token, that investors had variable information also makes materiality an individual issue.  Given Plaintiffs' theory and the existing evidence, this case is unlike most securities cases, where "the alleged misrepresentations and omissions, whether material or immaterial, would be so ***equally for all investors*** composing the class."  *Amgen*, 133 S. Ct. at 1191 (emphasis added).

Variations in knowledge, which are both intrinsic to Plaintiffs' theory and appear in the record evidence, create multiple individual materiality issues because "materiality is undoubtedly a flexible concept due to its fact-specific nature."  *Litwin v. Blackstone Grp.*, 634 F.3d 706, 722 (2d Cir. 2011).  Specifically, materiality is assessed "in light of the disclosures [the issuer] made ***and other information*** that … was available to investors during the class period."  *Shemian v. Research In Motion Ltd.*, 570 F. App'x 32, 36 & n.4 (2d Cir. 2014) (emphasis added).[29]  Where (as here) other information available to many investors "fairly captured" the substance of that allegedly omitted information, "not attributing that [available information] to" one particular source is immaterial.  *In re Sanofi Sec. Litig.*, 2015 WL 365702, at *25 (S.D.N.Y. 2015) ("Although not attributing that sentiment to the FDA, that statement fairly captured the FDA's admonition to the company …." ) (dismissing claims under the Securities and Exchange Acts).

This Court's decisions in *In re Bear Stearns Cos., Inc. Securities, Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423 (S.D.N.Y. 2011) (Sweet, J.) ("*Bear Stearns I*"), and *Wang v. Bear Sterns Cos.* 14 F. Supp. 3d 537 (S.D.N.Y. 2014) (Sweet, J.) ("*Bear Stearns II*"), confirm that materiality is not a common question when the mix of available information varies.  *Bear*

---

[29] Cases like *Shemian* that address materiality under Section 10(b) of the Exchange Act govern this case too, because "the test for materiality is the same when claims are brought pursuant to Sections 11 and 12(a)(2) of the Securities Act."  *Litwin*, 634 F.3d at 717 n.10.

*Stearns I* held that a class of plaintiffs who purchased from December 14, 2006 to March 14, 2008 "adequately demonstrate[d]" that certain "misstatements … [materially] altered the 'total mix' of information available to [the class] investors" and therefore denied the defendants' motion to dismiss.  763 F. Supp. 2d at 444, 498 (internal citations omitted).  But *Bear Stearns II* reached the opposite conclusion with respect to two sophisticated plaintiffs who purchased between March 6, 2008 and March 14, 2008 but opted out of the *Bear Stearns I* class.  14 F. Supp. 3d at 540, 545.  The Court found that the alleged misstatement did not "significantly alter[] the total mix of information made available" to them, and dismissed their claims.  *Id.* at 544-45 (emphasis omitted).  Here, because the other available information necessarily varied even within the proposed subclasses, materiality (like causation and knowledge) is not a common issue.  *See, e.g.*, *Klein v. A.G. Becker Paribas Inc.*, 109 F.R.D. 646, 652-53 & nn. 11,12 (S.D.N.Y. 1986); *Zimmerman v. Bell*, 800 F.2d 386, 390 (4th Cir. 1986).

Ultimately, Plaintiffs' apparent but improper goal "is that individual plaintiffs who could not recover had they sued separately *can* recover only because their claims were aggregated with others through the procedural device of the class action."  *Philip Morris USA Inc. v. Scott*, 131 S. Ct. 1, 4 (2010) (Scalia, J. in chambers) (granting stay).  Such an "adventurous application of" Rule 23 would certainly violate the Rules Enabling Act's prohibition against "interpreting Rule 23 to … enlarge … any substantive right" held by any investor.  *Police & Fire Ret. Sys. of Detroit v. Indymac MBS, Inc.*, 721 F.3d 95, 109 (2d Cir. 2013) (quotation and citations omitted).

## C.    Plaintiffs' Inconsistent Arguments Create Impermissible Conflicts

The variations of knowledge within the proposed class not only create individualized issues of knowledge, loss causation and materiality, but also create impermissible conflicts within the proposed class that Plaintiffs' subclasses do nothing to alleviate.

The class members have conflicts on loss causation.  On the one side, if the class certification motion is correct that the only allegedly concealed fact is Facebook's revisions, then "the stock price decline [resulting from the May 22 story on underwriters' revisions] cannot be attributed to the prospectus's failure to disclose" that Facebook revised its projections.  *Iowa Pub. Emps.' Ret. Sys. v. MF Global, Ltd.*, 620 F.3d 137, 145 (2d Cir. 2010).  For institutional (and retail) investors that already knew of the underwriters' revisions, the May 22 story was merely "[a] negative journalistic characterization of previously disclosed facts [that] does not constitute a corrective disclosure of anything but the journalists' opinions."  *In re Omnicom Grp., Inc. Sec. Litig,.* 597 F.3d 501, 512 (2d Cir. 2010).  Those investors therefore must make the highly dubious argument that the May 22 decline was caused *only* by the May 18 *Reuters* story about Facebook's revisions, and not at all by the May 22 story about underwriters' revisions.[30]

On the other side of the conflict, retail investors (and any institutional investors who did not know about the underwriters' revisions) have an interest in arguing—**as the Complaint does**—that Facebook's price declined on May 22 because of the May 22 *Reuters* story about underwriters' revisions.  That argument contradicts the argument of most institutional and some retail investors that only the May 18 *Reuters* story about Facebook's revisions still affected the

---

[30] This will be very difficult because Plaintiffs will argue that the May 18 NASDAQ debacle and NASDAQ's announcement of an accommodation for those who sold by noon on May 21 (*see, e.g.,* A-916 (NASDAQ_FB00007849)); A-1262-64 (John Melloy, *How Facebook's Stock Selloff Nearly Turned Into a Run*, CNBC (May 22, 2012)), did not affect Facebook's price even on *May 21*, much less May 22.  Such inconsistency negates loss causation. *See Akerman v. Oryx Commc'ns Inc.*, 810 F.2d 336, 343 (2d Cir. 1987) (When Securities Act defendants put forth evidence supporting an absence of loss causation, summary judgment is required when plaintiffs "failed to produce any evidence, other than unreliable and sometimes inconsistent statistical studies and theories, suggesting that [issuer's] price decline actually resulted from the misstatement.").  *Akerman* illustrates that loss causation is governed by the same principles under both the Exchange Act and the Securities Act. *See In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 345 n.39 (S.D.N.Y. 2005).

stock price more than three days later on May 22. Indeed, the proposed class includes retail and institutional investors who purchased on May 21 and therefore *cannot* support loss causation by arguing that the May 22 decline was caused by the prior May 18 *Reuters* story about Facebook's revisions, which *pre-dated* their purchases. *See infra* Section IV.A.2 (post-May 18 purchasers improperly included in the class). The stark conflict on the causation issue between May 21 purchasers and investors who were aware that the underwriters had revised their projections may explain why *no proposed class representatives purchased on May 21*.

The conflicts within the proposed class also extend to materiality issues. On the one side, the materiality allegations in the Complaint and the *MTD Decision* relied heavily on investor reactions to the *underwriter* revisions. *See MTD Decision*, 986 F. Supp. 2d at 520; Compl. ¶¶ 13839, 165-69, 180, 184. Class members who did not know of the underwriters' revisions have an interest in continuing to make this materiality argument. On the other side of the conflict, however, Plaintiffs' class certification motion is premised on treating underwriters' revisions as unimportant, a position that class members who knew of the underwriters' revisions will have an interest in continuing to press. All these fundamental conflicts among class members preclude class certification because although "all affected members of the plaintiff class are interested in maximizing their individual compensation, severally they accomplish that goal in different ways." *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 251-52 (2d Cir. 2011) ("*Literary Works*"); *accord Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003) (denying certification when "the class collapses into distinct groups of winners and losers") (quotation omitted).

Plaintiffs' proposal of two subclasses represented by the *same counsel* does nothing to resolve these conflicts. As Plaintiffs admit, subclasses cannot "proceed with unified

63

representatives and counsel" where the "subclasses have conflicting interests."  Mem. at 25 n.7.  "[T]he value of any subgroup of claims [cannot] be properly assessed without independent counsel pressing its most compelling case."  *Literary Works*, 654 F.3d at 253.  The same counsel for the two proposed subclasses cannot argue both that (a) the May 22 *Reuters* story caused all and none of the May 22 decline and (b) that underwriter revisions both *were* and *were not* material.  *See* N.Y. RULES OF PROF'L CONDUCT R. 1.7(a)(1) & R. 1.7 cmts. 2, 24 ("A conflict of interest exists … if there is a significant risk that a lawyer's action on behalf of one client will materially limit the lawyer's representation of another client[,]… for example, when a decision favoring one client will create a precedent likely to weaken seriously the position taken on behalf of the other client.").  Because there is, "at the very least, the potential for conflicting interests … for the class counsel,… class certification should be denied."  *Nat'l Air Traffic Controllers Ass'n. v. Dental Plans, Inc.*, 2006 WL 584760, at *4 (N.D. Ga. 2006); *see also Valley Drug*, 350 F.3d at 1194 ("the defendant does not have to show actual antagonistic interest" in this regard, as "the potentiality is enough" to deny class certification) (quotation omitted).

## III.    NAMED PLAINTIFFS HAVE FAILED TO DEMONSTRATE THAT PROPOSED CLASS REPRESENTATIVES ARE TYPICAL OR ADEQUATE.

Plaintiffs have also failed to satisfy their burden of showing by a preponderance of the evidence that any of the proposed representatives—the three Lead Plaintiffs (North Carolina DST, ATRS, and Fresno), and six individuals, including four not named in the Complaint (Mem. at 1)—are typical or adequate.  The Lead Plaintiffs and at least one individual are all subject to knowledge, loss causation, and materiality defenses that "threaten[] to become the focus of the litigation," *Gary Plastic Packaging Corp. v. Merrill, Lynch, Pierce, Fenner & Smith Inc.*, 903 F.2d 176, 180 (2d Cir. 1990), and Plaintiffs' assertions of typicality and adequacy are "based on conjecture as opposed to provable facts."  *Sicav*, 2015 WL 268855, at *6.

64

### A.    Proposed Class Representatives Are Subject To A Knowledge Defense.

Some Plaintiffs, including all of the Lead Plaintiffs, are subject to a knowledge defense based on individual communications that renders their claims "atypical of other class members," *Landry v. Price Waterhouse Chartered Accountants*, 123 F.R.D. 474, 476 (S.D.N.Y. 1989), and "highlights the thousands of individualized inquiries the class requires." *Mazzei v. Money Store*, 288 F.R.D. 45, 59 (S.D.N.Y. 2012).

Each of the Lead Plaintiffs had knowledge of the allegedly omitted information through their investment managers, whose "knowledge is imputed to their clients." *Tsereteli*, 283 F.R.D. at 213 & n.109; *see also Residential Capital*, 272 F.R.D. at 169 (imputing knowledge of plaintiff's investment advisor to plaintiff where the advisor "had complete discretion over [plaintiff's] investments").

- North Carolina DST's investment managers Wellington and Sands knew that "Facebook was cutting its projections in advance of the IPO due to the trend in mobile" (A-89 (Shilling Supp. Aff. ¶ 5); *see also* A-885-88 (MS_FB_00014993-96)); and that underwriters had done so as well (A-983-88 (WMC_FB005594-95); A-979-82 (WMC_FB005591-92)).

- Arkansas Teacher's investment manager UBS knew that "Facebook's revenue projections had been revised downward due to the impact that the shift to mobile usage was already having on Facebook's revenues" (A-86 (Nell Decl. ¶ 2); ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ that underwriters had done so (A-67 (Green Decl. ¶ 4); A-881 (MS_FB_00014655)); and that there were "near-term headwinds numbers" (A-869 (MS_FB_00014141)).

- And Fresno's investment managers Waddell and Winslow knew "that Facebook Inc. had recently revised its revenue projections for 2012 due to increased use of Facebook on mobile devices which was negatively impacting revenues more than had been previously expected." (A-81 (Kapoor Decl. ¶ 4); *see also* A-970, A-974 (WINS-FB-0013250, 0013583).)

In addition, proposed individual representative Mr. Galvan testified he thought that, prior to the IPO, he ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

██████████████████████████████████ And Mrs. Galvan testified ███

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████

### B.    Plaintiffs Have Failed To Prove That Proposed Class Representatives Are Typical Or Adequate Representatives.

Even beyond the distraction of these individual issues, Plaintiffs offer no "basis in admissible evidence" for their assertions that any of the proposed representatives are typical or adequate. *Sicav*, 2015 WL 268855, at *6.

To start, ***without pointing to any evidence***, Plaintiffs assert that typicality and adequacy are established because "all Plaintiffs assert the same claims … based on the same misstatements and omissions in the same offering documents" (Mem. at 19) and Plaintiffs all "purchase[d] … Facebook common stock" (Mem. at 20).  But four of the proposed individual class representatives are not even named in the Complaint and thus are not even plaintiffs and have not alleged *any* claims (and have never filed a certification (either contemporaneously with the filing of the Complaint, or any time thereafter) as required by 15 U.S.C. § 78u-4(a)(2)(A)[31]).  The time for amending pleadings and adding named plaintiffs has passed.  (ECF No. 253.)

Moreover, "[t]he purpose of Rule 23(a)(4)'s adequacy requirement is to ferret out potential conflicts between representatives and other class members." *Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 95 (S.D.N.Y. 2010) (internal quotations and citation omitted).  It is clear that despite Plaintiffs' unsupported assertions (Mem. at 20), the proposed representatives do not have

---

[31] Rand moved for appointment as a lead plaintiff in *Brian Roffe Sharing Plan v. Facebook, Inc.*, but was not named as a plaintiff in this consolidated action.  He filed a certification in that prior action, but did not attach it to the consolidated Complaint here, which also did not identify him as a plaintiff. *See* 7/23/12 Rand Certification (ECF No. 34-5).

interests aligned with the class.  All of the proposed representatives bought stock in the IPO or on the first day of trading, May 18.  Compl. at Appendix A.  ███████████████████████

████████████████████████████████████████████████████████████████████

███[32]  The class, however, includes investors who bought *after* May 18—that is, after Plaintiffs claim the media reported the "corrective disclosure" that Facebook had revised its revenue projections.  By pursuing their new liability theory that only Facebook's revenue projections count, Plaintiffs will be proving that any class member who bought after the May 18 disclosure must be excluded from the class and denied recovery.  Likewise, by declining to contest that institutional investors were informed of underwriters' revisions, *see* Mem. at 28, Plaintiffs necessarily undercut any claim that the second *Reuters* report on May 22 caused investor losses.

Indeed, the differences in purchase times, coupled with Plaintiffs' new liability theory, show not just that Plaintiffs are inadequate but also that they lack "class standing" to assert claims on behalf of later purchasers or on behalf of investors who had knowledge.  *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 162 (2d Cir. 2012) ("plaintiff has class standing if he plausibly alleges [*inter alia*] that [defendants' alleged] conduct [causing his injury] implicates *the same set of concerns* as the conduct alleged to have caused injury to other members of the putative class by the same defendants") (emphasis added; quotation and citations omitted).  Indeed, Plaintiffs could not even say whether investors who knew about underwriters' revised projections would still be eligible for class membership.  (A-127 (ATRS

---

[32]  One Lead Plaintiff North Carolina DST, in fact, acquired shares well before the IPO and received a ████████ cash distribution as a result of shares *sold in the IPO*, representing a return of ███████████████████████████████████████████████████ ███ North Carolina DST's profits, coupled with the fact that it still owns shares at a current unclaimed profit of ███████████, and sold its other shares acquired in the IPO at a profit on May 18 ████████████████ distract from the claims of shareholders who suffered only losses.

███████████████████████████████████████████████████

████████████████████████████████

Finally, Plaintiffs' failure to offer *any* factual basis to prove that they have '"knowledge of and involvement in the class action,"' *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 61 (2d Cir. 2000) (quoting *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1077-78 (2d Cir. 1995)), is fatal in light of the law requiring that class certification be based on *evidence* about each proposed representative's adequacy.  *See In re IPO*, 471 F.3d at 41; *Ramirez*, 39 F. Supp. 3d at 361-62; *see also, e.g.*, *In re Kosmos Energy*, 299 F.R.D. at 146-47 (holding that plaintiff failed to demonstrate adequacy where "the only evidence submitted . . . in support of its claims of adequacy is the Declaration of its Board Chair . . . [which] contains little more than formulaic, boiler-plate assertions" and "conclusory pronouncements").  And as their testimony discloses, the proposed individual representatives are *not* all actively involved in the litigation and lack adequate knowledge to monitor and supervise the case.  ████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████  Hiring counsel is not enough.  *See, e.g.*, *London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246, 1253 (11th Cir. 2003).

## IV.   THE PROPOSED CLASSES ARE NOT PROPERLY DEFINED.

The way Plaintiffs have defined the proposed classes underscores that no class can be certified.  Compl. ¶ 203; Mem. at 5-6.  First, the class definitions contain no date restriction and instead improperly include on their face atypical investors who purchased and sold at different

times with different knowledge.  Second, in lieu of any date restriction, Plaintiffs purport to limit the class definitions with the fact-intensive phrase "damaged thereby."  Mem. at 5-6.  But that is no limitation at all and improperly requires a threshold merits inquiry.  Third, while Plaintiffs propose subclasses that they assume will amount to "knowledge" and "no knowledge" classes, their proposed demarcation between institutional and retail does not work.  Finally, the inclusion of investors who purchased stock "traceable to Facebook's IPO" only amplifies the individual issues that preclude certification.

### A.    The Proposed Classes Are Overbroad.

Because a "class must [] be defined in such a way that anyone within it would have standing," *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006), the Court must exclude from the class any investors who have no injury.  *See In re Flag Telecom Holdings, Ltd. Sec. Litig.,* 574 F.3d 29, 38-39 (2d Cir. 2009); *In re Smart Techs.*, 295 F.R.D. at 58-59.  Most obviously, and as discussed *supra* Sections I and II, the factual record shows that the class improperly includes many class members who knew the information that was purportedly selectively disclosed.  Plaintiffs offer no way of separating out these class members, other than individualized inquiry, and Plaintiffs' proposed class definitions provide the Court no meaningful help in this regard.

To start, there is no date restriction in the proposed class definition.  Instead, Plaintiffs sweep in any investor who purchased and sold stock "in the IPO" *or* "traceable" to the IPO.  The definition, in other words, includes not just investors in the IPO but anyone who purchased Facebook stock in the aftermarket, even, for example, on May 29, 2012, a week after the lawsuits consolidated here were filed.  Such a class is plainly overbroad.  *See In re Am. Int'l Grp., Inc. Sec. Litig.*, 265 F.R.D. 157, 166 (S.D.N.Y. 2010), *vacated and remanded on other*

69

*grounds*, 689 F.3d 229 (2d Cir. 2012) (investor who acquired stock *after* the filing of the complaint has no Section 11 claim); *Ross v. Warner*, 1980 WL 1474, at *10 (S.D.N.Y. 1980) ("For those shares purchased after the original suit was filed, it would be patently absur[d] to award the plaintiffs any damages on these facts.").

And even apart from the factual record showing that knowledge, loss causation, materiality, and damages require individual inquiry, the proposed classes *on their face* raise typicality and individual issues because they purport to include (i) investors who *sold* their securities on May 18 *before* the May 18 *Reuters* story (*i.e.*, "in-and-out" traders) ██████████ ████████████████████████ and (ii) investors who *purchased* securities *after* the May 18 *Reuters* story.[33]  It is well established that investors who purchased in the secondary market *after* the corrective disclosure cannot be included because they "would have known of the alleged 'untruth or omission at the time of his or her acquisition of the security.'"  *In re Smart Techs.*, 295 F.R.D. at 58 (quoting *In re IPO*, 483 F.3d at 73 n.1); *see also Klein v. A.G. Becker Paribas Inc.*, 109 F.R.D. 646, 652 (S.D.N.Y. 1986); *see also Shockley v. Adams Golf, Inc.*, 2005 WL 3654346, *2 (D. Del. 2005).  It is equally well established that "in-and-out traders," namely, those who bought and sold *before* an alleged corrective disclosure, cannot be included.  *See In re Flag*, 574 F.3d at 40-41; *In re Smart Techs.*, 295 F.R.D. at 59-60; *IBEW Local 90 Pension Fund v. Deutsche Bank AG*, 2013 WL 5815472, at *22 (S.D.N.Y. 2013).   But Plaintiffs' proposed class definitions make no effort to sort this out.

**B.      The Proposed Class And Subclasses Are Not Ascertainable.**

Rule 23 also has an "implied requirement of ascertainability," which turns on the

---

[33]  Plaintiffs have denied that knowledge of underwriters' projections is relevant to their claims, which makes the second *Reuters* story on May 22 irrelevant as it does not discuss Facebook's revised projections at all, only underwriters' projections.

definition of the proposed class. *In re IPO*, 471 F.3d at 30; *see also McBean v. City of N.Y.*, 260 F.R.D. 120, 132–33 (S.D.N.Y. 2009) (class must be "readily identifiable, such that the court can determine who is in the class and, thus, bound by the ruling"); Charles Alan Wright & Arthur R. Miller, *FEDERAL PRACTICE & PROCEDURE,* § 1760 (3d ed. 2014) ("[T]he requirement that there be a class will not be deemed satisfied unless the class description is sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member."). Plaintiffs have not met this requirement in two independent respects. First, using "and were damaged thereby" to define the class improperly makes class membership depend on the ultimate merits resolution. Second, Plaintiffs' effort to avoid knowledge problems by defining subclasses of "institutional" and "retail" investors does not resolve the question of who would be in which subclass.

> 1.     "Damaged Thereby" Would Require Merits Determinations.

Plaintiffs' effort to delimit their proposed classes with the words "and were damaged thereby," Mem. at 5-6 (reciting class definition contained in the complaint and defining retail investor subclass); ██████████████████████████████████████████████ ████████████████████████████████████████████████ cannot provide a substitute for date restrictions. To the contrary, relying on the phrase "damaged thereby" to distinguish class members from other Facebook investors would improperly "impose[] a merits determination on class membership." *In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*, 2013 WL 396117, at *15 (D.N.J. 2013). Similarly, it reflects an impermissible effort to define a fail-safe class that includes "*only* those who are *entitled* to relief" and excludes any claimant who loses. *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 538 (6th Cir. 2012) (citation omitted; emphasis in original); *see also Schuh v. HCA Holdings, Inc.*,

2014 WL 4716231, *13 (M.D. Tenn. 2014).

> 2.     The Subclasses Are Not Ascertainable.

Plaintiffs' alternative effort at defining subclasses to eliminate "individual issues of knowledge" is even more problematic.  As an initial matter, their claim to avoid knowledge questions because members of the Retail Investor Subclass had no knowledge of revised revenue projections, Mem. at 8, 25, is both unsupported by any facts, *see Sicav*, 2015 WL 268855, at *6, and refuted by the record discussed above, *see supra* Section I.

But, in any event, Plaintiffs refuse to define the terms "institutional investor" and "retail investor."  ██████████████████████  Critically, what Plaintiffs are trying to do is separate the potential class members who Plaintiffs "will not dispute … were widely informed of the Syndicate Analysts' model revisions," Mem. at 28, from others.  But the sub-classes' definitions raise distinct questions, without providing answers.  To be sure, in defining the "institutional investor" subclass to ***include*** "[a]pproximately 900 institutional investors [who] received allocations in the Facebook IPO" through what is referred to as the "institutional pot," Mem. at 27 n.9, it has made some effort at ascertaining ***those 900*** to be in the "Institutional Investor Subclass."[34]  But what about other corporations, partnerships, trusts, etc., who got IPO allocations other than through the "institutional pot" or who bought stock only after the IPO?

---

[34] Plaintiffs' list of approximately 900 names does not even provide clarity about who is among that 900, for the list often identifies a "brand" rather than a legal entity (*see, e.g.*, A-373-90 (FB-IPO 0005203-20) ("Fidelity, Boston"; "BlackRock, Plainsboro"; "Citadel, Chicago"; "Invesco, Houston")), and includes investment advisors that bought for those whose money it managed, (*id.* ("UBS Global Asset Management"; "Sands Capital Management"; "Winslow Capital Management"; "Wellington Management Company")).  Plaintiffs do not say whether, for example, all affiliates of "Fidelity" or "BlackRock" are in the "Institutional Investor Subclass", nor do they say whether "UBS Global Asset Management" and "Sands Capital Management" mean that everyone whose money those entities manage is in the "Institutional Investor Subclass".

Are they members of the "institutional investor" class or not? And, by the same token, what about individuals (such as Ian DelBalso) and individual clients who got information about revised projections from institutions whose knowledge Plaintiffs will not contest?

These problems are underscored by Plaintiffs' inability to explain objectively who would be in the proposed "Institutional Investor Subclass." For example, Plaintiffs say "corporations" are "not necessarily" in the Institutional Investor Subclass ████████████████ )); it depends on "whether they invest like an institutional investor or a retail investor," ████████████ ██ ), whatever that means.[35] One Lead Plaintiff ████████████████ says "[i]nstitutional investors are generally larger sophisticated investors who have some expertise" ████████████ ████ , but cannot identify any other relevant characteristics ████████████ It denies that there is any size threshold that would make someone an institutional investor ████████████ ████ and likewise denies that any particular amount of training, any educational degrees, and any certification would be either necessary or sufficient to render someone an institutional investor. ████████████████████ Another Lead Plaintiff ████████ seems to be on a different page entirely, and does not know whether sophistication or assets under management have anything to do with whether someone is an "Institutional Investor." ████████████████ ████ In short, "it's not a bright line test," but would impermissibly require individualized inquiries of "look[ing] at factors to try to understand whether someone fits the ordinary meaning of one [Institutional Investor] or two [Retail Investor]." ████████████████ [36]

---

[35] One of the Lead Plaintiffs invoked "the ordinary dictionary meaning" of the words "institutional investor" and "retail investor." ████████████████

[36] In response to questions seeking to identify how to distinguish "institutional" and "retail" investors, Plaintiffs' counsel objected—literally dozens of times—on the ground that it was vague, called for speculation and required legal conclusions. ████████████████ ████████████████████████ That is just the point: the characteristics that

None of these questions can be resolved by glibly saying that knowledge of the revisions distinguishes the two subclasses because determining who knew what is precisely the nature of the problem Plaintiffs are attempting—and need—to avoid. *See In re IPO*, 471 F.3d at 44.

**C.    *Morrison* Bars Certification Of A Class That Neither Excludes Extraterritorial IPO Allocations Nor Traces Aftermarket Transactions To Domestic Allocations.**

Certifying the class here would also be inappropriate because, as the Supreme Court and the Second Circuit have recognized, U.S. securities laws do not apply extraterritorially, *Morrison v. Nat'l Australia Bank Ltd.,* 561 U.S. 247, 265 (2010), but only where title to the security transfers within the U.S. *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 67-68 (2d Cir. 2012). That limitation presents insuperable problems for class certification here for two reasons.

First, in light of *Morrison* and *Absolute Activist*, Sections 11 and 12(a)(2) do not apply to shares allocated to investors outside of the United States. Plaintiffs themselves submitted evidence showing that over 53 million shares (out of the 421 million IPO size) were allocated to at least 295 investors identified in myriad foreign locations from Abu Dhabi to Zurich, on every continent except Antarctica. (Ex. 42 to Decl. of S. Graziano (ECF No. 256) (Investors With Foreign Identification Listed in Exhibit 42) (*e.g.*, London, Paris, Sao Paulo, Toyko, Beijing, Sydney, Johannesburg, Toronto). Those Facebook IPO investors took title to shares according to the law that governed their relationships with the allocating underwriter(s). "Thus, to the extent that putative class members incurred 'irrevocable liability,' or obtained 'title' to securities … anywhere [] outside the United States … they do not have a viable cause of action under the

---

would constitute "institutional" versus "retail" are not at all clear and would entail myriad inquiries and fact-specific judgment calls to determine the threshold question of class membership.

74

Securities Act, and may not be included in the class certified here." *In re SMART Techs.*, 295 F.R.D. at 57.

Second, because Section 11 only applies to shares that can be traced to a transaction covered by Section 11, aftermarket purchasers of Facebook stock must trace their shares to domestic allocations in the IPO. *See* Joseph Grundfest, *Morrison, the Restricted Scope of Securities Act Section 11 Liability, and Prospects for Regulatory Reform*, at 4-5 (Mar. 2, 2015) (available at papers.ssrn.com/sol3/papers.cfm?abstract_id=2572649) (last visited on April 9, 2015). Where, as here, the secondary market includes some shares not covered by Section 11, courts recognize that "tracing" is an individualized issue that disqualifies class certification. *In re IPO Sec. Litig.*, 227 F.R.D. 65, 118 (S.D.N.Y. 2004). (excluding from class time periods when covered and uncovered shares were traded in the market; "While some individual class members who purchased after the end of the class period might be able to trace their shares successfully, the resulting inquiry would fragment the class action into myriad mini-trials on the subject of tracing."), *rev'd on other grounds*, 471 F.3d 24 (2d Cir. 2006), *clarified on denial of reh'g,* 483 F.3d 70 (2d Cir. 2006).

*In re Smart Technologies*, which involved shares that were both covered and not covered by Section 11, does not warrant a different result. In that case, the court deferred ruling on traceability, finding (i) the predominance inquiry satisfied because liability turns "first and primarily" on the common issue of a registration statement's adequacy regardless of individualized traceability issues, and (ii) the defendants failed to demonstrate by "the preponderance of the evidence … that *no* secondary-market purchaser could prove traceability." *In re Smart Techs.*, 295 F.R.D. at 61, 62 n.20. *Smart Technologies* is both distinguishable and wrong. As discussed *supra*, the predominance inquiry turns on whether "more 'substantial'

75

aspects of th[e] litigation will be susceptible to generalized proof for all class members than any individualized issues." *Myers*, 624 F.3d at 551 (quotation omitted). Here, individualized tracing inquiries add to the individual issues of knowledge, loss causation and materiality to preclude a finding that the common issue of the registration statement's adequacy predominates. In any event, tracing is no less part of Plaintiff's burden for establishing liability under Section 11 than a misleading registration statement; indeed, it is a threshold standing question. *See In re IPO*, 471 F.3d at 31 n.1 ("To prevail on a Section 11 claim for a misleading registration statement, a plaintiff must be able to 'trace' his or her shares to the defective registration statement.").

It is not enough for class certification that it is "*arguably possible for anyone at all* to prove traceability." *In re Smart Techs.*, 295 F.R.D. at 62 (emphasis added). Defendants do not have to disprove traceability categorically; it is the plaintiff's burden to show both that "shares are traceable to a registration statement," *In re Puda Coal Sec. Inc. Litig.*, 2013 WL 5493007, at *6 (S.D.N.Y. 2013), and to "actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23," *Halliburton Co. v. Eric P. John Fund, Inc.*, 134 S. Ct. 2398, 2412 (2014). In this case, Plaintiffs' proposed class definitions recognize the need for aftermarket purchases to be "traceable to the Company's IPO," Mem. at 5 (proposed class definition), and 6 (definition for alternatively proposed subclasses). But they never claim traceability is even a question susceptible to common proof, *id.* at 18; *see also* Compl. ¶ 207, or otherwise grapple with the question about how "traceability" will affect this case in light of *Morrison*'s clear directive that the securities laws do not apply to extraterritorial transactions.

## V.    A CLASS ACTION IS NOT SUPERIOR TO OTHER METHODS.

As discussed *supra*, between the proposed Institutional Investor and Retail Investor subclasses and within each proposed subclass, there are multiple individual knowledge, loss

causation, materiality, and tracing issues, as well as conflicts. Any class action here would risk jury confusion in applying similarly-labeled issues to very different facts, and therefore is inferior to adding additional plaintiffs that want to join, coordinating discovery, and reaching individualized resolutions. *See Kendler v. Federated Dep't Stores, Inc.*, 88 F.R.D. 688, 694-95 (S.D.N.Y. 1981).

Nor is this a case where individual damages are so small that any claims could rationally be maintained, if at all, only as a class. Plaintiffs, after all, allege more than seven dollars per share of damages from the May 21 and 22 declines, which means that every investor who bought 15,000 or more shares of Facebook stock may allege (on Plaintiffs' theory) that it suffered $100,000 or more in damages. Indeed, at least 211 investors could claim damages ***ten times*** that figure, without even including any secondary market purchasers. (A-373-90 (FB-IPO 0005203-220).) Investors with even modestly substantial purchases may reasonably calculate that ***they*** would be better off pressing their own claims, rather than risk falling with the defenses that Facebook is entitled to level against Lead Plaintiffs based on their investment advisors' knowledge.

Even for smaller investors, moreover, any imposition in joining a centralized non-class proceeding before this Court would be *de minimis*. To be sure, a joining plaintiff would have to litigate its individual knowledge, loss causation, materiality, and tracing issues. But, a court cannot instead certify a class "on the premise that [the defendant] will not be entitled to litigate its … defenses to individual claims." *Wal-Mart*, 131 S. Ct. at 2561.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel should be denied.

77

DATED: April 10, 2015

Susan E. Engel
KIRKLAND & ELLIS LLP
655 Fifteenth St. NW
Washington, DC 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

Richard D. Bernstein
Elizabeth J. Bower
WILLKIE FARR & GALLAGHER LLP
1875 K Street, NW
Washington, DC 20006
Telephone: (202) 303-1000
Facsimile: (202) 303-2000

_____
Andrew B. Clubok
(andrew.clubok@kirkland.com)
Brant W. Bishop, P.C.
Nathaniel Kritzer
Adam B. Stern
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800

Tariq Mundiya
Todd G. Cosenza
Sameer Advani
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8000

*Attorneys for Facebook, Inc. and Individual Facebook Defendants*

_____
James P. Rouhandeh
Charles S. Duggan
Andrew Ditchfield
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800

*Attorneys for Underwriter Defendants*

78