**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE FACEBOOK, INC., IPO SECURITIES AND DERIVATIVE LITIGATION | MDL No. 12-2389<br><br>ECF Case<br><br>This document relates to the Consolidated Securities Action: |

| | |
|---|---|
| NO. 12-CV-4081 | NO. 12-CV-4763 |
| NO. 12-CV-4099 | NO. 12-CV-4777 |
| NO. 12-CV-4131 | NO. 12-CV-5511 |
| NO. 12-CV-4150 | NO. 12-CV-7542 |
| NO. 12-CV-4157 | NO. 12-CV-7543 |
| NO. 12-CV-4184 | NO. 12-CV-7544 |
| NO. 12-CV-4194 | NO. 12-CV-7545 |
| NO. 12-CV-4215 | NO. 12-CV-7546 |
| NO. 12-CV-4252 | NO. 12-CV-7547 |
| NO. 12-CV-4291 | NO. 12-CV-7548 |
| NO. 12-CV-4312 | NO. 12-CV-7550 |
| NO. 12-CV-4332 | NO. 12-CV-7551 |
| NO. 12-CV-4360 | NO. 12-CV-7552 |
| NO. 12-CV-4362 | NO. 12-CV-7586 |
| NO. 12-CV-4551 | NO. 12-CV-7587 |
| NO. 12-CV-4648 | |

**DEFENDANTS' SUR-REPLY MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................1

ARGUMENT ......................................................................................................7

I.     INDIVIDUAL KNOWLEDGE ISSUES DEFEAT PREDOMINANCE...........................7

      A.    Plaintiffs' Common Questions Are Irrelevant Because Constructive Knowledge Is Not At Issue. ...................................................................9

      B.    The Record Contains Individualized Evidence Indicating Investors' Actual Knowledge Or Awareness Of Facebook's Revised Projections...........................11

            1.    Individualized Evidence Indicates That Thousands Of Investors Were Told Expressly About Facebook's Revised Projections. ................11

            2.    Individualized Evidence Indicates That Other Investors Who Were Expressly Told Only Underwriters' Revisions Subjectively Understood That Facebook Had Revised Its Projections. .........................21

            3.    The Record Refutes Plaintiffs' Presumption That Investors Could Not Learn About Any Revised Projections From Media Reports. ...........24

            4.    The Record Refutes Plaintiffs' Presumptions That Retail Investors Did Not Learn About Any Revised Projections And That Retail And Institutional Subclasses Are Easily Identifiable And Distinct. ..........28

      C.    The Court Should Not Consider Or Certify A Class Under Rule 23(c)(4)...........33

II.    INDIVIDUAL CAUSATION ISSUES ALSO DEFEAT PREDOMINANCE.................34

      A.    *Comcast* Prohibits Class Certification Because Plaintiffs' Broad Damages Are Inconsistent And In Conflict With Their Narrow Liability Theory...............34

      B.    The NASDAQ Settlement Creates Additional Individualized Issues...................40

      C.    If This Court Does Not Deny Class Certification, It Should Defer Ruling Pending The Supreme Court's Decision In *Tyson Foods, Inc. v. Bouaphakeo*................................................................................43

III.   VARIATION IN INVESTOR KNOWLEDGE YIELDS INDIVIDUAL MATERIALITY ISSUES THAT DEFEAT PREDOMINANCE. ...................................44

IV.   PLAINTIFFS HAVE NOT DEMONSTRATED THAT CLASS REPRESENTATIVES ARE TYPICAL OR ADEQUATE................................................44

V.      *MORRISON* BARS CERTIFICATION OF THE PROPOSED CLASS. .........................46

VI.     PLAINTIFFS   HAVE   FAILED   TO   DEMONSTRATE   THAT   CLASS
        CERTIFICATION  IS  WARRANTED  FOR  THE  *PLEADED*  CLAIM  THAT
        THIS COURT ADDRESSED ON THE MOTION TO DISMISS...................................47

CONCLUSION.........................................................................................................................50

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Abbott v. Am. Elec. Power, Inc.*,
    2012 WL 3260406 (S.D.W. Va. 2012) ................................................................40

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
    677 F.3d 60 (2d Cir. 2012) .................................................................................47

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*,
    2013 WL 1155420 (S.D.N.Y. 2013) ...................................................................46

*Adkins v. Morgan Stanley*,
    307 F.R.D. 119 (S.D.N.Y. 2015) ..................................................................36, 43

*Akerman v. Oryx Commc'ns, Inc.*,
    810 F.2d 336 (2d Cir. 1987) ...............................................................................35

*Amgen Inc. v. Conn. Ret. Plans and Trust Funds*,
    133 S. Ct. 1184 (2013) .......................................................................................44

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ...........................................................................................35

*Authors Guild, Inc. v. Google Inc.*,
    721 F.3d 132 (2d Cir. 2013) ...............................................................................48

*Brown v. Kelly*,
    609 F.3d 467 (2d Cir. 2010) .................................................................................8

*Burley v. City of New York*,
    2005 WL 668789 (S.D.N.Y. 2005) .....................................................................10

*Burroughs v. County of Nassau*,
    2014 WL 2587580, at *13 (E.D.N.Y. 2014) .......................................................33

*Charron v. Pinnacle Grp. N.Y. LLC*,
    269 F.R.D. 221 (S.D.N.Y. 2010) ........................................................................34

*Charron v. Weiner*,
    731 F.3d 241 (2d Cir. 2013) ...............................................................................38

*Chris-Craft Indus., Inc. v. Piper Aircraft Corp.*,
    480 F.2d 341 (2d Cir. 1973) ...............................................................................49

*Comcast Corp. v. Behrend*,
    133 S. Ct. 1426 (2013) ....................................................................5, 35, 40, 50

*Cromer Fin. Ltd. v. Berger*,
    205 F.R.D. 113 (S.D.N.Y. 2001) ...................................................................37, 40

*DeMarco v. Lehman Bros., Inc.*,
    222 F.R.D. 243 (S.D.N.Y. 2004) ...........................................................................49

*Dietrich v. Bauer*,
    192 F.R.D. 119 (S.D.N.Y. 2000) ...........................................................................38

*Dodona I, LLC v. Goldman, Sachs & Co.*,
    296 F.R.D. 261 (S.D.N.Y. 2014) ...........................................................................45

*Emig v. Am. Tobacco Co.*,
    184 F.R.D. 379 (D. Kan. 1998) ..............................................................................40

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    131 S. Ct. 2179 (2011) .....................................................................................35, 36

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    2015 WL 4522863 (N. D. Tex. 2015) .....................................................................36

*Ernst Haas Studio, Inc. v. Palm Press, Inc.*,
    164 F.3d 110 (2d Cir. 1999) ...............................................................................29, 33

*Fed. Hous. Fin. Agency v. HSBC N. Am. Holdings Inc.*,
    33 F. Supp. 3d 455 (S.D.N.Y. 2014) ....................................................................5, 9

*Glatt v. Fox Searchlight Pictures, Inc.*,
    --- F. 3d ---, 2015 WL 4033018 (2d Cir. 2015) ...................................................7, 34

*Gordon v. Sonar Capital Mgmt. LLC*,
    2015 WL 1283636 (S.D.N.Y. 2015) .......................................................................45

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    134 S. Ct. 2398 (2014) ...........................................................................10, 11, 36

*In re AIG, Inc. Sec. Litig.*,
    689 F.3d 229 (2d Cir. 2012) ..................................................................................10

*In re Alstom SA Sec. Litig.*,
    253 F.R.D. 266 (S.D.N.Y. 2008) ................................................................37, 39, 44

*In re Amaranth Natural Gas Commodities Litig.*,
    269 F.R.D. 366 (S.D.N.Y. 2010) ........................................................................37, 40

*In re Facebook, Inc. IPO Sec. & Deriv. Litig.*,
    986 F. Supp. 2d 487 (S.D.N.Y. 2013) .........................................................21, 27, 28, 48

*In re Healthsouth Corp. Sec. Litig.*,
    213 F.R.D. 447 (N.D. Ala. 2003) ...........................................................................38

*In re IPO Sec. Litig.*,
227 F.R.D. 65 (S.D.N.Y. 2004) ................................................................5

*In re IPO Sec. Litig.*,
471 F.3d 24 (2d Cir. 2006) ........................................................... *passim*

*In re IPO Sec. Litig.*,
483 F.3d 70 (2d Cir. 2007) ................................................................8

*In re Jiffy Lube Sec. Litig.*,
772 F. Supp. 890 (D. Md. 1991) ............................................................41

*In re Lehman Bros. Sec. & ERISA Litig.*,
2013 WL 440622 (S.D.N.Y. 2013) ..........................................................8

*In re Literary Works in Elec. Databases Copyright Litig.*,
654 F.3d 242 (2d Cir. 2011) ..............................................................38

*In re Livent, Inc. Noteholders Sec. Litig.*,
151 F. Supp. 2d 371 (S.D.N.Y. 2001) ................................................17, 46

*In re NASDAQ Market-Makers Antitrust Litig.*,
169 F.R.D. 493 (S.D.N.Y. 1996) .......................................................10, 11

*In re Nassau County Strip Search Cases*,
461 F.3d 219 (2d Cir. 2006) ..............................................................34

*In re NYSE Specialists Sec. Litig.*,
260 F.R.D. 55 (S.D.N.Y. 2009) ....................................................37, 40, 44

*In re OSG Sec. Litig.*,
2015 WL 3466094 (S.D.N.Y. 2015) .......................................................35

*In re Refco, Inc.*,
2007 WL 57872 (S.D.N.Y. 2007) .........................................................41

*In re Superior Offshore Int'l., Inc. Sec. Litig.*,
2010 WL 2305742 (S.D. Tex. 2010) ...............................................4, 17, 46

*In re Thornburg Mortg., Inc. Sec. Litig.*,
912 F. Supp. 2d 1178 (D.N.M. 2012) .....................................................40

*In re Time Warner Inc. Sec. Litig.*,
9 F.3d 259 (2d Cir. 1993) ................................................................49

*In re U.S. Foodservice Inc. Pricing Litig.*,
729 F.3d 108 (2d Cir. 2013) ....................................................3, 8, 11, 17

*In re Vitamin C Antitrust Litig.*,
279 F.R.D. 90 (E.D.N.Y. 2012) ...........................................................38

*In re WorldCom, Inc. Sec. Litig.*,
　　2005 U.S. Dist. LEXIS 3791 (S.D.N.Y. 2005) ................................................... 41

*Klein* v. *A.G. Becker Paribas Inc.*,
　　109 F.R.D. 646 (S.D.N.Y. 1986) .................................................................... 44

*Koch v. Greenberg*,
　　14 F. Supp. 3d 247 (S.D.N.Y. 2014) ............................................................. 42

*Marcus v. BMW of N. Am., LLC*,
　　687 F.3d 583 (3d Cir. 2012) ........................................................................... 33

*McLaughlin v. Am. Tobacco Co.*,
　　522 F.3d 215 (2d Cir. 2008) ......................................................... 8, 10, 25, 34

*Moore v. PaineWebber, Inc.*,
　　306 F.3d 1247 (2d Cir. 2002) ............................................................................ 9

*Morrison v. Nat'l Australia Bank Ltd.*,
　　561 U.S. 247 (2010) ........................................................................................ 47

*Myers v. Hertz Corp.*,
　　624 F.3d 537 (2d Cir. 2010) ........................................................................ 8, 35

*N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*,
　　2011 WL 3874821 (S.D.N.Y. 2011) .............................................................. 44

*N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*,
　　2014 WL 1013835 (S.D.N.Y. 2014) .............................................................. 25

*N.J. Carpenters Health Fund v. Rali Series 2006-QO1 Trust*,
　　477 F. App'x 809 (2d Cir. 2012) .................................................. 7, 16, 17, 34

*N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*,
　　709 F.3d 109 (2d Cir. 2013) .......................................................... 3, 10, 28

*Neely v. Ethicon, Inc.*,
　　2001 WL 1090204 (E.D. Tex. 2001) .............................................................. 40

*Pub. Employees' Ret. Sys. of Miss. v. Merrill Lynch & Co.*,
　　277 F.R.D. 97 (S.D.N.Y. 2011) ..................................................... 8, 25, 37, 40

*Ret. Fund v. J.P. Morgan Chase & Co.*,
　　301 F.R.D. 116 (S.D.N.Y. 2014) .................................................................. 34, 35

*Roach v. T.L. Cannon Corp.*,
　　2013 WL 1316452 (N.D.N.Y. 2013) .............................................................. 40

*Roach v. T.L. Cannon Corp.*,
　　778 F.3d 401 (2d Cir. 2015) ........................................................................... 39

*Robidoux v. Celani*,
   987 F.2d 931 (2d Cir. 1993)..........................................................................44

*Sandwich Chef of Tex., Inc. v. Reliance Nat'l Indem. Ins. Co.*,
   319 F.3d 205 (5th Cir. 2003) .....................................................................8, 11

*Scherer v. Equitable Life Assurance Soc'y of U.S.*,
   2004 WL 2101932 (S.D.N.Y. 2004)...........................................................33

*SEC v. Bank of Am. Corp.*,
   677 F. Supp. 2d 717 (S.D.N.Y. 2010).......................................................27

*SEC. v. KPMG LLP*,
   412 F. Supp. 2d 349 (S.D.N.Y. 2006).......................................................17

*Seijas v. Republic of Arg.*,
   606 F.3d 53 (2d Cir. 2010).....................................................................37, 38

*Shemian v. Research In Motion Ltd.*,
   570 F. App'x 32 (2d Cir. 2014) .................................................................44

*Sicav v. James Jun Wang*,
   2015 WL 268855 (S.D.N.Y. 2015).........................................................35, 39

*Sikhs for Justice v. Nath*,
   893 F. Supp. 2d 598 (S.D.N.Y. 2012)........................................................43

*Singer v. Olympia Brewing Co.*,
   878 F.2d 596 (2d Cir. 1989).......................................................................41

*Sykes v. Mel S. Harris & Assocs., LLC*,
   780 F.3d 70 (2d Cir. 2015).....................................................................39, 40

*Tyson Foods, Inc. v. Bouaphakeo*,
   135 S. Ct. 2806 (2015)................................................................................43

*UFCW Local 1776 v. Eli Lilly & Co.*,
   620 F.3d 121 (2d Cir. 2010).......................................................................36

*Valley Drug Co. v. Geneva Pharm., Inc.*,
   350 F.3d 1181 (11th Cir. 2003) .................................................................38

*W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*,
   549 F.3d 100 (2d Cir. 2008)........................................................................30

*Wal-Mart Stores, Inc v. Dukes*,
   131 S. Ct. 2541 (2011)...........................................................................7, 8, 9

*Wallace v. IntraLinks*,
   302 F.R.D. 310 (S.D.N.Y. 2014) ............................................................38, 45

*Westfall v. City of Cohoes*,
    1988 WL 79202 (N.D.N.Y. 1988) .......................................................27

*Westwood Chem. Co. v. Kulick*,
    570 F. Supp. 1032 (S.D.N.Y. 1983)..................................................42

**Statutes**

15 U.S.C. § 77e ..............................................................................27

15 U.S.C. § 78u-4 ...........................................................................40

N.Y. Gen. Oblig. Law § 15-108(a) ..................................................41

**Rules**

Fed. R. Civ. P. 1 .............................................................................35

Fed. R. Civ. P. 8 .............................................................................35

Fed. R. Civ. P. 9 .............................................................................49

Fed. R. Civ. P. 23 ...........................................................33, 34, 35, 36

FINRA Rule 2210 ......................................................................31, 32

FINRA Rule 4512 ...........................................................................31

**Other Authorities**

5 Bromberg & Lowenfels on Sec. Fraud § 7:150 (2d ed. 2015).............5, 17

*Tyson Foods, Inc. v. Bouaphakeo*, Pet'n for a Writ of Cert.,
    2015 WL 1285369 (Mar. 19, 2015) ................................................43

*Tyson Foods, Inc. v. Bouaphakeo*, Pet'n for a Writ of Cert. Reply Brief,
    2015 WL 2251177 (May 11, 2015) .................................................43

William B. Rubenstein, *Newberg on Class Actions* § 7.29 (5th ed.)...........38

## INTRODUCTION

Plaintiffs cannot escape the fact that the unprecedented record raises more than a "reasonable inference" that at least hundreds of institutional investors, including investment advisors for thousands of individual clients, knew the information allegedly omitted or misrepresented.  Plaintiffs seek to narrowly limit the inquiry to Facebook's revised projections, but that is not the theory of their Complaint.  And



Even if this case were so limited, however, Facebook's revised projections were not kept in a lockbox, as Plaintiffs contend. Instead, evidence shows that information about Facebook calling underwriters and disclosing revised projections spread widely and rapidly:

- Contemporaneous investor emails show that ***many institutional investors (including those with individual—or "retail"—clients) learned almost immediately that Facebook was*** ████████████████████████████████████████

- Investors have also testified that ***they knew "Facebook had been calling its underwriters to inform them that Facebook had lowered its internal projections for the second quarter and full year of 2012, primarily due to mobile.***"  (*E.g.*, A-61 (Foster Decl. ¶ 3).[3]

---

[1]   Cites "A-1" to "A-1496" are to the Appendix to the Apr. 10, 2015 Declaration of Adam B. Stern, filed with Defendants' Opposition to Plaintiffs' Motion for Class Certification ("Opposition" or "Opp.").  Cites to "A-1497" and beyond are to the Appendix to the Aug. 13, 2015 Declaration of Adam B. Stern.  Emphasis within quotes is added unless otherwise noted.

[2]   (*See also, e.g.*, A-964 (TROW-00016) (May 11, 2012 email and memo informing T. Rowe Price distribution group that "the company's Treasurer/IR has been calling sell-side analysts up and telling them that the[ir] 2Q12 revenue is heading towards the lower end of the range they previously gave them"); A-547 (JENN 0001313) (May 9, 2012 email to Jennison distribution group, stating that "[t]hey are calling the underwriters tonight to translate this commentary into q2 revenue 'guidance' which will now fall at the lower end of the $1.1-1.2b range and represents growth of 23%-34%.").)

[3]   (*See also, e.g.*, A-98 (Ward Decl. ¶ 6) ("I acquired information and believed that Facebook personnel had informed analysts to lower revenue projections to the low-end of the prior forecasted range for the quarter."); A-89 (Schilling Supp. Decl. ¶ 5) ("I was aware in the

- Some investors **shared this information with others**.  (*E.g.*, A-547 (JENN 0001313) (sharing news of Facebook's revised guidance); A-1548 (Hui Decl. Ex. E); Opp. Ex. A.)

- Investors have also testified that **underwriters' representatives directly** told them about Facebook's revised projections.  (*See, e.g.*, A-14 (Brown Decl. ¶ 3).[4])

- 

- Underwriter analysts also testified that many investors with whom they spoke were **already** aware that Facebook had revised its projections and that Facebook had called its underwriters. ███████████████████████████████ A-1530-31 (Anmuth Supp. Decl. ¶¶ 4-5); A-11-12 (Bellini Decl. ¶ 8).)

- In addition, investors who may not have been told directly about Facebook's revised projections testified that they nevertheless "understood the underwriters' revisions were made because Facebook had informed underwriters of changes to its own revenue

---

period prior to the IPO that Facebook was cutting its projections in advance of the IPO due to the trend in mobile…."); A-81 (Kapoor Decl. ¶ 4) ("At the time of the initial public offering, [Waddell & Reed] was aware that Facebook Inc. had recently revised its revenue projections for 2012 due to increased use of Facebook on mobile devices which was negatively impacting revenues more than had been previously expected."); (A-1568 (Shaulov Decl. ¶ 2) (Maple Lane Capital knew that "Facebook had been calling its underwriters and telling them that Facebook had lowered its internal projections for the Second Quarter and full year of 2012").)

4   (*See also, e.g.*, A-6-7 (Barrett Decl. ¶ 5) ("Certain of [the underwriters'] analysts informed [me] that Facebook recently had lowered its internal revenue projections to reflect an anticipated decline in Facebook's revenue growth"); A-203 (Kuhlkin Dep. Tr. 32) (learned about Facebook's revised guidance from "more than one underwriter");  A-16 (Burke Decl. ¶ 4) ("[R]esearch analysts from the underwriting syndicate appear to have advised Fidelity that they had reduced their own estimates and that Facebook had reduced its guidance post the amendment."); A-17 (Casey Decl. ¶ 4) (underwriter Stifel's analyst told him that "Facebook had recently lowered its internal projections" to reflect "the growing use of mobile devices to access Facebook"); A-1541 (Feldman Decl. ¶ 2) (from discussions "with representatives of several of the underwriters for Facebook's IPO … I learned that Facebook had … revise[d] its revenues projections from $5 billion for the full year 2012 to less than $5 billion.").)

projections." (A-1539 (Dveirin Decl. ¶ 2); *see also* A-1560-61 (Mitchell Decl. ¶¶ 2-3); A-46.2 (Ettinger Decl. ¶ 4); A-220-21 (Kuhlkin Dep. Tr. 98-99).)

- Underwriter analysts confirmed that they told investors they had spoken with Facebook management, and that they believe investors understood underwriters made their revisions because Facebook management gave underwriters revised projections. (A-1530-31 (Anmuth Supp. Decl. ¶ 4); A-1534 (Bellini Supp. Decl. ¶ 3).)

- Plaintiffs' and Defendants' experts agreed that ███████████████████████
███████████████████████████████████████████████████████████████
██████ A-1337-41 (Womack Report ¶¶ 27-33)), ████████████████████████
███████████████████████████████████████████████████████████████

- Defendants' expert opined that information about Facebook's revenue projections spread widely throughout the investor community. (A-1428-29 (Ghose Report ¶ 118).[5])

Plaintiffs hardly respond to this overwhelming evidentiary record. Instead, they try to manufacture "common questions" about whether investors had **constructive** knowledge of Facebook's own projections. But this case is not about constructive knowledge; it is about what each investor **actually** understood. *See N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 127 n.13 (2d Cir. 2013) (knowledge defense requires "defendant to prove actual knowledge," not just that the "plaintiff should have known the relevant information"). Actual knowledge plainly requires individual inquiries where, as here, the record amply identifies "*individualized proof* indicating knowledge or awareness." *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 120-21 (2d Cir. 2013) (emphasis in original).

Mischaracterizing lead underwriters' 30(b)(6) deposition testimony, Plaintiffs claim that

---

[5] Defendants have separately responded to Plaintiffs' motion to strike the Ghose Report, in which Plaintiffs disingenuously argued that Dr. Ghose opined that investors had constructive knowledge of the mobile revenue impact based on media reports. As Defendants explain in their opposition to Plaintiffs' motion to strike (ECF 300), Dr. Ghose gives expert evidence regarding the widespread diffusion of information about the mobile revenue impact. This underscores that individual inquiries are required into each investor's own connections to information in the media, online, and communications with underwriters and other investors.

not many investors had actual knowledge because nondisclosure agreements ("NDAs") supposedly prevented underwriters from telling investors about Facebook's revisions.  Plaintiffs are obviously wrong. ████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████  Underwriter analysts believed they were "permitted under the NDA to tell investors that [they] … had revised [their] own estimates of Facebook's revenue … after receiving new guidance from Facebook." (A-1534 (Bellini Supp. Decl. ¶ 4).)   In short, the NDAs did not "change the manner in which [underwriters] communicated with institutional investors." (A-1530 (Anmuth Supp. Decl. ¶ 2); *see also* A-1534 (Bellini Supp. Decl. ¶ 2); A-1537 (Devitt Supp. Decl. ¶ 2).)

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████  *see also* A-1570 (Wagner Decl. ¶ 2) ("Based on my experience in this highly publicized IPO, specific press coverage following the FWP of a change in Facebook's projected revenues and my communications with investors, it was my assumption that the information regarding Facebook's revised projected revenues was generally known by the investors with whom I spoke in the days after May 9, 2012 through the May 16, 2015 pricing date of the IPO.").)

Plaintiffs try to avoid this evidence by limiting Defendants' knowledge defense to information "directly attributed to Facebook," Reply 10, rather than information investors received from another source or subjectively inferred.  That too is wrong.  An investor's knowledge can come "from multiple public and private sources." *In re Superior Offshore Int'l., Inc. Sec. Litig.*, 2010 WL 2305742, at *5 (S.D. Tex. 2010); *see also In re IPO Sec. Litig.*, 471

F.3d 24, 43-44 (2d Cir. 2006) (finding that investigative reporting by MSNBC, CNBC, and Barron's indicated widespread knowledge requiring individual inquiries), *rev'g In re IPO Sec. Litig.*, 227 F.R.D. 65, 85-86 (S.D.N.Y. 2004) (explaining that sources for the reports included "market experts," "a finance professor," and the SEC).  It also may be shown by evidence that the investor "received the information from someone else" or "by evidence … that he indicated to someone else that he had the knowledge"; and it "can be inferred."  5 Bromberg & Lowenfels on Sec. Fraud § 7:150 (2d ed. 2015); *see also Fed. Hous. Fin. Agency v. HSBC N. Am. Holdings Inc.*, 33 F. Supp. 3d 455, 480 (S.D.N.Y. 2014) ("[C]ircumstantial evidence of actual knowledge can be just as probative as direct evidence.").

Plaintiffs' response is to ask this Court to certify at least a class of retail investors.  But that does not save their case because institutional advisors' knowledge is imputed to their individual clients, many of whom fit Plaintiffs' newly-adopted FINRA definition of retail investors; the proposed retail class thus includes knowledgeable investors.  Moreover, Plaintiffs' institutional investor subclass (which they now concede was told of underwriters' revisions) has a conflict with any retail investor subclass (which Plaintiffs say was not told) about whether the underwriters' revisions were material and their disclosure caused the May 22 decline.  And both proposed subclasses run afoul of *Comcast Corp. v. Behrend*, which precludes a class action that combines a liability theory limited to Facebook's revisions (as Plaintiffs now urge) with a damages theory that includes price responses to a disclosure about underwriters' revisions.  133 S. Ct. 1426, 1433 (2013) (a class cannot be certified where a damages methodology does not "measure only those damages attributable to [plaintiff's current] theory" of class-wide liability).

Plaintiffs' other suggestion that the Court should carve out the purportedly "few" knowledgeable investors and limit individual inquiry to them, Reply 47-48, is equally

inappropriate.  Defendants have now submitted declarations from over thirty investors whose combined allocation was nearly twenty-eight percent of the IPO shares—and that does not include the many other investors whose documents indicate knowledge.  These thirty-plus investors are a varied group, ranging from one of the largest broker-dealers in the world (Fidelity), to an individual computer programmer (Ian DelBalso), and everything in between, including hedge funds, banks, and investment advisors such as Jennison and Sands who purchased shares on behalf of thousands of institutional and individual clients.  Plaintiffs point to nothing that distinguishes these investors from all the other proposed class members.

To take just one example, Plaintiffs would have the Court exclude Jennison, which Plaintiffs concede is subject to a knowledge defense, Reply 48, but not AllianceBernstein, an investment management firm that bought 500,000 shares in the IPO (A-374 (FB-IPO 0005204)), and invests on behalf of individually managed accounts (A-1843, 1848 (AllianceBernstein L.P., 2014 Form 10-K (Feb. 12, 2015)).)  Yet AllianceBernstein had conversations about "revenue reductions," "deceleration," "revenue growth," and/or "estimates" with at least six underwriters' representatives, ███████████████████████████████████████████████ ███████████████████████████████████████████████████ (A-1783 (JPM_FB_00011225);  A-1785  (MS_FB_00013891);  A-1737  (FB-IPO  0062987);  A-1801 (PAC_FB_000000010); ████████████████████████.) █████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████████████████. Only by considering this *individual* evidence could a fact finder address whether AllianceBernstein (and investors on whose behalf it purchased) knew not just of the underwriters' revised projections but also that Facebook had

revised its projections because mobile usage had already impacted revenue growth.  After individual inquiries, the result for AllianceBernstein and countless other investors will be no different than for Jennison.  *See Wal-Mart Stores, Inc v. Dukes*, 131 S. Ct. 2541, 2561 (2011).

Defendants are not required at the class certification stage to conduct individual discovery of every class member as to whom they may have an individualized defense; rather, Defendants only have to submit evidence "indicat[ing] that individual knowledge inquiries *might* be necessary."  *N.J. Carpenters Health Fund v. Rali Series 2006-QO1 Trust*, 477 F. App'x 809, 813 (2d Cir. 2012); *see also In re IPO Sec. Litig.*, 471 F.3d at 43-44 (holding predominance not shown where the record created "at least a reasonable inference" of the need for widespread individual knowledge inquiries).   The evidence overwhelmingly shows that in this case, individual inquiries *are* necessary for knowledge, as well as the issues of causation and materiality that Plaintiffs would have this Court put off.  Class certification should be denied.

## ARGUMENT

## I.     INDIVIDUAL KNOWLEDGE ISSUES DEFEAT PREDOMINANCE.

Even if the knowledge inquiry were limited to Facebook's own revised projections (which it is not, *see infra* Section VI), the record raises more than a "reasonable inference" that actual knowledge requires individualized inquiries, *see In re IPO Sec. Litig.*, 471 F.3d at 43-44 n.14, and "cannot be answered with generalized proof," *Glatt v. Fox Searchlight Pictures, Inc.*, --- F. 3d ---, 2015 WL 4033018, at *9 (2d Cir. 2015) (vacating district court's class certification order in an FLSA case where "the most important question in this litigation cannot be answered with generalized proof").  The answer would be no different even if knowledge were solely an affirmative defense, which it is not under Section 12.  Because an affirmative defense is "in reality the 'mirror image' of plaintiffs' claim … there is no reason … to [] give[] [a] 'defense' less weight in determining whether class certification would serve the goals of the predominance

requirement." *Myers v. Hertz Corp.*, 624 F.3d 537, 551 (2d Cir. 2010); *see also Wal-Mart*, 131 S. Ct. at 2561 ("[A] class cannot be certified on the premise that [a defendant] will not be entitled to litigate its statutory defenses to individual claims.").[6]

In response, Plaintiffs offer a red herring. They say knowledge of Facebook's projections is no obstacle to certification because **constructive** knowledge supposedly presents common issues. But Defendants are arguing that individual investors had **actual** knowledge. Where the record contains, as here, ample individualized evidence indicating that class members were aware of the alleged omission, courts have not merely excluded or limited individual inquiry to those who submitted that evidence, as Plaintiffs suggest (Reply 47)—courts have denied class certification. *See*, *e.g.*, *In re IPO Sec. Litig.*, 471 F.3d at 43; *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 226 (2d Cir. 2008); *cf. In re U.S. Foodservice*, 729 F.3d at 120 (recognizing that individual knowledge issues "that will be components of defendants' **defense**" warranted denying class certification where "defendants had produced evidence that class members … [were] wholly aware of the truth") (emphasis in original) (quoting *Sandwich Chef of Tex., Inc. v. Reliance Nat'l Indem. Ins. Co.*, 319 F.3d 205 (5th Cir. 2003)).[7]

---

[6]   Relying on *Brown v. Kelly*, 609 F.3d 467, 483 (2d Cir. 2010), Plaintiffs incorrectly say the Court's predominance inquiry focuses "primarily" on liability issues. Reply 6, 52-53. While *Brown* shows that "the existence of a defense potentially implicating different class members differently does not **necessarily** defeat class certification," *Myer* makes clear that defenses must get the same weight as other issues in assessing predominance. *Myers*, 624 F.3d at 551. That makes particular sense here where knowledge is also an element for a Section 12 claim. *Cf. In re IPO Sec. Litig.*, 483 F.3d 70, 73 & n.1 (2d Cir. 2007) (reaffirming reversal of predominance finding without regard to burden of proving knowledge).

[7]   The cases upon which Plaintiffs rely are inapposite because the defendants in those cases submitted no credible evidence of actual individual knowledge. *See In re U.S. Foodservice*, 729 F.3d at 121 ("the record does not contain a single piece of evidence suggesting 'actual individual knowledge' on the part of a specific customer"); *Pub. Employees' Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 277 F.R.D. 97, 118 (S.D.N.Y. 2011) ("evidence in the record that any class member knew of false statements in the Offering before purchase is weak at best"); *In re Lehman Bros. Sec. & ERISA Litig.*, 2013 WL 440622, at *3-4 (S.D.N.Y. 2013) (noting an

### A.     Plaintiffs' Common Questions Are Irrelevant Because Constructive Knowledge Is Not At Issue.

The "common" questions relevant to the predominance inquiry are only those that go to "central disputed issues."  *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1253 (2d Cir. 2002); *see also Wal-Mart*, 131 S. Ct. at 2551 (relevant common questions are those whose "truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke").  None of Plaintiffs' "common questions" about knowledge fit the bill.   All three are admittedly questions about constructive knowledge, Reply 14, 20, 22, while the relevant inquiry here is actual knowledge, which requires individual inquiries into each investor's subjective awareness.

To begin, contrary to Plaintiffs' mischaracterization, Reply 19, Defendants have made clear that they are not arguing constructive knowledge as the basis for defeating certification:

> Defendants are not seeking to charge investors with knowledge of anything ….
> Rather, Defendants ***agree*** with Plaintiffs (Mem. at 28-29) that, as *Federal Hous. Fin. Agency [v. HSBC North America Holdings Inc.*, 33 F. Supp. 3d 455, 480 (S.D.N.Y. 2014)], explains, the inquiry is whether each investor had actual (***not constructive***) knowledge of the specific information.

Opp. 27; *see also id.* at 35.  Neither Professor Womack, Defendants' expert in the IPO process, nor Professor Ghose, their expert in information diffusion, opined on constructive knowledge.  Rather, Womack opined that "determining whether any particular institutional investors knew about Facebook's or the underwriters' revised revenue projections … would require inquiry about what communications each investor had with underwriters, Facebook, or others, and what understanding the investor drew from such communications."  (A-1347 (Womack Report ¶ 45).)

---

"absence of any significant evidence" of knowledge).  The evidence of knowledge in *Lehman Bros.*, on which Plaintiffs rely heavily, did not approach the scope of the record here.  No investor declarations admitted to actual knowledge, nor was there evidence that the specific information was widely disseminated by various sources; the few declarations spoke only to general practices.  But here dozens of declarations and documents show that thousands of investors, including the Lead Plaintiffs' own investment advisors and retail investors, were actually aware of the specific information allegedly omitted and obtained that knowledge from a wide variety of sources including the underwriters' representatives.

He did not opine that industry practice **charges** investors with understanding Facebook revised its projections based on underwriters' revisions.  Similarly, Ghose opined that information about Facebook's revisions spread so widely in the media and through the investor and analyst community that individual inquiries are warranted to find out which investors learned about it, not that investors should be **charged** with knowing it.  (A-1428-29 (Ghose Report ¶ 118).)

Thus, far from "hotly disput[ing]" whether investors can be charged with knowledge, the parties **agree** knowledge **cannot** be presumed and requires proof of actual knowledge of the untruth or omission.  Reply 14.  And actual knowledge turns on whether an individual investor was subjectively aware of Facebook's revisions.  *See N.J. Carpenters Health Fund*, 709 F.3d at 127 n.12; *see also McLaughlin*, 522 F.3d at 233 n.10 (distinguishing "constructive notice," which goes to "what a 'reasonable person' would have known," and "actual notice").

Plaintiffs object to Defendants' reliance on *McLaughlin*, saying it is not a securities decision.  Reply 14 n.9.  But the Second Circuit has recognized that where a defendant shows that some investors might have actual knowledge, neither a Section 11 nor a Section 12 class can be certified.  *See In re IPO Sec. Litig.*, 471 F.3d at 43-44.  Like *McLaughlin*, *In re IPO* underscores that a subjective inquiry into state of mind is an individual inquiry that precludes class certification.  *Cf. Burley v. City of New York*, 2005 WL 668789, at *8-9 (S.D.N.Y. 2005) ("A class whose definition hinges on subjective determinations is incompatible with Rule 23's definiteness requirement.").  Indeed, in securities fraud cases courts routinely recognize that in the absence of a presumption of reliance, the necessary individual inquiries into reliance preclude class certification.  *See In re AIG, Inc. Sec. Litig.*, 689 F.3d 229, 241 (2d Cir. 2012).[8]

---

[8]   *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2412 (2014), and *In re NASDAQ Market-Makers Antitrust Litigation*, 169 F.R.D. 493, 523 (S.D.N.Y. 1996), do not say that where a defendant proves that some individual investors have actual knowledge, a

*In re U.S. Foodservice*, which like *McLaughlin* is a consumer fraud case, says the same thing.  The Second Circuit upheld class certification because "the record does not contain a single piece of evidence suggesting 'actual individual knowledge' on the part of a specific customer."  *In re U.S. Foodservice*, 729 F.3d at 121.  In contrast to the record here, the defendant had offered only "conjecture" about individual class members' awareness and expert testimony on industry practice.  The Second Circuit distinguished, but did not disagree with, the Fifth Circuit's decision in *Sandwich Chef*, 319 F.3d at 220-21, which found a fraud class improperly certified where a defendant submitted "*individualized proof* indicating knowledge or awareness" of the challenged practices.  *In re U.S. Foodservice*, 729 F.3d at 120 (emphasis in original).

**B.      The Record Contains Individualized Evidence Indicating Investors' Actual Knowledge Or Awareness Of Facebook's Revised Projections.**

Defendants here have built a record of overwhelming "*individualized proof* indicating knowledge or awareness," *id.* (emphasis in original):  (i) many investors learned expressly that Facebook itself revised its projections, and (ii) many investors who may have learned expressly only of underwriters' revised projections fully understood that the underwriter analysts' estimates were ██████████████████████████████████████

**1.      Individualized Evidence Indicates That Thousands Of Investors Were Told Expressly About Facebook's Revised Projections.**

Plaintiffs try to minimize Defendants' mountain of evidence by claiming it relates to "just 27 investors."  Reply 47.  But testimony from over two dozen investors—and it is now over thirty investors—is far more than any other case challenging class certification on these grounds

---

class can still be certified.  Reply 40.  In *Halliburton*, 134 S. Ct. at 2412, the Supreme Court recognized that reliance is a common issue where the presumption of reliance applies, even if that presumption might be rebutted for individual class members.  *In re NASDAQ Market-Makers*, 169 F.R.D. at 523, held that the impact element of a price-fixing antitrust claim is a common issue because it requires proof only of widespread injury; the degree to which individual class members were injured goes only to damages.

and is alone sufficient to justify individual inquiries into each investor's actual knowledge. These investors, moreover, were allocated a whopping twenty-eight percent of the IPO shares, which greatly exceeds the (erroneous) twelve percent line that Plaintiffs invented in their opening memorandum as a test for whether common questions predominate. Mem. 32.  Nor are these investors a unique or readily identifiable bunch.  They represent a sampling of small and big investors (A-373, A-378 (████████ purchased over 8 million shares; ████████ purchased 50,000)), who bought shares on behalf of thousands of clients, including both proposed institutional and retail class members ████████████████████████████████████

████████████████████████████████████████████████████████

████████████  Their allocations range from the largest (Fidelity's 30 million shares (A-373)), to the more modest (Chilton's 50,000 (A-61)), to the small 400 share allocation Mr. DelBalso received (A-560). ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████  And Defendants are submitting with this Sur-Reply still more investor declarations showing that allocants Maple Lane Capital (A-1568 (Shaulov Decl. ¶¶ 2-3)), Weiss Multi-Strategy Advisers (A-1541 (Feldman Decl. ¶¶ 2-3)), and Columbia Management Investment Advisers (A-1552 (Iijimia Decl. ¶¶ 3-4)), also knew about Facebook's

---

9   Plaintiffs criticize the Jennison analyst for not "recall[ing] *any* of the other market participants with which she discussed [Facebook's] revised projections, apart from her husband … and a colleague at Fidelity."  Reply 50 (emphasis in original).  But this incomplete memory merely underscores why it is fair to inquire individually:  other investors' emails, phone logs, calendars, or memories may confirm discussions between investors.  Plaintiffs have already admitted that Fidelity learned about Facebook's revised projections.  *Id.* at 48.  They give no reason further individual inquiry is not required to determine which other investors learned from either the Jennison analyst, the Fidelity representative or from the other 49 people at Jennison who indisputably knew.  (A-1548-50 (Hui Decl. Ex. E) (listing recipient of JENN 0001313).)  Indeed, other documents show that numerous people at Jennison did "a deep dive on Facebook" on May 10 with another underwriter, Credit Suisse, and discussed the import of the fact "[t]hat FB … just lowered 'guidance' for Q2."  (A-1733 (CS_FB_00000078).)

revised projections.[10]  All of this evidence—which represents a cross-section of investors and which required hundreds of hours of third party discovery—highlights the extensive individual inquiries that would be necessary to discover what the other thousands of investors knew and reflects precisely the sort of individual inquiry that precludes class certification.

Moreover, the evidence in the record relates to far more than just thirty-plus investors and their thousands of clients; they are the tip of the iceberg.  Sworn testimony unambiguously shows that underwriter analysts *did* tell investors about Facebook's revised projections.  (A-6-7 (Barrett Decl. ¶ 5) (underwriter "analysts told [them] that Facebook recently had lowered its internal revenue projections"); A-14 (Brown Decl. ¶ 3) (describing discussions with underwriters representatives revealing that "primarily due to a continued trend of increased mobile usage, Facebook's projected revenue ha[d] been reduced from a range of $1.1 to $1.2 billion dollars for the second quarter of 2012 to the low end of that range and from $5 billion for the full year 2012 to less than $5 billion"); A-16 (Burke Decl. ¶ 4) ("[R]esearch analysts from the underwriting syndicate appear to have advised Fidelity … that Facebook had reduced its guidance post the amendment."); A-17 (Casey Decl. ¶ 4) (stating that a Stifel analyst "informed [him] that Facebook had recently lowered its internal projections of future revenue to reflect a newly anticipated decline in revenue growth"); A-1541 (Feldman Decl. ¶ 2) (stating a Weiss Multi-Strategy Advisors' analyst learned about Facebook's revised projections from "representatives of several of the underwriters for Facebook's IPO"); A-202-03 (Kuhlkin Dep. Tr. 31-32) (testifying that she learned from multiple underwriters' representatives that "Facebook was calling the underwriters to translate the commentary from the FWP into Q2 revenue guidance"); A-362

---

[10]  While Plaintiffs attempt to preempt additional evidence, Reply 6, they also explicitly invite it, *id.* at 48-49 ("Plaintiffs would also not object to the exclusion of other specific investors that Defendants credibly identify as having actual knowledge (including in their surreply).").

(CITI_FB_00000136) ; A-1708, 1710 (ACI00113205, 07) (notes of American Century calls with underwriter analysts showing projected revenues at low end of $1.1-1.2 billion estimate for Second Quarter 2012 and $150 million below $5 billion estimate for full 2012 year);

Plaintiffs ignore page after page of documents showing that investors and underwriters discussed the fact that ***Facebook***, not just underwriters, revised projections.  In addition to the documents cited in Defendants' Opposition (*e.g.*, at 22-25), continued discovery shows, for example,

—which received an allocation from underwriter Cabrera Capital's "***retail*** retention" (A-1498-99, 1525-28 (Aguilar Decl. ¶¶ 4-5 & Exs. 4, 5); A-1726 (CCM_FB_00006881))—asked Bank of America about "the recent guidance revision."  (A-1784 (MLPFS_FB_00000016).)  Polygon Investment Partners raised the question of "cannibalisation of ad revenues" in light of "revised guidance from the company."  (A-1773 (GS_FB_00000937).)   Soros Fund Management "[l]eft mtg with [management] feeling that [Facebook's CFO] didn't understand the severity of taking #s down."  (A-1780 (GS_FB_00001424).)  And "[d]iscussed [the] recent number cut" and "25% growth in Q2" with Pacific Crest.  (A-1810-11 (PAC_FB_00001607).)

A J.P. Morgan analyst explained that his notes of investor feedback repeatedly contain the term "revisions," which in some instances "reflect statements [investors] made to the effect

14

that **Facebook** had revised its revenue projections." (A-1531-32 (Anmuth Supp. Decl. ¶ 6).) Likewise, Pacific Crest has notes reflecting calls with investors that repeatedly contain the terms "new #s," "new numbers," "updated numbers," or "number changes," including calls with investor ██████████████████, who thought the new numbers would be "rounding [e]rrors anyway" and investor ████████████████, who "d[idn't] care" about them. (A-1812-13 (PAC_FB_00001607).) Analysts from other underwriters had similar notes. (*See, e.g.*, A-1781 (GS_FB_00001456) (Thornburg Value Fund "[d]iscussed the guide down last week"); A-1730-32 (CS_FB_00000031-33) (notes from over 20 calls between Credit Suisse and investors, including with ████████ about "their numbers" and with ██████████████ about the fact that "Ests ha[d] effectively been lowered for FB"); A-1723 (BCI_FB_00000002) (summarizing calls between Barclays and two investors regarding the "reset of revs following updated s-1"); A-1778 (GS_FB_00001199) (identifying "financial guidance" as a "[k]ey [f]ocus of [m]eeting/[q]uestions to [d]iscuss in "3x1" meeting with Alyeska Investment Group ).)[11]

Ignoring all this, Plaintiffs mischaracterize the 30(b)(6) deposition testimony of the three lead underwriters, wrongly suggesting these witnesses said no underwriter representative told any investor about Facebook's revised projections. In the first place, none of these witnesses spoke about discussions *other underwriters* may have had. And as Mr. Fisher of Goldman Sachs testified, he did not know the content of the "many, many conversations" between investors and "hundreds" of Goldman Sachs salesforce members, including private wealth

---

[11] Plaintiffs do admit that T. Rowe Price must be excluded based solely on evidence from documents. Yet Plaintiffs minimize that evidence, arguing it is just an email discussing the "'buzz' about Facebook's revenue cuts," without "identify[ing] anyone who was actually discussing this issue." Reply 50. This makes no sense. The memo itself was sent to an internal distribution group and discussed the fact that "the company's Treasurer/IR has been calling sell-side analysts up and telling them that the[ir] 2Q12 revenue is heading towards the lower end of the range they previously gave them." (A-964.)

manager representatives, and that it was "entirely possible" that there were conversations about Facebook revising its forecasts; the only way to find out "would be to ask every individual about the conversations they had." (A-1586-87, 1591, 1594-95 (Fisher Dep. Tr. 247-48, 253, 272-73).) Mr. Stewart of Morgan Stanley testified that sales call feedback reflected comments from investors about "Facebook cut[ting] its numbers," which was used "interchangeably" with "analysts cut[ting] its numbers" (A-1674-75 (Stewart Dep. Tr. 149-50)), and he explained that he did not know how the sales force answered questions that came up, such as "'Have you spoken to the company?'" (A-1670 (Stewart Dep. Tr. 139).) Mr. Wintroub of J.P. Morgan likewise recognized that "there was different information that institutional investors had based on our – when we discussed our revised projections and our views on the business with them." (A-1654 (Wintroub Dep. Tr. 103).)

Plaintiffs elected not to depose a single one of the analysts or salespersons *who actually had conversations with investors*. They dismiss the declarations from the lead three underwriters' analysts who had those conversations on the ground the analysts did not specifically say they "inform[ed] investors" of Facebook's revised projections. Reply 14, 20-21. But those declarations plainly say that investors' discussions with the analysts indicated that many investors were aware that "Facebook had called underwriter analysts to … provide them with an updated revenue outlook for the second quarter of 2012 and full 2012 year." (A-4-5 (Anmuth Decl. ¶ 8); *see also* A-11-12 (Bellini Decl. ¶ 8).) Ms. Herman's declaration similarly says it was clear to her that many investors in roadshow meetings after May 9, 2012 were aware of "the Company's revised revenue projections." (A-77-78 (Herman Decl. ¶ 6).)

The knowledge inquiry only requires a showing that an investor knew about the alleged omission, not the *source* of the investor's knowledge. *See Rali Series*, 477 F. App'x at 813 ("the

defendant must show the purchaser's actual knowledge of the specific untruth or omission"); *see also In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 441 (S.D.N.Y. 2001) (defendant must show the plaintiff was "aware" that the registration statement contained a material misrepresentation but need not show the plaintiff knew the true fact that was misrepresented).  An investor's knowledge can come from "multiple public and private sources," *In re Superior Offshore*, 2010 WL 2305742, at *5, and "may be shown by evidence that [a person] received the information from someone else," or "by evidence … that he indicated to someone else that he had the knowledge."  5 Bromberg & Lowenfels on Sec. Fraud § 7:150 (2d ed. 2015); *see also Rali Series*, 477 F. App'x at 814 ("public information could constitute circumstantial evidence of individual purchaser knowledge").[12]

*Federal Housing* did not suggest, as Plaintiffs do, that "awareness" is insufficient.  (ECF 302 at 5.)  Rather, it rejected as insufficient awareness that a misrepresentation "***might***" be inaccurate.  33 F. Supp. 3d at 481.  That is a far cry from saying an investor who is aware of omitted information can bring a disclosure claim so long as it learned the information from a source other than the ***issuer***—much less that an investor's awareness is insufficient grounds to warrant ***individualized inquiry***.  *See In re U.S. Foodservice*, 729 F.3d at 120 ("*individualized proof* indicating knowledge or ***awareness***" warrants individual inquiry); *see also Rali Series*, 477 F. App'x at 813 ("the question before [the court] … is not the *merits* question of whether defendants have shown purchasers' knowledge, but the *certification* question of whether

---

[12] Actual knowledge also "can be inferred from knowledge of related things" or "from access or position."  5 Bromberg & Lowenfels on Sec. Fraud § 7:150 (2d ed. 2015); *see also SEC. v. KPMG LLP*, 412 F. Supp. 2d 349, 384-85 (S.D.N.Y. 2006) (holding that "a jury could infer" knowledge that "financials were significantly misstated," where defendant denied "actual knowledge" of accounting fraud, but was aware of an "economically irrational result").  But in all events the question of "actual knowledge" is about what investors subjectively understood, not whether they should be charged with understanding it.

common liability issues predominate over individual knowledge defenses").

In any event, in addition to the investor testimony and documents already discussed, **underwriters' own testimony makes clear that in many conversations with investors underwriters were the source**—and in many other conversations, investors had already learned about Facebook's revisions from another source. ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████ ████ *see also* A-1820-21 (WFS_FB_00011475, WFS_FB_00012731) (internal Wells Fargo email passing along information from call with Cipora Herman that Facebook had "[r]evise[d] q2 revs and full year #s down due to mobile usage").)  In addition, in other conversations with investors, ███████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

[REDACTED]

Other underwriter analysts have testified similarly.  (*See, e.g.*, A-1534-35 (Bellini Supp. Decl. ¶¶ 3, 5) (Ms. Bellini "told some [investors] that [she] had spoken with Cipora Herman, Facebook's Treasurer, after the May 9 filing" and "that [Goldman's] revenue estimates were generally in the same range for those periods for which Facebook had provided revenue guidance"); A-1570 (Wagner Decl. ¶ 2) ("Shortly after the FWP was filed, I spoke with at least one or two potential investors about the revised guidance concerning Facebook's projected revenues for the second quarter of 2012 and the full 2012 year."); A-1530 (Anmuth Supp. Decl. ¶ 4) ("In many of my conversations with personnel at institutional investors on or after May 9, 2012, the analysts or portfolio managers told me that Facebook had called analysts for the underwriters and given them updated guidance.").)

This record confirms the nondisclosure agreements ("NDAs") did not work in the "extraordinarily restrictive" way Plaintiffs imagine.  Reply 15.  Underwriter analysts "provided investors in the Facebook IPO the same kind of information that [they] typically provided and provide to IPO investors."  (A-1530 (Anmuth Supp. Decl. ¶ 2); *see also* A-1534 (Bellini Supp. Decl. ¶ 2) ("I understood that the NDA allowed me to provide potential investors in the Facebook IPO the same kind of information that I typically provide to investors in IPOs."); A-1537 (Devitt Supp. Decl. ¶ 2) ("The NDA did not change the way I communicated with investors in the Facebook IPO, as compared with how I typically communicated with investors in other IPOs.").) [13] ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████ As one of the Lead Plaintiffs' advisors has testified, "[k]nowing that [in addition to underwriters revising their projections] Facebook also reduced revenue guidance in a similar amount for the

---

[13] Plaintiffs say Mr. Anmuth, a J.P. Morgan analyst expressed concerns about the NDA restricting him from attributing his revised projections to Facebook; but the document they rely upon is a May 2 email to a Facebook representative, Mr. Heysse, a week before projections were revised.  Reply 16 & Pls.' Ex. 49.  As Mr. Anmuth explains, whatever the content of that email, "I do not recall expressing any concern to Mr. Heysse about conveying guidance to investors, either before or after the May 9 filing."  (A-1532 (Anmuth Supp. Decl. ¶ 8).)  Plaintiffs also point to a Goldman Sachs email stating that Ms. Bellini planned to attribute Goldman's revised projections *only* to the May 9 filing, "and not her conversations with Facebook."  Reply 16-17 & Ex. 50.  But Ms. Bellini did not even receive the email, Pls.' Ex. 50, and she has testified that she "told some [investors] that [she] had spoken with Cipora Herman, Facebook's Treasurer, after the May 9 filing," and that "[she] believed at the time (and continue[s] to believe) that [she] was permitted under the NDA to tell investors … that [she] had revised [her] own estimates of Facebook's revenue for the second quarter of 2012 and full 2012 year after receiving new guidance from Facebook regarding its revenue projections for those periods."  (A-1534 (Bellini Supp. Decl. ¶¶ 3-4).)

20

same reasons would not have caused [him] to change [his] 'buy' recommendation for Sands Capital to invest in Facebook in its IPO at the offering price of $38 per share."  (A-1535.2 (Clarke Supp. Decl. ¶ 4).)

Nor has this Court held otherwise, as Plaintiffs claim.  Reply 16 n.10.  Indeed, the Court explicitly stated that Facebook's "fail[ure] 'to disclose its internal revenue projections'" was the "essence" of the derivative complaints, which failed to allege materiality.  *In re Facebook, Inc. IPO Sec. & Deriv. Litig.*, 986 F. Supp. 2d 487, 512 n.24 (S.D.N.Y. 2013) ("*MTD Decision*").  And it held only that the omission in the Complaint—Defendants' "fail[ure] to disclose that known trends had already had a material impact on Facebook's revenues at the time of the IPO"—was sufficient to allege materiality.  *Id.* at 521.  That holding was based on investors not knowing **either** set of revisions, which is what Plaintiffs had argued.  *Id.* at 519.

Individual inquiry is necessary for every single one of the hundreds of institutional investors with whom underwriters' representatives spoke, and certifying a class in light of this record would impermissibly prevent Defendants from raising actual knowledge defenses.

> **2.    Individualized Evidence Indicates That Other Investors Who Were Expressly Told Only Underwriters' Revisions Subjectively Understood That Facebook Had Revised Its Projections.**

Defendants' evidence also shows that even the many institutional investors who may only have been told directly about underwriters' revisions understood that Facebook must have also revised its projections in line with underwriters' revisions.  Opp. 33-35.  The only way to find out which investors had that understanding is individual inquiry.  Plaintiffs conflate a subjective inquiry into what some investors in fact understood with a constructive knowledge inquiry into what all investors should be charged with understanding.  Only the former is at issue.

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████

Individualized evidence shows that this happened in the Facebook IPO—it was "clear"

████████████████████████████████ to some investors who were told expressly only about

underwriters' revisions that Facebook had similarly revised its projections.  For example, an

analyst at Alyeska Investment Group, which was allocated 750,000 shares, testified that

underwriter analysts told him that "underwriters had spoken with Facebook management

following the May 9 filing and then revised their revenue projections for Facebook for the

second quarter and full year of 2012 to reflect a change in the mix of usage of Facebook toward

mobile."  (A-1560-61 (Mitchell Decl. ¶¶ 1-2).)  From this, Alyeska chose to invest in the IPO

with "knowledge that underwriters in Facebook's IPO had revised their revenue projections …

based on information that Facebook shared with them."  (*Id.* ¶ 3.)  As another example, an

analyst at Clovis Capital Management, which was allocated 5,000 shares (A-1538 (Dveirin Decl. ¶ 1)), testified that he learned "underwriters had revised their revenue projections for Facebook for the second quarter and full year of 2012 to reflect increased usage of Facebook on mobile devices." (*Id.* ¶ 2.) "Given that these underwriters had simultaneously revised their projections in roughly the same magnitude, and [his] understanding that issuers discuss revenue projections with their underwriters, [the Clovis analyst] understood the underwriters' revisions were made because Facebook had informed underwriters of changes to its own revenue projections." (*Id.*) And a senior portfolio manager at Federated Kaufmann, which purchased 5 million shares, testified that he learned that "certain analysts had lowered their revenue projections to project decreased growth" and "[he] likely would have assumed that the analysts were basing these projections on information received from Facebook." (A-46.2 (Ettinger Decl. ¶¶ 1, 4).)

These are just a few examples of investors testifying that they were aware that Facebook revised its projections, ***even though they may not have been told that information directly***. They do not stand alone. Underwriter analysts, including the J.P. Morgan analyst who spoke with the Alyeska and Clovis analysts cited above, have explained that they told investors precisely the type of information that according to Plaintiffs' expert "makes it clear" to investors that underwriters revised their projections because Facebook had revised its own. As Mr. Anmuth testified in a supplemental declaration, he told some investors that "[he] had spoken with Cipora Herman" and had thereafter revised his projections. (A-1530 (Anmuth Supp. Decl. ¶ 3).) He "believe[s] that many … investors with whom [he] spoke" then "understood that Facebook had updated its revenue projections," "based on, among other factors, their understanding that [he] had spoken to Ms. Herman following the May 9 filing, their experience with the IPO process, and the fact that [he] and other underwriters' analysts had revised [their]

respective estimates of Facebook's future revenue after Facebook's May 9 filing." (*Id.* ¶ 4.)  He explained that he did not "believe the NDA caused [him] to change the manner in which [he] communicated with institutional investors" in the Facebook IPO.  (*Id.* ¶ 2.)

Ms. Bellini, the Goldman Sachs analyst, similarly explained that she "told some [investors] that [she] had spoken with Cipora Herman, Facebook's Treasurer, after the May 9 filing" and that "[she] believe[d] that the investors to whom [she] provided this information understood that [her] revised revenue estimates reflected updated revenue guidance [she] had received from Ms. Herman."  (A-1534 (Bellini Supp. Decl. ¶ 3).)  Indeed, Ms. Bellini's call records show that she spoke with dozens of investors in the days following the May 9 filing (A-1782.7 (GS_FB 00001560)), while other Goldman representatives had "many hundreds" more such discussions (A-1590-91 (Fisher Dep. Tr. 252-53)).  And Mr. Stewart, Morgan Stanley's vice chairman of global capital markets, testified that "in conversations that I may have had," investors had "an understanding" that "Facebook made a change to its numbers or at least the information that was given to the research analysts led to a change in the numbers."  (A-1673 (Stewart Dep. Tr. 148).)  Mr. Stewart explained further that "investors are aware and understand that research analysts have access to the company and access to information that others may not, and so they understand that these numbers are guided or shaped or influenced by information that – that is given to the research analysts from the company."  (A-1669 (*Id.* at 138).)

Plainly individual inquiry is required to determine which investors who were told directly only about underwriters' revisions also understood that Facebook had revised its projections.

### 3.   The Record Refutes Plaintiffs' Presumption That Investors Could Not Learn About Any Revised Projections From Media Reports.

The record also contains evidence showing that some investors who knew Facebook revised its forecasts learned that information after reading such widely read sources as

24

*Bloomberg* and *Business Insider*.  (*E.g.*, A-94-95 (Ter-Grigoryan Decl. ¶¶ 3-4) ("Fifty minutes after I received the [] Bloomberg article, I emailed a colleague" warning that Facebook  was "calling all analysts pulling down num[ber]s"); A-15 (Burke Decl. ¶ 3.b) ("personnel at Fidelity read, or had access to, articles that discussed … the impact of Facebook's shift of its user base from the web to mobile, including" *Bloomberg's* report that "Facebook is also telling analysts that sales may not meet their most optimistic projections").)  Defendants are not arguing, as Plaintiffs misrepresent, that "investors somehow ***must have*** inferred" Facebook's revisions through media reports.  Reply 40.  The question is which investors other than TPG-Axon and Fidelity ***actually*** learned about Facebook's revisions from media reports.

The cases Plaintiffs cite do not stand for the proposition that an investor cannot obtain "actual knowledge" from reading an article, *see, e.g.*, *Merrill Lynch*, 277 F.R.D. at 116 (disregarding "generic news reports" that "do not directly focus on the Certificates here at issue"); *N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, 2014 WL 1013835, at *9 (S.D.N.Y. 2014) ("there is no testimonial or documentary evidence directly suggesting that a potential plaintiff had knowledge of the misstatements or omissions at issue"), and the Second Circuit has made clear that media reports are relevant to whether individual inquiries are required.  *See In re IPO Sec. Litig.*, 471 F.3d at 43 (holding that widespread individual issues of knowledge precluded a finding of predominance where "two cable television networks, MSNBC and CNBC, reported on the aftermarket purchase requirements in 1999, and in 2000 the practice was the subject of an SEC Staff Legal Bulletin and a report in Barron's discussing the bulletin"); *see also McLaughlin*, 522 F.3d at 221 & 225 (finding individual issues of knowledge based on publicly available information regarding risks of light cigarettes).

Plaintiffs spend several pages splicing language, arguing that individual media articles

are too vague or unreliable to show that an investor knew that Facebook revised its projections.[14]

But they offer **no evidence** that any investor rejected these articles as totally unreliable, much

less that all investors did.  Moreover, none of the articles stands alone.  The point is that each

investor had access to a variety of different information, including traditional news media and

online media reports discussing one of the most widely watched IPOs in history.  (A-1377

(Ghose Report ¶ 35 Figure 2) (displaying the "multiple channels" from which investors obtained

information).)  It is thus irrelevant whether any media report is alone "curative" of the alleged

omission.  (ECF 302 at 4 n.1.)  For example, while Plaintiffs quibble over whether ▮▮▮▮▮▮

learned from the May 11 *Bloomberg* article that "revenue growth was now expected to be 30%,

or 2.5% below $5 billion," Reply 44, what matters is that shortly after he received the *Bloomberg*

article disclosing that "Facebook is telling analysts that sales may not meet their most optimistic

projections," the ▮▮▮▮▮ analyst emailed a colleague that "***they are calling all analysts***

***pulling down nums***" and that revenue growth was expected to be 30 percent.  (A-95, ▮▮▮▮)

Whether this awareness came strictly from the *Bloomberg* article, or from connecting it with

other information, Defendants are entitled to put forward **all** the information each investor had to

show awareness of Facebook revising its projections.

     Finally, Plaintiffs incorrectly argue that this Court held that a boilerplate prospectus

warning prevented investors from learning about the omission from media reports.  That warning

---

[14]  For instance, Plaintiffs attack the May 11 *Bloomberg* article on the grounds that it said
Facebook "may" not meet its most optimistic projections.  Reply 44.  But the fact that
Facebook "may" not meet its most optimistic projections captured the essence of what Cipora
Herman told the underwriters—that Facebook "could" miss its $5b estimate. (A-428 (FB-IPO
0126601).)  Plaintiffs also attack the May 10 *PrivCo* article that states "Facebook admits
mobile shift damaging business faster than expected" and that Facebook "will miss Q2
projections" (A-1278-91), on the grounds that another *PrivCo* article published over three
weeks after the IPO criticized Facebook's Registration Statement.  Reply 45 (citing Ex. 85 at
2).  What *PrivCo* published long after the IPO is irrelevant.

says investors "should not rely on information in public media" and "should rely only on the information contained in this prospectus." (Pls.' Ex. 41 at 31.)[15] Plaintiffs' proposition—that the knowledge inquiry must be resolved based only on information contained in the prospectus and not based on media coverage (or even any information from underwriters or other investors)—is on its face untenable.[16] A prospectus warning does not waive Defendants' statutory knowledge defense, Opp. 29 n.15 (citing, *inter alia*, *Westfall v. City of Cohoes*, 1988 WL 79202, at *5 n.14 (N.D.N.Y. 1988) ("a court cannot infer acquiescence to the deprivation of [a] statutory … right") (internal quotation omitted)), nor does it preclude Defendants from rebutting any evidence of an absence of knowledge for Section 12. Indeed, the knowledge defense would be an empty set if it could only be based on information from the prospectus.

This Court did not rule otherwise in holding that the prospectus warning supported a finding that ***materiality*** was adequately pleaded. Unlike the materiality inquiry, which turns on what a "reasonable investor" should have relied upon, *see MTD Decision*, 986 F. Supp. 2d at 522 ("A reasonable investor will not be ***charged*** to regard press reports as a reliable source of information after having read such advice."); *SEC v. Bank of Am. Corp.*, 677 F. Supp. 2d 717,

---

[15] This type of boilerplate warning is common (*see, e.g.*, A-1838 (AliBaba Group Holdings Ltd. Prospectus at 1 (Sept. 18, 2014)) ("You should rely only on the information contained in this prospectus.")), yet no court has ever held that it precludes an issuer from invoking an actual knowledge defense. To the contrary, numerous courts have held that an actual knowledge defense precludes class certification, even where the prospectus contained a similar warning. (*See, e.g.*, A-1875 (Rhythms Netconnections, Inc. Prospectus at 21 (Oct. 31, 2000)) (prospectus at issue in *In re IPO*); A-1877 (Superior Offshore International, Inc. Prospectus at i (Apr. 19, 2007)) (prospectus at issue in *In re Superior Offshore*).)

[16] Plaintiffs say Facebook "could have relied on its own statements, outside the Registration Statement, if it had "simply issued a press release or made any other public statement disclosing the information it withheld." (ECF 302 at 5.) But this incorrectly suggests that a knowledge defense is limited to an issuer's own statements that both risk violating the securities laws' "quiet period" provisions, *see* 15 U.S.C. § 77e(c), and navigate complex regulatory exemptions from those provisions. As noted above, an actual knowledge defense is not limited to knowledge acquired from the issuer at all. *See supra* pages 17-18.

719 (S.D.N.Y. 2010) (holding "a reasonable investor" would not view media articles as part of "the total mix of information"), the "actual knowledge" standard turns on an investor's subjective awareness.[17]   Plaintiffs point to no evidence showing that investors told about Facebook's revisions considered the prospectus warning a reason to discount that information, much less that the warning prevented them from becoming aware of it.

Moreover, the Court's ruling with respect to materiality was limited to what a reasonable investor might do "***after having read such advice***," *i.e.*, the prospectus warning.  *MTD Decision*, 986 F. Supp. 2d at 522.  But the record shows that many investors, ███████████████████ ███████ never read the prospectus warning.  ███████████████████████

███████████████████████████████████████████████

### 4. The Record Refutes Plaintiffs' Presumptions That Retail Investors Did Not Learn About Any Revised Projections And That Retail And Institutional Subclasses Are Easily Identifiable And Distinct.

Plaintiffs try to cabin Defendants' evidence such that a retail subclass remains an option, insisting that retail investors could not have learned about revised projections.  Reply 24-32. █

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████[18]   Regardless, Plaintiffs submit no evidence rebutting Defendants' showing that

---

[17] Even in the materiality context, the Second Circuit has made clear that the "total mix" of information relevant to the question of materiality can include "publicly available information," just so long as the information appeared in more than just "sporadic news reports," making it reasonable to believe it was part of the "total mix" of information available to investors.  *N.J. Carpenters Health Fund*, 709 F.3d at 126-27.

[18] Plaintiffs suggest "that Facebook used unsuspecting retail investors to achieve an historic $100 billion valuation in the IPO," Reply 22, by "increas[ing] the price and size of the offering, and allocat[ing] a sizeable portion of these shares to retail investors," *id.* at 24, and they attempt to tie it to the revised projections.  This revisionist history is demonstrably

investors did learn this, either directly or through investment advisors.  Their belated reliance on FINRA Rules and the Final Allocation list as conclusive definitions for the proposed subclasses should be disregarded both for tardiness, *see, e.g.*, *Ernst Haas Studio, Inc. v. Palm Press, Inc.*, 164 F.3d 110, 112 (2d Cir. 1999) ("new arguments may not be made in a reply brief"), and for offering no coherent distinction between retail and institutional investors.

Rather than offering any individualized evidence, Plaintiffs instead rely on general policies of two of the 33 underwriters that restricted information that could be given directly to retail investors.  Reply 24-32.  But these policies do not prove that *other underwriters* did not inform "retail" investors.  Indeed, Goldman Sachs's 30(b)(6) deponent testified that the same information available to "institutional" sales representatives, including Ms. Bellini's projections, was available to its private wealth management representatives.  (A-1582-83 (Fisher Dep. Tr. 60-61).)  In any event, the two underwriter policies plaintiffs cite are irrelevant:  Defendants are *not* arguing that individual retail investors learned revised projections directly *from underwriters*, but that thousands of retail investors learned about the revisions through investment advisors who bought on their behalf, as well as from other investors or from media articles.  Opp. 49-54.

---

untrue.  From April 2012—*i.e.*, well before the revised projections of Plaintiffs' theory—Morgan Stanley had recommended allocating 20-30 percent of the deal to retail investors. ██████
██████████████████████████████████████████████████)  The ultimate 26.1 percent retail allocation was about the middle of the original plan, and ██████████████████

Plaintiffs argue that investment advisors Jennison and Gilder, who bought with discretion on behalf of thousands of individual investors, are themselves "institutional" investors, *id.* at 32-24, ***and*** that the individual investors who bought through Jennison or Gilder can purportedly be dealt with *ad hoc*, by either treating them as institutional investors or excluding them from the class, *id.* at 34-35.  Neither argument has merit.  Regardless of whether Jennison and Gilder are "institutional" investors, the individual investors who acquired and owned shares as a result of Jennison's and Gilder's decisions are the ones who have standing to bring claims and who would be class members. *See W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 111 (2d Cir. 2008) (advisor's "unfettered discretion over its clients' investment decisions" did not give advisor standing to sue on clients' behalf).  Plaintiffs themselves contend that any investor not on the Final Allocation list "is necessarily a retail investor."  Reply 61.[19]  Jennison's and Gilder's individual clients are not on that list ███████████ and thus are ***retail*** investors under Plaintiffs' own approach, which means Plaintiffs' retail class impermissibly includes investors who, through their advisors, knew about Facebook's revised projections.

Plaintiffs' inconsistency rebuts the claim that "one can differentiate between institutional and retail investors according to straightforward criteria."  Reply 60.  The supposedly straightforward criteria—the "Final Allocation" list and FINRA Rules—are anything but.

The "'Final Allocation' list"—the document reflecting "institutional pot" allocations—

---

[19] ████████████████████████████████████████████████████████

neither represents exclusively "institutional" buyers of Facebook stock, nor is a list of "every institutional investor that purchased shares in the IPO." Reply 61. The list merely identifies the large allocations made to the most significant institutional money managers and investors through the book-running underwriters' equity capital market process. (A-1498 (Aguilar Decl. ¶¶ 3-4).) Many of those institutions bought shares not just for their own accounts but also on behalf of accounts they managed on a discretionary basis. For example, Jennison and Gilder purchased shares in the IPO on behalf of institutions, as well as many individuals (A-1544-45 ████████████████████████ A-69-70 (Haupt Decl. ¶ 2) (Gilder)), who likely would qualify as retail investors under FINRA Rules that require extensive individualized inquiries into each investor's acquisition of Facebook shares; their relationship with any one of hundreds of thousands of FINRA registered persons, investment companies, investment advisers, banks, insurance companies, etc.;[20] and their financial assets.[21]

Nor are Jennison and Gilder the only ones on the Final Allocation list that bought shares on behalf of individuals. For example, Eaton Vance received shares reflected on the Final Allocation list, some of which it bought on behalf of individual clients and trusts. (A-1554 (Kreider Decl. ¶ 2); A-373 (FB-IPO 0005203).) Indeed, one of the Lead Plaintiffs' advisors, Sands, is on the Final Allocation list as receiving 11 million shares (A-373 (FB-IPO 0005203)), and "[r]oughly two-thirds of the[] accounts" for which it bought shares "were held by high-net-

---

[20]   *See* FINRA Rules 2210(a)(4)(A)-(E), 4512(c)(1)-(2); (A-1861-62 (FINRA Statistics) (4,289 registered FINRA member firms, 161,264 branch offices, and 630,391 registered representatives as of 2012); A-1826-36 (2015 Investment Company Fact Book) (14,725 investment companies—mutual funds, closed-end funds, exchange-traded funds and unit investment trusts—in 2012); A-1822-25 (2012 Evolution Revolution: A Profile of the Investment Adviser Profession) (10,511 registered investment advisers in 2012); A-1852 (FDIC Key Statistics) (7,280 FDIC-insured banks/savings & loans as of May 23, 2012); A-1867-70 (Insurance Information Institute: Industry Overview) (6,086 insurance companies by 2013).)

[21]   *See* FINRA Rule 4512(c)(3).

worth individuals." (A-1535.3 (Clarke Supp. Decl. ¶ 6).)   And Fidelity, UBS, Lord Abbett, AllianceBernstein, Franklin Templeton, Waddell & Reed, and T. Rowe Price, among many others, maintain separately managed accounts for individual investors, where advisors have full discretion over investing decisions.[22]   The evidence shows that each of these institutions was aware of the supposedly omitted facts; and Plaintiffs admit that, "based on the record," at least T. Rowe Price and Fidelity should be excluded from the class.  Reply 48.

In addition, some "institutional investors" purchased IPO shares through the so-called retail allocation and those purchases are not reflected on the Final Allocation list.  Underwriter Cabrera Capital Markets, for example, was given a 500,000 share "retail retention," and allocated 499,900 of those shares to twenty *institutional* investors, including "twelve … investment advisors registered with the Securities and Exchange Commission."  (A-1498-99, 1525-26, 28 (Aguilar Decl. ¶¶ 4-5 & Exs. 4, 5).)  It is unclear whether Plaintiffs include these twelve investment advisers in the "retail" subclass because their allocations through channels other than the Final Allocation list means they are "necessarily retail investor[s]," Reply 61, or in the "institutional investor" subclass because FINRA Rules 2210(a)(4) and 4512(c) make every "investment adviser registered … with the SEC" an "institutional investor."  (*See also* A-1729 (COS_FB_00000006) (reflecting Castle Oak Securities allocations to institutions including ███████████████████████████████).)

Either way, Plaintiffs' "straightforward criteria" point to indeterminate or even contradictory results, and require extensive individualized inquiries.  The same investors might receive an allocation through the "institutional pot"—which Plaintiffs say is limited to

---

[22] (A-1855-60 (Fidelity webpage); A-1880-82 (UBS wepage); A-1871-72 (Lord Abbett webpage); A-1843, 48-49 (AllianceBernstein L.P., 2014 Form 10-K, at 5 & 8 (Feb. 12, 2015)); A-1863-66 (Franklin Templeton webpage); A-1883-84 (Waddell & Reed webpage); A-1878-79 (T. Rowe Price webpage).)

"institutional investors"—and another allocation from the "retail retentions" distributed by other underwriters—which they say is limited to investors who are "necessarily retail." This appears to be what happened at least for Jennison, Morgan Stanley Investment Management, William Blair and Levin Capital Strategies. (Pls.' Ex. 42 (noting 8 million, 10 million, 100,000 and 15,500 share "institutional pot" allocations for these investors, respectively); A-1498-99, 1528 (Aguilar Decl. ¶ 5 & Ex. 5) ███████████████████████████████████████████ ████████████████████████ A-1726 (CCM_FB_00006881) (IPO Certification of ████████ ████████████████ A-1725 (BMO_FB_00000237) (████████████████████████████████ ███████████████████████████████.) It is no answer to say investors can simply fill out standard class member response forms, as Plaintiffs contend. Reply 62-63. Defendants are not required simply to take proposed class members' word for how they should be classified. *See Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 594 (3d Cir. 2012).

### C.     The Court Should Not Consider Or Certify A Class Under Rule 23(c)(4).

Plaintiff belatedly offer Rule 23(c)(4) as a back-up plan, arguing that the Court should certify a class on all "issues" other than knowledge. But Plaintiffs are precluded from requesting Rule 23(c)(4) certification for the first time in their reply brief. *See, e.g., Ernst Haas,* 164 F.3d at 112. This is true even where doing so "d[oes] not deprive [the opposing party] of *all* opportunity to respond, since … full consideration and development of these issues require[] that the arguments be raised in the original moving papers." *Scherer v. Equitable Life Assurance Soc'y of U.S.*, 2004 WL 2101932, at *5 n.1 (S.D.N.Y. 2004) (citing *Ernst Haas,* 164 F.3d at 112); *see also Burroughs v. County of Nassau*, 2014 WL 2587580, at *13 (E.D.N.Y. 2014) (plaintiffs may not "attempt to cure deficiencies in its moving papers by including new evidence in its reply," even if "the court could choose to allow the defendants to submit a [sur]reply brief.").

In any event, Plaintiffs' request is without merit. They ask the Court "to certify for

common resolution all 'issues' other than class members' purported, individualized knowledge." Reply 53.  But the issue of individualized knowledge is "the most important question in [the] litigation," *Glatt*, 2015 WL 4033018, at *9, and regardless of how other issues are resolved, knowledgeable investors cannot recover under Section 11 or 12.  *Rali Series*, 477 F. App'x at 813 & n.1.  Plaintiffs do not even identify the other issues, and for good reason:  other than a common question about whether there is a misrepresentation or omission, the remaining issues of knowledge, loss causation, and materiality all raise individual issues that are preconditions for liability.  This stands in stark contrast to cases like *Charron v. Pinnacle Grp. N.Y. LLC*, 269 F.R.D. 221, 239 (S.D.N.Y. 2010), "where Defendants' liability [could] be determined once, on a class-wide basis, through common evidence," *id.* at 242, or cases like *Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 142 (S.D.N.Y. 2014), and *In re Nassau County Strip Search Cases*, 461 F.3d 219, 230 (2d Cir. 2006), which certified liability classes that resolved ***every*** issue in the case except damages.[23]  There is no precedent for or efficiency in subdividing isolated issues of liability in the way Plaintiffs vaguely propose, while leaving aside other liability issues, including knowledge, to be resolved in thousands of mini-trials.

## II.   INDIVIDUAL CAUSATION ISSUES ALSO DEFEAT PREDOMINANCE.

### A.   *Comcast* Prohibits Class Certification Because Plaintiffs' Broad Damages Are Inconsistent And In Conflict With Their Narrow Liability Theory.

Plaintiffs confirm that they seek damages for declines in Facebook's stock price "[i]n

---

[23]  In *Charron*, the court modified the definition of a proposed class seeking to end a fraudulent rent scheme, and it certified equitable  relief portions of the claims under Rule 23(b)(2) and a "'liability-only' issues class" under Rule 23(c)(4), leaving out individual damages and RICO injury issues.  It found this approach "sensible" because it was efficient "to litigate Defendants' liability on a classwide basis" at the same time for both the equitable relief class and the damages class.  *Id.* at 243-44.   The court expressly distinguished *McLaughlin*, which rejected a Rule 23(c)(4) class in similar circumstances as present here:  "the issue of defendants' scheme to defraud[ ] would not materially advance the litigation because it would not dispose of larger issues, such as reliance, injury, and damages." 522 F.3d at 234.

response to" "'material information'" that "all the lead **underwriters** had significantly cut their forecasts." Reply 58. But they also urge certification by explicitly **excluding** underwriters' revisions from the liability analysis. *Id.* at 9-11. This violates *Comcast Corp. v. Behrend*'s holding that a class cannot be certified where, as here, the proposed damages methodology does not "measure **only** those damages attributable to [plaintiff's current] theory" of class-wide liability. 133 S. Ct. 1426, 1433 (2013).

Plaintiffs try to evade *Comcast* with three flawed arguments. **First**, they claim *Comcast* applies only to antitrust actions, Reply 78—the same specious reasoning soundly rejected in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Just as Rule 8 (in *Iqbal*) governs "'in all civil actions and proceedings in the United States district courts,'" *id. at* 684 (quoting Fed. R. Civ. P. 1), Rule 23 (discussed in *Comcast*) governs all federal-court class actions. *See, e.g.*, *Fort Worth Employees' Ret. Fund*, 301 F.R.D. at 140-42 (applying *Comcast* in 1933 Act case); *Sicav v. James Jun Wang*, 2015 WL 268855, at *6-7 (S.D.N.Y. 2015) (same in 1934 Act case).

**Second**, Plaintiffs argue that *Comcast* does not apply because loss causation is a defense. Reply 81. But it is "well established that courts must consider potential defenses in assessing the predominance requirement." *Myers*, 624 F.3d at 551. Likewise, the statutory formula for damages in 1933 Act cases does not, contrary to Plaintiffs' Reply at 79, 81, excuse Plaintiffs from satisfying *Comcast*. Rather, where, as here, a defendant has raised a negative causation defense because of information that an investor knew before purchase, there are no recoverable damages unless the plaintiff produces "evidence" showing the price decline "actually resulted" from information withheld from the plaintiff. *Akerman v. Oryx Commc'ns, Inc.*, 810 F.2d 336, 343 (2d Cir. 1987); *see also In re OSG Sec. Litig.*, 2015 WL 3466094, at *1 (S.D.N.Y. 2015).

**Third**, Plaintiffs contend that *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct.

2179 (2011) ("*Halliburton I*"), held that loss causation is always a common issue.  Reply 80.

But *Halliburton I* held only that plaintiffs need not prove loss causation on the merits at the class

certification stage.   131 S. Ct. at 2183-86.   *Halliburton I* did not hold that damages may be

sought for reasons outside plaintiffs' class-wide theory of liability, much less that all issues

relating to stock price movements must necessarily be treated as a "common" issue.   To the

contrary, in *Halliburton II*, the Supreme Court directed that the defendant be allowed to

introduce evidence of a lack of price impact at the class certification stage to show the absence of

predominance under Rule 23.   134 S. Ct. 2398, 2414-17 (2014).   The district court in the

*Halliburton* litigation then decided that defendants had shown that five of the six alleged

corrective disclosures did not create common price impact issues and denied class certification

for them.   *Erica P. John Fund, Inc. v. Halliburton Co.*, 2015 WL 4522863, at *28 (N. D. Tex.

2015) (denying certification with respect to five of six alleged corrective disclosures).   Other

courts have denied class certification when individual variations mean causation is not a

common issue.   *See UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 134 (2d Cir. 2010)

(plaintiffs had not shown that causation was a common issue because "varying actions"

prompted individualized questions about proximate causation); *Adkins v. Morgan Stanley*, 307

F.R.D. 119, 143 (S.D.N.Y. 2015) (denying class certification where the question of causation

was "simply not subject to a classwide proof" and there would be "arguments[] … available to

some [class members] on issues of causation that will be unavailable to others").

Plaintiffs are stuck with the mismatch that *Comcast* forbids.   Their current class-wide

liability theory is limited to **Facebook's** revised projections, yet Plaintiffs seek much broader

damages based on May 22, 2012 price declines that occurred "[i]n response to" a disclosure of

**underwriter's** revisions, Reply 57-58.   Indeed, the mismatch is worse here than in *Comcast*.   The

plaintiffs in *Comcast* advanced merely overbroad damages.  Here, Plaintiffs are proposing one trial where the same class counsel must advance diametrically conflicting causation theories for (a) investors with knowledge of underwriters' revisions and (b) those without.  Contrary to Plaintiffs' contentions, these class members are actually, and not just theoretically, in "competition" with one another.  Reply 73 (quoting *Seijas v. Republic of Arg.*, 606 F.3d 53, 55, 57 (2d Cir. 2010)).  The investors with knowledge of underwriters' revisions need to argue ***against*** other investors without such knowledge about whether the underwriters' revisions were material and their disclosure caused the May 22 decline.

The proposed "institutional" and "retail" subclasses do not remedy the conflict, because they do not distinguish between investors who knew about underwriters' revisions and those who did not.  To start, as demonstrated in Defendants' Opposition at 49-54, and *supra*, numerous retail investors knew about the underwriters' revisions before May 18, thus pitting many retail investors against other retail investors.[24]  Furthermore, the retail subclass includes those who purchased on May 21.  Those May 21 purchasers must argue—contrary to all retail May 17 and 18 purchasers—that the May 22 decline was not caused by the May 18 disclosure of Facebook's revisions that preceded their purchase.  Rather, the May 21 purchasers must argue that the May 22 decline was caused only by the May 22 disclosure of underwriters' revisions.

Independently, the subclasses provide no remedy for the conflicts among class members

---

[24] In none of Plaintiffs' pre-*Comcast* cases were plaintiffs' liability theories necessarily, diametrically opposed.  *See In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 73 (S.D.N.Y. 2009) (no conflict where plaintiffs' claims are all "based on *identical* legal and remedial theories"); *Merrill Lynch*, 277 F.R.D. at 119-20 (no conflict created by defendants' negative causation defense); *In re Amaranth Natural Gas Commodities Litig.*, 269 F.R.D. 366, 381 (S.D.N.Y. 2010) (no conflicts based on different methods of quantifying damages); *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 276-77 (S.D.N.Y. 2008) (no conflict where plaintiffs made "similar legal arguments to establish the defendant's liability," only differing views on when stock was most inflated); *Cromer Fin. Ltd. v. Berger*, 205 F.R.D. 113, 126-27 (S.D.N.Y. 2001) ("no conflict" on questions of liability).

because opposing investors would be represented by the same class counsel. All groups of investors, however, are entitled to "independent [class] counsel pressing [each group's] *most compelling* case." *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 253 (2d Cir. 2011). Plaintiffs' authority confirms that "counsel cannot represent one class if there are significant conflicts of interest among the class members," and subclasses avoid that conflict only if each subclass has its "own … class counsel." William B. Rubenstein, *Newberg on Class Actions* § 7.29 (5th ed.). Plaintiffs' suggestion that "additional counsel" on behalf of certain *individual* investors will ameliorate the conflict is incorrect because only the conflicted class counsel will be presenting arguments at trial. Likewise, Plaintiffs offer no support for their argument that the separate counsel requirement is limited to settlement subclasses.[25]

To avoid conflicts and the disqualifying mismatch under *Comcast*, at a minimum, Plaintiffs had to narrow the proposed class to include (a) only investors who purchased *before* the post-trading May 18 disclosure that Facebook revised its forecasts, and only (b) damages for

---

[25] *In re Literary Works* noted that settlement classes deserved "heightened[] attention," but did not hold that conflicts in non-settlement classes deserved no attention. 654 F.3d at 249-50. *See, e.g.*, *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1195 (11th Cir. 2003) (vacating grant of class certification where some class members had interests that "are significantly different from—and potentially antagonistic to—the named representatives"); *In re Healthsouth Corp. Sec. Litig.*, 213 F.R.D. 447, 459, 462-64 (N.D. Ala. 2003) (denying class certification because intra-class conflicts, including that a portion of the class had specific knowledge of the misrepresented information, precluded a finding of typicality, adequacy, and predominance). None of Plaintiffs other cases cited allowed the same counsel to represent classes with substantive, fundamental conflicts. *Sejias v. Republic of Argentina*, 606 F.3d 53, 55 (2d Cir. 2010) (no conflict as to plaintiffs' theory of liability); *Wallace v. IntraLinks*, 302 F.R.D. 310, 317, 319 (S.D.N.Y. 2014) (no conflicts considered); *In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 113 (E.D.N.Y. 2012) (no fundamental conflict between class members); *Dietrich v. Bauer*, 192 F.R.D. 119, 126-27 (S.D.N.Y. 2000) (no conflict of counsel where substantive "conflict alleged involves claims in different actions against different defendants" such that one class was "not pit[ted] … against the other in terms of satisfying a potential judgment"). *Charron v. Weiner*, 731 F.3d 241, 250-51 (2d Cir. 2013), declined to use a settlement to reconsider the original class certification decision because no one challenged the original certification motion on conflict grounds.

the May 21 decline **before** the May 22 disclosure about underwriters' revised projections, which Plaintiffs insist are not relevant to the liability question of knowledge. But while they belatedly limit their proposed classes to purchasers on May 17, 18, and 21, 2012, suing for declines in Facebook's stock price on May 21 and 22, 2012, Reply 56-58, 60, Plaintiffs have rejected any further limitation. Reply 59. That is still too broad.

Plaintiffs seek to ignore that disqualifying mismatch by contending that *Roach v. T.L. Cannon Corp.*, 778 F.3d 401 (2d Cir. 2015) and *Sykes v. Mel S. Harris & Assocs., LLC*, 780 F.3d 70 (2d Cir. 2015), held that *Comcast* does not preclude certification simply because of individual damages determinations. Reply 79. To be clear, Defendants are not claiming the *mere* presence of individualized damages issues defeats predominance. *Roach* itself recognizes that "*Comcast* reiterated that *damages questions should be considered* at the certification stage when weighing predominance issues." 778 F.3d at 408. Specifically, the Court "must understand, *concretely*, how plaintiffs propose to reliably establish damages" either class-wide or formulaically on an individual basis after class issues are resolved. *Sicav v. James Jun Wang*, 2015 WL 268855, at *6 (S.D.N.Y. Jan. 21, 2015). Plaintiffs have not proposed how they would do so with a "liability model … uniquely tied to the damages" they seek. *Sykes*, 780 F.3d at 88.

Nor is the problem merely one of "differential damages" amongst class members. Reply 70 (citing *In re Alstom*, 253 F.R.D. at 276-77). Differential damages refer to when the stock was merely "more or less inflated at different time periods." *In re Alstom*, 253 F.R.D. at 277. The conflict within the class here, however, "relate[s] to the very subject matter of the suit," *i.e.*, whether underwriters' revisions were the relevant information which, when revealed, caused price declines; this "defeat[s]" class certification. *Id.* at 277-78. No case Plaintiffs cite permits class certification where either the class seeks damages contradicted by their liability theory or

different groups within the class have opposing arguments.[26]

**B.    The NASDAQ Settlement Creates Additional Individualized Issues.**

The recent NASDAQ Settlement[27] confirms that the NASDAQ trading debacle raises individual issues, because the Settlement triggers the mandatory damages reduction provision of the PSLRA.  *E.g.*, *Abbott v. Am. Elec. Power, Inc.*, 2012 WL 3260406, at *4 (S.D.W. Va. 2012) (contributory negligence raises individual inquiries); *Neely v. Ethicon, Inc.*, 2001 WL 1090204, at *11 (E.D. Tex. 2001) (contributory negligence and comparative fault); *Emig v. Am. Tobacco Co.*, 184 F.R.D. 379, 390 (D. Kan. 1998) (comparative fault).  That provision is mandatory:

> *If a covered person enters into a settlement with the plaintiff* prior to final verdict or judgment, the verdict or judgment *shall be* reduced by the *greater* of -- (i) an amount that corresponds to the *percentage of responsibility* of that covered person; or (ii) the amount paid to the plaintiff by that covered person.

15 U.S.C. § 78u-4(f)(7)(B).  Under this plain text, the only condition to the judgment reduction is whether the plaintiff settled with a "covered person," *In re Thornburg Mortg., Inc. Sec. Litig.*, 912 F. Supp. 2d 1178, 1248 (D.N.M. 2012) ("The pla[i]n language of the statute says the [non-settling defendants] are entitled to the reduction; the Court should thus give it."), which the NASDAQ Defendants plainly are.  15 U.S.C. § 78u-4(f)(10).  A non-settling defendant's right to "credit [the settlement against any judgment] does not depend upon the law under which the

---

[26]  *See Sykes*, 780 F.3d at 90 (holding that the court may create a subclass for plaintiffs with time-barred claims because such plaintiffs are not "antagonistic" to other class members); *Roach v. T.L. Cannon Corp.*, 2013 WL 1316452, at *3, *5 (N.D.N.Y. 2013) (no intra-class conflicts alleged).    Plaintiffs' pre-*Comcast* citations are similarly inapposite.    *See In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 73 (S.D.N.Y. 2009) (no conflict where claims are all "based on *identical* legal and remedial theories"); *Merrill Lynch & Co.*, 277 F.R.D. at 119-20 (no conflict created by defendants' negative causation defense); *In re Amaranth Natural Gas Commodities Litig.*, 269 F.R.D. 366, 381 (S.D.N.Y. 2010) ("no conflicts of interest" based on different methods of quantifying damages); *Cromer Finance Ltd.*, 205 F.R.D. at 126-27 ("no conflict" as to questions of liability); *see also* 253 F.RD. at 276-77 (no conflict where plaintiffs all made "similar legal arguments to establish the defendant's liability").

[27]  The "NASDAQ Settlement" and the "NASDAQ Action" refers to the Consolidated NASDAQ Actions in MDL No.12-2389.

damages are due." *In re Refco, Inc.*, 2007 WL 57872, at *5 (S.D.N.Y. 2007).[28]

In fact, Defendants in *this action* are expressly named as "Non-Settling Defendants" in the NASDAQ Settlement. Stip. of Settlement ¶ 1.9 (filed May 22, 2015) (Ex. A to ECF 282-1). This is because many but not all putative class members in the Facebook action are also class members in the NASDAQ Action. The proposed class here would include initial allocation recipients on May 17, 2012 and secondary market buyers on May 18 and May 21. Reply 60. By comparison, the NASDAQ Settlement includes "all persons and entities that entered retail pre-market and aftermarket orders to *purchase and/or sell* the common stock of Facebook, Inc., on *May 18, 2012*, and who suffered monetary losses." Stip. of Settlement ¶ 1.3. At least two sets of "Overlapping Plaintiffs" are thus settling NASDAQ class members and proposed class members here: (1) everyone who purchased on May 18, 2012; and (2) everyone who purchased on May 17, 2012, and attempted but failed or were delayed in selling in the market on May 18, 2012.

Overlapping Plaintiffs have various individual injuries (a) that were covered by the NASDAQ release, (b) for which Plaintiffs seek damages here and (c) that require individual judgment reductions in this action. For example:

- Investors like Lead Plaintiff Fresno who tried (but NASDAQ rendered unable) to sell shares on May 18—before the price began falling on May 21 allegedly in response to a corrective disclosure about Facebook's projections, Opp. 58—face a 100 percent reduction for any damages to those shares. NASDAQ is responsible for those damages.

---

[28] Even if the PSLRA did not apply, the same judgment reduction would be required by federal common law. *See, e.g.*, *Refco*, 2007 WL 57872, at *3-4; *In re WorldCom, Inc. Sec. Litig.*, 2005 U.S. Dist. LEXIS 3791, *33-34 (S.D.N.Y. 2005). Indeed, because the NASDAQ Settlement also settles the New York negligence claims against NASDAQ, the Facebook Defendants are also entitled to a judgment reduction for NASDAQ's "equitable share" under N.Y. Gen. Oblig. Law § 15-108(a). *Cf. In re Jiffy Lube Sec. Litig.*, 772 F. Supp. 890, 894 n.3 (D. Md. 1991) ("Where federal securities cases involve pendent state claims which are governed by applicable state law[,] … the setoffs would have to be figured differently with respect to each set of claims."). A judgment reduction applies the same whether the settling defendant and the non-settling defendants were sued in one action or in "separate actions." *Singer v. Olympia Brewing Co.*, 878 F.2d 596, 599-600 (2d Cir. 1989).

- Investors like Lead Plaintiff Morley who tried to buy Facebook stock on May 18 but were delayed by NASDAQ and therefore paid a higher price, confront a very individualized problem of judgment reduction.  Opp. 59.  Investors who purchased on May 18 and sold on May 21 or later, for example, are seeking Section 12 damages for the difference between their May 18 purchase price and the price at which they subsequently sold.  But how much they actually paid on May 18 was the result of NASDAQ's delays, among other things, and the mandatory damage reduction thus depends on exactly when each tried to buy and when NASDAQ's errors no longer prevented the execution.

- Investors whose executions were adversely affected by NASDAQ's errors or whose trading behavior was altered by concern over NASDAQ (*see*, *e.g.*, A-1851 (Equity Trader Alert #2012-21, *NASDAQ Proposes Policy for Unfilled Orders in the Facebook Inc. (FB) IPO Cross*, (May 21, 2012)), face a damages reduction that will depend on the price for which the investor would have sold *but for* the distorting effects both of NASDAQ's May 18 errors and its subsequent encouragement to sell.  If that "but for" price exceeds $38, then NASDAQ is responsible for all the damages the investor seeks from Defendants through its Section 11 claim in this case.  And if it exceeds the investor's purchase price, NASDAQ is responsible for all of the Section 12 damages the investor could seek here.

Different Overlapping Plaintiffs may confront different **combinations** of these three distinct damage-reduction problems—or possibly others—and in different degrees.

Plaintiffs cannot avoid these problems by arguing that the damages settled in the NASDAQ action did not include these injuries.  The Settlement, after all, releases the NASDAQ Defendants from all conceivable injuries relating to the IPO, even if claims were "unknown" and "unsuspected."  Stip. of Settlement ¶¶ 1.21, 2.3.  This unquestionably includes the three individual scenarios described above.  Moreover, as *Koch v. Greenberg,* held, "[s]ettling parties may not structure the apportionment to avoid a later setoff by a non-settling defendant; to hold otherwise would permit them to circumvent the policy underlying" a judgment reduction statute. 14 F. Supp. 3d 247, 271 (S.D.N.Y. 2014) (internal quotation mark omitted).  Rather, when a settlement is for a plaintiff's loss from the same event about which that plaintiff has asserted a claim against a non-settling defendant, a full judgment reduction is required.  *See Westwood Chem. Co. v. Kulick*, 570 F. Supp. 1032, 1039 (S.D.N.Y. 1983) (rejecting allocation argument and reducing plaintiffs' damages against a non-settling defendant by the "*total* amount paid by

42

[the settling-defendant] for the release").

> In sum, for the NASDAQ damages reduction issues, as well as the loss causation issues,
>
> these are real differences among class members that result in arguments being available to some on issues of causation that will be unavailable to others.  In short, the question of *causation* is simply not subject to a classwide proof.  This is *itself sufficient* to establish that common questions do not predominate.

*Adkins*, 307 F.R.D. at 143.

### C.  If This Court Does Not Deny Class Certification, It Should Defer Ruling Pending The Supreme Court's Decision In *Tyson Foods, Inc. v. Bouaphakeo*.

*Comcast* precludes certification, but to the extent the Court finds otherwise, the Court should stay this case pending the Supreme Court's consideration of *Tyson Foods, Inc. v. Bouaphakeo*, 135 S. Ct. 2806 (2015).  *See Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 621-22 (S.D.N.Y. 2012) (Sweet, J.) (stay granted where Supreme Court's resolution could "clarify and determine" central questions in the case).  In *Tyson Foods*, the Supreme Court will consider whether (a) class plaintiffs may prove predominance despite substantial variation among class members; and (b) absence of injury to some class members can be ignored at the class certification stage.  *Tyson Foods*, Pet'n for a Writ of Cert., 2015 WL 1285369, at *15 & *25 (Mar. 19, 2015).  Petitioners have noted "wide variation" among class members' injuries and argue that *Comcast* precludes certification.  *Id.* at *18 & *22.  The *Tyson Foods* questions thus dovetail with the *Comcast* issues here: whether Plaintiffs can prove predominance despite variation and conflict within the proposed class about causation and injury, and whether a class may include those who "would receive zero damages in an individual lawsuit."  *Tyson Foods*, Pet'n for a Writ of Cert. Reply Brief, 2015 WL 2251177, at *1 (May 11, 2015).

## III.   VARIATION IN INVESTOR KNOWLEDGE YIELDS INDIVIDUAL MATERIALITY ISSUES THAT DEFEAT PREDOMINANCE.

*Amgen Inc. v. Conn. Ret. Plans and Trust Funds*, 133 S. Ct. 1184 (2013), did not hold as Plaintiffs contend that "There Is No Such Thing As Individual Issues of Materiality."  Reply 86. In *Amgen*, the issue was whether class certification must be denied unless the plaintiff "*proves* materiality*" on the merits.  133 S. Ct. at 1191.  It held that where a proposed class had access to the ***same*** information,[29] materiality was a common issue.  *Id.* at 1195-96.  It did not decide that materiality is a common issue where investors are "[un]equally" situated, *see id.* at 1191, as Plaintiffs themselves have argued here.  Materiality is assessed "in light of the disclosures [the issuer] made *and other information* that … was available to investors during the class period." *Shemian v. Research In Motion Ltd.*, 570 F. App'x 32, 36 & n.4 (2d Cir. 2014).  Where, as here, huge swaths of the class had "additional information," this creates *uncommon* materiality issues. *See Klein* v. *A.G. Becker Paribas Inc.*, 109 F.R.D. 646, 652-53 & nn. 11-12 (S.D.N.Y. 1986).

## IV.   PLAINTIFFS HAVE NOT DEMONSTRATED THAT CLASS REPRESENTATIVES ARE TYPICAL OR ADEQUATE.

Plaintiffs have failed to establish either typicality or adequacy.

***First***, Plaintiffs' mere "assert[ion]" that "defendants committed the same wrongful acts in the same manner, against all members of the class," Reply 66, is insufficient.[30]  Their only

---

[29]  Unlike here, the *Amgen* defendants argued that the information available to all investors was the same:  "Amgen showed through analyst reports and public documents that the *market* was aware of *all* the information that Connecticut Retirement claimed Amgen had concealed through alleged misrepresentations during the class period."  Br. for Petitioners at 5, *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184 (2013) (No. 11-1085).

[30]  Plaintiffs' cases do not excuse them from proving typicality by a preponderance of the evidence.  *See, e.g., In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 73 (S.D.N.Y. 2009) ("***no evidence*** that [lead plaintiffs were] subject to unique defenses that render them atypical"); *N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, 2011 WL 3874821, at *4 (S.D.N.Y. 2011) ("speculative" conflicts would not defeat typicality); *Robidoux v. Celani*, 987 F.2d 931, 937 (2d Cir. 1993) (leaving open the issue of whether typicality was satisfied and holding that plaintiffs (or an intervenor) would need to submit evidence on remand); *In re*

evidence of typicality is a third declaration from one advisor, which merely confirms that Wellington, one of North Carolina's advisors, knew of the trend this Court held Plaintiffs had adequately pleaded as an omission.  (A-88-89 (Schilling Supp. Decl. ¶ 4).)  Otherwise Plaintiffs quibble over whether Defendants' evidence "demonstrates[]" that Lead Plaintiffs' advisors knew about Facebook's revisions and the "amount."   Reply 66-68, 67 n.30.   But Defendants have shown all that they need to, namely, that the knowledge defense "is meritorious enough to require the plaintiff to devote considerable time to rebut" it.   *Gordon v. Sonar Capital Mgmt. LLC*, 2015 WL 1283636, at *5 (S.D.N.Y. 2015) (internal quotations omitted).

Evidence from their investment advisors shows knowledge will be a focus for each Lead Plaintiff. ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████ North Carolina's advisor, Sands, also knew "the[y] change[d] their opinion on this year." (A-885-88 (MS_FB_00014993-96).)  Indeed, the Sand's analyst has testified that he knew the "trend" of "increased usage of Facebook on mobile devices … was already negatively impacting revenues."  (A-1535.2 (Clarke Supp. Decl. ¶ 4).)  And while the declaration from Arkansas advisor UBS "does not state that [UBS] gained actual knowledge of Facebook's revenue cuts *from Facebook*," as Plaintiffs contend, Reply 68, an investor's knowledge of an omission or misrepresentation, not the source of that knowledge, is all that is required to prove knowledge.

---

*Alstom*, 253 F.R.D. at 276 (no evidence of individual or unique defenses to plaintiffs' claims); *Dodona I, LLC v. Goldman, Sachs & Co.*, 296 F.R.D. 261, 268 (S.D.N.Y. 2014) (rejecting defendant's argument that unusual trading activity in securities not at issue defeated class certification); *Wallace v. IntraLinks*, 302 F.R.D. 310, 316 (S.D.N.Y. 2014) ("[c]ourts have rejected class representatives who are potentially vulnerable to unique defenses because other class members may be disserved if those defenses become a focus of the litigation").

*See In re Superior Offshore*, 2010 WL 2305742, at *5, *In re Livent*, 151 F. Supp. 2d at 441.[31]

███████████████████████████████████████████████████████████████

████████████████████████    ███████████████████████████████  Plaintiffs'

unsupported claim that "the documentary record" shows Fresno's advisor Waddell "received

only the Underwriter Defendants' revised revenue estimates," Reply 68, is flatly contradicted by

the Waddell declaration, which says it knew "Facebook Inc. had recently revised its revenue

projections." (A-81 (Kapoor Decl. ¶ 4).) Plaintiffs also have no answer to evidence indicating

that the Galvans knew about the impact mobile usage was having on Facebook. Opp. 65-66.

**Second**, Plaintiffs offer no evidence that the proposed *individual* class representatives are

adequate. The record shows they lack a basic understanding of their claims, the alleged

misstatements, and even their own purchases of Facebook stock, *i.e.*, whether they bought in the

IPO or the aftermarket. (*E.g.*, A-1576-78 (Rand Dep. Tr. 84-86); A-1599-1600 (J. Galvan Dep.

Tr. 179-80).) Nor have they made any effort to understand the substance of the alleged

misstatements. (A-1658-59 (L. Melton Dep. Tr. 57-58); A-1665 (M. Galvan Dep. Tr. 270).)

**Third**, as discussed *supra* Section II.A, because class representatives all purchased in the

IPO or on the first day of public trading (May 18), they have an actual conflict of interest based

on Plaintiffs' own theory with investors who bought on May 21.

## V. *MORRISON* BARS CERTIFICATION OF THE PROPOSED CLASS.

Other than asking the Court to punt the issue of "tracing" to the merits stage (which it

---

[31] Plaintiffs also argue that the knowledge of Mr. Nell (who is one out of two UBS declarants), is insufficient because he was not employed by the UBS entity that made the purchasing decision on behalf of Arkansas. Reply 68. ████████████████████████ ████████████████████████████████ A-85 (Nell Decl. ¶ 1)), and moreover, evidence of knowledge within an institution is "circumstantial evidence of the actual knowledge of the individuals responsible" for the relevant investments. *See Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, 2013 WL 1155420, at *4 (S.D.N.Y. 2013).

should not do for all the reasons explained in Defendants' Opposition at 75-76), Plaintiffs' response on *Morrison* is to say "the shares at issue here are listed exclusively on a U.S. Exchange" and therefore are not "foreign" transactions under *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010), and *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 70 (2d Cir. 2012).  Reply 82-83.  But Plaintiffs offer no evidence to back this up, and in fact, they are wrong.  Facebook stock was not listed on a domestic exchange **when it was allocated in the IPO** to investors, including foreign investors.   IPO allocations are direct sales by underwriters to those who buy in the IPO; they are not mediated through an exchange.  (A-1558 (Milner Decl. ¶ 4).)  Nor is it enough that this was a purportedly "**U.S.** IPO of a **U.S.** Company" and that after the IPO shares "trade[d] exclusively on an American exchange."  Reply 83 (emphasis in original).  Where the shares at issue are not **already** listed on a domestic exchange, Section 11 does not apply unless "irrevocable liability [was] incurred or title passe[d] within the United States."  *Absolute Activist*, 677 F.3d at 67.  Plaintiffs have made no such showing.  And the IPO itself was not even **exclusively** a "U.S. IPO," but included a "Canadian wrapper" for offering to Canadian buyers (*see, e.g.*, A-1792 (MS_FB_00018083)) and prospectus provisions that made clear shares could be offered in the IPO to investors within regulatory exemptions in the European Economic Area, the United Kingdom, Hong Kong, Singapore, Japan, and Dubai (*see* A-1181-83).  It thus does not matter whether there was just "one offering."  Reply 84.  There is no common way to identify shares traceable to "domestic" transactions.

## VI.   PLAINTIFFS HAVE FAILED TO DEMONSTRATE THAT CLASS CERTIFICATION IS WARRANTED FOR THE *PLEADED* CLAIM THAT THIS COURT ADDRESSED ON THE MOTION TO DISMISS.

Independently, this Court should deny class certification because Plaintiffs do not even attempt to show that knowledge of the omission pleaded in the Complaint raises a common issue.

In determining whether a class may be certified, "a court must understand the claims,

47

defenses, relevant facts, and applicable substantive law." *Authors Guild, Inc. v. Google Inc.*, 721 F.3d 132, 135 (2d Cir. 2013) (internal quotations and alterations omitted).   Understanding the claims in this case is no easy task, because Plaintiffs have waffled about what information Defendants failed to disclose, and correspondingly, what information is at the heart of the knowledge inquiry.   When Plaintiffs opposed Defendants' motion to dismiss, they insisted this case was ***not*** about forward-looking projections, but about the trend of increased mobile usage already having an impact on Facebook's revenues before the IPO.   As this Court explained:

> Plaintiffs do not allege that Defendants were required to disclose their internal projections or numerical estimates.   Instead, … Plaintiffs posit that the loss of revenues caused by the increasing mobile usage was a trend known by Facebook that the Company had a duty to disclose.

*MTD Decision*, 986 F. Supp. 2d at 508.   A class may not be certified for that claim, because as Plaintiffs admit, discovery has shown that underwriters "broadly disseminated" their revised projections, Reply 20 n.13, which disclosed both the "loss of revenues caused by the increasing mobile usage" and the extent of the revenue impact.   Opp. 38-54 (discussing widespread disclosure of underwriters' revisions and the impact mobile usage was having).

To save their case, Plaintiffs now insist that it ***is*** about "revised projections."   Reply 19.



—the revised projections disclosed to underwriters.[32]

Plaintiffs also now insist that their case is about disclosure of ***Facebook***'s revised projections, which they claim are materially different from underwriters'.   Reply 13-19.

---

[32]   Plaintiffs also have abandoned any reliance on the allegedly omitted revenue impact of "product decisions," as Defendants flagged in their Opposition at 7 n.3.

██████████████████████████████████████████████████████████

████████████████████████████████   *see also* A-1535.2 (Clarke Supp. Decl. ¶ 4).)

Defendants have not argued that knowledge of underwriters' revisions counts for all investors as knowledge of Facebook's revisions, but that an investor's knowledge of underwriters' revisions shows knowledge of the ***pleaded*** omission, namely, that mobile usage was already having an impact on revenues, including the "extent' of any revenue impact.  The only thing underwriters' revisions do not themselves unequivocally do—though many investors understood it—is expressly attribute the information to Facebook.

Plaintiffs offer no plausible reason why attribution would matter for disclosure purposes.[33]  Their new theory was never tested on the motion to dismiss, because that is not what the Complaint alleges, nor what Plaintiffs had argued.  Indeed, if they had, the claim would have been dismissed:  an issuer is not required to disclose projections in its offering documents— neither original nor revised—even if those projections are selectively disclosed to some institutional investors and underwriters.  ECF. No. 90 at 27-36; *see also* Reply 14 n.8 (admitting Complaint is not based on a selective disclosure theory).  Plaintiffs are not entitled to class certification of a claim alleging a ***different*** omission than what was alleged in the Complaint and

---

[33]  Neither of the cases Plaintiffs cites supports there being "a key distinction."  *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 265 (2d Cir. 1993), held that a plaintiff did not satisfy Rule 9(b) when the complaint failed to identify the speaker of allegedly fraudulent statements in newspaper articles and analyst reports.  And *DeMarco v. Lehman Brothers, Inc.*, 222 F.R.D. 243, 247 (S.D.N.Y. 2004), observed that a "statement of fact emanating from an issuer" about, for example, an increase in profits was more likely to have an impact on market price than an analyst's statement of opinion such as a buy recommendation.  That has no bearing on the issue here, where the statements are the same, *i.e.*, revised projections.  Indeed, *DeMarco* acknowledged that both research analysts and newspaper columnists "have the ability to influence market prices," and that is particularly true of underwriters who are an integral part of the pricing process in a public offering:  "Prospective investors look to the underwriter–a fact well known to all concerned and especially to the underwriter–to pass on the soundness of the security and the correctness of the registration statement and prospectus."  *Chris-Craft Indus., Inc. v. Piper Aircraft Corp.*, 480 F.2d 341 (2d Cir. 1973).

tested on a motion to dismiss. *Cf. Comcast*, 133 S. Ct. at 1433 (evidence supporting class certification "must be consistent with [plaintiffs'] liability case") (internal quotations omitted). Nor should Defendants be forced to continue litigating this case like a sort of whack-a-mole game. This Court should deny class certification based on Defendants' unrebutted showing that widespread knowledge of the pleaded information requires individual inquiries.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel should be denied.

DATED:  August 13, 2015

Andrew B. Clubok
(andrew.clubok@kirkland.com)
Brant W. Bishop, P.C.
Nathaniel Kritzer
Adam B. Stern
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800

Susan E. Engel
KIRKLAND & ELLIS LLP
655 Fifteenth St. NW
Washington, DC 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

Richard D. Bernstein
Elizabeth J. Bower
WILLKIE FARR & GALLAGHER LLP
1875 K Street, NW
Washington, DC 20006
Telephone: (202) 303-1000
Facsimile: (202) 303-2000

Tariq Mundiya
Todd G. Cosenza
Sameer Advani
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8000

*Attorneys for Facebook, Inc. and the Individual Facebook Defendants*

James P. Rouhandeh
Charles S. Duggan
Andrew Ditchfield
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800

*Attorneys for the Underwriter Defendants*