**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE FACEBOOK, INC. IPO SECURITIES
AND DERIVATIVE LITIGATION

MDL No. 12-2389 (RWS)

This document relates to the
Consolidated Securities Action:

| | |
|---|---|
| No. 12-cv-4081 | No. 12-cv-4763 |
| No. 12-cv-4099 | No. 12-cv-4777 |
| No. 12-cv-4131 | No. 12-cv-5511 |
| No. 12-cv-4150 | No. 12-cv-7542 |
| No. 12-cv-4157 | No. 12-cv-7543 |
| No. 12-cv-4184 | No. 12-cv-7544 |
| No. 12-cv-4194 | No. 12-cv-7545 |
| No. 12-cv-4215 | No. 12-cv-7546 |
| No. 12-cv-4252 | No. 12-cv-7547 |
| No. 12-cv-4291 | No. 12-cv-7548 |
| No. 12-cv-4312 | No. 12-cv-7550 |
| No. 12-cv-4332 | No. 12-cv-7551 |
| No. 12-cv-4360 | No. 12-cv-7552 |
| No. 12-cv-4362 | No. 12-cv-7586 |
| No. 12-cv-4551 | No. 12-cv-7587 |
| No. 12-cv-4648 | |

**PLAINTIFFS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THEIR**
**MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF**
**CLASS REPRESENTATIVES AND CLASS COUNSEL**

# TABLE OF CONTENTS

<u>**PAGE**</u>

TABLE OF AUTHORITIES ............................................................................................... iii

INTRODUCTION .................................................................................................................1

ARGUMENT .......................................................................................................................7

I.      Individual Issues Of Knowledge Do Not Preclude Certification ............................7

      A.      The Issue Of Whether Investors May Be Charged With "Actual Knowledge" Of Facebook's Revenue Cuts Based On Information From Third Parties Presents A Common Question That Will Generate A Common Answer With Respect To The Entire Alleged Class ...........................................................................................................8

      B.      In The Alternative, The Issue Of Whether Information From Third Parties Represents "Actual Knowledge" Of Facebook's Revenue Cuts Under Section 11 Of The Securities Act Presents Common Questions That Will Generate Common Answers With Respect To The Proposed Subclasses ...........................................................................11

            1.      Common Questions Predominate with Respect to the Institutional Investor Subclass ................................................... 13

                  a.      Institutional Investor Knowledge Of The Syndicate Analysts' Model Revisions Is Not "Actual Knowledge" Of Facebook's Own Revenue Cuts ..............14

                  b.      The Question Of Whether Institutional Investor Knowledge Of The Syndicate Analysts' Model Revisions Represents "Actual Knowledge" Of Facebook's Revenue Cuts Is Subject To Generalized Proof .............................................................19

            2.      Common Questions Predominate As To The Retail Investor Subclass ..................................................................................... 22

                  a.      Facebook Used Unsuspecting Retail Investors To Achieve A $100 Billion Valuation In The IPO ................22

                  b.      Retail Investors Were Not Provided Non-Public Information About Facebook Prior To The IPO ...............24

                  c.      Defendants' Handful Of Purported Examples Of Retail Investors Being Told The Withheld Information Demonstrates Nothing Of The Sort, And Falls Far Short Of Defeating Predominance .............32

      C.      The Relatively Insignificant Number Of Investors Who Appear To Have Had "Actual Knowledge" Can Be Excluded From The Class .........46

D.    Defendants' Speculation About Broader "Leakage" And Vague References To Meetings With Unspecified Investors Do Not Defeat Predominance ......................................................49

E.    At The Very Minimum, The Court Should Certify A Class On All Issues Other Than "Actual Knowledge"..................................53

II.    The Proposed Class And Subclasses Are Properly Defined And Ascertainable...........................................................................................55

A.    The Class Is Properly Limited To Investors "Damaged" By The Misrepresentations ...................................................................55

B.    The Members of the Class and Subclasses Are Ascertainable ................58

1.    It Is Routine For Class Definitions To Be Limited By The Phrase "Were Damaged Thereby" ...............................59

2.    The Proposed Class And Subclasses Are Ascertainable With Respect To Both IPO Allocants And Secondary Market Purchasers ...............................................60

a.    IPO Allocants...................................................61

b.    Secondary Market Purchasers...........................62

3.    Defendants Repeatedly Distinguished Between Retail Investors And Institutional Investors Throughout The IPO Process ...............................................63

III.    The Proposed Class Representatives Are Typical And Adequate .......................65

A.    Typicality Is Satisfied ...............................................................65

B.    Adequacy Is Satisfied ...............................................................69

1.    There Are No Impermissible Intra-Class Conflicts ....................70

2.    There Are No Impermissible Counsel Conflicts.........................71

3.    The Individual Plaintiffs Are Adequate ......................................74

IV.    Defendants' Remaining Arguments Are Meritless................................................77

A.    Neither *Comcast* Nor Purported Damages Questions Preclude Certification .............................................................................77

B.    Defendants' Arguments Concerning Foreign Purchasers Provide No Basis To Deny Class Certification .......................................81

C.    There Is No Such Thing As Individual Issues of Materiality ..................86

D.    A Class Action Is Superior To Other Methods .........................................87

CONCLUSION...............................................................................................88

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
  677 F.3d 60 (2d Cir. 2012)................................................................82, 83

*Adair v. Bristol Tech. Sys., Inc.*,
  179 F.R.D. 126 (S.D.N.Y. 1998) ........................................................83, 85

*In re Alstom SA Sec. Litig.*,
  253 F.R.D. 266 (S.D.N.Y. 2008) ....................................................65, 70, 71

*In re Amaranth Natural Gas Commodities Litig.*,
  269 F.R.D. 366 (S.D.N.Y. 2010) ..............................................................71

*Amgen Inc. v. Conn. Ret. Plans and Trust Funds*,
  133 S. Ct. 1184 (2013).................................................................. *passim*

*Ash v. Wallenmeyer*,
  879 F.2d 272 (7th Cir. 1989) ....................................................................21

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
  222 F.3d 52 (2d Cir. 2000)................................................................74, 76

*In re Bank of Am. Corp. Sec., Deriv. and ERISA Litig.*,
  281 F.R.D. 134 (S.D.N.Y. 2012) ......................................................56, 60

*Bd. of Trustees of the AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*,
  269 F.R.D. 340 (S.D.N.Y. 2010) ..............................................................53

*In re Bear Stearns Cos., Inc. Sec., Derivative & ERISA Litig.*,
  763 F. Supp. 2d 423 (S.D.N.Y. 2011)........................................................87

*Betances v. Fischer*,
  304 F.R.D. 416 (S.D.N.Y. 2015) ..............................................................59

*In re Blech Sec. Litig.*,
  187 F.R.D. 97 (S.D.N.Y. 1999) ...........................................................6, 52

*Brown v. Kelly*,
  609 F.3d 467 (2d Cir. 2010)...........................................................6, 52, 53

*Charron v. Pinnacle Grp. N.Y. LLC*,
  269 F.R.D. 221 (S.D.N.Y. 2010) ......................................................54, 55

*Charron v. Wiener*,
    731 F.3d 241 (2d Cir. 2013).................................................................72, 73

*Comcast Corp. v. Behrend*,
    133 S. Ct. 1426 (2013) .......................................................7, 77, 78, 79

*Cromer Fin. Ltd. v. Berger*,
    205 F.R.D. 113 (S.D.N.Y. 2001) ..............................................71, 75

*DeMarco v. Lehman Bros., Inc.*,
    222 F.R.D. 243 (S.D.N.Y. 2004) .......................................................15

*DeMaria v. Andersen*,
    318 F.3d 170 (2d Cir. 2003)......................................................83, 84, 85

*Dietrich v. Bauer*,
    192 F.R.D. 119 (S.D.N.Y. 2000) .......................................................74

*In re DJ Orthopedics, Inc., Sec. Litig.*,
    2003 U.S. Dist. LEXIS 21534 (S.D. Cal. Nov. 17, 2003) ...........................12, 13, 43

*Dodona I, LLC v. Goldman, Sachs & Co.*,
    296 F.R.D. 261 (S.D.N.Y. 2014) .......................................................66

*Dunnigan v. Metro. Life Ins. Co.*,
    214 F.R.D. 125 (S.D.N.Y. 2003) .......................................................63

*Ebin v. Kangadis Food Inc.*,
    297 F.R.D. 561 (S.D.N.Y. 2014) .......................................................59

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    131 S. Ct. 2179 (2011).......................................................7, 57, 80

*In re Facebook, Inc. IPO Sec. & Deriv. Litig.*,
    986 F. Supp. 2d 487 (S.D.N.Y. 2013),
    *motion to certify appeal denied*,
    986 F. Supp. 2d 524 (S.D.N.Y. 2014).......................................................*passim*

*Fed. Hous. Fin. Agency v. HSBC N. Am. Holdings Inc.*,
    33 F. Supp. 3d 455 (S.D.N.Y. 2014).......................................................18

*Fed. Hous. Fin. Agency v. Nomura Holding Am. Inc.*,
    2014 WL 7232590 (S.D.N.Y. Dec. 18, 2014) .......................................................77

*Fed. Hous. Fin. Agency v. UBS Ams. Inc.*,
    2013 WL 3284118 (S.D.N.Y. June 28, 2013) .......................................................19

*In re Flag Telecom Holdings, Ltd., Sec. Litig.*,
  245 F.R.D. 147 (S.D.N.Y. 2007) ...................................................76

*Flores v. Anjost Corp.*,
  284 F.R.D. 112 (S.D.N.Y. 2012) ...................................................63

*Halliburton Co. v. Erica P. John Fund*,
  134 S. Ct. 2398 (2014)..............................................................2, 40

*In re Initial Pub. Offering Sec. Litig.*,
  671 F. Supp. 2d 467 (S.D.N.Y. 2009)............................................59

*Klein v. A.G. Becker Paribas Inc.*,
  109 F.R.D. 646 (S.D.N.Y. 1986) ..................................................87

*In re Lehman Bros. Sec. & ERISA Litig.*,
  2013 WL 440622 (S.D.N.Y. Jan. 23, 2013) ..........................49, 51, 52

*In re Literary Works in Elec. Databases Copyright Litig.*,
  654 F.3d 242 (2d Cir. 2011)........................................................72

*Litwin v. Blackstone Grp., L.P.*,
  634 F.3d 706 (2d Cir. 2011)...................................................10, 41

*McLaughlin v. Am. Tobacco Co.*,
  522 F.3d 215 (2d Cir. 2008).........................................................14

*In re Moody's Corp. Sec. Litig.*,
  274 F.R.D. 480 (S.D.N.Y. 2011). ..........................................14, 15, 38

*Morrison v. Nat'l Austl. Bank Ltd.*,
  561 U.S. 247 (2010)..........................................................81, 82, 83

*Myers v. Hertz Corp.*,
  624 F.3d 537 (2d Cir. 2010).........................................................52

*N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*,
  2011 WL 3874821 (S.D.N.Y. Aug. 16, 2011)....................52, 66, 70, 75

*N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*,
  2014 WL 1013835 (S.D.N.Y. Mar. 17, 2014) ...................................42

*N.J. Carpenters Health Fund v. Rali Series 2006-Q01 Trust*,
  477 F. App'x 809 (2d Cir. 2012)..........................................14, 18, 43

*N.J. Carpenters Health Fund v. Residential Capital, LLC*,
  2013 WL 6839093 (S.D.N.Y. Dec. 27, 2013) ...............................42, 78

*N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC,*
709 F.3d 109 (2d Cir. 2013)........................................................................10, 41

*In re NASDAQ Market-Makers Antitrust Litig.,*
169 F.R.D. 493 (S.D.N.Y. 1996) ........................................................................40

*In re Nassau Cnty. Strip Search Cases,*
461 F.3d 219 (2d Cir. 2006)........................................................................55

*Nat'l Air Traffic Controllers Ass'n v. Dental Plans, Inc.,*
2006 WL 584760 (N.D. Ga. Mar. 10, 2006)........................................................72

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.,*
693 F.3d 145 (2d Cir. 2012)........................................................................70

*In re NYSE Specialists Sec. Litig.,*
260 F.R.D. 55 (S.D.N.Y. 2009) ........................................................12, 66, 69

*In re Oxford Health Plans, Inc. Sec. Litig.,*
191 F.R.D. 369 (S.D.N.Y. 2000) ........................................................................76

*In re Parmalat Sec. Litig.,*
2008 WL 3895539 (S.D.N.Y. Aug. 21 2008)........................................................55

*Plumbers & Pipefitters Nat'l Pension Fund v. Burns,*
292 F.R.D. 515 (N.D. Ohio 2013) ........................................................................74

*Ret. Fund v. J.P. Morgan Chase & Co.,*
301 F.R.D. 116 (S.D.N.Y. 2014) ........................................................54, 78, 79, 86

*Ret. Sys. of Miss. v. Goldman Sachs Grp. Inc.,*
280 F.R.D. 130 (S.D.N.Y. 2012) ........................................................52, 56, 86

*Ret. Sys. of Miss. v. Merrill Lynch & Co., Inc.,*
277 F.R.D. 117 (S.D.N.Y. 2011) ........................................................... *passim*

*City of Livonia Emps.' Ret. System v. Wyeth,*
284 F.R.D. 173 (S.D.N.Y. 2012) ........................................................................57

*Roach v. T.L. Cannon Corp.,*
778 F.3d 401 (2d Cir. 2015)........................................................................79, 81

*Robidoux v. Celani,*
987 F.2d 931 (2d Cir. 1993)........................................................................65

*In re Sanofi Sec. Litig.,*
2015 WL 365702 (S.D.N.Y. Jan. 28, 2015) ........................................................87

*In re Sanofi-Aventis Sec. Litig.*,
   293 F.R.D. 449 (S.D.N.Y. 2013) ..................................................................76

*Schleicher v. Wendt*,
   618 F.3d 679 (7th Cir. 2010) ....................................................................4, 5

*SEC v. Bank of Am. Corp.*,
   677 F. Supp. 2d 717 (S.D.N.Y. 2010) ......................................................3, 10

*Seijas v. Republic of Arg.*,
   606 F.3d 53 (2d Cir. 2010)..........................................................................73

*Sicav v. James Jung Wang*,
   2015 WL 268855 (S.D.N.Y. Jan. 21, 2015) .............................................79

*In re Smart Tech., Inc. S'holder Litig.*,
   295 F.R.D. 50 (S.D.N.Y. 2013) .........................................................84, 85, 86

*Stinson v. City of New York*,
   282 F.R.D. 360 (S.D.N.Y. 2012) ......................................................46, 59, 75

*Sykes v. Mel S. Harris & Assocs., LLC*,
   780 F.3d 70 (S.D.N.Y. 2015) .....................................................................79

*In re Time Warner Inc. Sec. Litig.*,
   9 F.3d 259 (2d Cir. 1993).............................................................................15

*Tsereteli v. Residential Asset Securitization Trust 2006-A8*,
   283 F.R.D. 199 (S.D.N.Y. 2012) .................................................................80

*In re U.S. Foodservice Inc. Pricing Litig.*,
   729 F.3d 108 (2d Cir. 2013),
   *cert. denied sub nom.*,
   *US Foods, Inc. v. Catholic Healthcare W.*, 134 S. Ct. 1938 (2014) ....................21, 22, 51, 79

*United Paperworkers Int'l Union v. Int'l Paper Co.*,
   985 F.2d 1190 (2d Cir. 1993)......................................................................41

*Valley Drug Co. v. Geneva Pharms., Inc.*,
   350 F.3d 1181 (11th Cir. 2008) ...................................................................72

*In re Vitamin C Antitrust Litig.*,
   279 F.R.D. 90 (E.D.N.Y. 2012)...................................................................72

*In re Vivendi Universal, S.A. Sec. Litig.*
   284 F.R.D. 144 (S.D.N.Y. 2012) .................................................................34

*Wallace v. IntraLinks*,
    302 F.R.D. 310 (S.D.N.Y. 2014) .................................................................65, 73, 74

*Wang v. Bear Stearns Cos.*,
    14 F. Supp. 3d 537 (S.D.N.Y. 2014).......................................................................87

*In re WorldCom, Inc. Sec. Litig.*,
    219 F.R.D. 267 (S.D.N.Y. 2003) .............................................................................77

*Zimmerman v. Bell*,
    800 F.2d 386 (4th Cir. 1986) ...................................................................................87

**Statutes**

15 U.S.C. § 78u-4(a)(2)(A).............................................................................................77

**Other Authorities**

5 Moore's Federal Practice § 23.21[3][a] ......................................................................60

1 William B. Rubinstein, *Newberg on Class Actions*, § 3.75 (5th ed. 2011, Supp.
    Winter 2013) .....................................................................................................71, 72

## INTRODUCTION

As the Supreme Court has held, what matters at the class certification stage is the capacity of the class to "generate common answers" to "common questions." *Amgen Inc. v. Conn. Ret. Plans and Trust Funds*, 133 S. Ct. 1184, 1210 (2013). Defendants' primary argument is that the generation of common answers will be impossible here because "thousands" of Facebook investors supposedly had "actual knowledge" of the allegedly concealed information—*i.e.*, the fact that Facebook had cut its revenue estimates due to the impact of increasing mobile usage, and the magnitude of the impact. Therefore, Defendants assert, individual issues will predominate over common ones with respect to Defendants' statutory affirmative defense of "actual knowledge" under Section 11 of the Securities Act of 1933 (the "Securities Act").

However, this is simply not accurate. *First*, Defendants have shown that only relatively few investors out of a gigantic Class had "actual knowledge" of Facebook's revenue cuts. This does not defeat class certification, particularly where, as here, Plaintiffs do not object to excluding these investors from the Class. *See* Section I.C, *infra*. *Second*, the Class is massive in comparison to the relatively few examples Defendants cite. In what was one of the largest public offerings in financial history, Facebook sold more than 484 million shares in the IPO for proceeds of approximately $18.4 billion. Of these shares, Facebook ███████████████████████ ███████████████████████████████████████████████████ ████████████████████████████████████████████[1] And those were just the shares sold in the IPO itself, before any of the shares traded in the secondary market

---

[1] The Expert Report of James F. Miller dated June 16, 2015 ("Miller Report") is submitted herewith as Exhibit 105.

are counted. Over the remainder of the Class Period, from May 18 through the close of trading on

May 21, nearly 751 million shares were traded in the secondary market, thus bringing vast numbers

of additional investors into the Class. In total, the members of this Class likely number in the

hundreds of thousands. It is against the backdrop of this huge Class that all of Defendants'

predominance arguments must be viewed. *See Halliburton Co. v. Erica P. John Fund*, Inc., 134 S.

Ct. 2398, 2412 (2014) ("[t]hat the defendant might attempt to pick off the occasional class member

here or there through individualized rebuttal does not cause individual questions to predominate").

    *Third*, as to this massive Class, there are many common questions of law and fact that will

generate common answers. These questions—including whether the offering documents for the

Facebook IPO contained misstatements and omissions, whether the alleged misstatements and

omissions were material, and the proper measure of damages—predominate over the questions

impacting the relatively few Class members Facebook focuses on.

    Significantly, even Defendants' purported "actual knowledge" defense raises common

questions that will generate common answers for all but a relative few class members that will be

excluded. For instance, the affirmative defense raises the following common question as to the

entire Class:

**Common Question 1: Can a reasonable investor be charged with "actual knowledge" of
Facebook's revenue cuts based on information from media outlets or other third party
sources, such as Syndicate Analysts and Underwriters, where Defendants admonished
investors to rely only on statements made in the Prospectus, and prohibited the Underwriters
from attributing any financial information to Facebook?**

    Plaintiffs assert the common answer is that investors cannot be charged with "actual

knowledge" based on information received from third parties because, among other reasons,

Defendants explicitly warned investors that such information was unreliable since it did not come

from Facebook itself, and told them to rely only on the Prospectus in making their investment

decision. *See* Section I.A, *infra*. The Prospectus states: "In making your investment decision, you should not rely on information in public media that is published by third parties. ***You should rely only on statements made in this prospectus in determining whether to purchase our shares***." Ex. 41 at 31.[2]  As the Court previously held after considering this language, "A reasonable investor will not be charged to regard press reports as a reliable source of information after having read such advice." *In re Facebook, Inc. IPO Sec. & Deriv. Litig.*, 986 F. Supp. 2d 487, 522 (S.D.N.Y. 2013), *motion to certify appeal denied*, 986 F. Supp. 2d 524 (S.D.N.Y. 2014); *see also SEC v. Bank of Am. Corp.*, 677 F. Supp. 2d 717, 719 (S.D.N.Y. 2010) (Rakoff, J.) ("[S]ince the Bank itself warned investors not to rely on the media, ***it would be unreasonable for a shareholder to consider the media pronouncements to be part of the relevant mix of information***.").

This is particularly so where discovery has also shown that 

*See* Section I.B.1.a, *infra*.

The salient point for this motion is that, whatever the ultimate resolution of the underlying merits issue, ***it cannot defeat class certification where, as here, it presents a common question that will generate a common answer***. *See Amgen*, 133 S. Ct. at 1191. As Chief Judge Easterbrook

---

[2] Herein, all emphasis is added unless otherwise indicated. "Ex. __" refers to exhibits appended to the declarations of Salvatore J. Graziano dated December 23, 2014 (which contains Exhibits 1-44) and June 16, 2015 (which contains Exhibits 45-105).  "¶__" refers to a paragraph of the Complaint. "A-_" refers to pages of the Appendix to the Declaration of Adam B. Stern submitted with Defendants' Opposition.

has stated, "Rule 23 allows certification of classes that are fated to lose as well as classes that are sure to win." *Schleicher v. Wendt*, 618 F.3d 679, 685-86 (7th Cir. 2010).

Moreover, even if the Court found that investors can be charged with "actual knowledge" based on third-party sources, Defendants' purported "actual knowledge" defense would nevertheless present common questions that will generate common answers with respect to the two Subclasses that Plaintiffs propose in the alternative. For instance, application of the affirmative defense presents the following common question as to the Institutional Investor Subclass:

**Common Question 2: Can institutional investors who were informed of the Syndicate Analysts' model revisions be charged with "actual knowledge" of Facebook's own, internal revenue cuts?**

Because Plaintiffs do not dispute that all members of the Institutional Investor Subclass received the Syndicate Analysts' model revisions, this is a key ***common*** issue for this Subclass's claims. As noted above, Plaintiffs assert the common answer to this question is that knowledge of the Syndicate Analysts' model revisions does ***not*** represent "actual knowledge" of Facebook's own revenue cuts because ██████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████

But again, it matters not if Plaintiffs ultimately succeed or are proven wrong on this question. *Schleicher*, 618 F.3d at 685. What matters at this procedural stage is whether the issue presents common questions that will generate common answers, and it does. Given that all members of the Institutional Investor Subclass received the Syndicate Analysts' model revisions, the claims of that Subclass will rise or fall "in unison" on the question of whether they gained "actual knowledge" from the receipt of such information. *Amgen*, 133 S. Ct. at 1191.

Given the stark difference in how retail investors were treated, the application of Defendants' affirmative defense also presents obvious common questions as to the Retail Investor Subclass. As explained herein, a plethora of evidence adduced in this case—including admissions by the CEO of Lead Underwriter Morgan Stanley, ███████████████████████████ ████████████████████████████████████████████████—demonstrates that members of the Retail Investor Subclass were ***not*** informed of the Syndicate Analysts' model revisions. *See* Section II.B.2. Thus, application of Defendants' same affirmative defense to the Retail Investor Subclass raises the following common question:

**Common Question 3: Given that retail investors were not informed of the model revisions, can retail investors nevertheless be charged with "actual knowledge" of Facebook's revenue cuts based only on publicly-available media reports?**

Plaintiffs assert that the common answer to the above question is that knowledge of third-party media speculation does ***not*** represent "actual knowledge" of Facebook's own revenue cuts for a host of reasons, including that such information was inherently unreliable and "misleading," according to Defendants' own warning not to rely on it, and the fact that Defendants' own evidence referred to the reports as mere "***rumor***." A-1253. But again, at this procedural stage, it matters not if Defendants or a jury ultimately disagrees. *See Schleicher*, 618 F.3d at 685. In all events, the question is a common one and the answer will bind the Retail Investor Subclass as a whole. *See, e.g.*, *Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co., Inc.*, 277 F.R.D. 117, 119 (S.D.N.Y. 2011) ("[T]o the extent Defendants argue that actual knowledge can be inferred from the slew of newspaper articles and public reports they have submitted to the Court, this again is an issue subject to generalized proof.").

Defendants will contend that, even if all the above were true, the application of their affirmative defense raises ***some*** individualized questions as to ***some*** among hundreds of thousands

of Class members, including any specific additional Class members they may attempt to identify for the first time on sur-reply (which would be inappropriate). However, the existence of some individualized issues arising from the application of an affirmative defense cannot defeat a finding of predominance where so many common issues bind a Class of unquestionably enormous size. As this Court has explained, "[i]n determining whether common questions of fact predominate, a court's inquiry is directed primarily toward whether the issue of liability is common to members of the class"—as it is here. *In re Blech Sec. Litig.*, 187 F.R.D. 97, 107 (S.D.N.Y. 1999) (Sweet, J.); *see also Merrill Lynch*, 277 F.R.D. at 117 ("When determining whether common questions predominate courts 'focus on the liability issue . . . and if the liability issue is common to the class, common questions are held to predominate over individual questions.'"). These decisions comport with Second Circuit precedent, which holds that, "[a]lthough a defense may arise and may affect different class members differently, this does not compel a finding that individual issues predominate over common ones. . . . As long as a sufficient constellation of common issues binds class members together, variations in the sources and application of a defense will not automatically foreclose class certification under Rule 23(b)(3)." *Brown v. Kelly*, 609 F.3d 467, 483 (2d Cir. 2010).

Finally, as discussed in Sections II-IV, *infra*, Defendants' remaining arguments are meritless. Defendants' argument that retail and institutional investors cannot be ascertained is contradicted by a multitude of evidence, ████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████, and industry regulations that specifically define "retail" and "institutional" investors. Defendants also repeatedly argue that certain issues are appropriately addressed at the class certification stage, even though recent Supreme Court

authority holds that they are not. For instance, while Defendants assert that individualized issues of materiality predominate, the Supreme Court has held that materiality is a common issue and that Plaintiffs need not show materiality at the class certification stage. *See Amgen*, 133 S. Ct. 1184.  Similarly, although Defendants make multiple arguments contending that Plaintiffs have not established loss causation, Section 11 has no loss causation requirement, and even in cases in which plaintiffs bear the burdens of alleging and proving loss causation, they need not do so at the class certification stage.  *See Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179 (2011). And while Defendants assert that *Comcast Corporation v. Behrend*, 133 S. Ct. 1426 (2013), precludes certification because of damages issues, they ignore that damages in this case are measured according to a mechanical statutory formula.

Plaintiffs respectfully submit that certification of the proposed Class is appropriate. In the alternative, Plaintiffs request certification of the proposed Subclasses.

## ARGUMENT

## I.    Individual Issues Of Knowledge Do Not Preclude Certification

As noted in Plaintiffs' opening brief, Plaintiffs request certification of the Class alleged in the Complaint. *See* Pl. Br. at 5. Defendants argue that certification of the proposed Class is inappropriate because they have purportedly shown that "thousands" of class members had "actual knowledge" of Facebook's revenue cuts based on information received from third parties, such as media outlets, Syndicate Analysts or other market participants, demonstrating the need for individualized inquiry into each putative class member's knowledge and defeating predominance. *See* Opp. Section I.  However, as discussed in Section I.A, *infra*, the issue of whether Defendants can charge investors with "actual knowledge" of Facebook's revenue cuts based on information from third parties presents a common question that will generate a common answer with respect to the entire proposed Class.

In the alternative, as discussed in Section I.B, *infra*, the issue of whether such information provides "actual knowledge" of Facebook's revenue cuts also presents common questions that will generate common answers with respect to each of the proposed Subclasses—the Retail Investor Subclass and the Institutional Investor Subclass. Although Defendants have presented evidence showing that a relatively few investors might have had "actual knowledge," that does not defeat class certification of either the Class or the Proposed Subclasses because the Class is enormous, and Plaintiffs do not object to the exclusion of these investors from any Class or Subclass, as discussed in Section I.C, *infra*.

A.   **The Issue Of Whether Investors May Be Charged With "Actual Knowledge" Of Facebook's Revenue Cuts Based On Information From Third Parties Presents A Common Question That Will Generate A Common Answer With Respect To The Entire Alleged Class**

Certification of the proposed Class is appropriate. The issue of liability generates numerous common questions (*see* Pl. Br. at 18), and Defendants' affirmative defense generates additional common questions and answers that bind all Class members. Significantly, Facebook has not asserted (nor could it) that it told investors that it had reduced its internal revenue estimates due to the mobile usage trend, or that it told investors the extent of those reductions—the information that the Court has held was required to be disclosed. *See Facebook*, 986 F. Supp. 2d at 512-14. ■

███████████████████████ Accordingly, Defendants are forced to argue that investors somehow gained "actual knowledge" of Facebook's revenue cuts through third party sources, including media articles and, as to institutional investors only, the fact that the Syndicate Analysts had revised their own independent research models.

However, as noted above, in the Prospectus for the Facebook IPO, Defendants specifically warned prospective investors to disregard information received from parties other than Facebook because such "misleading" information was "***not directly attributable to***" Facebook, and instructed investors to "rely ***only*** on statements made in this prospectus":

> In making your investment decision, you should not rely on information in public media that is published by third parties. ***You should rely only on statements made in this prospectus in determining whether to purchase our shares.***

> You should carefully evaluate all of the information in this prospectus. We have in the past received, and may continue to receive, a high degree of media coverage, including coverage that is ***not directly attributable to statements made by our officers*** and employees, that ***incorrectly*** reports on statements made by our officers or employees, or that is ***misleading*** as a result of omitting information provided by us, our officers, or employees. ***You should rely only on the information contained in this prospectus in determining whether to purchase our shares of Class A common stock.***

Ex. 41 at 31. ███████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████[3]

The issue of whether, in light of the specific instruction in the Prospectus, investors may

---

[3] While Defendants assert that the FWP disclosed the relevant truth (Opp. at 8, n.5), the Court has already held that this disclosure was materially misleading and, in any event, arguments about the adequacy of Facebook's public disclosures could only raise common issues.

now be charged with "actual knowledge" of Facebook's revenue cuts based on information from third parties presents a common question that will generate a common answer with respect to the entire Class. Plaintiffs contend that investors may not be charged with "actual knowledge" based on third-party information that was not directly attributed to Facebook. This Court has already held as much with respect to media reports, and other courts in this District have reached similar conclusions. *See Facebook*, 986 F. Supp. 2d at 522 ("A reasonable investor will not be charged to regard press reports as a reliable source of information after having read such advice."); *Bank of Am. Corp.*, 677 F. Supp. 2d at 719 ("since the Bank itself warned investors not to rely on the media, it would be unreasonable for a shareholder to consider the media pronouncements to be part of the relevant mix of information").

This position accords with the law of the Second Circuit, which has repeatedly held that "[t]here are serious limitations on a corporation's ability to charge its stockholders with knowledge of information omitted from a document such as a ... prospectus ***on the basis that the information is public knowledge and otherwise available to them***." *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 718 (2d Cir. 2011) (quoting *Kronfeld v. Trans World Airlines, Inc.*, 832 F.2d 726, 736 (2d Cir. 1987)). Similarly, in *New Jersey Carpenters Health Fund v. Royal Bank of Scotland Group, PLC*, where the defendants argued that newspaper articles "would have informed the Fund of the very information it claims that the [the prospectus at issue] withheld," the Second Circuit held that "'sporadic news reports ... should ***not*** be considered part of the total mix of information that would clarify or place in proper context ... representations' that were contained in materials ***that the company provided 'directly.***'" 709 F.3d 109, 126-27 (2d Cir. 2013) (quoting *United Paperworkers*

*Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1199 (2d Cir. 1993)).[4]

The same reasoning extends beyond media reports and applies to other third-party sources of information, such as Syndicate Analysts or other market participants, because Defendants explicitly warned investors to rely "only" on the Prospectus. Further, discovery has shown that

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████  *See* Exs. 45 at 140:1-13 (Morgan Stanley); 46 at 97:15-98:13 (J.P. Morgan); and 47 at 59:18-60:12 (Goldman Sachs).

In short, the issue of whether Defendants can charge investors with "actual knowledge" of Facebook's revenue cuts based on information from third parties, including the Syndicate Analysts, presents a common question that will generate a common answer with respect to the entire alleged Class.

> **B.    In The Alternative, The Issue Of Whether Information From Third Parties Represents "Actual Knowledge" Of Facebook's Revenue Cuts Under Section 11 Of The Securities Act Presents Common Questions That Will Generate Common Answers With Respect To The Proposed Subclasses**

Even if investors could be charged with "actual knowledge" based on information obtained from the Syndicate Analysts and media, class certification would still be appropriate. This is

---

[4] Moreover, as explained in Section I.B.2, *infra*, the media reports of "rumors" that Defendants cite cannot create individual knowledge issues because none of them conveyed to investors the key information about Facebook's revenue cuts that was omitted from the Registration Statement here: the fact that Facebook determined that mobile usage had negatively impacted its revenues, and the extent of the impact of the trend at issue.

because the issue of whether such third party information constitutes "actual knowledge" also presents a common question that will generate a common answer with respect to the proposed Subclasses.[5] *See* Pl. Br. at 31. In this case, there was a clear distinction between how institutional and retail investors were treated, and this distinction neatly divides the issues faced by each group. The Institutional Investor Subclass was informed of the Syndicate Analysts' model revisions and, as detailed in Section I.B.2, the Retail Investor Subclass was not. Thus, dividing the Class into the two proposed subclasses would alleviate any predominance concerns.

In a decision that is directly on-point, the court certified two subclasses along the lines that Plaintiffs propose here. In *In re DJ Orthopedics, Inc., Securities Litigation*, 2003 U.S. Dist. LEXIS 21534 (S.D. Cal. Nov. 17, 2003), as here, plaintiffs alleged that the issuer's registration statement for its IPO was materially false and misleading because it omitted material adverse information about the company's then-current quarter's decline in sales. *Id*. When moving for class certification, plaintiffs, as in this case, proposed a division into two subclasses: (1) the no-knowledge subclass, which consisted of persons who were not contacted by the underwriters regarding the new, lower earnings estimates omitted from the Prospectus (the Retail Investor Subclass here); and (2) the putative knowledge subclass, which included institutional investors who the underwriters "contacted [] before the IPO regarding the information omitted from the Prospectus" (similar to the Institutional Investor Subclass here). *Id*. at *10.[6] In a well-reasoned

---

[5] The Court may decide the issue of whether subclasses are necessary now or after the record in this Action is developed more fully in fact discovery. *See e.g., In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 74 (S.D.N.Y. 2009) (Sweet, J.) ("To the extent that different formulas may apply to the calculation of any damages suffered…this Court can order certification of appropriate sub-classes at a later juncture within its broad discretion in arranging the structure of a class action litigation. . . .").

[6] The briefing in *DJ Orthopedics* makes clear that the knowledge subclass consisted only of institutional investors who were contacted by the underwriters about downwardly revised estimates, as is the case here.

decision, the *DJ Orthopedics* court held that, although "knowledge is likely to be a significant issue," common questions of law or fact still predominated over individualized issues, and certified the two separate subclasses of investors. *Id*. at *25-26 (citing *In re First Republic Bank Sec. Litig*., 1989 U.S. Dist. LEXIS 11139, at *22 (N.D. Tex. 1989) ("Although individual issues with respect to class members' personal knowledge may develop in the course of this case, the Court is unable to conclude that individual issues predominate over common ones.")). As explained below, at the very least, the same outcome is appropriate here.[7]

### 1. Common Questions Predominate with Respect to the Institutional Investor Subclass

Class certification discovery has demonstrated that, 

While Plaintiffs concede discovery shows that institutional investors were provided with the Syndicate Analysts' estimates, the legal import of this fact is hotly disputed by the parties. Significant at this stage, however, the answer to this legal question is a common one that affects all members of the Institutional Investor Subclass.  Accordingly, as discussed further below, the Court should certify an Institutional Investor Subclass.

---

*See* Plaintiffs' Reply Mem. in Supp. of Lead Plaintiff's Motion for Class Certification, 2003 WL 23831259, at *1 (S.D. Cal. Nov. 12, 2003) ("defendants focus on an alleged affirmative defense to plaintiffs' [section] 11 claims, alleging that the material facts which were omitted from the Registration Statement/Prospectus were uniformly disclosed to some institutional investors").

[7] Defendants argue that *DJ Orthopedics* is distinguishable because members of the knowledge subclass in that case all received uniform information, whereas here, Defendants contend they did not. Opp. at 37.  But Defendants themselves argue that institutional investors received uniform information here in that they all received the Syndicate Analysts' model revisions, which Defendants contend were essentially the same as Facebook's internal projections. *Id*. at 30 (arguing that "the underwriters' revised projections did not differ materially from the revised projections that Ms. Herman gave underwriters").

13

> ### a. Institutional Investor Knowledge Of The Syndicate Analysts' Model Revisions Is Not "Actual Knowledge" Of Facebook's Own Revenue Cuts

The gravamen of the Complaint is that the offering documents for the Facebook IPO were misleading because they failed to disclose that (1) *Facebook itself* had determined that the mobile usage trend had already had a material negative impact on the Company's 2012 second-quarter and year-end revenues; and (2) the extent of that impact. *See, e.g.*, ¶¶ 10-11, 188-90, 193-94, 197-201.[8] For numerous reasons, institutional investor knowledge of the Syndicate Analysts' model revisions does not constitute "actual knowledge" of these facts under the Securities Act.

*First*, as explained in Plaintiffs' opening brief, the Second Circuit has held that the standard for showing actual knowledge is exceptionally high, and cannot be satisfied with a showing of constructive knowledge. *See N.J. Carpenters Health Fund v. Rali Series 2006-Q01 Trust*, 477 F. App'x 809, 813 (2d Cir. 2012) ("The statutory language leaves no ambiguity: For the knowledge affirmative defense to succeed on the merits, the defendant must show the purchaser's *actual knowledge of the specific untruth or omission*."); *see also* cases cited in Pl. Br. at 28-29. This is significant because, as noted above, neither Facebook nor the Underwriters informed investors of the specific untruth or omission here.[9]

---

[8] Defendants argue that Plaintiffs' claim is based on selective disclosure, that the "'selective disclosure' allegation turned out to be wrong," and "Plaintiffs have pivoted away from their selective disclosure theory." Opp. at 1-2. However, that is a straw-man argument. As this Court has held, Plaintiffs' Complaint is not based on a selective disclosure theory. *Facebook*, 986 F. Supp. 2d at 513. Rather, as the Court held, Facebook's selective disclosure merely shows that the information at issue was material and not disclosed in the Prospectus.

[9] In support of their argument that "individualized questions" of knowledge predominate, Defendants mistakenly rely upon *McLaughlin v. American Tobacco Company*, 522 F.3d 215 (2d Cir. 2008), which was a RICO case brought by smokers allegedly deceived by defendants' marketing of light cigarettes. *See, e.g.*, Opp. at 13, 35, 57. As the court held in *In re Moody's Corp. Securities Litigation*, "*McLaughlin* involved a consumer goods fraud and it draws a sharp distinction between securities cases where information is being

14

The Second Circuit has further recognized a key distinction between information provided by the issuer and third parties, including analysts, for the purposes of the securities laws. Critically, "investors tend to discount information in newspaper articles and analyst reports when the author is unable to cite specific, attributable information from the company"—as the Syndicate Analysts were prohibited from doing here. *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 265 (2d Cir. 1993); *see also DeMarco v. Lehman Bros., Inc.*, 222 F.R.D. 243, 246 (S.D.N.Y. 2004) (Rakoff, J.) ("there is a qualitative difference between a statement of fact emanating from an issuer and a statement of opinion emanating from a research analyst").

*Second*, evidence adduced in this case undercuts any contention that knowledge of the Syndicate Analysts' model revisions constitutes "actual knowledge" of Facebook's own revenue cuts. Discovery shows that ████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████████ This was no technicality. ████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

---

absorbed instantaneously by the market, and consumer goods cases where consumer information is being absorbed much more sporadically and inconsistently." 274 F.R.D. 480, 492 (S.D.N.Y. 2011) (rejecting argument that "individual questions predominate … because the market was well aware" of the misrepresented facts).



*See, e.g.*, Ex. 12 at MS_FB_00008882

(Morgan Stanley Institutional Selling Memo); *see also* Ex. 37 at FB-IPO 0010273 (May 23, 2012

*Bloomberg* report quoting a Morgan Stanley spokesperson as stating that the Syndicate Analysts

reduced their revenue estimates for Facebook "[i]n response to" the Company's May 9, 2012

revised S-1).

---

[10] However, the fact that Facebook
made revenue cuts was obviously material, as the Court held at the motion to dismiss stage. *Facebook*, 986
F. Supp. 2d at 519-21.

███████████████████████████████████████

███████████████████████████████████████

██████████████████████

Even after Facebook's revenue cuts later were publicly revealed, the Underwriter Defendants publicly maintained that the Syndicate Analysts' model revisions were based on the disclosures in the FWP (also known as an "S-1"), and *not* on the information provided by Facebook about its own revenue cuts. ███████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████[11] Investors cannot be charged with "actual knowledge" where, as here, they were falsely told that the Syndicate Analysts' model revisions were based on the public FWP—and *not* Facebook's own revenue cuts.

*Third*, as Defendants themselves have recognized, Facebook's revenue cuts are not the same as the Syndicate Analysts' model revisions. In Defendants' memorandum in support of their motion to dismiss the Complaint, Defendants recognized this distinction, making clear that Plaintiffs do *not* allege that investors knew of Facebook's own revenue cuts, stating, ***"Plaintiffs do not allege that the underwriters shared Facebook's internal projections with the institutional investors, or anyone else."*** Def. MTD (ECF No. 92) at 8 n.3. ███████████████████

––––––––––––––––––––

[11] This entirely undercuts Defendants' argument that "[t]here would have been no reason for underwriters (all at the same time) to change their projections of Facebook's revenues, except for the fact that Facebook had changed its projections . . . ." Opp. at 34; *see also id*. at 40. █████████████████████████ ███████████████████████████████████████████.

17

[BLACK REDACTION BAR]

[BLACK REDACTION BAR]

[BLACK REDACTION BAR]

[BLACK REDACTION BAR]

[BLACK REDACTION BAR]

[BLACK REDACTION BAR]

[BLACK REDACTION BAR]

[BLACK REDACTION BAR]

[BLACK REDACTION BAR]

[BLACK REDACTION BAR] Ex. 46 at 81:13-21.  As the Underwriter Defendants themselves have acknowledged, their analysts' revenues estimates are not the same as—and should not be equated with—Facebook's own revenue estimates.

In sum, knowledge of the Syndicate Analysts' model revisions is not sufficient to establish the "actual knowledge" defense where the key information at issue (*i.e.*, Facebook's own revenue cuts) was not disclosed, and where the Underwriter Defendants publicly attributed their model revisions solely to the FWP, and not to Facebook.[12]

In their Opposition, Defendants attempt to broaden the ways in which they can show "actual knowledge" by arguing that they prevail on the merits of their affirmative defense so long as they show that investors generally knew that mobile was impacting Facebook's revenues "even

---

[12] At most, knowledge of the Syndicate Analysts' model revisions represented **constructive** knowledge of Facebook's revenue cuts, which is insufficient as a matter of law to establish the "actual knowledge" defense. *See N.J. Carpenters Health Fund*, 477 F. App'x at 813; *Fed. Hous. Fin. Agency v. HSBC N. Am. Holdings Inc.*, 33 F. Supp. 3d 455, 480-81 (S.D.N.Y. 2014) ("[A] *case for constructive knowledge, on a record that establishes no actual knowledge, will not suffice*. . . . Even suspicion of falsity, before it ripens into actual knowledge, will not suffice.").

if investors knew neither Facebook's nor underwriters' revised projections." Opp. at 39. Not so. The Court has already found at the motion to dismiss stage that in addition to "whether" mobile was affecting Facebook's revenues, Defendants were required to disclose "***the extent*** the increased mobile usage seen by the Company was already affecting Facebook's revenues." *Facebook*, 986 F. Supp. 2d at 512.  And, contrary to Defendants' assertions (Opp. at 38), Plaintiffs have always maintained that Defendants had a duty to disclose to investors the extent of Facebook's revised revenue estimates under the circumstances in this case.  *See* ¶201; *see also* MTD Opp. (ECF No. 114) at 23.  Accordingly, for Defendants to prevail on their "actual knowledge" defense, they would need to show that investors knew all of the omitted facts, including the fact that Facebook itself determined mobile usage had already had a negative impact on its revenues for the quarter and the year, and "the extent" of that impact.  *Id*.; *Fed. Hous. Fin. Agency v. UBS Ams. Inc.*, 2013 WL 3284118, at *14 (S.D.N.Y. June 28, 2013) ("the knowledge required must be specific knowledge of the falsity of the particular statements at issue").

> **b.     The Question Of Whether Institutional Investor Knowledge Of The Syndicate Analysts' Model Revisions Represents "Actual Knowledge" Of Facebook's Revenue Cuts Is Subject To Generalized Proof**

In any event, the question of whether institutional investors had "actual knowledge" of Facebook's revenue cuts by virtue of being informed of the Syndicate Analysts' model revisions is a common question subject to generalized proof for the Institutional Investor Subclass. Defendants' own arguments illustrate the point. Defendants contend that "[t]here is no meaningful distinction" between the Syndicate Analysts' model revisions and Facebook's revenue cuts. Opp. at 30. In fact, the entire thrust of Defendants' opposition is that essentially all institutional investors actually knew the truth about Facebook's own revenue cuts from the analysts' varying model revisions. Opp. at 2-3, 30-36.  Whether or not Defendants are correct in their argument presents a

common question that, if anything, supports certification of the Institutional Investor Subclass.

The opinion of Defendants' expert, Professor Womack, further shows that members of the Institutional Investor Subclass were treated the same and shared the same general understanding.

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████ While Plaintiffs disagree this type of constructive knowledge is legally sufficient to satisfy Facebook's "actual knowledge" defense, the point is that Womack's own opinion demonstrates that this is an issue of generalized proof.

Similarly, Defendants contend, based on allegations from Plaintiffs' Complaint, that any investor who received the model revision knew about the change in Facebook's business and is subject to the actual knowledge defense—an argument they say applies Class-wide. *See* Opp. at 31-32.[13] ███████████████████████████████████████████████

---

[13] █████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████ At the very least, this raises a common question with a common answer for

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████ *See, e.g.*, A-4-5 (Anmuth Decl.

¶8); A-11-12 (Bellini Decl. ¶8); A-77-78 (Herman Decl. ¶6). In short, Defendants' own assertions,

and the assertion of their own expert, demonstrate that whether institutional investors understood

the model revisions to be based on information from Facebook is something that can be litigated

across the Institutional Investor Subclass as a whole, including by introducing evidence of industry

custom and practice.

The Second Circuit has recently held that "such proof, far from demonstrating that factual

questions regarding the knowledge of individual class members will predominate over questions

common to the class, is in fact generalized proof . . . ." *In re U.S. Foodservice Inc. Pricing Litig.*,

729 F.3d 108, 121 (2d Cir. 2013), *cert. denied sub nom.*, *US Foods, Inc. v. Catholic Healthcare*

*W.*, 134 S. Ct. 1938 (2014). In *U.S. Foodservice*, the Second Circuit affirmed an order certifying

a nationwide class consisting of approximately 75,000 customers of the defendant company, U.S.

Foodservice Inc., ("USF"), who were allegedly overbilled as a result of a fraudulent scheme. 729

F.3d at 112.

USF argued that the district court had failed to consider an "overwhelming evidentiary

record" demonstrating that many class members were not deceived as to "the nature of its billing

practices." *Id.* at 120. Among other things, USF cited the testimony of its expert, who opined that

---

the institutional investors in the Class. Contrary to Defendants' suggestion (*see* Opp. at 32), Plaintiffs were
not required to amend the Complaint to include these new facts. *See Ash v. Wallenmeyer*, 879 F.2d 272,
274 (7th Cir. 1989) ("The federal rules do not contemplate that parties will amend their pleadings to reflect
new information obtained in the discovery process. The information is to be reflected in the framing of
issues in the pretrial order, which supersedes the complaint.").

"questions regarding the knowledge of individual class members will predominate over questions common to the class" because class members would have understood that USF's billing practices were based on "well-known and common industry practice." *Id.* at 121. The Second Circuit held that such testimony did not "raise the concern of issues of individual knowledge predominating" because "***USF points to generalized proof supporting this defense—proof wholly consistent with class action treatment*** . . . ." *Id.*

In short, the issue of whether institutional investors gained "actual knowledge" of Facebook's revenue cuts by virtue of being informed of the Syndicate Analysts' model revisions presents a common question subject to generalized proof.[14]

### 2. Common Questions Predominate As To The Retail Investor Subclass

The proposed Retail Investor Subclass is also fit for class certification. Unlike institutional investors, retail investors were not told of the Syndicate Analysts' model revisions. Accordingly, as discussed further below, they are not subject to any constructive knowledge defense—much less one that would predominate over the common issues in the case.

### a. Facebook Used Unsuspecting Retail Investors To Achieve A $100 Billion Valuation In The IPO

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

---

[14] To the extent Defendants argue that both institutional and retail investors were informed of the analyst model revisions (*see, e.g.*, Opp. at 41, 50), Plaintiffs disagree, but this issue still presents a common question for the entire Class.

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

As noted in Plaintiffs' opening brief, as this retail demand was reaching a pitch just before the IPO, Facebook increased the price and size of the offering, and allocated a sizeable portion of these shares to retail investors—[REDACTED]

[REDACTED] *See* Pl. Br. at 13-14. [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

Critically, as explained further below, Facebook kept its enormous base of retail investors in the dark about the material downward turn in its business prior to the IPO, which enabled it to take advantage of retail investors' ignorance and achieve the historic IPO valuation it was seeking. Because no material non-public information was disclosed to retail investors, common issues plainly predominate for the Retail Investor Subclass.

**b.**   **Retail Investors Were Not Provided Non-Public Information About Facebook Prior To The IPO**

Defendants' principal argument is that individualized issues of actual knowledge predominate for the Class because many investors were informed of the Syndicate Analysts' model

revisions. Discovery has shown, however, that this argument is *irrelevant* to the Retail Investor

Subclass because retail investors, unlike institutional investors, were *not* informed of these analyst

model revisions. Nor were retail investors told by Defendants the qualitative point that Facebook

had determined that increasing mobile usage had already negatively impacted its revenues, and to

what extent. Rather, retail investors were instructed to rely on Facebook's misleading public

disclosures. ██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

The testimony of J.P. Morgan's 30(b)(6) representative is corroborated by the opinions of

Plaintiffs' expert, James F. Miller.   Mr. Miller has nearly two decades of experience working as

an investment banker, during which time he served as the lead investment banker or lead capital

markets banker on over 100 public offerings of securities. *See* Miller Report ¶¶2-4. As discussed

in his expert report, Mr. Miller has opined that under industry custom and practice, retail investors

and institutional investors are provided different information in IPOs. Specifically, while

institutional investors may be informed of syndicate analysts' revenue estimates for the issuer,

retail investors are provided with only the information contained in the issuer's public disclosures.

*Id.* ¶¶24-25. Retail investors are not provided with revenue estimates by either the issuer or the

underwriters' analysts, and retail investors are not provided with any substantive qualitative

information about the issuer apart from the information in the issuer's public disclosures. *Id.* ¶25.[15]

A plethora of evidence in this case demonstrates that the Facebook IPO was conducted in

---

[15] While Defendants may complain that Plaintiffs supposedly should have submitted Mr. Miller's report with their opening papers, Mr. Miller is proffered as a rebuttal expert to address certain issues Defendants raised in their opposition concerning their affirmative defense of actual knowledge. Further, Defendants are being given the opportunity to depose Mr. Miller and submit a sur-reply.

accordance with this industry custom and practice, and that retail investors were left to rely only on Facebook's misleading and incomplete public disclosures. *First*, following the IPO, the CEO of Lead Underwriter Morgan Stanley, James Gorman, publicly admitted that retail investors, unlike institutional investors, were ***not*** provided with ***any*** Syndicate Analysts' revised Facebook revenue projections. On May 31, 2012, Gorman made a national appearance on *CNBC* and was asked how the Underwriters decided which of their clients to inform about the Syndicate Analysts' model revisions.  *See* Ex. 61 at 12:1-11.  In response, consistent with Mr. Miller's opinion and discovery in this case, Gorman stated unequivocally that ***all*** the Underwriters adhered to the widely accepted practice of ***not*** distributing their analysts' estimates to retail clients:

> The policy that we and the other underwriters operated under . . . is that there is individual disclosure, oral disclosure, no written reports, to institutional investors interested in what that particular analyst says . . . . ***And that policy to date has not been offering that same information, either the original projection or the revised, to retail investors*** . . . . ***This was standard operating procedure. It's the policy we and all the underwriters operated under with retail organizations.***

*Id.* at 12:12-14:17.

      *Second*, consistent with Gorman's public statements,











*Seventh*, Defendants themselves repeatedly emphasized at the motion to dismiss stage that the Underwriters provided their revenue estimates to "[i]nstitutional [i]nvestors" only, and ***not*** to retail investors. Def. MTD (ECF No. 92) at 8. They vigorously defended this practice of selective disclosure, explaining that "'[s]ince retail investors do not participate in the price discovery

30

process, ***they do not need to receive estimates (or, by definition, any updated estimates)***." *Id.* at 14 (citation omitted). And, as Defendants further argued to the Court, "'retail investors are restricted from fully participating in the market for IPOs because ***they are not privy to the same information as the institutional investors***." *Id.* at 49 n.24. Defendants' new assertion—that retail investors somehow knew the non-public information at the heart of this case—cannot be reconciled with the factual record and is completely belied by their prior representations to the Court.

*Eighth*, the market's negative reaction to the post-IPO disclosures that Facebook and the Underwriters had lowered their revenue estimates during the road show (without disclosing that information to the public) further demonstrates that retail investors were not provided this information. If a significant number of retail investors knew this information beforehand, as Defendants now contend, financial commentators would not have concluded that the news was a "bombshell," and Facebook's stock price would not have plummeted by over 18% on May 21 and 22, when news of this information was revealed to the market. Nor would the financial press have concluded that the Underwriters had selectively disclosed their revised revenue estimates to institutional (rather than retail) investors—yet that is exactly what occurred. For example, as a financial commentator reported on May 24, 2012, there had been "recent revelations" that "big institutional investors" learned of the underwriters' revised revenue estimates after "Facebook told them that its business outlook had deteriorated—information that was ***not*** given to small investors." Ex. 71 at Rand_00000014.  As a result, "some institutional investors 'got the willies' about the Facebook deal [but] ***[i]ndividual investors, meanwhile, were unaware that anything had changed.***" *Id.* As the *Los Angeles Times* reported on May 25, "Morgan Stanley and other underwriters warned privileged clients that their analysts had grown sour on Facebook's revenue

growth potential" but they "***failed to telegraph the same information to retail clients and the general public***." Ex. 72 at 1.  In the words of a Morgan Stanley Smith Barney investment adviser who worked with retail clients, quoted by *Reuters* after the IPO: "Night and day the institutional clients get things that we don't get." Ex. 73 at 3.

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████ That is because they did not.

> **c.**   **Defendants' Handful Of Purported Examples Of Retail Investors Being Told The Withheld Information Demonstrates Nothing Of The Sort, And Falls Far Short Of Defeating Predominance**

In the face of this evidence that retail investors were not told the information at issue in this case, Defendants attempt to defeat predominance in two principal ways. First, Defendants severely mischaracterize the record in contending that "many thousands" of retail investors learned the truth about Facebook's faltering revenues through communications with either the Company or the Underwriters. Second, ultimately unable to demonstrate that retail investors were actually informed of the truth through any such communications, Defendants are forced to fall back on the argument that retail investors deciphered the relevant information through vague media speculation that the Court has already held did not disclose the true facts at issue. As set forth below, all of Defendants' arguments should be rejected.

> **(1)**   <u>Gilder Gagnon And Jennison Are Institutional Investors</u>

The centerpiece of Defendants' arguments as to the Retail Investor Subclass is that they

supposedly provided the misrepresented and omitted information to "many thousands" of retail investors through communications with their independent money managers at: (1) Gilder Gagnon Howe & Co., LLC ("Gilder") (Opp. at 50-51); and (2) Jennison Associates LLC ("Jennison") (Opp. at 3, 15-16). This argument fails to defeat predominance for the Retail Investor Subclass. In reality, the basis for the assertion that "many thousands" of retail investors knew the relevant information is Defendants' claim that just these *two* managers were told—Gilder and Jennison— who manage individual client accounts on a discretionary basis. Defendants neglect to inform the Court that these two investors were clearly denominated as *institutions* by Facebook and the Underwriters and are, in fact, members of the Institutional Investor Subclass under the definitions proposed to the Court.

Because both Gilder and Jennison are registered investment advisers (Exs. 74 and 75), they are "institutional investors" under the definition promulgated by FINRA—the self-regulatory body that regulates broker-dealers, and which regulated the Underwriters in the IPO. *See* Ex. 76 (an "institutional account" means the account of a registered investment adviser).

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████[18]

████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████  Alternatively, at the appropriate time, individuals could be asked on a claim form if they acquired their shares through Gilder or Jennison and then treated accordingly.  *Cf. In re Vivendi Universal, S.A. Sec. Litig.* 284 F.R.D. 144, 155 (S.D.N.Y. 2012) (setting forth a procedure by which claimants would submit claim forms and the defendant company would have the opportunity to rebut the presumption of reliance with respect to a limited number of claimants).  In either event, identifying these investors is straightforward.

------

[18] █████████████████████████████████████████████████████████████

And even if there were any concern about identifying these individuals—and there is not—their existence cannot defeat predominance for the Retail Investor Subclass because they make up a very small fraction of retail stock purchased in the IPO and aftermarket. █████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████

Gilder Gagnon's and Jennison's share of that amount is miniscule. █████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████[19]

    (2)    <u>There Is No Evidence That Goldman Sachs' Retail Clients Were Told The Withheld Information</u>

Defendants also attempt to suggest that retail investors in Goldman Sachs' Private Wealth

---

[19] Defendants suggest that Wellington purchased shares on behalf of retail investors (Opp. at 51), but there is no evidence Wellington did and, further, Wellington is an institutional investor.

Management ("PWM") Group may have been told the misrepresented and withheld information by their brokers at Goldman Sachs. Opp. at 41. If Defendants' suggestion had any merit, one would expect Defendants to simply say that Goldman Sachs brokers told their retail clients the relevant information. Tellingly, Defendants do not say that.

Instead, in an attempt to create the misleading impression that PWM clients were informed of the Syndicate Analysts' model revisions, Goldman Sachs Managing Director Heather Bellini's Declaration vaguely mentions that: ██████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████

    ████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████ Given this record, Defendants' attempts to obfuscate this issue in the Bellini Declaration are entitled to no weight and provide no basis to deny class certification to an enormous subclass consisting of hundreds of thousands of retail investors.

Moreover, even if every Goldman Sachs PWM Group client who purchased in the IPO were told of Goldman Sachs' revised earnings estimates—and there is no evidence that they actually were—such a showing would still not defeat predominance for the Retail Investor Subclass. ██████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████

Finally, if there is any concern that Goldman Sachs' PWM investors learned the withheld information for predominance purposes (which there should not be given the absence of evidence and the massive size of the Retail Investor Subclass), these investors can be identified through a simple review of records maintained by Goldman Sachs, and removed from the Retail Investor Subclass.

> (3)     Defendants' Arguments Concerning A Handful Of Individual Investors Do Not Defeat Predominance for the Retail Investor Subclass

Throughout their brief, and notwithstanding its lengthy presentation and exhibits, Defendants cite to only a handful of examples of actual retail investors they claim were supposedly informed that the Syndicate Analysts had revised their models or of other information about Facebook. However, at most, these arguments concern a few individuals, which does not come close to defeating predominance in a retail investor subclass that includes an estimated 100,000 retail investors who bought in the initial IPO, and many more who purchased in the aftermarket between May 18 and the close of trading on May 21. *See, e.g.*, *In re Moody's*, 274 F.R.D. at 492 n.9 (reasoning that "[i]f only 12% of the class has such knowledge and the other 88% traded in ignorance, individual questions of knowledge do not 'predominate' over common questions").

For instance, Defendants argue that a Managing Director at "institutional allocant" Jennison, Natasha Kuhlkin, told her husband that Facebook had cut its projections. Opp. at 3. Defendants, however, offer no evidence that Ms. Kuhlkin's husband purchased Facebook stock. In fact, financial industry professionals *and* their family members were prohibited from purchasing

in the Facebook IPO under FINRA Rule 5130.

Defendants also argue that individual IPO allocant Ian DelBalso learned through email communications with his father (Michael DelBalso, also an employee of Jennison) that Facebook "revised its revenue projections." Opp. at 3. Michael's email appears to be based only on Facebook's public disclosure in Facebook's FWP (A-556) and, in any event, he can easily be carved out of the Retail Investor Subclass, as set forth in Section I.C, *infra*.

Defendants also argue that individual allocant Connie Prater—who purchased a total of 50 shares in the IPO—supposedly admitted, based on her receipt of media speculation, that she purchased Facebook stock knowing the risk that mobile usage posed to the Company. Opp. at 3-4, 52-53. But Prater's awareness of the risk based on media speculation does not equal actual knowledge of the fact that Facebook had cut its estimates, or the magnitude of the cuts. Nor can media speculation defeat predominance for the numerous reasons detailed directly below in Section I.B.4. And again, Ms. Prater is just one investor out of an oceanic retail subclass. Similarly, Defendants claim that Larry Kim had actual knowledge of Facebook's revenue cuts (Opp. at 52), but have submitted nothing to substantiate that claim, and even if they had, he is but a single investor.

Defendants also cherry-pick testimony from proposed class representatives Jose and Mary Jane Galvan in an attempt to show that they somehow knew of Facebook's lowered revenue estimates. Opp. at 3. ██████████████████████████████████████████████
███████████████████████████████████████████ *Id*. (citing A-154, 156-57). However, Defendants cannot credibly argue that Mr. Galvan—the owner of a local waste management company in Plano, Texas—somehow became privy to Facebook's own internal projections prior to the IPO. ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████ This media speculation clearly does not amount to her "actual knowledge" that Facebook determined that the mobile usage trend had already had a material negative impact on the Company's revenues for second quarter and full year 2012, and the magnitude of the impact.

In the end, at best, Defendants have shown that a mere handful of retail investors may have known pertinent information. Even this dubious gloss, if accepted, would fall far short of the showing needed to defeat predominance for this vast subclass. As the Supreme Court has held, "[t]hat the defendant might attempt to pick off the occasional class member here or there through individualized rebuttal does not cause individual questions to predominate." *Halliburton*, 134 S. Ct. at 2412. And, as this Court has held, "[e]ven if it could be shown that some individual class members were not injured, class certification, nevertheless, is appropriate where the . . . violation has caused widespread injury to the class." *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 523 (S.D.N.Y. 1996) (Sweet, J.). Finally, to the extent that it is necessary, any specific investors whom the evidence shows were informed that Facebook cut its revenue estimates can easily be carved out of the Class, as explained in Section I.C, *infra*.

(4)    The Vague Media Speculation That Defendants Cite Is Irrelevant And, In Any Event, Raises Only Common Issues

Unable to demonstrate that Defendants actually provided retail investors the non-public information at the heart of this case, Defendants resort to claiming that retail investors somehow must have inferred the undisclosed information through vague and speculative media reports and

"Tweets"—none of which was authored by Facebook or any Underwriter. Opp. at 26-29; 46-49. Defendants' argument fails for a host of reasons.

*First*, the Court has already rejected Defendants' argument that class members were informed of Facebook's revenue cuts via media reports. As the Court held at the motion to dismiss stage after reviewing dozens of articles that Defendants rehash on this motion, reasonable investors would ***not*** "regard press reports as a reliable source of information." *Facebook*, 986 F. Supp. 2d at 522. Given that reasonable investors would not regard such media speculation as reliable, the existence of these reports cannot raise individualized issues of knowledge sufficient to defeat predominance.

*Second*, as the Court recognized, Second Circuit law holds that media speculation is irrelevant to determining individual class members' knowledge. As noted above, the Second Circuit has repeatedly held that "[t]here are serious limitations on a corporation's ability to charge its stockholders with knowledge of information omitted from a document such as a prospectus on the basis that the information is public knowledge and otherwise available to them." *Litwin*, 634 F.3d at 718 (quoting *Kronfeld*, 832 F.2d at 736); *see also Royal Bank of Scotland Grp., PLC*, 709 F.3d at 127 (news articles reporting relaxed underwriting standards at issuer did not cure fraud that issuer had abandoned published underwriting guidelines because "sporadic news reports . . . do not alone clarify or contextualize the alleged misstatements in the 2007-2 Prospectus."); *United Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1199 (2d Cir. 1993) ("[T]he mere presence in the media of sporadic news reports . . . should not be considered to be part of the total mix of information that would clarify or place in proper context the company's representations in its proxy materials.").

*Third*, as this Court already held, this is especially true here because Facebook instructed

investors to disregard media speculation and "rely *only* on the information contained in this prospectus in determining whether to purchase our shares of Class A common stock." Ex. 41 at 31; *see Facebook*, 986 F. Supp. 2d at 522. In fact, the Amended Registration Statement cautioned investors that outside media reports were ***not reliable*** because they include "coverage that is ***not directly attributable to statements made by our officers and employees***, that ***incorrectly reports*** on statements made by our officers or employees, or that ***is misleading*** as a result of omitting information provided by us, our officers, or employees." Ex. 41 at 31. ███████████████

████████████████████████████████████████████████████

█████████████ Because Facebook specifically instructed investors to disregard media reports, such reports cannot impute "actual knowledge" of the undisclosed facts to members of the Retail Investor Subclass.

*Fourth*, even if members of the Retail Investor Subclass could be charged with "actual knowledge" of the undisclosed information based on third-party media reports, which they cannot, the law is clear that any such argument would be ***common*** to this Subclass given that the reports were publicly available. *See Merrill Lynch*, 277 F.R.D. at 119 ("[T]o the extent Defendants argue that actual knowledge can be inferred from the slew of newspaper articles and public reports they have submitted to the Court, this again is an issue subject to generalized proof."); *N.J. Carpenters Health Fund v. Residential Capital, LLC*, 2013 WL 6839093, at *4 (S.D.N.Y. Dec. 27, 2013) (holding that "publicly available news stories do not create individualized knowledge," and, even "assuming that news reports provided some knowledge to investors, this information is 'subject to generalized proof'"); *N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, 2014 WL 1013835, at *8 (S.D.N.Y. Mar. 17, 2014) ("Since the information was public, the knowledge inquiries for the investors in the 2006-5 and 2007-2 Offerings may be different, but they would

not be individualized."). As the Court explained in *DJ Orthopedics*, "the proof regarding the individualized issue [of whether the investors had knowledge under Section 11] would rely as much on information common to all subclass members (*e.g.*, how widespread was the public dissemination of the information) as it would on individual information (*e.g.*, to what sources of information was each subclass member exposed)." 2003 U.S. Dist. LEXIS 21534, at *27-28.[20]

*Finally*, as the Court concluded after conducting a detailed examination of many of these media articles at the motion to dismiss stage, the information in the market purportedly concerning Facebook's revenue outlook was vague, speculative and unreliable—and nothing that Defendants have submitted changes that. Indeed, one of the articles cited by Defendants stated that these reports were based on "***rumor***" and wrote: "In summary, ***nobody really knows anything***" about whether Facebook's revenues were weakening. A-1254. Yet another article reported on the "contradictory information" in the media and found there was "wild ***spinning*** on both sides of the issue." A-1272.

A review of Defendants' other articles further illustrates the point. Defendants cite two pre-IPO media reports about Facebook's revenues, but neither of those disclosures conveyed to anyone that Facebook itself had internally lowered its second quarter 2012 and full-year 2012 revenue guidance, the magnitude of the decrease, or that the Underwriters had also reduced their own revenue guidance. The first article, published on May 10, 2012 in *Business Insider*, reported on third-party rumors that the company was "***said*** to have told investors that it won't meet their most

---

[20] Defendants attempt to distinguish *N.J. Carpenters* by arguing that the court found predominance satisfied despite varying degrees of knowledge because "'even the most sophisticated class members did not have access' to any of the information on which damages were based." Opp. at 59 n.28. But the same is true here, where even sophisticated institutional investors did not have "actual knowledge" of Facebook's revenue cuts, except for those few that Plaintiffs submit may be excluded from the Class, *infra*.

optimistic projections." A-1260. The author of the article did not credit the rumor, writing that "*[i]t's hard to believe* Facebook is reviewing and reacting to specific projections on the roadshow" and "*if* it is, it should certainly disclose this to the public." *Id*. The author also was not clear on the specific projections at issue, asking, "What projections is Facebook saying it won't meet?" *Id*. In fact, the article concludes with the warning that any reader should disregard the report and "*take this report with a grain of salt*." *Id*.

The second article cited by Defendants, published by *Bloomberg* on May 11, 2012, merely stated that "Facebook is also telling analysts that sales *may* not meet their most optimistic projections," thus parroting the "may" language of Facebook's misleading public disclosures. A-1285. That article also cited a third party's estimate of 2012 Facebook revenues of $6.1 billion (*id*.), which was over $1 billion *more* than Facebook's internal revised forecast at that time. *Id*.[21]

Additional articles cited by Defendants simply reached certain conclusions based on the public information in Facebook's amended S-1 filing. *See* Opp. at 47-48. Many of these media reports echoed the language of the Registration Statement by stating that the financial impact of the trends at issue was a mere possibility or noted that Facebook was actually well-positioned to capitalize on its mobile users. A-1276 (stating that, in March 2012, Facebook introduced Sponsored Stories on mobile "as a way to make money from mobile users"); A-1257 ("mobile growth *may* negatively affect the company's earnings"). The *Washington Post* article cited by Defendants at page 47 of their brief drew its own conclusions based on the Company's disclosure in the FWP, rather than the material undisclosed information. A-1257. The same is true of the

---

[21] While Defendants try to suggest that institutional investor TPG-Axon somehow learned from the *Bloomberg* article itself that "revenue growth was now expected to be 30%, or 3.5% below $5 billion" (Opp. at 28), the *Bloomberg* article contains no such disclosure.

*PrivCo* and *Financial Times* articles Defendants cite. Opp. at 47, A-1278, A-1244.

And while Defendants rely heavily on a *PrivCo* article, they ignore the fact that *PrivCo* later concluded that Facebook's Registration Statement failed to disclose material information stating, "The reduction to Facebook's forecasts of this magnitude—reducing the revenue growth rate by over 6 percentage points—is so material that it should absolutely have been disclosed in a revised S-1 filing before the IPO pricing." ¶172. *PrivCo* further recognized that the Registration Statement offered only "a bare minimum disclosure" regarding increasing mobile usage and "***potentially*** decreasing revenues," and the fact that mobile use had already significantly impaired Facebook's revenues was "material insider information" that was not available to the market. Ex. 84 at 1. Similarly, in another *PrivCo* report, *PrivCo*'s CEO stated that Facebook made "***less than full and complete disclosure on the adverse impact on Facebook's business from the rapid shift to mobile-device access***." Ex. 85 at 2.

### (5)    The Ghose Report Should Be Stricken

To prop up Defendants' arguments about the purported spread of information through the media, Defendants rely on a supposed expert in so-called "information diffusion," Professor Ghose. For all the reasons set forth in Plaintiffs' Motion to Strike, Ghose's report should be stricken, and provides no basis to deny certification of the Class or Subclasses.

### (6)    The Womack Report Has No Bearing On The Retail Investor Subclass

The expert report of Professor Kent Womack, a proposed expert in the capital markets process and book building of IPOs, provides no support for Defendants' argument as to the Retail Investor Subclass. Tellingly, Professor Womack does not offer any opinion about whether ***retail*** investors were told the allegedly withheld information in this case. *See, e.g.*, A-1327-30, A-1336-38 (███████████████████████████████████████████████████



In short, the Womack Report provides no support for Defendants' arguments as to the Retail Investor Subclass.

### C.    The Relatively Insignificant Number Of Investors Who Appear To Have Had "Actual Knowledge" Can Be Excluded From The Class

In addition to creating Subclasses, the Court may simply carve out of the Class the few investors who received second-hand information that Facebook itself had reduced its revenue estimates.  It is settled that it is within the Court's discretion to exclude from the Class the relatively few putative class members who appear to have had "actual knowledge" of Facebook's revenue cuts. *See Stinson v. City of New York*, 282 F.R.D. 360, 367 (S.D.N.Y. 2012) (Sweet, J.) (The Court has discretion on questions of class certification because "the district court is often in the best position to assess the propriety of the class and has the ability . . . to alter or modify the class, create subclasses, and decertify the class whenever warranted.") (quoting *Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd.*, 262 F.3d 134, 139 (2d Cir. 2001)).

Defendants argue that "[p]reliminary discovery shows that **thousands** of putative class members, including both institutional and individual investors, learned from various sources that **Facebook itself** revised its projections because increased mobile usage had already impacted revenues." Opp. at 15. This is hyperbole. Outside of Defendants' cosmology in which knowledge of the Syndicate Analysts' model revisions represents "actual knowledge" of Facebook's revenue cuts, Defendants have shown that only a relatively few investors out of an enormous Class might have had "actual knowledge" sufficient to establish the statutory defense.

After more than a year of extensive discovery—including the production of nearly 1.3 million pages of documents by the parties and third parties, responses to 51 third party subpoenas for documents and testimony, 15 depositions of the parties, third parties and experts, and countless additional efforts by Facebook to privately obtain declarations supporting its "actual knowledge" defense—Facebook has submitted declarations and testimony from just 27 investors out of this huge Class purporting to show that they supposedly had knowledge of Facebook's revenue cuts. Here, where the members of the Class number in the hundreds of thousands, the purported knowledge of a few cannot defeat predominance. Even assuming that an individualized inquiry were necessary for every single investor from whom Facebook has obtained a declaration or testimony—and it is not—this would amount to just 27 investors, a minuscule percentage of a Class consisting of hundreds of thousands of investors. *See* Pl. Br. at 32 (citing *In re Moody's*, 274 F.R.D. at 491 n.8); *see also* authorities cited *supra* at 40.[22]

Moreover, while Defendants quote soundbites from the 27 investor declarations and

---

[22] Defendants argue, "In stark contrast to *Moody's*, the relevant knowledge here is not limited to a small, discrete or readily identifiable subset of Plaintiffs' proposed class or subclasses." Opp. at 36. But here, after extensive discovery on the issue, the only "actual knowledge" of the alleged misstatements and omissions does not appear to have been "broad" at all.

transcripts to create an impression of widespread actual knowledge, many of the declarations state only that the investor received the Syndicate Analysts' model revisions, such as the declarations from  Such declarations do not show actual knowledge.

The Court should not allow such relatively insignificant leakage to redound to the benefit of Defendants by allowing it to defeat class certification in this Action, to the detriment of a Class that includes hundreds of thousands of other investors. Rather, based on the record, the Court can simply exclude the following twelve persons and entities:



Plaintiffs would also not object to the exclusion of other specific investors that Defendants credibly

identify as having actual knowledge (including in their sur-reply).[23]

Given that these relatively few investors can be excluded from the much larger class, Defendants' repeated reliance on *In re Initial Public Offering Securities Litigation* ("*IPO*") is misplaced. As courts have observed in distinguishing that case, in *IPO*, "the proposed class included thousands of investors who were alleged to have actually participated in the fraudulent scheme." *See Merrill Lynch*, 277 F.R.D. at 117 (distinguishing *IPO*). In that case it was undisputed that nearly ***11,000*** class members participated in the fraud by entering into illegal kick-back agreements with the underwriters. *IPO*, 471 F.3d 24, 43, n.13 (2d Cir. 2006). No such facts exist here. While Defendants gloss over the key factual differences between this case and those at issue in the Second Circuit's *IPO* decision, courts in this District have cautioned that the *IPO* decision "rest[s] on [its] unique facts and [has] been persuasively distinguished by courts in this District in subsequent opinions." *In re Lehman Bros. Sec. & ERISA Litig.*, 2013 WL 440622, at *4 (S.D.N.Y. Jan. 23, 2013). It does not control this very different case.

### D. Defendants' Speculation About Broader "Leakage" And Vague References To Meetings With Unspecified Investors Do Not Defeat Predominance

Defendants speculate that because individuals working at institutions were informed of the Syndicate Analysts' revenue cuts, they must have told many other unidentified investors about this information through unspecified leakage or general word of mouth. *See* Opp. at 16-18. This contention is not supported by sufficient evidence, although Defendants have had more than ample opportunity to develop it, and provides no basis to deny certification.

As their prime example, Defendants assert that Jennison acted as a "hub" of "information diffusion" because its analyst, Ms. Kuhlkin, testified that she discussed Facebook's revenue cuts

---

[23] Plaintiffs request that any excluded person or entity be given notice.

with "other fellow buy side colleagues or friends," and "the fact that Facebook had cut its projections" was "fairly widely known." Opp. at 16, 17. ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████ Similarly, Defendants cite an email stating that there was "buzz" about Facebook's revenue cuts, but the email does not identify anyone who was actually discussing this issue. Opp. at 4. And, to the extent that Defendants rely on the Ghose Report to support their speculative "information diffusion" theory, it should be stricken for the reasons set forth in Plaintiff's accompanying motion. In short, speculation about leakage to unidentified investors does not defeat predominance for a Class of this magnitude.[24]

The Court should also reject Defendants' argument that, during Facebook's road show meetings with potential investors, the Company and Underwriters held discussions with unspecified investors, from which it was supposedly "clear that many investors already knew Facebook had revised its projections because increased mobile usage was already affecting revenues." Opp. at 18. That argument is supported only by vague, self-serving statements that amount to nothing more than assumptions and speculation about the knowledge of other unnamed

---

[24] As another example, Defendants argue that a managing director for one institutional investor "heard what can best be described as 'market chatter'" from "multiple sources" at "buy-side firms" about "revisions before the IPO." Opp. at 17. But the managing director stated, "In the days preceding the Facebook IPO, I heard what can best be called 'market chatter' that *either* Facebook *or* underwriters were revising their internal projections downward." A-64 (Gaonkar Decl.) ¶3. ██████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████ *Id.* Such information is obviously unreliable, and Plaintiffs are unaware of any case in which a court has declined to certify a class based on "market chatter."

people or entities. As noted above, nowhere do Defendants assert that they told a specific investor

that Facebook had cut its revenue estimates and the magnitude of the cuts, even though Defendants

obviously know who they met with and what they supposedly told them. *See id.* (citing A-77-78

(Herman Decl. ¶6); *see also id.* at 22 (citing A-11-12 ¶8 ███████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

The generalities and conjecture outlined above are insufficient to establish the "actual

knowledge" defense with respect to any class members, much less show that individual issues of

knowledge predominate throughout the vast Class and Subclasses. *See, e.g.*, *In re Lehman Bros.*,

2013 WL 440622, at *3 (predominance satisfied despite the defendant's submission of declarations

from financial advisors stating that they discussed the omitted information with clients); *In re U.S.*

*Foodservice*, 729 F.3d at 121-22 (holding that "speculation" was insufficient to establish the

"actual knowledge" defense); *Merrill Lynch*, 277 F.R.D. at 118-19 ("Sheer conjecture that class

members 'must have' discovered [the misrepresentations] is insufficient to defeat Plaintiff's

showing of predominance when there is no admissible evidence to support Defendants'

assertions.").

Finally, common issues predominate even if there are some individualized knowledge

51

issues as to some relatively small amount of unidentified Class members, including any that Defendants argue in their sur-reply were told that Facebook itself cut its own revenue estimates. This is because the test under Rule 23(b)(3) is not whether someone in the Class knew the truth; rather, the relevant test is whether individualized questions of knowledge "predominate" over the common questions, which they do not in this case given the core common questions that bind this enormous class of investors. *See* Pl. Br. at 21-23.

As noted above, numerous courts in this District—including this one—have held that a potential affirmative defense against class members does not preclude certification for Securities Act claims. *See In re Blech*, 187 F.R.D. at 107 (holding that "[i]n determining whether common questions of fact predominate, a court's inquiry is directed primarily toward whether the issue of liability is common to members of the class"); *Merrill Lynch*, 277 F.R.D. at 117 (holding that "[w]hen determining whether common questions predominate courts 'focus on the liability issue . . . and if the liability issue is common to the class, common questions are held to predominate over individual questions.'"); *Pub. Emps.' Ret. Sys. of Miss. v. Goldman Sachs Grp. Inc.*, 280 F.R.D. 130, 137-39 (S.D.N.Y. 2012) (same); *N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, 2011 WL 3874821, at *5-7 (S.D.N.Y. Aug. 16, 2011) (same).[25]

_____

[25] Defendants assert that Judge Rakoff's decision in "*Merrill Lynch* is not good law" after *Myers*. Opp. at 11 n.8. But *Merrill Lynch* accords with Second Circuit precedents, including *Brown*, 609 F.3d 467, which was decided within just months of *Myers* and held that the existence of individual defenses will not defeat predominance so long as "a sufficient constellation of common issues binds class members together." *Id.* at 483. As Judge Kaplan reaffirmed in a 2013 decision, quoting *Merrill Lynch*, "'[c]ourts generally focus on the liability issue in deciding whether the predominance requirement is met, and if the liability issue is common to the class, common questions are held to predominate over individual questions," and "[n]umerous courts have held that potential affirmative defenses against individual plaintiffs do not preclude class certification for claims under Section 11." *In re Lehman Bros.*, 2013 WL 440622, at *3 (citing cases). And *Myers* itself explained that it does not disrupt the "well established" rule "that the existence of a defense potentially implicating different class members differently does not necessarily defeat class certification." *Myers v. Hertz Corp.*, 624 F.3d 537, 551 (2d Cir. 2010).

These decisions are based on Second Circuit precedent holding that "[a]lthough a defense may arise and may affect different class members differently, this does not compel a finding that individual issues predominate over common ones. . . . As long as a sufficient constellation of common issues binds class members together, variations in the sources and application of a defense will not automatically foreclose class certification under Rule 23(b)(3)." *Brown*, 609 F.3d at 483 (affirming order certifying class even where the defendants could raise defenses that would require individualized inquiries that were "not *de minimis*"); *see also Bd. of Trustees of the AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, 269 F.R.D. 340, 346 (S.D.N.Y. 2010) ("That some class members may be subject to a unique defense that is inapplicable to other class members does not undermine a conclusion that common issues predominate.").[26]

In sum, after copious discovery, Defendants have identified relatively few investors who may have had actual knowledge of Facebook's revenue cuts, all of whom can be excluded from the Class. To the extent some relatively small amount of unidentified investors may potentially have had such knowledge, it is not enough to preclude certification.

### E.    At The Very Minimum, The Court Should Certify A Class On All Issues Other Than "Actual Knowledge"

Absent certification of the proposed Class or Subclasses, the Court should use Rule 23(c)(4) to certify for common resolution all "issues" other than class members' purported, individualized knowledge. "The Second Circuit has expressly encouraged district courts to 'take full advantage of this provision to certify separate issues in order ... to reduce the range of disputed

---

[26] Defendants argue that Plaintiffs need to prove lack of knowledge as to each plaintiff pursuant to their claim under Section 12(a)(2). Opp. at 11. Significantly, this argument has **no bearing** on Plaintiffs' Section 11 claims.  Further, as to the Section 12(a)(2) claim, even a particular investor's awareness of a Syndicate Analyst's revised estimates is not actual knowledge of the withheld information.

issues in complex litigation and achieve judicial efficiencies.'" *Charron v. Pinnacle Grp. N.Y. LLC*, 269 F.R.D. 221, 239 (S.D.N.Y. 2010) (quoting *Robinson v. Metro–North Commuter R.R.*, 267 F.3d 147, 167–68 (2d Cir. 2001)). "Issue certification is especially appropriate" where, as in this case, "Defendants' liability can be determined once, on a class-wide basis, through common evidence." *Id.* at 242. Significantly, "the Second Circuit has held that 'a court may employ Rule 23(c)(4) to certify a class on a particular issue ***even if the action as a whole does not satisfy Rule 23(b)(3)'s predominance requirement.***'" *Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 142 (S.D.N.Y. 2014) (quoting *In re Nassau Cnty. Strip Search Cases*, 461 F.3d 219, 225 (2d Cir. 2006)).

Consistent with Second Circuit precedents, courts in this District have liberally used Rule 23(c)(4), in both securities and non-securities cases, to certify "issue classes" to resolve common liability issues where, as Defendants argue in this case, a single defense or single issue presents individualized questions. For example, in *Fort Worth Employees' Retirement Fund*, the Honorable Richard J. Sullivan recently used Rule 23(c)(4) to certify a "liability-issues only" class of investors who asserted Section 11 claims under the Securities Act relating to misrepresentations in a registration statement for mortgage-backed securities. 301 F.R.D. at 142. Finding that individualized damages issues precluded certification of the class on ***all*** issues (because of a unique problem in valuing illiquid asset-backed securities not present in this case), the Court "carved out" the individualized issues concerning damages and certified a class on "liability issues" only, leaving individualized damages issues for a later day and individualized proceedings, if they ever became necessary. *Id*. Absent certification of the proposed Class or Subclasses on all issues in this case, Plaintiffs respectfully submit that the Court should also use Rule 23(c)(4) to certify an "issue class" on all common liability issues.

Defendants assert in a footnote that the Court cannot use Rule 23(c)(4) to certify the class on all "common" issues, and carve out any individualized issues of "knowledge," because Plaintiffs did not seek such a Class definition in their Complaint or in their opening motion for class certification. Opp. at 54 n.26. But, the Second Circuit has held that "courts may use subsection (c)(4) to single out issues for class treatment when the action as a whole does not satisfy Rule 23(b)(3)," *Nassau Cnty. Strip Search Cases*, 461 F.3d at 227, and it is well established that the "district court is not bound by the class definition proposed in the complaint, and is empowered to carve out an appropriate class" in its discretion, *Charron*, 269 F.R.D. at 229. *See also In re Parmalat Sec. Litig.*, 2008 WL 3895539, at *3 (S.D.N.Y. Aug. 21 2008) (same) (citing Rule 23(c)(4)). There is no reason why the Court should not, at minimum, certify the Class with regard to the many common issues in this case.

## II. The Proposed Class And Subclasses Are Properly Defined And Ascertainable

As set forth in the Motion, Plaintiffs seek certification of a class of investors who purchased or otherwise acquired Facebook's common stock in or traceable to its IPO on May 18, 2012 and were damaged thereby. *See* Pl. Br. at 5. In the alternative, Plaintiffs propose two subclasses of investors—an Institutional Investor Subclass and a Retail Investor Subclass—to address any potential concerns about the differing level of knowledge of these two groups of investors. *Id*. at 6. In response, Defendants advance a series of arguments contending that the proposed Class and Subclass definitions are unbounded and fail to satisfy the minimal standard for ascertainability. As explained below, Defendants' arguments are incorrect.

### A. The Class Is Properly Limited To Investors "Damaged" By The Misrepresentations

Defendants first argue that the proposed Class definition is overbroad because it has "no date restriction" and, thus, sweeps investors into the Class who were not damaged by Defendants'

misrepresentations. Opp. at 68-70. They also contend that the Class definition improperly includes investors who purchased their stock on May 21 because the corrective disclosure before the market opened on May 22 supposedly did not cause any investor losses. *Id*. at 70. Both of Defendants' arguments fail.

To begin with, the Class definition in this case is not boundless in time, as Defendants suggest. Rather, the Class definition expressly limits membership to investors who purchased in or traceable to the IPO and "were damaged" by Defendants' misrepresentations. Accordingly, contrary to what Defendants contend, investors who sold their Facebook stock ***before*** the first corrective disclosure on May 18 were not "damaged" and are ***not*** members of the Class. Likewise, investors who purchased their shares ***after*** the final corrective disclosure in the early morning of May 22 were not "damaged" and, thus, are ***not*** members of the Class.

Courts widely recognize in securities class actions that it is appropriate to limit class membership by using the phrase "and were damaged thereby." Courts in this District and elsewhere have repeatedly approved class definitions in Securities Act cases that are virtually verbatim to the one here, and there is no requirement in Rule 23 or otherwise that the Class definition be any more specific or contain a particular "date restriction," as Defendants contend. *See, e.g.*, *In re Bank of Am. Corp. Sec., Deriv. and ERISA Litig.*, 281 F.R.D. 134, 146 (S.D.N.Y. 2012) (certifying class of "persons and entities who purchased BoA common stock issued under the Registration Statement and Prospectus for the BoA common stock offering that occurred on or about October 7, 2008, and were damaged thereby").[27]

---

[27] *See also Goldman Sachs*, 280 F.R.D. at 132 (certifying "a class of all persons and entities that purchased or acquired [securities in the Offering] and who were damaged thereby"); *Merrill Lynch*, 277 F.R.D. at 100, n.1 (S.D.N.Y. 2011) (certifying a class of "[a]ll persons or entities who purchased or otherwise acquired [securities in the Offerings] and who were damaged thereby").

Equally without merit is Defendants' argument that the relevant Class Period should end after the close of trading on May 18, 2012, and should exclude investors who purchased on May 21. Opp. at 70. Defendants' argument rests on the assertion that investors could not have been damaged by the May 22 corrective disclosure because that additional disclosure supposedly did not reveal new information that caused the Company's stock price to decline. *Id*. In other words, Defendants are contending that there is no loss causation for the May 22 disclosure, and thus, the relevant period in this case must end after the May 18 partial disclosure. This argument is legally irrelevant and factually wrong.

In *Halliburton*, the Supreme Court squarely held, as a matter of law, that questions of "loss causation"—in this case, whether the May 22 *Reuters* article revealed new information that caused Facebook's stock price to decline—are irrelevant to class certification. 131 S. Ct. at 2183 ("***securities fraud plaintiffs [need not] prove loss causation in order to obtain class certification***"); *see also City of Livonia Emps.' Ret. System v. Wyeth*, 284 F.R.D. 173, 182 (S.D.N.Y. 2012) ("Defendants' assertion that '[t]he evidence does not indicate that the drop was due to information about hepatic events in Study 315' but rather due to other confounding events, is a loss causation argument and, therefore, not appropriate at the class certification stage.").

This is particularly true in a Securities Act case such as this one because "loss causation ***is not even an element of a plaintiff's claim***. *See Facebook*, 986 F. Supp. 2d at 522-23 (collecting authorities). Under the Securities Act, causation is presumed under the statutory damages formula, and it is Defendants' burden to prove "negative causation" as a matter of law—a heavy burden they have not even attempted to meet on this motion. *Id*. Nor could they, as questions of negative causation raise fact-intensive merits issues that can only be addressed at summary judgment based on a full factual record and detailed expert testimony. *Id*. As this Court previously held in rejecting

a similar argument at the motion to dismiss stage, "[w]hether the May 18 and May 22 *Reuters* reports constituted corrective disclosures that revealed Facebook's alleged omissions or misrepresentations and whether such disclosures actually caused the drop in Facebook stock prices are issues of fact." *Id*. This Court further explained that, "'[g]iven the burden on [d]efendants to establish an affirmative defense such as negative causation, the Court finds that dismissal on this ground is more properly considered on a motion for summary judgment.'" *Id*. (*quoting In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 444 (S.D.N.Y. 2009)). In sum, given that loss causation need not be shown to obtain class certification—and that loss causation is not even an element of Plaintiffs' claims—Defendants' arguments regarding the May 22 final disclosure provide no basis for denying class certification or otherwise circumscribing the Class.

Moreover, even if the Court wished to wade into this irrelevant and fact-bound question, there is no basis for concluding that Defendants have established negative causation for the May 22 disclosure as a matter of law. For instance, the market reaction to the May 22 disclosure demonstrates that it disclosed new information that led directly to a steep decline in Facebook's share price. Immediately following the May 22 disclosure, analysts and the financial press reported that the news was a "bombshell" that "buyers deserve to be outraged about," that it was "highly unusual" and "investors are angry" to learn that all the lead underwriters had significantly cut their forecasts in the middle of the IPO roadshow, and that "[a]ny investor considering an investment in Facebook would consider an estimate cut from the underwriters' analysts 'material information.'" ¶¶167-68. In response to this news, Facebook's stock price fell 9% in a single day on extraordinarily high trading volume. ¶169. Such facts preclude any finding as a matter of law that Defendants have established negative causation for the May 22 disclosure.

### B.     The Members of the Class and Subclasses Are Ascertainable

Defendants next argue that the Court should deny class certification because the

proposed Class and Subclasses are supposedly not "ascertainable." Opp. at 70-74. As this Court and others have explained, "'[t]he standard for ascertainability is not demanding,'" with the requirement "'designed only to prevent the certification of a class whose membership is truly indeterminable.'" *Stinson*, 282 F.R.D. at 373; *see also Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 567 (S.D.N.Y. 2014) (Rakoff, J.) (noting the very low standard for ascertainability under Second Circuit law and certifying class even though the "ascertainability difficulties" were "formidable," because they "should not be made into a device for defeating the action"). All that is required is that class membership be determined by reference to "objective criteria," and that the process for analyzing membership be "administratively feasible." *See, e.g.*, *Stinson*, 282 F.R.D. at 373; *Betances v. Fischer*, 304 F.R.D. 416, 426, 429 (S.D.N.Y. 2015).

The Class easily satisfies this requirement. Here, membership in the Class and Subclasses may be ascertained through a review of Defendants' and investors' trading records, which will show the date when investors purchased and sold their Facebook stock, the relevant price of the securities, and whether they suffered any damages under the Securities Act's mechanical damages formula—something that courts and claims administrators routinely do in every securities class action. *See In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 492 (S.D.N.Y. 2009) ("A quick look at trading records would show whether JKM Company had lost money on its investments.").

### 1.      It Is Routine For Class Definitions To Be Limited By The Phrase "Were Damaged Thereby"

Relying solely on out-of-circuit authority, Defendants argue that the Class is not ascertainable because it is limited to "damaged" investors. Opp. at 71. However, as explained above, it is routine for class definitions to be limited by the phrase "were damaged thereby," as this Class is. Further, courts in this District have specifically rejected Defendants' argument that

the use of the phrase "were damaged thereby" as a limiting mechanism renders the class unascertainable. As these courts have explained in certifying classes of "damaged" investors, "[w]hether a potential class member purchased [Defendants'] shares in the offering and held those shares until the corrective disclosure can be determined via objective criteria. Thus, members of the class are ascertainable." *In re Bank of Am.*, 281 F.R.D. at 147; *see also* 5 Moore's Federal Practice § 23.21[3][a] ("A reference to damages or injuries caused by particular wrongful actions taken by the defendants will be sufficiently objective criterion for proper inclusion in a class definition.").

### 2.    The Proposed Class And Subclasses Are Ascertainable With Respect To Both IPO Allocants And Secondary Market Purchasers

Defendants next argue that the two proposed Subclasses are not ascertainable because one supposedly cannot differentiate an institutional investor from a retail investor. Opp. at 72-74. This argument defies the evidence in this case, industry regulations that were applicable to the Facebook IPO, and Defendants' own contemporaneous words and actions, in which they routinely differentiated between retail and institutional investors. Defendants' contention should be rejected.

The Class definition, as well as the Subclass definitions, include (1) investors who purchased directly "in" the IPO—*i.e.*, investors who bought the stock directly in the initial placement at $38 per share on or about May 17; and (2) investors who purchased in the aftermarket (also known as the secondary market)—*i.e.*, those investors who purchased stock "traceable to" the Registration Statement after the stock began publicly trading at various prices set by the aftermarket between May 18 and the close of trading on May 21. With respect to each group of investors, one can differentiate between institutional and retail investors according to straightforward criteria.

### a.     IPO Allocants

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████ Accordingly, Plaintiffs have specifically identified all the institutions that purchased stock in the IPO—a showing that is unusual in securities litigation and far surpasses anything Plaintiffs are required to do in order to meet the minimal standard of ascertainability.

Retail investors who purchased directly in the IPO can also be easily identified. In order to determine whether an investor who purchased in the IPO is a retail investor, one can simply cross-check that investor against the institutions set forth on the Final Allocation list. If the investor does not appear on Defendants' own list of "institutions" that purchased stock in the IPO, then the investor is necessarily a retail investor, who received their shares from the "retail allocation" that Defendants authorized.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████

61

### b.    Secondary Market Purchasers

Defendants also claim that it is supposedly impossible to distinguish between retail investors and institutions among secondary market purchasers (*see* Opp. at 72-74), but they are wrong on this score as well. Although the Final Allocation List does not include investors who purchased ***exclusively*** in the secondary market, FINRA has promulgated rules that specifically define a "retail investor" and an "institutional investor." *See* Exs. 87 (FINRA Rule 2210(a)(4), (6)) and 76 (FINRA Rule 4512(c)). For the investors who purchased only in the secondary market, the official FINRA Rules can be used to differentiate a retail investor from an institutional investor.

FINRA is the "Financial Industry Regulatory Authority," and is a self-regulatory organization that regulates broker-dealers—including regulating the Underwriter Defendants in connection with the Facebook IPO. FINRA Rules 2210(a)(4) and 4512(c) specifically enumerate what qualifies as an institutional investor, including a "governmental entity or subdivision thereof," an "employee benefit plan," a "qualified plan as defined in Section 3(a)(12)(c) of the Exchange Act" (Ex. 87) a "bank, savings and loan association, insurance company or registered investment company," "an investment adviser registered either with the SEC under Section 203 of the Investment Advisers Act or with a state securities commission," and "any other person (whether a natural person, corporation, partnership, trust or otherwise) with total assets of at least $50 million" (Ex. 76). Under FINRA Rules, a "'retail investor' means any person other than an institutional investor." Ex. 87.

In order to determine whether a particular secondary market investor qualifies as an institutional or retail investor under these definitions, one could simply have the investor fill out a standard class member response form, which in this case would ask whether he falls within any of the enumerated categories of an "institutional investor" (and, if necessary, submit paperwork demonstrating this status). If not, then the investor is a retail investor under industry definitions.

Although Defendants may contend that such a process would take time, that assertion is irrelevant. "The fact that [the process for determining class membership] may be slow and burdensome cannot defeat the ascertainability requirement." *Dunnigan v. Metro. Life Ins. Co.*, 214 F.R.D. 125, 136 (S.D.N.Y. 2003); *see also Flores v. Anjost Corp.*, 284 F.R.D. 112, 123 (S.D.N.Y. 2012) ("The fact that an analysis of Defendants' data is necessary [to determine class membership] does not render a class unascertainable.").

Any other assertion by Defendants that the FINRA definition is not workable, or is somehow subjective, would also be without merit. Clearly, Defendants' own self-regulatory organization has found the definitions a workable and effective way to distinguish between retail and institutional investors. And J.P. Morgan, a lead underwriter for the Facebook IPO, has expressly adopted the FINRA definitions and used them to distinguish between communications that may be issued to institutional and retail investors, respectively. ████████████

████████████████████████████████████████

████████████████████████████████████

### 3. Defendants Repeatedly Distinguished Between Retail Investors And Institutional Investors Throughout The IPO Process

Defendants' own contemporaneous words and actions at the time of the IPO further belie their assertion that the Subclasses are not "ascertainable." Throughout the IPO process, Defendants repeatedly distinguished between retail investors and institutional investors in order to make a host of crucial decisions about the IPO. ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████

Most significantly, the Underwriter Defendants repeatedly distinguished between retail and institutional investors in determining whom to inform of their revised estimates—which aligns precisely with the distinction between the two subclasses that Plaintiffs have recognized. ████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████[28]

███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

---

[28] *See, e.g.*, Ex. 68 at MS_FB_00110104 (retail); Ex. 69 at MS_FB_00011477 (institutional).

████████████████████████████████████████

████████████████████████████████   In short, the fact that the Underwriter Defendants

delineated between retail and institutional investors to determine whom to inform of their model

revisions undermines any assertion that the difference is not ascertainable now.[29]

## III.    The Proposed Class Representatives Are Typical And Adequate

Defendants make a series of arguments contending that the proposed class representatives

are not typical or adequate. *See* Opp. at 64-68. As explained below, these arguments misstate the

applicable law and the factual record, and should be rejected. Plaintiffs have demonstrated

typicality and adequacy in accordance with what courts in this Circuit actually require. *See, e.g.*,

*Wallace v. IntraLinks*, 302 F.R.D. 310, 315, 316 (S.D.N.Y. 2014) (Griesa, J.) (explaining that both

the typicality and adequacy requirements are "not demanding").

### A.    Typicality Is Satisfied

"When it is alleged that the same unlawful conduct was directed at or affected both the

named plaintiff and the class sought to be represented, the typicality requirement is usually met

irrespective of minor variations in the fact patterns underlying individual claims." *Robidoux v.

Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993). The typicality requirement is "satisfied when each

class member's claim arises from the same course of events and each class member makes similar

arguments to prove defendant's liability." *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 276

---

[29] Ignoring the above facts, Defendants argue in their Opposition that the Institutional and Retail Subclasses are not ascertainable based on snippets of speculative testimony by certain Plaintiffs concerning theoretical differences between retail and institutional investors. *See* Opp. at 73. This speculation is irrelevant. Clearly, the legal question of whether the proposed subclasses meet the minimal standards for ascertainability is one for the Court to decide, not for witnesses to speculate on. Further, it is well recognized that class representatives do not need be knowledgeable about the intricacies of the class definition or issues of ascertainability to serve as class representatives and, in fact, the reason they hire experienced counsel is to advise them on such technical legal issues. *See* Section III.B.3 (class representatives are entitled to rely on the expertise of counsel with respect to complicated legal issues).

(S.D.N.Y. 2008).

As Plaintiffs demonstrated in their opening brief, typicality is established here because all Plaintiffs assert the same claims under the Securities Act based on the same misstatements and omissions in the same offering documents, and assert the same allegations of "control person" liability. *See* Pl. Br. at 19; *Dodona I, LLC v. Goldman, Sachs & Co.*, 296 F.R.D. 261, 267 (S.D.N.Y. 2014) (finding that plaintiffs "sufficiently demonstrated" typicality because plaintiff alleged that it and other members of the proposed class were damaged by purchasing securities pursuant to offering documents containing the same allegedly misleading omissions).

While Defendants argue that Plaintiffs have not "point[ed] to any evidence" to establish typicality (Opp. at 66), courts have held that "[a]s long as [P]laintiffs assert, as they do here, that defendants committed the same wrongful acts in the same manner, against all members of the class, they establish [the] necessary typicality." *In re NYSE Specialists*, 260 F.R.D. at 72. This is because "[t]he focus of the typicality inquiry is not on the plaintiff['s] behavior, but rather on the defendant[s'] actions." *DLJ Mortg.*, 2011 WL 3874821, at *2. Plaintiffs have done all that is required. And to the extent that Defendants acted differently toward retail and institutional investors, subclasses can be certified, further ensuring typicality.

Defendants further argue that the Lead Plaintiffs are subject to the "actual knowledge" defense based on individual communications that render their claims atypical of the other class members. *See* Opp. at 65-66. In support, Defendants submit declarations of Lead Plaintiffs' investment managers, which purportedly demonstrate that Lead Plaintiffs knew of Facebook's revenue cuts. *Id.* at 65. ██████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

███████ [30]

Further, an additional declaration from Wellington, another investment manager for North Carolina, clarifies vague and misleading statements contained in a declaration submitted by Defendants. ██████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████ ████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████

      █████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

────────────────────

█ █████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████

[REDACTED] Nor does the declaration make any reference to knowing the magnitude of the impact to Facebook's revenue.  Accordingly, any "awareness" about Facebook's revised revenue estimates appears to have been based on second-hand accounts—not receipt of Facebook's own estimates—none of which amounts to "actual knowledge."

Defendants also argue that proposed class representatives Mr. and Mrs. Galvan are atypical because they supposedly had actual knowledge of Facebook's internal revenue estimates. Opp. at 65-66. [REDACTED]



This media report plainly does not amount to her having "actual knowledge" under the Securities Act of the undisclosed fact that **Facebook** itself determined that the mobile usage trend had already had a material negative impact on the Company's revenues for second quarter and full year 2012, particularly when the Company instructed investors ***not*** to rely upon such articles. Opp. at 3 (citing A-195).  And, in any event, exposure to ***publicly available*** media reports can hardly render a class representative atypical.[31]

## B.    Adequacy Is Satisfied

The adequacy requirement focuses on whether (i) plaintiff's interests are antagonistic to the interest of other members of the class and (ii) plaintiff's attorneys are qualified, experienced, and able to conduct the litigation. *See In re NYSE Specialists*, 260 F.R.D. at 73. Plaintiffs have easily satisfied these requirements. Plaintiffs have demonstrated (and Defendants do not dispute) that proposed Class Counsel are highly experienced and capable of conducting this Action. *See* Pl. Br. at 21; Exs. 43-44.

Moreover, although Defendants argue that conflicts defeat adequacy here, the asserted conflicts are merely speculative, as set forth in Sections III.B.1-2. Finally, the

---

[31] Contrary to Defendants' argument (*see* Opp. at 66-67), individual issues of loss causation do not defeat typicality, for the same reasons that they do not defeat adequacy. *See* Sections III.B.1-2.

individual plaintiffs are adequate, as set forth in Section III.B.3.

### 1.      There Are No Impermissible Intra-Class Conflicts

Defendants argue that an impermissible intra-class conflict exists here based on speculation that class members will take conflicting positions with respect to loss causation because they purchased their Facebook shares on different dates based on varying levels of knowledge. Opp. at 54-58. However, as noted in Section II.A, loss causation is not an element of Plaintiffs' claim, and Defendants have not even attempted to discharge their burden of proving negative causation. Defendants' speculative arguments about what might occur later do not demonstrate an actual conflict. *DLJ Mortg.*, 2011 WL 3874821, at *3-4 (rejecting defendants' argument that a conflict existed between bond holders in different tranches that would need to make different arguments with respect to materiality and loss causation because these "potential conflicts between proposed class members [were] speculative").

Further, Defendants' argument relates exclusively to differential damages between class members, which does not preclude certification, because such issues "may be mitigated by an allocation plan." *See In re Alstom*, 253 F.R.D. at 276-77 (explaining that "potential issues related to differential damages do[] not preclude class certification" and finding no intra-class conflict).[32]

Moreover, Plaintiffs' proposed subclasses would alleviate any purported conflicts that might arise from any differences between institutional and retail investors relating to damages. *See supra* note 5 (citing *In re NYSE Specialists*, 260 F.R.D. at 74); *see also, e.g., Merrill Lynch*,

---

[32] Defendants also suggest that Lead Plaintiffs who purchased their Facebook shares on May 18 lack "class standing" to assert claims on behalf of later purchasers. Opp. at 67. Not so. Lead Plaintiffs and all members of the Class purchased their Facebook shares pursuant or traceable to the *same* Registration Statement, containing the *same* misleading statements and omissions, and issued and underwritten by the *same* defendants. Thus, the requirement of "class standing" is plainly satisfied in this case. *See NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 163 (2d Cir. 2012).

277 F.R.D. at 120 ("The Court may determine at a later point that subclasses are appropriate to manage the allocation of damages, but this decision need not be made at this early stage."); *In re Amaranth Natural Gas Commodities Litig.*, 269 F.R.D. 366, 381 (S.D.N.Y. 2010) (Scheindlin, J.) (finding no conflict of interest among class members and explaining that "if true intra-class conflicts regarding . . . damages arise, the Court can always create appropriate sub-classes"); *In re Alstom*, 253 F.R.D. at 277 ("[A]ny future intra-class conflict relating to damages could be mitigated by certifying subclasses pursuant to Rule 23(c)(4)."); *Cromer Fin. Ltd. v. Berger*, 205 F.R.D. 113, 126-27 (S.D.N.Y. 2001) (reasoning that, although "conflicts among class members may arise at the settlement or damages stage," this "does not require the denial of class certification" because, "[i]f they are needed later, the court has substantial discretion to create sub-classes").

### 2.    There Are No Impermissible Counsel Conflicts

Defendants argue that the proposed subclasses "do nothing" to alleviate the purported class conflict because the subclasses would be represented by the same counsel. Opp. at 61-64. Defendants are wrong, as there are no impermissible counsel conflicts.

"In general, class counsel may represent multiple sets of litigants—whether in the same action or in a related proceeding—so long as the litigants' interests are not inherently opposed." 1 William B. Rubinstein, *Newberg on Class Actions*, § 3.75 at 403 (5th ed. 2011, Supp. Winter 2013). *Newberg* also sets forth specific examples of situations in which litigants' interests are "inherently opposed," none of which is present here.[33] All investors, retail and institutional, will

---

[33] Inherent conflicts include situations where: (i) there is a limited fund; (ii) substantive law permits recovery by only one or the other set of litigants; (iii) one client is litigating an appeal to a class action settlement in which another client claimed recovery; and (iv) counsel's actions have generated conflicts between class representatives and the class.

seek to prove that Facebook's public offering documents misrepresented and omitted material information.  Where, as here, retail and institutional investors' interests are not inherently opposed, concurrent representation is not only permitted, it may be deemed beneficial. For instance, *Newberg* provides that "concurrent representation may enable counsel to leverage a better settlement for both sets of plaintiffs due to a defendant's desire to obtain a global resolution." *Id.* Accordingly, courts in this Circuit hold that a conflict of interest will not destroy adequacy if it is "merely speculative or hypothetical"—precisely the case here. *See, e.g.*, *In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 113 (E.D.N.Y. 2012) (Cogan, J.).

Defendants rely on *In re Literary Works in Electronic Databases Copyright Litigation* (Opp. at 63), in which the Second Circuit reversed an order approving a settlement class based on conflicts.[34] 654 F.3d 242, 254-55 (2d Cir. 2011). But *Literary Works* is plainly distinguishable because it involved the certification of a settlement class where the settlement's terms raised the concern that counsel was "selling out of one category of claim for another." *Id.* at 252. Indeed, the court began its analysis by explicitly stating that it would apply "heightened[] attention" to the district court's determination because this more exacting review is necessary "[w]hen a court is asked to certify a class and approve its settlement in one proceeding," particularly when one subclass consisted of only a small number of class members who suffered a relatively minuscule amount of losses. *Id.* at 249; *see also Charron v. Wiener*, 731 F.3d 241, 250 (2d Cir. 2013) (distinguishing *Literary Works* where the settlement at issue was "not being approved at the same

---

[34] While Defendants cite *National Air Traffic Controllers Association v. Dental Plans, Inc.*, 2006 WL 584760, at *4 (N.D. Ga. Mar. 10, 2006), the entity that proposed counsel represented in that case was "potentially liable to the proposed class." *Id.* at *3. No such conflict exists here. In *Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*, 350 F.3d 1181, 1189, 1196 (11th Cir. 2008), certain class members claimed to be harmed by the same conduct that benefited other class members. Again, no such conflict exists here.

time that the class was being certified" and explaining that it is when settlement and certification "proceed simultaneously" that the heightened attention applied in *Literary Works* is necessary). Unlike plaintiffs in *Literary Works*, Plaintiffs here are not seeking certification of a settlement class, both Subclasses are of significant size and suffered substantial damages, and there is absolutely no suggestion that Class Counsel is "selling out of one category of claim for another." *Id*. at 252.

The Second Circuit's opinion in the *Seijas* case is instructive. In that case, the Republic of Argentina appealed from eight final judgments granting relief to eight classes consisting of holders of defaulted Argentine bonds. *Seijas v. Republic of Arg.*, 606 F.3d 53, 55 (2d Cir. 2010). Argentina argued that, because overlapping counsel represented the eight classes, as well as individual plaintiffs in non-class actions, conflicts of interest existed with respect to the apportionment of any monetary judgments that might be awarded, as "all of these plaintiffs are theoretically in competition with one another to recover on their judgments." *Id.* at 55, 57. The Second Circuit rejected that argument, reasoning:

> At the time the district court granted class certification, it concluded that the potential conflicts of interest would threaten the damages phase of the proceedings, ***not*** the liability phase. The district court promised to revisit the damages issue if necessary, recognizing its continuing obligation to do so. Fed. R. Civ. P. 23(c)(1). We have no doubt that the district court will continue to be alert to this issue in the course of subsequent proceedings and agree that ***the potential conflict did not justify refusing to certify the class***.

*Id.* at 57.

The same reasoning applies here: a potential conflict during the damages or other later phase of the case does not justify refusing to certify a litigation class. Courts routinely certify subclasses represented by the same counsel. *See, e.g.*, *IntraLinks*, 302 F.R.D. at 317, 319 (certifying a class and subclass represented by the same counsel); *In re Vitamin C*, 279 F.R.D. at 113-14 (finding no conflict of interest for class counsel in their dual representation of a damages

class and an injunction class because the purported conflict was "speculative" and "merely the prospect that class counsel [would] use manipulative litigation tactics to leverage one class for the benefit of another," which was "unlikely to create a 'fundamental' conflict capable of destroying class certification"); *cf. Dietrich v. Bauer*, 192 F.R.D. 119, 126-27 (S.D.N.Y. 2000) (Sweet, J.) (holding that class counsel did not have a conflict of interest where it represented a different class in a related action and would arguably need to pursue conflicting positions in each action with respect to loss causation and damages).

In any event, while Lead Counsel represents all Plaintiffs and the entire Class, the individual plaintiffs have additional counsel representing them, which further eliminates any potential for conflict that may arise later on in the litigation. Accordingly, even if there were a possibility that a conflict could arise in the future, there are structural safeguards in place, including the presence of additional counsel not alleged to have any conflict. *See Plumbers & Pipefitters Nat'l Pension Fund v. Burns*, 292 F.R.D. 515, 523 (N.D. Ohio 2013) (plaintiffs' retention of additional counsel "provides a system of checks, and balances the power between plaintiffs").

### 3.   The Individual Plaintiffs Are Adequate

Defendants challenge the adequacy of individual representatives' involvement in the class action. *See* Opp. at 68. As the Second Circuit has recognized, "the Supreme Court [has] expressly disapproved of attacks on the adequacy of a class representative based on the representatives' ignorance.'" *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 61 (2d Cir. 2000). Thus, courts routinely reject similar attempts to defeat adequacy. As these courts explain, the adequacy requirement is "not demanding" and, under the Second Circuit's test set forth in *Baffa*, is "satisfied unless 'the class representatives have so little knowledge of and involvement in the class action that they would be unable and unwilling to protect the interests of the class against the possibly competing interests of the attorneys.'" *IntraLinks*, 302 F.R.D. at 316-17 (holding that

74

adequacy was demonstrated where the representative for the plaintiff "displayed a basic familiarity with the litigation's subject matter, the identities of the defendants, and the reasons for the [representatives'] involvement"); *Stinson*, 282 F.R.D. at 372-73 (plaintiffs adequate even where certain of them "demonstrated incompetency concerning basic issues such as the number of class representatives in the case, the advantages of pursuing the putative plaintiffs as a class [and] the procedural posture and goals of the litigation and the general facts of the case"); *Cromer*, 205 F.R.D. at 124 (adequacy was demonstrated where the named plaintiffs "showed that they [were] more than sufficiently aware of the essential facts and issues in th[e] case").

There simply is no argument here that the individual plaintiffs are "so ignorant of the facts of this case that [they are] 'unable or unwilling' to protect the interests of the class." *DLJ Mortg.*, 2011 WL 3874821, at *4. ███████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████ █████████████████████████████████████

████████████████████████, in a complex action such as this, class representatives are entitled to rely on the expertise of counsel when it comes to legal issues such as the affirmative defenses available under the law. *See DLJ Mortg.*, 2011 WL 3874821, at *4 (explaining that in complex actions, "a great deal of reliance on expert counsel is to be expected"). Courts routinely find proposed class representatives adequate when they lack a detailed understanding of the law, recognizing that named plaintiffs are expected to rely on the expertise of counsel and need only

---

[35] *See, e.g.*, Ex. 92 at 86:11-87:7 (Morley); Ex. 93 at 120:15-121:9 (Lynn Melton); Ex. 94 at 228:9-25 (Paul Melton)███████████████████████████████████████████████████████████████

███████████████████████████████████████████; Ex. 95 at 59:11-60:3, 61:5-62:19, 93:12-94:18, 95:12-20, 225:14-227:5 (Eric Rand); Ex. 96 at 145:19-146:20, 342:14-23 (Jose Galvan); and Ex. 97 at 96:24-97:9, 168:9-169:13, 292:10-293:23 (Mary Jane Lule Galvan).

have a basic understanding of the litigation. *See, e.g.*, *Baffa*, 222 F.3d at 61-62 (reversing district court's determination that proposed class representative lacked sufficient knowledge of the case where, among other reasons, he demonstrated an "ability to appreciate the limits of his knowledge and rely on those with relevant expertise"); *In re Flag Telecom Holdings, Ltd., Sec. Litig.*, 245 F.R.D. 147, 161 (S.D.N.Y. 2007) ("It is well established that in complex actions such as securities actions, a plaintiff need not have expert knowledge of all aspects of the case to qualify as a class representative, and a great deal of reliance on the expertise of counsel is to be expected." (internal quotations omitted).[36]

Defendants also challenge the adequacy of some (but not all) of the proposed individual class representatives because they are "not even named in the Complaint," and the deadline to amend the Complaint has passed. Opp. at 66. Contrary to Defendants' assertions, each of the additional class representatives are members of the Class specifically named in the Complaint, and class representatives may be changed at "any stage of the litigation." *See In re Sanofi-Aventis Sec. Litig.*, 293 F.R.D. 449, 451-53 (S.D.N.Y. 2013) (at the class certification stage, appointing class representative that was neither a lead plaintiff nor named plaintiff); *In re Oxford Health Plans, Inc. Sec. Litig.*, 191 F.R.D. 369, 380-81 (S.D.N.Y. 2000) ("The Court believes on reflection that it

---

[36]

probably has the power to designate a Class Representative under Rule 23 who is not a Lead Plaintiff, simply because there is nothing in the statute which prevents it."); *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 286-88 (S.D.N.Y. 2003).[37] Moreover, Defendants cannot claim any legitimate prejudice by their addition, particularly because they each timely produced documents, responded to interrogatories, and sat for deposition prior to Defendants' submission of their Opposition brief.[38]

## IV.    Defendants' Remaining Arguments Are Meritless

Defendants' remaining arguments—that there are individual issues of materiality, loss causation, and damages, and that superiority is defeated—should give the Court little pause in certifying the Class here.

### A.    Neither *Comcast* Nor Purported Damages Questions Preclude Certification

Defendants contend that *Comcast* precludes class certification because there supposedly is a "mismatch" between Plaintiffs' theory of liability and damages. Specifically, Defendants argue that a class cannot be certified because Plaintiffs are seeking damages for the decline on May 22, when news reports revealed that the Syndicate Analysts revised their models before the IPO, yet Plaintiffs have stated that their claim is not based on the failure to disclose these model revisions.

---

[37] Defendants also complain that the newly-added proposed individual class representatives did not file a PSLRA certification. Opp. at 66. However, this technical requirement only applies when a plaintiff files a complaint, not when a class representative is replaced or added. *See* 15 U.S.C. § 78u-4(a)(2)(A) ("Certification filed *with complaint*"). The newly-added proposed class representatives have each provided sworn interrogatories, testified at deposition, and produced to Defendants the trading information and the other information required by 15 U.S.C. § 78u-4(a)(2)(A).

[38] Defendants argue in a footnote that Lead Plaintiff North Carolina DST is "inadequate" because it had an interest in a fund that bought Facebook securities at one point in time and made a profit. Opp. at 67 n.32. But, the Facebook interest that North Carolina made a profit on was based on *pre*-IPO shares that are *not* at issue in this case. As to the shares at issue in the case, North Carolina is entitled to recover approximately $4 million in statutory damages under the Securities Act. *See Fed. Hous. Fin. Agency v. Nomura Holding Am. Inc.*, 2014 WL 7232590, at *7 (S.D.N.Y. Dec. 18, 2014) ("The plain language of section 11(e) prescribes the method of calculating damages, and the court must apply that method in every case.").

Opp. at 54-55. Defendants are wrong.

*Comcast* was an antitrust action, not a Section 11 securities IPO case. In *Comcast*, the Supreme Court determined that the antitrust class was improperly certified because plaintiffs' damages model computed total damages based on four types of antitrust injuries without separately computing damages for each type of injury. Ultimately, only one of those categories of injury was viable, and plaintiff was then left with a damages model that did not separately compute damages for that particular injury. *See Comcast*, 133 S. Ct. at 1430-35. Accordingly, plaintiffs' damages model "failed to measure damages from the particular antitrust injury on which petitioners' liability [was] premised." *Id*. at 1433.

Defendants' arguments should be rejected for three reasons. *First*, *Comcast* has no application here, where there is a statutory formula for the calculation of class members' damages, and thus, no need to prepare a complex regression model of the sort at issue in *Comcast*. *See Residential Capital*, 2013 WL 6839093, at *5 ("Defendants assert that [*Comcast*], requires a new damages analysis here. However, … section 11(e) of the Securities Act sets out the proper method for calculating damages in this case."). Significantly, under Section 11(e)'s statutory damages formula, plaintiffs are entitled to damages for all stock price declines between the time of the IPO and the time when suit was filed (the close of trading on May 22), regardless of the cause of those declines, unless Defendants can prove their negative causation affirmative defense—which they have not even attempted to do at this stage. While Defendants rely on *Fort Worth Employees' Retirement Fund* to contend that *Comcast* applies to Section 11 cases, the court declined to certify the damages class only because plaintiffs could not calculate the value of their illiquid securities (301 F.R.D. at 141-42)—an issue that has no bearing here, where Facebook's common stock is highly liquid and has a daily market price.

78

*Second*, even assuming that *Comcast* applies here, which it does not, Plaintiffs readily satisfy its very modest requirement. In two cases, the Second Circuit recently held that *Comcast's* holding is extremely narrow. Contrary to what Defendants contend, the Second Circuit has held that "*Comcast* does **not** mandate that certification pursuant to Rule 23(b)(3) requires a finding that damages are capable of measurement on a classwide basis" and "did not overrule the "well-established" law of the Circuit that "'the fact that damages may have to be ascertained on an **individual** basis is not sufficient to defeat class certification." *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 402, 405 (2d Cir. 2015) (holding that individualized damages determinations alone cannot defeat predominance, citing *Seijas*, 606 F.3d at 58, and vacating an order denying certification).[39] As the Second Circuit has made clear, "[a]ll that is required at class certification is that the plaintiffs must be able to show that their damages stemmed from the defendants' actions that created the liability," *Sykes v. Mel S. Harris & Assocs., LLC*, 780 F.3d 70, 88 (S.D.N.Y. 2015) (citing *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013)), and this is precisely what Section 11(e)'s damages formula achieves in a Section 11 case.

*Third*, Defendants' argument is simply a "backdoor" attempt to make Plaintiffs prove loss causation at the class certification stage for the May 22 stock price decline, which is clearly

---

[39] Defendants' authorities are distinguishable. Defendants argue that, in *In re U.S. Foodservice*, the Second Circuit, interpreting *Comcast*, required courts to "examine the proposed damages methodology at the certification stage to ensure that it is . . . ***capable of measurement on a class-wide basis***.'" Opp. at 54 (citing *In re U.S. Foodservice*, 729 F.3d at 123 n.8). Defendants further argue that this test applies to Securities Act cases, relying on *Fort Worth Employees' Retirement Fund*, 301 F.R.D. 116. But these cases predated *Roach*, which explains why the court in *Fort Worth* explicitly stated that the "Second Circuit has not yet made a definitive assessment of *Comcast*'s effects." *See id.* at 141. In *Sicav v. James Jung Wang*, 2015 WL 268855, at *6 (S.D.N.Y. Jan. 21, 2015), which Defendants also cite (Opp. *passim*), the plaintiffs' theory of injury was "unusual" because it was based on the allegation that the defendants had improperly flooded the market with the issuer's stock, which has "almost always been held ill-suited for classwide resolution." *Id.* at *2-3. Here, damages are to be determined by application of a statutory formula that is routinely used in class actions.

improper. Plaintiffs are not required to demonstrate loss causation at the class certification stage under *Halliburton*, 131 S. Ct. at 2187 ("[T]he Court of Appeals erred by requiring EPJ Fund to prove loss causation at the certification stage."). Further, as noted above, loss causation is not an element of Plaintiffs' claim, and thus, Plaintiffs need not show loss causation at *any* procedural stage. In this Section 11 case, Defendants bear the burden of proving "negative causation" at the merits stage, *see Facebook*, 986 F. Supp. 2d at 523 (citing *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 36 (2d Cir. 2009)). But nowhere in the 1,500 pages Defendants submitted with their Opposition—which includes 30 declarations and two expert reports—is there an expert report on loss causation and damages. Thus, Defendants have not even attempted to discharge their burden of proving negative causation, implicitly acknowledging either that they cannot do so or that such matters will be the subject of expert testimony at a later procedural stage. *See Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 283 F.R.D. 199, 216 (S.D.N.Y. 2012) ("[C]ourts repeatedly have rejected the argument that loss causation can defeat predominance for class certification purposes.").

Defendants separately argue that class certification must be denied because Plaintiffs have supposedly failed to show how damages can feasibly be calculated on a Class-wide basis. Opp. at 56-59. Specifically, Defendants assert that individualized damages issue predominate because (1) class members' varying levels of knowledge means that they are not entitled to recover for certain price declines, and (2) NASDAQ trading issues preclude certain class members from recovering for some of their losses. *Id*. For the reasons set forth above, these arguments fail.

*First*, as explained above, Plaintiffs are *not* required to demonstrate that damages are capable of measurement on a classwide basis, and indeed, the law is clear that "'the fact that damages may have to be ascertained on an *individual* basis is not sufficient to defeat class

certification." *Roach*, 778 F.3d at 405. *Second*, in any event, Plaintiffs plan to calculate damages across the Class according to Section 11's mechanical formula. *Third*, while Defendants contend that certain knowledge or NASDAQ issues prevent certain Class members from recovering for certain declines, this is solely a question of whether Defendants can succeed in their affirmative defense of negative causation. As explained above, Defendants have not even attempted to discharge their burden at this stage.[40]

### B.     Defendants' Arguments Concerning Foreign Purchasers Provide No Basis To Deny Class Certification

Defendants argue that the Underwriters' allocations of shares to 295 investors residing in foreign countries prevents the Court from certifying a class that includes: (1) those foreign-resident investors; and (2) *any* aftermarket purchasers. Specifically, Defendants argue that the Underwriters' allocations of shares to foreign-resident investors constitute "foreign transactions" within the meaning of *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010), and are, therefore, not subject to federal securities laws. Opp. at 74-75. Defendants further argue that these supposed "foreign transactions" somehow taint the secondary trading market and prevent all aftermarket purchasers from "tracing" their shares to the defective Registration Statement, necessitating their exclusion from the Class. *Id.* at 75-76. Defendants' arguments are unprecedented, contradicted by the holdings of the Supreme Court and Second Circuit, and, as a practical matter, would eliminate Section 11 standing for all aftermarket purchasers in any U.S. IPO.

---

[40] For example, Defendants argue that there are loss causation issues attributable to the May 18 NASDAQ trading-system failures. ███████

Defendants' first assertion—that the U.S. Underwriters' allocations to the 295 foreign-resident investors are not subject to federal securities laws—is a merits question that need not even be resolved at this stage.  Nor could a question as to 295 investors defeat predominance in a Class of this size.

Further, Defendants are wrong.  Their argument rests on the false premise that the location of an investor at the time a securities transaction is executed determines whether the transaction is foreign or domestic. The Second Circuit, however, has squarely rejected that proposition. *See Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 69 (2d Cir. 2012). The defendants in *Absolute Activist* argued that "the identity of the buyer or seller should be used to determine whether a transaction is domestic," and where "the buyer and seller are both foreign entities," the "transaction cannot be considered domestic." *Id*. The Second Circuit flatly rejected this contention and held that "[a] purchaser's citizenship or residency ***does not affect where a transaction occurs***." *Id*. (internal quotations omitted).

Instead, under *Morrison*, the primary test for determining whether the federal securities laws apply to a transaction is whether the subject securities are "listed on domestic exchanges." 561 U.S. at 267. That is precisely the case here: the Facebook shares at issue, including all the shares allocated to foreign investors, trade ***exclusively*** on a U.S. exchange, the NASDAQ. For this reason alone, the allocations to the foreign-resident investors are not "foreign transactions," and are subject to federal securities laws and properly included in the Class.

Moreover, a transaction is domestic if either title to the securities passes within the United States, or "the purchaser incurred irrevocable liability within the United States to take and pay for a security, or [] the seller incurred irrevocable liability within the United States to deliver a security." *Absolute Activist*, 677 F.3d at 67-68. Courts examine a variety of factors to determine

where the parties became irrevocably bound, "including, but not limited to, facts concerning the formation of the contracts, the placement of purchase orders, the passing of title, or the exchange of money." *Id*. at 70.

It is ***not*** necessary for the Court to undertake this analysis because, as discussed above, the shares at issue here are listed exclusively on a U.S. exchange. Further, Defendants have offered no evidence that the transactions were actually foreign under *Morrison*, and the available facts show they were not. Here, the foreign allocants participated in a strictly ***U.S.*** IPO of a ***U.S.*** company in order to receive ***shares registered in the United States with the SEC that would trade exclusively on an American exchange***. No court has ever held that such a transaction was foreign, and there is no basis to do so here. Such a characterization would stretch *Morrison* far beyond its breaking point.

Even if the allocations to the 295 foreign investors Defendants cite were somehow foreign transactions, which they are not, it would not create a tracing problem or otherwise warrant denial of class certification. Defendants argue that, assuming (incorrectly) the 295 initial allocations were "foreign transactions," then all secondary market purchasers will somehow be unable to meet Section 11's "tracing requirement," and thus lack standing. Opp. at 74-76. This argument, too, is unprecedented, and contradicts the most fundamental aspects of the tracing requirement.

As this Court has held, "it has been the law in this Circuit for [almost fifty] years that a plaintiff who can trace their securities to a registered offering has standing to sue under the Securities Act for a defect in that registration." *Adair v. Bristol Tech. Sys., Inc.*, 179 F.R.D. 126, 130 (S.D.N.Y. 1998) (Sweet, J.). In other words, to establish standing, a plaintiff need only show her securities were issued pursuant to a false and misleading registration statement. *See, e.g.*, *DeMaria v. Andersen*, 318 F.3d 170, 176 (2d Cir. 2003) (describing the "long-standing practice in

this circuit of permitting suit under § 11 by those who can 'trace' their shares to the allegedly defective registration statement"); *In re Smart Tech., Inc. S'holder Litig.*, 295 F.R.D. 50, 61 (S.D.N.Y. 2013) ("Put simply, any individual who can show that his or her shares were issued under/registered to the allegedly defective registration statement—regardless of whether the shares were acquired directly from the issuer or in the aftermarket—has standing to pursue a section 11 claim.").

In this case, there is only one offering at issue, and thus, it is ***undisputed*** that each and every share of Facebook stock issued in the IPO or traded in the aftermarket was issued pursuant to the Registration Statement alleged to be materially misleading in this action. Accordingly, there is no question that every purchaser of Facebook stock can trace his or her shares back to the same defective Registration Statement—***regardless*** of whether a foreign investor ever owned those shares. *See DeMaria*, 318 F.3d at 176 ("In a case such as this one, where there has been only one stock offering, any person who acquires the security may sue under § 11, regardless of whether he bought in the initial offering, a week later, or a month after that.") (internal quotation marks omitted).

Defendants seek to alter this deeply enshrined principle, adding a further requirement that a plaintiff must not only be able to show that she purchased shares issued pursuant to a deficient registration statement, but must also show that every beneficial owner of those securities preceding her was a U.S. resident with a viable Section 11 claim. Defendants cite no support for this new, additional requirement, and it bears no logical relationship to the tracing requirement's purpose. As noted above, the tracing requirement exists to ensure that a Section 11 plaintiff actually purchased shares issued pursuant to the same defective registration about which she complains, which is plainly the case here—not to ensure that all prior purchasers of the securities were U.S.

84

residents or had a viable Section 11 claim.

Moreover, given that at least some foreign investors participate in virtually every U.S. IPO, if Defendants' new standard were accepted, no secondary market purchasers would have standing to bring claims under Section 11. This outcome would eviscerate secondary market liability under Section 11, and is directly at cross-purposes with Congress' intent, as recognized by this Court, to accord Section 11's remedies "***to purchasers 'regardless of whether they bought their securities at the time of the original offer or at some later date***.'" *Bristol*, 179 F.R.D. at 131 (quoting *Barnes v. Osofsky*, 373 F.2d 269, 273 (2d Cir. 1967) (emphasis added)); *see also DeMaria*, 318 F.3d at 175-78.

In any event, contrary to what Defendants contend, even if Defendants had raised a valid tracing argument, which they have not, it would not defeat certification of the Class because it is well-established that the question of whether absent class members can trace their shares is irrelevant at the class certification stage. This is both because tracing is a merits issue unrelated to a Rule 23 requirement, and because, in all events, common liability issues predominate. *See, e.g.*, *Smart Tech.*, 295 F.R.D. at 61-62 (holding that tracing is a "merits issue" that cannot defeat predominance at class certification because the "predominance inquiry is directed primarily toward whether the issue of liability is common to members of the class") (internal citations omitted).

Notably, in *Smart Technologies*, stock bearing the same CUSIP number had been issued pursuant to both Canadian and U.S. registration statements in simultaneous IPOs, and the same stock traded on both U.S. and Canadian exchanges. 295 F.R.D. at 53-54. Accordingly, defendants argued that the U.S. and Canadian shares were hopelessly intermingled, and none of the aftermarket purchasers could trace to the U.S., rather than the Canadian, registration statement. *Id.* at 60-62. The court rejected defendants' argument that these traceability issues posed a barrier to

class certification, reasoning that "[a]lthough determining traceability may require individualized inquiries, the potential for such inquiries alone does not defeat predominance. The predominance inquiry requires this Court to analyze whether common questions regarding liability exceed those which are individualized." *Id*. at 61-62. It is even clearer in this case, where each and every share purchased in the secondary market is traceable to a single U.S. registration statement, that any purported individual issues of traceability (which do not exist) cannot preclude certification here.

### C.    There Is No Such Thing As Individual Issues of Materiality

Defendants argue that investors' purportedly varied knowledge with respect to Facebook's revenue cuts creates individual materiality issues. Opp. at 60. However, even assuming, *arguendo*, the existence of such variation with respect to any relevant knowledge (which, as discussed in Section I, does not exist to any significant extent) it is irrelevant to materiality, because materiality is determined according to an objective standard. As the Supreme Court held in *Amgen*:

> ***Because materiality is judged according to an objective standard, the materiality of Amgen's alleged misrepresentations and omissions is a question common to all members of the class*** Connecticut Retirement would represent. The alleged misrepresentations and omissions, whether material or immaterial, would be so equally for all investors composing the class. … As to materiality, therefore, the class is entirely cohesive: It will prevail or fail in unison. In no event will the individual circumstances of particular class members bear on the inquiry.

133 S. Ct. at 1191; *see also Goldman Sachs*, 280 F.R.D. at 139 (rejecting argument that questions of materiality raise significant individual issues because materiality is subject to an objective standard); *Merrill Lynch*, 277 F.R.D. at 114 (holding that the defendants' argument that "individual issues regarding materiality will predominate can be swiftly rejected" because materiality is a common issue). Defendants' own authority acknowledges as much. *See Forth Worth*, 301 F.R.D. at 137 (reasoning that materiality does not require individual inquiries because materiality is

determined according to an objective standard).[41]

Finally, while Defendants cite two cases that were decided nearly three decades ago (*see* Opp. at 61), one case involved individual issues of knowledge, not materiality, *see Klein v. A.G. Becker Paribas Inc.*, 109 F.R.D. 646, 652 (S.D.N.Y. 1986), and the other case, *Zimmerman v. Bell*, 800 F.2d 386, 390 (4th Cir. 1986), is an out-of-circuit outlier that conflicts with *Amgen*'s later holding that "materiality is judged according to an objective standard," 133 S. Ct. at 1191.[42]

### D.     A Class Action Is Superior To Other Methods

This securities class action easily satisfies the superiority requirement for the reasons explained in Plaintiffs' opening brief. Pl. Br. at 33-34. Defendants argue that a class action is not superior to other methods of adjudicating the alleged claims because there are multiple individual knowledge, causation, materiality, and tracing issues, as well as class conflicts. Opp. at 76-77. But, as Plaintiffs have demonstrated *supra*, these issues do not preclude class certification here.

Defendants further argue that this is not a case "where individual damages are so small that any claims could rationally be maintained, if at all, only as a class." Opp. at 77. It is true that a number of investors suffered significant losses, as is to be expected in an action involving one of the largest IPOs in history. But Defendants should not be immune to class-action liability merely because Facebook's investors suffered significant losses. In any event, it is beyond dispute that

---

[41] Defendants cite *In re Sanofi Securities Litigation*, 2015 WL 365702 (S.D.N.Y. Jan. 28, 2015), for the proposition that "'not attributing that [particular information] to' one particular source is immaterial." That case did not involve the issue of whether investors consider statements from the **issuer** to be more important than statements from other sources, but rather the exact opposite situation: "whether defendants were required to disclose **the FDA's feedback** about the company's testing methodology to make the company's statements about [a pharmaceutical product] non-misleading." *Id.* at *24.

[42] Defendants also stretch too far when they argue that two cases decided by this Court—*In re Bear Stearns Cos., Inc. Securities, Derivative & ERISA Litigation*, 763 F. Supp. 2d 423 (S.D.N.Y. 2011), and *Wang v. Bear Stearns Companies*, 14 F. Supp. 3d 537 (S.D.N.Y. 2014)—supposedly show that materiality is an individualized issue. Nowhere do these cases hold that materiality is an individualized issue at class certification, nor could that be so in light of *Amgen*.

many individual Class members suffered losses that are small enough to render individual litigation prohibitively expensive.

These losses were extremely harmful to investors, especially members of the enormous Retail Investor Subclass. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████  The losses of these individuals are emblematic of the fact that many, many thousands of retail investors lost sums that were very significant to them personally, although not nearly large enough to support individual actions against a company like Facebook, which has vast resources—precisely the scenario class action litigation is meant to address.

## CONCLUSION

For the reasons set forth herein, Plaintiffs respectfully request certification of the Class. In the alternative, Plaintiffs request certification of the Subclasses.

Dated:  June 16, 2015

BERNSTEIN LITOWITZ
BERGER & GROSSMANN LLP

By: _____
Max W. Berger
Salvatore J. Graziano
John J. Rizio-Hamilton
1285 Avenue of the Americas
New York, NY 10019
Tel: (212) 554-1400
Fax: (212) 554-1444

*Co-Lead Counsel For Lead Plaintiffs And The
Proposed Class*


Thomas A. Dubbs
James W. Johnson
Thomas G. Hoffman, Jr.
LABATON SUCHAROW LLP
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477

*Co-Lead  Counsel  For  Lead  Plaintiffs,
Proposed Class Representative Sharon Morley
And The Proposed Class*


Steven E. Fineman
Nicholas Diamand
LIEFF CABRASER
HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013
Tel: (212) 355-9500
Fax: (212) 355-9592

*Additional Counsel For Additional Named
Plaintiffs And Proposed Class
Representatives Jose G. Galvan And Mary
Jane Lule Galvan*

Frank R. Schirripa
HACH ROSE SCHIRRIPA
& CHEVERIE LLP
185 Madison Ave
New York, New York 10016
Tel: (212) 213-8311
Fax: (212) 799-0028

*Additional Counsel For Proposed Class Representatives Eric Rand, And Paul And Lynn Melton*