UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED #: 12/29/2015
```

------------------------------------------X

IN RE FACEBOOK, INC., IPO SECURITIES AND
DERIVATIVE LITIGATION,

OPINION
MDL No. 12-2389

FILED UNDER SEAL

------------------------------------------X


A P P E A R A N C E S:


> Attorneys for Lead Plaintiffs and
> the Proposed Class
>
> LABATON SUCHAROW LLP
> 140 Broadway
> New York, NY 10005
> By:  Thomas A. Dubbs, Esq.
>      James W. Johnson, Esq.
>      Thomas G. Hoffman, Jr., Esq.
>
> Attorneys for Lead Plaintiffs, Proposed Class
> Representative Morley and the Proposed Class
>
> BERNSTEIN LITOWITZ BERGER & GROSSMAN LLP
> 1251 Avenue of the Americas, 44th Floor
> New York, NY 10019
> By:  Max W. Berger, Esq.
>      Salvatore J. Graziano, Esq.
>      John Rizio-Hamilton, Esq.
>
> Attorneys for Additional Named Plaintiffs and
> Proposed Class Representatives Mr. & Mrs. Galvan
>
> LIEFF CABRASER HEIMANN & BERNSTEIN LLP
> 250 Hudson Street, 8th Floor
> New York, NY 10013
> By:  Steven E. Fineman, Esq.
>      Nicholas Diamand, Esq.

<u>Attorneys for Proposed Class Representatives</u>
<u>Rand and Mr. & Mrs. Melton</u>
HACH ROSE SCHIRRIPA LLP
185 Madison Ave.
New York, NY 10016
By: Frank R. Schirripa


<u>Attorneys for Defendant Facebook</u>

KIRKLAND & ELLIS LLP
655 Fifteenth St. NW
Washington, DC 20005
By:  Susan E. Engel, Esq.

KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
By:  Andrew B. Clubok, Esq.
     Brant W. Bishop, Esq.
     Nathaniel Kritzer, Esq.
     Adam B. Stern, Esq.

WILLKIE FARR & GALLAGHER LLP
1875 K Street, NW
Washington, DC 20006
By:  Richard D. Bernstein, Esq.
     Elizabeth J. Bower, Esq.

WILKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019-6099
By:  Tariq Mundiya, Esq.
     Todd G. Cosenza, Esq.
     Sameer Advani, Esq.

**Sweet, D.J.**

Court-appointed Lead Plaintiffs North Carolina Department of State Treasurer on behalf of the North Carolina Retirement Systems ("North Carolina DST"), Arkansas Teacher Retirement Systems ("Arkansas Teacher"), Fresno County Employees' Retirement Association ("Fresno"), Individual Named Plaintiffs Jose G. Galvan and Mary Jane Lule Galvan (the "Galvans"), and additional proposed individual class representatives Eric Rand ("Rand"), Paul and Lynn Melton (the "Meltons"), and Sharon Morley ("Morley") (collectively, "Plaintiffs"), have moved pursuant to Federal Rule of Civil Procedure 23(a), (b)(3), (c)(5), and (g) seeking certification of a Class of investors in the initial public offering (the "IPO") of Facebook, Inc. ("Facebook" or the "Company"), for appointment as Class Representatives, and appointment of Bernstein Litowitz Berger & Grossman LLP and Labaton Sucharow LLP as Class Counsel. For the reasons set forth below, the motions are granted.

## I. Prior Proceedings

The procedural history and factual background of this litigation has been detailed extensively in various opinions by this Court.  See, e.g., In re Facebook, Inc., IPO Sec. & Deriv.

*Litig.,* 986 F.Supp.2d 487, 492–93 (S.D.N.Y. 2013) <u>motion to</u> <u>certify appeal denied sub nom.</u> <u>In re Facebook, Inc., IPO Sec. &</u> <u>Derivative Litig.</u>, 986 F. Supp. 2d 524 (S.D.N.Y. 2014) ("MTD Opinion"); <u>see also</u> <u>In re Facebook, Inc., IPO Sec. & Derivative</u> <u>Litig.</u>, 288 F.R.D. 26, 31–34 (S.D.N.Y. 2012) ("Consolidation Opinion").  Familiarity with the general background of this case as provided in the Court's previous opinions is assumed.

The instant motion, filed December 23, 2014, concerns the Consolidated Securities Action. Investors allege that Facebook and certain officers violated Sections 11, 12(a)(2), and 15 of the Securities Act in negligent misstatements or omissions surrounding the Company's May 18, 2012 IPO. <u>See</u> MTD Opinion § II.  Plaintiffs seek certification to proceed as a class pursuant to Federal Rule of Civil Procedure 23 defined as follows:

> All persons and entities who purchased or otherwise
> acquired the Class A common stock of Facebook, Inc.
> ("Facebook" or the "Company") in or traceable to Facebook's
> initial public offering ("IPO"), which occurred on or about
> May 17, 2012 and were damaged thereby.

Pls.' Mot. at 5.[1]  In the alternative, Plaintiffs request

---

[1] This particular motion has an extensive record. In the interests of space and ease of reference, full citations and their corresponding short form are collected here and will appear hereinafter. Plaintiff's Memorandum of Law in Support of Motion for Class Certification ("Pls.' Mot."); Declaration of Salvatore J. Graziano in Support of Plaintiff's Motion for Class

classification of two subclasses, one for retail investors and one for institutional investors, as follows:

> (1) The Institutional Investor Subclass, consisting of the institutional investors that purchased or otherwise acquired Facebook Class A common stock in or traceable to the Company's IPO allocations as listed in Exhibit 42.[2] The proposed Class Representatives for this Subclass are North Carolina DST, Arkansas Teacher, and Fresno.
>
> (2) The Retail Investor Subclass, consisting of all retail investors who purchased or otherwise acquired Facebook Class A common stock in or traceable to the Company's IPO, and were damaged thereby. The proposed Class Representatives for this Subclass are the Galvans, Rand, the Meltons, and Morley.

Pls.' Mot. at 6.


Excluded from the class/subclasses are Defendants, present or former executive officers of Facebook and their immediate family members. Pls.' Mot. at 5n.3. In reply and oral argument, Plaintiffs have offered several exclusions from the Class on the basis that Defendants' affirmative defense of actual knowledge

---

Certification ("Graziano Decl. 1"); Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for Class Certification ("Defs.'s Opp."); Declaration of Adam B. Stern in Support of Defendant's Opposition to Plaintiff's Motion ("Stern Decl.") and Appendix ("A-"); Plaintiff's Reply Memorandum of Law in Further Support of Motion for Class Certification ("Pls.' Reply"); Declaration of Salvatore J. Graziano in Further Support of Plaintiff's Motion for Class Certification ("Graziano Decl. 2"); Defendant's Sur-Reply Memorandum of Law in Opposition to Plaintiff's Motion for Class Certification ("Defs.' Sur-Reply"); October 7, 2015 Class Certification Hearing Transcript ("Tr."); Plaintiff's October 7, 2015 Class Certification Hearing Exhibit ("Pls.' Ex."); Defendant's October 7, 2015 Class Certification Hearing Exhibit ("Defs.' Ex.").
[2] Graziano Decl. 1, Ex. 42.

is either established or close enough that it is not worth
rebutting. Tr. 21:19-22:6. Their final comprehensive list of
exclusions is as follows: American Century Investment
Management, Blue Ridge, Capital Research and Management Company,
Chilton Investment Company, Clovis Capital Management, Columbia
Management Investment Advisors, Fidelity Management and Research
Company, Jennison Associates, Kingdon Capital Management, Loews,
Maple Lane Capital, Schroder Investment Management North
America, Soros Fund Management, Surveyor Capital, T. Rowe Price
Distribution Group, Teachers Insurance Annuity Association of
America, Turner Investments, Weiss Multi-Strategy Advisers, and
Wellington Management Company (collectively, the "Exclusions").

Discovery has been ongoing during submission of the motion
for class certification. Discovery commenced on February 7,
2014. Stip. and Pretrial Scheduling Order (Feb. 5, 2014), ECF
No. 209. Production of documents relevant to class certification
necessitated extension of discovery deadlines, and by
stipulation and Order, the deadlines were modified on August 18,
2014. Stip. and Pretrial Scheduling Order (Aug. 18, 2014), ECF
No. 249. Deadlines were again extended by Orders on October 28,
2014 and September 10, 2015. Stip. and Modified Pretrial
Scheduling Order (Oct. 28, 2014), ECF No. 253; Stip. and
Modified Pretrial Scheduling Order (Sept. 10, 2015), ECF No.

346. Pursuant to the latest Modified Pretrial Scheduling Order, fact discovery is scheduled to close December 4, 2015, and expert discovery is scheduled to close on July 3, 2016.

Oral argument was held and the motion was deemed fully submitted on October 7, 2015.

## I. The Relevant Facts

Given the extensive factual background detailed in this Court's other decisions, the following facts provide only a truncated retelling of undisputed events for purposes of approaching the instant motion.[3]

On February 1, 2012, Facebook publicly filed its initial registration statement with the SEC ("Registration Statement") for its upcoming initial public offering. The Registration Statement referenced Facebook's historical performance data and its primary revenue source, advertisements. It also made mention

---

[3] The facts that follow are drawn from filings in this case and are not in dispute except as noted. For a detailed and cited recitation of the facts in the securities litigation portion of this case, see MTD Opinion at 493-505; Consolidation Opinion at 31-33. For an overview of the issues with Nasdaq's technical systems issues trading Facebook stock during the relevant time period, see Consolidated Opinion at 33-34.

of the opportunities for growth in the mobile market, the risks associated with attempting to monetize that market by displaying ads on mobile devices (which Facebook had not yet done), and the "product decisions" involved with balancing the revenue needs for advertisement and the user experience. On March 7, 2012, Facebook responded to an SEC comment letter by revising its Registration Statement to include more information clarifying the trend of increasing mobile usage and completed first quarter financial results.

Facebook provided these financial results and internal projected revenue guidance to the investment banks underwriting the IPO, which the underwriter analysts (the "Syndicate Analysts") used to generate their own estimates and predictions of Facebook's revenues and financial performance for use in marketing the IPO. Facebook and its underwriters signed unique Non-Disclosure Agreements controlling the flow of information Facebook provided.[4]

On May 7, 2012, Facebook held its first live roadshow

---

[4] See e.g., Graziano Decl., Ex. 2 (Morgan Stanley Non-Disclosure Agreement); see also Pls.' Mot. 13 (collecting citations). The parties disagree over the effect of the Non-Disclosure Agreements. See e.g., Pls.' Mot. at 5, 7, 13; Defs.' Opp. at 14n.9.

presentation. Between this first presentation and the following day, Facebook cut its internal projected revenue figures for the second quarter of 2012.  On May 9, Facebook filed a Free Writing Prospectus (the "FWP") and an Amended Registration Statement warning further about the possible negative revenue implications for increased user transition to mobile. Beginning almost immediately thereafter, Facebook's Treasurer Cipora Herman ("Herman") made nineteen calls to Syndicate Analysts (the "Herman Calls" or the "Calls") following a script describing mobile's downward pressure on revenue, and notifying them that Facebook had revised its own Q2 projections downward.  The Syndicate Analysts revised their own models and estimates down. At least some Syndicate Analysts then reached out to others, and at least some of the projection information flowed beyond the 19 Herman called. Though the parties agree on the fact that leakage occurred, they dispute nearly everything else, including the scope of what was relayed, to whom, and to what effect(s).

Facebook managed to hold on to its preferred pricing at $38 per share. The IPO went forward on May 17, 2012 selling in excess of 421 million shares, one of the largest initial public offerings in history. On May 18, 2012, the stock began publicly trading. Prices initially exceeded projections, opening at $42.05, but the surge did not last.  The stock dipped and closed

that day at $38.23.   On the following two trading days, Facebook
stock continued to tumble, closing at $34.03 on May 21, and $31
on May 22. As the stock price fell, interest in the cause
increased, and the information conveyed in the Herman Calls
leaked further outward from the original 19 recipients.
Facebook's stock price did not recover until more than a year
later, on July 31, 2013.

Plaintiffs allege that the FWP and Amended Registration
Statement constitute material misstatements or omissions by
failing to disclose what Facebook knew at the time with
certainty: the previously disclosed possibility that mobile
might negatively affect revenue had come to fruition causing
Facebook to internally revise its own revenue forecast, and this
downward trend was not offset by product decisions. See MTD
Opinion at 506–522.

## II. Applicable Standard

To obtain certification, a proposed class must meet Federal
Rule of Civil Procedure 23(a)'s prerequisites of numerosity,
commonality, typicality, and adequacy of representation. Fed. R.
Civ. P. 23(a); Amgen Inc. v. Connecticut Ret. Plans & Trust
Funds, 133 S. Ct. 1184, 1191, 185 L. Ed. 2d 308 (2013).

In addition, the proposed class must satisfy one of three requirements listed in Rule 23(b).  Fed. R. Civ. P. 23(b); Amgen, 133 S. Ct. at 1191.  Plaintiffs have moved under Rule 23(b)(3), which requires that "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

The Second Circuit has described the standard of proof governing class certification:

> "(1) a district judge may certify a class only after making determinations that each of the Rule 23 requirements has been met; (2) such determinations can be made only if the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established and is persuaded to rule, based on the relevant facts and the applicable legal standard, that the requirement is met; (3) the obligation to make such determinations is not lessened by overlap between a Rule 23 requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement; (4) in making such determinations, a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement"

In re Initial Public Offerings Sec. Litig., 471 F.3d 24, 41 (2d Cir. 2006) ("In re IPO I") decision clarified on denial of reh'g sub nom. In re Initial Pub. Offering Sec. Litig., 483 F.3d 70 (2d Cir. 2007) ("In re IPO II").  "'[T]he standard of proof

applicable to evidence proffered to meet' the requirements of
Rule 23 [is] a 'preponderance of the evidence.' " In re Flag
Telecom Holdings, Ltd. Sec. Litig., 574 F.3d 29, 35 (2d Cir.
2009) (quoting Teamsters Local 445 Freight Div. Pension Fund v.
Bombardier Inc., 546 F.3d 196, 202 (2d Cir. 2008)).

"In determining whether class certification is appropriate
in a securities action, the Second Circuit has directed district
courts to apply Rule 23 according to a liberal rather than a
restrictive interpretation." Billhofer v. Flamel Techs., S.A.,
281 F.R.D. 150, 155 (S.D.N.Y. 2012) (citing Maywalt v. Parker &
Parsley Petroleum Co., 147 F.R.D. 51, 54 (S.D.N.Y. 1993); Green
v. Wolf Corp., 406 F.2d 291, 298, 301 (2d Cir.1968), cert.
denied, 395 U.S. 977, 89 S. Ct. 2131, 23 L.Ed.2d 766 (1969)).
"[I]f there is to be an error made, let it be in favor and not
against the maintenance of the class action, for it is always
subject to modification should later developments during the
course of the trial so require." Green, 406 F.2d at 298 (citing
Esplin v. Hirshi, 402 F.2d 94 (10th Cir. 1968)).

## III.    The Proposed Subclasses Satisfy Rule 23(a)

### a. Numerosity

"For class certification to be appropriate, the proposed class must be so numerous that joinder of all of its individual members would be impracticable." Billhofer, 281 F.R.D. at 156; See also Fed.R.Civ.P. 23(a)(1); In re NYSE Specialists Sec. Litig., 260 F.R.D. 55, 69-70 (S.D.N.Y.2009). Joinder need not be impossible, but only difficult or inconvenient enough to make class treatment appropriate. Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, LLC, 504 F.3d 229, 244-45 (2d Cir. 2007); see also In re NASDAQ Market-Makers Antitrust Litig., 169 F.R.D. 493, 508 (S.D.N.Y. 1996). A class of more than 40 commands a presumption of sufficient numerosity. Billhofer, 281 F.R.D. at 156; NYSE Specialists, 260 F.R.D. at 70 (citing Consol. Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d Cir. 1995)); see also In re Sadia, S.A. Sec. Litig., 269 F.R.D. 298, 304 (S.D.N.Y. 2010).

"In securities fraud class actions relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period."

In re Vivendi Universal, S.A., 242 F.R.D. 76, 84 (S.D.N.Y. 2007)
("Vivendi I")(quoting Teachers' Ret. Sys. of La. v. ACLN Ltd.,
No. 01 Civ. 11814(LAP), 2004 WL 2997957, at *3 (S.D.N.Y. Dec.
27, 2004)); see also In re Globalstar Sec. Litig., No. 01 Civ.
1748(PKC), 2004 WL 2754674, at *3*4 (S.D.N.Y. Dec.1, 2004); In
re Deutsche Telekom Ag Sec. Litig., 229 F.Supp.2d 277 (S.D.N.Y.
2002). 421,233,615 shares were sold in the Facebook IPO.
Graziano Decl. 1, Ex. 40.  Whether in one class or two, this
case involves a great deal more than 40 plaintiffs, making
joinder impracticable and establishing numerosity.

### b. Commonality

"Rule 23(a)(2) demands the existence of common questions of
law or fact between members of the class." Billhofer, 281 F.R.D.
at 156. Common questions must also "generate common *answers* apt
to drive the resolution of the litigation." Wal-Mart Stores,
Inc. v. Dukes, 131 S. Ct. 2541, 2551, 180 L. Ed. 2d 374 (2011)
(citation omitted). However, "commonality does not mandate that
all class members make identical claims and arguments or that
the circumstances of their securities purchase be identical."
Id. (citing Trief v. Dun & Bradstreet Corp., 144 F.R.D. 193, 198
(S.D.N.Y.1992) (internal quotation marks omitted)); see also
Port Auth. Police Benevolent Ass'n v. Port Auth., 698 F.2d 150,

153-54 (2d Cir.1983)). "The commonality requirement has been applied permissively by courts in the context of securities fraud litigation, and minor variations in the class members' positions will not suffice to defeat certification." Dietrich v. Bauer, 192 F.R.D. 119, 124 (S.D.N.Y.2000) (citations omitted); see also Vivendi I, 242 F.R.D. at 84 (stating commonality is "applied permissively in securities fraud litigation") (citing In re Nortel Networks Corp. Sec. Litig., No. 01 Civ. 1855(RMB), 2003 WL 22077464, at *3 (S.D.N.Y. Sept. 8, 2003); In re Frontier Ins. Grp., Inc. Sec. Litig., 172 F.R.D. 31, 40 (E.D.N.Y. 1997)).

"Common questions of law and fact are present where the alleged fraud involves material misrepresentations and omissions in documents circulated to the investing public, press releases and statements provided to the investment community and the media, and investor conference calls." Billhofer, 281 F.R.D. at 156; see also e.g., Darquea v. Jarden Corp., No. 06 Civ. 722, 2008 WL 622811, at *2 (S.D.N.Y. Mar. 6, 2008) ("The alleged misrepresentation leading to artificially inflated stock prices relate to all the investors and the existence and materiality of such misstatements or omissions present important common issues."); In re Frontier, 172 F.R.D. at 40 (E.D.N.Y. 1997) (disseminating statements that omitted or misrepresented material facts deemed common questions).

The existence of large common questions with common answers in this matter cannot be disputed.  Plaintiffs' primary claim is that the FWP and Amended Registration Statement contain material misrepresentations or omissions.  Pls.' Mot. at 18. Notwithstanding any unique facts as to any Plaintiff, the success or failure of any and all investor claims necessarily turns on several determinative liability questions the Court has sustained in its Opinion on Defendants' motion to dismiss: (1) Was "Defendants' duty under Item 303 . . . triggered before the Registration Statement became effective" because "Facebook was aware of the material negative impact on Facebook's revenues the Company had suffered as a result of increasing mobile usage and the Company's product decisions ten days before the IPO?" MTD Opinion at 513. (2) Did the risk warnings in the IPO Prospectus misleadingly represent that Facebook's revenue cut was merely possible when in fact the trend had already materialized? Id. at 516. (3) Did Rule 408 of SEC Regulation C require Facebook to disclose the "known financial effects related to increasing mobile usage and certain product decisions?" Id. at 522. The evidence necessary to answer these questions will be the same as to every Plaintiff, and the answer for any one must necessarily apply to all others.  The necessity of answering these central questions for potentially thousands of plaintiffs suffices to meet the "low hurdle" and permissible application of

commonality. See In re Marsh & McLennan Cos., Inc. Sec. Litig.,
No. 04 CIV. 8144 (CM), 2009 WL 5178546, at *9 (S.D.N.Y. Dec. 23,
2009) (citations omitted); see also Billhofer, 281 F.R.D. at 156
(explaining misrepresentations and omissions alleged in public
filings "are of the sort that courts routinely hold to satisfy
the common question requirement" (citations and internal
quotation marks omitted)); Vivendi I, 242 F.R.D. at 84.

That Defendants intend to bring subjective, individualized
defenses by challenging the actual knowledge of each Plaintiff[5]
may defeat commonality, but this is a weighty question for the
predominance analysis. See e.g., Korn v. Franchard Corp., 456
F.2d 1206, 1210 (2d Cir. 1972) (finding commonality "plainly
satisfied" where the alleged misrepresentations related to all
investors, reserving "the more difficult problem" of whether
reliance posed a common issue for the 12(b)(3) predominance
analysis). Where Plaintiffs have identified a "unifying thread
among the members' claims that warrants class treatment," as
Plaintiffs have here, "[n]ot every issue must be identical as to
each class member." Vivendi I, 242 F.R.D. at 84 (quoting Cutler
v. Perales, 128 F.R.D. 39, 44 (S.D.N.Y.1989) (internal quotation

---

[5] See e.g., Defs.' Opp. at 11 ("[F]or each plaintiff's Section 11
claim, Defendants are entitled to prove that at the time of
acquisition the purchaser knew of such untruth or omission."
(citations and internal quotation marks omitted)).

marks and citation omitted). The individual questions here do not negate the plain existence of the common liability questions that must generate common answers applicable to every single claim in this matter.

However, commonality established, there remains an administrative question of whether the class certification analysis should be applied to one class or two in light of Defendants' individualized arguments. "Rule 23 gives the district court flexibility to certify subclasses as the case progresses and as the nature of the proof to be developed at trial becomes clear." Marisol A. v. Giuliani, 126 F.3d 372, 379 (2d Cir. 1997); Vivendi I, 242 F.R.D. at 109 ("The Court has the authority under Rule 23(c)(4)(B) of the Federal Rules of Civil Procedure to divide a class into subclasses.").

Defendants have marshaled an impressive amount of evidence showing that varying aspects and amounts of the content of the Herman Calls and the Syndicate Analysts' projections spread to other institutional investors. See Defs.' Opp. at 22-26.[6] Emails

---

[6] As a singular example, Natasha Kuhlkin of Jennison Associates emailed 65 individuals to relay some of the content of the Herman Calls. Defs.' Ex. A-547. Defendants have put forth evidence that investors at numerous institutions gathered, inferred, or were informed of some aspects of what was conveyed

from Morgan Stanley and JP Morgan show teams of employees executing an effort to touch base with dozens of investment institutions regarding the changed circumstances after the Herman Calls. A-867-891. This evidence applies widely to institutional investors. Retail investors had an altogether different experience from institutional investors: they were not necessarily well connected in the investment world, they were not subjects of the underwriters' direct marketing efforts to the same degree or in the same ways, and most significantly, there was no corresponding systematic effort to reach out to retail investors after the Herman calls.[7] Pls.' Reply at 24-32.

_____

in the Herman Calls or Syndicate Analyst Revisions, including: American Century Investment Management (A-14), Alyeska Investment Group (A-1561), Capital Research Global Investors (A-6-7), Capital World Investors (A-17), Chilton Investment Company (A-61), Clovis Capital Management L.P. (A-1539),  Columbia Management Investment Advisers (A-1552), Criterion Capital Management, LLC (A-50; A-59), Federated Kaufmann (A-46.2), Fidelity (A-16), Gilder Gagnon Howe & Co., LLC (A-70; A-72), Jennison Associates (A-204; A-206), Lone Pine Capital LLC (A-64), Maple Lane Capital (A-1568), Oppenheimer and Nueberger Berman (A-1723), Schroder Investment Management (A-98), Alliance Bernstein (A-1685), Teachers Advisors, Inc. (A-79), TPG-Axon Management (A-95), Polygon Investments (A-1772-3), UBS Global Asset Management (A-86), Waddell & Reed Investment Management (A-91), Weiss Multi-Strategy Advisors LLC (A-1541), Wellington Management Company (A-89), Winslow Capital Management, LLC (A-1556; A-972).

[7] Defendants do allege isolated instances of this information reaching retail investors. See Defs.' Opp at 49-53; see also § IV.a). For example, one individual that learned some of the relevant information through his father, and another through her research and analysis as a consumer news writer. See Defs.' Opp. at 52-3; § IV.a). Defendants allege that the most widespread

Specific merits determination as to what exact information spread, when, and to whom need not be reached to know that the answers to these questions have a significant administrative impact on the case. The record has established that a unique world of facts applies to institutional investors but not retail investors. It therefore raises additional common questions with common answers, such as whether a reasonable investor's actual knowledge of the Facebook revenue cuts can be inferred from the broad spread of this information. These questions and their answers are subject to generalized evidence, but will also require distinguishing between retail and institutional investors. To avoid confusing the issues and to administratively manage this exceptionally large case, if any class is to proceed, two subclasses are necessary.

### c. Typicality

Rule 23(a)'s typicality requirement "'is satisfied when each class member's claim arises from the same course of events,

---

diffusion of this information to retail investors was through either media sources, or by imputation to the individuals who invested through institutions. Defs.' Opp. at 49-54. Facts regarding the former issue apply to both subclasses, and the latter issue is addressed infra in section IV.a). Defendants do not posit that retail investors were systematically connected to or directly informed by the diffusion of the information between institutional investors.

and each class member makes similar legal arguments to prove the defendant's liability.' " Cent. States, 504 F.3d at 245 (quoting Robinson v. Metro-N. Commuter R.R. Co., 267 F.3d 147, 155 (2d Cir.2001)). Typicality may be found to fail in cases where the named plaintiff was not harmed by the conduct alleged to have injured the class. Newman v. RCN Telecom Servs., Inc., 238 F.R.D. 57, 64 (S.D.N.Y.2006).

As discussed, all Plaintiffs put forth the same claims based on the same misstatements and omissions in the same documents. See supra §III.b); see also Pls.' Mot. at 19. All Plaintiffs' injuries stem from those material misstatements or omissions. Thus, the claims asserted by all plaintiffs are typical of one another. The division of subclasses cures any concern, valid or not, that a retail investor's claim is contextually not "typical" of a highly experienced repeat-player institutional investor's claim.

Defendants argue that Plaintiffs have offered only "assertions" of typicality "without pointing to any evidence" Defs.' Opp at 66-8. The typicality analysis asks whether "the claims and defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Plaintiffs' papers adequately provide evidence of typicality by

pointing to the identical claims of all Plaintiffs in both proposed subclasses. Pls.' Mot. at 19. This is all the Rule requires. See NYSE Specialists, 260 F.R.D. at 72 ("As long as plaintiffs assert, as they do here, that defendants committed the same wrongful acts in the same manner, against all members of the class, they establish [the] necessary typicality." (citing In re Towers Fin. Corp., Noteholders Litig., 177 F.R.D. 167, 170 (S.D.N.Y. 1997) (internal quotation marks and citation omitted); Robidoux v. Celani, 987 F.2d 931, 936–37 (2d Cir.1993) ("When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims.")). Defendants' arguments about lack of class standing are unavailing for the same reason: plaintiffs here all allege they suffered the same injury as a result of the same conduct, and that conduct implicates the same set of concerns as the allegedly illegal conduct that caused injury—the misleading FWP and Amended Registration Statement. See NECA–IBEW Health & Welfare Fund v. Goldman Sachs & Co., 693 F.3d 145, 162 (2d Cir. 2012).

Defendants also argue that "[s]ome plaintiffs, including all of the Lead Plaintiffs, are subject to a knowledge defense

22

based on individual communications that renders their claims atypical of other class members." Defs.' Opp. at 65 (citations and internal quotation marks omitted).  For each plaintiff Defendants provide evidence to prove actual knowledge, Plaintiffs point to other evidence to rebut the claims.  Pl's Reply at 66-69.  Defendants, of course, rebut much of *that* evidence and argument in their Sur-Reply. Defs.' Sur-Reply 45-46. This is the song that never ends. What is clear is that Defendants intend to vigorously pursue an actual knowledge defense as to every Plaintiff possible (as is their right), not that the proposed Plaintiffs are any more atypical in relation to the class than any other.  It is therefore the particular circumstances, not the fact, of the actual knowledge defenses that suggests any atypicality, an obvious truism with any subjective defense such as actual knowledge. Typicality is a question of the relation of each claim to the others. To find that the individualized circumstances of an actual knowledge defense preclude typicality here would allow Defendants to unhinge the class certification analysis at this point not because Plaintiffs' claims are dissimilar when compared, but simply because the defense may apply. Because Defendants intend to argue actual knowledge widely, the fact of actual knowledge defenses and the individualized inquiries required to adjudicate them, whether against the claims of the proposed representatives

23

or other potential class members, more appropriately goes to predominance rather than typicality. See infra § IV.a). Further, as described below, subclasses and administrative procedures will effectively manage the minor variations that may be applicable to the proposed representatives. See id. At the typicality stage, as set forth above, Plaintiffs have satisfied Rule 23's requirement. They need not demonstrate they will succeed on the merits (by disproving Defendants' affirmative defenses(s) or otherwise).

### d. Adequacy

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). "Adequacy entails inquiry as to whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." In re Flag Telecom, 574 F.3d at 35 (citing Baffa v. Donaldson, 222 F.3d 52, 60 (2d Cir.2000)) (internal quotation marks omitted). The first prong of this analysis "serves to uncover conflicts of interest between named parties and the class they seek to represent" and ensure that the proposed class representative possesses "the same interest and suffer[ed] the same injury as

the class members." Amchem Prods., Inc. v. Windsor, 521 U.S.
591, 625-26, 117 S. Ct. 2231, 138 L.Ed.2d 689 (1997). To defeat
certification, a conflict between named parties and the class
they seek to represent must be fundamental. In re Visa
Check/MasterMoney Antitrust Litig., 280 F.3d 124, 145 (2d Cir.
2001, abrogated in part on other grounds by In re IPO I, 471
F.3d 24).

North Carolina DST, Arkansas Teacher, and Fresno would
represent the institutional investor class, while the Galvans,
Eric Rand, the Meltons, and Sharon Morley would represent the
retail investors. "As discussed above, all members of the
proposed class allege claims arising from the same wrongful
conduct that are based on the same legal theories as Plaintiff's
claims" and therefore "none of Plaintiff's interests are
antagonistic to those of the proposed class." Billhofer, 281
F.R.D. at 157. Any conflict that may exist is not fundamental.

Defendants submit that Plaintiffs' interests are
antagonistic because some purchased shares before May 18 media
reports about Facebook's revised revenue projections, and some
after.  Defs.' Opp at 66-67.  Much of the differences are
alleviated by separating the institutional investors and the
retail investors.  Regardless, these arguments go to

contradictions regarding loss causation and knowledge. Knowledge is an affirmative defense and as this Court has already stated, "loss causation is not an element of a claim under either Section 11 or 12." MTD Opinion at 522-23 (collecting citations). Though this does not make knowledge and loss causation irrelevant to the entire class certification inquiry, see infra § IV.a), it does mean that the purported conflict is speculative as to adequacy at this stage and thus not grounds to defeat certification. See N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc., No. 08 CIV. 5653 PAC, 2011 WL 3874821, at *4 (S.D.N.Y. Aug. 16, 2011) amended in part, No. 08 CIV. 5653 PAC, 2014 WL 1013835 (S.D.N.Y. Mar. 17, 2014) (finding speculative conflict did not defeat typicality, and thus, class certification). In the event an actual conflict arises, whether at the damages phase of this case or otherwise, the parties are free to alert the Court and the issue will be resolved at that time.

With regard to the second prong of the adequacy analysis, Counsel is highly qualified and has prosecuted this action vigorously, their efforts resulting in surviving a motion to dismiss against some of the finest firms in the nation. See Graziano Decl. 1, Exs. 43-44 (firm resumes); MTD Opinion.

Counsel are more than sufficiently qualified and experienced to conduct this litigation.[8]

Defendants argue that Plaintiffs have not shown sufficient knowledge of involvement in the case to meet the requirements of adequacy, and that certain proposed representatives are insufficiently aware of the case. Defs.' Opp. at 68. "[C]lass representative status may properly be denied where the class representatives have so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys." Baffa v. Donaldson, 222 F.3d at 61. Defendants cite an excised portion of this quote to justify individualized attacks on myopic aspects of proposed representatives' understandings of this case. Defs.' Opp at 68 (pointing to Melton's knowledge before she joined the case in December 2014, Mr. Galvan's understanding of the knowledge issue, Mr. Melton's unawareness of a document search).

---

[8] Defendants have also submitted that counsel is conflicted in representing Plaintiffs of both subclasses, whose interests' conflict due to the timing of their allegedly corrective actual knowledge. Pl's Opp. at 63-4. Counsel is only conflicted if the subclasses truly conflict; in other words, this is the same speculative argument that the two proposed subclasses conflict because their loss-causation arguments, which are not a part of their claim, are necessarily opposed.

Defendants leave out the immediately preceding sentences in Baffa: "The Supreme Court in Surowitz v. Hilton Hotels Corp., 383 U.S. 363 . . . expressly disapproved of attacks on the adequacy of a class representative based on the representative's ignorance." Baffa, 222 F.3d at 61.

Even if Defendants' attacks were proper, "[c]ourts rarely deny class certification on the basis of the inadequacy of class representatives, doing so only in flagrant cases, where the putative class representatives display an alarming unfamiliarity with the suit, display an unwillingness to learn about the facts underlying their claims, or are so lacking in credibility that they are likely to harm their case." In re Pfizer Inc. Sec. Litig., 282 F.R.D. 38, 51 (S.D.N.Y. 2012). Such circumstances are not present here. Plaintiffs pleaded specific reasons and ways in which lead plaintiffs would remain involved in this litigation. See Pls.' Mot. at 20-21. Resolving any doubt, depositions taken in mid-2015 and submitted in Reply demonstrate the adequacy of Plaintiffs' involvement in the case. See Graziano Decl. 2, Ex. 92-7. Plaintiffs need not demonstrate "a deep understanding of this litigation" to meet the adequacy requirement. See In re Sadia, 269 F.R.D. at 310. The awareness and willingness the proposed representatives have demonstrated are more than sufficient. See id.

Defendants also argue that Rand, the Meltons, and Morley were not named in the Complaint, and therefore "have not alleged any claims" and did not attach PSLRA certifications to the Complaint. Defs.' Opp. at 66. Defendants do not argue any of these individuals are not part of the class or subclasses proposed. Rule 23 gives the Court the power to designate class representatives who are not lead plaintiffs, and Defendants do not protest that to do so would cause dislocation or delay. See In re Oxford Health Plans, Inc., 191 F.R.D. 369, 380-81 (S.D.N.Y. 2000) (finding "[t]he Court believes on reflection that it probably has the power to designate a Class Representative under Rule 23 who is not a Lead Plaintiff, simply because there is nothing in the statute which prevents it."). Accordingly, the concern does not defeat a finding of adequacy.

IV. **The Proposed Subclasses Satisfy Rule 23(b)(3)**

    a. **Predominance**

"Rule 23(b)(3) requires a proposed class representative to establish that common questions of law or fact predominate over any questions affecting only individual members, and that a class action is superior to other available means of adjudication." Billhofer, 281 F.R.D. at 158; see also Fed. R.

Civ. P. 23(b)(3). The "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem Prods., 521 U.S. at 623, 117 S. Ct. 2231. However, "[i]t is a more demanding criterion than the commonality inquiry under Rule 23(a)." Billhofer, 281 F.R.D. at 158 (citing Amchem Prods., 521 U.S. at 623-24). "The matters pertinent to these findings include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A)-(D).

"Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." Moore v. PaineWebber, Inc., 306 F.3d 1247, 1252 (2d Cir.2002) (citation omitted). Rule 23(b)(3) "does *not* require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof. What the rule does require is that common questions *predominate* over any questions affecting only individual class members." Amgen, 133 S. Ct. at 1196.

With these principles in mind, before proceeding to analyze the individualized questions in this matter, it must again be noted that this case is of a staggering size, involving a very great number of potential claimants.  See supra § III.a). The presence of common questions and answers is therefore an extremely heavy counterweight to any individualized questions.

Defendants argue strenuously that predominance is defeated because individualized inquiries will be required to determine whether each investor knew the truth of the alleged misstatements or omissions at the time of their purchases. Defs.' Opp. at 11-54. It is undeniable that Defendants have shown that a large number of plaintiffs and potential class members had varying degrees of knowledge about mobile's negative impact on Facebook's revenue, Facebook's revised projections given that impact, the Syndicate Analyst's Revised Projections given Facebook's report of that impact, or some combination thereof. See supra n. 6-7. Of course, Defendants are correct that for each individual with any degree of knowledge—whether or not that knowledge is found on the merits to preclude that particular plaintiff's claim—is a subjective inquiry for each and every investor. At the same time, it has been noted in this District that "individual issues will likely arise in this case

as in all class action cases, and to allow various secondary
issues of plaintiffs' claim[s] to preclude certification of a
class would render the rule an impotent tool for private
enforcement of the securities laws." Pub. Emps.' Ret. Sys. of
Mississippi v. Merrill Lynch & Co., 277 F.R.D. 97, 111 (S.D.N.Y.
2011) (citations and internal quotation marks omitted) ("Pub.
Emps.'"). Moreover, "[a]lthough a defense may arise and may
affect different class members differently, this does not compel
a finding that individual issues predominate over common ones.
As long as a sufficient constellation of common issues binds
class members together, variations in the sources and
application of a defense will not automatically foreclose class
certification under Rule 23(b)(3)." Brown v. Kelly, 609 F.3d
467, 483 (2d Cir. 2010) (citations and internal quotation marks
omitted).

   Given the extraordinary size of this case, it is a
perplexing problem that the sheer number of potential plaintiffs
of all stripes and colors with the same claims against the same
defendants is what threatens their ability to proceed as a
class. Though the case is not binding on this Court, the
approach of In re DJ Orthopedics, Inc. is instructive in
resolving the issue. 2003 U.S. Dist. LEXIS 21534 (S.D. Cal. Nov.
16, 2003) ("DJ Orthopedics"). DJ Orthopedics is startlingly

comparable to this one factually: the defendant company had been preparing to go public when they learned of declining sales for the current quarter, the equivalent of Facebook's realization of mobile's impact on ad revenue. See id. at *4. The day before the IPO, underwriter sales teams contacted a limited number of investors to notify them of the new lowered projections for the quarter, the equivalent of the Herman Calls. See id. The IPO went ahead, and investors subsequently brought suit against the company claiming the Registration Statement and Prospectus issued in connection with the IPO—which had not been updated after the realization of declining sales—contained material misstatements and omissions in violation of sections 11, 12, and 15 of the Securities Exchange Act of 1934. Id. at *4-5. Plaintiffs sought certification of two subclasses: a "knowledge class," composed of the investors the underwriters had contacted, and a "no-knowledge class" composed of the investors the underwriters did not contact. Id. at *8. Just as in this case, the DJ Orthopedics defendants argued that individualized determinations of knowledge would predominate. See Id. at *25.

The Honorable Judith N. Keep of the Southern District of California agreed the knowledge issues would be significant for the investors in DJ Orthopedics that were not contacted by underwriters, but nonetheless certified the subclass on four

principles applicable here: first, the division of subclasses
"reduc[ed] the need for individualized determinations on the
issue of knowledge." Id. at *26-7. Second, plaintiffs had
presented multiple common questions with common answers
applicable to every class member, whereas "defendants
indicate[d] only one question that is individualized"—knowledge.
Id. at *27. Third, "the proof regarding the individualized issue
would rely as much on information common to all subclass members
(e.g. how widespread was the public dissemination of the
information) as it would on individual information (e.g. to what
sources of information was each subclass member exposed)." Id.
Fourth, "the trial court has broad discretion in determining
whether a class should be certified." Id. (citations omitted);
see also Hamilton v. Accu-tek, 935 F. Supp. 1307, 1331-32
(E.D.N.Y. 1996) ("It is universally recognized that . . . a
district court is afforded broad discretion in determining
whether an action should be certified under Rule 23." (citing
City of New York v. Int'l Pipe & Ceramics Corp., 410 F.2d 295,
298 (2d Cir.1969); In re Joint E. & S. Dist. Asbestos Litig.,
129 B.R. 710, 816 (E.D.N.Y. 1991) vacated, 982 F.2d 721 (2d Cir.
1992) opinion modified on reh'g, 993 F.2d 7 (2d Cir. 1993); In
re Tetracycline Cases, 107 F.R.D. 719, 735 (W.D.Mo.1985) (citing
cases and treatises); 7A C. Wright, A. Miller, & M. Kane,
Federal Practice and Procedure § 1759, at 111 (2d ed. 1986))).

Defendants attempt to distinguish DJ Orthopedics on the grounds that the "knowledge class" in that case was subject to a uniform disclosure, and no uniform disclosure is present here. Defs.' Opp. at 37-8. However, the case's reasoning certified the class despite the individualized knowledge inquiries applicable to the "no-knowledge" subclass—i.e., the class not subject to any formal disclosure, not the "knowledge" subclass subject to uniform disclosure. 2003 U.S. Dist. LEXIS 21534, at *24-5 (finding under the heading "Putative-Knowledge Subclass" that "no individualized determinations [we]re necessary," while granting under the heading "No-Knowledge Subclass" that individualized questions, "likely to be a significant issue" nonetheless did not predominate).

DJ Orthopedics' logic and factual similarity is persuasive in this matter. With respect to the institutional investor class, Defendants' evidence is so widespread it presents yet another common question and answer: whether the information was so diffuse that all institutional investors can be charged with actual knowledge of the truth of the material misstatements and omissions alleged.[9] Indeed, Defendants' have retained an expert

_____

[9] Defendants attempt to rebut this additional common issue by

to testify to widespread diffusion of information.[10] The division

of subclasses therefore reduces the need for individualized

determinations on the issue of knowledge, and in fact adds more

weight to the predominance of common questions and answers,

practically negating the individualized questions raised.

Multiple common questions and answers to the institutional

investor subclass therefore outweigh any individualized

questions. Defendants attempt to place a thumb on the scale

against predominance by arguing at times in terms of shares

(which were often purchased in significant numbers by

institutional investors). See e.g., Defs.' Sur-Reply at 6,

---

protesting that they do not intend to put forth a constructive
knowledge defense. See Defs.' Sur-Reply at 3. Regardless of the
merit of such an argument, whether an inference of actual
knowledge stemming from widespread diffusion of the information
in question can be made is similar to but distinct from a
constructive knowledge defense.
[10] Plaintiffs have moved to strike the report of Dr. Aninyda
Ghose. Pls.' Mot. to Strike, ECF No. 292. The Court has
considered the Ghose Report in determining whether "information
discussing the negative impact of mobile usage on Facebook's
revenue was broadly diffused." Defs.' Opp. to Pls.' Mot. to
Strike the Report of Aninyda Ghose at 5. In light of the
multitudinous examples of information presented by Defendants
showing some aspect of the Herman Calls leaked (to institutions,
investors, and media), this conclusion appears warranted.
Nevertheless, for all the reasons set forth herein, the common
questions, facts, and answers presented predominate over the
individualized questions of knowledge that will be relevant in
resolving Defendants' affirmative defense. The motion to strike
is therefore denied without prejudice, and the issue of whether
the Ghose Report satisfies Daubert is moot. In the event
Defendants offer Ghose or the Ghose Report for other purposes,
Plaintiffs are free to renew their Daubert objection.

Defs.' Ex. at 11.   However, how many individualized knowledge
inquiries are present and whether they predominate is a matter
of investors, not shares. Defendants need not ask a single
investor who purchased 40,000 shares whether she knew about
mobile's negative impact on Facebook's revenue (or anything
else) 40,000 times. Once is enough.[11]

Likewise, whether any investor, institutional or retail,
gained relevant actual knowledge from media reports precluding
their claim presents another common question as to whether the
relevant media reports conveyed all of the truth Plaintiffs
allege was misstated or omitted. See Defs.'s Opp at. 26-28; 46-
49. For every individual question of whether each investor had
actual knowledge stemming from these reports, there are scores
of common facts and questions about the content of each and
every media report.

As to the retail subclass, Defendants have presented much
less evidence of actual knowledge, and each allegation is worth
addressing in turn. First, Defendants allege that retail

---

[11] A maxim as applicable to fact discovery as to life and broken
hearts. See Willie Nelson, Steven Tyler, One Time Too Many, on
The Essential Willie Nelson (Columbia/Legacy 2003); Lyle Lovett,
Once is Enough, on Lyle Lovett and His Large Band (MCA/Curb
Records 1989); Elvis Presley, Once is Enough, on Kissin' Cousins
(RCA Victor 1964).

investors who purchased stock in the IPO through accounts managed by investment advisors can be imputed with the knowledge of institutional advisors. Defs.' Opp at 50. This argument loops back to at least one common question of whether institutional investors can all be charged with actual knowledge. See supra text accompanying n.9-10. Regardless, Plaintiffs have clarified that these individuals who purchased their shares through institutional investors are considered a part of the institutional investor class both by the industry and for purposes of this class action if the investor made the purchase decision.  Pls.' Reply at 33, Tr. 77:4-7 ("The question is what is the status of the person making the investment decision. If that person is an investment advisor, they are under FINRA, a quote-unquote institution. And they are treated that way."). Furthermore, 19 institutions will be excluded from the class (see Exclusions, supra § I), significantly reducing the weight of the issue with regard to the institutional investor subclass.

Next, Defendants allege Ian DelBalso learned at least some of the relevant facts from his father, an employee at Jennison, one of the institutional investors. Defs.' Opp. at 52. This incredibly unique set of facts applies solely to Mr. DelBalso, hardly presenting an issue of predominance or even plausible speculation that the same circumstances of knowledge might apply

on any widespread basis. Regardless, he is excluded from the
retail class as set forth above. Pls.' Reply at 39.

Defendants allege Larry Kim had actual knowledge evidenced
by his blog posts voicing concerns about Facebook's ability to
monetize its mobile platform. Defs.' Opp. at 52. Mr. Kim's
insightful analysis of readily apparent public information
(specifically, that Facebook did not offer mobile ads, and that
mobile use was growing fast) alone hardly suffices to meet the
high bar of the actual knowledge of the specific misstatements
and omissions alleged in this case. Similarly, Defendants allege
Connie Prater, a consumer news writer, had actual knowledge due
to having referred readers to articles about Facebook's
decelerating revenue growth and revised projections, and
testifying that she invested "knowing the risks." Id. at 52-3.
As with Mr. Kim, this evidence does not rise to the level of the
actual knowledge standard.

Regardless, even assuming that Defendants had sufficiently
proven each of these individuals had actual knowledge sufficient
to defeat their particular claims, and even assuming none were
excluded from the retail class as the significant portion of
individuals who invested through institutional investors will
be, this is a relatively miniscule portion of the total proposed

class of retail investors when compared to the whole. Granting

all of the above arguendo, the single individualized issue of

knowledge as to a small handful of retail investors is not

enough to defeat predominance for the retail subclass. Both

qualitatively and quantitatively, the many common questions,

answers, and facts articulated above predominate over the

individualized issue of knowledge.


To defeat predominance, Defendants also rely heavily on In

re IPO I where the Second Circuit found predominance of

individual questions of knowledge defeated common questions in a

10(b) action. 471 F.3d at 27. The Second Circuit subsequently

clarified In re IPO by distinguishing the different

circumstances of Section 11 and 12 claims. In re IPO II, 483

F.3d 70, 73n.1 (2d Cir. 2007); see also Pub. Emps.', 277 F.R.D.

at 117 ("The Second Circuit's clarification is not trivial in

this context, as courts generally focus on the liability issue

in deciding whether the predominance requirement is met, and if

the liability issue is common to the class, common questions are

held to predominate over individual questions." (citing Dura-

Bilt Corp. v. Chase Manhattan Corp., 89 F.R.D. 87, 93

(S.D.N.Y.1981) (internal quotation marks omitted)). Moreover,

courts decline to follow IPO in instances where, as here, the

proposed class does not include investors who are alleged to

have participated in the fraud in question. See In re Moody's Corp. Sec. Litig., 274 F.R.D. 480, 491 (S.D.N.Y. 2011)(declining to follow IPO in 10(b)(5) action where Defendant could not "point to anything that rises to the same level of actual knowledge or, even a reasonable inference of such knowledge, that the market had in *IPO*"); Pub. Emps.', 277 F.R.D. at 117 (declining to follow In re IPO given "[t]here is no allegation in this case that any class member actually participated in the conduct described in the Amended Complaint."); see also In re Lehman Bros. Sec. & ERISA Litig., No. 08 CIV. 5523 LAK, 2013 WL 440622, at *4 (S.D.N.Y. Jan. 23, 2013).

Defendants argue that the same knowledge issues undermine certification because "Plaintiffs have not carried their burden to prove that causation and damages are class-wide issues . . . and that materiality will be a common question." Defs.' Opp. at 54.

Regarding materiality, the law is clear: "Because materiality is judged according to an objective standard, the materiality of [Defendant's] alleged misrepresentations and omissions is a question common to all members of the class. . . . As to materiality, therefore, the class is entirely cohesive: It will prevail or fall in unison. In no event will the

individual circumstances of particular class members bear on the inquiry." Amgen, 133 S. Ct. at 1191. This Court having found materiality on a class-wide basis sufficient to uphold Plaintiffs' claims on the motion to dismiss defeats Defendants' argument. MTD Opinion at 519-522. Nevertheless, to whatever extent Defendants are concerned that "huge swaths of the class had 'additional information'" creating "uncommon materiality issues," it is practically resolved by certification of the subclasses.

With respect to loss causation, this is not an element of any of Plaintiffs claims. See MTD Opinion at 522-3. The causes of the Facebook stock declines are factual questions suitable for resolution on a class-wide basis. Defendants have yet to provide sufficient evidence at this stage to establish negative causation. Whether subsequent resolution will be in favor of Defendants such that investors who made their purchases on certain dates will be precluded from recovery does not constitute an individualized question, nor does it tip the scales of predominance in Defendants' favor.

Tangentially to their loss causation argument, Defendants next submit that the damages inquiries here are individualized, resulting in both predominant uncommon questions, and a mismatch

between damages and Plaintiffs' theory of liability barred by
Comcast v. Behrend. Defs.' Opp. at 54-60; Defs.' Sur-Reply at
34-40; see generally, 133 S. Ct. 1426, 185 L. Ed. 2d 515 (2013).
Defendants allege a mismatch due to incongruity between the
allegations in the Complaint (specifically, that the May 22
Facebook stock price decline was a result of reports of the
underwriters' revisions), and Plaintiffs' post-motion to dismiss
position (that the material misstatement or omission at issue is
that Facebook had determined mobile was reducing revenues and
cut its own revenue projections as a result). Defs.' Opp. at 55-
6 (citing Compl. ¶ 184; Pls.' Mot. at 7, 23, 28). Comcast was
an antitrust case where the regression model used to calculate
damages did not measure damages attributable to the surviving
theory of liability. 133 S. Ct. at 1433 ("There is no question
that the model failed to measure damages resulting from the
particular antitrust injury on which petitioners' liability in
this action is premised."). The case requires that "at the
class-certification stage (as at trial), any model supporting a
plaintiff's damages case must be consistent with its liability
case." Id.

First, "Comcast does not mandate that certification
pursuant to Rule 23(b)(3) requires a finding that damages are
capable of measurement on a classwide basis." Roach v. T.L.

Cannon Corp., 778 F.3d 401, 402 (2d Cir. 2015). The Second
Circuit "did not read Comcast as overruling" the law of this
Circuit holding "the fact that damages may have to be
ascertained on an individual basis is not sufficient to defeat
class certification" under Rule 23(b)(3)." Id. at 405. Second,
Comcast does not bar certification here, where Section 11(e) of
the Securities Act provides a statutory formula for damages.
N.J. Carpenters Health Fund v. Residential Capital, LLC, No. 08
CV 5093 HB, 2013 WL 6839093, at *5 (S.D.N.Y. Dec. 27, 2013)
(rejecting Comcast's application to claims under Sections 11,
12(a)(2), and 15 of the Securities Act where Section 11(e)
provided a damages formula). Defendants attempt to refute this
conclusion by characterizing it as an argument that "Comcast
applies only to anti-trust actions," an easier point to
disprove. Defs.' Sur-Reply at 45. Quite to the contrary, Comcast
applies beyond anti-trust, but it does not bar certification for
the claims Plaintiffs have presented. New Jersey Carpenters,
2013 WL 6839093, at *5 ("While [Comcast's] analysis is not
limited to the anti-trust context, see Wang v. Hearst Corp., 293
F.R.D. 489, 497 (S.D.N.Y. 2013), it is inapposite here, where
damages reflect liability by statutory formula."). Because the
statutory formula applies, the individual damages questions are
sufficiently reduced that predominance of the common questions,
answers, and facts remains. Likewise, the offset of the Nasdaq

44

settlement presents another weighty common question (and perhaps
several) that outweighs the individualized matter of how it will
apply to individual investors, matters that can be
administratively managed as set forth below.

Citing Morrison v. National Australia Bank, 561 U.S. 247
(2010), Defendants posit that the class cannot be certified
because "U.S. securities laws do not apply extraterritorially, .
. . but only where title to the security transfers within the
U.S." Defs. Opp. at 74. Defendants submit their proof of
international investors stems from Plaintiffs' evidence "showing
that over 53 million shares (out of the 421 million IPO size)
were allocated to at least 295 investors identified in myriad
foreign locations." Id. Coupling this fact with the purchase of
many of the shares implicated in this action on a secondary
market, Defendants argue that Plaintiffs are unable to trace a
vast number of shares to domestic transactions, and therefore
fail Morisson. Defs,' Opp. at 74-5.

First, Defendants' argument admittedly goes to 295
investors in a potential class of many thousands.  See id. at
74. For this reason alone, it does not defeat predominance.
Second, the "identified in myriad foreign locations" language is
notably imprecise in light of a doctrine that asks exactly where

irrevocable liability was incurred. That any buyers were "identified" outside the United States is not determinative of where their transactions occurred. "[I]n order to adequately allege the existence of a domestic transaction, it is sufficient for a plaintiff to allege facts leading to the plausible inference that the parties incurred irrevocable liability within the United States." Absolute Activist Value Master Fund Ltd. v. Ficeto, 677 F.3d 60, 68 (2d Cir. 2012). Aftermarket notwithstanding, that Plaintiffs have alleged that any foreign allocants "participated in a strictly U.S. IPO of a U.S. company in order to receive shares registered in the United States with the SEC that would trade exclusively on an American exchange" is sufficient to establish that plausibility. Pls.' Reply at 83 (emphasis omitted). Defendants' other arguments on this issue are not persuasive, and to the extent traceability issues exist to overturn the plausible inference, Defendants are free to present these issues at a later stage.

Finally, Defendant's put forth a Sur-Reply prayer to defer ruling on (or, more precisely, defer granting) class certification pending the Supreme Court's resolution of Tyson Foods, Inc. v. Bouaphakeo. See Defs.' Sur-Reply at 43; see also 2015 WL 1285369 (U.S.). Decision in that case may touch upon the 23(b)(3) predominance inquiry, but it may also rest on solely

independent grounds relating to a 1974 wage-and-hour ruling.[12]
The Court declines to wait and see for a possibly relevant
ruling that may never arrive.


For the reasons set forth above, the individualized
inquiries Defendants present are not more substantial than the
many common questions, answers, and facts subject to generalized
proof, and thus the Plaintiffs have met their burden of 12(b)(3)
predominance. See Moore, 306 F.3d at 1252. Certification does
not bar Defendants from exercising their due process right to
raise individualized knowledge defenses, as they have repeatedly
suggested. See e.g. Tr. 31:16-18, 35:9-13. It is
administratively feasible (and indeed far more feasible than the
prospect of thousands of full-blown individualized trials for
each and every claimant necessarily involving the same facts and
questions) to manage Defendants' actual knowledge questions as
reliance was managed in In re Vivendi. See generally 284 F.R.D.
144 (2012) ("Vivendi II"). Defendants may submit their class
wide actual knowledge defense arguments on a motion for summary
judgment and/or at trial, and individualized actual knowledge

---

[12] In fact, oral argument seems to suggest the opinion in Tyson
Foods will "say[] nothing about Rule 23." See Lyle Denniston,
Argument Analysis: Big test of class action – maybe not so big,
Scotusblog.com (Nov. 10, 2015, 1:48pm),
http://www.scotusblog.com/2015/11/argument-analysis-big-test-of-
class-action-maybe-not-so-big/.

can be adequately managed post-trial through an individualized phase involving separate jury trials if necessary. This is the most efficient way to manage both the predominant common questions and the individualized questions in this case without overwhelming the common adjudication with individualized issues and vice versa. The specific procedures for management through adequate notice and the claim process can be resolved when those matters are properly before the Court.

### b. Superiority

"The superiority requirement asks courts to balance, in terms of fairness and efficiency, the advantages of a class action against those of alternative available methods of adjudication." Vivendi I, 242 F.R.D. at 91; Fed. R. Civ. P. 23(b)(3). The interests of the class members in controlling separate actions, the extent and nature of any litigation already commenced, the desirability of concentrating the litigation in a particular forum, and the difficulties in management are all to be considered in the superiority analysis. See Fed. R. Civ. P. 23(b)(3).

Superiority of managing this litigation as a class action is readily apparent for both subclasses, as it is in most

securities suits. See In re Blech Sec. Litig., 187 F.R.D. 97,

107 (S.D.N.Y. 1999). As has been reiterated in this District:

> Most violations of the federal securities laws ... inflict
> economic injury on large numbers of geographically
> dispersed persons such that the cost of pursuing individual
> litigation to seek recovery is often not feasible. Multiple
> lawsuits would be costly and inefficient, and the exclusion
> of class members who cannot afford separate representation
> would neither be 'fair' nor an adjudication of their
> claims. Moreover, although a large number of individuals
> may have been injured, no one person may have been damaged
> to a degree which would induce him to institute litigation
> solely on his own behalf.

Pub. Emps.', 277 F.R.D. at 120 (quoting In re Merrill Lynch Tyco

Research Sec. Litig., 249 F.R.D. 124, 132 (S.D.N.Y.2008)

(quoting In re Blech Sec. Litig., 187 F.R.D. at 107).


All of the Rule 23(b)(3) factors weigh in favor of

proceeding as a class: there is no weighty interest for each

class member to proceed individually here, and the interests of

any class members in proceeding as separate actions can easily

be met through the opt-out process. Meanwhile, a class action

achieves the benefit of allowing a class of geographically and

economically diverse plaintiffs to adjudicate their claims

expeditiously and efficiently. For the institutional investor

subclass, this allows institutions for whom it may not be a

sound tradeoff of business resources to litigate their claims

individually to nonetheless obtain redress. For the retail

investor subclass, recovery may be obtained for claims

financially significant to an individual or family, but too
minor to justify hiring independent counsel and proceeding
individually.[13] Proceeding as a class also gives these smaller
players leverage in a bargaining dynamic where most of the power
lies in the hands of a large corporation. Pub. Emps.', 277
F.R.D. at 120 (citing Board of Tr. of AFTRA Ret. Fund v.
JPMorgan Chase Bank, N.A., 269 F.R.D. 340, 355 (S.D.N.Y. 2010)).


The desirability of concentrating this litigation in a
particular forum and reduced difficulty of case management by
certification of a class is evidenced by the fact that
consolidation has helped this case proceed smoothly, and for the
administrative reasons outlined above that make adjudication of
a single class action, followed by individualized inquiries if
necessary, the superior method of process. See supra § IV.a).
"[C]oncentrating litigation in a single forum plainly has a
number of benefits, including eliminating the risk of
inconsistent adjudications and promoting the fair and efficient
use of the judicial system, and the Southern District of New

---

[13] Defendants argue that such small claims are not an issue here
because large claims can be shown. Defs.' Opp. at 77. This case
does implicate relatively small claims such as the Meltons'
($13,000) and Sharon Morley's ($14,000). Pls.' Reply at 88.
Moreoever, the "existence of large individual claims that are
sufficient for individual suits is no bar to a class when the
advantages of unitary adjudication exist to determine the
defendant's liability." Pub. Emps.', 277 F.R.D. at 120.

York is well known to have expertise in securities law." <u>Pub.
Emps.'</u>, 277 F.R.D. at 121 (citing <u>In re Marsh & McLennan</u>, 2009
WL 5178546, at *12 (S.D.N.Y. Dec. 23, 2009) (internal quotation
marks omitted)).  Plaintiffs have met their burden to establish
superiority.

### c. Ascertainability

Rule 23 contains an "implied requirement of
ascertainability." <u>Brecher v. Republic of Argentina</u>, No. 14-
4385, 2015 WL 7273415, at *2 (2d Cir. Nov. 18, 2015) (collecting
citations). "[T]he touchstone of ascertainability is whether the
class is "sufficiently definite so that it is administratively
feasible for the court to determine whether a particular
individual is a member." <u>Id.</u> (citations and internal quotation
marks omitted). "A class is ascertainable when defined by
objective criteria that are administratively feasible and when
identifying its members would not require a mini-hearing on the
merits of each case." <u>Id.</u> (quoting <u>Charron v. Pinnacle Grp. N.Y.
LLC</u>, 269 F.R.D. 221, 229 (S.D.N.Y.2010) (citations and internal
quotation marks omitted)). Though objective criteria are
necessary, they are not alone sufficient, and must "establish
the definite boundaries of a readily identifiable class." <u>Id.</u>

"The standard for ascertainability is not demanding. It is designed only to prevent the certification of a class whose membership is truly indeterminable." Stinson v. City of New York, 282 F.R.D. 360, 374 (S.D.N.Y. 2012) (citing Gortat v. Capala Bros., Inc., No. 07-CV-3629(ILG), 2010 WL 1423018, at *2, (E.D.N.Y. Apr. 9, 2010) (internal quotation marks omitted). This standard in mind, Plaintiffs have proposed ascertainable subclasses. Given that the subclasses may be ascertained with reference to investor records, it is administratively feasible to determine whether an investor is a member of the institutional investor subclass, the retail investor subclass, or no subclass at all. See Pls.' Reply at 59. Though documentation may be required, mini-hearings on the merits of each investor's inclusion in the subclasses will not be.

With respect to class allocation, whether an IPO allocant is a member of the retail class or the institutional class is determined first by reference to Facebook's own Final Allocant List, which lists institutional investors. Graziano Decl. 1 Ex. 42. Obvious institutions that received shares from both the institutional and retail allocations appearing on this list (Morgan Stanley Investment Management, William Blai, Levin Capital Strategies) remain part of the institutional subclass. The odd few institutional investors that allegedly received

retail allocations remain part of the institutional subclass
because their identity, not the source of their shares,
controls. Whether an aftermarket purchaser is part of the retail
or institutional class is determined by applying the Financial
Industry Regulatory Authority definitions to the individual who
made the investment decision.  See Tr. 25:10-11. These objective
steps lead to definite boundaries, and thus highly ascertainable
subclasses (not to mention result in intuitive determinations of
which investors belong to which subclass).

Defendants protest that Plaintiffs did not provide a
definition for either "institutional investor" or "retail
investor" in their moving papers, and thus two subclasses cannot
be certified.  Defs.' Opp. at 72-4.  It is disingenuous at best
for Defendants to suggest the subclasses are unascertainable,
and thus that the Court cannot feasibly determine when an
individual falls in one class or the other, while Defendants
distinguish between retail and institutional investors on their
own initiative in the same motion. See e.g., Defs.' Opp at 11
("Defendants have compiled unrebutted evidence showing thousands
of class members, including both institutional and individual
investors..." (emphasis omitted)); 3 ("An analyst at Jennison .
. ., an institutional allocant..."); 49-54 ("Retail Investors

Also Had Actual Knowledge of the Alleged Omission and
Misrepresentation").

Defendants also argue the "damaged thereby" language
requires merits determinations and defeats ascertainability.[14]
Defs.' Opp. at 71-2. Notably, Defendants provide no Second
Circuit authority to support their argument. This language is
standard, and regardless, "[w]hether a potential class member
purchased [Defendant's] shares in the offering and held those
shares until the corrective disclosure can be determined via
objective criteria. Thus, members of the class are
ascertainable." In re Bank of Am. Corp. Sec., Derivative, &
Employee Ret. Income Sec. Act (ERISA) Litig., 281 F.R.D. 134,
140 (S.D.N.Y. 2012)

---

[14] Defendants also re-raise their same knowledge argument, which
the Court finds unpersuasive for all the reasons set forth in
the predominance section. See § IV.a).

## V. Conclusion

For the foregoing reasons and as set forth above, the motions for class certification, appointment as Class Representatives, and appointment of Class Counsel are granted.

In light of the confidentiality stipulation and order entered in this case, the parties are directed to jointly submit a redacted version of this opinion to be filed publicly.

It is so ordered.

New York, NY
December 11, 2015

ROBERT W. SWEET
U.S.D.J.