**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

IN RE FACEBOOK, INC. IPO SECURITIES
AND DERIVATIVE LITIGATION

MDL No. 12-2389 (RWS)

This document relates to the
Consolidated Securities Action:

| | |
|---|---|
| No. 12-cv-4081 | No. 12-cv-4763 |
| No. 12-cv-4099 | No. 12-cv-4777 |
| No. 12-cv-4131 | No. 12-cv-5511 |
| No. 12-cv-4150 | No. 12-cv-7542 |
| No. 12-cv-4157 | No. 12-cv-7543 |
| No. 12-cv-4184 | No. 12-cv-7544 |
| No. 12-cv-4194 | No. 12-cv-7545 |
| No. 12-cv-4215 | No. 12-cv-7546 |
| No. 12-cv-4252 | No. 12-cv-7547 |
| No. 12-cv-4291 | No. 12-cv-7548 |
| No. 12-cv-4312 | No. 12-cv-7550 |
| No. 12-cv-4332 | No. 12-cv-7551 |
| No. 12-cv-4360 | No. 12-cv-7552 |
| No. 12-cv-4362 | No. 12-cv-7586 |
| No. 12-cv-4551 | No. 12-cv-7587 |
| No. 12-cv-4648 | |

---

### MEMORANDUM OF LAW IN SUPPORT OF
### LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES
### AND PAYMENT OF LITIGATION EXPENSES

**LABATON SUCHAROW LLP**
Thomas A. Dubbs
James W. Johnson
Thomas G. Hoffman, Jr.
140 Broadway
New York, New York 10005
Tel: (212) 907-0700
Fax: (212) 818-0477

**BERNSTEIN LITOWITZ BERGER**
**& GROSSMANN LLP**
Salvatore J. Graziano
John J. Rizio-Hamilton
1251 Avenue of the Americas
New York, New York 10020
Tel: (212) 554-1400
Fax: (212) 554-1444

*Lead Counsel for Lead Plaintiffs and the Class*

Dated:  August 1, 2018

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...................................................................................................1

ARGUMENT .............................................................................................................................3

I.      A REASONABLE PERCENTAGE-OF-THE-FUND RECOVERED IS THE
        APPROPRIATE METHOD FOR AWARDING ATTORNEYS' FEES IN
        COMMON FUND CASES .......................................................................................3

II.     A FEE OF 25% IS FAIR, REASONABLE AND CONSISTENT WITH FEES
        AWARDED IN SIMILAR CASES ...........................................................................4

III.    OTHER FACTORS CONSIDERED WITHIN THE SECOND CIRCUIT
        CONFIRM THAT THE REQUESTED FEE IS REASONABLE .......................................6

        A.      The Time and Labor Expended by Counsel ...........................................7

        B.      The Risks of the Litigation .................................................................9

                1.      Risks Concerning Liability ......................................................9

                2.      Risks Concerning Negative Causation and Damages ..............................13

                3.      The Contingent Nature of Lead Counsel's Representation .......................14

        C.      The Magnitude and Complexity of the Litigation ..................................15

        D.      The Quality of Representation ..........................................................16

        E.      Public Policy Considerations ............................................................17

        F.      The Requested Attorneys' Fees in Relation to the Settlement ..............................18

        G.      The Requested Attorneys' Fees Are Also Reasonable Under the Lodestar
                Cross-Check.............................................................................18

        H.      The Class's Reaction to the Fee and Expense Request...........................................20

IV.     THE FEE WAS NEGOTIATED WITH LEAD PLAINTIFFS ........................................21

V.      PLAINTIFFS' COUNSEL'S EXPENSES WERE REASONABLY INCURRED
        AND NECESSARY TO THE PROSECUTION OF THIS ACTION ..............................21

VI.     CLASS REPRESENTATIVES SHOULD BE REIMBURSED PURSUANT TO
        THE PSLRA FOR THEIR REASONABLE EXPENSES .................................................23

CONCLUSION..............................................................................................................25

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Am. Bank Note Holographics, Inc. Sec. Litig,*
    127 F. Supp. 2d 418 (S.D.N.Y. 2001)....................................................................14

*In re Am. Int'l Grp., Inc. Sec. Litig.,*
    No. 04 Civ. 8141 (DAB), 2010 WL 5060697 (S.D.N.Y. Dec. 2, 2010) ...............................25

*Anixter v. Home-Stake Prod. Co.,*
    77 F.3d 1215 (10th Cir. 1996) ...........................................................................15

*In re Apple Comput. Sec. Litig.,*
    No. C-84-20148, 1991 WL 238298 (N.D. Cal. Sept. 6, 1991)...............................15

*Arbuthnot v. Pierson,*
    607 F. App'x. 73 (2d Cir. 2015) ..........................................................................3

*Basic Inc. v. Levinson,*
    485 U.S. 224 (1988)............................................................................................17

*Bateman Eichler, Hill Richards, Inc. v. Berner,*
    472 U.S. 299 (1985)............................................................................................17

*In re Bear Stearns Cos. Sec. Derivative & ERISA Litig.,*
    909 F. Supp. 2d 259 (S.D.N.Y. 2012).................................................................20

*Bentley v. Legent Corp.,*
    849 F. Supp. 429 (E.D. Va. 1994), *aff'd, Herman v. Legent Corp.,* 50 F.3d 6
    (4th Cir. 1995)....................................................................................................15

*In re Blech Sec. Litig.,*
    No. 94 Civ. 7696, 2002 WL 31720381 (S.D.N.Y. Dec. 4, 2002).........................4, 5

*Boeing Co. v. Van Gemert,*
    444 U.S. 472 (1980)............................................................................................3

*Central States and Southwest Areas Health and Welfare Fund v. Merck-Medco
    Managed Care, L.L.C.,*
    504 F. 3d 229 (2d Cir. 2007)..............................................................................5

*City of Austin Police Ret. Sys. v. Kinross Gold Corp.,*
    No. 12-cv-01203-VEC, 2015 U.S. Dist. LEXIS 181932 (S.D.N.Y. Oct. 15,
    2015) ..................................................................................................................6

*City of Providence v. Aeropostale, Inc.*,
No. 11-cv-7132 (CM), 2014 WL 1883494 (S.D.N.Y. May 9, 2014), *aff'd*,
*Arbuthnot v. Pierson,* 607 F. App'x. 73 (2d Cir. 2015) ............................................................3

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
MDL No. 12-2389, 2015 WL 6971424 (S.D.N.Y. Nov. 9, 2015) ......................................5, 22

*In re Flag Telecom Holdings Ltd. Sec. Litig.*,
No. 02-cv-3400, 2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010) ...................................16, 17, 19

*Fogarazzo v. Lehman Bros. Inc.*,
No. 03-5194, 2011 WL 671745 (S.D.N.Y. Feb. 23, 2011) ....................................................15

*Goldberger v. Integrated Res., Inc.*,
209 F.3d 43 (2d Cir. 2000) .......................................................................................... *passim*

*Hicks v. Morgan Stanley*,
01-CIV-10071, 2005 WL 2757792 (S.D.N.Y. Oct. 24, 2005) ...............................................24

*Herman v. Legent Corp.*,
50 F.3d 6 (4th Cir. 1995) ......................................................................................................15

*In re IMAX Sec. Litig.*,
No. 06 Civ. 6128 (NRB), 2012 WL 3133476 (S.D.N.Y. Aug. 1, 2012) ..................................4

*In re JDS Uniphase Corp. Sec. Litig.*,
No. CO2-1486 CW, 2007 WL 4788556 (N.D. Cal. Nov. 27, 2007) ......................................15

*Landy v. Amsterdam*,
815 F.2d 925 (3d Cir. 1987) ................................................................................................15

*Maley* v. *Del. Global Techs. Corp.*
186 F. Supp. 2d 358 (S.D.N.Y. 2002) ..................................................................................18

*In re Marsh & McLennan, Co. Sec. Litig.*
No. 04-8144, 2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009) ................................18, 20, 21, 25

*In re Marsh ERISA Litig.*,
265 F.R.D. 128 (S.D.N.Y. 2010) ............................................................................................6

*McDaniel v. County of Schenectady*,
595 F.3d 411 (2d Cir. 2010) ...................................................................................................9

*In re Med. X-Ray Film Antitrust Litig.*,
No. 93-5904, 1998 WL 661515 (E.D.N.Y. Aug. 7, 1998) .....................................................18

*In re Merrill Lynch & Co. Inc., Research Reports Sec. Litig.*,
No. 02 MDL 1484, 2007 WL 313474 (S.D.N.Y. Feb. 1, 2007) .............................................15

*Missouri v. Jenkins*,
    491 U.S. 274 (1989) ........................................................................................ 19

*Mohney v. Shelly's Prime Steak, Stone Crab & Oyster Bar*,
    No. 06 Civ. 4270 (PAC), 2009 WL 5851465 (S.D.N.Y. Mar. 31, 2009) .................................. 5

*In re NASDAQ, Mkt-Makers Antitrust Litig.*
    187 F.R.D. 465 (S.D.N.Y. 1998) ........................................................................ 16

*Robbins v. Koger Props., Inc.*,
    116 F.3d 1441 (11th Cir. 1997) ........................................................................ 15

*In re Sadia S.A. Sec. Litig.*,
    No. 08 Civ. 9528 (SAS), 2011 WL 6825235 (S.D.N.Y. Dec. 28, 2011) .................................. 6

*Savoie v. Merchs. Bank*,
    166 F.3d 456 (2d Cir. 1999) ............................................................................. 4

*Shapiro v. J.P. Morgan Chase & Co.*
    No. 11-8331, 2014 WL 1224666 (S.D.N.Y. Mar. 24, 2014) .......................................... 17

*Stefaniak v. HSBC Bank USA, N.A.*,
    No. 05-cv-720, 2008 WL 7630102 (W.D.N.Y. June 28, 2008) ......................................... 5

*Teachers' Ret. Sys. of La. v. A.C.L.N., Ltd.*,
    No. 01-CV-11814 (MP), 2004 WL 1087261 (S.D.N.Y. May 14, 2004) .................................. 9

*In re Telik, Inc. Sec. Litig.*
    576 F. Supp. 2d 570 (S.D.N.Y. 2008) ................................................................... 9

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ...................................................................................... 17

*Varljen v. H.J. Meyers & Co.*,
    No. 97 CIV 6742 (DLC), 2000 WL 1683656 (S.D.N.Y. Nov. 8, 2000) ................................ 24

*In re Veeco Instruments Inc. Sec. Litig*,
    No. 05-1695, 2007 WL 4115808 (S.D.N.Y. Nov. 7, 2007) ............................................ 18

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
    396 F.3d 96 (2d Cir. 2005) ........................................................................ 4, 20

*In re WorldCom, Inc. Sec. Litig.*,
    388 F. Supp. 2d 319 (S.D.N.Y. 2005) ............................................................ 17, 21

**Docketed Cases**

*In re Celestica Inc. Sec. Litig.*,
No. 07-cv-00312-GBD, slip op. (S.D.N.Y. July 28, 2015) ................................6

*Central Laborers' Pension Fund v. Sirva*,
No. 04 C-7644, slip op. (N.D. Ill. Oct. 31, 2007) ....................................6

*In re Lebranche Sec. Litig.*,
No. 03-CV-8201, slip op. (S.D.N.Y. Jan. 22, 2009) ................................5

*In re McLeodUSA Inc. Sec. Litig.*,
No. C02-0001-MWB, slip op. (N.D. Iowa Jan. 5, 2007) ......................6

*In re NYSE Specialists Sec. Litig.*,
No. 03-cv-8264, slip op. (S.D.N.Y. June 10, 2013) ................................5

*In re OSG Sec. Litig.*,
No. 12-cv-07948-SAS, slip op. (S.D.N.Y. Dec. 2, 2015) ......................6

*In re Regions Morgan Keegan Closed-End Fund Litig.*,
No. 07-cv-02830-SHM-dkv, slip op. (W.D. Tenn. Aug. 5, 2013) ...........6

*In re Salomon Analyst Metromedia Litig.*,
No 02-7966, slip op. (S.D.N.Y. Feb. 27, 2009) ....................................6

*In re Satyam Comput. Servs. Ltd. Sec. Litig.*,
No. 09-MD-2027-BSJ, slip op. (S.D.N.Y. Sept. 13, 2011) ..................24

*South Ferry LP #2 v. Killinger*,
No. C04-1599-JCC, slip op. (W.D. Wash. June 5, 2012) ......................6

*In re Winstar Commc'ns Sec. Litig.*,
No. 01 Civ 3014 (GBD), slip op. (S.D.N.Y. Nov. 13, 2013) ................24

**Statutes**

15 U.S.C. § 77z-1(a)(4) .........................................................................23

**Rules**

Fed. R. Civ. P. 23(f) ..............................................................................8

Fed. R. Civ. P. 23(h) ..............................................................................1

Fed. R. Civ. P. 54(d)(2) ..........................................................................1

Court-appointed Lead Counsel, Bernstein Litowitz Berger & Grossmann LLP ("BLBG") and Labaton Sucharow LLP ("Labaton Sucharow") (together, "Lead Counsel")[1] in this securities class action, respectfully submit this memorandum of law in support of their motion, on behalf of all Plaintiffs' Counsel[2] that contributed to the prosecution of the Action, pursuant to Rules 23(h) and 54(d)(2) of the Federal Rules of Civil Procedure, for: (i) an award of attorneys' fees in the amount of 25% of the Settlement Fund; (ii) payment of $4,962,978.46 in litigation expenses incurred in prosecuting the Action; and (iii) payment of $56,792.53 in costs and expenses incurred by the Class Representatives directly related to their representation of the Class, as authorized by the Private Securities Litigation Reform Act of 1995 (the "PSLRA").

## PRELIMINARY STATEMENT

After more than five years of hard-fought litigation, involving the completion of fact and expert discovery (including conducting more than 40 fact and expert depositions), certification of a litigation class, appellate practice, opposing Defendants' four motions for summary judgment, and trial preparation through just eight weeks before trial, Lead Counsel have negotiated a favorable settlement of this class action with Defendants Facebook, Inc. ("Facebook" or the

---

[1] All capitalized terms not defined herein have the meanings provided in the Stipulation and Agreement of Settlement, dated February 26, 2018 (the "Stipulation") (ECF No. 571-1) or in the Joint Declaration of John Rizio-Hamilton and James W. Johnson in Support of: (I) Lead Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation, and (II) Lead Counsel's Motion for an Award of Attorneys' Fees and Payment of Litigation Expenses (the "Joint Declaration" or "Joint Decl."), filed herewith. Citations to "¶" in this memorandum refer to paragraphs in the Joint Declaration, and all exhibits cited herein are attached to the Joint Declaration.

[2] Lead Counsel are applying for an award of attorneys' fees and expenses for all Plaintiffs' Counsel, including other firms that performed work in this Action at the direction and under the supervision of Lead Counsel, specifically Lieff Cabraser Heimann & Bernstein, LLP, Hach Rose Schirripa & Cheverie, LLP, Baron & Budd, P.C., Motley Rice LLC, and Kessler Topaz Meltzer & Check LLP.  These firms represented Court-appointed Class Representatives in the Action and/or performed work under the direction of Lead Counsel that assisted in the prosecution of this Action.

"Company"); Mark Zuckerberg, Sheryl K. Sandberg, David A. Ebersman, David M. Spillane, Marc L. Andreessen, Erskine B. Bowles, James W. Breyer, Donald E. Graham, Reed Hastings, and Peter A. Thiel (collectively, the "Individual Defendants"); and the Underwriter Defendants (which, collectively with Facebook and the Individual Defendants, are hereafter the "Defendants") in the amount of $35,000,000, which will be distributed to eligible Class Members if approved by the Court.

For their substantial efforts in achieving this result, Lead Counsel seek, on behalf of all Plaintiffs' Counsel, a fee of 25% of the Settlement Fund (*i.e.*, 25% of the Settlement Amount, plus interest thereon at the same rate earned by the Settlement Fund). Lead Counsel also seek payment of $4,962,978.46 in litigation expenses incurred by Plaintiffs' Counsel in prosecuting the Action and $56,792.53 to reimburse Class Representatives Fresno, Arkansas Teacher, Mr. and Mrs. Galvan, Ms. Morley, Mr. Rand, and Mr. and Mrs. Melton for the time they dedicated to representing the Class in the litigation.

As set forth in detail in the accompanying Joint Declaration,[3] the recovery obtained for the Class was achieved despite very significant risks of no recovery and through the skill, experience, and effective advocacy of Lead Counsel. Lead Counsel's efforts to date have been without compensation of any kind and the fee has been wholly contingent upon the result achieved. It is respectfully submitted that the attorneys' fee request is fair and reasonable when one considers, among other things: (i) the very significant amount of work conducted on behalf of the Class and the wide-ranging litigation efforts; (ii) the unique risks and challenges faced by counsel during the litigation; (iii) that Lead Plaintiffs, sophisticated institutional investors, have endorsed the fee

---

[3] The Joint Declaration describes the history of the litigation and the claims asserted, the extensive litigation efforts undertaken, and the risks of the litigation, among other things, which for the sake of brevity are only summarized herein.

request; and (iv) the amount of fees awarded by courts within the Second Circuit and this District in comparable cases.

For the reasons set forth herein and in the Joint Declaration, Lead Counsel respectfully submit that the attorneys' fees requested are fair and reasonable under the particular circumstances now before this Court and that the requested litigation and Class Representatives' expenses are reasonable in amount and were necessarily incurred for the successful prosecution of the Action.

## ARGUMENT

### I.     A REASONABLE PERCENTAGE-OF-THE-FUND RECOVERED IS THE APPROPRIATE METHOD FOR AWARDING ATTORNEYS' FEES IN COMMON FUND CASES

As the Court is aware, attorneys who achieve a benefit for class members in the form of a "common fund" are entitled to be compensated for their services from that settlement fund.  *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) ("a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole"); *see also Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 47 (2d Cir. 2000). The purpose of the common fund doctrine is to fairly and adequately compensate counsel for services rendered and to ensure that all class members contribute equally towards the costs associated with litigation on their behalf. *See Goldberger*, 209 F.3d at 47.

Courts have recognized that, in addition to providing just compensation, "awards of fair attorneys' fees from a common fund should also serve to encourage skilled counsel to represent those who seek redress for damages inflicted on entire classes of persons, and to discourage future alleged misconduct of a similar nature." *City of Providence v. Aeropostale, Inc.*, No. 11-cv-7132 (CM), 2014 WL 1883494, at *11 (S.D.N.Y. May 9, 2014), *aff'd*, *Arbuthnot v. Pierson,* 607 F. App'x. 73 (2d Cir. 2015).

The Second Circuit has authorized district courts to employ the percentage-of-the-fund method when awarding fees in common fund cases. *See Goldberger,* 209 F.3d at 47 (holding that the percentage-of-the-fund method may be used to determine appropriate attorneys' fees, although the lodestar method may also be used). In expressly approving the percentage method, the Second Circuit recognized that "the lodestar method proved vexing" and resulted in "an inevitable waste of judicial resources." *Goldberger,* 209 F.3d at 48, 49; *Savoie v. Merchs. Bank,* 166 F.3d 456, 460 (2d Cir. 1999) (stating that "the percentage-of-the-fund method has been deemed a solution to certain problems that may arise when the lodestar method is used in common fund cases").

Indeed, "[t]he trend in this Circuit is toward the percentage method, which directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96, 121 (2d Cir. 2005);[4] *see also In re Blech Sec. Litig.*, No. 94 Civ. 7696, 2002 WL 31720381, at *1 (S.D.N.Y. Dec. 4, 2002) (Sweet, J.) ("This court … continues to find that the percentage of the fund method is more appropriate than the lodestar method for determining attorney's fees in common fund cases."); *In re IMAX Sec. Litig.,* No. 06 Civ. 6128 (NRB), 2012 WL 3133476, at *5 (S.D.N.Y. Aug. 1, 2012) ("'the percentage method continues to be the trend of district courts in the [Second] Circuit'").

In sum, the weight of authority suggests that the Court should use the percentage-of-recovery method in determining a reasonable attorneys' fee here.

## II.   A FEE OF 25% IS FAIR, REASONABLE AND CONSISTENT WITH FEES AWARDED IN SIMILAR CASES

This Court, like many others within the Southern District, has previously awarded fees of 25% or more in complex securities class actions. The Court awarded a 33% fee in a related class

---

[4] All internal quotations and citations are omitted unless otherwise noted.

action that was consolidated with this Action, which settled at an earlier procedural stage. *See In re Facebook, Inc. IPO Sec. & Derivative Litig.*, MDL No. 12-2389, 2015 WL 6971424 (S.D.N.Y. Nov. 9, 2015) (awarding 33% of $26.5 million settlement). *See also, e.g.*, *In re NYSE Specialists Sec. Litig.*, No. 03-cv-8264, slip op. at ¶19 (S.D.N.Y. June 10, 2013) (Sweet, J.) (awarding approximately 41% of $18.5 million settlement) (Ex. 5),[5] *In re Lebranche Sec. Litig.,* No. 03-CV-8201, slip op. at 1 (S.D.N.Y. Jan. 22, 2009) (Sweet, J.) (awarding 30% of $13 million settlement) (Ex. 5); *In re Blech Sec. Litig.,* No. 94 Civ. 7696, 2002 WL 31720381, at *1 (S.D.N.Y. Dec. 4, 2002) (Sweet, J.) (awarding 33-1/3% of $15 million settlement).

On a percentage basis, a 25% award is actually less than many fee awards in settlements with recoveries similar to the $35 million Settlement Amount here. For instance, in *Central States and Southwest Areas Health and Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F. 3d 229, 249 (2d Cir. 2007), the Second Circuit affirmed the district court's award of a 30% fee based on a $42.5 million settlement, noting that the "District Court applied the *Goldberger* test and made specific and detailed findings from the record, as well as from its own familiarity with the case, including the fact that counsel expended substantial time and effort in the litigation, that the case was litigated on a purely contingent basis." *See also Mohney v. Shelly's Prime Steak, Stone Crab & Oyster Bar*, No. 06 Civ. 4270 (PAC), 2009 WL 5851465, at *5 (S.D.N.Y. Mar. 31, 2009) (collecting cases awarding over 30% and noting that "Class Counsel's request for 33% of the Settlement Fund is typical in class action settlements in the Second Circuit"); *Stefaniak v. HSBC Bank USA, N.A.*, No. 05-cv-720, 2008 WL 7630102, at *3 (W.D.N.Y. June 28, 2008) (awarding 33% of fund, finding it "typical in class action settlements in the Second Circuit"). A survey of

---

[5] All unreported slip opinions are submitted herewith in a compendium of cases, which is Exhibit 5 to the Joint Del.

other cases within the Southern District finds similar results. *See. e.g., In re Salomon Analyst Metromedia Litig*., No 02-7966, slip op. at 1 (S.D.N.Y. Feb. 27, 2009) (27% fee of $35 million settlement) (Ex. 5); *In re Marsh ERISA Litig*., 265 F.R.D. 128, 149 (S.D.N.Y. 2010) (awarding 33.3% of $35 million ERISA class action settlement); *City of Austin Police Ret. Sys. v. Kinross Gold Corp*., No. 12-cv-01203-VEC, 2015 U.S. Dist. LEXIS 181932 (S.D.N.Y. Oct. 15, 2015) (awarding 30% of $33 million settlement); *In re Celestica Inc. Sec. Litig*., No. 07-cv-00312-GBD, slip op. at 2 (S.D.N.Y. July 28, 2015) (awarding 30% fee of $30 million settlement) (Ex. 5); *In re OSG Sec. Litig.,* No. 12-cv-07948-SAS, slip op. at 1 (S.D.N.Y. Dec. 2, 2015)(awarding 30% of $31.6 million) (Ex. 5); *In re Sadia S.A. Sec. Litig*., No. 08 Civ. 9528 (SAS), 2011 WL 6825235, at *3 (S.D.N.Y. Dec. 28, 2011) (awarding 30% of $27 million settlement).

An examination of fee decisions in securities class actions with similarly sized or larger settlements in other federal jurisdictions also shows that an award of 25% would be comparable. *See, e.g., In re Regions Morgan Keegan Closed-End Fund Litig.,* No. 07-cv-02830-SHM-dkv, slip op. at 21 (W.D. Tenn. Aug. 5, 2013) (awarding 30% of $62 million settlement) (Ex. 5); *South Ferry LP #2 v. Killinger*, No. C04-1599-JCC, slip op. at 9 (W.D. Wash. June 5, 2012) (awarding 29% of $41.5 million settlement) (Ex. 5); *Central Laborers' Pension Fund v. Sirva*, No. 04 C-7644, slip op. at 10 (N.D. Ill. Oct. 31, 2007) (awarding 29.85% of $53.3 million settlement) (Ex. 5); *In re McLeodUSA Inc. Sec. Litig*., No. C02-0001-MWB, slip op. at 5 (N.D. Iowa Jan. 5, 2007) (awarding 30% of $30 million settlement) (Ex. 5). Accordingly, the 25% fee requested here is consistent with fees awarded in similar cases and is reasonable.

## III.   OTHER FACTORS CONSIDERED WITHIN THE SECOND CIRCUIT CONFIRM THAT THE REQUESTED FEE IS REASONABLE

The Second Circuit in *Goldberger* has explained that, whether a court uses the percentage method or the lodestar approach, it should continue to consider the traditional criteria that reflect

a reasonable fee in common fund cases, including: (i) the time and labor expended by counsel; (ii) the risks of the litigation; (iii) the magnitude and complexity of the litigation; (iv) the requested fee in relation to the settlement; (v) the quality of representation; and (vi) public policy considerations. *Goldberger*, 209 F.3d at 50. An analysis of these factors demonstrates that the requested fee is fair and reasonable under the circumstances before this Court.

### A.   The Time and Labor Expended by Counsel

Plaintiffs' Counsel have expended a very significant amount of time and effort pursuing the claims on behalf of the Class. *See generally* Joint Decl. and Exhibit 3 (Summary Chart of Plaintiffs' Counsel's Lodestar & Expenses); Exhibits 3A – 3G. Since the inception of the Action more than five years ago, Plaintiffs' Counsel have devoted more than 94,317 hours to this Action with a total lodestar value of $50,042,638.00. Joint Decl. ¶¶ 159-160; Exhibits 3 – 3G. The overwhelming majority of the total lodestar (95%) was incurred by Lead Counsel. *Id.*

The Settlement follows more than five years of litigation that included, *inter alia*:

- Preparation of a detailed consolidated complaint after an extensive pre-filing investigation that included, *inter alia,* review and analysis of: (i) documents filed publicly by Facebook with the U.S. Securities and Exchange Commission ("SEC"); (ii) press releases, media reports, and other public statements issued by or concerning Defendants; (iii) economic analyses of securities movement and pricing data; (iv) publicly available filings in a legal action brought by the Massachusetts Securities Division against Defendant Morgan Stanley concerning the Facebook IPO; and (v) research reports issued by financial analysts concerning Facebook. (Joint Decl. ¶¶ 22-26);

- Responding to and surviving a complex and voluminous motion to dismiss the Complaint, including opposing a motion for an interlocutory appeal (*id.* ¶¶ 29-34);

- Completing class-certification discovery and securing class certification, including successfully opposing a petition under Federal Rule of Civil Procedure 23(f) seeking interlocutory review (*id.* ¶¶ 36-55);

- Successfully defeating Defendants' attempt to have any litigated judgment obtained in this Action reduced by the amount that the NASDAQ defendants paid to settle the related NASDAQ Action, regardless of whether they were

found to relate to "common damages," through arguments before this Court and by successfully opposing Defendants' appeal on that issue in the Second Circuit (*id.* ¶¶ 70-75);

- Completing fact discovery that involved, *inter alia*: (i) propounding and responding to numerous discovery requests; (ii) litigating significant discovery disputes to ensure the production of all relevant material; (iii) the review of more than 1.5 million pages of documents produced by Defendants and third parties; (iv) taking, defending, or participating in 40 depositions of fact witnesses (*id.* ¶¶ 62-69);

- Completing expert discovery that involved, *inter alia*:  working extensively with experts in the areas of social media industry, securities-industry practices, investors' absorption of information, underwriting and due diligence, and negative causation and damages throughout the litigation; producing opening and rebuttal expert reports; taking and defending 12 expert depositions; and fully briefing and arguing Lead Plaintiffs' motion to exclude Defendants' experts' testimony and Lead Plaintiffs' opposition to Defendants' six motions to exclude Plaintiffs' experts' testimony (*id.* ¶¶ 66, 86-102);

- Fully briefing and arguing Lead Plaintiffs' opposition to Defendants' four motions for summary judgment (*id.* ¶¶ 76-85);

- Conducting detailed mock jury exercises with the assistance of a jury consultant to analyze the reaction of potential jurors to evidence gathered through discovery and possible lines of argument at trial, in which Lead Counsel prepared and delivered opening and closing statements and detailed evidentiary presentations before two panels of more than 40 jurors (*id.* ¶ 104);

- Extensively preparing for trial, which was scheduled to begin only eight weeks after the Parties reached an agreement in principle to settle the Action, including briefing and arguing Lead Plaintiffs' motion to bifurcate the trial (*id.* ¶¶ 105-110); and

- Preparing detailed mediation material in advance of two mediation sessions, mediating the dispute with Defendants in multiple in-person mediation sessions, and ultimately negotiating the terms of the Settlement (*id.* ¶¶ 111-112).

In addition, the legal work in the Action will not end with the Court's approval of the proposed Settlement. Additional hours and resources necessarily will be expended assisting members of the Class with their Proof of Claim and Release forms, shepherding the claims process, responding to Class Member inquiries, and moving for a distribution order. The time and effort

devoted to this case by Plaintiffs' Counsel to obtain this $35 million Settlement confirm that the 25% fee request is reasonable.

    **B.**    <u>**The Risks of the Litigation**</u>

"Little about litigation is risk-free, and class actions confront even more substantial risks than other forms of litigation." *Teachers' Ret. Sys. of La. v. A.C.L.N., Ltd.*, No. 01-CV-11814 (MP), 2004 WL 1087261, at \*3 (S.D.N.Y. May 14, 2004). "Courts have repeatedly recognized that 'the risk of litigation' is a pivotal factor in assessing the appropriate attorneys' fees to award plaintiffs' counsel in class actions." *In re Telik*, *Inc. Sec. Litig.* 576 F. Supp. 2d 570, 592 (S.D.N.Y. 2008). For this reason, the Second Circuit has said that "[t]he level of risk associated with litigation . . . is 'perhaps the foremost factor' to be considered in assessing the propriety of the multiplier." *McDaniel v. County of Schenectady*, 595 F.3d 411, 424 (2d Cir. 2010) (quoting *Goldberger*, 209 F.3d at 54).

While Lead Plaintiffs remain confident in their ability to prove their claims and to effectively rebut Defendants' defenses, they recognize that proving liability and recovering their damages was far from certain. Lead Counsel was required to overcome numerous challenges in order to reach the point where the Class could recover. The primary risks are discussed below. For a more detailed discussion, the Court is respectfully referred to the Joint Declaration, at paragraphs 116 through 137, and the Memorandum of Law in Support of Lead Plaintiffs' Motion for Final Approval of Settlement and Approval of Plan of Allocation ("Settlement Memorandum"), at Sections I.B.4 & I.B.4.

    **1.**    **Risks Concerning Liability**

As set forth in the Joint Declaration and discussed more generally below, Defendants strongly disputed the existence of falsity and materiality, and presented arguments and defenses,

including a negative-causation defense, which required considerable legal skill to rebut. *See generally* Joint Decl. ¶¶ 117-129.

Absent the Settlement, there was a significant risk both that the Court might have granted Defendants' motions for summary judgment in part or in whole on any of several grounds or that, even if the summary judgment motions were denied, a jury would have found that Lead Plaintiffs had not proven liability. In particular, the Court or a jury might have accepted Defendants' principle argument that the Offering Documents did not misrepresent or omit any material facts about the impact of increasing mobile usage on Facebook's revenue because: (1) the statements in the Offering Documents were highly qualified and soft; (2) the Offering Documents contained copious warnings about the impact of mobile usage; and (3) the evidence showed that there was no present certainty that increasing mobile usage had already harmed Facebook's revenues before the IPO. Indeed, as the Court is aware, Defendants argued vociferously at summary judgment that the evidence showed that mobile revenues increased just before the IPO, and that Facebook ultimately met its original, higher revenue projections for the second quarter and full year 2012. The Court or a jury might also have accepted Defendants' argument that the Offering Documents' statement that increasing mobile usage would negatively affect Facebook's revenue if the Company did not successfully implement monetization strategies for mobile users was a correct statement of opinion.

There was also an extremely serious risk that the Court or a jury might have found that the evidence proved Defendants' actual-knowledge defense on the grounds that all institutional investors were in fact told about the Underwriter Defendants' analysts' revenue-model revisions revealing the impact of mobile, and that pre-IPO news reports disclosed Facebook's revenue cuts to retail investors. As the Court is aware, Defendants presented extensive evidence in support of

10

these arguments, including submitting numerous declarations from institutional investors acknowledging that they were aware that Facebook had reduced its revenue guidance before the IPO. For example, Defendants developed evidence that Jennison Associates LLC, an institutional investor, was told before the IPO that Facebook had cut its revenue guidance, and that Jennison considered this information to be common knowledge among investors prior to the IPO.

The Court or a jury might also have credited the Underwriter Defendants' due-diligence defense on the grounds that the lead Underwriters had extensive knowledge of Facebook before they began to work on the IPO; that they retained experienced counsel, who performed thorough legal due diligence; that they conducted extensive business and financial due diligence, including with respect to the impact of increasing mobile usage on Facebook's revenues, in accordance with industry standards and their own policies; and that they confirmed that the Offering Documents' representations were consistent with the information they learned from their due diligence.

The Court also might have granted Defendants' *Daubert* motions in whole or in part, and the Court might have denied Lead Plaintiffs' *Daubert* motions in part or in whole. Such rulings would have dramatically increased the risk of an ultimate liability decision against Lead Plaintiffs at summary judgment or trial, since the challenged expert opinions were at the core of Lead Plaintiffs' affirmative proof of liability and rebuttal to Defendants' defenses.

There were also significant trial-related challenges that Lead Counsel faced in proving the claims. For example, there was a risk that the Court would deny Lead Plaintiffs' motion to bifurcate the trial. Trying both common questions affecting the entire Class and individual questions affecting particular Plaintiffs and other Class members in a single trial would have significantly increased the risk of a jury verdict for Defendants, because it would have allowed Defendants to present extensive evidence that many institutional investors or their investment advisers knew

11

about the Underwriter Defendants' analysts' reduced revenue models before the IPO and still considered Facebook stock a good investment at the IPO price.

More fundamentally, Lead Plaintiffs had the burden of explaining complex and novel claims to a jury.  Lead Counsel faced myriad challenges in clearly persuading a jury with respect to each element of Lead Plaintiffs' claims.  For instance, Lead Plaintiffs would have faced a substantial challenge in trying to convince jurors that it was materially misleading for Facebook to disclose in the Offering Documents that increasing mobile usage "may negatively affect our revenue and financial results," rather than that increasing mobile usage "has had" such an impact—a subtle distinction.

Moreover, most or all of the jurors would have been personally familiar with Facebook's services, and many of them likely would have been familiar with the public reputations of Defendants Zuckerberg, a famous self-made billionaire, and Sandberg, a best-selling author and prominent advocate for women in business. In addition, most or all of the jurors would have been at least generally aware that Facebook successfully developed mobile-advertising services after its IPO, and that Facebook has generated enormous mobile-advertising revenues in subsequent years, leading to its stock price achieving record highs in early 2018, when the trial would have occurred.

Finally, it was likely that Defendants would not abandon their challenges to class certification, which can be reviewed by the Court at any time before judgment, and that they would move to decertify the Institutional Investor Subclass and the Retail Investor Subclass either before trial or at trial, in light of evidence that institutional investors were told about the Underwriter Defendants' analysts' reduced revenue models that were prompted by Facebook's reduced

guidance, and that information about the analysts' reduced models was published in the news media before the IPO.[6]

### 2.    Risks Concerning Negative Causation and Damages

Whether Lead Plaintiffs could overcome Defendants' negative-causation defense and establish damages was also highly unsettled, and these complex issues required the considerable effort and skill of Lead Counsel.  Defendants raised three main damages arguments, each of which presented significant risks and challenges in connection with prevailing at summary judgment, trial, and in post-trial proceedings.  *See generally* Joint Decl. ¶¶ 130-136.

First, bolstered by the expert reports of Dr. Maureen O'Hara and Dr. Paul Gompers, Defendants vigorously argued that investors' losses during the Class Period were caused entirely or in large part by NASDAQ's system failures on the first day of trading after the IPO, which caused trading delays, order disruptions, and investor uncertainty. If the Court denied Lead Plaintiffs' *Daubert* motion with respect to Drs. O'Hara and Gompers, there would have been a significant risk that a jury might have accepted their testimony that little or none of the investors' losses were caused by misrepresentations or omissions in the Offering Documents.

Second, Defendants argued that the evidence proved their negative-causation defense because the post-IPO news articles about Facebook's revised guidance cited by Lead Plaintiffs did not contain any new information that had not been publicly disclosed before the IPO, and therefore the allegedly misrepresented or omitted information could not have caused investors' losses.

Third, Defendants argued that a large portion of the Class was not harmed because the price of Facebook common stock rebounded strongly a year after the IPO and was at record highs in

---

[6] The Court is respectfully referred to paragraphs 117 to 129 of the Joint Declaration for a more detailed discussion of the risks concerning liability.

early 2018, when the trial would have occurred. Class members who retained their shares after the end of the Class Period arguably had no recoverable damages in the Action.

Finally, even if Lead Plaintiffs were successful in proving damages at trial, Defendants would have persistently challenged the damages of every Class member in post-trial proceedings and on appeal, substantially reducing any aggregate recovery by the Class.[7]

### 3.      The Contingent Nature of Lead Counsel's Representation

Lead Counsel undertook this Action on an entirely contingent fee basis, assuming a substantial risk that the litigation would yield no or potentially little recovery and leave them uncompensated for their significant investment of time and expenses, here valued at more than $55 million. Courts within the Second Circuit have consistently recognized that this risk is an important factor favoring an award of attorneys' fees. *See, e.g.*, *In re Am. Bank Note Holographics, Inc. Sec. Litig*, 127 F. Supp. 2d 418, 433 (S.D.N.Y. 2001) (concluding it is "appropriate to take this [contingent fee] risk into account in determining the appropriate fee to award").

Unlike counsel for defendants, who are paid substantial hourly rates and reimbursed for their expenses on a regular basis, Lead Counsel have not been compensated for any time or expenses since this case began in 2012, and would have received no compensation or expenses had this case not achieved a recovery for the Class. From the outset, Lead Counsel understood that they were embarking on a complex, expensive, and lengthy endeavor with no guarantee of ever being compensated for the enormous investment of time and money the case would require. In undertaking that responsibility, Lead Counsel were obligated to ensure that sufficient attorney and professional resources were dedicated to the prosecution of the Action and that funds were

---

[7] The Court is respectfully referred to paragraphs 130 to 136 of the Joint Declaration for a more detailed discussion of the risks concerning negative causation and damages.

available to compensate staff and to pay for the costs entailed. Indeed, there have been many class actions in which plaintiffs' counsel took on the risk of pursuing claims on a contingent basis, expended thousands of hours and millions of dollars in expenses and time and received nothing for their efforts.[8] This case could have been dismissed like so many others on Defendants' motions for summary judgment or resulted in a defense verdict, leading to absolutely no recovery for the Class or Lead Counsel. Accordingly, the contingency risk in this case strongly supports the requested attorneys' fee.

## C.    The Magnitude and Complexity of the Litigation

The complexity of the litigation is another factor examined by courts evaluating the reasonableness of attorneys' fees requested by class counsel. The complex and multifaceted subject matters involved in a securities class action such as this one amply support the fee request. *See Fogarazzo v. Lehman Bros. Inc.*, No. 03-5194, 2011 WL 671745, at *3 (S.D.N.Y. Feb. 23, 2011) ("courts have recognized that, in general, securities actions are highly complex"); *In re Merrill Lynch & Co. Inc., Research Reports Sec. Litig.*, No. 02 MDL 1484, 2007 WL 313474, at *14 (S.D.N.Y. Feb. 1, 2007) ("[S]ecurities class litigation "is notably difficult and notoriously uncertain.'").

As described in greater detail in the Joint Declaration, the Action involved difficult, hotly disputed, and expert-intensive issues related to the social media industry, securities-industry

---

[8] *See, e.g.*, *Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) (reversal of jury verdict of $81 million against accounting firm after a 19-day trial); *Bentley v. Legent Corp.*, 849 F. Supp. 429 (E.D. Va. 1994), *aff'd*, *Herman v. Legent Corp.*, 50 F.3d 6 (4th Cir. 1995) (directed verdict after plaintiffs' presentation of its case to the jury); *Landy v. Amsterdam*, 815 F.2d 925 (3d Cir. 1987) (directed verdict for defendants after five years of litigation;); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (overturning plaintiffs' verdict following two decades of litigation); *In re Apple Comput. Sec. Litig.*, No. C-84-20148, 1991 WL 238298, at *1-2 (N.D. Cal. Sept. 6, 1991) ($100 million jury verdict vacated on post-trial motions); *In re JDS Uniphase Corp. Sec. Litig.*, No. CO2-1486 CW, 2007 WL 4788556 (N.D. Cal. Nov. 27, 2007) (defense verdict after four weeks of trial).

practices, IPO underwriting and due diligence, negative causation, and damages. Overall, the magnitude and complexity of the Action and the difficulty of the legal and factual issues faced by Lead Counsel support the requested fee.

### D.    The Quality of Representation

The quality of the representation of Lead Counsel is an important factor that supports the reasonableness of the fee request. *See In re Flag Telecom Holdings Ltd. Sec. Litig.,* 02-cv-3400, 2010 WL 4537550, at *28 (S.D.N.Y. Nov. 8, 2010). It took a great deal of skill to achieve a settlement at this level in this particular case. Specifically, this Action required the marshalling of proofs related to complicated and nuanced factual circumstances, the ability to develop compelling legal theories, and the skill to respond to a host of legal defenses.

BLBG and Labaton Sucharow are nationally known as leaders in the field of securities class action litigation and have substantial experience litigating securities class actions in courts throughout the country with success. *See* Joint Decl. ¶ 163; Exhibits 3A – 4; 3B - 3.  This favorable Settlement is attributable in substantial part to the diligence, determination, hard work, and skill of counsel, who developed, litigated, and successfully negotiated the resolution of this Action.

The quality of opposing counsel is also important in evaluating the quality of counsel's work, as noted by this Court in *In re NASDAQ*, *Mkt-Makers Antitrust Litig.* 187 F.R.D. 465, 488 (S.D.N.Y. 1998).  "The quality of opposing counsel is. . . significant in considering the quality of services rendered by plaintiff's counsel, as measured by the result achieved. . . .  The ability of Class Counsel to obtain record-breaking settlements in the face of a stubborn and well executed defense further evidences the excellent quality of petitioners' work." *See also Flag Telecom*, 2010 WL 4537550, at *28.  Here, Defendants' Counsel, Latham & Watkins LLP, Kirkland & Ellis LLP, Willkie Farr & Gallagher LLP, Wilson Sonsini Goodrich & Rosati, and Davis Polk & Wardwell

LLP, are long-time leaders among national litigation firms, with well-noted expertise in corporate litigation practices.

### E.      Public Policy Considerations

The federal securities laws are remedial in nature, and, to effectuate their purpose of protecting investors, the courts must encourage private lawsuits such as this one.  *See Basic Inc. v. Levinson*, 485 U.S. 224, 230-31 (1988). The Supreme Court has emphasized that private securities actions provide "'a most effective weapon in the enforcement' of the securities laws and are 'a necessary supplement to [SEC] action.'" *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310 (1985); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (noting that the court has long recognized that meritorious private actions to enforce federal anti-fraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions).

Courts in the Second Circuit have held that "public policy concerns favor the award of reasonable attorneys' fees in class action securities litigation." *Flag Telecom*, 2010 WL 4537550, at *29. Specifically, "[i]n order to attract well-qualified plaintiffs' counsel who are able to take a case to trial, and who defendants understand are able and willing to do so, it is necessary to provide appropriate financial incentives." *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 359 (S.D.N.Y. 2005). Indeed, Judge McMahon recently noted the importance of "private enforcement actions and the corresponding need to incentivize attorneys to pursue such actions on a contingency fee basis" in *Shapiro v. J.P. Morgan Chase & Co.*:

> [C]lass actions serve as private enforcement tools when . . . regulatory entities fail to adequately protect investors . . . . [P]laintiffs' attorneys need to be sufficiently incentivized to commence such actions in order to ensure that defendants who engage in misconduct will suffer serious financial consequences . . . . [A]warding counsel a fee that is too low would therefore be detrimental to this system of private enforcement.

No. 11-8331, 2014 WL 1224666, at *24 (S.D.N.Y. Mar. 24, 2014) (citing *In re Initial Pub.*

*Offering Sec. Litig.*, 671 F. Supp. 2d 467, 515-16 (S.D.N.Y. 2009)); *see also Maley* v. *Del. Global Techs. Corp.* 186 F. Supp. 2d 358,  373 (S.D.N.Y. 2002) ("In considering an award of attorney's fees, the public policy of vigorously enforcing the federal securities laws must be considered."); *In re Med. X-Ray Film Antitrust Litig.*, No. 93-5904, 1998 WL 661515, at *8 (E.D.N.Y. Aug. 7, 1998) ("an adequate award furthers the public policy of encouraging private lawsuits").

Lawsuits such as this one can only be maintained if competent counsel can be retained to prosecute them. This will occur if courts award reasonable and adequate compensation for such services where successful results are achieved. Public policy therefore supports awarding Lead Counsel's attorneys' fee request.

### F.    The Requested Attorneys' Fees in Relation to the Settlement

"In determining whether the Fee Application is reasonable in relation to the settlement amount, the Court compares the Fee Application to fees awarded in similar securities class-action settlements of comparable value." *In re Marsh & McLennan*, *Co. Sec. Litig*. No. 04-8144, 2009 WL 5178546, at *19 (S.D.N.Y. Dec. 23, 2009); *see also In re Veeco Instruments Inc. Sec. Litig,* No. 05-1695, 2007 WL 4115808, at *7 (S.D.N.Y. Nov. 7, 2007) (noting that the fee awarded is "consistent with fees awarded in a similar class actions settlements of comparable value"). As discussed above, the compensation requested here is within the range of percentage fee awards given in comparable securities class action cases within the Second Circuit and in other district courts throughout the country. *See* § II *supra*.

### G.    The Requested Attorneys' Fees Are Also Reasonable Under the Lodestar Cross-Check

To ensure the reasonableness of a fee awarded under the percentage method, the Second Circuit encourages a "crosscheck" against counsel's lodestar. *Goldberger*, 209 F.3d at 50.  Under the lodestar method, a court must engage in a two-step analysis:  first, to determine the lodestar,

the court multiplies the number of hours each timekeeper spent on the case by each person's reasonable hourly rate; and second, the court adjusts that lodestar figure (by applying a multiplier) to reflect such factors as the risk and contingent nature of the litigation, the result obtained, and the quality of the attorney's work. *See, e.g., Flag Telecom*, 2010 WL 4537550, at *25-26 ("Under the lodestar method, a positive multiplier is typically applied to the lodestar in recognition of the risk of litigation, the complexity of the issues, the contingent nature of the engagements, the skill of the attorneys, and other factors"). Performing the lodestar cross-check here confirms that the fee requested by Lead Counsel is reasonable and should be approved.

Plaintiffs' Counsel have collectively expended more than 94,317 hours in the prosecution of this case. *See* Joint Decl. ¶ 160; Exhibits 3; 3A – 3G. Overall the time also reflects a reduction of the hours that were worked, as attorneys and other professionals who billed under 10 hours have been excluded from this submission.  Exhibits 3A – 3G.

The resulting lodestar at Plaintiffs' Counsel's current rates is $50,042,638.00. The Supreme Court and other courts have held that the use of current rates is proper since such rates compensate for inflation and the loss of use of funds.  *See Missouri v. Jenkins*, 491 U.S. 274, 283-84 (1989). The hourly rates of Plaintiffs' Counsel here range from $575 to $1,250 for partners, $550 to $750 for of-counsel/sernior counsel, and $335 to $675 for other attorneys.  *See* Joint Decl. ¶ 159.

Thus, the amount of attorneys' fees requested by Lead Counsel represents a very significant *negative* multiplier of 0.17 of Plaintiffs' Counsel's lodestar. Stated differently, Lead  Counsel are requesting that Plaintiffs' Counsel be paid just 17% of the legal fees they billed to the case. Such a "multiplier" is well below the parameters used throughout district courts in the Second Circuit and is additional evidence that the requested fee is reasonable. *See, e.g.*, *In re Bear Stearns Cos. Sec. Derivative & ERISA Litig.*, 909 F. Supp. 2d 259, 271 (S.D.N.Y. 2012) (Sweet, J.)  (approving

fee with a negative multiplier and noting that the negative multiplier was a "strong indication of the reasonableness of the [requested] fee"); *Marsh*, 2009  WL 5178546, at *20 (reasoning that where the multiplier is negative, the lodestar cross-check "unquestionably supports the requested percentage fee award.") Indeed, within the Second Circuit, lodestar multiples between 1 and 5 are commonly awarded. *See, e.g., Walmart Stores Inc. v. Visa USA Inc.*, 396 F. 3d 96, 123 (2d Cir. 2005) (upholding a multiplier of 3.5 as reasonable on appeal).

With respect to the hours worked, Lead Counsel submits that the substantial time devoted to litigating the claims against Defendants reflects the tremendous effort needed to prosecute the claims and to bring them to a favorable resolution, as summarized above (*see* § III.A) and set forth in detail in the Joint Declaration. It is respectfully submitted that the requested fee is manifestly reasonable, whether calculated as a percentage-of-the-fund or in relation to Plaintiffs' Counsel's lodestar.

**H.      The Class's Reaction to the Fee and Expense Request**

In accordance with this Court's Preliminary Approval Order, 1,313,895 copies of the Settlement Notice were sent to potential Class Members. *See* Declaration of Adam D. Walter Regarding (A) Mailing of the Settlement Notice and Claim Form, and (B) Publication of the Summary Settlement Notice ("Walter Decl."), ¶¶ 3-10, Exhibit 1. The Settlement Notice informed Members of the Class that Lead Counsel would make an application not to exceed 25% of the Settlement Fund (which includes interest) and litigation expenses not to exceed $5.6 million. The time to object to the fee request expires on August 15, 2018. To date, not a single objection to the fee and expense request has been received.[9]

---

[9] Lead Counsel will address any objections to the fee and expense request in their reply papers, which will be filed with the Court by August 29, 2018.

## IV.    THE FEE WAS NEGOTIATED WITH LEAD PLAINTIFFS

Lead Plaintiffs are sophisticated institutional investors that manage billions of dollars in assets for their beneficiaries. Lead Plaintiffs were substantially involved throughout the prosecution of the Action. They have evaluated the Fee and Expense Application and believe that it is fair and reasonable and warrants approval by the Court. *See* Exhibits 2A and 2B. In reaching this conclusion, Lead Plaintiffs considered factors such as the substantial amount of work performed, the size of the recovery obtained, and the considerable risks of proceeding with trial. *Id*.

"[P]ublic policy considerations support fee awards where, as here, large public pension funds, serving as lead plaintiffs, conscientiously supervised the work of lead counsel, and gave their endorsement to lead counsel's fee request." *Marsh & McLennan*, 2009 WL 5178546, at *16; *see also WorldCom*, 388 F. Supp. 2d at 356 ("When class counsel in a securities lawsuit have negotiated an arm's-length agreement with a sophisticated lead plaintiff possessing a large stake in the litigation, and when that lead plaintiff endorses the application following close supervision of the litigation, the court should give the terms of that agreement great weight.")  Accordingly, Lead Plaintiffs' endorsement of the fee and expense request supports its approval.

## V.    PLAINTIFFS' COUNSEL'S EXPENSES WERE REASONABLY INCURRED AND NECESSARY TO THE PROSECUTION OF THIS ACTION

Lead Counsel also respectfully request $4,962,978.46 in expenses incurred in prosecuting this Action.  These expenses are set forth in the individual firm declarations submitted herewith, *see* Exhibit 3 (Summary Chart); Exhibits 3A – 3G, and are of the type approved by courts for payment, *see* Exhibit 4 (Summary Chart of Expenses).  "It is well-settled that attorneys may be compensated for reasonable out-of-pocket expenses incurred and customarily charged to their clients, as long as they were incidental and necessary to the representation of those clients."

*Facebook*, 2015 WL 6971424, at *12 (approving expenses related to experts, appellate printing, postage, court fees, legal research, mediation, press releases, process service, copies, telephone, transcripts, travel, and meals.)

One of the most significant expenses in the Action was the cost of experts and consultants, which totaled $3,262,417.58 or approximately 66% of Plaintiffs' Counsel's expenses. As detailed in the Joint Declaration, Lead Plaintiffs retained experts to opine on such areas as the social media industry, securities-industry practices, investors' absorption of information, underwriting and due diligence, and loss causation and damages. *See* Joint Decl. ¶ 174. Lead Counsel consulted with five testifying experts who submitted opening reports in connection with class certification or on the merits and rebuttal reports. All five experts also sat for depositions. (Mr. Miller was deposed at both the class certification and merits stages.) Lead Counsel also retained various consulting experts in order to efficiently frame the issues, gather relevant evidence, and make a realistic assessment of provable damages, as well as an expert trial consulting firm that assisted Lead Counsel in conducting the mock jury exercises, which included a detail analysis of the results of the deliberations of mock jurors and the reason for their decisions. Lead Plaintiffs received crucial advice and assistance from their experts and consultants throughout the course of the Action.

Another significant cost was the expense of using a database provider to host and manage the data related to the extensive document production obtained in the Action. Those costs totaled $264,291.64, or approximately 5% of the total expenses. Joint Decl. ¶ 175.

Another large component of expenses, $333,080 (7% of total), relates to travel, business transportation, and working meals. Plaintiffs' Counsel were required to travel extensively for depositions and to work late hours.  *Id.* ¶ 177. As detailed in the Fee and Expense Declarations, Plaintiffs' Counsel imposed limitations on these travel reimbursements, including limiting airfare

to coach rates and capping expenses for meals and hotels. The remaining expenses are attributable to such things as mediation ($141,109), court reporting and transcription fees ($225,847.32), the costs of computerized research, duplicating documents, filing fees, and other incidental expenses. *See generally* Exhibit 4. Overall, the expenses sought are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour.

The Settlement Notice advised potential Class Members that Lead Counsel would seek payment of litigation expenses not to exceed $5.6 million.  Exhibit 1 – B at 2, 12. The expenses sought here are below this "cap" and should be awarded. Additionally, not a single objection to the expense request has been received to date.

## VI.   CLASS REPRESENTATIVES SHOULD BE REIMBURSED PURSUANT TO THE PSLRA FOR THEIR REASONABLE EXPENSES

Finally, Lead Counsel seek expense awards totaling $56,792.53 on behalf of the Class Representatives, pursuant to the PSLRA which provides that an "award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class" may be made to "any representative party serving on behalf of a class." 15 U.S.C. § 77z-1(a)(4). The Settlement Notice disseminated to the Class stated that Class Representatives may seek reimbursement for the time and expense they incurred. *See* Exhibit 1 – B at 2, 12. There has been no objection to this request to date.

Courts "award such costs and expenses to both reimburse named plaintiffs for expenses incurred through their involvement with the action and lost wages, as well as provide an incentive for such plaintiffs to remain involved in the litigation and incur such expenses in the first place." *Hicks v. Morgan Stanley*, 01-CIV-10071, 2005 WL 2757792, at *10 (S.D.N.Y. Oct. 24, 2005); *see also Varljen v. H.J. Meyers & Co.*, No. 97 CIV 6742 (DLC), 2000 WL 1683656, at *6 n.2

(S.D.N.Y. Nov. 8, 2000) (reimbursement of such expenses should be allowed because it "encourages participation of plaintiffs in the active supervision of their counsel").

Here, (a) Lead Plaintiff Arkansas Teacher is seeking reimbursement of $6,012.53, Exhibit 2A at ¶ 14; (b) Lead Plaintiff Fresno is seeking reimbursement of $5,000, Exhibit 2B at ¶ 11; (c) Mr. and Mrs. Galvan are seeking reimbursement of $15,000, Exhibit 2C at ¶ 8; (d) Ms. Morley is seeking reimbursement of $7,605, Exhibit 2D at ¶ 10; (e) Mr. Rand is seeking reimbursement of $7,425, Exhibit 2E at ¶ 8; and (f) Mr. and Mrs. Melton are seeking reimbursement of $15,750, Exhibit 2F at ¶ 8, Exhibit 2G at ¶ 8. Each seeks reimbursement of their reasonable lost wages incurred in fulfilling their duties to ably represent the interests of the Class, and their declarations detail the time and effort they dedicated to the prosecution of this case by complying with all the demands placed on them, including, among other things, producing documents and sitting for depositions.

Numerous cases have approved payments to compensate lead plaintiffs for the time and effort devoted by them. *See, e.g., In re Winstar Commc'ns Sec. Litig.,* No. 01 Civ. 3014 (GBD), slip op. at 2 (S.D.N.Y. Nov. 13, 2013) (awarding $60,000 to lead plaintiffs) (Ex. 5); *In re Satyam Comput. Servs. Ltd. Sec. Litig.,* No. 09-MD-2027-BSJ, slip op. at 3-4 (S.D.N.Y. Sept. 13, 2011) (awarding $193,111 to lead plaintiffs) (Ex. 5); *In re Am. Int'l Grp., Inc. Sec. Litig.,* No. 04 Civ. 8141 (DAB), 2010 WL 5060697, at *3 (S.D.N.Y. Dec. 2, 2010) (awarding $30,000 to institutional lead plaintiffs "to compensate them for the time and effort they devoted on behalf of a class"); *Marsh & McLennan,* 2009 WL 5178546, at *21 (awarding a combined $214,657 to two institutional lead plaintiffs). Accordingly, Lead Counsel respectfully request that the Court reimburse the Class Representatives for their reasonable lost wages incurred in fulfilling their duties and achieving the substantial result reflected in the Settlement.

## CONCLUSION

For all the foregoing reasons, Lead Counsel respectfully request that the Court award: (i) attorneys' fees in the amount of 25% of the Settlement Fund; (ii) payment of litigation expenses in the amount of $4,962,978.46; and (iii) $56,792.53 in the aggregate to the Class Representatives, pursuant to the PSLRA. A proposed order will be submitted with Lead Counsel's reply papers after the deadline for objections has passed.

DATED: August 1, 2018                      Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER
 & GROSSMANN LLP**

/s/ *John Rizio-Hamilton*
Salvatore J. Graziano
John J. Rizio-Hamilton
1251 Avenue of the Americas
New York, New York 10020
Tel: (212) 554-1400
Fax: (212) 554-1444

*Co-Lead Counsel for Lead Plaintiffs
and the Class*

**LABATON SUCHAROW LLP**
Thomas A. Dubbs
James W. Johnson
Thomas G. Hoffman, Jr.
140 Broadway
New York, New York 10005
Tel: (212) 907-0700
Fax: (212) 818-0477

*Co-Lead Counsel for Lead Plaintiffs, Class
Representative Sharon Morley and the Class*

Steven E. Fineman
Nicholas Diamand
**LIEFF CABRASER**
**HEIMANN & BERNSTEIN, LLP**
250 Hudson Street, 8th Floor
New York, New York 10013
Tel: (212) 355-9500
Fax: (212) 355-9592

*Additional Counsel for Named Plaintiffs and Class*
*Representatives Jose G. Galvan and Mary Jane*
*Lule Galvan*


Frank R. Schirripa
**HACH ROSE SCHIRRIPA**
**& CHEVERIE LLP**
112 Madison Avenue 10th Floor
New York, New York 10016
Tel: (212) 213-8311
Fax: (212) 799-0028

*Additional Counsel for Class Representatives Eric*
*Rand, and Paul and Lynn Melton*