UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------X

IN RE FACEBOOK, INC., IPO SECURITIES AND    MDL No. 12-2389
DERIVATIVE LITIGATION,

                                            OPINION & ORDER


-------------------------------------------X


A P P E A R A N C E S:

Attorneys for Lead Plaintiffs

LABATON SUCHAROW LLP
140 Broadway
New York, NY 10005
By:  Thomas A. Dubbs, Esq.
     James W. Johnson, Esq.
     Thomas G. Hoffman, Jr., Esq.

BERNSTEIN LITOWITZ BERGER & GROSSMAN LLP
1251 Avenue of the Americas, 44th Floor
New York, NY 10019
By:  Max W. Berger, Esq.
     Salvatore J. Graziano, Esq.
     John Rizio-Hamilton, Esq.
     Jonathan Uslaner, Esq.
     Jai Chandrasekhar, Esq.

Attorneys for Additional Named Plaintiffs and
Class Representatives Mr. & Mrs. Galvan

LIEFF CABRASER HEIMANN & BERNSTEIN LLP
250 Hudson Street, 8th Floor
New York, NY 10013
By:  Steven E. Fineman, Esq.
     Nicholas Diamand, Esq.

Attorneys for Additional Named Plaintiffs and
Class Representatives Rand and Mr. & Mrs. Melton

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 1-16-18

HACH ROSE SCHIRRIPA & CHEVERIE LLP
185 Madison Avenue
New York, NY 10016
By: Frank R. Schirripa, Esq.

Attorneys for Defendant Facebook and Individual
Facebook Defendants

KIRKLAND & ELLIS LLP
655 Fifteenth St. NW
Washington, DC 20005
By: Susan E. Engel, Esq.
    Beth A. Williams, Esq.

KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
By: Andrew B. Clubok, Esq.
    Brant W. Bishop, Esq.
    Nathaniel Kritzer, Esq.

KIRKLAND & ELLIS LLP
555 California Street, #2700
San Francisco, CA 94104
By: Elizabeth L. Deeley, Esq.

WILLKIE FARR & GALLAGHER LLP
1875 K Street, NW
Washington, DC 20006
By: Richard D. Bernstein, Esq.
    Elizabeth J. Bower, Esq.
    Matthew Edwards, Esq.

WILKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019-6099
By: Todd G. Cosenza, Esq.


Attorneys for Underwriter Defendants

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
By: James P. Rouhandeh, Esq.
    Charles S. Duggan, Esq.
    Andrew Ditchfield, Esq.

Attorneys for Defendant James W. Breyer

WILSON SONSINI GOODRICH & ROSATI
650 Page Mill Road
Palo Alto, CA 94304
By:  Nina F. Locker, Esq.
     Doru Gavril, Esq.
     Liles H. Repp, Esq.

**Sweet, D.J.**

Lead Plaintiffs Arkansas Teacher Retirement System and Fresno County Employees' Retirement Association, Named Plaintiffs and Class Representatives Jose G. Galvan and Mary Jane Lule Galvan, and Class Representatives Eric Rand, Paul Melton, Lynn Melton, and Sharon Morley (together, "Plaintiffs") have moved under Rule 23(e) for final approval of the Proposed Settlement[1] and approval of a plan for its allocation (the "Plan of Allocation"). Court-appointed lead class counsel, Bernstein Litowitz Berger & Grossman LLP and Labaton Sucharow LLP ("Lead Counsel") have moved for a Lead Counsel Award of Attorneys' fees, for payment of litigation expenses, and for payment of costs and expenses incurred by the Class Representatives. For the reasons that follow, Plaintiffs' motions are granted.

---

[1] The Proposed Settlement seeks to settle claims against Defendants Facebook, Inc. ("Facebook" or the "Company"); Mark Zuckerberg, Sheryl K. Sandberg, David A. Ebersman, David M. Spillane, Marc L. Andreessen, Erskine B. Bowles, James W. Breyer, Donald E. Graham, Reed Hastings, and Peter A. Thiel (collectively, the "Individual Defendants"); and the Underwriter Defendants (which, together with Facebook and the Individual Defendants, are "Defendants")in the amount of $35,000,000.

4

**Prior Proceedings**

The procedural history and factual background of this
litigation has been detailed extensively in various opinions by
the Court. See In re Facebook, Inc., IPO Sec. & Derivative
Litig., MDL No. 12-2389, 2016 WL 5080152, at *1 (S.D.N.Y. July
7, 2016) (the "Discovery Opinion"); In re Facebook, Inc., IPO
Sec. & Derivative Litig., 312 F.R.D. 332, 337 (S.D.N.Y. 2015)
(the "Class Certification Opinion"); In re Facebook, Inc., IPO
Sec. & Deriv. Litig., 986 F. Supp. 2d 487, 492-93 (S.D.N.Y.
2013) motion to certify appeal denied In re Facebook, Inc., IPO
Sec. & Derivative Litig., 986 F. Supp. 2d 524 (S.D.N.Y. 2014)
(the "MTD Opinion"); see also In re Facebook, Inc., IPO Sec. &
Derivative Litig., 288 F.R.D. 26, 31-34 (S.D.N.Y. 2012) (the
"Consolidation Opinion"). Familiarity with the general
background of this case as provided in previous opinions of the
Court is assumed.

The present case is a consolidation of many separate
actions brought before this Court pursuant to the transfer order
of the United States Judicial Panel on Multidistrict Litigation
(the "MDL Panel"), which was entered on October 4, 2012. On
February 28, 2013, following the Consolidation Opinion,
Plaintiffs filed their Complaint, which alleged violations of

Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77l(a)(2) and 77o.

The Plaintiffs' consolidated class action complaint alleged, among other things, that certain disclosures made by Defendants, in registration statement effective at the time of its IPO (the "Registration Statement"), were materially false or misleading.

On December 11, 2013, the Court denied Defendants' motion to dismiss in its Opinion of that date. Discovery commenced and, on December 29, 2015, the Court granted Plaintiffs' motion for class certification pursuant to Federal Rule of Civil Procedure 23, classifying two subclasses, one for retail investors (the "Retail Investors") and one for institutional investors (the "Institutional Investors," and together, the "Class"), with certain exclusions as detailed in the Class Certification Opinion.[2] See Class Certification Opinion, 312 F.R.D. at 338.

---

[2] The two subclasses were defined as "(i) the Institutional Investor Subclass, consisting of the institutional investors that purchased or otherwise acquired [Facebook's] Class A common stock in or traceable to [Facebook's IPO] between May 17, 2012 and May 21, 2012, inclusive, [the "Class Period"] and were damaged thereby; and (ii) the Retail Investor Subclass, consisting of all retail investors who purchased or otherwise acquired Facebook Class A common stock in or traceable to the

6

**Facts**

On February 1, 2012, Facebook, a worldwide social media company, filed its initial Form S-1 Registration Statement with the Securities and Exchange Commission ("SEC") in preparation for an initial public offering ("IPO"). (Defs.' 56.1 ¶ 1; Pls.' 56.1 ¶ 22.) At the end of the first quarter of 2012, Facebook had nine hundred million monthly active users ("MAU"), constituting approximately 13% of the world's population; of those MAUs, 45.8% accessed Facebook through personal computers only, 45.0% accessed Facebook on both personal computers and mobile devices, and 9.2% accessed Facebook only on mobile devices. (Defs.' 56.1 ¶¶ 3-4.)

Around the end of 2011 and beginning of 2012, Facebook's senior management observed that Facebook users were using Facebook on mobile devices as a substitute for personal computer use.[3] (See Pls.' 56.1 ¶¶ 14, 21, 26.) Mobile devices

---

[Facebook's] IPO between May 17, 2012 and May 21, 2012, inclusive, and were damaged thereby." (Dkt. No. 193 at 2.)

[3]    The parties disputed Facebook's perception of and response to the proliferation of mobile users, as reflected in internal conversations and third-party analyses. To the extent factual disputes remain, they have been omitted from this opinion.

allowed non-personal computer users to access Facebook and increased the ability of users to consume Facebook content more often and from more locations. (See Defs.' 56.1 ¶¶ 76-77.) Prior to March 2012, however, Facebook did not have any advertisements shown for users accessing the website on mobile devices, which limited direct revenue from mobile users. (Defs.' 56.1 ¶¶ 80, 88.) Up to that point, the majority of Facebook's revenue came from desktop advertising and fee payments associated with personal computer advertising as well as virtual and digital goods sales. (Pls.' 56.1 ¶ 11; Defs.' 56.1 ¶¶ 37-38.) Around the end of 2011 and beginning of 2012, Facebook had begun investigating the impact of mobile usage and its potential to cannibalize or supplement personal computer usage. (See Pls.' 56.1 ¶ 18; Defs.' 56.1 ¶¶ 85-87; Pls.' 56.1 Response ¶¶ 85-87.)

In the months leading up to its IPO, Facebook adjusted downward its internal forecasted revenue numbers. On December 8, 2011, Facebook's Board of Directors (the "Board") discussed the IPO, selected Morgan Stanley, along with J.P. Morgan and Goldman Sachs, as lead underwriter for the IPO, and set Facebook's internal revenue forecast for 2012 at $6.6 billion with second quarter 2012 revenue forecasts at $1.53 billion.[4] (Pls.' 56.1

---

4 By 2012, on average, Facebook's Board directors had been serving for several years. (Pls.' Individual Defs.' 56.1

¶ 19; Individual Defs.' 56.1 ¶ 4.) The Board met several times during the end of January 2012, during which time Board directors discussed Facebook's latest draft registration statement, asked questions, and discussed disclosures. (See Individual Defs.' 56.1 ¶¶ 6-11.)

By February 1, 2012, Facebook's annual internal revenue forecast was reduced to $6.23 billion. (Pls.' 56.1 ¶ 22.) On February 16, 2012, Facebook's Board was informed that revenue was tracking below expectations for several reasons, including that "Canvas[5] traffic has declined, negatively impacting Payments and Ads revenue," "[s]lower than planned uptake on Sponsored Stories driven by limited amount of 'sponsorable' content," "Facebook mobile use increasing," and "[p]otential softness in advertiser demand." (Rizio-Hamilton Decl., Ex. 34; see Pls.' 56.1 ¶ 23.) At the February 16 meeting,

Response ¶¶ 1-2.) The Board was asked to allocate significant time in the first half of 2012 to assist with the IPO and met several times during the IPO process. (See Pls.' Individual Defs.' 56.1 Response ¶¶ 3, 5-6.)

[5]    "Canvas" is a Facebook product that was only available on desktops and a part of Facebook's "Payment" Business; "Canvas" provided a "webpage canvas for 'third-party developers to show their content," often games, from which Facebook users could purchase virtual and digital goods and for which Facebook collected fees for hosting the developers' products. (Pls.' 56.1 ¶ 11.) At the time of the IPO, this was the source of "substantially all" of Facebook's revenue. (Id.; see also Pls.' 56.1 ¶ 122)

the Board also created a Pricing Committee for the IPO, which
was composed of Andreessen, Breyer, and Thiel. (Individual
Defs.' 56.1 ¶ 12.)

On March 19, 2012, Facebook's annual internal revenue
forecast was reduced to $5.6 billion. (Pls.' 56.1 ¶ 25.) When
informed that this number was likely to drop further to $5.2
billion, Sandberg stated that this was a "real problem." (Pls.'
56.1 ¶ 29.) Around this time, in response to the observed
revenue growth and revenue forecast decline, Facebook
established a "war room" to analyze and address the trend.
(Pls.' 56.1 ¶¶ 26-27.) Members of the "war room" looked, in
part, at the financial impact of existing and new Facebook users
accessing Facebook on mobile devices. (Id.)

In late March 2012, Kurt Runke ("Runke"), Facebook's
Advertising Inventory Manager and participant in the "war room,"
circulated analysis regarding the declining revenue growth using
data from late 2011 and early 2012. (Defs.' 56.1 ¶ 96.) As part
of his analysis, Runke wrote that users who increased Facebook
use on mobile devices varied in how their use impacted
Facebook's revenue growth, but also wrote that "the short-term
impact of encouraging existing users to become active on mobile
is that it will decrease our revenue" and that it is "likely

10

that increased mobile adoption over the last year has reduced FB revenue by a few percentage (based on rough analysis of data, underway)." (Pls.' 56.1 Response ¶ 96.) Runke also stated that, as the number of desktop users increased, determining the "impact of mobile on web monetization [was] not clear." (Defs.' 56.1 ¶ 97.)

Members of the "war room" presented their initial analysis to Sandberg, Facebook's Chief Operating Officer ("COO"), and Ebersman, Facebook's Chief Financial Officer ("CFO"), on March 29, 2012, which was subsequently circulated to Facebook's senior officers, including Zuckerberg. (Pls.' 56.1 ¶¶ 29-30, 34-35.) Shortly thereafter, on April 4, Zuckerberg wrote that "everything here is going really badly" and that Facebook's "revenue projection has gone down so much we now think we might go public at less than $50b if things continue." (Pls.' 56.1 ¶ 37.) A few days later, on April 9, Zuckerberg wrote to Ebersman that Zuckerberg was "scared that we're just way behind in a few key areas. Mobile is the biggest, where Wilde will dig us out of the hole we're in but otherwise not be particularly amazing." (Pls.' 56.1 ¶ 16.)

On April 12, 2012, Zuckerberg and other Facebook management discussed the mobile usage trend with the Board at a

11

dinner meeting. (See Individual Defs.' 56.1 ¶ 13.) The "initial
analyses" of the "war room" examined first quarter revenue
"drivers" and stated, among other things, that the "shift from
web to mobile – can hurt revenue per user by as much as 25%" and
that Facebook "see[s] a drop in revenue among users that
increase their mobile usage (versus similar users that keep
their mobile constant)." (Pls.' 56.1 ¶ 30.)

On April 13, 2012, Facebook's Board received a
presentation entitled "2012 Financial Forecast Update," which
noted that "revenue was running lower than plan" and indicated
Facebook would issue a downward revenue forecast. (Pls.' 56.1
¶ 39.) The presentation listed factors that "ha[d] driven this
change," one of which was an "ongoing shift to mobile usage";
the presentation did not state a quantification of the lost
revenue. (Id.; Defs.' 56.1 Response ¶ 39.) Facebook's management
presented to the Board a revenue forecast of $5.16 billion for
2012 and some of the "war room" analysis. (Individual Defs.'
56.1 ¶ 14; Defs.' 56.1 ¶ 65; see Pls.' 56.1 ¶ 42.) Members of
the Facebook Board received a copy of the presentation and
management's updates, which were reviewed at the Board meeting.
(See Pls.' 56.1 ¶¶ 38-40; Individual Defs.' 56.1 ¶ 17.)

On the same day, Sandberg distributed a "2012 Revenue & Growth Analysis" presentation to Facebook's Business Operations group that included slides stating that while MAUs increased, users were shifting to mobile, and that such a shift "could hurt revenue per user as much as 25%." (Pls.' 56.1 ¶ 42.)

On April 16, 2012, Ebersman met with investment bank analysts underwriting Facebook's IPO (the "Syndicate Analysts") and informed them that Facebook had revised its 2012 annual revenue estimate to around $5 billion, with second quarter revenue earnings estimated to be between $1.1 and $1.2 billion. (Pls.' 56.1 ¶ 46; Defs.' 56.1 ¶ 16.)

On April 23, 2012, Facebook filed an Amended Form S-1, which reported first quarter 2012 revenue of $1.058 billion, a 44.7% growth from 2011's first quarter revenue but a 6.8% decline from 2011's fourth quarter revenue of $1.131 billion. (Defs.' 56.1 ¶ 7; Pls.' 56.1 Response ¶ 7; Pls.' 56.1 ¶ 51.) The Amended Form S-1 noted in numerous locations that Facebook's advertising revenue "may" or "could" be affected by users switching from using Facebook on personal computers to mobile devices. (See Defs.' 56.1 Response ¶ 52.)

On May 3, 2012, Runke shared additional mobile usage revenue analysis, similar to prior analysis but with more data, with Susan Li ("Li"), Facebook's Finance Manager. (Pls.' 56.1 ¶ 55.) This analysis modeled a hypothetical number of Facebook users moving from a desktop computer to a mobile device, which appeared to result in a reduction in revenue site-wide. (Id.)

In the succeeding days, members of Facebook's management discussed amongst themselves how to address Facebook's reduced 2012 annual estimate to $4.9 billion and that revenue numbers had been declining week over week. (See Pls.' 56.1 ¶¶ 56-60.) For example, on May 5, 2012, Li emailed Sandberg, Ebersman, and others, stating that "we have been seeing ongoing softness since Tuesday evening causing revenue to be down roughly 5% week over week and the ads team plus analytics folks are actively investigating as we speak." (Pls.' 56.1 ¶ 56.) That same day, Ebersman left a voicemail for Sandberg, observing that "[r]evenue is actually down week over week which to my experience we haven't seen very often." (Pls.' 56.1 ¶ 59.)

In anticipation of its IPO, Facebook organized a "roadshow," which began on May 7, 2012, through May 17, 2012.[6] (Pls.' 56.1 ¶ 62; Defs.' 56.1 ¶ 21.) Facebook's roadshow allowed Facebook's senior executives an opportunity to make presentations and market its IPO to potential investors around the United States. (Id.) At the start of the roadshow, Facebook's senior management continued to discuss Facebook's revenue trends internally and concluded that the IPO should continue. (Pls.' 56.1 ¶¶ 64-67.) At the start of the roadshow, members of Facebook senior management, including Zuckerberg, Sandberg, Ebersman, and Li discussed the IPO; during the meeting, Zuckerberg texted his fiancée that "[w]e still haven't figured out the revenue issue yet" and that it "may be a real issue" because the "decrease was as big as we thought but it is not continuing to decline . . . it hasn't returned [to baseline] . . . [i]t just hasn't gone down further." (Pls.' 56.1 ¶ 65.) The parties disagree about the nature of Facebook's revenue projections at this time, specifically whether the estimated 2012 revenue figure was stabilizing at around $5 billion based

---

[6]     Preparation for the roadshow had been going on at Facebook for months prior. Of note, a draft script for the roadshow from February 27, 2012, sent from Ebersman to Jeff McCombs ("McCombs"), Facebook's Director of Business Operations, included language stating that "the macro trend towards more mobile engagement does negatively impact our short-term revenue trends." (Pls.' 56.1 ¶ 24.)

15

on short-term "levers" used by Facebook's management to increase revenue in the short-term or if Facebook's strategy with regard to mobile was succeeding as a longer-term business solution. (Rizio-Hamilton Decl., Ex. 11 at 120:20; see Pls.' 56.1 ¶¶ 49, 66; Defs.' 56.1 Response ¶¶ 64-67.)

During the roadshow, Facebook's executives, including Ebersman, Cipora Herman ("Herman"), Facebook's Treasurer, and Michael Grimes ("Grimes"), Morgan Stanley agreed to provide Facebook's most recent projections only to the Syndicate Analysts and, publically, to issue a free writing prospectus ("FWP") that would supplement a preliminary prospectus released by Facebook back on May 3, 2012. (Pls.' 56.1 ¶ 70.) On May 8, 2012, Grimes also spoke with Li and discussed Facebook's updated revenue estimates and Facebook's rationale for the revisions to the registration statement. (Pls.' 56.1 ¶ 73.)

On May 9, 2012, Ebersman sent an email to the Board about the mobile usage trend and discussed whether to update the Form S-1's disclosures. (Individual Defs.' 56.1 ¶¶ 18-19; see Pls.' Individual Defs.' 56.1 Response ¶ 26.) Later that day, Facebook filed an Amended Form S-1 Registration Statement (the "May 9 Registration Statement") and the FWP, both of which stated that:

16

We believe this increased usage of Facebook on mobile devices has contributed to the recent trend of our daily active users (DAUs) increasing more rapidly than the increase in the number of ads delivered.

* * * *

As an example, we believe that the recent trend of our DAUs increasing more rapidly than the increase in the number of ads delivered has been due in part to certain pages having fewer ads per page as a result of these kinds of product decisions.

* * * *

Based upon our experience in the second quarter of 2012 to date, the trend we saw in the first quarter of DAUs increasing more rapidly than the number of ads delivered has continued. We believe this trend is driven in part by increased usage of Facebook on mobile devices where we have only recently begun showing an immaterial number of sponsored stories in News Feed, and in part due to certain pages having fewer ads per page as a result of product decisions. For additional information on factors that may affect these matters, see "Risk Factors–Growth in use of Facebook through our mobile products, where our ability to monetize is unproven, as a substitute for use on personal computers may negatively affect our revenue and financial results" and "Risk Factors–Our culture emphasizes rapid innovation and prioritizes user engagement over short-term financial results.

(Defs.' 56.1 ¶ 13; Pls.' 56.1 ¶ 76.) Earlier drafts of the

FWP written by Grimes had included additional language

stating that: "As a result of these trends and based on our

experience in the second quarter to date, our current

expectation is that revenue for the second quarter will be

between $1.1 billion and $1.15 billion." (Pls.' 56.1 ¶ 71.)

17

The same afternoon as the FWP's release, Herman made 19 calls to the Syndicate Analysts and read from a script that Grimes and she had prepared (the "Herman Calls"). (Pls.' 56.1 ¶ 83; Defs.' 56.1 ¶ 29.) The script stated:

> I wanted to make sure you saw the disclosure we made in our amended filing. We provided an update on certain trends in monetization—questions near term are the Q1 trends and if they are sustaining. The upshot of this is that we believe we are going to come in the lower end of our $1.1 to $1.2 bn range for Q2 based upon the trends we described in the disclosure. A lot of investors have been focused on whether the trend of ad impressions per user declining (primarily as a result of mobile) was a one-time, or continuing, occurrence. As you can see from our disclosure, the trend is continuing. Trends/headwinds over [the] next 6-9 months as this runs through the rest of the year, this could be 3-3.5% off of $5B target. You can decide what you want to do with your estimates, our long term conviction is unchanged, but in the near term we see these trends continuing, hence our being at the low end of the $1,100-$1,200 range.

(Id.) Ebersman, Zuckerberg, and Sandberg were aware of the Herman Calls. (Pls.' 56.1 ¶ 84.)

As a result of the Herman Calls and Facebook's lowered revenue guidance, which the Syndicate Analysts understood to be caused by increasing mobile usage, the Syndicate Analysts reduced their revenue models; Facebook's lead underwriters similarly revised their marketing materials based on the new revenue estimates. (Pls.' 56.1 ¶¶ 87-88.) Retail Investors were

generally not informed of Facebook's revised revenue estimates. (See Defs.' 56.1 Response ¶ 94.)

On May 13, 2012, in anticipation of the upcoming May 17 Board meeting, a presentation entitled "Advertising Update for the Board" was circulated amongst Facebook management, including Zuckerberg, Sandberg, and Ebersman (the "May 17 Board Presentation"). (Pls.' 56.1 ¶ 115; Defs.' 56.1 ¶ 102.) The presentation contained analysis from McCombs, which stated, *inter alia*, that: "Mobile only users have grown rapidly while Desktop-only user growth has flattened," "This is a key driver of which desktop PVs [page views] per user are down 12% vs. last year," and "Estimated revenue loss from this migration of $200MM to $300MM in 2012." (Id.) The $200 to $300 million estimate was a projected loss for all of 2012, and McCombs indicated that the presentation's estimates with regard to revenue loss from the platform migration was his "swag at an estimate," or a "scientific wild-ass guess." (Defs.' 56.1 ¶¶ 103, 105.)

On May 15, 2012, during the roadshow, Facebook increased its anticipated price range for its IPO shares to between $34 and $38 per share, an increase from its earlier set price range of between $28 and $35 per share. (Pls.' 56.1 ¶ 108.) This adjustment aligned with Facebook's strategy to

implement "price integrity," which was an attempt to have the post-IPO trading price approximate the IPO price, within a discrete percentage band. (See Pls.' 56.1 ¶¶ 104, 108; Defs.' 56.1 Response ¶ 104.) Specifically, "price integrity" involves pricing an IPO high enough so that many top investors lose interest in participating, which would result in the stock price not rising as much following the IPO. (See Pls.' 56.1 ¶¶ 104-06.) The following day, May 16, 2012, Facebook also increased the size of its IPO offering. (Pls.' 56.1 ¶ 110.) By this time, Facebook was generating revenue from mobile usage, although the parties dispute the degree to which Facebook was certain it would sustain mobile use as a revenue source. (See Defs.' 56.1 ¶¶ 88-91; Pls.' 56.1 Response ¶¶ 11, 88-91.)

On May 17, 2012, the Board discussed the May 17 Board Presentation, which included McCombs' analysis. (Pls.' 56.1 ¶¶ 118, 121; Individual Defs.' 56.1 ¶¶ 23-24.) The Board learned at the same meeting that Facebook's revenue projections for the second quarter of 2012 and full year of 2012 were $1.1715 billion and $5.057 billion, respectively. (Individual Defs.' 56.1 ¶ 21.) On the same day, Facebook conducted its IPO at a price of $38 per share. (Pls.' 56.1 ¶ 112; Defs.' 56.1 ¶ 8.) In connection with its IPO, Facebook's Form S-1 Registration Statement became effective. (Defs.' 56.1 ¶ 10.)

The Officer Defendants were involved in the drafting of, and reviewed portions of, the Registration Statement. (See Individual Defs.' 56.1 ¶¶ 51-54.)

The Facebook IPO was scheduled to start at 11 AM on May 18, 2012.[7] (Defs.' 56.1 ¶ 132.) Prior to NASDAQ's opening that day, orders to buy Facebook shares surpassed orders to sell Facebook shares. (Defs.' 56.1 ¶ 133.) Trading started late that morning, however, due to programming errors in NASDAQ, sell orders had outpaced and surpassed buy orders. (Defs.' 56.1 ¶¶ 134-36.) One consequence of NASDAQ's technical errors was a failure to deliver order confirmations timely, and as a result, certain orders became "stuck" and were only fulfilled several hours after being made and, sometimes, even after being cancelled; other "stuck" orders later put on the market ended up cancelled because they were no longer marketable. (Pls.' 56.1 ¶ 124; Defs.' 56.1 ¶¶ 139, 144-46.) NASDAQ's failure to process cancelled orders resulted in a short-sell order imbalance of Facebook stocks. (Defs.' 56.1 ¶ 147.) NASDAQ's technological malfunctions were fixed by approximately 1:50 PM that same day.

---

[7]    A prerequisite for listing a security on NASDAQ is that an issuer must certify that it has completed a certain number of initial share distributions in off-exchange transactions. (Defs.' 56.1 ¶ 195.) 295 foreign investors acquired Facebook shares in this fashion. (See Defs.' 56.1 ¶ 194.)

(Defs.' 56.1 ¶ 139.) At the end of its opening day, Facebook's stock closed up, at $38.23 a share. (Id.)

Starting after close of trading on May 18 and continuing through May 22, 2012, news media published articles stating that Facebook had reduced its revenue guidance during its roadshow. (See Pls.' 56.1 ¶¶ 131-32, 140-44; Pls.' 56.1 Response ¶ 162.) On May 18, 2012, after the close of Facebook's first day of public trading, Reuters stated: "Facebook also altered its guidance for research earnings last week, during the road show, a rare and disruptive move." (Pls.' 56.1 ¶ 131.) In addition, Defendants identify articles, starting back on May 10, 2012, and published up until the IPO, that stated that Facebook was unlikely to "meet their most optimistic projections" and similar language. (See Defs.' 56.1 ¶¶ 175-90.)

In the days following the IPO, Facebook's closing stock price fell. On May 21, 2012, the price closed at $34.03; on May 22, 2012, the price closed at $31.00. (Pls.' 56.1 ¶¶ 124, 133, 152.) Facebook's stock price remained below its $38 IPO offer price through August 2013. (Pls.' 56.1 ¶ 154-55.)

22

**The Proposed Settlement**

On February 26, 2018, the parties informed this Court that a settlement had been reached (the "Proposed Settlement"). ECF No. 569. The settlement provides for a $35,000,0000 cash payment to resolve the securities class action brought against defendants Facebook, Zuckerberg, Sandberg, Ebersman, Spillane, Andreessen, Bowles, Breyer, Graham, Reed Hastings, and Peter Thiehl, along with the Underwriter Defendants. The Proposed Settlement was agreed to at the recommendation of mediator Judge Daniel Weinstein ("Judge Weinstein") of the JAMS in December 2017. Parties memorialized in a term sheet their agreement and executed it on January 12, 2018.

On August 01, 2018, Plaintiffs moved for final approval of the Proposed Settlement, for final approval of the Plan of Allocation (ECF No. 586), and for an award of attorneys' fees and payment of litigation expenses (ECF No. 588). These motions were argued on September 5, 2018, at which time they were marked fully submitted.

## Applicable Standards

Rule 23(e) provides that "claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval." F.R.C.P. 23(e). Court approval of a class action settlement must be premised on a hearing and subsequent finding that the settlement is "fair, reasonable, and adequate" and not the product of collusion or some other malfeasance. See F.R.C.P. 23(e)(3); see also Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 116 (2d Cir. 2005) (citing Joel A. v. Guiliani, 218 F.3d 132, 138 (2d Cir. 2000). Courts in this Circuit recognize a "strong judicial policy in favor of settlements, particularly in the class action context." Wal-Mart, 396 F.3d at 116 (cleaned up).

Courts tasked with approving a settlement consider its procedural and substantive fairness; they ask whether "the terms of the settlement and the negotiation process leading up to it" are fair. In re Telik, Inc. Sec. Litig., 576 F. Supp. 2d 570, 575 (S.D.N.Y. 2008). When a settlement is the product of "arms-length negotiations between experienced, capable counsel after meaningful discovery," it is afforded a "presumption of fairness, adequacy, and reasonableness." Wal-Mart, 396 F.3d at 116.

# I. The Proposed Settlement is Approved.

## a. The Proposed Settlement is Procedurally Fair

The parties in this litigation are represented by highly experienced, fully informed, and eminently capable legal counsel. Settlement negotiations have involved extensive arms-length negotiations between parties, including "multiple in-person mediation sessions and significant follow-up discussions[.]" Pls.' Memo. in Support at 6, ECF No. 587. The $35 million amount is based on the suggestion by a neutral mediator, Judge Weinstein of the JAMS. Id.

The Proposed Settlement was reached just eight weeks before trial was set to begin. Parties therefore had a deep understanding of the facts and legal theories supporting the claims. Before settlement, Lead Plaintiffs conducted extensive investigations into Defendants' alleged misrepresentations, opposed Defendants' motions to dismiss, conducted extensive discovery including review of over 1.5 million pages of documents, participated in 40 depositions of fact witnesses, and prepared an expert report on the underwriting of the Facebook IPO, among other things. See generally Pls.' Prelim. Approval Memo at 7-8.

Settlement negotiations were carried out under the direction of Lead Plaintiffs, sophisticated institutional investors whose involvement suggests procedural fairness. Id. at 16; see also In re Global Crossing Sec. & ERISA Litig., 225 F.R.D. 436, 462 (S.D.N.Y. 2004) (presence of sophisticated investors as lead plaintiffs is indicia of fairness).

In addition to Lead Plaintiffs' deep understanding of the facts and legal issues, expert consultants have assisted with extensive pre-trail preparation. This includes the depositions of 12 expert witnesses and fully briefed Daubert motions. Pl. Final Approval Memo. at 7, ECF No. 586.

Based on the process followed, including involvement of a third-party mediator and multiple experts, and the extensive arms-length negotiations performed by sophisticated counsel, this late-stage Settlement is procedurally fair.

## b. The Proposed Settlement is Substantively Fair

Courts in this Circuit consider substantive fairness using a nine-factor test from City of Detroit v. Grinnell Corp., 495 F.2d 448, 463 (2d Cir. 1974). The Grinnell factors include:

(1) the complexity, expense, and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through trial; (7) the ability of defendants to withstand greater judgment; (8) the range of reasonableness of the settlement in light of the best possible recovery and (9) the range of reasonableness of the settlement in light of the risks of litigation. Grinnell, 495 F.2d at 463.

## i. Complexity, Expense, and Likely Duration of Litigation

In general, securities class actions are recognized by courts as "notably difficult and notoriously uncertain to litigate." In re Michael Milken & Assocs. Sec. Litig., 150 F.R.d. 46, 53 (S.D.N.Y. 1993)(quoting Lewis v. Newman, 59 F.R.D. 525, 528 (S.D.N.Y. 1973); see also In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig., 909 F.Supp.2d 259, 266 (S.D.N.Y. 2012).

The outstanding issues in this included whether and to what extent Facebook's alleged misstatements and omissions caused the post-IPO stock price decline ("Loss Causation"),

27

whether the institutional investor subclass had actual knowledge of the alleged misstatements and omissions prior to the registration statement's issuance ("Truth on the Market"), whether foreign purchasers of Facebook stock met the domesticity requirements of Morrison v. Nat'l Australia Bank Ltd., and whether the "no loss" plaintiffs had cognizable claims under the federal securities laws. Each of these issues would have involved extensive expert testimony and reports presented at trial. Appeals would follow, further protracting the litigation and delaying any recovery.

These issues presented in this case are complex and difficult. They require the involvement of costly experts whose involvement tends to increase both the cost and duration of litigation. This factor weighs in favor of approval of the Proposed Settlement.

## ii. Reaction of the Class to the Settlement

The "reaction of the class to the settlement is perhaps the most significant factor to be weighted in considering its adequacy." In re Bear Stearns, 909 F.Supp.2d 259, 266 (RWS)(S.D.N.Y. 2012)(citing In re Am. Bank Note Holographics, Inc., 127 F.Supp.2d 418, 425 (S.D.N.Y. 2001). "If

only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement." Wal-Mart Stores, Inc. v. Visa U.S.A. Inc., 396 F.3d 96, 119 (2d Cir. 2005).

Upon settlement in this case, the Court-appointed claims administrator, A.B. Data, Ltd. ("A.B. Data"), sent notice packets, which contained a notice of settlement and class member claim form ("Notice Packet), to 1,313,895 potential class members and nominees. See Pls.' Memo. at 15. Plaintiffs also arranged for notice of settlement to be published in *Investor's Business Daily*, over the *PR Newswire* and *CNW Newswire*. Id. In the notice materials, recipients were informed of their right to object to the settlement, and the relevant procedures for the same. Id.

Out of more than 1.3 million potential class members who received Notice Packets, two objected. Pls.' Reply at 5. Both objections were filed by retail investors whose total share ownership equaled 1,100, or .0003 of the shares at issue in the litigation. Id. That not one sophisticated institutional investor objected to the Proposed Settlement is indicia of its fairness. See In re Citigroup Inc. Sec. Litig., 965 F.Supp. 2d 369, 382 (S.D.N.Y. 2013).

The overwhelmingly positive reaction—or absence of a negative reaction—weighs strongly in favor of confirming the Proposed Settlement. The two objections, however, must be evaluated.

The first objector, James J. Hayes, has a well-known history of filing class action objections in federal court. Hayes v. Harmony Gold Mining Co., 509 F.App'x 21, 23 n.1 (2d Cir. 2013) (recognizing Hayes as a "frequent class action objector"), City of Brockton Re. Sys. V. Avon Prods., Inc., No. 1:11-cv-4665, Tr. At 12:3-4 (S.D.N.Y. Dec. 28, 2015) (characterizing Hayes as a "serial objector"); In re IPO Sec. Litig., 728 F. Supp. 2d 289, 294 (S.D.N.Y. 2010) (requiring a post appeal bond from Hayes, as a "serial objector").

Hayes's primary objection to the Proposed Settlement centers on the strategic decision by Lead Plaintiffs to forego causes of action under the Securities Exchange Act of 1934 ("'34 Act") in favor of 1933 Act claims. It is axiomatic, however, that "a lead plaintiff has the sole authority to determine what claims to pursue on behalf of the class." In re Facebook, 2013 WL 4399215, at *3 (S.D.N.Y. Aug 13, 2013); see also In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig., 2011 WL 4538428,

at *2 (S.D.N.Y. Sept. 29, 2011). And in any event, Hayes has been on notice of Lead Plaintiffs' decision not to pursue '34 Act claims since at least 2015. Pls.' Reply at 13. As Plaintiffs point out, Hayes could have pursued an individual '34 Act claim against Facebook. He chose not to.

Assuming a '34 Act claim or claims would have had merit in this case—and Hayes has not made such a showing—the Class has not been prejudiced by the absence of such claims. The Complaint was filed in 2013 (ECF No. 71), putting class members on notice of the strategic decision to exclude '34 Act claims. Neither Hayes nor the other Retail Subclass members brought an individual action against Facebook under the '34 Act on these facts, nor did the other class members. This objection is therefore without substantial merit.

Hayes's next objection is to the Proposed Settlement's release of liability, which bars class members from asserting '34 Act claims against parties to the action. Pls.' Reply at 14. For the reasons Plaintiffs note—that this Circuit has approved such releases and that '34 Act claims at this stage are untimely—the Court is unpersuaded by this objection. See Wal-Mart, 396 F.3d at 107 ("[C]lass action releases may include claims not presented . . . so long as the related conduct arises

out of the identical factual predicate as the settled conduct.")
(cleaned up).

Finally, Hayes objects on the basis that notice of
settlement was inadequate because certain class members had not
been identified by their brokers and banks ("Nominees") during
the process, and because some copies of the Notice Packet were
mailed late. Hayes Objection at 1, 3-4. Because purchases and
sales of securities are often executed by Nominees and not
individual shareholders, Notice Packets could not have been sent
to shareholders until they were identified. Pls.' Reply at 15.
Following requests sent by Lead Counsel, over 325,000 potential
class members were identified by Nominees for the first time
after Notice Packets were sent to them. A portion of those
names, 138,000, were not provided until just before, or slightly
after, the claim-filing and settlement objection deadlines. Id.

The notice process, however, was reasonably calculated
to apprise potential class members of the settlement, as
required by Rule 23. By sending notice to all persons who could
be identified by reasonable efforts—and requesting Nominees
provide the names of those that could not—Plaintiffs met the
requirements of Rules 23(c), 23(e), and due process. In re
Prudential Sec. Inc. Ltd. P'ships Litig., 164 F.R.D. 362, 368

(S.D.N.Y.), aff'd, 107 F.3d 3 (2d Cir. 1996)("for the due process standard to be met it is not necessary that every class member receive actual notice, so long as class counsel acted reasonably in selecting means likely to inform persons affected.").

By two weeks before the objection deadline in this case, 1,313,895 Notice Packets had been mailed, comprising 95% of all total packets mailed. Pls.' Reply at 18. The relevant question is "not whether some individual shareholders got adequate notice," but rather "whether the class as a whole had notice adequate to flush out whatever objections might reasonably be raised." Fidel, 534 F.3d at 514.

While it is less than ideal for certain investors not to have received Notice Packets prior to relevant deadlines, alternate notice was provided in widely distributed publications, such as *Investor's Business Daily*, at least one national newswire, and on the internet. Pls.' Reply at 15. This, along with actual notice that was reasonably calculated to achieve the widest possible class-wide distribution, is satisfactory. See id; see also Fidel v. Farley, 534 F.3d 508, 514-15 (6th Cir. 2008)(approving settlement despite 20% of the

class without notice until after objection and exclusion deadlines). Accordingly, Hayes's objections are without merit.

The second objection, lodged by Edward and Sheila Brennan following their joint purchase of 100 shares of Facebook common stock, is likewise unpersuasive. The Brennans do not articulate a legal basis for their objection. See Brennan Objection at 1 ("I have had several of these offers on other stocks and never received any where near the amount I lost."). For this reason, the second and final objection is without merit.

The reaction of the class being overwhelmingly positive, this factor supports final approval of the Proposed Settlement.

### iii. Stage of the Proceedings and Discovery Completed

The advanced stage of this proceeding, and the discovery so far completed, weighs in favor of approving the Proposed Settlement. At the time of settlement, discovery was completed, the class had been certified, and numerous pre-trial motions had been briefed and heard. Plaintiffs reviewed more than 1.5 million pages of documents, took and defended dozens of

depositions, including of top executives Zuckerberg and Sandberg, and conducted mock jury exercises to test legal theories. Pls.' Memo in Support at 11. These facts suggest Lead Plaintiffs and their counsel had a "sufficient understanding of the case to gauge the strengths and weaknesses of their claims" as well as the "adequacy of the settlement." In re AOL Time Warner, Inc. Sec. & ERISA Litig., No. 02 Civ. 5575 (SWK), 2006 WL 903236, at *10 (S.D.N.Y. Apr. 6, 2006). This factor weighs in favor of approval.

## iv.  Risks of Establishing Liability

The risks of establishing liability in this case were considerable, especially at this pivotal stage. Grinnell, 495 F.2d at 462. Those risks included an unfavorable decision on summary judgment, an unfavorable outcome at trial, and lengthy appeals even if Plaintiffs prevailed. Such risks could limit recovery, or eliminate it altogether.

Among the risks of establishing liability is Defendants' contention with respect to Facebook's mobile revenue disclosure: that Facebook's statement that increasing mobile usage "may" or "would" affect revenue is not definite enough and therefore inactionable. See Pls.' Memo in Support at 18. A

second risk arises out of Defendants' argument that, because Facebook's revenue rebounded by the time of the IPO, there was no loss, and therefore no liability. Id. Even if Plaintiffs overcame these defenses and others, lengthy appeals could tie up, delay, or ultimately preclude recovery for the class.

The inherent risks to establishing liability support approval of the Proposed Settlement.

v. Risks of Establishing Damages

The risks of establishing liability apply with equal force to the establishment of damages. Certain of the defenses raised by Defendants present risks unique to the establishment of damages. Chief among them is the negative causation defense to loss causation. Plaintiffs themselves note the "plausibility" of Defendants' negative causation defense. Pls. Memo in Support at 21-22. The unique circumstances surrounding Facebook's IPO, including Nasdaq's May 18, 2012 widespread system failure on Facebook's first day of trading, would complicate loss causation and damages determinations. Id. at 22.

What is more, Defendants may well have successfully argued at trial that damages should be limited, perhaps to a

number smaller than the settlement amount, due to Facebook's strong performance since this litigation. Id. ("Facebook common stock ultimately rebounded strongly and was trading at many multiples of the IPO price as the trial approached."). A costly and lengthy battle of the experts would likely coincide with such a determination. See In re IMAX Sec. Litig., 283 F.R.D. 178 (S.D.N.Y. 2012)("It is well established that damages calculations in securities class actions often descend into a battle of experts"); In re Telik, Inc. Sec. Litig., 576 F.Supp.2d 570-80 (S.D.N.Y. 2008)(with a "battle of experts, it is virtually impossible to predict with any certainty which testimony would be credited, and ultimately, which damages would be found").

The risks and unknowns associated with establishing damages in this case weigh in favor of approving the Proposed Settlement.

## vi. Risks of Maintaining the Class Action Through Trial

While two subclasses of Plaintiffs have been certified in this case, Defendants have indicated an intent to move to decertify the Institutional Investor Subclass and the Retail Investor Subclass either before or after trial. Pls.' Memo in

Support at 23. Because of the risk of decertification—which
appears particularly acute because certain class members were
informed of reduced revenue models before the IPO—this factor
weight in favor of approving the Proposed Settlement. In re Bear
Stearns, 909 F.Supp.2d at 268-69 ("The risk that Defendants
could in fact succeed in their efforts to decertify the class
militates in favor of settlement approval."); see also Ingles v.
Toro, 438 F.Supp. 2d 203, 214 (S.D.N.Y. 2006) (same).

### vii. Ability of Defendants to Withstand Greater Judgment

The ability of Defendants, and in particular Facebook,
to withstand a judgment in excess of $35 million is clear. This
fact alone, however, "does not suggest that the settlement is
unfair." See D'Amato v. Deutsche Bank, 236 F.3d 78, 86 (2d Cir.
2001). For a settlement to be fair and adequate, a "defendant is
not required to empty its coffers." IMAX, 283 F.R.D. at 191
(cleaned up); see also FLAG Telecom, 2010 WL 4537550, at *19
("the mere ability to withstand a greater judgment does not
suggest the settlement is unfair").

"It is well-settled that a case settlement amounting
to only a fraction of the potential recovery will not per se
render the settlement inadequate or unfair." Morris v. Affinity

Health Plan, Inc., 859 F.Supp.2d 611, 621 (S.D.N.Y. 2012); see also Cagan v. Anchor Sav. Bank FSB, NO. 88 Civ. 3024, 1990 WL 73423, at *12 (E.D.N.Y. May 22, 1990) (approving class action settlement of $2.3 million despite objections that "possible recovery would be approximately $121 million."). Were this the case, as one court in this Circuit has noted, "then only the most massive settlement awards could be deemed reasonable in cases against large corporations." See Davis v. J.P. Morgan Chase & Co., 827 F.Supp.2d 172, 178 (W.D.N.Y. 2011) (assigning "relatively little weight to th[is] factor" because "it is more important to assess the judgment in light of plaintiffs' claims and the other factors").

Defendants' ability to withstand greater judgment does not support approval and nor does it militate against approval. Accordingly, this factor is neutral.

## viii. Range of Reasonableness of Settlement Fund in Light of Best Possible Recovery and Attendant Risks of Litigation

The final two Grinnell factors require analysis of the settlement's reasonableness compared with the best possible recovery, along with the attendant risks of recovery. See Grinnell, 495 F.2d at 462. While this factor does not require

39

"use of a mathematical equation yielding a particularized sum," there is a numerical range of reasonableness arrived at by considering "the uncertainties of law and fact in any particular case." See Morris, 859 F.Supp.2d at 621; see also In re Bear Stearns, 909 F.Supp.2d at 269.

Because Plaintiffs face serious challenges to establishing liability, see supra § II(V), consideration of Plaintiffs' best possible recovery must be accompanied by the risk of non-recovery. See generally In re Bear Stearns, 909 F.Supp.2d at 270 (noting that the final Grinnell factor is "a function of both (1) the size of the amount relative to the best possible recovery; and (2) the likelihood of non-recovery").

Plaintiffs contend that, when weighed against the substantial risks of continued litigation and the ultimate potential of non-recovery, "$35 million in cash is a favorable result." See Pls.' Memo in Support at 25. The $35 million figure was agreed upon only after careful consideration, both by competent Lead Counsel and by Judge Weinstein of the JAMS. Id. There is no indication this settlement was the result of haste or unscrupulous lawyering.

Instead, parties have presented and the Court has observed serious risks and obstacles to recovery. Among those obstacles, discussed more fully supra, is the negative causation defense, the truth on the market defense, and the risk that, even if Plaintiffs prevail, this case will be tied up in costly post-judgment litigation and appeals. Id. (noting obstacles to judgment, including "Defendants' arguments that the truth was widely known among institutional investors prior to the IPO" and the capacity of "negative-causation arguments" to "significantly lower, or eliminate entirely" a final judgment).

While particularized evidence has not been adduced to support a "best possible" judgment, the agreed-upon figure is reasonable in light of the substantial risks to recovery. Even if $35 million amounts to one-tenth—or less—of Plaintiffs' potential recovery, the risk of a zero- or minimal-recovery scenario are real. Accordingly, while the *best possible* recovery in this case may be higher than $35 million, the potentiality of a dramatically reduced judgment—or no judgment at all—suggests $35 million is within the range of reasonableness.

The Proposed Settlement being procedurally and substantively fair, it is approved.

41

## VI. **Plaintiffs' Plan of Allocation is Approved**

"To warrant approval, the plan of allocation must also
meet the standards by which the settlement was scrutinized—
namely, it must be fair and adequate." In re WorldCom, Inc. Sec.
Litig., 388 F.Supp.2d 319, 344 (S.D.N.Y. 2005); see also IMAX,
283 F.R.D. at 192. The formula established for allocation "need
only have a reasonable, rational basis, particularly if
recommended by experienced and competent class counsel." In re
Bear Stearns, 909 F.Supp.2d at 270 (quoting In re Worldcom, 388
F.Supp.2d at 344). In particular, "courts look primarily to the
opinion of counsel" in determining the reasonableness and
fairness of a plan of allocation. See In re Giant Interactive
Grp., Inc. Sec. Litig., 279 F.R.D. 151, 163 (S.D.N.Y. 2011); see
also In re Marsh ERISA Litig, 265 F.R.D. 128, 145 (S.D.N.Y.
2010) (same).

Plaintiffs' Plan of Allocation was prepared by
experienced counsel along with a damages expert—both indicia of
reasonableness. See Pls.' Memo in Support at 26; see also In re
Bear Stearns, 909 F.Supp.2d at 270 (considering experience of
counsel and the presence of a damages expert as evidence of
fairness and reasonableness). The Plan's individual class member
allocation is arrived at using the statutory formula in Section

11(e) of the 34 Act (15 U.S.C. § 77k(e). See id.; see also
Settlement Notice ¶ 64. The Plan of Allocation provides, for
example, that individual class members cannot recover for shares
"sold before the close of trading on May 18, 2012, because the
first public disclosure of [allegedly misleading information]
did not occur until after the close of trading on May 18, 2012."
Pls. Memo in Support at 27.

For class members eligible for recovery—that is, class
members who bought shares during the Class Period and sold after
close of trading on May 18, 2012—individual recovery is
calculated under one of two options: (1) the purchase price
minus the sale price ("Option 1"); or (2) the purchase price
minus the greater of (a) the sale price or (b) $31.00, which was
the closing price of Facebook's Common Stock on May 22, 2012
("Option 2"). Id. Recovery under Option 1 applies to class
members who sold their common stock at a loss after close of
trading on May 18, 2012, but before close of trading on May 22,
2012, while recovery under Option 2 applies to class members who
sold their common stock at a loss after close of trading on May
22, 2012 but before close of trading on February 23, 2018. Id.

There are further provisions in the Plan of Allocation
to "ensure equitable treatment for members of the Institutional

43

Subclass and the Retail Subclass," such as "substantially

discounted" recovery for the Institutional Subclass based on the

reasonably held position that a "truth on the market" defense is

more likely to limit recovery when asserted against

sophisticated institutional investors. See Id. (recognizing the

"substantial additional risks [the Institutional Subclass] would

have faced in establishing that they were not aware that

Facebook had reduced its revenue estimated prior to the IPO" and

the attendant risk of decertification).


Plaintiffs' Plan of Allocation, like the settlement

itself, is "fair and adequate" and therefore satisfactory. See

In re Worldcom, 388 F.Supp.2d at 344 (S.D.N.Y. 2005) ("To

warrant approval, the plan of allocation must also meet the

standards by which the settlement was scrutinized—namely, it

must be fair and adequate[.]"). The Plan of Allocation is

approved.


## VII. **Plaintiffs' Request for Attorneys' and Litigation Expenses is Granted**


Lead Counsel have moved for an award of attorneys'

fees in the amount of 25 percent of the Settlement Fund, for

payment of $4,962,978.46 in litigation expenses incurred

prosecuting this action, and for payment of $56,792.53 in costs and expenses incurred by the Class Representatives, as authorized by the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). See ECF No. 8.

Throughout this five-year litigation, Lead Counsel have worked on a contingency-fee basis, and to date have not received payment or fees for their able representation. See Pls.' Fees Memo at 8, ECF. No. 589.

**a. Attorneys' Fees and Litigation Expenses**

i.  Attorneys' Fees

The reasonableness of a requested fee award depends on six factors: (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risks of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) the public interest at issue. See Goldberger v. Integrated Res., Inc., 209 F.3d 43, 50 (2d Cir. 2000); see also In re Bear Stearns, 909 F.Supp.2d at 271.

Courts in this Circuit have approved complex securities class action fee awards totaling well over 25 percent. See Central States and Southwest Areas Health and Welfare Fund v. Merck-Medco Managed Care, L.L.C., 504 F. 3d 229, 249 (2d Cir. 2007); Mohney v. Shelly's Prime Steak, Stone Crab & Oyster Bar, NO. 06-cv-4270 (PAC), 2009 WL 5851465, at *5 (S.D.N.Y. Mar. 31, 2009) (collecting cases); see also In re NYSE Specialists Sec. Litig., No. 03-cv-8264 (S.D.N.Y. June 10, 2013) (41% of $18.5 million settlement); In re Lebranche Sec. Litig., No. 03-cv-8201 (S.D.N.Y. Jan. 22, 2009) (30% of $13 million settlement).

In addition to serving as just compensation for class counsel, attorneys' fee awards in common fund class actions "also serve to encourage skilled counsel to represent those who seek redress for damages inflicted on entire classes of persons, and to discourage future alleged misconduct of a similar nature." City of Providence v. Aeropastale, Inc., No. 11-cvp7132 (CM), 2014 WL 1883494, at *11 (S.D.N.Y. May 9, 2014), aff'd, Arbuthnot v. Pierson, 607 F. App'x 73 (2d Cir. 2015).

"The trend in this Circuit is toward the percentage method, which directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient

prosecution and early resolution of litigation." Wal-Mart
Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 121 (2d Cir.
2005); In re IMAX Sec. Litig., 2012 WL 3133476, at *5.

a. Time and Labor Expended by Counsel

The first Goldberger factor weighs in favor of
approval of the fee award. This five-year litigation presented
myriad challenges for Lead Counsel—both procedural and
substantive. Plaintiffs' Counsel has devoted more than 94,000
hours to this litigation, with Lead Counsel's hours making up
95% of the total. Pls.' Fees Memo at 14. The fully-briefed
motions in this case include: an initial motion to dismiss and a
motion for interlocutory appeal of its denial; a motion for
class certification; motions to exclude expert testimony, and
four motions for summary judgment. See generally Pls.' Fees Memo
at 15. Second, as Lead Counsel points out in their brief, the
work is not finished. Lead Counsel will move for a distribution
order, oversee the claims process, respond to class member
inquiries, and assist with class members' proofs of claim. See
id.

The time and effort expended by Lead Counsel supports
approval of the attorneys' fee award sought.

b. Magnitude and Complexity of the Litigation

"Courts have recognized that, in general, securities actions are highly complex" (Fogarazzo v. Lehman Bros. Inc., No. 03 MDL 5194, 2011 WL 671745, at *3 (S.D.N.Y. Feb. 23, 2011)) and that "securities class litigation is notably difficult and notoriously uncertain" (In re Merrill Lynch & Co. Inc., Research Reports Sec. Litig., No. 02 MDL 1484, 2007 WL 313474, at *14 (S.D.N.Y. Feb. 1, 2007)).

As set forth above, this case presents unique and difficult issues not only for the parties, but also for the broader investor public. With respect to Facebook, the enforcement of federal securities laws—and the attendant duties of accurate and complete disclosure—is of great importance to the public markets. And the complexity of this case is evidenced by the confluence of factors that allegedly resulted in Facebook's post-IPO performance, including, among other things, the significant technological failures at Nasdaq, the varying revenue guidance, and conflicting media and analyst reports directed at an emerging industry: social media. See generally Parties' Joint Decl. This factor weighs in favor of approving the fee award.

c. Risks of Litigation

The risk of litigation represents "a pivotal factor in assessing the appropriate attorneys' fees to award plaintiffs' counsel in class action." In re Telik, Inc. Sec. Litig., 576 F.Supp.2d 570, 592 (S.D.N.Y. 2008); see also McDaniel v. County of Schenectady, 595 F.3d 411, 424 (2d Cir. 2010)("The level of risk associated with litigation is perhaps the foremost factor to be considered in assessing the propriety of the [fee] multiplier.")(quoting Goldberger, 209 F.3d at 54)(cleaned up).

As set forth above (supra § II(V)), the risks Plaintiffs, and in turn Plaintiffs' Counsel, faced in establishing both liability and damages are significant. The truth-on-the-market, negative causation, and damages defenses, in particular—all bolstered by expert testimony—present challenges counsel avoid by settlement. See Pls.' Fees Memo at 20; see also Parties' Joint Decl. ¶¶ 130-136.

The procedurally precarious posture of this case—with several motions for summary judgment pending and the very real possibility of decertification (supra discussion § II(V))— underscore the risk involved. As Plaintiffs note, Defendants'

contention that certain statements about mobile revenue were not misleading because "mobile revenues increased just before the IPO" adds to the risk. And no matter the final result at trial, lengthy and expensive appeals seem inevitable.

The strategic litigation risk associated with contingency fee representation adds to the mix. Courts in this Circuit recognize contingency fee representation as an important factor in determining appropriate fee awards. See, e.g., In re Am. Bank Note Holographics, Inc. Sec. Litig., 127 F.Supp.2d 418, 433 (S.D.N.Y. 2001)(considering the risk of non-recovery associated with contingency fee representation). This case, like others taken on a contingency fee basis, could have been dismissed or decertified at least once prior to settlement—resulting in no compensation for Lead Counsel. For that reason, and the reasons discussed above (see supra discussion §§ II(iv)-(vi)), the risks of litigation are established. They weigh in favor of approving the fee award.

d. The Quality of Representation

The quality of representation in this case has been evident from the start. The two firms comprising Lead Counsel are nationally recognized as having substantial experience and

expertise prosecuting complex class actions. See Parties' Joint
Decl. ¶¶ 130-136. The quality of Plaintiffs' representation is
evident from the fact that Plaintiffs survived motions to
dismiss filed by some of the nation's preeminent law firms. This
factor, too, supports approval of the fee award.

> e. The Attorneys' Fees Requested in Relation to the
> Settlement

"In determining whether the Fee Application is
reasonable in relation to the settlement amount, the Court
compares the Fee Application to fees awarded in similar
securities class-action settlements of comparable value." In re
Marsh & McLennan, Co. Sec. Litig., No. 04 MDL 8144, 2009 WL
5178546, at *19 (S.D.N.Y. Dec. 23, 2009). As set forth above,
courts in this Circuit have approved fee awards totaling well
over 25 percent. See supra § VII(a) (collecting cases). This
factor favors fee approval.

> f. Public Policy Considerations

"When class counsel in a securities lawsuit have
negotiated an arm's-length agreement with a sophisticated lead
plaintiff possessing a large stake in the litigation, and when

that lead plaintiff endorses the application following close supervision of the litigation, the court should give the terms of that agreement great weight." In re WorldCom, 388 F.Supp.2d at 353. The public interest supports enforcement of fair and reasonable agreements that are the product of arm's-length negotiation by competent counsel and independent third-parties.

For that reason, and the reasons set forth above, the fee award of 25 percent of the Settlement Fund is approved.

## ii. Litigation Expenses

"It is well-settled that attorneys may be compensated for reasonable out-of-pocket expenses incurred and customarily charged to their clients, as long as they were incidental and necessary to the representation of those clients." See In re Indep. Energy Holdings PLC Sec. Litig., 302 F.Supp.2d 180, 184 (S.D.N.Y. 2003); see also Facebook, 2015 WL 6971424, at *12 (approving expert, printing, postage, court, research, mediation, press release, process service, telephone, travel, and meal expenses).

Lead Counsel's primary expense was for experts and consultants, which totaled over $3 million, or approximately 66%

of the total Plaintiffs' Counsel's total expenses. Pls.' Fees Memo at 29. Throughout this litigation, Lead Counsel understandably consulted with at least five testifying experts whose reports were submitted to this Court. See id.

Other experts were retained to assist in gathering evidence, assessing damages, and conducting mock jury exercises. These fees, along with travel fees totaling over $300,000, are sizeable. As Plaintiffs note, however, the amount sought is less than the $5.6 million figure included in the Settlement Notice. See Pls.' Fees Memo at 30 ("The Settlement Notice advised potential Class Members that Lead Counsel would seek payment of litigation expenses not to exceed $5.6 million."). To date, there have been no substantive objections to the requested fee award.

Because the requested fees fall into categories that are commonly recognized as reimbursable, see In re Bear Stearns, 909 F.Supp.2d at 273, and because the expenses are reasonable in light of the duration and complexity of this action, the fee award is approved.

### b. Class Representatives' Expenses

Lead Counsel seeks an expense award totaling $56,792.53 on behalf of Class Representatives, pursuant to the PSLRA's provision for "award[s] of reasonable costs and expenses (including lost wages) directly relating to the representation of the class" made to "any representative party serving on behalf of a class." 15 U.S.C. § 77z-1(a)(4); Pls.' Fees Memo at 30.

The expenses sought by Class Representatives Arkansas Teacher, Mr. and Mrs. Galvan, Ms. Morley, Mr. Rand, and Mr. and Mrs. Melton, totaling $56, 792.53, have been reviewed and comport with similar requests approved in this Circuit. See Pls.' Fees Memo at 31 (collecting cases). Accordingly, Class Representatives' expense request is approved.

**Conclusion**

For the foregoing reasons, Plaintiffs' motions for final approval of the Proposed Settlement and for approval of the Plan of Allocation are granted. Also for the foregoing reasons, Lead Counsel's motion for approval of the attorneys' fee award and attorneys' expenses, and for approval of the Class Representatives' expenses is also granted.

It is so ordered.

**New York, NY**
**November 2 6 2018**

ROBERT W. SWEET
U.S.D.J.